**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | |
| Plaintiff, | Hon. _____ |
| v. | Case No. 1:17-cv-06416 |
| MONEX DEPOSIT COMPANY, MONEX CREDIT COMPANY, NEWPORT SERVICES CORPORATION, LOUIS CARABINI, and MICHAEL CARABINI, | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 1

II.    THE PRELIMINARY INJUNCTION STANDARD APPLICABLE
      TO THE CFTC ............................................................................................... 2

III.   MONEX'S LEVERAGED ATLAS TRANSACTIONS ARE "RETAIL
      COMMODITY TRANSACTIONS" THAT MUST BE EXECUTED ON A
      REGULATED EXCHANGE ......................................................................... 3

   A.   Monex's Leveraged Atlas Transactions Are Retail Commodity Transactions ............... 3

   B.   Monex Does Not Actually Deliver Metals In Leveraged Atlas Trades .......................... 6

      1.   "Actual Delivery" in Section 2(c)(2)(D) Requires A Transfer Of Possession and
          Control .................................................................................................. 6

      2.   Monex Maintains Possession of Atlas Platform Metals in Depositories Subject to
          Monex Control ..................................................................................... 8

      3.   Monex's Customer Account Agreements Give Monex Complete Control Over Atlas
          Metals ................................................................................................. 10

      4.   Monex Can (and Does) Liquidate Customer Trading Positions At Any Time .......... 11

      5.   Monex's "Title Transfer" Notices Are a Sham ........................................... 12

      6.   Monex's Short Trading Positions Illustrate the Fiction of Monex's Claimed
          "Delivery" to Customers in Leveraged Atlas Trades ................................. 14

      7.   Atlas Platform Metals Secure Monex's Own Financing ............................ 16

   C.   Monex Has Violated and Is Continuing To Violate Section 4(a) of the Commodity
      Exchange Act By Failing To Execute Leveraged Atlas Transactions On
      a Regulated Exchange .................................................................................. 18

IV.   MONEX IS DEFRAUDING RETAIL CUSTOMERS IN LEVERAGED ATLAS
      TRANSACTIONS ......................................................................................... 19

   A.   The Truth About Leveraged Atlas Trading – Customers Suffer Massive Losses And Are
      Almost Sure To Lose ................................................................................... 20

   B.   Monex And Its Owners Know the Atlas Program is a Scam .......................... 22

   C.   Monex Deceptively Pitches The Atlas Program as a Safe, Secure and Profitable
      Investment .................................................................................................. 24

1.    Monex Misleadingly Portrays Leveraged Atlas Metals Trading as a Good Investment ........................................................................................ 24

2.    Monex Account Reps Verbally Deceive Customers ................................... 27

3.    Monex Incentivizes its Sales Force to Lure Customers Into the Atlas Program ........ 31

**V.    CONCLUSION ........................................................................................ 33**

## **TABLE OF AUTHORITIES**

**Cases**

*CFTC v. British Am. Commodity Options Corp.*, 560 F.2d 135, 142 (2d Cir. 1977) .................. 33

*CFTC v. Carnegie Trading Group, Ltd.*, 450 F. Supp. 2d 788, 799 (N.D. OH 2006)................. 24

*CFTC v. Commonwealth Fin. Grp., Inc.*, 874 F. Supp. 1345, 1357 at n.10 (S.D. Fla. 1994) ...... 31

*CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979).................................................................... 2

*CFTC v. Hunter Wise Commodities, LLC*, 749 F.3d 967 (11th Cir. 2014) ...................... 3, 6, 7, 8

*CFTC v. Hunter Wise Commodities, LLC*, Order Denying Motions to Dismiss,
   12-cv-81311, dkt. 155, at 17 (S.D. Fla. June 21, 2013)............................................................ 6

*CFTC v. Lake Shore Asset Mgmt. Ltd.*, 2008 WL 1883308 ....................................................... 31

*CFTC v. Monex Deposit Co.*, 824 F.3d 690 (7th Cir. 2016)......................................................... 1

*CFTC v. Monex Deposit Co.*, Case No. 14 C 6131, 2014 WL 7213190 (Dec. 17, 2014) ...... 1, 6, 8

*CFTC v. Muller*, 570 F.2d 1296, 1300 (5th Cir. 1978)................................................................. 2

*CFTC v. Noble Metals*, 67 F.3d 766, 773-775 (9th Cir. 1995)................................................... 18

*CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th Cir. 2002) ........................... 23, 30, 31

*CFTC v. Sidoti*, 178 F.3d 1132, 1136 (11th Cir. 1999) ............................................................... 31

*CFTC v. Southern Trust Metals*, 180 F. Supp. 3d 1124, 1130 (S.D. Fla. 2016)........................... 6

*Clayton Brokerage Co. v. CFTC*, 794 F.2d 573, 580-81 (11th Cir. 1986) ................................. 31

*Drexel Burnham Lambert Inc. v. CFTC*, 850 F.2d 742, 748 (D.C. Cir. 1988)........................... 20

*EEOC v. Chicago Club*, 86 F.3d 1423, 1429 (7th Cir. 1996)....................................................... 6

*FTC v. Morton Salt*, 334 U.S. 37, 44-45 (1948) ......................................................................... 6

*Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317................................................................ 20

*JCC, Inc. v. CFTC*, 63 F.3d 1557, 1568-70 (11th Cir. 1995) ..................................................... 31

*Myron v. Hauser*, 673 F.2d 994, 1007 (8th Cir. 1982) .............................................................. 31

*R&W Technical Serv. Ltd. v. CFTC*, 205 F.3d 165, 169 (5th Cir. 2000)..................................... 30

**Statutes**

7 U.S.C. § 13a-1(a) (2012).......................................................................................................... 2

7 U.S.C. § 1a(18)(xi) (2012) ........................................................................................................ 3

7 U.S.C. § 2(c)(2)(D) (2012) .............................................................................................. 3, 6, 18

7 U.S.C. § 2(c)(2)(D)(iii) ........................................................................................................ 3, 18

7 U.S.C. § 6(a) (2012)................................................................................................................ 18

7 U.S.C. § 6d(1) (2012) ............................................................................................................. 19

7 U.S.C. §§ 6(a), 6b (2012) ........................................................................... 3

7 U.S.C. §§ 6b(a) .......................................................................................... 19

Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. 111-203, H.R. 4173 ............................................................................................................... 3

**Other Authorities**

Retail Commodity Transactions Under Commodity Exchange Act,
78 Fed Reg. 52426, 52428 (Aug. 23, 2013) .................................... 7, 8, 14

**Regulations**

17 C.F.R. § 180.1 (2017) .............................................................................. 20

17 C.F.R. § 180.1(a) (2016) ......................................................................... 20

## I.  <u>INTRODUCTION</u>

Monex[1] is operating an illegal commodity trading platform it calls the "Atlas" program. The Atlas program is also a scam.  Monex misleadingly markets the Atlas program as a safe, secure, and profitable way for retail customers to invest in precious metals such as gold, silver, platinum, and palladium.  Every business day, Monex dupes retail customers into placing high-risk, speculative leveraged bets on the prices of precious metals through its Atlas platform, never disclosing that approximately 90% of its Atlas accounts lose money.  In fact, the Atlas program is structured to benefit Monex at the expense of its customers, who are charged enormous fees making it virtually impossible to profit regardless of market conditions.  Between July 16, 2011 and March 31, 2017, more than 12,000 leveraged Atlas accounts collectively lost more than $290 million.  Meanwhile, Monex collected more than $170 million in the form of exorbitant spread charges, commissions, storage fees, and interest that it assesses customers.  But in addition to and apart from the fraud, Monex's leveraged Atlas trades are illegal because they are not executed on a regulated commodity exchange.

As it has in previous litigation with the CFTC,[2] Monex likely will claim that it makes "actual delivery" of metals in its Atlas transactions and that its leveraged Atlas transactions are

---

[1] Monex is a common enterprise made up of three corporate entities: Monex Deposit Company, Monex Credit Company and Newport Services Corporation.  We refer to these corporate Defendants collectively as "Monex" in this brief.  Monex is owned and controlled by Defendants Michael Carabini and his father Louis Carabini through various corporate entities and trusts.  *See Gomberg Dec.* ¶¶ 9-18 and Exs. 1-8; *see also M. Carabini Trans.*, at pgs. 7-20.  The CFTC submits in support of this Motion an Appendix of declarations, exhibits, and sworn testimony.  Citations to declaration paragraphs and exhibits appear, for example, as follows: *Gomberg Dec.* ¶ _ and Ex. _.  Citations to transcripts of and exhibits to testimony appear, for example as follows: *L. Carabini Trans.*, at pg. _ and Ex. _.

[2] The CFTC filed an action against Monex in this Court in 2014 when Monex refused to comply with a CFTC subpoena.  Magistrate Judge Schenkier ordered Monex to comply with the CFTC's subpoena. *CFTC v. Monex Deposit Co.*, Case No. 14 C 6131, 2014 WL 7213190 (Dec. 17, 2014).  On February 5, 2015, Judge Guzman adopted Judge Schenkier's order and rejected Monex's objections.  (*Id.*, at Docket Entry 58).  Monex appealed and the Seventh Circuit affirmed the District Court's order.  *CFTC v. Monex Deposit Co.*, 824 F.3d 690 (7th Cir. 2016).

not subject to the CFTC's jurisdiction. But Monex's claimed "delivery" of metals is a sham. At all times Monex retains possession of, and absolute control over, the metals traded on its Atlas platform. Atlas customer trading positions are really just book entries in Monex's database that Monex can liquidate with a push of a button.

The CFTC is seeking an order of preliminary injunction requiring that Monex immediately cease offering and executing leveraged commodity trading through its Atlas platform. A preliminary injunction is warranted for two primary reasons addressed in this brief: (1) Monex's leveraged Atlas transactions are "retail commodity transactions" subject to the Commodity Exchange Act, and therefore are illegal unless executed on a regulated exchange; and (2) Monex is engaged in pervasive, ongoing fraud to deceive customers into executing leveraged Atlas transactions.

## II. <u>THE PRELIMINARY INJUNCTION STANDARD APPLICABLE TO THE CFTC</u>

Section 6c(a) of the Commodity Exchange Act (the "CEA" or "Act"), 7 U.S.C. § 13a-1(a) (2012), authorizes the CFTC to seek injunctive relief in a federal district court when it appears that a person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of the Act or CFTC regulations. Under Section 6c(b), the Court has broad discretion to enter a preliminary injunction when the CFTC makes a prima facie showing that (1) the defendants have violated the CEA or CFTC regulations, and (2) there is a reasonable likelihood of future violations. *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979) ("The discretion afforded to the district court in deciding whether to issue such relief . . . [is] broad."); *CFTC v. Muller*, 570 F.2d 1296, 1300 (5th Cir. 1978) ("the agency need not prove irreparable injury or the inadequacy of other remedies as required in private injunctive suits; [instead, proof of a] prima facie case of illegality is sufficient."); *see also CFTC v. Hunter Wise Commodities,*

2

*LLC*, 749 F.3d 967 (11th Cir. 2014) (affirming grant of a preliminary injunction against the operator of an illegal and fraudulent retail commodity trading platform).

The evidence submitted in support of this motion far exceeds this standard.

## III. MONEX'S LEVERAGED ATLAS TRANSACTIONS ARE "RETAIL COMMODITY TRANSACTIONS" THAT MUST BE EXECUTED ON A REGULATED EXCHANGE

### A. Monex's Leveraged Atlas Transactions Are Retail Commodity Transactions

Section 2(c)(2)(D) of the CEA, 7 U.S.C. § 2(c)(2)(D) (2012), provides that the CEA applies to leveraged commodity transactions with retail customers.[3] Absent an exception, Section 2(c)(2)(D) covers all (1) agreements, contracts or transactions in any commodity that are (2) entered into with or offered to retail customers[4] (3) on a leveraged, margined or financed basis. Such transactions are subject to Sections 4(a) (an exchange-trading requirement) and 4b (an anti-fraud prohibition) of the CEA, 7 U.S.C. §§ 6(a), 6b (2012), "as if" they are commodity futures contracts. 7 U.S.C. § 2(c)(2)(D)(iii); s*ee also Hunter Wise Commodities*, 749 F.3d at 979 (holding that Section 2(c)(2)(D) expanded the CFTC's authority to regulate leveraged, margined and financed commodity transactions with retail customers).

Monex's leveraged Atlas transactions plainly fall within the scope of Section 2(c)(2)(D). Monex allows retail investors to deposit margin in an Atlas account in order to place leveraged

---

[3] Effective July 16, 2011, the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. 111-203, H.R. 4173, commonly referred to as "the Dodd-Frank Act," added Section 2(c)(2)(D) and broadened the scope of the Commodity Exchange Act to include financed commodity transactions with retail customers ("retail commodity transactions").

[4] Retail customers described by Section 2(c)(2)(D) of the CEA are non-"Eligible Contract Participants," meaning individuals who do not have in excess of $10 million invested on a discretionary basis, or $5 million invested on a discretionary basis, if the individual enters into the transaction "in order to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual." 7 U.S.C. § 1a(18)(xi) (2012).

long or short trades for gold, silver, platinum and palladium.[5]  As one Monex employee put it:
"When we think the market is going to go up, we put long positions on . . . Now we think the
market is going down.  We put a short position on, which is one that speculates on the drop in the
market price."[6]  The Atlas account is a trading platform designed to allow retail investors to
place speculative leveraged bets on price movements of precious metals.[7]  Since July 16, 2011
Monex has executed more than 140,000 leveraged metals trades for more than 12,000 Atlas
accounts.[8]

In terms of the mechanics, an Atlas transaction operates similarly to a futures trade on a
regulated exchange.  Atlas customers must make a margin deposit (generally 25% of the initial
trading position) before they can begin trading.[9]  A customer's account equity fluctuates along
with both the movement in metals prices in an account's open trading positions, and is also
reduced by interest charges and service fees.[10]  Monex may make a margin call for additional
funds if a customer's account equity drops below 14%, and will liquidate trading positions if a
customer fails to meet a margin call or if the equity in the account drops to 7% ("force

---

[5] *Gomberg Dec.* ¶¶ 29-31, and Exs. 1, 13-17.  The Atlas program is offered indiscriminately to the general
public, and most Atlas customers are not ECPs.  *See, e.g. Bar Dec.* ¶ 5 (reflecting that customer did not
qualify as an ECP); *Cappello Dec.* ¶ 3 (same); *Cotton Dec.* ¶ 5 (same); *Golla Dec.* ¶ 9 (same); *Hadden
Dec.* ¶ 3 (same); *McLaughlin Dec.* ¶ 9 (same); *Mustazza Dec.* ¶ 3 (same); *Pugliese Dec.* ¶ 5 (same).

[6] *Mustazza Dec.* ¶ 33, Ex D. at pgs. 16-17.

[7] By volume of transactions, more than 75% of Monex's business involves the purchase or sale of
physical metals such as coins and bars, where the metals are delivered to the customer after full payment
is made (the "fully paid" business).  *Gomberg Dec.* ¶ 7 and Ex. 2.  This fully paid aspect of Monex's
business is not the subject of this case.

[8] *Gomberg Dec.* ¶ 8.

[9] For example, a customer may deposit $25,000 in an Atlas account and open a trading position for
$100,000 of metal.  *Gomberg Dec.* Ex. 15 (listing Monex's margin requirements for various
commodities).

[10] *Gomberg Dec.* ¶¶ 33, 36.  Monex deducts interest charges and service fees from customer account
equity each month.

liquidation").[11]  Monex's Atlas customers can place "stop" or "limit" orders to manage their trading positions.[12]

Atlas customers place more than 2,000 trades each month.[13]  Monex accepts trading orders from customers by telephone.[14]  Atlas transactions are not conducted on a regulated board of trade.[15]  Instead, Monex is the counterparty to every customer trade.  Monex sets the prices for all trades on its platform, charging a massive price spread, plus commissions, service fees and interest.[16]  Monex allows (and even encourages) customers to engage in short-term trading.  Approximately 25% of the positions in leveraged Atlas accounts were opened and closed within two weeks.[17]  Almost all leveraged Atlas trading positions are closed by offset rather than by delivery.[18]  Monex does not actually deliver any metals to Atlas customers with leveraged trading positions unless and until the customer pays in full for the metals (including accrued interest and fees, including a separate delivery fee) and specifically requests delivery.[19]

Monex's Atlas Account is a trading platform designed for leveraged commodity trading.

---

[11] *Gomberg Dec.* ¶¶ 33-34 and Exs. 1, 14, and 17.

[12] *Gomberg Dec.* ¶ 31 and Ex. 17.

[13] *Gomberg Dec.* ¶ 126.

[14] *Gomberg Dec.* ¶ 35 and Exs. 8, 17.

[15] *Gomberg Dec.* ¶ 29.

[16] *Gomberg Dec.* ¶¶ 32, 36, 146-155 and Ex. 63 (Table G); *L. Carabini Trans.,* at pgs. 51-52.  According to Monex's internal data, Monex collected $95 million in price spread, $14 million in commissions, $6.4 million in service fees, and more than $57 million in interest charges on leveraged Atlas customer accounts between July 16, 2011 and March 31, 2017.  *Gomberg Dec.* ¶¶ 154-155 and Ex. 63 (Table G).

[17] *Gomberg Dec.* ¶¶ 124-125 and Ex. 63 (Table B).

[18] *Gomberg Dec.* ¶¶ 127-129 and Ex. 63 (Table C).  Only 5% of leveraged Atlas trades ever end up resulting in a fully paid and actually delivered transaction.  *Id.*

[19] *Gomberg Dec.* ¶ 37 and Ex. 20 ("*Individual specific units of a commodity are not identifiable to a particular customer **unless and until actual delivery is made to him**.*") (emphasis added).  Monex treats a fully paid transaction resulting in delivery to a customer entirely differently from leveraged Atlas trades that initiate a trading position.  For example, on Monex's internal trade tickets there is a specific "instruction code" for a "Cash Delivery" transaction as opposed to a "Credit" trade in the Atlas program. *See Gomberg Dec.* ¶¶ 38-39 and Ex. 19.

Absent an exception, Monex's leveraged Atlas transactions are covered by Section 2(c)(2)(D) of the CEA. However, the CFTC expects Monex will argue that it "actually delivers" metals in these transactions and so they fall within an exception.

**B.    Monex Does Not Actually Deliver Metals In Leveraged Atlas Trades**

Monex claims that it "actually delivers" metals to customers in leveraged Atlas trades when it issues what it calls a "Commodity Title Transfer Notice" ("CTTN") after a customer places a trade.[20] But as explained below, issuing this piece of paper in Atlas transactions does not result in actual delivery. Actual delivery requires that the seller transfer to the buyer possession of and control over a commodity, which does not occur in Monex's leveraged Atlas transactions.

**1.    "Actual Delivery" in Section 2(c)(2)(D) Requires A Transfer Of Possession and Control**

Congress provided limited exceptions to the requirement that retail commodity transactions be executed on a regulated board of trade. One exception is for contracts of sale of commodities that result in actual delivery within 28 days. Monex has the burden of establishing that it meets this exception.[21] In *CFTC v. Hunter Wise Commodities, LLC*, 749 F.3d 967 (11th Cir. 2014), the Eleventh Circuit examined the meaning of this "actual delivery" exception in a

---

[20] This was Monex's argument, distilled to its essence, when the CFTC recently and successfully sought the enforcement of its investigative subpoena in this Court. *See Monex Deposit Co.*, 2014 WL 7213190 at *2 ("Monex contends that under the Atlas program, it always provides for 'actual delivery within 28 days after payment *by transfer of title to the customer*'") (emphasis added).

[21] *CFTC v. Southern Trust Metals*, 180 F. Supp. 3d 1124, 1130 (S.D. Fla. 2016) ("The actual delivery exception is an affirmative defense and the burden to prove its applicability lies with Defendants."), *citing FTC v. Morton Salt*, 334 U.S. 37, 44-45 (1948); *see also CFTC v. Hunter Wise Commodities, LLC*, Order Denying Motions to Dismiss, 12-cv-81311, dkt. 155, at 17 (S.D. Fla. June 21, 2013) (burden on defendants to establish entitlement to actual delivery exception) (*citing EEOC v. Chicago Club*, 86 F.3d 1423, 1429 (7th Cir. 1996) (quotation omitted) ("It is a commonly accepted cannon that one who claims the benefit of an exception from the prohibition of a statute has the burden of proving that his claim comes within the exception.").

case brought by the CFTC against a group of companies offering leveraged precious metals transactions almost identical to Monex's Atlas transactions. The Eleventh Circuit looked to the plain meaning of the term "actual delivery" in the statute:

> Because the Act does not define the term "actual delivery," 7 U.S.C. § 1a, we again refer to the ordinary meaning of the term to interpret the statute. [citation omitted] "Delivery" is "[t]he formal act of transferring something"; it denotes a transfer of possession and control. *Black's Law Dictionary* 494 (9th ed. 2009). "Actual delivery" denotes "[t]he act of giving real and immediate possession to the buyer or the buyer's agent." *Id.* "Actual" is that which "exist[s] in fact" and is "real," rather than constructive. *Id.* at 40.

749 F.3d at 978-79 (alteration in original). The defendant in *Hunter Wise* argued that it actually delivered metals to customers on its leveraged trading platform when it issued "Transfer of Commodity Notices" following the execution of customer trades. The Court rejected this argument, finding that without physical transfer of the commodity, the purported delivery by issuance of these notices was "by any definition constructive, rather than actual." *Id.* at 979.

The Eleventh Circuit explained that its interpretation of "actual delivery" was consistent with guidance published by the CFTC in 2013 concerning the meaning of "actual delivery." *Hunter Wise*, 749 F.3d at 978-79 (*citing* Retail Commodity Transactions Under Commodity Exchange Act, 78 Fed Reg. 52426, 52428 (Aug. 23, 2013)) ("2013 Guidance"). In that 2013 Guidance, the CFTC stated that in deciding whether the "actual delivery" exception was met, it would "employ a functional approach and examine how the agreement, contract, or transaction is marketed, managed, and performed, instead of relying solely on language used by the parties in the agreement, contract, or transaction." 2013 Guidance, at 52428. "Relevant factors" include "[o]wnership, possession, title and physical location of the commodity purchased or sold, both before and after execution of the agreement, contract, or transaction, including all related documentation; the nature of the relationship between the buyer, seller, and possessor of the

7

commodity purchased or sold; and the manner in which the purchase or sale is recorded and completed." *Id*. The analysis "requires consideration of evidence regarding delivery beyond the four corners of the contract documents." *Id*. Crucially, actual delivery will not have occurred if the purported delivery is "simply a sham." *Id.* at 52427-28 & fn. 25.[22]

Viewed in the framework outlined by the Eleventh Circuit in *Hunter Wise*, Monex at best makes constructive, and not actual, delivery because it does not transfer possession of or control over any metals to customers in Atlas transactions. *Hunter Wise Commodities*, 749 F.3d 967; *cf. Monex Deposit Co.*, 2014 WL 7213190 at \*7 (For purposes of subpoena enforcement, the CFTC provided "sufficient evidence regarding the question of possession and control over the consumers' precious metals under the Atlas program to make the case that delivery of the metals is only 'constructive' and not 'actual.'"). Viewed in the framework of the CFTC's 2013 Guidance on the meaning of "actual delivery," Monex's purported delivery of metals to its Atlas customers is at best a sham, designed to convey the impression that customers receive delivery of metals when in fact Monex at all times maintains possession and control.

### 2. Monex Maintains Possession of Atlas Platform Metals in Depositories Subject to Monex Control

Monex will likely argue that it actually delivers metals because it maintains an inventory of physical metals at depositories that meets or exceeds the amounts of metals underlying its customers' trading positions. Even accepting this as true (at least for long trading positions; short trading positions on the other hand are entirely illusory as shown below) this inventory of

---

[22] The CFTC's 2013 Guidance on the meaning of "actual delivery" provided an example in which actual delivery of a commodity could be made to a regulated depository on behalf of the customer. 2013 Guidance, at 52428 (Example 2). However, even if metals are stored at a depository, it remains necessary to examine the mechanics of the transaction because actual delivery will not have occurred if there is "evidence indicating that the purported delivery is a sham." *Id.*, at 52428 n.25. Monex's claimed actual delivery is a sham.

metals is always under the complete control of Monex,[23] meaning that those metals have not been "actually delivered" to Atlas customers.

Between July 2011 and the present, Monex stored its Atlas platform metals at three depositories: Delaware Depository Services Company ("Delaware Depository"); Brink's Global Service USA Inc. ("Brink's"); and Farmers & Merchants Bank ("Farmers"). Monex has contracts and accounts with each that govern Monex's storage of metals at their facilities.[24] Monex Atlas customers are not parties to these depository agreements.[25] If a Monex Atlas customer wants information about any metals supposedly in her account, she must call Monex.[26] Atlas customers have no right to access the vaults to see the metal they supposedly own.[27] Indeed, Monex's depositories specifically disclaim any relationship with Monex's Atlas customers, and state that they are not agents for the customers.[28] The depositories also rely entirely on information provided by Monex for the supposed ownership status of the metals in

---

[23] *See Gomberg Dec.* Ex. 49 (2011 Description of Monex Operations, at pg. 8: "Customers have title to the collateral, while MCC maintains possession, control and its security interest.").

[24] *Gomberg Dec.* ¶ 99 and Exs. 23, 43-48.

[25] *Gomberg Dec.* ¶ 99. *See also Potts (Delaware Depository) Trans.*, at pg. 24 ("**Q.** Monex customers don't sign any agreements with Delaware Depository; is that right? **A.** Yes.").

[26] *Gomberg Dec.* ¶ 101-102 and exhibits cited therein. *See also Sauchelli (Farmers) Trans.*, at pgs. 53, 78, 86; *Lotti (Brink's) Trans.*, at pgs. 57-58 ("**Q.** Can a Monex customer who has received one of these title transfer notices, call up Brink's and inform Brink's that these metals have been sold to somebody not Monex? Somebody else, a third party? **A.** No. We wouldn't talk to the customer directly."); *Potts (Delaware Depository) Trans.*, at pg. 23 ("**Q.** So no metal can be removed or transferred, unless it is authorized by the signatories for both Monex and Bank of New York? **A.** That's correct. **Q.** So if a Monex customer wanted to remove or transfer the metal, they could not do it through you? **A.** No.").

[27] *Gomberg Dec.* ¶ 101; and Ex. 48 (at ¶ 6, limiting access to "Authorized Persons," which do not include Atlas customers), Ex. 23 (at ¶ 3.1 (same)). *See also J. Potts Trans.*, at pg. 26 ("**Q.** A Monex customer calls Delaware Depository and says, 'I'd like to come in and see my metal.' You would tell them what? **A.** We would refer them back to Monex.").

[28] *J. Potts (Delaware Depository) Trans.*, at pgs. 24-25 ("**Q.** [T]hese customers, the Monex customers, are Monex customers and not Delaware Depository's customers. **A.** Yes, that is correct."); *Sauchelli (Farmers) Trans.*, at pg. 63 ("If a customer has a question regarding precious metals we direct those to Monex to be resolved."); *Lotti (Brink's) Trans.*, at p. 19 ("We are storing metals for the account of Monex.").

Monex's accounts.[29]

The contracts between Monex and its depositories expressly provide that Monex maintains control over Atlas platform metals at all times. For example, one of Monex's contracts with Delaware Depository explicitly provides that "Control over the Precious Metals shall be and shall remain vested in [Monex and Bank of New York[30]]."[31] Monex's other depository contracts contain the same or similar language.[32]

Whether Monex can point to metals in its depositories or not, in the end, these metals are always in accounts in Monex's name, in Monex's possession and under Monex's complete control; the metals therefore have not been "actually delivered" to any Atlas customer.

### 3. Monex's Customer Account Agreements Give Monex Complete Control Over Atlas Metals

To trade as part of its Atlas program, Monex requires that customers sign and return its "Atlas Account Agreement," which includes a "Purchase and Sale" contract and a "Loan, Security and Storage" contract.[33] The terms of the Atlas contracts deprive Monex's customers of any control over the metals they are supposedly buying or selling, and give Monex complete control over the metals.

---

[29] *See, e.g., Lotti (Brink's) Trans.*, at pgs. 21-22 ("**Q.** So in all cases with respect to the information contained on this Commodity Title Transfer Notice, Brink's is relying on information provided by Monex in order to -- for the issuance and the reconciliation process? **A.** Yes."). *See also Gomberg Dec.* ¶ 45 and Exs. 22-23.

[30] Bank of New York was the trustee of Monex's "Concord" trust, a Monex financing vehicle discussed in detail in Section III.B.7. of this Memorandum.

[31] *Gomberg Dec.* Ex. 23 (2009 Monex-Bank of New York-Delaware Depository Concord Depository Agreement, ¶ 2.1 and ¶ 2.4, metals may be removed or transferred only by prior written notice of Monex or Monex's Trustee).

[32] *Gomberg Dec.* Ex. 107 (2012 Monex-Wells Fargo-DDSC Depository Agreement, stating "Control over the Precious Metals shall be and shall remain vested in [Monex] . . ."); Ex. 45 (2013 Monex-F&M Depository Agreement, ¶ 5, Depository can release metals only upon receipt of an "authenticated notice" from Monex); Ex. 47 (2015 Monex-Brink's Storage Agreement, providing that all withdrawals must be initiated by Monex).

[33] *Gomberg Dec.* Ex. 14.

The very first sentence of the Atlas "loan" agreement says that the financing is a "demand loan" which Monex can require the customer to repay immediately, at any time, and in Monex's sole discretion.[34]  Customers agree to maintain account equity "to the satisfaction of" Monex and must make additional cash payments if the equity in the account is "insufficient to secure such obligations to the satisfaction of [Monex] in its sole discretion." *Id.*, § 3.  Monex can change its equity call level "at its sole discretion at any time." *Id.*  If Monex "determines at any time and in [Monex's] sole discretion" that its loan is "insufficiently secured," it may call the loan and sell off the customer's metal. *Id.* § 11.  This trading position offset "may be effected at any time of the day or night, on regular business days or otherwise, without prior notice." *Id.*

The import of the Monex Atlas account agreements is clear: it is Monex—not the customer—that maintains all rights to possess or control any metals traded on the platform.  That Monex maintains the right to liquidate metals supposedly delivered to customers is inconsistent with the claim that anything has been "actually delivered" to them.

### 4. Monex Can (and Does) Liquidate Customer Trading Positions At Any Time

Monex does not actually deliver metals to customer in leveraged Atlas trades because it can (and does) liquidate customer trading positions at any time and for any reason.  This is not just theoretical.  If the customer does not immediately pay up when Monex demands additional funds in a margin call, or if account equity drops to 7%, Monex will liquidate the customer's trading position.[35]  There is no requirement of formal legal process or action; Monex can

---

[34] *Gomberg Dec.* Ex. 14 (Atlas Loan Agreement, § 1, "The Customer(s) signing below ('Borrower') promises to pay to [MCC] at its office in California on demand … the sum of all outstanding cash advances ('loan balance') made by MCC …").

[35] *See Gomberg Dec.* ¶ 34 and Ex. 1 (Monex Margin Requirements), Ex. 17 (Monex Desktop Guide, § 15.2), Ex. 31 (Monex Management Presentation), Ex. 58 (sample Monex "Forced Liquidations Report"); *M. Carabini Trans.*, Ex. 3.

liquidate the trading position with just the press of a button.[36] Margin calls and forced

liquidations of trading positions are frequent occurrences on the Atlas platform. Between

July 16, 2011 and March 31, 2017, more than 3,000 leveraged Atlas accounts were subject to a

margin call, and at least 1,850 had trading positions force liquidated.[37] In other words, during

that five-year and eight month time period, more than 30% of Monex's leveraged Atlas customer

accounts either received a margin call, were subject to forced liquidation of trading positions, or

both.

Monex has structured its Atlas platform so that it can liquidate customers' trading

positions at any time because Monex's "lending decision is based entirely on the value of the

metal, ignoring the credit quality of the borrower."[38] So when metals prices are volatile and a

customer's account equity drops, Monex can simply press a button and the customer's trading

position has been converted to money in Monex's bank account. Monex even boasts about its

ability to immediately liquidate Atlas trading positions, and even to make money on these forced

liquidations, in presentations to its creditors.[39] This ability to liquidate customer trading

positions at any time and for any reason clearly demonstrates that Monex always has possession

and control over Atlas platform metals and never actually delivers them in leveraged Atlas

trades.

### 5. Monex's "Title Transfer" Notices Are a Sham

Monex claims that it makes "actual delivery" of metals to its customers when it generates

---

[36] *Maroney (Monex VP of Sales) Trans.*, at pg. 57: ("**Q.** How does the auto forced sell system work? **A.** Once an account hits 7[%] or below 7[%] the trade department can push a button and then it will automatically forced sell anybody at or below those levels.").

[37] *Gomberg Dec.* ¶ 130 and Ex. 63 (Table D).

[38] *Gomberg Dec.* Ex. 16 (2011 Monex Description of Financing Structure).

[39] *Gomberg Dec.* Ex. 25 (Monex Historical Loan Performance Summary, noting that between 1987 and 2011, "aggregate commission gains on foreclosures far exceed[ed] the miniscule loan losses").

and issues a "Commodity Title Transfer Notice" [40] ("CTTN") after each Atlas customer trade. But Monex's CTTN is just a trade confirmation that Monex prints and provides to its depositories following an Atlas customer trade.[41] Monex's depositories rely entirely on Monex for the content of the information on the CTTN.[42] The Depositories do not independently confirm any transaction reflected on a CTTN, and specifically disavow their accuracy.[43]

These CTTN documents are worth no more than the paper they are printed on. On its face, Monex's CTTN states that it is "non-negotiable."[44] Atlas customers cannot sell or transfer metal described by these CTTNs to anyone other than Monex.[45] Atlas customers also cannot use the CTTN or the metals they supposedly describe as collateral for another loan.[46] The fine print

---

[40] *Gomberg Dec.* Ex. 21 (sample CTTN).

[41] *See Gomberg Dec.* ¶¶ 44-45. *See also L. Carabini Trans.*, at pgs. 178-179: ("**Q.** [W]ho generates this document? **A.** Monex."); *Lotti (Brink's) Trans.*, at pgs. 13-14 ("**Q.** So it's Monex that is either emailing these to Brink's or printing them directly at a printer located at the Brink's facility? **A.** Yes.").

[42] Even the telephone contact information on each of the CTTNs directs any questions or comments to Monex, not to the depository. *See Gomberg Dec.*, ¶ 45.

[43] *See, e.g. Gomberg Dec.* Ex. 22 (May 2, 2016 Monex-BNY-Brink's Storage Agreement, ¶ 5, "Brink's has no obligation, liability or responsibility for the accuracy of any written allocation reports that it receives …"); *Gomberg Dec.* Ex. 23 (June 29, 2009 Monex-Bank of New York-Delaware Depository-Concord Depository Agreement, ¶ 4.3, proving that depository is entitled to rely on accuracy of allocation report transmitted by Monex).

[44] That the CTTNs are "non-negotiable" distinguishes them from other title documents typically handled by depositories, such as warrants or warehouse receipts, which are fully negotiable and transferrable. *See Lotti (Brink's) Trans.*, at pgs. 22-23.

[45] *Lotti (Brink's) Trans.* at pg. 26 ("**Q.** If a recipient of [a CTTN] contacted Brink's to request the physical shipment of the metals identified on the notice, how would Brink's deal with that? **A.** We would not speak to the customer. We would ask them to speak to Monex directly.").

[46] *Gomberg Dec.* Ex. 21 (Monex CTTN, stating that Monex customer "shall not grant a security interest or other right in or otherwise pledge any commodities held by [the depository] to any party other than [Monex] or [the depository], and [the depository] will not recognize any such interest, right or pledge."). *See also Potts (Delaware Depository) Trans.* at pgs. 59-60 (depository would refuse to recognize a customer's attempt to encumber metal stored at the depository).

Similarly, Monex's Atlas customer contract prohibits the customer from encumbering or transferring any interest in his or her supposedly "owned" metals. *See, e.g. Gomberg Dec.* Ex. 14 (Atlas Loan Agreement, ¶ 10, stating "Until the Indebtedness is repaid in full, Borrower shall not sell, encumber or otherwise transfer any interest in the Collateral or permit to exist any encumbrance of any kind on the Collateral other than the security interest of MCC under this Agreement.")

"terms and conditions" on Monex's CTTN gives Monex's depositories authority "to transfer or deliver the described commodities to [Monex] upon receipt . . . of . . . instructions from [Monex]."[47]  In other words, the depositories rely completely on Monex for information about whether it is Monex or one of Monex's customers that owns the metals described by Monex's CTTN documents.[48]

In sum, while Monex claims to transfer "legal title" to Atlas customers with its CTTN document, Monex fails to transfer any real rights to possess or control metals, and these documents are effectively just trade confirmations.[49]

### 6.    Monex's Short Trading Positions Illustrate the Fiction of Monex's Claimed "Delivery" to Customers in Leveraged Atlas Trades

Monex claims it "actually delivers" metals to customers in short trades in the same way it delivers in long trades – by sending customers a CTTN.[50]  Monex's short trades illustrate the fiction of actual delivery in the Atlas program.  Atlas short trades are simply book entry trading positions in Monex's database.[51]  In a short trade, the customer theoretically "borrows" metal from Monex, and then immediately "sells" this borrowed metal right back to Monex.[52]  The

---

[47] *Gomberg Dec.* Ex. 21.

[48] *Lotti (Brink's) Trans.*, at pg. 30 ("**Q.** [I]s it your understanding that Brink's only receives instructions from Monex with respect to the transfer or delivery of the metals that are stored in the Monex account?  **A.** Yes.").

[49] *Potts (Delaware Depository) Trans.*, at pgs. 45-46 ("**Q.** What can a customer do with this transfer notice?  What rights does [the CTTN] convey?  Could [a customer] sell this position to somebody? […] **A.** It's just a notification of what happened.  That's it.").

[50] *L. Carabini Trans.*, at pg. 97.

[51] Book entries in a database are not the actual delivery of commodities.  *See* 2013 Guidance, 78 Fed Reg. at 52428 (Example 3).

[52]  *L. Carabini Trans.*, at pg. 97 ("**Q.** So the customer borrows commodities from Monex?  **A.** Credit Company.  **Q.** And sells them to Monex?  **A.** Deposit Company.  **Q.** And they then have a short position; right?  **A.** They owe -- when you owe something, you are short, yes.").  *See also Gala (Monex Sales Director) Trans.*, at  pg. 49: ("**Q.** [To close out a short position], who is he buying it from?  **A.** From us. **Q.** Who did he borrow it from?  **A.** From us.").

purpose of this short trade is only to speculate on a price decrease in metals.[53]  The short trade shows up on Monex's customer trading statements as a "commodity loan" transaction.[54]  But this purported "loan" and immediate sale of metals is all smoke and mirrors.  Even Monex's Head of Trading cannot explain what it is that Monex does with its metals inventory to both loan a customer metals and simultaneously buy those very metals from the customer.[55]

The issuance of a "title" transfer document, Monex's CTTN, is absurd in the context of a short trade.  Monex is not actually transferring title to any metals when it supposedly "loans" the customer metals.  The customer does not have title to any metals in the first place, and so cannot possibly transfer title to any metals when "selling" them back to Monex.[56]  Possession of and control over the metals does not change.  This is true whether it is a short or a long trade.  The issuance of a CTTN, in either a short trade or a long, is meaningless and does not result in the actual delivery of metals.

---

[53] *See, e.g., Mustazza Dec.* ¶ 23, Ex. D at p. 16: ("[W]hen we have got the short position, that speculates on the market going down.")

[54] *Gomberg Dec.* Ex. 18 (Trade Ticket Guide for Shorts and Cross Hedges: "Taking a short position (that is not against a long position) is referred to as a naked short and the client is doing a 'Commodity Loan' in Monex terms.").

[55] *Smoler (Monex Head of Trading) Trans.*, at pgs. 92-93: ("**Q.** From your standpoint, your vantage point on the trade desk, are you managing the inventory for MCC and MDC? **A.** Yes.  **Q.** So when MCC loans this customer the inventory so he can sell it back to MDC, what, mechanically, happens? **A.** I don't know. **Q.** Is there anything more than just a trading position reflected for this customer taking this short? **A.** I don't know.").

[56] *L. Carabini Trans.*, at pg. 97-98 (**Q.** When Monex lends the commodities to the customer, what happens?  A. They borrow it, and most customers will sell it to MDC.  **Q.** So do the metals move anywhere in that transaction?  **A.** Most likely not. I don't know what they do at the depository, but title passes from MCC to the borrower and from the borrower to MDC if they sell it. They don't have to sell it. They can take it home.  **Q.** How does title pass to commodity somebody is borrowing?  **A.** By documentation.  **Q.** What documentation gets executed?  **A.** Well, there's one called Custodial Report. There's one called -- well, it's a 334. The – also the Commodity Transfer Notice that's sent by the depository to the customer. Those are the three primary documents.  **Q.** So taking just a step back, the customer is borrowing commodities from Monex Credit; right?  **A.** Correct.  **Q.** Does Monex Credit still own the commodities?  **A.** No.  **Q.** Why isn't that a sale, then, of commodities to the customer?  **A.** Because it isn't.").

### 7. Atlas Platform Metals Secure Monex's Own Financing

Another fact demonstrating that Atlas customers never obtain possession or control over metals is that a substantial portion of the metals ultimately secure Monex's own financing, and those financing agreements require customers' metals to be liquidated and sold should Monex ever default. Monex finances a substantial portion of its inventory and its business operations through loans and other financing vehicles.[57] During the relevant period, Monex obtained approximately $200 million in financing through what Monex calls the "Concord" and "Scala" entities.[58] Monex also obtained at least $25 million in financing from Wells Fargo, and routinely used a line of credit of up to $50 million from Farmers & Merchants Bank.[59] Whether the financing was through Monex's Concord and Scala affiliates, or from banks Wells Fargo and Farmers, ultimately Monex secures this financing through Atlas platform metals.[60] Monex cannot obtain this financing unless Monex and its creditors at all times have possession of and complete control over all of Monex's metals inventory, including metals supposedly owned by Monex customers.[61] As Monex said in an October 2011 memo to potential investors in the

---

[57] *See Gomberg Dec.* ¶¶ 80-98 and exhibits cited therein, including Ex. 1 (2014 Monex Management Presentation, stating Monex's "current portfolio of approximately $165 MM in customer margin loans . . . is currently financed via a combination of [Concord] notes and a credit line with the company's long time bank in Newport Beach."); Ex. 2 (2013 Concord Private Placement Memo); Ex. 6 (2016 Scala Private Placement Memo); and Ex. 38 (Farmers Loan Approval Memo).

[58] *See id.*

[59] *See Gomberg Dec.* ¶¶ 90-98 and exhibits cited therein.

[60] *See Gomberg Dec.* ¶¶ 80-98 and exhibits cited therein. *See also Castle (Bank of New York, Trustee for Concord) Trans.*, at pg. 57 ("The metals that are held at [Delaware Depository] are pledged to us as trustee as collateral again for the notes, to benefit the noteholders. So it's important that we as trustee be able to exercise control over that collateral in the event that we needed to enforce the noteholders' rights with respect to it.").

[61] *Flannery (Piper Jafray, Monex Investment Banker) Trans.*, at pg. 77: ("**Q.** [I]s it an important feature of the notes that the metals have to remain at the depository? **A.** It is. **Q.** Okay. And why is that? **A.** Well, there's two sorts of metals here. There's metals inventory. So that's metal that's owned by Concord. And there's metals collateral which is metal owned by customers but that serves as security for loans to those

Concord vehicle, "customers have title to the collateral, while [Monex] maintains possession, control and its security interest."[62]

The documents governing the Concord and Scala vehicles require that Monex have the ability to liquidate Atlas customer positions at any time in order to generate cash sufficient to pay down Monex's financing obligations. Monex promotes its ability to instantly convert its customers' metals to cash succinctly in its Concord and Scala private placements:

> The Loan Agreement grants MCC the right to demand repayment of the entire Loan at any time for any reason or no reason, with notice, and to increase the required Equity for a Loan at any time for any reason or no reason, with notice. Under the Loan Agreement, MCC also has the right to liquidate the collateral securing the loan without notice should the account's Equity fall below the current liquidation level.[63]

If Monex fails to meet its payment obligations under the Scala funding vehicle (and Concord before that), Monex is "obligated to increase the required Equity for [Monex Atlas customers] under their Loan Agreements, and make and enforce resultant Collateral Demands on Obligors, to the extent necessary" to cure Monex's deficiency.[64] In other words, if Monex doesn't pay its

---

customers, which loans are owned by Concord. So in both cases, though, those metals serve as security for the notes ultimately.").

[62] *See Gomberg Dec.* Ex. 16 (2011 Description of Monex Operations, at pg. 8: "Customers have title to the collateral, while MCC maintains possession, control and its security interest."). *See also Castle (Bank of New York, Trustee for Concord) Trans.*, at pg. 78-79: ("**Q.** So when Monex transfers title to the customers in the context of this financing structure, the metals, the physical metals themselves, remain under the control of Monex and the trustee, correct? **A.** I believe that's correct, yes. **Q.** And, similarly, if the title is transferred back to Monex in the context of this financing structure, the metals remain under the control of Monex and the trustee? **A.** Yes.").

[63] *See Gomberg Dec.* ¶ 84, and Exs. 2 and 6.

[64] *Gomberg Dec.* Ex. 2, (2013 Concord Private Placement Memo, at pgs. 9, 41). *See also Gomberg Dec.,* Ex. 31 (Concord 2012 Servicing Agreement, § 5.03). As Monex's investment banker for the Concord transaction put it, "If MCC does not cure the breach within one day, that constitutes a Servicer Default, the back-up servicer steps in the next day and proceeds to liquidate the entire portfolio of Concord assets pursuant to the process outlined in the Transition document." *See Gomberg Dec.*, Ex. 34. The same features requiring liquidation of customer metals in the case of a Monex default exist in the 2016 Scala financing documents. *See Gomberg Dec.* Ex. 6 (2016 Scala Private Placement Memo, pgs. 8, 41).

creditors, Monex must unilaterally ratchet up its margin call and forced liquidation thresholds until it can liquidate sufficient trading positions to meet the deficiency.[65]  The encumbrance of Atlas platform metals by Monex's own financing is completely at odds with the concept of actual delivery.

### C. Monex Has Violated and Is Continuing To Violate Section 4(a) of the Commodity Exchange Act By Failing To Execute Leveraged Atlas Transactions On a Regulated Exchange

Monex's leveraged Atlas transactions are "retail commodity transactions" covered by Section 2(c)(2)(D) of the CEA, and are therefore treated "as if" they are futures contracts.[66] Section 4(a) of the CEA, 7 U.S.C. § 6(a) (2012), provides that unless conducted on a regulated exchange, it is "unlawful for any person to offer to enter into, to enter into, to execute, to confirm the execution of, or to conduct any office or business anywhere in the United States for the purpose of soliciting, or accepting any order for, or otherwise dealing in, or in connection with," retail commodity transactions.  The CFTC does not have to establish scienter to prove a violation of Section 4(a) of the Act – Monex's transactions either violate the exchange trading requirement, or they do not.  *CFTC v. Noble Metals*, 67 F.3d 766, 773-775 (9th Cir. 1995).

Monex has engaged in - and is presently engaging in - conduct that violates Section 4(a). Monex solicits retail customers throughout the United States via television commercials and on the internet through its website at www.monex.com, and therefore undoubtedly offers to enter into retail commodity transactions.  Monex accepts trading orders from customers by telephone

---

[65] As with the Concord vehicle, should Monex default on its loans with its bank creditors, the banks have the right to step into Monex's shoes, demand immediate payment from Atlas customers, and liquidate customer positions if repayment is not made.  *See Gomberg Dec.* ¶¶ 90-98 and exhibits cited therein.

[66] *See* CEA § 2(c)(2)(D)(iii) ("Sections 4(a), 4(b) and 4b apply to any agreement, contract, or transaction described in clause (i), as if the agreement, contract, or transaction was a contract of sale of a commodity for future delivery.").

before entering the trades into its database.[67]  Monex is the counterparty to every trade, and

therefore enters into and executes these trades with its customers.[68]  Monex confirms the

execution of customer transactions by sending customers trade confirmations, CTTNs, and

account statements.[69]  Monex conducts its business from its office in the U.S. (Newport Beach,

California), where it solicits hundreds of potential customers by telephone every day.  Monex has

engaged in, and is continuing to engage in, conduct that violates Section 4(a) of the CEA.[70]

## IV.  MONEX IS DEFRAUDING RETAIL CUSTOMERS IN LEVERAGED ATLAS TRANSACTIONS

Monex is also defrauding customers on a massive scale.  Between July 16, 2011 and

March 31, 2017, Monex's leveraged Atlas customers lost more than $290 million.  Nonetheless,

Monex consistently lures retail customers into risky leveraged Atlas trading with the false

promise of a safe, secure and profitable investment.  And while approximately nine out of ten

leveraged Atlas customers suffer losses, Monex and its owners make millions of dollars.  These

customer losses are driven by the structure of the Atlas transaction.  It is the fees, commissions,

interest and price spread charged by Monex that are the heart of the problem.

Sections 4b(a) and 6(c) of the CEA, 7 U.S.C. §§ 6b(a) and § 9 (2012), are broad anti-

fraud provisions.  Section 4b(a) provides, in pertinent part, that it is unlawful for any person "to

cheat or defraud or attempt to cheat or defraud" another person in connection with retail

commodity transactions.  Section 4b applies to Monex's leveraged Atlas transactions "as if" they

---

[67] *Gomberg Dec.* ¶ 35 and Ex. 17.

[68] *Gomberg Dec.* ¶ 32 and Ex. 14, Trading Agreement § 8.  *See also Hamilton Trans.*, at pgs. 17-20.

[69] *Gomberg Dec.* ¶¶ 35, 108 and Exs. 21, 50, 51, and 52.  *See also* Monex Account Statements, attached to *Mustazza Dec.*, *Iman Dec.*, *Cappello Dec.*, *Golla Dec.*, *Hadden Dec.*, *Hubert Dec.*, *Liu Dec.*, and *Pugliese Dec.*

[70] Monex is also violating Section 4d of the CEA, 7 U.S.C. § 6d(1) (2012), for many of these same reasons which requires persons who accept funds in connection with retail commodity transactions covered by the CEA to register as a "futures commission merchant."

are futures pursuant to Section 2(c)(2)(D) of the CEA. Section 6(c)(1) of the CEA provides the CFTC with authority to prohibit the use of "any manipulative or deceptive device" in connection with "any contract of sale of any commodity in interstate commerce." Under this authority the CFTC enacted Rule 180.1, making it unlawful in commodity transactions for any person to "intentionally or recklessly make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading." 17 C.F.R. § 180.1 (2017). Thus, even assuming Monex did actually deliver metals in connection with Atlas trades (it does not), that would not immunize Monex from the fraud it perpetrates on its customers.

In the context of this case, the elements needed to show a violation of both provisions are: (1) that a misrepresentation, misleading statement, or omission was made; (2) with scienter;[71] and (3) that the misrepresentation, statement or omission was material. *See, e.g., CFTC v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317, 1338 and 1346-1348 (S.D. Fla. 2014).

### A. The Truth About Leveraged Atlas Trading – Customers Suffer Massive Losses And Are Almost Sure To Lose

From July 16, 2011 through the present, more than 12,000 retail investors engaged in leveraged commodity trading in Monex's Atlas program. Approximately 90% of them lost money. Monex Atlas customers collectively realized more than $290 million in losses between

---

[71] The scienter element is established when either: (1) the defendant knew his representations were false; or (2) the defendant made the representations with a reckless disregard for their truth or falsity. *Drexel Burnham Lambert Inc. v. CFTC*, 850 F.2d 742, 748 (D.C. Cir. 1988) ("recklessness is sufficient to satisfy [S]ection 4b's scienter requirement") (internal quotation marks and citation omitted). Similarly, under Rule 180.1(a), the CFTC must establish that defendants acted "intentionally or recklessly." 17 C.F.R. § 180.1(a) (2016).

July 16, 2011 and March 31, 2017, an average of more than $4 million a month.[72]  It is not simply bad luck that makes the Atlas account an almost certain-to-lose investment.  Rather, it is the spread, fees, commissions and interest Monex charges – the structure of the investment itself – that makes it an almost certain loser.  In fact, no informed and rational investor (in other words, a person who prefers making more money to less) would place leveraged commodity trades through Monex's Atlas account given the available alternatives.[73]

A substantial portion of Monex's customer losses were caused by Monex's fees and charges.  Taking just one example, the 3% price spread imposed by Monex on many trades can result in a spread more than 100 times greater than a functionally equivalent trade on a regulated exchange.  For a 5,000 ounce futures silver trade on the COMEX market, for example, retail investors would pay about $25 in spread if they bought one futures contract at the bid and immediately sold at the offer.[74]  By comparison, buying and immediately selling 5,000 ounces of silver on the Atlas platform with a spot price of $17 per ounce would incur a spread charge of approximately $2,550.  The more trades that are placed, the larger the impact will be.

Even when metals prices skyrocket upwards, leveraged Atlas traders still lose money. For example, between January 1, 2009 and July 16, 2011, the price of silver quadrupled (it went

---

[72] *See Gomberg Dec.* ¶ 14 and Ex. 63 (Table E), summarizing figures from transactional data provided by Monex.

[73] *See* Report of Robert D. Selvaggio, PhD, Rutter Associates LLC, Exhibit 3 to the Appendix.  In his report, Dr. Selvaggio analyzed the Monex Atlas trading account, comparing trades in ten sample accounts to functionally-equivalent trades in regulated futures or Exchange Traded Funds ("ETF") markets.  Dr. Selvaggio concluded that (1) an investor can always expect to earn a higher return with lower risk by choosing futures or ETF trades rather than trading through Monex's Atlas program; (2) an informed and rational investor (one who understands fully available investment choices and who prefers more money to less) would not choose to trade via the Atlas Account rather than futures or ETFs; and (3) these conclusions flow from the cost structure of the Atlas platform itself.  In his terminology, Dr. Selvaggio found that at every risk/return level, the Atlas account was "stochastically dominated" by available alternatives, meaning that no rational investor should prefer it.

[74] *See Gomberg Dec.* ¶¶ 146-151.

from about $11 to $38 per ounce) and the price of gold nearly doubled (about $870 to $1,600 per ounce).[75]  Even in this extreme bull market, about 56% of leveraged Atlas accounts lost money.[76]

The truth is that the vast majority of leveraged Atlas customers lose money, and many on a catastrophic scale.

### B.    Monex And Its Owners Know the Atlas Program is a Scam

None of this is hidden from Monex and its owners.  Monex is the counterparty to every customer transaction, so it knows the precise impact of the spread, commissions and fees on that customer's investment performance.  Monex and its owners, Michael and Louis Carabini, have at all times had the ability to track and analyze Atlas customers' performance,[77] and they can clearly see the massive losses Monex Atlas customers are suffering.  Monex has built a sophisticated database that constantly tracks customer trading activity and performance.[78]  For example, Monex precisely tracks when any customer's account equity reaches 7% and automatically closes out trading positions when that occurs.[79]  Monex precisely tracks the money it makes as its customers suffer losses.[80]

Through a host of reports distributed to top management, Monex closely monitors its

---

[75] *Gomberg Dec.* ¶ 145 and Ex. 63 (Table F).

[76] *Gomberg Dec.* ¶ 145 and Ex. 63 (Table F).

[77] *L. Carabini Trans.*, at pg. 108 ("**Q.** You would be able to figure out the profit or loss to the customer too; right?  **A.** Yes.").

[78] *See Gomberg Dec.*, ¶¶ 104-111.

[79] *See Hamilton Trans.*, pgs. 44-45 ("**Q.** In terms of that last component, the screen that enables them to check and generate forced sales or equity calls, can you describe what information they're able to see in connection with that aspect of the system?  **A,** They just run a program, series of programs which goes through the database, calculates all of the customer's equity based on the current prices.  And if any accounts are force-liquidated it generates – it generates reports that go out to the various teams, sales teams.").

[80] *See Gomberg Dec.*, ¶¶ 104-111 and Exs. 53-62.

Atlas customers' trading.[81]  On a daily basis, Monex executives including Michael and Louis Carabini have reports available to them that track, among many other data points: the value of customer trading positions, equity percentage, dollar "cushion" before a margin call, dollar "cushion" before a forced liquidation, excess equity available for additional trades, and the gain or loss on open trading positions.[82]  Monex tracks the number and value of long and short trading positions, the number and value of margin calls and forced liquidations, and the revenue Monex makes from all of them.[83]  Monex and its executives have more than sufficient information at their fingertips to know precisely how poor leveraged Atlas trading accounts fare, but yet disclose none of it as they paint a rosy picture of safe, secure and profitable metals transactions.

Whether a misrepresentation has been made depends upon the "overall message" and the "common understanding of the information conveyed."  *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th Cir. 2002) (internal quotations omitted).  Monex has defrauded customers by promoting the Atlas program as a safe, secure and profitable investment vehicle with limited risk without disclosing that nearly all Atlas customers lose money.  *Cf. id.* at 1332-33 (defendants liable for fraud for portraying an "extremely rosy picture for profit potential" and

---

[81] *Gomberg Dec.*, ¶¶ 104-111 and Exs. 53-62, attaching a selection of Monex management reports; *see also Hamilton Trans.*, at pgs. 50-53 (reflecting that the reports are distributed to Monex executives).

[82] *Id.  See also L. Carabini Trans.*, at pgs. 137-140, 148-150 and Ex. 7; *Maroney Trans.* (Monex V.P. of Sales), at pgs. 81-82 ("Typically, it's just an easy access view of all the customers that you have that you can go through very quickly on a piece of paper instead of having to scroll through on a computer. Normally what they would look at is they look at equity requirements, and a lot of guys, that's the first thing they look at just to make sure that the customer's equity is at a level that they don't need to give them a preliminary call and say, you know what, it might be getting close.  So equity is something they look at.  Other than that, if the customer was interested in placing another transaction and they needed specific information they would give them the excess equity amount.  If the customer called and said I want to take delivery of everything, we'd just give them the loan balance amount and the additional cost as far as delivery is concerned, but it just gives somebody a quick overview that's available also in your computer as far as where each account sits.").  Maroney testified that this information is available to Monex employees through Monex's database system.  *Id.*

[83] *Gomberg Dec.*, ¶ 110 and Exs. 53-58.

"limited risk" while failing to disclose that 95% of investors lost money); *CFTC v. Carnegie Trading Group, Ltd.*, 450 F. Supp. 2d 788, 799 (N.D. OH 2006) (defendants liable for fraud for touting an investment's "enormous profit potential" with minimal risk while failing to inform customers that most investors lost money).

Monex and its owners should be keenly aware that the law prohibits them from overstating the profit potential of the Atlas account and understating its risks. Louis Carabini and his Monex companies have in the past been defendants in cases brought by the Federal Trade Commission, the Securities and Exchange Commission, state regulators, and private plaintiffs, all alleging fraud in connection with leveraged metals transactions.[84] Nonetheless, Monex and its owners continue to engage in similar conduct.

### C. Monex Deceptively Pitches The Atlas Program as a Safe, Secure and Profitable Investment

Despite massive customer losses, despite readily available data showing these massive losses, despite knowing precisely how bad leveraged Atlas trading compares to available alternatives, Monex lures customers into leveraged Atlas trading every single day. Monex does it with a basic formula: (1) Lure in prospects by touting physical precious metals as an investment opportunity; (2) pitch prospects on the safety, security and profitability of leveraged Atlas trading (while hiding the massive losses suffered by past and existing customers); and (3) train and incentivize sales staff to "Raise Money!"[85] from customers by convincing customers to throw their money into leveraged Atlas trading.

#### 1. Monex Misleadingly Portrays Leveraged Atlas Metals Trading as a Good Investment

Monex claims the Atlas program is a "*unique and powerful way to acquire precious*

---

[84] *Gomberg Dec.*, ¶¶ 23-26 and Exs. 11-12, 24.

[85] *Gomberg Dec.*, ¶ 67 and Ex. 26.

*metals with the strength of investment leverage combined with the safekeeping security of*

*independent depository storage.*"[86]  This would only be true if by "unique" and "powerful"

Monex means a unique and powerful way for Monex to make more money from its customers.

But of course that is not the message Monex is conveying.  Through carefully crafted marketing

materials, Monex lures customers in so that its sales force can "close"[87] the sale and ensnare

customers in the leveraged Atlas trap.  Monex pitches the importance and urgency of investing in

physical precious metals, paired with dire predictions of impending economic collapse.[88]  Monex

then tells customers that the leveraged Atlas program is a powerful, safe, secure, and profitable

way to invest in precious metals:

- "[P]recious metals can produce impressive investment returns even when (and sometimes, especially when) returns from stock, bond and other paper investments decline in value or evaporate completely.  The Monex Atlas Account, a way to purchase precious metals using up to 5-to-1 investment leverage, can be a powerful short-term trading vehicle during periods of rapidly changing precious metals prices.  And many financial experts have predicted and continue to forecast rising gold, silver, platinum and palladium prices in the months and years ahead."
- By investing in precious metals through the Atlas program you can "protect yourself from further declines in the value of the U.S. dollar."
- The Atlas program is a way to "shield your wealth against the ravaging effects of inflation, deflation and other economic calamities."
- "[R]ight now may be an ideal time to invest in precious metals with the power

---

[86] *Gomberg Dec.*, ¶ 56 and Ex 13, Atlas Brochure, pg. 2.

[87] *Gomberg Dec.*, Ex. 28, pgs. 3, 11, 52 (Blueprint for Success: "Immediately after handling any objection, ask for the order without fear, failure, or fumbling.")

[88] *See Christianson Dec.*, Monex website excerpts, Ex. A (excerpts from 2013 Monex website) and Ex. B (excerpts from 2017 Monex website), *Gomberg Dec.*, ¶¶ 58-64 (excerpting and citing key Monex marketing claims).

For example, Monex touts precious metals as "a solid hedge against a declining U.S. dollar" and "a proven safe-haven in times of war, political strife and uncertainty." Monex claims that "[p]recious metals are one of the only financial asset classes in an investment portfolio that are not simultaneously someone else's liability," and "[u]nlike paper investments (like stocks, bonds and currencies) that can and have become worthless overnight, precious metals have true intrinsic value . . . and, hence, will always be valuable."  Monex also highlights the profit potential of investing in precious metals, including with a "Profit Opportunity" section of its website.  Monex also claims that precious metals can offer "traders periods of outstanding price appreciation and profit potential."

and built-in security of the Atlas Account."[89]

These claims are false and misleading: "impressive investment returns" are exceedingly rare in the Atlas Account,[90] and the account is only "powerful" as a tool to line the pockets of Monex's owners.

Monex also makes misleading statements about the security of Atlas trading based on the purported "physical" nature of the investment. In its Atlas Account brochure, Monex misleadingly tells customers and prospects that:

- "The depository custodian will maintain the safekeeping of your precious metals until you decide to sell them or take personal possession."
- "Your metals are your sole assets."
- "You are the sole owner of your metals and the sole decision maker on when to buy and sell them."[91]

These claims are false and misleading because Monex can liquidate its Atlas customers' trading positions at any time in Monex's sole discretion. In fact, many Atlas customers experience margin calls and forced liquidations where it is Monex – not the customer – deciding whether, when, and at what price to offset what are in reality just book entry trading positions.

Monex's sales training materials encourage Monex account representatives to lure prospects into Atlas trading by emphasizing profit potential and security. For example, Monex representatives were trained to use phrases on sales calls such as:

- "If gold were to increase in value by $100 per ounce in the next year, and you had a 30% to 40% net gain, you'd feel pretty good, wouldn't you?"
- "I'd like to show you some ways that you might earn a very positive return on investments in precious metals today."
- "Discover an opportunity to invest with defined risk, while enjoying the possibility of unlimited upside potential."

---

[89] *Gomberg Dec.*, ¶¶ 53-64 (excerpting key Monex marketing claims), and *citing Christianson Dec.* Exs. A and B.

[90] *Gomberg Dec.*, ¶¶ 60; 141 (90.03% of Atlas customers lost money).

[91] *Gomberg Dec.*, ¶ 57, Ex 5 (Atlas brochure).

- "Would you like the potential to earn an annualized rate of return of 20% or more on your money?"
- "Since you're looking for short term profit, but with defined risk, I think you're going to love the proposal I have for you."[92]

These claims are false and misleading because Monex knows that leveraged Atlas customers rarely make money. Many customers report that they initially opened accounts with Monex because of the perceived security of investments in physical precious metals. However, Monex then pushed these customers into the much more risky Atlas program, never disclosing the poor performance of other customers in the program.[93]

### 2. Monex Account Reps Verbally Deceive Customers

Monex operates a telephone sales boiler room, and what Monex account representatives tell customers on the phone goes far further than Monex's written sales materials. On unrecorded sales calls,[94] Monex's representatives systematically tell customers that the Atlas Account is a low-risk or no-risk investment with good opportunities to profit. Yvonna Golla, a Polish immigrant with limited English skills and no investment experience, was tricked by Monex into investing part of the life insurance proceeds she received from the U.S. military after the death of her son in Iraq. Her Monex account representative told her that her money would be "safe and secure" and that she would "definitely make a profit."[95] She was instead devastated by losing approximately $159,000 out of the $173,500 she initially invested.

Elisa Pugliese, who lost a substantial part of her life savings with Monex, invested after her account representative told her that the Atlas Account was "safe and secure" and as "safe as

---

[92] *Gomberg Dec.*, ¶¶ 72-75, *citing* Ex. 28 (Monex "Blueprint for Success").

[93] *See Bar Dec.*, *Cotton Dec.*, *Golla Dec.*, *Hadden Dec.*, *Mustazza Dec.*, *Pugliese Dec.*

[94] Monex does not record its account representatives' phone calls with customers although it has the ability to do so. Monex does record the portions of customer phone calls in which a customer authorizes the placement of a trade.

[95] *Golla Dec.*, ¶¶ 14-18.

having my money in a savings account."  Ms. Pugliese's account representative said she was "buying a share of a gold or silver bar" and, echoing Monex's marketing materials, that Pugliese could not lose her investment because gold would always be worth something.[96]

Person Cotton and his wife, retirees living in rural Texas, lost all their retirement savings investing with Monex.  Their Monex account representative said that since the Cottons were buying "real metal," they "would always own that metal" and "the metal would 'always be worth something'" and therefore the account could "never go to zero."  Monex told Mr. Cotton that in the history of mankind, gold and silver were always valuable, and would continue to be – so if the price went down for a time, it wouldn't be a problem.[97]  Sales representatives fail to disclose the reality - that most leveraged Atlas customers lose money, and many customers lose their entire investment.  Sales representatives hide that the metals that customers supposedly "own" can be liquidated by Monex without notice.

Monex sales representatives also promise profits to prospective customers.  Ms. Pulgiese's account representative told her that she "would get 10% on top of her investment by the end of the year – if not more."[98]  Christine Mustazza, a single mother with no investment experience, lost approximately $150,000 after agreeing to let her account representative manage her account.[99]  Ms. Mustazza's account representative told her that he could generate profits in

---

[96] *Pugliese Dec*, ¶¶ 8, 10, 11, 38.

[97] *Cotton Dec.*, ¶¶ 14, 15, 27.  Similarly, Sheena Liu was assured by Monex that specific trades had no risk for her and that she would "never be forced to sell [her] metals."  *Liu Dec.,* ¶ 24; *see also Hadden Dec*., ¶¶ 12 and 14 (stating that sales representative provided assurances of safety and informed her that she could not lose more than a small amount of her investment); *Bar Dec*., ¶¶ 12, 15 and 21 (stating that account representative promoted Atlas Account as completely secure and low-risk).

[98] *Pugliese Dec.* ¶¶ 10, 12.

[99] *Mustazza Dec.*  ¶¶ 21, 34, 38.

her account and help her make up losses if he actively traded for her.[100]  After being promised

security and profits, customers are invariably shocked when they receive margin calls or their

positions are force-liquidated.

Customers describe Monex account representatives using high-pressure sales tactics,

pressuring them to buy and sell frequently and to make decisions quickly.[101]  When customers do

agree to trades, they often only do so in reliance on a salesperson's representation that he or she

will closely monitor and manage the account, is acting in their best interests, and/or or is the

customer's "fiduciary."[102]  Monex specifically trains its representatives to overcome hesitancy by

falsely telling customers that they are their "fiduciaries" and will act in their best interests.[103]

When customers complain, they are informed that Monex is not liable for their losses

because Atlas Accounts are "self-directed," Monex is not the customer's account manager or

---

[100] *Id.* ¶¶ 21, 34, 38, 42.  *See also Bar Dec.*, ¶ 12 (account representative promised that the price of gold would rise).

[101] *See, e.g.*, *Pugliese Dec.*, ¶ 17 (stating she was pressured to buy and sell frequently despite informing the account representative she was not interested in frequent trading); *McLaughlin Dec.*, ¶ 22 (stating he felt pressured to make trades immediately and was rushed into decisions); *Cotton Dec.*, ¶ 23 (account representative "would often call and demand to speak with us on an urgent basis, and would say things like 'We need to sell now, or else we'll have a big loss! Or 'We need to buy right away or we'll miss a big opportunity!").

[102] *See, e.g.*, *Cotton Dec.*, ¶¶ 13-14 (account representative told him that he "didn't have to worry" about losing his nest egg since Monex would be closely monitoring the account and would be acting "like our trader or stockbroker"); *Mustazza Dec.*, ¶¶ 20-21, 27, 34, 38, 51 (stating that she relied upon representations from her account representative who portrayed himself as a trained professional and repeatedly told her to trust him because he had her best interests in mind and she would profit if she followed his advice); *Liu Dec.*, ¶¶ 10 and 20 (stating that she agreed to proposed trades in reliance upon the representations of a Monex sales person who portrayed himself as a professional supported by experts who was acting in her best interests); *McLaughlin Dec.* ¶¶ 16 and 19 (stating that he only agreed to trade using leverage based upon the sales person's representations that he was an expert acting in McLaughlin's best interests).

[103] *Gomberg Dec.*, ¶¶ 76-79, Ex. 29 (Monex Training Transcript), pgs. 14-16 ("Or I might even use the analogy where if you go to your lawyer and you hold back any information, what is he going to tell you? […] We have that same kind of fiduciary relationship, a relationship of trust, okay.  And I do want to help you. And, again, everything that I do -- and I tell them this on a pretty consistent basis, that everything that I do will always be in your best interests, and I mean that."); Ex. 30 (Monex Training Transcript), pgs. 35-36 (To a prospect: "my job is to do the best that I can and do what's in the best interests of the people that I talk to.").

fiduciary, and Monex possesses recordings of the customer agreeing to execute the trades.[104]
Monex's senior management is often involved with customer complaints and is therefore well-aware of the misrepresentations and omissions made by account representatives and the substantial losses suffered by customers who rely upon them.[105]

Finally, on many occasions, account representatives enter leveraged trades for customers despite a customer's clear instruction that they are not interested in leveraged trading,[106] or use customer funds without the customer's authorization.[107] When customers learn of the losses in their account, they are surprised to learn that trades are made using leverage, instead believing that they own physical metal being stored in a Monex depository.[108]

All of these misstatements and omissions are material. "A statement or omitted fact is material if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *R&W Technical Serv. Ltd. v. CFTC*, 205 F.3d 165, 169 (5th Cir. 2000) (footnote omitted); *see also R.J. Fitzgerald & Co.*, 310 F.3d at 1328-29. Before investing, Monex Atlas customers would want to know that most Atlas customers lose money and that the structure of the Atlas platform makes it highly unlikely they will profit. Customers would want to know that leveraged metals trading on the Atlas platform is not a secure way to preserve value, is not as safe as holding funds in a bank account, and that

---

[104] *See, e.g.*, *Golla Dec.* ¶ 37; *Bar* Dec., ¶ 33.

[105] *See, e.g.*, *Pugliese Dec.*, ¶¶ 30 and 39; *Liu* ¶¶ 42-51.

[106] *See, e.g.*, *Liu Dec.*, ¶ 10; *Golla Dec.*, ¶¶ 24 and 28.

[107] *See, e.g.*, *Capello Dec.*, ¶¶ 13-15; 18 (stating that she only approved the use of a small portion of her investment for leveraged trading).

[108] *See, e.g.*, *Cotton Dec.*, ¶ 26 (stating that until he received a call informing him that he had nothing left in his account, be believed that he owned physical metal that was being stored at a Monex depository); *Golla Dec.*, ¶ 35 (stating that she did not understand how her account could be "low" or she could "owe" Monex when she was simply storing gold); *Bar Dec.*, ¶¶ 34-35 (stating that she believed that she owned physical gold until a few days before receiving a margin call).

they can lose their entire investment. *See, e.g., CFTC v. Lake Shore Asset Mgmt. Ltd.*, 2008 WL 1883308, at *8 (N.D. Ill. Apr. 24, 2008) ("misrepresentations or omissions about experience, historical success, and profitability are material and may constitute fraud."); *Hunter Wise Commodities*, 21 F. Supp. 3d at 1345-46 ("A potential retail customer would find it to be a material fact that almost all of Hunter Wise's customers lost money."); *CFTC v. Commonwealth Fin. Grp., Inc.*, 874 F. Supp. 1345, 1357 at n.10 (S.D. Fla. 1994) ("It amounts to a misrepresentation when salespeople emphasize the profits enjoyed by customers without mentioning any of the losses.").[109]

### 3. Monex Incentivizes its Sales Force to Lure Customers Into the Atlas Program

It is no accident that many Monex customers who initially look to Monex to buy gold or silver coins or bullion end up engaging in high risk, leveraged commodity trading. Monex trains and incentivizes its representatives to push customers to open Atlas trading accounts, and to engage in frequent, large trades. Monex tells its newly hired account representatives that a fundamental "key to success" is "to build a large book of clients that trade metals."[110] Monex tells new hires that their six-month goal should be "25 Leveraged Accounts and a book of $1 million," and their one-year goal should be "50 leveraged accounts and a book of $2 million."

---

[109] Monex may claim that it is free from liability for fraud because it disclosed certain risks of leveraged precious metals investing in its account agreements and in taped compliance calls. Such boilerplate disclosures cannot nullify Monex's fraud. *See, e.g. JCC, Inc. v. CFTC*, 63 F.3d 1557, 1568-70 (11th Cir. 1995) (one "cannot use the customer agreement as a contractual shield against valid federal regulation and liability for violation of such regulation, or as an 'advance exoneration of contemplated fraudulent conduct.'"), *quoting Myron v. Hauser*, 673 F.2d 994, 1007 (8th Cir. 1982); *CFTC v. Sidoti*, 178 F.3d 1132, 1136 (11th Cir. 1999) ("we seriously doubt whether boilerplate risk disclosure language could ever render an earlier material misrepresentation immaterial."); *Clayton Brokerage Co. v. CFTC*, 794 F.2d 573, 580-81 (11th Cir. 1986) ("[P]resentation of the risk disclosure statement does not relieve a broker of any obligation under the CEA to disclose all material information about risk to customers."). *C.f. R.J. Fitzgerald & Co., Inc.*, 310 F.3d at 1329-1330 ("[T]he fact that the [T.V. commercial] had a general risk disclosure statement does not automatically preclude liability under the CEA where the overall message is clearly and objectively misleading or deceptive.").

[110] *Gomberg Dec.*, ¶ 67, Ex. 26 (Account Representative Team Leader Training File), at pg. 3.

Trainees are encouraged to "Raise Money!" to "Have a sense of URGENCY," and to "Ask for the order on every call."[111] Monex's compensation structure reinforces this basic message - account representatives make more money if they get customers to open and place leveraged trades in Atlas accounts.[112]

Monex incentivizes account representatives to push customers to execute leveraged metals trades in several ways. First, Monex representatives receive more "leads" if they open and execute more trades in leveraged Atlas accounts.[113] The more leveraged Atlas transactions, the better the opportunity to get "leads" to open new accounts, generate additional trades and make money. The second major incentive is obvious: compensation. Apart from a training period, Monex account representatives do not receive a salary.[114] Their compensation is based on commissions along with a percentage of the revenue Monex makes on customer transactions. They make more money when their customers execute leveraged Atlas transactions.[115] Monex also periodically provides other "bonus" and incentive opportunities to encourage the opening and trading of leveraged Atlas accounts and transactions.[116]

The end result is that Monex has deceived thousands of retail investors into highly risky leveraged commodity trading where Monex is able to funnel their money into Monex's own bank accounts. Monex is defrauding retail investors across the country on a massive scale in violation of the U.S. Commodity Exchange Act.

---

[111] *Gomberg Dec.*, ¶ 67, Ex. 26 (Account Representative Team Leader Training File), at pg. 3.

[112] *See Gomberg Dec.*, ¶¶ 68-71, Exs. 17, 27 (Monex Compensation Policy and Bonus Memo).

[113] *Gomberg Dec.*, ¶ 68, Ex. 17, § 19.0 (Lead Allocation policy stating "3 points more for each that are Financed or Commodity Loan Transactions").

[114] *L. Carabini Trans.*, at pgs. 65-66.

[115] *Gomberg Dec.*, ¶ 69, Ex. 17, § 18.0 (Commission Plan). *See also Maroney Trans.*, at pg. 90-91.

[116] *Gomberg Dec.*, ¶ 71, Ex. 27 (February 7, 2014 Sales Memorandum offering cash bonuses for new financed customers).

## V. __CONCLUSION__

The evidence described in this motion and contained in the supporting Appendix shows past and ongoing violations of the Commodity Exchange Act. Monex is engaging in (1) illegal off-exchange retail commodity transactions, and (2) fraud. There is no dispute that Monex is not conducting its leveraged retail commodity transactions on a regulated exchange, and Monex will continue to do so unless enjoined by the Court. While there is substantial evidence of fraud, the illegality of Monex's leveraged retail commodity transactions alone is sufficient to warrant a preliminary injunction. *CFTC v. British Am. Commodity Options Corp.*, 560 F.2d 135, 142 (2d Cir. 1977) ("The district court erred in concluding that the 'mere' continuation of the proscribed activities is not the necessary repetition of a wrong to warrant the injunction unless there is, in addition, proof of fraud or misconduct.").

Absent an injunction, Monex will continue to offer customers off-exchange leveraged Atlas commodity trading, and it will continue to fraudulently induce retail customers into entering its Atlas trap. Monex has shown no indication that it intends to cease offering and executing retail commodity transactions despite being well aware of the CFTC's years-long investigation. Instead, between October 2016 and February 2017 (which represents the most recent data Monex produced), Monex added 355 new leveraged Atlas accounts.[117]

The CFTC moves this Court for a preliminary injunction pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), (1) prohibiting Monex from offering leveraged commodity trading during the pendency of the litigation, (2) appointing an independent monitor to assume control over Monex's leveraged Atlas trading platform, (3) freezing Monex's assets or otherwise requiring Monex to post bond in the approximate amount of customer losses from leveraged

---

[117] *Gomberg Dec.*, ¶ 156, Ex. 63 (Table H).

Atlas trading between July 16, 2011 and the present, and (4) otherwise preserving the *status quo* during the pendency of the litigation.

Date:  September 6, 2017                                    Respectfully submitted,

*Attorneys for Plaintiff*
*Commodity Futures Trading Commission*

*/s Carlin R. Metzger*
Carlin R. Metzger (cmetzger@cftc.gov)
Trial Attorney

Michael D. Frisch (mfrisch@cftc.gov)
Trial Attorney

Eric L. Schleef (eschleef@cftc.gov)
Trial Attorney

Joseph A. Konizeski (jkonizeski@cftc.gov)
Chief Trial Attorney

Scott R. Williamson
(swilliamson@cftc.gov)
Deputy Regional Counsel

Rosemary Hollinger (rhollinger@cftc.gov)
Deputy Director

Commodity Futures Trading Commission
525 West Monroe Street, Suite 1100
Chicago, Illinois 60661
(312) 596-0536 (Metzger)
(312) 596-0700 (main office number)
(312) 596-0714 (facsimile)