# Exhibit 1
# Declaration of Jeffrey Gomberg

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

<u>**DECLARATION OF CFTC SENIOR INVESTIGATOR JEFFREY GOMBERG**</u>
<u>**PURSUANT TO 28 U.S.C. § 1746**</u>

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

## **TABLE OF CONTENTS**

**I.**    **An Overview of Monex**
    **A.**    Monex Corporate Structure
    **B.**    Michael and Louis Carabini Ownership and Control Over Monex
    **C.**    Monex's Corporate and Regulatory History
    **D.**    Customer Complaints and Legal Actions Against Monex

**II.**    **The Monex Atlas Trading Account**
    **A.**    Structure of the Atlas Transaction
    **B.**    The Atlas Account Agreement
    **C.**    Monex's "Commodity Title Transfer Notice"
    **D.**    Monex's "Auto-Force-Sell" System

**III.**    **Monex's Promotion of Leveraged Atlas Trading**
    **A.**    Monex and Atlas Account Advertising
    **B.**    Account Representative Training and Incentives

**IV.**    **Monex's Inventory and Financing Structure**
    **A.**    The Concord Trust and Scala Trust
    **B.**    Bank Financing
    **C.**    Monex's Contracts With Its Depositories

**V.**    **Monex's Data Management System**

**VI.**    **The CFTC's Review and Summary of the Data Produced by Monex**
    **A.**    The CFTC's Collection and Review of the Data
    **B.**    Atlas Account Statistics
    **C.**    Atlas Customer Profit and Loss
    **D.**    Impact of Monex Price Spread
    **E.**    Monex's Revenue
    **F.**    Monex's Ongoing Conduct

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

**<u>TABLE OF EXHIBITS</u>**

| Exhibit | Description |
|---------|-------------|
| 1 | Monex Management Presentation (May 14, 2014) |
| 2 | March 26, 2013 Private Placement Memorandum for Concord Funding Company, L.L.C. |
| 3 | California Secretary of State Records for Monex Deposit Company |
| 4 | California Secretary of State Records for Monex Credit Company |
| 5 | California Secretary of State Records for Newport Services Corporation |
| 6 | December 22, 2016 Private Placement Memorandum for Scala Funding Company, L.L.C. |
| 7 | Signature Cards for Monex and Affiliate Bank Accounts |
| 8 | 2014 California Telephonic Seller Registration Application Form |
| 9 | NFA Basic Records for Monex International, Ltd. |
| 10 | NFA Basic Records for Monex Trading Corporation |
| 11 | *SEC v. Monex International LTD and Louis E. Carabini, Jr.*, 1975 U.S. Dist. LEXIS 16495, No. CV 74-3634-HF, Final Judgment of Permanent Injunction (C.D. Cal., Aug. 20, 1975) |
| 12 | *State of New York v. Monex International, LTD. and Louis E. Carabini*, No. 41439/74, Order of Permanent Injunction (Supreme Court, New York Cty., May 1, 1979) |
| 13 | Monex Atlas Account Brochure |
| 14 | Monex Atlas Account Agreements |
| 15 | Monex List of Margin Requirements (Revised 12/09/15) |
| 16 | Monex Description of Financing Structure dated October 7, 2011 |
| 17 | Monex Account Representative Desktop Guide |
| 18 | Monex Trade Ticket Guide for Shorts and Cross Hedges |
| 19 | Monex Leveraged Trade Ticket Instructions and Sample |
| 20 | Monex Atlas Compliance Manual |
| 21 | Sample Commodity Title Transfer Notice |
| 22 | May 2, 2016 Monex-BNY-Brink's Storage Agreement |
| 23 | June 29, 2009 Monex-Bank of New York-DDSC Concord Depository Agreement |
| 24 | *Federal Trade Commission v. Unimet Credit Corp., et al.*, Civ. No. 92-5759 RSWL, Final Judgment and Consent Order (C.D. Cal. Dec. 20, 1994) |
| 25 | MCC Historical Loan Performance Summary (Oct. 7, 2011) |
| 26 | Training File for Account Representative Team Leader Sean Brazney |
| 27 | February 7, 2014 Sales Memorandum |
| 28 | Monex "Blueprint for Success" Sales Training Guide |
| 29 | Transcript of Monex Sales Training Video (1) |
| 30 | Transcript of Monex Sales Training Video (2) |
| 31 | Concord Amended and Restated Servicing Agreement (July 12, 2012) |
| 32 | Oct. 21, 2011 e-mail from M. Carabini to B. Jenkins (Monex CFO) re: Atlas operations |
| 33 | Oct. 27, 2011 e-mail from B. Jenkins to Goldman Sachs re: Atlas operations |

3

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

| 34 | July 18, 2011 e-mail from C. Flannery (Piper Jaffray) to B. Jenkins re: Monex/Concord |
|----|-----------------------------------------------------------------------------------------|
| 35 | Scala Closing Memorandum |
| 36 | April 20, 2012 Monex-Wells Fargo Credit Agreement |
| 37 | April 20, 2012 Monex-Wells Fargo-DDSC Depository Agreement |
| 38 | F&M September 3, 2013 Monex Loan Approval Memo |
| 39 | F&M Loan Approval File |
| 40 | Nov. 21, 2012 Monex-Farmers Loan Security Agreement |
| 41 | June 17, 2016 Memo re: Commodity Audit of Monex Collateral as of May 31, 2016 |
| 42 | Monex Account Representative Guide — Listing of Banks and Depositories |
| 43 | June 18, 2001 Monex-DDSC Depository Agreement with 2013 Addendum |
| 44 | September 6, 1985 Monex-F&M Depository Agreement |
| 45 | June 19, 2013 Monex-F&M Depository and Safekeeping Agreement |
| 46 | July 31, 2014 Monex-Brink's Storage Agreement |
| 47 | February 16, 2015 Monex-Brink's Storage Agreement |
| 48 | May 2, 2016 Monex-BNY-Brink's Storage Agreement |
| 49 | 2011 Description of Monex Operations |
| 50 | Sample Monthly Customer Account Statement |
| 51 | Sample Trade Confirmation |
| 52 | Sample End-of Year Customer Account Summary |
| 53 | Sample Customer Position Report (R017) |
| 54 | Sample Position Report Summary (R015) |
| 55 | Sample Customer Unrealized Loss Report (R495) |
| 56 | Sample Equity Calls Report (R715) |
| 57 | Sample Margin Call report (R723) |
| 58 | Sample Forced Liquidations Report (R722) |
| 59 | Sample Monthly Customer Index Report For Month End (R493) |
| 60 | Sample Customer Market Value Report For Month End (R494) |
| 61 | Sample Sales Rep "Awards Report" (R162) |
| 62 | Sample MTD Account Representative Production Report (R477M) |
| 63 | Monex Data Summaries (Group Exhibit) |

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

I, Jeffrey Gomberg, hereby make the following declaration based upon my personal knowledge:

1.      I am employed with the Commodity Futures Trading Commission ("CFTC") as a Senior Futures Trading Investigator in the Division of Enforcement.  I have worked as an investigator for the CFTC since July 2015.

2.      My job is to conduct investigations to determine whether there have been violations of the United States Commodity Exchange Act and CFTC regulations.  In conducting these investigations, I review and analyze financial records, trading statements, and other related documents.  I often also collect and analyze data associated with trading activity.

3.      I am a Certified Fraud Examiner and member of the Association of Certified Fraud Examiners.

4.      Prior to joining the CFTC, I worked as a futures trader, market maker, and software developer for several proprietary trading firms.  I hold a Bachelor's Degree in Computer Engineering and a Master's Degree in Electrical Engineering from the University of Illinois at Urbana-Champaign.

5.      I was assigned to the investigation of Monex in July 2015.[1]  Among other tasks, during the course of the investigation, I have:

      a.   Reviewed and summarized voluminous customer transactional data provided to the CFTC by Monex;

      b.   Reviewed transcripts of investigative testimony of Monex employees and third party witnesses taken during the course of the investigation;

      c.   Reviewed documents produced by Monex to the CFTC including internal reports,

---

[1] In this declaration I use the term Monex to include Monex and its various affiliates I will describe more fully below.

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

promotional materials, training documents, customer account statements, financial

statements, accounting records, corporate formation and organizational

documents, correspondence, emails, and other company documents;

d.   Reviewed Monex's website, www.monex.com;

e.   Reviewed records provided to the CFTC by third parties including the California

Secretary of State, the National Futures Association, the Federal Trade

Commission and the California Office of the Attorney General, and numerous

other entities and individuals;

f.   Reviewed certain of Monex's bank and trading records;

g.   Reviewed certain of Monex's depository agreements;

h.   Reviewed the complaints of numerous current and former customers of Monex;

i.   Participated in interviews of retail customers who invested with Monex; and

j.   Reviewed documents provided to the CFTC by retail customers who invested

with Monex.

6.      In this declaration, I will describe the structure and operations of Monex and its

Atlas trading platform, and will provide a summary of certain portions of the customer

transaction data that Monex produced.

**I.      <u>An Overview of Monex</u>**

7.      Monex claims that it is the largest retail dealer of precious metals in the United

States, claiming that it has executed over $40 billion in trades for its customers.[2]  By volume of

transactions, more than 75% of Monex's business involves the purchase or sale of physical

---

[2] *See* Exhibit 1, Monex Management Presentation (May 14, 2014), at pg. 3.

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

metals such as coins and bars, where the metals are delivered to the customer after full payment is made (the "fully paid" business).[3] This aspect of Monex's business was not the subject of the investigation.

8.      Instead, the investigation concerned the leveraged commodity trading platform Monex operates, which it calls its Atlas program.  Under the terms of the Atlas program, a retail customer enters into the purported financed purchase or sale of physical precious metals with Monex.  The size of this trading platform is substantial.  As I detail below, between July 16, 2011 and the present, more than 12,000 Atlas customer accounts engaged in leveraged commodity trading.  From July 16, 2011 to March 31, 2017 (the "review period") Monex executed more than 140,000 trades for the customer accounts engaging in leveraged precious metals trading through Monex's Atlas program.

### A.  Monex Corporate Structure

9.      I reviewed corporate documentation relating to Monex and its affiliates during the investigation.  This is a brief summary of the corporate organization of Monex and its affiliates.

10.     Monex Deposit Company ("MDC") and Monex Credit Company ("MCC") are California limited partnerships organized in 1987.  Newport Service Corporation ("Newport") is a California corporation formed in 1987.[4]  All three entities operate from the same building at 4910 Birch Street, Newport Beach, California.  *Id.*  I refer to these three entities collectively as

---

[3] *See, e.g.* Exhibit 2, March 26, 2013 Private Placement Memorandum for Concord Funding Company, L.L.C. ("2013 Concord PPM"), at pg. 25 (indicating that historically, approximately 75% of Monex's customers purchase metals on a fully-paid basis without utilizing credit).  As I explain below, the Concord Funding Company, L.L.C. is an investment vehicle organized in order to provide financing for Monex's business operations.  In December 2016, the Concord Funding Company L.L.C. financing vehicle was replaced with a similar company, called Scala Funding Company, L.L.C.

[4] Exhibits 3 - 5, California Secretary of State Records for Defendants MDC, MCC, and Newport.

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

"Monex" throughout this declaration.

11.    Monex describes the role of each of these three entities as follows: MDC is the counterparty to its customers, selling metals to and buying metals from customers; MCC provides the financing in connection with these transactions; and Newport provides administrative services such as accounting and payroll for the various Monex entities and affiliates.[5]

### B. Michael and Louis Carabini Ownership of and Control Over Monex

12.    According to corporate records, the Monex entities are commonly owned and controlled by Michael Carabini and his father Louis Carabini through various corporate entities and trusts.

13.    Michael Carabini is the President of Newport Services Corporation and describes his role as the "operational overseer of Monex Deposit Company and Monex Credit Company and its affiliated companies."[6]

14.    MCC is 80.6% owned by two trusts (Lemonwood Investments and Amberwood Investments) that are "personal, family trusts of Michael A. Carabini and his wife," and Michael A. Carabini is the trustee and a beneficiary of both trusts.[7]  Michael Carabini also owns 5% of MCC directly.  *Id.*  The general partner of MCC is Metco Management Corporation, a California Sub-S corporation, which also owns 11% of MCC.  *Id.*  Metco Management Corporation is

---

[5] *See* Exhibit 2, 2013 Concord PPM, at pgs. 24-28.  *See also* Exhibit 1, Monex Management Presentation (May 14, 2014) (providing an overview of the corporate organization of Monex).

[6] *See* Excerpts of Investigative Testimony of Michael Carabini, at pg. 7.

[7] *See,* Exhibit 6, December 22, 2016 Private Placement Memorandum for Scala Funding Company, L.L.C. ("2016 Scala PPM"), at pg. 26.  *See also See* excerpts of Investigative Testimony of Michael Carabini, at pgs. 15-16.

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

100% owned by Madison Investments, another trust controlled by Michael Carabini.  *Id.*[8]

15.     The ownership of MDC follows a similar structure.  MDC is 80.6% owned by Montgomery Trust and Emerson Trust, both of which are "personal, family trusts of Michael A. Carabini and his wife," for which Michael Carabini is the trustee.  *Id.*  Michael Carabini also owns 11% of MDC directly.  *Id.*  The general partner of MDC is Comco Management Corporation, a California Sub-S corporation that is 100% owned by Madison Investments.  *Id.*

16.     Louis Carabini is the President of Comco Management Corporation and signs agreements on behalf of Comco.[9]  Michael Carabini is the President of Metco Management Corporation and signs agreements on behalf of Metco.[10]

17.      Michael Carabini is a signatory on all of the Monex (and affiliates) bank and other financial accounts.  Louis Carabini is a signatory on most accounts.[11]

18.     In addition, in applications filed by Monex with the State of California to register as a telemarketing firm, Louis Carabini signed the applications and described himself as being "in charge" of Monex.[12]

### C.  Monex's Corporate and Regulatory History

19.     Louis Carabini founded the predecessor to what is now Monex in 1967.[13]  This company, Pacific Coast Coin Exchange, Ltd., was later renamed Monex International, Ltd.  *Id.*

---

[8] *See also* excerpts of Investigative Testimony of Michael Carabini, at pg. 20 (indicating that Michael Carabini is the trustee of Madison Investments).

[9] *See* Excerpts of Investigative Testimony of Michael Carabini, at pgs. 9-10.

[10] *See* Excerpts of Investigative Testimony of Michael Carabini, at pg. 15.

[11] Michael and/or Louis Carabini are signers on numerous Monex-related financial accounts.  *See* Group Exhibit 7 (signature cards for Monex and affiliate bank accounts).

[12] *See, e.g.* Exhibit 8, 2014 California Telephonic Seller Registration Application Form, at pg. 7.

[13] Exhibit 6, 2016 Scala PPM, at pg. 23.

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

In 1971, Monex International, Ltd. began offering leveraged metals transactions to customers. *Id.*

20.     I accessed records concerning the CFTC registration history of Monex-related companies via the National Futures Association ("NFA") public registrations database, called the "BASIC" system. Monex International, Ltd. (which was, as Monex is now, located at 4910 Birch Street in Newport Beach) was registered with the CFTC as a Leverage Transaction Merchant between 1985 and 1991.[14] It was registered as a Commodity Trading Advisor between 1986 and 1991. *Id.* According to NFA records, Monex International, Ltd. was the subject of 213 CFTC reparations cases and 1 CFTC enforcement action. *Id.* Monex International, Ltd. is no longer operating.

21.     Monex Trading Corporation (which was also located at 4910 Birch Street in Newport Beach) was registered with the CFTC as a Futures Commission Merchant between 1982 and 1991.[15] Per NFA records, Monex Trading Corporation was the subject of 37 CFTC reparations cases and 1 NFA arbitration action. *Id.* Monex Trading Corporation is no longer operating.

22.     The currently-operating Monex entities are not, and have never been, registered with the CFTC in any capacity.

23.     Louis Carabini and Monex-related entities have faced several regulatory actions in the past in which they were charged with defrauding customers in connection with leveraged precious metals investments.

24.     In 1974, the U.S. Securities and Exchange Commission filed an enforcement

[14] Exhibit 9, NFA Basic Records for Monex International, Ltd. (accessed 8/29/2017).

[15] Exhibit 10, NFA Basic Records for Monex Trading Corporation (accessed 8/29/2017).

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

action against Monex International, Ltd. and Louis Carabini, including charges of fraud. The case resulted in an order of permanent injunction against Monex International, Ltd. and Louis Carabini prohibiting them from engaging in misleading conduct in connection with leveraged precious metals transactions.[16]

25.     The State of New York sued Monex International, Ltd. and Louis Carabini in 1974. That action resulted in a settlement that included a permanent injunction that prohibited, among other things, Monex International, Ltd. and Carabini from defrauding customers in connection with precious metals.[17]

26.     In 1992, Louis Carabini and his companies Unimet Trading Corporation and Unimet Credit Corporation were charged with fraud by the Federal Trade Commission. The final judgment against the Unimet entities included a permanent injunction prohibiting them from "misrepresenting, directly or by implication":

   a.  . . . "the degree of risk associated with an investment in commodities,"
   b.  "the likelihood that a consumer would earn a profit on an investment in commodities," . . . "
   c.  the amount of the fees that a consumer would pay in order to acquire an interest in commodities financed by the defendants," . . . and
   d.  "any other fact objectively material to a consumer's decision to invest in a commodity or other investment offering."[18]

---

[16] *See* Exhibit 11, *SEC v. Monex International LTD and Louis E. Carabini, Jr.*, 1975 U.S. Dist. LEXIS 16495, No. CV 74-3634-HF, Final Judgment of Permanent Injunction (C.D. Cal., Aug. 20, 1975).

[17] Exhibit 12, *State of New York v. Monex International, LTD. and Louis E. Carabini*, No. 41439/74, Order of Permanent Injunction (Supreme Court, New York Cty., May 1, 1979).

[18] *See* Exhibit 24, *Federal Trade Commission v. Unimet Credit Corp., et al.*, Civ. No. 92-5759 RSWL, Final Judgment and Consent Order (C.D. Cal. Dec. 20, 1994).

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

### D. Customer Complaints and Legal Actions Against Monex

27.    As a part of the investigation I reviewed complaints filed by Monex customers in court and in arbitration actions against Monex.  I also reviewed complaints made by Monex customers to the Better Business Bureau and to regulatory agencies including the NFA and CFTC.

28.    I located at least 50 such complaints by customers against Monex.  I reviewed these complaints to assess the nature of the allegations.  I examined these complaints further to assess whether there was similarity in terms of how Monex customers described being defrauded by Monex.  Due to the significant number of complaints, I focused on those filed during the relevant period in this case (after July 16, 2011).  The complaints made by customers against Monex during this period included some or all of the following categories of conduct alleged to have been committed by Monex:

   a.   Representations concerning the profit potential of trading with leverage in a Monex Atlas account;

   b.   High pressure sales tactics urging an immediate investment or trade;

   c.   Statements downplaying risk;

   d.   Failure to adequately disclose the risk and mechanics of margin calls or forced liquidations;

   e.   Failure to adequately disclose the impact of the price spread, commissions and fees charged by Monex; and/or

   f.   Unauthorized trading.

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

## II.    **The Monex Atlas Trading Account**

### A.  **Structure of the Atlas Transaction**

29.      Monex offers financed trading of gold, silver, platinum and palladium to retail customers, primarily through what it calls the "Atlas" trading account.[19]  Monex's Atlas transactions are not conducted on a regulated exchange or board of trade.

30.      In order to trade on the platform, customers must deposit sufficient funds to serve as margin for their trading positions.[20]  Monex generally requires that customers deposit an initial margin of 22-25% of their open trading positions.[21]  Monex finances the balance of a customer's "purchase" (or short sale) through a loan, secured by the precious metals the customer purchased or sold.[22]  Thus, a customer's creditworthiness is never considered by Monex.[23]

31.      As in futures trading, Monex customers can place "long" or "short" trades.[24]  The long trades allow customers the ability to speculate on the price of a metal going up.  A short trade allows customers to speculate on falling metals prices.[25]  Also similar to trading on a

---

[19] *See, e.g.* Exhibit 13, Monex Atlas Account Brochure; Exhibit 14, Monex Atlas Account Agreements: (a) Purchase and Sale Agreement ("Trading Agreement"), and (b) Loan, Security and Storage Agreement ("Loan Agreement") (downloaded from www.monex.com on November 1, 2013) .

[20] *See, e.g.* Exhibit 13, Monex Atlas Account Brochure, at pg. 4 ("Currently, the Atlas Account allows you to put down as little as 25 percent of your purchase, giving you four-to-one investment leverage.").

[21] *Id.*, *see also* Exhibit 15, Monex List of Margin Requirements (Revised 12/09/2015) (reflecting applicable margin requirements for different commodities); Exhibit 1, Monex Management Presentation (May 14, 2014), at pg. 7 (same).

[22] *See* Exhibit 14, Monex Atlas Account Agreements, Loan Agreement, § 6.

[23] *See* Exhibit 16, Monex Description of Financing Structure dated October 7, 2011, at pg. 1 ("MCC's lending decision is based entirely on the value of the metal, ignoring the credit quality of the borrower.").

[24] *See, e.g.* Exhibit 17, Monex Account Representative Desktop Guide, § 6.0 (describing types of orders available on the Atlas platform).

[25] Monex calls its short positions "commodity loans."  *See, e.g.* Exhibit 14, Monex Atlas Account

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

futures exchange, Customers can also place "stop" or "limit" orders to manage their trading positions.[26]  Monex also allows customers to enter into what it describes as a "hedge," which is essentially concurrent long and short trading positions in the same (a "like-to-like hedge") or different (a "cross hedge") commodities.[27]

33.     Monex serves as the counterparty to every transaction.  All transactions are conducted at Monex defined "commercial prices" which Monex determines in its sole discretion.[28]  Monex frequently imposes a 3% spread between its bid and ask commercial prices. The midpoint between its bid and ask prices is referred to as "spot", which is published on the internet during regular business hours. *Id.*  I discuss the impact of this spread charge below.

33.     Monex monitors the "equity" in its customers' trading accounts, which is the market value of the customer's account minus the customer's outstanding loan balance.  A customer's account equity will fluctuate along with the movement of metals prices in an account's open trading positions, and are also impacted by interest charges and service fees.  If a customer's equity in his or her trading account declines to 14% of the account value (historically the minimum maintenance equity percent level), the customer will receive a margin call. Consequently, a customer must deposit additional funds into the trading account, or offset (part of) an open position to bring the equity in the account above the minimum maintenance equity

---

Agreements, Loan Agreement § 1 (allowing customers to borrow commodities); Exhibit 6, 2016 Scala PPM, at pg. 24 (describing "commodity loan positions" as instances when MCC "loans commodities to customers who want to take advantage of possible declines in precious metals prices.").

[26] Exhibit 17, Monex Account Representative Desktop Guide, § 6.0.

[27] Exhibit 17, Monex Account Representative Desktop Guide, § 2.1; Exhibit 18, Monex Trade Ticket Guide for Shorts and Cross Hedges.

[28] Exhibit 14, Monex Atlas Account Agreements, Trading Contract, § 8.

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

requirement.[29]

34.    If a customer fails to meet a margin call, trading positions are subject to what Monex calls "forced liquidation."  This means that the trading positions are liquidated without the customer having a say in the matter.[30]  If a customer's account equity at any time drops to 7%, trading positions are automatically force liquidated.[31]

35.    Monex accepts trading orders from customers by telephone.[32]  Sales representatives fill out trade tickets reflecting customer orders and provide them to the Monex Trading Department to enter the trade information into the Monex database.[33]  Monex executes the transaction by entering the trades into its database.  Monex confirms the execution of the transaction by sending the customer a trade confirmation.[34]

36.    Monex charges interest on its loans to customers – typically 5.9%.  Monex has discretion to change the interest rate it charges on its loans any time.[35]  Monex does not require Atlas customers to make periodic payments on the loans.  Instead, monthly interest charges and fees are deducted from customers' account equity each month and added to their loan balance.

---

[29] *See* Exhibit 14, Monex Atlas Account Agreements, Loan Agreement § 3; Exhibit 17, Monex Account Representative Desktop Guide, § 15.2 (discussing Equity Call Procedures).

[30] *Id.*

[31] *Id.  See also* Exhibit 1, Monex Management Presentation (May 14, 2014), at pg. 7 ("When a customer's equity falls below the maintenance requirement, they receive a margin call; When it falls below the forced sell level, the position is liquidated and proceeds used to pay off margin loan and pay expenses with remainder sent to customer.").

[32] Exhibit 17, Monex Account Representative Desktop Guide, § 5.0 ("Trade Desk Scripts").  *See generally* Customer Declarations (discussing placement of phone orders).

[33] *See, e.g.*, Exhibit 19, Monex Leveraged Trade Ticket Instructions and Sample.

[34] *See* Excerpts of Investigative Testimony of Darrell Hamilton, at pgs. 17-20.

[35] Exhibit 14, Monex Atlas Account Agreements, Loan Agreement § 1 ("MCC may change its interest rate at any time.").

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

37.     Monex does not deliver any metals to Atlas customers with leveraged trading positions unless and until the customer pays in full for the metals; instead, metals are stored in depositories under contracts with Monex as explained below.[36]  Monex clearly distinguishes in its records between "fully paid" purchases for home delivery or pick-up by the customer, and Atlas account transactions that do not result in delivery.

38.     On account statements, for example, Monex describes the "Transaction Type" of orders involving the delivery of metals as a "DELIVERY ORDER."  And when Monex ships the metals to the customer, it notes on the account statement that the metals have been "DELIVERED."

Figure 1

| DATE | TRANSACTION NUMBER | TRANSACTION TYPE | UNITS | DESCRIPTION |
|------|--------------------|-------------------|-------|-------------|
|  |  |  |  | BALANCE FORWARD |
|  |  |  |  | ACTIVITY DURING MONTH: |
| 03/07/12 | 314835 | DELIVERY ORDER | 1 | 10 1oz GOLD BUFFALOS |
| 03/12/12 | 314835 | DELIVERED | 1 | 10 1oz GOLD BUFFALOS |
| 03/31/12 |  |  |  | INT. & LEASE CHARGES |
| 03/31/12 |  |  |  | SERVICE FEE |

By contrast, if the transaction is an Atlas trade and does not involve delivery, the "Transaction Type" does not reflect the term "DELIVERY ORDER," or "DELIVERED," and instead includes a term such as "PURCHASED":

Figure 2

---

[36] *See* Exhibit 20, Monex Atlas Compliance Manual, at pg. 7 ("*Individual specific units of a commodity are not identifiable to a particular customer **unless and until actual delivery is made to him**.*") (emphasis added).

16

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

| DATE | TRANSACTION NUMBER | TRANSACTION TYPE | UNITS | DESCRIPTION |
|---|---|---|---|---|
| | | | | BALANCE FORWARD |
| | | | | ACTIVITY DURING MONTH: |
| 05/07/13 05/31/13 05/31/13 | 307181 | PURCHASED | 1 | 10 OUNCES GOLD INT. & LEASE CHARGES SERVICE FEE |

39.    On trade tickets[37] there are specific "instruction codes" for "CASH DELIVERY"

and "PICK-UP" transactions as opposed to Atlas transactions involving "CREDIT."

Figure 3



**B.  The Atlas Account Agreement**

40.    Monex requires its Atlas customers to sign and return an Atlas Account

Agreement.  The Atlas Account Agreement includes what Monex calls a "Purchase and Sale"

agreement and a "Loan, Security and Storage" agreement.[38]

---

[37] Exhibit 19, Monex Leveraged Trade Ticket Instructions and Sample.

[38] Exhibit 14, Monex Atlas Account Agreements: (a) Purchase and Sale Agreement ("Trading Agreement"), and (b) Loan, Security and Storage Agreement ("Loan Agreement") (downloaded from www.monex.com on November 1, 2013).

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

### C.  Monex's "Commodity Title Transfer Notice"

41.  Monex generates what it calls "Commodity Title Transfer Notices" (otherwise known as "CTTNs") following the execution of customer trades.[39]

42.  On their face, Monex's CTTNs explicitly state they are "Non-negotiable." *Id.* The fine print "terms and conditions" on the CTTNs also say that the depository (the "Custodian" in the phrasing of the CTTN) "is authorized to transfer or deliver the described commodities to [Monex] upon receipt by Custodian of written or oral instructions from [Monex] without surrender of this statement and upon so doing, Custodian is free of all liability to you or other parties." *Id.*

43.  The CTTN further states that "you shall not grant a security interest or other right in or otherwise pledge any commodities held by Custodian to any party other than [Monex] or Custodian, and Custodian will not recognize any such interest, right or pledge." *Id.*

44.  Monex does not send these CTTNs directly to its customers.  Instead, Monex generates and prints out the CTTN, and sends them to one of its three depositories (DDSC, Farmers or Brink's) to then mail to Monex's customer.[40]

45.  While it is the depositories that mail the CTTNs to Monex's Atlas customers, Monex handles every other aspect of the transaction.  Monex generates these documents.  Monex sends these documents to the depositories.[41]  Monex provides the transaction data that appears on these documents.  The depositories are reliant on Monex for the accuracy of the information on

---

[39] *See* Exhibit 21, Sample CTTN.

[40] *See* Excerpts of Investigative Testimony of Louis Carabini, at pgs. 178-179; Excerpts of Investigative Testimony of Richard Lotti (Brink's), at pgs. 13-14.

[41] *Id.*

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

the CTTN and specifically disavow its accuracy.[42]  Even the telephone contact information on

each of the CTTNs directs any questions or comments to Monex, not to the depository.[43]

### D.  Monex's "Auto-Force-Sell" System

46.      Monex has implemented what it calls a proprietary "Auto-Force-Sell System" that

automatically liquidates customer trading positions as soon as their account equity falls below

half of Monex's minimum margin requirements.[44]  Monex can change the level at which it force

liquidates customer positions at any time, in its sole discretion.[45]

47.      Monex describes its Auto-Force-Sell System for purchasers of the notes issued in

connection with the Concord and Scala Funding vehicles:

> "MCC's proprietary Auto-Force-Sell System converts loan information into sell
> orders on a batch basis, enabling MCC to liquidate its portfolio on a pool-wide
> basis, rather than a loan-by-loan basis.  The system processes current price
> information and reports by product the amount of metals that need to be sold due
> to account equities falling below the foreclosure level.  Once the metals are sold,
> the system applies the proceeds to accounts in ascending order, beginning with
> the account with the lowest level of relative equity."[46]

48.      This feature of Monex's system allows Monex to sell the metals supposedly

---

[42] Exhibit 22, May 2, 2016 Monex-BNY-Brink's Storage Agreement, ¶ 5 ("Brink's has no obligation, liability or responsibility for the accuracy of any written allocation reports that it receives …"); Exhibit 23, June 29, 2009 Monex-Bank of New York-DDSC Concord Depository Agreement, ¶ 4.3 (DDSC entitled to rely on accuracy of allocation report transmitted by Monex); *see also* Excerpts of Investigative Testimony of John Potts (Delaware Depository), at pg. 46; *see also* Excerpts of Investigative Testimony of Richard Lotti (Brink's), at pgs. 21-27; 40 ("Q: [I]s Brink's always relying on Monex in the context of these title transfer notices for the accuracy of the information contained in them? A: Yes.").

[43] The CTTNs for each of the depositories used by Monex for Atlas transactions say: "You may request the current status of our custody of your commodities at any time by faxing a copy of the front of this notice to 949-261-5363."  This is Monex's number in Newport Beach, California.

[44] The minimum margin requirement is generally 14% (the margin call level) and half that is 7% (the forced liquidation level).

[45] Exhibit 14, Monex Atlas Account Agreements, Loan Agreement §§ 3, 11.

[46] Exhibit 2, 2013 Concord PPM, at pgs. 26-27.  *See also* Exhibit 6, 2016 Scala PPM, at pg. 25 (same).

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

owned by customers automatically when metals prices drop and margined customers' account equity dips below Monex's threshold.

49.     Monex advertises its ability to automatically force liquidate its customers' trading positions to the banks providing it with financing.  For example, Monex has a $50 million line of credit with its bank Farmers and Merchants Bank.  In the bank's 2013 loan renewal file, the bank made a special note about Monex's Auto-Force-Sell-System.  The bank wrote:

> "Irrespective of a collateral call, if at any moment, the customer's equity falls below half of the minimum 14% required level, which is the 7% foreclosure level, MCC sells, without customer notification, metal securing the loan to raise the equity above initial equity level. . . . According to Mr. Carabini, their computer system "Auto-Force-Sell" application will do portfolio-wide batch foreclosures within a minute.  He indicated that although there is no limit to the number of accounts that the computer can execute, it is generally few because of the equity percent stratification of individual investor self-directed accounts and the Force-Sell application is run constantly as prices change.  On April 15th of this year there was a sharp drop in the price of gold and other precious metals.  Mr. Carabini indicated that Monex Credit Company was forced to execute a margin call on many of the Atlas contracts and the volume on that one day exceeded what a whole month of margin calls had been in the past.  He indicated that everything went very smoothly and they did not have any negative equity on any of the sold out contracts.  He said this was a real test of their systems and everything went fine."[47]

50.     Monex also advertises its Auto-Force-Sell application to investors in its Concord and Scala financing vehicles.  For example, in an August 18, 2011 email from Michael Carabini to Chris Flannery (an executive with the investment bank hired to market Concord), Carabini wrote:

> "When a Monex customer's equity position falls below the forced sell level (currently 7% for all four metals but no less than 6% per the Concord Funding Note documents), ***whether this is at market open or at any other time during the trading day, that customer's account is automatically liquidated***.  For more than

---

[47] *See* Exhibit 24, F&M September 3, 2013 Monex Loan Approval Memo, at pgs. 2-3.

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

six months, Monex has been using only their "Auto-Force-Sell System" batched portfolio-wide application, because it has proved to be more consistent and efficient (requiring no work by account rep) than the semi-automatic approach using an account rep to call to confirm orders. ***This system, which converts loan and price information into sell orders on a batch basis, enables Monex to liquidate its portfolio pool-wide in*** seconds. The system automatically books the liquidation orders to customer accounts based on metals sold, and applies the proceeds to the loan."[48] (Emphasis added.)

51. When a customer's account is "automatically liquidated," Monex makes an entry into its internal computer system that transfers the metal supposedly owned by the customer to metal now owned by Monex. The metal is automatically "sold" back to Monex. Instead of an entry for the number of ounces of metal in the customer's account, the customer now has an accounting entry for the cash value that Monex selected for this transaction, minus commissions and what is left over after paying off the loan balance.

52. Monex can execute this type of transaction simultaneously for multiple Atlas customer accounts, or as Monex calls it "pool-wide" or on a "batch basis." This system is designed to protect Monex from suffering "losses," whereby the amount of its outstanding loan becomes greater than the value of the collateral securing it. Due to this system, Monex has made substantially more revenue in commissions from forced sales than it has "lost" due to defaults.[49]

---

[48] *See* Excerpts of Investigative Testimony of Michael Carabini, Carabini Ex. 3.

[49] *See* Exhibit 25, MCC Historical Loan Performance Summary (Oct. 7, 2011), at pg. 7 (a document describing Monex's historical loan performance noted that between 1987 and 2011, "aggregate commission gains on foreclosures far exceed[ed] the miniscule loan losses" experienced).

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

### III. __Monex's Promotion of Leveraged Atlas Trading__

### A. **Monex and Atlas Account Advertising**

53.     Monex markets its Atlas trading account by telemarketing, internet advertising, the Monex website, television and internet video advertisements, radio advertisements, and written promotional materials.

54.     Monex holds itself out as a "trusted" financial institution,[50] with decades as "America's trusted name in gold and other precious metals,"[51] with "the experience, expertise and resources to serve most any precious metals investor's needs."[52]

55.     Monex provides prospective customers with an Atlas Account brochure, describing the account as "A Precious Metals Investment Program."[53]   The very first sentence of the brochure's introduction section says "Today, the question is not IF you should own gold and other precious metals . . . rather, it is HOW best to buy, hold and sell them."[54]

56.     In the Atlas brochure, Monex claims that:

    a.  The Atlas account is a "unique and powerful way to acquire precious metals with the strength of investment leverage combined with the safekeeping security of independent depository storage."[55]
    b.  Investing in precious metals through the Atlas account can be a "hedge against the increasing volatility of . . . 'paper-based' financial markets."[56]
    c.  The Atlas account is a way to "shield your wealth against the ravaging effects of

---

[50] For example, on its website and in the Atlas promotional brochure (Exhibit 13, Monex Atlas Account Brochure, at pg. 16) Monex claims it is "The Most Trusted Name in Precious Metals."

[51] *Christianson Dec.*, Attachment A (Nov. 1, 2013 forensic website capture), at pg. 1; Attachment B. (August 22, 2017 forensic website capture), at pg. 1.

[52] *Christianson Dec.*, Attachment A, at pg. 2; Attachment B, at pg.2.

[53] Exhibit 13, Monex Atlas Account Brochure, pg. 1.

[54] *Id.*, pg. 2.

[55] *Id.*, pg. 2.

[56] *Id.*, pg. 2.

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

inflation, deflation and other economic calamities."[57]

d. "The prudent investor should consider converting at least part of his or her paper assets into precious metals" and that "right now may be an ideal time to invest in precious metals with the power and built-in security of the Atlas Account."[58]

57. The Atlas brochure also contains statements about an Atlas customer's ownership of and control over metals traded in an Atlas account, including:

a. "The depository custodian will maintain the safekeeping of your precious metals until you decide to sell them or take personal possession."[59]
b. "Your metals are your sole assets."[60]
c. "You are the sole owner of your metals and the sole decision maker on when to buy and sell them."[61]
d. "You will get full legal ownership and physical title to all the metals you purchased."[62]
e. In the Monex Atlas bank storage account, every ounce of metal purchased by every customer is physically delivered, stored, and legally titled to each customer by name – ounce for ounce."[63]

58. On its website, www.monex.com, Monex advertises the profit potential and the value of investing in precious metals. For example, Monex devotes entire sections of its website to describe investing in precious metals as a "Profit Opportunity," and for "Wealth Protection."[64]

59. Monex touts "Compelling Reasons to Invest in Precious Metals with Monex Now," where it highlights "uncertainty" in world economic markets.[65] Monex claims that "Every stock market investor should consider balancing his market risk with real precious metals

---

[57] *Id.*, pg. 2.

[58] *Id.*, pg. 3.

[59] Exhibit 13, Monex Atlas Account Brochure, pg. 5.

[60] *Id.*, pg. 5.

[61] *Id.*, pg. 6.

[62] *Id.*, pg. 6.

[63] *Id.*, pg. 6.

[64] *Christianson Dec.*, Attachment A, at pgs. 54-71; Attachment B, at pgs.130-41, 150-177.

[65] *Id*., Attachment A, at pg. 96; Attachment B, at pg.188.

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

and not just gold stocks, which like all stocks, are subject to business risk as well as market risk (and can be extremely volatile at times.)"[66]  Monex's website describes precious metals as "one of the only financial asset classes in an investment portfolio that are not simultaneously someone else's liability."[67]

60.      Monex describes precious metals investments as "an outstanding investment opportunity."  For example, over the relevant time period, the Monex website stated:

a.  "[P]recious metals can produce impressive investment returns even when (and sometimes, especially when) returns from stock, bond and other paper investments decline in value or evaporate completely.  The Monex Atlas Account, a way to purchase precious metals using up to 5-to-1 investment leverage, can be a powerful short-term trading vehicle during periods of rapidly changing precious metals prices.  And many financial experts have predicted and continue to forecast rising gold, silver, platinum and palladium prices in the months and years ahead."[68]

b.  "[T]here may never be a better time to buy silver bullion than right now . . . For these reasons, many feel silver bullion represents an outstanding investment opportunity."[69]

c.  "Thousands of Monex customers have viewed our exclusive DVDs on the silver market ("Why Silver? Why Now?"), and after watching the programs, have projected substantial increases in the future price of silver."[70]

d.  "you'll see why we here at Monex believe it is urgent to consider diversification

---

[66]  *Id.*, Attachment A, at pg. 97; Attachment B, at pg.189.

[67]  *Id.*

[68]  *Id.*, Attachment A, at pg. 105.  While this statement was on Monex's website in 2013, it does not appear in the 2017 version.

[69]  *Id.*, Attachment A, at pg. 100; Attachment B, at pg.193.

[70]  *Id.*, Attachment A, at pg. 101.

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

with precious metals."[71]

    e. Monex cites "experts" stating that "it's important that retirees have a certain percentage [of their assets] in gold," and recommending "20% . . . or higher."[72]

61. On its website, Monex points to doomsday economic predictions while touting the safety of an investment in precious metals:

    a. Precious metals are "a solid hedge against a declining U.S. dollar" and "a proven safe-haven in times of war, political strife and uncertainty."[73]

    b. "in such an uncertain environment, it is natural – and highly appropriate – to seek out strategic investment alternatives in order to 1) preserve one's wealth; and, ideally, to 2) increase one's wealth." Monex recommends "precious metals" which "have offered investors a solid, long-term and tangible way to hold and protect wealth with relative safety."[74]

    c. "[U]nlike paper investments (like stocks, bonds and currencies) that can and have become worthless overnight, precious metals have true intrinsic value . . . and, hence, will always be valuable."[75]

    d. "precious metals can offer inflation protection and profit opportunity."[76]

62. On its website, Monex describes a "looming economic crisis," and pitches precious metals investments as a way to provide safety from an economic collapse, and to bring "balance" to an investment portfolio. For example, over the relevant time period, on its website, Monex cited and linked to articles or blogs with titles such as:

    a. "Will Americans' purchasing power and savings be eroded away?"[77]

---

[71] *Christianson Dec.*, Attachment A, at pg. 102; Attachment B, at pg. 196.

[72] *Id.*, Attachment A, at pg. 104.

[73] *Id.*, Attachment A, at pg. 197; Attachment B, at pg.105.

[74] *Id.*, Attachment A, at pg. 97; Attachment B, at pg. 200.

[75] *Id.*, Attachment A, at pg. 97-98; Attachment B, at pg. 200.

[76] *Id.*, Attachment A, at pg. 97; Attachment B, at pg.189.

[77] *Christianson Dec.*, Attachment A, at pg. 13; Attachment B, at pg. 47.

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

    b.   "Will people continue flocking to gold and silver?"[78]

    c.   "Is devaluation of the Dollar imminent?"[79]

    d.   "Is gold a 'logical hedge' against paper currencies and other economic risks?"[80]

    e.   "How is it that a once-solid U.S. Dollar has lost nearly all of its value?"[81]

    f.   "Is now an opportune time to hedge the dollar with gold?"[82]

    g.   "Is the silver market as hot as ever?"[83]

    h.   "Could money-market funds yield LESS than zero?"[84]

    i.   "Why is gold for protection?"[85]

    j.   "Will the gold market surge higher?"[86]

    k.   "Is there a precious metal that may have better profit potential than gold?"[87]

    l.   "Could gold prices actually double or triple from current levels?"[88]

63.     Monex's website states that "precious metals can offer outstanding price appreciation and profit potential."  Monex also describes precious metals as "outstanding short-term trading vehicles, offering traders periods of outstanding profit potential."[89]

64.     During the relevant time period, on its website, Monex pitches leveraged trading through its Atlas account as a way to enhance investment returns:

    a.   "The Monex Atlas Account, a way to purchase precious metals using up to 4-to-1

---

[78] *Id.*

[79] *Id.*, Attachment A, at pg. 13; Attachment B, at pg. 48.

[80] *Id.*, Attachment A, at pg. 14; Attachment B, at pg. 48.

[81] *Id.*, Attachment A, at pg. 14; Attachment B, at pg. 49.

[82] *Id.*, Attachment A, at pg. 15; Attachment B, at pg. 52.

[83] *Id.*, Attachment A, at pg. 16; Attachment B, at pg. 53.

[84] *Id.*, Attachment A, at pg. 17; Attachment B, at pg. 55.

[85] *Id.*, Attachment A, at pg. 19; Attachment B, at pg. 59.

[86] *Id.*, Attachment A, at pg. 65; Attachment B, at pg. 131.

[87] *Id.*

[88] *Id.*, Attachment A, at pg. 92; Attachment B, at pg. 56.

[89] *Id.*, Attachment A, at pgs. 98, 105; Attachment B, at pgs. 197, 200.

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

        investment leverage, can be a powerful short-term trading vehicle during periods of rapidly changing precious metals prices. And many financial experts have predicted and continue to forecast rising gold, silver, platinum and palladium prices in the months and years ahead." [90]

    b.   "For these reasons and many more, the silver market certainly appears to represent an outstanding investing opportunity. The Monex Atlas Account makes investing in silver bullion and coins convenient and flexible, offering up to 4-to-1 investment leverage, and it can be a powerful short-term trading vehicle during periods of rapidly changing silver prices." [91]

    c.   "silver bullion's investment potential may be enhanced by utilizing the Monex ATLAS account where investors can finance their silver bullion investment and control up to five times the silver as in an all-cash purchase." [92]

    d.   "you may elect financing of your precious metals, using as little as a 25% down payment and taking advantage of investment leverage of as much as 4-to-1, through our exclusive Atlas Account program." [93]

65.    In summary, Monex suggests that metals investment is a good way to "increase" or "preserve" your wealth, and then describes the Atlas account as the best way to invest in metals.

## B. Monex Account Representative Training and Incentives

66.    Monex trains and incentivizes its sales representatives to open Atlas trading accounts, and to encourage frequent leveraged trading in its Atlas accounts.

67.    According to the Training File for Account Representative Team Leader Sean Brazney, Monex tells its newly hired account representatives that a fundamental "key to success"

---

[90] *Christianson Dec.*, Attachment A, at pg. 105; Attachment B, at pg. 198.

[91] *Id.*, Attachment A, at pg. 101; Attachment B, at pg. 195.

[92] *Id.*, Attachment A, at pg. 100; Attachment B, at pg. 193.

[93] *Id.*, Attachment A, at pg. 106; Attachment B, at pg. 201.

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

is "to build a large book of clients that trade metals."[94]  The Training File states that a new hire's

six-month goal should be "25 Leveraged Accounts and a book of $1 million," and their one-year

goal should be "50 leveraged accounts and a book of $2 million."  *Id.*  The Training File

demonstrates that trainees are encouraged to "Raise Money!" to "Have a sense of URGENCY,"

and to "Ask for the order on every call."  *Id.*

68.     Monex's compensation structure incentivizes sales representatives to push

customers to execute leveraged metals trades in several ways.  First, Monex sales representatives

receive a larger share of calls coming into Monex from potential customers ("leads") if they open

and execute more trades in leveraged Atlas accounts.  The Monex "Lead Allocation" policy

states that:

> "Allocation figures are a 2-month average of the sum of the following 4 values:
> 1 point for each New, **First-Time Financed** and Reactivated Customer; **3 points
> more for each that are Financed or Commodity Loan Transactions**; 1 point
> for each 200 NAIPS (New Account Index Points) up to 5,000; 2 points more for
> each 200 NAIDS (New Account Index Doubling) up to 5,000."  (emphasis
> added).[95]

The more leveraged Atlas transactions, the better the opportunity to get "leads" to open new

accounts, generate additional trades and make money.

69.     The second major incentive is compensation.  Apart from a training period,

Monex sales representatives do not receive a salary.  Their compensation is based on

commissions along with a percentage of the sales or purchases that they generate.  The

percentage of those transactions that account representatives earn increases based on the volume

---

[94] Exhibit 26, Training File for Account Representative Team Leader Sean Brazney, at pg. 3.

[95] Exhibit 17, Monex Account Representative Desktop Guide, § 19.0 (Lead Allocation Policy).

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

of the financed transactions they conduct.[96]

70.     The Monex Commission Plan also awards a "**MONTHLY FINANCED CUSTOMER BONUS**" to sales representatives.  *Id.* (reflecting $500 bonus for "**6** First Financed or Reactivated Financed" customers in a month).

71.     Monex also periodically provides other "bonus" and incentive opportunities to encourage sales representatives to open new accounts.  These bonus programs also encourage the opening and trading of financed Atlas accounts and transactions.[97]

72.     Monex's sales training provides guidance on how sales representatives can meet their sales goals and build large books of leveraged Atlas trading accounts.  For example, in at least 2011 and 2012, Monex required its sales trainees to read Monex's "Blueprint for Success," which provides specific recommendations on how to pitch Monex and the Atlas account.[98]  The Blueprint coaches sales representatives to use "effective language" that is "psychologically impactful" such as: "If gold were to increase in value by $100 per ounce in the next year, and you had a 30% to 40% net gain, you'd feel pretty good, wouldn't you?"  *Id.*, pg. 4.

73.     The Blueprint trains Monex sales representatives to "arouse interest" with statements such as:

   a.   "if the account representative with whom you spoke had spent more time learning about your investment goals and explaining our programs, you might not have missed past profit opportunities;"  (*id.*, pg. 13)

   b.   "I'm calling you because I thought you, as a past client, knowledgeable in

---

[96] Exhibit 17, Monex Account Representative Desktop Guide, § 18.0 (Account Representative Commission Plan).

[97] *See, e.g.* Exhibit 27, February 7, 2014 Sales Memorandum (offering cash bonuses for new financed customers).

[98] Exhibit 28, Monex "Blueprint for Success" Sales Training Guide.

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

precious metals, would be interested in the potential profits that I believe are available with current market conditions;" (*id.*, pg. 16)

c. "I'd like to show you some ways that you might earn a very positive return on investments in precious metals today;" (*id.*, pg. 16) and

d. I'm sure you are aware of the security and diversification that accrues when you add silver or gold to your portfolio. I believe we are looking at some of the best values in recent years." (*id.*, pg. 16)

74. The Blueprint encourages Monex sales representatives to "break down barriers" with statements such as:

a. "I just wanted to share a couple of strategies that clients have used successfully;" (*id.*, pg. 14)

b. "discover an opportunity to invest with defined risk, while enjoying the possibility of unlimited upside potential." (*id.*, pg. 18)

75. The Blueprint encourages Monex sales representatives to "bridge into qualifications" or "bridge into presentation" with statements such as: "Since you're looking for short term profit, but with defined risk, I think you're going to love the proposal I have for you." *Id.*, pg. 24.

76. Monex training videos used with sales representatives discuss overcoming hesitancy expressed by prospects by explaining that they have a fiduciary relationship to Atlas customers analogous to the relationship between a lawyer and her client, and that everything they do as sales representatives will be in the prospect's, or customer's, best interest. By contrast, Monex's written agreements disclaim such a relationship.[99]

77. In a training video used with sales staff, a Monex trainer trains representatives to tell prospects: "I want to give you the best possible chances of success in the markets that we

---

[99] Exhibit 14, Monex Atlas Account Agreements, Trading Agreement, §§ 4.2, 12.

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

deal with.  And everything that I ask will always be in your best interests."[100]

78.     The video also trains sales staff to say: "Or I might even use the analogy where if you go to your lawyer and you hold back any information, what is he going to tell you?  Take a walk, I can't help you. Okay.  We have that same fiduciary relationship, a relationship of trust, okay.  And I do want to help you.  And, again, everything that I do – and I tell them this on a pretty consistent basis, that everything I do will always be in your best interests, and I mean that."[101]

79.     In another sales training video, a Monex sales trainer calls a prospect in the presence of his training class, and tells her that "my job is to do the best that I can and do what's in the best interests of the people that I talk to. … [I]f I am going to make a recommendation, I want to make sure that I do what's in your best interests."[102]

## IV.     Monex's Inventory and Financing Structure

### A.     The Concord Trust and Scala Trust

80.     Monex finances a substantial portion of its inventory (and its business operations) through two investment vehicles controlled by Monex: Concord Funding Company, L.L.C. and Scala Funding Company, L.L.C.

81.     Concord Funding Company, L.L.C. ("Concord") is a Delaware limited liability company established in 1995 for the purpose of issuing asset-backed notes for Monex.[103]  Scala Funding Company, LLC is similarly a Delaware limited liability company, but established in

---

[100] Exhibit 29, Transcript of Monex Sales Training Video (1), at pgs. 14-15.

[101] *Id.*, pgs. 15-16.

[102] Exhibit 30, Transcript of Monex Sales Training Video (2), at pgs. 35-36.

[103] Exhibit 2, 2013 Concord PPM, at pgs. 1, 17.

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

2016.[104]  Concord and Scala are owned by affiliates of MCC and MDC.[105]  The "principal executive offices" of Concord and Scala are at Monex's office – 4900 Birch Street, Newport Beach California.[106]

82.     Through Concord and Scala, Monex issues asset-backed notes which are purchased by investors.  The current investment vehicle – Scala Funding Company – provides for the issuance of $100 million in Secured Subordinated Term Notes.[107]  The funds from investors in the Notes are used by Monex to purchase metals and pay for Monex business operations.  *See, id.*  The Notes are secured by certain of Monex's assets, including Atlas customer loans transferred to trusts established and associated with Concord and Scala.  As explained below, the metals that Monex claims to sell to its customers ultimately provide security for Monex's financing.

83.     The Concord and Scala Notes are secured by the "Trust Estate" pledged to the vehicle, as defined in the transaction documents.  Under both vehicles, the Trust Estate includes all of Monex's interests in a pool of loans that MCC makes to its Atlas customers to finance their trading positions.[108]

84.     The documents governing the Concord and Scala vehicles require that Monex

---

[104] Exhibit 6, 2016 Scala PPM.

[105] *E.g.* Exhibit 6, 2016 Scala PPM, at pg. 1.

[106] Exhibit 2, 2013 Concord PPM, at pg. 17; Exhibit 6, 2016 Scala PPM, at pg. 16.

[107] Exhibit 6, 2016 Scala PPM, at pg. 1.

[108] Exhibit 2, 2016 Scala PPM, pgs. 3-4 ("The Notes will be secured by the Issuer's pledge of its assets to the Trustee under the Master Indenture (the *'Trust Estate'*).  The Trust Estate will include U.S. Dollar Loans originated by MCC and sold or contributed to the Issuer from time to time … which Loans were made to finance the related [Atlas Customer's] purchase of precious metals (palladium, gold, silver, or platinum) (*'Metals'*), including the security interest granted by the Obligor in the related Metals to secure the Loan (*'Metals Collateral'*)…"); Exhibit 2, 2013 Concord PPM, at pgs. 3-4 (same).

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

have the ability to liquidate its customers trading positions at any time in order to pay down its

financing obligations. Monex describes this feature in the Concord and Scala PPMs:

> The Loan Agreement grants MCC the right to demand repayment of the entire
> Loan at any time for any reason or no reason, with notice, and to increase the
> required Equity for a Loan at any time for any reason or no reason, with notice.
> Under the Loan Agreement, MCC also has the right to liquidate the collateral
> securing the loan without notice should the account's Equity fall below the
> current liquidation level (half of its minimum Equity level)."[109]

85.     If Monex falls short in repaying the Concord and Scala notes, Monex will

liquidate customer trading positions to pay back investors. If a funding deficiency (termed an

"Unsatisfied NPV" in the governing documents) exists for five consecutive calendar days,

Monex is "obligated to increase the required Equity for [Atlas Customers] under their Loan

Agreements, and make and enforce resultant Collateral Demands on [Atlas Customers], to the

extent necessary so as to generate Dollars from any combination of [Atlas Customer] payments

and/or proceeds of liquidated Metals Collateral in the amount of the current Unsatisfied NPV."[110]

86.     The Concord and Scala Servicing Agreements even include as an exhibit a form

"Demand Notice" that would be sent to a Monex Atlas customer under such circumstances, that

states the customer must pay off his or her loan in full within 5 days, and that if payment is not

received within 10 business days, their metals will be sold to pay off the loan.[111]

---

[109] Exhibit 2, 2013 Concord PPM, at pg. 18; Exhibit 6, 2016 Scala PPM, at pg. 17 (same).

[110] Exhibit 6, 2016 Scala PPM, at pg. 8. *See also id.*, pg. 41 (same); Exhibit 2, 2013 Concord PPM, at pgs. 9, 41 (same); Exhibit 31, Concord Amended and Restated Servicing Agreement (July 12, 2012), § 5.03 (same). These same terms exist in the 2016 Scala documents.

[111] Exhibit 31, Concord Amended and Restated Servicing Agreement (July 12, 2012), Exhibit M ("Form of Section 5.04 Demand Notice") ("The undersigned, as servicing agent . . . with respect to your outstanding cash advance loan . . . hereby notifies you that in accordance with the demand feature in Section 1 of the Agreement and the assignment provisions at Section 19 of the Agreement, repayment of your outstanding cash advance loan . . . is hereby demanded in full. . . . if repayment of same in full has not been received within 10 business days following the date of this notice, your outstanding loan will be

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

87.     Along similar lines, if Monex fails to meet its obligations to keep the "Required

Amounts" account for Concord and Scala sufficiently funded, Monex is "required to make

written demand for repayment in full of Loans (and, if necessary, liquidate related Metals

Collateral) to an extent sufficient to generate Collections to fund the Required Amounts in

full."[112]

88.      In response to the CFTC's subpoenas, Monex produced internal correspondence

and correspondence with banks, investment banks, and others concerning the Concord vehicle.

The following are attached here:

   a. Exhibit 32, Oct. 21, 2011 e-mail from M. Carabini to B. Jenkins (Monex CFO) re:
      Atlas operations;

   b. Exhibit 33, Oct. 27, 2011 e-mail from B. Jenkins to Goldman Sachs re: Atlas
      operations;

   c. Exhibit 34, July 18, 2011 e-mail from C. Flannery (Piper Jaffray) to B. Jenkins re:
      Monex/Concord (regarding events of default and liquidation of customer metals).

89.     In December 2016, Monex issued nearly $90 million of Scala Notes, which

remain outstanding and do not mature until February 2021.[113]

**B.      Bank Financing**

90.     In addition to obtaining financing for its operations from the Scala and Concord

vehicles, Monex also obtains financing through loans from various banks.  During the relevant

period, Monex obtained loans from Farmers and Merchants Bank and Wells Fargo.

91.     In April 2012, Monex obtained a $25 million line of credit from Wells Fargo

---

subject to liquidation . . . by liquidation of your precious metals . . . ").

[112] *See* Exhibit 6, 2016 Scala PPM, at pg. 9; Exhibit 2, 2013 Concord PPM, at pg. 9 (same).

[113] Exhibit 35, Scala Closing Memorandum.

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

Bank.[114]  As with other financing obtained by Monex, the collateral for the line of credit included Atlas customer loans and inventory.[115]  The loan agreements with Wells Fargo provided that in the event of a default by Monex, the Bank could exercise all rights of Monex under the Atlas agreements, which includes the immediate liquidation of Monex Atlas customer trading positions.[116]

      92.     Monex and Wells Fargo also entered into a depository agreement with Delaware Depository for the storage of metals subject to this financing.[117]  This depository agreement covered metals stored for the trading positions of Monex's Atlas customers.  *Id.*  Section 2 of the Depository Agreement is entitled "Control Receipt and Storage of the Precious Metals" and governed the possession and control over metals that were stored subject to the Wells Fargo financing.  This section provides, in pertinent part:

> Control over the Precious Metals shall be and shall remain vested in [Monex] except as otherwise provided in Section 5. (. . . )  The Depository shall receive, hold and keep the Precious Metals in the Depository's custody at its premises . . . The Depository will not be responsible for the Precious metals until they are actually delivered to and received by the Depository at its premises.[118]

Section 5 is entitled "Bank's Right to Exercise Control" and provides that Wells Fargo (described as the "Bank") can also exercise control over the metals:

> . . . upon receipt of notice from Bank to Depository . . . Depository shall not honor

---

[114] Exhibit 36, April 20, 2012 Monex-Wells Fargo Credit Agreement, § 1.1(a) (Line of Credit).

[115] *Id.*, § 1.1 (b) (defining "Eligible Customer Collateral" as metals "owned by [Monex's] customer"); § 1.4 (granting Wells Fargo security interest in "Eligible Customer Collateral").

[116] Exhibit 36, April 20, 2012 Monex-Wells Fargo Credit Agreement, § 6.2 (Remedies); *Id.*, §§ 1, 7, 10 (authorizing Wells Fargo, upon a default, to "exercise all rights, powers and remedies which [Monex] would have … with respect to all Collateral subject hereto" which includes Atlas customer loan agreements).

[117] *See* Exhibit 37, April 20, 2012 Monex-Wells Fargo-DDSC Depository Agreement.

[118] *Id.*, § 2.1.

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

> any directions for release of the Precious Metals from Depositors pursuant to
> Section 4, but shall release the Precious Metals only in accordance with Bank's
> instructions . . .[119]

There are no provisions in this depository agreement providing for Monex Atlas customers to

exercise control over any stored metals.

93.     Monex also has a revolving commercial line of credit in the amount of $50

million through Farmers & Merchants Bank.[120]  As is the case with the Concord financing

vehicle, this line of credit to Monex is secured by Monex's metals inventory and also the

assignment to Farmers by Monex of "Atlas" contracts.  *See id.* ("Collateral consists of the

assignment of precious metal commodity inventory in the form of bullion and coins and the

assignment of 'Atlas' contracts from Monex Credit which represent the indebetness of the

customer to Monex for commodities purchased by them and financed by Monex Credit.  These

contracts are secured by the commodities purchased.").[121]

94.     In the event of a default by Monex on the repayment of its loan to Farmers,

Farmers has all "rights, powers, privileges and remedies" with respect to the collateral granted by

a secured party.  This includes "the right . . . to contact all persons obligated to [Monex] on any

Collateral," which includes Monex's Atlas customer agreements, "and to instruct such persons to

deliver all Collateral directly to Bank, and to sell, lease, license or otherwise dispose of any or all

Collateral."  *Id.* ¶ 10.

95.     The ability of Monex (and Farmers as its creditor) to liquidate customer trading

---

[119] *Id.*, § 5.1.

[120] *See* Exhibit 38, F&M September 3, 2013 Monex Loan Approval Memo, at pg. 1; Exhibit 39, FMB
Loan Approval File, at pg. 1.

[121] *See also* Exhibit 40, Nov. 21, 2012 Monex-Farmers Loan Security Agreement, at ¶ 1 (collateral
pledged to secure line of credit includes "Assigned Agreements," defined as "all [Atlas] Purchase and
Sale Agreements and Loan, Security and Storage Agreements and related agreements.").

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

positions is also highlighted in Farmers loan approval documentation.  For example in a June 2012 Farmers loan approval memo, the bank notes that:

> In the event of a sudden decline in the price of the precious metals underlying the customer contracts [Monex] is authorized to sell the customer's collateral to maintain the contractually agreed upon advance rate.[122]

96.     As described by Farmers, repayment of principal on the loan "can come from three different sources: 1) payment of the outstanding balance of the Atlas contracts by Monex's customers and/or sale of inventory; 2) Refinance of the relationship by another lender; or 3) *liquidation of the precious metals held as collateral for the Atlas contracts and liquidation of the precious metals commodities inventory pledged to the Bank*."[123]

97.     The metals related to those Atlas contracts which have been designated as collateral for the Farmers loan are held primarily at a Farmers vault, or at a DDSC vault (where Farmers has its own depository account).[124]

98.     Farmers monitors the Atlas account metals within its possession and control.  On a monthly basis Farmers prepares a memo to its senior management auditing Monex's metals collateral for the Farmers line of credit.  In this monthly memo, Farmers tracks "the total value of commodities under Farmers & Merchants Bank's control in all locations."[125]  On the spreadsheet accompanying this monthly memo, Farmers lays out in detail the precise amount of ounces of metal "Held by F&M as Collateral."  *Id.*, pg. 2.

---

[122] Exhibit 39, FMB Loan Approval File, at pg. 25

[123] *Id.* at pg. 17 (June 18, 2012 Loan Approval Memorandum) (emphasis supplied).

[124] *Id.* at pg. 9 (minutes of a July 9, 2012 Loan Committee Meeting).

[125] Exhibit 41, June 17, 2016 Memo re: Commodity Audit of Monex Collateral as of May 31, 2016, Section 1 (Inventory).

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

### C. Monex's Contracts With Its Depositories

99.     Atlas customers with open trading positions do not take delivery of any metal. Rather, all metal is stored in depositories in Monex accounts.  Monex maintains its Atlas account metals inventory in Monex-denominated accounts at three depositories: Delaware Depository Services Company ("DDSC"), Farmers & Merchants Bank ("F&M") and Brink's Global Service USA Inc. ("Brink's").[126]  Monex's contracts with these depositories govern Monex's storage of metals at their facilities.[127]  Monex Atlas customers do not enter into separate contracts with these depositories in connection with their Atlas account.[128]

100.     Monex's Atlas program metals are always in the possession of these three depositories.[129]  Atlas customers are not allowed to possess any metals unless they have made full payment for the metals and have requested delivery of specific physical metals.

101.     Only Monex has the ability to instruct the Depositories as to the disposition of metals.  For example, Monex's contract with DDSC provided that "Control over the Precious Metals shall be and shall remain vested in the Depositors [Monex and Bank of New York], as more specifically set forth in Section 2.4 hereof."[130]  The other Depository agreements contain

---

[126] *See* Exhibit 42, Monex Account Representative Guide — Listing of Banks and Depositories.

[127]  Exhibit 43, June 18, 2001 Monex-DDSC Depository Agreement with 2013 Addendum; Exhibit 23, June 29, 2009 Monex-Bank of New York-DDSC Concord Depository Agreement; Exhibit 44, September 6, 1985 Monex-F&M Depository Agreement; Exhibit 45, June 19, 2013 Monex-F&M Depository and Safekeeping Agreement;  Exhibit 46, July 31, 2014 Monex-Brink's Storage Agreement; Exhibit 47, February 16, 2015 Monex-Brink's Storage Agreement; and Exhibit 48, May 2, 2016 Monex-BNY-Brink's Storage Agreement.

[128] *See, e.g.* Excerpts of Investigative Testimony of John Potts (Delaware Depository), at pg. 24 ("Q: Monex customers don't sign any agreements with Delaware Depository; is that right? A: Yes."); Excerpts of Investigative Testimony of Richard Lotti (Brink's), at pg. 28 (same).

[129] *See id.*, *see also* Exhibit 49, 2011 Description of Monex Operations, at pg. 8 ("Customers have title to the collateral, while MCC maintains possession, control and its security interest.").

[130] Exhibit 23, June 29, 2009 Monex-Bank of New York-DDSC Concord Depository Agreement, ¶ 2.1;

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

similar language.[131]  According to representatives of the Depositories, Monex – and not the Atlas

customers – can cause metal to be removed or transferred.[132]  Customers have no right to access

the vaults to see their metal.[133]

      102.    The Depositories specifically disclaim any relationship with Monex's Atlas

customers, and state that they are not agents for the customers.[134]

      103.    Depositories do not segregate or allocate Atlas customer metals separately from

---

*see also id*, ¶ 2.4 (metals may be removed or transferred only by prior written notice of Monex or Monex's Trustee).

[131] *See* Exhibit 45, June 19, 2013 Monex-F&M Depository and Safekeeping Agreement, ¶ 6.c.ii (Depository "agrees not to release any Precious Metals held in the Customer Account to a Customer without prior authorization from MCC or the [Depository's] giving at least 5 Business Days prior written notice to MCC"); Exhibit 47, February 16, 2015 Monex-Brink's Storage Agreement, ¶ 4 (withdrawals limited to "Authorized Persons," which do not include Atlas customers).

[132] *See, e.g.* Excerpts of Investigative Testimony of John Potts  (DDSC), at pgs. 23, 60; Excerpts of Investigative Testimony of Thomas Sauchelli (F&M), at pgs. 53, 78, 86; Excerpts of Investigative Testimony of Richard Lotti, at pg. 26 ("Q: If a recipient of [a CTTN] contacted Brink's to request the physical shipment of the metals identified on the notice, how would Brink's deal with that?  A: We would not speak to the customer. We would ask them to speak to Monex directly."); *id.* at pg. 30 ("[I]s it your understanding that Brink's only receives instructions from Monex with respect to the transfer or deliver of the metals that are stored in the Monex account?  A: Yes.").

[133] Exhibit 48, May 2, 2016 Monex-BNY-Brink's Storage Agreement, ¶ 6 (limiting access to "Authorized Persons," which do not include Atlas customers); Exhibit 23, June 29, 2009 Monex-Bank of New York-DDSC Concord Depository Agreement, ¶ 3.1 (same).  *See also* Excerpts of Investigative Testimony of John Potts (Delaware Depository), at pg. 26 ("Q: Could a Monex customer come and inspect the metal? A: If Monex and Bank of New York authorized them to.  Q: How would that work? A Monex customer calls Delaware Depository and says, 'I'd like to come in and see my metal.' You would tell them what? A: We would refer them back to Monex."); Excerpts of Investigative Testimony of Richard Lotti (Brink's), at pg. 45 ("Q: If a person that received one of these title transfer notices … showed up at a Brink's facility and asked to see his metal, would he be able to? A: No.").

[134] Excerpts of Investigative Testimony of John Potts (Delaware Depository), at 24-25 (stating that if DDSC received a call from a Monex customer seeking to transfer metal, it would "refer them back to Monex. […] Q: I mean, it's pretty clear these customers, the Monex customers, are Monex customers and not Delaware Depository's customers.  A: Yes, that is correct."); *See also* Excerpts of Investigative Testimony of Thomas Sauchelli (Farmers), at pg. 63 ("If a customer has a question regarding precious metals we direct those to Monex to be resolved."); Investigative Testimony of Richard Lotti (Brinks), at pgs. 26-27.

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

Monex metals.[135]  Depositories cannot identify whether any particular bar or coin belongs to

Monex or to one of its customers.

### V.      Monex's Data Management System

104.     Monex maintains a data system to track, among other things, all of its retail

customers' transactions.  Monex refers to this as its Monex Interactive Combined Accounting, or

"MICA" system.[136]

105.     Monex made productions of its data responsive to CFTC subpoenas starting in

April, 2015.  As I discuss below, I reviewed these productions, along with data dictionaries and

other guides produced by Monex to assist in the interpretation of the database.

106.     The Monex database contains numerous data fields that track information about

customer transactions, customer accounts, as well as market data such as metals prices.  The

system allows a user to identify information about each transaction entered into by an Atlas

customer, including Transaction Date, Transaction Number, Transaction Size, Transaction Type,

Units, Price, and Description.  The database also includes information about how wide the bid-

ask spread was for each purchase or sale, whether transactions are a result of forced liquidation

---

[135] *See, e.g.* Exhibit 23, June 29, 2009 Monex-Bank of New York-DDSC Concord Depository Agreement,
¶ 3.1 (only requiring depository to segregate Monex metal from metals held for other depositors);
Exhibit 48, May 2, 2016 Monex-BNY-Brink's Storage Agreement, ¶ 5 (only requiring Brink's to
segregate the property of Monex [Concord] and "Loan Obligors" [customers] apart from Brink's other
customers); *see also* Excerpts of Investigative Testimony of Richard Lotti (Brink's), at pg. 36 ("Q: Does
Brink's segregate out specific metals for individual Monex customers? A: No. Q: The metals that Brink's
is storing for the Monex account, those Brink's can identify; am I understanding that right? A: Yes. Q:
Brink's would -- am I understanding right that Brink's would not, however, be able to identify a specific
bar for a Monex customer receiving one of these title transfer notices? A: Correct.").

[136] Excerpts of Investigative Testimony of Darrell Hamilton, at pg. 13-14.  Monex has also designed and
maintains additional data systems that focus on customer relationship management.  Monex calls this
portion of its data management system its Account Representative Information System, or "ARIS."  *Id.*, at
pg. 23-24.

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

or margin calls, and what type of commission was charged on a transaction (*e.g.* a fixed amount, percentage of sale, or waived).

107.    The system also includes information, on an account-specific basis, showing a customer's Loan Balance, profit and loss for a closing position, Market Value for metals owned or borrowed, and various Year-To-Date Summary information regarding Interest & Lease Charges, Interest & Lease Credits, Service Fees, and Realized Profit & Loss.  Monex's database also includes daily calculations of a customer's equity percentage, which Monex defines as the total market value of the commodities in a customer account less the customer's total indebtedness, divided into the market value of the commodities.

108.    From its database, Monex generates customer account documents including monthly statements, trade confirmations, year-end account summaries, and Commodity Title Transfer Notices.  I have attached a sample of each, below:

   a.   Sample monthly customer account statement.  (Exhibit 50)

   b.   Sample trade confirmation.  (Exhibit 51)

   c.   Sample end-of Year customer account summary.  (Exhibit 52)

   d.   Sample "Commodity Title Transfer Notice"  (Exhibit 21)

109.    Monex summarizes the performance of customer accounts on the accounts statements it generates for customers.  For example on monthly statements, Monex includes a summary which reflects the end of month account equity in dollars as well as a percentage figure.  Monex also includes a "Year-To-Date Summary" which shows Interest and Lease Charges/Credits, Service Fees, and Realized Profit & Loss for the year.

110.    Monex uses the data in its system not only to track trades and transactions, but also to generate a wide variety of reports that summarize and analyze customer transactions and

41

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

sales performance.[137]  In terms of customer performance, Monex issues reports from its database

on a daily basis that track customers' positions and the profitability of the positions.  Monex also

generates reports that track the results of account representatives' sales efforts.  The following

are some of the reports generated by Monex on a periodic or daily basis:

a. Customer Position Report (R017), sample attached as Exhibit 53.[138]  Monex generates and disseminates this report to management and sales representatives on a daily basis.[139]  It contains a daily snapshot of individual customers' accounts, tracking among other things, each customer's active trading positions, equity percentage, cushion before a margin call, cushion before a forced liquidation, excess equity available for additional trades, and the gain or loss on open trading positions.

b. Position Report Summary (R015), sample attached as Exhibit 54.  This daily report provides, for each Monex account representative, high-level information about each customer within his or her portfolio.  It includes information about each account representative's accounts, such as number of trades, gains, losses, types of trades, account value, excess equity, and equity percentage.

c. Customer Unrealized Loss Report (R495), sample attached as Exhibit 55.  This report shows unrealized losses in selected Atlas accounts, organized by largest unrealized loss.

d. Equity Calls Report (R715), sample attached as Exhibit 56.  This report reflects margin calls given each day, along with the amount of the equity call, and equity percentage of the account receiving the margin call.  *See also* Margin Call Report (R723) (sample attached as Exhibit 57) (showing similar information).

e. Forced Liquidations Report (R722), sample attached as Exhibit 58.  This report shows the "month to date" forced liquidations of Atlas customers, along with how much commission was charged on each forced sale, index points awarded to sales representatives, and the current equity percentage of the accounts.

---

[137] *See* Excerpts of Investigative Testimony of Darrell Hamilton, at pgs. 50-53, 66-67 (describing process for how reports are run and distributed within Monex).

[138] Each R017 report is as long as 1,000 pages.  I have included the first page only as Exhibit 53 to demonstrate the content of the information included in these reports.

[139] *See* Excerpts of Investigative Testimony of Michael Maroney (Monex Sales Director), at pgs. 75-77, 79-82 (discussing dissemination of R017 report within Monex).

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

     f.    Monthly Customer Index Report For Month End (R493), sample attached as Exhibit 59. This report shows, on a customer-specific basis, the number of trades conducted within a month, how much equity is remaining in the customer's account, the "total index" associated with the account (higher index means more volume), and the "equity turnover" for the account. Similar information is presented in the Customer Market Value Report For Month End (R494), sample attached as Exhibit 60.

     g.    Sales Rep "Awards Report" (R162), sample attached as Exhibit 61. This report tracks the performance of Monex sales representatives by several metrics including the amount of "index" they have generated on financed and non-financed sales, and the amount of money they have made during the report period. *See also* MTD Account Representative Production Report (R477M), sample attached as Exhibit 62 (showing similar information).\

111.    Monex produces other, similar reports that track sales representative performance (*e.g.* R173 Report), rank sales representatives based on their sales (*e.g.* 461 Report), and other metrics, which are not included with this declaration.

## VI.    The CFTC's Review and Summary of the Data Produced by Monex

112.    As a part of the investigation I was asked to review and summarize data for Atlas customers provided by Monex. The focus of my review was on aggregating this data to describe the structure of the Atlas trading platform, the types of trading conducted by Monex's Atlas customer accounts, and the total profits and losses of Monex's Atlas customer accounts between July 16th, 2011 and March 31, 2017 (the "review period").

### A.    The CFTC's Collection and Review of the Data[140]

113.    Monex made productions of its data responsive to CFTC's subpoenas starting in April, 2015, and has made additional productions on a rolling basis. These productions consisted of various "comma separated values" (CSV) files, which included daily transactional data,

---

[140] This summary contains calculations from data produced by Monex to the CFTC during the course of the CFTC's investigation. This summary relies on the completeness of the data provided by Monex and is subject to revision based on ongoing discovery.

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

monthly Atlas customer account records, daily trading position and cash account equity records, and Monex metals pricing data.

114.     CFTC staff loaded the CSV files from Monex's productions into a database (the "Monex database").  I ensured that the data was loaded accurately from the CSV files into the Monex database.

115.     In order to accurately summarize the data that Monex produced, I relied on a data dictionary that Monex provided, which describes what each data field in the Monex database represents.  I also reviewed transcripts of investigative testimony taken by CFTC staff on May 6, 2015 of Darrell Hamilton, a Management Information Science Supervisor who works for Newport Service Corporation, which provides services for Monex.  In the testimony, Mr. Hamilton described what various data fields in the Monex database are used for.

116.     The Monex database contains many fields that contain information about customer transactions, customer accounts, and Monex's prices for various metals.  Based on the descriptions provided by Monex, these fields include account numbers, dates, types of trades (purchase, sell, sell short, etc.), number of units, unit description and size (e.g. 1000 oz. bar), types of commodities (silver, gold, etc.), types of transactions (delivery, pick-up, storage, etc.), prices paid for metal, prices of metal sold, interest payments, service fees, the realized PNL for offset positions, and other fields.  The database also includes information about how wide the bid-ask spread was for each trade, whether or not a transaction was the result of a forced liquidation, margin calls issued to Atlas customers, and whether a transaction opened or closed a trading position.

117.     The database additionally contains fields calculated daily on an account-specific basis, showing a customer's loan balance and the market value for open metals trading positions.

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

Furthermore, Monex's database has fields showing daily calculations of a customer's equity and equity percentage, which Monex defines as the total market value of the commodities in a customer account less the customer's loan balance, divided into the market value of the commodities.

118.    In total, the productions contained more than 550 million lines of data. Using Monex's data dictionary and Mr. Hamilton's testimony, I was able to summarize the voluminous data to calculate how many Atlas accounts used leverage, how many days trading positions were held, how often trading positions resulted in delivery, how often customers received margin calls and forced liquidations, customer profits and losses, Monex's revenues, and to determine how many new leveraged Atlas customer accounts were opened each month.

119.    While Monex's database does indicate a customer's equity percentage each day, it does not include a clear flag or identifier in the data that indicates which Atlas accounts entered into leveraged trades. I wanted to ensure that my summary did not include accounts that, for one reason or another, had an equity percentage of less than 100% for a short amount of time. Accordingly, I considered an Atlas account to be "leveraged" if it had an equity percentage of 99% or less for a period lasting longer than 1 month. This definition of the term "leveraged" account is used throughout this declaration and in all summary exhibits.

120.    This metric is consistent with how Monex defines a leveraged account. In Monex's Account Representative Commission Plan, in order for a sales representative to receive a "Monthly Financed Customer Bonus," he must initiate a loan that is outstanding for longer than a month. *See* Exhibit 17, Monex Account Representative Desktop Guide, § 18.0 (Account Representative Commission Plan), ("To be *Financed*, the loan must be outstanding for greater than 1 month.") (emphasis in original).

45

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

**B.    Atlas Account Statistics**

121.    **Group Exhibit 63** is a collection of summary tables based on the voluminous data in the Monex database.

122.    **Table A (Exhibit 63), Atlas Customer Accounts in the Monex Database**, shows how many customer accounts are in the Monex database.  It shows that there are 81,353 accounts in the database during the review period.  This represents all accounts without regard to whether or not they executed trades or engaged in leveraged trading during the review period.

123.    **Table A (Exhibit 63)** shows that there were 12,185 "leveraged" accounts during the review period.  Of the 12,185 leveraged accounts in the Monex database, 8,223 of them closed at least one trading position that was opened during the review period, after the account became "leveraged."

124.    Monex data indicated the date of each transaction, whether the transaction was a purchase or a sale, and whether each opened or closed a position.  The data also identified trades that could be grouped together by a unique Transaction Number that matched for trades that opened and closed trading positions.  Using that information, I summarized the duration of the trading positions opened and closed by leveraged Atlas customer accounts during the review period.  This information is shown in **Table B (Exhibit 63), Leveraged Atlas Customer Accounts Trading Position Duration Summary**.  In total, there were 57,707 trading positions reviewed.

   a.   The median duration for the trading positions was 44 days.

   b.   There were 449 trading positions opened and closed on the same day.

   c.   There were 3,190 trading positions that were closed out in 2 days or less.

46

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

    d.   More than 25% of trading positions that were opened and closed during the review period had durations of 14 days or less.

    e.   More than 40% of trading positions that were opened and closed during the review period had durations of 28 days or less.

125.    As noted above, Monex allows customers to open both short and long trading positions.  As shown in **Table B (Exhibit 63)**, of the 57,707 trading positions opened and closed during the review period by leveraged Atlas customer accounts, 8,489 of them were short positions (14.7%).

    a.   The median duration for these short trading positions was 13 days.

    b.   155 short trading positions were established and closed on the same day.

    c.   There were 1,154 short trading positions that were closed out in 2 days or less.

    d.   More than 50% of short trading positions that were opened and closed during the review period had durations of 14 days or less.

    e.   More than 70% of short trading positions opened and closed during the review period had durations of 28 days or less.

126.    By reviewing the transaction data that Monex produced, I determined that Monex executed more than 140,000 leveraged metals trades during the review period, an average of more than 2,000 leveraged trades per month.

127.    Monex provided data fields in their database that show if a transaction is for delivery, pick-up, storage, and so forth.  I summarized delivery transactions by leveraged Atlas customer accounts in **Table C (Exhibit 63), Leveraged Atlas Customer Accounts Trading Position Delivery Summary**.  There were 59,724 long trading positions established by leveraged Monex Atlas customer accounts during the review period.  Of those, 3,651 (6.11%)

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

resulted in a delivery of precious metal to a customer, or for the customer to pick up. Of the long trading positions, 49,218 (82.41%) were closed with no delivery. The remaining 6,855 (11.48%) long trading positions were open at the end of the review period with neither a closing trade nor delivery transaction associated with them.

128.     **Table C (Exhibit 63)** reflects that there were 8,720 short trading positions established by leveraged Monex Atlas customer accounts during the review period. There were no delivery transactions associated with those positions (0%). 8,489 (97.35%) of those short trading positions had been closed, while the remaining 231 (2.65%) short trading positions were open at the end of the review period.

129.     According to Monex's data, 5.33% of all positions resulted in a delivery. *Id.*

130.     As noted, Monex's data identifies margin calls and forced liquidations.

**Table D (Exhibit 63), Margin Calls and Forced Liquidations Summary**, summarizes the margin calls and forced liquidations in leveraged Monex Atlas customer accounts during the review period. Of the 12,185 leveraged Atlas accounts, 3,264 (26.79%) received a margin call during the review period. There were 1,850 (15.18%) leveraged accounts that had positions force liquidated during the review period. 3,774 leveraged accounts (30.96%) received either a margin call, forced liquidation, or both, during the review period.

### C.     Atlas Customer Profit and Loss

131.     In general, realized profit (loss) means the profit or loss that occurs when a trade is closed. By contrast, unrealized profit (loss) means the profit or loss in a position that has yet to be realized. For example, if a customer purchased 1,000 ounces of silver for $17,000, and one month later the price of silver fell to $16/oz, the trader would have $1,000 of unrealized losses in

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

her account. If the customer sold the 1,000 ounces of silver for $16,000, she would incur a realized loss of $1,000.

132. Monex calculates and tracks customer PNL on every transaction, and reflects a PNL on monthly customer account statements. Monex registers a profit or a loss whenever a trading position is offset (closed without delivery or pick-up), whether long or short. This profit or loss is entered as a line item on monthly account statements, associated with the transaction that led to the closing of the position by using the Transaction Number.

133. Monex's PNL calculations are inaccurate and incomplete for at least the following reasons.

134. First, Monex excludes from its PNL calculation the value of metals that customers send to Monex for storage which are later liquidated (sold to Monex). These metals act as collateral (margin) for open trading positions in Atlas trading accounts. When the metals are liquidated, Monex values the original price of the sent-in metal at $0 which in turn shows a profit on an account statement equal to the amount the collateral was sold for. This overstates profits in customer accounts.

135. For example, declarant Suzanne Cappello sent Monex 60 gold maple leaf coins on January 4, 2013. Monex valued these coins at $99,624. *See Cappello Dec.*, Ex. B, pg. 2. Approximately eleven months later, on November 21, 2013, Ms. Cappello sold these coins for $74,700. *Id.*, pg. 13. Instead of booking the sale as a loss, Monex booked a ***profit*** for Ms. Cappello of $73,766.22 (the sale price minus commission). *Id.* To account for this inaccuracy, I excluded all transactions of this nature in my summaries.

136. Second, Monex does not include interest payments or service fees in its PNL calculations. Accordingly, even if the price of metal does not change, a customer's account

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

equity will fall from month to month as she pays interest on her loan and other service fees. This eroding account equity is not reflected in the PNL figures when a customer offsets her position.

137.    Third, Monex does not track profit or loss associated with transactions in which a customer closes out an Atlas account trading position by taking physical delivery of metals. I disregard these transactions for all PNL summaries.

138.    Monex provided data sufficient to summarize realized and unrealized profit and loss ("PNL") for the 12,185 leveraged Atlas accounts during the review period. **Table E (Exhibit 63), PNL Summary of Leveraged Atlas Customer Accounts**, shows this information.

139.    I report customer PNL in three different ways. First, "**Trading Profit/Loss**" is PNL effectively as Monex reports it on Monex account statements, minus the inaccurate profits from the sale of sent-in metals to Monex as described in paragraphs 134-135 above. Because Monex only records a PNL when a position is closed (by offset), I limited my summary to those leveraged accounts that *opened and closed* a position, and therefore had a realized PNL event on such a transaction, during the review period. There were 8,223 such accounts. Under this metric, even using Monex's own profit and loss calculations, the total net realized losses from positions opened and closed in accounts after they became leveraged were over $227.5 million. 6,591 of these accounts, or 80.15%, realized a loss. *Id.*

140.    The second way in which I report PNL is by correcting all of the deficiencies noted in paragraph 136, above. I call this "**Trading Profit/Loss (Corrected)**." *See* **Table E (Exhibit 63)**. This PNL figure includes losses from fees and interest, and again excludes PNL from metals sent in and then sold to Monex by customers as I explained above.

141.    Under this metric, Table E shows 12,185 leveraged accounts experienced a net loss from transactions such as interest payments and other fees, and positions opened and closed

50

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

in accounts after they became leveraged of approximately $290 million. *Id.* Under the "Trading Profit/Loss (Corrected)" metric, 10,970 of these accounts, or 90.03%, had a loss during the review period.

142.     The third way in which I report PNL is by including unrealized PNL from positions that were opened during the review period. Monex calculates, tracks, and records daily unrealized mark-to-market PNL on all customer trading positions. I summarized the transaction data and unrealized mark-to-market PNL data into what I describe as the "**Trading Profit/Loss (Corrected, Realized & Unrealized)**" for the 12,185 leveraged Atlas customer accounts.

143.     The **Trading Profit/Loss (Corrected, Realized & Unrealized)** consists of the **Trading Profit/Loss (Corrected)** plus any unrealized mark-to-market PNL for trading positions opened during the review period by Atlas leveraged customer accounts once they use margin.

144.     Table E (Exhibit 63) shows that, under this metric, the total net loss across all margined accounts was more than $325 million. 10,501 of these accounts, or 86.18%, reflected a loss. Under this metric, the largest loss for a leveraged Atlas account was over $11 million whereas the largest gain for a leveraged Atlas account was around $310,000. The average losing account had a combined loss of more than $32,000 whereas the average profitable account had a combined gain of less than $4,100. *Id.*

145.     Monex's productions also included metals pricing data between January 2, 2009 and July 15, 2011. This data indicated how Monex priced various products (*i.e.* gold bullion, silver bullion, etc.) over that time period. **Table F (Exhibit 63), Summary of January 2, 2009 to July 15, 2011 Pricing**, is a summary of some of that information. Table F shows that between January 2, 2009 and July 15, 2011, metals prices appreciated by a minimum of 80%. As indicated in Table F, over that same time period, almost 57% of leveraged Atlas customer

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

accounts lost money (utilizing the "Trading Profit/Loss (Corrected, Realized & Unrealized) metric) for a net loss of approximately $9 million.

### D.    Impact of Monex Price Spread

146.    Monex charges its customers a price spread on each trade.  Typically there is a 2.5% to 3% spread between Monex's bid and ask prices.  This means Monex will allow customers to place a long trade at 1.5% over its existing spot price, and close out a long position at 1.5% under Monex's existing spot price.

147.    To provide context for the magnitude of this price spread and its impact on Atlas trades, it is helpful to compare the price spread to a benchmark.  In its Atlas account brochure, Monex compares its daily spot prices to the prices on CME Group's COMEX and NYMEX contract markets.  Monex provides a "correlation coefficient" which it says "represents the degree to which the quoted daily prices by Monex and the quoted daily prices by another market source show a tendency to vary together.  A coefficient of '1' is a perfect positive correlation."[141]  The correlation coefficients identified by Monex are all close to .99, inviting a comparison of the price spread on the Atlas platform to the price spread on the COMEX and NYMEX exchanges.

148.    The price spread charged by Monex is significantly higher than the price spread for similar trades executed on COMEX or NYMEX.  The impact can be substantial on even a single trade.  For example, on July 14, 2011, a customer (Account *-***5732-0) was filled on a purchase order for 5,000 ounces of silver (Transaction No. 414517).  This is the equivalent amount of silver represented by one COMEX silver futures contract.  Monex charged the

---

[141] Exhibit 13, Monex Atlas Account Brochure, pg. 3.

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

customer $195,790 for the 5,000 ounces.  The Monex database reflects a 3 percent bid-ask spread for the transaction, meaning that the customer paid a total of $2,950 in spread for that purchase transaction.

149.    Four days later, on July 18, 2011, the customer sold the 5,000 ounces of silver, for $197,935, earning a profit of $2,145.  According to the Monex database, the customer paid another 3% bid-ask spread charge, or $3,070 for that sale.  Accordingly, buying and selling 5,000 of silver in July 2011 cost the customer a total of $6,020 in spread charges.

| 07/14/11 | 414517 | PURCHASED | 5 | 1000 OUNCES SILVER | (195,790.00) |
| 07/14/11 | 425133 | SOLD | 5 | 1000 OUNCES SILVER 05/26/11 | 194,330.00 |
| | | | | COMMISSION | (485.85) |
| | | | | PROFIT $2,784.15 | |
| 07/18/11 | 412367 | SOLD | 4 | 1000 OUNCES SILVER 07/12/11 | 158,348.00 |
| | | | | PROFIT $10,772.00 | |
| 07/18/11 | 414517 | SOLD | 5 | 1000 OUNCES SILVER 07/14/11 | 197,935.00 |
| | | | | PROFIT $2,145.00 | |

150.    Had the customer done similar buy and sell transactions on COMEX (buying one silver futures contract and then selling it four days later), he likely would have paid a total of $25 in bid-ask spread.

151.    The COMEX minimum price fluctuation (tick) is one-half cent per ounce of silver.  So for one silver futures contract (5,000 ounces), the total price spread would have been $25 in a one-tick wide market, which is common during normal U.S. trading hours.  Had the customer conducted a similar trade on COMEX instead of on the Atlas platform, he would have earned $8,140 in profit, minus a small commission.  Put another way, the customer sacrificed nearly $6,000 in profit by conducting his trade on the Atlas program instead of on the regulated COMEX market.

### E.    Monex's Revenue

152.    The Monex database included data fields relating to interest payments, commissions, service fees, and bid-ask spread.  This information permitted me to determine the

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

amount of revenue that Monex generated from leveraged Atlas accounts during the review period.

153.      **Table G (Exhibit 68), Monex Revenue From Leveraged Atlas Customer Accounts**, is a summary of transaction data that shows this information.

154.      As shown in **Table G (Exhibit 68)**, Monex charged its leveraged Atlas customer accounts over $170 million in spread, interest, commissions, and service fees during the review period.  Bid-ask spread charges were the largest category of revenue for Monex.  Leveraged Atlas account owners paid approximately $95 million in bid-ask spread during the review period.  *See id.*  Monex leveraged Atlas account holders were also charged over $57 million in interest during the review period due to loans for leveraged trading positions.

155.      As shown in **Table G (Exhibit 68)**, Monex leveraged Atlas account customers paid more than $6.4 million in service fees and at least $14 million in commissions during the review period.

   **F.      Monex's Ongoing Conduct**

156.      **Table H (Exhibit 68), Summary of Final 6 Months of Data in Monex Database for Leveraged Atlas Customer Accounts** is a summary of transaction data for the last 6 months of data that Monex produced to the CFTC.  The summary shows that from October 2016 through March 2017, Monex averaged 71 new leveraged Atlas customer accounts per month, for a total of 355 new accounts.  Further, during that time period, across all leveraged Atlas accounts (both new and extant), Monex customers placed on average over 1,700 leveraged trades per month.  From those trades and other charges, the summary shows that Monex has collected over $2 million in revenue per month from October 2016 to March 2017.

On this 6th day of September, 2017, in Chicago, Illinois, I declare under the penalty of

*Declaration of CFTC Senior Investigator Jeffrey Gomberg*

perjury that the foregoing is true and correct.

JEFFREY GOMBERG, SENIOR INVESTIGATOR

# EXHIBIT 1

# MONEX CREDIT COMPANY
# MONEX DEPOSIT COMPANY
# CONCORD FUNDING COMPANY



## MANAGEMENT PRESENTATION

## May 14, 2014

Prepared by:

**Brian Jenkins**

**CFO**

**The Monex Companies**

**(949) 752-1400**

**Chris Flannery**

**Managing Director**

**Piper Jaffray & Co.**

**(612) 303-2193**



# TABLE OF CONTENTS

MONEX OVERVIEW                                                    3

CONCORD FUNDING COMPANY FINANCINGS                               9

SERIES 2014-1 TRANSACTION                                        13

QUESTIONS                                                        14

APPENDIX A – Monex Liquidation and Loss History

APPENDIX B – Current Monex Portfolio Stratifications

APPENDIX C – Concord Funding Company Indenture Performance

APPENDIX D – Monex Customer Credit Statistics

APPENDIX E – Preliminary Series 2014-1 Term Sheet



# Monex Overview

## Company History

- Predecessor company, Pacific Coast Coin Exchange, founded by Lou Carabini in 1967

- Monex Deposit Company (MDC), the trading affiliate, and Monex Credit Company (MCC), the financing affiliate, were founded in 1987

- MDC has executed over $40 billion in trades for customers over the past 10 years

- Monex has become far and away the leading retail dealer of precious metals in the U.S.



# Monex Overview

## Company Organization and Management

- MDC is a California limited partnership which executes precious metals trades with customers and with institutional dealers and trading partners

- MCC is a California limited partnership which finances customer precious metals purchases and is servicer for the Concord Funding Company transactions

- Concord Funding Company, LLC (CFC) is a Delaware LLC and single purpose entity which is the issuer of the company's asset-backed notes under an indenture created in 2002

- Current Management
  - Michael Carabini, President
  - Brian Jenkins, CFO
  - Greg Walker, Corporate Counsel

4



# Monex Overview

## Company Organization and Management

- MDC, MCC and CFC trade and finance customer positions in gold, silver, platinum and palladium bullion and coins

- MDC currently consists of 66 account representatives and 80 total employees

- Unrelated to the bullion business but affiliated is the Monaco group of companies which markets and finances customer investments in rare coins, recovered treasure and related collectibles

5



# Monex Overview

## The Business

- MDC account reps execute trades with customers through MDC's trading desk via recorded transactions

- If the customer is not financing the position, MDC will deliver or store metal per the customer's direction

- If the customer wants to finance, the metal is held as collateral at the company's depository – Delaware Depository Service Company (DDSC), a NYMEX approved depository

- All collateral for CFC owned margin loans and all inventory owned by CFC is held at DDSC

- MCC currently charges 5.90% on all of its margin loans

- MCC customers have historically had and still have a very strong credit profile with average credit scores consistently above 750 (see Appendix D for Monex portfolio FICO distributions for the past 5 years)

6



# Monex Overview

## The Business

- Current margin levels:

  - Initial equity requirement: 25% for gold, silver, platinum and palladium

  - Maintenance equity requirement: 14% for all four metals

  - Forced sell equity level: 7% for all four metals

- When a customer's equity falls below the maintenance requirement, they receive a margin call

- When it falls below the forced sell level, the position is liquidated and proceeds used to pay off margin loan and pay expenses with remainder sent to customer

7



# Monex Overview

## The Business

- In 27 years of financing customer positions, MCC has experienced extremely low losses of principal on its loan portfolio – see Appendix A for details

- See Appendix B for stratifications of current portfolio of approximately $165MM in customer margin loans

- This portfolio is currently financed via a combination of CFC notes and a credit line with the company's long time bank in Newport Beach



# Concord Funding Company Financings

## Securitization History

- Concord Funding Company (CFC) was established in 1995 for the purpose of issuing the Monex Companies' first series of asset-backed notes

  - A total of $42 million in trust certificates were issued in 1995 and 1996

  - Certificates were rated AA (1995-1 issue) and AAA (1996-1) by S & P by virtue of a customized dynamic put to CSFB that protected certificate holders from adverse precious metals price movements

  - When certificates were set to mature in 2002, the put was no longer available

- In 2002, CFC hired Piper Jaffray to help structure and place new asset-backed notes

- CFC issued its $50MM Series 2002-1 Secured Notes in three classes, $43 million AAA-rated Class A, $4.45 million A-rated Class M and $2.55 million BBB-rated Class B

- Subsequently, CFC issued $25MM Series 2004-1, $25MM Series 2005-1 and $75MM Series 2006-1 out of the same parity indenture with substantially similar structure

- Post-credit crisis, CFC came back to market with several transactions structured with lower ratings and much higher O/C levels due to significant changes in ABS rating methodology at S & P – and not due to any reason specific to CFC or Monex

- Post-crisis issues have included: $25MM Series 2012-1, $100MM Series 2012-2 and $75MM Series 2013-1, each with an A-rated and a BBB-rated Class and all of which are outstanding in their full original par amounts

9



# Concord Funding Company Financings

## Pre-Crisis Note Structure

- Each CFC issue out of the 2002 indenture is secured by MCC customer loans, MDC inventory and cash

- The structure is revolving with a daily borrowing base – eligible loans, eligible inventory and cash can be moved in and out of CFC subject to a daily borrowing base calculation

- Borrowing base worked as follows pre-crisis:

  - Inventory is subject to a haircut of 83.5% applied to its value based on prices as of market close the day before – this was the S & P haircut applicable to the BBB rating category for a two day exposure to silver price movements (silver being the most volatile historically)

  - Customer loans are subject to a loan by loan haircut at a loan to daily value of 83.5%

  - Cash is valued at 100%

- Three month interest and fee reserve and a litigation reserve

- Every day, the aggregate haircutted value of all inventory, loans and cash must at least equal the total amount of all AAA, A and BBB Notes outstanding

# Concord Funding Company Financings

## Pre-Crisis Note Structure

- All pre-crisis Notes issued out of the 2002 indenture were floaters – priced at fixed spreads to one month LIBOR

- Original maturities were all approximately 5 years

- One notable variation – the Series 2006-1 Class A (AAA-rated) Notes were Variable Funding Notes, i.e. the Issuer can draw the outstanding balance down and up subject to a maximum outstanding amount of $64.5MM

- See Appendix C for an asset and cash flow performance history for the 2002 indenture to date – pre and post-crisis

11



# Concord Funding Company Financings

## CFC Indenture Performance

- All CFC transactions, pre and post-crisis, have performed without incident

- Monex loan losses remain negligible despite some historically high periods of precious metals market volatility during the credit crisis

- S & P changes to criteria on this transaction flow from their troubles in real estate backed ABS/CDO sectors and have nothing to do with Monex/Concord performance, assets, etc.:

  - specifically, as a direct consequence of the poor performance of its real estate related ratings during the crisis, S & P completely revamped its criteria for many ABS asset classes (not just real estate) in a fashion that has become completely dysfunctional for an issuer of non-real estate backed, alternative asset class ABS – e.g. Monex/Concord

12



# Series 2014-1 Transaction

## Proposed Structure – Back to the Future: Identical to Pre-Crisis Structure

- Total Par Amount: $75MM
- Maturity: 5 years, soft bullet with one month payoff window
- Three Classes structured to pre-crisis S & P AAA/A/BBB O/C levels
- 3 month interest/fee reserve, no litigation reserve
- Same eligibility rules for inventory, loans
- Same early amortization, event of default, liquidation, back-up servicing provisions
- Either fixed or floating
- Desired closing in the second half of 2014
- See preliminary term sheet attached as Appendix E

13

**Questions**

14



# Appendix A – Monex Liquidation and Loss History

1

**MCC LOAN LOSS EXPERIENCE**

| | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AVERAGE MCC CUSTOMER LOAN BALANCE | 87,647,500 | 81,672,500 | 75,384,600 | 80,153,400 | 55,201,000 | 48,484,800 | 41,170,600 | 42,521,800 | 42,316,200 | 50,512,400 | 45,026,600 | 44,686,000 | 73,035,800 | 84,794,600 |
| FORCED LIQUIDATIONS | 23,299,251 | 7,006,660 | 8,166,390 | 25,127,127 | 7,569,478 | 6,080,765 | 8,584,061 | 6,655,684 | 6,237,469 | 5,562,700 | 39,104,218 | 25,150,124 | 6,467,368 | 4,706,330 |
| MCC LOAN LOSSES | 14,602 | 18,953 | 1,352 | 15,261 | 9,505 | 1,613 | 246 | 109 | 902 | 50 | 8,335 | 28,366 | 56 | 835 |

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AVERAGE MCC CUSTOMER LOAN BALANCE | 49,863,000 | 51,385,600 | 62,127,000 | 83,577,000 | 101,703,114 | 162,079,155 | 164,759,970 | 187,308,113 | 103,429,482 | 119,779,485 | 200,431,278 | 231,415,600 | 180,998,985 | 146,123,861 |
| FORCED LIQUIDATIONS | 6,212,240 | 5,410,993 | 4,228,687 | 11,493,239.69 | 1,802,340.61 | 45,801,332.76 | 12,385,696.82 | 94,718,789.70 | 528,003.64 | 7,324,379.35 | 18,419,912.81 | 1,129,398.47 | 51,995,620.64 | 47,210.91 |
| MCC LOAN LOSSES | 111 | 0 | 0 | 1,723 | 0 | 1,177 | 0 | 20,516 | (13) | 3,163 | 0 | 0 | 0 | 0 |



# Appendix B – Current Monex Portfolio Stratifications

1

## DISTR OF LOAN POOL BY GEO

| OBLIGOR LOCATION | OUTSTANDING LOAN | % OF AGGREGATE OUTSTANDING LOAN | NUMBER OF ACCOUNTS | % OF AGGREGATE NUMBER OF ACCOUNTS |
|---|---|---|---|---|
| CALIFORNIA | 32,363,850.21 | 19.7 | 851 | 20.20 |
| FLORIDA | 11,883,266.20 | 7.2 | 308 | 7.31 |
| TEXAS | 10,717,019.77 | 6.5 | 326 | 7.74 |
| NEW YORK | 10,191,018.31 | 6.2 | 226 | 5.36 |
| SOUTH DAKOTA | 9,778,918.62 | 6.0 | 12 | 0.28 |
| MASSACHUSETTS | 8,989,138.70 | 5.5 | 66 | 1.57 |
| GEORGIA | 6,239,278.53 | 3.8 | 111 | 2.63 |
| ILLINOIS | 5,212,658.75 | 3.2 | 116 | 2.75 |
| HAWAII | 4,647,796.15 | 2.8 | 63 | 1.50 |
| NEVADA | 4,621,688.63 | 2.8 | 74 | 1.76 |
| NORTH CAROLINA | 4,268,155.86 | 2.6 | 124 | 2.94 |
| MARYLAND | 4,207,647.02 | 2.6 | 77 | 1.83 |
| WISCONSIN | 3,906,457.01 | 2.4 | 51 | 1.21 |
| VIRGINIA | 3,575,214.51 | 2.2 | 120 | 2.85 |
| PENNSYLVANIA | 3,548,153.43 | 2.2 | 148 | 3.51 |
| WASHINGTON | 3,116,955.65 | 1.9 | 88 | 2.09 |
| OREGON | 2,923,168.26 | 1.8 | 60 | 1.42 |
| COLORADO | 2,909,123.36 | 1.8 | 125 | 2.97 |
| OHIO | 2,767,550.99 | 1.7 | 105 | 2.49 |
| ARIZONA | 2,698,866.85 | 1.6 | 102 | 2.42 |
| NEW JERSEY | 2,536,300.41 | 1.6 | 126 | 2.99 |
| MISSOURI | 2,387,461.24 | 1.5 | 64 | 1.52 |
| IDAHO | 2,231,102.16 | 1.4 | 39 | 0.93 |
| TENNESSEE | 1,853,994.57 | 1.1 | 59 | 1.40 |
| MICHIGAN | 1,698,257.60 | 1.0 | 121 | 2.87 |
| SOUTH CAROLINA | 1,466,311.96 | 0.9 | 50 | 1.19 |
| CONNECTICUT | 1,433,598.72 | 0.9 | 50 | 1.19 |
| ALABAMA | 1,397,520.39 | 0.9 | 42 | 1.00 |
| INDIANA | 1,287,713.90 | 0.8 | 35 | 0.83 |
| LOUISIANA | 1,158,512.09 | 0.7 | 48 | 1.14 |
| UTAH | 1,017,001.99 | 0.6 | 48 | 1.14 |
| OKLAHOMA | 741,019.96 | 0.5 | 38 | 0.90 |
| WYOMING | 710,205.22 | 0.4 | 19 | 0.45 |
| ARKANSAS | 690,143.46 | 0.4 | 24 | 0.57 |
| CANADA | 663,828.18 | 0.4 | 27 | 0.64 |
| ALASKA | 602,763.62 | 0.4 | 23 | 0.55 |
| IOWA | 594,483.60 | 0.4 | 26 | 0.62 |
| NEW MEXICO | 589,822.48 | 0.4 | 41 | 0.97 |
| KANSAS | 446,194.15 | 0.3 | 27 | 0.64 |
| WEST VIRGINIA | 439,160.18 | 0.3 | 16 | 0.38 |
| KENTUCKY | 309,743.88 | 0.2 | 27 | 0.64 |
| NORTH DAKOTA | 308,639.25 | 0.2 | 20 | 0.47 |
| MISSISSIPPI | 296,155.01 | 0.2 | 23 | 0.55 |
| MAINE | 234,194.71 | 0.1 | 18 | 0.43 |
| RHODE ISLAND | 165,143.50 | 0.1 | 8 | 0.19 |
| VERMONT | 109,505.96 | 0.1 | 12 | 0.28 |
| MILITARY | 49,370.60 | 0.0 | 1 | 0.02 |

## DISTR OF LOAN POOL BY GEO

| | | | | |
|---|---|---|---|---|
| DELAWARE | 31,532.36 | 0.0 | 6 | 0.14 |
| VIRGIN ISLANDS | 29,184.17 | 0.0 | 1 | 0.02 |
| WASHINGTON DC | 16,330.02 | 0.0 | 6 | 0.14 |
| PUERTO RICO | 13,799.10 | 0.0 | 3 | 0.07 |
| MEXICO | 6,866.84 | - | 1 | 0.02 |
| MINNESOTA | 4,368.68 | - | 2 | 0.05 |
| NEBRASKA | 1,283.48 | - | 6 | 0.14 |
| MONTANA | 147.99 | - | 3 | 0.07 |
| GUAM | 0.00 | - | 0 | 0.00 |
| NEW HAMPSHIRE | 0.00 | - | 0 | 0.00 |
| TOTALS | 164,087,588.24 | 100.0 | 4,213 | 99.98 |

## DISTR OF LOAN POOL BY BAL

| RECEIVABLE SIZE | OUTSTANDING LOAN | % OF AGGREGATE OUTSTANDING LOAN | NUMBER OF ACCOUNTS | % OF AGGREGATE NUMBER OF ACCOUNTS |
|---|---|---|---|---|
| $0 - $19,999.99 | 15,237,842.31 | 9.29 | 3,045 | 72.28 |
| $20,000 - $49,999.99 | 20,103,909.25 | 12.25 | 617 | 14.65 |
| $50,000 - $99,999.99 | 21,249,209.96 | 12.95 | 294 | 6.98 |
| $100,000 - $499,999.9 | 46,773,061.41 | 28.50 | 220 | 5.22 |
| >= $500,000 | 60,723,565.31 | 37.01 | 37 | 0.88 |
| TOTALS | 164,087,588.24 | 100.00 | 4,213 | 100.01 |

## DISTR OF LOAN POOL BY EQ

| ACCOUNT EQUITY % | OUTSTANDING LOAN | % OF AGGREGATE OUTSTANDING LOAN | NUMBER OF ACCOUNTS | % OF AGGREGATE NUMBER OF ACCOUNTS |
|---|---|---|---|---|
| < 7.00 | 0.00 | 0.00 | 0 | 0.00 |
| 7.00 - 11.99 | 0.00 | 0.00 | 0 | 0.00 |
| 12.00 - 13.99 | 0.00 | 0.00 | 0 | 0.00 |
| 14.00 - 17.99 | 8,015,493.72 | 4.88 | 132 | 3.13 |
| 18.00 - 19.99 | 11,349,859.20 | 6.92 | 168 | 3.99 |
| 20.00 - 21.99 | 12,713,658.82 | 7.75 | 232 | 5.51 |
| 22.00 - 23.99 | 10,037,606.23 | 6.12 | 227 | 5.39 |
| 24.00 - 25.99 | 16,883,147.21 | 10.29 | 249 | 5.91 |
| 26.00 - 27.99 | 19,189,770.53 | 11.69 | 240 | 5.70 |
| 28.00 - 29.99 | 10,639,006.29 | 6.48 | 176 | 4.18 |
| 30.00 - 39.99 | 36,792,571.52 | 22.42 | 565 | 13.41 |
| 40.00 - 49.99 | 14,196,461.78 | 8.65 | 384 | 9.11 |
| 50.00 - 59.99 | 11,844,758.94 | 7.22 | 271 | 6.43 |
| 60.00 - 69.99 | 6,526,959.99 | 3.98 | 181 | 4.30 |
| 70.00 - 99.99 | 5,898,294.01 | 3.59 | 1,388 | 32.95 |
| TOTALS | 164,087,588.24 | 99.99 | 4,213 | 100.01 |

## DISTR OF LOAN POOL BY AGE

| AGE (YEARS) | OUTSTANDING LOAN | % OF AGGREGATE OUTSTANDING LOAN | NUMBER OF ACCOUNTS | % OF AGGREGATE NUMBER OF ACCOUNTS |
|---|---|---|---|---|
| 0 - 1 | 38,269,431.79 | 23.32 | 862 | 20.46 |
| 1 – 2 | 18,157,008.99 | 11.07 | 539 | 12.79 |
| 2 – 4 | 30,980,623.52 | 18.88 | 1,140 | 27.06 |
| 4 – 7 | 51,545,960.11 | 31.41 | 1,046 | 24.83 |
| 7 – 10 | 10,167,201.65 | 6.20 | 306 | 7.26 |
| > 10 | 14,967,362.18 | 9.12 | 320 | 7.60 |
| TOTALS | 164,087,588.24 | 100.00 | 4,213 | 100.00 |

## FIFTEEN LARGEST OBLIGORS

| OBLIGOR RANKING | OUTSTANDING LOAN | % OF AGGREGATE OUTSTANDING LOAN | ACCOUNT EQUITY | OPEN DATE | AGE (DAYS) |
|---|---|---|---|---|---|
| 1 | 9,478,313.44 | 5.78 | 26.57 | | 1,582 |
| 2 | 7,772,813.13 | 4.74 | 34.83 | | 1,807 |
| 3 | 4,731,107.79 | 2.88 | 24.78 | | 329 |
| 4 | 2,796,296.34 | 1.70 | 29.31 | | 529 |
| 5 | 2,385,794.23 | 1.45 | 19.46 | | 109 |
| 6 | 2,033,392.43 | 1.24 | 19.87 | | 3,711 |
| 7 | 1,883,381.23 | 1.15 | 59.29 | | 3,691 |
| 8 | 1,880,115.98 | 1.15 | 66.83 | | 1,941 |
| 9 | 1,811,233.54 | 1.10 | 45.39 | | 115 |
| 10 | 1,596,002.46 | 0.97 | 52.94 | | 4,041 |
| 11 | 1,582,017.94 | 0.96 | 29.7 | | 535 |
| 12 | 1,572,216.30 | 0.96 | 21.61 | | 294 |
| 13 | 1,481,770.80 | 0.90 | 15.23 | | 168 |
| 14 | 1,356,437.64 | 0.83 | 32.96 | | 2,227 |
| 15 | 1,213,328.52 | 0.74 | 39.45 | | 245 |
| OTHER | 120,513,366.47 | 73.44 | N/A | N/A | N/A |
| TOTALS | 164,087,588.24 | 99.99 | | | |

## DISTR OF METALS COLLATERAL

| PRODUCT | TYPE | OUNCES | % OF TOTAL OUNCES | MARKET VALUE | % OF TOTAL MARKET VALUE |
|---|---|---|---|---|---|
| GOLD | BULLION | 57,413.20 | 0.42 | 75,728,010.80 | 16.74 |
| | COIN | 64,509.21 | 0.47 | 85,087,647.99 | 18.81 |
| PLATINUM | BULLION | 3,520.00 | 0.03 | 5,135,680.00 | 1.14 |
| | COIN | 2,125.00 | 0.02 | 3,100,375.00 | 0.69 |
| SILVER | BULLION | 11,576,800.00 | 84.39 | 231,304,464.00 | 51.14 |
| | COIN | 1,999,770.00 | 14.58 | 39,955,404.60 | 8.83 |
| PALLADIUM | BULLION | 11,280.00 | 0.08 | 9,069,120.00 | 2.01 |
| | COIN | 3,590.00 | 0.03 | 2,886,360.00 | 0.64 |
| TOTAL | | 13,719,007.41 | 100.02 | 452,267,062.39 | 100.00 |

## DISTR OF METALS INVENTORY

| PRODUCT | TYPE | OUNCES | % OF TOTAL OUNCES | MARKET VALUE | % OF TOTAL MARKET VALUE |
|---|---|---|---|---|---|
| GOLD | COIN | 13,376.22 | 0.86 | 17,643,234.18 | 24.95 |
| PLATINUM | BULLION | 2,821.60 | 0.18 | 4,116,714.40 | 5.82 |
| | COIN | 1,474.50 | 0.09 | 2,151,295.50 | 3.04 |
| SILVER | COIN | 1,514,025.56 | 97.53 | 30,250,230.69 | 42.77 |
| PALLADIUM | BULLION | 16,590.48 | 1.07 | 13,338,745.92 | 18.86 |
| | COIN | 4,010.00 | 0.26 | 3,224,040.00 | 4.56 |
| TOTAL | | 1,552,298.36 | 99.99 | 70,724,260.69 | 100.00 |



# Appendix C – Concord Funding Company Indenture Performance

1

**Concord Funding Company, L.L.C.**
INDENTURE STATUS

| Date | Loan Balance | Adjusted Eligible Loan Balance* | Maximum Inventory Value** | Total Cash in Accts. | Hedge Account Value | Total Adjusted Asset Value | Notes Outstanding | Accrued Interest | Principal Variance |
|---|---|---|---|---|---|---|---|---|---|
| 10/02/2002 |  |  |  |  |  |  |  |  |  |
| 10/15/2002 | 39,436,066 | 32,427,148 | 11,203,734 | 6,584,675 |  | 50,215,557 | 50,000,000 |  | 215,557 |
| 11/15/2002 | 39,986,695 | 37,847,732 | 11,738,427 | 789,030 |  | 50,375,190 | 50,000,000 |  | 375,190 |
| 12/16/2002 | 39,221,973 | 29,129,124 | 20,959,285 | 139,104 |  | 50,227,513 | 50,000,000 |  | 227,513 |
| 01/15/2003 | 31,774,409 | 24,728,323 | 28,447,930 | 165,649 |  | 53,341,903 | 50,000,000 |  | 3,341,903 |
| 02/18/2003 | 38,458,431 | 29,216,375 | 21,240,852 | 812,069 |  | 51,269,295 | 50,000,000 |  | 1,269,295 |
| 03/17/2003 | 54,289,731 | 46,788,003 | 7,599,411 | 188,241 |  | 54,575,655 | 50,000,000 |  | 4,575,655 |
| 04/15/2003 | 55,425,224 | 43,456,868 | 6,220,932 | 996,133 |  | 50,673,933 | 50,000,000 |  | 673,933 |
| 05/15/2003 | 46,857,448 | 34,646,631 | 16,832,756 | 1,005,006 |  | 52,484,393 | 50,000,000 |  | 2,484,393 |
| 06/16/2003 | 38,155,212 | 32,587,100 | 14,436,635 | 3,538,970 |  | 50,562,705 | 50,000,000 |  | 562,705 |
| 07/15/2003 | 46,269,290 | 29,583,105 | 19,391,238 | 1,689,040 |  | 50,663,383 | 50,000,000 |  | 663,383 |
| 08/15/2003 | 40,848,827 | 25,819,314 | 25,777,091 | 1,197,388 |  | 52,793,793 | 50,000,000 |  | 2,793,793 |
| 09/15/2003 | 34,575,466 | 27,758,761 | 25,692,156 | 426,459 |  | 53,877,376 | 50,000,000 |  | 3,877,376 |
| 10/15/2003 | 40,706,767 | 33,308,276 | 21,202,868 | 843,015 |  | 55,354,159 | 50,000,000 |  | 5,354,159 |
| 11/17/2003 | 51,544,596 | 27,516,600 | 30,099,742 | 457,847 |  | 58,074,189 | 50,000,000 |  | 8,074,189 |
| 12/15/2003 | 33,250,957 | 19,674,038 | 32,460,546 | 678,310 |  | 52,812,894 | 50,000,000 |  | 2,812,894 |
| 01/15/2004 | 30,077,311 | 25,759,060 | 31,766,008 | 934,695 |  | 58,459,764 | 50,000,000 |  | 8,459,764 |
| 02/17/2004 | 46,520,378 | 37,349,569 | 19,938,826 | 492,418 |  | 57,780,812 | 50,000,000 |  | 7,780,812 |
| 03/16/2004 | 47,616,145 | 39,670,946 | 14,927,978 | 98,791 |  | 54,697,715 | 50,000,000 |  | 4,697,715 |
| 04/15/2004 | 57,778,875 | 36,837,263 | 19,008,688 | 673,189 |  | 56,519,140 | 50,000,000 |  | 6,519,140 |
| 05/17/2004 | 59,990,353 | 37,349,476 | 10,015,677 | 2,803,630 |  | 50,168,783 | 50,000,000 |  | 168,783 |
| 06/15/2004 | 45,950,193 | 45,659,701 | 3,691,524 | 2,569,014 |  | 51,920,239 | 50,000,000 |  | 1,920,239 |
| 07/15/2004 | 52,649,196 | 43,558,987 | 20,681,858 | 13,673,563 |  | 77,914,408 | 75,000,000 |  | 2,914,408 |
| 08/16/2004 | 50,116,311 | 45,092,873 | 26,930,869 | 4,354,183 |  | 76,377,925 | 75,000,000 |  | 1,377,925 |
| 09/15/2004 | 57,080,747 | 52,550,379 | 20,944,723 | 2,288,922 |  | 75,784,024 | 75,000,000 |  | 784,024 |
| 10/15/2004 | 77,109,150 | 33,089,631 | 43,093,807 | 990,092 |  | 77,173,530 | 75,000,000 |  | 2,173,530 |
| 11/15/2004 | 40,734,169 | 27,122,802 | 53,313,113 | 781,996 |  | 81,217,911 | 75,000,000 |  | 6,217,911 |
| 12/15/2004 | 51,135,989 | 36,163,987 | 42,381,841 | 1,217,210 |  | 79,763,038 | 75,000,000 |  | 4,763,038 |
| 01/18/2005 | 75,570,147 | 68,135,215 | 13,307,061 | 1,394,254 |  | 82,836,530 | 75,000,000 |  | 7,836,530 |
| 02/15/2005 | 84,313,829 | 63,406,657 | 21,089,656 | 714,800 |  | 85,211,113 | 75,000,000 |  | 10,211,113 |
| 03/15/2005 | 71,094,013 | 52,527,949 | 26,152,476 | 601,493 |  | 79,281,918 | 75,000,000 |  | 4,281,918 |
| 04/15/2005 | 64,206,380 | 70,313,334 | 4,913,413 | 99,142 |  | 75,325,889 | 75,000,000 |  | 325,889 |

**Concord Funding Company, L.L.C.**
INDENTURE STATUS

| Date | Loan Balance | Adjusted Eligible Loan Balance* | Maximum Inventory Value** | Total Cash in Accts. | Hedge Account Value | Total Adjusted Asset Value | Notes Outstanding | Accrued Interest | Principal Variance |
|---|---|---|---|---|---|---|---|---|---|
| 05/16/2005 | 92,967,974 | 73,468,506 | 6,191,042 | 712,344 | | 80,371,892 | 75,000,000 | | 5,371,892 |
| 06/15/2005 | 58,474,340 | 49,535,145 | 26,799,701 | 1,377,486 | | 77,712,332 | 75,000,000 | | 2,712,332 |
| 07/15/2005 | 88,034,065 | 59,656,725 | 15,698,143 | 2,997,200 | | 78,352,068 | 75,000,000 | | 3,352,068 |
| 08/15/2005 | 73,518,208 | 62,656,968 | 14,341,032 | 1,246,749 | | 78,244,749 | 75,000,000 | | 3,244,749 |
| 09/15/2005 | 82,916,027 | 67,630,058 | 11,235,187 | 988,323 | | 79,853,568 | 75,000,000 | | 4,853,568 |
| 10/17/2005 | 36,834,368 | 30,160,643 | 44,241,287 | 2,046,219 | | 76,448,149 | 75,000,000 | | 1,448,149 |
| 11/15/2005 | 55,124,896 | 41,615,123 | 36,317,267 | 1,252,990 | | 79,185,380 | 75,000,000 | | 4,185,380 |
| 12/15/2005 | 42,885,931 | 26,222,709 | 54,855,843 | 23,279,364 | | 104,357,916 | 100,000,000 | | 4,357,916 |
| 01/17/2006 | 62,157,011 | 42,094,454 | 56,747,136 | 6,124,881 | | 104,966,471 | 100,000,000 | | 4,966,471 |
| 02/15/2006 | 91,188,098 | 46,580,055 | 53,925,123 | 1,817,154 | | 102,322,332 | 100,000,000 | | 2,322,332 |
| 03/15/2006 | 89,747,298 | 65,898,681 | 34,423,173 | 1,075,865 | | 101,397,719 | 100,000,000 | | 1,397,719 |
| 04/17/2006 | 98,706,396 | 62,011,073 | 44,912,008 | 2,537,010 | | 109,460,091 | 100,000,000 | | 9,460,091 |
| 05/15/2006 | 129,951,378 | 78,230,150 | 41,693,095 | 783,050 | | 120,706,295 | 100,000,000 | | 20,706,295 |
| 06/15/2006 | 87,615,689 | 68,819,113 | 37,182,882 | 2,361,847 | | 108,363,841 | 100,000,000 | | 8,363,841 |
| 07/17/2006 | 89,326,308 | 78,464,579 | 40,298,401 | 11,472,727 | | 130,235,707 | 120,500,000 | | 9,735,707 |
| 08/15/2006 | 80,941,041 | 72,193,872 | 57,920,829 | 5,652,532 | | 135,767,232 | 130,500,000 | | 5,267,232 |
| 09/15/2006 | 108,565,508 | 84,746,689 | 49,421,749 | 11,444,798 | | 145,613,237 | 140,500,000 | | 5,113,237 |
| 10/16/2006 | 103,754,986 | 96,912,462 | 42,964,589 | 3,457,491 | | 143,334,542 | 140,500,000 | | 2,834,542 |
| 11/15/2006 | 94,326,683 | 77,652,346 | 68,501,746 | 1,795,200 | | 147,949,292 | 140,500,000 | | 7,449,292 |
| 12/15/2006 | 94,101,247 | 73,658,481 | 62,590,581 | 4,418,198 | | 140,667,260 | 140,500,000 | | 167,260 |
| 01/16/2007 | 121,575,611 | 112,694,289 | 15,591,420 | 13,909,576 | | 142,195,285 | 140,500,000 | | 1,695,285 |
| 02/15/2007 | 86,577,949 | 81,695,464 | 65,203,995 | 1,923,121 | | 148,822,580 | 140,500,000 | | 8,322,580 |
| 03/15/2007 | 131,300,057 | 89,635,766 | 53,230,456 | 1,474,161 | | 144,340,383 | 140,500,000 | | 3,840,383 |
| 04/16/2007 | 105,537,483 | 100,190,226 | 36,806,216 | 6,671,120 | | 143,667,562 | 140,500,000 | | 3,167,562 |
| 05/15/2007 | 125,638,547 | 107,596,581 | 36,153,989 | 2,109,716 | | 145,860,287 | 140,500,000 | | 5,360,287 |
| 06/15/2007 | 121,719,302 | 114,689,836 | 28,821,065 | 6,443,386 | | 149,954,287 | 145,500,000 | | 4,454,287 |
| 07/16/2007 | 127,782,103 | 117,847,875 | 30,892,960 | 11,431,106 | | 160,171,940 | 155,500,000 | | 4,671,940 |
| 08/15/2007 | 121,599,918 | 109,308,972 | 46,887,424 | 3,611,252 | | 159,807,648 | 155,500,000 | | 4,307,648 |
| 09/17/2007 | 101,392,778 | 99,170,580 | 61,561,755 | 3,560,694 | | 164,293,028 | 155,500,000 | | 8,793,028 |
| 10/15/2007 | 65,897,508 | 61,299,666 | 95,505,548 | 49,144,763 | | 205,949,977 | 175,000,000 | | 30,949,977 |
| 11/15/2007 | 78,772,373 | 53,433,963 | 99,857,044 | 1,719,688 | | 155,010,695 | 125,000,000 | | 30,010,695 |
| 12/17/2007 | 105,742,886 | 91,025,955 | 40,093,993 | 2,058,960 | | 133,178,909 | 125,000,000 | | 8,178,909 |

**Concord Funding Company, L.L.C.**
INDENTURE STATUS

| Date | Loan Balance | Adjusted Eligible Loan Balance* | Maximum Inventory Value** | Total Cash in Accts. | Hedge Account Value | Total Adjusted Asset Value | Notes Outstanding | Accrued Interest | Principal Variance |
|---|---|---|---|---|---|---|---|---|---|
| 01/15/2008 | 87,195,067 | 73,659,698 | 78,188,059 | 1,014,123 | | 152,861,880 | 125,000,000 | | 27,861,880 |
| 02/18/2008 | 84,697,032 | 60,106,188 | 86,758,071 | 1,408,605 | | 148,272,864 | 125,000,000 | | 23,272,864 |
| 03/17/2008 | 125,773,949 | 81,560,129 | 77,071,227 | 2,156,999 | | 160,788,356 | 125,000,000 | | 35,788,356 |
| 04/15/2008 | 116,595,271 | 105,213,748 | 28,403,493 | 1,976,177 | | 135,593,418 | 125,000,000 | | 10,593,418 |
| 05/15/2008 | 112,552,795 | 106,039,097 | 34,047,713 | 1,431,205 | | 141,518,014 | 125,000,000 | | 16,518,014 |
| 06/16/2008 | 119,778,227 | 109,170,006 | 26,783,048 | 2,287,351 | | 138,240,405 | 125,000,000 | | 13,240,405 |
| 07/15/2008 | 97,095,982 | 91,778,167 | 46,703,671 | 1,358,937 | | 139,840,775 | 125,000,000 | | 14,840,775 |
| 08/15/2008 | 123,772,982 | 94,623,125 | 22,634,210 | 9,649,653 | | 126,906,987 | 125,000,000 | | 1,906,987 |
| 09/15/2008 | 69,283,056 | 60,304,495 | 31,711,112 | 34,801,958 | | 126,817,565 | 125,000,000 | | 1,817,565 |
| 10/15/2008 | 81,755,164 | 58,159,788 | 23,687,199 | 50,025,536 | | 131,872,523 | 125,000,000 | | 6,872,523 |
| 11/17/2008 | 65,644,520 | 58,543,834 | 21,419,794 | 48,166,323 | | 128,129,951 | 115,000,000 | | 13,129,951 |
| 12/15/2008 | 60,180,341 | 54,114,583 | 20,223,881 | 54,356,642 | | 128,695,106 | 115,000,000 | | 13,695,106 |
| 01/15/2009 | 70,641,447 | 59,868,836 | 55,601,816 | 13,752,189 | | 129,222,842 | 125,000,000 | | 4,222,842 |
| 02/17/2009 | 59,960,292 | 45,118,532 | 96,273,012 | 3,585,475 | | 144,977,019 | 125,000,000 | | 19,977,019 |
| 03/16/2009 | 75,198,189 | 53,873,371 | 52,438,469 | 19,007,654 | | 125,319,495 | 125,000,000 | | 319,495 |
| 04/15/2009 | 50,005,899 | 75,690,059 | 50,005,899 | 5,812,369 | | 131,508,326 | 125,000,000 | | 6,508,326 |
| 05/15/2009 | 53,139,211 | 50,291,207 | 55,355,700 | 24,481,860 | | 130,128,767 | 125,000,000 | | 5,128,767 |
| 06/15/2009 | 39,765,746 | 37,359,589 | 66,740,703 | 35,216,079 | | 139,316,370 | 125,000,000 | | 14,316,370 |
| 07/15/2009 | 68,920,445 | 54,803,109 | 28,984,348 | 54,056,087 | | 137,843,544 | 100,000,000 | | 37,843,544 |
| 08/17/2009 | 47,326,093 | 41,308,843 | 44,242,463 | 47,630,365 | | 133,181,671 | 100,000,000 | | 33,181,671 |
| 09/15/2009 | 34,263,904 | 30,150,642 | 67,240,269 | 28,981,709 | | 126,372,619 | 100,000,000 | | 26,372,619 |
| 10/15/2009 | 39,275,001 | 30,657,650 | 76,741,097 | 29,356,588 | | 136,755,336 | 100,000,000 | | 36,755,336 |
| 11/16/2009 | 51,882,145 | 41,310,676 | 58,188,126 | 30,028,257 | | 129,527,058 | 100,000,000 | | 29,527,058 |
| 12/15/2009 | 83,825,144 | 52,948,894 | 50,653,017 | 31,508,423 | | 135,110,334 | 100,000,000 | | 35,110,334 |
| 01/15/2010 | 67,203,784 | 60,941,538 | 53,843,399 | 17,898,609 | | 132,683,545 | 100,000,000 | | 32,683,545 |
| 02/16/2010 | 85,586,061 | 73,201,256 | 33,025,245 | 19,988,163 | | 126,214,664 | 100,000,000 | | 26,214,664 |
| 03/15/2010 | 66,653,787 | 64,899,728 | 46,256,015 | 11,601,056 | | 122,756,799 | 100,000,000 | | 22,756,799 |
| 04/15/2010 | 48,667,823 | 47,012,983 | 64,775,167 | 9,472,396 | | 121,260,546 | 100,000,000 | | 21,260,546 |
| 05/17/2010 | 40,104,153 | 34,265,977 | 68,374,084 | 12,557,319 | | 115,197,380 | 100,000,000 | | 15,197,380 |
| 06/15/2010 | 47,582,931 | 39,253,758 | 51,091,672 | 12,993,109 | | 103,338,539 | 100,000,000 | | 3,338,539 |
| 07/15/2010 | 54,186,668 | 42,121,894 | 57,535,667 | 5,509,344 | | 105,166,905 | 100,000,000 | | 5,166,905 |
| 08/16/2010 | 56,481,610 | 51,702,349 | 31,024,120 | 21,810,971 | | 104,537,439 | 100,000,000 | | 4,537,439 |

**Concord Funding Company, L.L.C.**
INDENTURE STATUS

| Date | Loan Balance | Adjusted Eligible Loan Balance* | Maximum Inventory Value** | Total Cash in Accts. | Hedge Account Value | Total Adjusted Asset Value | Notes Outstanding | Accrued Interest | Principal Variance |
|---|---|---|---|---|---|---|---|---|---|
| 09/15/2010 | 38,130,842 | 35,305,791 | 55,850,926 | 19,699,543 | | 110,856,259 | 100,000,000 | | 10,856,259 |
| 10/15/2010 | 54,301,503 | 38,700,530 | 57,184,153 | 16,280,878 | | 112,165,561 | 100,000,000 | | 12,165,561 |
| 11/15/2010 | 69,344,094 | 45,915,872 | 57,397,474 | 6,028,693 | | 109,342,038 | 100,000,000 | | 9,342,038 |
| 12/15/2010 | 54,183,530 | 45,749,176 | 51,569,976 | 12,434,631 | | 109,753,783 | 100,000,000 | | 9,753,783 |
| 01/18/2011 | 80,000,862 | 60,941,034 | 37,551,566 | 3,875,349 | | 102,367,949 | 100,000,000 | | 2,367,949 |
| 02/15/2011 | 69,687,865 | 61,841,880 | 30,951,680 | 7,713,475 | | 100,507,035 | 100,000,000 | | 507,035 |
| 03/15/2011 | 84,325,925 | 63,654,677 | 63,706,729 | 12,407,378 | | 139,768,784 | 100,000,000 | | 39,768,784 |
| 04/15/2011 | 115,376,553 | 81,830,473 | 41,407,293 | 1,554,123 | | 124,791,890 | 75,000,000 | | 49,791,890 |
| 05/16/2011 | 110,228,280 | 68,970,169 | 57,272,267 | 4,920,613 | | 131,163,048 | 75,000,000 | | 56,163,048 |
| 06/15/2011 | 106,539,962 | 94,653,486 | 15,989,654 | 4,087,727 | | 114,730,867 | 75,000,000 | | 39,730,867 |
| 07/15/2011 | 90,713,731 | 85,585,688 | 22,844,869 | 3,039,557 | | 111,470,114 | 75,000,000 | | 36,470,114 |
| 08/15/2011 | 105,152,617 | 90,883,721 | 26,968,173 | 3,521,991 | | 121,373,884 | 75,000,000 | | 46,373,884 |
| 09/15/2011 | 129,103,983 | 109,932,527 | 9,391,438 | 16,473,983 | | 135,797,947 | 75,000,000 | | 60,797,947 |
| 10/07/2011 | 94,770,954 | 89,990,975 | 12,818,014 | 203,419 | | 102,922,408 | - | | 102,922,408 |
| 10/13/2011 | 95,432,924 | 85,654,424 | 10,048,827 | 23,630,225 | | 119,333,476 | 25,000,000 | | 94,333,476 |
| 11/15/2011 | 87,687,483 | 82,988,955 | 12,594,141 | 13,408,469 | | 108,991,565 | 25,000,000 | | 83,991,565 |
| 12/15/2011 | 82,401,125 | 74,911,189 | 13,906,563 | 16,354,481 | | 105,172,232 | 25,000,000 | | 80,172,232 |
| 01/17/2012 | 76,751,499 | 71,236,555 | 14,640,759 | 1,383,154 | | 87,260,468 | 25,000,000 | | 62,260,468 |
| 02/15/2012 | 111,742,627 | 69,988,808 | 15,330,971 | 1,682,794 | | 87,002,572 | 20,000,000 | | 67,002,572 |
| 03/15/2012 | 88,414,443 | 71,886,085 | 17,195,156 | 6,469,654 | | 95,550,895 | 20,000,000 | | 75,550,895 |
| 04/16/2012 | 91,400,803 | 81,355,889 | 3,091,326 | 601,656 | | 85,048,871 | 20,000,000 | | 65,048,871 |
| 05/15/2012 | 86,011,342 | 74,430,649 | 7,933,334 | 1,466,276 | | 83,830,259 | 20,000,000 | | 63,830,259 |
| 06/15/2012 | 87,188,852 | 77,066,683 | 3,188,491 | 338,006 | | 80,593,181 | 20,000,000 | | 60,593,181 |
| 07/16/2012 | 83,395,072 | 74,830,642 | 762,602 | 677,043 | | 76,270,287 | 25,000,000 | | 51,270,287 |
| 08/15/2012 | 82,896,333 | 75,043,044 | 3,057,917 | 199,604 | | 78,300,565 | 25,000,000 | | 53,300,565 |
| 09/17/2012 | 99,107,457 | 73,738,829 | 10,487,241 | 626,691 | 77,808 | 84,852,761 | 25,000,000 | | 59,852,761 |
| 10/15/2012 | 95,888,047 | 77,815,344 | 4,860,341 | 300,122 | 150,309 | 82,975,807 | 25,000,000 | | 57,975,807 |
| 11/15/2012 | 105,482,268 | 81,274,799 | 7,003,375 | 239,208 | 281,012 | 88,517,381 | 25,000,000 | | 63,517,381 |
| 12/17/2012 | 104,981,716 | 76,891,729 | 7,889,426 | 1,503,304 | 285,096 | 86,362,268 | 25,000,000 | 2,298 | 61,359,969 |
| 01/15/2013 | 116,850,633 | 96,344,298 | 8,599,796 | 25,391,848 | | 130,486,251 | 125,000,000 | 11,240 | 5,475,011 |
| 02/15/2013 | 125,736,780 | 106,872,056 | 16,140,649 | 5,363,534 | | 128,657,251 | 125,000,000 | 12,488 | 3,644,762 |
| 03/15/2013 | 162,507,335 | 127,133,357 | 10,319,880 | 2,020,924 | | 139,759,257 | 125,000,000 | 11,240 | 14,748,017 |

## Concord Funding Company, L.L.C.
### INDENTURE STATUS

| Date | Loan Balance | Adjusted Eligible Loan Balance* | Maximum Inventory Value** | Total Cash in Accts. | Hedge Account Value | Total Adjusted Asset Value | Notes Outstanding | Accrued Interest | Principal Variance |
|---|---|---|---|---|---|---|---|---|---|
| 04/15/2013 | 178,966,569 | 157,103,430 | 45,999,373 | 7,660,398 | 629,248 | 211,392,449 | 200,000,000 | 17,260 | 11,375,190 |
| 05/15/2013 | 117,745,848 | 106,121,041 | 64,878,650 | 25,013,768 | 4,023,080 | 200,036,539 | 200,000,000 | 15,642 | 20,898 |
| 06/17/2013 | 112,753,392 | 101,450,295 | 63,987,445 | 31,272,083 | 4,741,897 | 201,451,719 | 200,000,000 | 500,531 | 951,188 |
| 07/15/2013 | 91,216,916 | 83,321,710 | 65,224,773 | 49,131,335 | 2,914,949 | 200,592,766 | 200,000,000 | 16,684 | 576,082 |
| 08/15/2013 | 92,721,626 | 86,277,135 | 69,139,962 | 51,144,100 | 1,792,226 | 208,353,422 | 200,000,000 | 15,642 | 8,337,781 |
| 09/16/2013 | 96,217,027 | 85,708,866 | 57,929,666 | 54,858,691 | 2,186,551 | 200,683,774 | 200,000,000 | 17,260 | 666,514 |
| 10/15/2013 | 103,508,400 | 94,027,682 | 46,377,405 | 64,324,892 | 2,495,761 | 207,225,740 | 200,000,000 | 16,146 | 7,209,593 |
| 11/15/2013 | 112,011,677 | 94,895,438 | 51,727,691 | 52,099,173 | 2,896,493 | 201,618,795 | 200,000,000 | 16,684 | 1,602,111 |
| 12/16/2013 | 106,202,735 | 93,136,281 | 43,151,417 | 61,133,109 | 3,093,290 | 200,514,096 | 200,000,000 | 16,684 | 497,412 |
| 01/15/2014 | 99,414,357 | 90,126,287 | 47,040,548 | 65,932,209 | 2,518,095 | 205,617,139 | 200,000,000 | 14,722 | 5,602,417 |
| 02/18/2014 | 96,631,874 | 90,192,893 | 49,735,362 | 60,638,885 | 1,293,814 | 201,860,954 | 200,000,000 | 18,538 | 1,842,415 |
| 03/17/2014 | 111,920,054 | 93,962,487 | 52,854,294 | 56,482,739 | 1,790,184 | 205,089,705 | 200,000,000 | 17,260 | 5,072,445 |

\* This number is the "haircutted" loan balance (i.e. ineligible loans are excluded, each eligible loan is haircutted based on whether it is hedged or not and the total is haircutted based on concentration limits).

\** This number is the haircutted value of the metal inventory owned by the SPE with haircuts dependent on whether metal is hedged or not.

## Concord Funding Company, L.L.C.
### CASHFLOW

| Date | Class A Interest Due | Class M Interest Due | Class B Interest Due | Total Debt Service | Trustee Fee | Back-Up Servicer Fee | Servicer Fee | Total Fees | Total Debt Service and Fees | Cashflow to Collection Account (for the period ending with corresponding date) | Cashflow Excess | Interest/Fee Coverage Ratio |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/02/02 | | | | | | | | | | | | |
| 10/15/02 | 41,149 | 6,267 | 5,571 | 52,987 | 1,250 | 1,667 | 34,178 | 37,095 | 90,081 | 283,685 | 193,604 | 3.15 |
| 11/15/02 | 98,124 | 14,945 | 13,285 | 126,353 | 1,250 | 1,667 | 82,639 | 85,556 | 211,909 | 657,434 | 445,526 | 3.10 |
| 12/16/02 | 82,618 | 13,340 | 12,365 | 108,323 | 1,250 | 1,667 | 81,059 | 83,976 | 192,299 | 493,504 | 301,204 | 2.57 |
| 01/15/03 | 81,342 | 13,053 | 12,049 | 106,444 | 1,250 | 1,667 | 63,549 | 66,466 | 172,909 | 1,004,737 | 831,828 | 5.81 |
| 02/18/03 | 90,157 | 14,584 | 13,535 | 118,275 | 1,250 | 1,667 | 87,172 | 90,089 | 208,364 | 1,108,925 | 900,562 | 5.32 |
| 03/17/03 | 70,628 | 11,481 | 10,691 | 92,799 | 1,250 | 1,667 | 97,722 | 100,639 | 193,438 | 570,099 | 376,661 | 2.95 |
| 04/15/03 | 73,781 | 12,116 | 11,360 | 97,257 | 1,250 | 1,667 | 107,155 | 110,072 | 207,328 | 987,633 | 780,304 | 4.76 |
| 05/15/03 | 77,400 | 12,645 | 11,815 | 101,860 | 1,250 | 1,667 | 93,715 | 96,632 | 198,492 | 439,520 | 241,028 | 2.21 |
| 06/16/03 | 82,560 | 13,488 | 12,603 | 108,651 | 1,250 | 1,667 | 81,398 | 84,315 | 192,966 | 453,556 | 260,590 | 2.35 |
| 07/15/03 | 70,317 | 11,758 | 11,154 | 93,229 | 1,250 | 1,667 | 89,454 | 92,371 | 185,600 | 332,249 | 146,650 | 1.79 |
| 08/15/03 | 72,459 | 12,289 | 11,763 | 96,510 | 1,250 | 1,667 | 85,556 | 88,473 | 184,983 | 692,555 | 507,571 | 3.74 |
| 09/15/03 | 72,574 | 12,301 | 11,770 | 96,645 | 1,250 | 1,667 | 85,556 | 88,473 | 185,117 | 493,969 | 308,851 | 2.67 |
| 10/15/03 | 70,592 | 11,941 | 11,411 | 93,944 | 1,250 | 1,667 | 82,796 | 85,713 | 179,656 | 715,589 | 535,933 | 3.98 |
| 11/17/03 | 77,651 | 13,135 | 12,552 | 103,338 | 1,250 | 1,667 | 113,398 | 116,315 | 219,653 | 632,826 | 413,174 | 2.88 |
| 12/15/03 | 65,886 | 11,145 | 10,651 | 87,681 | 1,250 | 1,667 | 62,068 | 64,985 | 152,666 | 556,326 | 403,660 | 3.64 |
| 01/15/04 | 74,518 | 12,502 | 11,885 | 98,905 | 1,250 | 1,667 | 62,160 | 65,077 | 163,982 | 1,055,816 | 891,834 | 6.44 |
| 02/17/04 | 76,863 | 13,053 | 12,506 | 102,421 | 1,250 | 1,667 | 102,345 | 105,262 | 207,683 | 1,158,318 | 950,635 | 5.58 |
| 03/15/04 | 62,706 | 10,661 | 10,221 | 83,589 | 1,250 | 1,667 | 85,709 | 88,626 | 172,214 | 777,962 | 605,748 | 4.52 |
| 04/15/04 | 71,834 | 12,224 | 11,726 | 95,784 | 1,250 | 1,667 | 119,410 | 122,327 | 218,110 | 1,465,911 | 1,247,801 | 6.72 |
| 05/17/04 | 74,533 | 12,658 | 12,327 | 99,318 | 1,250 | 1,667 | 127,979 | 130,896 | 230,213 | 3,194,857 | 2,964,643 | 13.88 |
| 06/15/04 | 67,546 | 11,471 | 10,890 | 90,007 | 1,875 | 2,292 | 88,037 | 92,204 | 181,825 | 501,690 | 319,865 | 2.76 |
| 07/15/04 | 74,847 | 12,381 | 11,664 | 98,892 | 1,875 | 2,292 | 91,900 | 96,067 | 194,958 | 764,056 | 569,098 | 3.92 |
| 08/16/04 | 100,808 | 16,496 | 15,509 | 132,813 | 1,875 | 2,292 | 106,915 | 111,082 | 243,894 | 771,532 | 527,638 | 3.16 |
| 09/15/04 | 129,896 | 20,118 | 18,222 | 168,235 | 1,875 | 2,292 | 114,161 | 118,328 | 286,563 | 652,665 | 366,102 | 2.28 |
| 10/15/04 | 138,496 | 21,008 | 18,732 | 178,235 | 1,875 | 2,292 | 154,218 | 158,385 | 336,620 | 1,620,867 | 1,284,247 | 4.82 |
| 11/15/04 | 149,222 | 22,340 | 19,719 | 191,281 | 1,875 | 2,292 | 84,184 | 88,351 | 279,631 | 1,085,446 | 805,815 | 3.88 |
| 12/15/04 | 156,233 | 22,843 | 19,784 | 198,860 | 1,875 | 2,292 | 102,272 | 106,439 | 305,299 | 1,771,169 | 1,465,870 | 5.80 |
| 01/18/05 | 196,101 | 27,859 | 23,551 | 247,511 | 1,875 | 2,292 | 171,292 | 175,459 | 422,969 | 1,582,368 | 1,159,399 | 3.74 |
| 02/15/05 | 165,383 | 23,345 | 19,625 | 208,353 | 1,875 | 2,292 | 141,064 | 145,231 | 353,584 | 1,848,072 | 1,494,488 | 5.23 |
| 03/15/05 | 170,901 | 23,916 | 19,952 | 214,770 | 1,875 | 2,292 | 132,709 | 136,876 | 351,645 | 998,410 | 646,765 | 2.84 |
| 04/15/05 | 201,431 | 27,743 | 22,815 | 251,989 | 1,875 | 2,292 | 132,693 | 136,860 | 388,849 | 1,232,720 | 843,871 | 3.17 |
| 05/16/05 | 209,415 | 28,570 | 23,288 | 261,273 | 1,875 | 2,292 | 172,725 | 176,892 | 438,165 | 1,651,844 | 1,213,679 | 3.77 |
| 06/15/05 | 209,983 | 28,406 | 22,971 | 261,360 | 1,875 | 2,292 | 185,936 | 190,103 | 451,463 | 3,085,125 | 2,633,662 | 6.83 |
| 07/15/05 | 216,971 | 29,129 | 23,386 | 269,485 | 1,875 | 2,292 | 116,949 | 121,116 | 390,601 | 574,781 | 184,180 | 1.47 |
| 08/15/05 | 233,541 | 31,066 | 24,719 | 289,327 | 1,875 | 2,292 | 181,937 | 186,104 | 475,430 | 1,135,040 | 659,610 | 2.39 |
| 09/15/05 | 243,712 | 32,119 | 25,322 | 301,153 | 1,875 | 2,292 | 151,938 | 156,105 | 457,258 | 1,312,016 | 854,758 | 2.87 |
| 10/17/05 | 262,862 | 34,323 | 26,808 | 323,993 | 1,875 | 2,292 | 176,888 | 181,055 | 505,048 | 1,176,142 | 671,094 | 2.33 |
| 11/15/05 | 248,707 | 32,191 | 24,917 | 305,815 | 1,875 | 2,292 | 71,213 | 75,380 | 381,195 | 1,179,970 | 798,775 | 3.10 |
| 12/15/05 | 264,808 | 34,080 | 26,223 | 325,110 | 2,708 | 3,125 | 110,250 | 116,083 | 441,194 | 921,357 | 480,163 | 2.09 |
| 01/17/06 | 411,544 | 51,771 | 39,199 | 502,514 | 2,708 | 3,125 | 94,349 | 100,182 | 602,696 | 1,342,816 | 740,120 | 2.23 |

**Concord Funding Company, L.L.C.**
**CASHFLOW**

| | Debt Service | | | | Required Amounts Fees | | | | | Cashflow and Coverage | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Class A Interest Due | Class M Interest Due | Class B Interest Due | Total Debt Service | Trustee Fee | Back-Up Servicer Fee | Servicer Fee | Total Fees | Total Debt Service and Fees | Cashflow to Collection Account (for the period ending with corresponding date) | Cashflow Excess | Interest/Fee Coverage Ratio |
| 02/15/06 | 363,362 | 45,580 | 34,387 | 443,328 | 2,708 | 3,125 | 120,170 | 126,003 | 569,332 | 2,310,355 | 1,741,023 | 4.06 |
| 03/15/06 | 357,521 | 44,700 | 33,598 | 435,819 | 2,708 | 3,125 | 170,218 | 176,051 | 611,870 | 1,216,505 | 604,635 | 1.99 |
| 04/17/06 | 435,456 | 54,141 | 40,433 | 530,029 | 2,708 | 3,125 | 197,444 | 203,277 | 733,307 | 1,899,124 | 1,165,817 | 2.59 |
| 05/15/06 | 380,263 | 47,054 | 34,946 | 462,263 | 2,708 | 3,125 | 184,252 | 190,085 | 652,349 | 2,326,066 | 1,673,717 | 3.57 |
| 06/15/06 | 433,642 | 53,403 | 39,440 | 526,485 | 2,708 | 3,125 | 268,566 | 274,400 | 800,884 | 1,670,537 | 869,652 | 2.09 |
| 07/17/06 | 456,660 | 56,060 | 41,248 | 553,968 | 3,642 | 3,958 | 186,913 | 194,513 | 748,481 | 2,129,823 | 1,381,342 | 2.85 |
| 08/15/06 | 473,709 | 88,957 | 64,635 | 627,301 | 3,642 | 3,958 | 172,698 | 180,298 | 807,599 | 1,677,638 | 870,039 | 2.08 |
| 09/15/06 | 554,239 | 94,572 | 68,795 | 717,606 | 3,642 | 3,958 | 167,278 | 174,878 | 892,484 | 1,433,572 | 541,088 | 1.61 |
| 10/16/06 | 605,327 | 94,572 | 68,795 | 768,694 | 3,642 | 3,958 | 224,369 | 231,969 | 1,000,663 | 1,378,805 | 378,142 | 1.38 |
| 11/15/06 | 584,833 | 91,392 | 66,502 | 742,726 | 3,642 | 3,958 | 207,510 | 215,110 | 957,836 | 1,629,422 | 671,586 | 1.70 |
| 12/15/06 | 584,833 | 91,392 | 66,502 | 742,726 | 3,642 | 3,958 | 188,653 | 196,253 | 938,980 | 1,311,398 | 372,418 | 1.40 |
| 01/16/07 | 626,916 | 97,900 | 71,173 | 795,988 | 3,642 | 3,958 | 200,749 | 208,349 | 1,004,338 | 1,457,008 | 452,671 | 1.45 |
| 02/15/07 | 584,833 | 91,392 | 66,502 | 742,726 | 3,642 | 3,958 | 243,151 | 250,751 | 993,478 | 1,981,075 | 987,597 | 1.99 |
| 03/15/07 | 545,844 | 85,299 | 62,068 | 693,211 | 3,642 | 3,958 | 161,612 | 169,212 | 862,424 | 1,655,763 | 793,340 | 1.92 |
| 04/16/07 | 623,822 | 97,484 | 70,935 | 792,242 | 3,642 | 3,958 | 184,700 | 192,300 | 984,541 | 1,402,022 | 417,481 | 1.42 |
| 05/15/07 | 565,339 | 88,345 | 64,285 | 717,969 | 3,642 | 3,958 | 204,039 | 211,639 | 929,608 | 1,418,750 | 489,142 | 1.53 |
| 06/15/07 | 604,328 | 94,438 | 68,718 | 767,484 | 3,642 | 3,958 | 218,111 | 225,711 | 993,195 | 853,825 | (139,370) | 0.86 |
| 07/16/07 | 629,751 | 94,438 | 68,718 | 792,907 | 3,642 | 3,958 | 251,553 | 259,153 | 1,052,061 | 1,090,351 | 38,290 | 1.04 |
| 08/15/07 | 658,821 | 91,392 | 66,502 | 816,714 | 3,642 | 3,958 | 255,564 | 263,164 | 1,079,878 | 1,124,630 | 44,751 | 1.04 |
| 09/17/07 | 759,677 | 104,689 | 75,535 | 939,901 | 3,642 | 3,958 | 267,520 | 275,120 | 1,215,020 | 3,018,470 | 1,803,449 | 2.48 |
| 10/15/07 | 658,866 | 90,538 | 65,171 | 814,575 | 3,642 | 3,958 | 189,266 | 196,866 | 1,011,441 | 1,968,770 | 957,329 | 1.95 |
| 11/15/07 | 759,350 | 91,370 | 38,290 | 889,010 | 2,392 | 2,292 | 135,188 | 139,872 | 1,028,882 | 1,784,948 | 755,086 | 1.73 |
| 12/17/07 | 505,669 | 61,527 | 45,457 | 612,653 | 2,392 | 2,292 | 168,048 | 172,732 | 785,385 | 2,659,556 | 1,874,170 | 3.39 |
| 01/15/08 | 490,790 | 59,126 | 43,125 | 593,040 | 2,392 | 2,292 | 204,436 | 209,120 | 802,160 | 2,056,693 | 1,254,533 | 2.56 |
| 02/15/08 | 451,392 | 55,623 | 41,755 | 548,770 | 2,392 | 2,292 | 200,870 | 205,554 | 754,324 | 1,406,994 | 652,670 | 1.87 |
| 03/17/08 | 348,177 | 44,942 | 35,634 | 428,753 | 2,392 | 2,292 | 175,041 | 179,724 | 608,477 | 3,904,190 | 3,295,713 | 6.42 |
| 04/15/08 | 299,410 | 39,320 | 31,775 | 370,505 | 2,392 | 2,292 | 243,163 | 247,847 | 618,352 | 1,901,914 | 1,283,562 | 3.08 |
| 05/15/08 | 300,636 | 39,734 | 32,332 | 372,702 | 2,392 | 2,292 | 233,191 | 237,875 | 610,577 | 45,546 | (565,031) | 0.07 |
| 06/16/08 | 301,419 | 40,390 | 33,345 | 375,153 | 2,392 | 2,292 | 240,113 | 244,797 | 619,950 | 1,324,928 | 704,978 | 2.14 |
| 07/15/08 | 269,426 | 36,217 | 29,997 | 335,640 | 2,392 | 2,292 | 231,571 | 236,255 | 571,895 | 608,105 | 36,210 | 1.06 |
| 08/15/08 | 286,734 | 38,583 | 31,991 | 357,307 | 2,392 | 2,292 | 200,665 | 205,349 | 562,656 | 1,989,785 | 1,427,128 | 3.54 |
| 09/15/08 | 287,602 | 38,673 | 32,042 | 358,317 | 2,392 | 2,292 | 255,798 | 260,481 | 618,798 | 3,868,809 | 3,250,011 | 6.25 |
| 10/15/08 | 280,172 | 37,616 | 31,118 | 348,906 | 2,392 | 2,292 | 138,566 | 143,250 | 492,156 | 8,397,085 | 7,904,929 | 17.06 |
| 11/17/08 | 515,127 | 62,794 | 46,502 | 624,422 | 2,392 | 2,292 | 179,861 | 184,545 | 808,967 | 6,951,838 | 6,142,871 | 8.59 |
| 12/15/08 | 156,710 | 25,893 | 23,763 | 206,366 | 2,392 | 2,292 | 122,536 | 127,220 | 333,586 | 2,466,458 | 2,132,872 | 7.39 |
| 01/15/09 | 154,399 | 26,488 | 25,060 | 205,948 | 2,392 | 2,292 | 124,373 | 129,057 | 335,004 | 1,183,131 | 848,127 | 3.53 |
| 02/17/09 | 95,894 | 19,408 | 21,640 | 136,942 | 2,392 | 2,292 | 155,411 | 160,095 | 297,037 | 996,173 | 699,136 | 3.35 |
| 03/16/09 | 88,284 | 16,896 | 18,288 | 123,469 | 2,392 | 2,292 | 127,155 | 131,839 | 255,307 | 2,312,631 | 2,057,324 | 9.06 |
| 04/15/09 | 107,164 | 19,712 | 20,858 | 147,734 | 2,392 | 2,292 | 150,396 | 155,080 | 302,815 | 2,482,107 | 2,179,292 | 8.20 |
| 05/15/09 | 97,758 | 18,739 | 20,300 | 136,797 | 2,392 | 2,292 | 183,362 | 188,046 | 324,843 | 2,093,474 | 1,768,631 | 6.44 |
| 06/15/09 | 91,124 | 18,339 | 20,390 | 129,853 | 2,392 | 2,292 | 109,821 | 114,505 | 244,358 | 929,475 | 685,116 | 3.80 |

**Concord Funding Company, L.L.C.**
CASHFLOW

| Date | Class A Interest Due | Class M Interest Due | Class B Interest Due | Total Debt Service | Trustee Fee | Back-Up Servicer Fee | Servicer Fee | Total Fees | Total Debt Service and Fees | Cashflow to Collection Account (for the period ending with corresponding date) | Cashflow Excess | Interest/Fee Coverage Ratio |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/15/08 | 85,944 | 17,516 | 19,600 | 123,060 | 1,767 | 1,667 | 106,278 | 109,712 | 232,773 | 1,139,285 | 906,512 | 4.89 |
| 08/17/09 | 71,039 | 14,588 | 16,541 | 102,168 | 1,767 | 1,667 | 150,528 | 153,962 | 256,130 | 1,207,271 | 951,141 | 4.71 |
| 09/15/09 | 61,367 | 12,710 | 14,473 | 88,550 | 1,767 | 1,667 | 91,497 | 94,931 | 183,481 | 1,464,244 | 1,280,763 | 7.98 |
| 10/15/09 | 61,374 | 12,930 | 14,847 | 89,151 | 1,767 | 1,667 | 68,528 | 71,962 | 161,113 | 571,796 | 410,683 | 3.55 |
| 11/16/09 | 65,589 | 13,805 | 15,844 | 95,238 | 1,767 | 1,667 | 83,787 | 87,221 | 182,459 | 801,716 | 619,257 | 4.39 |
| 12/15/09 | 59,007 | 12,466 | 14,333 | 85,806 | 1,767 | 1,667 | 100,305 | 103,739 | 189,546 | 1,777,754 | 1,588,208 | 9.38 |
| 01/15/10 | 62,661 | 13,283 | 15,297 | 91,240 | 1,767 | 1,667 | 173,239 | 176,673 | 267,913 | 1,537,352 | 1,269,439 | 5.74 |
| 02/16/10 | 64,682 | 13,711 | 15,790 | 94,183 | 1,767 | 1,667 | 143,368 | 146,802 | 240,985 | 2,248,682 | 2,007,697 | 9.33 |
| 03/15/10 | 54,414 | 11,552 | 13,313 | 79,280 | 1,767 | 1,667 | 154,055 | 157,489 | 236,768 | 1,689,441 | 1,452,673 | 7.14 |
| 04/15/10 | 62,429 | 13,259 | 15,283 | 90,970 | 1,767 | 1,667 | 137,751 | 141,185 | 232,156 | 883,126 | 650,971 | 3.80 |
| 05/17/10 | 66,306 | 13,879 | 15,887 | 96,072 | 1,767 | 1,667 | 103,825 | 107,259 | 203,331 | 1,197,864 | 994,533 | 5.89 |
| 06/15/10 | 65,806 | 13,169 | 14,736 | 93,711 | 1,767 | 1,667 | 77,535 | 80,969 | 174,680 | 672,788 | 498,108 | 3.85 |
| 07/15/10 | 68,993 | 13,719 | 15,299 | 98,010 | 1,767 | 1,667 | 95,166 | 98,600 | 196,610 | 787,934 | 591,324 | 4.01 |
| 08/16/10 | 72,923 | 14,564 | 16,279 | 103,766 | 1,767 | 1,667 | 115,598 | 119,032 | 222,798 | 754,747 | 531,948 | 3.39 |
| 09/15/10 | 63,707 | 13,172 | 14,985 | 91,864 | 1,767 | 1,667 | 112,963 | 116,397 | 208,261 | 934,111 | 725,850 | 4.49 |
| 10/15/10 | 62,374 | 13,034 | 14,906 | 90,314 | 1,767 | 1,667 | 76,262 | 79,696 | 170,010 | 1,536,263 | 1,366,254 | 9.04 |
| 11/15/10 | 64,373 | 13,460 | 15,398 | 93,231 | 1,767 | 1,667 | 112,223 | 115,657 | 208,888 | 2,199,556 | 1,990,668 | 10.53 |
| 12/15/10 | 62,095 | 13,005 | 14,890 | 89,989 | 1,767 | 1,667 | 138,688 | 142,122 | 232,111 | 2,624,890 | 2,392,779 | 11.31 |
| 01/18/11 | 70,932 | 14,796 | 16,908 | 102,637 | 1,767 | 1,667 | 122,816 | 126,250 | 228,887 | 1,027,081 | 798,194 | 4.49 |
| 02/15/11 | 58,478 | 12,192 | 13,928 | 84,597 | 1,767 | 1,667 | 149,335 | 152,769 | 237,366 | 2,015,323 | 1,777,956 | 8.49 |
| 03/15/11 | 58,779 | 12,423 | 13,946 | 84,947 | 1,767 | 1,667 | 130,084 | 133,518 | 218,465 | 1,937,824 | 1,719,358 | 8.87 |
| 04/15/11 | 64,780 | 13,450 | 15,393 | 93,123 | 1,767 | 1,667 | 131,885 | 135,319 | 228,442 | 2,370,323 | 2,151,881 | 10.50 |
| 05/16/11 | 45,475 | 9,879 | 11,425 | 66,779 | 933 | 833 | 238,445 | 240,211 | 306,990 | 3,386,812 | 3,079,822 | 11.03 |
| 06/15/11 | 42,893 | 9,445 | 10,991 | 63,328 | 933 | 833 | 220,457 | 222,223 | 285,551 | 2,926,716 | 2,641,165 | 10.25 |
| 07/15/11 | 42,204 | 9,384 | 10,956 | 62,644 | 933 | 833 | 213,090 | 214,846 | 277,490 | 656,897 | 379,408 | 2.37 |
| 08/15/11 | 43,684 | 9,694 | 11,319 | 64,696 | 933 | 833 | 187,475 | 189,241 | 253,937 | 828,141 | 574,203 | 3.26 |
| 09/15/11 | 44,834 | 9,813 | 11,387 | 66,035 | 933 | 833 | 217,315 | 219,081 | 285,116 | 920,408 | 635,292 | 3.23 |
| 10/07/11 | 32,676 | 7,053 | 8,132 | 47,861 | - | - | 189,353 | 189,353 | 237,214 | 1,266,626 | 1,029,413 | 5.34 |
| 10/13/11 | | | | | | | | | | | | |
| 11/15/11 | 183,333 | 41,250 | - | 224,583 | 11,542 | - | 209,916 | 221,458 | 446,041 | 1,227,080 | 781,039 | 2.75 |
| 12/15/11 | 166,667 | 37,500 | - | 204,167 | 3,542 | - | 175,375 | 178,917 | 383,084 | 3,367,629 | 2,984,545 | 8.79 |
| 01/17/12 | 183,333 | 41,250 | - | 224,583 | 3,542 | - | 181,282 | 184,824 | 409,408 | 2,714,348 | 2,304,940 | 6.63 |
| 02/15/12 | 161,111 | - | - | 161,111 | 3,542 | - | 153,503 | 157,045 | 318,156 | 1,084,343 | 766,187 | 3.41 |
| 03/15/12 | 161,111 | - | - | 161,111 | 3,542 | - | 149,088 | 152,630 | 313,741 | 1,967,608 | 1,653,867 | 6.27 |
| 04/16/12 | 177,778 | - | - | 177,778 | 3,542 | - | 188,617 | 192,159 | 369,937 | 887,089 | 517,152 | 2.40 |
| 05/15/12 | 161,111 | - | - | 161,111 | 6,125 | - | 176,708 | 182,833 | 343,944 | 2,688,876 | 2,344,931 | 7.82 |
| 06/15/12 | 172,222 | - | - | 172,222 | 3,625 | - | 148,131 | 151,756 | 323,978 | 1,720,369 | 1,396,391 | 5.31 |
| 07/16/12 | - | - | - | - | 4,166 | - | - | 4,166 | 4,166 | 1,462,683 | 1,458,517 | 351.10 |
| 08/15/12 | 59,083 | - | 11,707 | 70,790 | 4,166 | - | 169,534 | 173,700 | 244,489 | 754,688 | 510,199 | 3.09 |
| 09/17/12 | 53,712 | - | 10,643 | 64,354 | 4,166 | - | 138,161 | 142,327 | 206,681 | 1,642,427 | 1,435,746 | 7.95 |
| 10/15/12 | 53,712 | - | 10,643 | 64,354 | 4,166 | - | 165,179 | 169,345 | 233,699 | 2,370,117 | 2,136,418 | 10.14 |

**Concord Funding Company, L.L.C.**
CASHFLOW

| | Debt Service | | | | Required Amounts Fees | | | | | Cashflow and Coverage | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Class A Interest Due | Class M Interest Due | Class B Interest Due | Total Debt Service | Trustee Fee | Back-Up Servicer Fee | Servicer Fee | Total Fees | Total Debt Service and Fees | Cashflow to Collection Account (for the period ending with corresponding date) | Cashflow Excess | Interest/Fee Coverage Ratio |
| 11/15/12 | 53,712 | - | 10,643 | 64,354 | 4,166 | - | 159,813 | 163,979 | 228,334 | 1,711,138 | 1,482,804 | 7.49 |
| 12/17/12 | 53,712 | - | 10,643 | 64,354 | 4,166 | - | 175,804 | 179,970 | 244,324 | 1,250,041 | 1,005,717 | 5.12 |
| 01/15/13 | 251,550 | - | 49,260 | 300,810 | 4,792 | - | 174,970 | 179,762 | 480,571 | 2,741,474 | 2,260,903 | 5.70 |
| 02/15/13 | 281,986 | - | 55,201 | 337,188 | 4,792 | - | 194,751 | 199,543 | 536,731 | 3,144,740 | 2,608,010 | 5.86 |
| 03/15/13 | 281,986 | - | 55,201 | 337,188 | 4,792 | - | 209,561 | 214,353 | 551,541 | 4,954,026 | 4,402,485 | 8.98 |
| 04/15/13 | 365,421 | - | 75,218 | 440,639 | 5,417 | - | 270,846 | 276,263 | 716,901 | 3,824,888 | 3,107,987 | 5.34 |
| 05/15/13 | 413,725 | - | 86,806 | 500,531 | 5,417 | - | 298,278 | 303,695 | 804,226 | 8,844,936 | 8,040,710 | 11.00 |
| 06/17/13 | 413,725 | - | 86,806 | 500,531 | 5,417 | - | 196,243 | 201,660 | 702,191 | 2,489,975 | 1,787,784 | 3.55 |
| 07/15/13 | 413,725 | - | 86,806 | 500,531 | 5,417 | - | 187,922 | 193,339 | 693,871 | 6,047,622 | 5,353,751 | 8.72 |
| 08/15/13 | 413,725 | - | 86,806 | 500,531 | 5,417 | - | 152,028 | 157,445 | 657,976 | 1,665,251 | 1,007,274 | 2.53 |
| 09/16/13 | 413,725 | - | 86,806 | 500,531 | 5,417 | - | 154,536 | 159,953 | 660,484 | 1,269,597 | 609,113 | 1.92 |
| 10/15/13 | 413,725 | - | 86,806 | 500,531 | 5,417 | - | 160,362 | 165,779 | 666,310 | 827,042 | 160,732 | 1.24 |
| 11/15/13 | 413,725 | - | 86,806 | 500,531 | 5,417 | - | 172,514 | 177,931 | 678,462 | 947,265 | 268,803 | 1.40 |
| 12/16/13 | 413,725 | - | 86,806 | 500,531 | 5,417 | - | 186,686 | 192,103 | 692,634 | 1,721,108 | 1,028,474 | 2.48 |
| 01/15/14 | 413,725 | - | 86,806 | 500,531 | 5,417 | - | 177,005 | 182,422 | 682,953 | 1,019,136 | 336,183 | 1.49 |
| 02/18/14 | 413,725 | - | 86,806 | 500,531 | 5,417 | - | 165,691 | 171,108 | 671,639 | 872,824 | 201,185 | 1.30 |
| 03/17/14 | 413,725 | - | 86,806 | 500,531 | 5,417 | - | 161,053 | 166,470 | 667,001 | 666,912 | (89) | 1.00 |



# Appendix D – Monex Customer Credit Statistics

1









# Distribution of FICO Scores - 2013





# Appendix E – Preliminary Series 2014-1 Term Sheet

## PRELIMINARY SUMMARY OF TERMS – CFC II SERIES 2014-1

Issuer ...................................................... [CFC II], L.L.C., a Delaware limited liability company (the *"Issuer"*) to be established as a limited purpose, bankruptcy-remote special purpose entity. The Series 2014-1 Notes will be the first series of Notes issued by the Issuer and will be issued for the purpose of refinancing the outstanding Concord Funding Company Series 2013-1 Notes certificates. The Series 2014-1 Notes will be issued pursuant to a new Master Indenture under which the Issuer intends to issue subsequent parity Notes.

The Issuer will be owned by [affiliates of MCC and MDC] (see below). MCC and MDC in certain circumstances may also acquire redeemable preferred membership interests in the Issuer as described herein. The principal executive offices of the Issuer will be located at [49__ Birch Street, Newport Beach, California 92660-2188, telephone number (949) 752-1400].

Notes Offered ........................................ [$63,500,000] aggregate principal amount of Secured Senior Term Notes, Series 2014-1, Class A (the *"Class A Notes"*), [$6,675,000] aggregate principal amount of Secured Mezzanine Term Notes, Series 2014-1, Class M (the *"Class M Notes"*) and [$3,825,000] aggregate principal amount of Secured Subordinated Term Notes, Series 2014-1, Class B (the *"Class B Notes"* and, collectively with the Class A Notes and Class M Notes, the *"Series 2014-1 Notes"* or the *"Notes"*).

The Notes represent obligations of the Issuer only and will not represent interests in or recourse obligations of MCC, MDC, or any Affiliate of either of them.

The Class B Notes and Class M Notes will be subordinated to the Class A Notes and the Class B Notes will be subordinated to the Class M Notes.

Payment Date.......................................... The fifteenth day of each calendar month (or the next Business Day if not a Business Day) commencing _____ 15, 2014.

Reference Rate........................................ One Month LIBOR (if applicable).

Note interest rates .................................. For the Class A Notes, Reference Rate plus [__%] per annum if floating or a fixed rate of [___%] per annum.

For the Class M Notes, Reference Rate plus [__%] per annum if floating or a fixed rate of [___%] per annum.

For the Class B Notes, Reference Rate plus [__%] per annum if floating or a fixed rate of [___%] per annum.

Scheduled Amortization Commencement Date
................................................................. The Payment Date one month prior to the Final Maturity Date

Final Maturity Date ............................... The [_____, 2019] Payment Date.

| | |
|---|---|
| Optional Redemption/Prepayment of Notes | The Notes are subject to early redemption in full on or after the occurrence of the Scheduled Amortization Commencement Date.  The Notes are not otherwise subject to early redemption or prepayment at the Issuer's option, in whole or in part, prior to maturity.  However, the commencement of an Early Amortization Period for Series 2014-1 as a result of an Event of Default or Early Amortization Event can result in the allocation of Collections to the Principal Funding Account and the repayment on subsequent Payment Dates of all or portions of outstanding principal on the Class A Notes, Class M Notes and Class B Notes (in that order of priority) prior to their final maturity. |
| Other Series ............................................ | The Notes will be the first series of notes issued under the Master Indenture and the only series outstanding at closing. The Issuer from time to time may, subject to the satisfaction of certain conditions, create other series of notes to be secured *pari passu* with the Notes by the Issuer's assets pledged under the Master Indenture (other than any Series Collateral for, or Collections required to be allocated to, any other Series). |
| Servicer.................................................... | Monex Credit Company, a California limited partnership (*"MCC"*) will be the initial Servicer (the *"Servicer"*) pursuant to a Servicing Agreement to be dated the date of closing on the Notes among the Servicer, the Trustee, the Backup Servicer and the Issuer (the *"Servicing Agreement"*).  The principal executive offices of MCC are located at 4910 Birch Street, Newport Beach, California 92660-2188, telephone number (949) 752-1400.  A Successor Servicer may be appointed in certain circumstances.   The Servicer will receive a monthly fee (the *"Servicing Fee"*) as compensation for its undertaking the duties and obligations of Servicer, payable from Collections allocated for such purpose in accordance with the Servicing Agreement. |
| Placement Agent..................................... | Piper Jaffray & Co. (*"PJC"*) will act as the Placement Agent for the Issuer (the *"Placement Agent"*).  The Notes will be offered for sale by the Issuer without registration pursuant to Rule 144A. |
| Trustee .................................................... | [TBD] will be the Trustee under the Master Indenture.  The principal corporate trust offices of the Trustee are located at [TBD].  [TBD] in its individual capacity will also act as Custodian for the Trustee in holding original Loan Documents delivered to it from time to time by the Issuer or MCC, under a separate Custody Agreement among the Issuer, the Servicer, [TBD] as Custodian and the Trustee. |
| | The Trustee will receive an annual fee as compensation for its agreement to serve as Trustee (the *"Trustee Fee"*).  Such fee will be paid annually in advance, initially on the date of issuance and thereafter from Collections allocated for such purpose in accordance with the Servicing Agreement. |
| Backup Servicer...................................... | Portfolio Financial Servicing Company will act as the Backup Servicer under the Servicing Agreement (the *"Backup Servicer"*), and as such, will commit to act as a successor Servicer in certain circumstances if MCC is terminated as the Servicer. |
| | The Backup Servicer will receive an annual fee as compensation for its commitment to become Servicer in the event of the termination of MCC as the initial Servicer (the *"Backup Servicer Fee"*).  Such fee will be paid annually in advance, initially on the date of issuance and thereafter from Collections allocated for such purpose in accordance with the Servicing |

Agreement.

| | |
|---|---|
| MDC and MDC Advances..................... | Monex Deposit Company, a California limited partnership (*"MDC"*) is an affiliate of MCC and is a dealer in precious metals. The Servicer is authorized under the Servicing Agreement on behalf of the Issuer to sell to MDC (or to an unaffiliated third party) Metals Collateral in connection with liquidation of a Loan, or existing Metals Inventory in connection with a liquidation thereof.<br><br>MDC may also from time to time voluntarily contribute (in consideration of receiving redeemable preferred membership units in the Issuer) either Metals to the Issuer as Eligible Metals Inventory, or Dollars, in each case pursuant to an Optional Advance Agreement between MDC and the Issuer to be dated as of closing on the Notes (the *"OAA"*). |
| Metals Depository................................. | Delaware Depository Service Company LLC] (the *"Metals Depository"*), pursuant to a Metals Depository Agreement among MCC, MDC, the Issuer, the Trustee and the Metals Depository (the *"Metals Depository Agreement"*). All Metals Collateral and Metals Inventory will be held on deposit with the Metals Depository. The Metals Depository Agreement provides for the Metals Depository's acknowledgment of (i) the rights of the Issuer as a transferee of the security interest in related Metals Collateral securing the Loans sold to the Issuer by MCC, (ii) the rights of the Issuer as the owner of all Metals Inventory transferred to it by MDC, and (iii) the rights of the Trustee as pledgee of same, as well as an agreement by the Metals Depository to follow instructions of the Servicer or Backup Servicer as to dispositions of Metals Collateral and Metals Inventory. |
| Trust Estate ............................................ | The Notes will be secured by the Issuer's pledge of its assets to the Trustee under the Master Indenture (the *"Trust Estate"*). The Trust Estate will include U.S. Dollar Loans originated by MCC and sold or contributed to the Issuer from time to time pursuant to a Transfer and Sale Agreement dated as of closing on the Notes between the Issuer and MCC (the *"TSA"*), which Loans finance the related Obligor's purchase of precious metals (palladium, gold, silver, or platinum) (*"Metals"*), including the security interest granted by the Obligor in the related Metals to secure the Loan (*"Metals Collateral"*); all Metals (*"Metals Inventory"*) transferred to the Issuer by MDC in respect of a Collection upon repayment or liquidation of a Loan, or otherwise voluntarily contributed from time to time by MDC to the Issuer in exchange for MDC receiving a redeemable preferred membership interest in the Issuer pursuant to the OAA; all monies due or to become due on or collected by the Servicer in repayment or satisfaction of the Loans or upon disposition of Metals Inventory; all Dollars voluntarily contributed from time to time by MDC to the Issuer pursuant to the OAA; and all related rights of MCC and MDC under the Metals Depository Agreement, the Servicing Agreement, the Lockbox Agreement and the Custody Agreement. |
| The Loans ............................................... | Individual U.S. Dollar loan transactions (each, a *"Loan"*) made from time to time by MCC to designated customers (*"Obligors"* with respect to *"Designated Accounts"*) under MCC's Loan Agreement with such Obligor. Each Loan finances the Obligor's purchase of Metals, which are titled to the Obligor and held for the benefit of the Obligor by the Metals Depository. To obtain a Loan the Obligor must supply, from its own funds, not less than [20%] of the purchase price of the related Metal being financed (*"Equity"*). The Obligor grants a security interest in all the acquired Metal, including the portion acquired using Equity, to secure its Loan (i.e. the |

Metals Collateral). The Loan Agreement provides for an accruing interest rate on each Loan which is added to principal as accrued daily. The Loan Agreement also provides for an ongoing Obligor requirement to maintain a minimum Equity level with respect to a Loan, which minimum currently is set at [14%] of the current market value of the Metals Collateral. The Loan Agreement grants MCC the right to demand repayment of the entire Loan at any time, with or without notice, and to increase the minimum required Equity for a Loan at any time, with or without notice.

The Issuer shall have the right, subject to certain conditions and aggregate limits and without adverse selection, to substitute for existing Loans in respect of a Designated Account in the Trust Estate, an equivalent principal balance of Loans in respect of a different Designated Account which substitute Loans have been conveyed to the Issuer by MCC under the TSA. Upon such substitution the replacement Loans will become subject to the lien of the Master Indenture and the Loans being substituted will be released from such lien and reconveyed back to MCC. No such substitution may be made for Loans as to which the Obligor is currently in arrears of a payment obligation under its Loan Agreement or is the subject of insolvency proceedings.

Metals eligible to serve as Metals Collateral or Metals Inventory ...............

Gold, silver, platinum and palladium bullion and coins of certain specifications and types.

Collections ...........................................

The Servicer will be required to promptly deposit all daily Collections received or realized in respect of the Loans, dispositions of Metals Collateral and dispositions of Metals Inventory into the Collection Account.

Such Collections (together with certain other amounts which are required to be treated and allocated as Collections such as the proceeds of Advances-- see "Summary of Terms--Mechanisms for maintaining required advance rate levels" and "--Mechanisms for maintaining Required Amounts" below) must then be allocated for the benefit of each outstanding Series (including any Series issued subsequent to the Notes offered hereby) as follows, and in the following order of priority:

*first*, an amount up to the amount necessary to pay (i) three times the interest on the notes of each outstanding Series on the next upcoming Interest Payment Date, (ii) three times each such Series' proportionate share of servicing fees payable on the next upcoming Payment Date, (iii) each such Series' proportionate share of a monthly accumulation of the next-upcoming annual Trustee Fee and Backup Servicer Fee payment (provided, in the case of (i), (ii) and (iii), the specified multiples or allocation may be increased or reduced for any Series if so specified in the related Supplement), and (iv) further amounts, reserves, or expenses (if any) specific to each such Series as specified in the related Supplement (each, the *"Required Amounts"* for such Series) with such funds to be deposited to a segregated Required Amounts Account established for each such Series (and, if Required Amounts at the time of such allocation remain unfunded for more than one outstanding Series, available collections will be allocated among such Series *pro rata*

based on the unpaid principal balance of each such Series, to the aggregate unpaid principal balances of all such Series, in each case determined as of the beginning of the relevant monthly collection period);

*second*, if a Negative Principal Variance exists for such date (see "Summary of Terms--Advance Rate" below), then to fund a deposit into the Equalization Account held by the Trustee for the benefit of all Series under the Master Indenture up to the amount of such Negative Principal Variance;

*third*, if an Amortization Period for such Series has commenced and is continuing, to fund a deposit in the related Principal Funding Account for such Series up to the amount necessary to make any permitted or required principal repayment on the next upcoming Payment Date (and, if the same has commenced for more than one outstanding Series at the time of such allocation, available Collections will be allocated among such Series *pro rata* based on the unpaid principal balance of each such Series, to the aggregate unpaid principal balances of all such Series, in each case determined as of the beginning of the relevant monthly collection period); and

*fourth*, with respect to any remaining available Collections as follows and in the following order of priority: (A) to the extent reimbursable expenses or indemnifications are payable by the Issuer to the Trustee or the Backup Servicer as Successor Servicer, to be paid *pro rata* to the respective party entitled thereto, (B) if and to the extent directed by the Issuer in its sole discretion, to be deposited into the Equalization Account, and (C) to be released to the Issuer free and clear of the lien of the Master Indenture to fund the purchase price to MCC for additional Loans under the TSA, or for general Issuer use and distribution to its members.

If at the time of a daily allocation of Collections described above, all required deposits have been made to each Required Amounts Account, as well as to each Principal Funding Account for the Series as to which an Amortization Period is in effect, collections on Loans may be received or held by the Issuer in the form of an equivalent Wholesale Value of Eligible Metals Inventory transferred from MDC, instead of in the form of Dollars derived from Obligor payments or liquidations of related Metals Collateral. As a result, Collections allocated to the Equalization Account as described above may be deposited therein in the form of either Dollars or an equivalent Wholesale Value of Eligible Metals Inventory transferred by MDC to the Issuer.

Payments or distributions from allocated Collections................................................

Amounts allocated to the Required Amounts Accounts and Principal Funding Accounts are to be distributed as follows:

On each Payment Date or Interest Payment Date, as specified below, the Servicer is required to instruct the Trustee to make the following funds transfers in respect of each outstanding Series on such date, from the

accounts and in the order of priority specified below:

*Certain Fixed Fees.*  (A) On each January Payment Date, an amount from each Required Amounts Account equal to the related Series Allocation Percentage of the annual fee payable to the Trustee, to be distributed on such Payment Date to the Trustee; (B) on each January Payment Date, an amount from each Required Amounts Account equal to the related Series Allocation Percentage of the annual fee payable to the Backup Servicer, to be distributed on such Payment Date to the Backup Servicer; and (C) in the event that the Servicer is not MCC or an Affiliate of MCC, on each Payment Date, an amount from each Required Amounts Account equal to the related Series Allocation Percentage of the monthly fee payable to the Servicer, to be distributed on such Payment Date to the Servicer.

*Interest; Other Amounts.*  (A) First, on each Interest Payment Date, an amount from each Required Amounts Account equal to the interest payable on such date in respect of the related Series outstanding, and then (B) on each Payment Date, an amount from the Required Amounts Account equal to such other amounts as are specified in the applicable Supplement with respect to a Series as payable on a Payment Date in respect of such Series from the Required Amounts Account, with such respective amounts in each case to be distributed as provided in the related Supplement.

*Principal During Amortization Period.*  If an Amortization Period has commenced and is continuing in respect of a Series, an amount from the related Principal Funding Account equal to the principal payable from the Principal Funding Account with respect to such Series as specified in the related Supplement for such Series, to be distributed on a Payment Date (or, if so specified in a related Supplement, an Interest Payment Date) to each Noteholder of such Series *pro rata* in accordance with such Noteholder's principal balance outstanding or as otherwise provided in the related Supplement.

*Servicing Fee.*  In the event that the Servicer is MCC or an Affiliate of MCC, on each Payment Date an amount from each Required Amounts Account equal to the Series Allocation Percentage of the Servicing Fee, to be distributed on such Payment Date to the Servicer, *provided,* that in the event the Trustee has received notice that any storage fees due and payable to the Metals Depository have not been paid, or that any fees or expenses payable to the Backup Servicer have not been paid, then the Trustee is required to deduct from the Servicing Fee otherwise payable to the Servicer hereunder (A) first, the amount of arrearage in storage fees and remit the same to the Metals Depository, and (B) after any such arrearage has been satisfied, then remit such amounts as

may be due the Backup Servicer.

| | |
|---|---|
| Subordination of repayment of Class M Notes and Class B Notes to Class A Notes...... | With respect to the payments described above from the Principal Funding Accounts established for Series 2014-1, no such payments shall be made to the holders of Class M Notes or Class B Notes until all principal outstanding on the Class A Notes has been repaid. |
| Subordination of repayment of Class B Notes to Class M Notes........................................ | With respect to the payments described above from the Principal Funding Accounts established for Series 2014-1, no such payments shall be made to the holders of Class B Notes until all principal outstanding on the Class M Notes has been repaid. |
| Advance Rate.......................................... | On each Business Day, the Servicer must determine the result of (i) the sum of the Adjusted Eligible Pool Balance, plus any Dollars then held for repayment of principal balances of any Series, plus 83.5% of the Wholesale Value of Metals Inventory (if any) held in the Equalization Account, plus Dollars (if any) held in the Equalization Account, minus (ii) the aggregate principal balances outstanding of all Series (including any Series issued subsequent to the Notes), in each case as of the close of the preceding Business Day. The result is the *"Principal Variance"* for the date of the Servicer's determination. To the extent the amount in clause (ii) exceeds the amount in clause (i), the excess constitutes a *"Negative Principal Variance"* for such date. The consequence of the Negative Principal Variance is to trigger a requirement, described in "Summary of Terms--Collections" above, that Collections that otherwise would be allocated on that date to the funding of deposits to Principal Funding Accounts for individual Series, or for release to the Issuer, must instead be allocated on that date to the Equalization Account in an amount necessary to eliminate the Negative Principal Variance. If this allocation, once made, is in an amount less than the Negative Principal Variance, then the continued deficiency constitutes an *"Unsatisfied NPV"* for such date. An Unsatisfied NPV requires the Servicer to take the further actions described under "Summary of Terms--Mechanisms for maintaining required advance rate levels" below. |
| • Adjusted Eligible Pool Balance....... | *"Adjusted Eligible Pool Balance"* consists of the aggregate of the principal balances of each otherwise Eligible Loan outstanding, reduced by (i) adjustments for certain obligor concentration limits (described below), and (ii) the aggregate of the amounts by which the outstanding balance of any individual Loan exceeds 83.5% of the current Wholesale Value of Metals Collateral securing that Loan. |
| • Concentration Limits...................... | Aggregate principal balances of otherwise Eligible Loans available to be included in the determination of Adjusted Eligible Pool Balance for the Servicer's daily calculation of Principal Variance will be reduced by the sum of the following: |

(a) The amount, if any, by which balances of otherwise Eligible Loans of the same single Obligor exceed 5% of the sum of (i) the aggregate outstanding principal balance of all Eligible Loans of all Obligors, plus (ii) 83.5% of the Wholesale Value of Eligible Metals Inventory held by the Issuer in the Equalization Account.

(b) The amount, if any, by which balances of otherwise

Eligible Loans of Obligors domiciled outside of the USA or Canada exceed 10% of the sum of (i) the aggregate outstanding principal balance of all Eligible Loans of all Obligors, plus (ii) 83.5% of the Wholesale Value of Eligible Metals Inventory held by the Issuer in the Equalization Account.

(c) The amount, if any, by which balances of otherwise Eligible Loans of Obligors domiciled in a single country (not the USA or Canada) exceed 5% of the sum of (i) aggregate outstanding principal balance of all Eligible Loans of all Obligors, plus (ii) 83.5% of the Wholesale Value of Eligible Metals Inventory held by the Issuer in the Equalization Account.

| | |
|---|---|
| Mechanisms for maintaining required advance rate levels................................. | If the Servicer's daily measurement shows that, after the required allocations of daily Collections as described in "Summary of Terms--Collections" above, an Unsatisfied NPV exists, then the Servicing Agreement will require the Servicer to take the following actions (in order): |

(i) Request a voluntary capital contribution from MDC to the Issuer under the OAA, in the form of Dollars and/or Eligible Metals Inventory, in an amount equal to the Unsatisfied NPV (valuing any contribution of Eligible Metals Inventory for this purpose at 83.5% of its then Wholesale Value).

(ii) If the foregoing action does not raise an amount equal to the Unsatisfied NPV, then liquidate Metals Inventory held in the Equalization Account so as to generate Dollar proceeds (to be allocated as Collections) at least equal to the remaining Unsatisfied NPV.

In addition, for so long as an Unsatisfied NPV exists on any date of determination, the Servicer is required to make and enforce demands on Obligors whose Equity level in their Loan has fallen below the level then required in the Loan Agreement to pay in additional Equity (a *"Collateral Demand"*), and if such Collateral Demand is not timely paid to liquidate sufficient Metals Collateral of such Obligors so as to obtain Dollars in the amount of such outstanding Collateral Demand, for allocation as Collections on subsequent Business Days (and the Servicer will no longer have its normal discretion to postpone such actions). The Servicer must also, for so long as an Unsatisfied NPV exists on any date of determination, demand repayment in full of (i) any Loans as to which outstanding Collateral Demands have not been satisfied within five Business Days, and (ii) any Loans whose equity has fallen below the Special Required Equity Level, and in each case liquidate Metals Collateral securing such accelerated Loans, with the proceeds of such actions once received to be allocated as Collections on subsequent Business Days (and the Servicer will no longer have its normal discretion to postpone such actions).

In addition to the foregoing, if an Unsatisfied NPV ever exists for five consecutive calendar days, the Servicer is obligated to increase the required Equity for Obligors under their Loan Agreements, and make and enforce

resultant Collateral Demands on Obligors, to the extent necessary so as to generate Dollars from any combination of Obligor payments and/or proceeds of liquidated Metals Collateral in the amount of the current Unsatisfied NPV.

Mechanisms for maintaining Required Amounts ................................................

As noted above in "Summary of Terms--Collections", daily Collections are to be allocated to each Series for application first to fund Required Amounts, i.e., interest due on such Series on the next upcoming Payment Date, and the Series' allocable share of servicing, backup servicing, trustee and other Series reserves, payments or expenses incurred for the benefit of such Series. Because accruing interest on each Loan is added to principal, there will not be regular monthly payments of scheduled interest on the Loans being applied and allocated as Collections (although Collections can be generated from other sources and events, such as the Obligor's requirement to maintain its required Equity on a Loan, an Obligor's voluntary repayment or liquidation of a Loan, etc.).

If on any day the Required Amounts for a Series are not funded in full (after giving effect to allocations of Collections for that day), then the Servicer is required under the Servicing Agreement to request a voluntary capital contribution from MDC under the OAA of Dollars, to be allocated as Collections and deposited into the related Required Amounts Account[s] in satisfaction of the deficiency. If such voluntary contribution is not promptly made, the Servicer is then required to liquidate Metals Inventory so as to generate Dollars (to be allocated as Collections) sufficient to cure the deficiency. If the deficiency has still not been cured in full within 15 days of the next upcoming Payment Date (or 3 Business Days before such upcoming date, in the case of a deficiency in Required Amounts other than interest and Trustee/Backup Servicer/Servicing fees), then the Servicer is required to make written demand for repayment in full of Loans (and, if necessary, liquidate related Metals Collateral) to an extent sufficient to generate Collections to fund the shortfall in Required Amounts in time for such upcoming Payment Date.

Early Amortization Events ....................

Any of the following will constitute an *"Early Amortization Event"* with respect to Series 2014-1:

(i) Failure on the part of the Issuer or Servicer to make any payment or deposit required to be made by the terms of (1) the Servicing Agreement or (2) any Supplement, with such failure continuing for two days after the date such payment or deposit is required to be made.

(ii) The Issuer shall have become an "investment company" within the meaning of the Investment Company Act.

(iii) Any Lien (other than a Permitted Lien) is imposed on the Loans or any other of the Trust Estate assets, and such Lien has not been removed or extinguished within ten days of its imposition.

(iv) MCC's, the Servicer's or the Issuer's failure to otherwise observe or perform in any material respect any other covenants or agreements set forth in any

Program Agreement to which they are a party which failure would have a Material Adverse Effect and which continues unremedied for a period of 30 days after the date on which written notice of such failure shall have been given to the offending party by the Issuer, the Servicer, the Trustee or a Majority of Noteholders, as the case may be (provided, that any failure to perform a covenant or agreement pertinent to a Loan or related Loan Agreement with respect to which MCC performs its repurchase obligation for the affected Loan under the TSA shall not constitute an Early Amortization Event).

(v) Any representation or warranty made by MCC in the TSA, or by the Issuer in the Master Indenture or any Supplement, shall prove to have been incorrect in any material respect when made or when delivered, and which shall continue to be incorrect in any material respect for a period of 30 days after the date on which written notice of such failure shall have been given to the Issuer by the Trustee, or to the Issuer and the Trustee by a Majority of Noteholders (provided, that an incorrect representation or warranty relating to a Loan or related Obligor with respect to which MCC performs its repurchase obligation of such affected Loan under the TSA shall not constitute an Early Amortization Event).

Under the Servicing Agreement the occurrence and continuance of an Early Amortization Event will cause Collections allocable to all Series to be allocated to the Principal Funding Account and applied to repay Note principal on subsequent Payment Dates, as described in "Summary of Terms--Collections" and "--Payment and distribution of allocated collections" and "--Subordination of Class M Notes and Class B Notes to Class A Notes" and "--Subordination of Class B Notes to Class M Notes" above.

Any such Early Amortization Event (other than the event described in clause (ii) above) may be waived with the prior written consent of a Majority of Noteholders, and prior written notice to each Rating Agency.

Events of Default ................................... *"Events of Default"* under the Master Indenture are:

(i) the Issuer's failure to pay note interest or note principal in respect of any outstanding Series when due;

(ii) an Early Amortization Event for any Series occurs and continues for 150 consecutive days;

(iii) the occurrence of an Insolvency Proceeding with respect to the Issuer, MCC, MDC, any general partner of either, or with respect to a common member of the Issuer;

(iv) a valid Termination Notice is delivered seeking the appointment of a Successor Servicer to MCC;

(v) the Issuer becomes an investment company

and such status is not cured within 30 calendar days; or

(vi) any representation, warranty or certification made by the Issuer in any Program Agreement or in any certificate delivered pursuant to any Program Agreement shall be incorrect, false or misleading in any material respect, and continues to be incorrect, false or misleading in any material respect for a period of 30 days after the date on which written notice of such incorrect, false or misleading representation, warranty or certification shall have been given to the Issuer (provided, that with respect to any incorrect, false or misleading representation or warranty as to which repurchase of the affected Loan or Loans is required under the TSA, such occurrence shall not constitute an Event of Default if MCC timely complies with such repurchase obligation).

Upon the occurrence of an Event of Default, the Servicer must first liquidate Metals Inventory and then, if such action is insufficient to generate Collections which following allocation to the Principal Funding Account will permit the Notes to be repaid in full, then the Servicer must make written demand on all Obligors for repayment in full of their Loans outstanding, and as necessary liquidate Metals Collateral in satisfaction of such Loans, so as to generate Collections which following allocation to the Principal Funding Account will permit the Notes to be repaid in full. Certain additional procedures apply if the Servicer acting as such at the time is not MCC as initial Servicer but rather a Successor Servicer, including the Backup Servicer as Successor Servicer. See "Servicing Agreement-- Actions Required Upon Event of Default or at Series Maturity" herein. All such Collections are to be allocated and applied in accordance with the Servicing Agreement as described in "Summary of Terms--Collections" and "--Payment and distribution of allocated collections" and "--Subordination of Class M Notes and Class B Notes to Class A Notes" and "-- Subordination of Class B Notes to Class M Notes" above.

In addition following an Event of Default outstanding Series may be accelerated, and upon an election of a Majority of Noteholders, the Trustee following an Event of Default will be required to exercise remedies against the Trust Estate assets directly (such as the foreclosure on and liquidation of the Trust Estate), with proceeds obtained therefrom to be allocated and applied as Collections as described in the preceding paragraph. See "Master Indenture-- Early Amortization Events; Events of Default and Remedies" herein.

| | |
|---|---|
| Amortization Period .............................. | An *"Amortization Period"* will commence for Series 2014-1 upon the earlier of the occurrence of an Early Amortization Event, an Event of Default or the Scheduled Amortization Commencement Date. |
| Certain United States federal income tax considerations ........................................ | In the opinion of _____, special federal tax counsel to the Issuer, the Notes will be characterized as debt for federal income tax purposes, and the Issuer will not be characterized as an association or publicly traded partnership taxable as a corporation. Under the Series 2011-1 Supplement, the Issuer, the Servicer, the Class A Noteholders, the Class M Noteholders and the Class B Noteholders will agree or be deemed to have agreed to treat the Class A Notes, Class M Notes and Class B Notes, as applicable, as debt for federal, state, and other tax purposes. |

Note Ratings .......................................... It is a condition to the issuance of the Class A Notes that they be rated at least *"AAA"* by Kroll Bond Rating Agency (*"Kroll"* or the *"Rating Agency"*).

It is a condition to the issuance of the Class M Notes that they be rated at least *"A"* by Kroll.

It is a condition to the issuance of the Class B Notes that they be rated at least *"BBB"* by Kroll.

Investors should not assume that a rating will not be lowered, qualified or withdrawn by the Rating Agency.

# EXHIBIT 2

Confidential                                                                                          March 26, 2013

_____

This Private Placement Memorandum Is Not to Be Shown or Given to Any Person Other Than The Person To Whom Distributed And it Is Not to Be Copied or Otherwise Reproduced in Any Manner Whatsoever.  Any Further Distribution or Reproduction of This Memorandum in Whole or in Part, or the Divulgence of Any of its Contents by an Offeree, Is Unauthorized.  Failure to Comply With This Directive Can Result in a Violation of The Securities Act of 1933, as Amended.  If This Memorandum Has Been Improperly Reproduced Or Circulated, Concord Funding Company, L.L.C., Monex Credit Company, Piper Jaffray & Co Disclaim Any Responsibility For Its Content And Use.

_____

**Private Placement Memorandum**
_____

**CONCORD FUNDING COMPANY, L.L.C.**
**$65,325,000 Secured Senior Term Notes, Series 2013-1, Class A**
**$9,675,000 Secured Subordinated Term Notes, Series 2013-1, Class B**



**MONEX CREDIT COMPANY**
*Servicer*

The $65,325,000 aggregate principal amount of Secured Senior Term Notes, Series 2013-1, Class A (the *"Class A Notes"*) and the $9,675,000 aggregate principal amount of Secured Subordinated Term Notes, Series 2013-1, Class B (the *"Class B Notes"* and, together with the Class A Notes, the *"Series 2013-1 Notes"* or the *"Notes"*) represent secured obligations of Concord Funding Company, L.L.C. (the *"Issuer"*) issued pursuant to the Amended and Restated Master Indenture dated as of August 12, 2012 (the *"Master Indenture"*) between the Issuer and The Bank of New York Mellon Trust Company, N.A. (successor in interest to BNY Midwest Trust Company)(*"BNY"*), as indenture trustee (the *"Trustee"*) and the Series 2013-1 Supplement thereto, dated as of March 26, 2013, between the Issuer and the Trustee (the "Series 2013-1 Supplement").

The property of the Issuer pledged under the Master Indenture to secure the Notes will include a portfolio of individual Loans (as defined herein) originated and conveyed to the Issuer by Monex Credit Company (*"MCC"*) in respect of Designated Accounts of Obligors (each as defined herein) to finance the Obligor's purchase of precious metals (gold, silver, platinum or palladium) (*"Metals"*), including the security interest granted by the Obligor in the related Metals to secure the Loan (*"Metals Collateral"*), all Metals (*"Metals Inventory"*) received as a Collection in respect of any such Loan from, or voluntarily contributed to the Issuer from time to time by, Monex Deposit Company (*"MDC"*), an affiliate of MCC, and all monies due or to become due on or collected by MCC as Servicer (in such capacity, the *"Servicer"*) in repayment or satisfaction of the Loans or upon disposition of Metals Inventory held by the Issuer.

(cover continued on next page)

**The Notes have not been registered under the Securities Act of 1933, as amended (the "Securities Act") or the securities laws of any state or foreign jurisdiction.  Therefore, the Notes may not be offered or sold within the United States or to, or for the account or benefit of, any U.S. person unless the offer or sale would qualify for a registration exemption from the Securities Act and state securities laws. The Issuer expects to sell the Notes offered hereby to Piper Jaffray & Co. as the Initial Purchaser ("Initial Purchaser") in a private placement under the Securities Act.  If such sale is consummated, the Initial Purchaser will sell the Notes offered hereby pursuant to an exemption from registration provided by Rule 144A under the Securities Act to persons who will be deemed to represent that they qualify as both "qualified institutional buyers" as defined in Rule 144A and "qualified purchasers" as defined in Section(2)(a)(52)(A) of the Investment Company Act of 1940, as amended (the "Investment Company Act").The Notes will bear a legend referring to the foregoing restrictions, and because of such restrictions, no secondary trading market for the Notes is expected to develop and purchasers must bear the risk of their investment for an indefinite amount of time.  See "Transfer Restrictions". The Notes are offered only through the Initial Purchaser when, as and if issued by the Issuer, subject to the prior sale or withdrawal, cancellation or modification of the offer without notice, and the right of the Issuer and/or the Initial Purchaser to reject any subscription, in whole or in part.  It is expected that the Notes will be available for delivery in book-entry form only on or about March 26, 2013.**

**PIPER JAFFRAY & CO.**

The Issuer from time to time may offer other Series of notes under the Master Indenture to the extent certain collateralization levels and other criteria are satisfied. Only the Notes are being offered hereby.

Distributions of interest or principal on the Notes will be payable, to the extent described herein, on the fifteenth day of each calendar month (or if such fifteenth day is not a Business Day (as defined herein), the next Business Day) (each, a *"Payment Date"*), beginning April 15, 2013, or as otherwise may be specified in the Series 2013-1 Supplement. See *"Description of the Notes and Series 2013-1 Supplement."*

MCC and MDC are not obligated in any way in respect of the Notes, the Loans, the Metals Collateral or the Metals Inventory. The obligations of the Servicer (including MCC as initial Servicer) with respect to the Notes are limited to its contractual servicing obligations. MCC will, however, as seller of the Loans to the Issuer, make certain representations and warranties relating to the Loans. In the event of an uncured breach of any such representation or warranty that materially adversely affects the Issuer's interest in a Loan, MCC may, under certain circumstances, be obligated to repurchase such Loan from the Issuer.

**The Notes will not be insured or guaranteed by any governmental agency or instrumentality, the Initial Purchaser, MCC, MDC or any of their respective Affiliates (as defined herein), and will be payable only from collections on the Loans, Metals Inventory and other assets of the Issuer as described herein. See "Special Considerations."**

**The Notes offered hereby will not be registered with or approved or disapproved by any federal or state bank regulatory agency, the Securities and Exchange Commission or the securities commission or regulatory authority of any state or foreign jurisdiction. Nor will any of them pass upon or endorse the merits of this offering or the accuracy or adequacy of this Private Placement Memorandum. Any representation to the contrary is unlawful.**

**All investors will be required to agree that they will not offer, sell or otherwise pledge, hypothecate or transfer the Notes unless an applicable exemption from the registration requirements of the Securities Act is available and only to a person who has signed an investor letter as described herein. Any such sales must also comply with any applicable state securities laws requirements. Also, because the Issuer will rely on the exemptions contained in sections 3(c)(7) and 3(c)(1)of the Investment Company Act, no transfer of Notes may be made to investors which are not "qualified purchasers" as defined in the Investment Company Act, and "qualified institutional buyers" as defined in Rule 144A and at no time may more than 100 persons beneficially own outstanding securities (other than short term paper) of the Issuer, within the meaning of Section 3(c)(1) of the Investment Company Act. The Notes will bear a legend to the foregoing effect. Prospective investors should be aware that they may be required to bear the financial risks of this investment for an indefinite period of time. See "Special Considerations" and "Transfer Restrictions".**

**The information contained in this Private Placement Memorandum is confidential and proprietary to the Issuer and is being submitted to prospective investors solely for their confidential use in consideration of purchasing the Notes. Distribution of this Private Placement Memorandum to any other person (other than a person retained to advise a prospective investor with respect to a purchase of the Notes) is unauthorized, and any disclosure by a prospective investor in any manner of any of its contents, without the Issuer's prior written consent, is prohibited. By accepting delivery of this Private Placement Memorandum, a prospective investor agrees to the foregoing and agrees not to make copies or reproductions of this Private Placement Memorandum. By accepting delivery of this Private Placement Memorandum, a prospective investor further agrees promptly to return it to the Issuer or the Initial Purchaser together with any other documents or information furnished to the prospective investor, and to destroy notes taken there from if the prospective investor elects not to purchase any of the Notes offered hereby or if the offering is terminated or withdrawn.**

**The Initial Purchaser has not independently verified the information contained herein or otherwise made any further investigation of the Issuer, the information provided herein or with respect to the information provided in the documents referred to herein. Neither the Initial Purchaser nor any of its affiliates, partners, officers, agents, employees or representatives makes any representation or warranty, express or implied, as to the accuracy or completeness of such information. Nothing contained herein is, or should be relied upon as, a promise or representation as to the future performance of the Issuer. All references to financial information of the Issuer, MCC or MDC shall be construed as being as of February 14, 2013, unless expressly stated otherwise.**

**This Private Placement Memorandum constitutes an offer only to the offeree to whom this Private Placement Memorandum is initially distributed. This Private Placement Memorandum does not purport to be all inclusive or to contain all of the information that a prospective investor may desire in investigating the Issuer or an investment in the Notes. A prospective investor must conduct and rely on its own evaluation of the Issuer and the terms of the offering, including the merits and risks involved, in making an investment decision with respect to the Notes. See "Special Considerations" for a discussion of certain risks and factors that should be considered in connection with a purchase of the Notes. Certain provisions of various agreements are summarized in this Private Placement Memorandum, but a**

prospective investor should not assume that the summaries are complete. Such summaries are qualified in their entirety by reference to the complete text of such agreements, copies of which may be obtained from the Issuer.

The contents of this Private Placement Memorandum are not to be considered as legal, business or tax advice. A prospective investor should consult its own counsel, accountants or other advisors as to legal, tax, business, financial and related aspects of a purchase of the Notes.

This Private Placement Memorandum does not constitute an offer to sell or a solicitation of an offer to purchase the Notes in any jurisdiction where, or to any person to whom, it is unlawful to make such offer or solicitation in such jurisdiction. Except as otherwise indicated, a prospective investor should assume that the information contained in this Private Placement Memorandum is accurate only as of the date on the front cover of this Private Placement Memorandum. Neither the delivery of this Private Placement Memorandum nor any sale made hereunder shall, under any circumstances, create any implication that there has not been a change in the affairs of the Issuer, MCC or MDC after the date hereof.

No person has been authorized to give any information or to make representations in connection with the offering made hereby other than the information and representations contained in this Private Placement Memorandum, and, if given or made, such other information or representations must not be relied upon. Prior to the consummation of the purchase and sale of the Notes, the Issuer will afford prospective investors an opportunity to ask questions of and receive answers from representatives of it, MCC and/or MDC concerning the terms and conditions of the Notes, the Issuer, MCC, MDC or other relevant matters and to obtain additional information to the extent that it possesses such information or can acquire it without unreasonable effort or expense.

The Issuer reserves the right, in its sole discretion and for any reason whatsoever, to modify, amend and/or withdraw all or a portion of the offering and/or to accept or reject in whole or in part any prospective investment in the Notes or to allot to a prospective investor less than the principal amount of the Notes that it desires to purchase. The Issuer shall have no liability whatsoever to a prospective investor in the event that any or all of the foregoing shall occur.

A prospective investor or investor must comply with all applicable laws and regulations in force in any jurisdiction in which it purchases, offers or sells the Notes or possesses or distributes this Private Placement Memorandum and must obtain any consent, approval or permission required by the Issuer for the purchase, offer or sale by the prospective investor or investor of the Notes under the laws and regulations in force in any jurisdiction to which it is subject or in which it makes such purchase, offer or sale, and the Issuer shall not have any responsibility therefor.

### NOTICE TO NEW HAMPSHIRE RESIDENTS

NOTICE PURSUANT TO NEW HAMPSHIRE LAW: NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

The Issuer expects to sell the Notes offered hereby to Piper Jaffray & Co as the Initial Purchaser ("Initial Purchaser") in a private placement under the Securities Act. If such sale is consummated, the Initial Purchaser will sell the Notes offered hereby pursuant to an exemption from registration provided by Rule 144A under the Securities Act to persons who will be deemed to represent that they qualify as both "qualified institutional buyers" as defined in Rule 144A and "qualified purchasers" as defined in Section(2)(a)(52)(A) of the Investment Company Act. The Notes are offered only through the Initial Purchaser when, as and if issued by the Issuer, subject to the prior sale or withdrawal, cancellation or modification of the offer without notice, and the right of the Issuer and/or the Initial Purchaser to reject any subscription, in whole or in part. The Initial Purchaser will act as a primary contact for, and will be available to consult with, prospective investors.

The Issuer will undertake to make available to every investor, during the course of the offering and prior to the sale of the Notes, the opportunity to ask questions of, and receive answers from, representatives of it, MCC or MDC concerning the terms and conditions of the offering and to obtain any appropriate additional information necessary to verify the accuracy of the information contained in this Private Placement Memorandum, or for any other purpose relevant to a prospective investment in the Notes.

All communication or inquiries relating to these materials should be directed to the following individual:

<div align="center">

Chris Flannery
Managing Director
Piper Jaffray & Co.
800 Nicollet Mall, J12NPF
Minneapolis, Minnesota 55402-7020
Tel:  612-303-2193
Fax:  612-303-6966

</div>

**TABLE OF CONTENTS**

**Page**

SUMMARY OF TERMS .................................................................................................................. 1
SPECIAL CONSIDERATIONS ....................................................................................................... 13
THE ISSUER ................................................................................................................................... 17
USE OF PROCEEDS ....................................................................................................................... 17
THE TRUST ESTATE ...................................................................................................................... 17
STATISTICAL AND OTHER INFORMATION CONCERNING THE LOANS AND METALS ...... 17
MONEX CREDIT COMPANY AND MONEX DEPOSIT COMPANY ........................................ 24
LEGAL PROCEEDINGS ................................................................................................................. 28
THE SERVICER .............................................................................................................................. 28
THE TRUSTEE ................................................................................................................................ 28
THE BACKUP SERVICER ............................................................................................................. 29
THE CUSTODIAN ........................................................................................................................... 29
TRANSFER AND SALE AGREEMENT ......................................................................................... 29
OPTIONAL ADVANCE AGREEMENT .......................................................................................... 34
SERVICING AGREEMENT ............................................................................................................ 36
DESCRIPTION OF THE NOTES AND SERIES 2013-1 SUPPLEMENT ...................................... 60
OPTIONAL REDEMPTION ............................................................................................................ 62
CERTAIN UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS ........................... 62
ERISA CONSIDERATIONS ............................................................................................................ 68
RATINGS ........................................................................................................................................ 69
PLAN OF DISTRIBUTION ............................................................................................................. 69
LEGAL MATTERS .......................................................................................................................... 69
INDEX OF PRINCIPAL TERMS .................................................................................................... 70

## SUMMARY OF TERMS

The following summary is qualified in its entirety by reference to the detailed information appearing elsewhere herein and in the Servicing Agreement (as defined herein), the Master Indenture, the Series 2013-1 Supplement, the TSA (as defined herein) and the OAA (as defined herein). Certain capitalized terms used in this Memorandum are defined elsewhere herein. See the "Index of Principal Terms" and "Definitions of Certain Terms" at the end of this Memorandum. Unless the context requires otherwise, certain capitalized terms, when used herein, relate only to the Notes offered hereby and not to other Series which may exist from time to time.

Issuer..............................................................
Concord Funding Company, L.L.C., a Delaware limited liability company (the *"Issuer"*) established as a limited purpose, bankruptcy-remote special purpose entity in 1995. The Issuer formed the Concord Master Trust in 1995, which Trust issued and retired two series of certificates, issued in 1995 and 1996. The Series 2002-1 Notes were issued for the purpose of refinancing the then outstanding Concord Master Trust certificates and the Concord Master Trust was dissolved at that time. The Issuer has also issued and retired five series of notes, Series 2002-1, Series 2004-1, Series 2005-1, Series 2006-1 and 2011-1. In addition, the Issuer has issued its Series 2012-1 Notes in an original amount of $25,000,000, which will mature on November 15, 2015 and Series 2012-2 Notes in an original amount of $100,000,000, which will mature on January 2017. The Series 2013-1 Notes will be, and the seven previous series of notes were, issued pursuant to the Master Indenture.

Concord Manager Corporation, a Delaware corporation established in 1995 as a limited purpose, bankruptcy-remote entity, owns 100% of the common membership interests in the Issuer. MCC and its affiliate, Secured Credit Corporation, own preferred membership interests in the Issuer. MCC and MDC in certain circumstances may also acquire redeemable preferred membership interests in the Issuer as described herein. The principal executive offices of the Issuer are located at 4900 Birch Street, Newport Beach, California 92660-2188, telephone number (949) 752-1400.

Notes Offered................................................
$65,325,000 aggregate principal amount of Secured Senior Term Notes, Series 2013-1, Class A (the *"Class A Notes"*) and $9,675,000 aggregate principal amount of Secured Subordinated Term Notes, Series 2013-1, Class B (the *"Class B Notes"* and, collectively with the Class A Notes, the *"Series 2013-1 Notes"* or the *"Notes"*) are anticipated to be issued pursuant to the Master Indenture and the Series 2013-1 Supplement thereto.

Each class of Notes will be represented by a master note (each, a "Master Note") held by the Trustee on behalf of, and ownership thereof will be recorded only through the book-entry system of, The Depository Trust Company ("DTC") in denominations of $100,000 and integral multiples of $1,000 in excess thereof. Beneficial owners will not receive certificates representing their ownership interest in the Notes. The Company has been advised by DTC that upon receipt of such payment DTC will credit, on its book-entry records and transfer system, the accounts of the DTC participants through whom Notes are directly or indirectly owned. Payments by DTC to its participants and by such participants to owners of the Notes or their representatives will be governed by customary practices and standing instructions and will be the sole responsibility of DTC, such DTC participants or such representatives, respectively.

The Notes represent obligations of the Issuer only and will not represent interests in or recourse obligations of MCC, MDC, or any Affiliate of either of them.

The Class B Notes are subordinated to the Class A Notes to the extent described herein.

| | |
|---|---|
| Payment Date.................................................. | The fifteenth day of each calendar month (or the next Business Day if not a Business Day) commencing April 15, 2013. |
| Interest Accrual Period.................................. | Payment Date (or, for the initial period, the date of issuance) to but not including the next succeeding Payment Date. |
| Note interest rates ........................................ | For the Class A Notes, 2.42% per annum. |
| | For the Class B Notes, 3.92% per annum. |
| Scheduled Early Amortization Commencement Dates .................................. | For the Class A Notes, the January 2015  Payment Date. |
| | For the Class B Notes, January 2015  Payment Date. |
| Final Maturity Dates ..................................... | For the Class A Notes, the February 2015  Payment Date. |
| | For the Class B Notes, the February 2015 Payment Date. |
| Optional Redemption/Prepayment of Notes ......................................................... | The Notes are subject to early redemption in full on or after the occurrence of the Scheduled Early Amortization Commencement Date described above.  The Notes are not otherwise subject to early redemption or prepayment at the Issuer's option, in whole or in part, prior to maturity.  However, the commencement of an Early Amortization Period for Series 2013-1 as a result of an Event of Default or Early Amortization Event or the occurrence of the Scheduled Early Amortization Commencement Date described above, can result in the allocation of Collections to the Principal Funding Account and the repayment on subsequent Payment Dates of all or portions of outstanding principal on the Class A Notes and Class B Notes (in that order of priority) prior to their final maturity.  See "Summary of Terms--Collections" and "--Payments or distributions from allocated Collections", and "Description of the Notes and Series 2013-1 Supplement" below. |
| Other Series .................................................. | The Issuer has outstanding two series of notes under the Master Indenture.  The Issuer's Series 2012-1 Notes were issued pursuant to the Series 2012-1 Supplement to the Master Indenture dated as of July 12, 2012, and are currently outstanding in the aggregate principal amount of $25,000,000.  The Issuer's Series 2012-2 Notes were issued pursuant to the Series 2012-2 Supplement to the Master Indenture dated as of December 19, 2012, and are currently outstanding in the aggregate principal amount of $100,000,000  The Series 2013-1 Notes, if and when issued, will be the only other outstanding Series secured pari passu with the Series 2012-1 Notes and Series 2012-2 Notes by the Issuer's assets pledged under the Master Indenture. The Issuer from time to time may, subject to the satisfaction of certain conditions, create other Series of notes to be secured *pari passu* with the Notes by the Issuer's assets pledged under the Master Indenture (other than any Series Collateral for, or Collections required to be allocated to, any other Series). |
| Servicer........................................................ | Monex Credit Company, a California limited partnership (*"MCC"*) is the initial Servicer (the *"Servicer"*) pursuant to the Amended and Restated Servicing Agreement dated as of July 12, 2012, among the Servicer, the Trustee, the Backup Servicer, and the Issuer (the *"Servicing Agreement"*). The principal executive offices of MCC are located at 4910 Birch Street, Newport Beach, California 92660-2188, telephone number (949) 752-1400. A Successor Servicer may be appointed in certain circumstances.   The Servicer will receive a monthly fee (the *"Servicing Fee"*) as compensation for its undertaking the duties and obligations of Servicer, payable from Collections allocated for such purpose in accordance with the Servicing Agreement. |

Initial Purchaser .............................................

Piper Jaffray & Co. (*"PJC"*) is acting as the Initial Purchaser for the Issuer (the *"Initial Purchaser"*). The Notes are being offered for sale by the Issuer without registration under Section 5 of the Securities Act in reliance on an exemption from registration provided by Rule 144A. $13,325,000 of the Class A Notes will not be purchased by the Initial Purchaser but will initially be retained by the Issuer on the Closing Date.

Trustee .........................................................

The Bank of New York Mellon Trust Company, N.A., (successor in interest to BNY Midwest Trust Company) (*"BNY"*) is the Trustee under the Master Indenture. The principal corporate trust offices of the Trustee are located at 2 North LaSalle Street, Suite 1020, Chicago, Illinois 60602. BNY in its individual capacity will also act as Custodian for the Trustee in holding original Loan Documents delivered to it from time to time by the Issuer or MCC, under a separate Custody Agreement among the Issuer, the Servicer, BNY as Custodian and the Trustee.

The Trustee will receive an annual fee as compensation for its agreement to serve as Trustee (the *"Trustee Fee"*). Such fee will be paid annually in advance, initially on the date of issuance and thereafter from Collections allocated for such purpose in accordance with the Servicing Agreement.

Backup Servicer .............................................

Portfolio Financial Servicing Company will act as the Backup Servicer under the Servicing Agreement (the *"Backup Servicer"*), and as such, will commit to act as a successor Servicer in certain circumstances if MCC is terminated as the Servicer.

The Backup Servicer will receive an annual fee as compensation for its commitment to become Servicer in the event of the termination of MCC as the initial Servicer (the *"Backup Servicer Fee"*). Such fee will be paid annually in advance, initially on the date of issuance and thereafter from Collections allocated for such purpose in accordance with the Servicing Agreement.

MDC and MDC Advances ............................

Monex Deposit Company, a California limited partnership (*"MDC"*), is an affiliate of MCC and is a dealer in precious metals. The Servicer is authorized under the Servicing Agreement on behalf of the Issuer to sell to MDC (or to an unaffiliated third party) Metals Collateral in connection with liquidation of a Loan, or existing Metals Inventory in connection with a liquidation thereof.

MDC may also from time to time voluntarily contribute (in consideration of receiving redeemable preferred membership units in the Issuer) either Metals to the Issuer as Eligible Metals Inventory, or Dollars, in each case pursuant to the Amended and Restated Optional Advance Agreement between MDC and the Issuer, dated as of October 2, 2002 (the *"OAA"*).

Metals Depository .........................................

Delaware Depository Service Company LLC (the *"Metals Depository"*), pursuant to a Metals Depository Agreement among MCC, MDC, the Issuer, the Trustee and the Metals Depository (the *"Metals Depository Agreement"*). All Metals Collateral and Metals Inventory are held on deposit with the Metals Depository. The Metals Depository Agreement provides for the Metals Depository's acknowledgment of (i) the rights of the Issuer as a transferee of the security interest in related Metals Collateral securing the Loans sold to the Issuer by MCC, (ii) the rights of the Issuer as the owner of all Metals Inventory transferred to it by MDC, and (iii) the rights of the Trustee as pledgee of same, as well as an agreement by the Metals Depository to follow instructions of the Servicer or the Trustee as to dispositions of Metals Collateral and Metals Inventory.

Trust Estate .................................................

The Notes will be secured by the Issuer's pledge of its assets to the Trustee under the Master Indenture (the *"Trust Estate"*). The Trust Estate will

include U.S. Dollar Loans originated by MCC and sold or contributed to the Issuer from time to time pursuant to the Amended and Restated Transfer and Sale Agreement, dated as of October 2, 2002, between the Issuer and MCC (the *"TSA"*), which Loans were made to finance the related Obligor's purchase of precious metals (palladium, gold, silver, or platinum) (*"Metals"*), including the security interest granted by the Obligor in the related Metals to secure the Loan (*"Metals Collateral"*); all Metals (*"Metals Inventory"*) transferred to the Issuer by MDC in respect of a Collection upon repayment or liquidation of a Loan, or otherwise voluntarily contributed from time to time by MDC to the Issuer in exchange for MDC receiving a redeemable preferred membership interest in the Issuer pursuant to the OAA; all monies due or to become due on or collected by the Servicer in repayment or satisfaction of the Loans or upon disposition of Metals Inventory; all proceeds from certain futures positions to be maintained by the Issuer in the Hedge Account (see Hedge below); all Dollars voluntarily contributed from time to time by MDC to the Issuer pursuant to the OAA; and all related rights of MCC and MDC under the Metals Depository Agreement, the Servicing Agreement, the Lockbox Agreement, and the Custody Agreement.

The Loans .....................................................

Individual U.S. Dollar loan transactions (each, a *"Loan"*) made from time to time by MCC to designated customers (*"Obligors"* with respect to *"Designated Accounts"*) under MCC's Loan Agreement with such Obligor. Each Loan finances the Obligor's purchase of Metals, which are titled to the Obligor and held for the benefit of the Obligor by the Metals Depository. To obtain a Loan, the Obligor must supply, from its own funds, initial equity at a level currently set at 25% of the purchase price of the Metals being financed. This initial level (*"Equity"*) can at no time be set at less than 20%. The Obligor grants a security interest in all the acquired Metal, including the portion acquired using Equity, to secure its Loan (i.e. the Metals Collateral). The Loan Agreement provides for an accruing interest rate on each Loan which is added to principal as and when accrued. The Loan Agreement also provides for an ongoing Obligor requirement to maintain a minimum Equity level with respect to a Loan, which minimum currently is set at 14% of the current market value of the Metals Collateral and which level can at no time be set at less than 14%. The Loan Agreement grants MCC the right to demand repayment of the entire Loan at any time, with notice, and to increase the minimum required Equity for a Loan at any time, with notice. The Loan Agreement provides that the Obligor may obtain from MCC a direct loan of Metals (rather than a loan of Dollars to finance the purchase of Metals) but the loaned Metals, and the Obligor's corresponding obligation to repay the Metals loaned, are not included as part of the assets and rights under the Loan Agreement transferred by MCC to the Issuer.

The Issuer shall have the right, subject to certain conditions and aggregate limits and without adverse selection, to substitute for existing Loans in respect of a Designated Account in the Trust Estate, an equivalent principal balance of Loans in respect of a different Designated Account which substitute Loans have been conveyed to the Issuer by MCC under the TSA. Upon such substitution the replacement Loans will become subject to the lien of the Master Indenture and the Loans being substituted will be released from such lien and reconveyed back to MCC. No such substitution may be made for Loans as to which the Obligor is currently in arrears of a payment obligation under its Loan Agreement or is the subject of insolvency proceedings.

Metals eligible to serve as Metals
Collateral or Metals Inventory ......................

Gold, silver, platinum and palladium bullion and coins, as more fully described in "Statistical and Other Information Concerning the Loans and Metals--The Metals" herein.

Collections and Allocations among Series .... The Servicer is required to promptly deposit all daily Collections received or realized in respect of the Loans, dispositions of Metals Collateral, dispositions of Metals Inventory and proceeds from the Hedge Account into the Collection Account.

Such Collections (together with certain other amounts which are required to be treated and allocated as Collections such as the proceeds of Advances-- see "Summary of Terms--Mechanisms for maintaining required advance rate levels" and "--Mechanisms for maintaining Required Amounts" below) must then be allocated for the benefit of each outstanding Series (including any Series issued subsequent to the Notes offered hereby) as follows, and in the following order of priority:

*first*, an amount up to the amount necessary to pay (i) three times the interest on the notes of each outstanding Series on the next upcoming Interest Payment Date, (ii) three times each such Series' proportionate share of servicing fees payable on the next upcoming Payment Date, (iii) each such Series' proportionate share of a monthly accumulation of the next-upcoming annual Trustee Fee payment and Backup Servicer Fee payment (provided, in the case of (i), (ii) and (iii), the specified multiples or allocation may be increased or reduced for any Series if so specified in the related Supplement), and (iv) further amounts, reserves, or expenses (if any) specific to each such Series as specified in the related Supplement (each, the *"Required Amounts"* for such Series) with such funds to be deposited to a segregated Required Amounts Account established for each such Series (and, if Required Amounts at the time of such allocation remain unfunded for more than one outstanding Series, available collections will be allocated among such Series *pro rata* based on the unpaid principal balance of each such Series, to the aggregate unpaid principal balances of all such Series, in each case determined as of the beginning of the relevant monthly collection period);

*second*, if a Negative Principal Variance exists for such date (see "Summary of Terms--Advance Rate" below), then to fund a deposit into the Equalization Account held by the Trustee for the benefit of all Series under the Master Indenture up to the amount of such Negative Principal Variance;

*third*, if an Amortization Period or Delineated Principal Funding Period for such Series has commenced and is continuing, to fund a deposit in the related Principal Funding Account for such Series up to the amount necessary to make any permitted or required principal repayment on the next upcoming Payment Date (and, if the same has commenced for more than one outstanding Series at the time of such allocation, available Collections will be allocated among such Series *pro rata* based on the unpaid principal balance of each such Series, to the aggregate unpaid principal balances of all such Series, in each case determined as of the beginning of the relevant monthly collection period); and

*fourth*, with respect to any remaining available Collections as follows and in the following order of priority (and, in the case of clause (B) and (C), subject to any special allocation rule provided for in a Supplement): (A) to the extent reimbursable expenses or indemnifications are payable by the Issuer to the Trustee or the Backup Servicer as Successor Servicer, to be paid *pro rata* to the respective party entitled thereto, (B) if and to the extent directed by the Issuer in its sole discretion, to be deposited into the Equalization Account, and (C) to be released to the Issuer free

5

and clear of the lien of the Master Indenture to fund the purchase price to MCC for additional Loans under the TSA, or for general Issuer use and distribution to its members.

If at the time of a daily allocation of Collections described above, all required deposits have been made to each Required Amounts Account, as well as to each Principal Funding Account for the Series as to which an Amortization Period is in effect, collections on Loans may be received or held by the Issuer in the form of an equivalent Wholesale Value of Eligible Metals Inventory transferred from MDC, instead of in the form of Dollars derived from Obligor payments or liquidations of related Metals Collateral. As a result, Collections allocated to the Equalization Account as described above may be deposited therein in the form of either Dollars or an equivalent Wholesale Value of Eligible Metals Inventory transferred by MDC to the Issuer.

Payments or distributions from
allocated Collections....................................

Amounts allocated to the Required Amounts Accounts and Principal Funding Accounts are to be distributed as follows:

On each Payment Date or Interest Payment Date, as specified below, the Servicer is required to instruct the Trustee to make the following funds transfers in respect of each outstanding Series on such date, from the accounts and in the order of priority specified below:

*Certain Fixed Fees.* (A) On each January Payment Date, an amount from each Required Amounts Account equal to the related Series Allocation Percentage of the annual fee payable to the Trustee, to be distributed on such Payment Date to the Trustee; (B) on each January Payment Date, an amount from each Required Amounts Account equal to the related Series Allocation Percentage of the annual fee payable to the Backup Servicer, to be distributed on such Payment Date to the Backup Servicer; and (C) in the event that the Servicer is not MCC or an Affiliate of MCC, on each Payment Date, an amount from each Required Amounts Account equal to the related Series Allocation Percentage of the monthly fee payable to the Servicer, to be distributed on such Payment Date to the Servicer.

*Interest; Other Amounts.* (A) First, on each Interest Payment Date, an amount from each Required Amounts Account equal to the interest payable on such date in respect of the related Series outstanding, and then (B) on each Payment Date, an amount from the Required Amounts Account equal to such other amounts as are specified in the applicable Supplement with respect to a Series as payable on a Payment Date in respect of such Series from the Required Amounts Account, with such respective amounts in each case to be distributed as provided in the related Supplement.

*Principal During Amortization or Delineated Principal Funding Period.* If an Amortization Period (or Delineated Principal Funding Period) has commenced and is continuing in respect of a Series, an amount from the related Principal Funding Account equal to the principal payable from the Principal Funding Account with respect to such Series as specified in the related Supplement for such Series, to be distributed on a Payment Date (or, if so specified in a related Supplement, an Interest Payment Date) to each Noteholder of such Series *pro rata* in accordance with such Noteholder's principal balance outstanding or as otherwise provided in the related Supplement.

*Servicing Fee.* In the event that the Servicer is MCC or an

Affiliate of MCC, on each Payment Date an amount from each Required Amounts Account equal to the Series Allocation Percentage of the Servicing Fee, to be distributed on such Payment Date to the Servicer, *provided,* that in the event the Trustee has received notice that any storage fees due and payable to the Metals Depository have not been paid, or that any fees or expenses payable to the Backup Servicer have not been paid, then the Trustee is required to deduct from the Servicing Fee otherwise payable to the Servicer hereunder (A) first, the amount of arrearage in storage fees and remit the same to the Metals Depository, and (B) after any such arrearage has been satisfied, then remit such amounts as may be due the Backup Servicer.

Subordination of repayment of Class B Notes to Class A Notes........................................... With respect to the payments described above from the Principal Funding Accounts established for the Series 2012-1, Series 2012-2 and Series 2013-1 Notes, the related supplements each provide that no such payments shall be made to the holders of Class B Notes of each such Series until all principal outstanding on the Class A Notes of all such Series has been repaid.

Advance Rate................................................. On each Business Day, the Servicer must determine the result of (i) the sum of (a) the Adjusted Eligible Pool Balance, (b) any Dollars then held for repayment of principal balances of any Series, (c) 83% of the Wholesale Value of Metals Inventory (if any) held in the Equalization Account which is Hedged, (d) 66% of the Wholesale Value of Metals Inventory (if any) held in the Equalization Account which is not hedged (see Hedge below), (e) Dollars (if any) held in the Equalization Account, (f) the net equity value of the Hedge Account, (g) amounts held in the Required Amounts Account, less (ii) the sum of (a) the aggregate principal balances outstanding of all Series (including any Series issued subsequent to the Notes), and (b) the amount of accrued and unpaid interest on the Notes, in each case as of the close of the preceding Business Day. This result is the *"Principal Variance"* for the date of the Servicer's determination. To the extent the amount in clause (ii) exceeds the amount in clause (i), the excess constitutes a *"Negative Principal Variance"* for such date. The consequence of the Negative Principal Variance is to trigger a requirement, described in "Summary of Terms--Collections" above, that Collections that otherwise would be allocated on that date to the funding of deposits to Principal Funding Accounts for individual Series, or for release to the Issuer, must instead be allocated on that date to the Equalization Account in an amount necessary to eliminate the Negative Principal Variance. If this allocation, once made, is in an amount less than the Negative Principal Variance, then the continued deficiency constitutes an *"Unsatisfied NPV"* for such date. An Unsatisfied NPV requires the Servicer to take the further actions described under "Summary of Terms--Mechanisms for maintaining required advance rate levels" below.

Adjusted Eligible Pool Balance .................... *"Adjusted Eligible Pool Balance"* consists of the aggregate of the principal balances of each otherwise Eligible Loan outstanding, reduced by (i) adjustments for certain obligor and silver concentration limits (described below), (ii) the aggregate of the amounts by which any individual Loan is not 20.482% over-collateralized with a current Wholesale Value of Metals Collateral which is Hedged, and (iii) the aggregate of the outstanding Loan amounts for all individual Loans not 51.515% over-collateralized with a current Wholesale Value of Metals Collateral in the case where the Metals Collateral is not hedged (see Hedge below).

Concentration Limits ..................................... Aggregate principal balances of otherwise Eligible Loans available to be included in the determination of Adjusted Eligible Pool Balance for the Servicer's daily calculation of Principal Variance will be reduced by the

sum of the following:

(a) The amount, if any, by which balances of otherwise Eligible Loans of the same single Obligor exceed 5% of the sum of (i) the aggregate outstanding principal balance of all Eligible Loans of all Obligors, (ii) 83% of the Wholesale Value of Eligible Metals Inventory held by the Issuer in the Equalization Account and which is Hedged is attributable, and (iii) 66% of the Wholesale Value of Metals Inventory held in the Equalization Account which is not hedged (see Hedge below).

(b) The amount, if any, by which balances of otherwise Eligible Loans of Obligors domiciled outside of the USA or Canada exceed 10% of the sum of (i) the aggregate outstanding principal balance of all Eligible Loans of all Obligors, (ii) 83% of the Wholesale Value of Eligible Metals Inventory held by the Issuer in the Equalization Account and which is Hedged, and (iii) 66% of the Wholesale Value of Metals Inventory held in the Equalization Account which is not hedged (see Hedge below).

(c) The amount, if any, by which balances of otherwise Eligible Loans of Obligors domiciled in a single country (not the USA or Canada) exceed 5% of the sum of (i) aggregate outstanding principal balance of all Eligible Loans of all Obligors, plus (ii) 83% of the Wholesale Value of Eligible Metals Inventory held by the Issuer in the Equalization Account and which is Hedged, plus (iii) 66% of the Wholesale Value of Metals Inventory held in the Equalization Account which is not hedged (see Hedge below).

(d) The amount, if any, by which balances of otherwise Eligible Loans backed by silver exceed 60% of the aggregate outstanding principal balance of all Eligible Loans of all Obligors.

(e) The amount, if any, by which the Wholesale Value of Eligible Metals Inventory consisting of silver exceed 60% of the aggregate Wholesale Value of Eligible Metals Inventory held by the Issuer in the Equalization Account.

Mechanisms for maintaining required
Advance Rate levels .....................................

If the Servicer's daily measurement shows that, after the required allocation of daily Collections as described in "Summary of Terms--Collections" above, an Unsatisfied NPV exists, then the Servicing Agreement will require the Servicer to take the following actions (in order):

(i) Request a voluntary capital contribution from MDC to the Issuer under the OAA, in the form of Dollars and/or Eligible Metals Inventory, in an amount equal to the Unsatisfied NPV (valuing any contribution of Eligible Metals Inventory which is Hedged at 83% of its then Wholesale Value and any contribution of Eligible Metals Inventory which is not hedged at 66% of its then Wholesale Value (see Hedge below).

(ii) If the foregoing action does not raise an amount equal to the Unsatisfied NPV, then liquidate Metals Inventory held in the Equalization Account so as

8

to generate Dollar proceeds (to be allocated as Collections) at least equal to the remaining Unsatisfied NPV.

In addition, for so long as an Unsatisfied NPV exists on any date of determination, the Servicer is required to make and enforce demands on Obligors whose Equity level in their Loan has fallen below the level then required in the Loan Agreement to pay in additional Equity (a *"Collateral Demand"*), and if such Collateral Demand is not timely paid to liquidate sufficient Metals Collateral of such Obligors so as to obtain Dollars in the amount of such outstanding Collateral Demand, for allocation as Collections on subsequent Business Days (and the Servicer will no longer have its normal discretion to postpone such actions). The Servicer must also, for so long as an Unsatisfied NPV exists on any date of determination, demand repayment in full of (i) any Loans as to which outstanding Collateral Demands have not been satisfied within five Business Days, and (ii) any Loans whose equity has fallen below the Special Required Equity Level, and in each case liquidate Metals Collateral securing such accelerated Loans, with the proceeds of such actions once received to be allocated as Collections on subsequent Business Days (and the Servicer will no longer have its normal discretion to postpone such actions).

In addition to the foregoing, the Servicer is obligated to increase the required Equity for Obligors under their Loan Agreements, and make and enforce resultant Collateral Demands on Obligors, to the extent necessary so as to generate Dollars from any combination of Obligor payments and/or proceeds of liquidated Metals Collateral in the amount of the current Unsatisfied NPV.

Mechanisms for maintaining Required Amounts ........................................................

As noted above in "Summary of Terms--Collections", daily Collections are to be allocated to each Series for application first to fund Required Amounts, i.e., interest due on such Series on the next upcoming Payment Date, the Series' allocable share of servicing, backup servicing, trustee and other Series reserves, and payments or expenses incurred for the benefit of such Series. Because accruing interest on each Loan is added to principal, there will not be regular monthly payments of scheduled interest on the Loans being applied and allocated as Collections (although Collections can be generated from other sources and events, such as the Obligor's requirement to maintain its required Equity on a Loan, an Obligor's voluntary repayment or liquidation of a Loan, etc.).

If on any day the Required Amounts for a Series are not funded in full (after giving effect to allocations of Collections for that day), then the Servicer is required under the Servicing Agreement to request a voluntary capital contribution from MDC under the OAA of Dollars, to be allocated as Collections and deposited into the related Required Amounts Account(s) in satisfaction of the deficiency. If such voluntary contribution is not promptly made, the Servicer is then required to liquidate Metals Inventory so as to generate Dollars (to be allocated as Collections) sufficient to cure the deficiency. If the deficiency has still not been cured in full within 15 days of the next upcoming Payment Date (or 3 Business Days before such upcoming date, in the case of a deficiency in Required Amounts other than interest and Trustee/Backup Servicer/Servicing fees), then the Servicer is required to make written demand for repayment in full of Loans (and, if necessary, liquidate related Metals Collateral) to an extent sufficient to generate Collections to fund the shortfall in Required Amounts in time for such upcoming Payment Date.

Hedge............................................................

The Issuer will establish and maintain a Jefferies Bache Commodity Futures Account with Jefferies Bache LLC, which is regulated under the Federal authority of the Commodity Futures Trading Commission (the

*"Hedge Account"*), and under which the Issuer will enter into short positions in gold, silver, platinum and/or palladium futures or options traded on the COMEX. The aggregate amount of ounces subject to short positions within the Hedge Account on any given Business Day cannot exceed 100% of the aggregate number of ounces of Metals Inventory owned by the Issuer together with the aggregate number of ounces of Metals Collateral securing Eligible Loans owned by the Issuer and with outstanding balances in excess of 66% of the Wholesale Value of Metals Collateral securing such Loans. On each Business Day, the Servicer will allocate short positions to Metals Inventory and Metals Collateral. Ounces of Metals Inventory allocated short positions covering at least 50% and at most 100% of such ounces will be deemed Hedged. Ounces of Metals Inventory allocated short positions covering less than 50% of such ounces will be deemed not hedged. Similarly, for Eligible Loans with outstanding amounts in excess of 66% of associated Metals Collateral, such Eligible Loans will be deemed Hedged if the Servicer has allocated short positions covering at least 50% and at most 100% of the ounces of Metals Collateral backing such Eligible Loans and not hedged otherwise.

Early Amortization Events............................ Any of the following will constitute an *"Early Amortization Event"* with respect to Series 2013-1:

(i) Failure on the part of the Issuer or Servicer to make any payment or deposit required to be made by the terms of (1) the Servicing Agreement or (2) any Supplement, with such failure continuing for two days after the date such payment or deposit is required to be made.

(ii) The Issuer shall have become an "investment company" within the meaning of the Investment Company Act.

(iii) Any Lien (other than a Permitted Lien) is imposed on the Loans or any other of the Trust Estate assets, and such Lien has not been removed or extinguished within ten days of its imposition.

(iv) MCC's, the Servicer's or the Issuer's failure to otherwise observe or perform in any material respect any other covenants or agreements set forth in any Program Agreement to which they are a party which failure would have a Material Adverse Effect and which continues unremedied for a period of 30 days after the date on which written notice of such failure shall have been given to the offending party by the Issuer, the Servicer, the Trustee or a Majority of Noteholders, as the case may be (provided, that any failure to perform a covenant or agreement pertinent to a Loan or related Loan Agreement with respect to which MCC performs its repurchase obligation for the affected Loan under the TSA shall not constitute an Early Amortization Event).

(v) Any representation or warranty made by MCC in the TSA, or by the Issuer in the Master Indenture or any Supplement, shall prove to have been incorrect in any material respect when made or when delivered, and which shall continue to be incorrect in any material respect for a period of 30 days after the date on which written notice of such failure shall have been given to the Issuer by the Trustee, or to the Issuer and the Trustee by a Majority of Noteholders (provided, that an

incorrect representation or warranty relating to a Loan or related Obligor with respect to which MCC performs its repurchase obligation of such affected Loan under the TSA shall not constitute an Early Amortization Event).

(vi)    For 180 consecutive calendar days, as reflected on Daily Reports delivered during such period, the components of the calculation of Principal Variance consisting of the Adjusted Eligible Pool Balance, plus the Adjusted Inventory Balance of Eligible Metals Inventory held in the Equalization Metals Account, shall be less than 40% of the aggregate outstanding principal balance of all Notes of any Series then outstanding.

Under the Servicing Agreement the occurrence and continuance of an Early Amortization Event will cause Collections allocable to all Series to be allocated to the Principal Funding Account and applied to repay Note principal on subsequent Payment Dates, as described in "Summary of Terms--Collections" and "--Payment and distribution of allocated collections" and "--Subordination of repayment of Class B Notes to Class A Notes" above.

Any such Early Amortization Event (other than the event described in clause (ii) above) may be waived with the prior written consent of a Majority of Noteholders, and prior written notice to each Rating Agency.

Events of Default .........................................    *"Events of Default"* under the Master Indenture are:

(i)  the Issuer's failure to pay note interest or note principal in respect of any outstanding Series when due;

(ii) an Early Amortization Event for any Series occurs and continues for 150 consecutive days;

(iii)    the occurrence of an Insolvency Proceeding with respect to the Issuer, MCC, MDC, any general partner of either, or with respect to a common member of the Issuer;

(iv)  a valid Termination Notice is delivered seeking the appointment of a Successor Servicer to MCC;

(v)    the Issuer becomes an investment company and such status is not cured within 30 calendar days;

(vi)    any representation, warranty or certification made by the Issuer in any Program Agreement or in any certificate delivered pursuant to any Program Agreement shall be incorrect, false or misleading in any material respect, and continues to be incorrect, false or misleading in any material respect for a period of 30 days after the date on which written notice of such incorrect, false or misleading representation, warranty or certification shall have been given to the Issuer (provided, that with respect to any incorrect, false or misleading representation or warranty as to which repurchase of the affected Loan or Loans is required under the TSA, such occurrence shall not constitute an Event of Default if MCC timely complies with such repurchase obligation); or

(vii) a Negative Principal Variance shall have existed for five (5) consecutive calendar days, and a Majority of Noteholders shall have given written notice to the Trustee, the Issuer and the Servicer that such event is to be deemed an Event of Default.

Upon the occurrence of an Event of Default, the Servicer must first liquidate Metals Inventory and then, if such action is insufficient to generate Collections which following allocation to the Principal Funding Account will permit the Notes to be repaid in full, then the Servicer must make written demand on all Obligors for repayment in full of their Loans outstanding, and as necessary liquidate Metals Collateral in satisfaction of such Loans, so as to generate Collections which following allocation to the Principal Funding Account will permit the Notes to be repaid in full. Certain additional procedures apply if the Servicer acting as such at the time is not MCC as initial Servicer but rather a Successor Servicer, including the Backup Servicer as Successor Servicer. See “Servicing Agreement-- Actions Required Upon Event of Default or at Series Maturity” herein. All such Collections are to be allocated and applied in accordance with the Servicing Agreement as described in "Summary of Terms--Collections" and "--Payment and distribution of allocated collections" and "--Subordination of repayment of Class B Notes to Class A Notes" above.

In addition following an Event of Default outstanding Series may be accelerated, and upon an election of a Majority of Noteholders, the Trustee following an Event of Default will be required to exercise remedies against the Trust Estate assets directly (such as the foreclosure on and liquidation of the Trust Estate), with proceeds obtained therefrom to be allocated and applied as Collections as described in the preceding paragraph. See “Master Indenture-- Early Amortization Events; Events of Default and Remedies” herein.

Amortization Period...................................... An *"Amortization Period"* will commence for Series 2013-1 upon the earlier of the occurrence of an Early Amortization Event, an Event of Default or the Payment Date occurring in January 2015.

Required actions upon Maturity Date ........... If upon the occurrence of a Series 2013-1 Maturity Date for any Class, amounts are not on deposit in the Principal Funding Account sufficient to repay the maturing Notes in full, the Servicer is required under the Servicing Agreement to take the same actions with respect to Metals Inventory and Loans as are specified above under "Summary of Terms--Events of Default" but, as to Loans, only with respect to a sufficient quantity of Loans necessary to repay the Notes and associated obligations in full.

Certain United States federal income tax considerations ......................................... In the opinion of Andrews Kurth LLP, special federal tax counsel to the Issuer, the Notes will be characterized as debt for federal income tax purposes, and the Issuer will not be characterized as an association or publicly traded partnership taxable as a corporation. Under the Series 2013-1 Supplement, the Issuer, the Servicer, the Class A Noteholders and the Class B Noteholders will agree or be deemed to have agreed to treat the Class A Notes and Class B Notes, as applicable, as debt for federal, state, and other tax purposes.

ERISA Considerations ................................. Subject to the considerations described under "ERISA Considerations" in this Offering Memorandum, the Class A Notes (but not the Class B Notes) may be purchased by pension, profit sharing and other employee benefit plans and retirement arrangements.

Investors should consult with their counsel regarding the applicability of the provisions of the Employee Retirement Income Security Act of 1974, as amended, before purchasing any Notes.

Note Ratings ................................................. It is a condition to the issuance of the Class A Notes that they be rated at least *"A"* by Standard & Poor's Ratings Services (*"S&P"* or the *"Rating Agency"*).

It is a condition to the issuance of the Class B Notes that they be rated at least *"BBB"* by S&P.

Investors should not assume that a rating will not be lowered, qualified or withdrawn by the Rating Agency.

## SPECIAL CONSIDERATIONS

*Prospective purchasers of the Notes should consider, among other things, the following risks and special considerations.*

### Limited Liquidity

The Notes will not be registered under the Securities Act or under any state securities or *"blue sky"* laws and will be made in reliance upon exemptions from registration provided by such laws, nor is there any undertaking or intention to do so. Transfers of the Notes or any interest therein may be made only pursuant to a valid registration statement, or an exemption from the registration requirements under the Securities Act, and any applicable state securities laws, and in addition only to investors which are "qualified purchasers" within the meaning of the Investment Company Act and "qualified institutional buyers" as defined in Rule 144A. Also, at no time may more than 100 persons beneficially own outstanding securities (other than short-term paper) of the Issuer, within the meaning of Section 3(c)(1) of the Investment Company Act. The Issuer has not agreed to provide registration rights to any purchaser of the Notes and no Noteholders may register the Notes under the Securities Act or any state securities laws.

There is currently no market for the Notes, nor is a market expected to develop in the future. A purchaser of Notes must be prepared to hold the Notes until final payment is made thereon.

### Non-Recourse to MCC, MDC or Affiliates Thereof

No Noteholder will have recourse for payment of its Notes to any assets of any of MCC, MDC, the initial or any subsequent Servicer, or any Affiliates thereof. In addition, the Issuer's assets will be limited to those assets pledged to the Trustee under the Master Indenture (except for Dollars distributed from time to time from the Trust Estate to the Issuer and held by the Issuer free and clear pending payment or distribution to its members). In addition, while MDC may from time to time make voluntary capital contributions to the Issuer of Dollars or Metals, MDC is not under any legal obligation to make such contributions and may decline to make further contributions at any time. Consequently, Noteholders must rely for the payment of interest and principal on the Notes solely upon Collections on the Loans, Dollars (if any) previously contributed to the Issuer by MDC, any Metals Inventory held by the Issuer (including Metals, if any, previously contributed by MDC to the Issuer) and amounts realized upon the disposition thereof and, following commencement of an Amortization Period for Series 2013-1, any available additional reserve amount then held in the Series 2013-1 Required Amounts Account as described in "Summary of Terms--Collections" above.

### Risk of Volatility of Market Price of Metals

The Trust Estate is expected to consist largely of the Loans secured by Metals Collateral, such Metals Inventory, if any, as may be held from time to time by the Issuer and by certain short positions maintained in the Hedge Account. As a condition to the issuance of the Notes, the Trust Estate must show a Principal Variance not less than zero, i.e., the Adjusted Eligible Pool Balance plus any Dollars held for repayment of Note principal plus the Adjusted Inventory Balance (if any) in the Equalization Account plus Dollars (if any) held in the Equalization Account, plus the net equity value of the Hedge Account must at least equal the aggregate principal amount of the Notes outstanding. This advance rate formula is designed to assure that (1) subject to certain Obligor and silver concentration limits, for every dollar of Eligible Loan principal balance supported by Metals Collateral which is at least 50% hedged via short positions held in the Hedge Account no more than $0.83 of Note principal is outstanding,

(2) subject to certain Obligor and silver concentration limits, for every dollar of Eligible Loan principal balance supported by Metals Collateral which is not 50% hedged no more than $0.66 of Note principal is outstanding, (3) subject to certain silver concentration limits, for every dollar in Wholesale Value of any Eligible Metals Inventory held by the Issuer, and 50% hedged via short positions in the Hedge Account no more than $0.83 of Note principal is outstanding, (4) subject to certain silver concentration limits, for every dollar in Wholesale Value of any Eligible Metals Inventory which is not 50% hedged no more than $0.66 of Note principal is outstanding and for every dollar of cash held in the Equalization or Collection Accounts no more than $1.00 of Note principal is outstanding. Wholesale Value is determined by reference to the prior Business Days' "London Fixing P.M. for Gold" and "London Fixing P.M. for Silver", as applicable, or shortest futures NYMEX price (for platinum and palladium), in each case as quoted in the Wall Street Journal. To the extent Wholesale Value declines from one day to the next, holding other factors constant, a dollar of Note principal advanced would become secured by Loan balances collateralized with, or Metals Inventory representing, a lesser Wholesale Value of Metals.

The Servicing Agreement requires that if such declines were to lead to a Principal Variance, measured daily, of less than zero (i.e., a Negative Principal Variance) the Servicer must take the actions described in "Summary of Terms--Mechanisms for maintaining required advance rate levels" until there is no longer a Negative Principal Variance. If such declines were of significant duration and severity, and/or such actions by the Servicer were not taken or were delayed, it is possible that a Negative Principal Variance could remain uncured. In fact, if Wholesale Value declines were of sufficient severity and duration, the Note principal advanced could become secured by Loan balances collateralized with, or Metals Inventory representing, a Wholesale Value of Metals less than the amount advanced. While outstanding Loan balances remain obligations of the Obligor even to the extent not secured by an equivalent value of Metals, there can be no assurance that Obligors would make deficiency payments or that the Servicer could obtain a recovery thereof. In addition, there is no percentage or aggregate limits in the advance rate formula on the amount of Note principal that may be supported by Metals Inventory as opposed to Loans. Moreover, other than the concentration limits related to palladium, there are no percentage or aggregate limits in the advance rate formula on the amount of Note principal that may be secured by Loans collateralized with, or Metals Inventory consisting of, any particular Metal (i.e., the Wholesale Value of Metals Collateral supporting Loans, or of Metals Inventory, could in theory consist entirely of exposure to any one Metal – gold, silver, or platinum). Accordingly in the event of Wholesale Value declines of sufficient severity and duration, Noteholders could suffer a loss of principal.

The Issuer will seek to mitigate some of the volatility of the collateral securing the Loans and the Inventory through a hedge account ("Hedge Account") established with Jefferies Bache, LLC. By entering into certain hedge agreements, the Issuer will be permitted to increase the advance rates of the Notes funded against the collateral securing the Notes. The Hedge Account will be funded by the Issuer for the purpose of satisfying potential margin requirements if the metals covered by the hedge agreements rise in value. Under that situation, the Issuer may be required to contribute additional funds to the Hedge Account, reduce the hedging contracts in the Hedge Account or close the Hedge Account. These options will all result in less collateral securing the Notes, unless MDC voluntarily contributes additional funding to the Issuer, although the rise in value of the metals should result in an increase in the collateral securing the Notes, thereby offsetting some of the loss in value of the Hedge Account. The hedge agreements held in the Hedge Account may not be sufficient to offset the potential risk of loss in the metals values of the underlying collateral.

**MCC or MDC Bankruptcy Considerations**

Andrews Kurth LLP, special counsel to MCC, MDC and the Issuer, will render an opinion to the Trustee to the effect that (a) in the event MCC became a debtor under the United States Bankruptcy Code the transfer of Loans from MCC to the Issuer in accordance with the TSA, would be treated as a sale of ownership and not as a pledge to secure a borrowing, (b) in the event MDC became a debtor under the United States Bankruptcy Code the transfer of Metals Inventory from MDC to the Issuer in accordance with the OAA, would be treated as an absolute conveyance in the form of a capital contribution, and not as a pledge to secure a borrowing, and (c) that the Issuer would not be substantively consolidated with either MCC or MDC as a single entity. If, however, such transfers were treated as a pledge to secure borrowings by the relevant transferee, or if the Issuer were ordered consolidated with MCC or MDC as a single entity or were to become bankrupt for any reason, the distribution of proceeds of the Loans and/or Metals Inventory to the Trustee for the benefit of the Noteholders might be subject to the automatic stay provisions of the United States Bankruptcy Code, which would delay the distribution of such proceeds for an uncertain period of time. In addition, a bankruptcy trustee would have the power to sell the Loans and Metals Inventory if the proceeds of such sale could satisfy the amount of the debt deemed owed by the Issuer, or the bankruptcy trustee could substitute other collateral in lieu of the Loans and Metals Collateral to secure such debt, or such debt could be subject to adjustment by the bankruptcy court if MCC or MDC were to file for reorganization under Chapter 11 of the United States Bankruptcy Code.

To the extent that MCC or MDC is deemed to have granted to the Issuer only a security interest in the Loans or Metals Inventory, as applicable, and that security interest was validly perfected before any insolvency of MCC or MDC and was not granted in contemplation of insolvency or with the intent to hinder, delay, or defraud MCC or MDC (as applicable) or its creditors, that security interest should not be subject to avoidance in the event of insolvency or receivership of MCC or MDC, and payments to the Trustee with respect to proceeds of the Loans and Metals Inventory should not be subject to recovery by a

bankruptcy trustee or receiver of MCC or MDC, as applicable. If, however, such a bankruptcy trustee or receiver were to assert a contrary position, delays in payments on the Notes and possible reductions in the amount of those payments could occur. If a bankruptcy trustee or receiver were appointed for the Servicer, and no Servicer Default other than such bankruptcy or receivership or insolvency of the Servicer exists, the bankruptcy trustee or receiver may have the power to prevent a transfer of servicing to a successor Servicer. If a bankruptcy trustee or receiver were appointed for the Issuer, causing an Event of Default with respect to all Series then outstanding, no new Loans or Metals Inventory would be transferred to the Issuer and, if directed to do so by a Majority of Noteholders, the Trustee would exercise remedies as a secured creditor against the Trust Estate, including foreclosure and liquidation. If the net proceeds from such sale, if any, were insufficient to pay the Noteholders in full, a loss to the Noteholders would result.

**Repurchase Obligation of MCC Provides Only Limited Protection Against Prior Liens on the Trust Estate Assets**

Federal or state law may grant liens on a Loan that have priority over the Issuer's interest therein (and hence the Trustee's interest as assignee/pledgee of the Issuer). To the extent a lien having priority over the Issuer's or Trustee's lien exists, the Trustee's interest in the asset will be subordinate to such prior lien. In the event the creditor associated with such prior lien exercises its remedies on its security interest it is unlikely that, after the senior creditor is repaid, sufficient cash proceeds from the Loans will be available to pay the Loan principal balance outstanding to the Trustee. An example of a lien arising under federal or state law is a tax or other government lien on property of MCC or the Issuer arising prior to the time the Loan is pledged to the Trustee.

Under the TSA, MCC will warrant to the Issuer that the Loans and security interest in Metals Collateral securing the same will be transferred free and clear of the lien of any third party other than certain permitted liens. MCC also will warrant to the Issuer that it will not sell, pledge, assign, transfer or grant any other lien on the Loans. In the event that such warranties are not true with respect to any Loan, MCC is required under the TSA to either cure the breach or repurchase the Loan. The Trustee, as assignee of the Issuer, is a beneficiary of such right against MCC. There can be no assurance that MCC will be able to repurchase a Loan at the time required under the TSA.

**Insolvency of Obligors May Reduce or Delay Collections on the Loans**

To the extent an Obligor fails to perform its obligations under its Loan Agreement, the Servicer is authorized (and is required under certain circumstances, such as when a Negative Principal Variance exists) to take prompt action to accelerate the Loan and liquidate the Metals Collateral securing the related Loan and apply the resulting liquidation proceeds as Collections in repayment of the outstanding Loan balance. In the event of a U.S. federal bankruptcy case with respect to an Obligor as debtor, such liquidation could be subject to a stay and associated delay. Such delay would increase the risk that a decline in the market value of the Metals Collateral prior to its eventual liquidation could lead to a deficiency in amounts available to satisfy the unpaid Loan balance. To the extent such deficiency arises, it will represent a general unsecured claim against the bankrupt Obligor and recovery of such deficiency against the Obligor's bankruptcy estate would be unlikely. In such event, a loss to Noteholders could result if other Collections or realizations on other Trust Estate assets could not make up the deficiency.

**Limited Nature of Credit Ratings Assigned to the Notes**

The rating assigned to the Notes reflect the Rating Agency's assessment only of the likelihood that interest will be paid on each Payment Date and that principal will be repaid on or before the stated Maturity Date of the Notes, not that it will be paid when expected or scheduled. The rating is based on the Rating Agency's determination of the value of the Loans, Metals Collateral and Metals Inventory, and the reliability of the cash flows and Collections expected to be generated therefrom. The ratings do not address the following:

-- the likelihood that principal on the Notes will be prepaid, paid on a scheduled date or paid on any particular date before the stated Maturity Date;

-- the possibility that the Notes will be paid early;

-- the marketability of the Notes, or any market price; or

-- that an investment in the Notes is suitable for any particular investor.

A rating is not a recommendation to purchase, hold or sell notes.

**Losses on the Loans May Differ from Historical Experience**

Since its inception in 1995, the Issuer has experienced extremely low losses (less than .10% of the Adjusted Eligible Pool Balance annually) on its portfolio of Loans held through the Trust. This historical performance, however, may not necessarily be an accurate depiction of future portfolio performance. Losses could arise depending on the mix of Loans and Designated Accounts included in the Trust Estate, changes in the management, underwriting and servicing systems of MCC, changes in the standards, procedures and policies of MCC, as well as for various other reasons, including changes in local, regional or national economies adversely affecting the credit of Obligors, or changes in the prices or volatility of prices of Metals.

**Commingling of Funds May Result in Reduced or Delayed Payments to Noteholders**

If bankruptcy or reorganization proceedings are commenced with respect to the Servicer, any funds then held by the Servicer either directly or indirectly (*i.e.*, on deposit in a lockbox account) may be unavailable to Noteholders. Under the Servicing Agreement, the Servicer is required to deposit promptly into the Collection Account maintained with the Trustee all payments received by the Servicer with respect to the Loans included in the Trust Estate. If those funds are not transferred to the Trustee, as required by the Servicing Agreement, payments to Noteholders could be delayed or reduced if the Servicer becomes bankrupt or insolvent.

**Payments and Maturity**

If an Early Amortization Event or Event of Default occurs, the Amortization Period will commence and the average life and maturity of the Notes may be significantly reduced. There can be no assurance in that event that the holders of the Notes would be able to reinvest any accelerated distributions on account of such Notes in other suitable investments having a comparable yield.

**Master Indenture Considerations and the Issuance of Additional Series of Notes**

In addition to the Notes, the Issuer under the Master Indenture has issued, and may (but is not obligated to) issue, additional Series from time to time. While the terms of any Series will be specified in the related Supplement, the provisions of a Supplement and, therefore, the terms of any additional Series, will not necessarily be subject to the prior review or consent of holders of the Notes. Such terms of other Series may include methods for determining Required Amounts, provisions granting additional Series Collateral, provisions for alternative forms of credit or liquidity enhancements, different Classes of notes, provisions subordinating such Series to another Series (if the Supplement relating to such Series so permits) or another Series to such Series (if the Supplement for such other Series so permits), and any other amendment or supplement to the Master Indenture which is made applicable only to such Series. In addition, the provisions of any Supplement may give the holders of the notes issued pursuant thereto consent, approval, or other rights that could result in such holders having the power to cause the Issuer, the Servicer or the Trustee to take or refrain from taking certain actions, including, without limitation, actions with respect to the exercise of certain rights and remedies under the Master Indenture, without regard to the position or interest of the Noteholders of any other Series. Similar rights may also be given to the provider of any credit or liquidity enhancement specific to such a Series. It is a condition precedent to the issuance of any additional Series that each Rating Agency that has rated any outstanding Series deliver written confirmation to the Trustee that the additional Series will not result in such Rating Agency reducing or withdrawing its then current rating on any outstanding Series. There can be no assurance, however, that the principal terms of any other Series, including any Series issued from time to time hereafter, might not have an adverse impact on the timing and amount of payments received by a Noteholder or the value of the Notes even if there is no change in the rating of any outstanding Series.

**Sharing of Collateral**

The Series 2013-1 Notes and each other outstanding series of notes that Issuer may from time-to-time issue, are secured by a shared security interest in the Loans and Metals Inventory and funds held in the Collection Account, but each series of notes is entitled to the benefits of only that portion of the Collections that are allocated to it under the Master Indenture and the Indenture Supplement. Upon the occurrence of an Event of Default or an Early Amortization Event, if the Collections on and/or proceeds of a liquidation of the Collateral that are allocated to a particular Series are insufficient to repay the notes of such Series in full, a loss to Noteholders could result.

**Subordination of Class B Notes**

The Issuer will repay principal on the Class A Notes of Series 2013-1 and the Class A notes of the other outstanding Series prior to repaying principal on the Class B Notes. The subordination of the Class B Notes to the Class A notes means that the Class B Notes are more likely to suffer the consequences of delinquent payments and defaults on the Loans or declines in the value of Metals Collateral and/or Metals Inventory than the Class A Notes. In such event, the Class B Noteholders may suffer a loss.

## THE ISSUER

Concord Funding Company, L.L.C. (the *"Issuer"*) is a limited liability company organized under the laws of the State of Delaware. The Issuer was formed for the limited purposes of (i) purchasing Loans and related assets, and acquiring Metals (including by contribution from one or more of its members), (ii) issuing notes or similar instruments (including through a trust) collateralized by or evidencing interests in its assets, (iii) holding and financing reversionary interests in such assets and (iv) engaging in acts incidental, necessary or convenient to the foregoing. The Issuer's actions are restricted by its organizational documents. In addition, the Issuer's organizational documents and the transaction documents related to the issuance of the Notes require the Issuer to operate in a manner so as to minimize the likelihood that it would be consolidated in the bankruptcy estate of MCC or MDC in the event that any of MCC or MDC becomes a debtor in a case under the federal Bankruptcy Code. The principal executive office of the Issuer is located at 4900 Birch Street, Newport Beach, California 92660-2188, telephone number (949) 752-1400.

The Issuer does not have, nor is it expected in the future to have, any significant assets other than the Trust Estate (with the exception of additional Series Collateral or credit or liquidity enhancement, if any, for other Series, if any, which would not necessarily be available for the benefit of the Notes). The Issuer will pledge its interest in the Trust Estate to the Trustee for the benefit of the Noteholders and issue the Notes (and may issue additional Series of notes) pursuant to the Master Indenture and individual Series Supplements thereunder.

## USE OF PROCEEDS

The Issuer will apply the net proceeds from the sale of the Notes as follows: (i) to purchase at closing or from time to time (holding Note proceeds until such use in the Equalization Account) certain specified additional Loans in respect of Designated Accounts from MCC pursuant to the TSA, and (ii) to pay certain costs and expenses.

## THE TRUST ESTATE

The Notes will be secured by a pool of assets pledged to the Trustee for all Series of notes outstanding, including the Series 2013-1 Notes, under the Master Indenture (the *"Trust Estate"*) which will consist of: (i) the Loans conveyed to the Issuer from time to time under the TSA, together with the security interest in the Metals Collateral securing the same, and any payments to be made by the Obligors under such Loans (but not including any Commodity Loan made to an Obligor by MCC under the related Loan Agreement); (ii) any guaranties of an Obligor's obligations under a Loan; (iii) the executed original Loan Agreement and the related rights against the Obligor thereunder; (iv) related rights of the Issuer, MCC and MDC under the Metals Depository Agreement; (v) any rights of the Issuer under the TSA or the OAA; (vi) moneys or Metals from time to time deposited in the Collection Account or held in the Equalization Account or any other Trust Account established under the Master Indenture; (vii) all assets, moneys and short positions held in the Hedge Account that are available for payment to the Issuer under the terms of the Hedge Account agreement; (viii) all the Issuer's right, title and interest in and to moneys on deposit in the Lockbox Account with respect to the Loans, and related rights under the Lockbox Agreement; and (ix) any and all income and proceeds of the foregoing.

Loans are conveyed to the Issuer from time to time pursuant to the TSA. Existing portfolios of Loans have been previously purchased by the Issuer from MCC, in connection with the Issuer's currently outstanding notes, under the TSA. The TSA provides for representations by MCC that the Loans conform to certain specified characteristics and eligibility criteria.

The Issuer has the right, subject to certain conditions and aggregate limits and without adverse selection, to substitute for existing Loans in respect of a Designated Account in the Trust Estate, an equivalent principal balance of Loans in respect of a different Designated Account, which substitute Loans have been conveyed to the Issuer by MCC under the TSA. Upon such substitution the replacement Loans will become subject to the lien of the Master Indenture and the Loans being substituted will be released from such lien and reconveyed by the Issuer back to MCC. No such substitution may be made for Loans as to which the Obligor is currently in arrears of a payment obligation under its Loan Agreement or is the subject of insolvency proceedings.

MDC may, but is not obligated to, from time to time contribute Metals Inventory or Dollars to the Issuer pursuant to the OAA. Certain Metals Inventory and/or Dollars held in the Trust Estate may have been contributed previously to the Issuer under the OAA. The OAA provides for representations by MDC that the Metals Inventory it contributes thereunder conform to certain specified characteristics and eligibility criteria.

## STATISTICAL AND OTHER INFORMATION CONCERNING THE LOANS AND METALS

*The Loans*

The Loans are individual U.S. Dollar loan transactions made from time to time by MCC to designated customers (*"Obligors"* with respect to *"Designated Accounts"*) under MCC's Loan Agreement with such Obligor. Each Loan finances the

Obligor's purchase of Metals (see the description of the Metals below), which are titled to the Obligor and held for the benefit of the Obligor by the Metals Depository. Currently, to obtain a Loan the Obligor must pay in its own Dollars not less than 25% of the purchase price of related Metal being financed (*"Equity"*). The Obligor grants a security interest in all the acquired Metal, including the portion acquired using Equity, to secure its Loan. The Loan Agreement provides for an accruing interest rate on each Loan that is added to principal as and when accrued. The Loan Agreement grants MCC the right to demand repayment of the entire Loan at any time for any reason or no reason, with notice, and to increase the required Equity for a Loan at any time for any reason or no reason, with notice. Under the Loan Agreement, MCC also has the right to liquidate the collateral securing the loan without notice should the account's Equity fall below the current liquidation level (half of its minimum Equity level).

The Loan Agreement also allows the Obligor to obtain from MCC a direct loan of Metals (rather than a loan of Dollars to finance the purchase of Metals). The loaned Metals, however, and the Obligor's corresponding obligation to repay the Metals loaned, are not included as part of the assets and rights under the Loan Agreement transferred by MCC to the Issuer.

The Loans, while payable on demand, also carry a stated term (if a prior demand is not made) which ends five years from the last advance under the Loan Agreement. In the event a Loan is to remain open beyond this point, a new Loan Agreement must be signed by the customer and returned to MCC. The Loans bear interest at a variable rate determined by MCC. This rate is the same on each of MCC's customer Loans. MCC reviews and, if necessary, resets the rate periodically. As of February 14, 2013, the rate on each of MCC's customer Loans, including those owned by the Trust Estate, was 5.90%. The Loans are subject to MCC policies concerning minimum initial and ongoing position Equity requirements (see "Monex Credit Company and Monex Deposit Company" below for a description of current requirements).

To be included as part of the Adjustable Eligible Pool Balance in the Servicer's daily calculation of Principal Variance, a Loan must satisfy each of the eligibility requirements detailed in the definition of Eligible Loan set forth in "Definitions of Certain Terms" at the end of this Placement Memorandum.

**[Remainder of page intentionally left blank]**

The tables below provide certain statistical information, as of February 14, 2013, regarding Loans and Metals Collateral securing the Loans previously conveyed by MCC to the Issuer and held in the Trust Estate on that date.

### DISTRIBUTION OF LOAN POOL BY OBLIGOR LOCATION

| OBLIGOR LOCATION | OUTSTANDING LOAN AMOUNT ($) | % OF AGGREGATE OUTSTANDING LOAN AMOUNT | NUMBER OF ACCOUNTS | % OF AGGREGATE NUMBER OF ACCOUNTS[1] |
|---|---|---|---|---|
| CALIFORNIA | 25,360,347.12 | 20.18 | 445 | 20.15 |
| TEXAS | 16,278,139.62 | 12.95 | 168 | 7.61 |
| FLORIDA | 8,631,406.55 | 6.87 | 165 | 7.47 |
| NEVADA | 5,146,892.44 | 4.09 | 94 | 4.26 |
| NEW YORK | 4,776,522.56 | 3.80 | 84 | 3.80 |
| NORTH CAROLINA | 4,229,808.56 | 3.37 | 69 | 3.13 |
| MASSACHUSETTS | 3,945,760.47 | 3.14 | 56 | 2.54 |
| VIRGINIA | 3,687,734.80 | 2.93 | 57 | 2.58 |
| ILLINOIS | 3,536,772.45 | 2.81 | 87 | 3.94 |
| PENNSYLVANIA | 3,201,258.84 | 2.55 | 49 | 2.22 |
| MICHIGAN | 3,155,025.60 | 2.51 | 59 | 2.67 |
| MISSOURI | 3,018,977.71 | 2.40 | 74 | 3.35 |
| NEW JERSEY | 2,979,974.87 | 2.37 | 26 | 1.18 |
| GEORGIA | 2,855,934.12 | 2.27 | 35 | 1.59 |
| WASHINGTON | 2,800,411.90 | 2.23 | 28 | 1.27 |
| HAWAII | 2,621,082.48 | 2.09 | 55 | 2.49 |
| SOUTH DAKOTA | 2,606,776.47 | 2.07 | 37 | 1.68 |
| ARIZONA | 2,330,814.64 | 1.85 | 62 | 2.81 |
| COLORADO | 2,155,264.93 | 1.71 | 59 | 2.67 |
| OHIO | 2,128,333.62 | 1.69 | 43 | 1.95 |
| MARYLAND | 2,125,511.12 | 1.69 | 53 | 2.40 |
| OREGON | 1,760,555.37 | 1.40 | 31 | 1.40 |
| IDAHO | 1,749,098.13 | 1.39 | 43 | 1.95 |
| UTAH | 1,443,617.69 | 1.15 | 17 | 0.77 |
| TENNESSEE | 1,309,365.77 | 1.04 | 27 | 1.22 |
| CANADA | 1,239,559.71 | 0.99 | 15 | 0.68 |
| CONNECTICUT | 1,118,207.21 | 0.89 | 28 | 1.27 |
| ALABAMA | 1,076,458.15 | 0.86 | 25 | 1.13 |
| SOUTH CAROLINA | 961,049.90 | 0.76 | 25 | 1.13 |
| LOUISIANA | 866,912.81 | 0.69 | 21 | 0.95 |
| INDIANA | 862,115.73 | 0.69 | 14 | 0.63 |
| KENTUCKY | 837,512.91 | 0.67 | 18 | 0.82 |
| ARKANSAS | 712,960.20 | 0.57 | 20 | 0.91 |
| WEST VIRGINIA | 635,304.37 | 0.51 | 8 | 0.36 |
| WISCONSIN | 596,532.16 | 0.47 | 15 | 0.68 |
| MISSISSIPPI | 527,625.00 | 0.42 | 8 | 0.36 |
| IOWA | 394,285.74 | 0.31 | 9 | 0.41 |
| NORTH DAKOTA | 275,879.31 | 0.22 | 10 | 0.45 |
| ALASKA | 272,868.25 | 0.22 | 8 | 0.36 |
| NEW MEXICO | 270,466.86 | 0.22 | 4 | 0.18 |

| | | | | |
|---|---|---|---|---|
| MAINE | 246,298.60 | 0.20 | 11 | 0.50 |
| KANSAS | 243,803.19 | 0.19 | 6 | 0.27 |
| OKLAHOMA | 234,036.39 | 0.19 | 8 | 0.36 |
| WYOMING | 170,965.75 | 0.14 | 12 | 0.54 |
| RHODE ISLAND | 119,200.73 | 0.09 | 4 | 0.18 |
| VERMONT | 91,926.69 | 0.07 | 5 | 0.23 |
| DELAWARE | 68,375.07 | 0.05 | 5 | 0.23 |
| WASHINGTON DC | 13,449.94 | 0.01 | 2 | 0.09 |
| MILITARY | 6,351.44 | 0.01 | 1 | 0.05 |
| PUERTO RICO | 5,225.67 | 0.00 | 1 | 0.05 |
| MEXICO | 4,019.53 | 0.00 | 1 | 0.05 |
| NEW HAMPSHIRE | 675.31 | 0.00 | 1 | 0.05 |
| **TOTALS** | 125,687,454.45 | 99.99 | 2,208 | 100.02 |

[1] Numbers may not add to 100.00% due to rounding.

### DISTRIBUTION OF LOAN POOL BY OUTSTANDING LOAN AMOUNT

| LOAN SIZE | OUTSTANDING LOAN AMOUNT ($) | % OF AGGREGATE OUTSTANDING LOAN AMOUNT[1] | NUMBER OF ACCOUNTS | % OF AGGREGATE NUMBER OF ACCOUNTS [1] |
|---|---|---|---|---|
| $0 - $19,999.99 | 7,343,605.29 | 5.84 | 1,238 | 56.07 |
| $20,000 - $49,999.99 | 14,102,768.86 | 11.22 | 435 | 19.70 |
| $50,000 - $99,999.99 | 17,783,734.35 | 14.15 | 254 | 11.50 |
| $100,000 - $499,999.99 | 46,687,462.80 | 37.15 | 238 | 10.78 |
| >= $500,000 | 39,769,883.15 | 31.64 | 43 | 1.95 |
| **TOTALS** | 125,687,454.45 | 100.00 | 2,208 | 100.00 |

[1] Numbers may not add to 100.00% due to rounding.

**DISTRIBUTION OF LOAN POOL BY ACCOUNT EQUITY**

| ACCOUNT EQUITY % | OUTSTANDING LOAN AMOUNT ($) | % OF AGGREGATE OUTSTANDING LOAN AMOUNT[1] | NUMBER OF ACCOUNTS | % OF AGGREGATE NUMBER OF ACCOUNTS[1] |
|---|---|---|---|---|
| < 7.00 | 0.00 | 0.00 | 0 | 0.00 |
| 7.00 - 11.99 | 0.00 | 0.00 | 0 | 0.00 |
| 12.00 - 13.99 | 0.00 | 0.00 | 0 | 0.00 |
| 14.00 - 17.99 | 10,776,014.71 | 8.57 | 91 | 4.12 |
| 18.00 - 19.99 | 11,108,556.92 | 8.84 | 85 | 3.85 |
| 20.00 - 21.99 | 12,417,030.45 | 9.88 | 101 | 4.57 |
| 22.00 - 23.99 | 9,365,775.61 | 7.45 | 122 | 5.53 |
| 24.00 - 25.99 | 12,593,976.67 | 10.02 | 134 | 6.07 |
| 26.00 - 27.99 | 5,870,473.44 | 4.67 | 98 | 4.44 |
| 28.00 - 29.99 | 10,733,300.85 | 8.54 | 84 | 3.80 |
| 30.00 - 39.99 | 21,943,143.80 | 17.46 | 362 | 16.39 |
| 40.00 - 49.99 | 13,380,235.84 | 10.65 | 242 | 10.96 |
| 50.00 - 59.99 | 4,401,571.04 | 3.50 | 145 | 6.57 |
| 60.00 - 69.99 | 6,789,495.02 | 5.40 | 134 | 6.07 |
| 70.00 - 99.99 | 6,307,880.10 | 5.02 | 610 | 27.63 |
| 100 | 0.00 | 0.00 | 0 | 0.00 |
| Totals | 6,307,880.10 | 5.02 | 610 | 27.63 |

[1] Numbers may not add to 100.00% due to rounding.

**DISTRIBUTION OF LOAN POOL BY LOAN AGE**

| AGE (YEARS) | OUTSTANDING LOAN AMOUNT ($) | % OF AGGREGATE OUTSTANDING LOAN AMOUNT[1] | NUMBER OF ACCOUNTS | % OF AGGREGATE NUMBER OF ACCOUNTS[1] |
|---|---|---|---|---|
| 0 < 1 | 12,829,672.05 | 10.21 | 236 | 10.69 |
| 1 < 2 | 20,973,409.03 | 16.69 | 464 | 21.01 |
| 2 < 4 | 32,536,008.63 | 25.89 | 506 | 22.92 |
| 4 < 7 | 37,880,876.63 | 30.14 | 651 | 29.48 |
| 7 < 10 | 10,071,057.38 | 8.01 | 164 | 7.43 |
| ≥ 10 | 11,396,430.73 | 9.07 | 187 | 8.47 |
| TOTALS | 125,687,454.45 | 100.01 | 2,208 | 100.00 |

[1] Numbers may not add to 100.00% due to rounding.

**FIFTEEN LARGEST OBLIGORS WITHIN LOAN POOL**

| OBLIGOR RANKING | OUTSTANDING LOAN AMOUNT ($) | % OF AGGREGATE OUTSTANDING LOAN AMOUNT[1] | ACCOUNT EQUITY % | ACCOUNT OPEN DATE | AGE (DAYS) |
|---|---|---|---|---|---|
| 1 | 2,397,381.03 | 1.91 | 19.90 | | 1,455 |
| 2 | 2,359,386.52 | 1.88 | 28.71 | | 687 |
| 3 | 1,703,119.46 | 1.36 | 75.98 | | 281 |
| 4 | 1,502,066.88 | 1.20 | 20.02 | | 5,060 |
| 5 | 1,486,302.04 | 1.18 | 28.07 | | 1,948 |
| 6 | 1,471,028.97 | 1.17 | 17.96 | | 3,936 |
| 7 | 1,334,814.28 | 1.06 | 24.80 | | 1,793 |
| 8 | 1,241,303.58 | 0.99 | 60.40 | | 562 |
| 9 | 1,206,052.28 | 0.96 | 43.23 | | 3,139 |
| 10 | 1,179,892.08 | 0.94 | 25.82 | | 679 |
| 11 | 1,145,310.89 | 0.91 | 24.18 | | 64 |
| 12 | 1,104,159.73 | 0.88 | 38.52 | | 3,250 |
| 13 | 1,093,624.58 | 0.87 | 46.60 | | 3,290 |
| 14 | 1,032,306.06 | 0.82 | 22.79 | | 2,430 |
| 15 | 996,168.84 | 0.79 | 31.79 | | 2,360 |
| OTHER | 104,434,537.23 | 83.09 | N/A | N/A | N/A |
| **TOTALS** | **125,687,454.45** | **100.01** | | | |

[1] Numbers may not add to 100.00% due to rounding.

**DISTRIBUTION OF METALS COLLATERAL SECURING LOANS BY PRODUCT AND TYPE**

| PRODUCT | TYPE | OUNCES | % OF TOTAL OUNCES[1] | MARKET VALUE ($) | % OF TOTAL MARKET VALUE[1] |
|---|---|---|---|---|---|
| GOLD | BULLION | 43,864.70 | 0.69 | 71,718,784.50 | 20.55 |
| | COIN | 46,260.00 | 0.73 | 75,635,100.00 | 21.67 |
| PLATINUM | BULLION | 2,430.00 | 0.04 | 4,165,020.00 | 1.19 |
| | COIN | 1,065.00 | 0.02 | 1,825,410.00 | 0.52 |
| SILVER | BULLION | 5,841,400.00 | 91.85 | 177,169,662.00 | 50.76 |
| | COIN | 417,290.00 | 6.56 | 12,656,405.70 | 3.63 |
| PALLADIUM | BULLION | 5,880.00 | 0.09 | 4,498,200.00 | 1.29 |
| | COIN | 1,800.00 | 0.03 | 1,377,000.00 | 0.39 |
| **TOTAL** | | **6,359,989.70** | **100.01** | **349,045,582.20** | **100.00** |

[1] Numbers may not add to 100.00% due to rounding.

*The Metals*

The following table displays all products that are permissible to serve as either Metals Collateral or Metals Inventory. The Issuer has the right to include other palladium, gold, silver, or platinum products as either Metals Collateral securing Loans or Metals Inventory pursuant to and subject to requirements set forth in the Servicing Agreement. The products are presented in customer lots, with the weight (or face value) of the lot noted in parenthesis. The decimals preceding each bullion type in the table represent minimum required purity levels.

| Silver | Gold | Platinum |
|--------|------|----------|
| .999 Silver Bullion (1, 100, 1000 oz. & 1 Kilo) | .995 Gold Bullion (1, 10, 100, 400 oz. & 1 Kilo) | .9995 Platinum Bullion (1, 10, 50 oz. & 1 thru 6 Kilos) |
| US 90% Silver Coins ($1000 Face Value) | Gold Canadian Maple Leaf Coins (one, 0.10, 0.25, 0.50 oz.) | Platinum Australian Koala Coins (one oz.) |
| US 40% Silver Clad Coins ($1000 Face Value) | Gold Australian Nugget Coins (two, one, 0.10, 0.25, 0.50 oz.) | Platinum Canadian Maple Leaf Coins (one oz.) |
| Silver Canadian Maple Leaf Coins (one oz.) | Gold South African Krugerrand Coins (one, 0.10, 0.2354, 0.25, 0.50 oz.) | Isle of Man Platinum Nobles Coins (one, 0.50, 0.25, 0.10 oz.) |
| Silver American Eagle Coins (one oz.) | Gold Austrian Vienna Philharmonic Coins (one thousand, one, 0.10, 0.25, 0.50, 20 oz.) | Platinum American Eagle Coins (one, 0.10, 0.25, 0.50 oz.) |
| Silver Austrian Vienna Philharmonic Coins (one oz.) | | |
| Silver Monex Eagle Coins (one oz.) | Gold American Eagle Coins (one, 0.10, 0.25, 0.50 oz.) | **Palladium** |
| | Gold American Buffalo Coins (one oz.) | .9995 Palladium Bullion (1, 10, 50 oz. & 1 thru 6 Kilos) |
| | Gold Canadian Mountie Coins (one, 0.10, 0.25, 0.50 oz.) | Palladium Canadian Maple Leaf Coins (one oz.) |
| | Pre-1934 US Gold Coins ($2.50, $5, $10 and $20 denomination) | |
| | Gold Austrian 100 Corona Coins (ten .9802 oz.) | Russian Ballerina Coins (one oz.) |
| | Gold Mexican 50 Peso Coins (ten 1.2056 oz.) | |

Most bullion traded is the product of a Commodity Exchange, Inc. (COMEX) approved refiner. Each bar of bullion is stamped by the refiner and given a unique serial number. All bullion meets the fineness (or purity) and other delivery requirements for precious metals traded on federally regulated U.S. commodity exchanges. The majority of precious metals traded on wholesale and futures markets is in the form of bullion.

MDC only trades in coins minted by the United States, Canadian, Australian, Austrian, Russian, British, South African and Mexican governments. All coins offered are legal tender in their country of origin. Coins typically trade at a premium over bullion due to their greater cost of manufacture, their beauty and their convenience, although discounts to bullion can and do occur.

The table below shows the breakdown by market value of the Metals Inventory held in the Trust Estate as of February 14, 2013.

**DISTRIBUTION OF METALS INVENTORY BY PRODUCT AND TYPE**

| PRODUCT | TYPE | OUNCES | % OF TOTAL OUNCES[1] | MARKET VALUE ($) | % OF TOTAL MARKET VALUE[1] |
|---|---|---|---|---|---|
| GOLD | COIN | 858.44 | 0.23 | 1,403,549.40 | 6.31 |
| PLATINUM | BULLION | 35.59 | 0.01 | 61,001.26 | 0.27 |
| | COIN | 297.05 | 0.08 | 509,143.70 | 2.29 |
| SILVER | COIN | 367,358.25 | 96.55 | 11,141,975.72 | 50.11 |
| PALLADIUM | BULLION | 5,891.50 | 1.55 | 4,506,997.50 | 20.27 |
| | COIN | 6,028.00 | 1.58 | 4,611,420.00 | 20.74 |
| TOTAL | | 380,468.83 | 100.00 | 22,234,087.58 | 99.99 |

[1] Numbers may not add to 100.00% due to rounding.

**MONEX CREDIT COMPANY AND MONEX DEPOSIT COMPANY**

Monex Credit Company ("*MCC*") and Monex Deposit Company ("*MDC*") (collectively, *"Monex"* or the *"Company"*) engage in the purchase and sale (and financing thereof) of precious metals with retail customers mainly within the United States. The principal offices of each of the Monex companies is 4910 Birch Street, Newport Beach, California 92660-2188. Their telephone number is (949) 752-1400.

*Company History*

In 1967, Louis E. Carabini founded Pacific Coast Coin Exchange, Ltd., which was later renamed Monex International, Ltd. Initially, PCCE was a coin dealer buying and selling numismatic coins and currencies. Carabini, who was a student of Austrian Economics, recognized earlier that monetary expansion and the introduction of non-silver coinage would cause then circulating silver coins to be hoarded for their commodity value. PCCE soon became America's foremost dealer in pre-1965 U.S. silver coins as a vehicle for owning silver as a tangible commodity hedge and storehouse of wealth. Because gold bullion ownership was illegal from 1933 to 1972, in its early years, PCCE offered semi-numismatic pre-1933 gold coins as a substitute for gold bullion.

In 1971, Monex International began offering leveraged purchases to investors. It grew rapidly as it specialized in a revolutionary vehicle it introduced which consisted of selling bags of silver coinage, containing $1,000 in face value, along with a $1,000 loan. The bags had a slight premium over their bullion melt value, and they had downside risk protection having legal tender value. Monex International became one of four congressionally-authorized Leveraged Transaction Merchants.

In 1985, Louis Carabini started two new companies; Monex Deposit Corporation and Monex Credit Corporation, to offer financed purchases of physical precious metals. This program was designed as an alternative to the precious metals leverage contracts then being offered by Monex International. In 1990, because of the preference of the companies' customers for the new, simpler program, Monex International discontinued its offerings of leverage contracts, and later was dissolved.

MCC and MDC were founded as limited partnerships in 1987 as the successors to Monex Credit Corporation and Monex Deposit Corporation, respectively. MCC finances purchases that customers make from MDC and also leases precious metals to customers. MDC buys and sells precious metals with customers through a telephonic sales force, currently consisting of about 100 account representatives. The products of MCC and MDC include gold, silver, platinum and palladium bullion and various popular gold, silver, platinum and palladium bullion coins. (See "Statistical and Other Information Concerning the Loans and the Metals--The Metals" above for a description of the Metals which may constitute Metals Collateral or Metals Inventory for the Notes.) As a principal, MDC maintains inventories of most of the products in which it makes a market. MDC generates revenue by charging commissions on retail customer trades and by maintaining a spread between retail and wholesale prices.

*Loan Origination Policies and Procedures*

Historically, approximately 25% of MDC's customers have purchased metals using funds borrowed from MCC pursuant to Loan Agreements. The loans are payable on demand and bear interest at variable rates determined by the Company. The metals purchased serve as collateral for the loans. (See "Statistical and Other Information Concerning the Loans and the Metals--The Loans" above for a description of the Loans to be included in the Trust Estate.) MCC's lending decision is based entirely on the value of the metal, ignoring the credit quality of the borrower. The metals securing all MCC loans are held in insured independent depositories.

MCC currently lends up to 75% of the value of the metal upon loan origination. The metal is valued at MDC's retail bid price, which generally is approximately 1.5% lower than the wholesale market's bid. The account's equity is recalculated daily to reflect the current market value of the metals, the accrual of interest, the inflow or outflow of cash, and any changes in positions.

Since 1995, MCC has been selling a portion of the loans it originates to the Issuer for inclusion in the Trust Estate.

*Portfolio Monitoring and Management*

When MCC finances a customer's metals purchase, the customer is required to make an initial payment in an amount at least equal to the initial equity requirement, currently 25% of the purchase price. To keep the account in good standing, the customer must always maintain at least the minimum required account equity level, currently 14%.Should the customer's account equity fall below the minimum required level, MCC will issue a collateral call requiring the customer to raise the equity to the current initial required level. If the customer fails to meet the collateral call within the required time period (no more than 5 days, though in some circumstances this period will be shorter and in all cases the customer must commit immediately to make payment),MCC will sell enough of the metals securing the loan to raise the account's equity above the minimum required equity level. In the event the customer's account equity falls below the foreclosure level (currently half of the minimum required level), MCC has the right, at its discretion and without notifying the customer, to sell some or all of the metal securing the loan to raise the account's equity above the minimum required level.

When collateral securing a loan is liquidated, the proceeds received (net of MDC's commission) are credited first to satisfaction of the outstanding loan equity requirements under the Loan Agreement. If collateral is liquidated and the proceeds are insufficient to repay a loan, the account will be closed and MCC will establish a reserve for the potential loan loss and take action to collect the remaining outstanding balance that it is owed. If the balance is not recovered within 30 days, the customer receivable will be written off and a loan loss will be incurred.

In periods of abnormally high volatility, MCC increases customer equity requirements. MCC has developed a formula for increasing the equity requirements when metal prices increase rapidly to protect customers from forced liquidation resulting from an equally rapid decline. If metals prices are relatively volatile at the time of a collateral call, or the amount of the call is large, MCC may require the borrower to wire the call amount to protect MCC against any interim price changes. MCC will not wait for collateral calls to be received if the price continues to fall; i.e., foreclosure always takes place once the 7%equity level is breached.

MCC has experienced negligible losses on its portfolio of customer loans since 1987. This includes the loans held within the Trust Estate since its inception in 1995. There can, however, be no assurance that the loss experiences on the Loans included in the Trust Estate will be similar to MCC's historical experience.

*Commodity Loan Positions*

MCC also loans commodities to customers who want to take advantage of possible declines in precious metals prices. When MCC loans a bar to a customer, the customer may either take delivery of the bar or sell it to MDC. To secure his obligation to return the bar, the customer is initially required to deposit cash in the account in an amount equal to 130% (silver) or 125% (all other Metals) of the bar's value. The deposit is generally comprised of sale proceeds and customer contributed cash. A customer with an open commodity loan is required to comply with similar equity, collateral call and foreclosure requirements as someone who has entered into a financed long position (see above). Neither commodity loans nor the security for these loans will be transferred to the Issuer, pledged as an asset to the Trust Estate or be included in Principal Variance calculations.

*Documentation and Storage*

Metals securing MCC's loans and metals owned by MDC are stored at insured COMEX-approved depositories. The depository tracks the pool of metals, uniquely identifying each piece by metal type (coin vs. bar) and its other distinguishing characteristics (e.g., refiner, weight, serial number). The depository provides safekeeping for both the metals it holds and the metals at other depositories that are subject to warehouse receipts (see below) in its possession.

Documentation varies by depository. Metals held at certain depositories are evidenced by warehouse receipts, which are negotiable instruments in bearer form. Metals held at other depositories, including the Metals Depository, are evidenced by an account. The liquidity of metals held on account is usually slightly greater than warehouse receipts, due to the documentational due diligence required in trading bearer warehouse receipts. Coins are held exclusively in account form.

Unless and until additional or successor Metals Depositories are appointed pursuant to the Metals Depository Agreement, the Servicing Agreement and the Master Indenture, all Metals securing Loans or being held as Metals Inventory will be stored at the Metals Depository or evidenced by warehouse receipts held at the Metals Depository.

*Liquidation Procedures*

In the event that an Obligor either (i) gives instruction to sell his metals, or (ii) fails to meet his Loan Agreement obligations, resulting in the liquidation of his collateral, MCC will notify the Trustee and the Metals Depository (if the Loan in question is then held by the Issuer as part of the Trust Estate) that the Obligor's collateral has been sold to MDC. The Metals Depository will notify the Obligor in writing that he/she no longer has title to the collateral, and will update its records to reflect the change in ownership. MDC will then credit the customer's account for cash equal to MDC's retail bid minus a commission. The cash is then applied in full to the outstanding loan balance (and, for a Loan then held as part of the Trust Estate, would be allocated as a Collection under and subject to the Servicing Agreement). Any cash remaining after the loan balance has been satisfied will be credited to the Obligor's account or remitted to the Obligor.

MDC may decide to retain the metals, which MDC now owns in its inventory for sale to another retail customer. Alternatively, MDC may sell the metals to a dealer at the current wholesale spot bid for settlement in two days. The metals would be sold "on account" at the depository. Generally, the dealer also has an account at the depository. Once payment for the metal is received, the depository reduces MDC's account and increases the buyer's account for the metals.

*Regulation*

MCC is regulated by the state of California as a finance lender. MDC is regulated by the state of California as a telephonic seller. MDC is also subject to the Federal Trade Commission's rules for telephonic sellers.

*Customers and Competitors*

Almost all of MDC's sales are the product of prospective retail customers contacting MDC to inquire about investing in metals. MDC believes that approximately 75% are the result of advertising (MDC advertises on the cable television network CNN), with the remainder being referrals from current customers.

Direct competitors of MDC in the retail metal brokerage industry include:

- A-Mark, a wholesale and retail metals dealer,

- Fidelitrade, an affiliate of Delaware Depository,

- Dillon Gage, Inc., a retailer of precious metals and rare coins, and

- Blanchard & Co., a retailer of precious metals and coins.

Many commodity brokerage firms, mutual fund managers and stock brokerage firms offer futures and securities investments based on metals, but they do not focus their businesses exclusively on metals.

*Information and Accounting Systems*

MCC manages its business on two DEC Alpha servers using an internally developed COBOL based accounting system. System files and backup data files are stored off-site through a third-party vendor. The accounting system is updated continuously for price movements and provides MCC management with minute-to-minute equity positions of its customers.

MCC's proprietary Auto-Force-Sell System converts loan information into sell orders on a batch basis, enabling MCC to liquidate its portfolio on a pool-wide basis, rather than a loan-by-loan basis. The system processes current price information and reports by product the amount of metals that need to be sold due to account equities falling below the foreclosure level. Once the metals are sold, the system applies the proceeds to accounts in ascending order, beginning with the account with the lowest

level of relative equity. The system also enables MCC management to perform sensitivity analyses measuring the effect of rapidly declining prices on all of MCC's loans. It was developed in response to the 1980 period of price volatility and, while it has been tested extensively, it has never been used to liquidate customer portfolios.

*Entity Structure and Ownership*

      MCC is a California limited partnership. Its general partner, Metco Management Corporation, is a California Sub-S corporation. Metco is 100% owned by Madison Investments. Metco's sole activity is the management of MCC. Metco's officers and directors are: Michael A. Carabini, President and sole director; Brian D. Jenkins, Secretary and Treasurer. MCC's partners hold the following interests in the company:

General:

| | |
|---|---|
| Metco Management Corporation | 11.00% |

Limited:

| | |
|---|---|
| Lemonwood Investments* | 40.30% |
| Amberwood Investments* | 40.30 |
| Michael A. Carabini | 5.00 |
| Brian D. Jenkins | 1.00 |
| Ronald Smoler | 1.40 |
| Michael Maroney | 1.00 |

_____

*These are personal, family trusts of Michael A. Carabini and his wife Michael A. Carabini is the trustee of both trusts.

      MDC is a California limited partnership. Its general partner, Comco Management Corporation, is a California Sub-S corporation. Comco is 100% owned by Madison Investments Comco's sole activity is the management of MCC. Comco's officers and directors are: Louis E. Carabini, President, Treasurer and sole director; Michael Maroney, Vice President; and Gregory G. Walker, Secretary. MDC's partners hold the following interests in the company:

General:

| | |
|---|---|
| Comco Management Corporation | 5.00% |

Limited:

| | |
|---|---|
| Montgomery Trust* | 40.30% |
| Emerson Trust* | 40.30 |
| Michael A. Carabini | 11.00 |
| Brian D. Jenkins | 1.00 |
| Ronald Smoler | 1.40 |
| Michael Maroney | 1.00 |

*These are personal, family trusts of Michael A. Carabini and his wife. Michael A. Carabini is the trustee of both trusts.

      Newport Service Corporation (*"NSC"*) is a California Sub-S corporation chartered in 1987. It provides administrative, accounting and other services to MCC, MDC and other related companies. NSC is 100% owned by Madison Investments. NSC's officers and directors are: Michael A Carabini, President and sole director; Gregory G. Walker, Vice President and Secretary; Brian D. Jenkins, Chief Financial Officer; and Geoffrey Hodes, Vice President.

      Secured Credit Corporation (*"SCC"*) is a California Sub-S corporation chartered in 1992. It is a licensed California finance lender and provides loans to customers who wish to finance their purchases of rare coins and rare ingots from an MCC affiliate. SCC is 100% owned by Michael A. Carabini. SCC's officers and directors are: Michael A Carabini, President, Treasurer and sole director; Brian D. Jenkins, Secretary.

      CFC is a Delaware limited liability company. Its members are Concord Manager Corporation (*"CMC"*), MCC and SCC. CFC's members hold the following interests in the company:

| | |
|---|---|
| Concord Manager Corporation | 20% (Common) |

| | |
|---|---|
| Monex Credit Company | 40% (Preferred)* |
| Secured Credit Corporation | 40% (Preferred) |

* This does not include any redeemable preferred membership units that may be outstanding from time to time.

CFC's managers are CMC, Michael A. Carabini and Orlando Figueroa. CMC is a Delaware Sub-S corporation that is 100% owned by Michael A. Carabini. It's sole activity is the management of CMC. CMC's officers and directors are: Michael A. Carabini, President and Chairman; Brian D. Jenkins, Secretary and Treasurer; Louis E. Carabini, Director; Orlando Figueroa, Director.

## LEGAL PROCEEDINGS

As of the date of this Offering Memorandum, there were no legal proceedings which management anticipates would have a material adverse effect on MCC, MDC or the Issuer.

## THE SERVICER

MCC, in its capacity as servicer (the *"Servicer"*) has contracted with the Issuer under the Amended and Restated Servicing Agreement, dated as of July 12, 2012, among the Issuer, MCC and BNY as Trustee and Backup Servicer (the *"Servicing Agreement"*) to provide servicing, collection and administration services for the Loans and Metals Inventory included in the Trust Estate. These services consist of transaction processing and management services for each Loan, from the time it is acquired by the Issuer under the TSA through its repayment, termination or liquidation. The Servicer provides for the Issuer both the personnel and system resources for set-up, billing, cash posting, customer service, accounting, collections, tax compliance and all asset management and reporting functions. Additional services provided by the Servicer include arrangements with and administration of the relationship with the Metals Depository, invoicing and collections. The Servicer maintains its principal office at 4910 Birch Street, Newport Beach, California 92660-2188, telephone number (949) 752-1400.

Generally, collection activities with respect to the Loans in the Trust Estate are required to be performed by the Servicer in accordance with its customary policies and procedures. See "Monex Credit Company and Monex Deposit Company" above for a description of certain of such procedures and policies as to MCC. Also see "The Servicing Agreement" below for a description of certain specific servicing procedures, policies and requirements with respect to the Loans and Metals Inventory. Under certain limited circumstances, the Servicer may resign or be removed, in which event a third party (which may be the Backup Servicer) meeting the requirements set forth in the Servicing Agreement will be appointed as Successor Servicer. In the event a third party cannot be engaged, the Trustee will perform the functions of the Servicer.

The Servicer may delegate certain of its servicing duties to any person, including an affiliate, but no such delegation relieves the Servicer of its liability and responsibility with respect to any such delegated duties or functions.

## THE TRUSTEE

The Bank of New York Mellon Trust Company, N.A. (successor in interest to BNY Midwest Trust Company)(*"BNY"*) is the indenture trustee (in such capacity the *"Trustee"*) under the Master Indenture as well as the individual Series Supplements thereto. BNY is a national banking association. The Trustee will operate out of its offices located at 2 North LaSalle Street, Suite 1020, Chicago, Illinois 60602 (the *"Corporate Trust Office"*). The Trustee's duties in connection with the Notes are limited solely to its express obligations under the Master Indenture and any related Series Supplement thereto.

The Trustee will be entitled to receive, payable as part of the Required Amounts in respect of each Series from Collections allocated to each such Series, such compensation for its services as has been agreed with the Issuer (the *"Trustee Fee"*).

The Trustee may resign, subject to the conditions set forth below, at any time upon written notice to the Servicer, in which event the Servicer will be obligated to appoint a successor Trustee. If no successor Trustee shall have been so appointed and have accepted such appointment within 30 days after the giving of such notice of resignation, the resigning Trustee may petition a court of competent jurisdiction for the appointment of a successor Trustee. Any successor Trustee must meet the financial and other standards for qualifying as a successor Trustee under the Master Indenture. The Servicer may and shall, at the direction of the Majority of Noteholders, also remove the Trustee if the Trustee ceases to be eligible to continue as such under the Master Indenture and fails to resign after written request therefor, or is legally unable to act, or if the Trustee is adjudicated to be insolvent. In such circumstances, the Servicer or such Noteholders will also be obligated to appoint a successor Trustee. Any

resignation or removal of the Trustee and appointment of a successor Trustee will not become effective until acceptance of the appointment by the successor Trustee.

## THE BACKUP SERVICER

Portfolio Financial Servicing Company will act as backup servicer (in such capacity, the *"Backup Servicer"*) for the Issuer. The Backup Servicer's duties in connection with the Notes are limited to its express obligations under the Servicing Agreement. In the event that the current servicer resigns or is terminated, the Backup Servicer will assume the role and duties of Servicer until a Successor Servicer is formally appointed (which may be Portfolio Financial Servicing Company). The Backup Servicer will be entitled to receive, payable as part of the Required Amounts in respect of each Series from Collections allocated to each such Series, such compensation for its services as has been agreed with the Issuer (the *"Backup Servicer Fee"*) for acting in such capacity.

Pursuant to the Servicing Agreement, the Backup Servicer's principal responsibility is to stand ready to assume the role of Successor Servicer in the event a Servicer Default by MCC as initial Servicer leads to the delivery of a Termination Notice under the Servicing Agreement seeking appointment of a Successor Servicer. The Backup Servicer only is agreeing to assume such Successor Servicer role, however, if the Event of Default corresponding to delivery of such Termination Notice is not waived by a Majority of Noteholders. Accordingly, the Backup Servicer's sole function when becoming Successor Servicer will be to perform the Loan demand and liquidation obligations set forth in the Servicing Agreement required upon an Event of Default. Not less than weekly, the Servicer is required under the Servicing Agreement to provide to the Backup Servicer updated information regarding the Loans, Metals Collateral, Obligors, Designated Accounts and Metals Inventory in form and substance as would, in the reasonable judgment of the Servicer and Backup Servicer, enable the Backup Servicer if acting as Successor Servicer to promptly comply with such Loan demand and liquidation requirements. The Servicing Agreement imposes no general obligation on the Backup Servicer to supervise the performance of the initial Servicer and imposes no liability on it for any particular actions taken or omitted by the initial Servicer.

The Backup Servicer agrees not to resign from the obligations and duties imposed on it by the Servicing Agreement as Backup Servicer or, in the event it replaces the Servicer, as Successor Servicer, except (i) upon a determination that by reason of a change in legal requirements the performance of its duties would cause it to be in violation of such legal requirements in a manner which would have a material adverse effect on the Backup Servicer, or (ii) upon the waiver by a Majority of Noteholders of the Event of Default associated with the delivery of a Termination Notice seeking appointment of a Successor Servicer. Any determination described in clause (i) permitting the resignation of the Backup Servicer must be evidenced by an Opinion of Counsel to such effect.

## THE CUSTODIAN

MCC and the Issuer have agreed to cause the original Loan Agreements in respect of the Loans to be deposited with BNY acting in its individual capacity as Custodian, under and pursuant to a Custody Agreement among BNY as Custodian, the Issuer, MCC as Initial Servicer and the Trustee. The Custody Agreement establishes the Custodian as a bailee and custodian in respect of such original Loan Agreements for the benefit of the Trustee as pledgee of such Loan Agreements under the Master Indenture.

## TRANSFER AND SALE AGREEMENT

MCC and the Issuer are parties to the TSA pursuant to which the Issuer purchases from time to time Loans and Related Interests from MCC. The following summary describes certain terms of the TSA and is qualified in its entirety by reference to the TSA.

On each designated Purchase Date MCC sells and assigns to the Issuer, without recourse and without any formal or other instrument of assignment, any and all of MCC's right, title and interest, whether then existing or thereafter acquired, in, to and under the following (being the *"Loans and Related Interests"*):

(i)	all Loans in respect of Designated Accounts, including, but not limited to those Accounts which may be added to the List of Designated Accounts from time to time, (but not including any Commodity Loans) in existence as of the related Cut-Off Date, together with all Collections in respect thereof,

(ii)	all rights related thereto under such Loan Agreements and all accounts, chattel paper, general intangibles, instruments and other obligations of an Obligor with respect to such Loans and Loan Agreements,

(iii)	all security interests in the related Metals Collateral securing such Loans,

(iv)     all rights to or under any lock-box account relating to the Loans, and in the Lock-Box Agreement, together with all funds, certificates and instruments, if any, from time to time representing or evidencing or held in such lock-box account, and

(v)     all proceeds or products of any of the foregoing.

MCC agrees to sell to the Issuer, and the Issuer agrees (subject to the terms and conditions of the TSA) to purchase from MCC, each Loan and Related Interest then originated and existing, or thereafter to be originated from time to time by MCC in respect of such Designated Accounts.  Each such sale is in consideration of the Issuer's payment of the Purchase Price therefor on such Purchase Date, in an amount equal to the Outstanding Balance.  The Purchase Price is to be paid by the Issuer in Dollars (including Dollars available to the Issuer from borrowings under the Notes, and Collections available on the date of purchase after prior allocations which are released to the Issuer under the Servicing Agreement).  If Dollars from such sources are not available, MCC may (but is not obligated to) contribute Loans to the Issuer as a capital contribution in consideration of the Issuer's issuance of redeemable preferred membership units to MCC, which contribution is to be treated for all other purposes under the TSA as if a sale for the Purchase Price as aforesaid.

It is a condition to the occurrence of any conveyances under the TSA that, among other things,  no Event of Default shall have occurred and be continuing, and that an Amortization Period shall not then be in effect for all outstanding Series.

MCC represents (among other things) as follows with respect to the Loans and Related Interests conveyed from time to time under the TSA, as of the related Cut-Off Date or Purchase Date, as applicable, with respect to each such Loan:

- Each Loan Agreement was originated by MCC to the Issuer without any fraud or misrepresentation on the part of MCC or any other Person.

- MCC is the holder of all right, title and interest in and to the Loans and Related Interests, free from any Lien; and MCC shall defend such Loans and Related Interests against all claims and demands of all Persons at any time claiming any interest therein adverse to that of the Issuer or the Trustee.  Notwithstanding the foregoing, no Loan Agreement is subject to any right of rescission, setoff, counterclaim or defense and no such right has been asserted or threatened with respect to any Loan Agreement.

- MCC has in its possession, pending delivery to the Custodian in accordance with the Custody Agreement, all original executed copies of the Loan Agreements, and has caused all such copies in its possession to be separately identified and distinguished from MCC's other customer loan agreements, and MCC has caused, and as of each Purchase Date as of which Additional Designated Accounts have been designated, MCC will have caused (with respect to Loan Agreements in respect of such Additional Designated Accounts) each such Loan Agreement in its possession to be affixed with an appropriate marking, attachment or legend clearly disclosing the fact that such Loan Agreement and all security interests in the related Metals Collateral have been transferred and that the Issuer is the owner thereof and further disclosing the fact that interests in such Loan Agreements and security interests in the related Metals Collateral have been further assigned by the Issuer to the Trustee, and any copies of such Loan Agreements subsequently coming into the possession of MCC also will be so identified.  Such Loan Agreements do not have any marks or notations indicating that they have been pledged, assigned or otherwise conveyed to any Person other than the Issuer and any further assignees of the Issuer.  All financing statements filed or to be filed against MCC in favor of the Issuer in connection herewith describing the Loans and Related Interests contain or will contain a statement to the following effect:  "A purchase of or security interest in any collateral described in this financing statement will violate the rights of Concord Funding Company, L.L.C. and/or its assignees."  In addition, within 30 days of the Closing Date MCC (on behalf of the Issuer) agrees to cause, and within 5 Business Days after each Purchase Date as of which Additional Designated Accounts have been designated, MCC (on behalf of the Issuer) will cause (with respect to Loan Agreements in respect of such Additional Designated Accounts) the original executed copies of each such Loan Agreement to be delivered to the possession of the Custodian pursuant to the Custody Agreement.

- The Loans being sold by MCC are in full force and effect in accordance with their respective terms and constitute Eligible Loans as of the date of transfer.

- The Loan Agreements represent the genuine, legal, valid, binding and enforceable obligations of the parties thereto, subject, as to enforcement, to applicable bankruptcy, insolvency, reorganization and other similar laws of general applicability relating to or affecting creditors' rights generally and to general principles of equity regardless of whether enforcement is sought in a court of law or equity; and all parties to each Loan Agreement had full legal capacity to execute and deliver such Loan Agreement and all other documents related thereto and to grant the security interest purported to be granted thereby.

- No Obligor is the United States of America or any State or any agency, department, subdivision or instrumentality thereof.

- At the related Cutoff Date, no Obligor had been identified on the records of MCC as being the subject of a bankruptcy proceeding.

- There is only one original executed copy of each Loan Agreement.

- No Loan Agreement is assumable by another Person in a manner that would release the Obligor thereof from such Obligor's obligations to MCC with respect to such Loan Agreement.

- No selection procedures adverse to the Noteholders or the Issuer were utilized in selecting the Loans from those Loans owned by MCC.

- The Metals Collateral securing the Loans and held by the Metals Depository is covered by insurance procured by the Metals Depository in the usual and customary amounts maintained by prudent metals depositories engaging in similar business, naming the Metals Depository, or its assignee, as a loss payee and insuring against loss and damage due to theft and other risks covered by comprehensive coverage. All premiums due on such insurance have been paid in full.

- The Loans were not originated in and are not subject to the laws of any jurisdiction whose laws would make the transfer of the Loans under the TSA unlawful or unenforceable.

- All requirements of any federal, state or local law, including, without limitation, usury, truth in lending, and equal credit opportunity laws, applicable to the Loans have been complied with, and MCC shall, for at least the period of the TSA, maintain in its possession available for the Issuer's and the Trustee's inspection, and shall deliver to the Issuer or the Trustee upon demand, evidence of compliance with all such requirements.

- No Loan has been satisfied, subordinated or rescinded, and the Metals Collateral securing each such Loan has not been released from the Lien of the related Loan in whole or in part. No terms of any Loan Agreement have been waived, altered or modified in any respect since its origination, except as otherwise expressly provided. All funds payable to or on behalf of the Obligors with respect to the Loans have been fully disbursed.

- No Loan was originated in, or is subject to the laws of, any jurisdiction the laws of which would make unlawful, void or voidable the sale, transfer and assignment of such Loan and Related Interests under this Agreement. For the validity of the sale, transfer and assignment of the Loans and Related Interests to the Issuer and the Trustee, no consent by any Obligor or other Person is required under any agreement or applicable law.

- The Loan Agreements create a valid, subsisting and enforceable first priority perfected security interest in favor of MCC in the Metals Collateral. Such security interest is prior to all other Liens upon and security interest in such Metals Collateral that now exists or may arise or be created. As to the related Cutoff Date, there were no Liens or claims for taxes, work, labor or materials affecting the Metals Collateral that are or may be Liens prior or equal to the Liens of the related Loan.

- The Loans were originated by MCC in the regular course of its business and taken into possession in the ordinary course of MCC's business, without knowledge that the Loans or Metals Collateral were subject to any Lien or other claim, except for Liens which are or were released or extinguished upon or prior to the purchase of the Loans on the related Purchase Date.

- No Loan has been sold, transferred, assigned or pledged by MCC to any Person other than the Issuer. No Person has an unpaid participation in, or other right to receive, proceeds of any Loan. Except as contemplated in the Program Agreements, MCC has not taken any action to convey any right to any Person that would result in such Person having a right to payments received under the Loans. MCC has not done anything to convey any right to any Person (other than the Issuer or the Trustee) that would result in such Person having a right to payments due under the Loan Agreement or otherwise impair the rights of the Issuer, the Trustee and the Noteholders in any Loan Agreement or the proceeds thereof.

- There is no default, breach, violation or event permitting acceleration existing under the respective Loan Agreements with respect to Loans and no event which, with notice and the expiration of any grace or cure period, would constitute such a default, breach, violation or event permitting acceleration under such Loan Agreement. MCC has not waived

any such default, breach, violation or event permitting acceleration. MCC has not waived any such default, breach, violation or event permitting acceleration. As of the Cutoff Date, no Metals Collateral has been repossessed by or at the direction of MCC or any other Person.

- No Liens or claims have been filed or made affecting the Metals Collateral securing the Loan Agreements which are or may be Liens prior to, or equal or coordinate with, the interest established by the Loan Agreement.

- The Loan Agreements contain customary and enforceable provisions such as to render the rights and remedies of claimants thereunder adequate for the realization against the Metals Collateral of the benefits of the security.

- All filings (including UCC filings) and recordings as may be necessary to perfect the interest of the Issuer and the Trustee in the Loans and Related Interests being sold, conveyed and assigned have been accomplished and are in full force and effect.

- The List of Designated Accounts (as supplemented when and if Additional Loans are sold on any Purchase Date) contains a complete and correct list of all Loans sold by MCC under the TSA originated under and related to the existing Designated Accounts.

- All Loan Agreements evidencing Loans sold by MCC under the TSA are substantially similar in all material respects to the forms of loan agreement attached to the TSA, as the same may be modified from time to time in accordance with the TSA.

- With respect to any Loans and Related Interests transferred, (i) MCC has transferred and the Issuer has obtained legal and equitable title thereto, and (ii) no such transfer has been made on account of an antecedent debt owed by MCC to the Issuer or is voidable under any provision of the Bankruptcy Code.

- The Loan Agreements constitute tangible chattel paper under the UCC as in effect in the Relevant UCC State.

- The Loans were originated in accordance with and do not contravene (1) any laws, rules or regulations applicable thereto, or (2) any contract or other agreement between MCC and any third party, and no party to a Loan Agreement is in violation of any such law, rule or regulation.

- No procedures or investigations are pending or threatened which would adversely affect the payment or enforcement of the Loans or the security interest in the related Metals Collateral.

- The Loans made to Obligors pursuant to the Loan Agreements sold and to be sold to the Issuer are secured by Eligible Metals Collateral.

- Any Eligible Warehouse Receipts evidencing Metals Collateral are "warehouse receipts" within the meaning of the UCC.

- The Eligible Warehouse Receipts are "documents of title" within the meaning of Section 1-201 of the UCC.

- The Eligible Warehouse Receipts were issued in compliance with Article 7 of the UCC.

- The bank which is a signatory to the Lockbox Agreement and is maintaining the lock-box account described therein is the only institution holding any lock-box account for receipt of payment from Obligors in respect of the Loans, and all Obligors have been instructed to make payments to such lock-box account referred to in the Lockbox Agreement and such instructions will be in full force and effect. Except as expressly contemplated in the Lockbox Agreement, neither MCC nor any Person claiming through or under MCC has any claim or interest in such lock-box account.

Under the TSA, in the event any defect, misrepresentation or omission adversely affects the interests of the Noteholders in the Loans and Related Interests, MCC must either (A) eliminate or cure the condition or circumstance causing such defect, misrepresentation or omission, as applicable, or (B) repurchase the affected Loans and Related Interests by depositing a repurchase price equal to the related Outstanding Balance, in either case within ten (10) Business Days of the first to occur of (i) MCC's making such determination; or (ii) MCC's receiving written notice of such determination from the Issuer or the Trustee.

MCC also covenants under the TSA (among other things) as follows:

32

- MCC will execute or endorse, acknowledge, and deliver to the Issuer and the Trustee from time to time such schedules, confirmatory assignments, conveyances, and other reassurances or instruments and take such further similar actions, as are necessary to preserve, protect and defend the interest of the Issuer in the Loans and Related Interests and the rights covered by the TSA, and shall take such other or further actions as the Issuer or the Trustee (upon written direction of a Majority of Noteholders) may reasonably request to preserve and maintain the Issuer's title to and interest in the Loans and Related Interests and the rights of the Issuer and the Trustee and the Noteholders therein against the claims of all persons and parties.

- MCC will do nothing to disturb or impair its conveyance of the Loans and Related Interests.

- MCC will from time to time, at its own expense, execute and file such additional financing statements (including continuation statements) as may be necessary to preserve the interests conveyed to the Issuer herein described and as may be reasonably requested by the Issuer or the Trustee (upon written direction of a Majority of Noteholders) and as are reasonably satisfactory in form and substance to the same.

- Prior to the date which is one year and one day after the payment in full of all outstanding Series, it will not institute against or join with any other Person in instituting against the Issuer any Involuntary Insolvency Proceedings.

- Any amendment, modification or deviation from the permissible forms of the Loan Agreement in effect on the Closing Date for the Notes will not have a material adverse effect on the collectability or timing of collection of amounts payable under the Loan Agreements.

- MCC will take no action to cause any Loan, and the Loan Agreement evidencing the same, to be evidenced by any instrument (as defined in the UCC). MCC will take no action to cause any Loan, and the Loan Agreement evidencing the same, to be anything other than "tangible chattel paper" (as defined in the UCC).

- Except for the conveyances under the TSA, MCC will not sell, pledge, assign or transfer to any other Person, or grant, create, incur, assume or suffer to exist any Lien (other than a Permitted Lien) on any Loan, or any interest therein; MCC will immediately notify the Issuer and the Trustee of the existence of any Lien (other than a Permitted Lien) on any Loan; and MCC shall defend the right, title and interest of the Issuer and Trustee in, to and under the Loans, against all claims of third parties claiming through or under MCC.

- MCC shall comply with and perform its obligations under any Loan Agreement that relates to a Designated Account.

- In the event that MCC receives Collections, MCC agrees to pay to the Issuer or such other Person designated by the Issuer all such Collections as soon as practicable after receipt thereof by MCC (but in no event later than the Business Day following the date of receipt).

- MCC will not convey, assign, exchange or otherwise transfer any interest in a Designated Account to any Person other than the Issuer prior to the termination of the TSA.

- MCC will comply in all material respects with all applicable laws, rules, regulations and orders applicable to the Loans and Related Interests, including, without limitation, usury laws, rules and regulations relating to truth in lending, fair credit billing, fair credit reporting, equal credit opportunity, fair debt collection practices and privacy.

- MCC will preserve and maintain in all material respects its existence, rights (charter and statutory) and franchises as a limited partnership under the laws of California.

- At any reasonable time during normal business hours and from time to time, MCC will permit (i) the Issuer or the Trustee, or any Person designated by any of them, to examine and make copies of or abstracts from the records, books of account and documents (including, without limitation, computer tapes and disks) of MCC relating to Loans and Related Interests owned or to be purchased by the Issuer hereunder and (ii) the Issuer or the Trustee, or any Person designated by any of them, to visit the properties of MCC for the purpose of examining such records, books of account and documents, and to discuss the affairs, finances and accounts of MCC relating to the Loans and Related Interests or to MCC's performance hereunder, with any of its officers and/or with its independent certified public accountants.

- MCC will not change its name, identity or structure in any manner which might make any financing or continuation statement filed against it with respect to the Loans and Related Interests misleading within the meaning of the UCC, unless it shall have given the Trustee and each Rating Agency at least 30 days' prior written notice thereof and shall

have taken all action, not later than 20 days after making such change, necessary or advisable to amend such financing statement or continuation statement so that it is not misleading. MCC shall not change its state of organization or change the location of its principal records concerning the Loans and Related Interests from the current location unless it has given the Trustee and each Rating Agency at least 30 days' prior written notice of its intention to do so and has taken such action as is necessary or advisable to cause the interest of the Issuer, as well as the Trustee, in the Loans and Related Interests to continue to be perfected with the priority required by the TSA. MCC shall at all times maintain each office at which it maintains records relating to the Loans and Related Interests within the United States of America.

- MCC shall promptly pay and discharge all taxes, assessments, levies and other governmental charges imposed on it, the failure of which to pay and discharge could have a Material Adverse Effect.

- MCC, even if not treating the transfer of Loans and Related Interests as an "off balance sheet" conveyance under generally accepted accounting principles, shall nonetheless disclose in its financial statements (by footnote or other appropriate designation) that the Loans and Related Interests sold, transferred, assigned, and otherwise conveyed to the Issuer under the TSA are property of the Issuer and subject to the interests of the Issuer and its further assignees, and any other disclosures to MCC's creditors shall be consistent with the foregoing. MCC acknowledges that the Loans and Related Interests are not to constitute property of MCC under applicable state law, nor property of MCC's estate in the event of Insolvency Proceedings involving MCC.

- MCC shall promptly give the Issuer, the Trustee and each Rating Agency written notice of the following events, as soon as possible and in any event within 30 days after MCC or any of its ERISA Affiliates knows or has reason to know thereof: (i) the occurrence or expected occurrence of any Reportable Event with respect to any Plan to which MCC or any of its ERISA Affiliates contributes, or any withdrawal by MCC or any of its ERISA Affiliates from, or the termination, reorganization or insolvency of any Multiemployer Plan to which MCC or any of its ERISA Affiliates contributes or to which contributions have been required to be made by MCC or such ERISA Affiliate during the preceding five years or (ii) the institution of proceedings or the taking of any other action by the PBGC or MCC or any of its ERISA Affiliates or any such Multiemployer Plan with respect to the withdrawal by MCC or any ERISA Affiliates from, or the termination of any such Plan or Multiemployer Plan or the reorganization or insolvency of any such Multiemployer Plan.

- MCC will keep proper books of record and account in which full and correct entries shall be made of all financial transactions and the assets and business of MCC in accordance with generally accepted accounting principles. MCC will implement and maintain administrative and operating procedures (including an ability to recreate records evidencing the Loans and Related Interests in the event of the destruction of any original records) to keep and maintain all documents, books, records and other information reasonably necessary or advisable for the collection of all Loans and Related Interests (including, without limitation, records adequate to permit the daily identification of each new Loan and Collections of and adjustments to each existing Loan).

- All written information furnished on and after the Closing Date by MCC to the Issuer, the Trustee or the Holders of any Series pursuant to or in connection with any Program Agreement or any transaction contemplated therein shall not contain any untrue statement of a material fact or omit to state material facts necessary to make the statements made not misleading, in each case in light of the circumstances under which such statements were made or such information was furnished.

- MCC shall be operated in such a way that is consistent with the assumptions set forth in the most recent Opinion of Counsel delivered in connection with the closing of any Series, relating to the question of whether the Issuer would be substantively consolidated in the bankruptcy estate of MCC in the event of MCC's bankruptcy.

## OPTIONAL ADVANCE AGREEMENT

MDC and the Issuer are parties to the OAA pursuant to which MDC may, from time to time at its sole option and with no legal obligation to do so, contribute as an Advance to the Issuer either Metals Inventory or Dollars, in exchange for preferred membership units in the Issuer. Such Advances are to be applied and allocated in the same manner as, and be treated as, Collections (of Dollars or Metals, as applicable) under the Servicing Agreement on the date received. The following summary describes certain terms of the OAA and is qualified in its entirety by reference to the OAA.

In the event and to the extent that MDC makes a Metals Advance to the Issuer of Metals Inventory or a Dollar Advance to the Issuer of Dollars, the Issuer shall issue with respect to such Advance, redeemable Series A Preferred Units with a stated value in a like amount on the date of such Advance, as provided in the related Supplement to the Issuer's Limited Liability

Company Agreement to be entered into for such Series A Preferred Units. Upon receipt of such Advance by the Issuer, all of MDC's right, title and interest in and to such Metals Inventory and Dollars (as applicable) contributed by MDC shall have been assigned, transferred and conveyed to the Issuer.

MDC represents and agrees (among other things) as follows with respect to the Advances:

- MDC is the holder of all right, title and interest in and to the Dollars or Metals Inventory being transferred, assigned and conveyed by it free from any lien, security interest, encumbrance or other right, title or interest of any persons; and MDC shall defend such Dollars or Metals Inventory against all claims and demands of all persons at any time claiming the same or any interest therein adverse to that of the Issuer or the Trustee.

- On each Advance Date, pursuant to the terms of the Metals Depository Agreement, MDC, to the extent MDC contributes Metals Inventory, shall cause the Metals Depository to identify with appropriate notations on its books and records that such Metals Inventory have been transferred to the Issuer and that the Issuer is the owner thereof and further reflecting the fact that such Metals Inventory shall have been further pledged and assigned by the Issuer to the Trustee.

- On each Advance Date, MDC, to the extent MDC contributes Dollars, shall wire transfer such Dollars in immediately available funds to the Collection Cash Account.

- No liens or claims have been filed with respect to the Metals Inventory or the Dollars constituting the proceeds of any Advance.

- The transactions contemplated by the OAA are being consummated by MDC in furtherance of its ordinary business purposes, with no contemplation of insolvency and with no intent to hinder, delay or defraud any of its present or future creditors.

- The consideration received by MDC for the Advances, consisting of the equity interest represented by the Series A Preferred Units, constitutes or will constitute fair consideration having value reasonably equivalent to or in excess of that of the Dollars and/or Metals Inventory so Advanced.

- With respect to any Dollars or Metals Inventory Advanced, (i) MDC has transferred the same as a capital contribution and the Issuer has obtained legal and equitable title thereto, and (ii) no such transfer has been made on account of an antecedent debt owed by MDC to the Issuer or shall be voidable under any Section of the Bankruptcy Code.

- MDC is solvent and will not become insolvent after giving effect to the making of any Advance; MDC is paying its debts as they become due; and MDC, after making any Advance, will have adequate capital to conduct its business.

- MDC shall operate its business generally such that the Issuer would not be substantively consolidated in the bankruptcy estate of MDC in the event of MDC's bankruptcy.

- MDC has filed on a timely basis all required tax returns.

- All of MDC's (and any consolidated subsidiary) pension or profit sharing plans have been fully funded in accordance with MDC's applicable obligations.

- All Metals Inventory which MDC may Advance constitutes Eligible Metals Inventory.

- In the event and to the extent MDC makes an Advance, MDC will execute or endorse, acknowledge, and deliver to the Issuer and the Trustee from time to time such schedules, confirmatory assignments, conveyances, and other reassurances or instruments and take such further similar actions relating to the Metals Inventory and Dollars, as applicable, as may be necessary or advisable to establish, evidence and maintain the Issuer's and the Trustee's right, title and interest in and to the Metals Inventory and/or Dollars conveyed, including against claims of all other persons and parties.

- MDC will do nothing to disturb or impair its transfer, assignment and conveyance of the Dollars or Metals Inventory.

- MDC agrees that prior to the date which is one year and one day after the payment in full of all outstanding Series, it will not institute against or join with any other Person in instituting against the Issuer any Involuntary Insolvency Proceedings.

## SERVICING AGREEMENT

The Issuer, MCC as initial Servicer, BNY as Trustee and Portfolio Financial Servicing Company as Backup Servicer are parties to the Amended and Restated Servicing Agreement, dated July 12, 2012, as amended, providing for (among other things) the duties of the Servicer in servicing, administering and collecting the Loans, the disposition or liquidation of Loans, Metals Collateral and/or Metals Inventory under certain circumstances, the administration of the Hedge Account, the allocation of received Collections and delivery of payment instructions to the Trustee with respect thereto, and daily as well as periodic information reporting requirements of the Servicer. The following summary describes certain terms of the Servicing Agreement, and is qualified in its entirety by reference to the actual terms and provisions of the Servicing Agreement.

The Servicer under the Servicing Agreement agrees to service and administer the Loans and Related Interests, and collect payments due under the Loans, in accordance with its customary and usual servicing procedures and the Collection Policies. MCC as initial Servicer, and except as contemplated in the Custody Agreement, is not obligated to use separate servicing procedures, offices or employees for servicing the Loans from the procedures, offices and employees used by MCC in connection with servicing other loans to its customers to finance the purchase of Metals.

Upon reasonable prior notice by the Trustee, the Servicer agrees to make available at an office of the Servicer (or other location designated by the Servicer if such records are not accessible by the Servicer at an office of the Servicer) selected by the Servicer for inspection by the Trustee or its agent (reasonably acceptable to the Servicer) on a Business Day during the Servicer's normal business hours a record setting forth (A) the Collections on each Loan, (B) the amount of Loans for the Business Day preceding the date of the inspection, and (C) all other Relevant Information concerning the Loans. The Servicer agrees to maintain its computer files with respect to the Loans in such a manner so that the Loans may be specifically identified and, upon reasonable prior request of the Trustee, will make available to the Trustee, at an office of the Servicer (or other location designated by the Servicer if such computer files are not located at an office of the Servicer) selected by the Servicer, on any Business Day of the Servicer during the Servicer's normal business hours any computer programs necessary to make such identification.

*Establishment of Trust Accounts*

*The Collection Account*. The Trustee has established in the name of the Trustee, for the benefit of the Holders of all Series, each of the following accounts:

(i)    a noninterest bearing segregated account (the "*Collection Cash Account*") bearing a designation clearly indicating that the funds deposited therein are held in trust for the benefit of the Holders of all Series, to be established and maintained in a segregated trust account with a Qualified Institution (which may be the Trustee); and

(ii)    an account with the Metals Depository, evidencing the ownership by the Issuer of Metals constituting Eligible Metals Inventory received as a Collection in accordance with "The Servicing Agreement--Receipt of Collections" below (the "*Collection Metals Account*") (and which may also be the Equalization Metals Account as described in the succeeding paragraph below) and the records with respect to which clearly indicate that the Metals Inventory evidenced thereby are held for the security and benefit of the Trustee on behalf of the Holders of all Series.

The Collection Cash Account and the Collection Metals Account shall be deemed to constitute collectively the "*Collection Account*".

*Principal Funding Accounts; Required Amounts Accounts*. The Servicer is required to direct the Trustee to establish in the name of the Trustee, for the benefit of the Holders of each outstanding Series individually, and maintain with a Qualified Institution (which may be the Trustee) separate segregated trust accounts (each a "*Principal Funding Account*" and a "*Required Amounts Account*" for the related Series), each bearing a designation clearly indicating that the funds therein are held for the benefit of the Noteholders of each such applicable Series.

*The Equalization Account*. The Trustee has established in the name of the Trustee, for the benefit of the Holders of all Series,

(A)     with a Qualified Institution (which may be the Trustee), a segregated trust account (the "*Equalization Cash Account*") bearing a designation clearly indicating that the funds deposited therein are held for the benefit of the Holders of all Series, and

(B)     with the Metals Depository, an account evidencing the ownership by the Issuer of Metals constituting Metals Inventory (the "*Equalization Metals Account*") and the records with respect to which clearly indicate that the Metals Inventory evidenced thereby are held for the benefit of Trustee on behalf of the Holders of all Series.

The Equalization Cash Account and the Equalization Metals Account shall be deemed to constitute collectively the "*Equalization Account*" as defined herein. References to "amounts on deposit in the Equalization Account" or words to similar effect shall, when used in the context of determining a measurement of such amounts as of any date, be deemed to refer to an aggregate amount equal to (1) the cash value of monies on deposit in the Equalization Cash Account, plus (2) the Adjusted Inventory Balance in respect of Metals Inventory on deposit in the Equalization Metals Account, *provided* that references to withdrawals or transfers of such amounts shall, in the context of the Equalization Metals Account, be deemed to refer to amounts actually realized or to be realized upon the disposition of Metals Inventory comprising such account.

*Administration of Trust Accounts*.  The Servicing Agreement provides that the Trustee shall possess all right, title and interest in all funds on deposit from time to time in the Trust Accounts and in all proceeds thereof.  Except as provided below, the Trust Accounts shall be under the sole dominion and control of the Trustee for the benefit of the Noteholders.  Pursuant to authority granted to it under the Servicing Agreement, however, the Servicer shall have the revocable power to instruct the Trustee to withdraw funds from the Trust Accounts for the purpose of carrying out the Servicer's or the Trustee's duties.  The Trustee is required at all times to maintain accurate records reflecting each transaction in the Trust Accounts, and that funds held therein shall at all times be held in trust for the benefit of the Noteholders of all, or the related, as applicable, Series.

Funds on deposit in the Trust Accounts (other than the Collection Account, which shall remain uninvested) may be invested by the Trustee (if directed in writing by the Servicer) in Eligible Investments.  Any such investment must be in the name of the Trustee and shall mature and such funds shall be available for withdrawal on or prior to the date on which such funds must be distributed.  Earnings from any such investments when received shall be deposited in the Collection Account and treated as Collections.  For purposes of determining the availability of funds or the balances in the Trust Accounts for any reason under the Servicing Agreement, all investment earnings on such funds shall be deemed not to be available or on deposit.

*Receipt of Collections*

The Servicer is authorized under the Servicing Agreement to obtain Collections on the Loans in either of the following forms, whether derived as a result of voluntary payment by the Obligor or through involuntary Liquidations:

(i)     Collections in the form of direct cash Dollar payments and deposits, whether received from the Obligor or representing proceeds of Liquidation of Metals Collateral by sale to MDC or a third party; or

(ii)     Eligible Metals Inventory in an Equivalent Quantity transferred and assigned to the Issuer by MDC (which Metals Inventory pursuant to the terms of the Master Indenture are automatically and concurrently pledged and assigned to the Trustee and become a part of the Trust Estate) thereby effecting a Liquidation of Metals Collateral to MDC in respect of a Loan, and with respect to which

(A)     to the extent that the Wholesale Value of such Equivalent Quantity is less than or equals the amount of the Obligor's obligation being satisfied through such Liquidation, such transferred Metals Inventory is to be deemed as a Collection in respect of such Obligor's obligation realized by the Issuer through a Liquidation sale of Metals Collateral to MDC, and

(B)     to the extent that the Wholesale Value of such Equivalent Quantity exceeds the amount of such Obligor's obligation being satisfied through such Liquidation (and provided that the Obligor has been paid all amounts to which it is entitled in connection therewith), such excess is to be deemed an Advance to the Issuer by MDC pursuant to the Optional Advance Agreement.

Such Metals Inventory is to be assigned a Dollar value (i) for purposes of determining the amount received as a Collection on the related Loan into the Collection Metals Account, of the Wholesale Value of the related Eligible Metals, and (ii) for purposes of the corresponding concurrent allocation thereof to the credit of the Equalization Metals Account as described further below, of the Adjusted Inventory Balance of the related Eligible Metals.

Notwithstanding the foregoing, the Servicer is not authorized to accept Collections in the form of Metals Inventory, and shall instead be required to receive Collections solely in the form of cash Dollars (whether obtained through Liquidations in a sale to MDC or to a third party), to the extent that (A) the amount on deposit in any Required Amounts Account on any date is less than the Required Amount, or (B) an Amortization Period is effect with respect to one or more Series, and the amount on deposit in the related Principal Funding Account[s] is less the aggregate Principal Amount[s] of such Series.

*Certain Daily and Periodic Servicer Duties*

The Servicer is required under the Servicing Agreement to undertake the following actions in the order set forth below:

(i)        with respect to and at the commencement of each Business Day, prepare a Daily Report, as well as a written allocation report to the Metals Depository, setting forth the information required therein determined as of the close of the preceding Business Day;

(ii)        at the commencement of each Business Day,

(A)        to determine with respect to each Series whether such Series is in a Revolving Period, a Delineated Principal Funding Period or an Amortization Period,  and whether such Amortization Period is an Early Amortization Period;

(B)        to determine the Series Allocation Percentage for each Series as well as the Required Amount with respect to each Series, the amount then on deposit in the related Required Amounts Account, and the additional amount necessary (if any) for deposit into each Required Amounts Account to equal the Required Amount for each Series;

(C)        to calculate the Principal Variance for such day, and to determine the amount of Collections received in respect of Loans as of the close of the preceding Business Day, as well as all other amounts deposited into the Collection Account in accordance with the Servicing Agreement as of the close of the preceding Business Day, and to instruct the Trustee to allocate such Collections in accordance with the allocation description below;

(D)        to the extent that the Collections applied as described in clause (C) above are not sufficient to satisfy the aggregate of the Required Amounts, then to take (or cause the Trustee to take) the actions required under "Servicing Agreement--Actions to Obtain Required Amounts" below to the extent required on such Business Day, depositing all amounts realized from such actions into the Collection Account;

(E)        to the extent of any Unsatisfied NPV existing after applying Collections as described in clause (C) above, to take all actions as are required (and in the order of priority required) under Article V of the Servicing Agreement for so long as any Unsatisfied NPV continues to exist; and

(F)        if such Business Day is a Payment Date or an Interest Payment Date, to instruct the Trustee (after application of all Collections and other amounts received as required) to transfer and distribute (y) from the Required Amounts Account, the respective portions of the Required Amounts to the Noteholders and the other parties entitled to receive distributions therefrom on such Payment Date or Interest Payment Date, and (z) in respect of any Series as to which an Amortization Period has commenced or a Delineated Principal Funding Period is in effect, to transfer and distribute from the Principal Funding Account (to the extent available) an amount equal (in the case of each such Series) to the amount required under the Servicing Agreement and the applicable Supplement.

(iii)        to execute and deliver, on behalf of the Issuer and the Trustee for the benefit of the Noteholders, any and all instruments of satisfaction or cancellation, or of partial or full release or discharge, and all other comparable instruments, with respect to the Loans and, after the delinquency of any Loan and to the extent permitted under and in compliance with the Loan Agreement and applicable law and regulations, to commence enforcement proceedings with respect to such Loans in accordance with the Collection Policies and customary procedures of the Servicer;

(iv)        to make any filings, reports, notices, applications, registrations with, and to seek any consents or authorizations from, the Securities and Exchange Commission and any state securities authority on behalf of the Issuer as may be necessary or advisable to comply with any federal or state securities or reporting requirements; and

(v)     to delegate certain of its servicing, collection, enforcement and administrative duties hereunder with respect to the Designated Accounts and the Loans to any Person who agrees to conduct such duties in accordance with the Collection Policies.

The Trustee agrees in the Servicing Agreement that it shall promptly follow the written instructions of the Servicer to withdraw funds and/or make dispositions from the Collection Account, any Principal Funding Accounts, the Equalization Account, any Required Amounts Accounts or any other Series Account at such time as required under the Servicing Agreement or under the applicable Supplement.    The Trustee also agrees (i) to, on a daily basis, compare the daily Hedge Account report for the net hedge position provided by the Hedge Account broker to the Servicer's Daily Report containing such information and to confer with the Servicer and the Issuer to determine the reason for any discrepancies,and (ii) to make certain calculations to determine whether there is a Negative Principal Variance with respect to the Collateral and to report such determination to the Servicer.

*Allocations of Collections*

*Collections*.  The Servicing Agreement requires that Collections (i) received in respect of the Loans in the lockbox account established pursuant to the Lockbox Agreement, in accordance with the Lockbox Agreement, and (ii) any other amounts or Metals required to be paid or transferred as if the same were Collections pursuant to the provisions of the Servicing Agreement or any Supplement shall be paid or transferred, as the case may be, to the Collection Account, and the Servicer shall (A) in the case of cash payments, or cash proceeds derived from a Liquidation sale to MDC or to a third party other than MDC, allocate all such payments to the Collection Cash Account no later than the first Business Day following the date of receipt, and (B) in the case of payments received in respect of Liquidations where the related Metals Collateral has been sold directly to MDC in return for a conveyance of Eligible Metals Inventory as described in "The Servicing Agreement--Receipt of Collections" above, allocate an Equivalent Quantity of Eligible Metals Inventory to the Collection Metals Account on the same Business Day.  No credit is to be given for deposits to the Collection Cash Account until such deposits represent actually collected funds.

*Certain Advances*.  The Issuer may (and shall, when a request for Advance required under the Servicing Agreement is voluntarily complied with by MDC) accept a transfer and conveyance of Dollars or Metals Inventory from MDC in the form of an optional Advance.  Such assets when conveyed shall be treated as Collections hereunder for the day on which the Advance is made and allocated accordingly.

*Allocations for Series*.  On each Business Day, the amounts on deposit and available in the Collection Account for allocation representing Collections (or amounts required to be treated as Collections) received as of the close of the prior Business Day, shall be determined by the Servicer.  The Servicer is required, prior to 2:00 p m. (New York time) on such current Business Day, to withdraw amounts from the Collection Account and allocate such amounts as set forth below, in the following order of priority:

(i)     *Required Amounts*.  To the extent the Required Amount for such Series exceeds the amounts then on deposit in the related Required Amounts Account, an amount (in the form of cash Dollars) up to (but not exceeding) such excess for deposit to the Required Amounts Account for such Series (with such amounts, in the event a deficiency in Required Amounts exists for more than one Series, to be withdrawn from the Collection Account and allocated pro rata based on the Series Allocation Percentages of the respective Series).

(ii)     *Equalization Account*.  To the extent a Negative Principal Variance exists, an amount up to (but not exceeding) the amount of such Negative Principal Variance, for deposit to the Equalization Account, with such amounts to be derived from the Collection Account in the following order of priority:  (i) by the transfer of Dollars on deposit in the Collection Cash Account to the Equalization Cash Account, then (ii) from the transfer of Metals on deposit in the Collection Metals Account to the Equalization Metals Account (valuing the Metals for such purpose at the Adjusted Inventory Balance thereof).

(iii)     *Principal Funding Account*.  In the event an Amortization Period or a Delineated Principal Funding Period exists in respect of such Series, an amount (in the form of cash Dollars) up to (but not exceeding) the aggregate Principal Amount of each such Series outstanding (or such lesser amount with respect to the Amortization Period or Delineated Principal Funding Period with respect to a Series as may be specified in the related Supplement), for deposit into the Principal Funding Account  (with such amounts, in the event that an Amortization Period and/or Delineated Principal Funding Period exists with respect to more than one Series, to be withdrawn from the Collection Account and allocated amongst Series' pro rata based on the proportion that the Principal Amount of each such Series bears to the sum of the Principal Amounts of all such Series); *provided,* that if an Amortization Period shall have commenced in respect of an Early Amortization Event  and such Early Amortization Event shall have been cured to the satisfaction of a Majority of Noteholders or otherwise waived by such a Majority of Noteholders, such that the related Amortization Period shall have reverted to the Revolving Period, then any amounts previously deposited and remaining in the

Principal Funding account in respect of such Amortization Period shall be released and treated as Collections for allocation on the next Business Day.

(iv) *Excess Collections*. Any Collections remaining in the Collection Account, after giving effect to the allocations pursuant to clauses (i)-(iii) above (and in the case of clause (A) and (B) below, subject to an special allocation rules provided for in a Supplement), (A) first, to the extent reimbursable expenses or indemnifications are payable to the Trustee or the Backup Servicer as Successor Servicer, shall be paid pro rata to the respective party entitled thereto, (B) second, to the extent (if any) specified by the Servicer on the related Daily Report at the direction of the Issuer in its sole discretion, shall be deposited into the Equalization Account, and (C) third, shall be released for the account of the Issuer, to be paid directly to the Issuer to be used for the purchase of Additional Loans, payment of dividends on or the redemption price of any Preferred Units, or for any other permissible purpose.

*Certain Releases from Equalization Account*. The Issuer may, if on any Business Day either

(i) there exists a positive Principal Variance (whether as a result of Advances or otherwise), or

(ii) if no Negative Principal Variance then exists and the release of amounts described in this sentence will, following allocation as a Collection as described below, result in the purchase by the Issuer of an equivalent Adjusted Eligible Pool Balance of Additional Loans,

direct that amounts on deposit in the Equalization Account in the amount of such positive Principal Variance, in the case of clause (i) (representing, in the discretion of the Issuer, either Metals Inventory or Dollars) or, in the case of clause (ii), amounts on deposit in the Equalization Cash Account equivalent to such Adjusted Eligible Pool Balance of Additional Loans, be released and transferred to the Collection Account for allocation as a Collection.

*Payments From Trust Accounts*. On each Payment Date or Interest Payment Date, as specified below, the Servicer is required to instruct the Trustee to make the following funds transfers in respect of each Series of Notes that remain outstanding on such date, from the Trust Accounts and in the order of priority specified below:

(i) *Certain Fixed Fees*. (A) On each October Payment Date (other than the initial one), an amount from each Required Amounts Account equal to the related Series Allocation Percentage of the Trustee Fee, to be distributed on such Payment Date to the Trustee; (B) on each October Payment Date (other than the initial one), an amount from each Required Amounts Account equal to the related Series Allocation Percentage of the Backup Servicer Fee, to be distributed on such Payment Date to the Backup Servicer; and (C) in the event that the Servicer is not MCC or an Affiliate of MCC, on each Payment Date, an amount from each Required Amounts Account equal to the related Series Allocation Percentage of the Servicing Fee, to be distributed on such Payment Date to the Servicer.

(ii) *Interest; Other Amounts*. (A) First, on each Interest Payment Date, an amount from each Required Amounts Account equal to the Note Interest payable on such date in respect of the related Series outstanding, and then (B) on each Payment Date, an amount from the Required Amounts Account equal to such other amounts as are specified in the applicable Supplement with respect to a Series as payable on a Payment Date from the Required Amounts Account, with such respective amounts in each case to be distributed as provided in the related Supplement.

(iii) *Principal During Amortization or Delineated Principal Funding Period*. If an Amortization Period (or Delineated Principal Funding Period) has commenced and is continuing in respect of a Series, an amount from the Principal Funding Account equal to the applicable Note Principal distributable from the Principal Funding Account with respect to such Series as specified in the related Supplement for such Series, to be distributed on a Payment Date (or, if so specified in a related Supplement, an Interest Payment Date) to each Noteholder of such Series *pro rata* in accordance with such Noteholder's principal balance outstanding or as otherwise provided in the related Supplement.

(iv) *Servicing Fee*. In the event that the Servicer is MCC or an Affiliate of MCC, on each Payment Date an amount from each Required Amounts Account equal to the Series Allocation Percentage of the Servicing Fee, to be distributed on such Payment Date to the Servicer, *provided,* that in the event the Trustee has received notice that any storage fees due and payable to the Metals Depository have not been paid, or that any fees or expenses payable to the Backup Servicer have not been paid, then the Trustee is required to deduct from the Servicing Fee otherwise payable to the Servicer (A) first, the amount of arrearage in storage fees and remit the same to the Metals Depository, and (B) after any such arrearage has been satisfied, then remit such amounts as may be due the Backup Servicer, and *provided further,* that no such amounts shall be distributed to the Servicer to the extent an Unsatisfied NPV exists on such Payment Date.

*Actions Required When Unsatisfied NPV Exists*

If the Servicer's daily measurement shows that, after the required allocations of daily Collections as described in "Servicing Agreement--Allocations of Collections" above, an Unsatisfied NPV exists, then the Servicing Agreement will require the Servicer to take the following actions (in order):

(i)  Request an Advance from MDC to the Issuer under the OAA of additional equity, in the form of Dollars and/or Eligible Metals Inventory, in an amount equal to the Unsatisfied NPV (valuing any contribution of Eligible Metals Inventory for this purpose at its Adjusted Inventory Balance).

(ii)  If the foregoing action does not raise an amount equal to the Unsatisfied NPV, then liquidate Metals Inventory held in the Equalization Account so as to generate Dollar proceeds (to be applied as Collections on the next Business Day) at least equal to the remaining Unsatisfied NPV.

In addition, for so long as an Unsatisfied NPV exists on any date of determination, the Servicer is required to make and enforce demands to pay in additional Equity on Obligors whose Equity level in their Loan has fallen below the level then required in the Loan Agreement (a "Collateral Demand"), and if such Collateral Demand is not timely paid to liquidate sufficient Metals Collateral of such Obligors so as to obtain Dollars in the amount of such outstanding Collateral Demand, for allocation once received as Collections on subsequent Business Days (and the Servicer will no longer have its normal discretion to postpone such actions).  The Servicer must also, for so long as an Unsatisfied NPV exists on any date of determination, demand repayment in full of (i) Loans as to which Collateral Demands have not been satisfied within five Business Days, and (ii) any Loans whose Equity has fallen below the Special Required Equity Level, and in each case liquidate Metals Collateral securing such accelerated Loans, with the proceeds of such actions once received to be allocated as Collections on subsequent Business Days (and the Servicer will no longer have its normal discretion to postpone such actions).

In addition to the foregoing, if an Unsatisfied NPV ever exists for five consecutive calendar days, the Servicer is obligated to increase the required Equity for Obligors under their Loan Agreements, and make and enforce resultant Collateral Demands on Obligors, to the extent necessary so as to generate Dollars from any combination of Obligor payments and/or proceeds of liquidated Metals Collateral in the amount of the current Unsatisfied NPV.

*Actions Required When Shortfall in Required Amounts*

If on any day the Required Amounts for a Series are not funded in full, then the Servicer is required under the Servicing Agreement to request a voluntary Advance from MDC of Dollars, to be allocated as Collections and deposited into the related Required Amounts Account[s] in satisfaction of the deficiency.  If such Advance is not promptly made, the Servicer is then required to liquidate Metals Inventory so as to generate Dollars (to be allocated as Collections) sufficient to cure the deficiency. If the deficiency has still not been cured in full within 15 days of the next upcoming Payment Date (or 3 Business Days before such upcoming date, in the case of a deficiency in Required Amounts other than interest and Trustee/Backup Servicer/Servicing fees), then the Servicer is required to make written demand for repayment in full of Loans (and, if necessary, liquidate related Metals Collateral) to an extent sufficient to generate Collections to fund the Required Amounts in full.

As was the case for Series 2012-1 Notes and Series 2012-2 Notes, it is a condition precedent to the issuance of the Series 2013-1 Notes that an amount equal to the current Required Amounts for Series 2013-1 then be on deposit in the Required Amounts Account for Series 2013-1.

*Actions Required Upon Event of Default or at Series Maturity*

If upon the first to occur of (a) an Event of Default, or (b) the 30th day before the Series Maturity Date with respect to a Series, the amount on deposit in the applicable Principal Funding Account[s] is less than the amount necessary (i) in the case of an Event of Default, to repay the Principal Amount of all outstanding Series in full, or (ii) in the case of an incipient Series Maturity Date, to repay the Principal Amount of the maturing Series in full, the Servicer shall (1) first, immediately Liquidate Metals Inventory with the proceeds to be allocated and applied as Collections to increase the Principal Funding Account[s] up to such necessary amounts, and (2) if such necessary amounts are still not available after the action in clause (1), then the Servicer shall make written demand upon all Obligors, in the case of an Event of Default, or a sufficient number of Obligors (taking into account Loans as to which demands are already outstanding), in the case of an incipient Series Maturity Date, for repayment in their entirety of their Loans, informing such Obligors that payment must be received on their Loans within 5 business days of the date of such demand notice and that (subject to the right of immediate liquidation if the Obligor's equity position falls below the Special Required Equity Level) if such repayment has not been received within 10 business days of the date of such notice, the Metals Collateral relating to their respective Loans will be subject to liquidation.  With respect to demanded Loans as to which the entire amount due has not been received within such 10 business day period, the Servicer shall, not later than 25 days after the

41

sending of the related notices, Liquidate the related Metals Collateral, depositing the proceeds of such Liquidation (net of amounts required to be paid to the Obligors) into the Collection Account for allocation as aforesaid.

Notwithstanding the foregoing, if the Liquidation provided for in the preceding paragraph results from the occurrence of an Event of Default occasioned solely by the delivery of a Termination Notice effecting the appointment of a Successor Servicer hereunder, the Servicing Agreement requires the Successor Servicer to (i) immediately and concurrently Liquidate Metals Inventory, and (ii) in the manner specified in this paragraph below make written demand upon all Obligors for repayment in their entirety of their Loans and, not later than the time period specified in this paragraph below, Liquidate related Metals Collateral to the extent necessary to pay off such demanded Loans. Such demands and Liquidations are to be accomplished based on the information set forth in the most recent Daily Report and related metals allocation report delivered by the initial Servicer. In connection with a Liquidation described in this paragraph, the Successor Servicer is required to send a notice to all Obligors informing the Obligors that repayment of their Loans is demanded in full, with payment to be received within 5 business days after the date of such notice, and that (subject to the right of immediate liquidation if the Obligor's equity position falls below the Special Required Equity Level) if repayment has not been received within 10 business days of the date of such notice, the related Metals Collateral will be subject to liquidation with the proceeds to be used to pay off the related Loans. With respect to demanded Loans as to which the entire amount due has not been received within the 10 business day period referred to above, the Successor Servicer is required, not later than 25 days after the sending of the related notices, to Liquidate the related Metals Collateral and use the proceeds to pay off the demanded Loans, in accordance with bid solicitation and acceptance procedures set forth in the Servicing Agreement. The Successor Servicer agrees to deposit the proceeds of any Liquidation described in this paragraph, or repayment Collections otherwise received from Obligors during this period, into the Collection Account for allocation in accordance with the Servicing Agreement. As soon as practicable after a sufficient amount has been deposited into the Collection Account to repay all outstanding Series in full, the Trustee shall redeem all outstanding Notes; *provided*, however, that such redemption shall comply with the Master Indenture and any applicable Supplement.

*Servicer Reporting Requirements*

*Daily Reporting.* On each Business Day the Servicer is required to prepare a completed Daily Report and deliver the same to the Trustee by 1:00 p.m. (New York time) on each Business Day with respect to activity in the Loans and related Metals Collateral for the prior Business Day. The Servicer also must deliver to the Trustee on each Business Day, concurrently with the Daily Report, a written allocation report addressed to the Metals Depository as contemplated in the Metals Depository Agreement setting forth the appropriate allocation of Metals Collateral and Metals Inventory on deposit in the Issuer's dedicated account with the Metals Depository established thereunder, and whether any Metals are to be released from such dedicated account. In addition, the Servicer must deliver to the Trustee on each Business Day, concurrently with the Daily Report, a Hedge Report setting forth the status and prior day's activity in the Hedge Account.

*Settlement Statement.* On the second Business Day prior to each Payment Date, the Servicer by 2:00 p.m. (New York time) on such day, is required to deliver to the Trustee and each Rating Agency the monthly Settlement Statement in the form required in the Servicing Agreement.

*Annual Settlement Statement.* On or before the January Payment Date of each year, beginning with January 2014, the Servicer is required to deliver to the Trustee an annual settlement statement, substantially in the form of the monthly Settlement Statements but providing information on an annualized basis, summarizing in the aggregate the year-to-date information set forth on each monthly Settlement Statement.

*Ongoing Annual Review Procedures.* Not more than twenty-five (25) days prior to each semiannual Payment Date occurring in October and April (beginning in October 2013), the Servicer shall cause a firm of independent public accountants to review a random sample of Daily Reports and the Settlement Statement(s) for the preceding period and to prepare and deliver to the Trustee and each Rating Agency a report setting forth the verifications of data and information specified in, and in accordance with the procedures specified in, the related exhibit to the Servicing Agreement. In addition, and unless the following sentence applies, not more than twenty-five (25) days prior to each Payment Date occurring in October (other than the initial one), the Servicer shall cause a firm of independent public accountants to (i) visit the Metals Depository to confirm, audit and verify Metals Collateral and Metals Inventory (including Warehouse Receipts) held by the Metals Depository, in accordance with the review criteria and procedures set forth in the related exhibit to the Servicing Agreement, and (ii) to prepare and provide to the Trustee (with a copy to each Rating Agency) a written report summarizing the information obtained on such visit. Notwithstanding the foregoing, if the Servicer is able to engage the Metals Depository itself to perform the reviews and verifications described above, and the Metals Depository confirms its agreement to do so at the times specified below in a writing in form and substance otherwise reasonably satisfactory to the Trustee (at the written direction of a Majority of Noteholders), then not more than twenty-five (25) days prior to each quarterly Payment Date occurring in December, March, June and September, the Servicer shall cause the Metals Depository to (i) confirm, audit and verify Metals Collateral and Metals Inventory held by the Metals Depository, consistent with the procedures described in the related exhibit to the Servicing Agreement, including performing the reviews and verification procedures described in such exhibit in respect of Warehouse

Receipts, and (ii) to thereupon promptly prepare and provide to the Trustee (with a copy to be sent to each Rating Agency) a written report summarizing the information obtained on such review.

*Annual Financial Statements.* On or before the 120th day following the end of each Issuer Fiscal Year, beginning with the Issuer Fiscal Year ending December 31, 2014, the Servicer shall cause a firm of independent public accountants to furnish to the Trustee and each Rating Agency audited financial statements with respect to MCC, MDC and the Issuer along with a copy of the annual management letter prepared by such auditors pertaining to MCC, MDC and any subsidiaries of either.

*Resignation of Servicer*

The initial Servicer agrees under the Servicing Agreement not to resign from the obligations and duties thereby imposed on it except upon determination that (i) the performance of its duties thereunder is no longer permissible under applicable law and (ii) there is no reasonable action which the Servicer could take to make the performance of its duties thereunder permissible under applicable law. Any such determination permitting the resignation of the Servicer shall be evidenced as to clause (i) above by an Opinion of Counsel to such effect delivered to the Trustee. No such resignation shall become effective until the Trustee or a Successor Servicer shall have assumed the responsibilities and obligations of the Servicer in accordance with the Servicing Agreement. If the Trustee is unable within 120 days of the date of delivery to it of such Opinion of Counsel to appoint a Successor Servicer, the Trustee agrees in the Servicing Agreement to serve as Successor Servicer (but shall have continued authority to appoint another Person as Successor Servicer).

*Servicer Default and Replacement of Servicer*

If any one of the following events (a "*Servicer Default*") shall occur and be continuing:

(a)       any failure by the Servicer to make any payment, transfer or deposit, to prepare or provide any Daily Report, or to take any actions in respect of Loans, Metals Inventory or other Trust Estate assets required under any provision of Article V of the Servicing Agreement (as described under "Servicing Agreement--Actions Required When Unsatisfied NPV Exists" and "--Actions Required When Shortfall in Required Amounts" and "--Actions Required Upon Event of Default or at Series Maturity", or to give certain instructions or notices to the Trustee pursuant to the Servicing Agreement, on or before the date such payment, transfer, deposit, withdrawal or drawing or such instruction or notice is required to be made or given, as the case may be, under the terms of the Servicing Agreement;

(b)       failure on the part of the Servicer duly to observe or perform in any respect any other covenants or agreements of the Servicer set forth in the Servicing Agreement, which continues unremedied for a period of 20 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Trustee;

(c)       any representation, warranty or certification made by the Servicer in the Servicing Agreement or in any certificate delivered pursuant thereto shall prove to have been incorrect when made, and which continues to be incorrect in any material respect for a period of 20 days after the date on which written notice of such incorrectness shall have been given to the Servicer by the Trustee;

(d)       an Insolvency Proceeding shall occur with respect to the Servicer; or

(e)       MCC and/or MDC shall have suffered the issuance of any judgment, writ or attachment, execution or similar process involving, in the aggregate, a liability of $10,000,000 or more not otherwise covered by insurance (subject to standard deductibles), which judgment, attachment or execution thereon is not being stayed pending appeal;

then, so long as such Servicer Default shall not have been remedied, either the Trustee, or a Majority of Noteholders, shall promptly  give notice of such Servicer Default in writing (with a copy to the Rating Agencies) to the Servicer (and to the Trustee if given by a Majority of Noteholders (a *"Default Notice"*).   If such Servicer Default is not remedied within 24 hours of receipt by the Servicer (and the Trustee, if given by a Majority of Noteholders) of the Default Notices, then the Trustee is required to deliver in writing to the Servicer a notice (a *"Termination Notice"*) thereby terminating all of the rights and obligations of the Servicer as Servicer under the Servicing Agreement and thereby effecting a transfer of the same to the Successor Servicer (which may be the Backup Servicer).

The Servicer agrees that promptly after it receives such Termination Notice, the Servicer will at its own expense deliver to the Successor Servicer or its designee a computer file or microfiche list containing a true and complete list of all Designated Accounts, identified by account number and setting forth the Outstanding Balance of each Loan as of the date of receipt of such Termination Notice together with all other Relevant Information. After receipt by the Servicer of such Termination Notice, all authority and power of the Servicer under the Servicing Agreement is to pass to and be vested in the Successor Servicer; and,

without limitation, the Successor Servicer is authorized and empowered (upon the failure of the Servicer to cooperate) to execute and deliver, on behalf of the Servicer, as attorney-in-fact or otherwise, all documents and other instruments upon the failure of the Servicer to execute or deliver such documents or instruments, and to do and accomplish all other acts or things necessary or appropriate to effect the purposes of such transfer of servicing rights and obligations. The Servicer agrees in the Servicing Agreement to cooperate with the Trustee and the Successor Servicer in effecting the termination of the responsibilities and rights of the Servicer to conduct servicing thereunder including, without limitation, the transfer to the Successor Servicer of all authority of the Servicer to service the Loans, Metals Collateral and Metals Inventory and Hedge Account provided for under the Servicing Agreement, all authority over all Collections which shall on the date of transfer be held in any lockbox account or held by the Servicer for deposit, or which have been deposited by the Servicer, in the Collection Account, the Equalization Account, any Required Amounts Account, any Principal Funding Account, or any other Series Account, or which shall thereafter be received with respect to the Trust Estate. The Servicer agrees to promptly transfer its electronic records or electronic copies thereof relating to the Loans, Metals Collateral and Metals Inventory to the Successor Servicer in such electronic form as the Successor Servicer may reasonably request and agrees to promptly transfer to the Successor Servicer all other records, correspondence and documents necessary for the continued servicing of the Loans, Metals Collateral and Metals Inventory in the manner and at such times as the Successor Servicer shall reasonably request.

To the extent that compliance with the foregoing requires the Servicer to disclose to the Successor Servicer information of any kind which the Servicer reasonably deems to be confidential, the Successor Servicer shall be required to enter into such customary licensing and confidentiality agreements as the Servicer shall deem necessary to protect its interests.

In connection with any service transfer, all reasonable costs and expenses (including attorneys' fees) incurred in connection with transferring the records, correspondence and other documents with respect to the Loans and the other Trust Estate assets to the Successor Servicer and amending the Servicing Agreement to reflect such succession as Successor Servicer are required to be paid by the Servicer. Also in connection with any servicing transfer, the Servicer and Issuer each have authorized and granted to the Successor Servicer an irrevocable power-of-attorney to take any and all steps in the Servicer's or the Issuer's name and on behalf of the Servicer or the Issuer that are necessary or desirable to perform its duties, including without limitation collecting amounts due under the Loans, endorsing the Servicer's or Issuer's name on checks and other instruments representing Collections and enforcing or realizing against the Loans and Related Interests and other Trust Estate assets.

On and after the receipt by the Servicer of a Termination Notice, the Servicer agrees to continue to perform all servicing functions under the Servicing Agreement until the date specified in the Termination Notice or as otherwise specified by the Trustee in writing or, if no such date is specified in such Termination Notice, or otherwise specified by the Trustee, until a date mutually agreed upon by the Servicer and Trustee. The Trustee shall notify each Rating Agency of such removal of the Servicer and the appointment of a Successor Servicer.

Upon its appointment, and upon its written acceptance in form and substance acceptable to the Trustee, the Backup Servicer (or any other successor servicer with the prior written approval of a Majority of Noteholders) is to be appointed the successor (the *"Successor Servicer"*) in all respects to the Servicer with respect to servicing functions under the Servicing Agreement and agrees therein to be subject to all the responsibilities, duties and liabilities relating thereto placed on the Servicer by the terms and provisions thereof, *provided, however,* the Backup Servicer's obligation to assume the role of Successor Servicer is limited to the circumstance where an Event of Default has occurred and is continuing (and, as indicated in the description of Events of Default herein, such Event of Default may itself be occasioned solely by the delivery of a Termination Notice seeking appointment of a Successor Servicer). Accordingly, the Backup Servicer in such capacity as Successor Servicer is engaging to undertake only the obligations and duties of a Successor Servicer which relate to, or are necessary or incidental to, accomplishing the actions and results which are required to occur as a result of an Event of Default, or which are otherwise required to be performed by a Successor Servicer acting as Servicer following the occurrence of an Event of Default.

A Majority of Noteholders may, on behalf of all Holders, and with prior written notice to each Rating Agency, waive any default by the Servicer in the performance of its obligations and its consequences. Upon any such waiver of a past default, such default shall cease to exist, and any default arising therefrom shall be deemed to have been remedied for every purpose of the Servicing Agreement. No such waiver shall extend to any subsequent or other default or impair any right consequent thereon except to the extent expressly so waived.

## MASTER INDENTURE

The Issuer and the Trustee have entered into the Master Indenture, as amended, providing for (among other things) the Issuer's grant of a security interest in the Loans and Related Interests, Metals Inventory and other Trust Estate assets to secure the Series 2013-1 Notes and any prior and subsequent Series; the issuance of Supplements for individual Series; and certain rights and remedies following an Event of Default. The following summary describes certain terms of the Master Indenture, and is qualified in its entirety by reference to the actual terms and provisions of thereof.

Under the Master Indenture the Issuer pledges to the Trustee and grants a security interest to the Trustee in, for the benefit and security of the Noteholders of all Series, all of its right, title and interest in, to and under the assets and property described below (collectively being the *"Trust Estate"*):

(a)     all Loans existing, originated or acquired from time to time in respect of a Designated Account (including Additional Loans existing or arising from time to time, whether in respect of existing or Additional Designated Accounts), together with all Collections therefrom and all Liens, guaranties and assignments securing the same;

(b)     all rights, powers, privileges, benefits and remedies under the Loan Agreements related to the Designated Accounts (including, but not limited to, all guaranties, lien priority agreements, security agreements, collateral assignments, subordination agreements, negative pledge agreements and loan agreements) then or hereafter evidencing, securing or guaranteeing or otherwise relating to or delivered in connection with a Loan and a Loan Agreement, including the pledge and security interest granted under the Loan Agreements in the Metals (including without limitation any Warehouse Receipts evidencing the same) securing the Loans (being the Metals Collateral), together with all other property and assets and contract rights comprising the Loans and Related Interests sold, assigned and conveyed from time to time to the Issuer pursuant to the TSA;

(c)     all right, title and interest (but not the obligations of) the Issuer under the OAA, as well as all Metals Inventory (including without limitation any Warehouse Receipts evidencing the same) received pursuant to an Advance and held from time to time in the Collection Metals Account or the Equalization Metals Account established under the Servicing Agreement, together with all cash Dollars received pursuant to an Advance and held on deposit in the Collection Cash Account or the Equalization Cash Account established thereunder, and all attachments, accessories, accessions, substitutions and replacements with respect to, and all proceeds of, any of the foregoing;

(d)     to the extent not already included in clauses (a), (b) or (c) above, and in each case to the extent evidencing or related to any of the foregoing, all of the Issuer's existing or thereafter acquired or created accounts, accounts receivable, lockbox accounts and other deposit accounts, rights in the Lockbox Agreement, other contract rights, notes, drafts, acceptances, chattel paper, leases, letter of credit and writings evidencing a monetary obligation or Lien or security interest in or a lease of property, all rights to receive the payment of money or other consideration given, whether or not earned by performance and whether or not evidenced by or set forth in or arising out of any then present or future chattel paper, note, draft, lease, acceptance, writing, bond, insurance policy, instrument, document or general intangible, and all extensions and renewals of any thereof, all rights under or arising out of then present or future contracts, agreements or general intangibles, including all rights and payments under licensing agreements or arrangements, franchises or permits, all claims or causes of action then existing or thereafter arising in connection with or under any agreement or document or by operation of law or otherwise, all collateral security of any kind given by any person with respect to any of the foregoing, including in any event, all accounts, instruments and chattel paper within the meaning of the UCC;

(e)     all right, title and interest of the Issuer, if any, in and to each of the Trust Accounts and in all funds deposited in such accounts from time to time (including any amounts initially on deposit in the Equalization Account or any Required Amounts Account), and all certificates and instruments, if any, from time to time representing or evidencing any interest in such accounts, and all interest, dividends, proceeds, cash, investment funds, instruments and other property, if any, from time to time received, receivable or otherwise distributed in respect of or in exchange for all or any of such accounts or the funds on deposit in such accounts and all rights and entitlements, tangible or intangible, in respect of the foregoing;

(f)     all other documents, instruments, books, correspondence, credit files and records of every nature of the Issuer, whether then existing or thereafter acquired or created, and in any event all documents of the Issuer within the meaning of the UCC;

(g)     all right, title and interest (but not the obligations of) the Issuer under the TSA including, without limitation, (i) all rights of the Issuer to receive moneys due and to become due under or pursuant to the Transfer and Sale Agreement, whether payable as fees, expenses, costs or otherwise, (ii) all rights of the Issuer to receive proceeds of any insurance, indemnity, warranty or guaranty with respect to the TSA, (iii) claims of the Issuer for damages arising out of or for breach of or default under the TSA, (iv) the right of the Issuer to amend, waive or terminate the TSA, to perform thereunder and to compel performance and otherwise exercise all remedies thereunder and (v) all other rights, remedies, powers, privileges and claims of the Issuer under or in connection with the TSA;

(h)     all right, title and interest (but not the obligations) of the Issuer under each other Program Agreement not heretofore mentioned, including without limitation the Metals Depository Agreement, the Servicing Agreement, the Lockbox Agreement and the Custody Agreement;

(i)     all right, title and interest (but not the obligations of) the Issuer under the Hedge Account and the hedging agreements contained therein;and

(j)     the proceeds, in cash or otherwise, of the assets and property described in the foregoing clauses (a) through (i) (including, without limitation, the proceeds of any sale or other disposition of such property and all insurance proceeds of any kind paid at any time in connection with such property), all Liens (whether possessory, contractual, statutory or otherwise) with respect to such property, and all rights, remedies and claims (whether in the nature of indemnities, warranties, guaranties or otherwise) of the Issuer with respect to such property, including without limitation, the right of the Issuer to bring suit to enforce its rights with respect to such property, in any case whether now existing or hereafter at any time or from time to time arising.

The grant is made to secure (i) the payment of all amounts due on the Notes of all outstanding Series in accordance with their terms, (ii) the payment of all other sums payable under the Master Indenture and any Supplement and (iii) compliance with the provisions of the Master Indenture and any Supplement (being the *"Secured Obligations"*).

In connection with such grant, the Issuer has recorded and filed financing statements (and related continuation statements with respect to such financing statements) with respect to the Loans now existing and hereafter created for the transfer of chattel paper (as defined in the UCC as in effect in the Relevant UCC State) meeting the requirements of applicable state law in such manner and in such jurisdictions as are necessary to perfect the grant and assignment of the Loans, Loan Agreements, Metals Collateral and other Trust Estate assets to the Trustee, and has delivered file-stamped copies of such financing statements or continuation statements or other evidence of such filing to the Trustee.

In connection with such grant the Issuer agrees, on or prior to each Cut-Off Date on which Designated Accounts are designated to the Issuer and become subject to the lien of the Master Indenture, (i) to annotate and indicate in its computer files, and to cause the Servicer to annotate and indicate in the Servicer's computer files, that Loans, Loan Agreements, Metals Collateral and other Trust Estate assets with respect to such Designated Accounts have become subject to the lien of the Master Indenture for the benefit of the Noteholders, (ii) to deliver or cause to be delivered to the Custodian, at the times required in the TSA, each executed original Loan Agreement relating to a Designated Account, (iii) to affix or cause the Servicer to affix each such Loan Agreement with a legend, attachment or similar marking indicating the Issuer's and the Trustee's interest therein, and (iv) to deliver or cause to be delivered to the Servicer (or, upon request of a Majority of Noteholders, to the Trustee directly) a computer file containing a true and complete list of all Loans, Loan Agreements, Metals Collateral and Metals Inventory constituting the Trust Estate, identified by account number and setting forth the Outstanding Balance of each Loan and each Eligible Loan as of the Cut-Off Date, together with all other Relevant Information in respect thereof. The Issuer further agrees not to alter or permit to be altered the file designation referenced in clause (i) of this paragraph with respect to any Designated Account, Loan, Loan Agreement, Metals Collateral or Metals Inventory during the term of the Master Indenture unless and until such Designated Account, Loan, Loan Agreement, Metals Collateral, Loan and Loan Agreement is released from the lien of the Master Indenture.

As and if provided in a Supplement, the Issuer may (but is not obligated to) grant to the Trustee, for the benefit of the holders of the related Series, such other collateral that shall be in addition to the Trust Estate (such other collateral being, for that Series, its *"Series Collateral"*). Any grants of Series Collateral pursuant to a Supplement, unless otherwise provided in such Supplement, are made for the exclusive benefit of the Holders of the related Series and shall not secure in any manner the Issuer's obligations under any other Series or related Supplement.

*Transfers and Exchanges of Notes*

The Series 2013-1 Notes will be issued, maintained and transferred on the book-entry records of DTC and its participants in denominations of $100,000 and integral multiples of $1,000 in excess thereof. It is expected that the Notes will be eligible for trading in The Portal Market ("PORTAL"), a subsidiary of the Nasdaq Stock Market, Inc. The Notes will each initially be represented by one or more global Notes registered in the name of the nominee of DTC (together with any successor clearing agency selected by us, the "Clearing Agency"). We have been informed by DTC that DTC's nominee will be CEDE & Co. No holder of any such Note will be entitled to receive a Note representing such person's interest, except as set forth below under "--Definitive Certificates." Unless and until definitive Notes are issued under the limited circumstances described herein, all references to actions by Noteholders with respect to any such Notes shall refer to actions taken by DTC upon instructions from its participants.

Under the rules, regulations and procedures creating and affecting DTC and its operations, DTC will take action permitted to be taken by a Noteholder under the Master Indenture only at the direction of one or more participants to whose DTC account such Notes are credited. Additionally, DTC will take such actions with respect to specified voting rights only at the

direction and on behalf of participants whose holdings of such Notes evidence such specified voting rights. DTC may take conflicting actions with respect to voting rights, to the extent that participants whose holdings of Notes evidence such voting rights, authorize divergent action.

*Definitive Notes*

Definitive Notes will be issued to Noteholders or their nominees, respectively, rather than to DTC or its nominee, only if (i) the Issuer advises the Trustee in writing that DTC is no longer willing or able to discharge properly its responsibilities as Clearing Agency with respect to each class of Notes and the Initial Purchasers are unable to locate a qualified successor or (ii) the Issuer, at its option, elects to terminate the book-entry system through DTC.

Upon the occurrence of any event described in the immediately preceding paragraph, the Trustee is required to notify all participants of the availability through DTC of definitive Notes. Upon surrender by DTC of the definitive Notes representing the Notes and receipt of instructions for re-registration, the Trustee will reissue such Notes as definitive Notes issued in the respective principal amounts owned by the individual owners of the Notes. Thereafter the Trustee will recognize the holders of the definitive Notes as Noteholders under the Indenture.

 *Access to Noteholder Lists*

The Issuer shall furnish or cause to be furnished to the Trustee, the Servicer, any Noteholder or any Paying Agent requesting it a list of the names and addresses of the Noteholders within five Business Days after receipt by the Issuer of a written request therefor from that Person. Every Noteholder, by receiving and holding a Note, agrees that none of the Issuer, the Trustee, the Transfer Agent and Registrar or the Servicer nor any of their respective agents and employees shall be held accountable for the disclosure of any information as to the names and addresses of the Noteholders, regardless of the sources from which such information was derived.

*Issuance of Additional Series*

The Issuer and the Trustee may, at any time and from time to time, enter into a Supplement to the Master Indenture for the purpose of authorizing the issuance by the Issuer of Notes in one or more Series (and within Series, if applicable, Classes thereof). The Notes of all outstanding Series shall be equally and ratably entitled to the benefits of the Master Indenture, without preference, priority or distinction, except, with respect to any Series or Class within a Series, as provided in the related Supplement. Principal and interest on the Notes of all outstanding Series shall be paid as specified in the related Supplements.

On or before the issuance date of any Series of Notes, the Issuer and the Trustee shall execute and deliver a Supplement that will specify the principal terms of such Series. The terms of that Supplement may modify or amend the terms of the Master Indenture solely as applied to such Series. An issuance of any Series of Notes by the Issuer is subject to the satisfaction of the following conditions:

- on or before the tenth Business Day immediately preceding the issuance date of such Series, the Issuer shall have given the Trustee, any provider of liquidity or credit enhancement for an outstanding Series (which does not include holders of subordinate securities), and the Servicer (if the Servicer is MCC or one of its Affiliates) written notice of the issuance and issuance date of such Series. That notice shall state the designation of such Series (and any Classes within such Series) and for such Series: (A) its initial principal amount, (B) the interest rates of such Series or each Class thereof, if applicable (or the method of calculating the rates); (C) the provider of any external credit enhancement for such Series or for any Classes in such Series; and (D) that prior to (and after giving effect to) such issuance, no Unsatisfied NPV shall exist;

- the Issuer shall have executed and delivered to the Trustee the related Supplement, in a form satisfactory to the Trustee and specifying the principal terms of the Notes of the Series;

- the Issuer shall have delivered to the Trustee (A) notice of the form of any Series external credit enhancement and (B) any related agreement executed by the Issuer and the provider thereof;

- the Rating Agency Condition shall be satisfied with respect to the issuance of such Series of Notes;

- the Issuer shall have delivered to the Trustee an officer's certificate of the Issuer dated the issuance date of such Series (upon which the Trustee may conclusively rely) to the effect that the Issuer reasonably believes that (A) no Event of Default or Early Amortization Event then exists, (B) the issuance will not result in the occurrence of an Event of Default or Early Amortization Event for any Series, and (C) prior to (and after giving effect to) such issuances, the

Issuer is and will be in compliance with any Principal Variance or similar collateralization test then applicable to any Series;

- the Issuer shall have delivered to the Trustee an Opinion of Counsel to the effect that (A) the issuance of such Series (i) either has been registered under the Securities Act or need not be so registered, (ii) will not result in the requirement that any outstanding Series not registered under the Securities Act be so registered (unless the Issuer has elected, in its sole discretion, to register those Series of Notes), (iii) will not result in the Issuer being required to be registered as an investment company under the Investment Company Act of 1940, (iv) will not require the Master Indenture or the related Supplement to be qualified under the Trust Indenture Act of 1939 and (v) has been authorized by all necessary action of the Issuer, (B) the Issuer has duly executed and delivered the Notes of such Series to be issued on the initial issuance date, (C) the Notes of such Series constitute enforceable obligations of the Issuer (subject to customary exceptions as to enforceability), and (D) the Trustee has a first priority, perfected security interest in the Trust Estate (and such opinions as to the above-described matters may contain such assumptions and qualifications, and otherwise may be substantially in the form and/or to the effect of, the opinion or opinions as to any of such matters delivered at the closing of the initial Series);

- the Issuer shall have delivered to the Trustee a Tax Opinion, dated the issuance date of such Series, with respect to such issuance;

- if applicable, the Notes representing a Series to be exchanged shall be delivered to the Trustee for cancellation; and

- if applicable, any conditions precedent to the issuance of such Series imposed by any Supplement shall have been satisfied.

The Issuer may direct the Trustee to use the proceeds of any new issuance (i) to purchase Eligible Loans arising under Additional Designated Accounts, (ii) to deposit the net proceeds from the new issuance in the Collection Account or (iii) to retire or redeem any outstanding Series that is eligible for retirement or redemption under the related Supplement.

*Substitutions of Loans and Other Releases*

In the event, and to the extent MCC shall substitute an Account together with all associated Loans and Related Interests pursuant to the TSA, (i) such new substitute Account shall thereupon become a Designated Account and all Loans and Related Interests in respect of such substitute Designated Account, whether such Loans are then existing or thereafter originated, which are thereupon or thereafter conveyed to the Issuer in accordance with the Transfer and Sale Agreement shall constitute part of the Trust Estate subject to the Lien of the Master Indenture, and (ii) the Trustee shall be deemed to have concurrently released to the Issuer, free and clear of the Lien of the Master Indenture, all Loans and Related Interests for which such substitute Loans and Related Interests are being substituted.

In addition, Collections and other Trust Estate assets, to the extent a release to the Issuer is provided therefor in the Servicing Agreement, shall be deemed to have been released to the Issuer free and clear of the Lien of the Master Indenture.

*Issuer Representations and Covenants*

The Issuer represents (among other things), as of the Closing Date for the Notes and, with respect to any subsequent Series, as of the Closing Date specified in the related Supplement for such Series, and agrees as follows:

- *Organization and Good Standing.* The Issuer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has full power, authority and legal right to own its properties and conduct its business as such properties are presently owned and such business is presently conducted, and to execute, deliver and perform its obligations under the Master Indenture, any Supplement and any other Program Agreement to which it is a party and to execute and deliver to the Trustee the Notes.

- *Due Qualification.* The Issuer is duly qualified to do business and is in good standing (or is exempt from such requirement) in any state required in order to conduct its business, and has obtained all necessary licenses and approvals required to conduct its business under applicable law; *provided, however,* that no representation or warranty is made with respect to any qualifications, licenses or approvals which the Trustee would have to obtain to do business in any state in which the Trustee seeks to enforce any Loan or Loan Agreement or rights in the related Metals Collateral or Metals Inventory.

- *Due Authorization; Enforceability.* The execution and delivery of the Master Indenture and any other Program Agreement to which it is a party and the consummation of the transactions provided for in the Program Agreements

الإ

have been duly authorized by the Issuer by all necessary action on its part. The Master Indenture, and each other Program Agreement to which it is a party, constitutes the legal, valid and binding obligation of the Issuer, enforceable against it in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereinafter in effect, affecting the enforcement of creditors' rights in general and except as such enforceability may be limited by general principles of equity (whether considered in a proceeding at law or in equity).

- *No Conflicts.* The execution, delivery and performance of the Master Indenture and any other Program Agreement to which it is a party, the execution and delivery of the Notes of any Series being then issued, and the performance of the transactions contemplated under the Program Agreements by the Issuer, do not (i) contravene its Certificate of Formation or its Limited Liability Company Agreement or any other agreements pursuant to which it is organized, (ii) violate any provision of, or require any filing (except for the filings under the UCC required by the Master Indenture, each of which has been duly made and is in full force and effect), registration, consent or approval under, any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to the Issuer, except for such filings, registrations, consents or approvals as have already been obtained and are in full force and effect, (iii) result in a breach of or constitute a default or require any consent under any indenture or loan or credit agreement or any other agreement, lease or instrument to which the Issuer is a party or by which it or its properties may be bound or affected except those as to which a consent or waiver has been obtained and is in full force and effect and an executed copy of which has been delivered to the Trustee, or (iv) result in, or require, the creation or imposition of any Lien upon or with respect to any of the properties now owned or hereafter acquired by the Issuer other than as specifically contemplated in the Master Indenture.

- *Taxes.* The Issuer has filed all tax returns (federal, state and local) required to be filed in any jurisdiction and has paid or made adequate provision for the payment of all taxes, assessments and other governmental charges shown to be due and payable on such returns from the Issuer or is contesting any such tax, assessment or other governmental charge in good faith through appropriate proceedings. The Issuer knows of no basis for any material additional tax assessment for any fiscal year for which adequate reserves (in accordance with generally accepted accounting principles) have not been established. The charges, accruals and reserves on the books of the Issuer in respect of federal, state and other taxes for all fiscal periods are adequate. The federal income tax liabilities of the Issuer have been determined and paid for all fiscal years.

- *No Violation.* The execution and delivery by the Issuer of the Program Agreements to which it is a party, and the performance of the transactions contemplated thereby, will not conflict with or violate any Requirements of Law applicable to the Issuer.

- *No Proceedings.* There are no proceedings or investigations pending or, to the knowledge of the Issuer, threatened against the Issuer before any court, regulatory body, administrative agency, or other tribunal or governmental instrumentality (i) asserting the invalidity of any Program Agreement or the Notes, (ii) seeking to prevent the issuance of the Notes or the consummation of any of the transactions contemplated by any Program Agreement, (iii) seeking any determination or ruling that, in the reasonable judgment of the Issuer, would materially and adversely affect the performance by the Issuer of its obligations under any Program Agreement, (iv) seeking any determination or ruling that would materially and adversely affect the validity or enforceability of any Program Agreement or the Notes or (v) seeking to affect adversely the income tax attributes of the Notes.

- *All Consents Required.* All approvals, authorizations, consents, orders or other actions of any Person or of any governmental body or official required in connection with the execution and delivery of any Program Agreement and the Notes, the performance of the transactions contemplated thereby, and the fulfillment of the terms thereof, have been obtained.

- *Bona Fide Loans.* Each Loan is at the time of its acquisition by the Issuer from MCC an Eligible Loan originated by MCC arising out of MCC's performance in accordance with the terms of a Loan Agreement. The Issuer has no knowledge at the time of the initial creation of an interest of the Trustee in any Loan hereunder of any fact which should have led it to expect that such Loan would not be enforceable against the Obligor when due.

- *Place of Business.* The sole place of business of the Issuer is located at 4900 Birch Street, Newport Beach, California. Unless and except as otherwise specified in any related Supplement, the Issuer has had no office location other than this location during the four months prior to the Closing Date for any Series.

- *Use of Proceeds.*  No proceeds of the issuance of any Note will be used by the Issuer to purchase or carry any margin security within the meaning of, or otherwise contravene or conflict with any of, Regulations T, U or X of the Board of Governors of the Federal Reserve System.

- *Certain Events.*  As of the Closing Date, no Event of Default or Early Amortization Event, and no condition that with the giving of notice and/or the passage of time would constitute an Event of Default or an Early Amortization Event (a "*Prospective Event of Default*" and "*Prospective Early Amortization Event*", respectively), has occurred or is continuing.

- *Not an Investment Company.*  The Issuer is not an "investment company" or "controlled" by an "investment company" within the meaning of the Investment Company Act, or is exempt from all provisions of such Act.

- *No Claim or Interest.*  Neither the Issuer nor any Person claiming through or under the Issuer has any claim or interest in the lock-box account referred to in the Lock-Box Agreement (except for the Issuer's interest therein subject to the Lien of the Master Indenture).

- *Legal Name.*  The legal name of the Issuer is as set forth in the Master Indenture, and the Issuer operates under no other names including without limitation any tradenames, fictitious names, assumed names or "doing business as" names. Unless and except as otherwise specified in any related Supplement, the Issuer has had no change in its name during the four months prior to the Closing Date for any Series.

- *Sale Treatment*.  The Issuer is treating its acquisition of the Loans and Related Assets, as well as Metals Inventory from time to time, as an acquisition by it of ownership thereof, consistent with the representations and covenants of MCC and MDC (as applicable) with respect thereto contained in the TSA and the OAA.

- *Subsidiaries.*  The Issuer has no subsidiaries.

- *Limited Activities.*  The Issuer engages in no activities other than those contemplated in the Program Agreements or incidental thereto.

- *Certain Security Interest Representations.*  The Issuer further represents and warrants as follows with respect to the security interest in the Loans and Related Interests granted to the Trustee under the Master Indenture:

  - The Master Indenture creates a valid and continuing security interest (as defined in the UCC) in the Loans and Related Interests transferred thereunder in favor of the Trustee, which security interest is prior to all other Liens and is enforceable as such against creditors of and purchasers from the Issuer.

  - The Issuer has taken or caused to be taken all steps necessary to perfect the security interest against the Obligors in the Metals Collateral securing the Loans transferred hereunder.

  - The Loan Agreements evidencing the Loans granted thereunder constitute "tangible chattel paper" within the meaning of the UCC.

  - At the time of granting thereunder the Issuer owned and had good and marketable title to the Loans and Related Interests free and clear of any Lien, claim or encumbrance of any Person (other than Permitted Liens and Liens, if any, which by their terms are released in full upon conveyance thereunder).

  - The Issuer has caused the filing of all appropriate financing statements in the proper filing office in the appropriate jurisdictions under applicable law in order to perfect the grant of the Loans and Related Interests to the Trustee.

  - Other than the transfer to the Trustee pursuant to the Master Indenture, and any Liens or encumbrances which by their terms or otherwise are released in full upon conveyance hereunder, the Issuer has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the Loans and Related Interests. The Issuer has not authorized the filing of and is not aware of any financing statements against the Issuer that include a description of collateral covering the Loans and Related Interests other than any financing statement relating to the transfers hereunder or that has been or is being terminated or that relates to a Lien that is or was released in full upon or prior to the transfer hereunder.  The Issuer is not aware of any judgment or tax lien filings against the Issuer.

50

> ➤ Except as permitted in the related covenant of the Issuer set forth below, the Issuer has no outstanding indebtedness, guaranty or liability. The Issuer is not in default and no waiver of default is currently in effect in the payment of any principal or interest on any indebtedness of the Issuer, and no event or condition exists with respect to any indebtedness of the Issuer that would permit (or that with notice, lapse of time or both would permit) one or more Persons to cause such indebtedness to become due and payable

> ➤ The Issuer has in its possession, or the Servicer or Custodian maintains on behalf of the Issuer possession of, all original copies of the Loan Agreements evidencing the Loans and Related Interests transferred hereunder. Such Loan Agreements do not have any marks or notations indicating that they have been pledged, assigned or otherwise conveyed to any Person other than the Issuer and the Trustee. All financing statements filed or to be filed against the Issuer in favor of the Trustee in connection herewith describing the Loans and Related Interests contain or will contain a statement to the following effect: "A purchase of or security interest in any collateral described in this financing statement will violate the rights of Concord Funding Company, L.L.C. and/or its assignees."

- *Valid Lien Under Master Indenture.* The Master Indenture constitutes a grant of a security interest (as defined in the UCC as in effect in the Relevant UCC State) in, to and under the Trust Estate, securing the Secured Obligations (as defined therein), which grant is enforceable with respect to the existing Loans and any Additional Loans and the proceeds thereof upon execution and delivery of the Master Indenture, and which will be enforceable with respect to such Loans hereafter originated and the proceeds thereof, upon such origination. The Trustee has a first priority perfected security interest in such property, except for Permitted Liens. Except as contemplated in the Master Indenture or any Supplement, neither the Issuer nor any Person claiming through or under the Issuer shall have any claim to or interest in the Collection Account, any Principal Funding Account, the Equalization Account, any Required Amounts Account, or any other Series Account except for the interest of the Issuer in such property as a debtor for purposes of the UCC as in effect in the Relevant UCC State.

- *Valid Transfer Under TSA.* The TSA constitutes a valid transfer, assignment, set-over and conveyance to the Issuer of all right, title and interest of MCC in and to the Loans and other related property conveyed and assigned thereunder, whether then existing or thereafter created in respect of the applicable Designated Accounts and the proceeds thereof.

- *Solvency.* The Issuer is not insolvent and will not be rendered insolvent by the transfers and other transactions contemplated in the Master Indenture.

- *Ownership.* The Issuer is (or, with respect to Loans originated after the date hereof, will be) the legal and beneficial owner of all right, title and interest in and to each Loan and all related Trust Estate assets, and a Lien in all such Trust Estate assets has been or will be granted to the Trustee free and clear of any Lien other than Permitted Liens.

- *Consents, Etc.* All consents, licenses, approvals or authorizations of or registrations or declarations with any Governmental Authority required to be obtained, effected or given by the Issuer in connection with the grant and assignment of the Trust Estate to the Trustee have been duly obtained, effected or given and are in full force and effect.

- *Marking of Files.* The Issuer has clearly and unambiguously marked all its computer records regarding the Loans, other related Trust Estate assets and Metals Inventory as the property of the Issuer subject to the Lien of the Master Indenture and shall maintain such records in a manner such that the Trustee shall have a perfected interest in such Loans and other property.

- *Eligibility.* Each Loan classified as an "Eligible Loan" in any document or report delivered hereunder or under the Servicing Agreement will satisfy the requirements contained in the definition of Eligible Loan as of the time of such document or report. Metals Inventory classified as "Eligible Metals Inventory" in any document or report delivered hereunder or under the Servicing Agreement will satisfy the requirements contained in the definition of Eligible Metals Inventory as of the time of such document or report.

- *Relevant Information.* All Relevant Information provided to the Trustee was true and correct in all material respects as of, and will be true and correct subsequent to, the Closing Date, or with respect to Additional Loans, as of each Subsequent Purchase Date.

- *Loan Consents.* With respect to each Loan then existing, all consents, licenses, approvals or authorizations of or registrations or declarations with any Governmental Authority required to be obtained, effected or given by the Issuer in connection with the conveyance of such Loan to the Issuer and the grant of the Lien in such Loan to the Trustee have been duly obtained, effected or given and are in full force and effect.

- *MCC/MDC Representations.* The representations and warranties of MCC with respect to the Loans and Related Interests set forth in the TSA were true and correct as and when made. The representations and warranties of MDC with respect to Metals Inventory which was the subject of an Advance set forth in the OAA were true and correct as and when made.

- *Compliance with Laws, Etc.* The Issuer agrees it will comply with all applicable laws, rules, regulations, judgments, decrees and orders (including those relating to the Loans and Related Assets, any other Trust Estate assets and any other agreements related thereto) where the failure to do so would result in a Material Adverse Effect.

- *Preservation of Legal Existence.* It will preserve and maintain its legal existence, rights, franchises and privileges in the jurisdiction of its formation, and qualify and remain qualified in good standing in each jurisdiction in which the ownership or lease of property or the conduct of its business requires such qualification, licenses or approvals.

- *Location of Records and Offices.* It will maintain its sole place of business and chief executive office, and will cause the Servicer to keep all records, files and other documents related to the Loans and Related Assets (including all original documents relating thereto), at the addresses referred to in the Servicing Agreement or, upon not less than 30 days' prior written notice given by the Issuer to the Servicer and the Trustee, at such other locations in jurisdictions where all action required pursuant to the Servicing Agreement shall have been taken and completed. The Issuer will at all times maintain its chief executive office within the United States.

- *Reporting Requirements.* Unless the Trustee (upon written direction of a Majority of Noteholders) shall otherwise consent in writing, the Issuer shall furnish to the Trustee and each Rating Agency:

  ➢ *Event of Default or Early Amortization Event.* As soon as possible, and in any event within two Business Days after the Issuer has knowledge of the occurrence of any Event of Default or Early Amortization Event, a written statement of an authorized officer of the Issuer describing such event and the action that the Issuer proposes to take with respect thereto, in each case in reasonable detail;

  ➢ *Material Adverse Effect.* As soon as possible and in any event within two Business Days after the Issuer has knowledge thereof, written notice that describes in reasonable detail any adverse claim against the Trust Estate or any other event or occurrence which, individually or in the aggregate for all such events or occurrences, has had, or has a substantial likelihood of having, a Material Adverse Effect;

  ➢ *Proceedings.* As soon as possible and in any event within two Business Days after the Issuer has knowledge thereof, written notice of (A) any litigation, investigation or proceeding of the type described in a representation above not previously disclosed to the Trustee, and (B) any judgment, settlement or other final disposition with respect to any such previously disclosed litigation, investigation or proceeding;

  ➢ *Change in Personnel.* As soon as possible and in any event within two Business Days after the Issuer has knowledge thereof, written notice of any change in management personnel of the Issuer; and

  ➢ *Other.* Promptly, from time to time, such other information, documents, records or reports respecting the Loans and Related Assets or such other information respecting the condition or operations, financial or otherwise, of the Issuer, in each case as the Trustee (as directed by a Majority of Noteholders in writing) or a Majority of Noteholders may from time to time reasonably request in order to protect the interests of the Trustee or the Noteholders.

- *Amalgamations, Acquisitions, Sales, Etc.* The Issuer agrees that it shall not:

  ➢ be a party to any amalgamation or consolidation, or directly or indirectly purchase or otherwise acquire any assets or any stock of any class of, or any partnership or joint venture interest in, any other Person, or (B) except pursuant to the Program Agreements, directly or indirectly sell, transfer, assign, convey, lease, pledge or grant a security interest in, whether in one transaction or in a series of transactions, all or any material part of its assets, or sell or assign with or without recourse any Loans or Related Assets (other than pursuant to the Program Agreements);

  ➢ except as contemplated in a Program Agreement, (A) make, incur or suffer to exist an investment in, equity contribution to, or payment obligation in respect of the deferred purchase price of property or services from, any Person, or (B) make any loan or advance to any Person other than for reasonable and customary operating expenses; or

> ➢ except as contemplated in any Program Agreement, create any direct or indirect subsidiary or otherwise acquire direct or indirect ownership of any equity interests in any other Person.

- *Change in Name.* The Issuer will not change its legal name or change its identity or entity structure in a manner that would make any previously filed financing statement seriously misleading or the name under or by which it does business, or permit MCC to change its legal name or the name under or by which it does business, unless the Issuer shall have given the Servicer and the Trustee 30 days prior written notice thereof and unless, prior to any such change in name, the Issuer shall have filed (or shall have caused to be filed) such financing statement amendments as are necessary or advisable to maintain and preserve the Trustee's perfected interest in the Trust Estate or as the Servicer or the Trustee (upon written direction of a Majority of Noteholders) determine may be necessary to continue the perfection of the Trustee's interest for the benefit of the Holders in the Trust Estate.

- *Amendment of Charter Documents.* The Issuer will not amend its Certificate of Formation or its Limited Liability Company Agreement without first obtaining (i) the consent of the Trustee (at the direction of a Majority of Noteholders), and (ii) a Ratings Confirmation.

- *Permitted Indebtedness.* The Issuer shall not create, incur or permit to exist any indebtedness, guaranty or liability, except for (A) indebtedness incurred pursuant to the Program Agreements, or (B) reasonable and customary operating expenses incidental to its activities under the Program Agreements in an amount not to exceed $25,000 in any calendar year.

- *Accuracy of Information.* All written information furnished before or after the Closing Date by the Issuer to the Servicer or the Trustee or any Noteholder pursuant to or in connection with any transaction contemplated in the Program Agreements did not, and shall not contain any untrue statement of a material fact or omit to state material facts necessary to make the statements made therein not misleading, in each case in the light of the circumstances under which such statements were made or such information was furnished.

- *Taxes.* The Issuer will file (or cause to be filed on its behalf) all tax returns and reports required by law to be filed by it, will accrue in accordance with generally accepted accounting principles for all taxes payable by it and will pay all taxes and governmental charges shown on such tax returns and reports to be owing by it, except any such taxes or charges which are being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with generally accepted accounting principles have been set aside on its books. To the extent any taxes are imposed with respect to the Loans and Related Interests conveyed to the Issuer, the Issuer will bear liability for and pay such taxes in accordance with the foregoing.

- *Servicer's Covenants and Agreements.* The Issuer will cause the Servicer and the Trustee to duly observe and perform all covenants and agreements of the Servicer or Trustee, as applicable, set forth in the Master Indenture, the Servicing Agreement or in any other Program Agreement.

- *Security Interests.* Except for the grants and assignments hereunder and under any Supplement, the Issuer will not sell, pledge, assign or transfer to any other Person, or grant, create, incur, assume or suffer to exist any Lien (other than a Permitted Lien), on any Loan, Loan Agreement or in respect of any other Trust Estate assets, whether now existing or hereafter created or arising, or any interest therein; the Issuer will immediately notify the Trustee of the existence of any Lien (other than a Permitted Lien) on any Loan or such other Trust Estate assets; and the Issuer shall defend the right, title and interest of the Trustee in, to and under the Trust Estate, whether now existing or hereafter created or arising, against all claims of third parties claiming through or under the Issuer.

- *Collection Policies.* The Issuer shall comply with and perform its obligations and shall take all actions reasonably within its control to cause MCC and the Servicer to comply with and perform its obligations in accordance with the Collection Policy except insofar as any failure to comply or perform would not have a Material Adverse Effect.

- *Delivery of Collections.* In the event that the Issuer receives Collections directly, the Issuer agrees to deposit such Collections into the Collection Account as soon as practicable after the receipt thereof, but in no event later than two Business Day after receipt thereof; *provided,* that Collections received in the form of Metals Inventory shall be deposited into the Collection Metals Account upon receipt thereof in accordance with the Servicing Agreement.

- *Notice of Liens.* The Issuer shall notify the Trustee promptly after becoming aware of any Lien on any Loan or with respect to any other Trust Estate assets other than Permitted Liens.

- *No Other Business*. The Issuer agrees to engage in no business other than the business contemplated hereunder, under the TSA, under the OAA and under the other Program Agreements to which it is a party.

- *Enforcement of Agreements*. The Issuer agrees to take all action necessary and appropriate to enforce its rights and claims under the TSA, the OAA, the Servicing Agreement and each other Program Agreement to which it is a party.

- *Separate Business*. The Issuer will not permit its assets to be commingled with those of MCC, MDC or any Affiliate of either, and the Issuer shall maintain separate entity records and books of account from those of MCC, MDC and its Affiliates. The Issuer will conduct its business solely in its own name and will cause MCC, MDC and its Affiliates to conduct their business solely in their own names so as not to mislead others as to the identity of the entity with which those others are concerned. The Issuer will provide for its own operating expenses and liabilities from its own funds. The Issuer will not hold itself out, or permit itself to be held out, as having agreed to pay, or as being liable for, the debts of MCC, MDC or any of its Affiliates. The Issuer shall cause MCC, MDC and its Affiliates not to hold themselves out, or permit themselves to be held out, as having agreed to pay, or as being liable for, the debts of the Issuer. The Issuer will maintain an arm's length relationship with MCC, MDC and its Affiliates with respect to any transactions between the Issuer, on the one hand, and MCC or MDC or its Affiliates, on the other. Not less than one manager of the Issuer will be an "Independent Manager" as defined in the Issuer's Certificate of Formation in existence on the Closing Date.

- *Loan, Metal Acquisitions*. The Issuer shall not acquire Loans from any Person other than MCC, and shall not acquire Metals from any Person other than MDC (or, if applicable, from an Obligor in connection with an acquisition or liquidation of Metals Collateral).

- *Transfer and Sale Notices; Amendments; Additions/Removals*. The Issuer (i) shall promptly give the Trustee copies of any notices, reports or certificates given or delivered to the Issuer under the TSA and each other Program Agreement, (ii) shall not amend or consent to the amendment of an Loan Agreement with respect to Loans constituting part of the Trust Estate which amendment would have a material adverse effect on the collectability of, or the timing of receipt of collections on, such Loans, and (iii) shall not permit the addition or removal of a Loan to or from the operation of the TSA unless there is a corresponding right or obligation of the Issuer to add or remove such Loan to or from the Trust Estate.

*Allocations of Collections and Other Funds*

The Master Indenture provides that all payments of amounts due and payable on the Notes that are to be made from amounts withdrawn from the Collection Account or any other Trust Account shall be made on behalf of the Issuer by the Trustee or by another Paying Agent, and no amounts so withdrawn from the Collection Account or any other Trust Account shall be paid at the direction of the Issuer except as provided in the Servicing Agreement and in the related Supplement.

Collections are to be allocated to each Series in accordance with the Servicing Agreement and any related Supplement. Amounts so allocated to any Series will not be available to the Noteholders of any other Series, except as specified in the Servicing Agreement or in the related Supplement. Allocations of Collections among the Classes in any Series and to any related provider of liquidity or credit enhancement for a Series shall be set forth in the related Supplements and by written order of the Servicer.

*Withholding*

The Master Indenture provides that if any withholding tax is imposed on the Issuer's payment to the Noteholders, such withholding tax shall reduce the amount otherwise distributable to the Noteholders as provided below. The Trustee is hereby authorized and directed to retain from amounts otherwise distributable to the Noteholders sufficient funds for the payment of any tax that is legally owed by the Issuer. This authorization shall not prevent the Trustee from contesting any tax in appropriate proceedings and withholding payment of the tax, if permitted by law, pending the outcome of the proceedings. The amount of any withholding tax imposed on any distributions shall be treated as cash distributed to the Noteholder at the time it is withheld by the Issuer and remitted to the appropriate taxing authority. If withholding tax might be payable on a distribution to a non-U.S. Noteholder, the Trustee may in its sole discretion withhold an appropriate amount to cover that possibility. The Issuer shall have no obligation to hold any Noteholder harmless against, or to "gross up", any withholding taxes imposed on any of the Issuer's payments (or allocations of income) to any Noteholder.

*Unclaimed Funds*

The Master Indenture provides that, on the request of the Issuer, any money deposited with the Trustee or any Paying Agent, or then held by the Issuer, in trust for the payment of the principal of or interest on any Note and remaining unclaimed for

two years after it has become due and payable shall be released from the Trust Estate and paid to the Issuer. The Holder of the Note on which payment was due shall thereafter look only to the Issuer for payment as an unsecured general creditor. All liability of the Trustee or the Paying Agent regarding that trust money to the extent so paid to the Issuer shall thereupon cease. The Trustee or the Paying Agent, before being required to make any payment, may at the expense of the Issuer cause to be published once, in a newspaper of general circulation published in the English language and customarily published on each Business Day in New York, New York and in the city in which the principal corporate trust office of the Trustee is located, notice that such money remains unclaimed and that, after a date specified therein, which shall be not less than 30 days from the date of the publication, any unclaimed balance of that money then remaining will be repaid to the Issuer. The Trustee may also adopt and employ, at the expense of the Issuer, any other reasonable means of notification of a release of payment (including mailing notice of the release to Noteholders whose Notes have been called but have not been surrendered for redemption or whose right to monies payable but not claimed is determinable from the records of any Paying Agent, such notice to be nailed to the last address of record of each such Noteholder).

*Issuer May Consolidate, Etc. Only on Certain Terms*

The Master Indenture provides that the Issuer shall not consolidate or merge with or into any other Person, or transfer its assets substantially as an entirety to any Person, unless:

- the Person (if other than the Issuer) formed by or surviving the consolidation or merger or that acquires the assets of the Issuer substantially as an entirety expressly assumes the due and punctual payment of the principal of and interest on all the Notes and the performance of the terms of the Master Indenture and each Supplement on the part of the Issuer to be performed, by a written agreement, executed and delivered to the Trustee, in form and substance satisfactory to the Trustee;

- immediately after giving effect to the transaction, no Event of Default or Early Amortization Event with respect to any Series has occurred and is continuing;

- the Issuer has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel each stating that (A) the consolidation, merger or transfer and the supplemental indenture described in clause (i) above comply with this Section, (B) all conditions precedent in this Section have been complied with and (C) the written agreement described in clause (i) above is duly authorized, executed and delivered and is valid, binding, and enforceable against the successor entity;

- the Rating Agency Condition is satisfied after taking into account the transaction;

- the Issuer has received a tax opinion dated the date of the consolidation, merger, or transfer (and has delivered copies of it to the Trustee) to the effect that the transaction will not have any material adverse tax consequence to the Issuer or any Noteholder;

- the Issuer has received an Opinion of Counsel dated the date of the consolidation, merger, or transfer (and has delivered copies of it to the Trustee) to the effect that the transaction will not require the Issuer to register as an "investment company" under the Investment Company Act; and

- any action that is necessary to maintain the Lien and security interest created by the Master Indenture and any Supplement has been taken and the Issuer has received an Opinion of Counsel dated the date of the consolidation, merger, or transfer (and has delivered copies of it to the Trustee) to the effect that the Trustee has, and after giving effect to such consolidation, merger, or transfer will continue to have, a first priority, perfected security interest in the Trust Estate and Series Collateral, if applicable.

Except pursuant to any Program Agreement, the Issuer shall not transfer any of its assets substantially as an entirety, including those included in the Trust Estate, to any Person unless:

- the Person that acquires assets of the Issuer the transfer of which is restricted by the Master Indenture (A) is a United States citizen or a Person organized and existing under the laws of the United States of America or any state, (B) expressly assumes the due and punctual payment of the principal of and interest on all the Notes and the performance of the terms of the Master Indenture on the part of the Issuer to be performed by a supplemental indenture or other written agreement, executed and delivered to the Trustee, in form and substance satisfactory to the Trustee, (C) expressly agrees in that supplemental indenture or other written agreement that all right, title, and interest transferred to it shall be subject and subordinate to the rights of Holders of the Notes, (D) expressly agrees to indemnify the Issuer against any loss, liability or expense related to the Master Indenture and the Notes and (E) expressly agrees in that

55

supplemental indenture or other written agreement that it shall make all filings with the Commission (and any other appropriate Person) required by the Exchange Act in connection with the Notes;

- immediately after giving effect to the transaction, no Event of Default or Early Amortization Event with respect to any Series has occurred and is continuing;

- the Rating Agency Condition is satisfied after taking into account the transaction;

- the Issuer has received a tax opinion (and has delivered copies of it to the Trustee) to the effect that the transaction will not have any material adverse tax consequence to the Issuer or any Noteholder;

- any action that is necessary to maintain the Lien and security interest created by the Master Indenture and any Supplement has been taken and the Issuer has received an Opinion of Counsel dated the date of the consolidation, merger, or transfer (and has delivered copies of it to the Trustee) to the effect that the Trustee has, and after giving effect to such consolidation, merger, or transfer will continue to have, a first priority, perfected security interest in the Trust Estate and, if applicable, Series Collateral; and

- the Issuer has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel each stating that the transfer and the supplemental indenture or other written agreement comply with this Section and that all conditions precedent in this Section have been complied with (including any filing required by the Exchange Act).

*Early Amortization Events; Events of Default and Remedies*

The Early Amortization Events applicable to the Notes of any outstanding Series shall be specified in the related Supplement, and the consequences of the occurrence of such Early Amortization Events with respect to such Series shall be specified in the related Supplement.

An *"Event of Default"* with respect to any Note of any outstanding Series means any one of the events designated as such above in "Summary of Terms - Events of Default" (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body).

Within five days after its occurrence, the Issuer shall deliver to the Trustee written notice in the form of an Officer's Certificate stating the particulars of any event that with the giving of notice or the lapse of time or both would become an Event of Default, its status, and what action the Issuer is taking or proposes to take regarding the event.

If an Event of Default in clause (iii) of the listing thereof shall occur, the unpaid principal amount of the Notes of all Series, together with accrued and unpaid interest on the Notes through the date of acceleration, shall become immediately due and payable and no notice to such effect from the Issuer, any Noteholder or any other Person to the Trustee shall be required. If any other Event of Default described in the definition thereof occurs and is continuing, the Majority Noteholders of each outstanding Series may declare the Notes of all Series to be immediately due and payable by a notice in writing to the Issuer and to the Trustee. Upon any such declaration the unpaid principal amount of the Notes, together with accrued and unpaid interest on the Notes through the date of acceleration, shall become immediately due and payable.

If at any time a declaration of acceleration of maturity has been made but before a judgment or decree for payment of the money due has been obtained by the Trustee as provided in this Article, Majority Noteholders for each outstanding Series of Notes may rescind and annul the declaration and its consequences by written notice to the Issuer and the Trustee if the Issuer has paid or deposited with the Trustee a sum sufficient to pay:

    i)        all payments of principal of and interest on the Notes and all other amounts that would then be due under the Master Indenture and related Supplements or upon the Notes if the Event of Default giving rise to the acceleration had not occurred; and

    ii)       all sums paid or advanced by the Trustee under the Program Agreements and the reasonable compensation, expenses, disbursements and advances of the Trustee and their respective agents and outside counsel; and

    iii)      all Events of Default, other than the nonpayment of the principal of the Notes that has become due solely by such acceleration, have been cured or waived as provided in the relevant provision of the Master Indenture.

No such rescission shall affect any subsequent default or impair any right consequent thereto.

*Collection of Indebtedness and Suits for Enforcement by Trustee*

The Issuer covenants that upon the acceleration of the maturity of the Notes and the demand of the Trustee, the Issuer will immediately pay to the Trustee for the benefit of the Noteholders the whole amount then due and payable on the Notes for principal and interest, with interest upon the overdue principal and, to the extent that payments of such interest shall be legally enforceable, upon overdue installments of interest, in the order set forth in the applicable Supplement and, in addition thereto, any further amount necessary to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel.

If the Issuer fails to pay these amounts forthwith upon the demand of the Trustee, the Trustee, in its own name and as Trustee of an express trust, may institute a proceeding for the collection of the sums so due and unpaid, and may prosecute the proceeding to judgment or final decree, and may enforce the same against the Issuer and collect the monies adjudged or decreed to be payable in the manner provided by law.  However, liability for any payment whether resulting from a collection action or otherwise shall lie solely with the Trust Estate assets, and no claim for payment shall be pursued except against the Trust Estate assets.

If an Event of Default occurs and is continuing, the Trustee may, in its discretion and subject to certain provisions of the Master Indenture, proceed to protect and enforce its rights and the rights of the Noteholders under the Master Indenture and related Supplements by whatever appropriate proceedings the Trustee deems most effective to protect and enforce any of those rights, whether for the specific enforcement of any covenant or agreement contained in the Master Indenture, any Supplement or the Servicing Agreement or in aid of the exercise of any power granted in the Master Indenture, any Supplement or the Servicing Agreement, or to enforce any other proper remedy or legal or equitable right vested in the Trustee by the Master Indenture, any Supplement or the Servicing Agreement or by law.

If proceedings relating to the Issuer under Title 11 of the United States Code or any other applicable federal or state bankruptcy, insolvency, or other similar law are pending, or if a receiver, assignee, or trustee in bankruptcy or reorganization, liquidator, sequestrator, or similar official has been appointed for or taken possession of the Issuer or its property, or if any other comparable judicial proceedings relating to the Issuer or the creditors or property of the Issuer are pending, then regardless of whether the principal of any Notes shall then be payable by their terms or by declaration or otherwise and regardless of whether the Trustee has made any demand pursuant to this Section, the Trustee shall be entitled and empowered, by intervention in the proceedings or otherwise:

       (a)     to file and prove a claim for the whole amount of principal and interest owing and unpaid on the Notes, and to file any other papers or documents that may be appropriate to have the claims of the Trustee and of the Noteholders allowed in any proceedings relating to the Issuer or other obligor upon the Notes, or to the creditors or property of the Issuer or other obligor,

       (b)     to vote on behalf of the Noteholders in any election of a trustee or a standby trustee in any arrangement, reorganization, liquidation, or other bankruptcy or insolvency proceedings or in any election of any Person performing similar functions in comparable proceedings, and

       (c)     to collect any monies or other property payable or deliverable on any such claims, and to distribute all amounts received on the claims of the Noteholders and of the Trustee on their behalf,

and any trustee, receiver, liquidator, custodian, or other similar official is authorized by each of the Noteholders to make payments to the Trustee, and, if the Trustee consents to payments going directly to the Noteholders, to pay to the Trustee such amounts as shall be sufficient to cover reasonable compensation to the Trustee, each predecessor Trustee, and their respective agents, attorneys, and counsel, and all other expenses and liabilities incurred (including attorneys' fees and expenses), and all advances made, by the Trustee and each predecessor Trustee except as a result of gross negligence or bad faith.

Nothing contained in the Master Indenture shall be deemed to authorize the Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Noteholders any plan of reorganization, arrangement, adjustment, or composition affecting the Notes or the rights of any Noteholder, or to authorize the Trustee to vote regarding the claim of any Noteholder in any such proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or Person performing similar functions.

In any proceedings involving the Master Indenture or the Notes the Trustee shall represent all the Noteholders, and it shall not be necessary to make any Noteholders parties to the proceedings.

*Remedies*

If an Event of Default has occurred and is continuing and the maturity of the Notes has been accelerated, the Trustee shall do one or more of the following:

- institute proceedings in its own name and as trustee for an express trust for the collection of all amounts then payable on the Notes or under the Master Indenture or any Supplement (whether by declaration or otherwise), enforce any judgment obtained, and collect from the Trust Estate securing the Notes monies adjudged due;

- only if so instructed in writing by the Majority Noteholders of each outstanding Series, sell or liquidate all or a portion of the Trust Estate assets at one or more public or private sales to the extent permitted by law; *provided, however,* that if the proceeds of such sale or liquidation distributable to the Noteholders are insufficient to discharge in full all amounts then due and unpaid upon the Notes for principal and interest, the Trustee shall not proceed with such sale or liquidation unless the Holders of 100% of the Notes of each outstanding Series (other than any Notes then held by the Issuer or any Affiliate thereof) consent in writing thereto;

- institute proceedings from time to time for the complete or partial foreclosure of the Master Indenture with respect to the Trust Estate (or the applicable Supplement with respect to Series Collateral, if any); and

- exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights and remedies of the Trustee or the Noteholders under the Master Indenture and related Supplements.

For the purpose of determining the sufficiency or insufficiency in clause (ii) above, the Trustee may, but need not, obtain and conclusively rely upon an opinion of an independent investment banking or accounting firm of national reputation as to the feasibility of the proposed action and as to the sufficiency of the Trust Estate for these purposes.

The proceeds of the sale or other liquidation of the Trust Estate shall be treated as Collections and shall be distributed in accordance with the terms of the Program Agreements after being deposited into the Collection Account. If the Trustee collects any money or property pursuant to the foregoing, it shall allocate such money or property among each outstanding Series based on the Series Allocation Percentages, respectively, and (after paying all amounts then due and owing to the Trustee under the Program Agreements and, to the extent provided in the relevant Supplement, all amounts then due and owing to any credit or liquidity enhancement provider under its related agreement with the Issuer) shall distribute such money or property to the Issuer in accordance with the Servicing Agreement and the Supplements.

*Optional Preservation of Trust Assets*

If the Notes have been accelerated following an Event of Default and the declaration and its consequences have not been rescinded and annulled, the Trustee may, but need not, elect to maintain possession of the Trust Estate. It is the intent of the parties to the Master Indenture and the Noteholders that all principal of and interest on the Notes be paid in full when due, and the Trustee is required to consider the parties' wishes when determining whether or not to maintain possession of the Trust Estate. In determining whether to maintain possession of the Trust Estate, the Trustee may, but need not, obtain and rely upon an opinion of an independent investment banking or accounting firm of national reputation as to the feasibility of the proposed action and as to the sufficiency of the Trust Estate for these purposes.

*Limitation on Suits*

No Noteholder shall have any right to institute any proceedings, judicial or otherwise, regarding the Master Indenture or related Supplement, or for the appointment of a receiver or trustee, or for any other remedy under the Master Indenture or related Supplement, unless:

- Holders of not less than 25% of the Principal Amount of each Series of Notes have made written request to the Trustee to institute the proceeding in its own name as Trustee;

- those Noteholders have previously given written notice to the Trustee of a continuing Event of Default;

- those Noteholders have offered to the Trustee indemnity satisfactory to it against the costs, expenses, and liabilities to be incurred in compliance with their request (it being understood that the

Trustee shall not reject any proposed indemnity on grounds of the financial incapacity of the indemnitor if such indemnitor has a net worth exceeding $100,000,000);

- the Trustee for 60 days after its receipt of that notice, request and offer of indemnity has failed to institute appropriate proceedings; and

- no direction inconsistent with the written request has been given to the Trustee during the 60-day period by the Majority Noteholders of any outstanding Series.

No one or more Noteholders may in any manner whatever under any provision of the Master Indenture affect, disturb, or prejudice the rights of any other Noteholder or obtain or seek to obtain priority or preference over any other Noteholder or enforce any right under the Master Indenture, except in the manner provided in the Master Indenture and for the equal and ratable benefit of all the Noteholders.

If the Trustee receives conflicting or inconsistent requests and indemnity from two or more groups of Noteholders, each representing less than Majority Noteholders of the related Series, the Trustee in its sole discretion may determine what action, if any, shall be taken, notwithstanding any other provisions of the Master Indenture.

*Rights of Noteholders to Direct Trustee*

Majority Noteholders of any outstanding Series of Notes may direct the time, method, and place of conducting any proceeding for any remedy available to the Trustee regarding the Notes of that Series or exercising any trust or power conferred on the Trustee regarding the Notes of that Series.

Notwithstanding the foregoing and subject to Section 6.01 of the Master Indenture:

- the Trustee may decline any direction if the Trustee, after being advised by counsel, determines that the action so directed is in conflict with any rule of law or with the Master Indenture, and

- the Trustee may decline any direction if the Trustee in good faith, by a Responsible Officer of the Trustee, determines that the proceedings so directed would be illegal or involve the Trustee in personal liability or be unjustly prejudicial to Noteholders not parties to that direction.

Waiver of Past Defaults

Prior to the declaration of the acceleration of the maturity of the Notes, Majority Noteholders of each outstanding Series of Notes may, on behalf of all the Noteholders, waive in writing any past default on the Notes and its consequences, except:

(i) a default in the payment of the principal or interest on any Note or

(ii) an Event of Default described in clause (iii) of the definition thereof (each of which may be waived only with the consent of all of the Noteholders), or

(iii) regarding any of the provisions under the Master Indenture that cannot be modified or amended without the consent of the Noteholder of each outstanding Note affected.

Upon any written waiver, the default shall cease to exist, and any Event of Default arising from it shall be deemed to have been cured for every purpose of the Master Indenture. No such waiver shall extend to any subsequent or other default or impair any right consequent to it.

*Undertaking for Costs*

All parties to the Master Indenture agree, and each Noteholder by its acceptance of a Note shall be deemed to have agreed, that in any suit for the enforcement of any right or remedy under the Master Indenture, or in any suit against the Trustee for any action taken, suffered, or omitted by it as Trustee, any court may in its discretion require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and that the court may in its discretion assess reasonable cots, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by that party litigant. The foregoing shall not apply to any suit instituted by the Trustee, to any suit instituted by

any Noteholders holding in the aggregate more than 10% of the principal balance of the outstanding Notes, or to any suit instituted by any Noteholder for the enforcement of the payment of the principal or interest on any Note on or after the Payment Date on which the principal or interest was due (or, in the case of redemption, on or after the applicable redemption date).

## DESCRIPTION OF THE NOTES AND SERIES 2013-1 SUPPLEMENT

The Notes will be issued pursuant to the Master Indenture, as supplemented by the Series 2013-1 Supplement thereto.

The Class A and Class B Notes will be represented by a master note (the "Master Note") held by the Trustee on behalf of, and ownership thereof will be recorded only through the book-entry system of, The Depository Trust Company ("DTC") in denominations of $100,000 and integral multiples of $1,000 in excess thereof. Beneficial owners will not receive certificates representing their ownership interest in the Notes. The Company has been advised by DTC that upon receipt of payment DTC will credit, on its book-entry records and transfer system, the accounts of the DTC participants through whom Notes are directly or indirectly owned.

**Interest and Principal Payments**

Payments of principal and interest on the Notes will be made on the fifteenth calendar day of each month, or, if such day is not a Business Day, the next succeeding Business Day (each such date, a *"Payment Date"*), commencing on April 15, 2013, to Noteholders of record as of the day immediately preceding such Payment Date (the *"Record Date"*). Payments by DTC to its participants and by such participants to owners of the Notes or their representatives will be governed by customary practices and standing instructions and will be the sole responsibility of DTC, such DTC participants or such representatives, respectively.

*Interest Payments.* The Notes will bear interest from the Closing Date at the applicable interest rate for the respective Class as set forth below (the *"Note Rate"*).

The Note Rate for each Class of Notes offered hereby is as follows:

- 2.42% per annum for the Class A Notes (the *"Class A Note Rate"*).

- 3.92% per annum on the Class B Notes (the *"Class B Note Rate"*).

On each Payment Date, the interest payments due with respect to the Notes since the last Payment Date will be the interest that has accrued on such Notes since the last Payment Date through (but not including) the day preceding such Payment Date (or in the case of the first Payment Date, since the Closing Date) (the *"Interest Accrual Period"*) at the applicable Note Rate applied to the outstanding principal balance of the Notes outstanding during such Interest Accrual Period, after giving effect to payments (if any) of principal to the Noteholders on the prior Payment Date.

It is a condition to the initial issuance of the Series 2013-1 Notes that an amount at least equal to the Required Amounts for Series 2013-1 shall at such time be on deposit in the Required Amounts Account for Series 2013-1.

*Determination of Class A Interest and Class A Additional Amounts.*

(i) Interest on the outstanding Class A Principal Amount shall accrue during any Interest Accrual Period at the Class A Note Rate, calculated in each case on the basis of 12 months of 30 days.

(ii) Interest with respect to the Class A Notes due but not paid on any Payment Date will be due on demand with additional interest on the amount at the Alternate Base Rate, to the extent permitted by law, with such interest to be compounded daily.

*Determination of Class B Interest*

(i) Interest on the outstanding Class B Principal Amount shall accrue during any Interest Accrual Period at the Class B Note Rate, calculated in each case on the basis of on the basis of 12 months of 30 days.

*Determination of Class A Principal and Class B Principal; Subordination of Class B Principal*

Class A Principal and Class B Principal shall be payable, from the Series 2013-1 Investor Percentage of daily Collections allocated therefor and on deposit in the Series 2013-1 Principal Funding Account in accordance with the Servicing Agreement, in the manner and order of priority set forth below:

(i) during any Amortization Period, on each Payment Date during such Amortization Period, Class A Principal shall be payable in an amount equal to the largest Class A Controlled Distribution Amount which does not exceed such allocated Collections on deposit in the Series 2013-1 Principal Funding Account as of the close of business on the last Business Day of the calendar month preceding the month in which such Payment Date occurs (plus, in respect of a Payment Date constituting the Series 2013-1 Maturity Date or a Payment Date following acceleration of the Series 2013-1 Notes after an Event of Default, the Series Allocation Percentage of any amounts then on deposit in the Equalization Cash Account, which in such circumstances shall be allocated to the Series 2013-1 Principal Funding Account for repayment of principal on Series 2013-1 as aforesaid), *provided, however,* that (A) with respect to any Payment Date, Class A Principal may not exceed the Class A Principal Amount outstanding, (B) on and after the Series 2013-1 Maturity Date, or following acceleration of the Class A Notes after an Event of Default, the Class A Principal payable shall be an amount equal to the Class A Principal Amount outstanding on such date, and  (C) to the extent that such allocated Collections do not exceed the smallest Class A Controlled Distribution Amount, Class A Principal shall (except as specified in clause (B) above) be deemed to be zero;

(ii) during any Amortization Period, on each Payment Date during such Amortization Period, (A) no Class B Principal shall be payable until all Class A Principal Amount outstanding has been repaid in full (or a priority allocation under clause (i) above results in sufficient funds to repay the Class A Principal Amount in full on the current upcoming Payment Date), and (B) thereafter Class B Principal shall be payable in an amount equal to the largest Class B Controlled Distribution Amount which does not exceed the remaining allocated Collections on deposit in the Series 2013-1 Principal Funding Account, not theretofore allocated to pay Class A Principal, as of the close of business on the last Business Day of the calendar month preceding the month in which such Payment Date occurs (plus, in respect of a Payment Date constituting the Series 2013-1 Maturity Date or a Payment Date following acceleration of the Series 2013-1 Notes after an Event of Default, the Series Allocation Percentage of any amounts then on deposit in the Equalization Cash Account, which in such circumstances shall be allocated to the Series 2013-1 Principal Funding Account for repayment of principal on Series 2013-1 as aforesaid), *provided, however,* that (1) with respect to any Payment Date, Class B Principal may not exceed the Class B Principal Amount outstanding, (2) on and after the Series 2013-1 Maturity Date, or following acceleration of the Class B Notes after an Event of Default, the Class B Principal payable shall be an amount equal to the Class B Principal Amount outstanding on such date (but subject to subclause (A) of this clause (ii) above), and  (3) to the extent that such allocated Collections do not exceed the smallest Class B Controlled Distribution Amount, Class B Principal shall (except as specified in clause (2) above) be deemed to be zero;

*Distributions*

On each Payment Date, the Trustee agrees in the Series 2013-1 Supplement that it shall, in accordance with instructions set out in the applicable Daily Report, distribute to the Class A Holders and Class B Holders, as applicable, at or before 2:00 p.m., New York City time, all accrued and unpaid Class A Interest and Class B Interest, as applicable, payable on such Payment Date with respect to such Class, and any additional interest payable to the Class A Holders as described above, to the extent funds are available for such payment in the Series 2013-1 Required Amounts Account.  In addition, the Trustee shall, in accordance with instructions set out in the applicable Daily Report, distribute to the Holders at or before 2:00 p m., New York City time, the following amounts:

(a) on any Payment Date, from funds deposited in the Series 2013-1 Principal Funding Account, the Class A Principal to be distributed in repayment of the Class A Principal Amount as and to the extent provided in "--Determination of Class A Principal and Class B Principal" above;

(b) on any Payment Date, from funds deposited in the Series 2013-1 Principal Funding Account, the Class B Principal to be distributed in repayment of the Class B Principal Amount as and to the extent provided in "--Determination of Class A Principal and Class B Principal" above and

(c)     on any Payment Date, any further amounts in respect of Servicing Fees, etc. to be paid to the parties entitled to such payment from the Series 2013-1 Required Amounts Account, in accordance with the Servicing Agreement (and without duplication of the payments described above).

In addition, following repayment in full of all principal amount outstanding and accrued interest on the Series 2013-1 Notes, and all other Secured Obligations related to Series 2013-1, any amounts remaining in the Required Amounts Account for Series 2013-1 are to be released from such account and allocated as Collections in accordance with the Servicing Agreement (or, if no other Series of Notes or other Secured Obligations are then outstanding, released to the Issuer free and clear of the lien of the Master Indenture and the applicable Supplement).

All distributions described in this section shall be distributed to the Holders or other parties entitled thereto in immediately available funds by wire transfer, in accordance with written instructions provided by the applicable payee or its authorized representative.

## OPTIONAL REDEMPTION

The Series 2013-1 Notes may be redeemed in whole but not in part, at the option of the Issuer, on any day on or after the Payment Date occurring in January 2015, with the proceeds of the sale of any notes of an additional subsequent Series or with other refinancing proceeds or other sources of funds lawfully obtained by the Issuer, provided that in connection with such redemption all Secured Obligations relating to Series 2013-1 accrued through the date of redemption are repaid in full on such date.

## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS

### General

THIS DISCUSSION WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN. IT IS NOT INTENDED OR WRITTEN TO BE USED, AND IT CANNOT BE USED BY ANY TAXPAYER, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER. A TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

The following is a general and brief discussion of certain United States federal income tax considerations with respect to the purchase, ownership and disposition of the Notes offered hereby.  The discussion that follows, and the opinions described below of Andrews Kurth LLP, special federal tax counsel, are based upon current provisions of the Internal Revenue Code of 1986, as amended (the *"Code"*), existing and proposed Treasury Regulations, current administrative rulings, judicial decisions and other applicable authorities in effect as of the date hereof, all of which are subject to change, possibly with retroactive effect. There can be no assurance that the IRS will not challenge the conclusions reached in this description of "Certain United States Federal Income Tax Considerations," and no ruling from the IRS has been or will be sought on any of the issues discussed below. Furthermore, legislative, judicial or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements set forth below.

This discussion does not attempt to explain fully every relevant technical aspect of the applicable tax provisions.  This discussion also does not attempt to deal with all aspects of federal income taxation that may be relevant to all holders of Notes in light of their personal investment or tax circumstances.  Also, this discussion does not describe tax consequences to certain types of holders who may be subject to special treatment under the federal income tax laws including, without limitation, financial institutions, dealers in securities or currencies, insurance companies, and persons who hold the Notes as part of a straddle, hedging or conversion transaction.  Nothing herein is or should be construed as legal or tax advice to any prospective investor. Accordingly, prospective investors should consult their own tax advisors and tax return preparers regarding the preparation of any item on a tax return even where the anticipated tax treatment has been discussed in this Private Placement Memorandum. Prospective investors consult with their own tax advisors as to the federal, state, local, foreign and any other tax consequences to them of the purchase, ownership and disposition of the Notes.

### Classification of the Issuer

In connection with the issuance of the Notes, Andrews Kurth LLP will deliver its opinion that, for federal income tax purposes, under existing law the Issuer will not be treated as an association or publicly traded partnership taxable as a corporation.  The Amended and Restated Limited Liability Company Agreement of the Issuer (the *"Operating Agreement"*) will restrict the number of owners of equity interests in the Issuer to no more than 100 persons, as ownership is determined for purposes of Treasury Regulation Section 1.7704-1(h).  In addition, except as described in the following paragraph, the owners of equity interests in the Issuer will agree not to take any action which would be inconsistent with the characterization of the Issuer

as a partnership for federal income tax purposes. In rendering this opinion, Andrews Kurth LLP has assumed that the terms of the various documents, including, without limitation, the Issuer's Operating Agreement, will be substantially in the form contemplated by this Private Placement Memorandum and will be complied with by all of the parties to the transaction.

If, in the future, there is a single owner of equity interests in the Issuer, rather than multiple owners, then for federal income tax purposes, the Issuer may be disregarded as a separate entity from the owner of the interests in the Issuer. It is further assumed that, at that time, such owner of interests in the Issuer will take all action necessary, if any, or refrain from taking any inconsistent action so as to ensure the Issuer is, for federal income tax purposes, disregarded as a separate entity from such owner. Pursuant to the terms of the Issuer's Operating Agreement, the single owner of the Issuer's equity interests will agree not to take any action inconsistent with that characterization.

In any case where the Issuer is treated as a partnership for federal income tax purposes, it is the opinion of Andrews Kurth LLP that it will not constitute a publicly traded partnership taxable as a corporation. That opinion is based upon Andrews Kurth LLP's conclusions that (1) the nature of the income of the Issuer will exempt it from publicly traded partnership characterization and/or (2) the Issuer will at all times have no more than 100 owners of its equity interests. If, contrary to the opinion of Andrews Kurth LLP, the Issuer were treated as a publicly traded partnership taxable as a corporation for federal income tax purposes, it would be subject to corporate income tax on its taxable income. The Issuer's taxable income would include all its income on the Loans and other assets in the Trust Estate, which may be reduced by the interest expense on the Notes issued by the Issuer to the extent the Notes are properly characterized as debt. Any such corporate income tax could materially reduce the cash available to make payments on the Notes.

## Classification of the Series 2013-1 Notes

Andrews Kurth LLP will deliver its opinion that, for federal income tax purposes, under existing law the Series 2013-1 Notes will be treated as indebtedness. In rendering this opinion, Andrews Kurth LLP has assumed that the terms of the various documents relating to the issuance of the Notes will be substantially in the form contemplated by this Private Placement Memorandum and will be complied with by all of the parties to the transaction. Those terms include a requirement, which each investor agrees to by virtue of acquiring ownership of any beneficial interest in a Series 2013-1 Note, that the Issuer and the investors in the Series 2013-1 Notes treat such Notes as indebtedness for federal income tax purposes.

Although it is the opinion of Andrews Kurth LLP that the Series 2013-1 Notes will be characterized as indebtedness for federal income tax purposes, no assurance can be given that this characterization of the Series 2013-1 Notes will prevail. If the IRS successfully asserted that one or more of such Notes or a Class thereof did not represent debt for federal income tax purposes, such Notes or Class thereof might be treated as equity interests in the Issuer.

If the Issuer were classified as a partnership other than a publicly traded partnership taxable as a corporation, the Issuer itself would not be subject to United States federal income tax. However, holders of Notes that were determined to be equity interests in the partnership would be required to take into account their allocable share of the Issuer's income and deductions. Such treatment may have adverse federal income tax consequences for some Noteholders. For example:

(a) income to some tax-exempt entities, including pension funds, may constitute "unrelated business taxable income,"

(b) income to foreign holders is often subject to U.S. tax and U.S. tax return filing and withholding requirements,

(c) individual holders might be subject to certain limitations on their ability to deduct their share of Issuer expenses, and

(d) income from the Issuer's assets would be taxable to such Noteholders without regard to whether cash distributions are actually made by the Issuer or any particular Noteholder's method of tax accounting.

The opinions of Andrews Kurth LLP do not foreclose the possibility of a contrary determination by the IRS or by a court of competent jurisdiction, or of a contrary position by the IRS or Treasury Department in regulations or rulings issued in the future.

The discussion that follows assumes that the Issuer will not be treated as an association or publicly traded partnership taxable as a corporation and that all of the Notes will be treated as indebtedness for federal income tax purposes.

**General Federal Income Tax Treatment of Noteholders**

**Payments of Interest.** An investor will be taxed on the amount of payments of interest on a Note as ordinary interest income at the time it accrues or is received in a manner that is consistent with the investor's regular method of accounting for United States federal income tax purposes. This treatment assumes that all payments on the Notes are denominated in U.S. Dollars. This treatment also assumes that an investor does not acquire its Notes at a discount as discussed below.

**Sale or Other Disposition of a Note.** An investor who disposes of a Note, whether by sale, exchange for other property, or payment by the Issuer, will recognize taxable gain or loss equal to the difference between the amount realized on the sale or other disposition (not including any amount attributable to accrued but unpaid interest not previously included in income, which will be taxable as such), and the investor's adjusted tax basis in the Note. In general, an investor's adjusted tax basis in a Note will be equal to the investor's initial purchase price increased by any accrued original issue discount or market discount previously included in income by the investor and decreased by the amount of any premium previously amortized and the amount of any payments, other than payments of stated interest, previously received by the investor with respect to the Note. Any gain or loss recognized upon the sale or other disposition of a Note will be capital gain or loss so long as the Note is a "capital asset" in the hands of the investor. For non-corporate investors, under current law, capital gain recognized on the sale or other disposition of a Note held by the investor for more than one year will be taxed at preferential income tax rates. Capital gain for a Note held for one year or less is currently taxed at the rates applicable to ordinary income. Taxpayers must aggregate capital gains and losses for each taxable year. In the event a taxpayer realizes a net capital loss for any year there are limits on the amount of capital losses which can be deducted.

**Information Reporting and Backup Withholding.** The Issuer will be required to report annually to the IRS, and to each non-corporate Noteholder, the amount of interest paid on the Notes (including any OID) for each calendar year. Each non-corporate Noteholder, other than Noteholders who are not subject to the reporting requirements, will be required to provide, under penalties of perjury, a certificate (Form W-9) containing the Noteholder's name, address, correct federal taxpayer identification number and a statement that the Noteholder is not subject to backup withholding. Should a non-exempt Noteholder fail to provide the required certification, the Issuer will be required to withhold or cause to be withheld 28% of the interest otherwise payable to the Noteholder (including any OID) and remit the withheld amounts to the IRS as a credit against the Noteholder's federal income tax liability.

**Special Tax Rules**

**Purchase at a Discount.** An investor who purchases a Note as part of the initial offering by the Issuer for an issue price that is less than its "stated redemption price at maturity" will generally be considered to have purchased the Note at an original issue discount for United States federal income tax purposes, referred to as "OID". In general, the stated redemption price at maturity for a Note is equal to the principal amount. If a Note is acquired with OID greater than a de minimis amount (i.e. 0.25% of the Note's principal amount or other stated redemption price at maturity multiplied by the full number of years included in determining the weighted average maturity of the Note), the investor will be required to include in income each year, taxable as ordinary income in the same manner as cash interest payments, a portion of the OID. For cash basis investors, such as individuals, the requirement that OID be accrued as income each year means the investor recognizes taxable income even though the investor may not receive cash corresponding to that income. The amount of OID accrued as income each year is based upon a formula which looks at the constant yield on the Notes and the term to maturity so as to annually allocate a proportionate share of OID. Under these rules, investors will generally be required to include in income increasingly greater amounts of OID in successive accrual periods.

Generally, an investor that acquires a Note that has more than a de minimis amount of OID must include in gross income the sum of the "daily portions" of the OID for each day on which it owns a Note, including the date of purchase but excluding the date of disposition. In the case of an original holder of a Note, the daily portions of OID with respect to the Note generally would be determined as follows. A calculation will be made of the portion of OID that accrues on the Note during each successive monthly accrual period (or shorter period in respect of the date of original issue or the final payment date). This will be done, in the case of each full monthly accrual period, by adding (1) the present value of all remaining payments to be received on the Note under the prepayment assumption used in respect of the Loans and (2) any payments received during that accrual period, and subtracting from that total the "adjusted issue price" of the Note at the beginning of that accrual period. The adjusted issue price of a Note at the beginning of the first accrual period is generally the purchase price paid by the holder for the Note. The adjusted issue price of a Note at the beginning of a subsequent accrual period is the adjusted issue price at the beginning of the immediately preceding accrual period plus the amount of OID allocable to that accrual period and reduced by the amount of any payment on the Note (other than qualified stated interest) made at the end of or during that accrual period. The OID accruing during that accrual period will then be divided by the number of days in the period to determine the daily portion of OID for each day in the period. With respect to an initial accrual period shorter than a full monthly accrual period, the daily portions of OID must be determined according to a reasonable method, provided that the method is consistent with the method used to determine the yield to maturity of the Note.

For purposes of calculating the daily portion of OID to be accrued as income, the method of determining yield to maturity is not clear, and in particular it is not clear whether prepayments on the underlying contracts should be taken into account in determining such yield. In determining the weighted average maturity of the Notes for purposes of calculating OID, the Issuer expects to use a reasonable assumption regarding prepayment of the Loans. No representation is made as to the actual prepayments to be made on the Loans. This method of calculating the accrual of OID will cause the accrual of OID to either increase or decrease (but never below zero) in any given accrual period to reflect the fact that prepayments are occurring at a faster or slower rate than the prepayment assumption used in respect of the Loans.

In determining whether a Note has OID, the issue price of the Note may not necessarily equal the investor's purchase price, although they should be approximately the same. The issue price of a Note will equal the initial offering price to the public at which price a substantial amount of the Notes is sold, not including sales to bond houses, brokers or similar persons or organizations acting in the capacity of underwriters or wholesalers.

If an investor acquires a Note in a secondary market transaction for a purchase price which is less than the principal amount or other amount payable at maturity of the Note, the difference is referred to for tax purposes as market discount. Similarly to OID, an investor must accrue a portion of the market discount each year. Unlike OID, however, an investor does not include accrued market discount in ordinary income each year. Rather, the aggregate amount of accrued market discount is included in income when an investor sells or otherwise disposes of the Note or receives principal amounts. At that time, the portion of the amount realized by the investor on the sale or other disposition of the Note equal to accrued market discount is taxed as ordinary income rather than as long term capital gain. The amount of market discount which accrues annually will be calculated on a straight-line basis over the remaining term to maturity of the Note unless the investor elects to accrue market discount using a constant-yield method.

If an investor would prefer to be taxed on the annual accrual of market discount each year rather than being taxed on the aggregate amount of all accrued market discount when the Note is sold or otherwise disposed of, the investor can file an election to do so. The adjusted basis of a Note subject to the election will be increased to reflect the market discount included in gross income, thereby reducing gain or increasing any loss on a sale or other taxable disposition of the Note. Such an election would apply to all of the investor's debt investments acquired in or after the taxable year in which the Notes are acquired and not just to the Notes.

Limitations imposed by the federal tax law which are intended to match deductions with the taxation of income may defer deductions for interest paid by an investor on indebtedness incurred or continued, or short-sale expenses incurred, to purchase or carry a Note with market discount. A Noteholder who elects to include market discount in gross income as it accrues is exempt from this rule.

Whenever an investor accrues and includes in income an amount of OID or market discount, the investor's adjusted basis in the corresponding Note in increased by that same amount. As a result, the investor would recognize a lower capital gain or greater capital loss on the sale or other disposition of the Note.

In general, if the amount of OID or market discount would be less than 0.25% of the Note's principal or other stated redemption price at maturity multiplied by the number of full years included in determining the weighted average maturity of the Note, the investor can disregard the OID or market discount rules.

**Purchase at a Premium.** If an investor purchases a Note as part of the initial offering for a price that exceeds the principal amount or other amount payable at maturity, the investor will be considered to have an amortizable bond premium. An investor can elect to accrue a portion of the premium each year as a deduction to offset interest income on the corresponding Note. The amount of premium which can be amortized and deducted each year is calculated using a constant-yield method over the remaining term to maturity of the Note. The deduction is available only to offset interest income on the corresponding Note; it cannot be used as a deduction to the extent it exceeds taxable Note interest. The adjusted tax basis which an investor has in a Note must be reduced by the amount of premium for which a deduction is claimed. Because the basis is reduced, the investor would recognize a larger taxable capital gain or a smaller capital loss on the sale or other disposition of the Note. If an investor elects to amortize and deduct premium, the election will apply to all of the investor's debt investments and not just to the Notes.

If an investor purchases in a secondary market transaction a Note which was originally issued with OID for an amount which is less than the sum of all amounts payable on the Note after the purchase date other than payments of qualified stated interest but in excess of its adjusted issue price (*i.e.*, the original issue price plus any accrued OID as those terms are described above), the excess is referred to for tax purposes as "acquisition premium." The investor would be permitted to reduce the daily portions of OID the investor would otherwise include in income by an amount corresponding to the ratio of (1) the excess of the investor's purchase price for the Note over the adjusted issue price of the Note as of the purchase date to (2) the excess of all amounts payable on the Note after the purchase date, other than payments of qualified stated interest, over the Note's adjusted issue price.

**Election to Treat All Interest as Original Issue Discount**.  An investor may elect to include in gross income all interest that accrues on a Note using the constant-yield method described above under the heading "Purchase at a Discount," with modifications described below.  For purposes of this election, interest includes qualified stated interest, OID, de minimis OID, market discount, de minimis market discount, and unstated interest, as adjusted by any amortizable bond premium or acquisition premium.

In applying the constant-yield method to a Note with respect to which this election has been made, the issue price of the Note will equal the electing investor's adjusted basis in the Note immediately after its acquisition.  The issue date of the Note will be the date of its acquisition by the electing investor, and no payments on the Note will be treated as payments of qualified stated interest.  This election, if made, may not be revoked without the consent of the IRS.  Investors should consult with their own tax advisors as to the effect in their circumstances of making this election.

**Foreign Investors.**  Special tax rules apply to the purchase of Notes by foreign persons.  For U.S. tax purposes, foreign investors include any person who is not taxable as a partnership and is not:

- a citizen or resident of the United States,

- a corporation or other entity treated as a corporation for tax purposes, created or organized in or under the laws of the United States, any state or the District of Columbia,

- an estate the income of which is includible in gross income for U.S. federal income tax purposes, regardless of its sources,

- a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust, or

- a trust that has a valid election in effect under applicable United States Treasury Regulations to be treated as a United States person.

If a partnership (including for this purpose any entity treated as a partnership for federal income tax purposes) is a beneficial owner of a Note, the treatment of a partner in the partnership will generally depend upon the status of the partner and upon the activities of the partnership.  A Noteholder that is a partnership and partners in such partnership should consult their tax advisors about the federal income tax considerations of holding and disposing a Note, as the case may be.

Interest paid or accrued to a foreign investor that is not effectively connected with the conduct of a trade or business within the United States by the investor will be considered "portfolio interest" and generally will not be subject to United States federal income tax or withholding tax as long as the foreign investor does not actually or constructively own 10 percent or more of the capital or profits interest in the Issuer or is not a controlled foreign corporation related to the Issuer through stock ownership  or a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business.  Additionally, the foreign investor must provide an appropriate statement (Form W-8 BEN or successor form) to the Issuer or paying agent that is signed under penalties of perjury, certifying that the beneficial owner of the Note is a foreign person and providing that foreign person's name and address.  Additional reporting requirements may apply to interest payments made to a foreign investor that is not an individual or corporation (or an entity treated as a corporation for federal income tax purposes) holding the Note on its own behalf.  If the information provided in this statement changes, the foreign investor must provide a new form within 30 days.  If the foreign investor fails to satisfy these requirements so that interest on the investor's Notes was not portfolio interest, interest payments would be subject to United States federal withholding tax at a rate of 30% unless reduced or eliminated under an applicable income tax treaty.  To qualify for any reduction as the result of an income tax treaty, the foreign investor must provide the paying agent with a Form W-8 BEN or successor form.

Any capital gain realized on the sale or other taxable disposition of a Note by a foreign investor will be exempt from United States federal income tax, provided that:

(1)     the gain is not effectively connected with the conduct of a trade or business in the United States by the investor, and

(2)     in the case of an individual foreign investor, the investor is not present in the United States for 183 days or more during the taxable year.

If an individual foreign investor is present in the U.S. for 183 days or more during the taxable year, the gain on the sale or other disposition of the Notes could be subject to a flat 30% United States federal income tax unless reduced by an applicable tax treaty. If the interest, gain or income on a Note held by a foreign investor is effectively connected with the conduct of a trade or business in the United States by the investor, the Noteholder will be subject to United States federal income tax on the interest, gain or income at regular federal income tax rates. At the same time, the Noteholder may be exempt from withholding tax if a Form W-8 ECI or successor form is furnished to the paying agent. In addition, if the foreign investor is a foreign corporation, it may be subject to a branch profits tax equal to 30% of its "effectively connected earnings and profits" for the taxable year, as adjusted, unless it qualifies for a lower rate under an applicable tax treaty.

**Information Reporting and Backup Withholding- Foreign Investors.** Payments to a foreign investor of interest on a Note (including OID), and amounts withheld from such payments, if any, generally will be required to be reported to the IRS and to the foreign investor.

United States backup withholding tax generally will not apply to payments of interest to foreign investors if the statement described in "—Foreign Investors" is duly provided by the foreign investor or the foreign investor otherwise establishes an exemption, provided that the Issuer or its paying agent do not have actual knowledge or reason to know that the foreign investor is a United States person.

Payment of the proceeds of a sale or other disposition (including a retirement or redemption) of a Note effected by the U.S. office of a U.S. or foreign broker will be subject to information reporting and backup withholding unless the foreign investor properly certifies under penalties of perjury as to its foreign status and certain other conditions are met or the foreign investor otherwise establishes an exemption. Information reporting requirements and backup withholding generally will not apply to any payment of the proceeds of the sale of a Note effected outside the United States by a foreign office of a broker. However, unless such a broker has documentary evidence in its records that the foreign investor is a non-U.S. holder and certain other conditions are met, or the foreign investor otherwise establishes an exemption, information reporting will apply to a payment of the proceeds of the sale or disposition of a Note effected outside the United States by such a broker if it has certain relationship with the United States.

If a foreign investor fails to provide necessary documentation to the Issuer or its paying agent regarding the investor's taxpayer identification number or certification of exempt status, a 28% backup withholding tax may be applied to Note payments to that investor. Any amounts withheld under the backup withholding rules will be allowed as a refund or credit against the foreign investor's U.S. federal income tax liability provided the required information is furnished to the IRS.

**Additional Tax on Net Investment Income**

For tax years beginning after December 31, 2012, a 3.8% tax applies to the "net investment income" of certain U.S. citizens and resident aliens and on the undistributed "net investment income" of certain estates and trusts. Among other items, "net investment income" generally includes interest and certain net gain from the disposition of property, such as the Notes, less certain deductions. Investors should consult their tax advisors with respect to the tax consequences of the legislation described above.

**Legislation Involving Payments to Certain Foreign Entities**

The Foreign Account Tax Compliance Act ("FACTA") would impose a 30% withholding tax on any payments on the Issuer's obligations made to a foreign financial institution or non-financial foreign entity (including, in some cases, when such foreign financial institution or entity is acting as an intermediary), and on the gross proceeds of the sale or other disposition of the Issuer's obligations, unless (i) in the case of a foreign financial institution, such institution enters into an agreement with the U.S. government to withhold on certain payments, and to collect and provide to the U.S. tax authorities substantial information regarding U.S. account holders of such institution (which includes certain equity and debt holders of such institution, as well as certain account holders that are foreign entities with U.S. owners), (ii) in the case of a non-financial foreign entity, such entity certifies it does not have any substantial U.S. owners or provides the withholding agent with a certification identifying the direct and indirect U.S. owners of the entity, or (iii) the foreign financial institution or non-financial foreign entity otherwise qualifies for an exemption from these rules. Under certain circumstances, an investor might be eligible for refunds or credits of such taxes.

The Treasury Department recently issued final Treasury Regulations providing that FATCA withholding generally will only apply to payments of interest on certain debt obligations made on or after January 1, 2014 and to payments of gross proceeds from a sale or other disposition of such debt obligations after December 31, 2016. However, the final Treasury Regulations provide that debt obligations issued prior to January 1, 2014 are not subject to FATCA. Therefore, withholding under these rules would not be required on the Notes absent a "significant modification" of the Notes that occurs after January 1, 2014. Investors are encouraged to consult with their own tax advisors regarding these withholding rules.

**State and Local Tax Consequences**

Because of the differences in state and local tax laws and their applicability to different investors, it is not possible to summarize the potential state and local tax consequences of purchasing, holding or disposing of the Notes and no opinions of counsel have been obtained regarding state tax matters. *Accordingly, the Issuer recommends that each prospective investor consult a tax advisor regarding the state and local tax consequences of the purchase, ownership and disposition of Notes.*

<div align="center">

**ERISA CONSIDERATIONS**

</div>

**A fiduciary of an employee benefit plan or other retirement arrangement subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") should consider the fiduciary standards under ERISA in the context of the plan's particular circumstances before authorizing an investment of a portion of such plan's assets in the Notes. Accordingly, among other factors, such fiduciary should consider (i) whether the investment is for the exclusive benefit of plan participants and their beneficiaries; (ii) whether the investment satisfies the diversification requirements of Section 404 of ERISA; (iii) whether the investment is in accordance with the documents and instruments governing the plan and (iv) whether the investment is prudent, considering the nature of the investment.**

**Fiduciaries of employee benefit plans and certain other retirement plans and arrangements that are subject to Title I of ERISA or Section 4975 of the Code, including individual retirement accounts and annuities, Keogh plans and entities in which such plans, accounts, annuities or arrangements are invested (any of the foregoing, a "Plan"), persons acting on behalf of a Plan, or persons using the assets of a Plan ("Plan Investors"), should review** carefully with their legal advisors whether the purchase or holding of the Notes could either give rise to a transaction that is prohibited under ERISA or the Code or cause the any of the Trust Estate assets to be treated as plan assets for purposes of regulations of the Department of Labor set forth in 29 C.F.R. 2510.3-101 (the *"Plan Asset Regulations"*). Prospective investors should be aware that, although certain exceptions from the application of the prohibited transaction rules and the Plan Asset Regulations exist, there can be no assurance that any such exception will apply with respect to the acquisition of a Note.

Under the Plan Asset Regulations, if a Class of Note is treated as having substantial equity features, the purchaser of a Note of such Class could be treated as having acquired a direct interest in the Trust Estate assets securing such Notes. In that event, the purchase, holding, or resale of such Notes could result in a transaction that is prohibited under ERISA or the Code. The Issuer believes that the Class A Notes will be treated as debt obligations without significant equity features for purposes of the Plan Asset Regulations. Accordingly, a Plan that acquires a Class A Note should not be treated as having acquired a direct interest in the assets of the Trust Estate. However, there can be no complete assurance that each of the Class A Notes will be treated as debt obligations without significant equity features for purposes of the Plan Asset Regulations.

Regardless whether the Class A Notes are treated as debt or equity for purposes of ERISA, the acquisition or holding of Class A Notes by or on behalf of a Plan could still be considered to give rise to a prohibited transaction if the Issuer, the Indenture Trustee or any of their respective affiliates is or becomes a party in interest or a disqualified person with respect to such Plan or in the event that a subsequent transfer of a Class A Note is between a Plan and a party in interest or disqualified person with respect to such Plan. However, one or more exemptions may be available with respect to certain prohibited transaction rules of ERISA that might apply in connection with the initial purchase, holding and resale of the Class A Notes depending in part upon the type of Plan fiduciary making the decision to acquire Class A Notes and the circumstances under which such decision is made. These exemptions include, but are not limited to, (i) PTCE 96-23, regarding investments determined by in-house asset managers, (ii) PTCE 95-60, regarding investments by insurance company general accounts; (iii) PTCE 91-38, regarding investments by bank collective investment funds; (iv) PTCE 90-1, regarding investments by insurance company pooled separate accounts; or (v) PTCE 84-14, regarding transactions negotiated by qualified professional asset managers. Before purchasing Class A Notes a Plan subject to the fiduciary responsibility provisions of ERISA or described in Section 4975(e)(1) (and not exempt under Section 4975(g)) of the Code should consult with its counsel to determine whether the conditions of any exemption would be met. A purchaser of a Class A Note should be aware, however, that even if the conditions specified in one or more exemptions are met, the scope of the relief provided by an exemption might not cover all acts that might be construed as prohibited transactions.

With respect to the Class B Notes, it is unclear whether such Notes would be treated as indebtedness without substantial equity features for purposes of the Plan Assets Regulations. As a result, the purchase and holding of Class B Notes by a Plan might result in prohibited transactions under ERISA and the Code. Accordingly, the Class B Notes may not be acquired by a Plan. Each investor that acquires the Class B Notes, or to whom the Class B Notes are transferred, will be required to represent that it is not a Plan and is not acting on behalf of or investing the assets of a Plan.

Employee plans that are governmental plans (as defined in Section 3(32) of ERISA) and certain church plans (as defined in Section 3(33) of ERISA), are not subject to ERISA; however, such plans may be subject to comparable restrictions under federal, state or local law.

Any Plan fiduciary considering the purchase of a Note should consult with its counsel with respect to the potential applicability of ERISA and the Code to such investment. Moreover, each Plan fiduciary should determine whether, under the general fiduciary standards of investment prudence and diversification, an investment in the Notes is appropriate for the Plan, taking into account the overall investment policy of the Plan and the composition of the Plan's investment portfolio. The sale of Notes to a Plan is in no respect a representation by the Issuer that the investment meets all relevant legal requirements with respect to investments by Plans generally or any particular Plan, or that the investment is appropriate for Plans generally or any particular Plan.

## RATINGS

As a condition to the issuance of the Class A Notes, the Class A Notes must be rated at least "A" by Standard and Poor's Ratings Services ("*S&P*" also being sometimes referred to as a *"Rating Agency"*). As a condition to the issuance of the Class B Notes, the Class B Notes must be rated at least "BBB" by S&P.

A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time. The ratings assigned to the Notes address the likelihood of the receipt by the Noteholders of all timely distributions of interest, and the payment in full of the respective Note principal balance no later than the Series 2013-1 Maturity Date. The ratings assigned to the Notes do not represent any assessment of the likelihood that principal prepayments might differ from those originally anticipated or address the possibility that Noteholders might suffer a lower than anticipated yield.

## PLAN OF DISTRIBUTION

**The Issuer expects to sell the Notes offered hereby to Piper Jaffray & Co. as the Initial Purchaser ("Initial Purchaser") in a private placement under the Securities Act. If such sale is consummated, the Initial Purchaser will offer the Notes to persons who will be deemed to represent that they qualify as both "qualified institutional buyers" as defined in Rule 144A and "qualified purchasers" as defined in Section(2)(a)(52)(A) of the Investment Company Act of 1940, as amended (the "Investment Company Act"). The Notes will bear a legend referring to the foregoing restrictions, and because of such restrictions, no secondary trading market for the Notes is expected to develop and purchasers must bear the risk of their investment for an indefinite amount of time. See "Transfer Restrictions". The Notes are offered only through the Initial Purchaser when, as and if issued by the Issuer, subject to the prior sale or withdrawal, cancellation or modification of the offer without notice, and the right of the Issuer and/or the Initial Purchaser to reject any subscription, in whole or in part. It is expected that the Notes will be available for delivery in book-entry form only on or about March 26, 2013.**

## LEGAL MATTERS

Certain legal matters relating to the Notes will be passed upon for the Issuer by Andrews Kurth LLP, Washington, D.C. and New York, NY. Certain legal matters relating to MCC and MDC will be passed upon for them by Gregory Walker, in-house counsel. Certain federal income tax matters will be passed upon for the Issuer by Andrews Kurth LLP, Washington, D.C and New York, NY.

**INDEX OF PRINCIPAL TERMS**

Adjusted Eligible Pool Balance ................................7
Amortization Period...........................................12
Backup Servicer.................................................28
Backup Servicer Fee ..........................................29
Class A Note Rate...............................................60
Class A Notes.......................................................1
Class B Note Rate................................................60
Class B Notes.......................................................1
CMC....................................................................27
Code.....................................................................62
Collateral Demand ..............................................9
Collection Account.............................................36
Collection Cash Account ...................................36
Collection Metals Account ................................36
Company..............................................................24
Corporate Trust Office ......................................28
Designated Accounts............................................4
Early Amortization Event ..................................10
Required Amounts..............................................36
Equalization Account.........................................36
Required Amounts Account ...............................36
Equalization Cash Account ...............................36
Equalization Metals Account ............................36
Equity ...................................................................4
ERISA..................................................................68
Event of Default..................................................56
Events of Default................................................11
Interest Accrual Period.......................................60
Initial Purchaser............................................... ..69
Investment Company Act...................................69
Issuer...................................................................1
Loan.......................................................................4
Loans and Related Interests...............................29
Master Indenture ............................................ ..cover
MCC.......................................................................2
MDC.......................................................................3
Metals....................................................................4
Metals Collateral..................................................4
Metals Depository................................................3

Metals Depository Agreement ..................................3
Metals Inventory ......................................................4
Monex......................................................................24
Negative Principal Variance....................................7
Note Rate.................................................................60
Notes..........................................................................1
NSC..........................................................................27
OAA............................................................................3
Obligors.....................................................................4
Operating Agreement..............................................62
Payment Date.........................................................(ii)
Plan..........................................................................68
Plan Asset Regulations...........................................68
Plan Investors..........................................................68
Principal Funding Account .....................................36
Principal Variance .....................................................7
Prospective Early Amortization Event...................49
Prospective Event of Default ..................................49
Rating Agency.........................................................69
Record Date.............................................................60
S&P..........................................................................69
SCC...........................................................................27
Secured Obligations................................................46
Securities Act.......................................................cover
Series 2013-1 Notes..................................................1
Series 2013-1 Supplement ..................................cover
Series Collateral......................................................46
Servicer......................................................................2
Servicer Default......................................................43
Servicing Agreement.................................................2
Servicing Fee .............................................................2
Termination Notice .................................................43
Trust Estate................................................................3
Trustee.....................................................................28
Trustee Fee..............................................................28
TSA.............................................................................3
Unsatisfied NPV ........................................................7

## DEFINITIONS OF CERTAIN TERMS

*"Account"* means the contractual relationship between an Obligor and MCC evidenced by the related Loan Agreement, pursuant to which (if such Account is a Designated Account) Loans may be originated from time to time and be conveyed to the Issuer.

*"Additional Designated Accounts"* has the meaning assigned such term in Section 2.02 of the TSA.

*"Additional Loans"* has the meaning assigned such term in Section 2.01 of the TSA.

*"Additional Loans and Related Interests"* has the meaning given to such term in Section 2.01 of the TSA.

*"Adjusted Eligible Pool Balance"* means, for any date of determination, an amount calculated as follows:  (i) the aggregate of the Outstanding Balances of all Eligible Loans as of such date, minus (ii) the Aggregate Volatility Adjustment for such date, minus (iii) the Concentration Adjustment for such date.

*"Adjusted Inventory Balance"* means, for any date of determination an aggregate amount equal to the sum of: (a) the product of (1) the aggregate Wholesale Value of all Eligible Metals Inventory that is not hedged less the Silver Inventory Concentration Adjustment on such date times (2) 66% plus (b) the product of (1) the aggregate Wholesale Value of all Eligible Metals Inventory that is Hedged on such date times (2) 83%.

*"Advance"* means any transfer and assignment by MDC (at its option) to the Issuer of Eligible Metals Inventory as a capital contribution pursuant to Section 2.01(a) of the OAA, or by MDC (at its option) to the Issuer of Dollars as a capital contribution pursuant to Section 2.01(b) of the OAA.

*"Advance Date"* means any Business Day on which MDC makes an optional Advance to the Issuer.

*"Affiliate"* means, with respect to a particular Person, (a) any Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person, or (b) any Person who is a director or officer or general partner (i) of such Person, (ii) of any subsidiary of such Person, or (iii) of any Person described in clause (a) above.  For purposes of this definition, control of a Person shall mean the power, direct or indirect, (i) to vote 5% or more of the securities having ordinary voting power to elect the directors of such Person, or (ii) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

*"Aggregate Principal Amount"* means, as of any date of determination, the sum of the Principal Amounts of all Series of Notes issued and outstanding on such date of determination.

*"Aggregate Volatility Adjustment"* means the aggregate of, for each Eligible Loan and as of any date of determination, the excess of (i) the Outstanding Balance of such Eligible Loan, over (ii) the Collateral Realization Value for such Eligible Loan.

*"Alternate Base Rate"* means, on any day, a fluctuating rate of interest per annum equal to the highest of:

> (a) the Prime Rate reported as of the close of business of the preceding Business Day, and

> (b) the Federal Funds Rate plus 0.50%.

*"Amortization Period"*  means the period commencing with the Amortization Period Commencement Date, and ending on the day on which the Class A Principal Amount and Class B Principal Amount have each been repaid in full.

*"Amortization Period Commencement Date"* means the earlier of (i) the Early Amortization Commencement Date, or (ii) the Series 2013-1 Maturity Date.

*"Banking Day"* means any day on which dealings in U.S. dollar deposits may be entered into between a bank located in London, England and a bank located in New York, New York.

*"Bankruptcy Code"* means Title 11 of the United States Code, as amended and in effect from time to time.

*"Business Day"* means any day other than a Saturday, a Sunday or a day on which banking institutions in Chicago, Illinois, New York, New York or Los Angeles, California are authorized or obligated by law or executive order to be closed.

"*Class*" means, with respect to any Series, any one of the classes of Notes (if any) of that Series as specified in the related Supplement.

"*Class A Controlled Distribution Amount*" means, with respect to any Payment Date, an amount equal to $100,000 and integral multiples of $50,000 in excess thereof, not to exceed in the aggregate the Class A Principal Amount as of such Payment Date (prior to giving effect to any distribution in respect of principal of the Class A Notes to be made on such Payment Date).

"*Class A Holder*" means a Holder (as defined in Annex X to the Master Indenture) of a Class A Note.

"*Class A Interest*" means the Note Interest payable in respect of the Class A Notes as calculated in accordance with the applicable provisions of the Servicing Agreement and the Series 2013-1 Supplement.

"*Class A Principal*" means the Note Principal payable in respect of the Class A Notes as calculated in accordance with the applicable provisions of the Servicing Agreement and the Series 2013-1 Supplement.

"*Class A Principal Amount*" means, at any time, the sum of the principal amounts advanced in payment for Purchases made at or prior to that time, reduced (but not below zero) by the aggregate amount of all distributions that have been made to the Class A Holders in repayment of principal.

"*Class B Controlled Distribution Amount*" means, with respect to any Payment Date, an amount equal to $100,000 and integral multiples of $50,000 in excess thereof, not to exceed in the aggregate the Class B Principal Amount as of such Payment Date (prior to giving effect to any distribution in respect of principal of the Class B Notes to be made on such Payment Date).

"*Class B Holder*" means a Holder (as defined in Annex X to the Master Indenture) of a Class B Note.

"*Class B Interest*" means the Note Interest payable in respect of the Class B Notes as calculated in accordance with the applicable provisions of the Servicing Agreement and the Series 2013-1 Supplement.

"*Class B Principal*" means the Note Principal payable in respect of the Class B Notes as calculated in accordance with the applicable provisions of the Servicing Agreement and the Series 2013-1 Supplement.

"*Class B Principal Amount*" means, at any time, the aggregate principal amount of Class B Notes issued on the Closing Date, reduced (but not below zero) by the aggregate amount of all distributions that have been made to the Class B Holders in repayment of principal.

"*Closing Date*" means, with respect to any Series, the date specified as the Closing Date for such Series in the related Supplement.

"*Collateral Realization Value*" means, for any Loan and any date of determination, the aggregate of the sum of: (a) the products of (1) the number of ounces of each Metal constituting the Eligible Metals Collateral for such Loan which is not hedged, times (2) 66% of the Wholesale Metal Price for such Metal as of the day preceding the date of determination plus (b) the products of (1) the number of ounces of each Metal constituting the Eligible Metals Collateral for such Loan which is Hedged times (2) 83% of the Wholesale Metal Price for such Metal as of the day preceding the date of determination.

"*Collection Policies*" means the collection, customer relations and servicing policies of MCC that apply to Loans, as such policies currently exist and as such policies may be amended, modified or supplemented from time to time.

"*Collections*" means all payments received from an Obligor in respect of a Loan and posted to the books and records of the Servicer, in the form of cash, checks or any other form of payment in accordance with the related Loan Agreement, and shall also be deemed to include Eligible Metals Inventory received in respect of a Loan to the extent provided in, and subject to the limitations specified in, the Servicing Agreement.

"*COMEX*" means Commodity Exchange, Inc.

"*Commodity Loans*" means those transactions undertaken pursuant to a Loan Agreement in which MCC loans Metal to an Obligor directly, as opposed to making a loan of Dollars to be used for the purchase of a quantity of Metal (*i.e.*, a Loan), which Commodity Loans although originated pursuant to the same Loan Agreement in respect of which Loans may be originated, are not to be conveyed to the Issuer under the TSA.

"*Concentration Adjustment*" means, for any date of determination, the sum of: (1) the Obligor Concentration Adjustment, (2) the Foreign Concentration Adjustment, (3) the Single Country Concentration Adjustment and (4) the Silver Loan Concentration Adjustment for such date.

"*Corporate Trust Office*" means the principal office of the Trustee at which at any particular time its corporate trust business shall be administered, which office at the date of the execution of the Master Indenture is located at 2 North LaSalle Street, Suite 1020, Chicago, IL, 60602.

"*Custodian*" means BNY as custodian under the Custody Agreement.

"*Custody Agreement*" means the Custody Agreement among the Custodian, the Issuer, the Servicer and the Trustee, dated as of October 2, 2002, with respect to the original Loan Agreements evidencing the Loans, as the same may be amended, supplemented, restated or other modified from time to time.

"*Cut-Off Date*" means the Business Day preceding each Purchase Date with respect to such Loans under the TSA.

"*Daily Report*" means a report substantially in the form of *Exhibit C* to the Servicing Agreement, as the form of such Daily Report may be amended or revised from time to time with not less than ten (10) Business Days prior written notice to the Trustee and each Rating Agency, to be prepared and delivered by the Servicer as specified in the Servicing Agreement.

"*Delineated Principal Funding Period*" means any temporary period (if any) specified in a related Supplement as a Delineated Principal Funding Period for the purpose of providing allocations to the Principal Funding Account to redeem or prepay during the Revolving Period a portion of the outstanding Principal Amount of the related Series.

"*Dollars*", "*$*" or "*U.S. $*" means United States dollars and, where the context requires, means Dollars paid and/or held in the form of cash monies or dollar-denominated commercial deposit accounts.

"*Early Amortization Commencement Date*" means, with respect to Series 2013-1, the earlier of (i) the date on which an Early Amortization Event occurs, (ii) the date on which an Event of Default occurs, and (iii) the Payment Date occurring in January 2015.

"*Early Amortization Period*" means the period beginning on the Early Amortization Commencement Date and ending on the day on which the Class A Principal Amount and the Class B Principal Amount have each been repaid in full and all other Secured Obligations attributable to the Series 2013-1 Notes have been paid in full.

"*Eligible Investments*" means any of the following:

    (a)    negotiable instruments or securities represented by instruments in registered form which evidence

        (i)    obligations of or fully guaranteed by the United States of America;

        (ii)    time deposits, promissory notes, or certificates of deposit of any depository institution or trust company; *provided, however,* that at the time of the Issuer's investment or contractual commitment to invest therein, the certificates of deposit or short-term deposits of such depository institution or trust company shall have a credit rating from S&P of at least "A-1+";

        (iii)    commercial paper having, at the time of the Issuer's investment or contractual commitment to invest therein, a rating from S&P of at least "A-l+";

        (iv)    bankers acceptances issued by any depository institution or trust company described in clause (a)(ii) above; or

        (v)    investments in money market funds rated at least "AA-m" or "AA-mg" by S&P or otherwise approved in writing by S&P;

    (b)    time deposits and demand deposits in the name of the Issuer or the Trustee in any depository institution or trust company referred to in clause (a)(ii) above;

(c)        repurchase obligations pursuant to a written agreement (i) with respect to any obligation described in clause (a) above, where the Trustee has taken actual or constructive delivery of such obligation, and (ii) entered into with a depositary institution or trust company referred to in clause (a)(ii) above; or

(d)        securities not represented by an instrument that are registered in the name of the Trustee or its nominee (which may not be MCC, MDC or an Affiliate of either) upon books maintained for that purpose by or on behalf of the issuer thereof and identified on books maintained for that purpose by the Trustee as held for the benefit of the Issuer and the Noteholders, and consisting of Eurodollar time deposits of a depository institution or trust company that are rated at least A-l+ by S&P.

"*Eligible Loan*" means each Loan with respect to a Designated Account which has been conveyed to the Issuer pursuant to the TSA and which, as of its applicable Purchase Date, satisfied the following criteria:

(a)        it was originated by MCC in the ordinary course of its business;

(b)        it is payable in Dollars;

(c)        it was originated in accordance with the origination policy of MCC at the time of creation of the related Account;

(d)        MCC has not charged it off in its customary and usual manner for charging off Loans in such Accounts;

(e)        it, together with the related Loan Agreement under which such Loan was originated, does not contravene in any material respect any laws, rules or regulations applicable thereto (including, without limitation, usury laws, rules and regulations relating to truth in lending, fair credit billing, fair credit reporting, equal credit opportunity, fair debt collection practices and privacy);

(f)        all material consents, licenses, or authorizations of, or registrations with, any governmental authority required to be obtained or given in connection with the origination of such Loan or the execution, delivery and performance of the related Loan Agreement have been duly obtained or given and are in full force and effect;

(g)        at the time of its transfer to the Issuer, MCC had good and marketable title to the Loan and, at such time or immediately upon and after giving effect to the transfer, such Loan was free and clear of all Liens arising under or through MCC (other than Permitted Liens);

(h)        it was originated under a Loan Agreement that has been duly authorized by MCC and which is in full force and effect and constitutes the legal, valid and binding obligation of the Obligor enforceable against such Obligor in accordance with its terms and which is not subject to any legal proceeding, dispute, offset, counterclaim or defense whatsoever (which legal proceeding or dispute is specific to such Loan Agreement or Obligor, i.e., is not as a result of such Loan Agreement or Obligor being included as part of a class or purported class in a class action proceeding);;

(i)        it is secured by Eligible Metals Collateral;

(j)        the Obligor under such Loan

(i)        is living (if a natural person);

(ii)        is not the United States of America or any other sovereign nation, any state or other political subdivision thereof, or any municipality, agency, instrumentality, or other subdivision of any of the foregoing;

(iii)        is not (if a natural person) a minor under the laws of his/her state of residence;

(iv)        is competent (if a natural person) to enter into a contract and incur debt;

(v)        is not an Affiliate of MCC or MDC (*provided,* that any non-management employee of MCC or MDC or such Affiliate may be an Obligor);

74

(vi)     has executed a Loan Agreement with MCC pursuant to which the Loan has been originated;

(vii)    has not become the subject of an Insolvency Proceeding;

(viii)   has never undertaken legal proceedings against MCC or MDC or, to MCC's knowledge, any commodities or securities brokerage firm; and

(k)      such Loan bears interest at a rate in excess of the Prime Rate with interest accruing on either a daily or monthly basis.

*"Eligible Metals Collateral"* or *"Eligible Metals Inventory"* means Metals Collateral or Metals Inventory (or Eligible Warehouse Receipts evidencing either of the same) as the case may be, the Metal with respect to which:

(a)      is in a form described in *Exhibit K* to the Servicing Agreement,

(b)      if bullion, is the product of (i) in the case of gold, a COMEX-approved refinery, or Union Bank of Switzerland; (ii) in the case of silver, either a COMEX-approved refinery or the Royal Canadian Mint; and (iii) in the case of platinum or palladium, a NYMEX-approved refinery or a refinery on the London Platinum and Palladium Market's Good Delivery List; or (iv) any other bank, refinery, mint or manufacturer agreed to in writing by the Servicer and the Issuer, with the prior written consent of a Majority of Noteholders; *provided, however*, that the Servicer shall (in the case of clause (iv)) have provided at least ten (10) Business Days prior written notice thereof to each Rating Agency and the Trustee, and shall have not received notice of objection from any Rating Agency,

(c)      meets MDC's and MCC's customary standards for Loan origination, and conforms with the Metals Depository's customary policies and procedures, and

(d)      the related Obligor financing such Metals with a Loan (or, in the case of Metals Inventory, the Issuer) holds or has received title to the Metals so financed (or constituting Metals Inventory, as applicable), as evidenced by the notation of such Obligor's (or the Issuer's) ownership interest on the books and records of the Metals Depository holding such Metals (or Warehouse Receipts evidencing the same);

*"Eligible Warehouse Receipts"* means Warehouse Receipts which meet the following criteria (as applicable):

(i)      in the case of gold and silver, are COMEX receipts where such Metals are held at a COMEX depository and in respect of which procedures have been performed customary with Warehouse Receipts deliverable in exchange for COMEX futures contracts,

(ii)     in the case of platinum and palladium, are NYMEX receipts where such Metals are held at a NYMEX depository and in respect of which procedures have been performed customary with Warehouse Receipts deliverable in exchange for NYMEX futures contracts,

(iii)    which Warehouse Receipts in all events evidence Metals which, when held in direct physical form, would constitute Eligible Metals Collateral or Eligible Metals Inventory (as the case may be),

(iv)     which Warehouse Receipts fall in one or more of the following categories: (A) they have been originally issued to or for the benefit of MDC (as opposed to MDC's interest being reflected by a prior claimant's endorsement to MDC), or (B) they have been endorsed exclusively by Iron Mountain Depository and/or Farmers and Merchants Bank directly to the Metals Depository,

(v)      MCC or MDC has notified the Metals Depository in writing of its (or the Obligor's) interest in the Warehouse Receipt and the Metals evidenced thereby, and the metals depository holding the Metals evidenced by such Warehouse Receipt has delivered written confirmation of the serial numbers in respect of the bullion Metals evidenced by such Warehouse Receipts, and

(vi)    MCC (or MDC, in the case of Metals Inventory) has been, since acquiring its interest in such Warehouse Receipt, paying storage fees in respect thereof.

*"Equivalent Quantity"* means, when used in connection with a transfer and conveyance of Eligible Metals Inventory by MDC concurrent with a Liquidation of Metals Collateral as contemplated in the Servicing Agreement, a quantity of Eligible Metals Inventory with a Wholesale Value equal to the Metals Collateral being Liquidated.

*"ERISA Affiliate"* means with respect to any Person, at any time, each trade or business (whether or not incorporated) that would, at the time, be treated together with such Person as a single employer under Section 4001 of ERISA or Sections 414(b), (c), (m), or (o) of the Internal Revenue Code.

*"FDIC"* means the Federal Deposit Insurance Corporation, or any successor thereto.

*"Federal Funds Rate"* means the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for the day (or, if the day is not a Business Day, the immediately preceding Business Day) by the Federal Reserve Bank of New York; *provided* that if the rate is not so published for any Business Day, the rate for purposes of this clause will be the average of the quotations for the day on such transactions received by the Agent from three Federal funds brokers of recognized standing selected by it.

*"Foreign Concentration Adjustment"* means the amount, if any, by which the aggregate of the Outstanding Balances of Eligible Loans representing obligations of Obligors not domiciled in the United States or Canada, exceeds ten percent (10%) of the sum of (i) the aggregate of the Outstanding Balances of all Eligible Loans, plus (ii)  the Adjusted Inventory Balance of Eligible Metals Inventory held by the Issuer as of such date of determination.

*"Governmental Authority"* means the United States of America, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

*"Hedge Account"* means the Futures Account Agreement entered into between Jefferies Bache, LLC and the Issuer to hold hedging agreements and the proceeds thereof.

*"Hedged"* means, with respect to a quantity of Metals Inventory or Metals Collateral an amount of ounces for which the Servicer has allocated for that Business Day a short position maintained within the Hedge Account (i) covering at least 50% of such amount of ounces of Metals inventory or Metals Collateral and (ii) COMEX maintains a then-current minimum counterparty credit rating published by S&P for "A" rated securities.

*"Insolvency Proceeding"* means either a Voluntary Insolvency Proceeding or an Involuntary Insolvency Proceeding.

*"Interest Payment Date"* with respect to any Series has the meaning specified in the related Supplement and, if no such meaning is specified, means with respect to such Series each Payment Date.

*"Internal Revenue Code"* means the Internal Revenue Code of 1986, as amended from time to time.

*"Investment Company Act"* means the Investment Company Act of 1940, as amended from time to time.

*"Involuntary Insolvency Proceeding"* means, for any Person, the commencement of any proceeding or the filing of a petition against such Person under any bankruptcy, insolvency or similar law for the relief or aid of debtors (including, without limitation, the Bankruptcy Code), which proceeding or petition is not dismissed within sixty (60) days of its commencement or filing, seeking the dissolution, liquidation, arrangement, reorganization or similar relief of such Person or the appointment of a receiver, trustee, custodian or liquidator for such Person, or any writ order, judgment, warrant of attachment, execution or similar process shall be issued or levied against a substantial part of the property, assets or business of such Person.

*"Issuer Fiscal Year"* means the twelve month period ending December 31.

*"Lien"* means any security interest, mortgage, deed of trust, pledge, hypothecation, assignment, participation or equity interest, deposit arrangement, encumbrance, lien (statutory or other), preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and includes the filing of any financing statement under the UCC (other than any such financing statement filed for informational purposes only) or comparable law of any jurisdiction to evidence any of the foregoing.

*"Liquidate"* or *"Liquidation"* means any of the following, as the context requires: (a) the process of making demand upon an Obligor for amounts then due in respect of a Loan and realizing such amounts through the sale of Metals Collateral to MDC or to another third party; (b) the process of accepting voluntary repayment of a Loan from an Obligor and realizing all or part of such amounts through the sale of Metals Collateral at the direction of the Obligor to MDC or to another third party; or (c) the sale of Metals Inventory to MDC or to another third party.

*"List of Designated Accounts"* means the List of Designated Accounts in the form attached as Schedule 2.01 to the TSA, as such List of Designated Accounts may be amended and supplemented from time to time as contemplated therein.

*"Loan Agreement"* means, with respect to any Loan, the Loan Security and Storage Agreement between MCC and the Obligor in respect of such Loan (which Loan Agreement shall be substantially in the form of *Exhibit II* to the TSA), as the form of such Loan Agreement may be amended or otherwise modified from time to time in accordance with the TSA.

*"Loans and Related Interests"* has the meaning given such term in Section 2.01(a) of the TSA .

*"Lockbox Agreement"* means the Lockbox and Blocked Account Agreement, dated October 2, 2002, among Harris Trust and Savings Bank as lockbox bank thereunder, MCC, the Issuer and the Trustee, as the same may be amended, supplemented or restated from time to time.

*"London Banking Day"* means any day on which dealings in U.S. dollar deposits may be entered into between banks located in London, England.

*"Majority Noteholders"* or *"Majority of Noteholders"* means, for Series 2013-1 (i) for so long as any Class A Principal Amount remains outstanding, Holders of Class A Notes evidencing more than 50% of the outstanding Class A Principal Amount, and (ii) otherwise, Holders of Class B Notes evidencing more than 50% of the outstanding Class B Principal Amount.

*"Material Adverse Effect"* means a material adverse effect on the validity, enforceability or collectibility of the Loans, the Loan Agreements, the Metals Collateral, the enforceability of any Program Agreement, or on MCC's, the Issuer's or the Trustee's ability to realize on the Metals Collateral or any Metals Inventory pursuant to the terms of the Servicing Agreement.

*"Maturity Date"* means, with respect to each outstanding Series or individual Classes thereof, if any, the specified calendar date on which the entire Principal Amount on such Series or Class thereof is due and payable by the Issuer, as specified in the applicable Supplement.

*"MCC Preferred Units"* means the preferred equity interests in the Issuer, designated "Series A", issued by the Issuer to MCC pursuant to the Issuer's Limited Liability Company Agreement in consideration of MCC's voluntary contribution and conveyance of Loans to the Issuer under the TSA from time to time, if any, due to the unavailability to the Issuer of Dollars to pay the Purchase Price therefore under the TSA.

*"MDC Preferred Units"* means the preferred equity interests in the Issuer, designated "Series A", issued by the Issuer to MDC pursuant to the Issuer's Limited Liability Company Agreement in consideration of MDC's voluntary contribution and conveyance of Metals Inventory or Dollars to the Issuer under the OAA from time to time, if any.

*"Monthly Period"* means the period from and including any Payment Date to (but excluding) the next succeeding Payment Date, except that the first Monthly Period after the Closing Date for the Series 2013-1 Notes shall begin on and include such Closing Date and shall extend to (but exclude) the Payment Date in April 2013.

*"Multiemployer Plan"* means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which contributions are or have been made during the preceding five (5) years by any Person or any ERISA Affiliate of such Person.

*"Note Interest"* means interest payable in respect of the Notes of any Series pursuant to and in accordance with the Servicing Agreement and the Supplement for such Series.

*"Note Principal"* means principal payable in respect of the Notes of any Series pursuant to and in accordance with the Servicing Agreement and the Supplement for such Series.

*"Note Purchase Agreement"* means for any Series the Note Purchase Agreement entered into in connection with the initial purchase of Notes of such Series between the Issuer and such purchaser or purchasers, as the same may be amended, supplemented or restated from time to time.

*"Noteholder"* or *"Holder"* means the Person in whose name a Note is registered in the Note Register.

*"NYMEX"* means New York Mercantile Exchange.

*"Obligor Concentration Adjustment"* means the aggregate, for all Obligors in respect of Eligible Loans, of the amount, if any, by which the Outstanding Balances of Eligible Loans for any single individual Obligor exceeds five percent (5%) of the sum of (i) the aggregate of all Outstanding Balances of all Eligible Loans plus (ii) the Adjusted Inventory Balance of Eligible Metals Inventory held by the Issuer as of such date of determination.

*"Opinion of Counsel"* means a written opinion of counsel, who may be counsel for or an employee of the Person providing the opinion, and who shall be reasonably acceptable to the party to whom the opinion is directed.

*"Outstanding Balance"* means, with respect to any Loan and as of any date of determination thereof, the aggregate principal amount owed by the Obligor in respect of such Loan as of the close of business on the prior Business Day (which shall never be deemed to include any amounts owed by or obligations of such Obligor in respect of a Commodity Loan), which principal amount shall include accrued interest added to principal as provided for in the related Loan Agreement.

*"Paying Agent"* means any paying agent appointed pursuant to Section 2.08 of the Master Indenture, and shall initially be the Trustee.

*"Permitted Lien"* means with respect to the Loans, related Loan Agreements and other Trust Estate assets: (i) Liens in favor of the Issuer created pursuant to the Transfer and Sale Agreement and assigned to the Trustee pursuant to the Master Indenture; and (ii) Liens in favor of the Trustee pursuant to the Master Indenture.

*"Person"* means any legal person, including any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, governmental entity or other entity of similar nature.

*"Plan"* means, with respect to any Person, any employee pension benefit plan that (a) is maintained by such Person or any ERISA Affiliate of such Person, or to which contributions by any such Person are required to be made or under which such Person has or could have any liability, (b) is subject to the provisions of Title IV of ERISA, and (c) is not a Multiemployer Plan.

*"Prime Rate"* means the prime rate of interest as published from time to time in the most recent Pacific Edition of *The Wall Street Journal*.

*"Principal Amount"* means, with respect to any Series, the outstanding unpaid principal of the Notes of such Series.

*"Principal Variance"* means, for any date of determination, an amount calculated as follows: (i) the Adjusted Eligible Pool Balance for such date, plus (ii) the amount on deposit in the Equalization Account as of the close of the preceding Business Day (including the Adjusted Inventory Balance of Eligible Metals Inventory held in the Equalization Metals Account), plus (iii) the amounts on deposit in any Principal Funding Account as of the close of the preceding Business Day, plus (iv.) the net equity value of the Hedge Account, minus (v) the Aggregate Principal Amount of Notes outstanding as of the close of such preceding Business Day.

*"Program Agreements"* means the Servicing Agreement, the Master Indenture, any Supplement (and any agreement specified as a Program Agreement in such Supplement), the TSA, the OAA, the Lockbox Agreement, the Metals Depository Agreement, the Custody Agreement, and any Note Purchase Agreement.

*"Prospective Event of Default"* means an event which, with the giving of notice, lapse of time or both, would constitute an Event of Default.

*"Prospective Early Amortization Event"* means an event which, with the giving of notice, lapse of time or both, would constitute an Early Amortization Event.

*"Purchase Date"* means each date on which a purchase and conveyance of Loans was effected pursuant to the TSA.

*"Purchase Price"* means, in respect of a purchase by the Issuer pursuant to the TSA, the aggregate of the Outstanding Balances of the Loans being purchased, determined as of the related Cut-Off Date.

"*Qualified Institution*" means (A) a depository institution or trust company (which may include the Trustee) organized under the laws of the United States of America or any one of the states thereof or the District of Columbia and whose deposits are insured to the limits provided by law by the FDIC having corporate trust powers and acting as trustee for funds deposited therein (*provided, however,* that such deposit need not be maintained as a segregated trust account with the corporate trust department of such institution if at all times the certificates of deposit, short-term deposits or commercial paper or the long-term unsecured debt obligations (other than such obligation whose rating is based on collateral or on the credit of a Person other than such institution or trust company) of such depository institution or trust company shall have a credit rating from S&P of at least A-l in the case of the certificates of deposit, short-term deposits or commercial paper, or a rating from S&P of AA- in the case of long-term unsecured debt obligations) or (B) a depository institution, which may include the Trustee, which is otherwise acceptable to each Rating Agency.

"*Rating Agency Condition*" or "*Ratings Confirmation*" in relation to any Series or Class thereof that is rated by a Rating Agency on the date of the initial issuance thereof, means the notification in writing by each such Rating Agency to the Issuer that a proposed action will not result in a reduction or withdrawal of the rating of any such outstanding Series or Class rated by such Rating Agency.

"*Relevant Information*" means, in respect of any Loan, all information required to be included on or necessary for the preparation of each Daily Report in respect of such Loan, including without limitation (i) the Outstanding Balance, (ii) the Concentration Adjustment (and components thereof) and the Aggregate Volatility Adjustment, (iii) the Metals Collateral and composition thereof, identifying the amount constituting Eligible Metals Collateral, (iv) the Collateral Realization Value, and (v) the amount of Metals borrowed, if any, by such Obligor in respect of a Commodity Loan under the related Loan Agreement.

"*Relevant UCC State*" means each jurisdiction in which the filing of a UCC financing statement is necessary to perfect the ownership interest of the Issuer pursuant to the TSA or the security interest of the Trustee granted under the Master Indenture.

"*Reportable Event*" means any of the events set forth in Section 4043(b) of ERISA.

"*Required Amount*" with respect to any Series means, as of any date of determination thereof, the sum of the following: (a) three times the amount required to pay in full all Note Interest due to the Noteholders of such Series on the next upcoming Payment Date (or Interest Payment Date, if other than a Payment Date) and payable from the Required Amounts Account, plus (b) an amount equal to three times the Series Allocation Percentage of the Servicing Fee due on the next upcoming Payment Date, plus (c) an amount equal to each Series' proportionate share of a monthly accumulation of the next-upcoming annual Trustee Fee and Backup Servicer Fee payment (provided, in the case of (a), (b) and (c), the specified multiples or allocation may be increased or reduced for any Series if so specified in the related Supplement), plus (d) any other amounts specified (and in the quantity so specified) in the related Supplement as being Required Amounts payable from the Required Amounts Account for such Series.

"*Required Equity Level*" means, with respect to any Loan and as of any date of determination thereof,

(a) so long as an Unsatisfied NPV does not exist on any date which date follows the occurrence of a Significant NPV Period, the level of required equity (as described in the Loan Agreement relating to such Loan) representing the minimum permissible level for an Obligor's equity in such Loan, which level MCC may pursuant to the Loan Agreement establish and increase or decrease from time to time in accordance with the Collection Policies (and which level as of the Closing Date for Series 2013-1 is 14%), and

(b) if an Unsatisfied NPV exists on any date which date follows the occurrence of a Significant NPV Period (and in each case after giving effect to the prior applications and transfers contemplated in the Servicing Agreement), then such minimum permissible level as would permit the making of Collateral Demands in accordance with the Servicing Agreement in respect of Eligible Loans sufficient to realize (whether from payment of Collateral Demands directly by Obligors or through Liquidations) Collections in the amount of such Unsatisfied NPV.

"*Requirements of Law*" for any Person means the certificate of incorporation or articles of association and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation, or determination of an arbitrator or Governmental Authority, in each case applicable to or binding upon such Person or to which such Person is subject, whether federal, state or local (including, without limitation, usury laws, the federal Truth in Lending Act and Regulation Z and Regulation Q of the Board of Governors of the Federal Reserve System).

"*Responsible Officer*" means any officer within the Corporate Trust Office (or any successor group of the Trustee), including the President, any Vice President or any other officer of the Trustee customarily performing functions similar to those performed by any person who at the time shall be an above-designated officer and who shall have direct responsibility for the administration of any Program Agreement to which the Trustee is a party.

*"Restoration Equity Level"* means the Required Equity Level in effect under the Loan Agreement upon the initial origination of a Loan, as the same may have been increased from time to time in accordance with a change in the Collection Policies, but in no event to be reduced below the level in effect on the Closing Date for the earliest issued and outstanding Series.

*"Revolving Period"* means, with respect to Series 2013-1, the period beginning on the Closing Date and ending on the day before the Amortization Period Commencement Date.

*"Securities Act"* means the Securities Act of 1933, as amended.

*"Series"* means any series of notes issued under the Master Indenture pursuant to a Supplement thereto, which may include within any such Series a Class or Classes subordinate to another such Class or Classes.

*"Series Account"* means any account or accounts established pursuant to a Supplement for the benefit of the related Series.

*"Series Allocation Percentage"* means, with respect to any Series as of any date of determination, the percentage equivalent of a fraction, the numerator of which is the Principal Amount of such Series as of the close of business on the date immediately prior to such date of determination, and the denominator of which is the sum of the Principal Amounts of all outstanding Series as of the close of business on the date immediately prior to such date of determination.

*"Series 2013-1 Maturity Date"* means the Payment Date occurring in February 2015.

*"Series 2013-1 Investor Percentage"* means the percentage equivalent of a fraction, the numerator of which is the Series 2013-1 Principal Amount and the denominator of which is the sum of the Principal Amounts of all Series as to which an Amortization Period, or any Delineated Principal Funding Period, has commenced and is continuing.

*"Settlement Statement"* means a report in the form specified as the form of Settlement Statement in the Servicing Agreement, as such specifications may be supplemented pursuant to any Supplement.

*"Significant NPV Period"* means the occurrence of an Unsatisfied NPV for a period of five (5) consecutive calendar days.

*"Silver Loan Concentration Adjustment"* means the aggregate, for all Obligors in respect of Eligible Loans, of the amount, if any, by which the Outstanding Balances of Eligible Loans backed by silver exceeds sixty percent (60%) of the aggregate of all Outstanding Balances of all Eligible Loans

*"Silver Inventory Concentration Adjustment"* means the amount, if any, by which the Wholesale Value of all Eligible Metals Inventory consisting of silver exceeds 60% of the Wholesale Value of Eligible Metals Inventory held by the Issuer in the Equalization Account as of such date of determination.

*"Single Country Concentration Adjustment"* means the amount, if any, by which the aggregate of the Outstanding Balances of Eligible Loans representing obligations of Obligors domiciled in the same single country (not the United States or Canada), exceeds five percent (5%) of the sum of (i) the aggregate of the Outstanding Balances of all Eligible Loans, plus (ii) the Adjusted Inventory Balance of Eligible Metals Inventory held by the Issuer as of such date of determination.

*"Special Required Equity Level"* means 50% of the Required Equity Level.

*"Successor Servicer"* means a successor to the existing Servicer appointed in accordance with the Servicing Agreement.

*"Supplement"* means, with respect to any Series, a supplement to the Master Indenture complying with the terms thereof and, as and to the extent applicable, executed in conjunction with any issuance of notes of such Series.

*"Tax Opinion"* means, with respect to an issuance of an additional Series, an opinion of nationally recognized counsel to the effect that, for U.S. federal income tax purposes, (i) such issuance will not adversely affect the tax characterization of any outstanding Series or Class thereof that was characterized as debt at the time of its issuance and (ii) such issuance will not cause or constitute an event in which gain or loss would be recognized by any Holder or the Issuer.

"*Termination Notice*" means a notice seeking replacement of the Servicer with a Successor Servicer in accordance with the Servicing Agreement.

"*Trust Account*" means collectively the Collection Account, the Required Amounts Accounts, the Equalization Account and the Principal Funding Accounts established under the Servicing Agreement; any Series Account established pursuant to a Supplement; or any of the foregoing individually as the context requires.

"*UCC*" means the Uniform Commercial Code, as amended from time to time, as in effect in the applicable jurisdiction.

"*Unmatured Early Amortization Event*" means an event or condition that, upon the giving of notice or the passage of time, or both, would become an Early Amortization Event.

"*Unsatisfied NPV*" means, as of any time of determination on any Business Day, the excess, if any, of (a) the Negative Principal Variance as existing for such Business Day, over (b) the sum of Collections (or amounts treated as Collections pursuant to the Servicing Agreement) either (i) allocated from the Collection Account to the Equalization Account prior to such time of determination pursuant to the Servicing Agreement, or (ii) transferred or deposited from any of the sources described in Articles IV or V of the Servicing Agreement because of the existence of a Negative Principal Variance, to the Collection Account on such Business Day but prior to such time of determination.

"*Voluntary Insolvency Proceeding*" means for any Person that either (a) an order for relief under Title 11 of the United States Code shall be entered in a case in which such Person is a debtor, or such Person shall become insolvent or generally fail to pay, or admit in writing its inability to pay, its debts as they become due, or shall voluntarily commence any proceeding or file any petition under any bankruptcy, insolvency or similar law for the relief or aid of debtors (including without limitation, Title 11 of the United States Code or any amendment thereto), seeking dissolution or reorganization or similar relief for itself or the appointment of a receiver, trustee, custodian or liquidator for itself or a substantial portion of its property, assets or business or to effect a plan or other arrangement with its creditors, or shall file any answer admitting the jurisdiction of the court and the material allegations of an involuntary petition filed against it in any bankruptcy, insolvency or similar proceeding, or shall be adjudicated bankrupt, or shall make a general assignment for the benefit of creditors, or shall consent to, or acquiesce in the appointment of, a receiver, trustee, custodian or liquidator for itself or a substantial portion of its property, assets or business; or (b) action shall be taken by such Person for the purpose of effectuating any of the foregoing.

"*Warehouse Receipt*" means a written receipt for Metals issued by a person engaged in the business of storing Metals for hire.

"*Wholesale Metal Price*" means, as of any date of determination thereof, and in respect of any particular Metal, the prior Business Day's "London Fixing P.M. for Gold," "London Fixing P.M. for Silver," or NYMEX settlement price for the shortest futures contract (in the case of platinum and palladium), each as reported on the London Bullion Market Association's website (www.lbma.org.uk: in the case of gold and silver) or the CME Group's website (www.cmegroup.com: in the case of platinum and palladium) or an equivalent electronic source.

"*Wholesale Value*" means, with respect to any quantity of Metals and as of any date of determination, the product of the number of ounces of such Metal times the Wholesale Metal Price for such Metal.

# EXHIBIT 3



| Secretary of State | Administration | Elections | Business Programs | Political Reform | Archives | Registries |

**Business Entities (BE)**

Online Services
- **E-File Statements of Information for Corporations**
- **Business Search**
- **Processing Times**
- **Disclosure Search**

**Main Page**

**Service Options**

**Name Availability**

**Forms, Samples & Fees**

**Statements of Information** (annual/biennial reports)

**Filing Tips**

**Information Requests** (certificates, copies & status reports)

**Service of Process**

**FAQs**

**Contact Information**

Resources
- **Business Resources**
- **Tax Information**
- **Starting A Business**

Customer Alerts
- **Business Identity Theft**
- **Misleading Business Solicitations**

## Business Entity Detail

Data is updated to the California Business Search on Wednesday and Saturday mornings. Results reflect work processed through Tuesday, October 29, 2013. Please refer to **Processing Times** for the received dates of filings currently being processed. The data provided is not a complete or certified record of an entity.

| | |
|---|---|
| Entity Name: | MONEX DEPOSIT COMPANY, A CALIFORNIA LIMITED PARTNERSHIP |
| Entity Number: | 198704800031 |
| Date Filed: | 02/17/1987 |
| Status: | ACTIVE |
| Jurisdiction: | CALIFORNIA |
| Entity Address: | 4910 BIRCH STREET |
| Entity City, State, Zip: | NEWPORT BEACH CA 92660 |
| Agent for Service of Process: | LOUIS CARABINI % LAWLER, FELIX & HALL |
| Agent Address: | 700 S. FLOWER ST., #3100 |
| Agent City, State, Zip: | LOS ANGELES CA 90017 |

* Indicates the information is not contained in the California Secretary of State's database.

* **Note:** If the agent for service of process is a corporation, the address of the agent may be requested by ordering a status report.

- For information on checking or reserving a name, refer to **Name Availability**.
- For information on ordering certificates, copies of documents and/or status reports or to request a more extensive search, refer to **Information Requests**.
- For help with searching an entity name, refer to **Search Tips**.
- For descriptions of the various fields and status types, refer to **Field Descriptions and Status Definitions**.

**Modify Search   New Search   Printer Friendly   Back to Search Results**

**Privacy Statement** | **Free Document Readers**

Copyright © 2013   California Secretary of State

# EXHIBIT 4

common good · privacy · All people · Liberty · Speak · Conscience · without discrimination
proclaim

# California Secretary of State Debra Bowen

Secretary of State    Administration    Elections    **Business Programs**    Political Reform    Archives    Registries

**Business Entities (BE)**

Online Services
  - **E-File Statements of Information for Corporations**
  - **Business Search**
  - **Processing Times**
  - **Disclosure Search**

**Main Page**

**Service Options**

**Name Availability**

**Forms, Samples & Fees**

**Statements of Information** (annual/biennial reports)

**Filing Tips**

**Information Requests** (certificates, copies & status reports)

**Service of Process**

**FAQs**

**Contact Information**

Resources
  - **Business Resources**
  - **Tax Information**
  - **Starting A Business**

Customer Alerts
  - **Business Identity Theft**
  - **Misleading Business Solicitations**

## Business Entity Detail

Data is updated to the California Business Search on Wednesday and Saturday mornings. Results reflect work processed through Tuesday, October 29, 2013. Please refer to **Processing Times** for the received dates of filings currently being processed. The data provided is not a complete or certified record of an entity.

| | |
|---|---|
| Entity Name: | MONEX CREDIT COMPANY, A CALIFORNIA LIMITED PARTNERSHIP |
| Entity Number: | 198704800030 |
| Date Filed: | 02/17/1987 |
| Status: | ACTIVE |
| Jurisdiction: | CALIFORNIA |
| Entity Address: | 4910 BIRCH STREET |
| Entity City, State, Zip: | NEWPORT BEACH CA 92660 |
| Agent for Service of Process: | LOUIS CARABINI % LAWLER, FELIX & HALL |
| Agent Address: | 700 S. FLOWER ST., #3100 |
| Agent City, State, Zip: | LOS ANGELES CA 90017 |

* Indicates the information is not contained in the California Secretary of State's database.

* **Note:** If the agent for service of process is a corporation, the address of the agent may be requested by ordering a status report.

- For information on checking or reserving a name, refer to **Name Availability**.
- For information on ordering certificates, copies of documents and/or status reports or to request a more extensive search, refer to **Information Requests**.
- For help with searching an entity name, refer to **Search Tips**.
- For descriptions of the various fields and status types, refer to **Field Descriptions and Status Definitions**.

**Modify Search    New Search    Printer Friendly    Back to Search Results**

**Privacy Statement** | **Free Document Readers**
Copyright © 2013    California Secretary of State

# EXHIBIT 5

*common good* *privacy* *All people* *Liberty* *Speak* *without discrimination*
*preservation* *Conscience*

# California Secretary of State Debra Bowen

Secretary of State    Administration    Elections    **Business Programs**    Political Reform    Archives    Registries

**Business Entities (BE)**

Online Services
- **E-File Statements of Information for Corporations**
- **Business Search**
- **Processing Times**
- **Disclosure Search**

**Main Page**

**Service Options**

**Name Availability**

**Forms, Samples & Fees**

**Statements of Information** (annual/biennial reports)

**Filing Tips**

**Information Requests** (certificates, copies & status reports)

**Service of Process**

**FAQs**

**Contact Information**

Resources
- **Business Resources**
- **Tax Information**
- **Starting A Business**

Customer Alerts
- **Business Identity Theft**
- **Misleading Business Solicitations**

## Business Entity Detail

Data is updated to the California Business Search on Wednesday and Saturday mornings. Results reflect work processed through Friday, March 14, 2014. Please refer to **Processing Times** for the received dates of filings currently being processed. The data provided is not a complete or certified record of an entity.

| | |
|---|---|
| **Entity Name:** | NEWPORT SERVICE CORPORATION |
| **Entity Number:** | C1553540 |
| **Date Filed:** | 12/17/1987 |
| **Status:** | ACTIVE |
| **Jurisdiction:** | CALIFORNIA |
| **Entity Address:** | 4910 BIRCH STREET |
| **Entity City, State, Zip:** | NEWPORT BEACH, CA 92660 |
| **Agent for Service of Process:** | GREGORY G. WALKER |
| **Agent Address:** | 4910 BIRCH STREET |
| **Agent City, State, Zip:** | NEWPORT BEACH, CA 92660 |

* Indicates the information is not contained in the California Secretary of State's database.

- If the status of the corporation is "Surrender," the agent for service of process is automatically revoked. Please refer to California Corporations Code **section 2114** for information relating to service upon corporations that have surrendered.
- For information on checking or reserving a name, refer to **Name Availability**.
- For information on ordering certificates, copies of documents and/or status reports or to request a more extensive search, refer to **Information Requests**.
- For help with searching an entity name, refer to **Search Tips**.
- For descriptions of the various fields and status types, refer to **Field Descriptions and Status Definitions**.

**Modify Search    New Search    Printer Friendly    Back to Search Results**

**Privacy Statement** | **Free Document Readers**

Copyright © 2014    California Secretary of State

# EXHIBIT 6

Confidential                                                                                                December 22, 2016

THIS PRIVATE PLACEMENT MEMORANDUM IS NOT TO BE SHOWN OR GIVEN TO ANY PERSON OTHER THAN THE PERSON TO WHOM DISTRIBUTED AND IT IS NOT TO BE COPIED OR OTHERWISE REPRODUCED IN ANY MANNER WHATSOEVER.  ANY FURTHER DISTRIBUTION OR REPRODUCTION OF THIS MEMORANDUM IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS BY AN OFFEREE, IS UNAUTHORIZED.  FAILURE TO COMPLY WITH THIS DIRECTIVE CAN RESULT IN A VIOLATION OF THE SECURITIES ACT OF 1933, AS AMENDED.  IF THIS MEMORANDUM HAS BEEN IMPROPERLY REPRODUCED OR CIRCULATED, SCALA FUNDING COMPANY, L.L.C., MONEX CREDIT COMPANY and PIPER JAFFRAY & CO DISCLAIM ANY RESPONSIBILITY FOR ITS CONTENT AND USE.

**Private Placement Memorandum**

**SCALA FUNDING COMPANY, L.L.C.**
**$72,000,000 Secured Senior Term Notes, Series 2016-1, Class A**
**$14,000,000 Secured Mezzanine Term Notes, Series 2016-1, Class M**
**$14,000,000 Secured Subordinated Term Notes, Series 2016-1, Class B**



**MONEX CREDIT COMPANY**
*Servicer*

The $72,000,000 aggregate principal amount of Secured Senior Term Notes, Series 2016-1, Class A (the *"Class A Notes"*), the $14,000,000 aggregate principal amount of Secured Mezzanine Term Notes, Series 2016-1, Class M (the *"Class M Notes"*) and the $14,000,000 aggregate principal amount of Secured Subordinated Term Notes, Series 2016-1, Class B (the *"Class B Notes"* and, together with the Class A Notes and the Class M Notes, the *"Series 2016-1 Notes"* or the *"Notes"*) represent secured obligations of Scala Funding Company, L.L.C. (the *"Issuer"*) issued pursuant to the Master Indenture to be dated as of December 22, 2016 (the *"Master Indenture"*) between the Issuer and Citibank, N.A. (*"Citibank"*), as indenture trustee (the *"Trustee"*) and the Series 2016-1 Supplement thereto, to be dated as of December 22, 2016, between the Issuer and the Trustee (the "*Series 2016-1 Supplement*").

The property of the Issuer pledged under the Master Indenture to secure the Notes will include a portfolio of individual Loans (as defined herein) originated and conveyed to the Issuer by Monex Credit Company (*"MCC"*) in respect of Designated Accounts of Obligors (each as defined herein) to finance the Obligor's purchase of precious metals (gold, silver, platinum or palladium) (*"Metals"*), including the security interest granted by the Obligor in the related Metals to secure the Loan (*"Metals Collateral"*), all Metals (*"Metals Inventory"*) received as a Collection in respect of any such Loan from, or voluntarily contributed to the Issuer from time to time by, Monex Deposit Company (*"MDC"*), an affiliate of MCC, and all monies due or to become due on or collected by MCC as Servicer (in such capacity, the *"Servicer"*) in repayment or satisfaction of the Loans or upon disposition of Metals Inventory held by the Issuer.

**The Notes have not been registered under the Securities Act of 1933, as amended (the "Securities Act") or the securities laws of any state or foreign jurisdiction.  Therefore, the Notes may not be offered or sold within the United States or to, or for the account or benefit of, any U.S. person unless the offer or sale would qualify for a registration exemption from the Securities Act and state securities laws. The Issuer expects to sell the Notes offered hereby to Piper Jaffray & Co. as the Initial Purchaser ("Initial Purchaser") in a private placement under the Securities Act.  If such sale is consummated, the Initial Purchaser will sell the Notes offered hereby pursuant to an exemption from registration provided by Rule 144A under the Securities Act to persons who will be deemed to represent that they qualify as both "qualified institutional buyers" as defined in Rule 144A and "qualified purchasers" as defined in Section(2)(a)(52)(A) of the Investment Company Act of 1940, as amended (the "Investment Company Act"). The Notes will bear a legend referring to the foregoing restrictions, and because of such restrictions, no secondary trading market for the Notes is expected to develop and purchasers must bear the risk of their investment for an indefinite amount of time.  See "Transfer Restrictions." The Notes are offered only through the Initial Purchaser when, as and if issued by the Issuer, subject to the prior sale or withdrawal, cancellation or modification of the offer without notice, and the right of the Issuer and/or the Initial Purchaser to reject any subscription, in whole or in part.  It is expected that the Notes will be available for delivery in book-entry form only on or about December 22, 2016.**

**PIPER JAFFRAY & CO.**

The Issuer from time to time may offer other Series of notes under the Master Indenture to the extent certain collateralization levels and other criteria are satisfied. Only the Notes are being offered hereby.

Distributions of interest or principal on the Notes will be payable, to the extent described herein, on the fifteenth day of each calendar month (or if such fifteenth day is not a Business Day (as defined herein), the next Business Day) (each, a *"Payment Date"*), beginning January 15, 2017, or as otherwise may be specified in the Series 2016-1 Supplement. See *"Description of the Notes and Series 2016-1 Supplement."*

MCC and MDC are not obligated in any way in respect of the Notes, the Loans, the Metals Collateral or the Metals Inventory. The obligations of the Servicer (including MCC as initial Servicer) with respect to the Notes are limited to its contractual servicing obligations. MCC will, however, as seller of the Loans to the Issuer, make certain representations and warranties relating to the Loans. In the event of an uncured breach of any such representation or warranty that materially adversely affects the Issuer's interest in a Loan, MCC may, under certain circumstances, be obligated to repurchase such Loan from the Issuer.

**The Notes will not be insured or guaranteed by any governmental agency or instrumentality, the Initial Purchaser, MCC, MDC or any of their respective Affiliates (as defined herein), and will be payable only from collections on the Loans, Metals Inventory and other assets of the Issuer as described herein. See "Special Considerations."**

**The Notes offered hereby will not be registered with or approved or disapproved by any federal or state bank regulatory agency, the Securities and Exchange Commission or the securities commission or regulatory authority of any state or foreign jurisdiction. Nor will any of them pass upon or endorse the merits of this offering or the accuracy or adequacy of this Private Placement Memorandum. Any representation to the contrary is unlawful.**

**All investors will be required to agree that they will not offer, sell or otherwise pledge, hypothecate or transfer the Notes unless an applicable exemption from the registration requirements of the Securities Act is available and only to a person who has signed an investor letter as described herein. Any such sales must also comply with any applicable state securities laws requirements. Also, because the Issuer will rely on the exemptions contained in sections 3(c)(7) and 3(c)(1)of the Investment Company Act, no transfer of Notes may be made to investors which are not "qualified purchasers" as defined in the Investment Company Act, and "qualified institutional buyers" as defined in Rule 144A and at no time may more than 100 persons beneficially own outstanding securities (other than short term paper) of the Issuer, within the meaning of Section 3(c)(1) of the Investment Company Act. The Notes will bear a legend to the foregoing effect. Prospective investors should be aware that they may be required to bear the financial risks of this investment for an indefinite period of time. See "Special Considerations" and "Transfer Restrictions."**

**The information contained in this Private Placement Memorandum is confidential and proprietary to the Issuer and is being submitted to prospective investors solely for their confidential use in consideration of purchasing the Notes. Distribution of this Private Placement Memorandum to any other person (other than a person retained to advise a prospective investor with respect to a purchase of the Notes) is unauthorized, and any disclosure by a prospective investor in any manner of any of its contents, without the Issuer's prior written consent, is prohibited. By accepting delivery of this Private Placement Memorandum, a prospective investor agrees to the foregoing and agrees not to make copies or reproductions of this Private Placement Memorandum. By accepting delivery of this Private Placement Memorandum, a prospective investor further agrees promptly to return it to the Issuer or the Initial Purchaser together with any other documents or information furnished to the prospective investor, and to destroy notes taken there from if the prospective investor elects not to purchase any of the Notes offered hereby or if the offering is terminated or withdrawn.**

**The Initial Purchaser has not independently verified the information contained herein or otherwise made any further investigation of the Issuer, the information provided herein or with respect to the information provided in the documents referred to herein. Neither the Initial Purchaser nor any of its affiliates, partners, officers, agents, employees or representatives makes any representation or warranty, express or implied, as to the accuracy or completeness of such information. Nothing contained herein is, or should be relied upon as, a promise or representation as to the future performance of the Issuer. All references to financial information of the Issuer, MCC or MDC shall be construed as being as of October 31, 2016, unless expressly stated otherwise.**

**This Private Placement Memorandum constitutes an offer only to the offeree to whom this Private Placement Memorandum is initially distributed. This Private Placement Memorandum does not purport to be all inclusive or to contain all of the information that a prospective investor may desire in investigating the Issuer or an investment in the Notes. A prospective investor must conduct and rely on its own evaluation of the Issuer and the terms of the offering, including the merits and risks involved, in making an investment decision with respect to the Notes. See "Special Considerations" for a discussion of certain risks and factors that should be considered in connection with a purchase of the Notes. Certain provisions of various agreements are summarized in this Private Placement Memorandum, but a**

prospective investor should not assume that the summaries are complete. Such summaries are qualified in their entirety by reference to the complete text of such agreements, copies of which may be obtained from the Issuer.

The contents of this Private Placement Memorandum are not to be considered as legal, business or tax advice. A prospective investor should consult its own counsel, accountants or other advisors as to legal, tax, business, financial and related aspects of a purchase of the Notes.

This Private Placement Memorandum does not constitute an offer to sell or a solicitation of an offer to purchase the Notes in any jurisdiction where, or to any person to whom, it is unlawful to make such offer or solicitation in such jurisdiction. Except as otherwise indicated, a prospective investor should assume that the information contained in this Private Placement Memorandum is accurate only as of the date on the front cover of this Private Placement Memorandum. Neither the delivery of this Private Placement Memorandum nor any sale made hereunder shall, under any circumstances, create any implication that there has not been a change in the affairs of the Issuer, MCC or MDC after the date hereof.

No person has been authorized to give any information or to make representations in connection with the offering made hereby other than the information and representations contained in this Private Placement Memorandum, and, if given or made, such other information or representations must not be relied upon. Prior to the consummation of the purchase and sale of the Notes, the Issuer will afford prospective investors an opportunity to ask questions of and receive answers from representatives of it, MCC and/or MDC concerning the terms and conditions of the Notes, the Issuer, MCC, MDC or other relevant matters and to obtain additional information to the extent that it possesses such information or can acquire it without unreasonable effort or expense.

The Issuer reserves the right, in its sole discretion and for any reason whatsoever, to modify, amend and/or withdraw all or a portion of the offering and/or to accept or reject in whole or in part any prospective investment in the Notes or to allot to a prospective investor less than the principal amount of the Notes that it desires to purchase. The Issuer shall have no liability whatsoever to a prospective investor in the event that any or all of the foregoing shall occur.

A prospective investor or investor must comply with all applicable laws and regulations in force in any jurisdiction in which it purchases, offers or sells the Notes or possesses or distributes this Private Placement Memorandum and must obtain any consent, approval or permission required by the Issuer for the purchase, offer or sale by the prospective investor or investor of the Notes under the laws and regulations in force in any jurisdiction to which it is subject or in which it makes such purchase, offer or sale, and the Issuer shall not have any responsibility therefor.

### NOTICE TO NEW HAMPSHIRE RESIDENTS

NOTICE PURSUANT TO NEW HAMPSHIRE LAW: NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

The Issuer expects to sell the Notes offered hereby to Piper Jaffray & Co as the Initial Purchaser ("Initial Purchaser") in a private placement under the Securities Act. If such sale is consummated, the Initial Purchaser will sell the Notes offered hereby pursuant to an exemption from registration provided by Rule 144A under the Securities Act to persons who will be deemed to represent that they qualify as both "qualified institutional buyers" as defined in Rule 144A and "qualified purchasers" as defined in Section(2)(a)(52)(A) of the Investment Company Act. The Notes are offered only through the Initial Purchaser when, as and if issued by the Issuer, subject to the prior sale or withdrawal, cancellation or modification of the offer without notice, and the right of the Issuer and/or the Initial Purchaser to reject any subscription, in whole or in part. The Initial Purchaser will act as a primary contact for, and will be available to consult with, prospective investors.

The Issuer will undertake to make available to every investor, during the course of the offering and prior to the sale of the Notes, the opportunity to ask questions of, and receive answers from, representatives of it, MCC or MDC concerning the terms and conditions of the offering and to obtain any appropriate additional information necessary to verify the accuracy of the information contained in this Private Placement Memorandum, or for any other purpose relevant to a prospective investment in the Notes.

All communication or inquiries relating to these materials should be directed to the following individual:

Chris Flannery
Managing Director
Piper Jaffray & Co.
800 Nicollet Mall, J12NPF
Minneapolis, Minnesota 55402-7020
Tel: 612-303-2193
Fax: 612-303-6966

MNX-CFTC-01335290

**TABLE OF CONTENTS**

**Page**

SUMMARY OF TERMS .................................................................................................................... 1
SPECIAL CONSIDERATIONS ........................................................................................................ 12
THE ISSUER ..................................................................................................................................... 16
USE OF PROCEEDS ......................................................................................................................... 16
THE TRUST ESTATE ....................................................................................................................... 16
STATISTICAL AND OTHER INFORMATION CONCERNING THE LOANS AND METALS ......... 17
MONEX CREDIT COMPANY AND MONEX DEPOSIT COMPANY ............................................. 23
LEGAL PROCEEDINGS .................................................................................................................. 27
THE SERVICER ............................................................................................................................... 27
THE TRUSTEE .................................................................................................................................. 28
THE BACKUP SERVICER ............................................................................................................... 29
THE CUSTODIAN ............................................................................................................................ 29
TRANSFER AND SALE AGREEMENT .......................................................................................... 29
OPTIONAL ADVANCE AGREEMENT ........................................................................................... 35
SERVICING AGREEMENT .............................................................................................................. 36
DESCRIPTION OF THE NOTES AND SERIES 2016-1 SUPPLEMENT ........................................ 59
OPTIONAL REDEMPTION ............................................................................................................. 62
CERTAIN UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS ............................. 62
ERISA CONSIDERATIONS ............................................................................................................. 67
RATINGS .......................................................................................................................................... 68
PLAN OF DISTRIBUTION .............................................................................................................. 68
LEGAL MATTERS ........................................................................................................................... 68
INDEX OF PRINCIPAL TERMS ..................................................................................................... 69

**SUMMARY OF TERMS**

The following summary is qualified in its entirety by reference to the detailed information appearing elsewhere herein and in the Servicing Agreement (as defined herein), the Master Indenture, the Series 2016-1 Supplement, the TSA (as defined herein) and the OAA (as defined herein). Certain capitalized terms used in this Memorandum are defined elsewhere herein. See the "Index of Principal Terms" and "Definitions of Certain Terms" at the end of this Memorandum. Unless the context requires otherwise, certain capitalized terms, when used herein, relate only to the Notes offered hereby and not to other Series which may exist from time to time.

Issuer.............................................................. Scala Funding Company, L.L.C., a Delaware limited liability company (the *"Issuer"*) was established as a limited purpose, bankruptcy-remote special purpose entity. The Series 2016-1 Notes will be the first series of Notes issued by the Issuer and will be issued pursuant to a new Master Indenture under which the Issuer intends to issue subsequent parity Notes.

The Issuer will be owned by affiliates of MCC and MDC. MCC and MDC in certain circumstances may also acquire redeemable preferred membership interests in the Issuer as described herein. The principal executive offices of the Issuer are located at 4900 Birch Street, Newport Beach, California 92660-2188, telephone number (949) 752-1400.

Notes Offered................................................. $72,000,000 aggregate principal amount of Secured Senior Term Notes, Series 2016-1, Class A (the *"Class A Notes"*), the $14,000,000 aggregate principal amount of Secured Mezzanine Term Notes, Series 2016-1, Class M (the *"Class M Notes"*) and $14,000,000 aggregate principal amount of Secured Subordinated Term Notes, Series 2016-1, Class B (the *"Class B Notes"* and, collectively with the Class A Notes and the Class M Notes, the *"Series 2016-1 Notes"* or the *"Notes"*) are anticipated to be issued pursuant to the Master Indenture and the Series 2016-1 Supplement thereto.

Each class of Notes will be represented by a master note (each, a *"Master Note"*) held by the Trustee on behalf of, and ownership thereof will be recorded only through the book-entry system of, The Depository Trust Company (*"DTC"*) in denominations of $100,000 and integral multiples of $1,000 in excess thereof. Beneficial owners will not receive certificates representing their ownership interest in the Notes. The Company has been advised by DTC that upon receipt of such payment DTC will credit, on its book-entry records and transfer system, the accounts of the DTC participants through whom Notes are directly or indirectly owned. Payments by DTC to its participants and by such participants to owners of the Notes or their representatives will be governed by customary practices and standing instructions and will be the sole responsibility of DTC, such DTC participants or such representatives, respectively.

The Notes represent obligations of the Issuer only and will not represent interests in or recourse obligations of MCC, MDC, or any Affiliate of either of them.

The Class B Notes and the Class M Notes are subordinated to the Class A Notes and the Class B Notes are subordinated to the Class M Notes to the extent described herein.

Payment Date.................................................. The fifteenth day of each calendar month (or the next Business Day if not a Business Day) commencing January 15, 2017.

Interest Accrual Period................................... Payment Date (or, for the initial period, the date of issuance) to but not including the next succeeding Payment Date.

MNX-CFTC-01335292

| | | |
|---|---|---|
| Note interest rates ......................................... | For the Class A Notes, a fixed rate of | 3.91 % per annum. |
| | For the Class M Notes, a fixed rate of | 4.41% per annum. |
| | For the Class B Notes, a fixed rate of | 5.21 % per annum. |

Scheduled Amortization
Commencement Dates ................................. For the Class A Notes, the Payment Date one month prior to the Final Maturity Date.

For the Class M Notes, the Payment Date one month prior to the Final Maturity Date.

For the Class B Notes, the Payment Date one month prior to the Final Maturity Date.

Final Maturity Dates ...................................... For the Class A Notes, the February 2021 Payment Date.

For the Class M Notes, the February 2021 Payment Date.

For the Class B Notes, the February 2021 Payment Date.

Optional Redemption/Prepayment
of Notes ........................................................ The Notes are subject to early redemption in full on or after the occurrence of the Scheduled Amortization Commencement Dates described above. The Notes are not otherwise subject to early redemption or prepayment at the Issuer's option, in whole or in part, prior to maturity. However, the commencement of an Early Amortization Period for Series 2016-1 as a result of an Event of Default or Early Amortization Event can result in the allocation of Collections to the Principal Funding Account and the repayment on subsequent Payment Dates of all or portions of outstanding principal on the Class A Notes, Class M Notes and Class B Notes (in that order of priority) prior to their final maturity. See "Summary of Terms — Collections" and "—Payments or distributions from allocated Collections," and "Description of the Notes and Series 2016-1 Supplement" below.

Other Series .................................................. The Notes will be the first series of notes issued under the Master Indenture and the only series outstanding at closing. The Issuer from time to time may, subject to the satisfaction of certain conditions, create other series of notes to be secured pari passu with the Notes by the Issuer's assets pledged under the Master Indenture (other than any Series Collateral for, or Collections required to be allocated to, any other Series).

Servicer ........................................................ Monex Credit Company, a California limited partnership ("MCC") is the initial Servicer (the "Servicer") pursuant to a Servicing Agreement to be dated the date of closing on the Notes, among the Servicer, the Trustee, the Backup Servicer, and the Issuer (the "Servicing Agreement"). The principal executive offices of MCC are located at 4910 Birch Street, Newport Beach, California 92660-2188, telephone number (949) 752-1400. A Successor Servicer may be appointed in certain circumstances. The Servicer will receive a monthly fee (the "Servicing Fee") as compensation for its undertaking the duties and obligations of Servicer, payable from Collections allocated for such purpose in accordance with the Servicing Agreement.

Initial Purchaser ........................................... Piper Jaffray & Co. ("PJC") is acting as the Initial Purchaser for the Issuer (the "Initial Purchaser"). The Notes are being offered for sale by the Issuer without registration under Section 5 of the Securities Act in reliance on an exemption from registration provided by Rule 144A.

MNX-CFTC-01335293

Trustee ........................................................ Citibank, N.A. ("*Citibank*") is the Trustee under the Master Indenture. The principal corporate trust offices of the Trustee are located at 388 Greenwich Street, 14th Floor, New York, New York 10013.

The Trustee will receive an annual fee as compensation for its agreement to serve as Trustee (the "*Trustee Fee*") and any expenses or indemnification amounts due to the Trustee by the Issuer up to the Trustee Indemnification Cap, to the extent applicable. Such fee will be paid annually in advance, initially on the date of issuance and thereafter from Collections allocated for such purpose in accordance with the Servicing Agreement.

Backup Servicer ........................................... Portfolio Financial Servicing Company ("*PFSC*") will act as the Backup Servicer under the Servicing Agreement (the "*Backup Servicer*"), and as such, will commit to act as a successor Servicer in certain circumstances if MCC is terminated as the Servicer. PFSC in its individual capacity will also act as Custodian for the Trustee in holding original Loan Documents delivered to it from time to time by the Issuer or MCC, under a separate Custodial Agreement among the Issuer, the Servicer, PFSC as Custodian and the Trustee.

The Backup Servicer will receive an annual fee as compensation for its commitment to become successor Servicer in the event of the termination of MCC as the initial Servicer (the "*Backup Servicer Fee*"). Such fee will be paid annually in advance, initially on the date of issuance and thereafter from Collections allocated for such purpose in accordance with the Servicing Agreement.

Custodian ..................................................... PFSC in its individual capacity will also act as Custodian for the Trustee in holding original Loan Documents delivered to it from time to time by the Issuer or MCC, under a separate Custodial Agreement among the Issuer, the Servicer, PFSC as Custodian and the Trustee.

MDC and MDC Advances ............................ Monex Deposit Company, a California limited partnership ("*MDC*"), is an affiliate of MCC and is a dealer in precious metals. The Servicer is authorized under the Servicing Agreement on behalf of the Issuer to sell to MDC (or to an unaffiliated third party) Metals Collateral in connection with liquidation of a Loan, or existing Metals Inventory in connection with a liquidation thereof.

MDC may also from time to time voluntarily contribute (in consideration of receiving redeemable preferred membership units in the Issuer) either Metals to the Issuer as Eligible Metals Inventory, or Dollars, in each case pursuant to an Optional Advance Agreement between MDC and the Issuer, to be dated the date of closing on the Notes (the "*OAA*").

Metals Depository.......................................... Brink's Global Services USA, Inc., a COMEX/NYMEX approved precious metals depository (the "*Metals Depository*"), pursuant to a Precious Metals Storage Agreement among MCC, MDC, the Issuer, the Trustee and the Metals Depository (the "*Metals Depository Agreement*"). All Metals Collateral and Metals Inventory are held on deposit with the Metals Depository. The Metals Depository Agreement provides for the Metals Depository's acknowledgment of (i) the rights of the Issuer as a transferee of the security interest in related Metals Collateral securing the Loans sold to the Issuer by MCC, (ii) the rights of the Issuer as the owner of all Metals Inventory transferred to it by MDC, and (iii) the rights of the Trustee as pledgee of same, as well as an agreement by the Metals Depository to follow instructions of the Servicer or the Backup Servicer as to dispositions of Metals Collateral and Metals Inventory.

Trust Estate .................................................. The Notes will be secured by the Issuer's pledge of its assets to the Trustee under the Master Indenture (the "*Trust Estate*"). The Trust Estate will include U.S. Dollar Loans originated by MCC and sold or contributed to the

MNX-CFTC-01335294

Issuer from time to time pursuant to a Transfer and Sale Agreement, to be dated the date of closing on the Notes, between the Issuer and MCC (the *"TSA"*), which Loans were made to finance the related Obligor's purchase of precious metals (palladium, gold, silver, or platinum) (*"Metals"*), including the security interest granted by the Obligor in the related Metals to secure the Loan (*"Metals Collateral"*); all Metals (*"Metals Inventory"*) transferred to the Issuer by MDC in respect of a Collection upon repayment or liquidation of a Loan, or otherwise voluntarily contributed from time to time by MDC to the Issuer in exchange for MDC receiving a redeemable preferred membership interest in the Issuer pursuant to the OAA; all monies due or to become due on or collected by the Servicer in repayment or satisfaction of the Loans or upon disposition of Metals Inventory; all Dollars voluntarily contributed from time to time by MDC to the Issuer pursuant to the OAA; and all related rights of MCC and MDC under the Metals Depository Agreement, the Servicing Agreement, the Lockbox Agreement, and the Custodial Agreement.

The Loans .....................................................

Individual U.S. Dollar loan transactions (each, a *"Loan"*) made from time to time by MCC to designated customers (*"Obligors"* with respect to *"Designated Accounts"*) under MCC's Loan Agreement with such Obligor. Each Loan finances the Obligor's purchase of Metals, which are titled to the Obligor and held for the benefit of the Obligor by the Metals Depository. To obtain a Loan, the Obligor must supply, from its own funds, not less than 25% of the purchase price of the related Metals being financed *("Equity")*. The Obligor grants a security interest in all the acquired Metal, including the portion acquired using Equity, to secure its Loan (*i.e.,* the Metals Collateral). The Loan Agreement provides for an accruing interest rate on each Loan which is added to principal as accrued daily. The Loan Agreement also provides for an ongoing Obligor requirement to maintain a minimum Equity level with respect to a Loan, which minimum currently is set at 14% of the current market value of the Metals Collateral. The Loan Agreement grants MCC the right to demand repayment of the entire Loan at any time, with or without notice, and to increase the minimum required Equity for a Loan at any time, with or without notice.

The Issuer shall have the right, subject to certain conditions and aggregate limits and without adverse selection, to substitute for existing Loans in respect of a Designated Account in the Trust Estate, an equivalent principal balance of Loans in respect of a different Designated Account which substitute Loans have been conveyed to the Issuer by MCC under the TSA. Upon such substitution the replacement Loans will become subject to the lien of the Master Indenture and the Loans being substituted will be released from such lien and reconveyed back to MCC. No such substitution may be made for Loans as to which the Obligor is currently in arrears of a payment obligation under its Loan Agreement or is the subject of insolvency proceedings.

Metals eligible to serve as Metals
Collateral or Metals Inventory .....................

Gold, silver, platinum and palladium bullion and coins of certain specifications and types, as more fully described in "Statistical and Other Information Concerning the Loans and Metals—The Metals" herein.

Collections ....................................................

The Servicer is required to promptly deposit all daily Collections received or realized in respect of the Loans, dispositions of Metals Collateral and dispositions of Metals Inventory into the Collection Account.

Such Collections (together with certain other amounts which are required to be treated and allocated as Collections such as the proceeds of Advances— see "Summary of Terms—Mechanisms for maintaining required advance rate levels" and "—Mechanisms for maintaining Required Amounts" below) must then be allocated for the benefit of each outstanding Series (including any Series issued subsequent to the Notes offered hereby) as

follows, and in the following order of priority:

*first*, an amount up to the amount necessary to pay (i) three times the interest on the notes of each outstanding Series on the next upcoming Interest Payment Date, (ii) three times each such Series' proportionate share of servicing fees payable on the next upcoming Payment Date, (iii) each such Series' proportionate share of a monthly accumulation of the next-upcoming annual Trustee Fee payment and Backup Servicer Fee payment (provided, in the case of (i), (ii) and (iii), the specified multiples or allocation may be increased or reduced for any Series if so specified in the related Supplement), and (iv) further amounts, reserves, or expenses (if any) specific to each such Series as specified in the related Supplement (each, the *"Required Amounts"* for such Series) with such funds to be deposited to a segregated Required Amounts Account established for each such Series (and, if Required Amounts at the time of such allocation remain unfunded for more than one outstanding Series, available collections will be allocated among such Series *pro rata* based on the unpaid principal balance of each such Series, to the aggregate unpaid principal balances of all such Series, in each case determined as of the beginning of the relevant monthly collection period);

*second*, if a Negative Principal Variance exists for such date (see "Summary of Terms—Advance Rate" below), then to fund a deposit into the Equalization Account held by the Trustee for the benefit of all Series under the Master Indenture up to the amount of such Negative Principal Variance;

*third*, if an Amortization Period for such Series has commenced and is continuing, to fund a deposit in the related Principal Funding Account for such Series up to the amount necessary to make any permitted or required principal repayment on the next upcoming Payment Date (and, if the same has commenced for more than one outstanding Series at the time of such allocation, available Collections will be allocated among such Series *pro rata* based on the unpaid principal balance of each such Series, to the aggregate unpaid principal balances of all such Series, in each case determined as of the beginning of the relevant monthly collection period); and

*fourth*, with respect to any remaining available Collections as follows and in the following order of priority: (A) to the extent reimbursable expenses or indemnifications are payable by the Issuer to the Trustee or the Backup Servicer as Successor Servicer, to be paid *pro rata* to the respective party entitled thereto, (B) if and to the extent directed by the Issuer in its sole discretion, to be deposited into the Equalization Account, and (C) to be released to the Issuer free and clear of the lien of the Master Indenture to fund the purchase price to MCC for additional Loans under the TSA, or for general Issuer use and distribution to its members.

If at the time of a daily allocation of Collections described above, all required deposits have been made to each Required Amounts Account, as well as to each Principal Funding Account for the Series as to which an Amortization Period is in effect, collections on Loans may be received or held by the Issuer in the form of an equivalent Wholesale Value of Eligible Metals Inventory transferred from MDC, instead of in the form of Dollars derived from Obligor payments or liquidations of related Metals Collateral. As a result, Collections allocated to the Equalization Account

as described above may be deposited therein in the form of either Dollars or an equivalent Wholesale Value of Eligible Metals Inventory transferred by MDC to the Issuer.

Payments or distributions from allocated Collections.....................................

Amounts allocated to the Required Amounts Accounts and Principal Funding Accounts are to be distributed as follows:

On each Payment Date or Interest Payment Date, as specified below, the Servicer is required to instruct the Trustee to make the following funds transfers in respect of each outstanding Series on such date, from the accounts and in the order of priority specified below:

*Certain Fixed Fees.* (A) On each Payment Date (other than the initial one), an amount from each Required Amounts Account equal to the related Series Allocation Percentage of the Trustee Fee and any expenses or indemnification amounts due to the Trustee by the Issuer up to the Trustee Indemnification Cap, to the extent applicable, to be distributed on such Payment Date to the Trustee; and (B) in the event that the Servicer is not MCC or an Affiliate of MCC, on each Payment Date, an amount from each Required Amounts Account equal to the related Series Allocation Percentage of the Servicing Fee, to be distributed on such Payment Date to the Servicer.

*Interest; Other Amounts.* (A) First, on each Interest Payment Date, an amount from each Required Amounts Account equal to the interest payable on such date in respect of the related Series outstanding, and then (B) on each Payment Date, an amount from the Required Amounts Account equal to such other amounts as are specified in the applicable Supplement with respect to a Series as payable on a Payment Date in respect of such Series from the Required Amounts Account, with such respective amounts in each case to be distributed as provided in the related Supplement.

*Principal During Amortization Period.* If an Amortization Period has commenced and is continuing in respect of a Series, an amount from the related Principal Funding Account equal to the principal payable from the Principal Funding Account with respect to such Series as specified in the related Supplement for such Series, to be distributed on a Payment Date (or, if so specified in a related Supplement, an Interest Payment Date) to each Noteholder of such Series *pro rata* in accordance with such Noteholder's principal balance outstanding or as otherwise provided in the related Supplement.

*Servicing Fee.* In the event that the Servicer is MCC or an Affiliate of MCC, on each Payment Date an amount from each Required Amounts Account equal to the Series Allocation Percentage of the Servicing Fee, to be distributed on such Payment Date to the Servicer, *provided,* that in the event the Trustee has received notice that any storage fees due and payable to the Metals Depository have not been paid, or that any fees or expenses payable to the Backup Servicer have not been paid, then the Trustee is required to deduct from the Servicing Fee otherwise payable to the Servicer hereunder (A) first, the amount of arrearage in storage fees and remit the same to the Metals Depository, and (B) after any such arrearage has been satisfied, then remit such amounts as may be due the Backup Servicer. In the event that MCC is no longer the Servicer and the Backup Servicer has been appointed and has become successor servicer, the Servicing Fee shall also include a one-time supplemental

MNX-CFTC-01335297

amount equal to $100,000 payable on the first Payment Date following the transition of the Backup Servicer to Successor Servicer.

Subordination of repayment of Class M Notes and Class B Notes to Class A Notes .................... | With respect to the payments described above from the Principal Funding Accounts established for the Series 2016-1 Notes, no such payments shall be made to the holders of the Class M Notes or the Class B Notes until all principal outstanding on the Class A Notes has been repaid.

Subordination of repayment of Class B Notes to Class M Notes ......................................... | With respect to the payments described above from the Principal Funding Accounts established for the Series 2016-1 Notes, no such payments shall be made to the holders of the Class B Notes until all principal outstanding on the Class M Notes has been repaid.

Advance Rate............................................... | On each Business Day, the initial Servicer must determine the result of (i) the sum of the Adjusted Eligible Pool Balance, plus any Dollars then held for repayment of principal balances of any Series, plus 80% of the Wholesale Value of Metals Inventory less the Silver Inventory Concentration Limit (if any) held in the Equalization Account, plus Dollars (if any) held in the Equalization Account, minus (ii) the aggregate principal balances outstanding of all Series (including any Series issued subsequent to the Notes), in each case as of the close of the preceding Business Day.   This result is the *"Principal Variance"* for the date of the Servicer's determination.  To the extent the amount in clause (ii) exceeds the amount in clause (i), the excess constitutes a *"Negative Principal Variance"* for such date.   The consequence of the Negative Principal Variance is to trigger a requirement, described in "Summary of Terms—Collections" above, that Collections that otherwise would be allocated on that date to the funding of deposits to Principal Funding Accounts for individual Series, or for release to the Issuer, must instead be allocated on that date to the Equalization Account in an amount necessary to eliminate the Negative Principal Variance.  If this allocation, once made, is in an amount less than the Negative Principal Variance, then the continued deficiency constitutes an *"Unsatisfied NPV"* for such date.   An Unsatisfied NPV requires the Servicer to take the further actions described under "Summary of Terms—Mechanisms for maintaining required advance rate levels" below.

Adjusted Eligible Pool Balance .................... | *"Adjusted Eligible Pool Balance"* consists of the aggregate of the principal balances of each otherwise Eligible Loan outstanding, reduced by (i) adjustments for certain obligor and silver concentration limits (described below), and (ii) the aggregate of the amounts by which the outstanding balance of any individual Loan exceeds 80% of the current Wholesale Value of Metals Collateral securing that Loan.

Concentration Limits ..................................... | Aggregate principal balances of otherwise Eligible Loans available to be included in the determination of Adjusted Eligible Pool Balance for the Servicer's daily calculation of Principal Variance will be reduced by the sum of the following:

> (a)  The amount, if any, by which balances of otherwise Eligible Loans of the same single Obligor exceed 5% of the sum of (i) the aggregate outstanding principal balance of all Eligible Loans of all Obligors, plus (ii) 80% of the Wholesale Value of Eligible Metals Inventory held by the Issuer in the Equalization Account.

> (b)  The amount, if any, by which balances of otherwise Eligible Loans of Obligors domiciled outside of the USA or Canada exceed 10% of the sum of (i) the aggregate

MNX-CFTC-01335298

outstanding principal balance of all Eligible Loans of all Obligors, plus (ii) 80% of the Wholesale Value of Eligible Metals Inventory held by the Issuer in the Equalization Account.

(c) The amount, if any, by which balances of otherwise Eligible Loans of Obligors domiciled in a single country (not the USA or Canada) exceed 5% of the sum of (i) aggregate outstanding principal balance of all Eligible Loans of all Obligors, plus (ii) 80% of the Wholesale Value of Eligible Metals Inventory held by the Issuer in the Equalization Account.

(d) The aggregate outstanding principal amount, if any, of otherwise Eligible Loans backed by Metals Collateral consisting of Excess Silver.

Mechanisms for maintaining required Advance Rate levels......................................

If the initial Servicer's daily measurement shows that, after the required allocations of daily Collections as described in "Summary of Terms–Collections" above, an Unsatisfied NPV exists, then the Servicing Agreement will require the Servicer to take the following actions (in order):

(i) Request a voluntary capital contribution from MDC to the Issuer under the OAA, in the form of Dollars and/or Eligible Metals Inventory, in an amount equal to the Unsatisfied NPV (valuing any contribution of Eligible Metals Inventory for this purpose at 80% of its then Wholesale Value).

(ii) If the foregoing action does not raise an amount equal to the Unsatisfied NPV, then liquidate Metals Inventory held in the Equalization Account so as to generate Dollar proceeds (to be allocated as Collections) at least equal to the remaining Unsatisfied NPV.

In addition, for so long as an Unsatisfied NPV exists on any date of determination, the Servicer is required to make and enforce demands on Obligors whose Equity level in their Loan has fallen below the level then required in the Loan Agreement to pay in additional Equity (a *"Collateral Demand"*), and if such Collateral Demand is not timely paid to liquidate sufficient Metals Collateral of such Obligors so as to obtain Dollars in the amount of such outstanding Collateral Demand, for allocation as Collections on subsequent Business Days (and the Servicer will no longer have its normal discretion to postpone such actions). The Servicer must also, for so long as an Unsatisfied NPV exists on any date of determination, demand repayment in full of (i) any Loans as to which outstanding Collateral Demands have not been satisfied within five Business Days, and (ii) any Loans whose equity has fallen below the Special Required Equity Level, and in each case liquidate Metals Collateral securing such accelerated Loans, with the proceeds of such actions once received to be allocated as Collections on subsequent Business Days (and the Servicer will no longer have its normal discretion to postpone such actions).

In addition to the foregoing, if an Unsatisfied NPV ever exists for five consecutive calendar days, the Servicer is obligated to increase the required Equity for Obligors under their Loan Agreements, and make and enforce resultant Collateral Demands on Obligors, to the extent necessary so as to generate Dollars from any combination of Obligor payments and/or proceeds of liquidated Metals Collateral in the amount of the current Unsatisfied NPV.

MNX-CFTC-01335299

| | |
|---|---|
| Mechanisms for maintaining Required Amounts ....................................................... | As noted above in "Summary of Terms—Collections," daily Collections are to be allocated to each Series for application first to fund Required Amounts, i.e., interest due on such Series on the next upcoming Payment Date, and the Series' allocable share of servicing, backup servicing, trustee and other Series reserves, payments or expenses incurred for the benefit of such Series. Because accruing interest on each Loan is added to principal, there will not be regular monthly payments of scheduled interest on the Loans being applied and allocated as Collections (although Collections can be generated from other sources and events, such as the Obligor's requirement to maintain its required Equity on a Loan, an Obligor's voluntary repayment or liquidation of a Loan, etc.). |

If on any day the Required Amounts for a Series are not funded in full (after giving effect to allocations of Collections for that day), then the Servicer is required under the Servicing Agreement to request a voluntary capital contribution from MDC under the OAA of Dollars, to be allocated as Collections and deposited into the related Required Amounts Account(s) in satisfaction of the deficiency. If such voluntary contribution is not promptly made, the Servicer is then required to liquidate Metals Inventory so as to generate Dollars (to be allocated as Collections) sufficient to cure the deficiency. If the deficiency has still not been cured in full within 15 days of the next upcoming Payment Date (or 3 Business Days before such upcoming date, in the case of a deficiency in Required Amounts other than interest and Trustee/Backup Servicer/Servicing fees), then the Servicer is required to make written demand for repayment in full of Loans (and, if necessary, liquidate related Metals Collateral) to an extent sufficient to generate Collections to fund the shortfall in Required Amounts in time for such upcoming Payment Date.

| | |
|---|---|
| Early Amortization Events............................ | Any of the following will constitute an *"Early Amortization Event"* with respect to Series 2016-1: |

(i) Failure on the part of the Issuer or Servicer to make any payment or deposit required to be made by the terms of (1) the Servicing Agreement or (2) any Supplement, with such failure continuing for two days after the date such payment or deposit is required to be made.

(ii) The Issuer shall have become an "investment company" within the meaning of the Investment Company Act.

(iii) Any Lien (other than a Permitted Lien) is imposed on the Loans or any other of the Trust Estate assets, and such Lien has not been removed or extinguished within ten days of its imposition.

(iv) MCC's, the Servicer's or the Issuer's failure to otherwise observe or perform in any material respect any other covenants or agreements set forth in any Program Agreement to which they are a party which failure would have a Material Adverse Effect and which continues unremedied for a period of 30 days after the date on which written notice of such failure shall have been given to the offending party by the Issuer, the Servicer, the Trustee or a Majority of Noteholders, as the case may be (provided, that any failure to perform a covenant or agreement pertinent to a Loan or related Loan Agreement with respect to which MCC performs

MNX-CFTC-01335300

its repurchase obligation for the affected Loan under the TSA shall not constitute an Early Amortization Event).

(v)   Any representation or warranty made by MCC in the TSA, or by the Issuer in the Master Indenture or any Supplement, shall prove to have been incorrect in any material respect when made or when delivered, and which shall continue to be incorrect in any material respect for a period of 30 days after the date on which written notice of such failure shall have been given to the Issuer by the Trustee, or to the Issuer and the Trustee by a Majority of Noteholders (provided, that an incorrect representation or warranty relating to a Loan or related Obligor with respect to which MCC performs its repurchase obligation of such affected Loan under the TSA shall not constitute an Early Amortization Event).

(vi)   The occurrence of a Significant NPV Period which is defined to be a period of 5 consecutive business days throughout which the Trust Estate experiences a continuing Negative Principal Variance after taking into account Collections each day.

Under the Servicing Agreement the occurrence and continuance of an Early Amortization Event will cause Collections allocable to all Series to be allocated to the Principal Funding Account and applied to repay Note principal on subsequent Payment Dates, as described in "Summary of Terms—Collections," "—Payment and distribution of allocated collections," "—Subordination of repayment of Class M Notes and Class B Notes to Class A Notes" and "—Subordination of repayment of Class B Notes to Class A Notes" above.

Any such Early Amortization Event (other than the event described in clause (ii) above) may be waived with the prior written consent of a Majority of Noteholders, and prior written notice to each Rating Agency.

Events of Default .........................................   *"Events of Default"* under the Master Indenture are:

(i)  the Issuer's failure to pay note interest or note principal in respect of any outstanding Series when due;

(ii)  an Early Amortization Event for any Series occurs and continues for 150 consecutive days;

(iii)   the occurrence of an Insolvency Proceeding with respect to the Issuer, MCC, MDC, any general partner of either, or with respect to a common member of the Issuer;

(iv)   a valid Termination Notice is delivered seeking the appointment of a Successor Servicer to MCC;

(v)   the Issuer becomes an investment company and such status is not cured within 30 calendar days; or

(vi)   any representation, warranty or certification made by the Issuer in any Program Agreement or in any certificate delivered pursuant to any Program Agreement shall be incorrect, false or misleading in any material respect, and continues to be

MNX-CFTC-01335301

incorrect, false or misleading in any material respect for a period of 30 days after the date on which written notice of such incorrect, false or misleading representation, warranty or certification shall have been given to the Issuer (provided, that with respect to any incorrect, false or misleading representation or warranty as to which repurchase of the affected Loan or Loans is required under the TSA, such occurrence shall not constitute an Event of Default if MCC timely complies with such repurchase obligation).

Upon the occurrence of an Event of Default, the Servicer must first liquidate Metals Inventory and then, if such action is insufficient to generate Collections which following allocation to the Principal Funding Account will permit the Notes to be repaid in full, then the Servicer must make written demand on all Obligors for repayment in full of their Loans outstanding, and as necessary liquidate Metals Collateral in satisfaction of such Loans, so as to generate Collections which following allocation to the Principal Funding Account will permit the Notes to be repaid in full. Certain additional procedures apply if the Servicer acting as such at the time is not MCC as initial Servicer but rather a Successor Servicer, including the Backup Servicer as Successor Servicer. See "Servicing Agreement— Actions Required Upon Event of Default or at Series Maturity" herein. All such Collections are to be allocated and applied in accordance with the Servicing Agreement as described in "Summary of Terms—Collections," "—Payment and distribution of allocated collections," "—Subordination of repayment of Class M Notes and Class B Notes to Class A Notes" and "—Subordination of repayment of Class B Notes to Class M Notes" above.

In addition following an Event of Default outstanding Series may be accelerated, and upon an election of a Majority of Noteholders, the Trustee following an Event of Default will be required to exercise remedies against the Trust Estate assets directly (such as the foreclosure on and liquidation of the Trust Estate), with proceeds obtained therefrom to be allocated and applied as Collections as described in the preceding paragraph. See "Master Indenture— Early Amortization Events; Events of Default and Remedies" herein.

Amortization Period.....................................

An *"Amortization Period"* will commence for Series 2016-1 upon the earlier of the occurrence of an Early Amortization Event, an Event of Default or the Scheduled Amortization Commencement Date.

Required actions upon Maturity Date ...........

If upon the occurrence of a Series 2016-1 Maturity Date for any Class, amounts are not on deposit in the Principal Funding Account sufficient to repay the maturing Notes in full, the Servicer is required under the Servicing Agreement to take the same actions with respect to Metals Inventory and Loans as are specified above under "Summary of Terms— Events of Default" but, as to Loans, only with respect to a sufficient quantity of Loans necessary to repay the Notes and associated obligations in full.

Certain United States federal income tax considerations ..........................................

In the opinion of Andrews Kurth Kenyon LLP, special federal tax counsel to the Issuer, the Series 2016-1 Notes will be characterized as indebtedness for U.S. federal income tax purposes (except in the case of Series 2016-1 Notes held by (a) MCC or MDC or any of their affiliates or (b) any person in whose hands, due to such person's relationship with the Issuer and pursuant to Treasury regulations under Section 385 of the Code, the Series 2016-1 Notes would not be treated as indebtedness for U.S. federal income tax purposes), and the Issuer will not be classified as an association or publicly traded partnership taxable as a corporation. Under

MNX-CFTC-01335302

the Series 2016-1 Supplement, the Issuer, the Servicer, the Class A Noteholders, the Class M Noteholders and the Class B Noteholders will agree or be deemed to have agreed to treat the Class A Notes, the Class M Notes and Class B Notes, as applicable, as indebtedness for federal, state, local and foreign income and franchise tax purposes.

ERISA Considerations ................................. Subject to the considerations described under "ERISA Considerations" in this Memorandum, the Class A Notes and the Class M Notes (but not the Class B Notes) may be purchased by pension, profit sharing and other employee benefit plans and retirement arrangements.

Investors should consult with their counsel regarding the applicability of the provisions of the Employee Retirement Income Security Act of 1974, as amended, before purchasing any Notes.

Note Ratings ................................................. It is a condition to the issuance of the Class A Notes that they be rated *"AA"* by Morningstar Credit Ratings, LLC (*"Morningstar"* or the *"Rating Agency"*).

It is a condition to the issuance of the Class M Notes that they be rated at least *"A"* by Morningstar.

It is a condition to the issuance of the Class B Notes that they be rated at least *"BBB"* by Morningstar.

Investors should not assume that a rating will not be lowered, qualified or withdrawn by the Rating Agency.

## SPECIAL CONSIDERATIONS

*Prospective purchasers of the Notes should consider, among other things, the following risks and special considerations.*

### Limited Liquidity

The Notes will not be registered under the Securities Act or under any state securities or *"blue sky"* laws and will be made in reliance upon exemptions from registration provided by such laws, nor is there any undertaking or intention to do so. Transfers of the Notes or any interest therein may be made only pursuant to a valid registration statement, or an exemption from the registration requirements under the Securities Act, and any applicable state securities laws, and in addition only to investors which are "qualified purchasers" within the meaning of the Investment Company Act and "qualified institutional buyers" as defined in Rule 144A. Also, at no time may more than 100 persons beneficially own outstanding securities (other than short-term paper) of the Issuer, within the meaning of Section 3(c)(1) of the Investment Company Act. The Issuer has not agreed to provide registration rights to any purchaser of the Notes and no Noteholders may register the Notes under the Securities Act or any state securities laws.

There is currently no market for the Notes, nor is a market expected to develop in the future. A purchaser of Notes must be prepared to hold the Notes until final payment is made thereon.

### Non-Recourse to MCC, MDC or Affiliates Thereof

No Noteholder will have recourse for payment of its Notes to any assets of any of MCC, MDC, the initial or any subsequent Servicer, or any Affiliates thereof. In addition, the Issuer's assets will be limited to those assets pledged to the Trustee under the Master Indenture (except for Dollars distributed from time to time from the Trust Estate to the Issuer and held by the Issuer free and clear pending payment or distribution to its members). In addition, while MDC may from time to time make voluntary capital contributions to the Issuer of Dollars or Metals, MDC is not under any legal obligation to make such contributions and may decline to make further contributions at any time. Consequently, Noteholders must rely for the payment of interest and principal on the Notes solely upon Collections on the Loans, Dollars (if any) previously contributed to the Issuer by MDC, any Metals Inventory held by the Issuer (including Metals, if any, previously contributed by MDC to the Issuer) and amounts realized upon the disposition thereof and, following commencement of an Amortization Period for Series 2016-1, any available additional reserve amount then held in the Series 2016-1 Required Amounts Account as described in "Summary of Terms—Collections" above.

MNX-CFTC-01335303

**Risk of Volatility of Market Price of Metals**

The Trust Estate is expected to consist largely of the Loans secured by Metals Collateral, such Metals Inventory, if any, as may be held from time to time by the Issuer. As a condition to the issuance of the Notes, the Trust must show a Principal Variance not less than zero, i.e., the Adjusted Eligible Pool Balance plus any Dollars held for repayment of Note principal plus the Adjusted Inventory Balance (if any) in the Equalization Account plus Dollars (if any) held in the Equalization Account must at least equal the aggregate principal amount of the Notes outstanding. This advance rate formula is designed to assure that (1) subject to certain Obligor and silver concentration limits, for every dollar of Eligible Loan principal balance supported by Metals Collateral no more than $0.80 of Note principal is outstanding, and (2) subject to certain silver concentration limits, for every dollar in Wholesale Value of any Eligible Metals Inventory held by the Issuer, no more than $0.80 of Note principal is outstanding. Wholesale Value is determined by reference to the prior Business Days' "London Fixing P.M. for Gold" and "London Fixing P.M. for Silver," as applicable, or shortest futures NYMEX price (for platinum and palladium), in each case as quoted in the Wall Street Journal. To the extent Wholesale Value declines from one day to the next, holding other factors constant, a dollar of Note principal advanced would become secured by Loan balances collateralized with, or Metals Inventory representing, a lesser Wholesale Value of Metals.

The Servicing Agreement requires that if such declines were to lead to a Principal Variance, measured daily, of less than zero (i.e., a Negative Principal Variance) the Servicer must take the actions described in "Summary of Terms—Mechanisms for maintaining required advance rate levels" until there is no longer a Negative Principal Variance. If such declines were of significant duration and severity, and/or such actions by the Servicer were not taken or were delayed, it is possible that a Negative Principal Variance could remain uncured. In fact, if Wholesale Value declines were of sufficient severity and duration, the Note principal advanced could become secured by Loan balances collateralized with, or Metals Inventory representing, a Wholesale Value of Metals less than the amount advanced. While outstanding Loan balances remain obligations of the Obligor even to the extent not secured by an equivalent value of Metals, there can be no assurance that Obligors would make deficiency payments or that the Servicer could obtain a recovery thereof. In addition, there is no percentage or aggregate limits in the advance rate formula on the amount of Note principal that may be supported by Metals Inventory as opposed to Loans. Moreover, other than the concentration limits related to palladium, there are no percentage or aggregate limits in the advance rate formula on the amount of Note principal that may be secured by Loans collateralized with, or Metals Inventory consisting of, any particular Metal (i.e., the Wholesale Value of Metals Collateral supporting Loans, or of Metals Inventory, could in theory consist entirely of exposure to any one Metal – gold, silver, or platinum). Accordingly in the event of Wholesale Value declines of sufficient severity and duration, Noteholders could suffer a loss of principal.

**MCC or MDC Bankruptcy Considerations**

Andrews Kurth Kenyon LLP, special counsel to MCC, MDC and the Issuer, will render an opinion to the Trustee to the effect that (a) in the event MCC became a debtor under the United States Bankruptcy Code the transfer of Loans from MCC to the Issuer in accordance with the TSA, would be treated as a sale of ownership and not as a pledge to secure a borrowing, (b) in the event MDC became a debtor under the United States Bankruptcy Code the transfer of Metals Inventory from MDC to the Issuer in accordance with the OAA, would be treated as an absolute conveyance in the form of a capital contribution, and not as a pledge to secure a borrowing, and (c) that the Issuer would not be substantively consolidated with either MCC or MDC as a single entity. If, however, such transfers were treated as a pledge to secure borrowings by the relevant transferee, or if the Issuer were ordered consolidated with MCC or MDC as a single entity or were to become bankrupt for any reason, the distribution of proceeds of the Loans and/or Metals Inventory to the Trustee for the benefit of the Noteholders might be subject to the automatic stay provisions of the United States Bankruptcy Code, which would delay the distribution of such proceeds for an uncertain period of time. In addition, a bankruptcy trustee would have the power to sell the Loans and Metals Inventory if the proceeds of such sale could satisfy the amount of the debt deemed owed by the Issuer, or the bankruptcy trustee could substitute other collateral in lieu of the Loans and Metals Collateral to secure such debt, or such debt could be subject to adjustment by the bankruptcy court if MCC or MDC were to file for reorganization under Chapter 11 of the United States Bankruptcy Code.

To the extent that MCC or MDC is deemed to have granted to the Issuer only a security interest in the Loans or Metals Inventory, as applicable, and that security interest was validly perfected before any insolvency of MCC or MDC and was not granted or taken in contemplation of insolvency or with the intent to hinder, delay, or defraud MCC or MDC (as applicable) or its creditors, that security interest should not be subject to avoidance in the event of insolvency or receivership of MCC or MDC, and payments to the Trustee with respect to proceeds of the Loans and Metals Inventory should not be subject to recovery by a bankruptcy trustee or receiver of MCC or MDC, as applicable. If, however, such a bankruptcy trustee or receiver were to assert a contrary position, delays in payments on the Notes and possible reductions in the amount of those payments could occur. If a bankruptcy trustee or receiver were appointed for the Servicer, and no Servicer Default other than such bankruptcy or receivership or insolvency of the Servicer exists, the bankruptcy trustee or receiver may have the power to prevent a transfer of servicing to a successor Servicer. If a bankruptcy trustee or receiver were appointed for the Servicer, causing an Event of Default with respect to all Series then outstanding, no new Loans or Metals Inventory would be transferred to the Issuer and, if directed to do so by a Majority of Noteholders, the Trustee would exercise remedies as a secured creditor against the Trust Estate, including

foreclosure and liquidation. If the net proceeds from such sale, if any, were insufficient to pay the Noteholders in full, a loss to the Noteholders would result.

**Repurchase Obligation of MCC Provides Only Limited Protection Against Prior Liens on the Trust Estate Assets**

Federal or state law may grant liens on a Loan that have priority over the Issuer's interest therein (and hence the Trustee's interest as assignee/pledgee of the Issuer). To the extent a lien having priority over the Issuer's or Trustee's lien exists, the Trustee's interest in the asset will be subordinate to such prior lien. In the event the creditor associated with such prior lien exercises its remedies on its security interest it is unlikely that, after the senior creditor is repaid, sufficient cash proceeds from the Loans will be available to pay the Loan principal balance outstanding to the Trustee. An example of a lien arising under federal or state law is a tax or other government lien on property of MCC or the Issuer arising prior to the time the Loan is pledged to the Trustee.

Under the TSA, MCC will warrant to the Issuer that the Loans and security interest in Metals Collateral securing the same will be transferred free and clear of the lien of any third party other than certain permitted liens. MCC also will warrant to the Issuer that it will not sell, pledge, assign, transfer or grant any other lien on the Loans. In the event that such warranties are not true with respect to any Loan, MCC is required under the TSA to either cure the breach or repurchase the Loan. The Trustee, as assignee of the Issuer, is a beneficiary of such right against MCC. There can be no assurance that MCC will be able to repurchase a Loan at the time required under the TSA.

**Insolvency of Obligors May Reduce or Delay Collections on the Loans**

To the extent an Obligor fails to perform its obligations under its Loan Agreement, the Servicer is authorized (and is required under certain circumstances, such as when a Negative Principal Variance exists) to take prompt action to accelerate the Loan and liquidate the Metals Collateral securing the related Loan and apply the resulting liquidation proceeds as Collections in repayment of the outstanding Loan balance. In the event of a U.S. federal bankruptcy case with respect to an Obligor as debtor, such liquidation could be subject to a stay and associated delay. Such delay would increase the risk that a decline in the market value of the Metals Collateral prior to its eventual liquidation could lead to a deficiency in amounts available to satisfy the unpaid Loan balance. To the extent such deficiency arises, it will represent a general unsecured claim against the bankrupt Obligor and recovery of such deficiency against the Obligor's bankruptcy estate would be unlikely. In such event, a loss to Noteholders could result if other Collections or realizations on other Trust Estate assets could not make up the deficiency.

**Limited Nature of Credit Ratings Assigned to the Notes**

The rating assigned to the Notes reflect the Rating Agency's assessment only of the likelihood that interest will be paid on each Payment Date and that principal will be repaid on or before the stated Maturity Date of the Notes, not that it will be paid when expected or scheduled. The rating is based on the Rating Agency's determination of the value of the Loans, Metals Collateral and Metals Inventory, and the reliability of the cash flows and Collections expected to be generated therefrom. The ratings do not address the following:

- the likelihood that principal on the Notes will be prepaid, paid on a scheduled date or paid on any particular date before the stated Maturity Date;

- the possibility that the Notes will be paid early;

- the marketability of the Notes, or any market price; or

- that an investment in the Notes is suitable for any particular investor.

A rating is not a recommendation to purchase, hold or sell notes.

**Losses on the Loans May Differ from Historical Experience**

Since its inception in 1995, the Issuer has experienced extremely low losses (less than .10% of the Adjusted Eligible Pool Balance annually) on its portfolio of Loans held through the Trust. This historical performance, however, may not necessarily be an accurate depiction of future portfolio performance. Losses could arise depending on the mix of Loans and Designated Accounts included in the Trust Estate, changes in the management, underwriting and servicing systems of MCC, changes in the standards, procedures and policies of MCC, as well as for various other reasons, including changes in local, regional or national economies adversely affecting the credit of Obligors, or changes in the prices or volatility of prices of Metals.

**Commingling of Funds May Result in Reduced or Delayed Payments to Noteholders**

If bankruptcy or reorganization proceedings are commenced with respect to the Servicer, any funds then held by the Servicer either directly or indirectly (*i.e.*, on deposit in a lockbox account) may be unavailable to Noteholders. Under the Servicing Agreement, the Servicer is required to deposit promptly into the Collection Account maintained with the Trustee all payments received by the Servicer with respect to the Loans included in the Trust Estate. If those funds are not transferred to the Trustee, as required by the Servicing Agreement, payments to Noteholders could be delayed or reduced if the Servicer becomes bankrupt or insolvent.

**Payments and Maturity**

If an Early Amortization Event or Event of Default occurs, the Amortization Period will commence and the average life and maturity of the Notes may be significantly reduced. There can be no assurance in that event that the holders of the Notes would be able to reinvest any accelerated distributions on account of such Notes in other suitable investments having a comparable yield.

**Master Indenture Considerations and the Issuance of Additional Series of Notes**

The Notes will be the first series of notes issued under the Master Indenture and the only series outstanding at closing. The Issuer under the Master Indenture may (but is not obligated to) issue, additional Series from time to time. While the terms of any Series will be specified in the related Supplement, the provisions of a Supplement and, therefore, the terms of any additional Series, will not necessarily be subject to the prior review or consent of holders of the Notes. Such terms of other Series may include methods for determining Required Amounts, provisions granting additional Series Collateral, provisions for alternative forms of credit or liquidity enhancements, different Classes of notes, provisions subordinating such Series to another Series (if the Supplement relating to such Series so permits) or another Series to such Series (if the Supplement for such other Series so permits), and any other amendment or supplement to the Master Indenture which is made applicable only to such Series. In addition, the provisions of any Supplement may give the holders of the notes issued pursuant thereto consent, approval, or other rights that could result in such holders having the power to cause the Issuer, the Servicer or the Trustee to take or refrain from taking certain actions, including, without limitation, actions with respect to the exercise of certain rights and remedies under the Master Indenture, without regard to the position or interest of the Noteholders of any other Series. Similar rights may also be given to the provider of any credit or liquidity enhancement specific to such a Series. It is a condition precedent to the issuance of any additional Series that each Rating Agency that has rated any outstanding Series deliver written confirmation to the Trustee that the additional Series will not result in such Rating Agency reducing or withdrawing its then current rating on any outstanding Series. There can be no assurance, however, that the principal terms of any other Series, including any Series issued from time to time hereafter, might not have an adverse impact on the timing and amount of payments received by a Noteholder or the value of the Notes even if there is no change in the rating of any outstanding Series.

**Sharing of Collateral**

The Series 2016-1 Notes and each other outstanding series of notes that Issuer may from time-to-time issue, are secured by a shared security interest in the Loans and Metals Inventory and funds held in the Collection Account, but each series of notes is entitled to the benefits of only that portion of the Collections that are allocated to it under the Master Indenture and the Indenture Supplement. Upon the occurrence of an Event of Default or an Early Amortization Event, if the Collections on and/or proceeds of a liquidation of the Collateral that are allocated to a particular Series are insufficient to repay the notes of such Series in full, a loss to Noteholders could result.

**Subordination of Class M Notes and Class B Notes to Class A Notes; Subordination of Class B Notes to Class M Notes**

The Issuer will repay principal on the Class A Notes of Series 2016-1 prior to repaying principal on the Class M Notes or the Class B Notes and the Issuer will repay principal on the Class M Notes of Series 2016-1 prior to repaying principal on the Class B Notes. The subordination of the Class M Notes and the Class B Notes to the Class A Notes and the subordination of the Class B Notes to the Class M Notes means that the Class M Notes and the Class B Notes are more likely to suffer the consequences of delinquent payments and defaults on the Loans or declines in the value of Metals Collateral and/or Metals Inventory than the Class A Notes, and the Class B Notes are more likely to suffer those consequences or declines than the Class M Notes. In such an event, the Class M Noteholders and/or the Class B Noteholders may suffer a loss.

**Government Regulation**

Monex Deposit Company ("*MDC*") and Monex Credit Company ("*MCC*") (collectively, "*Monex*") engage in the purchase and sale (and financing thereof) of precious metals with retail customers, and are subject to various regulatory, financial and other requirements. In addition, Monex is subject to a variety of federal and state consumer protection laws.

In 2010, the U.S. Congress adopted the Dodd-Frank Wall Street Reform and Consumer Protection Act ("*Dodd-Frank*"), comprehensive financial reform legislation that provides for enhanced regulation of financial institutions and certain non-bank entities, derivatives and asset-backed securities offerings, and enhanced oversight of credit rating agencies. Dodd-Frank requires the Commodity Futures Trading Commission (the "*CFTC*") to, among other things, regulate certain retail commodity transactions when offered on a leveraged or margined basis or financed by the offeror or a person acting in concert with the offeror. Although Monex has not been subject to CFTC jurisdiction historically, it could be determined that Monex is subject to at least limited CFTC jurisdiction as a result of Dodd-Frank.

Changes required by Dodd-Frank, additional legislation or regulations, changes in existing laws and rules, or changes in interpretations or enforcement of existing laws and rules could have a material adverse effect on Monex's business, financial condition and operating results. Failure to comply with current or future legislation or regulations that apply to Monex's operations could subject it to fines, penalties, or material restrictions on Monex's business in the future. No assurances can be given that the ultimate outcome of any such event would not have a material adverse effect on Monex or its ability to perform its duties under the transaction documents. Additionally, any such outcome could adversely affect the marketability or liquidity of your Notes.

Monex may become involved from time to time in reviews, investigations and proceedings, and information gathering requests, by government and self-regulatory agencies, including among others, the CFTC and state attorneys general, relating to its sales and lending practices. Adverse actions could result in the imposition of damages, equitable remedies, fines or civil or criminal claims and/or penalties. Monex is currently subject to an ongoing investigation by the CFTC. For a further discussion, see "Legal Proceedings" herein.

## THE ISSUER

Scala Funding Company, L.L.C. (the *"Issuer"*) is a limited liability company organized under the laws of the State of Delaware. The Issuer was formed for the limited purposes of (i) purchasing Loans and related assets, and acquiring Metals (including by contribution from one or more of its members), (ii) issuing notes or similar instruments (including through a trust) collateralized by or evidencing interests in its assets, (iii) holding and financing reversionary interests in such assets and (iv) engaging in acts incidental, necessary or convenient to the foregoing. The Issuer's actions are restricted by its organizational documents. In addition, the Issuer's organizational documents and the transaction documents related to the issuance of the Notes require the Issuer to operate in a manner so as to minimize the likelihood that it would be consolidated in the bankruptcy estate of MCC or MDC in the event that any of MCC or MDC becomes a debtor in a case under the federal Bankruptcy Code. The principal executive office of the Issuer is located at 4900 Birch Street, Newport Beach, California 92660-2188, telephone number (949) 752-1400.

The Issuer does not have, nor is it expected in the future to have, any significant assets other than the Trust Estate (with the exception of additional Series Collateral or credit or liquidity enhancement, if any, for other Series, if any, which would not necessarily be available for the benefit of the Notes). The Issuer will pledge its interest in the Trust Estate to the Trustee for the benefit of the Noteholders and issue the Notes (and may issue additional Series of notes) pursuant to the Master Indenture and individual Series Supplements thereunder.

## USE OF PROCEEDS

The Issuer will apply the net proceeds from the sale of the Notes as follows: (i) to purchase at closing or from time to time (holding Note proceeds until such use in the Equalization Account) certain specified additional Loans in respect of Designated Accounts from MCC pursuant to the TSA, and (ii) to pay certain costs and expenses.

## THE TRUST ESTATE

The Notes will be secured by a pool of assets pledged to the Trustee for all Series of notes outstanding, including the Series 2016-1 Notes, under the Master Indenture (the *"Trust Estate"*) which will consist of: (i) the Loans conveyed to the Issuer from time to time under the TSA, together with the security interest in the Metals Collateral securing the same, and any payments to be made by the Obligors under such Loans (but not including any Commodity Loan made to an Obligor by MCC under the related Loan Agreement); (ii) any guaranties of an Obligor's obligations under a Loan; (iii) the executed original Loan Agreement and the related rights against the Obligor thereunder; (iv) related rights of the Issuer, MCC and MDC under the Metals Depository Agreement; (v) any rights of the Issuer under the TSA or the OAA; (vi) moneys or Metals from time to time deposited in the Collection Account or held in the Equalization Account or any other Trust Account established under the Master Indenture;

MNX-CFTC-01335307

(vii) all the Issuer's right, title and interest in and to moneys on deposit in the Lockbox Account with respect to the Loans, and related rights under the Lockbox Agreement; and (viii) any and all income and proceeds of the foregoing.

Loans are conveyed to the Issuer from time to time pursuant to the TSA. Existing portfolios of Loans have been previously purchased by the Issuer from MCC, in connection with the Issuer's currently outstanding notes, under the TSA. The TSA provides for representations by MCC that the Loans conform to certain specified characteristics and eligibility criteria.

The Issuer has the right, subject to certain conditions and aggregate limits and without adverse selection, to substitute for existing Loans in respect of a Designated Account in the Trust Estate, an equivalent principal balance of Loans in respect of a different Designated Account, which substitute Loans have been conveyed to the Issuer by MCC under the TSA. Upon such substitution the replacement Loans will become subject to the lien of the Master Indenture and the Loans being substituted will be released from such lien and reconveyed by the Issuer back to MCC. No such substitution may be made for Loans as to which the Obligor is currently in arrears of a payment obligation under its Loan Agreement or is the subject of insolvency proceedings.

MDC may, but is not obligated to, from time to time contribute Metals Inventory or Dollars to the Issuer pursuant to the OAA. Certain Metals Inventory and/or Dollars held in the Trust Estate may have been contributed previously to the Issuer under the OAA. The OAA provides for representations by MDC that the Metals Inventory it contributes thereunder conform to certain specified characteristics and eligibility criteria.

## STATISTICAL AND OTHER INFORMATION CONCERNING THE LOANS AND METALS

*The Loans*

The Loans are individual U.S. Dollar loan transactions made from time to time by MCC to designated customers (*"Obligors"* with respect to *"Designated Accounts"*) under MCC's Loan Agreement with such Obligor. Each Loan finances the Obligor's purchase of Metals (see the description of the Metals below), which are titled to the Obligor and held for the benefit of the Obligor by the Metals Depository. Currently, to obtain a Loan the Obligor must pay in its own Dollars an amount not less than 25% of the purchase price of related Metal being financed (*"Equity"*). The Obligor grants a security interest in all the acquired Metal, including the portion acquired using Equity, to secure its Loan. The Loan Agreement provides for an accruing interest rate on each Loan that is added to principal as accrued daily. The Loan Agreement grants MCC the right to demand repayment of the entire Loan at any time for any reason or no reason, with or without notice, and to increase the required Equity for a Loan at any time for any reason or no reason, with or without notice. Under the Loan Agreement, MCC also has the right to liquidate the collateral securing the loan without notice should the account's Equity fall below the current liquidation level (half of its minimum Equity level).

The Loans, while payable on demand, also carry a stated term (if a prior demand is not made) which ends five years from the last advance under the Loan Agreement. In the event a Loan is to remain open beyond this point, a new Loan Agreement must be signed by the customer and returned to MCC. The Loans bear interest at a variable rate determined by MCC. This rate is the same on each of MCC's customer Loans. MCC reviews and, if necessary, resets the rate periodically. As of October 31, 2016, the rate on each of MCC's customer Loans, including those owned by the Trust Estate, was 5.90%. The Loans are subject to MCC policies concerning minimum initial and ongoing position Equity requirements (see "Monex Credit Company and Monex Deposit Company" below for a description of current requirements).

To be included as part of the Adjustable Eligible Pool Balance in the Servicer's daily calculation of Principal Variance, a Loan must satisfy each of the eligibility requirements detailed in the definition of Eligible Loan set forth in "Definitions of Certain Terms" at the end of this Memorandum.

**[Remainder of page intentionally left blank]**

The tables below provide certain statistical information, as of October 31, 2016, regarding Loans and Metals Collateral securing the Loans previously conveyed by MCC to the Issuer and held in the Trust Estate on that date.

### DISTRIBUTION OF LOAN POOL BY OBLIGOR LOCATION

| OBLIGOR LOCATION | OUTSTANDING LOAN | % OF AGGREGATE OUTSTANDING LOAN | NUMBER OF ACCOUNTS | % OF AGGREGATE NUMBER OF ACCOUNTS |
|---|---|---|---|---|
| CALIFORNIA | 33,037,104.66 | 19.69% | 772 | 20.31% |
| TEXAS | 14,028,244.02 | 8.36% | 306 | 8.05% |
| FLORIDA | 13,525,436.07 | 8.06% | 287 | 7.55% |
| NEW YORK | 10,712,214.68 | 6.39% | 179 | 4.71% |
| ARIZONA | 6,115,067.75 | 3.64% | 84 | 2.21% |
| MARYLAND | 5,506,050.32 | 3.28% | 78 | 2.05% |
| WISCONSIN | 5,448,918.44 | 3.25% | 53 | 1.39% |
| PENNSYLVANIA | 5,401,134.21 | 3.22% | 126 | 3.31% |
| WASHINGTON | 5,339,735.94 | 3.18% | 98 | 2.58% |
| NEVADA | 5,250,400.34 | 3.13% | 58 | 1.53% |
| NEW JERSEY | 4,000,753.34 | 2.38% | 123 | 3.24% |
| COLORADO | 3,867,889.64 | 2.31% | 104 | 2.74% |
| ILLINOIS | 3,411,402.24 | 2.03% | 102 | 2.68% |
| NORTH CAROLINA | 3,402,598.13 | 2.03% | 105 | 2.76% |
| OREGON | 3,321,078.42 | 1.98% | 59 | 1.55% |
| GEORGIA | 3,301,625.45 | 1.97% | 109 | 2.87% |
| VIRGINIA | 3,096,295.52 | 1.85% | 103 | 2.71% |
| MISSOURI | 3,007,930.90 | 1.79% | 57 | 1.50% |
| OHIO | 2,823,213.35 | 1.68% | 98 | 2.58% |
| INDIANA | 2,785,091.63 | 1.66% | 46 | 1.21% |
| MICHIGAN | 2,534,387.53 | 1.51% | 102 | 2.68% |
| IDAHO | 2,445,034.87 | 1.46% | 35 | 0.92% |
| MASSACHUSETTS | 2,206,975.90 | 1.32% | 58 | 1.53% |
| HAWAII | 2,174,143.36 | 1.30% | 57 | 1.50% |
| SOUTH CAROLINA | 1,684,677.92 | 1.00% | 48 | 1.26% |
| WYOMING | 1,575,987.27 | 0.94% | 20 | 0.53% |
| KANSAS | 1,497,626.73 | 0.89% | 31 | 0.82% |
| ALABAMA | 1,321,071.95 | 0.79% | 39 | 1.03% |
| UTAH | 1,297,916.00 | 0.77% | 51 | 1.34% |
| CONNECTICUT | 1,275,428.40 | 0.76% | 33 | 0.87% |
| OKLAHOMA | 1,239,197.43 | 0.74% | 29 | 0.76% |
| ALASKA | 1,123,251.91 | 0.67% | 21 | 0.55% |
| MAINE | 1,075,853.15 | 0.64% | 22 | 0.58% |
| NEW MEXICO | 1,003,450.40 | 0.60% | 36 | 0.95% |
| CANADA | 969,731.35 | 0.58% | 20 | 0.53% |
| IOWA | 815,896.18 | 0.49% | 24 | 0.63% |
| WEST VIRGINIA | 809,283.84 | 0.48% | 15 | 0.39% |
| LOUISIANA | 733,504.77 | 0.44% | 28 | 0.74% |
| DELAWARE | 685,197.10 | 0.41% | 6 | 0.16% |
| TENNESSEE | 669,234.14 | 0.40% | 44 | 1.16% |
| SOUTH DAKOTA | 660,281.23 | 0.39% | 13 | 0.34% |
| KENTUCKY | 517,612.15 | 0.31% | 25 | 0.66% |

949864.2

18

| | | | | |
|---|---|---|---|---|
| ARKANSAS | 506,069.15 | 0.30% | 22 | 0.58% |
| RHODE ISLAND | 483,568.78 | 0.29% | 10 | 0.26% |
| MISSISSIPPI | 446,817.08 | 0.27% | 17 | 0.45% |
| NORTH DAKOTA | 299,797.45 | 0.18% | 13 | 0.34% |
| VERMONT | 179,981.44 | 0.11% | 11 | 0.29% |
| WASHINGTON DC | 100,164.63 | 0.06% | 6 | 0.16% |
| PUERTO RICO | 26,280.48 | 0.02% | 4 | 0.11% |
| MONTANA | 12,007.52 | 0.01% | 1 | 0.03% |
| MEXICO | 8,197.89 | 0.00% | 1 | 0.03% |
| MINNESOTA | 5,258.21 | 0.00% | 1 | 0.03% |
| NEW HAMPSHIRE | 2,008.57 | 0.00% | 2 | 0.05% |
| MILITARY | 1,095.67 | 0.00% | 2 | 0.05% |
| NEBRASKA | 677.91 | 0.00% | 7 | 0.18% |
| GUAM | 0.00 | 0.00% | 0 | 0.00% |
| VIRGIN ISLANDS | 0.00 | 0.00% | 0 | 0.00% |
| **TOTALS** | 167,769,853.41 | 1.00 | 3,801 | 1.00 |

### DISTRIBUTION OF LOAN POOL BY OUTSTANDING LOAN AMOUNT

| RECEIVABLE SIZE | OUTSTANDING LOAN | % OF AGGREGATE OUTSTANDING LOAN | NUMBER OF ACCOUNTS | % OF AGGREGATE NUMBER OF ACCOUNTS |
|---|---|---|---|---|
| $0 - $19,999.99 | 12,609,063.50 | 7.52% | 2,592.00 | 68.19% |
| $20,000 - $49,999.99 | 17,976,298.17 | 10.71% | 573.00 | 15.07% |
| $50,000 - $99,999.99 | 19,365,124.86 | 11.54% | 275.00 | 7.23% |
| $100,000 - $499,999.9 | 64,994,755.65 | 38.74% | 314.00 | 8.26% |
| >= $500,000 | 52,824,611.23 | 31.49% | 47.00 | 1.24% |
| TOTALS | 167,769,853.41 | 1.00 | 3,801 | 1.00 |

MNX-CFTC-01335310

**DISTRIBUTION OF LOAN POOL BY ACCOUNT EQUITY**

| ACCOUNT EQUITY % | OUTSTANDING LOAN | % OF AGGREGATE OUTSTANDING LOAN | NUMBER OF ACCOUNTS | % OF AGGREGATE NUMBER OF ACCOUNTS |
|---|---|---|---|---|
| < 7.00 | 19,647.45 | 0.01% | 3.00 | 0.08% |
| 7.00 - 11.99 | 3,291.25 | 0.00% | 1.00 | 0.03% |
| 12.00 - 13.99 | 0.00 | 0.00% | 0.00 | 0.00% |
| 14.00 - 17.99 | 17,668,438.33 | 10.53% | 153.00 | 4.03% |
| 18.00 - 19.99 | 15,368,516.45 | 9.16% | 131.00 | 3.45% |
| 20.00 - 21.99 | 14,608,061.22 | 8.71% | 125.00 | 3.29% |
| 22.00 - 23.99 | 13,547,999.37 | 8.08% | 147.00 | 3.87% |
| 24.00 - 25.99 | 18,254,631.17 | 10.88% | 182.00 | 4.79% |
| 26.00 - 27.99 | 13,161,725.11 | 7.85% | 168.00 | 4.42% |
| 28.00 - 29.99 | 8,504,803.99 | 5.07% | 189.00 | 4.97% |
| 30.00 - 39.99 | 31,839,112.54 | 18.98% | 724.00 | 19.05% |
| 40.00 - 49.99 | 16,002,373.27 | 9.54% | 333.00 | 8.76% |
| 50.00 - 59.99 | 8,324,524.07 | 4.96% | 226.00 | 5.95% |
| 60.00 - 69.99 | 4,366,099.43 | 2.60% | 153.00 | 4.03% |
| 70.00 - 99.99 | 6,100,629.76 | 3.64% | 1,266.00 | 33.31% |
| **TOTALS** | 167,769,853.41 | 1.00 | 3,801.00 | 1.00 |

**DISTRIBUTION OF LOAN POOL BY LOAN AGE**

| AGE (YEARS) | OUTSTANDING LOAN | % OF AGGREGATE OUTSTANDING LOAN | NUMBER OF ACCOUNTS | % OF AGGREGATE NUMBER OF ACCOUNTS |
|---|---|---|---|---|
| 0 - 1 | 23,351,295.57 | 13.92% | 472.00 | 12.42% |
| 1 – 2 | 18,617,993.71 | 11.10% | 369.00 | 9.71% |
| 2 – 4 | 41,611,432.81 | 24.80% | 785.00 | 20.65% |
| 4 – 7 | 40,217,429.32 | 23.97% | 1,013.00 | 26.65% |
| 7 – 10 | 23,765,054.48 | 14.17% | 676.00 | 17.78% |
| > 10 | 20,206,647.52 | 12.04% | 486.00 | 12.79% |
| **TOTALS** | 167,769,853.41 | 1.00 | 3,801.00 | 1.00 |

**FIFTEEN LARGEST OBLIGORS WITHIN LOAN POOL**

| OBLIGOR RANKING | OUTSTANDING LOAN | % OF AGGREGATE OUTSTANDING LOAN | ACCOUNT EQUITY % | OPEN DATE | AGE (DAYS) |
|---|---|---|---|---|---|
| 1 | 4,987,551.97 | 2.97% | 43.50 | 05/17/2013 | 1263 |
| 2 | 3,646,958.88 | 2.17% | 20.68 | 06/23/2014 | 861 |
| 3 | 3,112,961.51 | 1.86% | 28.07 | 10/29/2012 | 1463 |
| 4 | 2,451,119.50 | 1.46% | 18.25 | 07/12/2011 | 1938 |
| 5 | 2,254,255.56 | 1.34% | 22.45 | 03/17/2011 | 2055 |
| 6 | 1,887,622.07 | 1.13% | 39.45 | 03/19/2003 | 4975 |
| 7 | 1,692,187.07 | 1.01% | 20.05 | 08/21/2009 | 2628 |
| 8 | 1,573,655.27 | 0.94% | 25.78 | 10/22/2015 | 375 |
| 9 | 1,504,245.58 | 0.90% | 50.36 | 08/25/2016 | 67 |
| 10 | 1,419,546.46 | 0.85% | 19.52 | 10/07/2008 | 2946 |
| 11 | 1,333,632.90 | 0.79% | 17.52 | 01/08/2010 | 2488 |
| 12 | 1,316,330.92 | 0.78% | 15.91 | 10/25/2013 | 1102 |
| 13 | 1,105,538.57 | 0.66% | 73.20 | 03/03/2004 | 4625 |
| 14 | 1,099,227.17 | 0.66% | 16.11 | 12/17/2013 | 1049 |
| 15 | 1,083,811.06 | 0.65% | 26.13 | 11/10/2009 | 2547 |
| OTHER | 137,301,208.92 | 81.84% | N/A | N/A | N/A |
| **TOTALS** | 167,769,853.41 | 1.00 | | | |

**DISTRIBUTION OF METALS COLLATERAL SECURING LOANS BY PRODUCT AND TYPE**

| PRODUCT | TYPE | OUNCES | % OF TOTAL OUNCES | MARKET VALUE | % OF TOTAL MARKET VALUE |
|---|---|---|---|---|---|
| GOLD | BULLION | 46,664.80 | 0.27% | 59,404,290.40 | 12.60% |
| | COIN | 68,239.21 | 0.40% | 86,868,514.33 | 18.42% |
| PLATINUM | BULLION | 11,620.00 | 0.07% | 11,329,500.00 | 2.40% |
| | COIN | 3,845.00 | 0.02% | 3,748,875.00 | 0.80% |
| SILVER | BULLION | 13,253,600.00 | 77.07% | 235,649,008.00 | 49.98% |
| | COIN | 3,801,705.00 | 22.11% | 67,594,314.90 | 14.34% |
| PALLADIUM | BULLION | 9,290.00 | 0.05% | 5,722,640.00 | 1.21% |
| | COIN | 1,960.00 | 0.01% | 1,207,360.00 | 0.26% |
| **TOTAL** | | 17,196,924.01 | 1.00 | 471,524,502.63 | 1.00 |

*The Metals*

The following table displays all products that are permissible to serve as either Metals Collateral or Metals Inventory. The Issuer has the right to include other palladium, gold, silver, or platinum products as either Metals Collateral securing Loans or Metals Inventory pursuant to and subject to requirements set forth in the Servicing Agreement. The products are presented in customer lots, with the weight (or face value) of the lot noted in parenthesis. The decimals preceding each bullion type in the table represent minimum required purity levels.

| Silver | Gold | Platinum |
|---|---|---|
| .999 Silver Bullion (1, 100, 1000 oz. & 1 Kilo) | .995 Gold Bullion (1, 10, 100, 400 oz. & 1 Kilo) | .9995 Platinum Bullion (1, 10, 50 oz. & 1 thru 6 Kilos) |
| US 90% Silver Coins ($1000 Face Value) | Gold Canadian Maple Leaf Coins (one, 0.10, 0.25, 0.50, 2 oz.) | Platinum Australian Koala Coins (one oz.) |
| US 40% Silver Clad Coins ($1000 Face Value) | Gold Australian Nugget Coins (two, one, 0.10, 0.25, 0.50 oz.) | Platinum Canadian Maple Leaf Coins (one oz.) |
| Silver Canadian Maple Leaf Coins (one, 1.5 oz.) | Gold South African Krugerrand Coins (one, 0.10, 0.2354, 0.25, 0.50 oz.) | Isle of Man Platinum Nobles Coins (one, 0.50, 0.25, 0.10 oz.) |
| Silver American Eagle Coins (one oz.) | Gold Austrian Vienna Philharmonic Coins (one thousand, one, 0.10, 0.25, 0.50, 20 oz.) | Platinum American Eagle Coins (one, 0.10, 0.25, 0.50 oz.) |
| Silver Austrian Vienna Philharmonic Coins (one oz.) | | |
| Silver Monex Eagle Coins (one oz.) | Gold American Eagle Coins (one, 0.10, 0.25, 0.50 oz.) | **Palladium** |
| | Gold American Buffalo Coins (one oz.) | |
| | Gold Canadian Mountie Coins (one, 0.10, 0.25, 0.50 oz.) | .9995 Palladium Bullion (1, 10, 50 oz. & 1 thru 6 Kilos) |
| | Pre-1934 US Gold Coins ($2.50, $5, $10 and $20 denomination) | Palladium Canadian Maple Leaf Coins (one oz.) |
| | Gold Austrian 100 Corona Coins (ten .9802 oz.) | Russian Ballerina Coins (one oz.) |
| | Gold Mexican 50 Peso Coins (ten 1.2056 oz.) | |

Most bullion traded is the product of a Commodity Exchange, Inc. (COMEX) approved refiner. Each bar of bullion is stamped by the refiner and given a unique serial number. All bullion meets the fineness (or purity) and other delivery requirements for precious metals traded on federally regulated U.S. commodity exchanges. The majority of precious metals traded on wholesale and futures markets is in the form of bullion.

MDC only trades in coins minted by the United States, Canadian, Australian, Austrian, Russian, British, South African and Mexican governments. All coins offered are legal tender in their country of origin. Coins typically trade at a premium over bullion due to their greater cost of manufacture, their beauty and their convenience, although discounts to bullion can and do occur.

The table below shows the breakdown by market value of the Metals Inventory held in the Trust Estate as of October 31, 2016.

### DISTRIBUTION OF METALS INVENTORY BY PRODUCT AND TYPE

| PRODUCT | TYPE | OUNCES | % OF TOTAL OUNCES | MARKET VALUE | % OF TOTAL MARKET VALUE |
|---------|------|--------|-------------------|--------------|-------------------------|
| GOLD | COIN | 6,175.93 | 1.72% | 7,861,958.89 | 27.11% |
| PLATINUM | BULLION | 3,113.93 | 0.87% | 3,036,081.75 | 10.47% |
| | COIN | 1,550.90 | 0.43% | 1,512,127.50 | 5.21% |
| SILVER | COIN | 330,052.38 | 92.12% | 5,868,331.32 | 20.24% |
| PALLADIUM | BULLION | 12,778.41 | 3.57% | 7,871,500.56 | 27.14% |
| | COIN | 4,626.00 | 1.29% | 2,849,616.00 | 9.83% |
| **TOTAL** | | 358,297.55 | 1.00 | 28,999,616.02 | 1.00 |

### MONEX CREDIT COMPANY AND MONEX DEPOSIT COMPANY

Monex Credit Company ("*MCC*") and Monex Deposit Company ("*MDC*") (collectively, *"Monex"* or the *"Company"*) engage in the purchase and sale (and financing thereof) of precious metals with retail customers mainly within the United States. The principal offices of each of the Monex companies is 4910 Birch Street, Newport Beach, California 92660-2188. Their telephone number is (949) 752-1400.

*Company History*

In 1967, Louis E. Carabini founded Pacific Coast Coin Exchange, Ltd., which was later renamed Monex International, Ltd. Initially, PCCE was a coin dealer buying and selling numismatic coins and currencies. Carabini, who was a student of Austrian Economics, recognized earlier that monetary expansion and the introduction of non-silver coinage would cause then circulating silver coins to be hoarded for their commodity value. PCCE soon became America's foremost dealer in pre-1965 U.S. silver coins as a vehicle for owning silver as a tangible commodity hedge and storehouse of wealth. Because gold bullion ownership was illegal from 1933 to 1972, in its early years, PCCE offered semi-numismatic pre-1933 gold coins as a substitute for gold bullion.

In 1971, Monex International began offering leveraged purchases to investors. It grew rapidly as it specialized in a revolutionary vehicle it introduced which consisted of selling bags of silver coinage, containing $1,000 in face value, along with a $1,000 loan. The bags had a slight premium over their bullion melt value, and they had downside risk protection having legal tender value. Monex International became one of four congressionally-authorized Leveraged Transaction Merchants.

In 1985, Louis Carabini started two new companies; Monex Deposit Corporation and Monex Credit Corporation, to offer financed purchases of physical precious metals. This program was designed as an alternative to the precious metals leverage contracts then being offered by Monex International. In 1990, because of the preference of the companies' customers for the new, simpler program, Monex International discontinued its offerings of leverage contracts, and later was dissolved.

MCC and MDC were founded as limited partnerships in 1987 as the successors to Monex Credit Corporation and Monex Deposit Corporation, respectively. MCC finances purchases that customers make from MDC and also leases precious metals to customers. MDC buys and sells precious metals with customers through a telephonic sales force, currently consisting of about 100 account representatives. The products of MCC and MDC include gold, silver, platinum and palladium bullion and various popular gold, silver, platinum and palladium bullion coins. (See "Statistical and Other Information Concerning the Loans and the Metals—The Metals" above for a description of the Metals which may constitute Metals Collateral or Metals Inventory for the Notes.) As a principal, MDC maintains inventories of most of the products in which it makes a market. MDC generates revenue by charging commissions on retail customer trades and by maintaining a spread between retail and wholesale prices.

*Loan Origination Policies and Procedures*

Historically, approximately 25% of MDC's customers have purchased metals using funds borrowed from MCC pursuant to Loan Agreements. The loans are payable on demand and bear interest at variable rates determined by the Company.

The metals purchased serve as collateral for the loans. (See "Statistical and Other Information Concerning the Loans and the Metals—The Loans" above for a description of the Loans to be included in the Trust Estate.) MCC's lending decision is based entirely on the value of the metal, ignoring the credit quality of the borrower. The metals securing all MCC loans are held in insured independent depositories.

MCC currently lends up to 75% of the value of the metal upon loan origination. The metal is valued at MDC's retail bid price, which generally is approximately 1.5% lower than the wholesale market's bid. The account's equity is recalculated daily to reflect the current market value of the metals, the accrual of interest, the inflow or outflow of cash, and any changes in positions.

*Portfolio Monitoring and Management*

When MCC finances a customer's metals purchase, the customer is required to make an initial payment in an amount at least equal to the initial equity requirement, currently 25% of the purchase price. To keep the account in good standing, the customer must always maintain at least the minimum required account equity level, currently 14%. Should the customer's account equity fall below the minimum required level, MCC will issue a collateral call requiring the customer to raise the equity to the current initial required level. If the customer fails to meet the collateral call within the required time period (no more than 5 days, though in some circumstances this period will be shorter and in all cases the customer must commit immediately to make payment),MCC will sell enough of the metals securing the loan to raise the account's equity above the minimum required equity level. In the event the customer's account equity falls below the foreclosure level (currently half of the minimum required level), MCC has the right, at its discretion and without notifying the customer, to sell some or all of the metal securing the loan to raise the account's equity above the minimum required level.

When collateral securing a loan is liquidated, the proceeds received (net of MDC's commission) are credited first to satisfaction of the outstanding loan equity requirements under the Loan Agreement. If collateral is liquidated and the proceeds are insufficient to repay a loan, the account will be closed and MCC will establish a reserve for the potential loan loss and take action to collect the remaining outstanding balance that it is owed. If the balance is not recovered within 30 days, the customer receivable will be written off and a loan loss will be incurred.

In periods of abnormally high volatility, MCC increases customer equity requirements. MCC has developed a formula for increasing the equity requirements when metal prices increase rapidly to protect customers from forced liquidation resulting from an equally rapid decline. If metals prices are relatively volatile at the time of a collateral call, or the amount of the call is large, MCC may require the borrower to wire the call amount to protect MCC against any interim price changes. MCC will not wait for collateral calls to be received if the price continues to fall; i.e., foreclosure always takes place once the 7%equity level is breached.

MCC has experienced negligible losses on its portfolio of customer loans since 1987. There can, however, be no assurance that the loss experiences on the Loans included in the Trust Estate will be similar to MCC's historical experience.

*Commodity Loan Positions*

MCC also loans commodities to customers who want to take advantage of possible declines in precious metals prices. When MCC loans a bar to a customer, the customer may either take delivery of the bar or sell it to MDC. To secure his obligation to return the bar, the customer is initially required to deposit cash in the account in an amount equal to 130% (silver) or 125% (all other Metals) of the bar's value. The deposit is generally comprised of sale proceeds and customer contributed cash. A customer with an open commodity loan is required to comply with similar equity, collateral call and foreclosure requirements as someone who has entered into a financed long position (see above). Neither commodity loans nor the security for these loans will be transferred to the Issuer, pledged as an asset to the Trust Estate or be included in Principal Variance calculations.

*Documentation and Storage*

Metals securing MCC's loans and metals owned by MDC are stored at insured COMEX-approved depositories. The depository tracks the pool of metals, uniquely identifying each piece by metal type (coin vs. bar) and its other distinguishing characteristics (e.g., refiner, weight, serial number). The depository provides safekeeping for both the metals it holds and the metals at other depositories that are subject to warehouse receipts (see below) in its possession.

Documentation varies by depository. Metals held at certain depositories are evidenced by warehouse receipts, which are negotiable instruments in bearer form. Metals held at other depositories, including the Metals Depository, are evidenced by an account. The liquidity of metals held on account is usually slightly greater than warehouse receipts, due to the documentational due diligence required in trading bearer warehouse receipts. Coins are held exclusively in account form.

MNX-CFTC-01335315

Unless and until additional or successor Metals Depositories are appointed pursuant to the Metals Depository Agreement, the Servicing Agreement and the Master Indenture, all Metals securing Loans or being held as Metals Inventory will be stored at the Metals Depository or evidenced by warehouse receipts held at the Metals Depository.

*Liquidation Procedures*

In the event that an Obligor either (i) gives instruction to sell his metals, or (ii) fails to meet his Loan Agreement obligations, resulting in the liquidation of his collateral, MCC will notify the Trustee and the Metals Depository (if the Loan in question is then held by the Issuer as part of the Trust Estate) that the Obligor's collateral has been sold to MDC. The Metals Depository will notify the Obligor in writing that he/she no longer has title to the collateral, and will update its records to reflect the change in ownership. MDC will then credit the customer's account for cash equal to MDC's retail bid minus a commission. The cash is then applied in full to the outstanding loan balance (and, for a Loan then held as part of the Trust Estate, would be allocated as a Collection under and subject to the Servicing Agreement). Any cash remaining after the loan balance has been satisfied will be credited to the Obligor's account or remitted to the Obligor.

MDC may decide to retain the metals, which MDC now owns in its inventory for sale to another retail customer. Alternatively, MDC may sell the metals to a dealer at the current wholesale spot bid for settlement in two days. The metals would be sold "on account" at the depository. Generally, the dealer also has an account at the depository. Once payment for the metal is received, the depository reduces MDC's account and increases the buyer's account for the metals.

*Regulation*

MCC is regulated by the state of California as a finance lender. MDC is regulated by the state of California as a telephonic seller. MDC is also subject to the Federal Trade Commission's rules for telephonic sellers.

*Customers and Competitors*

Almost all of MDC's sales are the product of prospective retail customers contacting MDC to inquire about investing in metals. MDC believes that approximately 75% are the result of advertising (MDC advertises on the cable television network CNN), with the remainder being referrals from current customers.

Direct competitors of MDC in the retail metal brokerage industry include:

- A-Mark, a wholesale and retail metals dealer,

- Fidelitrade, an affiliate of Delaware Depository,

- Dillon Gage, Inc., a retailer of precious metals and rare coins, and

- Blanchard & Co., a retailer of precious metals and coins.

Many commodity brokerage firms, mutual fund managers and stock brokerage firms offer futures and securities investments based on metals, but they do not focus their businesses exclusively on metals.

*Information and Accounting Systems*

MCC manages its business on two DEC Alpha servers using an internally developed COBOL based accounting system. System files and backup data files are stored off-site through a third-party vendor. The accounting system is updated continuously for price movements and provides MCC management with minute-to-minute equity positions of its customers.

MCC's proprietary Auto-Force-Sell System converts loan information into sell orders on a batch basis, enabling MCC to liquidate its portfolio on a pool-wide basis, rather than a loan-by-loan basis. The system processes current price information and reports by product the amount of metals that need to be sold due to account equities falling below the foreclosure level. Once the metals are sold, the system applies the proceeds to accounts in ascending order, beginning with the account with the lowest level of relative equity. The system also enables MCC management to perform sensitivity analyses measuring the effect of rapidly declining prices on all of MCC's loans. It was developed in response to the 1980 period of price volatility and, while it has been tested extensively, it has never been used to liquidate customer portfolios.

*Entity Structure and Ownership*

MCC is a California limited partnership. Its general partner, Metco Management Corporation, is a California Sub-S corporation. Metco is 100% owned by Madison Investments. Metco's sole activity is the management of MCC. Metco's officers and directors are: Michael A. Carabini, President and director; Christina Carabini, director; and Brian D. Jenkins, Secretary and Treasurer. MCC's partners hold the following interests in the company:

General:

| | |
|---|---|
| Metco Management Corporation | 11.00% |

Limited:

| | |
|---|---|
| Lemonwood Investments* | 40.30% |
| Amberwood Investments* | 40.30 |
| Michael A. Carabini | 5.00 |
| Brian D. Jenkins | 1.00 |
| Ronald Smoler | 1.40 |
| Michael Maroney | 1.00 |

_____
*These are personal, family trusts of Michael A. Carabini and his wife. Michael A. Carabini is the trustee of both trusts.

MDC is a California limited partnership. Its general partner, Comco Management Corporation, is a California Sub-S corporation. Comco is 100% owned by Madison Investments. Comco's sole activity is the management of MCC. Comco's officers and directors are: Louis E. Carabini, President, Treasurer and sole director; Michael Maroney, Vice President; and Gregory G. Walker, Secretary. MDC's partners hold the following interests in the company:

General:

| | |
|---|---|
| Comco Management Corporation | 5.00% |

Limited:

| | |
|---|---|
| Montgomery Trust* | 40.30% |
| Emerson Trust* | 40.30 |
| Michael A. Carabini | 11.00 |
| Brian D. Jenkins | 1.00 |
| Ronald Smoler | 1.40 |
| Michael Maroney | 1.00 |

_____
*These are personal, family trusts of Michael A. Carabini and his wife. Michael A. Carabini is the trustee of both trusts.

Newport Service Corporation ("*NSC*") is a California Sub-S corporation chartered in 1987. It provides administrative, accounting and other services to MCC, MDC and other related companies. NSC is 100% owned by Madison Investments. NSC's officers and directors are: Michael A Carabini, President and director; Christina Carabini, director; Gregory G. Walker, Vice President and Secretary; and Brian D. Jenkins, Chief Financial Officer.

Secured Credit Corporation ("*SCC*") is a California Sub-S corporation chartered in 1992. It is a licensed California finance lender and provides loans to customers who wish to finance their purchases of rare coins and rare ingots from an MCC affiliate. SCC is 100% owned by Michael A. Carabini. SCC's officers and directors are: Michael A Carabini, President, Treasurer and director; Christina Carabini, director; and Brian D. Jenkins, Secretary.

Scala Funding Company, L.L.C. ("Scala") is a Delaware limited liability company. Its members are Amberwood Investments and Lemonwood Investments. Scala's members hold the following interests in the company:

| | |
|---|---|
| Amberwood Investments | 50% (Common) |
| Lemonwood Investments | 50% (Common) |

Scala's managers are Michael A. Carabini, Brian Jenkins and Orlando Figueroa.

MNX-CFTC-01335317

**LEGAL PROCEEDINGS**

As of the date of this Memorandum, there were no legal proceedings which management anticipates would have a material adverse effect on MCC, MDC or the Issuer, except as described below.

Since January of 2014, the Division of Enforcement (the "*DOE*") of the Commodity Futures Trading Commission (the "*CFTC*" or the "*Commission*") has been investigating the financed sale of precious metals by Monex Deposit Company ("*MDC*") and Monex Credit Company ("*MCC*") (collectively, "*Monex*") following the effective date of certain provisions established by the Dodd-Frank Wall Street Reform and Consumer Protection Act ("*Dodd-Frank*") in July 2011. The focus of the investigation is to determine whether those transactions violate provisions of the Commodity Exchange Act and the CFTC's regulations applicable to either retail commodity transactions or futures contracts. As part of its investigation, the DOE has questioned whether the terms of depository delivery of metals for Monex customers meet the Act's requirement of "actual delivery." It has also focused on whether certain Monex sales practices violate CFTC rules applicable to retail commodity sales. Monex received a verbal Wells notice in May of 2016, indicating that the staff of the DOE had made a preliminary determination to recommend to the Commission that an enforcement proceeding be brought against Monex. In response, Monex filed a written Wells submission on May 27, 2016, contesting all assertions of CFTC jurisdiction and denying any violative conduct. Monex counsel then met with DOE staff on June 9, 2016 and shortly thereafter filed a supplemental Wells submission to address certain matters discussed at the meeting. Monex counsel again met with DOE staff on October 6, 2016 and at the staff's suggestion filed a second supplemental Wells submission on December 5, 2016. Additional discussions between Monex counsel and the DOE are anticipated over the next 2-3 months with the goal of persuading DOE that it would be inappropriate for the Commission to file an enforcement action against Monex.

If the CFTC were to pursue and prevail in its claims that Monex's financed metals transactions and related sales practices have been subject to CFTC jurisdiction since implementation of Dodd-Frank, it is not entirely clear what sanctions might be imposed if those transactions and practices were found to have violated the Commodity Exchange Act and CFTC regulations. Potential remedies could involve undertakings by Monex regarding protocols and disclosures, and might also include a monetary penalty and/or disgorgement. Depending upon the severity of such penalty, Monex's ability to service the Loans and to honor the repurchase obligations for Loans that breach representations and warranties could be impaired. If an Obligor has a claim against Monex for a violation of any law and that claim materially and adversely affects the interests of the Issuer in a Loan, the violation would constitute a breach of Monex's representations and warranties and may create an obligation of Monex to repurchase the Loan unless the breach is cured. Other possible consequences of a CFTC proceeding or an action by an Obligor include Monex altering or terminating futures sales activities and potential rescission rights being available to Obligors. Monex believes that a successful rescission claim is unlikely.

While Monex management believes that the likelihood of a material impact on its financial condition resulting from the CFTC's investigation and any resulting legal action is unlikely, no assurance can be given that the Commodity Exchange Act and implementing regulations will not have a significant adverse impact on the Issuer or the Servicer, including on the servicing of the receivables, or the price that a subsequent purchaser would be willing to pay for your Notes. However, Monex has agreed in the TSA to indemnify the Issuer from and against, among other things, any liability arising from any violation of the Commodity Exchange Act and CFTC regulations.

**THE SERVICER**

MCC, in its capacity as servicer (the *"Servicer"*) shall be contracted with the Issuer under the Servicing Agreement, to be dated the date of closing on the Notes, among the Issuer, MCC and Citibank as Trustee and Backup Servicer (the *"Servicing Agreement"*) to provide servicing, collection and administration services for the Loans and Metals Inventory included in the Trust Estate. These services consist of transaction processing and management services for each Loan, from the time it is acquired by the Issuer under the TSA through its repayment, termination or liquidation. The Servicer provides for the Issuer both the personnel and system resources for set-up, billing, cash posting, customer service, accounting, collections, tax compliance and all asset management and reporting functions. Additional services provided by the Servicer include arrangements with and administration of the relationship with the Metals Depository, invoicing and collections. The Servicer maintains its principal office at 4910 Birch Street, Newport Beach, California 92660-2188, telephone number (949) 752-1400.

Generally, collection activities with respect to the Loans in the Trust Estate are required to be performed by the Servicer in accordance with its customary policies and procedures. See "Monex Credit Company and Monex Deposit Company" above for a description of certain of such procedures and policies as to MCC. Also see "The Servicing Agreement" below for a description of certain specific servicing procedures, policies and requirements with respect to the Loans and Metals Inventory. Under certain limited circumstances, the Servicer may resign or be removed, in which event a third party (which may be the Backup Servicer) meeting the requirements set forth in the Servicing Agreement will be appointed as Successor Servicer. In the event a third party cannot be engaged, the Trustee will perform the functions of the Servicer.

The Servicer may delegate certain of its servicing duties to any person, including an affiliate, but no such delegation relieves the Servicer of its liability and responsibility with respect to any such delegated duties or functions.

## THE TRUSTEE

The Trustee is Citibank, N.A ("*Citibank*"), a national banking association and wholly owned subsidiary of Citigroup Inc., a Delaware corporation. Citibank, N.A. performs as Trustee through the Agency and Trust line of business, a part of Issuer Services. Citibank, N.A. has primary corporate trust offices located in both New York and London. Citibank, N.A. is a leading provider of corporate trust services offering a full range of agency, fiduciary, tender and exchange, depositary and escrow services. As of the end of the third quarter of 2016, Citibank's Agency and Trust group manages in excess of $4.9 trillion in fixed income and equity investments on behalf of over 2,500 corporations worldwide. Since 1987, Citibank Agency and Trust has provided corporate trust services for asset-backed securities containing pool assets consisting of airplane leases, auto loans and leases, boat loans, commercial loans, commodities, credit cards, durable goods, equipment leases, foreign securities, funding agreement backed note programs, truck loans, utilities, student loans and commercial and residential mortgages. As of the end of the third quarter of 2016, Citibank, N.A. acts as indenture trustee and/or paying agent for approximately 228 various asset backed trusts supported by either auto loans or leases or equipment loans or leases.

In the ordinary course of business, Citibank is involved in a number of legal proceedings, including in connection with its role as trustee of certain RMBS transactions. Certain of these Citibank as trustee-related matters are disclosed herein.

On June 18, 2014, a civil action was filed against Citibank in the Supreme Court of the State of New York by a group of investors in 48 private-label RMBS trusts for which Citibank allegedly serves or did serve as trustee, asserting claims for purported violations of the Trust Indenture Act of 1939 (the "*Trust Indenture Act*"), breach of contract, breach of fiduciary duty and negligence based on Citibank's alleged failure to perform its duties as trustee for the 48 RMBS trusts. On November 24, 2014, plaintiffs sought leave to withdraw this action. On the same day, a smaller subset of similar plaintiff investors in 27 private-label RMBS trusts for which Citibank allegedly serves or did serve as trustee, filed a new civil action against Citibank in the United States District Court for the Southern District of New York asserting similar claims as the prior action filed in state court. In January 2015, the court closed plaintiffs' original state court action. Citibank's motion to dismiss the federal complaint was fully briefed as of May 13, 2015. On September 8, 2015, the federal court dismissed all claims as to 24 of the 27 trusts and allowed certain of the claims to proceed as to the other three trusts. Subsequently, plaintiffs voluntarily dismissed all claims with respect to two of the three trusts. This case is still pending as to the remaining trust at issue.

On November 24, 2015, the same investors that brought the federal case brought a new civil action in the Supreme Court of the State of New York related to 25 private-label RMBS trusts for which Citibank allegedly serves or did serve as trustee. This case includes the 24 trusts previously dismissed in the federal action, and one additional trust. The investors assert claims for breach of contract, breach of fiduciary duty, breach of duty to avoid conflicts of interest, and violation of New York's Streit Act (the "*Streit Act*"). Citibank's motion to dismiss was fully briefed as of April 15, 2016. Following oral argument on Citibank's motion to dismiss, Plaintiffs filed an amended complaint on August 5, 2016. Citibank filed a motion to dismiss the amended complaint on September 9, 2016, and all briefing on the motion is due by October 21, 2016.

On August 19, 2015, the Federal Deposit Insurance Corporation ("*FDIC*") as Receiver for a financial institution filed a civil action against Citibank in the Southern District of New York. This action relates to one private-label RMBS trust for which Citibank formerly served as trustee. FDIC asserts claims for breach of contract, violation of the Streit Act, and violation of the Trust Indenture Act. Citibank jointly briefed a motion to dismiss with The Bank of New York Mellon and U.S. Bank, entities that have also been sued by FDIC in their capacity as trustee, and whose cases are also in front of Judge Carter. Defendants' joint motion to dismiss was fully briefed as of March 22, 2016. On September 30, 2016, the Court granted Citibank's motion to dismiss the complaint without prejudice for lack of subject matter jurisdiction. On October 14, 2016, FDIC filed a motion for reargument or relief from judgment from the Court's dismissal order. On October 25, 2016, the court granted leave for defendants to file an opposition brief. Defendants filed their opposition November 15, 2016 and plaintiff filed its reply brief on November 22, 2016. Citibank awaits a decision from the Court on plaintiff's motion.

There can be no assurances as to the outcome of litigation or the possible impact of litigation on the trustee or the RMBS trusts. However, Citibank denies liability and continues to vigorously defend against these litigations. Furthermore, neither the above-disclosed litigations nor any other pending legal proceeding involving Citibank will materially affect Citibank's ability to perform its duties as Trustee under the Master Indenture for this transaction.

The Trustee's duties in connection with the Notes are limited solely to its express obligations under the Master Indenture and any related Series Supplement thereto.

The Trustee will be entitled to receive, payable as part of the Required Amounts in respect of each Series from Collections allocated to each such Series, such compensation, for its services as has been agreed with the Issuer (the "*Trustee*

MNX-CFTC-01335319

*Fee")*. In addition, the Trustee will also be entitled to receive any expenses or indemnification amounts due to the Trustee by the Issuer up to the Trustee Indemnification Cap, to the extent applicable.

The Trustee may resign, subject to the conditions set forth below, at any time upon written notice to the Servicer, in which event the Servicer will be obligated to appoint a successor Trustee. If no successor Trustee shall have been so appointed and have accepted such appointment within 30 days after the giving of such notice of resignation, the resigning Trustee may petition a court of competent jurisdiction for the appointment of a successor Trustee. Any successor Trustee must meet the financial and other standards for qualifying as a successor Trustee under the Master Indenture. The Servicer may and shall, at the direction of the Majority of Noteholders, also remove the Trustee if the Trustee ceases to be eligible to continue as such under the Master Indenture and fails to resign after written request therefor, or is legally unable to act, or if the Trustee is adjudicated to be insolvent. In such circumstances, the Servicer or such Noteholders will also be obligated to appoint a successor Trustee. Any resignation or removal of the Trustee and appointment of a successor Trustee will not become effective until acceptance of the appointment by the successor Trustee.

### THE BACKUP SERVICER

Portfolio Financial Servicing Company *("PFSC")* will act as backup servicer (in such capacity, the *"Backup Servicer")* for the Issuer. The Backup Servicer's duties in connection with the Notes are limited to its express obligations under the Servicing Agreement. In the event that the current servicer resigns or is terminated, the Backup Servicer will assume the role and duties of Servicer until a Successor Servicer is formally appointed (which may be Portfolio Financial Servicing Company). The Backup Servicer will be entitled to receive, payable as part of the Required Amounts in respect of each Series from Collections allocated to each such Series, such compensation for its services as has been agreed with the Issuer (the *"Backup Servicer Fee")* for acting in such capacity.

Pursuant to the Servicing Agreement, the Backup Servicer's principal responsibility is to stand ready to assume the role of Successor Servicer in the event a Servicer Default by MCC as initial Servicer leads to the delivery of a Termination Notice under the Servicing Agreement seeking appointment of a Successor Servicer. The Backup Servicer only is agreeing to assume such Successor Servicer role, however, if the Event of Default corresponding to delivery of such Termination Notice is not waived by a Majority of Noteholders. Accordingly, the Backup Servicer's sole function when becoming Successor Servicer will be to perform the Loan demand and liquidation obligations set forth in the Servicing Agreement required upon an Event of Default. Not less than weekly, the Servicer is required under the Servicing Agreement to provide to the Backup Servicer updated information regarding the Loans, Metals Collateral, Obligors, Designated Accounts and Metals Inventory in form and substance as would, in the reasonable judgment of the Servicer and Backup Servicer, enable the Backup Servicer if acting as Successor Servicer to promptly comply with such Loan demand and liquidation requirements. The Servicing Agreement imposes no general obligation on the Backup Servicer to supervise the performance of the initial Servicer and imposes no liability on it for any particular actions taken or omitted by the initial Servicer.

The Backup Servicer agrees not to resign from the obligations and duties imposed on it by the Servicing Agreement as Backup Servicer or, in the event it replaces the Servicer, as Successor Servicer, except (i) upon a determination that by reason of a change in legal requirements the performance of its duties would cause it to be in violation of such legal requirements in a manner which would have a material adverse effect on the Backup Servicer, or (ii) upon the waiver by a Majority of Noteholders of the Event of Default associated with the delivery of a Termination Notice seeking appointment of a Successor Servicer. Any determination described in clause (i) permitting the resignation of the Backup Servicer must be evidenced by an Opinion of Counsel to such effect.

### THE CUSTODIAN

MCC and the Issuer have agreed to cause the original Loan Agreements in respect of the Loans to be deposited with PFSC acting in its individual capacity as Custodian, under and pursuant to a Custodial Agreement among PFSC as Custodian, the Issuer, MCC as Initial Servicer and the Trustee. The Custodial Agreement establishes the Custodian as a bailee and custodian in respect of such original Loan Agreements for the benefit of the Trustee as pledgee of such Loan Agreements under the Master Indenture.

### TRANSFER AND SALE AGREEMENT

MCC and the Issuer are parties to the TSA pursuant to which the Issuer purchases from time to time Loans and Related Interests from MCC. The following summary describes certain terms of the TSA and is qualified in its entirety by reference to the TSA.

On each designated Purchase Date MCC sells and assigns to the Issuer, without recourse and without any formal or other instrument of assignment, any and all of MCC's right, title and interest, whether then existing or thereafter acquired, in, to and under the following (being the *"Loans and Related Interests"*):

(i)     all Loans in respect of Designated Accounts, including, but not limited to those Accounts which may be added to the List of Designated Accounts from time to time, (but not including any Commodity Loans) in existence as of the related Cut-Off Date, together with all Collections in respect thereof,

(ii)     all rights related thereto under such Loan Agreements and all accounts, chattel paper, general intangibles, instruments and other obligations of an Obligor with respect to such Loans and Loan Agreements,

(iii)     all security interests in the related Metals Collateral securing such Loans,

(iv)     all rights to or under any lock-box account relating to the Loans, and in the Lock-Box Agreement, together with all funds, certificates and instruments, if any, from time to time representing or evidencing or held in such lock-box account, and

(v)     all proceeds or products of any of the foregoing.

MCC agrees to sell to the Issuer, and the Issuer agrees (subject to the terms and conditions of the TSA) to purchase from MCC, each Loan and Related Interest then originated and existing, or thereafter to be originated from time to time by MCC in respect of such Designated Accounts. Each such sale is in consideration of the Issuer's payment of the Purchase Price therefor on such Purchase Date, in an amount equal to the Outstanding Balance. The Purchase Price is to be paid by the Issuer in Dollars (including Dollars available to the Issuer from borrowings under the Notes, and Collections available on the date of purchase after prior allocations which are released to the Issuer under the Servicing Agreement). If Dollars from such sources are not available, MCC may (but is not obligated to) contribute Loans to the Issuer as a capital contribution in consideration of the Issuer's issuance of redeemable preferred membership units to MCC, which contribution is to be treated for all other purposes under the TSA as if a sale for the Purchase Price as aforesaid.

It is a condition to the occurrence of any conveyances under the TSA that, among other things, no Event of Default shall have occurred and be continuing, and that an Amortization Period shall not then be in effect for all outstanding Series.

MCC represents (among other things) as follows with respect to the Loans and Related Interests conveyed from time to time under the TSA, as of the related Cut-Off Date or Purchase Date, as applicable, with respect to each such Loan:

- Each Loan Agreement was originated by MCC to the Issuer without any fraud or misrepresentation on the part of MCC or any other Person.

- MCC is the holder of all right, title and interest in and to the Loans and Related Interests, free from any Lien; and MCC shall defend such Loans and Related Interests against all claims and demands of all Persons at any time claiming any interest therein adverse to that of the Issuer or the Trustee. Notwithstanding the foregoing, no Loan Agreement is subject to any right of rescission, setoff, counterclaim or defense and no such right has been asserted or threatened with respect to any Loan Agreement.

- MCC has in its possession, pending delivery to the Custodian in accordance with the Custodial Agreement, all original executed copies of the Loan Agreements, and has caused all such copies in its possession to be separately identified and distinguished from MCC's other customer loan agreements, and MCC has caused, and as of each Purchase Date as of which Additional Designated Accounts have been designated, MCC will have caused (with respect to Loan Agreements in respect of such Additional Designated Accounts) each such Loan Agreement in its possession to be affixed with an appropriate marking, attachment or legend clearly disclosing the fact that such Loan Agreement and all security interests in the related Metals Collateral have been transferred and that the Issuer is the owner thereof and further disclosing the fact that interests in such Loan Agreements and security interests in the related Metals Collateral have been further assigned by the Issuer to the Trustee, and any copies of such Loan Agreements subsequently coming into the possession of MCC also will be so identified. Such Loan Agreements do not have any marks or notations indicating that they have been pledged, assigned or otherwise conveyed to any Person other than the Issuer and any further assignees of the Issuer. All financing statements filed or to be filed against MCC in favor of the Issuer in connection herewith describing the Loans and Related Interests contain or will contain a statement to the following effect: "A purchase of or security interest in any collateral described in this financing statement will violate the rights of Scala Funding Company, L.L.C. and/or its assignees." In addition, within 30 days of the Closing Date MCC (on behalf of the Issuer) agrees to cause, and within 5 Business Days after each Purchase Date as of which Additional

Designated Accounts have been designated, MCC (on behalf of the Issuer) will cause (with respect to Loan Agreements in respect of such Additional Designated Accounts) the original executed copies of each such Loan Agreement to be delivered to the possession of the Custodian pursuant to the Custodial Agreement.

- The Loans being sold by MCC are in full force and effect in accordance with their respective terms and constitute Eligible Loans as of the date of transfer.

- The Loan Agreements represent the genuine, legal, valid, binding and enforceable obligations of the parties thereto, subject, as to enforcement, to applicable bankruptcy, insolvency, reorganization and other similar laws of general applicability relating to or affecting creditors' rights generally and to general principles of equity regardless of whether enforcement is sought in a court of law or equity; and all parties to each Loan Agreement had full legal capacity to execute and deliver such Loan Agreement and all other documents related thereto and to grant the security interest purported to be granted thereby.

- No Obligor is the United States of America or any State or any agency, department, subdivision or instrumentality thereof.

- At the related Cutoff Date, no Obligor had been identified on the records of MCC as being the subject of a bankruptcy proceeding.

- There is only one original executed copy of each Loan Agreement.

- No Loan Agreement is assumable by another Person in a manner that would release the Obligor thereof from such Obligor's obligations to MCC with respect to such Loan Agreement.

- No selection procedures adverse to the Noteholders or the Issuer were utilized in selecting the Loans from those Loans owned by MCC.

- The Metals Collateral securing the Loans and held by the Metals Depository is covered by insurance procured by the Metals Depository in the usual and customary amounts maintained by prudent metals depositories engaging in similar business, naming the Metals Depository, or its assignee, as a loss payee and insuring against loss and damage due to theft and other risks covered by comprehensive coverage. All premiums due on such insurance have been paid in full.

- The Loans were not originated in and are not subject to the laws of any jurisdiction whose laws would make the transfer of the Loans under the TSA unlawful or unenforceable.

- All requirements of any federal, state or local law, including, without limitation, usury, truth in lending, and equal credit opportunity laws, applicable to the Loans have been complied with, and MCC shall, for at least the period of the TSA, maintain in its possession available for the Issuer's and the Trustee's inspection, and shall deliver to the Issuer or the Trustee upon demand, evidence of compliance with all such requirements.

- No Loan has been satisfied, subordinated or rescinded, and the Metals Collateral securing each such Loan has not been released from the Lien of the related Loan in whole or in part. No terms of any Loan Agreement have been waived, altered or modified in any respect since its origination, except as otherwise expressly provided. All funds payable to or on behalf of the Obligors with respect to the Loans have been fully disbursed.

- No Loan was originated in, or is subject to the laws of, any jurisdiction the laws of which would make unlawful, void or voidable the sale, transfer and assignment of such Loan and Related Interests under this Agreement. For the validity of the sale, transfer and assignment of the Loans and Related Interests to the Issuer and the Trustee, no consent by any Obligor or other Person is required under any agreement or applicable law.

- The Loan Agreements create a valid, subsisting and enforceable first priority perfected security interest in favor of MCC in the Metals Collateral. Such security interest is prior to all other Liens upon and security interest in such Metals Collateral that now exists or may arise or be created. As to the related Cutoff Date, there were no Liens or claims for taxes, work, labor or materials affecting the Metals Collateral that are or may be Liens prior or equal to the Liens of the related Loan.

- The Loans were originated by MCC in the regular course of its business and taken into possession in the ordinary course of MCC's business, without knowledge that the Loans or Metals Collateral were subject to any Lien or other

949864.2

31

MNX-CFTC-01335322

claim, except for Liens which are or were released or extinguished upon or prior to the purchase of the Loans on the related Purchase Date.

- No Loan has been sold, transferred, assigned or pledged by MCC to any Person other than the Issuer. No Person has an unpaid participation in, or other right to receive, proceeds of any Loan. Except as contemplated in the Program Agreements, MCC has not taken any action to convey any right to any Person that would result in such Person having a right to payments received under the Loans. MCC has not done anything to convey any right to any Person (other than the Issuer or the Trustee) that would result in such Person having a right to payments due under the Loan Agreement or otherwise impair the rights of the Issuer, the Trustee and the Noteholders in any Loan Agreement or the proceeds thereof.

- There is no default, breach, violation or event permitting acceleration existing under the respective Loan Agreements with respect to Loans and no event which, with notice and the expiration of any grace or cure period, would constitute such a default, breach, violation or event permitting acceleration under such Loan Agreement. MCC has not waived any such default, breach, violation or event permitting acceleration. MCC has not waived any such default, breach, violation or event permitting acceleration. As of the Cutoff Date, no Metals Collateral has been repossessed by or at the direction of MCC or any other Person.

- No Liens or claims have been filed or made affecting the Metals Collateral securing the Loan Agreements which are or may be Liens prior to, or equal or coordinate with, the interest established by the Loan Agreement.

- The Loan Agreements contain customary and enforceable provisions such as to render the rights and remedies of claimants thereunder adequate for the realization against the Metals Collateral of the benefits of the security.

- All filings (including UCC filings) and recordings as may be necessary to perfect the interest of the Issuer and the Trustee in the Loans and Related Interests being sold, conveyed and assigned have been accomplished and are in full force and effect.

- The List of Designated Accounts (as supplemented when and if Additional Loans are sold on any Purchase Date) contains a complete and correct list of all Loans sold by MCC under the TSA originated under and related to the existing Designated Accounts.

- All Loan Agreements evidencing Loans sold by MCC under the TSA are substantially similar in all material respects to the forms of loan agreement attached to the TSA, as the same may be modified from time to time in accordance with the TSA.

- With respect to any Loans and Related Interests transferred, (i) MCC has transferred and the Issuer has obtained legal and equitable title thereto, and (ii) no such transfer has been made on account of an antecedent debt owed by MCC to the Issuer or is voidable under any provision of the Bankruptcy Code.

- The Loan Agreements constitute tangible chattel paper under the UCC as in effect in the Relevant UCC State.

- The Loans were originated in accordance with and do not contravene (1) any laws, rules or regulations applicable thereto, or (2) any contract or other agreement between MCC and any third party, and no party to a Loan Agreement is in violation of any such law, rule or regulation.

- No procedures or investigations are pending or threatened which would adversely affect the payment or enforcement of the Loans or the security interest in the related Metals Collateral.

- The Loans made to Obligors pursuant to the Loan Agreements sold and to be sold to the Issuer are secured by Eligible Metals Collateral.

- Any Eligible Warehouse Receipts evidencing Metals Collateral are "warehouse receipts" within the meaning of the UCC.

- The Eligible Warehouse Receipts are "documents of title" within the meaning of Section 1-201 of the UCC.

- The Eligible Warehouse Receipts were issued in compliance with Article 7 of the UCC.

MNX-CFTC-01335323

- The bank which is a signatory to the Lockbox Agreement and is maintaining the lock-box account described therein is the only institution holding any lock-box account for receipt of payment from Obligors in respect of the Loans, and all Obligors have been instructed to make payments to such lock-box account referred to in the Lockbox Agreement and such instructions will be in full force and effect. Except as expressly contemplated in the Lockbox Agreement, neither MCC nor any Person claiming through or under MCC has any claim or interest in such lock-box account.

Under the TSA, in the event any defect, misrepresentation or omission adversely affects the interests of the Noteholders in the Loans and Related Interests, MCC must either (A) eliminate or cure the condition or circumstance causing such defect, misrepresentation or omission, as applicable, or (B) repurchase the affected Loans and Related Interests by depositing a repurchase price equal to the related Outstanding Balance, in either case within ten (10) Business Days of the first to occur of (i) MCC's making such determination; or (ii) MCC's receiving written notice of such determination from the Issuer or the Trustee.

MCC also covenants under the TSA (among other things) as follows:

- MCC will execute or endorse, acknowledge, and deliver to the Issuer and the Trustee from time to time such schedules, confirmatory assignments, conveyances, and other reassurances or instruments and take such further similar actions, as are necessary to preserve, protect and defend the interest of the Issuer in the Loans and Related Interests and the rights covered by the TSA, and shall take such other or further actions as the Issuer or the Trustee (upon written direction of a Majority of Noteholders) may reasonably request to preserve and maintain the Issuer's title to and interest in the Loans and Related Interests and the rights of the Issuer and the Trustee and the Noteholders therein against the claims of all persons and parties.

- MCC will do nothing to disturb or impair its conveyance of the Loans and Related Interests.

- MCC will from time to time, at its own expense, execute and file such additional financing statements (including continuation statements) as may be necessary to preserve the interests conveyed to the Issuer herein described and as may be reasonably requested by the Issuer or the Trustee (upon written direction of a Majority of Noteholders) and as are reasonably satisfactory in form and substance to the same.

- Prior to the date which is one year and one day after the payment in full of all outstanding Series, it will not institute against or join with any other Person in instituting against the Issuer any Involuntary Insolvency Proceedings.

- Any amendment, modification or deviation from the permissible forms of the Loan Agreement in effect on the Closing Date for the Notes will not have a material adverse effect on the collectability or timing of collection of amounts payable under the Loan Agreements.

- MCC will take no action to cause any Loan, and the Loan Agreement evidencing the same, to be evidenced by any instrument (as defined in the UCC). MCC will take no action to cause any Loan, and the Loan Agreement evidencing the same, to be anything other than "tangible chattel paper" (as defined in the UCC).

- Except for the conveyances under the TSA, MCC will not sell, pledge, assign or transfer to any other Person, or grant, create, incur, assume or suffer to exist any Lien (other than a Permitted Lien) on any Loan, or any interest therein; MCC will immediately notify the Issuer and the Trustee of the existence of any Lien (other than a Permitted Lien) on any Loan; and MCC shall defend the right, title and interest of the Issuer and Trustee in, to and under the Loans, against all claims of third parties claiming through or under MCC.

- MCC shall comply with and perform its obligations under any Loan Agreement that relates to a Designated Account.

- In the event that MCC receives Collections, MCC agrees to pay to the Issuer or such other Person designated by the Issuer all such Collections as soon as practicable after receipt thereof by MCC (but in no event later than the Business Day following the date of receipt).

- MCC will not convey, assign, exchange or otherwise transfer any interest in a Designated Account to any Person other than the Issuer prior to the termination of the TSA.

- MCC will comply in all material respects with all applicable laws, rules, regulations and orders applicable to the Loans and Related Interests, including, without limitation, usury laws, rules and regulations relating to truth in lending, fair credit billing, fair credit reporting, equal credit opportunity, fair debt collection practices and privacy.

MNX-CFTC-01335324

- MCC will preserve and maintain in all material respects its existence, rights (charter and statutory) and franchises as a limited partnership under the laws of California.

- At any reasonable time during normal business hours and from time to time, MCC will permit (i) the Issuer or the Trustee, or any Person designated by any of them, to examine and make copies of or abstracts from the records, books of account and documents (including, without limitation, computer tapes and disks) of MCC relating to Loans and Related Interests owned or to be purchased by the Issuer hereunder and (ii) the Issuer or the Trustee, or any Person designated by any of them, to visit the properties of MCC for the purpose of examining such records, books of account and documents, and to discuss the affairs, finances and accounts of MCC relating to the Loans and Related Interests or to MCC's performance hereunder, with any of its officers and/or with its independent certified public accountants.

- MCC will not change its name, identity or structure in any manner which might make any financing or continuation statement filed against it with respect to the Loans and Related Interests misleading within the meaning of the UCC, unless it shall have given the Trustee and each Rating Agency at least 30 days' prior written notice thereof and shall have taken all action, not later than 20 days after making such change, necessary or advisable to amend such financing statement or continuation statement so that it is not misleading.  MCC shall not change its state of organization or change the location of its principal records concerning the Loans and Related Interests from the current location unless it has given the Trustee and each Rating Agency at least 30 days' prior written notice of its intention to do so and has taken such action as is necessary or advisable to cause the interest of the Issuer, as well as the Trustee, in the Loans and Related Interests to continue to be perfected with the priority required by the TSA.  MCC shall at all times maintain each office at which it maintains records relating to the Loans and Related Interests within the United States of America.

- MCC shall promptly pay and discharge all taxes, assessments, levies and other governmental charges imposed on it, the failure of which to pay and discharge could have a Material Adverse Effect.

- MCC, even if not treating the transfer of Loans and Related Interests as an "off balance sheet" conveyance under generally accepted accounting principles, shall nonetheless disclose in its financial statements (by footnote or other appropriate designation) that the Loans and Related Interests sold, transferred, assigned, and otherwise conveyed to the Issuer under the TSA are property of the Issuer and subject to the interests of the Issuer and its further assignees, and any other disclosures to MCC's creditors shall be consistent with the foregoing.  MCC acknowledges that the Loans and Related Interests are not to constitute property of MCC under applicable state law, nor property of MCC's estate in the event of Insolvency Proceedings involving MCC.

- MCC shall promptly give the Issuer, the Trustee and each Rating Agency written notice of the following events, as soon as possible and in any event within 30 days after MCC or any of its ERISA Affiliates knows or has reason to know thereof: (i) the occurrence or expected occurrence of any Reportable Event with respect to any Plan to which MCC or any of its ERISA Affiliates contributes, or any withdrawal by MCC or any of its ERISA Affiliates from, or the termination, reorganization or insolvency of any Multiemployer Plan to which MCC or any of its ERISA Affiliates contributes or to which contributions have been required to be made by MCC or such ERISA Affiliate during the preceding five years or (ii) the institution of proceedings or the taking of any other action by the PBGC or MCC or any of its ERISA Affiliates or any such Multiemployer Plan with respect to the withdrawal by MCC or any ERISA Affiliates from, or the termination of any such Plan or Multiemployer Plan or the reorganization or insolvency of any such Multiemployer Plan.

- MCC will keep proper books of record and account in which full and correct entries shall be made of all financial transactions and the assets and business of MCC in accordance with generally accepted accounting principles.  MCC will implement and maintain administrative and operating procedures (including an ability to recreate records evidencing the Loans and Related Interests in the event of the destruction of any original records) to keep and maintain all documents, books, records and other information reasonably necessary or advisable for the collection of all Loans and Related Interests (including, without limitation, records adequate to permit the daily identification of each new Loan and Collections of and adjustments to each existing Loan).

- All written information furnished on and after the Closing Date by MCC to the Issuer, the Trustee or the Holders of any Series pursuant to or in connection with any Program Agreement or any transaction contemplated therein shall not contain any untrue statement of a material fact or omit to state material facts necessary to make the statements made not misleading, in each case in light of the circumstances under which such statements were made or such information was furnished.

- MCC shall be operated in such a way that is consistent with the assumptions set forth in the most recent Opinion of Counsel delivered in connection with the closing of any Series, relating to the question of whether the Issuer would be substantively consolidated in the bankruptcy estate of MCC in the event of MCC's bankruptcy.

## OPTIONAL ADVANCE AGREEMENT

MDC and the Issuer are parties to the OAA pursuant to which MDC may, from time to time at its sole option and with no legal obligation to do so, contribute as an Advance to the Issuer either Metals Inventory or Dollars, in exchange for preferred membership units in the Issuer. Such Advances are to be applied and allocated in the same manner as, and be treated as, Collections (of Dollars or Metals, as applicable) under the Servicing Agreement on the date received. The following summary describes certain terms of the OAA and is qualified in its entirety by reference to the OAA.

In the event and to the extent that MDC makes a Metals Advance to the Issuer of Metals Inventory or a Dollar Advance to the Issuer of Dollars, the Issuer shall issue with respect to such Advance, redeemable Series A Preferred Units with a stated value in a like amount on the date of such Advance, as provided in the related Supplement to the Issuer's Limited Liability Company Agreement to be entered into for such Series A Preferred Units. Upon receipt of such Advance by the Issuer, all of MDC's right, title and interest in and to such Metals Inventory and Dollars (as applicable) contributed by MDC shall have been assigned, transferred and conveyed to the Issuer.

MDC represents and agrees (among other things) as follows with respect to the Advances:

- MDC is the holder of all right, title and interest in and to the Dollars or Metals Inventory being transferred, assigned and conveyed by it free from any lien, security interest, encumbrance or other right, title or interest of any persons; and MDC shall defend such Dollars or Metals Inventory against all claims and demands of all persons at any time claiming the same or any interest therein adverse to that of the Issuer or the Trustee.

- On each Advance Date, pursuant to the terms of the Metals Depository Agreement, MDC, to the extent MDC contributes Metals Inventory, shall cause the Metals Depository to identify with appropriate notations on its books and records that such Metals Inventory have been transferred to the Issuer and that the Issuer is the owner thereof and further reflecting the fact that such Metals Inventory shall have been further pledged and assigned by the Issuer to the Trustee.

- On each Advance Date, MDC, to the extent MDC contributes Dollars, shall wire transfer such Dollars in immediately available funds to the Collection Cash Account.

- No liens or claims have been filed with respect to the Metals Inventory or the Dollars constituting the proceeds of any Advance.

- The transactions contemplated by the OAA are being consummated by MDC in furtherance of its ordinary business purposes, with no contemplation of insolvency and with no intent to hinder, delay or defraud any of its present or future creditors.

- The consideration received by MDC for the Advances, consisting of the equity interest represented by the Series A Preferred Units, constitutes or will constitute fair consideration having value reasonably equivalent to or in excess of that of the Dollars and/or Metals Inventory so Advanced.

- With respect to any Dollars or Metals Inventory Advanced, (i) MDC has transferred the same as a capital contribution and the Issuer has obtained legal and equitable title thereto, and (ii) no such transfer has been made on account of an antecedent debt owed by MDC to the Issuer or shall be voidable under any Section of the Bankruptcy Code.

- MDC is solvent and will not become insolvent after giving effect to the making of any Advance; MDC is paying its debts as they become due; and MDC, after making any Advance, will have adequate capital to conduct its business.

- MDC shall operate its business generally such that the Issuer would not be substantively consolidated in the bankruptcy estate of MDC in the event of MDC's bankruptcy.

- MDC has filed on a timely basis all required tax returns.

MNX-CFTC-01335326

- All of MDC's (and any consolidated subsidiary) pension or profit sharing plans have been fully funded in accordance with MDC's applicable obligations.

- All Metals Inventory which MDC may Advance constitutes Eligible Metals Inventory.

- In the event and to the extent MDC makes an Advance, MDC will execute or endorse, acknowledge, and deliver to the Issuer and the Trustee from time to time such schedules, confirmatory assignments, conveyances, and other reassurances or instruments and take such further similar actions relating to the Metals Inventory and Dollars, as applicable, as may be necessary or advisable to establish, evidence and maintain the Issuer's and the Trustee's right, title and interest in and to the Metals Inventory and/or Dollars conveyed, including against claims of all other persons and parties.

- MDC will do nothing to disturb or impair its transfer, assignment and conveyance of the Dollars or Metals Inventory.

- MDC agrees that prior to the date which is one year and one day after the payment in full of all outstanding Series, it will not institute against or join with any other Person in instituting against the Issuer any Involuntary Insolvency Proceedings.

<div align="center">

**SERVICING AGREEMENT**

</div>

The Issuer, MCC as initial Servicer, Citibank as Trustee and Portfolio Financial Servicing Company as Backup Servicer shall be parties to a Servicing Agreement to be dated the date of closing on the Notes, providing for (among other things) the duties of the Servicer in servicing, administering and collecting the Loans, the disposition or liquidation of Loans, Metals Collateral and/or Metals Inventory under certain circumstances, the allocation of received Collections and delivery of payment instructions to the Trustee with respect thereto, and daily as well as periodic information reporting requirements of the Servicer. The following summary describes certain terms of the Servicing Agreement, and is qualified in its entirety by reference to the actual terms and provisions of the Servicing Agreement.

The Servicer under the Servicing Agreement agrees to service and administer the Loans and Related Interests, and collect payments due under the Loans, in accordance with its customary and usual servicing procedures and the Collection Policies. MCC as initial Servicer, and except as contemplated in the Custodial Agreement, is not obligated to use separate servicing procedures, offices or employees for servicing the Loans from the procedures, offices and employees used by MCC in connection with servicing other loans to its customers to finance the purchase of Metals.

Upon reasonable prior notice by the Trustee, the Servicer agrees to make available at an office of the Servicer (or other location designated by the Servicer if such records are not accessible by the Servicer at an office of the Servicer) selected by the Servicer for inspection by the Trustee or its agent (reasonably acceptable to the Servicer) on a Business Day during the Servicer's normal business hours a record setting forth (A) the Collections on each Loan, (B) the amount of Loans for the Business Day preceding the date of the inspection, and (C) all other Relevant Information concerning the Loans. The Servicer agrees to maintain its computer files with respect to the Loans in such a manner so that the Loans may be specifically identified and, upon reasonable prior request of the Trustee, will make available to the Trustee, at an office of the Servicer (or other location designated by the Servicer if such computer files are not located at an office of the Servicer) selected by the Servicer, on any Business Day of the Servicer during the Servicer's normal business hours any computer programs necessary to make such identification.

*Establishment of Trust Accounts*

 *The Collection Account.*

  (i) The Servicer is required to direct the Trustee to establish in the name of the Trustee, for the benefit of the Holders of all Series, a noninterest bearing segregated account (the "*Collection Cash Account*") bearing a designation clearly indicating that the funds deposited therein are held in trust for the benefit of the Holders of all Series, to be established and maintained in a segregated trust account with a Qualified Institution (which may be the Trustee); and

  (ii) The Servicer or the Issuer is required to establish in the name of the Trustee, for the benefit of the Holders of all Series, an account with the Metals Depository, evidencing the ownership by the Issuer of Metals constituting Eligible Metals Inventory received as a Collection in accordance with "The Servicing Agreement—Receipt of Collections" below (the "*Collection Metals Account*") (and which may also be the Equalization Metals Account as

described in the succeeding paragraph below) and the records with respect to which clearly indicate that the Metals Inventory evidenced thereby are held for the security and benefit of the Trustee on behalf of the Holders of all Series.

The Collection Cash Account and the Collection Metals Account shall be deemed to constitute collectively the *"Collection Account."*

*Principal Funding Accounts; Required Amounts Accounts*. The Servicer or the Issuer is required to establish in the name of the Trustee, for the benefit of the Holders of each outstanding Series individually, and maintain with a Qualified Institution (which may be the Trustee) separate noninterest bearing trust accounts (each a *"Principal Funding Account"* and a *"Required Amounts Account"* for the related Series), each bearing a designation clearly indicating that the funds therein are held for the benefit of the Noteholders of each such applicable Series.

*The Equalization Account*. The Trustee has established in the name of the Trustee, for the benefit of the Holders of all Series,

(A) with a Qualified Institution (which may be the Trustee), a segregated trust account (the *"Equalization Cash Account"*) bearing a designation clearly indicating that the funds deposited therein are held for the benefit of the Holders of all Series, and

(B) with the Metals Depository, an account evidencing the ownership by the Issuer of Metals constituting Metals Inventory (the *"Equalization Metals Account"*) and the records with respect to which clearly indicate that the Metals Inventory evidenced thereby are held for the benefit of Trustee on behalf of the Holders of all Series.

The Equalization Cash Account and the Equalization Metals Account shall be deemed to constitute collectively the *"Equalization Account"* as defined herein. The Equalization Account shall be established by and initially maintained with the Trustee at the direction of the Servicer in accordance with the Servicing Agreement. References to "amounts on deposit in the Equalization Account" or words to similar effect shall, when used in the context of determining a measurement of such amounts as of any date, be deemed to refer to an aggregate amount equal to (1) the cash value of monies on deposit in the Equalization Cash Account, plus (2) the Adjusted Inventory Balance in respect of Metals Inventory on deposit in the Equalization Metals Account, *provided* that references to withdrawals or transfers of such amounts shall, in the context of the Equalization Metals Account, be deemed to refer to amounts actually realized or to be realized upon the disposition of Metals Inventory comprising such account.

*Administration of Trust Accounts*. The Servicing Agreement provides that the Trustee shall possess all right, title and interest in all funds on deposit from time to time in the Trust Accounts and in all proceeds thereof. Except as provided below, the Trust Accounts shall be under the sole dominion and control of the Trustee for the benefit of the Noteholders. Pursuant to authority granted to it under the Servicing Agreement, however, the Servicer shall have the revocable power to instruct the Trustee to withdraw funds from the Trust Accounts for the purpose of carrying out the Servicer's or the Trustee's duties. The Trustee is required at all times to maintain accurate records reflecting each transaction in the Trust Accounts, and that funds held therein shall at all times be held in trust for the benefit of the Noteholders of all, or the related, as applicable, Series.

Funds on deposit in the Trust Accounts (other than the Collection Account, which shall remain uninvested) may be invested by the Trustee (but only if directed in writing by the Servicer) in Eligible Investments. Any such investment must be in the name of the Trustee and shall mature and such funds shall be available for withdrawal on or prior to the date on which such funds must be distributed. Earnings from any such investments when received shall be deposited in the Collection Account and treated as Collections. For purposes of determining the availability of funds or the balances in the Trust Accounts for any reason under the Servicing Agreement, all investment earnings on such funds shall be deemed not to be available or on deposit.

*Receipt of Collections*

The Servicer is authorized under the Servicing Agreement to obtain Collections on the Loans in either of the following forms, whether derived as a result of voluntary payment by the Obligor or through involuntary Liquidations:

(i) Collections in the form of direct cash Dollar payments and deposits, whether received from the Obligor or representing proceeds of Liquidation of Metals Collateral by sale to MDC or a third party; or

(ii) Eligible Metals Inventory in an Equivalent Quantity transferred and assigned to the Issuer by MDC (which Metals Inventory pursuant to the terms of the Master Indenture are automatically and concurrently pledged and assigned to the Trustee and become a part of the Trust Estate) thereby effecting a Liquidation of Metals Collateral to MDC in respect of a Loan, and with respect to which

(A)    to the extent that the Wholesale Value of such Equivalent Quantity is less than or equals the amount of the Obligor's obligation being satisfied through such Liquidation, such transferred Metals Inventory is to be deemed as a Collection in respect of such Obligor's obligation realized by the Issuer through a Liquidation sale of Metals Collateral to MDC, and

(B)    to the extent that the Wholesale Value of such Equivalent Quantity exceeds the amount of such Obligor's obligation being satisfied through such Liquidation (and provided that the Obligor has been paid all amounts to which it is entitled in connection therewith), such excess is to be deemed an Advance to the Issuer by MDC pursuant to the Optional Advance Agreement.

Such Metals Inventory is to be assigned a Dollar value (i) for purposes of determining the amount received as a Collection on the related Loan into the Collection Metals Account, of the Wholesale Value of the related Eligible Metals, and (ii) for purposes of the corresponding concurrent allocation thereof to the credit of the Equalization Metals Account as described further below, of the Adjusted Inventory Balance of the related Eligible Metals.

Notwithstanding the foregoing, the Servicer is not authorized to accept Collections in the form of Metals Inventory, and shall instead be required to receive Collections solely in the form of cash Dollars (whether obtained through Liquidations in a sale to MDC or to a third party), to the extent that (A) the amount on deposit in any Required Amounts Account on any date is less than the Required Amount, or (B) an Amortization Period is effect with respect to one or more Series, and the amount on deposit in the related Principal Funding Account(s) is less the aggregate Principal Amount(s) of such Series.

*Certain Daily and Periodic Servicer Duties*

The Servicer is required under the Servicing Agreement to undertake the following actions in the order set forth below:

(i)    with respect to and at the commencement of each Business Day, prepare a Daily Report to the Metals Depository, setting forth the information required therein determined as of the close of the preceding Business Day;

(ii)    at the commencement of each Business Day,

(A)    to determine with respect to each Series whether such Series is in a Revolving Period or an Amortization Period, and whether such Amortization Period is an Early Amortization Period;

(B)    to determine the Series Allocation Percentage for each Series as well as the Required Amount with respect to each Series, the amount then on deposit in the related Required Amounts Account, and the additional amount necessary (if any) for deposit into each Required Amounts Account to equal the Required Amount for each Series;

(C)    to calculate the Principal Variance for such day, and to determine the amount of Collections received in respect of Loans as of the close of the preceding Business Day, as well as all other amounts deposited into the Collection Account in accordance with the Servicing Agreement as of the close of the preceding Business Day, and to instruct the Trustee to allocate such Collections in accordance with the allocation description below;

(D)    to the extent that the Collections applied as described in clause (C) above are not sufficient to satisfy the aggregate of the Required Amounts, then to take the actions required under "Servicing Agreement—Actions to Obtain Required Amounts" below to the extent required on such Business Day, depositing all amounts realized from such actions into the Collection Account;

(E)    to the extent of any Unsatisfied NPV existing after applying Collections as described in clause (C) above, to take all actions as are required (and in the order of priority required) under Article V of the Servicing Agreement for so long as any Unsatisfied NPV continues to exist; and

(F)    if such Business Day is a Payment Date or an Interest Payment Date, to instruct the Trustee (after application of all Collections and other amounts received as required) to transfer and distribute (y) from the Required Amounts Account, the respective portions of the Required Amounts to the Noteholders and the other parties entitled to receive distributions therefrom on such Payment Date or Interest Payment Date, and (z) in respect of any Series as to which an Amortization Period has commenced, to transfer and

distribute from the Principal Funding Account (to the extent available) an amount equal (in the case of each such Series) to the amount required under the Servicing Agreement and the applicable Supplement.

(iii)     to execute and deliver, on behalf of the Issuer and the Trustee for the benefit of the Noteholders, any and all instruments of satisfaction or cancellation, or of partial or full release or discharge, and all other comparable instruments, with respect to the Loans and, after the delinquency of any Loan and to the extent permitted under and in compliance with the Loan Agreement and applicable law and regulations, to commence enforcement proceedings with respect to such Loans in accordance with the Collection Policies and customary procedures of the Servicer;

(iv)     to make any filings, reports, notices, applications, registrations with, and to seek any consents or authorizations from, the Securities and Exchange Commission and any state securities authority on behalf of the Issuer as may be necessary or advisable to comply with any federal or state securities or reporting requirements; and

(v)     to delegate certain of its servicing, collection, enforcement and administrative duties hereunder with respect to the Designated Accounts and the Loans to any Person who agrees to conduct such duties in accordance with the Collection Policies.

The Trustee agrees in the Servicing Agreement that it shall promptly follow the written instructions of the Servicer to withdraw funds and/or make dispositions from the Collection Account, any Principal Funding Accounts, the Equalization Account, any Required Amounts Accounts or any other Series Account at such time as required under the Servicing Agreement or under the applicable Supplement.   The Trustee also agrees to make certain calculations to determine whether there is a Negative Principal Variance with respect to the Collateral and to report such determination to the Servicer.

If requested by the Issuer for purposes of compliance with its reporting obligations under the Exchange Act, the Servicer will provide to the Issuer on or before March 31 of each year, beginning March 31, 2017, the servicing criteria assessment required to be filed in respect of the Issuer under the Exchange Act under Item 1122 of Regulation AB if periodic reports under Section 15(d) of the Exchange Act, or any successor provision thereto, are required to be filed in respect of the Issuer and shall cause a firm of Independent certified public accountants, who may also render other services to the Issuer or the Servicer, to deliver to the Issuer the attestation report that would be required to be filed in respect of the Issuer under the Exchange Act if periodic reports under Section 15(d) of the Exchange Act, or any successor provision thereto, were required to be filed in respect of the Issuer. Such attestation shall be in accordance with Rules 1-02(a)(3) and 2-02(g) of Regulation S-X under the Securities Act and the Exchange Act, including that in the event that an overall opinion cannot be expressed, such registered public accounting firm shall state in such report why it was unable to express such an opinion.

*Allocations of Collections*

*Collections*.  The Servicing Agreement requires that Collections (i) received in respect of the Loans in the lockbox account established pursuant to the Lockbox Agreement, in accordance with the Lockbox Agreement, and (ii) any other amounts or Metals required to be paid or transferred as if the same were Collections pursuant to the provisions of the Servicing Agreement or any Supplement shall be paid or transferred, as the case may be, to the Collection Account, and the Servicer shall (A) in the case of cash payments, or cash proceeds derived from a Liquidation sale to MDC or to a third party other than MDC, allocate all such payments to the Collection Cash Account no later than the first Business Day following the date of receipt, and (B) in the case of payments received in respect of Liquidations where the related Metals Collateral has been sold directly to MDC in return for a conveyance of Eligible Metals Inventory as described in "The Servicing Agreement—Receipt of Collections" above, allocate an Equivalent Quantity of Eligible Metals Inventory to the Collection Metals Account on the same Business Day.  No credit is to be given for deposits to the Collection Cash Account until such deposits represent actually collected funds.

*Certain Advances*.  The Issuer may (and shall, when a request for Advance required under the Servicing Agreement is voluntarily complied with by MDC) accept a transfer and conveyance of Dollars or Metals Inventory from MDC in the form of an optional Advance.  Such assets when conveyed shall be treated as Collections hereunder for the day on which the Advance is made and allocated accordingly.

*Allocations for Series*.  On each Business Day, the amounts on deposit and available in the Collection Account for allocation representing Collections (or amounts required to be treated as Collections) received as of the close of the prior Business Day, shall be determined by the Servicer.  The Servicer is required, prior to 11:00 a.m. (California time) on such current Business Day, to withdraw amounts from the Collection Account and allocate such amounts as set forth below, in the following order of priority:

(i)     *Required Amounts*.  To the extent the Required Amount for such Series exceeds the amounts then on deposit in the related Required Amounts Account, an amount (in the form of cash Dollars) up to (but not exceeding) such excess for deposit to the Required Amounts Account for such Series (with such amounts, in the event a deficiency

in Required Amounts exists for more than one Series, to be withdrawn from the Collection Account and allocated pro rata based on the Series Allocation Percentages of the respective Series).

(ii)     *Equalization Account.*  To the extent a Negative Principal Variance exists, an amount up to (but not exceeding) the amount of such Negative Principal Variance, for deposit to the Equalization Account, with such amounts to be derived from the Collection Account in the following order of priority:  (i) by the transfer of Dollars on deposit in the Collection Cash Account to the Equalization Cash Account, then (ii) from the transfer of Metals on deposit in the Collection Metals Account to the Equalization Metals Account (valuing the Metals for such purpose at the Adjusted Inventory Balance thereof).

(iii)     *Principal Funding Account.*  In the event an Amortization Period exists in respect of such Series, an amount (in the form of cash Dollars) up to (but not exceeding) the aggregate Principal Amount of each such Series outstanding (or such lesser amount with respect to the Amortization Period with respect to a Series as may be specified in the related Supplement), for deposit into the Principal Funding Account  (with such amounts, in the event that an Amortization Period exists with respect to more than one Series, to be withdrawn from the Collection Account and allocated amongst Series' pro rata based on the proportion that the Principal Amount of each such Series bears to the sum of the Principal Amounts of all such Series); *provided,* that if an Amortization Period shall have commenced in respect of an Early Amortization Event  and such Early Amortization Event shall have been cured to the satisfaction of a Majority of Noteholders or otherwise waived by such a Majority of Noteholders, such that the related Amortization Period shall have reverted to the Revolving Period, then any amounts previously deposited and remaining in the Principal Funding account in respect of such Amortization Period shall be released and treated as Collections for allocation on the next Business Day.

(iv)     *Excess Collections*.  Any Collections remaining in the Collection Account, after giving effect to the allocations pursuant to clauses (i)-(iii) above, (A) first, to the extent reimbursable expenses or indemnifications are payable to the Trustee or the Backup Servicer as Successor Servicer, shall be paid pro rata to the respective party entitled thereto, (B) second, to the extent (if any) specified by the Servicer on the related Daily Report at the direction of the Issuer in its sole discretion, shall be deposited into the Equalization Account, and (C) third, shall be released for the account of the Issuer, to be paid directly to the Issuer to be used for the purchase of Additional Loans, payment of dividends on or the redemption price of any Preferred Units, or for any other permissible purpose.

*Certain Releases from Equalization Account*.  The Issuer may, if on any Business Day either

(i)     there exists a positive Principal Variance (whether as a result of Advances or otherwise), or

(ii)     if no Negative Principal Variance then exists and the release of amounts described in this sentence will, following allocation as a Collection as described below, result in the purchase by the Issuer of an equivalent Adjusted Eligible Pool Balance of Additional Loans,

direct that amounts on deposit in the Equalization Account in the amount of such positive Principal Variance, in the case of clause (i) (representing, in the discretion of the Issuer, either Metals Inventory or Dollars) or, in the case of clause (ii), amounts on deposit in the Equalization Cash Account equivalent to such Adjusted Eligible Pool Balance of Additional Loans, be released and transferred to the Collection Account for allocation as a Collection.

*Payments From Trust Accounts*.  On each Payment Date or Interest Payment Date, as specified below, the Servicer is required to instruct the Trustee to make the following funds transfers in respect of each Series of Notes that remain outstanding on such date, from the Trust Accounts and in the order of priority specified below:

(i)     *Certain Fixed Fees*.  (A) On each Payment Date (other than the initial one), an amount from each Required Amounts Account equal to the related Series Allocation Percentage of the Trustee Fee and any expenses or indemnification amounts due to the Trustee by the Issuer up to the Trustee Indemnification Cap, to the extent applicable, to be distributed on such Payment Date to the Trustee; and (B) in the event that the Servicer is not MCC or an Affiliate of MCC, on each Payment Date, an amount from each Required Amounts Account equal to the related Series Allocation Percentage of the Servicing Fee, to be distributed on such Payment Date to the Servicer.

(ii)     *Interest; Other Amounts*.  (A) First, on each Interest Payment Date, an amount from each Required Amounts Account equal to the Note Interest payable on such date in respect of the related Series outstanding, and then (B) on each Payment Date, an amount from the Required Amounts Account equal to such other amounts as are specified in the applicable Supplement with respect to a Series as payable on a Payment Date from the Required Amounts Account, with such respective amounts in each case to be distributed as provided in the related Supplement.

(iii)     *Principal During Amortization.*  If an Amortization Period has commenced and is continuing in respect of a Series, an amount from the Principal Funding Account equal to the applicable Note Principal distributable from the Principal Funding Account with respect to such Series as specified in the related Supplement for such Series, to be distributed on a Payment Date (or, if so specified in a related Supplement, an Interest Payment Date) to each Noteholder of such Series *pro rata* in accordance with such Noteholder's principal balance outstanding or as otherwise provided in the related Supplement.

(iv)     *Servicing Fee.*  In the event that the Servicer is MCC or an Affiliate of MCC, on each Payment Date an amount from each Required Amounts Account equal to the Series Allocation Percentage of the Servicing Fee, to be distributed on such Payment Date to the Servicer, *provided,* that in the event the Trustee has received notice that any storage fees due and payable to the Metals Depository have not been paid, or that any fees or expenses payable to the Backup Servicer have not been paid, then the Trustee is required to deduct from the Servicing Fee otherwise payable to the Servicer (A) first, the amount of arrearage in storage fees and remit the same to the Metals Depository, and (B) after any such arrearage has been satisfied, then remit such amounts as may be due the Backup Servicer, and *provided further,* that no such amounts shall be distributed to the Servicer to the extent an Unsatisfied NPV exists on such Payment Date. In the event that MCC is no longer the Servicer and the Backup Servicer has been appointed and has become successor servicer, the Servicing Fee shall also include a one-time supplemental amount equal to $100,000 payable on the first Payment Date following the transition of the Backup Servicer to Successor Servicer.

*Actions Required When Unsatisfied NPV Exists*

If the Servicer's daily measurement shows that, after the required allocations of daily Collections as described in "Servicing Agreement—Allocations of Collections" above, an Unsatisfied NPV exists, then the Servicing Agreement will require the Servicer to take the following actions (in order):

(i)   Request an Advance from MDC to the Issuer under the OAA of additional equity, in the form of Dollars and/or Eligible Metals Inventory, in an amount equal to the Unsatisfied NPV (valuing any contribution of Eligible Metals Inventory for this purpose at its Adjusted Inventory Balance).

(ii)  If the foregoing action does not raise an amount equal to the Unsatisfied NPV, then liquidate Metals Inventory held in the Equalization Account so as to generate Dollar proceeds (to be applied as Collections on the next Business Day) at least equal to the remaining Unsatisfied NPV.

In addition, for so long as an Unsatisfied NPV exists on any date of determination, the Servicer is required to make and enforce demands to pay in additional Equity on Obligors whose Equity level in their Loan has fallen below the level then required in the Loan Agreement (a "Collateral Demand"), and if such Collateral Demand is not timely paid to liquidate sufficient Metals Collateral of such Obligors so as to obtain Dollars in the amount of such outstanding Collateral Demand, for allocation once received as Collections on subsequent Business Days (and the Servicer will no longer have its normal discretion to postpone such actions).  The Servicer must also, for so long as an Unsatisfied NPV exists on any date of determination, demand repayment in full of (i) Loans as to which Collateral Demands have not been satisfied within five Business Days, and (ii) any Loans whose Equity has fallen below the Special Required Equity Level, and in each case liquidate Metals Collateral securing such accelerated Loans, with the proceeds of such actions once received to be allocated as Collections on subsequent Business Days (and the Servicer will no longer have its normal discretion to postpone such actions).

In addition to the foregoing, if an Unsatisfied NPV ever exists for five consecutive calendar days, the Servicer is obligated to increase the required Equity for Obligors under their Loan Agreements, and make and enforce resultant Collateral Demands on Obligors, to the extent necessary so as to generate Dollars from any combination of Obligor payments and/or proceeds of liquidated Metals Collateral in the amount of the current Unsatisfied NPV.

*Actions Required When Shortfall in Required Amounts*

If on any day the Required Amounts for a Series are not funded in full, then the Servicer is required under the Servicing Agreement to request a voluntary Advance from MDC of Dollars, to be allocated as Collections and deposited into the related Required Amounts Account(s) in satisfaction of the deficiency.  If such Advance is not promptly made, the Servicer is then required to liquidate Metals Inventory so as to generate Dollars (to be allocated as Collections) sufficient to cure the deficiency. If the deficiency has still not been cured in full within 15 days of the next upcoming Payment Date (or 3 Business Days before such upcoming date, in the case of a deficiency in Required Amounts other than related Trustee/Backup Servicer/Servicing fees), then the Servicer is required to make written demand for repayment in full of Loans (and, if necessary, liquidate related Metals Collateral) to an extent sufficient to generate Collections to fund the Required Amounts in full.

MNX-CFTC-01335332

It is a condition precedent to the issuance of the Series 2016-1 Notes that an amount equal to the current Required Amounts for Series 2016-1 then be on deposit in the Required Amounts Account for Series 2016-1.

*Actions Required Upon Event of Default or at Series Maturity*

If upon the first to occur of (a) an Event of Default, or (b) the 30th day before the Series Maturity Date with respect to a Series, the amount on deposit in the applicable Principal Funding Account(s) is less than the amount necessary (i) in the case of an Event of Default, to repay the Principal Amount of all outstanding Series in full, or (ii) in the case of an incipient Series Maturity Date, to repay the Principal Amount of the maturing Series in full, the Servicer shall (1) first, immediately Liquidate Metals Inventory with the proceeds to be allocated and applied as Collections to increase the Principal Funding Account(s) up to such necessary amounts, and (2) if such necessary amounts are still not available after the action in clause (1), then the Servicer shall make written demand upon all Obligors, in the case of an Event of Default, or a sufficient number of Obligors (taking into account Loans as to which demands are already outstanding), in the case of an incipient Series Maturity Date, for repayment in their entirety of their Loans, informing such Obligors that payment must be received on their Loans within 5 business days of the date of such demand notice and that (subject to the right of immediate liquidation if the Obligor's equity position falls below the Special Required Equity Level) if such repayment has not been received within 10 business days of the date of such notice, the Metals Collateral relating to their respective Loans will be subject to liquidation. With respect to demanded Loans as to which the entire amount due has not been received within such 10 business day period, the Servicer shall, not later than 25 days after the sending of the related notices, Liquidate the related Metals Collateral, depositing the proceeds of such Liquidation (net of amounts required to be paid to the Obligors) into the Collection Account for allocation as aforesaid.

Notwithstanding the foregoing, if the Liquidation provided for in the preceding paragraph results from the occurrence of an Event of Default occasioned solely by the delivery of a Termination Notice effecting the appointment of a Successor Servicer hereunder, the Servicing Agreement requires the Successor Servicer to (i) immediately and concurrently Liquidate Metals Inventory, and (ii) in the manner specified in this paragraph below make written demand upon all Obligors for repayment in their entirety of their Loans and, not later than the time period specified in this paragraph below, Liquidate related Metals Collateral to the extent necessary to pay off such demanded Loans. Such demands and Liquidations are to be accomplished based on the information set forth in the most recent Daily Report delivered by the initial Servicer. In connection with a Liquidation described in this paragraph, the Successor Servicer is required, within one Business Day of being appointed Successor Servicers, to send a demand notice to all Obligors informing the Obligors that repayment of their Loans is demanded in full, with payment to be received within 10 Business Days of the date of such notice, and that if repayment has not been received within 10 Business Days of the date of such notice, the related Metals Collateral will be subject to liquidation with the proceeds used to pay off the related Loan. With respect to demanded Loans as to which the entire amount due has not been received within the 10 Business Day period referred to above, the Successor Servicer is required, not later than 25 days after the sending of the related notices, to Liquidate the related Metals Collateral and use the proceeds to pay off the demanded Loans, in accordance with bid solicitation and acceptance procedures set forth in the Servicing Agreement. The Successor Servicer agrees to deposit the proceeds of any Liquidation described in this paragraph, or repayment Collections otherwise received from Obligors during this period, into the Collection Account for allocation in accordance with the Servicing Agreement. As soon as practicable after a sufficient amount has been deposited into the Collection Account to repay all outstanding Series in full, the Trustee shall redeem all outstanding Notes; *provided*, however, that such redemption shall comply with the Master Indenture and any applicable Supplement.

*Servicer Reporting Requirements*

*Daily Reporting.* On each Business Day the initial Servicer is required to prepare a completed Daily Report and deliver the same to the Trustee by 10:00 a.m. (California time) on each Business Day with respect to activity in the Loans and related Metals Collateral for the prior Business Day.

*Settlement Statement.* On the second Business Day prior to each Payment Date, the Servicer by 11:00 a.m. (California time) on such day, is required to deliver to each Rating Agency and the Trustee the monthly Settlement Statement in the form required in the Servicing Agreement.

*Annual Settlement Statement.* On or before the January Payment Date of each year, beginning with January 2018, the Servicer is required to deliver to the Trustee an annual settlement statement, substantially in the form of the monthly Settlement Statements but providing information on an annualized basis, summarizing in the aggregate the year-to-date information set forth on each monthly Settlement Statement.

*Annual Financial Statements.* On or before the 120th day following the end of each Issuer Fiscal Year, beginning with the Issuer Fiscal Year ending December 31, 2016, the initial Servicer shall cause a firm of independent public accountants to furnish to each Rating Agency audited financial statements with respect to MCC, MDC and the Issuer along with a copy of the annual management letter prepared by such auditors pertaining to MCC, MDC and any subsidiaries of either.

MNX-CFTC-01335333

*Resignation of Servicer*

The initial Servicer agrees under the Servicing Agreement not to resign from the obligations and duties thereby imposed on it except upon determination that (i) the performance of its duties thereunder is no longer permissible under applicable law and (ii) there is no reasonable action which the Servicer could take to make the performance of its duties thereunder permissible under applicable law. Any such determination permitting the resignation of the Servicer shall be evidenced as to clause (i) above by an Opinion of Counsel to such effect delivered to the Trustee. No such resignation shall become effective until a Successor Servicer shall have assumed the responsibilities and obligations of the Servicer in accordance with the Servicing Agreement.

*Servicer Default and Replacement of Servicer*

If any one of the following events (a *"Servicer Default"*) shall occur and be continuing:

(a) any failure by the Servicer to make any payment, transfer or deposit, to prepare or provide any Daily Report, or to take any actions in respect of Loans, Metals Inventory or other Trust Estate assets required under any provision of Article V of the Servicing Agreement (as described under "Servicing Agreement—Actions Required When Unsatisfied NPV Exists" and "—Actions Required When Shortfall in Required Amounts" and "—Actions Required Upon Event of Default or at Series Maturity," or to give certain instructions or notices to the Trustee pursuant to the Servicing Agreement, on or before the date such payment, transfer, deposit, withdrawal or drawing or such instruction or notice is required to be made or given, as the case may be, under the terms of the Servicing Agreement;

(b) failure on the part of the Servicer duly to observe or perform in any respect any other covenants or agreements of the Servicer set forth in the Servicing Agreement, which continues unremedied for a period of 20 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Trustee;

(c) any representation, warranty or certification made by the Servicer in the Servicing Agreement or in any certificate delivered pursuant thereto shall prove to have been incorrect when made, and which continues to be incorrect in any material respect for a period of 20 days after the date on which written notice of such incorrectness shall have been given to the Servicer by the Trustee;

(d) an Insolvency Proceeding shall occur with respect to the Servicer; or

(e) MCC and/or MDC shall have suffered the issuance of any judgment, writ or attachment, execution or similar process involving, in the aggregate, a liability of $100,000,000 or more not otherwise covered by insurance (subject to standard deductibles), which judgment, attachment or execution thereon is not being stayed pending appeal;

then, so long as such Servicer Default shall not have been remedied, either the Trustee, or a Majority of Noteholders, shall promptly give notice of such Servicer Default in writing (with a copy to the Rating Agencies) to the Servicer (and to the Trustee if given by a Majority of Noteholders (a *"Default Notice"*). If such Servicer Default is not remedied within 24 hours of receipt by the Servicer (and the Trustee, if given by a Majority of Noteholders) of the Default Notices, then the Trustee is required to deliver in writing to the Servicer a notice (a *"Termination Notice"*) thereby terminating all of the rights and obligations of the Servicer as Servicer under the Servicing Agreement and thereby effecting a transfer of the same to the Successor Servicer (which may be the Backup Servicer).

The Servicer agrees that promptly after it receives such Termination Notice, the Servicer will at its own expense deliver to the Successor Servicer or its designee a computer file or microfiche list containing a true and complete list of all Designated Accounts, identified by account number and setting forth the Outstanding Balance of each Loan as of the date of receipt of such Termination Notice together with all other Relevant Information. After receipt by the Servicer of such Termination Notice, all authority and power of the Servicer under the Servicing Agreement is to pass to and be vested in the Successor Servicer; and, without limitation, the Successor Servicer is authorized and empowered (upon the failure of the Servicer to cooperate) to execute and deliver, on behalf of the Servicer, as attorney-in-fact or otherwise, all documents and other instruments upon the failure of the Servicer to execute or deliver such documents or instruments, and to do and accomplish all other acts or things necessary or appropriate to effect the purposes of such transfer of servicing rights and obligations. The Servicer agrees in the Servicing Agreement to cooperate with the Trustee and the Successor Servicer in effecting the termination of the responsibilities and rights of the Servicer to conduct servicing thereunder including, without limitation, the transfer to the Successor Servicer of all authority of the Servicer to service the Loans, Metals Collateral and Metals Inventory provided for under the Servicing Agreement, all authority over all Collections which shall on the date of transfer be held in any lockbox account or held by the Servicer for deposit, or which have been deposited by the Servicer, in the Collection Account, the Equalization Account, any Required Amounts Account, any Principal Funding Account, or any other Series Account, or which shall thereafter be received

with respect to the Trust Estate. The Servicer agrees to promptly transfer its electronic records or electronic copies thereof relating to the Loans, Metals Collateral and Metals Inventory to the Successor Servicer in such electronic form as the Successor Servicer may reasonably request and agrees to promptly transfer to the Successor Servicer all other records, correspondence and documents necessary for the continued servicing of the Loans, Metals Collateral and Metals Inventory in the manner and at such times as the Successor Servicer shall reasonably request.

To the extent that compliance with the foregoing requires the Servicer to disclose to the Successor Servicer information of any kind which the Servicer reasonably deems to be confidential, the Successor Servicer shall be required to enter into such customary licensing and confidentiality agreements as the Servicer shall deem necessary to protect its interests.

In connection with any service transfer, all reasonable costs and expenses (including attorneys' fees) incurred in connection with transferring the records, correspondence and other documents with respect to the Loans and the other Trust Estate assets to the Successor Servicer and amending the Servicing Agreement to reflect such succession as Successor Servicer are required to be paid by the Servicer. Also in connection with any servicing transfer, the Servicer and Issuer each have authorized and granted to the Successor Servicer an irrevocable power-of-attorney to take any and all steps in the Servicer's or the Issuer's name and on behalf of the Servicer or the Issuer that are necessary or desirable to perform its duties, including without limitation collecting amounts due under the Loans, endorsing the Servicer's or Issuer's name on checks and other instruments representing Collections and enforcing or realizing against the Loans and Related Interests and other Trust Estate assets.

On and after the receipt by the Servicer of a Termination Notice, the Servicer agrees to continue to perform all servicing functions under the Servicing Agreement until the date specified in the Termination Notice or as otherwise specified by the Trustee in writing or, if no such date is specified in such Termination Notice, or otherwise specified by the Trustee, until a date mutually agreed upon by the Servicer and Trustee. The Trustee shall notify each Rating Agency of such removal of the Servicer and the appointment of a Successor Servicer.

Upon its appointment, and upon its written acceptance in form and substance acceptable to the Trustee, the Backup Servicer (or any other successor servicer with the prior written approval of a Majority of Noteholders) is to be appointed the successor (the *"Successor Servicer"*) in all respects to the Servicer with respect to servicing functions under the Servicing Agreement and agrees therein to be subject to all the responsibilities, duties and liabilities relating thereto placed on the Servicer by the terms and provisions thereof, *provided, however,* the Backup Servicer's obligation to assume the role of Successor Servicer is limited to the circumstance where an Event of Default has occurred and is continuing (and, as indicated in the description of Events of Default herein, such Event of Default may itself be occasioned solely by the delivery of a Termination Notice seeking appointment of a Successor Servicer). Accordingly, the Backup Servicer in such capacity as Successor Servicer is engaging to undertake only the obligations and duties of a Successor Servicer which relate to, or are necessary or incidental to, accomplishing the actions and results which are required to occur as a result of an Event of Default, or which are otherwise required to be performed by a Successor Servicer acting as Servicer following the occurrence of an Event of Default.

A Majority of Noteholders may, on behalf of all Holders, and with prior written notice to each Rating Agency, waive any default by the Servicer in the performance of its obligations and its consequences. Upon any such waiver of a past default, such default shall cease to exist, and any default arising therefrom shall be deemed to have been remedied for every purpose of the Servicing Agreement. No such waiver shall extend to any subsequent or other default or impair any right consequent thereon except to the extent expressly so waived.

## MASTER INDENTURE

The Issuer and the Trustee have entered into the Master Indenture, as amended, providing for (among other things) the Issuer's grant of a security interest in the Loans and Related Interests, Metals Inventory and other Trust Estate assets to secure the Series 2016-1 Notes and any prior and subsequent Series; the issuance of Supplements for individual Series; and certain rights and remedies following an Event of Default. The following summary describes certain terms of the Master Indenture, and is qualified in its entirety by reference to the actual terms and provisions of thereof.

Under the Master Indenture the Issuer pledges to the Trustee and grants a security interest to the Trustee in, for the benefit and security of the Noteholders of all Series, all of its right, title and interest in, to and under the assets and property described below (collectively being the *"Trust Estate"*):

(a)  all Loans existing, originated or acquired from time to time in respect of a Designated Account (including Additional Loans existing or arising from time to time, whether in respect of existing or Additional Designated Accounts), together with all Collections therefrom and all Liens, guaranties and assignments securing the same;

(b)  all rights, powers, privileges, benefits and remedies under the Loan Agreements related to the Designated Accounts (including, but not limited to, all guaranties, lien priority agreements, security agreements, collateral assignments, subordination agreements, negative pledge agreements and loan agreements) then or hereafter evidencing, securing or guaranteeing or otherwise relating to or delivered in connection with a Loan and a Loan Agreement, including the pledge and security interest granted under the Loan Agreements in the Metals (including without limitation any Warehouse Receipts evidencing the same) securing the Loans (being the Metals Collateral), together with all other property and assets and contract rights comprising the Loans and Related Interests sold, assigned and conveyed from time to time to the Issuer pursuant to the TSA;

(c)  all right, title and interest (but not the obligations of) the Issuer under the OAA, as well as all Metals Inventory (including without limitation any Warehouse Receipts evidencing the same) received pursuant to an Advance and held from time to time in the Collection Metals Account or the Equalization Metals Account established under the Servicing Agreement, together with all cash Dollars received pursuant to an Advance and held on deposit in the Collection Cash Account or the Equalization Cash Account established thereunder, and all attachments, accessories, accessions, substitutions and replacements with respect to, and all proceeds of, any of the foregoing;

(d)  to the extent not already included in clauses (a), (b) or (c) above, and in each case to the extent evidencing or related to any of the foregoing, all of the Issuer's existing or thereafter acquired or created accounts, accounts receivable, lockbox accounts and other deposit accounts, rights in the Lockbox Agreement, other contract rights, notes, drafts, acceptances, chattel paper, leases, letter of credit and writings evidencing a monetary obligation or Lien or security interest in or a lease of property, all rights to receive the payment of money or other consideration given, whether or not earned by performance and whether or not evidenced by or set forth in or arising out of any then present or future chattel paper, note, draft, lease, acceptance, writing, bond, insurance policy, instrument, document or general intangible, and all extensions and renewals of any thereof, all rights under or arising out of then present or future contracts, agreements or general intangibles, including all rights and payments under licensing agreements or arrangements, franchises or permits, all claims or causes of action then existing or thereafter arising in connection with or under any agreement or document or by operation of law or otherwise, all collateral security of any kind given by any person with respect to any of the foregoing, including in any event, all accounts, instruments and chattel paper within the meaning of the UCC;

(e)  all right, title and interest of the Issuer, if any, in and to each of the Trust Accounts and in all funds deposited in such accounts from time to time (including any amounts initially on deposit in the Equalization Account or any Required Amounts Account), and all certificates and instruments, if any, from time to time representing or evidencing any interest in such accounts, and all interest, dividends, proceeds, cash, investment funds, instruments and other property, if any, from time to time received, receivable or otherwise distributed in respect of or in exchange for all or any of such accounts or the funds on deposit in such accounts and all rights and entitlements, tangible or intangible, in respect of the foregoing;

(f)  all other documents, instruments, books, correspondence, credit files and records of every nature of the Issuer, whether then existing or thereafter acquired or created, and in any event all documents of the Issuer within the meaning of the UCC;

(g)  all right, title and interest (but not the obligations of) the Issuer under the TSA including, without limitation, (i) all rights of the Issuer to receive moneys due and to become due under or pursuant to the Transfer and Sale Agreement, whether payable as fees, expenses, costs or otherwise, (ii) all rights of the Issuer to receive proceeds of any insurance, indemnity, warranty or guaranty with respect to the TSA, (iii) claims of the Issuer for damages arising out of or for breach of or default under the TSA, (iv) the right of the Issuer to amend, waive or terminate the TSA, to perform thereunder and to compel performance and otherwise exercise all remedies thereunder and (v) all other rights, remedies, powers, privileges and claims of the Issuer under or in connection with the TSA;

(h)  all right, title and interest (but not the obligations) of the Issuer under each other Program Agreement not heretofore mentioned, including without limitation the Metals Depository Agreement, the Servicing Agreement, the Lockbox Agreement and the Custodial Agreement; and

(i)  the proceeds, in cash or otherwise, of the assets and property described in the foregoing clauses (a) through (h) (including, without limitation, the proceeds of any sale or other disposition of such property and all insurance proceeds of any kind paid at any time in connection with such property), all Liens (whether possessory, contractual, statutory or otherwise) with respect to such property, and all rights, remedies and claims (whether in the nature of indemnities, warranties, guaranties or otherwise) of the Issuer with respect to such property, including without limitation, the right of the Issuer to bring suit to enforce its rights with respect to such property, in any case whether now existing or hereafter at any time or from time to time arising.

The grant is made to secure (i) the payment of all amounts due on the Notes of all outstanding Series in accordance with their terms, (ii) the payment of all other sums payable under the Master Indenture and any Supplement and (iii) compliance with the provisions of the Master Indenture and any Supplement (being the *"Secured Obligations"*).

In connection with such grant, the Issuer has recorded and filed financing statements (and related continuation statements with respect to such financing statements) with respect to the Loans now existing and hereafter created for the transfer of chattel paper (as defined in the UCC as in effect in the Relevant UCC State) meeting the requirements of applicable state law in such manner and in such jurisdictions as are necessary to perfect the grant and assignment of the Loans, Loan Agreements, Metals Collateral and other Trust Estate assets to the Trustee, and has delivered file-stamped copies of such financing statements or continuation statements or other evidence of such filing to the Trustee.

In connection with such grant the Issuer agrees, on or prior to each Cut-Off Date on which Designated Accounts are designated to the Issuer and become subject to the lien of the Master Indenture, (i) to annotate and indicate in its computer files, and to cause the Servicer to annotate and indicate in the Servicer's computer files, that Loans, Loan Agreements, Metals Collateral and other Trust Estate assets with respect to such Designated Accounts have become subject to the lien of the Master Indenture for the benefit of the Noteholders, (ii) to deliver or cause to be delivered to the Custodian, at the times required in the TSA, each executed original Loan Agreement relating to a Designated Account, (iii) to affix or cause the Servicer to affix each such Loan Agreement with a legend, attachment or similar marking indicating the Issuer's and the Trustee's interest therein, and (iv) to deliver or cause to be delivered to the Servicer (or, upon request of a Majority of Noteholders, to the Trustee directly) a computer file containing a true and complete list of all Loans, Loan Agreements, Metals Collateral and Metals Inventory constituting the Trust Estate, identified by account number and setting forth the Outstanding Balance of each Loan and each Eligible Loan as of the Cut-Off Date, together with all other Relevant Information in respect thereof. The Issuer further agrees not to alter or permit to be altered the file designation referenced in clause (i) of this paragraph with respect to any Designated Account, Loan, Loan Agreement, Metals Collateral or Metals Inventory during the term of the Master Indenture unless and until such Designated Account, Loan and Loan Agreement is released from the lien of the Master Indenture.

As and if provided in a Supplement, the Issuer may (but is not obligated to) grant to the Trustee, for the benefit of the holders of the related Series, such other collateral that shall be in addition to the Trust Estate (such other collateral being, for that Series, its *"Series Collateral"*). Any grants of Series Collateral pursuant to a Supplement, unless otherwise provided in such Supplement, are made for the exclusive benefit of the Holders of the related Series and shall not secure in any manner the Issuer's obligations under any other Series or related Supplement.

*Transfers and Exchanges of Notes*

The Series 2016-1 Notes will be issued, maintained and transferred on the book-entry records of DTC and its participants in denominations of $100,000 and integral multiples of $1,000 in excess thereof. It is expected that the Notes will be eligible for trading in The Portal Market ("PORTAL"), a subsidiary of the Nasdaq Stock Market, Inc. The Notes will each initially be represented by one or more global Notes registered in the name of the nominee of DTC (together with any successor clearing agency selected by us, the "Clearing Agency"). We have been informed by DTC that DTC's nominee will be CEDE & Co. No holder of any such Note will be entitled to receive a Note representing such person's interest, except as set forth below under "—Definitive Certificates." Unless and until definitive Notes are issued under the limited circumstances described herein, all references to actions by Noteholders with respect to any such Notes shall refer to actions taken by DTC upon instructions from its participants.

Under the rules, regulations and procedures creating and affecting DTC and its operations, DTC will take action permitted to be taken by a Noteholder under the Master Indenture only at the direction of one or more participants to whose DTC account such Notes are credited. Additionally, DTC will take such actions with respect to specified voting rights only at the direction and on behalf of participants whose holdings of such Notes evidence such specified voting rights. DTC may take conflicting actions with respect to voting rights, to the extent that participants whose holdings of Notes evidence such voting rights, authorize divergent action.

*Definitive Notes*

Definitive Notes will be issued to Noteholders or their nominees, respectively, rather than to DTC or its nominee, only if (i) the Issuer advises the Trustee in writing that DTC is no longer willing or able to discharge properly its responsibilities as Clearing Agency with respect to each class of Notes and the Initial Purchaser is unable to locate a qualified successor or (ii) the Issuer, at its option, elects to terminate the book-entry system through DTC.

Upon the occurrence of any event described in the immediately preceding paragraph, the Trustee is required to notify all participants of the availability through DTC of definitive Notes. Upon surrender by DTC of the definitive Notes representing the Notes and receipt of instructions for re-registration, the Trustee will reissue such Notes as definitive Notes issued in the

respective principal amounts owned by the individual owners of the Notes. Thereafter the Trustee will recognize the holders of the definitive Notes as Noteholders under the Indenture.

*Access to Noteholder Lists*

The Issuer shall furnish or cause to be furnished to the Trustee, the Servicer, any Noteholder or any Paying Agent requesting it a list of the names and addresses of the Noteholders within five Business Days after receipt by the Issuer of a written request therefor from that Person. Every Noteholder, by receiving and holding a Note, agrees that none of the Issuer, the Trustee, the Transfer Agent and Registrar or the Servicer nor any of their respective agents and employees shall be held accountable for the disclosure of any information as to the names and addresses of the Noteholders, regardless of the sources from which such information was derived.

*Issuance of Additional Series*

The Issuer and the Trustee may, at any time and from time to time, enter into a Supplement to the Master Indenture for the purpose of authorizing the issuance by the Issuer of Notes in one or more Series (and within Series, if applicable, Classes thereof). The Notes of all outstanding Series shall be equally and ratably entitled to the benefits of the Master Indenture, without preference, priority or distinction, except, with respect to any Series or Class within a Series, as provided in the related Supplement. Principal and interest on the Notes of all outstanding Series shall be paid as specified in the related Supplements.

On or before the issuance date of any Series of Notes, the Issuer and the Trustee shall execute and deliver a Supplement that will specify the principal terms of such Series. The terms of that Supplement may modify or amend the terms of the Master Indenture solely as applied to such Series. An issuance of any Series of Notes by the Issuer is subject to the satisfaction of the following conditions:

- on or before the tenth Business Day immediately preceding the issuance date of such Series, the Issuer shall have given the Trustee, any provider of liquidity or credit enhancement for an outstanding Series (which does not include holders of subordinate securities), and the Servicer (if the Servicer is MCC or one of its Affiliates) written notice of the issuance and issuance date of such Series. That notice shall state the designation of such Series (and any Classes within such Series) and for such Series: (A) its initial principal amount, (B) the interest rates of such Series or each Class thereof, if applicable (or the method of calculating the rates); (C) the provider of any external credit enhancement for such Series or for any Classes in such Series; and (D) that prior to (and after giving effect to) such issuance, no Unsatisfied NPV shall exist;

- the Issuer shall have executed and delivered to the Trustee the related Supplement, in a form satisfactory to the Trustee and specifying the principal terms of the Notes of the Series;

- the Issuer shall have delivered to the Trustee (A) notice of the form of any Series external credit enhancement and (B) any related agreement executed by the Issuer and the provider thereof;

- the Rating Agency Condition shall be satisfied with respect to the issuance of such Series of Notes;

- the Issuer shall have delivered to the Trustee an officer's certificate of the Issuer dated the issuance date of such Series (upon which the Trustee may conclusively rely) to the effect that the Issuer reasonably believes that (A) no Event of Default or Early Amortization Event then exists, (B) the issuance will not result in the occurrence of an Event of Default or Early Amortization Event for any Series, and (C) prior to (and after giving effect to) such issuances, the Issuer is and will be in compliance with any Principal Variance or similar collateralization test then applicable to any Series;

- the Issuer shall have delivered to the Trustee an Opinion of Counsel to the effect that (A) the issuance of such Series (i) either has been registered under the Securities Act or need not be so registered, (ii) will not result in the requirement that any outstanding Series not registered under the Securities Act be so registered (unless the Issuer has elected, in its sole discretion, to register those Series of Notes), (iii) will not result in the Issuer being required to be registered as an investment company under the Investment Company Act of 1940, (iv) will not require the Master Indenture or the related Supplement to be qualified under the Trust Indenture Act of 1939 and (v) has been authorized by all necessary action of the Issuer, (B) the Issuer has duly executed and delivered the Notes of such Series to be issued on the initial issuance date, (C) the Notes of such Series constitute enforceable obligations of the Issuer (subject to customary exceptions as to enforceability), and (D) the Trustee has a first priority, perfected security interest in the Trust Estate (and such opinions as to the above-described matters may contain such assumptions and qualifications, and otherwise may be substantially in the form and/or to the effect of, the opinion or opinions as to any of such matters delivered at the closing of the initial Series);

MNX-CFTC-01335338

- the Issuer shall have delivered to the Trustee a Tax Opinion, dated the issuance date of such Series, with respect to such issuance;

- if applicable, the Notes representing a Series to be exchanged shall be delivered to the Trustee for cancellation; and

- if applicable, any conditions precedent to the issuance of such Series imposed by any Supplement shall have been satisfied.

The Issuer may use the proceeds of any new issuance (i) to purchase Eligible Loans arising under Additional Designated Accounts, (ii) to deposit the net proceeds from the new issuance in the Collection Account or (iii) to retire or redeem any outstanding Series that is eligible for retirement or redemption under the related Supplement.

*Substitutions of Loans and Other Releases*

In the event, and to the extent MCC shall substitute an Account together with all associated Loans and Related Interests pursuant to the TSA, (i) such new substitute Account shall thereupon become a Designated Account and all Loans and Related Interests in respect of such substitute Designated Account, whether such Loans are then existing or thereafter originated, which are thereupon or thereafter conveyed to the Issuer in accordance with the Transfer and Sale Agreement shall constitute part of the Trust Estate subject to the Lien of the Master Indenture, and (ii) the Trustee shall be deemed to have concurrently released to the Issuer, free and clear of the Lien of the Master Indenture, all Loans and Related Interests for which such substitute Loans and Related Interests are being substituted.

In addition, Collections and other Trust Estate assets, to the extent a release to the Issuer is provided therefor in the Servicing Agreement, shall be deemed to have been released to the Issuer free and clear of the Lien of the Master Indenture.

*Issuer Representations and Covenants*

The Issuer represents (among other things), as of the Closing Date for the Notes and, with respect to any subsequent Series, as of the Closing Date specified in the related Supplement for such Series, and agrees as follows:

- *Organization and Good Standing.* The Issuer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has full power, authority and legal right to own its properties and conduct its business as such properties are presently owned and such business is presently conducted, and to execute, deliver and perform its obligations under the Master Indenture, any Supplement and any other Program Agreement to which it is a party and to execute and deliver to the Trustee the Notes.

- *Due Qualification.* The Issuer is duly qualified to do business and is in good standing (or is exempt from such requirement) in any state required in order to conduct its business, and has obtained all necessary licenses and approvals required to conduct its business under applicable law; *provided, however,* that no representation or warranty is made with respect to any qualifications, licenses or approvals which the Trustee would have to obtain to do business in any state in which the Trustee seeks to enforce any Loan or Loan Agreement or rights in the related Metals Collateral or Metals Inventory.

- *Due Authorization; Enforceability.* The execution and delivery of the Master Indenture and any other Program Agreement to which it is a party and the consummation of the transactions provided for in the Program Agreements have been duly authorized by the Issuer by all necessary action on its part. The Master Indenture, and each other Program Agreement to which it is a party, constitutes the legal, valid and binding obligation of the Issuer, enforceable against it in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereinafter in effect, affecting the enforcement of creditors' rights in general and except as such enforceability may be limited by general principles of equity (whether considered in a proceeding at law or in equity).

- *No Conflicts.* The execution, delivery and performance of the Master Indenture and any other Program Agreement to which it is a party, the execution and delivery of the Notes of any Series being then issued, and the performance of the transactions contemplated under the Program Agreements by the Issuer, do not (i) contravene its Certificate of Formation or its Limited Liability Company Agreement or any other agreements pursuant to which it is organized, (ii) violate any provision of, or require any filing (except for the filings under the UCC required by the Master Indenture, each of which has been duly made and is in full force and effect), registration, consent or approval under, any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to the Issuer, except for such filings, registrations, consents or approvals as have already been obtained and are in full force and effect, (iii) result in a breach of or constitute a default or require any consent under any indenture or loan or

credit agreement or any other agreement, lease or instrument to which the Issuer is a party or by which it or its properties may be bound or affected except those as to which a consent or waiver has been obtained and is in full force and effect and an executed copy of which has been delivered to the Trustee, or (iv) result in, or require, the creation or imposition of any Lien upon or with respect to any of the properties now owned or hereafter acquired by the Issuer other than as specifically contemplated in the Master Indenture.

- *Taxes.* The Issuer has filed all tax returns (federal, state and local) required to be filed in any jurisdiction and has paid or made adequate provision for the payment of all taxes, assessments and other governmental charges shown to be due and payable on such returns from the Issuer or is contesting any such tax, assessment or other governmental charge in good faith through appropriate proceedings. The Issuer knows of no basis for any material additional tax assessment for any fiscal year for which adequate reserves (in accordance with generally accepted accounting principles) have not been established. The charges, accruals and reserves on the books of the Issuer in respect of federal, state and other taxes for all fiscal periods are adequate. The federal income tax liabilities of the Issuer have been determined and paid for all fiscal years.

- *No Violation.* The execution and delivery by the Issuer of the Program Agreements to which it is a party, and the performance of the transactions contemplated thereby, will not conflict with or violate any Requirements of Law applicable to the Issuer.

- *No Proceedings.* There are no proceedings or investigations pending or, to the knowledge of the Issuer, threatened against the Issuer before any court, regulatory body, administrative agency, or other tribunal or governmental instrumentality (i) asserting the invalidity of any Program Agreement or the Notes, (ii) seeking to prevent the issuance of the Notes or the consummation of any of the transactions contemplated by any Program Agreement, (iii) seeking any determination or ruling that, in the reasonable judgment of the Issuer, would materially and adversely affect the performance by the Issuer of its obligations under any Program Agreement, (iv) seeking any determination or ruling that would materially and adversely affect the validity or enforceability of any Program Agreement or the Notes or (v) seeking to affect adversely the income tax attributes of the Notes.

- *All Consents Required.* All approvals, authorizations, consents, orders or other actions of any Person or of any governmental body or official required in connection with the execution and delivery of any Program Agreement and the Notes, the performance of the transactions contemplated thereby, and the fulfillment of the terms thereof, have been obtained.

- *Bona Fide Loans.* Each Loan is at the time of its acquisition by the Issuer from MCC an Eligible Loan originated by MCC arising out of MCC's performance in accordance with the terms of a Loan Agreement. The Issuer has no knowledge at the time of the initial creation of an interest of the Trustee in any Loan hereunder of any fact which should have led it to expect that such Loan would not be enforceable against the Obligor when due.

- *Place of Business.* The sole place of business of the Issuer is located at 4900 Birch Street, Newport Beach, California. Unless and except as otherwise specified in any related Supplement, the Issuer has had no office location other than this location during the four months prior to the Closing Date for any Series.

- *Use of Proceeds.* No proceeds of the issuance of any Note will be used by the Issuer to purchase or carry any margin security within the meaning of, or otherwise contravene or conflict with any of, Regulations T, U or X of the Board of Governors of the Federal Reserve System.

- *Certain Events.* As of the Closing Date, no Event of Default or Early Amortization Event, and no condition that with the giving of notice and/or the passage of time would constitute an Event of Default or an Early Amortization Event (a "*Prospective Event of Default*" and "*Prospective Early Amortization Event,*" respectively), has occurred or is continuing.

- *Not an Investment Company.* The Issuer is not an "investment company" or "controlled" by an "investment company" within the meaning of the Investment Company Act, or is exempt from all provisions of such Act.

- *No Claim or Interest.* Neither the Issuer nor any Person claiming through or under the Issuer has any claim or interest in the lock-box account referred to in the Lock-Box Agreement (except for the Issuer's interest therein subject to the Lien of the Master Indenture).

- *Legal Name.* The legal name of the Issuer is as set forth in the Master Indenture, and the Issuer operates under no other names including without limitation any tradenames, fictitious names, assumed names or "doing business as" names.

Unless and except as otherwise specified in any related Supplement, the Issuer has had no change in its name during the four months prior to the Closing Date for any Series.

- *Sale Treatment*. The Issuer is treating its acquisition of the Loans and Related Assets, as well as Metals Inventory from time to time, as an acquisition by it of ownership thereof, consistent with the representations and covenants of MCC and MDC (as applicable) with respect thereto contained in the TSA and the OAA.

- *Subsidiaries*. The Issuer has no subsidiaries.

- *Limited Activities*. The Issuer engages in no activities other than those contemplated in the Program Agreements or incidental thereto.

- *Certain Security Interest Representations*. The Issuer further represents and warrants as follows with respect to the security interest in the Loans and Related Interests granted to the Trustee under the Master Indenture:

  ➢ The Master Indenture creates a valid and continuing security interest (as defined in the UCC) in the Loans and Related Interests transferred thereunder in favor of the Trustee, which security interest is prior to all other Liens and is enforceable as such as against creditors of and purchasers from the Issuer.

  ➢ The Issuer has taken or caused to be taken all steps necessary to perfect the security interest against the Obligors in the Metals Collateral securing the Loans transferred hereunder.

  ➢ The Loan Agreements evidencing the Loans granted thereunder constitute "tangible chattel paper" within the meaning of the UCC.

  ➢ At the time of granting thereunder the Issuer owned and had good and marketable title to the Loans and Related Interests free and clear of any Lien, claim or encumbrance of any Person (other than Permitted Liens and Liens, if any, which by their terms are released in full upon conveyance thereunder).

  ➢ The Issuer has caused the filing of all appropriate financing statements in the proper filing office in the appropriate jurisdictions under applicable law in order to perfect the grant of the Loans and Related Interests to the Trustee.

  ➢ Other than the transfer to the Trustee pursuant to the Master Indenture, and any Liens or encumbrances which by their terms or otherwise are released in full upon conveyance hereunder, the Issuer has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the Loans and Related Interests. The Issuer has not authorized the filing of and is not aware of any financing statements against the Issuer that include a description of collateral covering the Loans and Related Interests other than any financing statement relating to the transfers hereunder or that has been or is being terminated or that relates to a Lien that is or was released in full upon or prior to the transfer hereunder. The Issuer is not aware of any judgment or tax lien filings against the Issuer.

  ➢ Except as permitted in the related covenant of the Issuer set forth below, the Issuer has no outstanding indebtedness, guaranty or liability. The Issuer is not in default and no waiver of default is currently in effect in the payment of any principal or interest on any indebtedness of the Issuer, and no event or condition exists with respect to any indebtedness of the Issuer that would permit (or that with notice, lapse of time or both would permit) one or more Persons to cause such indebtedness to become due and payable

  ➢ The Issuer has in its possession, or the Servicer or Custodian maintains on behalf of the Issuer possession of, all original copies of the Loan Agreements evidencing the Loans and Related Interests transferred hereunder. Such Loan Agreements do not have any marks or notations indicating that they have been pledged, assigned or otherwise conveyed to any Person other than the Issuer and the Trustee. All financing statements filed or to be filed against the Issuer in favor of the Trustee in connection herewith describing the Loans and Related Interests contain or will contain a statement to the following effect: "A purchase of or security interest in any collateral described in this financing statement will violate the rights of Scala Funding Company, L.L.C. and/or its assignees."

- *Valid Lien Under Master Indenture*. The Master Indenture constitutes a grant of a security interest (as defined in the UCC as in effect in the Relevant UCC State) in, to and under the Trust Estate, securing the Secured Obligations (as defined therein), which grant is enforceable with respect to the existing Loans and any Additional Loans and the

proceeds thereof upon execution and delivery of the Master Indenture, and which will be enforceable with respect to such Loans hereafter originated and the proceeds thereof, upon such origination. The Trustee has a first priority perfected security interest in such property, except for Permitted Liens. Except as contemplated in the Master Indenture or any Supplement, neither the Issuer nor any Person claiming through or under the Issuer shall have any claim to or interest in the Collection Account, any Principal Funding Account, the Equalization Account, any Required Amounts Account, or any other Series Account except for the interest of the Issuer in such property as a debtor for purposes of the UCC as in effect in the Relevant UCC State.

- *Valid Transfer Under TSA.* The TSA constitutes a valid transfer, assignment, set-over and conveyance to the Issuer of all right, title and interest of MCC in and to the Loans and other related property conveyed and assigned thereunder, whether then existing or thereafter created in respect of the applicable Designated Accounts and the proceeds thereof.

- *Solvency.* The Issuer is not insolvent and will not be rendered insolvent by the transfers and other transactions contemplated in the Master Indenture.

- *Ownership.* The Issuer is (or, with respect to Loans originated after the date hereof, will be) the legal and beneficial owner of all right, title and interest in and to each Loan and all related Trust Estate assets, and a Lien in all such Trust Estate assets has been or will be granted to the Trustee free and clear of any Lien other than Permitted Liens.

- *Consents, Etc.* All consents, licenses, approvals or authorizations of or registrations or declarations with any Governmental Authority required to be obtained, effected or given by the Issuer in connection with the grant and assignment of the Trust Estate to the Trustee have been duly obtained, effected or given and are in full force and effect.

- *Marking of Files.* The Issuer has clearly and unambiguously marked all its computer records regarding the Loans, other related Trust Estate assets and Metals Inventory as the property of the Issuer subject to the Lien of the Master Indenture and shall maintain such records in a manner such that the Trustee shall have a perfected interest in such Loans and other property.

- *Eligibility.* Each Loan classified as an "Eligible Loan" in any document or report delivered hereunder or under the Servicing Agreement will satisfy the requirements contained in the definition of Eligible Loan as of the time of such document or report. Metals Inventory classified as "Eligible Metals Inventory" in any document or report delivered hereunder or under the Servicing Agreement will satisfy the requirements contained in the definition of Eligible Metals Inventory as of the time of such document or report.

- *Relevant Information.* All Relevant Information provided to the Trustee was true and correct in all material respects as of, and will be true and correct subsequent to, the Closing Date, or with respect to Additional Loans, as of each Subsequent Purchase Date.

- *Loan Consents.* With respect to each Loan then existing, all consents, licenses, approvals or authorizations of or registrations or declarations with any Governmental Authority required to be obtained, effected or given by the Issuer in connection with the conveyance of such Loan to the Issuer and the grant of the Lien in such Loan to the Trustee have been duly obtained, effected or given and are in full force and effect.

- *MCC/MDC Representations.* The representations and warranties of MCC with respect to the Loans and Related Interests set forth in the TSA were true and correct as and when made. The representations and warranties of MDC with respect to Metals Inventory which was the subject of an Advance set forth in the OAA were true and correct as and when made.

- *Compliance with Laws, Etc.* The Issuer agrees it will comply with all applicable laws, rules, regulations, judgments, decrees and orders (including those relating to the Loans and Related Assets, any other Trust Estate assets and any other agreements related thereto) where the failure to do so would result in a Material Adverse Effect.

- *Preservation of Legal Existence.* It will preserve and maintain its legal existence, rights, franchises and privileges in the jurisdiction of its formation, and qualify and remain qualified in good standing in each jurisdiction in which the ownership or lease of property or the conduct of its business requires such qualification, licenses or approvals.

- *Location of Records and Offices.* It will maintain its sole place of business and chief executive office, and will cause the Servicer to keep all records, files and other documents related to the Loans and Related Assets (including all original documents relating thereto), at the addresses referred to in the Servicing Agreement or, upon not less than 30

days' prior written notice given by the Issuer to the Servicer and the Trustee, at such other locations in jurisdictions where all action required pursuant to the Servicing Agreement shall have been taken and completed. The Issuer will at all times maintain its chief executive office within the United States.

- *Reporting Requirements.* Unless the Trustee (upon written direction of a Majority of Noteholders) shall otherwise consent in writing, the Issuer shall furnish to the Trustee and each Rating Agency:

  ➤ *Event of Default or Early Amortization Event.* As soon as possible, and in any event within two Business Days after the Issuer has knowledge of the occurrence of any Event of Default or Early Amortization Event, a written statement of an authorized officer of the Issuer describing such event and the action that the Issuer proposes to take with respect thereto, in each case in reasonable detail;

  ➤ *Material Adverse Effect.* As soon as possible and in any event within two Business Days after the Issuer has knowledge thereof, written notice that describes in reasonable detail any adverse claim against the Trust Estate or any other event or occurrence which, individually or in the aggregate for all such events or occurrences, has had, or has a substantial likelihood of having, a Material Adverse Effect;

  ➤ *Proceedings.* As soon as possible and in any event within two Business Days after the Issuer has knowledge thereof, written notice of (A) any litigation, investigation or proceeding of the type described in a representation above not previously disclosed to the Trustee, and (B) any judgment, settlement or other final disposition with respect to any such previously disclosed litigation, investigation or proceeding;

  ➤ *Change in Personnel.* As soon as possible and in any event within two Business Days after the Issuer has knowledge thereof, written notice of any change in management personnel of the Issuer; and

  ➤ *Other.* Promptly, from time to time, such other information, documents, records or reports respecting the Loans and Related Assets or such other information respecting the condition or operations, financial or otherwise, of the Issuer, in each case as the Trustee (as directed by a Majority of Noteholders in writing) or a Majority of Noteholders may from time to time reasonably request in order to protect the interests of the Trustee or the Noteholders.

- *Amalgamations, Acquisitions, Sales, Etc.* The Issuer agrees that it shall not:

  ➤ be a party to any amalgamation or consolidation, or directly or indirectly purchase or otherwise acquire any assets or any stock of any class of, or any partnership or joint venture interest in, any other Person, or (B) except pursuant to the Program Agreements, directly or indirectly sell, transfer, assign, convey, lease, pledge or grant a security interest in, whether in one transaction or in a series of transactions, all or any material part of its assets, or sell or assign with or without recourse any Loans or Related Assets (other than pursuant to the Program Agreements);

  ➤ except as contemplated in a Program Agreement, (A) make, incur or suffer to exist an investment in, equity contribution to, or payment obligation in respect of the deferred purchase price of property or services from, any Person, or (B) make any loan or advance to any Person other than for reasonable and customary operating expenses; or

  ➤ except as contemplated in any Program Agreement, create any direct or indirect subsidiary or otherwise acquire direct or indirect ownership of any equity interests in any other Person.

- *Change in Name.* The Issuer will not change its legal name or change its identity or entity structure in a manner that would make any previously filed financing statement seriously misleading or the name under or by which it does business, or permit MCC to change its legal name or the name under or by which it does business, unless the Issuer shall have given the Servicer and the Trustee 30 days prior written notice thereof and unless, prior to any such change in name, the Issuer shall have filed (or shall have caused to be filed) such financing statement amendments as are necessary or advisable to maintain and preserve the Trustee's perfected interest in the Trust Estate or as the Servicer or the Trustee (upon written direction of a Majority of Noteholders) determine may be necessary to continue the perfection of the Trustee's interest for the benefit of the Holders in the Trust Estate.

- *Amendment of Charter Documents.* The Issuer will not amend its Certificate of Formation or its Limited Liability Company Agreement without first obtaining (i) the consent of the Trustee (at the direction of a Majority of Noteholders), and (ii) a Ratings Confirmation.

- *Permitted Indebtedness*. The Issuer shall not create, incur or permit to exist any indebtedness, guaranty or liability, except for (A) indebtedness incurred pursuant to the Program Agreements, or (B) reasonable and customary operating expenses incidental to its activities under the Program Agreements in an amount not to exceed $25,000 in any calendar year.

- *Accuracy of Information*. All written information furnished before or after the Closing Date by the Issuer to the Servicer or the Trustee or any Noteholder pursuant to or in connection with any transaction contemplated in the Program Agreements did not, and shall not contain any untrue statement of a material fact or omit to state material facts necessary to make the statements made therein not misleading, in each case in the light of the circumstances under which such statements were made or such information was furnished.

- *Taxes*. The Issuer will file (or cause to be filed on its behalf) all tax returns and reports required by law to be filed by it, will accrue in accordance with generally accepted accounting principles for all taxes payable by it and will pay all taxes and governmental charges shown on such tax returns and reports to be owing by it, except any such taxes or charges which are being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with generally accepted accounting principles have been set aside on its books. To the extent any taxes are imposed with respect to the Loans and Related Interests conveyed to the Issuer, the Issuer will bear liability for and pay such taxes in accordance with the foregoing.

- *Servicer's Covenants and Agreements*. The Issuer will cause the Servicer and the Trustee to duly observe and perform all covenants and agreements of the Servicer or Trustee, as applicable, set forth in the Master Indenture, the Servicing Agreement or in any other Program Agreement.

- *Security Interests*. Except for the grants and assignments hereunder and under any Supplement, the Issuer will not sell, pledge, assign or transfer to any other Person, or grant, create, incur, assume or suffer to exist any Lien (other than a Permitted Lien), on any Loan, Loan Agreement or in respect of any other Trust Estate assets, whether now existing or hereafter created or arising, or any interest therein; the Issuer will immediately notify the Trustee of the existence of any Lien (other than a Permitted Lien) on any Loan or such other Trust Estate assets; and the Issuer shall defend the right, title and interest of the Trustee in, to and under the Trust Estate, whether now existing or hereafter created or arising, against all claims of third parties claiming through or under the Issuer.

- *Collection Policies*. The Issuer shall comply with and perform its obligations and shall take all actions reasonably within its control to cause MCC and the Servicer to comply with and perform its obligations in accordance with the Collection Policy except insofar as any failure to comply or perform would not have a Material Adverse Effect.

- *Delivery of Collections*. In the event that the Issuer receives Collections directly, the Issuer agrees to deposit such Collections into the Collection Account as soon as practicable after the receipt thereof, but in no event later than two Business Day after receipt thereof; *provided*, that Collections received in the form of Metals Inventory shall be deposited into the Collection Metals Account upon receipt thereof in accordance with the Servicing Agreement.

- *Notice of Liens*. The Issuer shall notify the Trustee promptly after becoming aware of any Lien on any Loan or with respect to any other Trust Estate assets other than Permitted Liens.

- *No Other Business*. The Issuer agrees to engage in no business other than the business contemplated hereunder, under the TSA, under the OAA and under the other Program Agreements to which it is a party.

- *Enforcement of Agreements*. The Issuer agrees to take all action necessary and appropriate to enforce its rights and claims under the TSA, the OAA, the Servicing Agreement and each other Program Agreement to which it is a party.

- *Separate Business*. The Issuer will not permit its assets to be commingled with those of MCC, MDC or any Affiliate of either, and the Issuer shall maintain separate entity records and books of account from those of MCC, MDC and its Affiliates. The Issuer will conduct its business solely in its own name and will cause MCC, MDC and its Affiliates to conduct their business solely in their own names so as not to mislead others as to the identity of the entity with which those others are concerned. The Issuer will provide for its own operating expenses and liabilities from its own funds. The Issuer will not hold itself out, or permit itself to be held out, as having agreed to pay, or as being liable for, the debts of MCC, MDC or any of its Affiliates. The Issuer shall cause MCC, MDC and its Affiliates not to hold themselves out, or permit themselves to be held out, as having agreed to pay, or as being liable for, the debts of the Issuer. The Issuer will maintain an arm's length relationship with MCC, MDC and its Affiliates with respect to any transactions between the Issuer, on the one hand, and MCC or MDC or its Affiliates, on the other. Not less than one

MNX-CFTC-01335344

manager of the Issuer will be an "Independent Manager" as defined in the Issuer's Certificate of Formation in existence on the Closing Date.

- *Loan, Metal Acquisitions*. The Issuer shall not acquire Loans from any Person other than MCC, and shall not acquire Metals from any Person other than MDC (or, if applicable, from an Obligor in connection with an acquisition or liquidation of Metals Collateral).

- *Transfer and Sale Notices; Amendments; Additions/Removals*. The Issuer (i) shall promptly give the Trustee copies of any notices, reports or certificates given or delivered to the Issuer under the TSA and each other Program Agreement, (ii) shall not amend or consent to the amendment of an Loan Agreement with respect to Loans constituting part of the Trust Estate which amendment would have a material adverse effect on the collectability of, or the timing of receipt of collections on, such Loans, and (iii) shall not permit the addition or removal of a Loan to or from the operation of the TSA unless there is a corresponding right or obligation of the Issuer to add or remove such Loan to or from the Trust Estate.

*Allocations of Collections and Other Funds*

The Master Indenture provides that all payments of amounts due and payable on the Notes that are to be made from amounts withdrawn from the Collection Account or any other Trust Account shall be made on behalf of the Issuer by the Trustee or by another Paying Agent, and no amounts so withdrawn from the Collection Account or any other Trust Account shall be paid at the direction of the Issuer except as provided in the Servicing Agreement and in the related Supplement.

Collections are to be allocated to each Series in accordance with the Servicing Agreement and any related Supplement. Amounts so allocated to any Series will not be available to the Noteholders of any other Series, except as specified in the Servicing Agreement or in the related Supplement. Allocations of Collections among the Classes in any Series and to any related provider of liquidity or credit enhancement for a Series shall be set forth in the related Supplements and by written order of the Servicer.

*Withholding*

The Master Indenture provides that if any withholding tax is imposed on the Issuer's payment to the Noteholders, such withholding tax shall reduce the amount otherwise distributable to the Noteholders as provided below. The Trustee is hereby authorized and directed to retain from amounts otherwise distributable to the Noteholders sufficient funds for the payment of any tax that is legally owed by the Issuer. This authorization shall not prevent the Trustee from contesting any tax in appropriate proceedings and withholding payment of the tax, if permitted by law, pending the outcome of the proceedings. The amount of any withholding tax imposed on any distributions shall be treated as cash distributed to the Noteholder at the time it is withheld by the Issuer and remitted to the appropriate taxing authority. If withholding tax might be payable on a distribution to a non-U.S. Noteholder, the Trustee may in its sole discretion withhold an appropriate amount to cover that possibility. The Issuer shall have no obligation to hold any Noteholder harmless against, or to "gross up," any withholding taxes imposed on any of the Issuer's payments (or allocations of income) to any Noteholder.

*Unclaimed Funds*

The Master Indenture provides that, on the request of the Issuer, any money deposited with the Trustee or any Paying Agent, or then held by the Issuer, in trust for the payment of the principal of or interest on any Note and remaining unclaimed for two years after it has become due and payable shall be released from the Trust Estate and paid to the Issuer. The Holder of the Note on which payment was due shall thereafter look only to the Issuer for payment as an unsecured general creditor. All liability of the Trustee or the Paying Agent regarding that trust money to the extent so paid to the Issuer shall thereupon cease. The Trustee or the Paying Agent, before being required to make any payment, may at the expense of the Issuer cause to be published once, in a newspaper of general circulation published in the English language and customarily published on each Business Day in New York, New York and in the city in which the principal corporate trust office of the Trustee is located, notice that such money remains unclaimed and that, after a date specified therein, which shall be not less than 30 days from the date of the publication, any unclaimed balance of that money then remaining will be repaid to the Issuer. The Trustee may also adopt and employ, at the expense of the Issuer, any other reasonable means of notification of a release of payment (including mailing notice of the release to Noteholders whose Notes have been called but have not been surrendered for redemption or whose right to monies payable but not claimed is determinable from the records of any Paying Agent, such notice to be nailed to the last address of record of each such Noteholder).

*Issuer May Consolidate, Etc. Only on Certain Terms*

MNX-CFTC-01335345

The Master Indenture provides that the Issuer shall not consolidate or merge with or into any other Person, or transfer its assets substantially as an entirety to any Person, unless:

- the Person (if other than the Issuer) formed by or surviving the consolidation or merger or that acquires the assets of the Issuer substantially as an entirety expressly assumes the due and punctual payment of the principal of and interest on all the Notes and the performance of the terms of the Master Indenture and each Supplement on the part of the Issuer to be performed, by a written agreement, executed and delivered to the Trustee, in form and substance satisfactory to the Trustee;

- immediately after giving effect to the transaction, no Event of Default or Early Amortization Event with respect to any Series has occurred and is continuing;

- the Issuer has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel each stating that (A) the consolidation, merger or transfer and the supplemental indenture described in clause (i) above comply with this Section, (B) all conditions precedent in this Section have been complied with and (C) the written agreement described in clause (i) above is duly authorized, executed and delivered and is valid, binding, and enforceable against the successor entity;

- the Rating Agency Condition is satisfied after taking into account the transaction;

- the Issuer has received a tax opinion dated the date of the consolidation, merger, or transfer (and has delivered copies of it to the Trustee) to the effect that the transaction will not have any material adverse tax consequence to the Issuer or any Noteholder;

- the Issuer has received an Opinion of Counsel dated the date of the consolidation, merger, or transfer (and has delivered copies of it to the Trustee) to the effect that the transaction will not require the Issuer to register as an "investment company" under the Investment Company Act; and

- any action that is necessary to maintain the Lien and security interest created by the Master Indenture and any Supplement has been taken and the Issuer has received an Opinion of Counsel dated the date of the consolidation, merger, or transfer (and has delivered copies of it to the Trustee) to the effect that the Trustee has, and after giving effect to such consolidation, merger, or transfer will continue to have, a first priority, perfected security interest in the Trust Estate and Series Collateral, if applicable.

Except pursuant to any Program Agreement, the Issuer shall not transfer any of its assets substantially as an entirety, including those included in the Trust Estate, to any Person unless:

- the Person that acquires assets of the Issuer the transfer of which is restricted by the Master Indenture (A) is a United States citizen or a Person organized and existing under the laws of the United States of America or any state, (B) expressly assumes the due and punctual payment of the principal of and interest on all the Notes and the performance of the terms of the Master Indenture on the part of the Issuer to be performed by a supplemental indenture or other written agreement, executed and delivered to the Trustee, in form and substance satisfactory to the Trustee, (C) expressly agrees in that supplemental indenture or other written agreement that all right, title, and interest transferred to it shall be subject and subordinate to the rights of Holders of the Notes, (D) expressly agrees to indemnify the Issuer against any loss, liability or expense related to the Master Indenture and the Notes and (E) expressly agrees in that supplemental indenture or other written agreement that it shall make all filings with the Securities and Exchange Commission (and any other appropriate Person) required by the Exchange Act in connection with the Notes;

- immediately after giving effect to the transaction, no Event of Default or Early Amortization Event with respect to any Series has occurred and is continuing;

- the Rating Agency Condition is satisfied after taking into account the transaction;

- the Issuer has received a tax opinion (and has delivered copies of it to the Trustee) to the effect that the transaction will not have any material adverse tax consequence to the Issuer or any Noteholder;

- any action that is necessary to maintain the Lien and security interest created by the Master Indenture and any Supplement has been taken and the Issuer has received an Opinion of Counsel dated the date of the consolidation, merger, or transfer (and has delivered copies of it to the Trustee) to the effect that the Trustee has, and after giving

effect to such consolidation, merger, or transfer will continue to have, a first priority, perfected security interest in the Trust Estate and, if applicable, Series Collateral; and

- the Issuer has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel each stating that the transfer and the supplemental indenture or other written agreement comply with this Section and that all conditions precedent in this Section have been complied with (including any filing required by the Exchange Act).

*Early Amortization Events; Events of Default and Remedies*

The Early Amortization Events applicable to the Notes of any outstanding Series shall be specified in the related Supplement, and the consequences of the occurrence of such Early Amortization Events with respect to such Series shall be specified in the related Supplement.

An *"Event of Default"* with respect to any Note of any outstanding Series means any one of the events designated as such above in "Summary of Terms - Events of Default" (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body).

Within five days after its occurrence, the Issuer shall deliver to the Trustee written notice in the form of an Officer's Certificate stating the particulars of any event that with the giving of notice or the lapse of time or both would become an Event of Default, its status, and what action the Issuer is taking or proposes to take regarding the event.

If an Event of Default in clause (iii) of the listing thereof shall occur, the unpaid principal amount of the Notes of all Series, together with accrued and unpaid interest on the Notes through the date of acceleration, shall become immediately due and payable and no notice to such effect from the Issuer, any Noteholder or any other Person to the Trustee shall be required. If any other Event of Default described in the definition thereof occurs and is continuing, the Majority Noteholders of each outstanding Series may declare the Notes of all Series to be immediately due and payable by a notice in writing to the Issuer and to the Trustee. Upon any such declaration the unpaid principal amount of the Notes, together with accrued and unpaid interest on the Notes through the date of acceleration, shall become immediately due and payable.

If at any time a declaration of acceleration of maturity has been made but before a judgment or decree for payment of the money due has been obtained by the Trustee as provided in this Article, Majority Noteholders for each outstanding Series of Notes may rescind and annul the declaration and its consequences by written notice to the Issuer and the Trustee if the Issuer has paid or deposited with the Trustee a sum sufficient to pay:

(i)    all payments of principal of and interest on the Notes and all other amounts that would then be due under the Master Indenture and related Supplements or upon the Notes if the Event of Default giving rise to the acceleration had not occurred; and

(ii)    all sums paid or advanced by the Trustee under the Program Agreements and the reasonable compensation, expenses, indemnification payments, disbursements and advances of the Trustee and their respective agents and outside counsel; and

(iii)    all Events of Default, other than the nonpayment of the principal of the Notes that has become due solely by such acceleration, have been cured or waived as provided in the relevant provision of the Master Indenture.

No such rescission shall affect any subsequent default or impair any right consequent thereto.

*Collection of Indebtedness and Suits for Enforcement by Trustee*

The Issuer covenants that upon the acceleration of the maturity of the Notes and the demand of the Trustee, the Issuer will immediately pay to the Trustee for the benefit of the Noteholders the whole amount then due and payable on the Notes for principal and interest, with interest upon the overdue principal and, to the extent that payments of such interest shall be legally enforceable, upon overdue installments of interest, in the order set forth in the applicable Supplement and, in addition thereto, any further amount necessary to cover the costs and expenses of collection, including the reasonable compensation, expenses, indemnification payments, disbursements and advances of the Trustee, its agents and counsel.

If the Issuer fails to pay these amounts forthwith upon the demand of the Trustee, at the written direction of a majority of the Noteholders, the Trustee, in its own name and as Trustee of an express trust, may institute a proceeding for the collection of the sums so due and unpaid, and may prosecute the proceeding to judgment or final decree, and may enforce the same against the Issuer and collect the monies adjudged or decreed to be payable in the manner provided by law. However, liability for any

MNX-CFTC-01335347

payment whether resulting from a collection action or otherwise shall lie solely with the Trust Estate assets, and no claim for payment shall be pursued except against the Trust Estate assets.

If an Event of Default occurs and is continuing, the Trustee, at the written direction of a majority of the Noteholders, shall, in its discretion and subject to certain provisions of the Master Indenture, proceed to protect and enforce its rights and the rights of the Noteholders under the Master Indenture and related Supplements by whatever appropriate proceedings the Trustee, at the written direction of a majority of the Noteholders, deems most effective to protect and enforce any of those rights, whether for the specific enforcement of any covenant or agreement contained in the Master Indenture, any Supplement or the Servicing Agreement or in aid of the exercise of any power granted in the Master Indenture, any Supplement or the Servicing Agreement, or to enforce any other proper remedy or legal or equitable right vested in the Trustee by the Master Indenture, any Supplement or the Servicing Agreement or by law.

If proceedings relating to the Issuer under Title 11 of the United States Code or any other applicable federal or state bankruptcy, insolvency, or other similar law are pending, or if a receiver, assignee, or trustee in bankruptcy or reorganization, liquidator, sequestrator, or similar official has been appointed for or taken possession of the Issuer or its property, or if any other comparable judicial proceedings relating to the Issuer or the creditors or property of the Issuer are pending, then regardless of whether the principal of any Notes shall then be payable by their terms or by declaration or otherwise and regardless of whether the Trustee has made any demand pursuant to this Section, the Trustee shall be entitled and empowered, by intervention in the proceedings or otherwise:

(a)     to file and prove a claim for the whole amount of principal and interest owing and unpaid on the Notes, and to file any other papers or documents that may be appropriate to have the claims of the Trustee and of the Noteholders allowed in any proceedings relating to the Issuer or other obligor upon the Notes, or to the creditors or property of the Issuer or other obligor,

(b)     to vote on behalf of the Noteholders in any election of a trustee or a standby trustee in any arrangement, reorganization, liquidation, or other bankruptcy or insolvency proceedings or in any election of any Person performing similar functions in comparable proceedings, and

(c)     to collect any monies or other property payable or deliverable on any such claims, and to distribute all amounts received on the claims of the Noteholders and of the Trustee on their behalf,

and any trustee, receiver, liquidator, custodian, or other similar official is authorized by each of the Noteholders to make payments to the Trustee, and, if the Trustee consents to payments going directly to the Noteholders, to pay to the Trustee such amounts as shall be sufficient to cover reasonable compensation to the Trustee, each predecessor Trustee, and their respective agents, attorneys, and counsel, and all other expenses and liabilities incurred (including attorneys' fees and expenses and including with respect to the enforcement of its indemnity rights), and all advances made, by the Trustee and each predecessor Trustee except as a result of gross negligence or bad faith.

Nothing contained in the Master Indenture shall be deemed to authorize the Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Noteholders any plan of reorganization, arrangement, adjustment, or composition affecting the Notes or the rights of any Noteholder, or to authorize the Trustee to vote regarding the claim of any Noteholder in any such proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or Person performing similar functions.

In any proceedings involving the Master Indenture or the Notes the Trustee shall represent all the Noteholders, and it shall not be necessary to make any Noteholders parties to the proceedings.

*Remedies*

If an Event of Default has occurred and is continuing and the maturity of the Notes has been accelerated, the Trustee shall, at the written direction of a majority of the Noteholders, do one or more of the following:

• institute proceedings in its own name and as trustee for an express trust for the collection of all amounts then payable on the Notes or under the Master Indenture or any Supplement (whether by declaration or otherwise), enforce any judgment obtained, and collect from the Trust Estate securing the Notes monies adjudged due;

• only if so instructed in writing by the Majority Noteholders of each outstanding Series, sell or liquidate all or a portion of the Trust Estate assets at one or more public or private sales to the extent permitted by law; *provided, however,* that if the proceeds of such sale or liquidation distributable to the Noteholders

are insufficient to discharge in full all amounts then due and unpaid upon the Notes for principal and interest, the Trustee shall not proceed with such sale or liquidation unless the Holders of 100% of the Notes of each outstanding Series (other than any Notes then held by the Issuer or any Affiliate thereof) consent in writing thereto;

- institute proceedings from time to time for the complete or partial foreclosure of the Master Indenture with respect to the Trust Estate (or the applicable Supplement with respect to Series Collateral, if any); and

- exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights and remedies of the Trustee or the Noteholders under the Master Indenture and related Supplements.

For the purpose of determining the sufficiency or insufficiency in clause (ii) above, the Trustee may, but need not, obtain at the expense of the Issuer and conclusively rely upon an opinion of an independent investment banking or accounting firm of national reputation as to the feasibility of the proposed action and as to the sufficiency of the Trust Estate for these purposes.

The proceeds of the sale or other liquidation of the Trust Estate shall be treated as Collections and shall be distributed in accordance with the terms of the Program Agreements after being deposited into the Collection Account. If the Trustee collects any money or property pursuant to the foregoing, it shall allocate such money or property among each outstanding Series based on the Series Allocation Percentages, respectively, and (after paying all amounts then due, including indemnification amounts, and owing to the Trustee under the Program Agreements and, to the extent provided in the relevant Supplement, all amounts then due and owing to any credit or liquidity enhancement provider under its related agreement with the Issuer) shall distribute such money or property to the Issuer in accordance with the Servicing Agreement and the Supplements.

*Optional Preservation of Trust Assets*

If the Notes have been accelerated following an Event of Default and the declaration and its consequences have not been rescinded and annulled, the Trustee may, at the written direction of a majority of the Noteholders, but need not, elect to maintain possession of the Trust Estate. It is the intent of the parties to the Master Indenture and the Noteholders that all principal of and interest on the Notes be paid in full when due, and the Trustee is required to consider the parties' wishes when determining whether or not to maintain possession of the Trust Estate. In determining whether to maintain possession of the Trust Estate, the Trustee may, but need not, obtain and rely upon an opinion of an independent investment banking or accounting firm of national reputation as to the feasibility of the proposed action and as to the sufficiency of the Trust Estate for these purposes.

*Limitation on Suits*

No Noteholder shall have any right to institute any proceedings, judicial or otherwise, regarding the Master Indenture or related Supplement, or for the appointment of a receiver or trustee, or for any other remedy under the Master Indenture or related Supplement, unless:

- Holders of not less than 25% of the Principal Amount of each Series of Notes have made written request to the Trustee to institute the proceeding in its own name as Trustee;

- those Noteholders have previously given written notice to the Trustee of a continuing Event of Default;

- those Noteholders have offered to the Trustee indemnity satisfactory to it against the costs, expenses, and liabilities to be incurred in compliance with their request;

- the Trustee for 60 days after its receipt of that notice, request and offer of indemnity has failed to institute appropriate proceedings; and

- no direction inconsistent with the written request has been given to the Trustee during the 60-day period by the Majority Noteholders of any outstanding Series.

No one or more Noteholders may in any manner whatever under any provision of the Master Indenture affect, disturb, or prejudice the rights of any other Noteholder or obtain or seek to obtain priority or preference over any other Noteholder or

MNX-CFTC-01335349

enforce any right under the Master Indenture, except in the manner provided in the Master Indenture and for the equal and ratable benefit of all the Noteholders.

If the Trustee receives conflicting or inconsistent requests and indemnity from two or more groups of Noteholders, each representing less than Majority Noteholders of the related Series, the Trustee in its sole discretion may determine what action, if any, shall be taken, notwithstanding any other provisions of the Master Indenture.

*Rights of Noteholders to Direct Trustee*

Majority Noteholders of any outstanding Series of Notes may direct the time, method, and place of conducting any proceeding for any remedy available to the Trustee regarding the Notes of that Series or exercising any trust or power conferred on the Trustee regarding the Notes of that Series.

Notwithstanding the foregoing and subject to Section 6.01 of the Master Indenture:

- the Trustee may decline any direction if the Trustee, after being advised by counsel, determines that the action so directed is in conflict with any rule of law or with the Master Indenture, and

- the Trustee may decline any direction if the Trustee in good faith, by a Responsible Officer of the Trustee, determines that the proceedings so directed would be illegal or involve the Trustee in personal liability or be unjustly prejudicial to Noteholders not parties to that direction.

*Waiver of Past Defaults*

Prior to the declaration of the acceleration of the maturity of the Notes, Majority Noteholders of each outstanding Series of Notes may, on behalf of all the Noteholders, waive in writing any past default on the Notes and its consequences, except:

(i) a default in the payment of the principal or interest on any Note or

(ii) an Event of Default described in clause (iii) of the definition thereof (each of which may be waived only with the consent of all of the Noteholders), or

(iii) regarding any of the provisions under the Master Indenture that cannot be modified or amended without the consent of the Noteholder of each outstanding Note affected.

Upon any written waiver, the default shall cease to exist, and any Event of Default arising from it shall be deemed to have been cured for every purpose of the Master Indenture. No such waiver shall extend to any subsequent or other default or impair any right consequent to it.

*Undertaking for Costs*

All parties to the Master Indenture agree, and each Noteholder by its acceptance of a Note shall be deemed to have agreed, that in any suit for the enforcement of any right or remedy under the Master Indenture, or in any suit against the Trustee for any action taken, suffered, or omitted by it as Trustee, any court may in its discretion require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and that the court may in its discretion assess reasonable cots, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by that party litigant. The foregoing shall not apply to any suit instituted by the Trustee, to any suit instituted by any Noteholders holding in the aggregate more than 10% of the principal balance of the outstanding Notes, or to any suit instituted by any Noteholder for the enforcement of the payment of the principal or interest on any Note on or after the Payment Date on which the principal or interest was due (or, in the case of redemption, on or after the applicable redemption date).

## DESCRIPTION OF THE NOTES AND SERIES 2016-1 SUPPLEMENT

The Notes will be issued pursuant to the Master Indenture, as supplemented by the Series 2016-1 Supplement thereto.

The Class A Notes, the Class M Notes and the Class B Notes will be represented by a master note (the "*Master Note*") held by the Trustee on behalf of, and ownership thereof will be recorded only through the book-entry system of, The Depository Trust Company ("*DTC*") in denominations of $100,000 and integral multiples of $1,000 in excess thereof. Beneficial owners

will not receive certificates representing their ownership interest in the Notes.  The Company has been advised by DTC that upon receipt of payment DTC will credit, on its book-entry records and transfer system, the accounts of the DTC participants through whom Notes are directly or indirectly owned.

**Interest and Principal Payments**

Payments of principal and interest on the Notes will be made on the fifteenth calendar day of each month, or, if such day is not a Business Day, the next succeeding Business Day (each such date, a *"Payment Date"*), commencing on January 15, 2017, to Noteholders of record as of the day immediately preceding such Payment Date (the *"Record Date"*).  Payments by DTC to its participants and by such participants to owners of the Notes or their representatives will be governed by customary practices and standing instructions and will be the sole responsibility of DTC, such DTC participants or such representatives, respectively.

*Interest Payments.*  The Notes will bear interest from the Closing Date at the applicable interest rate for the respective Class as set forth below (the *"Note Rate"*).

The Note Rate for each Class of Notes offered hereby is as follows:

- a fixed rate of 3.91% per annum for the Class A Notes (the *"Class A Note Rate"*).

- a fixed rate of 4.41% per annum for the Class M Notes (the *"Class M Note Rate"*)

- a fixed rate of 5.21% per annum for the Class B Notes (the *"Class B Note Rate"*).

On each Payment Date,  the interest payments due with respect to the Notes since the last Payment Date  will be the interest that has accrued on such Notes since the last Payment Date through (but not including)  the day preceding such Payment Date (or in the case of the first Payment Date, since the Closing Date) (the *"Interest Accrual Period"*) at the applicable Note Rate applied to the outstanding principal balance of the Notes outstanding during such Interest Accrual Period, after giving effect to payments (if any) of principal to the Noteholders on the prior Payment Date.

It is a condition to the initial issuance of the Series 2016-1 Notes that an amount at least equal to the Required Amounts for Series 2016-1 shall at such time be on deposit in the Required Amounts Account for Series 2016-1.

*Determination of Class A Interest and Class A Additional Amounts.*

(i)  Interest on the outstanding Class A Principal Amount shall accrue during any Interest Accrual Period at the Class A Note Rate, calculated in each case on the basis of 12 months of 30 days, or calculated on the basis of a three hundred sixty (360) day year for the actual number of calendar days during the stub period..

(ii)  Interest with respect to the Class A Notes due but not paid on any Payment Date will be due on demand with additional interest on the amount at the Alternate Base Rate, to the extent permitted by law, with such interest to be compounded daily.

*Determination of Class M Interest*

(i)  Interest on the outstanding Class M Principal Amount shall accrue during any Interest Accrual Period at the Class A Note Rate, calculated in each case on the basis of 12 months of 30 days, or calculated on the basis of a three hundred sixty (360) day year for the actual number of calendar days during the stub period.

(ii)  Interest with respect to the Class M Notes due but not paid on any Payment Date will be due on demand with additional interest on the amount at the Alternate Base Rate, to the extent permitted by law, with such interest to be compounded daily.

*Determination of Class B Interest*

(i)  Interest on the outstanding Class B Principal Amount shall accrue during any Interest Accrual Period at the Class B Note Rate, calculated in each case on the basis of on the basis of 12 months of 30 days, or calculated on the basis of a three hundred sixty (360) day year for the actual number of calendar days during the stub period.

(ii) Interest with respect to the Class B Notes due but not paid on any Payment Date will be due on demand with additional interest on the amount at the Alternate Base Rate, to the extent permitted by law, with such interest to be compounded daily.

*Determination of Class A Principal, Class M Principal and Class B Principal; Subordination of Class M Principal and Class B Principal to Class A Principal; Subordination of Class B Principal to Class M Principal*

Class A Principal, Class M Principal and Class B Principal shall be payable, from the Series 2016-1 Investor Percentage of daily Collections allocated therefor and on deposit in the Series 2016-1 Principal Funding Account in accordance with the Servicing Agreement, in the manner and order of priority set forth below:

(i) during any Amortization Period, on each Payment Date during such Amortization Period, Class A Principal shall be payable in an amount equal to the largest Class A Controlled Distribution Amount which does not exceed such allocated Collections on deposit in the Series 2016-1 Principal Funding Account as of the close of business on the last Business Day of the calendar month preceding the month in which such Payment Date occurs (plus, in respect of a Payment Date constituting the Series 2016-1 Maturity Date or a Payment Date following acceleration of the Series 2016-1 Notes after an Event of Default, the Series Allocation Percentage of any amounts then on deposit in the Equalization Cash Account, which in such circumstances shall be allocated to the Series 2016-1 Principal Funding Account for repayment of principal on Series 2016-1 as aforesaid), *provided, however,* that (A) with respect to any Payment Date, Class A Principal may not exceed the Class A Principal Amount outstanding, (B) on and after the Series 2016-1 Maturity Date, or following acceleration of the Class A Notes after an Event of Default, the Class A Principal payable shall be an amount equal to the Class A Principal Amount outstanding on such date, and  (C) to the extent that such allocated Collections do not exceed the smallest Class A Controlled Distribution Amount, Class A Principal shall (except as specified in clause (B) above) be deemed to be zero;

(ii) during any Amortization Period, on each Payment Date during such Amortization Period, (A) no Class M Principal shall be payable until all Class A Principal Amount outstanding has been repaid in full (or a priority allocation under clause (i) above results in sufficient funds to repay the Class A Principal Amount in full on the current upcoming Payment Date), and (B) thereafter Class M Principal shall be payable in an amount equal to the largest Class M Controlled Distribution Amount which does not exceed the remaining allocated Collections on deposit in the Series 2016-1 Principal Funding Account, not theretofore allocated to pay Class A Principal, as of the close of business on the last Business Day of the calendar month preceding the month in which such Payment Date occurs (plus, in respect of a Payment Date constituting the Series 2016-1 Maturity Date or a Payment Date following acceleration of the Series 2016-1 Notes after an Event of Default, the Series Allocation Percentage of any amounts then on deposit in the Equalization Cash Account, which in such circumstances shall be allocated to the Series 2016-1 Principal Funding Account for repayment of principal on Series 2016-1 as aforesaid), *provided, however,* that (1) with respect to any Payment Date, Class B Principal may not exceed the Class M Principal Amount outstanding, (2) on and after the Series 2016-1 Maturity Date, or following acceleration of the Class M Notes after an Event of Default, the Class M Principal payable shall be an amount equal to the Class M Principal Amount outstanding on such date (but subject to subclause (A) of this clause (ii) above), and  (3) to the extent that such allocated Collections do not exceed the smallest Class M Controlled Distribution Amount, Class M Principal shall (except as specified in clause (2) above) be deemed to be zero; and

(ii) during any Amortization Period, on each Payment Date during such Amortization Period, (A) no Class B Principal shall be payable until all Class A Principal Amount and Class M Principal Amount outstanding have been repaid in full (or a priority allocation under clauses (i) and (ii) above results in sufficient funds to repay the Class A Principal Amount and Class M Principal Amount in full on the current upcoming Payment Date), and (B) thereafter Class B Principal shall be payable in an amount equal to the largest Class B Controlled Distribution Amount which does not exceed the remaining allocated Collections on deposit in the Series 2016-1 Principal Funding Account, not theretofore allocated to pay Class A Principal or Class M Principal, as of the

MNX-CFTC-01335352

close of business on the last Business Day of the calendar month preceding the month in which such Payment Date occurs (plus, in respect of a Payment Date constituting the Series 2016-1 Maturity Date or a Payment Date following acceleration of the Series 2016-1 Notes after an Event of Default, the Series Allocation Percentage of any amounts then on deposit in the Equalization Cash Account, which in such circumstances shall be allocated to the Series 2016-1 Principal Funding Account for repayment of principal on Series 2016-1 as aforesaid), *provided, however,* that (1) with respect to any Payment Date, Class B Principal may not exceed the Class B Principal Amount outstanding, (2) on and after the Series 2016-1 Maturity Date, or following acceleration of the Class B Notes after an Event of Default, the Class B Principal payable shall be an amount equal to the Class B Principal Amount outstanding on such date (but subject to subclause (A) of this clause (iii) above), and (3) to the extent that such allocated Collections do not exceed the smallest Class B Controlled Distribution Amount, Class B Principal shall (except as specified in clause (2) above) be deemed to be zero.

*Distributions*

On each Payment Date, the Trustee agrees in the Series 2016-1 Supplement that it shall, in accordance with instructions set out in the applicable Daily Report, distribute to the Class A Holders and Class B Holders, as applicable, all accrued and unpaid Class A Interest and Class B Interest, as applicable, payable on such Payment Date with respect to such Class, and any additional interest payable to the Class A Holders as described above, to the extent funds are available for such payment in the Series 2016-1 Required Amounts Account. In addition, the Trustee shall, in accordance with instructions set out in the applicable Daily Report, distribute to the Holders, the following amounts:

(a) on any Payment Date, from funds deposited in the Series 2016-1 Principal Funding Account, the Class A Principal to be distributed in repayment of the Class A Principal Amount as and to the extent provided in "—Determination of Class A Principal and Class B Principal" above;

(b) on any Payment Date, from funds deposited in the Series 2016-1 Principal Funding Account, the Class B Principal to be distributed in repayment of the Class B Principal Amount as and to the extent provided in "—Determination of Class A Principal and Class B Principal" above and

(c) on any Payment Date, any further amounts in respect of Servicing Fees, Trustee Fees and/or Backup Servicer Fess to be paid to the parties entitled to such payment from the Series 2016-1 Required Amounts Account, in accordance with the Servicing Agreement (and without duplication of the payments described above).

In addition, following repayment in full of all principal amount outstanding and accrued interest on the Series 2016-1 Notes, and all other Secured Obligations related to Series 2016-1, any amounts remaining in the Required Amounts Account for Series 2016-1 are to be released from such account and allocated as Collections in accordance with the Servicing Agreement (or, if no other Series of Notes or other Secured Obligations are then outstanding, released to the Issuer free and clear of the lien of the Master Indenture and the applicable Supplement).

All distributions described in this section shall be distributed to the Holders or other parties entitled thereto in immediately available funds by wire transfer, in accordance with written instructions provided by the applicable payee or its authorized representative.

## OPTIONAL REDEMPTION

The Series 2016-1 Notes are subject to early redemption in full on or after the occurrence of the Scheduled Amortization Commencement Dates. The Notes are not otherwise subject to early redemption or prepayment at the Issuer's option, in whole or in part, prior to maturity. However, the commencement of an Early Amortization Period for Series 2016-1 as a result of an Event of Default or Early Amortization Event can result in the allocation of Collections to the Principal Funding Account and the repayment on subsequent Payment Dates of all or portions of outstanding principal on the Class A Notes, Class M Notes and Class B Notes (in that order of priority) prior to their final maturity.

## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS

### General

The following is a general discussion of certain U.S. federal income tax considerations with respect to the purchase, ownership and disposition of the Notes offered hereby. This discussion is limited to holders of the Notes who are the initial

purchasers of the Notes at their original issue price, which will equal the first price to the public (not including bond houses, brokers, or similar persons or organizations acting in the capacity of underwriters, placement agents, or wholesalers) at which a substantial amount of the Notes is sold for cash, and who hold the Notes as capital assets within the meaning of Section 1221 of the Code (generally property held for investment). The discussion that follows, and the opinions described below of Andrews Kurth Kenyon LLP, special federal tax counsel, are based upon current provisions of the Internal Revenue Code of 1986, as amended (the "*Code*"), existing and proposed Treasury regulations, current administrative rulings, judicial decisions and other applicable authorities in effect as of the date hereof, all of which are subject to change, possibly with retroactive effect. There can be no assurance that the Internal Revenue Service ("*IRS*") will not challenge the conclusions reached in this description of "Certain United States Federal Income Tax Considerations," and no ruling from the IRS has been or will be sought on any of the issues discussed below. Furthermore, legislative, judicial or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements set forth below.

This discussion does not attempt to explain fully every relevant technical aspect of the applicable tax provisions. This discussion also does not attempt to deal with all aspects of federal income taxation that may be relevant to all holders of Notes in light of their personal investment or tax circumstances. Also, this discussion does not describe tax consequences to certain types of holders who may be subject to special treatment under the federal income tax laws including, without limitation, financial institutions, dealers in securities or currencies, insurance companies, and persons who hold the Notes as part of a straddle, hedging or conversion transaction. Nothing herein is or should be construed as legal or tax advice to any prospective investor. Accordingly, prospective investors should consult their own tax advisors and tax return preparers regarding the preparation of any item on a tax return even where the anticipated tax treatment has been discussed in this Private Placement Memorandum. Prospective investors consult with their own tax advisors as to the federal, state, local, foreign and any other tax consequences to them of the purchase, ownership and disposition of the Notes.

If a partnership (including for this purpose any entity treated as a partnership for federal income tax purposes) is a beneficial owner of a Note, the treatment of a partner in the partnership will generally depend upon the status of the partner and upon the activities of the partnership. A Noteholder that is a partnership and partners in such partnership should consult their tax advisors about the federal income tax considerations of holding and disposing a Note, as the case may be.

## Classification of the Issuer

In connection with the issuance of the Notes, Andrews Kurth Kenyon LLP will deliver its opinion that, for U.S. federal income tax purposes, under existing law the Issuer will not be classified as an association or publicly traded partnership taxable as a corporation. The Amended and Restated Limited Liability Company Agreement of the Issuer (the "Operating Agreement") will restrict the number of owners of equity interests in the Issuer to no more than 100 persons, as ownership is determined for purposes of Treasury Regulation Section 1.7704-1(h). In addition, except as described in the following paragraph, the owners of equity interests in the Issuer will agree not to take any action which would be inconsistent with the characterization of the Issuer as a partnership for federal income tax purposes. In rendering this opinion, Andrews Kurth Kenyon LLP has assumed that the terms of the various documents, including, without limitation, the Operating Agreement, will be substantially in the form contemplated by this Private Placement Memorandum and will be complied with by all of the parties to the transaction.

If, in the future, there is a single owner of equity interests in the Issuer, rather than multiple owners, then for federal income tax purposes, the Issuer may be disregarded as a separate entity from the owner of the interests in the Issuer. It is further assumed that, at that time, such owner of interests in the Issuer will take all action necessary, if any, or refrain from taking any inconsistent action so as to ensure the Issuer is, for federal income tax purposes, disregarded as a separate entity from such owner. Pursuant to the terms of the Operating Agreement, the single owner of the Issuer's equity interests will agree not to take any action inconsistent with that characterization.

In any case where the Issuer is treated as a partnership for U.S. federal income tax purposes, it is the opinion of Andrews Kurth Kenyon LLP that it will not be classified as a publicly traded partnership taxable as a corporation. That opinion is based upon Andrews Kurth Kenyon LLP's conclusions that (1) the nature of the income of the Issuer will exempt it from publicly traded partnership characterization and/or (2) the Issuer will at all times have no more than 100 owners of its equity interests. If, contrary to the opinion of Andrews Kurth Kenyon LLP, the Issuer were treated as a publicly traded partnership taxable as a corporation for U.S. federal income tax purposes, it would be subject to corporate income tax on its taxable income. The Issuer's taxable income would include all its income on the Loans and other assets in the Trust Estate, which may be reduced by the interest expense on the Notes issued by the Issuer to the extent the Notes are properly characterized as indebtedness. Any such corporate income tax could materially reduce the cash available to make payments on the Notes.

## Classification of the Series 2016-1 Notes

Andrews Kurth Kenyon LLP will deliver its opinion that, for U.S. federal income tax purposes, under existing law the Series 2016-1 Notes will be characterized as indebtedness (except in the case of Series 2016-1 Notes held by (a) MCC or MDC

or any of their affiliates or (b) any person in whose hands, due to such person's relationship with the Issuer and pursuant to Treasury regulations under Section 385 of the Code, the Series 2016-1 Notes would not be treated as indebtedness for U.S. federal income tax purposes). In rendering this opinion, Andrews Kurth Kenyon LLP has assumed that the terms of the various documents relating to the issuance of the Notes will be substantially in the form contemplated by this Private Placement Memorandum and will be complied with by all of the parties to the transaction. Those terms include a requirement, which each investor agrees to by virtue of acquiring ownership of any beneficial interest in a Series 2016-1 Note, that the Issuer and the investors in the Series 2016-1 Notes treat such Notes as indebtedness for U.S. federal, state, local and foreign income and franchise tax purposes.

Although it is the opinion of Andrews Kurth Kenyon LLP that the Series 2016-1 Notes will be characterized as indebtedness for U.S. federal income tax purposes (except in the case of Series 2016-1 Notes held by (a) MCC or MDC or any of their affiliates or (b) any person in whose hands, due to such person's relationship with the Issuer and pursuant to Treasury regulations under Section 385 of the Code, the Series 2016-1 Notes would not be treated as indebtedness for U.S. federal income tax purposes), no assurance can be given that this characterization of the Series 2016-1 Notes will prevail. If the IRS successfully asserted that one or more of such Notes or a Class thereof did not represent indebtedness for U.S. federal income tax purposes, such Notes or Class thereof might be treated as equity interests in the Issuer.

Certain Treasury Regulations under Section 385 of the Code address the debt or equity treatment of instruments for U.S. federal income tax purposes held by certain parties that are related to the issuer of such instruments. In particular, in certain circumstances, a note that otherwise would be treated as debt is treated as stock for U.S. federal income tax purposes during periods in which the note is held by a note purchaser that is a member of the issuing entity's "expanded group." For this purpose, an "expanded group" is generally a group of corporations or controlled partnerships connected through 80% or greater direct or indirect ownership links. If such recharacterization were to occur with respect to the Notes, such Notes would be treated as stock during the period in which such Notes were held by a member of the Issuer's expanded group. As a result of these rules, a Note purchaser that is a member of the Issuer's expanded group could experience U.S. federal income tax adverse consequences, including that U.S. federal withholding taxes could apply to distributions on the Notes. Furthermore, changes in direct or indirect ownership of the equity interests of the Issuer may change the identity of the members of the Issuer's expanded group.

It is expected that any Notes treated as stock under these Treasury Regulations would be automatically converted back to debt for U.S. federal income tax purposes when acquired by a beneficial owner that is not an applicable related party of the Issuer, although the application of these Treasury Regulations in this regard is not entirely clear. In addition, such Note may have U.S. federal income tax characteristics that differ from Notes of the same class that were not previously held by a related party. These Treasury Regulations are complex and we urge you to consult your tax advisors regarding the possible effects of these rules.

If the Issuer were classified as a partnership other than a publicly traded partnership taxable as a corporation, the Issuer itself would not be subject to U.S. federal income tax. However, holders of Notes that were determined to be equity interests in the partnership would be required to take into account their allocable share of the Issuer's income and deductions. Such treatment may have adverse federal income tax consequences for some Noteholders. For example:

        (a)      income to some tax-exempt entities, including pension funds, may constitute "unrelated business taxable income,"

        (b)      income to foreign holders is often subject to U.S. tax and U.S. tax return filing and withholding requirements,

        (c)      individual holders might be subject to certain limitations on their ability to deduct their share of Issuer expenses, and

        (d)      income from the Issuer's assets would be taxable to such Noteholders without regard to whether cash distributions are actually made by the Issuer or any particular Noteholder's method of tax accounting.

The opinions of Andrews Kurth Kenyon LLP do not foreclose the possibility of a contrary determination by the IRS or by a court of competent jurisdiction, or of a contrary position by the IRS or Treasury Department in regulations or rulings issued in the future.

The discussion that follows assumes that the Issuer will not be treated as an association or publicly traded partnership taxable as a corporation and that all of the Notes will be treated as indebtedness for U.S. federal income tax purposes.

**Consequences to U.S. Holders**

MNX-CFTC-01335355

The following summarizes certain material U.S. federal income tax consequences to U.S. Holders of the purchase, ownership, and disposition of the Notes. As used herein, the term "U.S. Holder" means a beneficial owner of a Note who or that is for U.S. federal income tax purposes:

- an individual who is a citizen of the United States or who is a resident alien of the United States;

- a corporation or other entity taxable as a corporation created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons (as defined in the Code) have the authority to control all substantial decisions of the trust, or if a valid election is in effect under applicable Treasury Regulations to be treated as a United States person.

**Payments of Interest**. It is expected, and therefore this summary assumes, that the Series 2016-1 Notes will not be issued with original issue discount for U.S. federal income tax purposes. A U.S. Holder will be taxed on the amount of payments of interest on a Note as ordinary interest income at the time it accrues or is received in a manner that is consistent with the U.S. Holder's regular method of accounting for U.S. federal income tax purposes. This treatment assumes that all payments on the Notes are denominated in U.S. Dollars.

**Sale or Other Disposition of a Note**. A U.S. Holder who disposes of a Note, whether by sale, exchange for other property, or payment by the Issuer, will recognize taxable gain or loss equal to the difference between the amount realized on the sale or other disposition (not including any amount attributable to accrued but unpaid interest not previously included in income, which will be taxable as such), and the U.S. Holder's adjusted tax basis in the Note. In general, a U.S. Holder's adjusted tax basis in a Note will be equal to the U.S. Holder's initial purchase price decreased by the amount of any payments, other than payments of stated interest, previously received by the U.S. Holder with respect to the Note. Any gain or loss recognized upon the sale or other disposition of a Note will be capital gain or loss so long as the Note is a "capital asset" in the hands of the U.S. Holder. For non-corporate U.S. Holders, under current law, capital gain recognized on the sale or other disposition of a Note held by the U.S. Holder for more than one year will be taxed at preferential income tax rates. Capital gain for a Note held for one year or less is currently taxed at the rates applicable to ordinary income. Taxpayers must aggregate capital gains and losses for each taxable year. In the event a U.S. Holder realizes a net capital loss for any year there are limits on the amount of capital losses which can be deducted.

**Information Reporting and Backup Withholding**. The Issuer will be required to report annually to the IRS, and to each U.S. Holder, other than U.S. Holders who are not subject to the reporting requirements, the amount of interest paid on the Notes for each calendar year. Each U.S. Holder, other than U.S. Holders who are not subject to the reporting requirements, will be required to provide, under penalties of perjury, a certificate (Form W-9) containing the U.S. Holder's name, address, correct federal taxpayer identification number and a statement that the U.S. Holder is not subject to backup withholding. Should a non-exempt U.S. Holder fail to provide the required certification, the Issuer will be required to withhold or cause to be withheld 28% of the interest otherwise payable to the U.S. Holder and remit the withheld amounts to the IRS as a credit against the U.S. Holder's federal income tax liability.

**Consequences to Non-U.S. Holders**

Special tax rules apply to the purchase of Notes by Non-U.S. Holders. For U.S. tax purposes, a "Non-U.S. Holder" is any person who is not classified for U.S. federal income tax purposes as a partnership and is not a U.S. Holder.

Subject to the discussion below on backup withholding and FATCA withholdings, interest paid or accrued to a Non-U.S. Holder that is not effectively connected with the conduct of a trade or business within the United States by the Non-U.S. Holder will be considered "portfolio interest" and generally will not be subject to United States federal income tax or withholding tax as long as the Non-U.S. Holder does not actually or constructively own 10 percent or more of the capital or profits interest in the Issuer, is not a controlled foreign corporation related to the Issuer through stock ownership and is not a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business. Additionally, the Non-U.S. Holder must provide an appropriate statement (Form W-8 BEN, Form W-8 BEN-E or other applicable form) to the applicable withholding agent that is signed under penalties of perjury, certifying that the beneficial owner of the Note is not a United States person as that term is defined in the Code and providing that person's name and address. Additional reporting requirements may apply to interest payments made to a Non-U.S. Holder that is not an individual or corporation (or an entity treated as a corporation for federal income tax purposes) holding the Note on its own behalf. If the information provided in this

statement changes, the Non-U.S. Holder must provide a new form within 30 days. If the Non-U.S. Holder fails to satisfy these requirements so that interest on the Non-U.S. Holder's Notes was not portfolio interest, interest payments would be subject to United States federal withholding tax at a rate of 30% unless reduced or eliminated under an applicable income tax treaty. To qualify for any reduction as the result of an income tax treaty, the Non-U.S. Holder must provide the applicable withholding agent with a Form W-8 BEN, Form W-8 BEN-E or other applicable form.

Subject to the discussion below on backup withholding and FATCA withholding, any gain realized on the sale, redemption or other taxable disposition of a Note by a Non-U.S. Holder will be exempt from United States federal income tax, provided that:

(1)     the gain is not effectively connected with the conduct of a trade or business in the United States by the Non-U.S. Holder and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment, and

(2)     in the case of an individual Non-U.S. Holder, the Non-U.S. Holder is not present in the United States for 183 days or more during the taxable year.

If an individual Non-U.S. Holder is present in the U.S. for 183 days or more during the taxable year, the gain on the sale or other disposition of the Notes could be subject to a flat 30% United States federal income tax unless reduced by an applicable tax treaty. If the interest, gain or income on a Note held by a Non-U.S. Holder is effectively connected with the conduct of a trade or business in the United States by the Non-U.S. Holder and, if required by an applicable tax treaty, is attributable to a U.S. permanent establishment, the Noteholder will be subject to United States federal income tax on the interest, gain or income at regular federal income tax rates. At the same time, the Non-U.S. Holder may be exempt from withholding tax if a Form W-8 ECI or successor form is furnished to the paying agent. In addition, if the Non-U.S. Holder is a foreign corporation, it may be subject to a branch profits tax equal to 30% of its "effectively connected earnings and profits" for the taxable year, as adjusted, unless it qualifies for a lower rate under an applicable tax treaty.

Payments to a Non-U.S. Holder of interest on a Note, and amounts withheld from such payments, if any, generally will be required to be reported to the IRS and to the Non-U.S. Holder.

United States backup withholding tax generally will not apply to payments of interest to a Non-U.S. Holder if the Non-U.S. Holder provides a certification as to its non-U.S. status or the Non-U.S. Holder otherwise establishes an exemption, provided that the applicable withholding agent does not have actual knowledge or reason to know that the Non-U.S. Holder is a United States person.

Payment of the proceeds of a sale or other disposition (including a retirement or redemption) of a Note effected by the U.S. office of a U.S. or foreign broker will be subject to information reporting and backup withholding unless the Non-U.S. Holder properly certifies under penalties of perjury as to its foreign status and certain other conditions are met or the Non-U.S. Holder otherwise establishes an exemption. Information reporting requirements and backup withholding generally will not apply to any payment of the proceeds of the sale of a Note effected outside the United States by a foreign office of a broker. However, unless such a broker has documentary evidence in its records that the Non-U.S. Holder is a non-U.S. holder and certain other conditions are met, or the Non-U.S. Holder otherwise establishes an exemption, information reporting will apply to a payment of the proceeds of the sale or disposition of a Note effected outside the United States by such a broker if it has certain relationship with the United States.

If a Non-U.S. Holder fails to provide necessary documentation to the Issuer or its paying agent regarding the Non-U.S. Holder's taxpayer identification number or certification of exempt status, a 28% backup withholding tax may be applied to Note payments to that Non-U.S. Holder. Any amounts withheld under the backup withholding rules will be allowed as a refund or credit against the Non-U.S. Holder's U.S. federal income tax liability provided the required information is furnished to the IRS.

## Additional Tax on Net Investment Income

A 3.8% tax applies to the "net investment income" of certain U.S. citizens and resident aliens and on the undistributed "net investment income" of certain estates and trusts. Among other items, "net investment income" generally includes interest and certain net gain from the disposition of property, such as the Notes, less certain deductions. Investors should consult their tax advisors with respect to the tax consequences of this tax on net investment income described above.

## FATCA Withholding

The Foreign Account Tax Compliance Act ("*FATCA*") imposes a 30% withholding tax on interest paid on the Notes, and on the gross proceeds from a disposition of the Notes paid after December 31, 2018, in each case, if paid to a foreign

financial institution or non-financial foreign entity (including, in some cases, when such foreign financial institution or non-financial foreign entity is acting as an intermediary), unless (i) the foreign financial institution (for which purposes includes foreign broker-dealers, clearing organizations, investment companies, hedge funds and certain other investment entities) agrees to verify, report and disclose its U.S. accountholders and meets certain other specified requirements, (ii) the non-financial foreign entity that is a beneficial owner of the payment certifies that it does not have any substantial U.S. owners or provides identifying information regarding each substantial U.S. owner, or (iii) the foreign financial institution or non-financial foreign entity otherwise qualifies for an exemption from these rules. An intergovernmental agreement between the United States and an applicable foreign country, or future Treasury Regulations or other guidance, may modify these requirements. The Issuer will not pay additional amounts to holders of the Notes in respect of any amounts withheld under FATCA.

Prospective investors are encouraged to consult with their tax advisors regarding the possible implications of FATCA on an investment in the Notes.

## State and Local Tax Consequences

Because of the differences in state and local tax laws and their applicability to different investors, it is not possible to summarize the potential state and local tax consequences of purchasing, holding or disposing of the Notes and no opinions of counsel have been obtained regarding state tax matters. Accordingly, the Issuer urges each prospective investor to consult its tax advisor regarding the state and local tax consequences of the purchase, ownership and disposition of Notes.

## ERISA CONSIDERATIONS

A fiduciary of an employee benefit plan or other retirement arrangement subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("*ERISA*") should consider the fiduciary standards under ERISA in the context of the plan's particular circumstances before authorizing an investment of a portion of such plan's assets in the Notes. Accordingly, among other factors, such fiduciary should consider (i) whether the investment is for the exclusive benefit of plan participants and their beneficiaries; (ii) whether the investment satisfies the diversification requirements of Section 404 of ERISA; (iii) whether the investment is in accordance with the documents and instruments governing the plan and (iv) whether the investment is prudent, considering the nature of the investment.

Fiduciaries of employee benefit plans and certain other retirement plans and arrangements that are subject to Title I of ERISA or Section 4975 of the Code, including individual retirement accounts and annuities, Keogh plans and entities in which such plans, accounts, annuities or arrangements are invested (any of the foregoing, a "*Plan*"), persons acting on behalf of a Plan, or persons using the assets of a Plan ("*Plan Investors*"), should review carefully with their legal advisors whether the purchase or holding of the Notes could either give rise to a transaction that is prohibited under ERISA or the Code or cause the any of the Trust Estate assets to be treated as plan assets for purposes of regulations of the Department of Labor set forth in 29 C.F.R. 2510.3-101 (the *"Plan Asset Regulations"*). Prospective investors should be aware that, although certain exceptions from the application of the prohibited transaction rules and the Plan Asset Regulations exist, there can be no assurance that any such exception will apply with respect to the acquisition of a Note.

Under the Plan Asset Regulations, if a Class of Note is treated as having substantial equity features, the purchaser of a Note of such Class could be treated as having acquired a direct interest in the Trust Estate assets securing such Notes. In that event, the purchase, holding, or resale of such Notes could result in a transaction that is prohibited under ERISA or the Code. The Issuer believes that the Class A Notes and the Class M Notes will be treated as debt obligations without significant equity features for purposes of the Plan Asset Regulations. Accordingly, a Plan that acquires a Class A Note or a Class M Note should not be treated as having acquired a direct interest in the assets of the Trust Estate. However, there can be no complete assurance that each of the Class A Notes and the Class M Notes will be treated as debt obligations without significant equity features for purposes of the Plan Asset Regulations.

Regardless whether the Class A Notes or the Class M Notes are treated as debt or equity for purposes of ERISA, the acquisition or holding of Class A Notes or the Class M Notes by or on behalf of a Plan could still be considered to give rise to a prohibited transaction if the Issuer, the Trustee or any of their respective affiliates is or becomes a party in interest or a disqualified person with respect to such Plan or in the event that a subsequent transfer of a Class A Note or a Class M Note is between a Plan and a party in interest or disqualified person with respect to such Plan. However, one or more exemptions may be available with respect to certain prohibited transaction rules of ERISA that might apply in connection with the initial purchase, holding and resale of the Class A Notes or the Class M Notes depending in part upon the type of Plan fiduciary making the decision to acquire Class A Notes or the Class M Notes and the circumstances under which such decision is made. These exemptions include, but are not limited to, (i) PTCE 96-23, regarding investments determined by in-house asset managers, (ii) PTCE 95-60, regarding investments by insurance company general accounts; (iii) PTCE 91-38, regarding investments by bank collective investment funds; (iv) PTCE 90-1, regarding investments by insurance company pooled separate accounts; or (v) PTCE 84-14, regarding transactions negotiated by qualified professional asset managers. Before purchasing Class A Notes or

Class M Notes a Plan subject to the fiduciary responsibility provisions of ERISA or described in Section 4975(e)(1) (and not exempt under Section 4975(g)) of the Code) should consult with its counsel to determine whether the conditions of any exemption would be met. A purchaser of a Class A Note or a Class M Note should be aware, however, that even if the conditions specified in one or more exemptions are met, the scope of the relief provided by an exemption might not cover all acts that might be construed as prohibited transactions.

With respect to the Class B Notes, it is unclear whether such Notes would be treated as indebtedness without substantial equity features for purposes of the Plan Assets Regulations. As a result, the purchase and holding of Class B Notes by a Plan might result in prohibited transactions under ERISA and the Code. Accordingly, the Class B Notes may not be acquired by a Plan. Each investor that acquires the Class B Notes, or to whom the Class B Notes are transferred, will be required to represent that it is not a Plan and is not acting on behalf of or investing the assets of a Plan.

Employee plans that are governmental plans (as defined in Section 3(32) of ERISA) and certain church plans (as defined in Section 3(33) of ERISA), are not subject to ERISA; however, such plans may be subject to comparable restrictions under federal, state or local law.

Any Plan fiduciary considering the purchase of a Note should consult with its counsel with respect to the potential applicability of ERISA and the Code to such investment. Moreover, each Plan fiduciary should determine whether, under the general fiduciary standards of investment prudence and diversification, an investment in the Notes is appropriate for the Plan, taking into account the overall investment policy of the Plan and the composition of the Plan's investment portfolio. The sale of Notes to a Plan is in no respect a representation by the Issuer that the investment meets all relevant legal requirements with respect to investments by Plans generally or any particular Plan, or that the investment is appropriate for Plans generally or any particular Plan.

## RATINGS

As a condition to the issuance of the Class A Notes, the Class A Notes must be rated "AA" by Morningstar Credit Ratings, LLC ("*Morningstar*" also being sometimes referred to as a "*Rating Agency*"). As a condition to the issuance of the Class M Notes, the Class M Notes must be rated at least "A" by Morningstar. As a condition to the issuance of the Class B Notes, the Class B Notes must be rated at least "BBB" by Morningstar.

A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time. The ratings assigned to the Notes address the likelihood of the receipt by the Noteholders of all timely distributions of interest, and the payment in full of the respective Note principal balance no later than the Series 2016-1 Maturity Date. The ratings assigned to the Notes do not represent any assessment of the likelihood that principal prepayments might differ from those originally anticipated or address the possibility that Noteholders might suffer a lower than anticipated yield.

## PLAN OF DISTRIBUTION

**The Issuer expects to sell the Notes offered hereby to Piper Jaffray & Co. as the Initial Purchaser ("Initial Purchaser") in a private placement under the Securities Act. If such sale is consummated, the Initial Purchaser will offer the Notes to persons who will be deemed to represent that they qualify as both "qualified institutional buyers" as defined in Rule 144A and "qualified purchasers" as defined in Section(2)(a)(52)(A) of the Investment Company Act of 1940, as amended (the "Investment Company Act"). The Notes will bear a legend referring to the foregoing restrictions, and because of such restrictions, no secondary trading market for the Notes is expected to develop and purchasers must bear the risk of their investment for an indefinite amount of time. See "Transfer Restrictions." The Notes are offered only through the Initial Purchaser when, as and if issued by the Issuer, subject to the prior sale or withdrawal, cancellation or modification of the offer without notice, and the right of the Issuer and/or the Initial Purchaser to reject any subscription, in whole or in part. It is expected that the Notes will be available for delivery in book-entry form only on or about December 22, 2016.**

## LEGAL MATTERS

Certain legal matters relating to the Notes will be passed upon for the Issuer by Andrews Kurth Kenyon LLP, Washington, D.C. and Dallas, Texas. Certain legal matters relating to MCC and MDC will be passed upon for them by Gregory Walker, in-house counsel. Certain federal income tax matters will be passed upon for the Issuer by Andrews Kurth Kenyon LLP, Washington, D.C. and Dallas, Texas.

MNX-CFTC-01335359

## INDEX OF PRINCIPAL TERMS

| | |
|---|---|
| Adjusted Eligible Pool Balance ...................7 | Metals Depository Agreement ...................3 |
| Amortization Period...............................12 | Metals Inventory......................................4 |
| Backup Servicer.......................................28 | Monex.......................................................24 |
| Backup Servicer Fee ...............................29 | Negative Principal Variance.....................7 |
| Class A Note Rate....................................60 | Note Rate..................................................60 |
| Class A Notes .............................................1 | Notes...........................................................1 |
| Class B Note Rate....................................60 | NSC...........................................................27 |
| Class B Notes.............................................1 | OAA .............................................................3 |
| Class M Note Rate...................................60 | Obligors......................................................4 |
| Class M Notes.............................................1 | Operating Agreement...............................62 |
| CMC..........................................................27 | Payment Date.........................................(ii) |
| Code..........................................................62 | Plan...........................................................68 |
| Collateral Demand ....................................9 | Plan Asset Regulations............................68 |
| Collection Account...................................36 | Plan Investors..........................................68 |
| Collection Cash Account .........................36 | Principal Funding Account .....................36 |
| Collection Metals Account.......................36 | Principal Variance.....................................7 |
| Company...................................................24 | Prospective Early Amortization Event....49 |
| Corporate Trust Office ............................28 | Prospective Event of Default ..................49 |
| Designated Accounts..................................4 | Rating Agency..........................................69 |
| Early Amortization Event .......................10 | Record Date..............................................60 |
| Required Amounts....................................36 | SCC............................................................27 |
| Equalization Account...............................36 | Secured Obligations.................................46 |
| Required Amounts Account......................36 | Securities Act........................................cover |
| Equalization Cash Account .....................36 | Series 2016-1 Notes....................................1 |
| Equalization Metals Account ..................36 | Series 2016-1 Supplement ..................cover |
| Equity.........................................................4 | Series Collateral......................................46 |
| ERISA.......................................................68 | Servicer.......................................................2 |
| Event of Default ......................................56 | Servicer Default.......................................43 |
| Events of Default .....................................11 | Servicing Agreement..................................2 |
| Interest Accrual Period............................60 | Servicing Fee..............................................2 |
| Initial Purchaser......................................69 | Termination Notice ..................................43 |
| Investment Company Act.........................69 | Trust Estate................................................3 |
| Issuer.......................................................... 1 | Trustee......................................................28 |
| Loan.......................................................... 4 | Trustee Fee................................................28 |
| Loans and Related Interests....................29 | TSA..............................................................3 |
| Master Indenture................................cover | Unsatisfied NPV.........................................7 |
| MCC............................................................2 | |
| MDC............................................................3 | |
| Metals.........................................................4 | |
| Metals Collateral.......................................4 | |
| Metals Depository.......................................3 | |

### DEFINITIONS OF CERTAIN TERMS

*"Account"* means the contractual relationship between an Obligor and MCC evidenced by the related Loan Agreement, pursuant to which (if such Account is a Designated Account) Loans may be originated from time to time and be conveyed to the Issuer.

*"Additional Designated Accounts"* has the meaning assigned such term in Section 2.02 of the TSA.

*"Additional Loans"* has the meaning assigned such term in Section 2.01 of the TSA.

*"Additional Loans and Related Interests"* has the meaning given to such term in Section 2.01 of the TSA.

*"Adjusted Eligible Pool Balance"* means, for any date of determination, an amount calculated as follows: (i) the aggregate of the Outstanding Balances of all Eligible Loans as of such date, minus (ii) the Aggregate Volatility Adjustment for such date, minus (iii) the Concentration Adjustment for such date.

*"Adjusted Inventory Balance"* means, for any date of determination, the product of (1) the aggregate Wholesale Value of all Eligible Metals Inventory times (2) 80%, less the Silver Inventory Concentration Adjustment.

*"Advance"* means any transfer and assignment by MDC (at its option) to the Issuer of Eligible Metals Inventory as a capital contribution pursuant to Section 2.01(a) of the OAA, or by MDC (at its option) to the Issuer of Dollars as a capital contribution pursuant to Section 2.01(b) of the OAA.

*"Advance Date"* means any Business Day on which MDC makes an optional Advance to the Issuer.

*"Affiliate"* means, with respect to a particular Person, (a) any Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person, or (b) any Person who is a director or officer or general partner (i) of such Person, (ii) of any subsidiary of such Person, or (iii) of any Person described in clause (a) above. For purposes of this definition, control of a Person shall mean the power, direct or indirect, (i) to vote 5% or more of the securities having ordinary voting power to elect the directors of such Person, or (ii) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

*"Aggregate Principal Amount"* means, as of any date of determination, the sum of the Principal Amounts of all Series of Notes issued and outstanding on such date of determination.

*"Aggregate Volatility Adjustment"* means the aggregate of, for each Eligible Loan and as of any date of determination, the excess of (i) the Outstanding Balance of such Eligible Loan, over (ii) the Collateral Realization Value for such Eligible Loan.

*"Alternate Base Rate"* means, on any day, a fluctuating rate of interest per annum equal to the highest of:

      (a) the Prime Rate reported as of the close of business of the preceding Business Day, and

      (b) the Federal Funds Rate plus 0.50%.

*"Amortization Period"* means the period commencing with the Amortization Period Commencement Date, and ending on the day on which the Class A Principal Amount, Class M Principal Amount and Class B Principal Amount have each been repaid in full. The Issuer shall promptly notify the Trustee upon the commencement of the Amortization Period.

*"Amortization Period Commencement Date"* means the earlier of (i) the Early Amortization Commencement Date, or (ii) the Series 2016-1 Maturity Date.

*"Banking Day"* means any day on which dealings in U.S. dollar deposits may be entered into between a bank located in London, England and a bank located in New York, New York.

*"Bankruptcy Code"* means Title 11 of the United States Code, as amended and in effect from time to time.

*"Business Day"* means any day other than a Saturday, a Sunday or a day on which banking institutions in Chicago, Illinois, New York, New York or Los Angeles, California are authorized or obligated by law or executive order to be closed.

MNX-CFTC-01335361

*"Class"* means, with respect to any Series, any one of the classes of Notes (if any) of that Series as specified in the related Supplement.

*"Class A Controlled Distribution Amount"* means, with respect to any Payment Date, an amount equal to $100,000 and integral multiples of $50,000 in excess thereof, not to exceed in the aggregate the Class A Principal Amount as of such Payment Date (prior to giving effect to any distribution in respect of principal of the Class A Notes to be made on such Payment Date).

*"Class A Holder"* means a Holder (as defined in Annex X to the Master Indenture) of a Class A Note.

*"Class A Interest"* means the Note Interest payable in respect of the Class A Notes as calculated in accordance with the applicable provisions of the Servicing Agreement and the Series 2016-1 Supplement.

*"Class A Principal"* means the Note Principal payable in respect of the Class A Notes as calculated in accordance with the applicable provisions of the Servicing Agreement and the Series 2016-1 Supplement.

*"Class A Principal Amount"* means, at any time, the sum of the principal amounts advanced in payment for Purchases made at or prior to that time, reduced (but not below zero) by the aggregate amount of all distributions that have been made to the Class A Holders in repayment of principal.

*"Class B Controlled Distribution Amount"* means, with respect to any Payment Date, an amount equal to $100,000 and integral multiples of $50,000 in excess thereof, not to exceed in the aggregate the Class B Principal Amount as of such Payment Date (prior to giving effect to any distribution in respect of principal of the Class B Notes to be made on such Payment Date).

*"Class B Holder"* means a Holder (as defined in Annex X to the Master Indenture) of a Class B Note.

*"Class B Interest"* means the Note Interest payable in respect of the Class B Notes as calculated in accordance with the applicable provisions of the Servicing Agreement and the Series 2016-1 Supplement.

*"Class B Principal"* means the Note Principal payable in respect of the Class B Notes as calculated in accordance with the applicable provisions of the Servicing Agreement and the Series 2016-1 Supplement.

*"Class B Principal Amount"* means, at any time, the aggregate principal amount of Class B Notes issued on the Closing Date, reduced (but not below zero) by the aggregate amount of all distributions that have been made to the Class B Holders in repayment of principal.

*"Class M Controlled Distribution Amount"* means, with respect to any Payment Date, an amount equal to $100,000 and integral multiples of $50,000 in excess thereof, not to exceed in the aggregate the Class M Principal Amount as of such Payment Date (prior to giving effect to any distribution in respect of principal of the Class M Notes to be made on such Payment Date).

*"Class M Holder"* means a Holder (as defined in Annex X to the Master Indenture) of a Class M Note.

*"Class M Interest"* means the Note Interest payable in respect of the Class M Notes as calculated in accordance with the applicable provisions of the Servicing Agreement and the Series 2016-1 Supplement.

*"Class M Principal"* means the Note Principal payable in respect of the Class M Notes as calculated in accordance with the applicable provisions of the Servicing Agreement and the Series 2016-1 Supplement.

*"Class M Principal Amount"* means, at any time, the aggregate principal amount of Class M Notes issued on the Closing Date, reduced (but not below zero) by the aggregate amount of all distributions that have been made to the Class M Holders in repayment of principal.

*"Closing Date"* means, with respect to any Series, the date specified as the Closing Date for such Series in the related Supplement.

*"Collateral Realization Value"* means, for any Loan and any date of determination, the product of (1) the number of ounces of each Metal constituting the Eligible Metals Collateral times (2) 80% of the Wholesale Metal Price for such Metal as of the day preceding the date of determination.

MNX-CFTC-01335362

"*Collection Policies*" means the collection, customer relations and servicing policies of MCC that apply to Loans, as such policies currently exist and as such policies may be amended, modified or supplemented from time to time.

"*Collections*" means all payments received from an Obligor in respect of a Loan and posted to the books and records of the Servicer, in the form of cash, checks or any other form of payment in accordance with the related Loan Agreement, and shall also be deemed to include Eligible Metals Inventory received in respect of a Loan to the extent provided in, and subject to the limitations specified in, the Servicing Agreement.

"*COMEX*" means Commodity Exchange, Inc.

"*Commodity Loans*" means those transactions undertaken pursuant to a Loan Agreement in which MCC loans Metal to an Obligor directly, as opposed to making a loan of Dollars to be used for the purchase of a quantity of Metal (*i.e.*, a Loan), which Commodity Loans although originated pursuant to the same Loan Agreement in respect of which Loans may be originated, are not to be conveyed to the Issuer under the TSA.

"*Concentration Adjustment*" means, for any date of determination, the sum of: (1) the Obligor Concentration Adjustment, (2) the Foreign Concentration Adjustment, (3) the Single Country Concentration Adjustment and (4) the Silver Loan Concentration Adjustment for such date.

"*Corporate Trust Office*" means the principal office of the Trustee at which at any particular time its corporate trust business shall be administered, which office at the date of the execution of the Master Indenture is located at (i) solely for purposes of the transfer, surrender or exchanges of Notes, at 480 Washington Boulevard, 30th Floor, Jersey City, New Jersey 07310, Attention: Corporate Trust Services; and (ii) for all other purposes, at 388 Greenwich Street, 14th Floor, New York, New York 100013, Attention: Corporate Trust Services; Scala Funding/Monex.

"*Custodian*" means Portfolio Financial Servicing Company as custodian under the Custodial Agreement.

"*Custodial Agreement*" means the Custodial Agreement among the Custodian, the Issuer, the Servicer and the Trustee, dated as of            , 2016 with respect to the original Loan Agreements evidencing the Loans, as the same may be amended, supplemented, restated or other modified from time to time.

"*Cut-Off Date*" means the Business Day preceding each Purchase Date with respect to such Loans under the TSA.

"*Daily Report*" means a report substantially in the form of *Exhibit C* to the Servicing Agreement, as the form of such Daily Report may be amended or revised from time to time with not less than ten (10) Business Days prior written notice to the Trustee and each Rating Agency, to be prepared and delivered by the Servicer as specified in the Servicing Agreement.

"*Dollars*," "*$*" or "*U.S. $*" means United States dollars and, where the context requires, means Dollars paid and/or held in the form of cash monies or dollar-denominated commercial deposit accounts.

"*Early Amortization Commencement Date*" means, with respect to Series 2016-1, the earlier of (i) the date on which an Early Amortization Event occurs, (ii) the date on which an Event of Default occurs, and (iii) the Payment Date one month prior to the Final Maturity Date.

"*Early Amortization Period*" means the period beginning on the Early Amortization Commencement Date and ending on the day on which the Class A Principal Amount, the Class M Principal Amount and the Class B Principal Amount have each been repaid in full and all other Secured Obligations attributable to the Series 2016-1 Notes have been paid in full.

"*Eligible Investments*" means any of the following:

      (a)     negotiable instruments or securities represented by instruments in registered form which evidence

          (i)     obligations of or fully guaranteed by the United States of America;

          (ii)     time deposits, promissory notes, or certificates of deposit of any depository institution or trust company; *provided, however,* that at the time of the Issuer's investment or contractual commitment to invest therein, the certificates of deposit or short-term deposits of such depository institution or trust company shall have a credit rating from Morningstar of at least "A-1+";

MNX-CFTC-01335363

(iii)     commercial paper having, at the time of the Issuer's investment or contractual commitment to invest therein, a rating from Morningstar of at least "A-l+";

(iv)     bankers acceptances issued by any depository institution or trust company described in clause (a)(ii) above; or

(v)     investments in money market funds rated at least "AA-m" or "AA-mg" by Morningstar or otherwise approved in writing by Morningstar;

(b)     time deposits and demand deposits in the name of the Issuer or the Trustee in any depository institution or trust company referred to in clause (a)(ii) above;

(c)     repurchase obligations pursuant to a written agreement (i) with respect to any obligation described in clause (a) above, where the Trustee has taken actual or constructive delivery of such obligation, and (ii) entered into with a depositary institution or trust company referred to in clause (a)(ii) above; or

(d)     securities not represented by an instrument that are registered in the name of the Trustee or its nominee (which may not be MCC, MDC or an Affiliate of either) upon books maintained for that purpose by or on behalf of the issuer thereof and identified on books maintained for that purpose by the Trustee as held for the benefit of the Issuer and the Noteholders, and consisting of Eurodollar time deposits of a depository institution or trust company that are rated at least A-l+ by Morningstar.

*"Eligible Loan"* means each Loan with respect to a Designated Account which has been conveyed to the Issuer pursuant to the TSA and which, as of its applicable Purchase Date, satisfied the following criteria:

(a)     it was originated by MCC in the ordinary course of its business;

(b)     it is payable in Dollars;

(c)     it was originated in accordance with the origination policy of MCC at the time of creation of the related Account;

(d)     MCC has not charged it off in its customary and usual manner for charging off Loans in such Accounts;

(e)     it, together with the related Loan Agreement under which such Loan was originated, does not contravene in any material respect any laws, rules or regulations applicable thereto (including, without limitation, usury laws, rules and regulations relating to truth in lending, fair credit billing, fair credit reporting, equal credit opportunity, fair debt collection practices and privacy);

(f)     all material consents, licenses, or authorizations of, or registrations with, any governmental authority required to be obtained or given in connection with the origination of such Loan or the execution, delivery and performance of the related Loan Agreement have been duly obtained or given and are in full force and effect;

(g)     at the time of its transfer to the Issuer, MCC had good and marketable title to the Loan and, at such time or immediately upon and after giving effect to the transfer, such Loan was free and clear of all Liens arising under or through MCC (other than Permitted Liens);

(h)     it was originated under a Loan Agreement that has been duly authorized by MCC and which is in full force and effect and constitutes the legal, valid and binding obligation of the Obligor enforceable against such Obligor in accordance with its terms and which is not subject to any legal proceeding, dispute, offset, counterclaim or defense whatsoever (which legal proceeding or dispute is specific to such Loan Agreement or Obligor, i.e., is not as a result of such Loan Agreement or Obligor being included as part of a class or purported class in a class action proceeding);;

(i)     it is secured by Eligible Metals Collateral;

(j)     the Obligor under such Loan

MNX-CFTC-01335364

        (i)        is living (if a natural person);

        (ii)        is not the United States of America or any other sovereign nation, any state or other political subdivision thereof, or any municipality, agency, instrumentality, or other subdivision of any of the foregoing;

        (iii)        is not (if a natural person) a minor under the laws of his/her state of residence;

        (iv)        is competent (if a natural person) to enter into a contract and incur debt;

        (v)        is not an Affiliate of MCC or MDC (*provided,* that any non-management employee of MCC or MDC or such Affiliate may be an Obligor);

        (vi)        has executed a Loan Agreement with MCC pursuant to which the Loan has been originated;

        (vii)        has not become the subject of an Insolvency Proceeding;

        (viii)        has never undertaken legal proceedings against MCC or MDC or, to MCC's knowledge, any commodities or securities brokerage firm; and

    (k)        such Loan bears interest at a rate in excess of the Prime Rate with interest accruing on either a daily or monthly basis.

*"Eligible Metals Collateral"* or *"Eligible Metals Inventory"* means Metals Collateral or Metals Inventory (or Eligible Warehouse Receipts evidencing either of the same) as the case may be, the Metal with respect to which:

        (a)        is in a form described in *Exhibit K* to the Servicing Agreement,

        (b)        if bullion, is the product of (i) in the case of gold, a COMEX-approved refinery, or Union Bank of Switzerland; (ii) in the case of silver, either a COMEX-approved refinery or the Royal Canadian Mint; and (iii) in the case of platinum or palladium, a NYMEX-approved refinery or a refinery on the London Platinum and Palladium Market's Good Delivery List; or (iv) any other bank, refinery, mint or manufacturer agreed to in writing by the Servicer and the Issuer, with the prior written consent of a Majority of Noteholders; *provided, however,* that the Servicer shall (in the case of clause (iv)) have provided at least ten (10) Business Days prior written notice thereof to each Rating Agency and the Trustee, and shall have not received notice of objection from any Rating Agency,

        (c)        meets MDC's and MCC's customary standards for Loan origination, and conforms with the Metals Depository's customary policies and procedures, and

        (d)        the related Obligor financing such Metals with a Loan (or, in the case of Metals Inventory, the Issuer) holds or has received title to the Metals so financed (or constituting Metals Inventory, as applicable), as evidenced by the notation of such Obligor's (or the Issuer's) ownership interest on the books and records of the Metals Depository holding such Metals (or Warehouse Receipts evidencing the same);

*"Eligible Warehouse Receipts"* means Warehouse Receipts which meet the following criteria (as applicable):

        (i)        in the case of gold and silver, are COMEX receipts where such Metals are held at a COMEX depository and in respect of which procedures have been performed customary with Warehouse Receipts deliverable in exchange for COMEX futures contracts,

        (ii)        in the case of platinum and palladium, are NYMEX receipts where such Metals are held at a NYMEX depository and in respect of which procedures have been performed customary with Warehouse Receipts deliverable in exchange for NYMEX futures contracts,

(iii)     which Warehouse Receipts in all events evidence Metals which, when held in direct physical form, would constitute Eligible Metals Collateral or Eligible Metals Inventory (as the case may be),

(iv)     which Warehouse Receipts fall in one or more of the following categories: (A) they have been originally issued to or for the benefit of MDC (as opposed to MDC's interest being reflected by a prior claimant's endorsement to MDC), or (B) they have been endorsed exclusively by Iron Mountain Depository and/or Farmers and Merchants Bank directly to the Metals Depository,

(v)     MCC or MDC has notified the Metals Depository in writing of its (or the Obligor's) interest in the Warehouse Receipt and the Metals evidenced thereby, and the metals depository holding the Metals evidenced by such Warehouse Receipt has delivered written confirmation of the serial numbers in respect of the bullion Metals evidenced by such Warehouse Receipts, and

(vi)     MCC (or MDC, in the case of Metals Inventory) has been, since acquiring its interest in such Warehouse Receipt, paying storage fees in respect thereof.

*"Equivalent Quantity"* means, when used in connection with a transfer and conveyance of Eligible Metals Inventory by MDC concurrent with a Liquidation of Metals Collateral as contemplated in the Servicing Agreement, a quantity of Eligible Metals Inventory with a Wholesale Value equal to the Metals Collateral being Liquidated.

*"ERISA Affiliate"* means with respect to any Person, at any time, each trade or business (whether or not incorporated) that would, at the time, be treated together with such Person as a single employer under Section 4001 of ERISA or Sections 414(b), (c), (m), or (o) of the Internal Revenue Code.

*"Excess Silver"* means the amount, if any, by which the sum of the Wholesale Value of Metals Collateral consisting of silver and the Wholesale Value of Metals Inventory consisting of silver exceeds 60% of the aggregate Wholesale Value of Metals Collateral plus the Wholesale Value of Metals Inventory.

*"FDIC"* means the Federal Deposit Insurance Corporation, or any successor thereto.

*"Federal Funds Rate"* means the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for the day (or, if the day is not a Business Day, the immediately preceding Business Day) by the Federal Reserve Bank of New York; *provided* that if the rate is not so published for any Business Day, the rate for purposes of this clause will be the average of the quotations for the day on such transactions received by the Agent from three Federal funds brokers of recognized standing selected by it.

*"Foreign Concentration Adjustment"* means the amount, if any, by which the aggregate of the Outstanding Balances of Eligible Loans representing obligations of Obligors not domiciled in the United States or Canada, exceeds ten percent (10%) of the sum of (i) the aggregate of the Outstanding Balances of all Eligible Loans, plus (ii)  the Adjusted Inventory Balance of Eligible Metals Inventory held by the Issuer as of such date of determination.

*"Governmental Authority"* means the United States of America, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

*"Insolvency Proceeding"* means either a Voluntary Insolvency Proceeding or an Involuntary Insolvency Proceeding.

*"Interest Payment Date"* with respect to any Series has the meaning specified in the related Supplement and, if no such meaning is specified, means with respect to such Series each Payment Date.

*"Internal Revenue Code"* means the Internal Revenue Code of 1986, as amended from time to time.

*"Investment Company Act"* means the Investment Company Act of 1940, as amended from time to time.

*"Involuntary Insolvency Proceeding"* means, for any Person, the commencement of any proceeding or the filing of a petition against such Person under any bankruptcy, insolvency or similar law for the relief or aid of debtors (including, without limitation, the Bankruptcy Code), which proceeding or petition is not dismissed within sixty (60) days of its commencement or filing, seeking the dissolution, liquidation, arrangement, reorganization or similar relief of such Person or the appointment of a receiver, trustee, custodian or liquidator for such Person, or any writ order, judgment, warrant of attachment, execution or similar process shall be issued or levied against a substantial part of the property, assets or business of such Person.

MNX-CFTC-01335366

*"Issuer Fiscal Year"* means the twelve month period ending December 31.

*"Lien"* means any security interest, mortgage, deed of trust, pledge, hypothecation, assignment, participation or equity interest, deposit arrangement, encumbrance, lien (statutory or other), preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and includes the filing of any financing statement under the UCC (other than any such financing statement filed for informational purposes only) or comparable law of any jurisdiction to evidence any of the foregoing.

*"Liquidate"* or *"Liquidation"* means any of the following, as the context requires: (a) the process of making demand upon an Obligor for amounts then due in respect of a Loan and realizing such amounts through the sale of Metals Collateral to MDC or to another third party; (b) the process of accepting voluntary repayment of a Loan from an Obligor and realizing all or part of such amounts through the sale of Metals Collateral at the direction of the Obligor to MDC or to another third party; or (c) the sale of Metals Inventory to MDC or to another third party.

*"List of Designated Accounts"* means the List of Designated Accounts in the form attached as Schedule 2.01 to the TSA, as such List of Designated Accounts may be amended and supplemented from time to time as contemplated therein.

*"Loan Agreement"* means, with respect to any Loan, the Loan Security and Storage Agreement between MCC and the Obligor in respect of such Loan (which Loan Agreement shall be substantially in the form of *Exhibit II* to the TSA), as the form of such Loan Agreement may be amended or otherwise modified from time to time in accordance with the TSA.

*"Loans and Related Interests"* has the meaning given such term in Section 2.01(a) of the TSA .

*"Lockbox Agreement"* means the Lockbox and Blocked Account Agreement, to be dated            , 2016,    among Harris Trust and Savings Bank as lockbox bank thereunder, MCC, the Issuer and the Trustee, as the same may be amended, supplemented or restated from time to time.

*"London Banking Day"* means any day on which dealings in U.S. dollar deposits may be entered into between banks located in London, England.

*"Majority Noteholders"* or *"Majority of Noteholders"* means, for Series 2016-1 (i) for so long as any Class A Principal Amount remains outstanding, Holders of Class A Notes evidencing more than 50% of the outstanding Class A Principal Amount together with Holders of Class M Notes evidencing more than 50% of the outstanding Class M Principal Amount, together with Holders of Class B Notes evidencing more than 50% of the outstanding Class B Principal Amount, (ii) otherwise and for so long as any Class M Principal Amount remains outstanding, Holders of Class M Notes evidencing more than 50% of the outstanding Class M Principal Amount together with Holders of Class B Notes evidencing more than 50% of the outstanding Class B Principal Amount, and (iii) otherwise, Holders of Class B Notes evidencing more than 50% of the outstanding Class B Principal Amount.

*"Master Indenture"* means the Master Indenture, dated as of December 22, 2016, between the Issuer and the Trustee, as the same may be amended, supplemented or  restated from time to time.

*"Material Adverse Effect"* means a material adverse effect on the validity, enforceability or collectibility of the Loans, the Loan Agreements, the Metals Collateral, the enforceability of any Program Agreement, or on MCC's, the Issuer's or the Trustee's ability to realize on the Metals Collateral or any Metals Inventory pursuant to the terms of the Servicing Agreement.

*"Maturity Date"* means, with respect to each outstanding Series or individual Classes thereof, if any, the specified calendar date on which the entire Principal Amount on such Series or Class thereof is due and payable by the Issuer, as specified in the applicable Supplement.

*"MCC Preferred Units"* means the preferred equity interests in the Issuer, designated "Series A," which may be issued in either of two classes, designated "Class D" or "Class M", by the Issuer to MCC pursuant to the Issuer's Limited Liability Company Agreement in consideration of MCC's voluntary contribution and conveyance of Loans to the Issuer under the TSA from time to time, if any, due to the unavailability to the Issuer of Dollars to pay the Purchase Price therefore under the TSA.

*"MDC Preferred Units"* means the preferred equity interests in the Issuer, designated "Series A," which may be issued in either of two classes, designated "Class D" or "Class M", by the Issuer to MDC pursuant to the Issuer's Limited Liability Company Agreement in consideration of MDC's voluntary contribution and conveyance of Metals Inventory or Dollars to the Issuer under the OAA from time to time, if any.

MNX-CFTC-01335367

*"Monthly Period"* means the period from and including any Payment Date to (but excluding) the next succeeding Payment Date, except that the first Monthly Period after the Closing Date for the Series 2016-1 Notes shall begin on and include such Closing Date and shall extend to (but exclude) the Payment Date in January 2017.

*"Multiemployer Plan"* means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which contributions are or have been made during the preceding five (5) years by any Person or any ERISA Affiliate of such Person.

*"Note Interest"* means interest payable in respect of the Notes of any Series pursuant to and in accordance with the Servicing Agreement and the Supplement for such Series.

*"Note Principal"* means principal payable in respect of the Notes of any Series pursuant to and in accordance with the Servicing Agreement and the Supplement for such Series.

*"Note Purchase Agreement"* means for any Series the Note Purchase Agreement entered into in connection with the initial purchase of Notes of such Series between the Issuer and such purchaser or purchasers, as the same may be amended, supplemented or restated from time to time.

*"Noteholder"* or *"Holder"* means the Person in whose name a Note is registered in the Note Register.

*"NYMEX"* means New York Mercantile Exchange.

*"Obligor Concentration Adjustment"* means the aggregate, for all Obligors in respect of Eligible Loans, of the amount, if any, by which the Outstanding Balances of Eligible Loans for any single individual Obligor exceeds five percent (5%) of the sum of (i) the aggregate of all Outstanding Balances of all Eligible Loans plus (ii) the Adjusted Inventory Balance of Eligible Metals Inventory held by the Issuer as of such date of determination.

*"One Month LIBOR"* means for an Interest Accrual Period, the one-month rate described on the Dow Jones Telerate System, page 3750, as of 11:00 a.m. London time on the Rate Determination Date; provided, however, in the event such rate is not provided, "One Month LIBOR" shall mean the rate determined in accordance with the following procedure:

(i)       The Trustee on the Rate Determination Date will request the principal London offices of each of four major reference banks in the London interbank market, as selected by the Trustee, to provide the Trustee with its offered quotation for deposits in Dollars for the upcoming one month period, commencing on the second London Banking Day immediately following such Rate Determination Date, to prime banks in the London interbank market at approximately 11:00 A.M. London time on such Rate Determination Date and in a principal amount that is representative for a single transaction in Dollars in such market at such time.  If at least two such quotations are provided, One Month LIBOR determined on such Rate Determination Date will be the arithmetic mean of such quotations.

(ii)      If fewer than two quotations are provided, One Month LIBOR determined on such Rate Determination Date will be the arithmetic mean of the rates quoted at approximately 11:00 A.M. in New York City on such Rate Determination Date by three major banks in New York City selected by the Trustee for one month Dollar loans to leading European banks, in a principal amount that is representative for a single transaction in Dollars in such market at such time; provided, however, that if the banks so selected by the Trustee are not quoting as mentioned in this sentence, One Month LIBOR determined on such Rate Determination Date will continue to be One Month LIBOR as then currently in effect on such Rate Determination Date.

*"Opinion of Counsel"* means a written opinion of counsel, who may be counsel for or an employee of the Person providing the opinion, and who shall be reasonably acceptable to the party to whom the opinion is directed.

*"Outstanding Balance"* means, with respect to any Loan and as of any date of determination thereof, the aggregate principal amount owed by the Obligor in respect of such Loan as of the close of business on the prior Business Day (which shall never be deemed to include any amounts owed by or obligations of such Obligor in respect of a Commodity Loan), which principal amount shall include accrued interest added to principal as provided for in the related Loan Agreement.

*"Paying Agent"* means any paying agent appointed pursuant to Section 2.08 of the Master Indenture, and shall initially be the Trustee.

MNX-CFTC-01335368

*"Permitted Lien"* means with respect to the Loans, related Loan Agreements and other Trust Estate assets: (i) Liens in favor of the Issuer created pursuant to the Transfer and Sale Agreement and assigned to the Trustee pursuant to the Master Indenture; and (ii) Liens in favor of the Trustee pursuant to the Master Indenture.

*"Person"* means any legal person, including any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, governmental entity or other entity of similar nature.

*"Plan"* means, with respect to any Person, any employee pension benefit plan that (a) is maintained by such Person or any ERISA Affiliate of such Person, or to which contributions by any such Person are required to be made or under which such Person has or could have any liability, (b) is subject to the provisions of Title IV of ERISA, and (c) is not a Multiemployer Plan.

*"Prime Rate"* means the prime rate of interest as published from time to time in the most recent Pacific Edition of *The Wall Street Journal*.

*"Principal Amount"* means, with respect to any Series, the outstanding unpaid principal of the Notes of such Series.

*"Principal Variance"* means, for any date of determination, an amount calculated as follows: (i) the Adjusted Eligible Pool Balance for such date, plus (ii) the amount on deposit in the Equalization Account as of the close of the preceding Business Day (including the Adjusted Inventory Balance of Eligible Metals Inventory held in the Equalization Metals Account), plus (iii) the amounts on deposit in any Principal Funding Account as of the close of the preceding Business Day, plus (iv) amounts on deposit in the Required Amounts Account, minus (v) the Aggregate Principal Amount of Notes outstanding as of the close of such preceding Business Day.

*"Program Agreements"* means the Servicing Agreement, the Master Indenture, any Supplement (and any agreement specified as a Program Agreement in such Supplement), the TSA, the OAA, the Lockbox Agreement, the Metals Depository Agreement, the Custodial Agreement, and any Note Purchase Agreement.

*"Prospective Event of Default"* means an event which, with the giving of notice, lapse of time or both, would constitute an Event of Default.

*"Prospective Early Amortization Event"* means an event which, with the giving of notice, lapse of time or both, would constitute an Early Amortization Event.

*"Purchase Date"* means each date on which a purchase and conveyance of Loans was effected pursuant to the TSA.

*"Purchase Price"* means, in respect of a purchase by the Issuer pursuant to the TSA, the aggregate of the Outstanding Balances of the Loans being purchased, determined as of the related Cut-Off Date.

*"Qualified Institution"* means (A) a depository institution or trust company (which may include the Trustee) organized under the laws of the United States of America or any one of the states thereof or the District of Columbia and whose deposits are insured to the limits provided by law by the FDIC having corporate trust powers and acting as trustee for funds deposited therein *(provided, however,* that such deposit need not be maintained as a segregated trust account with the corporate trust department of such institution if at all times the certificates of deposit, short-term deposits or commercial paper or the long-term unsecured debt obligations (other than such obligation whose rating is based on collateral or on the credit of a Person other than such institution or trust company) of such depository institution or trust company shall have a credit rating from Morningstar of at least A-l in the case of the certificates of deposit, short-term deposits or commercial paper, or a rating from Morningstar of AA- in the case of long-term unsecured debt obligations) or an equivalent rating from any other credit rating agency that has been approved as a Nationally Recognized Statistical Rating Organization by the U.S. Securities and Exchange Commission, (B) a depository institution, which may include the Trustee, which is otherwise acceptable to each Rating Agency.

*"Rating Agency Condition"* or *"Ratings Confirmation"* in relation to any Series or Class thereof that is rated by a Rating Agency on the date of the initial issuance thereof, means the notification in writing by each such Rating Agency to the Issuer that a proposed action will not result in a reduction or withdrawal of the rating of any such outstanding Series or Class rated by such Rating Agency.

*"Relevant Information"* means, in respect of any Loan, all information required to be included on or necessary for the preparation of each Daily Report in respect of such Loan, including without limitation (i) the Outstanding Balance, (ii) the Concentration Adjustment (and components thereof) and the Aggregate Volatility Adjustment, (iii) the Metals Collateral and

composition thereof, identifying the amount constituting Eligible Metals Collateral, (iv) the Collateral Realization Value, and (v) the amount of Metals borrowed, if any, by such Obligor in respect of a Commodity Loan under the related Loan Agreement.

"*Relevant UCC State*" means each jurisdiction in which the filing of a UCC financing statement is necessary to perfect the ownership interest of the Issuer pursuant to the TSA or the security interest of the Trustee granted under the Master Indenture.

"*Reportable Event*" means any of the events set forth in Section 4043(b) of ERISA.

"*Required Amount*" with respect to any Series means, as of any date of determination thereof, the sum of the following: (a) three times the amount required to pay in full all Note Interest due to the Noteholders of such Series on the next upcoming Payment Date (or Interest Payment Date, if other than a Payment Date) and payable from the Required Amounts Account, plus (b) an amount equal to three times the Series Allocation Percentage of the Servicing Fee due on the next upcoming Payment Date, plus (c) an amount equal to each Series' proportionate share of a monthly accumulation of the next-upcoming annual Trustee Fee and Backup Servicer Fee payment (provided, in the case of (a), (b) and (c), the specified multiples or allocation may be increased or reduced for any Series if so specified in the related Supplement), plus (d) any other amounts specified (and in the quantity so specified) in the related Supplement as being Required Amounts payable from the Required Amounts Account for such Series.

"*Required Equity Level*" means, with respect to any Loan and as of any date of determination thereof,

(a) so long as an Unsatisfied NPV does not exist on any date which date follows the occurrence of a Significant NPV Period, the level of required equity (as described in the Loan Agreement relating to such Loan) representing the minimum permissible level for an Obligor's equity in such Loan, which level MCC may pursuant to the Loan Agreement establish and increase or decrease from time to time in accordance with the Collection Policies (and which level as of the Closing Date for Series 2016-1 is 14%), and

(b) if an Unsatisfied NPV exists on any date which date follows the occurrence of a Significant NPV Period (and in each case after giving effect to the prior applications and transfers contemplated in the Servicing Agreement), then such minimum permissible level as would permit the making of Collateral Demands in accordance with the Servicing Agreement in respect of Eligible Loans sufficient to realize (whether from payment of Collateral Demands directly by Obligors or through Liquidations) Collections in the amount of such Unsatisfied NPV.

"*Requirements of Law*" for any Person means the certificate of incorporation or articles of association and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation, or determination of an arbitrator or Governmental Authority, in each case applicable to or binding upon such Person or to which such Person is subject, whether federal, state or local (including, without limitation, usury laws, the federal Truth in Lending Act and Regulation Z and Regulation Q of the Board of Governors of the Federal Reserve System).

"*Responsible Officer*" means any officer within the Corporate Trust Office (or any successor group of the Trustee), including the President, any Vice President or any other officer of the Trustee customarily performing functions similar to those performed by any person who at the time shall be an above-designated officer and who shall have direct responsibility for the administration of any Program Agreement to which the Trustee is a party.

"*Restoration Equity Level*" means the Required Equity Level in effect under the Loan Agreement upon the initial origination of a Loan, as the same may have been increased from time to time in accordance with a change in the Collection Policies, but in no event to be reduced below the level in effect on the Closing Date for the earliest issued and outstanding Series.

"*Revolving Period*" means, with respect to Series 2016-1, the period beginning on the Closing Date and ending on the day before the Amortization Period Commencement Date.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Series*" means any series of notes issued under the Master Indenture pursuant to a Supplement thereto, which may include within any such Series a Class or Classes subordinate to another such Class or Classes.

"*Series Account*" means any account or accounts established pursuant to a Supplement for the benefit of the related Series.

"*Series Allocation Percentage*" means, with respect to any Series as of any date of determination, the percentage equivalent of a fraction, the numerator of which is the Principal Amount of such Series as of the close of business on the date

immediately prior to such date of determination, and the denominator of which is the sum of the Principal Amounts of all outstanding Series as of the close of business on the date immediately prior to such date of determination.

"*Series 2016-1 Maturity Date*" means the Payment Date occurring in February, 2021.

"*Series 2016-1 Investor Percentage*" means the percentage equivalent of a fraction, the numerator of which is the Series 2016-1 Principal Amount and the denominator of which is the sum of the Principal Amounts of all Series as to which an Amortization Period has commenced and is continuing.

"*Settlement Statement*" means a report in the form specified as the form of Settlement Statement in the Servicing Agreement, as such specifications may be supplemented pursuant to any Supplement.

"*Significant NPV Period*" means the occurrence of an Unsatisfied NPV for a period of five (5) consecutive calendar days.

"*Silver Inventory Concentration Adjustment*" means 80% of the portion, if any, of Excess Silver consisting of Metals Inventory, as of such date of determination.

"*Silver Loan Concentration Adjustment*" means the aggregate outstanding principal amount of Loans, if any, secured by Excess Silver which consists of Metals Collateral, as of such date of determination.

"*Single Country Concentration Adjustment*" means the amount, if any, by which the aggregate of the Outstanding Balances of Eligible Loans representing obligations of Obligors domiciled in the same single country (not the United States or Canada), exceeds five percent (5%) of the sum of (i) the aggregate of the Outstanding Balances of all Eligible Loans, plus (ii) the Adjusted Inventory Balance of Eligible Metals Inventory held by the Issuer as of such date of determination.

"*Special Required Equity Level*" means 50% of the Required Equity Level.

"*Successor Servicer*" means a successor to the existing Servicer appointed in accordance with the Servicing Agreement.

"*Supplement*" means, with respect to any Series, a supplement to the Master Indenture complying with the terms thereof and, as and to the extent applicable, executed in conjunction with any issuance of notes of such Series.

"*Tax Opinion*" means, with respect to an issuance of an additional Series, an opinion of nationally recognized counsel to the effect that, for U.S. federal income tax purposes, (i) such issuance will not adversely affect the tax characterization of any outstanding Series or Class thereof that was characterized as debt at the time of its issuance and (ii) such issuance will not cause or constitute an event in which gain or loss would be recognized by any Holder or the Issuer.

"*Termination Notice*" means a notice seeking replacement of the Servicer with a Successor Servicer in accordance with the Servicing Agreement.

"*Trust Account*" means collectively the Collection Account, the Required Amounts Accounts, the Equalization Account and the Principal Funding Accounts established under the Servicing Agreement; any Series Account established pursuant to a Supplement; or any of the foregoing individually as the context requires.

"*Trustee Fee*" means $48,000 per annum.

"*Trustee Fee Allocation*" means an amount equal to the product of (a) one-twelfth, times (b) $48,000.

"*Trustee Indemnification Cap*" means the cap for all indemnity payments and certain other expenses and fees due and owing to the Trustee is, prior to the occurrence of an Amortization Event or Event of Default that is continuing, an annual maximum amount of $300,000 (for the year ending on the first anniversary of the Closing Date and each year ending on each subsequent anniversary thereof). After the occurrence of an Amortization Event or an Event of Default that is continuing the Trustee Indemnification Cap shall not apply. After the Trustee Indemnification Cap is reached during the period prior to the occurrence of an Amortization Event or Event of Default that is continuing, all such amounts owed to the Trustee above the Trustee Indemnification Cap shall be paid beginning on the next anniversary of the Closing Date until the Trustee Indemnification Cap is again reached for such year.

"*UCC*" means the Uniform Commercial Code, as amended from time to time, as in effect in the applicable jurisdiction.

"*Unmatured Early Amortization Event*" means an event or condition that, upon the giving of notice or the passage of time, or both, would become an Early Amortization Event.

"*Unsatisfied NPV*" means, as of any time of determination on any Business Day, the excess, if any, of (a) the Negative Principal Variance as existing for such Business Day, over (b) the sum of Collections (or amounts treated as Collections pursuant to the Servicing Agreement) either (i) allocated from the Collection Account to the Equalization Account prior to such time of determination pursuant to the Servicing Agreement, or (ii) transferred or deposited from any of the sources described in Articles IV or V of the Servicing Agreement because of the existence of a Negative Principal Variance, to the Collection Account on such Business Day but prior to such time of determination.

"*Voluntary Insolvency Proceeding*" means for any Person that either (a) an order for relief under Title 11 of the United States Code shall be entered in a case in which such Person is a debtor, or such Person shall become insolvent or generally fail to pay, or admit in writing its inability to pay, its debts as they become due, or shall voluntarily commence any proceeding or file any petition under any bankruptcy, insolvency or similar law for the relief or aid of debtors (including without limitation, Title 11 of the United States Code or any amendment thereto), seeking dissolution or reorganization or similar relief for itself or the appointment of a receiver, trustee, custodian or liquidator for itself or a substantial portion of its property, assets or business or to effect a plan or other arrangement with its creditors, or shall file any answer admitting the jurisdiction of the court and the material allegations of an involuntary petition filed against it in any bankruptcy, insolvency or similar proceeding, or shall be adjudicated bankrupt, or shall make a general assignment for the benefit of creditors, or shall consent to, or acquiesce in the appointment of, a receiver, trustee, custodian or liquidator for itself or a substantial portion of its property, assets or business; or (b) action shall be taken by such Person for the purpose of effectuating any of the foregoing.

"*Warehouse Receipt*" means a written receipt (including in electronic form) for Metals issued by a person engaged in the business of storing Metals for hire.

"*Wholesale Metal Price*" means, as of any date of determination thereof, and in respect of any particular Metal, the prior Business Day's "London Fixing P.M. for Gold," "London Fixing P.M. for Silver," or NYMEX settlement price for the shortest futures contract (in the case of platinum and palladium), each as reported on the London Bullion Market Association's website (www.lbma.org.uk: in the case of gold and silver) or the CME Group's website (www.cmegroup.com: in the case of platinum and palladium) or an equivalent electronic source.

"*Wholesale Value*" means, with respect to any quantity of Metals and as of any date of determination, the product of the number of ounces of such Metal times the Wholesale Metal Price for such Metal.

MNX-CFTC-01335372

# EXHIBIT 7

COMCO MANAGEMENT CORPORATION SUPERSEDE

| ACCOUNT NAME | OPERATING ACCOUNT | ACCOUNT NUMBER |
|---|---|---|

☒ CHECKING ☐ SAVINGS ☐ MONEY MARKET ☐ ___
☒ CORPORATION ☐ PARTNERSHIP ☐ SOLE OWNER ☐ ASSOCIATION ☐ ___

ADDRESS ___ 4910 Birch St., Newport Beach, CA 92660

Mailing Address __Same__

TAXPAYER IDENTIFICATION NUMBER ___ Phone 714-752-1400

☒ MAIL ☐ HOLD all statements and other notices.
Number of signatures required to withdraw funds ___ Checks signed by ___
The undersigned, doing business under the name given above,
☐ Certifies that he is the SOLE OWNER of the above named firm.
☐ Certify that they are owners of the above named firm as COPARTNERS and constitute all of the general partners of the partnership.
☒ Certify that they are a corporation, association or lodge.
Under penalties of perjury, the undersigned certify (1) that the number shown on this form is the correct taxpayer identification number and (2) that this organization is not subject to backup withholding due to underreporting. We have read and agree to the terms and conditions of the agreement as set forth hereof.

| AUTHORIZED SIGNATURES | PRINTED NAME | ID NUMBER |
|---|---|---|
| 1. | Louis E. Carabini | |
| 2. | Michael A. Carabini | |
| 3. | William A. Nelles | |
| 4. | Brian D. Jenkins | |
| 5. See Addendum, effective | 3/29/10 | |

Date Opened ___ Opened by ___ Amount ___
Date Closed ___ Closed by ___ Reason ___

## BANK — DEPOSITOR AGREEMENT

I/we enter into this bank-depositor(s) agreement with FARMERS AND MERCHANTS BANK OF LONG BEACH agreeing that:

1. This account shall be carried as indicated on the reverse side hereof. All funds on deposit shall be governed by the By-Laws, Rules and Regulations of said Bank in force from time to time, and by all practices and procedures of said Bank as to stop payments, overdrafts, dormancy, posting, interest and service charges in relation to said account. The account shall be governed by rules and regulations as contained herein.
2. Depositor(s) further agree(s) that all funds now on deposit or which hereafter may be placed on deposit shall be the property of the depositor as a Sole Owner, Partner, Corporation or other as indicated who may withdraw funds upon number of signatures indicated, except in the event of conflicting demands of the depositor, the Bank can require all signatures of the depositor(s).
3. Depositor authorizes said Bank to endorse checks, when presented for deposit to said account, if presented unendorsed.
4. Statements, return items, and notices may be mailed, unregistered, to the last address of depositor on file with this Bank and all responsibility for loss in mail is assumed by the depositor.

(FOR CORPORATION, LODGE, ASSOCIATION)

To FARMERS AND MERCHANTS BANK OF LONG BEACH

RESOLVED: that this organization establish in its name one or more deposit accounts with the FARMERS AND MERCHANTS BANK OF LONG BEACH upon such terms and conditions as may be agreed upon with

said Bank and that the __President__ (Title) and __Secretary__ (Title) of the organization be and they are hereby authorized to establish such an account

__Louis E. Carabini__ or __Michael A. Carabini__

and __William A. Nelles__ or __Brian D. Jenkins__

and _____ or _____

of this organization be and they are hereby authorized to withdraw funds of this organization from the said account upon checks of this organization signed as provided herein with signatures duly certified to said Bank by the Secretary of this organization and said Bank is hereby authorized to honor and pay any and all checks so signed, including those drawn to the individual order of any officer or other person authorized to sign the same. **COMCO**

We hereby certify that the foregoing is a full, true and correct copy of the Resolution adopted by the Board of Directors of the _____

__Management Corp.__ meeting of said Board regularly held on the __30th__ day of __November__ 19 __95__

and that the signatures appearing on the reverse side of this card are the signatures of the persons thus authorized to withdraw funds of said organization from said Bank in accordance with the above resolution.

(SEAL)

President _____

Secretary _____

We hereby certify the foregoing to be correct (FOR LODGE, ASSOCIATION)

Retiring Officers (Titles) 1. _____

## CORPORATE RESOLUTION
### (for all Corporations, Associations, and Lodges)

To FARMERS & MERCHANTS BANK OF LONG BEACH:

RESOLVED: That this organization establish in its name one or more deposit accounts with the FARMERS & MERCHANTS BANK OF LONG BEACH upon such terms and conditions as agreed upon with the bank and furthermore that

Louis E. Carabini (Name) acting as the President (Title) and Gregory G. Walker (Name) acting as the Secretary (Title) of **COMCO MANAGEMENT CORPORATION [DDA 01069489]** are authorized to establish such an account on behalf of this organization.

Officers authorized to withdraw the funds of this organization from said account are:

Louis E. Carabini (Name) / Authorized Signer (Title), and
Michael A. Carabini (Name) / Authorized Signer (Title), and
Brian D. Jenkins (Name) / Authorized Signer (Title), and
Katherine M. Gernak (Name) / Authorized Signer (Title) upon presentation of checks drawn against said account and signed as provided and certified by the Secretary of this organization. The bank is further authorized to honor and pay any and all checks so signed, including those drawn to the individual order of any officer or other person authorized to sign the same.

We certify that the foregoing is a full, true, and correct copy of the Resolution adopted by the Board of Directors of the Comco Management Corporation (Organization Name) at a meeting of said Board held on the 12th day of 03/10 (Month & Year) and that the signatures provided with the Bank Depositor Agreement are the signatures of the persons duly authorized to withdraw funds of this organization from Farmers & Merchants Bank of Long Beach in accordance with the above resolution.

President: _____ Secretary: _____
　　　　　　Louis E. Carabini　　　　　　　　　　　　　　Gregory G. Walker

February 16, 1996


Mr. John Hinrichs
Farmers and Merchants Bank
302 Pine Avenue
Long Beach, California 90802

Re:  COMCO Management Corporation
     Account No. 0██████████

Dear Mr. Hinrichs:

        Due to a change in personnel, we find it necessary to change
the persons authorized to sign checks for the above account.
Effective immediately, the following will constitute acceptable
signatures:

                        Louis E. Carabini
                        Michael A. Carabini
                        William A. Nelles
                        Brian D. Jenkins

        Please acknowledge receipt by signing and returning the
enclosed copy of this letter.

                        Very truly yours,


                        Louis E. Carabini, President
                        COMCO Management Corporation
                        4910 Birch Street
                        Newport Beach, CA 92660

MAC/pac
Enclosures

Acknowledgment:

By

Date:  2/27/96


f&mcomco.ltr



Temp. Sig. Card

ACCOUNT NAME: CONCORD FUNDING COMPANY L.L.C.

CHECKING ☐ SAVINGS ☐ MONEY MARKET ☐
CORPORATION ☐ PARTNERSHIP ☐ SOLE OWNER ☐ ASSOCIATION ☐

ADDRESS: 4900 Birch Street

Mailing Address: Newport Beach, CA 92660

Phone: 714-752-1400

2 SIG. REQ.

PRINTED NAME 2 SIG REQ.

| AUTHORIZED SIGNATURES | PRINTED NAME | ID NUMBER |
|---|---|---|
| 1. | L. E. Carabini | |
| 2. | M. A. Carabini | |
| 3. | B. D. Jenkins | |
| 4. | R. Smoler | |
| 5. | | |

Date Opened 4.10.95   Opened by

Date Closed   Closed by

See Addendum, effective 3/29/10

Addendum to agreement dated 4/10/94, effective 3/29/10

**BUSINESS ACCOUNT: FOR BANK U' ONLY**

Account Name(s): Concord Funding Co

Account Number: _____ Date Opened: 04/10/95 Source of Deposit/Amount: _____

Opening Employee: Debbie Buchanan _____ Chex Systems: ☒ Yes ☐ No

Waiver Reason & Authorization: _____

Contact Person & Phone: _____

Anticipated Monthly Deposits/Withdrawals $ _____ $ _____

| Type of Account: | Applying as a/an: | Interest Payment (Time Deposit Only): |
|---|---|---|
| Business Checking | ☐ Sole Owner | Payment Intervals: / Payment Methods |
| | ☐ Partnership | ☐ Monthly   ☐ Compound |
| Primary CIF number: | ☒ Corporation | ☐ Quarterly   ☐ Issue Check |
| | ☐ Other _____ | ☐ At Maturity   ☐ Credit Account |

This is your: ☒ Permanent   ☐ Temporary Account Agreement   Account Type/ #: _____

Account Name: Concord Funding Co   Tax I.D. Number: _____

Street Address: 4900 Birch St   Newport Beach CA 92660   Phone Number: _____

Alternate Address: _____   FAX Number: _____

SPECIAL HANDLING REQUESTS: ☐ MAIL ☒ HOLD all statements and other notices.   Facsimile Signature ☐

SIGNATURE RESTRICTIONS: Number of signatures to withdraw funds ☒ 2 Circumstances: for $1,000 and over

OVERDRAFT PROTECTION: I/we ☐ do ☒ do not authorize F&M Bank to transfer funds automatically from THIS PRIMARY Account Number

_____ and or my (our) F&M Bankcard Number _____ to my Secondary Account.

Customer's Initials: _____

| 1st Signer Information: | Katherine | M | Gernak | |
|---|---|---|---|---|
| Existing Customer ☐ | First Name & Middle Initial | | Last Name | Home Phone Number |
| Customer Initials | 5'5 " /BROWN/BROWN | | CA | |
| GAA2454 | Height/Eye Color/Hair Color | | Identification Type & Number | Social Security Number |
| | Date of Birth | | Cell Phone | |

| 2nd Signer Information: | | | |
|---|---|---|---|
| Existing Customer ☐ | First Name & Middle Initial | Last Name | Home Phone Number |
| Customer Initials _____ | / / | | |
| | Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |
| | Date of Birth | Cell Phone | |

Add this customer to account ☐ Yes ☐ No   Relationship _____   Add customer to account title ☐ Yes ☐ No

| 3rd Signer Information: | | | |
|---|---|---|---|
| Existing Customer ☐ | First Name & Middle Initial | Last Name | Home Phone Number |
| Customer Initials _____ | / , / | | |
| | Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |
| | Date of Birth | Cell Phone | |

Add this customer to account ☐ Yes ☐ No   Relationship _____   Add customer to account title ☐ Yes ☐ No

**OFFICIAL SIGNATURES**

The undersigned agree to the terms stated on every page of this form and acknowledge receipt of a completed copy. The undersigned further authorize the financial institution from time to time to verify credit and employment history and/or have a credit reporting agency prepare a credit report on the undersigned, as individuals. The undersigned also acknowledge the receipt of a copy and agree to the terms of the following disclosure(s):

☒ Deposit Account - T & C   ☒ Funds Availability   ☒ Privacy
☒ Electronic Funds Transfer   ☒ Truth in Savings
☐

1. Katherine M Gernak   2. SUPERSEDE 3/29/10   3.

**4th Signer Information:**

Existing Customer ☐

Customer Initials _____

| First Name & Mi. .nitial | Last Name | Home Phone Number |
|---|---|---|
| / / | | |
| Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |
| Date of Birth | Cell Phone | |

Add this customer to account ☐ Yes ☐ No  Relationship _____  Add customer to account title ☐ Yes ☐ No

**5th Signer Information:**

Existing Customer ☐

Customer Initials _____

| First Name & Middle Initial | Last Name | Home Phone Number |
|---|---|---|
| / / | | |
| Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |
| Date of Birth | Cell Phone | |

Add this customer to account ☐ Yes ☐ No  Relationship _____  Add customer to account title ☐ Yes ☐ No

**6th Signer Information:**

Existing Customer ☐

Customer Initials _____

| First Name & Middle Initial | Last Name | Home Phone Number |
|---|---|---|
| / / | | |
| Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |
| Date of Birth | Cell Phone | |

Add this customer to account ☐ Yes ☐ No  Relationship _____  Add customer to account title ☐ Yes ☐ No

## OFFICIAL SIGNATURES

The undersigned agree to the terms stated on every page of this form and acknowledge receipt of a completed copy. The undersigned further authorize the financial institution from time to time to verify credit and employment history and/or have a credit reporting agency prepare a credit report on the undersigned, as individuals. The undersigned also acknowledge the receipt of a copy and agree to the terms of the following disclosure(s):

☒ Deposit Account - T & C      ☒ Funds Availability          ☒ Privacy

☒ Electronic Funds Transfer   ☒ Truth in Savings

☐ _____

| 4. | 5. | 6. |
|---|---|---|
| | | |

## CORPORATE RESOLUTION
### (for all Corporations, Associations, and Lodges)

To FARMERS & MERCHANTS BANK OF LONG BEACH:
RESOLVED:  That this organization establish name one or more deposit accounts with the FARMERS & MERCHANTS BANK OF LONG BEACH upon such terms and conditions as agreed upon with the bank and furthermore thet

_____ (Name) acting as the _____ (Title) and

_____ (Name) acting as the _____ (Title) of this organization are authorized to establish such an account on behalf of this organization. Officers authorized to withdraw the funds of this

organization from said account are: _____ (Name) / _____ (Title), and

_____ (Name) / _____ (Title), and

_____ (Name) / _____ (Title) upon presentation of checks drawn against said account and signed as provided and certified by the Secretary of this organization. The bank is further authorized to honor and pay any and all checks so signed, including those drawn to the individual order of any officer or other person authorized to sign the same.

We certify that the foregoing is a full, true, and correct copy of the Resolution adopted by the Board of Directors of the _____
_Concord Funding Co_____ (Organization Name)
at a meeting of said Board held on the _____ day of _____ (Month & Year) and that the signatures provided with the Bank Depositor Agreement are the signatures of the persons duly authorized to withdraw funds of this organization from Farmers & Merchants Bank of Long Beach in accordance with the above resolution.

President: _____    Secretary: _____

## Limited Liability Company Authorization Resolution
By:

Farmers & Merchants Bank
302 Pine Avenue
Long Beach, CA 90802

Concord Funding Company LLC
[DDA 11041005]
4910 Birch Street
Newport Beach, CA 92660-8100

I, Michael A Carabini , certify that I am a Manager or Designated Member of the above named Limited Liability Company organized under the laws of Delaware , and that the resolutions on this document are a correct copy of the resolutions adopted at a meeting of all members of the Limited Liability Company or the person or persons designated by the members of the Limited Liability Company to manage the Limited Liability Company as provided in the articles of organization or an operating agreement, duly and properly called and held on 3/12/10 (date). These resolutions appear in the minutes of this meeting and have not been rescinded or modified.
**AGENTS** Any Agent listed below, subject to any written limitations, is authorized to exercise the powers granted as indicated below:

Louis E. Carabini (Name) / Authorized Signer (Title), and
Michael A. Carabini (Name) / Authorized Signer (Title), and
Brian D. Jenkins (Name) / Authorized Signer (Title), and
Ronald Smoler (Name) / Authorized Signer (Title), and
Katherine M. Gernak (Name) / Authorized Signer (Title) upon presentation of checks drawn against said account and signed as provided and certified by the Managers or Members of this organization. The bank is further authorized to honor and pay any and all checks so signed, including those drawn to the individual order of any Managers or Members, or other person authorized to sign the same.

**CERTIFICATION OF AUTHORITY** I further certify that the Managers or Designated Members of the Limited Liability Company have, and at the time of adoption of this resolution had, full power and lawful authority to adopt the resolutions on page 2 and to confer the powers granted above to the persons named who have full power and lawful authority to exercise the same.

In Witness Whereof, I have subscribed my name to this document and affixed the seal, if any, of the Limited Liability Company on 3/12/10 (date).

Manager or Designated Member
Concord Manager Corporation
Its Member Manager
By: Michael A. Carabini, President

Attest by One Other Manager or Designated Member
Concord Manager Corporation
Its Member Manager
By: Brian D. Jenkins, Treasurer/Secretary

Page 1 of 2

As used in this resolution, the term "Manager" means the person or persons designated by the members of the Limited Liability Company in a manager-managed Limited Liability Company to manage the Limited Liability Company as provided in the articles of organization or an operating agreement. The term "Designated Member" means the member or members of the Limited Liability Company authorized to act on behalf of the Limited Liability Company in a member-managed Limited Liability Company. By signing this resolution, Manager or Designated Member represent that they have provided the Financial Institution with true and complete copies of the articles of organization and operating agreements of the Limited Liability Company as amended to the date of this resolution.

The Limited Liability Company named on this resolution resolves that,

(1) The Financial Institution is designated as a depository for the funds of the Limited Liability Company and to provide other financial accommodations indicated in this resolution.

(2) This resolution shall continue to have effect until express written notice of its rescission or modification has been received and recorded by the Financial Institution. Any and all prior resolutions adopted by the Managers or Designated Members of the Limited Liability Company and certified to the Financial Institution as governing the operation of this Limited Liability Company's account(s), are in full force and effect, until the Financial Institution receives and acknowledges an express written notice of its revocation, modification or replacement. Any revocation, modification or replacement of a resolution must be accompanied by documentation, satisfactory to the Financial Institution, establishing the authority for the changes.

(3) The signature of an Agent on this resolution is conclusive evidence of their authority to act on behalf of the Limited Liability Company. Any Agent, so long as they act in a representative capacity as an Agent of the Limited Liability Company, is authorized to make any and all other contracts, agreements, stipulations and orders which they may deem advisable for the effective exercise of the powers indicated on page one, from time to time with the Financial Institution, subject to any restrictions on this resolution or otherwise agreed to in writing.

(4) All transactions, if any, with respect to any deposits, withdrawals, rediscounts and borrowings by or on behalf of the Limited Liability Company with the Financial Institution prior to the adoption of this resolution are hereby ratified, approved and confirmed.

(5) The Limited Liability Company agrees to the terms and conditions of any account agreement, properly opened by any Agent of the Limited Liability Company. The Limited Liability Company authorizes the Financial Institution, at any time, to charge the Limited Liability Company for all checks, drafts, or other orders, for the payment of money, that are drawn on the Financial Institution, so long as they contain the required number of signatures for this purpose.

(6) The Limited Liability Company acknowledges and agrees that the Financial Institution may furnish at its discretion automated access devices to Agents of the Limited Liability Company to facilitate those powers authorized by this resolution or other resolutions in effect at the time of issuance. The term "automated access device" includes, but is not limited to, credit cards, automated teller machines (ATM), and debit cards.

(7) The Limited Liability Company acknowledges and agrees that the Financial Institution may rely on alternative signature and verification codes issued to or obtained from the Agent named on this resolution. The term "alternative signature and verification codes" includes, but is not limited to, facsimile signatures on file with the Financial Institution, personal identification numbers (PIN), and digital signatures. If a facsimile signature specimen has been provided on this resolution, (or that are filed separately by the Limited Liability Company with the Financial Institution from time to time) the Financial Institution is authorized to treat the facsimile signature as the signature of the Agent(s) regardless of by whom or by what means the facsimile signature may have been affixed so long as it resembles the facsimile signature specimen on file. The Limited Liability Company authorizes each Agent to have custody of the Limited Liability Company's private key used to create a digital signature and to request issuance of a certificate listing the corresponding public key. The Financial Institution shall have no responsibility or liability for unauthorized use of alternative signature and verification codes unless otherwise agreed in writing.

# Farmers & Merchants Bank of Long Beach
## Authorized Signers & Report Recipients – Exhibit A

Monex Deposit Company and Monex Credit Company (collectively "Company") indemnify and hold Bank harmless from any and all liabilities, damages, losses, expenses, claims demands, suits, fines, or judgments, including but not limited to, costs and attorney's fees Company or Bank may incur as a result of Bank's compliance with the instructions of any person named herein as authorized to act on Company's or Customers' behalf. Bank is authorized to accept and honor, without limit as to amount and without further inquiry, the instructions outlined below, whether personally benefiting any of the Authorized Signers, or deposited to the personal account of such person(s), or any of them, or otherwise. The authority of the persons named herein shall continue until revoked by Company but Bank shall be fully protected in acting on such authority and shall not be charged with any notice of the revocation of such authority or the removal of any such person(s) unless and until it shall have actually received an amendment to this notice setting forth such revocation or removal.

Signature _____ Date 6/19/13

Louis E. Carabini; President Comco Management Corporation the General Partner of Monex Deposit Company
Michael A. Carabini; President Moteo Management Corporation

**Authorized Signers:** Any two of the following principals, members, officers, managers and/or employees are authorized, on behalf of Company and in its name to deposit Assets into the Company's accounts and the Customer Account; to direct Depository to deliver, transfer, trade, liquidate, pledge or segregate Precious Metals in Company's accounts and the Customer Account; to direct payments or transfer funds, to execute any necessary documents to accomplish any of these authorized acts; and to issue instructions to Depository by written or electronic means.

| Name | Title | Signature |
|---|---|---|
| Michael A Carabini | PRESIDENT OF THE GENERAL PARTNER OF MDC | |
| Brian O. Jenkins | TREASURER OF THE GENERAL PARTNER OF MCC | |
| Ron Smolen | DIRECTOR OF TRADING OF MDC | |
| Ryan Valadez | AUTHORIZED SIGNATORY | |
| Richard T. Brown | AUTHORIZED SIGNATORY | |
| JoAnn Laborer | AUTHORIZED SIGNATORY | |
| Myrna R. Johnson | AUTHORIZED SIGNATORY | |

**Email Report Recipients:** Depository is instructed to send all Company reports via email to the following recipients.

| Name | Title | E-Mail Address |
|---|---|---|
| Anne Morgan | AUTHORIZED AGENT | AnneMorgan<inventory@monex.com |

Page 8 of 10

## BUSINESS ACCOUNT: FOR BANK USE ONLY

Account Name(s): Monex Credit Company          Customer Cash Disbursements

Account Number:_____ Date Opened: 10/05/01  Source of Deposit/Amount:_____

Opening Employee: Anna Figueroa      Chex Systems: ☐ Yes  ☒ No

Waiver Reason & Authorization: Existing

Contact Person & Phone:

**THIS CARD SUPERSEDES PREVIOUS CARD** 10/09/08

Anticipated Monthly Deposits/Withdrawals  $_____  $_____

| Type of Account: | Applying as a/an: | Interest Payment (Time Deposit Only): |
|---|---|---|
| Business Checking | ☐ Sole Owner | Payment Intervals: Payment Methods |
| | ☐ Partnership | ☐ Monthly ☐ Compound |
| Primary CIF number: | ☒ Corporation | ☐ Quarterly ☐ Issue Check |
| | ☐ Other ____ | ☐ At Maturity ☐ Credit Account |

This is your: ☒ Permanent  ☐ Temporary Account Agreement      Account Type/ #: _____

Account Name: Monex Credit Company          Tax I.D. Number:_____

Street Address: 4910 Birch Street   Newport Beach CA 92660-8100  Phone Number:_____

Alternate Address:_____          FAX Number:_____

SPECIAL HANDLING REQUESTS: ☒ MAIL ☐ HOLD all statements and other notices.   Facsimile Signature ☐

SIGNATURE RESTRICTIONS: Number of signatures to withdraw funds 1   Circumstances:_____

OVERDRAFT PROTECTION: I/we ☐ do ☒ do not authorize F&M Bank to transfer funds automatically from THIS PRIMARY Account Number _____ and or my (our) F&M Bankcard Number _____ to my Secondary Account.

Customer's Initials:

**1st Signer Information:** Louis E Carabini
Existing Customer ☒
First Name & Middle Initial / Last Name / Home Phone Number
5'9" /BROWN/BROWN  CA
Customer Initials: Height/Eye Color/Hair Color / Identification Type & Number / Social Security Number
C006734
Date of Birth / Cell Phone

**2nd Signer Information:** Michael Carabini
Existing Customer ☒
First Name & Middle Initial / Last Name / Home Phone Number
5'9" /BROWN/BROWN  CA
Customer Initials: Height/Eye Color/Hair Color / Identification Type & Number / Social Security Number
C007301
Date of Birth / Cell Phone
Add this customer to account ☒ Yes ☐ No  Relationship O   Add customer to account title ☐ Yes ☒ No

**3rd Signer Information:** Brian D Jenkins
Existing Customer ☒
First Name & Middle Initial / Last Name / Home Phone Number
CA
Customer Initials: Height/Eye Color/Hair Color / Identification Type & Number / Social Security Number
J004494
Date of Birth / Cell Phone
Add this customer to account ☒ Yes ☐ No  Relationship O   Add customer to account title ☐ Yes ☒ No

**OFFICIAL SIGNATURES**
The undersigned agree to the terms stated on every page of this form and acknowledge receipt of a completed copy. The undersigned further authorize the financial institution from time to time to verify credit and employment history and/or have a credit reporting agency prepare a credit report on the undersigned, as individuals. The undersigned also acknowledge the receipt of a copy and agree to the terms of the following disclosure(s):

☒ Deposit Account  ☒ Funds Availability  ☒ Privacy
☒ Electronic Funds Transfer  ☒ Truth in Savings
☐

**THIS CARD SUPERSEDES PREVIOUS CARD**

1. Louis Carabini  2. Michael Carabini  3. Brian Jenkins
See Addendum, effective 3/29/10

JHA FMBCA03 11/07 PAGE 1 OF 3

**4th Signer Information:**  Ronald [First Name & Middle Initial]  Smoler [Last Name]  [Home Phone Number]

Existing Customer ☐   Y   CA

Customer Initials *R S*   [Height/Eye Color/Hair Color]   Identification Type & Number   [Social Security Number]

S014232   [Date of Birth]   [Cell Phone]

Add this customer to account ☒ Yes ☐ No   Relationship A   Add customer to account title ☐ Yes ☒ No

**5th Signer Information:**  Patricia   A   Lange [Last Name]   [Home Phone Number]

Existing Customer ☒   S   CA

Customer Initials *Pat*   [Height/Eye Color/Hair Color]   Identification Type &   [Social Security Number]

L009303   [Date of Birth]   [Cell Phone]

Add this customer to account ☒ Yes ☐ No   Relationship A   Add customer to account title ☐ Yes ☒ No

**6th Signer Information:**  Richard   T   Brown [Last Name]   [Home Phone Number]

Existing Customer ☒   CK   CA

Customer Initials *RTB*   [Height/Eye Color/Hair Color]   Identification Type & Number   Social Security Number

B013818   [Date of Birth]   [Cell Phone]

Add this customer to account ☒ Yes ☐ No   Relationship A   Add customer to account title ☐ Yes ☒ No

**OFFICIAL SIGNATURES**
The undersigned agree to the terms stated on every page of this form and acknowledge receipt of a completed copy. The undersigned further authorize the financial institution from time to time to verify credit and employment history and/or have a credit reporting agency prepare a credit report on the undersigned, as individuals. The undersigned also acknowledge the receipt of a copy and agree to the terms of the following disclosure(s):

☒ Deposit Account -T&C   ☒ Funds Availability   ☒ Privacy
☒ Electronic Funds Transfer   ☒ Truth in Savings
☐

4. *[signature]*   5. *Patricia A Lange*   6. *[signature]*
Ronald Smoler   Patricia Lange (REMOVED, EFFECTIVE 3/29/10)   Richard Brown

**BACKUP WITHHOLDING CERTIFICATIONS**

TIN: [redacted]

☒ TAXPAYER I.D. NUMBER - The Taxpayer Identification Number shown above (TIN) is my correct taxpayer identification number.
☒ BACKUP WITHHOLDING - I am not subject to backup withholding either because I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified me that I am no longer subject to backup withholding.
☐ EXEMPT RECIPIENTS - I am an exempt recipient under the Internal Revenue Service Regulations.
SIGNATURE: I certify under penalties of perjury the statements checked in this section and that I am a U.S. person or other U.S. person.

X *Brian D. Jenkins, CFO NSC*   05/23/08   Date

Bank use only: Superseded Card

Accepting Employee: *[signature]*   Branch: *Main*   Date: *6-9-08*

PAGE 2 OF 3

## BUSINESS ACCOUNT: FOR BANK USE ONLY

Account Name(s): Monex Credit Company      Customer Cash Disbursements

Account Number: ▆▆▆▆▆   Date Opened: 10/05/01   Source of Deposit/Amount: _____

Opening Employee: Anna Figueroa      Chex Systems: ☐ Yes   ☒ No

Waiver Reason & Authorization: Existing

Contact Person & Phone: _____

Anticipated Monthly Deposits/Withdrawals $ _____ $ _____

| Type of Account: | Applying as a/an: | Interest Payment (Time Deposit Only): |
|---|---|---|

Business Checking

Primary CIF number: M007044

- ☐ Sole Owner
- ☐ Partnership
- ☒ Corporation
- ☐ Other _____

Payment Intervals:    Payment Methods
- ☐ Monthly    ☐ Compound
- ☐ Quarterly    ☐ Issue Check
- ☐ At Maturity    ☐ Credit Account

This is your: ☒ Permanent   ☐ Temporary Account Agreement    Account Type/ #: _____

Account Name: Monex Credit Company      Tax I.D. Number: ▆▆▆▆▆

Street Address: 4910 Birch Street    Newport Beach CA 92660-8100   Phone Number: ▆▆▆▆▆

Alternate Address: _____      FAX Number: _____

SPECIAL HANDLING REQUESTS: ☒ MAIL ☐ HOLD all statements and other notices.   Facsimile Signature ☐

SIGNATURE RESTRICTIONS: Number of signatures to withdraw funds 1   Circumstances: _____

OVERDRAFT PROTECTION: I/we ☐ do ☒ do not authorize F&M Bank to transfer funds automatically from THIS PRIMARY Account Number _____ and or my (our) F&M Bankcard Number _____ to my Secondary Account.

Customer's Initials: ▆▆

**1st Signer Information:**
Existing Customer ☒
Customer Initials ▆▆
L009304

| First Name & Middle Initial | | Last Name | Home Phone Number |
|---|---|---|---|
| Joann | M | Lahners | ▆▆▆▆ |
| Height/Eye Color/Hair Color | | CA | Social Security Number |
| Date of Birth | | Identification Type & Number | |
| ▆▆▆▆ | | Cell Phone | |

**2nd Signer Information:**
Existing Customer ☒
Customer Initials ▆▆
JAA0562

| First Name & Middle Initial | | Last Name | Home Phone Number |
|---|---|---|---|
| Myrna | R | Johnson | ▆▆▆▆ |
| Height/Eye Color/Hair Color | | CA | Social Security Number |
| ▆▆▆▆ | | Identification Type & Number | |
| Date of Birth | | Cell Phone | |

Add this customer to account ☒ Yes ☐ No Relationship O    Add customer to account title ☐ Yes ☒ No

**3rd Signer Information:**
Existing Customer ☒
Customer Initials _____

| First Name & Middle Initial | Last Name | Home Phone Number |
|---|---|---|
| | | |
| Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |
| Date of Birth | Cell Phone | |

Add this customer to account ☒ Yes ☐ No Relationship O    Add customer to account title ☐ Yes ☒ No

## OFFICIAL SIGNATURES

The undersigned agree to the terms stated on every page of this form and acknowledge receipt of a completed copy. The undersigned further authorize the financial institution from time to time to verify credit and employment history and/or have a credit reporting agency prepare a credit report on the undersigned, as individuals. The undersigned also acknowledge the receipt of a copy and agree to the terms of the following disclosure(s):

- ☒ Deposit Account
- ☒ Electronic Funds Transfer
- ☒ Funds Availability
- ☒ Truth in Savings
- ☒ Privacy

THIS CARD SUPERSEDES PREVIOUS CARD 4/9/08

1. *(signature)* JoAnn Lahners      2. *(signature)* Myrna Johnson      3.

JHA FMBCA03 11/07
PAGE 1 OF 3

**4th Signer Information:**

Existing Customer ☐

Customer Initials _____

| First Name & Middle Initial | Last Name | Home Phone Number |
| / | | |
| Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |
| Date of Birth | Cell Phone | |

Add this customer to account ☒ Yes ☐ No   Relationship  A _____        Add customer to account title ☐ Yes ☒ No

**5th Signer Information:**

Existing Customer ☒

Customer Initials _____

| First Name & Middle Initial | Last Name | Home Phone Number |
| / / | | |
| Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |
| Date of Birth | Cell Phone | |

Add this customer to account ☒ Yes ☐ No   Relationship  A _____        Add customer to account title ☐ Yes ☒ No

**6th Signer Information:**

Existing Customer ☒

Customer Initials _____

| First Name & Middle Initial | Last Name | Home Phone Number |
| / / | | |
| Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |
| Date of Birth | Cell Phone | |

Add this customer to account ☒ Yes ☐ No   Relationship  A _____        Add customer to account title ☐ Yes ☒ No

**OFFICIAL SIGNATURES**

The undersigned agree to the terms stated on every page of this form and acknowledge receipt of a completed copy. The undersigned further authorize the financial institution from time to time to verify credit and employment history and/or have a credit reporting agency prepare a credit report on the undersigned, as individuals. The undersigned also acknowledge the receipt of a copy and agree to the terms of the following disclosure(s):

☒ Deposit Account –T&C       ☒ Funds Availability          ☒ Privacy
☒ Electronic Funds Transfer   ☒ Truth in Savings
☐ _____

| 4. | 5. | 6. |
| | | |

**BACKUP WITHHOLDING CERTIFICATIONS**

TIN: _____

☐ TAXPAYER I.D. NUMBER - The Taxpayer Identification Number shown above (TIN) is my correct taxpayer identification number.

☐ BACKUP WITHHOLDING - I am not subject to backup withholding either because I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified me that I am no longer subject to backup withholding.

☐ EXEMPT RECIPIENTS - I am an exempt recipient under the Internal Revenue Service Regulations.

SIGNATURE: I certify under penalties of perjury the statements checked in this section and that I am a U.S. person or other U.S. person.

| X |
| Date |

| Bank use only: Superseded Card |
| Accepting Employee: _____   Branch: _____   Date: _____ |

## CORPORATE RESOLUTION
### (for all Corporations, Associations, and Lodges)

**To: FARMERS & MERCHANTS BANK OF LONG BEACH:**

**RESOLVED:** That this organization establish in the name of **Monex Credit Company ("MCC")** one or more deposit accounts with the **FARMERS & MERCHANTS BANK OF LONG BEACH** upon such terms and conditions as agreed upon with the bank and furthermore that **Michael A. Carabini,** acting as the **President of the General Partner** of MCC is authorized to establish such an account on behalf of **MCC**. Persons authorized to withdraw the funds of **MCC** from said account are: **Louis E. Carabini, Michael A. Carabini, President of the General Partner, and Brian D. Jenkins, Treasurer and Secretary of the General Partner**, upon presentation of checks drawn against said account and signed as provided and certified by the Secretary of this organization. The bank is further authorized to honor and pay any and all checks so signed, including those drawn to the individual order of any officer or other person authorized to sign the same.

We certify that the foregoing is a full, true, and correct copy of the Resolution adopted by the Board of Directors of **Metco Management Corporation**, the General Partner of **Monex Credit Company** at a meeting of said Board held on the **2ⁿᵈ day of June, 2008**, and that the signatures provided with the Bank Depositor Agreement are the signatures of the persons duly authorized to withdraw funds of **MCC** from **Farmers & Merchants Bank of Long Beach** in accordance with the above resolution.

President: _____   Secretary: _____

Michael A. Carabini                                             Brian D. Jenkins

Metco Management Corporation                    Metco Management Corporation
The General Partner                                          The General Partner
Monex Credit Company                                     Monex Credit Company

corpresolutionmcc.doc
06/02/08/pac

**THIS CARD SUPERSEDES
PREVIOUS CARD**
6/4/08

## WAIVER OF NOTICE AND CONSENT TO HOLDING
## SPECIAL MEETING OF THE BOARD
## OF
## METCO MANAGEMENT CORPORATION

The undersigned being the President and sole director of Metco Management Corporation ("MMC"), a California corporation, and desiring to hold a special meeting of the board of said corporation for the purpose of approving the addition of one or more new signatories on bank accounts for Monex Credit Company, a California limited partnership of which MMC is the general partner, does hereby waive notice of said meeting and consent to the holding thereof on November 28, 2005, at 4910 Birch Street, Newport Beach, California; and does further agree that such business transacted at said meeting shall be as valid and legal and of the same force and effect as though said meeting was held after notice was duly given.

Dated: November 28, 2005

Michael A. Carabini
President and Director

## MINUTES OF SPECIAL MEETING OF
## THE BOARD OF
## METCO MANAGEMENT CORPORATION

A Special Meeting of the Board of Metco Management Corporation ("MMC"), a

California corporation, was held November 28, 2005, at 4910 Birch Street, Newport Beach,

California. The sole director was present. The meeting considered the approval and

establishment of new bank accounts for Monex Credit Company ("MCC"), a California limited

partnership of which MMC is the general partner, and the authorization of various persons as

signatories on the account(s). After consideration, the Board approved the following resolution:

> **RESOLVED:** That MMC revise, on behalf of MCC, the
> signatories on one or more of the deposit accounts held by MCC
> with Farmers and Merchants Bank of Long Beach to include
> Michael A. Carabini, Brian D. Jenkins, Louis E. Carabini, Ronald
> Smoler, Patricia A. Lange, Richard T. Brown and Joann M.
> Lahners. Each of these persons is hereby authorized to withdraw
> funds of MCC from said account(s) upon checks of MCC signed
> as provided herein with signatures duly certified to the bank by the
> Secretary of MCC and said bank is duly authorized to honor and
> pay any and all checks so signed. The signatures appearing
> hereunder are the signatures of the persons duly authorized to
> withdraw funds of MCC from said bank in accordance with the
> foregoing provisions.

Michel A. Carabini

Brian D. Jenkins

Louis E. Carabini

Ron Smoler

_____
Patricia A. Lange

_____
Richard T. Brown

_____
Joann M. Lahners

Signature authority may be limited as set forth on the Depositor
Agreement(s) and/or signature cards for the subject account(s).


There being no further business to come before the meeting, upon a motion duly
made and carried, the meeting was adjourned.

_____
Brian D. Jenkins, Secretary

ATTEST:

_____
Michael A. Carabini, President

2

~~MONEY CREDIT COMPANY~~ P.C.C.E. INC.

NEW SIGNATURE CARD    25

| ACCOUNT NAME | OPERATING ACCOUNT | ACCOUNT NUMBER | |

☒ CHECKING   ☐ SAVINGS   ☐ MONEY MARKET   ☐
☐ CORPORATION   ☒ PARTNERSHIP   ☐ SOLE OWNER   ☐ ASSOCIATION   ☐

ADDRESS   4910 Birch Street, Newport Beach, CA 92660

Mailing Address   P.O. Box 1800, Newport Beach, CA 92660

TAXPAYER IDENTIFICATION NUMBER _____   Phone

☒ MAIL   ☐ HOLD all statements and other notices.
Number of signatures required to withdraw funds _____ Checks signed by _____
The undersigned, doing business under the name given above,
☐ Certifies that he is the SOLE OWNER of the above named firm.
☐ Certify that they are owners of the above named firm as COPARTNERS and constitute all of the general partners of the partnership.
☐ Certify that they are a corporation, association or lodge.
Under penalties of perjury, the undersigned certify (1) that the number shown on this form is the correct taxpayer identification number and (2) that this organization is not subject to backup withholding due to underreporting. We have read and agree to the terms and conditions of the agreement as set forth hereof.

| | AUTHORIZED SIGNATURES | PRINTED NAME | ID NUMBER |
|---|---|---|---|
| 1. | | Michael A. Carabini | |
| 2. | | Brian D. Jenkins | |
| 3. | | Ronald Smoler | |
| 4. | | | |
| 5. | | | |

See Addendum, effective 3/29/10

Date Opened _____ Opened by _____ Amount _____
Date Closed _____ Closed by _____ Reason _____

**\*of General Partner, METCO**

## BANK — DEPOSITOR AGREEMENT

I/ we enter into this bank-depositor(s) agreement with FARMERS AND MERCHANTS BANK OF LONG BEACH agreeing that:

1. This account shall be carried as indicated on the reverse side hereof. All funds on deposit shall be governed by the By-Laws, Rules and Regulations of said Bank in force from time to time, and by all practices and procedures of said Bank as to stop payments, overdrafts, dormancy, posting, interest and service charges in relation to said account. The account shall be governed by rules and regulations as contained herein.

2. Depositor(s) further agree(s) that all funds now on deposit or which hereafter may be placed on deposit shall be the property of the depositor as a Sole Owner, Partner, Corporation or other as indicated who may withdraw funds upon number of signatures indicated, except in the event of conflicting demands of the depositor, the Bank can require all signatures of the depositor(s).

3. Depositor authorizes said Bank to endorse checks, when presented for deposit to said account, if presented unendorsed.

4. Statements, return items, and notices may be mailed, unregistered, to the last address of depositor on file with this Bank and all responsibility for loss in mail is assumed by the depositor.

(FOR CORPORATION, LODGE, ASSOCIATION)

**To FARMERS AND MERCHANTS BANK OF LONG BEACH**

RESOLVED: that this organization establish in its name one or more deposit accounts with the FARMERS AND MERCHANTS BANK OF LONG BEACH upon such terms and conditions as may be agreed upon with _____

said Bank and that the __**President\***__ (Title) and __**Secretary\***__ (Titles) of the organization be and they are hereby authorized to establish such an account.

__**Michael A. Carabini**__ or ____ __**Brian D. Jenkins**__

and __**Ronald Smoler**__ or _____

and _____ or _____

of this organization be and they are hereby authorized to withdraw funds of this organization from the said account upon checks of this organization signed as provided herein with signatures duly certified to said Bank by the Secretary of this organization and said Bank is hereby authorized to honor and pay any and all checks so signed, including those drawn to the individual order of any officer or other person authorized to sign the same. __**Monex**__

We hereby certify that the foregoing is a full, true and correct copy of the Resolution adopted by the Board of Directors of the _____

__**Credit Company**__ at a meeting of said Board regularly held on the __13__ day of __May__ , 19 __93__

and that the signatures appearing on the reverse side of this card are the signatures of the persons duly authorized to withdraw funds of said organization from said Bank in accordance with the above resolution.

(SEAL)

President _____

Secretary _____

We hereby certify the foregoing to be correct: (FOR LODGE ASSOCIATION)

Retiring Officers (Titles) 1. _____    2. _____

Addendum to agreement dated 5/25/93, effective 3/29/10

## BUSINESS ACCOUNT: FOR BANK USE ONLY

Account Name(s): Monex Credit Company _____ Operating _____

Account Number: ▮▮▮▮▮▮▮ Date Opened: 05/14/87 Source of Deposit/Amount: _____

Opening Employee: Debbie Buchanan _____ Chex Systems: ☒ Yes ☐ No

Waiver Reason & Authorization: _____

Contact Person & Phone: _____

Anticipated Monthly Deposits/Withdrawals $ _____ $ _____

| Type of Account: | Applying as a/an: | Interest Payment (Time Deposit Only): |
|---|---|---|
| Business Checking | ☐ Sole Owner | Payment Intervals: Payment Methods |
| | ☐ Partnership | ☐ Monthly  ☐ Compound |
| Primary CIF number:  M007044 | ☒ Corporation | ☐ Quarterly  ☐ Issue Check |
| | ☐ Other _____ | ☐ At Maturity  ☐ Credit Account |

This is your: ☒ Permanent  ☐ Temporary Account Agreement     Account Type/ #: _____

Account Name: Monex Credit Company _____ Tax I.D. Number: ▮▮▮▮▮▮▮▮▮

Street Address: 4910 Birch Street    Newport Beach CA 92660-8100   Phone Number: ▮▮▮▮▮▮▮

Alternate Address: _____ FAX Number: _____

SPECIAL HANDLING REQUESTS: ☐ MAIL ☒ HOLD all statements and other notices.   Facsimile Signature ☐

SIGNATURE RESTRICTIONS: Number of signatures to withdraw funds 1 ____ Circumstances: _____

OVERDRAFT PROTECTION: I/we ☐ do ☒ do not authorize F&M Bank to transfer funds automatically from THIS PRIMARY Account Number

_____ and or my (our) F&M Bankcard Number _____ to my Secondary Account.

Customer's Initials: ___

| 1st Signer Information: | Katherine          M        Gernak | ▮▮▮▮▮▮▮ |
|---|---|---|
| Existing Customer ☐ | First Name & Middle Initial          Last Name | Home Phone Number |
| Customer Initials *KMG* | CA | |
| GAA2454 | Height/Eye Color/Hair Color    Identification Type & Number | Social Security Number |
| | Date of Birth ▮▮▮▮    Cell Phone | |

| 2nd Signer Information: | First Name & Middle Initial          Last Name | Home Phone Number |
|---|---|---|
| Existing Customer ☐ | /    / | |
| Customer Initials ____ | Height/Eye Color/Hair Color    Identification Type & Number | Social Security Number |
| | Date of Birth    Cell Phone | |

Add this customer to account ☐ Yes ☐ No   Relationship _____   Add customer to account title ☐ Yes ☐ No

| 3rd Signer Information: | First Name & Middle Initial          Last Name | Home Phone Number |
|---|---|---|
| Existing Customer ☐ | /    / | |
| Customer Initials ____ | Height/Eye Color/Hair Color    Identification Type & Number | Social Security Number |
| | Date of Birth    Cell Phone | |

Add this customer to account ☐ Yes ☐ No   Relationship _____   Add customer to account title ☐ Yes ☐ No

### OFFICIAL SIGNATURES

The undersigned agree to the terms stated on every page of this form and acknowledge receipt of a completed copy. The undersigned further authorize the financial institution from time to time to verify credit and employment history and/or have a credit reporting agency prepare a credit report on the undersigned, as individuals. The undersigned also acknowledge the receipt of a copy and agree to the terms of the following disclosure(s):

☒ Deposit Account - T & C    ☒ Funds Availability    ☒ Privacy
☒ Electronic Funds Transfer    ☒ Truth in Savings
☐

| 1. *Katherine M Gernak* | 2. | 3. |
|---|---|---|

JHA FMBCA03 04/09
PAGE 1 OF 3

**4th Signer Information:**

Existing Customer ☐

Customer Initials _____

| First Name & Middle Initial | Last Name | Home Phone Number |
|---|---|---|
| Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |
| Date of Birth | Cell Phone | |

Add this customer to account ☐ Yes ☐ No   Relationship _____   Add customer to account title ☐ Yes ☐ No

**5th Signer Information:**

Existing Customer ☐

Customer Initials _____

| First Name & Middle Initial | Last Name | Home Phone Number |
|---|---|---|
| Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |
| Date of Birth | Cell Phone | |

Add this customer to account ☐ Yes ☐ No   Relationship _____   Add customer to account title ☐ Yes ☐ No

**6th Signer Information:**

Existing Customer ☐

Customer Initials _____

| First Name & Middle Initial | Last Name | Home Phone Number |
|---|---|---|
| Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |
| Date of Birth | Cell Phone | |

Add this customer to account ☐ Yes ☐ No   Relationship _____   Add customer to account title ☐ Yes ☐ No

**OFFICIAL SIGNATURES**

The undersigned agree to the terms stated on every page of this form and acknowledge receipt of a completed copy. The undersigned further authorize the financial institution from time to time to verify credit and employment history and/or have a credit reporting agency prepare a credit report on the undersigned, as individuals. The undersigned also acknowledge the receipt of a copy and agree to the terms of the following disclosure(s):

☐ Deposit Account - T & C      ☐ Funds Availability      ☐ Privacy
☐ Electronic Funds Transfer    ☐ Truth in Savings
☐ _____

| 4. | 5. | 6. |
|---|---|---|

**CORPORATE RESOLUTION**
(for all Corporations, Associations, and Lodges)

To FARMERS & MERCHANTS BANK OF LONG BEACH:
RESOLVED: That this organization establish inits name one or more deposit accounts with the FARMERS & MERCHANTS BANK OF LONG BEACH upon such terms and conditions as agreed upon with the bank and furthermore that

_____ (Name) acting as the _____ (Title) and
_____ (Name) acting as the _____ (Title) of
this organization are authorized to establish such an account on behalf of this organization. Officers authorized to withdraw the funds of this

organization from said account are: _____ (Name) /_____ (Title), and

_____ (Name) / _____ (Title), and

_____ (Name) / _____ (Title) upon presentation of checks drawn
against said account and signed as provided and certified by the Secretary of this organization. The bank is further authorized to honor end pay any and all checks so signed, including those drawn to the individual order of any officer or other person authorized to sign the same.

We certify that the foregoing is a full, true, and correct copy of the Resolution adopted by the Board of Directors of the _____
_____ (Organization Name)
at a meeting of said Board held on the _____ day of _____ (Month & Year) and that the signatures provided with the Bank Depositor Agreement are the signatures of the persons duly authorized to withdraw funds of this organization from Farmers & Merchants Bank of Long Beach in accordance with the above resolution.

President: _____   Secretary: _____

**BACKUP WITHHOLDING CERTIFICATIONS**

Check the appropriate box:

☐ Individual/Sole Proprietor

☐ Corporation

☐ Partnership

☐ L.L.C.  Enter the tax clasification (D = disregarded entity, C = corporation, P = partnership) _____

☐ Unincorporated Association

☐ Other ____

Check the following box if true:

☐ Exempt payee

Taxpayer Identification Number: _____

Under penalties of perjury, I certify that:

(1)  The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

(2)  I am not subject to backup withholding either because: (1) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the Internal Revenue Service has notified me that I am no longer subject to backup withholding, and

(3)  I am a U.S. person (including a U.S. resident alien).

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return.  For real estate trans-actions item 2 does not apply.  For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN.

X _____
                                                                  Date

**ONLINE BANKING ONLY:**  I/we acknowledge receipt of a copy and agree to the terms of the Online Banking Disclosure.

Customer Initials: _____          Customer Initials: _____          Customer Initials: _____

**SPECIAL PROMOTION:**  I ☐ do or ☐ do not request Farmers & Merchants Bank to provide my name to _____ as notification that I have opened an account as part of special promotion in their benefit.

Customer Signature: _____

| Bank use only:  Superseded Card |
| --- |
| Accepting Employee: _____          Branch: _____          Date: _____ |

**Partnership Resolution of Authority**

By:

Farmers & Merchants Bank
302 Pine Avenue
Long Beach, CA 90802

Referred to in this document as
"Financial Institution"

**Monex Credit Company, a
California Limited Partnership
[DDA 01069497]**
4910 Birch Street
Newport Beach, CA 92660-8100
Referred to in this document as
"Partnership"

The above partnership consists of the following partners (or if a limited
partnership, the following general partners):

Metco Management Corporation

The above-named parties represent that they constitute all of the partners of the
Partnership designated above, or if a limited Partnership, constitute all of the
general partners of the partnership designated above. These individuals are
referred to in this document as "Partners."

AGENTS Any Agent listed below, subject to any written limitations, is authorized
to exercise the powers granted as indicated below:

Michael A. Carabini (Name) / Authorized Signer (Title), and
Brian D. Jenkins (Name) / Authorized Signer (Title), and
Ronald Smoler (Name) / Authorized Signer (Title), and
Katherine M. Gernak (Name) / Authorized Signer (Title) upon presentation of
checks drawn against said account and signed as provided and certified by the
Partners of this organization. The bank is further authorized to honor and pay any
and all checks so signed, including those drawn to the individual order of any
Partners, or other person authorized to sign the same.

**CERTIFICATION OF AUTHORITY** I further certify that the Partnership has, and
at the time of adoption of this resolution had, full power and lawful authority to
adopt the resolutions on page 2 and to confer the powers granted above to the
person named who have full power and lawful authority to exercise the same.
Signatures: (Type name of each Partner below each signature line.)

Metco Management Corporation
By Michael A. Carabini
Its President

Metco Management Corporation
By Brian D. Jenkins
Its Secretary

Page 1 of 2

The Partners to the Partnership resolve, warrant and agree as follows:

(1) The Financial Institution is designated as a depository for the funds of the Partnership and to provide other financial accommodations indicated in this resolution.

(2) This resolution shall continue to have effect until express written notice of its rescission or modification has been received and recorded by the Financial Institution. Any and all prior resolutions adopted by the Partners and certified to the Financial Institution as governing the operation of this partnership's account(s), are in full force and effect, until the Financial Institution receives and acknowledges an express written notice of its revocation, modification or replacement. Any revocation, modification or replacement of a resolution must be accompanied by documentation, satisfactory to the Financial Institution, establishing the authority for the changes.

(3) The signature of an Agent on this resolution is conclusive evidence of their authority to act on behalf of the Partnership. Any Agent, so long as they act in a representative capacity as an Agent of the Partnership, is authorized to make any and all other contracts, agreements, stipulations and orders which they may deem advisable for the effective exercise of the powers indicated on page one, from time to time with the Financiall nstitution, subject to any restrictions on this resolution or otherwise agreed to in writing.

(4) All transactions, if any, with respect to any deposits, withdrawals, rediscounts and borrowings by or on behalf of the Partnership with the Financial Institution prior to the adoption of this resolution are hereby ratified, approved and confirmed.

(5) The Partners agree to the terms and conditions of any account agreement, properly opened by any Agent of the Partnership. The Partners authorize the Financial Institution, at any time, to charge the Partnership for all checks, drafts, or other orders, for the payment of money, that are drawn on the Financial Institution, so long as they contain the required number of signatures for this purpose.

(6) The Partners acknowledge and agree that the Financial Institution may furnish at its discretion automated access devices to Agents of the Partnership to facilitate those powers authorized by this resolution or other resolutions in effect at the time of issuance. The term "automated access device" includes, but is not limited to, credit cards, automated teller machines (ATM), and debit cards.

(7) The Partners acknowledge and agree that the Financial Institution may rely on alternative signature and verification codes issued to or obtained from the Agent named on this resolution. The term "alternative signature and verification codes" includes, but is not limited to, facsimile signatures on file with the Financial Institution, personal identification numbers (PIN), and digital signatures. If a facsimile signature specimen has been provided on this resolution, (or that are filed separately by the Partnership with the Financial Institution from time to time) the Financial Institution is authorized to treat the facsimile signature as the signature of the Agent(s) regardless of by whom or by what means the facsimile signature may have been affixed so long as it resembles the facsimile signature specimen on file. The Partners authorize each Agent to have custody of the Partnership's private key used to create a digital signature and to request issuance of a certificate listing the corresponding public key. The Financial

Institution shall have no responsibility or liability for unauthorized use of alternative signature and verification codes unless otherwise agreed in
writing.

(8) If any other parties become interested in the partnership as co-partners, the partnership relationship is altered in any way or if the business should become incorporated, the Partners shall promptly notify the Financial Institution.

(9) By signing this resolution, Partners represent that they have provided the Financial Institution with true and complete copies of the partnership
agreement, if any, as amended to the date of this resolution.

May 24, 1993

Mr. John Hinrichs
Farmers and Merchants Bank
302 Pine Avenue
Long Beach, California 90802

Re:  METCO Management Corporation
     Account No. ████████

Dear Mr. Hinrichs:

     Due to a change in personnel, Monex Credit Company finds it
necessary to change the persons authorized to sign checks for the
above account.  Effective immediately, the following will
constitute acceptable signatures:

                    Michael A. Carabini
                    Brian D. Jenkins
                    Ronald Smoler

     Please acknowledge receipt by signing and returning the
enclosed copy of this letter.

                              Very truly yours,

                              Michael A. Carabini, President
                              METCO Management Corporation
                              4910 Birch Street
                              Newport Beach, CA 92660

MAC/pac
Enclosures

Acknowledgment:

By:_____

Date:_____

f&mmetc1.ltr

**Account Agreement**

Date: _12/3/2010_

| Institution Name & Address | Internal Use |
|---|---|
| Farmers and Merchants Bank<br>302 Pine Avenue<br>Long Beach, CA 90802 | **Account Title & Address**<br><br>MONEX DEPOSIT COMPANY<br>PAYROLL ACCOUNT<br>4910 BIRCH STREET<br>NEWPORT BEACH, CA 92660 |

**IMPORTANT ACCOUNT OPENING INFORMATION:** Federal law requires us to obtain sufficient information to verify your identity. You may be asked several questions and to provide one or more forms of identification to fulfill this requirement. In some instances we may use outside sources to confirm the information. The information you provide is protected by our privacy policy and federal law.

Enter Non-Individual Owner Information on page 2. There is additional Owner/Signer Information space on page 2.

### Ownership of Account

The specified ownership will remain the same for all accounts.

☐ Individual                        ☐ Corporation - For Profit
☐ Joint Account                   ☐ Corporation - Nonprofit
☐ Joint - Husband and Wife   ☐ Partnership
(With right of survivorship)     ☐ Sole Proprietorship
☐ Community Property          ☐ Limited Liability Company
(Husband and Wife)
☐ Tenancy in Common
☐ Trust-Separate Agreement Dated: _____
☒ **LIMITED PARTNERSHIP**

### Owner/Signer Information 1

| | |
|---|---|
| Name | COMCO MANAGEMENT CORPORATION |
| Relationship | Partner |
| Address | 4910 BIRCH ST<br>NEWPORT BEACH, CA 92660-8100 |
| Mailing Address (if different) | |
| Home Phone | ▉ |
| Work Phone | ▉ |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | ▉ |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | STUDENT ID #,<br>Issued - Expires |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | ▉ |

### Beneficiary Designation

*(Check appropriate ownership above.)*

☐ Totten Trust                    ☐ Pay-on-Death (P.O.D.)
☐

### Beneficiary Name(s), Address(es), and SSN(s)

*(Check appropriate beneficiary designation above.)*

☐ If checked, this is a temporary account agreement.

Number of signatures required for withdrawal: _____.

### Signature(s)

The undersigned authorize the financial institution to investigate credit and employment history and obtain reports from consumer reporting agency(ies) on them as individuals. Except as otherwise provided by law or other documents, each of the undersigned is authorized to make withdrawals from the account(s), provided the required number of signatures indicated above is satisfied. The undersigned personally and as, or on behalf of, the account owner(s) agree to the terms of, and acknowledge receipt of copy(ies) of, this document and the following:

☒ Terms and Conditions          ☒ Privacy
☒ Electronic Fund Transfers     ☒ Truth in Savings
☐ Substitute Checks               ☒ Funds Availability
☐ Common Features               ☒ Customer Overdraft Policy

☐ Authorized Signer (See Owner/Signer Information for Authorized Signer designation(s).)

### Owner/Signer Information 2

| | |
|---|---|
| Name | LOUIS EUGENE CARABINI |
| Relationship | Ath Signer |
| Address | 4910 BIRCH ST<br>NEWPORT BEACH, CA 92660-8100 |
| Mailing Address (if different) | |
| Home Phone | ▉ |
| Work Phone | ▉ |
| Mobile Phone | ▉ |
| E-Mail | |
| Birth Date | ▉ |
| SSN/TIN | ▉ |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | STUDENT ID ▉, CA<br>Issued - Expires |
| Other ID (Description, Details) | OTHER #EXISTING ▉<br>Issued - Expires |
| Employer | MONACO FINANCIAL LLC- *Newport Service Corporation* |
| Previous Financial Inst. | ▉ |

X _(signature)_ COMCO MANAGEMENT CORPORATION    *Louis Carabini*

X _(signature)_ LOUIS EUGENE CARABINI

X _(signature)_ MICHAEL ANTHONY CAI    4 _(signature)_ KATHERINE M GERNAK

## Owner/Signer Information 3

| | |
|---|---|
| Name | MICHAEL ANTHONY CARABINI |
| Relationship | Ath Signer |
| Address | 31461 VIA SANTA MARIA SAN JUAN CAPISTRANO, CA 92675-5532 |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | C007301 |

## Non-Individual Owner Information

| | |
|---|---|
| Name | MONEX DEPOSIT COMPANY |
| EIN | |
| Phone | (949) 752-1400 |
| Mobile Phone | |
| E-Mail | |
| Type of Entity | LIMTED PARTNERSHIP |
| State/Country & Date of Organization | |
| Nature of Business | PRECIOUS METALS COMMODITIES |
| Address | 4910 BIRCH STREET NEWPORT BEACH, |
| Mailing Address (if different) | |
| Authorization/ Resolution Date | |
| Previous Financial Inst. | M007047 |

## Owner/Signer Information 4

| | |
|---|---|
| Name | KATHERINE M GERNAK |
| Relationship | Ath Signer |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | |
| Other ID (Description, Details) | Issued - Expires |
| Employer | MONEX/NEWPORT SERVICE CORPORATI |
| Previous Financial Inst. | GAA2454 |

| Account Description | Account # | Initial Deposit/Source |
|---|---|---|
| Branch Business Checking | | $ 200.00 ☒ Cash ☐ Check ☐ |
| | | $ NO DEP AMT ☐ Cash ☐ Check ☐ |
| | | $ NO DEP AMT ☐ Cash ☐ Check ☐ |

## Services Requested

☐ ATM ☐ Debit/Check Cards (No. Requested: )
☐ Online Banking ☐ Provide Name to NPO
☐ ☐

## Other Terms/Information

## Backup Withholding Certifications

(If not a "U.S. Person," certify foreign status separately.)

TIN:

☒ **Taxpayer I.D. Number (TIN)** - The number shown above is my correct taxpayer identification number.

☒ **Backup Withholding** - I am not subject to backup withholding either because I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified me that I am no longer subject to backup withholding.

☐ **Exempt Recipients** - I am an exempt recipient under the Internal Revenue Service Regulations.

I certify under penalties of perjury the statements checked in this section and that I am a U.S. person (including a U.S. resident alien).

X _____ (Date) 12/5/10

COMCO MANAGEMENT CORPORATION    LOUIS CARABINI

Signature Card-CA
Bankers Systems +
Wolters Kluwer Financial Services _ 2003, 2006

MPMP-LAZ-CA 5/2/2007
Page 2 of 2
Initials: RC1613

**Account Agreement** Date: 12/3/2010

Institution Name & Address

Farmers and Merchants Bank
302 Pine Avenue
Long Beach, CA 90802

**Internal Use**

Account Title & Address

MONEX DEPOSIT COMPANY
PAYROLL ACCOUNT
4910 BIRCH STREET
NEWPORT BEACH, CA 92660

**Ownership of Account**

The specified ownership will remain the same for all accounts.

- [ ] Individual
- [ ] Joint Account
- [ ] Joint - Husband and Wife (With right of survivorship)
- [ ] Community Property (Husband and Wife)
- [ ] Corporation - For Profit
- [ ] Corporation - Nonprofit
- [ ] Partnership
- [ ] Sole Proprietorship
- [ ] Limited Liability Company
- [ ] Tenancy in Common
- [ ] Trust-Separate Agreement Dated: _____
- [x] LIMITED PARTNERSHIP

**IMPORTANT ACCOUNT OPENING INFORMATION:** Federal law requires us to obtain sufficient information to verify your identity. You may be asked several questions and to provide one or more forms of identification to fulfill this requirement. In some instances we may use outside sources to confirm the information. The information you provide is protected by our privacy policy and federal law.

Enter Non-Individual Owner Information on page 2. There is additional Owner/Signer Information space on page 2.

**Beneficiary Designation**

(Check appropriate ownership above.)
- [ ] Totten Trust
- [ ] Pay-on-Death (P.O.D.)
- [ ]

**Beneficiary Name(s), Address(es), and SSN(s)**

(Check appropriate beneficiary designation above.)

**Owner/Signer Information 1**

| | |
|---|---|
| Name | BRIAN DANIEL JENKINS |
| Relationship | Ath Signer |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

- [ ] If checked, this is a temporary account agreement.

Number of signatures required for withdrawal: _____

**Signature(s)**

The undersigned authorize the financial institution to investigate credit and employment history and obtain reports from consumer reporting agency(ies) on them as individuals. Except as otherwise provided by law or other documents, each of the undersigned is authorized to make withdrawals from the account(s), provided the required number of signatures indicated above is satisfied. The undersigned personally and as, or on behalf of, the account owner(s) agree to the terms of, and acknowledge receipt of copy(ies) of, this document and the following:

- [x] Terms and Conditions
- [x] Electronic Fund Transfers
- [ ] Substitute Checks
- [ ] Common Features
- [x] Privacy
- [x] Truth in Savings
- [x] Funds Availability
- [x] Customer Overdraft Policy

- [ ] Authorized Signer (See Owner/Signer Information for Authorized Signer designation(s).)

[ X /s/ ] 
BRIAN DANIEL JENKINS

[ x ]

[ x ]  4[ x ]

**Owner/Signer Information 2**

| | |
|---|---|
| Name | |
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

Signature Card-CA
Bankers Systems
Wolters Kluwer Financial Services _ 2003, 2006

MPMP-LAZ-CA 5/2/2007
Page 1 of 2
Initials: RC1613

## Owner/Signer Information 3

| | |
|---|---|
| Name | |
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

## Owner/Signer Information 4

| | |
|---|---|
| Name | |
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

## Backup Withholding Certifications

*(If not a "U.S. Person," certify foreign status separately.)*

TIN: ▇▇▇▇

☒ **Taxpayer I.D. Number (TIN)** - The number shown above is my correct taxpayer identification number.

☒ **Backup Withholding** - I am not subject to backup withholding either because I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified me that I am no longer subject to backup withholding.

☐ **Exempt Recipients** - I am an exempt recipient under the Internal Revenue Service Regulations.

I certify under penalties of perjury the statements checked in this section and that I am a U.S. person (including a U.S. resident alien).

X _Taiubini_ ___ - 12/5/2010___

COMCO MANAGEMENT CORPORATION    LOUIS CARABINI    (Date)

## Non-Individual Owner Information

| | |
|---|---|
| Name | MONEX DEPOSIT COMPANY |
| EIN | ▇▇▇▇ |
| Phone | (949) 752-1400 |
| Mobile Phone | |
| E-Mail | |
| Type of Entity | LIMTED PARTNERSHIP |
| State/Country & Date of Organization | |
| Nature of Business | PRECIOUS METALS COMMODITIES |
| Address | 4910 BIRCH STREET NEWPORT BEACH, |
| Mailing Address (if different) | |
| Authorization/ Resolution Date | |
| Previous Financial Inst. | ▇▇▇▇ |

| Account Description | Account # | Initial Deposit/Source |
|---|---|---|
| Branch Business Checking | ▇▇▇▇ | $ 200.00<br>☒ Cash ☐ Check<br>☐ |
| | | $ NO DEP AMT<br>☐ Cash ☐ Check<br>☐ |
| | | $ NO DEP AMT<br>☐ Cash ☐ Check<br>☐ |

## Services Requested

☐ ATM   ☐ Debit/Check Cards (No. Requested: )
☐ Online Banking   ☐ Provide Name to NPO
☐

## Other Terms/Information

Signature Card-CA
Bankers Systems ™
Wolters Kluwer Financial Services _ 2003, 2006

MPMP-LAZ-CA  5/2/2007
Page 2 of 2
Initials: RC1613

## Partnership Resolution of Authority
### By:

Farmers & Merchants Bank
302 Pine Avenue
Long Beach, CA 90802

Referred to in this document as
"Financial Institution"

**Monex Deposit Company, a
California Limited Partnership
[DDA 01069446]**
4910 Birch Street
Newport Beach, CA 92660-8100
Referred to in this document as
"Partnership"

The above partnership consists of the following partners (or if a limited partnership, the following general partners):

Comco Management Corporation

The above-named parties represent that they constitute all of the partners of the Partnership designated above, or if a limited Partnership, constitute all of the general partners of the partnership designated above. These individuals are referred to in this document as "Partners."

**AGENTS** Any Agent listed below, subject to any written limitations, is authorized to exercise the powers granted as indicated below:

Louis E. Carabini (Name) / Authorized Signer (Title), and
Michael A. Carabini (Name) / Authorized Signer (Title), and
Brian D. Jenkins (Name) / Authorized Signer (Title), and
Ronald Smoler (Name) / Authorized Signer (Title), and
Katherine M. Gernak (Name) / Authorized Signer (Title) upon presentation of checks drawn against said account and signed as provided and certified by the Partners of this organization. The bank is further authorized to honor and pay any and all checks so signed, including those drawn to the individual order of any Partners, or other person authorized to sign the same.

**CERTIFICATION OF AUTHORITY** I further certify that the Partnership has, and at the time of adoption of this resolution had, full power and lawful authority to adopt the resolutions on page 2 and to confer the powers granted above to the person named who have full power and lawful authority to exercise the same. Signatures: (Type name of each Partner below each signature line.)

Comco Management Corporation
By Louis E. Carabini
Its President

Comco Management Corporation
By Gregory G. Walker
Its Secretary

Page 1 of 2

The Partners to the Partnership resolve, warrant and agree as follows:

(1) The Financial Institution is designated as a depository for the funds of the Partnership and to provide other financial accommodations indicated in this resolution.

(2) This resolution shall continue to have effect until express written notice of its rescission or modification has been received and recorded by the Financial Institution. Any and all prior resolutions adopted by the Partners and certified to the Financial Institution as governing the operation of this partnership's account(s), are in full force and effect, until the Financial Institution receives and acknowledges an express written notice of its revocation, modification or replacement. Any revocation, modification or replacement of a resolution must be accompanied by documentation, satisfactory to the Financial Institution, establishing the authority for the changes.

(3) The signature of an Agent on this resolution is conclusive evidence of their authority to act on behalf of the Partnership. Any Agent, so long as they act in a representative capacity as an Agent of the Partnership, is authorized to make any and all other contracts, agreements, stipulations and orders which they may deem advisable for the effective exercise of the powers indicated on page one, from time to time with the Financiall nstitution, subject to any restrictions on this resolution or otherwise agreed to in writing.

(4) All transactions, if any, with respect to any deposits, withdrawals, rediscounts and borrowings by or on behalf of the Partnership with the Financial Institution prior to the adoption of this resolution are hereby ratified, approved and confirmed.

(5) The Partners agree to the terms and conditions of any account agreement, properly opened by any Agent of the Partnership. The Partners authorize the Financial Institution, at any time, to charge the Partnership for all checks, drafts, or other orders, for the payment of money, that are drawn on the Financial Institution, so long as they contain the required number of signatures for this purpose.

(6) The Partners acknowledge and agree that the Financial Institution may furnish at its discretion automated access devices to Agents of the Partnership to facilitate those powers authorized by this resolution or other resolutions in effect at the time of issuance. The term "automated access device" includes, but is not limited to, credit cards, automated teller machines (ATM), and debit cards.

(7) The Partners acknowledge and agree that the Financial Institution may rely on alternative signature and verification codes issued to or obtained from the Agent named on this resolution. The term "alternative signature and verification codes" includes, but is not limited to, facsimile signatures on file with the Financial Institution, personal identification numbers (PIN), and digital signatures. If a facsimile signature specimen has been provided on this resolution, (or that are filed separately by the Partnership with the Financial Institution from time to time) the Financial Institution is authorized to treat the facsimile signature as the signature of the Agent(s) regardless of by whom or by what means the facsimile signature may have been affixed so long as it resembles the facsimile signature specimen on file. The Partners authorize each Agent to have custody of the Partnership's private key used to create a digital signature and to request issuance of a certificate listing the corresponding public key. The Financial
Institution shall have no responsibility or liability for unauthorized use of alternative signature and verification codes unless otherwise agreed in
writing.

(8) If any other parties become interested in the partnership as co-partners, the partnership relationship is altered in any way or if the business should become incorporated, the Partners shall promptly notify the Financial Institution.

(9) By signing this resolution, Partners represent that they have provided the Financial Institution with true and complete copies of the partnership
agreement, if any, as amended to the date of this resolution.

## Business Entity Detail

Data is updated weekly and is current as of Friday, November 26, 2010. It is not a complete or certified record of the entity.

| | |
|---|---|
| **Entity Name:** | MONEX DEPOSIT COMPANY, A CALIFORNIA LIMITED PARTNERSHIP |
| **Entity Number:** | ███████ |
| **Date Filed:** | 02/17/1987 |
| **Status:** | ACTIVE |
| **Jurisdiction:** | CALIFORNIA |
| **Entity Address:** | 4910 BIRCH STREET |
| **Entity City, State, Zip:** | NEWPORT BEACH CA 92660 |
| **Agent for Service of Process:** | LOUIS CARABINI % LAWLER, FELIX & HALL |
| **Agent Address:** | 700 S. FLOWER ST., #3100 |
| **Agent City, State, Zip:** | LOS ANGELES CA 90017 |

* Indicates the information is not contained in the California Secretary of State's database.

* **Note:** If the agent for service of process is a corporation, the address of the agent may be requested by ordering a status report.

- For information on checking or reserving a name, refer to Name Availability.
- For information on ordering certificates, copies of documents and/or status reports or to request a more extensive search, refer to Information Requests.
- For help with searching an entity name, refer to Search Tips.
- For descriptions of the various fields and status types, refer to Field Descriptions and Status Definitions.

Privacy Statement | Free Document Readers

Copyright © 2010    California Secretary of State

SUPERSEDE    FEB 28 1996

## MONEX DEPOSIT COMPANY
## CUSTOMER CASH RECEIPTS

ACCOUNT NAME

ACCOUNT NUMBER ▇▇▇▇▇

[X] CHECKING    [ ] SAVINGS    [ ] MONEY/MARKET    [ ] _____
[ ] CORPORATION   [X] PARTNERSHIP   [ ] SOLE OWNER   [ ] ASSOCIATION   [ ] _____

ADDRESS   4910 Birch Street, Newport Beach, CA 92660

Mailing Address   P.O. Box 1800, Newport Beach, CA 92660

TAXPAYER IDENTIFICATION NUMBER _____▇▇▇▇▇_____   Phone _____

[X] MAIL    [ ] HOLD all statements and other notices.
Number of signatures required to withdraw funds _____ Checks signed by *two signatures over $1,000.00*
The undersigned, doing business under the name given above,
[ ] Certifies that he is the SOLE OWNER of the above named firm.
[ ] Certify that they are owners of the above named firm as COPARTNERS and constitute all of the general partners of the partnership.
[ ] Certify that they are a corporation, association or lodge.
Under penalties of perjury, the undersigned certify (1) that the number shown on this form is the correct taxpayer identification number and (2) that this organization is not subject to backup withholding due to underreporting. We have read and agree to the terms and conditions of the agreement as set forth hereof.

| AUTHORIZED SIGNATURES | PRINTED NAME | ID NUMBER |
|---|---|---|
| 1. | Louis E. Carabini | |
| 2. | Michael A. Carabini | |
| 3. | Brian D. Jenkins | |
| 4. | Ronald Smoler | |
| 5. See Addendum, effective | 3/29/10 | |

Date Opened _____ Opened by _____ Amount _____
Date Closed _____ Closed by _____ Reason _____

## BANK — DEPOSITOR AGREEMENT

I/we enter into this bank-depositor(s) agreement with FARMERS AND MERCHANTS BANK OF LONG BEACH agreeing that:

1. This account shall be carried as indicated on the reverse side hereof. All funds on deposit shall be governed by the By-Laws, Rules and Regulations of said Bank in force from time to time, and by all practices and procedures of said Bank as to stop payments, overdrafts, dormancy, posting, interest and service charges in relation to said account. The account shall be governed by rules and regulations as contained herein.

2. Depositor(s) further agree(s) that all funds now on deposit or which hereafter may be placed on deposit shall be the property of the depositor as a Sole Owner, Partner, Corporation or other as indicated who may withdraw funds upon number of signatures indicated, except in the event of conflicting demands of the depositor, the Bank can require all signatures of the depositor(s).

3. Depositor authorizes said Bank to endorse checks, when presented for deposit to said account, if presented unendorsed.

4. Statements, return items, and notices may be mailed, unregistered, to the last address of depositor on file with this Bank and all responsibility for loss in mail is assumed by the depositor.

(FOR CORPORATION, LODGE, ASSOCIATION)

**To FARMERS AND MERCHANTS BANK OF LONG BEACH**
RESOLVED: that this organization establish in its name one or more deposit accounts with the FARMERS AND MERCHANTS BANK OF LONG BEACH upon such terms and conditions as may be agreed upon with *of the General Partner, COMCO (Title) of the organization be and they are hereby

said Bank and that the *President (Title) and *Secretary (Title) of the organization be and they are hereby authorized to establish such an account.

Louis E. Carabini or Michael A. Carabini
and Brian D. Jenkins or Ronald Smoler
and _____ or _____

of this organization be and they are hereby authorized to withdraw funds of this organization from the said account upon checks of this organization signed as provided herein with signatures duly certified to said Bank by the Secretary of this organization and said Bank is hereby authorized to honor and pay any and all checks so signed, including those drawn to the individual order of any officer or other person authorized to sign the same. Monex We hereby certify that the foregoing is a full, true and correct copy of the Resolution adopted by the Board of Directors of the

Deposit Co., at a meeting of said Board regularly held on the 30th day of November 19 95 and that the signatures appearing on the reverse side of this card are the signatures of the persons duly authorized to withdraw funds of said organization from said Bank in accordance with the above resolution.

(SEAL)

President _____

Secretary _____

We hereby certify the foregoing to be correct. (FOR LODGE, ASSOCIATION)

Retiring Officers (Titles) 1. _____

Addendum to agreeemnt dated 2/28/96, effective 3/29/10

## BUSINESS ACCOUNT: FOR BANK USE ONLY

Account Name(s): Monex Deposit Company          Cost Cash Receipt

Account Number: ▮▮▮▮▮        Date Opened: 06/23/87        Source of Deposit/Amount:_____

Opening Employee: Debbie Buchanan _____ Chex Systems: ☒ Yes  ☐ No

Waiver Reason & Authorization:_____

Contact Person & Phone:_____

Anticipated Monthly Deposits/Withdrawals  $_____          $_____

| Type of Account: | Applying as a/an: | Interest Payment (Time Deposit Only): | |
|---|---|---|---|
| Business Checking | ☐ Sole Owner | Payment Intervals: | Payment Methods |
| | ☐ Partnership | ☐ Monthly | ☐ Compound |
| Primary CIF number:  M007047 | ☒ Corporation | ☐ Quarterly | ☐ Issue Check |
| | ☐ Other _____ | ☐ At Maturity | ☐ Credit Account |

This is your: ☒ Permanent  ☐ Temporary Account Agreement          Account Type/ #:_____

Account Name: Monex Deposit Company          Tax I.D. Number: ▮▮▮▮

Street Address: 4910 Birch Street     Newport Beach CA 92660     Phone Number: ▮▮▮▮

Alternate Address:_____          FAX Number:_____

SPECIAL HANDLING REQUESTS: ☒ MAIL  ☐ HOLD all statements and other notices.     Facsimile Signature ☐

SIGNATURE RESTRICTIONS: Number of signatures to withdraw funds ☒  2  Circumstances: for $1,000 and over

OVERDRAFT PROTECTION: I/we ☐ do ☒ do not authorize F&M Bank to transfer funds automatically from THIS PRIMARY Account Number

_____ and or my (our) F&M Bankcard Number _____ to my Secondary Account.

Customer's Initials: _____

| 1st Signer Information: | Katherine          M          Gernak | | ▮▮▮▮ |
|---|---|---|---|
| Existing Customer ☐ | First Name & Middle Initial | Last Name | Home Phone Number |
| Customer Initials KMG | | | ▮▮▮▮ |
| GAA2454 | Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |
| | November 18, 1958 | | |
| | Date of Birth | Cell Phone | |

| 2nd Signer Information: | | | |
|---|---|---|---|
| Existing Customer ☐ | First Name & Middle Initial | Last Name | Home Phone Number |
| | /     / | | |
| Customer Initials _____ | Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |
| | Date of Birth | Cell Phone | |

Add this customer to account ☐ Yes ☐ No  Relationship _____    Add customer to account title ☐ Yes ☐ No

| 3rd Signer Information: | | | |
|---|---|---|---|
| | First Name & Middle Initial | Last Name | Home Phone Number |
| Existing Customer ☐ | /     / | | |
| Customer Initials _____ | Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |
| | Date of Birth | Cell Phone | |

Add this customer to account ☐ Yes ☐ No  Relationship _____    Add customer to account title ☐ Yes ☐ No

## OFFICIAL SIGNATURES

The undersigned agree to the terms stated on every page of this form and acknowledge receipt of a completed copy. The undersigned further authorize the financial institution from time to time to verify credit and employment history and/or have a credit reporting agency prepare a credit report on the undersigned, as individuals. The undersigned also acknowledge the receipt of a copy and agree to the terms of the following disclosure(s):

☒ Deposit Account - T & C      ☒ Funds Availability      ☒ Privacy
☒ Electronic Funds Transfer    ☒ Truth in Savings
☐

| Katherine M Gernak | 2. | 3. |
|---|---|---|

JHA FMBCA03 04/09
PAGE 1 OF 3

**4th Signer Information:**

Existing Customer ☐

Customer Initials _____

| First Name & Middle Initial | Last Name | Home Phone Number |
| Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |
| Date of Birth | Cell Phone | |

Add this customer to account ☐ Yes ☐ No    Relationship _____    Add customer to account title ☐ Yes ☐ No

**5th Signer Information:**

Existing Customer ☐

Customer Initials _____

| First Name & Middle Initial | Last Name | Home Phone Number |
| Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |
| Date of Birth | Cell Phone | |

Add this customer to account ☐ Yes ☐ No    Relationship _____    Add customer to account title ☐ Yes ☐ No

**6th Signer Information:**

Existing Customer ☐

Customer Initials _____

| First Name & Middle Initial | Last Name | Home Phone Number |
| Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |
| Date of Birth | Cell Phone | |

Add this customer to account ☐ Yes ☐ No    Relationship _____    Add customer to account title ☐ Yes ☐ No

**OFFICIAL SIGNATURES**

The undersigned agree to the terms stated on every page of this form and acknowledge receipt of a completed copy. The undersigned further authorize the financial institution from time to time to verify credit and employment history and/or have a credit reporting agency prepare a credit report on the undersigned, as individuals. The undersigned also acknowledge the receipt of a copy and agree to the terms of the following disclosure(s):

☒ Deposit Account - T & C      ☒ Funds Availability          ☒ Privacy
☒ Electronic Funds Transfer    ☒ Truth in Savings
☐ _____

| 4. | 5. | 6. |
|----|----|----|
|    |    |    |

## CORPORATE RESOLUTION
### (for all Corporations, Associations, and Lodges)

To FARMERS & MERCHANTS BANK OF LONG BEACH:
RESOLVED: That this organization establish in its name one or more deposit accounts with the FARMERS & MERCHANTS BANK OF LONG BEACH upon such terms and conditions as agreed upon with the bank and furthermore that

_____ (Name) acting as the _____ (Title) and

_____ (Name) acting as the _____ (Title) of
this organization are authorized to establish such an account on behalf of this organization. Officers authorized to withdraw the funds of this

organization from said account are: _____ (Name) / _____ (Title), and

_____ (Name) / _____ (Title), and

_____ (Name) / _____ (Title) upon presentation of checks drawn
against said account and signed as provided and certified by the Secretary of this organization. The bank is further authorized to honor and pay any and all checks so signed, including those drawn to the individual order of any officer or other person authorized to sign the same.

We certify that the foregoing is a full, true, and correct copy of the Resolution adopted by the Board of Directors of the _____
Monex Deposit Company                                                                                      (Organization Name)
at a meeting of said Board held on the _____ day of _____ (Month & Year) and that the signatures provided with the Bank Depositor Agreement are the signatures of the persons duly authorized to withdraw funds of this organization from Farmers & Merchants Bank of Long Beach in accordance with the above resolution.

President: _____      Secretary: _____

## BACKUP WITHHOLDING CERTIFICATIONS

Check the appropriate box:

☐ Individual/Sole Proprietor

☐ Corporation

☐ Partnership

☐ L.L.C. Enter the tax clasification (D = disregarded entity, C = corporation, P = partnership) _____

☐ Unincorporated Association

☐ Other _____

Check the following box if true:

☐ Exempt payee

Taxpayer Identification Number: _____

Under penalties of perjury, I certify that:

(1) The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

(2) I am not subject to backup withholding either because: (1) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the Internal Revenue Service has notified me that I am no longer subject to backup withholding, and

(3) I am a U.S. person (including a U.S. resident alien).

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate trans- actions item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN.

X _____
                                          Date

**ONLINE BANKING ONLY:** I/we acknowledge receipt of a copy and agree to the terms of the Online Banking Disclosure.

Customer Initials: _____     Customer Initials: _____     Customer Initials: _____

**SPECIAL PROMOTION:** I ☐ do or ☐ do not request Farmers & Merchants Bank to provide my name to _____ as notification that I have opened an account as part of special promotion in their benefit.

Customer Signature: _____

| Bank use only: Superseded Card | | |
|---|---|---|
| Accepting Employee: _____ | Branch: _____ | Date: _____ |

## Partnership Resolution of Authority
### By:

Farmers & Merchants Bank
302 Pine Avenue
Long Beach, CA 90802

Referred to in this document as
"Financial Institution"

**Monex Deposit Company, a
California Limited Partnership
[DDA 01069446]**
4910 Birch Street
Newport Beach, CA 92660-8100
Referred to in this document as
"Partnership"

The above partnership consists of the following partners (or if a limited partnership, the following general partners):

Comco Management Corporation

The above-named parties represent that they constitute all of the partners of the Partnership designated above, or if a limited Partnership, constitute all of the general partners of the partnership designated above. These individuals are referred to in this document as "Partners."

AGENTS  Any Agent listed below, subject to any written limitations, is authorized to exercise the powers granted as indicated below:

Louis E. Carabini (Name) / Authorized Signer (Title), and
Michael A. Carabini (Name) / Authorized Signer (Title), and
Brian D. Jenkins (Name) / Authorized Signer (Title), and
Ronald Smoler (Name) / Authorized Signer (Title),  and
Katherine M. Gernak (Name) / Authorized Signer (Title) upon presentation of checks drawn against said account and signed as provided and certified by the Partners of this organization. The bank is further authorized to honor and pay any and all checks so signed, including those drawn to the individual order of any Partners, or other person authorized to sign the same.

**CERTIFICATION OF AUTHORITY** I further certify that the Partnership has, and at the time of adoption of this resolution had, full power and lawful authority to adopt the resolutions on page 2 and to confer the powers granted above to the person named who have full power and lawful authority to exercise the same. Signatures: (Type name of each Partner below each signature line.)

Comco Management Corporation
By Louis E. Carabini
Its President

Comco Management Corporation
By Gregory G. Walker
Its Secretary

The Partners to the Partnership resolve, warrant and agree as follows:

(1) The Financial Institution is designated as a depository for the funds of the Partnership and to provide other financial accommodations indicated in this resolution.

(2) This resolution shall continue to have effect until express written notice of its rescission or modification has been received and recorded by the Financial Institution. Any and all prior resolutions adopted by the Partners and certified to the Financial Institution as governing the operation of this partnership's account(s), are in full force and effect, until the Financial Institution receives and acknowledges an express written notice of its revocation, modification or replacement. Any revocation, modification or replacement of a resolution must be accompanied by documentation, satisfactory to the Financial Institution, establishing the authority for the changes.

(3) The signature of an Agent on this resolution is conclusive evidence of their authority to act on behalf of the Partnership. Any Agent, so long as they act in a representative capacity as an Agent of the Partnership, is authorized to make any and all other contracts, agreements, stipulations and orders which they may deem advisable for the effective exercise of the powers indicated on page one, from time to time with the Financiall nstitution, subject to any restrictions on this resolution or otherwise agreed to in writing.

(4) All transactions, if any, with respect to any deposits, withdrawals, rediscounts and borrowings by or on behalf of the Partnership with the Financial Institution prior to the adoption of this resolution are hereby ratified, approved and confirmed.

(5) The Partners agree to the terms and conditions of any account agreement, properly opened by any Agent of the Partnership. The Partners authorize the Financial Institution, at any time, to charge the Partnership for all checks, drafts, or other orders, for the payment of money, that are drawn on the Financial Institution, so long as they contain the required number of signatures for this purpose.

(6) The Partners acknowledge and agree that the Financial Institution may furnish at its discretion automated access devices to Agents of the Partnership to facilitate those powers authorized by this resolution or other resolutions in effect at the time of issuance. The term "automated access device" includes, but is not limited to, credit cards, automated teller machines (ATM), and debit cards.

(7) The Partners acknowledge and agree that the Financial Institution may rely on alternative signature and verification codes issued to or obtained from the Agent named on this resolution. The term "alternative signature and verification codes" includes, but is not limited to, facsimile signatures on file with the Financial Institution, personal identification numbers (PIN), and digital signatures. If a facsimile signature specimen has been provided on this resolution, (or that are filed separately by the Partnership with the Financial Institution from time to time) the Financial Institution is authorized to treat the facsimile signature as the signature of the Agent(s) regardless of by whom or by what means the facsimile signature may have been affixed so long as it resembles the facsimile signature specimen on file. The Partners authorize each Agent to have custody of the Partnership's private key used to create a digital signature and to request issuance of a certificate listing the corresponding public key. The Financial Institution shall have no responsibility or liability for unauthorized use of alternative signature and verification codes unless otherwise agreed in writing.

(8) If any other parties become interested in the partnership as co-partners, the partnership relationship is altered in any way or if the business should become incorporated, the Partners shall promptly notify the Financial Institution.

(9) By signing this resolution, Partners represent that they have provided the Financial Institution with true and complete copies of the partnership agreement, if any, as amended to the date of this resolution.

February 15, 1996

Mr. John Hinrichs
Farmers and Merchants Bank
302 Pine Avenue
Long Beach, California 90802

Re:  Monex Deposit Company
     Account No. ███████████  Receipts

Dear Mr. Hinrichs:

     Due to a change in personnel, Monex Deposit Company finds it
necessary to change the persons authorized to sign checks for the
above account.  Effective immediately, the following will
constitute acceptable signatures:

                    Louis E. Carabini
                    Michael A. Carabini
                    Brian D. Jenkins
                    Ronald Smoler

     Please acknowledge receipt by signing and returning the
enclosed copy of this letter.

                         Very truly yours,

                         Louis E. Carabini, President
                         COMCO Management Corporation
                         4910 Birch Street
                         Newport Beach, CA 92660

MAC/pac
Enclosures

Acknowledgment:

By:

Date:  2-27-96


f&mcomc4.ltr

MONEX DEPOSIT COMPANY

| ACCOUNT NAME | OPERATING ACCOUNT | | ACCOUNT NUMBER | ███████ |

☒ CHECKING    ☐ SAVINGS    ☐ MONEY MARKET    ☐ _____
☐ CORPORATION    ☒ PARTNERSHIP    ☐ SOLE OWNER    ☐ ASSOCIATION    ☐ _____

ADDRESS _____ 4910 Birch Street, Newport Beach, CA 92660

Mailing Address ____ Same

TAXPAYER IDENTIFICATION NUMBER ____ ███████ ____ Phone ███████

☒ MAIL    ☐ HOLD all statements and other notices.
Number of signatures required to withdraw funds ____ Checks signed by 2. sig over $1,000.00
The undersigned, doing business under the name given above,
☐ Certifies that he is the SOLE OWNER of the above named firm.
☐ Certify that they are owners of the above named firm as COPARTNERS and constitute all of the general partners of the partnership.
☐ Certify that they are a corporation, association or lodge.
Under penalties of perjury, the undersigned certify (1) that the number shown on this form is the correct taxpayer identification number and (2) that this organization is not subject to backup withholding due to underreporting. We have read and agree to the terms and conditions of the agreement as set forth hereof.

| AUTHORIZED SIGNATURES | PRINTED NAME | ID NUMBER |
|---|---|---|
| 1. | Louis E. Carabini | |
| 2. | Michael A. Carabini | |
| 3. | William A. Nelles | |
| 4. | Brian D. Jenkins | |
| 5. See Addendum, effective | 3/29/10 | |

Date Opened _____ Opened by _____ Amount _____
Date Closed _____ Closed by _____ Reason _____

**BANK — DEPOSITOR AGREEMENT**

I; we enter into this bank-depositor(s) agreement with FARMERS AND MERCHANTS BANK OF LONG BEACH agreeing that:
1. This account shall be carried as indicated on the reverse side hereof. All funds on deposit shall be governed by the By-Laws, Rules and Regulations of said Bank in force from time to time, and by all practices and procedures of said Bank as to stop payments, overdrafts, dormancy, posting, interest and service charges in relation to said account. The account shall be governed by rules and regulations as contained herein.
2. Depositor(s) further agree(s) that all funds now on deposit or which hereafter may be placed on deposit shall be the property of the depositor as a Sole Owner, Partner, Corporation or other as indicated who may withdraw funds upon number of signatures indicated, except in the event of conflicting demands of the depositor, the Bank can require all signatures of the depositor(s).
3. Depositor authorizes said Bank to endorse checks, when presented for deposit to said account, if presented unendorsed.
4. Statements, return items, and notices may be mailed, unregistered, to the last address of depositor on file with this Bank and all responsibility for loss in mail is assumed by the depositor.

(FOR CORPORATION, LODGE, ASSOCIATION)

**To FARMERS AND MERCHANTS BANK OF LONG BEACH**
RESOLVED; that this organization establish in its name one or more deposit accounts with the FARMERS AND MERCHANTS BANK OF LONG BEACH upon such terms and conditions as may be agreed upon with **\*of the General Partner, COMCO**

said Bank and that the **\*President** (Title) and **\*Secretary** (Title) of the organization be and they are hereby authorized to establish such an account.

   **Louis E. Carabini** of **Michael A. Carabini**

and **William A. Nelles** of **Brian D. Jenkins**

and _____ of _____
of this organization be and they are hereby authorized to withdraw funds of this organization from the said account upon checks of this organization signed as provided herein with signatures duly certified to said Bank by the Secretary of this organization and said Bank is hereby authorized to honor and pay any and all checks so signed, including those drawn to the individual order of any officer or other person authorized to sign the same. **Monex**
We hereby certify that the foregoing is a full, true and correct copy of the Resolution adopted by the Board of Directors of the same

**Deposit Company** at a meeting of said Board regularly held on the **30th** day of **November** 19 **95**
and that the signatures appearing on the reverse side of this card are the signatures of the persons duly authorized to withdraw funds of said organization from said Bank in accordance with the above resolution.

(SEAL) President _____

Secretary _____

We hereby certify the foregoing to be correct. (FOR LODGE, ASSOCIATION)

Retiring Officers (Titles) 1. _____ 2. _____

Addendum to agreement dated 2/28/96, effective 3/29/10

# BUSINESS ACCOUNT: FOR BANK USE ONLY

Account Name(s): **Monex Deposit Company**          **Operating Account**

Account Number: _____ Date Opened: **01/31/94**    Source of Deposit/Amount: _____

Opening Employee: **Debbie Buchanan** _____ Chex Systems: ☒ Yes ☐ No

Waiver Reason & Authorization: _____

Contact Person & Phone: _____

Anticipated Monthly Deposits/Withdrawals $ _____ $ _____

| Type of Account: | Applying as a/an: | Interest Payment (Time Deposit Only): |
|---|---|---|
| **Business Checking** | ☐ Sole Owner | Payment Intervals:   Payment Methods |
| | ☐ Partnership | ☐ Monthly   ☐ Compound |
| **Primary CIF number:** ▮▮▮ | ☒ Corporation | ☐ Quarterly   ☐ Issue Check |
| | ☐ Other _____ | ☐ At Maturity   ☐ Credit Account |

This is your: ☒ Permanent  ☐ Temporary Account Agreement        Account Type/ #: _____

Account Name: **Monex Deposit Company** _____ Tax I.D. Number: ▮▮▮

Street Address: **4910 Birch Street      Newport Beach CA 92660**   Phone Number: ▮▮▮

Alternate Address: _____ FAX Number: _____

SPECIAL HANDLING REQUESTS: ☒ MAIL  ☐ HOLD all statements and other notices.    Facsimile Signature ☐

SIGNATURE RESTRICTIONS: Number of signatures to withdraw funds **X   2** Circumstances: **for $1,000 and over**

OVERDRAFT PROTECTION: I/we ☐ do ☒ do not authorize F&M Bank to transfer funds automatically from THIS PRIMARY Account Number

_____ and or my (our) F&M Bankcard Number _____ to my Secondary Account.

Customer's Initials: _____

| 1st Signer Information: | Katherine        M    Gernak | |
|---|---|---|
| Existing Customer ☐ | First Name & Middle Initial       Last Name | ▮▮▮ |
| Customer Initials *KMG* | Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |
| **GAA2454** | **November 18, 1958** | | |
| | Date of Birth | Cell Phone | |

| 2nd Signer Information: | | |
|---|---|---|
| Existing Customer ☐ | First Name & Middle Initial       Last Name | Home Phone Number |
| Customer Initials _____ | Height/Eye Color/Hair Color       /     / | Identification Type & Number | Social Security Number |
| | Date of Birth | Cell Phone | |

Add this customer to account ☐ Yes ☐ No  Relationship _____   Add customer to account title ☐ Yes ☐ No

| 3rd Signer Information: | | |
|---|---|---|
| Existing Customer ☐ | First Name & Middle Initial       Last Name | Home Phone Number |
| Customer Initials _____ | Height/Eye Color/Hair Color       /     / | Identification Type & Number | Social Security Number |
| | Date of Birth | Cell Phone | |

Add this customer to account ☐ Yes ☐ No  Relationship _____   Add customer to account title ☐ Yes ☐ No

## OFFICIAL SIGNATURES

The undersigned agree to the terms stated on every page of this form and acknowledge receipt of a completed copy. The undersigned further authorize the financial institution from time to time to verify credit and employment history and/or have a credit reporting agency prepare a credit report on the undersigned, as individuals. The undersigned also acknowledge the receipt of a copy and agree to the terms of the following disclosure(s):

☒ Deposit Account - T & C     ☒ Funds Availability     ☒ Privacy
☒ Electronic Funds Transfer   ☒ Truth in Savings
☐

| 1. *Katherine M Gernak* | 2. | 3. |
|---|---|---|

JHA FMSCA03 04/09
PAGE 1 OF 3

**4th Signer Information:**

| | First Name & Middle Initial | Last Name | Home Phone Number |

Existing Customer ☐

/ /

Customer Initials _____   Height/Eye Color/Hair Color    Identification Type & Number    Social Security Number

Date of Birth    Cell Phone

Add this customer to account ☐ Yes ☐ No   Relationship _____    Add customer to account title ☐ Yes ☐ No

**5th Signer Information:**

First Name & Middle Initial    Last Name    Home Phone Number

Existing Customer ☐

Customer Initials _____   Height/Eye Color/Hair Color    Identification Type & Number    Social Security Number

Date of Birth    Cell Phone

Add this customer to account ☐ Yes ☐ No   Relationship _____    Add customer to account title ☐ Yes ☐ No

**6th Signer Information:**

First Name & Middle Initial    Last Name    Home Phone Number

Existing Customer ☐

/ /

Customer Initials _____   Height/Eye Color/Hair Color    Identification Type & Number    Social Security Number

Date of Birth    Cell Phone

Add this customer to account ☐ Yes ☐ No   Relationship _____    Add customer to account title ☐ Yes ☐ No

## OFFICIAL SIGNATURES

The undersigned agree to the terms stated on every page of this form and acknowledge receipt of a completed copy. The undersigned further authorize the financial institution from time to time to verify credit and employment history and/or have a credit reporting agency prepare a credit report on the undersigned, as individuals. The undersigned also acknowledge the receipt of a copy and agree to the terms of the following disclosure(s):

☒ Deposit Account - T & C    ☒ Funds Availability    ☒ Privacy
☒ Electronic Funds Transfer    ☒ Truth in Savings
☐ _____

| 4. | 5. | 6. |
|---|---|---|
| | | |

## CORPORATE RESOLUTION
### (for all Corporations, Associations, and Lodges)

To FARMERS & MERCHANTS BANK OF LONG BEACH:

RESOLVED: That this organization establish in its name one or more deposit accounts with the FARMERS & MERCHANTS BANK OF LONG BEACH upon such terms and conditions as agreed upon with the bank and furthermore that

_____ (Name) acting as the _____ (Title) and

_____ (Name) acting as the _____ (Title) of

this organization are authorized to establish such an account on behalf of this organization. Officers authorized to withdraw the funds of this

organization from said account are: _____ (Name) / _____ (Title), and

_____ (Name) / _____ (Title), and

_____ (Name) / _____ (Title) upon presentation of checks drawn

against said account and signed as provided and certified by the Secretary of this organization. The bank is further authorized to honor and pay any and all checks so signed, including those drawn to the individual order of any officer or other person authorized to sign the same.

We certify that the foregoing is a full, true, and correct copy of the Resolution adopted by the Board of Directors of the _____

__Monex Deposit Company__ (Organization Name)

at a meeting of said Board held on the _____ day of _____ (Month & Year) and that the signatures provided with the Bank Depositor Agreement are the signatures of the persons duly authorized to withdraw funds of this organization from Farmers & Merchants Bank of Long Beach in accordance with the above resolution.

President: _____    Secretary: _____

## BACKUP WITHHOLDING CERTIFICATIONS

Check the appropriate box:

☐ Individual/Sole Proprietor

☐ Corporation

☐ Partnership

☐ L.L.C.  Enter the tax clasification (D = disregarded entity, C = corporation, P = partnership) _____

☐ Unincorporated Association

☐ Other ____

Check the following box if true:

☐ Exempt payee

Taxpayer Identification Number: _____

Under penalties of perjury, I certify that:

(1)  The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

(2)  I am not subject to backup withholding either because: (1) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the Internal Revenue Service has notified me that I am no longer subject to backup withholding, and

(3)  I am a U.S. person (including a U.S. resident alien).

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN.

X _____
                                                    Date

**ONLINE BANKING ONLY:**  I/we acknowledge receipt of a copy and agree to the terms of the Online Banking Disclosure.

Customer Initials: _____      Customer Initials: _____      Customer Initials: _____

**SPECIAL PROMOTION:** I ☐ do or ☐ do not request Farmers & Merchants Bank to provide my name to _____ as notification that I have opened an account as part of special promotion in their benefit.

Customer Signature: _____

| Bank use only:  Superseded Card | | |
| --- | --- | --- |
| Accepting Employee: _____ | Branch: _____ | Date: _____ |

**Partnership Resolution of Authority**
By:

| | |
|---|---|
| Farmers & Merchants Bank<br>302 Pine Avenue<br>Long Beach, CA 90802 | **Monex Deposit Company, a**<br>**California Limited Partnership**<br>**[DDA 01069470]**<br>4910 Birch Street<br>Newport Beach, CA 92660-8100 |
| Referred to in this document as<br>"Financial Institution" | Referred to in this document as<br>"Partnership" |

The above partnership consists of the following partners (or if a limited partnership, the following general partners):

Comco Management Corporation

The above-named parties represent that they constitute all of the partners of the Partnership designated above, or if a limited Partnership, constitute all of the general partners of the partnership designated above. These individuals are referred to in this document as "Partners."

AGENTS Any Agent listed below, subject to any written limitations, is authorized to exercise the powers granted as indicated below:

Louis E. Carabini (Name) / Authorized Signer (Title), and
Michael A. Carabini (Name) / Authorized Signer (Title), and
Brian D. Jenkins (Name) / Authorized Signer (Title), and
Katherine M. Gernak (Name) / Authorized Signer (Title) upon presentation of checks drawn against said account and signed as provided and certified by the Partners of this organization. The bank is further authorized to honor and pay any and all checks so signed, including those drawn to the individual order of any Partners, or other person authorized to sign the same.

**CERTIFICATION OF AUTHORITY** I further certify that the Partnership has, and at the time of adoption of this resolution had, full power and lawful authority to adopt the resolutions on page 2 and to confer the powers granted above to the person named who have full power and lawful authority to exercise the same. Signatures: (Type name of each Partner below each signature line.)

Comco Management Corporation
By Louis E. Carabini
Its President

Comco Management Corporation
By Gregory G. Walker
Its Secretary

The Partners to the Partnership resolve, warrant and agree as follows:

(1) The Financial Institution is designated as a depository for the funds of the Partnership and to provide other financial accommodations indicated in this resolution.

(2) This resolution shall continue to have effect until express written notice of its rescission or modification has been received and recorded by the Financial Institution. Any and all prior resolutions adopted by the Partners and certified to the Financial Institution as governing the operation of this partnership's account(s), are in full force and effect, until the Financial Institution receives and acknowledges an express written notice of its revocation, modification or replacement. Any revocation, modification or replacement of a resolution must be accompanied by documentation, satisfactory to the Financial Institution, establishing the authority for the changes.

(3) The signature of an Agent on this resolution is conclusive evidence of their authority to act on behalf of the Partnership. Any Agent, so long as they act in a representative capacity as an Agent of the Partnership, is authorized to make any and all other contracts, agreements, stipulations and orders which they may deem advisable for the effective exercise of the powers indicated on page one, from time to time with the Financiall nstitution, subject to any restrictions on this resolution or otherwise agreed to in writing.

(4) All transactions, if any, with respect to any deposits, withdrawals, rediscounts and borrowings by or on behalf of the Partnership with the Financial Institution prior to the adoption of this resolution are hereby ratified, approved and confirmed.

(5) The Partners agree to the terms and conditions of any account agreement, properly opened by any Agent of the Partnership. The Partners authorize the Financial Institution, at any time, to charge the Partnership for all checks, drafts, or other orders, for the payment of money, that are drawn on the Financial Institution, so long as they contain the required number of signatures for this purpose.

(6) The Partners acknowledge and agree that the Financial Institution may furnish at its discretion automated access devices to Agents of the Partnership to facilitate those powers authorized by this resolution or other resolutions in effect at the time of issuance. The term "automated access device" includes, but is not limited to, credit cards, automated teller machines (ATM), and debit cards.

(7) The Partners acknowledge and agree that the Financial Institution may rely on alternative signature and verification codes issued to or obtained from the Agent named on this resolution. The term "alternative signature and verification codes" includes, but is not limited to, facsimile signatures on file with the Financial Institution, personal identification numbers (PIN), and digital signatures. If a facsimile signature specimen has been provided on this resolution, (or that are filed separately by the Partnership with the Financial Institution from time to time) the Financial Institution is authorized to treat the facsimile signature as the signature of the Agent(s) regardless of by whom or by what means the facsimile signature may have been affixed so long as it resembles the facsimile signature specimen on file. The Partners authorize each Agent to have custody of the Partnership's private key used to create a digital signature and to request issuance of a certificate listing the corresponding public key. The Financial
Institution shall have no responsibility or liability for unauthorized use of alternative signature and verification codes unless otherwise agreed in
writing.

(8) If any other parties become interested in the partnership as co-partners, the partnership relationship is altered in any way or if the business should become incorporated, the Partners shall promptly notify the Financial Institution.

(9) By signing this resolution, Partners represent that they have provided the Financial Institution with true and complete copies of the partnership
agreement, if any, as amended to the date of this resolution.

Addendum to agreement dated 5/25/93, effective 3/29/10

# BU⬤ESS ACCOUNT: FOR BANK USE⬤NLY

Account Name(s): __Metco Management Corporation__

Account Number: _____ Date Opened: _05/14/87_ Source of Deposit/Amount: _____

Opening Employee: __Debbie Buchanan__ _____ Chex Systems: ☒ Yes ☐ No

Waiver Reason & Authorization: _____

Contact Person & Phone: _____

Anticipated Monthly Deposits/Withdrawals $ _____ $ _____

| Type of Account: | Applying as a/an: | Interest Payment (Time Deposit Only): |
|---|---|---|
| Business Checking | ☐ Sole Owner | Payment Intervals: Payment Methods |
| | ☐ Partnership | ☐ Monthly ☐ Compound |
| Primary CIF number: | ☒ Corporation | ☐ Quarterly ☐ Issue Check |
| | ☐ Other _____ | ☐ At Maturity ☐ Credit Account |

This is your: ☒ Permanent ☐ Temporary Account Agreement     Account Type/ #: _____ _____

Account Name: __Metco Management Corporation__     Tax I.D. Number: _____

Street Address: __4910 Birch St__     __Newport Beach CA 92660__     Phone Number: _____

Alternate Address: _____     FAX Number: _____

**SPECIAL HANDLING REQUESTS:** ☒ MAIL ☐ HOLD all statements and other notices.     Facsimile Signature ☐

SIGNATURE RESTRICTIONS: Number of signatures to withdraw funds _1_ _Circumstances: _____

OVERDRAFT PROTECTION: I/we ☐ do ☒ do not authorize F&M Bank to transfer funds automatically from THIS PRIMARY Account Number

_____ and or my (our) F&M Bankcard Number _____ to my Secondary Account.

Customer's Initials: _____

| 1st Signer Information: | Katherine | M | Gernak | |
|---|---|---|---|---|
| | First Name & Middle Initial | | Last Name | Hor |
| Existing Customer ☐ | | | CA   A6851657 | 5 |
| Customer Initials | Height/Eye Color/Hair Color | | Identification Type & Number | Social Security Number |
| GAA2454 | Date of Birth | | Cell Phone | |

| 2nd Signer Information: | | | | |
|---|---|---|---|---|
| | First Name & Middle Initial | | Last Name | Home Phone Number |
| Existing Customer ☐ | / / | | | |
| Customer Initials _____ | Height/Eye Color/Hair Color | | Identification Type & Number | Social Security Number |
| | Date of Birth | | Cell Phone | |

Add this customer to account ☐ Yes ☐ No   Relationship _____   Add customer to account title ☐ Yes ☐ No

| 3rd Signer Information: | | | | |
|---|---|---|---|---|
| | First Name & Middle Initial | | Last Name | Home Phone Number |
| Existing Customer ☐ | / / | | | |
| Customer Initials _____ | Height/Eye Color/Hair Color | | Identification Type & Number | Social Security Number |
| | Date of Birth | | Cell Phone | |

Add this customer to account ☐ Yes ☐ No   Relationship _____   Add customer to account title ☐ Yes ☐ No

**OFFICIAL SIGNATURES**

The undersigned agree to the terms stated on every page of this form and acknowledge receipt of a completed copy. The undersigned further authorize the financial institution from time to time to verify credit and employment history and/or have a credit reporting agency prepare a credit report on the undersigned, as individuals. The undersigned also acknowledge the receipt of a copy and agree to the terms of the following disclosure(s):

☒ Deposit Account - T & C     ☒ Funds Availability     ☒ Privacy
☒ Electronic Funds Transfer     ☒ Truth in Savings
☐ _____

1. Katherine M Gernak     2. _____     3. _____

**4th Signer Information:**

Existing Customer ☐

Customer Initials _____

| First Name & Middle Initial | Last Name | Home Phone Number |

| Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |

| Date of Birth | Cell Phone |

Add this customer to account ☐ Yes ☐ No    Relationship _____    Add customer to account title ☐ Yes ☐ No

**5th Signer Information:**

Existing Customer ☐

Customer Initials _____

| First Name & Middle Initial | Last Name | Home Phone Number |

| Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |

| Date of Birth | Cell Phone |

Add this customer to account ☐ Yes ☐ No    Relationship _____    Add customer to account title ☐ Yes ☐ No

**6th Signer Information:**

Existing Customer ☐

Customer Initials _____

| First Name & Middle Initial | Last Name | Home Phone Number |

| Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |

| Date of Birth | Cell Phone |

Add this customer to account ☐ Yes ☐ No    Relationship _____    Add customer to account title ☐ Yes ☐ No

**OFFICIAL SIGNATURES**

The undersigned agree to the terms stated on every page of this form and acknowledge receipt of a completed copy. The undersigned further authorize the financial institution from time to time to verify credit and employment history and/or have a credit reporting agency prepare a credit report on the undersigned, as individuals. The undersigned also acknowledge the receipt of a copy and agree to the terms of the following disclosure(s):

☒ Deposit Account - T & C          ☒          Funds Availability          ☒          Privacy
☒ Electronic Funds Transfer        ☒ Truth in Savings
☐ _____

| 4. | 5. | 6. |
|---|---|---|
| | | |

**CORPORATE RESOLUTION**
(for all Corporations, Associations, and Lodges)

To FARMERS & MERCHANTS BANK OF LONG BEACH:
RESOLVED: That this organization establish inits name one or more deposit accounts with the FARMERS & MERCHANTS BANK OF LONG BEACH upon such terms and conditions as agreed upon with the bank and furthermore that

_____ (Name) acting as the _____ (Title) and

_____ (Name) acting as the _____ (Title) of
this organization are authorized to establish such an account on behalf of this organization. Officers authorized to withdraw the funds of this

organization from said account are: _____ (Name) / _____ (Title), and

_____ (Name) / _____ (Title), and

_____ (Name) / _____ (Title) upon presentation of checks drawn
against said account and signed as provided and certified by the Secretary of this organization. The bank is further authorized to honor and pay any and all checks so signed, including those drawn to the individual order of any officer or other person authorized to sign the same.

We certify that the foregoing is a full, true, and correct copy of the Resolution adopted by the Board of Directors of the _____
_Metco Management Corporation_                                                                                    (Organization Name)
at a meeting of said Board held on the _____ day of _____ (Month & Year) and that the signatures
provided with the Bank Depositor Agreement are the signatures of the persons duly authorized to withdraw funds of this organization from
Farmers & Merchants Bank of Long Beach in accordance with the above resolution.

President: _____    Secretary: _____

PAGE 2 OF 3

## BACKUP WITHHOLDING CERTIFICATIONS

Check the appropriate box:

☐ Individual/Sole Proprietor

☐ Corporation

☐ Partnership

☐ L.L.C. Enter the tax clasification (D = disregarded entity, C = corporation, P = partnership) _____

☐ Unincorporated Association

☐ Other _____

Check the following box if true:

☐ Exempt payee

Taxpayer Identification Number: _____

Under penalties of perjury, I certify that:

(1) The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

(2) I am not subject to backup withholding either because: (1) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the Internal Revenue Service has notified me that I am no longer subject to backup withholding, and

(3) I am a U.S. person (including a U.S. resident alien).

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN.

X _____
                                  Date

**ONLINE BANKING ONLY:** I/we acknowledge receipt of a copy and agree to the terms of the Online Banking Disclosure.

Customer Initials: _____      Customer Initials: _____      Customer Initials: _____

**SPECIAL PROMOTION:** I ☐ do or ☐ do not request Farmers & Merchants Bank to provide my name to _____ as notification that I have opened an account as part of special promotion in their benefit.

Customer Signature: _____

| | | |
|---|---|---|
| Bank use only: Superseded Card | | |
| Accepting Employee: _____ | Branch: _____ | Date: _____ |

PAGE 3 OF 3

## CORPORATE RESOLUTION
### (for all Corporations, Associations, and Lodges)

To FARMERS & MERCHANTS BANK OF LONG BEACH:
RESOLVED: That this organization establish in its name one or more deposit accounts with the FARMERS & MERCHANTS BANK OF LONG BEACH upon such terms and conditions as agreed upon with the bank and furthermore that

Michael A. Carabini (Name) acting as the President (Title) and Brian D. Jenkins (Name) acting as the Secretary (Title) of **METCO MANAGEMENT CORPORATION [DDA 01069500]** are authorized to establish such an account on behalf of this organization.

Officers authorized to withdraw the funds of this organization from said account are:

Michael A. Carabini (Name) / Authorized Signer (Title), and
Brian D. Jenkins (Name) / Authorized Signer (Title), and
Ronald Smoler (Name) / Authorized Signer (Title), and
Katherine M. Gernak (Name) / Authorized Signer (Title) upon presentation of checks drawn against said account and signed as provided and certified by the Secretary of this organization. The bank is further authorized to honor and pay any and all checks so signed, including those drawn to the individual order of any officer or other person authorized to sign the same.

We certify that the foregoing is a full, true, and correct copy of the Resolution adopted by the Board of Directors of the Metco Management Corporation (Organization Name) at a meeting of said Board held on the 12th day of 03/10 (Month & Year) and that the signatures provided with the Bank Depositor Agreement are the signatures of the persons duly authorized to withdraw funds of this organization from Farmers & Merchants Bank of Long Beach in accordance with the above resolution.

President: _____  Secretary: _____
       Michael A. Carabini                            Brian D. Jenkins

METCO MANAGEMENT CORPORATION

| ACCOUNT NAME | OPERATING ACCOUNT | | ACCOUNT NUMBER | |

NEW SIGNATURE CARD

MAY 25 1993

☒ CHECKING  ☐ SAVINGS  ☐ MONEY MARKET
☒ CORPORATION  ☐ PARTNERSHIP  ☐ SOLE OWNER  ☐ ASSOCIATION  ☐

ADDRESS  4910 Birch Street, Newport Beach, CA 92660

Mailing Address  P.O. Box 1800, Newport Beach, CA 92660

TAXPAYER IDENTIFICATION NUMBER ___  6 ___  Phone

☒ MAIL  ☐ HOLD all statements and other notices.
Number of signatures required to withdraw funds _____ Checks signed by _____
The undersigned, doing business under the name given above,
☐ Certifies that he is the SOLE OWNER of the above named firm.
☐ Certify that they are owners of the above named firm as COPARTNERS and constitute all of the general partners of the partnership.
☒ Certify that they are a corporation, association or lodge.
Under penalties of perjury, the undersigned certify (1) that the number shown on this form is the correct taxpayer identification number and (2) that this organization is not subject to backup withholding due to underreporting. We have read and agree to the terms and conditions of the agreement as set forth hereof.

| AUTHORIZED SIGNATURES | PRINTED NAME | ID NUMBER |
|---|---|---|
| 1. | Michael A. Carabini | |
| 2. | Brian D. Jenkins | |
| 3. | Ronald Smoler | |
| 4. | | |
| 5. See Addendum, effective 3/29/10 | | |

Date Opened _____ Opened by _____ Amount _____
Date Closed _____ Closed by _____ Reason _____

## BANK — DEPOSITOR AGREEMENT

I/we enter into this bank-depositor(s) agreement with FARMERS AND MERCHANTS BANK OF LONG BEACH agreeing that:
1. This account shall be carried as indicated on the reverse side hereof. All funds on deposit shall be governed by the By-Laws, Rules and Regulations of said Bank in force from time to time, and by all practices and procedures of said Bank as to stop payments, overdrafts, dormancy, posting, interest and service charges in relation to said account. The account shall be governed by rules and regulations as contained herein.
2. Depositor(s) further agree(s) that all funds now on deposit or which hereafter may be placed on deposit shall be the property of the depositor as a Sole Owner, Partner, Corporation or other as indicated who may withdraw funds upon number of signatures indicated, except in the event of conflicting demands of the depositor, the Bank can require all signatures of the depositor(s).
3. Depositor authorizes said Bank to endorse checks, when presented for deposit to said account, if presented unendorsed.
4. Statements, return items, and notices may be mailed, unregistered, to the last address of depositor on file with this Bank and all responsibility for loss in mail is assumed by the depositor.

(FOR CORPORATION, LODGE, ASSOCIATION)

**To FARMERS AND MERCHANTS BANK OF LONG BEACH**
RESOLVED: that this organization establish in its name one or more deposit accounts with the FARMERS AND MERCHANTS BANK OF LONG BEACH upon such terms and conditions as may be agreed upon with

said Bank and that the __President__ (Title) and __Secretary__ (Title) of the organization be and they are hereby authorized to establish such an account.
__Michael A. Carabini__ or __Brian D. Jenkins__
and __Ronald Smoler__ or _____
and _____ or _____
of this organization be and they are hereby authorized to withdraw funds of this organization from the said account upon checks of this organization signed as provided herein with signatures duly certified to said Bank by the Secretary of this organization and said Bank is hereby authorized to honor and pay any and all checks so signed, including those drawn to the individual order of any officer or other person authorized to sign the same. __Metco__
We hereby certify that the foregoing is a full, true and correct copy of the Resolution adopted by the Board of Directors of the _____
__Management Corp__ at a meeting of said Board regularly held on the __13__ day of __May__, 19 __93__
and that the signatures appearing on the reverse side of this card are the signatures of the persons duly authorized to withdraw funds of said organization from said Bank in accordance with the above resolution.

(SEAL)

President _____

Secretary _____

We hereby certify the foregoing to be correct: (FOR LODGE, ASSOCIATION)

ficers (Titles) 1. _____ 2. _____

May 24, 1993

Mr. John Hinrichs
Farmers and Merchants Bank
302 Pine Avenue
Long Beach, California 90802

Re:   METCO Management Corporation
      Account No. ████████████

Dear Mr. Hinrichs:

     Due to a change in personnel, we find it necessary to change
the persons authorized to sign checks for the above account.
Effective immediately, the following will constitute acceptable
signatures:

                    Michael A. Carabini
                    Brian D. Jenkins
                    Ronald Smoler

     Please acknowledge receipt by signing and returning the
enclosed copy of this letter.

                              Very truly yours,

                              Michael A. Carabini, President
                              METCO Management Corporation
                              4910 Birch Street
                              Newport Beach, CA 92660

MAC/pac
Enclosures

Acknowledgment:

By:_____

Date:_____

f&mmetco.ltr

# BUSINESS ACCOUNT: FOR BANK USE ONLY

Account Name(s): **Monex Precious Metals**                    A Division of Monex xx Deposit Co.

Account Number: _____ Date Opened: **09/03/96** ___ Source of Deposit/Amount: _____

Opening Employee: **Anna Fiqueroa** _____ Chex Systems: ☐ Yes ☒ No        6/9/08

Waiver Reason & Authorization: **EXISTING**                           THIS CARD SUPERSEDES

Contact Person & Phone: _____                    PREVIOUS CARD

Anticipated Monthly Deposits/Withdrawals  $ _____      $ _____

| Type of Account: | Applying as a/an: | Interest Payment (Time Deposit Only): |
|---|---|---|
| Business Checking | ☐ Sole Owner | Payment Intervals: Payment Methods |
| | ☐ Partnership | ☐ Monthly   ☐ Compound |
| Primary CIF number: ___ | ☒ Corporation | ☐ Quarterly   ☐ Issue Check |
| | ☐ Other ___ | ☐ At Maturity   ☐ Credit Account |

This is your: ☒ Permanent    ☐ Temporary Account Agreement          Account Type/ #: _____

Account Name: **Monex Precious Metals**                  Tax I.D. Number: _____

Street Address: **4910 Birch Street**      **Newport Beach CA 92660**      Phone Number: _____

Alternate Address: _____              FAX Number: _____

SPECIAL HANDLING REQUESTS: ☒ MAIL  ☐ HOLD all statements and other notices.    Facsimile Signature ☐

SIGNATURE RESTRICTIONS: Number of signatures to withdraw funds **1** ___ Circumstances: _____

OVERDRAFT PROTECTION: I/we ☐ do ☒ do not authorize F&M Bank to transfer funds automatically from THIS PRIMARY Account Number

_____ and or my (our) F&M Bankcard Number _____ to my Secondary Account.

Customer's initials

| 1st Signer Information: | Louis | E | Carabini | |
|---|---|---|---|---|
| | First Name & Middle Initial | | Last Name | Home Phone Number |
| Existing Customer ☒ | | | | |
| Customer Initials | Height/Eye Color/Hair Color | | Identification Type & Number | Social Security Number |
| C006734 | Date of Birth | | Cell Phone | |

| 2nd Signer Information: | Michael | | Carabini | |
|---|---|---|---|---|
| | First Name & Middle Initial | | Last Name | Home Phone Number |
| Existing Customer ☒ | | | CA | |
| Customer Initials | Height/Eye Color/Hair Color | | Identification Type & Number | Social Security Number |
| C007301 | Date of Birth | | Cell Phone | |

Add this customer to account ☒ Yes ☐ No   Relationship  O ___    Add customer to account title ☐ Yes ☒ No

| 3rd Signer Information: | Brian | D | Jenkins | |
|---|---|---|---|---|
| | First Name & Middle Initial | | Last Name | Home Phone Number |
| Existing Customer ☒ | | | CA | |
| Customer Initials | Height/Eye Color/Hair Color | | Identification Type & Number | Social Security Number |
| J004494 | Date of Birth | | Cell Phone | |

Add this customer to account ☒ Yes ☐ No   Relationship  O ___    Add customer to account title ☐ Yes ☒ No

**OFFICIAL SIGNATURES**
The undersigned agree to the terms stated on every page of this form and acknowledge receipt of a completed copy. The undersigned further authorize the financial institution from time to time to verify credit and employment history and/or have a credit reporting agency prepare a credit report on the undersigned, as individuals. The undersigned also acknowledge the receipt of a copy and agree to the terms of the following disclosure(s):

☒ Deposit Account          ☒ Funds Availability              ☒ Privacy **THIS CARD SUPERSEDES**
☒ Electronic Funds Transfer   ☒ Truth In Savings                        **PREVIOUS CARD**
☐

**Louis Carabini**          **Michael Carabini**          **Brian Jenkins**

See Addendum, effective 3/29/10

JHA FMBCA08 11/07
PAGE 1 OF 3

MAY-21-2008 10:26 From:F&M BANK     5624378672     To:949 250 0553     P.3/4

| **4th Signer Information:** | Patric███ | A | Lange | | Home Phone Number ████ |
|---|---|---|---|---|---|
| | First Name & Middle Initial | | Last Name | | |
| Existing Customer ☐ | | | CA | 1 | Social Security Number |
| Customer Initials ███ | Height/Eye Color/Hair Color | | Identification Type & Number | | |
| L009303 | | | | | |
| | Date of Birth | | Cell Phone | | |

Add this customer to account ☒ Yes ☐ No     Relationship **A**      Add customer to account title ☐ Yes ☒ No

| **5th Signer Information:** | Ronald | | Smoler | | Home Phone Number ████ |
|---|---|---|---|---|---|
| | First Name & Middle Initial | | Last Name | | |
| Existing Customer ☒ | S██████Y | | CA | ████ | Social Security Number |
| Customer Initials ~~initials~~ **RS** | Height/Eye Color/Hair Color | | Identification Type & Number | | |
| S014232 | | | | | |
| | Date of Birth | | Cell Phone | | |

Add this customer to account ☒ Yes ☐ No     Relationship **A**      Add customer to account title ☐ Yes ☒ No

| **6th Signer Information:** | Myrna | R | Johnson | | Home Phone Number ████ |
|---|---|---|---|---|---|
| | First Name & Middle Initial | | Last Name | | |
| Existing Customer ☐ | | | CA | ████ | Social Security Number |
| Customer ~~initials~~ | Height/Eye Color/Hair Color | | Identification Type & Number | | |
| JAA0562 | | | | | |
| | Date of Birth | | Cell Phone | | |

Add this customer to account ☒ Yes ☐ No     Relationship **A**      Add customer to account title ☐ Yes ☒ No

## OFFICIAL SIGNATURES

The undersigned agree to the terms stated on every page of this form and acknowledge receipt of a completed copy. The undersigned further authorize the financial institution from time to time to verify credit and employment history and/or have a credit reporting agency prepare a credit report on the undersigned, as individuals. The undersigned also acknowledge the receipt of a copy and agree to the terms of the following disclosure(s):

☒ Deposit Account – T&C        ☒ Funds Availability              ☒ Privacy
☒ Electronic Funds Transfer    ☒ Truth in Savings
☐ _____

| *Patricia A. Lange* | *M█████* | *Myrna Johnson* |
|---|---|---|
| **Patricia Lange** | **Ronald Smoler** | **Myrna Johnson** |

### BACKUP WITHHOLDING CERTIFICATIONS

TIN: ████████

☒ **TAXPAYER I.D. NUMBER** - The Taxpayer Identification Number shown above (TIN) is my correct taxpayer identification number.

☒ **BACKUP WITHHOLDING** - I am not subject to backup withholding either because I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified me that I am no longer subject to backup withholding.

☐ **EXEMPT RECIPIENTS** - I am an exempt recipient under the Internal Revenue Service Regulations.

**SIGNATURE:** I certify under penalties of perjury the statements checked in this section and that I am a U.S. person or other U.S. person.

X _____     09/23/08
~~Brian D. Jenkins, CFO NSC~~     Date

**THIS CARD SUPERSEDES PREVIOUS CARD**

| Bank use only: Superseded Card | | |
|---|---|---|
| Accepting Employee ███████ | Branch: ██████ | Date: 6/9/08 |

MAY-21-2008 10:26 From:F&M BANK     5624378672     To:949 250 0553     P.4/4

## BUSINESS ACCOUNT: FOR BANK USE ONLY

Account Name(s): **Monex Deposit Company**     A Division of Monex XX Deposit Co.

Account Number: **1**_____ Date Opened: **09/03/96** Source of Deposit/Amount:_____

Opening Employee: **Anna Figueroa** Chex Systems: ☐ Yes ☒ No

Waiver Reason & Authorization: **EXISTING**

Contact Person & Phone:_____

Anticipated Monthly Deposits/Withdrawals $_____ $_____

| Type of Account: | Applying as a/an: | Interest Payment (Time Deposit Only): |
|---|---|---|
| **Business Checking** | ☐ Sole Owner | Payment Intervals: Payment Methods |
| | ☐ Partnership | ☐ Monthly ☐ Compound |
| Primary CIF number: | ☒ Corporation | ☐ Quarterly ☐ Issue Check |
| | ☐ Other ____ | ☐ At Maturity ☐ Credit Account |

This is your: ☒ Permanent ☐ Temporary Account Agreement     Account Type/ #:_____

Account Name: **Monex Deposit Company**     Tax I.D. Number:_____

Street Address: **4910 Birch Street**    **Newport Beach CA 92660**    Phone Number:_____

Alternate Address:_____ FAX Number:_____

SPECIAL HANDLING REQUESTS: ☒ MAIL ☐ HOLD all statements and other notices.     Facsimile Signature ☐

SIGNATURE RESTRICTIONS: Number of signatures to withdraw funds 1 ____ Circumstances:_____

OVERDRAFT PROTECTION: I/we ☐ do ☒ do not authorize F&M Bank to transfer funds automatically from THIS PRIMARY Account Number _____ and or my (our) F&M Bankcard Number _____ to my Secondary Account.

Customer's Initials:_____

**1st Signer Information:**

Existing Customer ☒

Customer Initials X

L009304

| First Name & Middle Initial | Last Name | Home Phone Number |
|---|---|---|
| **Joann** M | **Lahners** | |
| Height/Eye Color/Hair Color | **CA** Identification Type & Number | Social Security Number |
| Date of Birth | Cell Phone | |

**2nd Signer Information:**

Existing Customer ☒

Customer Initials_____

| First Name & Middle Initial | Last Name | Home Phone Number |
|---|---|---|
| / / | | |
| Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |
| Date of Birth | Cell Phone | |

Add this customer to account ☐ Yes ☐ No   Relationship _____   Add customer to account title ☐ Yes ☐ No

**3rd Signer Information:**

Existing Customer ☐

Customer Initials_____

| First Name & Middle Initial | Last Name | Home Phone Number |
|---|---|---|
| / / | | |
| Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |
| Date of Birth | Cell Phone | |

Add this customer to account ☐ Yes ☐ No   Relationship _____   Add customer to account title ☐ Yes ☐ No

## OFFICIAL SIGNATURES

The undersigned agree to the terms stated on every page of this form and acknowledge receipt of a completed copy. The undersigned further authorize the financial institution from time to time to verify credit and employment history and/or have a credit reporting agency prepare a credit report on the undersigned, as individuals. The undersigned also acknowledge the receipt of a copy and agree to the terms of the following disclosure(s):

☒ Deposit Account    ☒ Funds Availability    ☒ Privacy
☒ Electronic Funds Transfer    ☒ Truth in Savings
☐

1. _Joann Lahners_    2. _____    3. _____

**THIS CARD SUPERSEDES PREVIOUS CARD**    4/9/08

JHA FMBCARD 11/07
PAGE 3 of 3

## CORPORATE RESOLUTION
### (for all Corporations, Associations, and Lodges)

**To: FARMERS & MERCHANTS BANK OF LONG BEACH:**

**RESOLVED:**  That this organization establish in the name of **Monex Deposit Company ("MDC")** one or more deposit accounts with the **FARMERS & MERCHANTS BANK OF LONG BEACH** upon such terms and conditions as agreed upon with the bank and furthermore that **Louis E. Carabini,** acting as the **President of the General Partner** of MDC is authorized to establish such an account on behalf of **MDC.**  Persons authorized to withdraw the funds of **MDC** from said account are: **Louis E. Carabini, President of the General Partner, Michael A. Carabini, and Brian D. Jenkins,** upon presentation of checks drawn against said account and signed as provided and certified by the Secretary of this organization.  The bank is further authorized to honor and pay any and all checks so signed, including those drawn to the individual order of any officer or other person authorized to sign the same.

We certify that the foregoing is a full, true, and correct copy of the Resolution adopted by the Board of Directors of **Comco Management Corporation**, the General Partner of **Monex Deposit Company** at a meeting of said Board held on the **2nd day of June, 2008,** and that the signatures provided with the Bank Depositor Agreement are the signatures of the persons duly authorized to withdraw funds of **MDC** from **Farmers & Merchants Bank of Long Beach** in accordance with the above resolution.

President: _____    Secretary: _____
Louis E. Carabini                                      Gregory G. Walker

Comco Management Corporation             Comco Management Corporation
The General Partner                              The General Partner
Monex Deposit Company                         Monex Deposit Company

corpresolutionmdc.doc
06/02/08/pac

Addendum to agreement dated 6/9/08, effective 3/29/10

## BUSINESS ACCOUNT: FOR BANK USE ONLY

Account Name(s): **Monex Precious Metals**     A Division of Monex Deposit Co

Account Number: ▮▮▮▮▮   Date Opened: 09/03/96   Source of Deposit/Amount:

Opening Employee: **Debbie Buchanan**     Chex Systems: ☒ Yes ☐ No

Waiver Reason & Authorization:

Contact Person & Phone:

Anticipated Monthly Deposits/Withdrawals $ ____ $ ____

| Type of Account: | Applying as a/an: | Interest Payment (Time Deposit Only): |
|---|---|---|
| **Business Checking** | ☐ Sole Owner | |
| | ☒ Partnership | Payment Intervals: Payment Methods |
| **Primary CIF number:** | ☐ Corporation | ☐ Monthly ☐ Compound |
| | ☐ Other ____ | ☐ Quarterly ☐ Issue Check |
| | | ☐ At Maturity ☐ Credit Account |

This is your: ☒ Permanent ☐ Temporary Account Agreement    Account Type/ #: ____

Account Name: **Monex Precious Metals**     Tax I.D. Number: ▮▮▮

Street Address: **4910 Birch Street**   **Newport Beach CA 92660**   Phone Number: ▮▮▮

Alternate Address:     FAX Number:

**SPECIAL HANDLING REQUESTS:** ☒ MAIL ☐ HOLD all statements and other notices.   Facsimile Signature ☐

SIGNATURE RESTRICTIONS: Number of signatures to withdraw funds **X**   **2** Circumstances: **for $1,000 and over**

OVERDRAFT PROTECTION: I/we ☐ do ☒ do not authorize F&M Bank to transfer funds automatically from THIS PRIMARY Account Number

____ and my (our) F&M Bankcard Number ____ to my Secondary Account.

Customer's Initials: ____

| 1st Signer Information: | Katherine M | Gernak | |
|---|---|---|---|
| | First Name & Middle Initial | Last Name | Home Phone Number |
| Existing Customer ☐ | ▮▮▮▮▮ | | |
| Customer Initials ✗ MG | Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |
| GAA2454 | **November 18, 1958** | | |
| | Date of Birth | Cell Phone | |

| 2nd Signer Information: | | | |
|---|---|---|---|
| | First Name & Middle Initial | Last Name | Home Phone Number |
| Existing Customer ☐ | / / | | |
| Customer Initials ____ | Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |
| | Date of Birth | Cell Phone | |

Add this customer to account ☐ Yes ☐ No   Relationship ____   Add customer to account title ☐ Yes ☐ No

| 3rd Signer Information: | | | |
|---|---|---|---|
| | First Name & Middle Initial | Last Name | Home Phone Number |
| Existing Customer ☐ | / / | | |
| Customer Initials ____ | Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |
| | Date of Birth | Cell Phone | |

Add this customer to account ☐ Yes ☐ No   Relationship ____   Add customer to account title ☐ Yes ☐ No

**OFFICIAL SIGNATURES**

The undersigned agree to the terms stated on every page of this form and acknowledge receipt of a completed copy. The undersigned further authorize the financial institution from time to time to verify credit and employment history and/or have a credit reporting agency prepare a credit report on the undersigned, as individuals. The undersigned also acknowledge the receipt of a copy and agree to the terms of the following disclosure(s):

☒ Deposit Account - T & C    ☒ Funds Availability    ☒ Privacy
☒ Electronic Funds Transfer    ☒ Truth in Savings
☐

| 1. Katherine M Gernak | 2. | 3. |
|---|---|---|

JHA FMBCA03 04/09
PAGE 1 OF 3

**4th Signer Information:**

Existing Customer ☐

Customer Initials _____

| First Name & Middle Initial | Last Name | Home Phone Number |

/          /

| Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |

| Date of Birth | Cell Phone |

Add this customer to account ☐ Yes ☐ No   Relationship _____   Add customer to account title ☐ Yes ☐ No

**5th Signer Information:**

Existing Customer ☐

Customer Initials _____

| First Name & Middle Initial | Last Name | Home Phone Number |

| Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |

| Date of Birth | Cell Phone |

Add this customer to account ☐ Yes ☐ No   Relationship _____   Add customer to account title ☐ Yes ☐ No

**6th Signer Information:**

Existing Customer ☐

Customer Initials _____

| First Name & Middle Initial | Last Name | Home Phone Number |

/          /

| Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |

| Date of Birth | Cell Phone |

Add this customer to account ☐ Yes ☐ No   Relationship _____   Add customer to account title ☐ Yes ☐ No

## OFFICIAL SIGNATURES

The undersigned agree to the terms stated on every page of this form and acknowledge receipt of a completed copy. The undersigned further authorize the financial institution from time to time to verify credit and employment history and/or have a credit reporting agency prepare a credit report on the undersigned, as individuals. The undersigned also acknowledge the receipt of a copy and agree to the terms of the following disclosure(s):

☒ Deposit Account - T & C       ☒ Funds Availability       ☒ Privacy
☒ Electronic Funds Transfer      ☒ Truth in Savings
☐ _____

| 4. | 5. | 6. |
| --- | --- | --- |
|  |  |  |

## CORPORATE RESOLUTION
### (for all Corporations, Associations, and Lodges)

**To FARMERS & MERCHANTS BANK OF LONG BEACH:**
RESOLVED: That this organization establish inits name one or more deposit accounts with the FARMERS & MERCHANTS BANK OF LONG BEACH upon such terms and conditions as agreed upon with the bank and furthermore that

_____ (Name) acting as the _____ (Title) and
_____ (Name) acting as the _____ (Title) of this organization are authorized to establish such an account on behalf of this organization. Officers authorized to withdraw the funds of this

organization from said account are: _____ (Name) /_____ (Title), and

_____ (Name) / _____ (Title), and

_____ (Name) / _____ (Title) upon presentation of checks drawn against said account and signed as provided and certified by the Secretary of this organization. The bank is further authorized to honor and pay any and all checks so signed, including those drawn to the individual order of any officer or other person authorized to sign the same.

We certify that the foregoing is a full, true, and correct copy of the Resolution adopted by the Board of Directors of the _____
_Monex Precious Metals_____ (Organization Name)
at a meeting of said Board held on the _____ day of _____ (Month & Year) and that the signatures provided with the Bank Depositor Agreement are the signatures of the persons duly authorized to withdraw funds of this organization from Farmers & Merchants Bank of Long Beach in accordance with the above resolution.

President: _____   Secretary: _____

## BACKUP WITHHOLDING CERTIFICATIONS

**Check the appropriate box:**

☐ Individual/Sole Proprietor

☐ Corporation

☐ Partnership

☐ L.L.C.  Enter the tax clasification (D = disregarded entity, C = corporation, P = partnership) _____

☐ Unincorporated Association

☐ Other _____

**Check the following box if true:**

☐ Exempt payee

Taxpayer Identification Number: _____

Under penalties of perjury, I certify that:

(1) The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

(2) I am not subject to backup withholding either because: (1) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the Internal Revenue Service has notified me that I am no longer subject to backup withholding, and

(3) I am a U.S. person (including a U.S. resident alien).

Certification instructions.  You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return.  For real estate transactions item 2 does not apply.  For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN.


X _____
                                               Date

**ONLINE BANKING ONLY:**  I/we acknowledge receipt of a copy and agree to the terms of the Online Banking Disclosure.

Customer Initials: _____          Customer Initials: _____          Customer Initials: _____

**SPECIAL PROMOTION:** I ☐ do or ☐ do not request Farmers & Merchants Bank to provide my name to _____ as notification that I have opened an account as part of special promotion in their benefit.

Customer Signature: _____

| Bank use only:  Superseded Card |
| --- |
| Accepting Employee: _____          Branch: _____          Date: _____ |

**Partnership Resolution of Authority**
By:

| | |
|---|---|
| Farmers & Merchants Bank<br>302 Pine Avenue<br>Long Beach, CA 90802<br><br>Referred to in this document as<br>"Financial Institution" | **Monex Deposit Company, a**<br>**California Limited Partnership**<br>**Monex Precious Metals**<br>**[DDA 01105299]**<br>4910 Birch Street<br>Newport Beach, CA 92660-8100<br>Referred to in this document as<br>"Partnership" |

The above partnership consists of the following partners (or if a limited partnership, the following general partners):

Comco Management Corporation

The above-named parties represent that they constitute all of the partners of the Partnership designated above, or if a limited Partnership, constitute all of the general partners of the partnership designated above. These individuals are referred to in this document as "Partners."

AGENTS Any Agent listed below, subject to any written limitations, is authorized to exercise the powers granted as indicated below:

Louis E. Carabini (Name) / Authorized Signer (Title), and
Michael A. Carabini (Name) / Authorized Signer (Title), and
Brian D. Jenkins (Name) / Authorized Signer (Title), and
Ronald Smoler (Name) / Authorized Signer (Title), and
Katherine M. Gernak (Name) / Authorized Signer (Title), and
Myrna Johnson (Name) / Authorized Signer (Title), and
Joann M. Lahners (Name) / Authorized Signer (Title), and upon presentation of checks drawn against said account and signed as provided and certified by the Partners of this organization. The bank is further authorized to honor and pay any and all checks so signed, including those drawn to the individual order of any Partners, or other person authorized to sign the same.

**CERTIFICATION OF AUTHORITY** I further certify that the Partnership has, and at the time of adoption of this resolution had, full power and lawful authority to adopt the resolutions on page 2 and to confer the powers granted above to the person named who have full power and lawful authority to exercise the same.
Signatures: (Type name of each Partner below each signature line.)

| | |
|---|---|
| Comco Management Corporation<br>By Louis E. Carabini<br>Its President | Comco Management Corporation<br>By Gregory G. Walker<br>Its Secretary |

The Partners to the Partnership resolve, warrant and agree as follows:

(1) The Financial Institution is designated as a depository for the funds of the Partnership and to provide other financial accommodations indicated in this resolution.

(2) This resolution shall continue to have effect until express written notice of its rescission or modification has been received and recorded by the Financial Institution. Any and all prior resolutions adopted by the Partners and certified to the Financial Institution as governing the operation of this partnership's account(s), are in full force and effect, until the Financial Institution receives and acknowledges an express written notice of its revocation, modification or replacement. Any revocation, modification or replacement of a resolution must be accompanied by documentation, satisfactory to the Financial Institution, establishing the authority for the changes.

(3) The signature of an Agent on this resolution is conclusive evidence of their authority to act on behalf of the Partnership. Any Agent, so long as they act in a representative capacity as an Agent of the Partnership, is authorized to make any and all other contracts, agreements, stipulations and orders which they may deem advisable for the effective exercise of the powers indicated on page one, from time to time with the Financiall nstitution, subject to any restrictions on this resolution or otherwise agreed to in writing.

(4) All transactions, if any, with respect to any deposits, withdrawals, rediscounts and borrowings by or on behalf of the Partnership with the Financial Institution prior to the adoption of this resolution are hereby ratified, approved and confirmed.

(5) The Partners agree to the terms and conditions of any account agreement, properly opened by any Agent of the Partnership. The Partners authorize the Financial Institution, at any time, to charge the Partnership for all checks, drafts, or other orders, for the payment of money, that are drawn on the Financial Institution, so long as they contain the required number of signatures for this purpose.

(6) The Partners acknowledge and agree that the Financial Institution may furnish at its discretion automated access devices to Agents of the Partnership to facilitate those powers authorized by this resolution or other resolutions in effect at the time of issuance. The term "automated access device" includes, but is not limited to, credit cards, automated teller machines (ATM), and debit cards.

(7) The Partners acknowledge and agree that the Financial Institution may rely on alternative signature and verification codes issued to or obtained from the Agent named on this resolution. The term "alternative signature and verification codes" includes, but is not limited to, facsimile signatures on file with the Financial Institution, personal identification numbers (PIN), and digital signatures. If a facsimile signature specimen has been provided on this resolution, (or that are filed separately by the Partnership with the Financial Institution from time to time) the Financial Institution is authorized to treat the facsimile signature as the signature of the Agent(s) regardless of by whom or by what means the facsimile signature may have been affixed so long as it resembles the facsimile signature specimen on file. The Partners authorize each Agent to have custody of the Partnership's private key used to create a digital signature and to request issuance of a certificate listing the corresponding public key. The Financial
Institution shall have no responsibility or liability for unauthorized use of alternative signature and verification codes unless otherwise agreed in
writing.

(8) If any other parties become interested in the partnership as co-partners, the partnership relationship is altered in any way or if the business should become incorporated, the Partners shall promptly notify the Financial Institution.

(9) By signing this resolution, Partners represent that they have provided the Financial Institution with true and complete copies of the partnership
agreement, if any, as amended to the date of this resolution.

**Farmers & Merchants Bank**
Main Office
302 Pine Avenue
Long Beach, CA 90802

| ACCOUNT NUMBER | |
|---|---|

Business Checking
**ACCOUNT OWNER(S) NAME & ADDRESS**

Newport Service Corp
H & D Care Reimbursement
4910 Birch St
Newport Beach CA 92660

**OWNERSHIP OF ACCOUNT - CONSUMER PURPOSE**

☐ INDIVIDUAL
☐ JOINT ACCOUNT ☐ TENANCY IN COMMON ACCOUNT
☐ COMMUNITY PROPERTY ACCOUNT OF HUSBAND AND WIFE
☐ JOINT ACCOUNT OF HUSBAND AND WIFE WITH RIGHT OF SURVIVORSHIP
☐ TRUST - SEPARATE AGREEMENT:
☐ TOTTEN TRUST    OR    ☐ PAY-ON-DEATH
DESIGNATION AS DEFINED IN THIS AGREEMENT
Name and Address of Beneficiaries:

Revised Date:02/11/03
Updating signatures

☐ NEW    ☒ EXISTING
**TYPE OF ACCOUNT** ☒ CHECKING ☐ SAVINGS
☐ MONEY MARKET ☐ CERTIFICATE OF DEPOSIT
☐ NOW

This is your (check one):
☒ Permanent ☐ Temporary account agreement.

THIS CARD SUPERSEDES PREVIOUS CARD
* Number of signatures required for withdrawal 1 FEB ~ ~ 2003
FACSIMILE SIGNATURE(S) ALLOWED? ☐ YES ☒ NO

**OWNERSHIP OF ACCOUNT - BUSINESS PURPOSE**

☐ SOLE PROPRIETORSHIP
☒ CORPORATION: ☒ FOR PROFIT ☐ NOT FOR PROFIT
☐ PARTNERSHIP
☐ _____

BUSINESS: _____
COUNTY & STATE OF ORGANIZATION: LOS ANGELES    CA
AUTHORIZATION DATED: _____

DATE OPENED 07/28/89 BY _____
INITIAL DEPOSIT $ _____
☐ CASH ☐ CHECK ☐ _____
HOME TELEPHONE # _____
BUSINESS PHONE # _____
DRIVER'S LICENSE # _____
EMAIL _____
EMPLOYER _____
MOTHER'S MAIDEN NAME _____
Name and address of someone who will always know your location: _____
Chex System: N
EXISTING

*One signature on checks under
$1,000 and Two signatures on
x checks of $1,000 or more

SIGNATURE(S) - The undersigned agree to the terms stated on every page of this form and acknowledge receipt of a completed copy. The undersigned further authorize the financial institution to verify credit and employment history and/or have a credit reporting agency prepare a credit report on the undersigned, as individuals. The undersigned also acknowledge the receipt of a copy and agree to the terms of the following disclosure(s):

☒ Deposit Account ☒ Funds Availability ☒ Privacy
☒ Electronic Funds Transfer ☐ Truth in Savings
☐

(1): Michael A. Carabini
I.D. # _____ CDL D.O.B. _____

(2): Gregory G. Walker
I.D. # _____ D.O.B. _____

(3): Brian D. Jenkins
I.D. # _____ CDL D.O.B. _____

(4): Ronald Smoler
I.D. # _____ CDL D.O.B. _____
See Addendum, effective 3
☐ Authorized Signer (Individual Accounts Only)

I.D. # _____ D.O.B. _____

**BACKUP WITHHOLDING CERTIFICATIONS**

TIN: _____
☒ TAXPAYER I.D. NUMBER - The Taxpayer Identification Number shown above (TIN) is my correct taxpayer identification number.

☒ BACKUP WITHHOLDING - I am not subject to backup withholding either because I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified me that I am no longer subject to backup withholding.

☐ EXEMPT RECIPIENTS - I am an exempt recipient under the Internal Revenue Service Regulations.

SIGNATURE: I certify under penalties of perjury the statements checked in this section and that I am a U.S. person (including a U.S. resident alien).

X _____
(Date)

Farmers & Merchants Bank
302 Pine Avenue
Long Beach, CA 90802

**ACCOUNT NUMBER**

Business Checking

**ACCOUNT OWNER(S) NAME & ADDRESS**

Newport Service Corp
H & D Care Reimbursement
4910 Birch St
Newport Beach CA  92660

## OWNERSHIP OF ACCOUNT - CONSUMER PURPOSE

☐ INDIVIDUAL  ☐ _____
☐ JOINT ACCOUNT  ☐ TENANCY IN COMMON ACCOUNT
☐ COMMUNITY PROPERTY ACCOUNT OF HUSBAND AND WIFE
☐ JOINT ACCOUNT OF HUSBAND AND WIFE WITH RIGHT OF SURVIVORSHIP
☐ TRUST - SEPARATE AGREEMENT:
☐ TOTTEN TRUST  OR  ☐ PAY-ON-DEATH
DESIGNATION AS DEFINED IN THIS AGREEMENT
Name and Address of Beneficiaries:

Revised Date: 02/11/03

Updating signatures

|  |  |
|---|---|
| ☐ NEW | ☒ EXISTING |
| **TYPE OF ACCOUNT** ☒ CHECKING | ☐ SAVINGS |
| ☐ MONEY MARKET | ☐ CERTIFICATE OF DEPOSIT |
| ☐ NOW | ☐ _____ |

This is your (check one):
☒ Permanent  ☐ Temporary  account agreement.

Number of signatures required for withdrawal  1
FACSIMILE SIGNATURE(S) ALLOWED?  ☐ YES  ☒ NO

[
X
]

## OWNERSHIP OF ACCOUNT - BUSINESS PURPOSE

☐ SOLE PROPRIETORSHIP
☒ CORPORATION:  ☒ FOR PROFIT  ☐ NOT FOR PROFIT
☐ PARTNERSHIP
☐ _____
BUSINESS:  LOS ANGELES  CA
COUNTY & STATE
OF ORGANIZATION: _____
AUTHORIZATION DATED: _____

DATE OPENED  07/28/89  BY  ES8519
INITIAL DEPOSIT $ _____
☐ CASH  ☐ CHECK  ☐ _____
HOME TELEPHONE # _____
BUSINESS PHONE # _____
DRIVER'S LICENSE # _____
EMPLOYER _____
MOTHER'S MAIDEN NAME _____
Name and address of someone who will always know your location: _____
_____

SIGNATURE(S) - THE UNDERSIGNED AGREE(S) TO THE TERMS STATED ON PAGES 1 AND 2 OF THIS FORM, AND ACKNOWLEDGE(S) RECEIPT OF A COMPLETED COPY ON TODAY'S DATE. THE UNDERSIGNED ALSO ACKNOWLEDGE(S) RECEIPT OF A COPY OF AND AGREE(S) TO THE TERMS OF THE FOLLOWING DISCLOSURE(S):

☒ Deposit Account Disclosure  ☒ Funds Availability Disclosure
☒ Electronic Funds Transfer Disclosure  ☐ TIS Disclosure
☐ _____

(1): [ X  _Carabini_ ]
(5)  Louis F. Carabini
    I.D. #

(2): [ X ]
(6)
    I.D. # _____  D.O.B. _____

(3): [ X ]
(7)
    I.D. # _____  D.O.B. _____

(4): [ X ]
(8)
    I.D. # _____  D.O.B. _____

☐ Authorized Signer (Individual Accounts Only)

[ X ]
    I.D.# _____  D.O.B. _____

## BACKUP WITHHOLDING CERTIFICATIONS

TIN: _____
☒ TAXPAYER I.D. NUMBER - The Taxpayer Identification Number shown above (TIN) is my correct taxpayer identification number. .

☒ BACKUP WITHHOLDING - I am not subject to backup withholding either because I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified me that I am no longer subject to backup withholding.

☐ EXEMPT RECIPIENTS - I am an exempt recipient under the Internal Revenue Service Regulations.

SIGNATURE: I certify under penalties of perjury the statements checked in this section.

X _____
(Date)

(page 1 of 2)

**SETOFF** - We may (without prior notice and when permitted by law) set off the funds in this account against any due and payable debt you owe us now or in the future, by any of you having the right of withdrawal, to the extent of such persons' or legal entity's right to withdraw. The amount of the setoff may be further limited by applicable law. If the debt arises from a note, "any due and payable debt" includes the total amount of which we are entitled to demand payment under the terms of the note at the time we set off, including any balance the due date for which we properly accelerate under the note.

This right of setoff does not apply to this account if: (a) it is an IRA or other tax-deferred retirement account, or (b) the debt is created by a consumer credit transaction under a credit card plan (but this does not affect our rights under any consensual security interest), or (c) the debtor's right of withdrawal only arises in a representative capacity. We will not be liable for the dishonor of any check when the dishonor occurs because we set off a debt against this account. You agree to hold us harmless from any claim arising as a result of our exercise of our right of setoff.

**AUTHORIZED SIGNER (Individual Accounts only)** - A single individual is the owner. The authorized signer is merely designated to conduct transactions on the owner's behalf. We undertake no obligation to monitor transactions to determine that they are on the owner's behalf.

**FACSIMILE SIGNATURES** - You authorize us, at any time, to charge you for all checks, drafts, or other orders, for the payment of money, that are drawn on us regardless of by whom or by what means the facsimile signature(s) may have been affixed so long as they resemble the facsimile signature specimen filed with us, and contain the required number of signatures for this purpose.

**RESTRICTIVE LEGENDS** - We are not required to honor any restrictive legend on checks you write unless we have agreed in writing to the restriction. Examples of restrictive legends are "must be presented within 90 days" or "not valid for more than $1,000.00."

**FICTITIOUS BUSINESS NAME ACCOUNTS** - If the name in which the account is held is fictitious, each account holder represents that one or more of the account holders have the right to use that name and have fulfilled all legal requirements for using and or doing business under that name.

Experie ©1983, 1990, 1991 Bankers Systems, Inc., St. Cloud, MN  Form MPSC-LAZ-CA  11/18/2000

Addendum to agreement dated 2/11/03, effective 3/29/10

## BUSINESS ACCOUNT: FOR BANK USE ONLY

Account Name(s): Newport Service Corp     H & D Care Reimbursement

Account Number: ███████     Date Opened: 07/28/89     Source of Deposit/Amount:_____

Opening Employee: Debbie Buchanan     Chex Systems: ☒ Yes   ☐ No

Waiver Reason & Authorization:_____

Contact Person & Phone:_____

Anticipated Monthly Deposits/Withdrawals  $ _____     $ _____

| Type of Account: | Applying as a/an: | Interest Payment (Time Deposit Only): |
|---|---|---|
| Business Checking | ☐ Sole Owner | Payment Intervals:  Payment Methods |
|  | ☐ Partnership | ☐ Monthly    ☐ Compound |
| Primary CIF number: ████ | ☒ Corporation | ☐ Quarterly   ☐ Issue Check |
|  | ☐ Other _____ | ☐ At Maturity  ☐ Credit Account |

This is your: ☒ Permanent   ☐ Temporary Account Agreement     Account Type/ #: _____

Account Name: Newport Service Corp     Tax I.D. Number:_____

Street Address: 4910 Birch St     Newport Beach CA 92660     Phone Number:_____

Alternate Address:_____     FAX Number:_____

SPECIAL HANDLING REQUESTS: ☐ MAIL ☒ HOLD all statements and other notices.     Facsimile Signature ☐

SIGNATURE RESTRICTIONS: Number of signatures to withdraw funds ☒ 2 Circumstances: for $1,000 and over

OVERDRAFT PROTECTION: I/we ☐ do ☒ do not authorize F&M Bank to transfer funds automatically from THIS PRIMARY Account Number

_____ and or my (our) F&M Bankcard Number _____ to my Secondary Account.

Customer's Initials: _____

| 1st Signer Information: | Katherine          M | Gernak | Hon |
|---|---|---|---|
| Existing Customer ☐ | First Name & Middle Initial | Last Name |  |
|  |  | CA | ███ |
| Customer Initials *KMG* | Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |
| GAA2454 |  |  |  |
|  | Date of Birth | Cell Phone |  |

| 2nd Signer Information: |  |  | Home Phone Number |
|---|---|---|---|
| Existing Customer ☐ | First Name & Middle Initial | Last Name |  |
|  | /    / |  |  |
| Customer Initials_____ | Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |
|  | Date of Birth | Cell Phone |  |

Add this customer to account ☐ Yes ☐ No   Relationship _____     Add customer to account title ☐ Yes ☐ No

| 3rd Signer Information: |  |  | Home Phone Number |
|---|---|---|---|
| Existing Customer ☐ | First Name & Middle Initial | Last Name |  |
|  | /    / |  |  |
| Customer Initials _____ | Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |
|  | Date of Birth | Cell Phone |  |

Add this customer to account ☐ Yes ☐ No   Relationship _____     Add customer to account title ☐ Yes ☐ No

### OFFICIAL SIGNATURES

The undersigned agree to the terms stated on every page of this form and acknowledge receipt of a completed copy. The undersigned further authorize the financial institution from time to time to verify credit and employment history and/or have a credit reporting agency prepare a credit report on the undersigned, as individuals. The undersigned also acknowledge the receipt of a copy and agree to the terms of the following disclosure(s):

☒ Deposit Account - T & C     ☒ Funds Availability     ☒ Privacy
☒ Electronic Funds Transfer     ☒ Truth in Savings
☐ _____

1. Katherine M Gernak     2.     3.

JHA FMBCA03 04/09
PAGE 1 OF 3

**4th Signer Information:**

Existing Customer ☐

Customer Initials _____

| First Name & Middle Initial | Last Name | Home Phone Number |
| Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |
| Date of Birth | Cell Phone | |

Add this customer to account ☐ Yes ☐ No    Relationship _____    Add customer to account title ☐ Yes ☐ No

**5th Signer Information:**

Existing Customer ☐

Customer Initials _____

| First Name & Middle Initial | Last Name | Home Phone Number |
| Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |
| Date of Birth | Cell Phone | |

Add this customer to account ☐ Yes ☐ No    Relationship _____    Add customer to account title ☐ Yes ☐ No

**6th Signer Information:**

Existing Customer ☐

Customer Initials _____

| First Neme & Middle Initial | Last Name | Home Phone Number |
| Height/Eye Color/Hair Color | Identification Type & Number | Social Security Number |
| Date of Birth | Cell Phone | |

Add this customer to account ☐ Yes ☐ No    Relationship _____    Add customer to account title ☐ Yes ☐ No

## OFFICIAL SIGNATURES

The undersigned agree to the terms stated on every page of this form and acknowledge receipt of a completed copy. The undersigned further authorize the financial institution from time to time to verify credit and employment history and/or have a credit reporting agency prepare a credit report on the undersigned, as individuals. The undersigned also acknowledge the receipt of a copy and agree to the terms of the following disclosure(s):

☐ Deposit Account - T & C          ☐ Funds Availability          ☐ Privacy
☐ Electronic Funds Transfer      ☐ Truth in Savings
☐ _____

| 4. | 5. | 6. |
| | | |

## CORPORATE RESOLUTION
### (for all Corporations, Associations, and Lodges)

To FARMERS & MERCHANTS BANK OF LONG BEACH:
RESOLVED: That this organization establish in its name one or more deposit accounts with the FARMERS & MERCHANTS BANK OF LONG BEACH upon such terms and conditions as agreed upon with the bank and furthermore that

_____ (Name) acting as the _____ (Title) and

_____ (Name) acting as the _____ (Title) of
this organization are authorized to establish such an account on behalf of this organization. Officers authorized to withdraw the funds of this

organization from said account are: _____ (Name) /_____ (Title), and

_____ (Name) / _____ (Title), and

_____ (Name) / _____ (Title) upon presentation of checks drawn
against said account and signed as provided and certified by the Secretary of this organization. The bank is further authorized to honor and pay any and all checks so signed, including those drawn to the individual order of any officer or other person authorized to sign the same.

We certify that the foregoing is a full, true, and correct copy of the Resolution adopted by the Board of Directors of the _____
_____ (Organization Name)
at a meeting of said Board held on the _____ day of _____ (Month & Year) and that the signatures
provided with the Bank Depositor Agreement are the signatures of the persons duly authorized to withdraw funds of this organization from Farmers & Merchants Bank of Long Beach in accordance with the above resolution.

President: _____          Secretary: _____

**BACKUP WITHHOLDING CERTIFICATIONS**

Check the appropriate box:

☐ Individual/Sole Proprietor

☐ Corporation

☐ Partnership

☐ L.L.C. Enter the tax clasification (D = disregarded entity, C = corporation, P = partnership) _____

☐ Unincorporated Association

☐ Other _____

Check the following box if true:

☐ Exempt payee

Taxpayer Identification Number: _____

Under penalties of perjury, I certify that:

(1) The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

(2) I am not subject to backup withholding either because: (1) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the Internal Revenue Service has notified me that I am no longer subject to backup withholding, and

(3) I am a U.S. person (including a U.S. resident alien).

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate trans-actions item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN.

X _____
                                                    Date

**ONLINE BANKING ONLY:** I/we acknowledge receipt of a copy and agree to the terms of the Online Banking Disclosure.

Customer Initials: _____     Customer Initials: _____     Customer Initials: _____

**SPECIAL PROMOTION:** I ☐ do or ☐ do not request Farmers & Merchants Bank to provide my name to _____ as notification that I have opened an account as part of special promotion in their benefit.

Customer Signature: _____

| Bank use only: Superseded Card | | |
|---|---|---|
| Accepting Employee: _____ | Branch: _____ | Date: _____ |

PAGE 3 OF 3

**CORPORATE RESOLUTION**
**(for all Corporations, Associations, and Lodges)**

To FARMERS & MERCHANTS BANK OF LONG BEACH:
RESOLVED: That this organization establish in its name one or more deposit accounts with the FARMERS & MERCHANTS BANK OF LONG BEACH upon such terms and conditions as agreed upon with the bank and furthermore that

Michael A. Carabini (Name) acting as the President (Title) and Gregory G. Walker (Name) acting as the Secretary (Title) of **NEWPORT SERVICE CORPORATION [DDA 01076256 AND DDA 01083155]** are authorized to establish such an account on behalf of this organization.

Officers authorized to withdraw the funds of this organization from said account are:

Michael A. Carabini (Name) / Authorized Signer (Title), and
Gregory G. Walker (Name) / Authorized Signer (Title), and
Louis E. Carabini (Name) / Authorized Signer (Title), and
Brian D. Jenkins (Name) / Authorized Signer (Title), and
Ronald Smoler (Name) / Authorized Signer (Title), and
Katherine M. Gernak (Name) / Authorized Signer (Title) upon presentation of checks drawn against said account and signed and certified by the Secretary of this organization. The bank is further authorized to honor and pay any and all checks so signed, including those drawn to the individual order of any officer or other person authorized to sign the same.

We certify that the foregoing is a full, true, and correct copy of the Resolution adopted by the Board of Directors of the Newport Service Corporation (Organization Name) at a meeting of said Board held on the 12th day of 03/10 (Month & Year) and that the signatures provided with the Bank Depositor Agreement are the signatures of the persons duly authorized to withdraw funds of this organization from Farmers & Merchants Bank of Long Beach in accordance with the above resolution.

President: _____   Secretary: _____
         Michael A. Carabini                    Gregory G. Walker

# Newport Service Corporation

4910 Birch Street

Newport Beach, California

92660-2188

714/752/1400

May 24, 1993

Mr. John Hinrichs
Farmers and Merchants Bank
302 Pine Avenue
Long Beach, California 90802

Re: Newport Service Corporation
    Account No. ▮▮▮▮▮▮▮

Dear Mr. Hinrichs:

Due to a change in personnel, we find it necessary to change
the persons authorized to sign checks for the above account.
Effective immediately, the following will constitute acceptable
signatures:

Louis E. Carabini
Michael A. Carabini
Gregory G. Walker
Brian D. Jenkins
Ronald Smoler

Please acknowledge receipt by signing and returning the
enclosed copy of this letter.

Very truly yours,

Michael A. Carabini
President

MAC/pac
Enclosures

Acknowledgment:

By:_____

Date:_____

f&mnsc.ltr

D

Farmers & Merchants Bank
Main Office
302 Pine Avenue
Long Beach, CA 90802

| ACCOUNT NUMBER | 1▮ |
|---|---|

Business Checking

**ACCOUNT OWNER(S) NAME & ADDRESS**

Newport Service Corp
4910 Birch St
Newport Beach CA  92660

Revised Date:02/11/03

Updating signatures

**OWNERSHIP OF ACCOUNT - CONSUMER PURPOSE**

☐ INDIVIDUAL    ☐ _____
☐ JOINT ACCOUNT    ☐ TENANCY IN COMMON ACCOUNT
☐ COMMUNITY PROPERTY ACCOUNT OF HUSBAND AND WIFE
☐ JOINT ACCOUNT OF HUSBAND AND WIFE WITH RIGHT OF SURVIVORSHIP
☐ TRUST - SEPARATE AGREEMENT:
☐ TOTTEN TRUST    OR    ☐ PAY-ON-DEATH
DESIGNATION AS DEFINED IN THIS AGREEMENT
Name and Address of Beneficiaries:

☐ NEW    ☒ EXISTING
TYPE OF ACCOUNT: ☒ CHECKING    ☐ SAVINGS
☐ MONEY MARKET    ☐ CERTIFICATE OF DEPOSIT
☐ NOW

This is your (check one):
☒ Permanent    ☐ Temporary    account agreement.

THIS CARD SUPERSEDES PREVIOUS CARD
* Number of signatures required for withdrawal _1_FEB_5_/_/03

FACSIMILE SIGNATURE(S) ALLOWED?    ☐ YES    ☒ NO

**OWNERSHIP OF ACCOUNT - BUSINESS PURPOSE**

☐ SOLE PROPRIETORSHIP
☒ CORPORATION:    ☒ FOR PROFIT    ☐ NOT FOR PROFIT
☐ PARTNERSHIP
☐ _____

BUSINESS: _____
COUNTY & STATE OF ORGANIZATION:   LOS ANGELES        CA
AUTHORIZATION DATED: _____

DATE OPENED _____ BY____ ES8519
INITIAL DEPOSIT $ _____
☐ CASH  ☐ CHECK  ☐ _____
HOME TELEPHONE # _____
BUSINESS PHONE # _____
DRIVER'S LICENSE # _____
EMAIL _____
EMPLOYER _____
MOTHER'S MAIDEN NAME _____
Name and address of someone who will always know your location: ____
Chex System: N
            EXISTING

*One signature on checks under
$1,000 and Two signatures on
X   checks of $1,000 or more

SIGNATURE(S) - The undersigned agree to the terms stated on every page of this form and acknowledge receipt of a completed copy. The undersigned further authorize the financial institution to verify credit and employment history and/or have a credit reporting agency prepare a credit report on the undersigned, as individuals. The undersigned also acknowledge the receipt of a copy and agree to the terms of the following disclosure(s):

☒ Deposit Account    ☒ Funds Availability    ☒ Privacy
☒ Electronic Funds Transfer    ☐ Truth in Savings
☐

(1):  ☒ _____
        Michael A. Carabini
      I.D. #

(2):  ☒ _____
        Gregory G. Walker
      I.D. # _____ D.O.B. _____

(3):  ☒ _____
        Brian D. Jenkins
      I.D. # _____

(4):  X _____
        Ronald Smoler
      I.D. # _____
☐ See Addendum, effective 3/29/10
Authorized Signer (individual Accounts Only)

**BACKUP WITHHOLDING CERTIFICATIONS**

TIN: _____
☒ TAXPAYER I.D. NUMBER - The Taxpayer Identification Number shown above (TIN) is my correct taxpayer identification number.

☒ BACKUP WITHHOLDING - I am not subject to backup withholding either because I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified me that I am no longer subject to backup withholding.

☐ EXEMPT RECIPIENTS - I am an exempt recipient under the Internal Revenue Service Regulations.

SIGNATURE: I certify under penalties of perjury the statements checked in this section and that I am a U.S. person (including a U.S. resident alien).

X _____
            (Date)

X _____
I.D.# _____ D.O.B. _____

Farmers & Merchants Bank
302 Pine Avenue
Long Beach, CA 90802

**OWNERSHIP OF ACCOUNT - CONSUMER PURPOSE**

☐ INDIVIDUAL        ☐ _____
☐ JOINT ACCOUNT    ☐ TENANCY IN COMMON ACCOUNT
☐ COMMUNITY PROPERTY ACCOUNT OF HUSBAND AND WIFE
☐ JOINT ACCOUNT OF HUSBAND AND WIFE WITH RIGHT OF SURVIVORSHIP
☐ TRUST - SEPARATE AGREEMENT: _____
☐ TOTTEN TRUST    OR    ☐ PAY-ON-DEATH
DESIGNATION AS DEFINED IN THIS AGREEMENT
Name and Address of Beneficiaries:

**OWNERSHIP OF ACCOUNT - BUSINESS PURPOSE**

☐ SOLE PROPRIETORSHIP
☒ CORPORATION:    ☒ FOR PROFIT    ☐ NOT FOR PROFIT
☐ PARTNERSHIP
☐ _____

BUSINESS: _____ LOS ANGELES _____ CA
COUNTY & STATE
OF ORGANIZATION: _____
AUTHORIZATION DATED: _____

DATE OPENED ___12/22/87___ BY___ ES8519 ___
INITIAL DEPOSIT $ _____
☐ CASH  ☐ CHECK  ☐ _____
HOME TELEPHONE # _____
BUSINESS PHONE # _____
DRIVER'S LICENSE # _____
EMPLOYER _____
MOTHER'S MAIDEN NAME _____
Name and address of someone who will always know your location: ____
_____
_____

**BACKUP WITHHOLDING CERTIFICATIONS**

TIN: _____
☒ TAXPAYER I.D. NUMBER - The Taxpayer Identification Number shown above (TIN) is my correct taxpayer identification number.

☒ BACKUP WITHHOLDING - I am not subject to backup withholding either because I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified me that I am no longer subject to backup withholding.

☐ EXEMPT RECIPIENTS - I am an exempt recipient under the Internal Revenue Service Regulations.

SIGNATURE: I certify under penalties of perjury the statements checked in this section.

X _____
                           (Date)

---

**ACCOUNT NUMBER** _____

Business Checking
**ACCOUNT OWNER(S) NAME & ADDRESS**

Newport Service Corp
4910 Birch St
Newport Beach CA  92660

Revised Date:02/11/03
Updating signatures

                    ☐ NEW            ☒ EXISTING
**TYPE OF**   ☒ CHECKING      ☐ SAVINGS
**ACCOUNT**  ☐ MONEY MARKET  ☐ CERTIFICATE OF DEPOSIT
                    ☐ NOW            ☐ _____

This is your (check one):
☒ Permanent    ☐ Temporary    account agreement.

Number of signatures required for withdrawal __1__
FACSIMILE SIGNATURE(S) ALLOWED?  ☐ YES  ☒ NO

[ X                                    ]

SIGNATURE(S) - THE UNDERSIGNED AGREE(S) TO THE TERMS STATED ON PAGES 1 AND 2 OF THIS FORM, AND ACKNOWLEDGE(S) RECEIPT OF A COMPLETED COPY ON TODAY'S DATE. THE UNDERSIGNED ALSO ACKNOWLEDGE(S) RECEIPT OF A COPY OF AND AGREE(S) TO THE TERMS OF THE FOLLOWING DISCLOSURE(S):

☒ Deposit Account Disclosure    ☒ Funds Availability Disclosure
☒ Electronic Funds Transfer Disclosure    ☐ TIS Disclosure
☐ _____

(1): X _____
         Louis E. Carabini
(5)
         I.D. # _____

(2): X _____
(6)
         I.D. # _____  D.O.B. _____

(3): X _____
(7)
         I.D. # _____  D.O.B. _____

(4): X _____
(8)
         I.D. # _____  D.O.B. _____

☐ Authorized Signer (Individual Accounts Only)

     X _____

     I.D.# _____  D.O.B. _____

                                                    (page 1 of 2)

Addendum to agreement dated 2/11/03, effective 3/29/10

## BUSINESS ACCOUNT: FOR BANK USE ONLY

Account Name(s): Newport Service Corp

Account Number: _____ Date Opened: _____ Source of Deposit/Amount: _____

Opening Employee: Debbie Buchanan _____ Chex Systems: [X] Yes [ ] No

Waiver Reason & Authorization: _____

Contact Person & Phone: _____

Anticipated Monthly Deposits/Withdrawals $ _____ $ _____

| Type of Account: | Applying as a/an: | Interest Payment (Time Deposit Only): |
|---|---|---|
| Business Checking | [ ] Sole Owner | Payment Intervals: Payment Methods |
| | [ ] Partnership | [ ] Monthly  [ ] Compound |
| | [X] Corporation | [ ] Quarterly  [ ] Issue Check |
| Primary CIF number: N001557 | [ ] Other _____ | [ ] At Maturity  [ ] Credit Account |

This is your: [X] Permanent  [ ] Temporary Account Agreement  Account Type/ #: _____

Account Name: Newport Service Corp _____ Tax I.D. Number: _____

Street Address: 4910 Birch St  Newport Beach CA 92660  Phone Number: _____

Alternate Address: _____ FAX Number: _____

SPECIAL HANDLING REQUESTS: [ ] MAIL [X] HOLD all statements and other notices.  Facsimile Signature [ ]

SIGNATURE RESTRICTIONS: Number of signatures to withdraw funds X  2  Circumstances: for $1,000 and over

OVERDRAFT PROTECTION: I/we [ ] do [X] do not authorize F&M Bank to transfer funds automatically from THIS PRIMARY Account Number

_____ and or my (our) F&M Bankcard Number _____ _____ to my Secondary Account.

Customer's Initials: _____

| 1st Signer Information: | Katherine | M | Gernak | |
|---|---|---|---|---|
| | First Name & Middle Initial | | Last Name | Home Phone Number |

Existing Customer [ ]

Customer Initials KMG

GAA2454

Height/Eye Color/Hair Color  Identification Type & Number  Social Security Number

November 18, 1958
Date of Birth  Cell Phone

| 2nd Signer Information: | | | | |
|---|---|---|---|---|
| | First Name & Middle Initial | | Last Name | Home Phone Number |

Existing Customer [ ]

Customer Initials _____

/ /

Height/Eye Color/Hair Color  Identification Type & Number  Social Security Number

Date of Birth  Cell Phone

Add this customer to account [ ] Yes [ ] No  Relationship _____  Add customer to account title [ ] Yes [ ] No

| 3rd Signer Information: | | | | |
|---|---|---|---|---|
| | First Name & Middle Initial | | Last Name | Home Phone Number |

Existing Customer [ ]

Customer Initials _____

/ /

Height/Eye Color/Hair Color  Identification Type & Number  Social Security Number

Date of Birth  Cell Phone

Add this customer to account [ ] Yes [ ] No  Relationship _____  Add customer to account title [ ] Yes [ ] No

### OFFICIAL SIGNATURES

The undersigned agree to the terms stated on every page of this form and acknowledge receipt of a completed copy. The undersigned further authorize the financial institution from time to time to verify credit and employment history and/or have a credit reporting agency prepare a credit report on the undersigned, as individuals. The undersigned also acknowledge the receipt of a copy and agree to the terms of the following disclosure(s):

[X] Deposit Account - T & C  [X] Funds Availability  [X] Privacy
[X] Electronic Funds Transfer  [X] Truth in Savings
[ ] _____

1. Katherine M Gernak  2. _____  3. _____

JHA FMBCA03 04/09
PAGE 1 OF 3

**4th Signer Information:**

Existing Customer ☐

Customer Initials _____

First Name & Middle Initial

Height/Eye Color/Hair Color

Date of Birth

Last Name

Identification Type & Number

Cell Phone

Home Phone Number

Social Security Number

Add this customer to account ☐ Yes ☐ No    Relationship _____    Add customer to account title ☐ Yes ☐ No

**5th Signer Information:**

Existing Customer ☐

Customer Initials _____

First Name & Middle Initial

Height/Eye Color/Hair Color

Date of Birth

Last Name

Identification Type & Number

Cell Phone

Home Phone Number

Social Security Number

Add this customer to account ☐ Yes ☐ No    Relationship _____    Add customer to account title ☐ Yes ☐ No

**6th Signer Information:**

Existing Customer ☐

Customer Initials _____

First Name & Middle Initial

Height/Eye Color/Hair Color

Date of Birth

Last Name

Identification Type & Number

Cell Phone

Home Phone Number

Social Security Number

Add this customer to account ☐ Yes ☐ No    Relationship _____    Add customer to account title ☐ Yes ☐ No

## OFFICIAL SIGNATURES

The undersigned agree to the terms stated on every page of this form and acknowledge receipt of a completed copy.  The undersigned further authorize the financial institution from time to time to verify credit and employment history and/or have a credit reporting agency prepare a credit report on the undersigned, as individuals. The undersigned also acknowledge the receipt of a copy and agree to the terms of the following disclosure(s):

☐ Deposit Account - T & C        ☐        Funds Availability        ☐        Privacy
☐ Electronic Funds Transfer     ☐ Truth in Savings
☐ _____

| 4. | 5. | 6. |
|---|---|---|

## CORPORATE RESOLUTION
### (for all Corporations, Associations, and Lodges)

To FARMERS & MERCHANTS BANK OF LONG BEACH:
RESOLVED:  That this organization establish inits name one or more deposit accounts with the FARMERS & MERCHANTS BANK OF LONG BEACH upon such terms and conditions as agreed upon with the bank and furthermore that

_____ (Name) acting as the _____ (Title) and

_____ (Name) acting as the _____ (Title) of
this organization are authorized to establish such an account on behalf of this organization.  Officers authorized to withdraw the funds of this

organization from said account are: _____ (Name) / _____ (Title), and

_____ (Name) / _____ (Title), and
_____ (Name) / _____ (Title) upon presentation of checks drawn
against said account and signed as provided and certified by the Secretary of this organization.  The bank is further authorized to honor end pay any and all checks so signed, including those drawn to the individual order of any officer or other person authorized to sign the same.

We certify that the foregoing is a full, true, and correct copy of the Resolution adopted by the Board of Directors of the _____
_____ (Organization Name)
at a meeting of said Board held on the _____ day of _____ (Month & Year) and that the signatures provided with the Bank Depositor Agreement are the signatures of the persons duly authorized to withdraw funds of this organization from Farmers & Merchants Bank of Long Beach in accordance with the above resolution.

President: _____    Secretary: _____

**BACKUP WITHHOLDING CERTIFICATIONS**

Check the appropriate box:

☐ Individual/Sole Proprietor

☐ Corporation

☐ Partnership

☐ L.L.C.  Enter the tax clasification (D = disregarded entity, C = corporation, P = partnership) _____

☐ Unincorporated Association

☐ Other _____

Check the following box if true:

☐ Exempt payee

Taxpayer Identification Number: _____

Under penalties of perjury, I certify that:

(1) The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

(2) I am not subject to backup withholding either because: (1) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the Internal Revenue Service has notified me that I am no longer subject to backup withholding, and

(3) I am a U.S. person (including a U.S. resident alien).

Certification instructions.  You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return.  For real estate trans-actions item 2 does not apply.  For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN.

X _____
                                                                    Date

**ONLINE BANKING ONLY:**  I/we acknowledge receipt of a copy and agree to the terms of the Online Banking Disclosure.

Customer Initials: _____          Customer Initials: _____          Customer Initials: _____

**SPECIAL PROMOTION:** I ☐ do or ☐ do not request Farmers & Merchants Bank to provide my name to _____ as notification that I have opened an account as part of special promotion in their benefit.

Customer Signature: _____

| Bank use only:  Superseded Card |
| --- |
| Accepting Employee: _____     Branch: _____     Date: _____ |

**CORPORATE RESOLUTION**
**(for all Corporations, Associations, and Lodges)**

To FARMERS & MERCHANTS BANK OF LONG BEACH:
RESOLVED: That this organization establish in its name one or more deposit accounts with the FARMERS & MERCHANTS BANK OF LONG BEACH upon such terms and conditions as agreed upon with the bank and furthermore that

Michael A. Carabini (Name) acting as the President (Title) and Gregory G. Walker (Name) acting as the Secretary (Title) of **NEWPORT SERVICE CORPORATION [DDA 01076256 AND DDA 01083155]** are authorized to establish such an account on behalf of this organization.

Officers authorized to withdraw the funds of this organization from said account are:

Michael A. Carabini (Name) / Authorized Signer (Title), and
Gregory G. Walker (Name) / Authorized Signer (Title), and
Louis E. Carabini (Name) / Authorized Signer (Title), and
Brian D. Jenkins (Name) / Authorized Signer (Title), and
Ronald Smoler (Name) / Authorized Signer (Title), and
Katherine M. Gernak (Name) / Authorized Signer (Title) upon presentation of checks drawn against said account and signed as provided and certified by the Secretary of this organization. The bank is further authorized to honor and pay any and all checks so signed, including those drawn to the individual order of any officer or other person authorized to sign the same.

We certify that the foregoing is a full, true, and correct copy of the Resolution adopted by the Board of Directors of the Newport Service Corporation (Organization Name) at a meeting of said Board held on the 12th day of 03/10 (Month & Year) and that the signatures provided with the Bank Depositor Agreement are the signatures of the persons duly authorized to withdraw funds of this organization from Farmers & Merchants Bank of Long Beach in accordance with the above resolution.

President: _____    Secretary: _____
            Michael A. Carabini                         Gregory G. Walker

Page 1 of 1

**Newport Service Corporation**

4910 Birch Street

Newport Beach, California

92660-2188

714/752/1400

May 24, 1993

Mr. John Hinrichs
Farmers and Merchants Bank
302 Pine Avenue
Long Beach, California 90802

Re: Newport Service Corporation
    Account No. ▉▉▉▉▉▉

Dear Mr. Hinrichs:

Due to a change in personnel, we find it necessary to change
the persons authorized to sign checks for the above account.
Effective immediately, the following will constitute acceptable
signatures:

> Louis E. Carabini
> Michael A. Carabini
> Gregory G. Walker
> Brian D. Jenkins
> Ronald Smoler

Please acknowledge receipt by signing and returning the
enclosed copy of this letter.

Very truly yours,

Michael A. Carabini
President

MAC/pac
Enclosures

Acknowledgment:

By:_____

Date:_____

f&mnscl.ltr

# EXHIBIT 8

# TELEPHONIC SELLER REGISTRATION



| TELEMARKETING UNIT INFORMATION | |
| --- | --- |
| REGISTRATION NO. | |
| REGISTRATION DATE | |
| BUSINESS NAME | |
| ADDRESS | |
| CITY | |
| STATE | ZIP CODE |

**MAIL REGISTRATION FORM TO:**
**Attorney General's Office**
**300 S. Spring Street, Suite 1702**
**Los Angeles, CA 90013**
**ATTN: Consumer Law Section, Telemarketing Unit**

**IMPORTANT NOTE:** Issuance of a Telephonic Seller Registration Number by the Attorney General's Office does not indicate approval of the solicitations being used nor approval of any aspect of the Telephonic Seller's Business

**1.** THIS FILING IS MADE ON BEHALF OF (BUSINESS NAME WHEN CONTACTING THE PUBLIC):

Monex Deposit Company

**2.** OTHER NAME(S) USED WHEN DOING BUSINESS:

Monex

**3.** LEGAL NAME:

Same as item 1

**4.** BRIEF DESCRIPTION OF PRODUCT(S) SOLD:
Gold, silver, platinum, and palladium coins and bullion

**5.**

a) ☐ WE HAVE NEVER REGISTERED BEFORE AS A TELEPHONIC SELLER.

b) ☒ WE HAVE REGISTERED BEFORE AS A TELEPHONIC SELLER. GIVE REGISTRATION NUMBER & DATE OF CURRENT REGISTRATION BELOW:

REGISTRATION NUMBER: ███████

DATE OF REGISTRATION: **10/25/2014**

c) ☒ ATTACHED IS CHECK NO.: ███████ FOR $50.00 MADE PAYABLE TO "THE CALIFORINIA ATTORNEY GENERAL'S OFFICE."

**6.** OUR BUSINESS IS A:

a) ☐ CORPORATION INCORPORATED IN: _____
(STATE OF INCORPORATION)

☐ ATTACHED AND MARKED **EXHIBIT 1** IS A COPY OF OUR **ARTICLES OF INCORPORATION** OUR **BY-LAWS** AND **AMENDMENTS** THERETO.

b) ☒ PARTNERSHIP UNDER THE LAWS OF: _____
(STATE WHERE PARTNERSHIP FOUNDED)

☐ ATTACHED AND MARKED AS EXHIBIT 1 IS A COPY OF OUR **PARTNERSHIP AGREEMENT**.

STATE OF CALIFORNIA
JUS 8773 Rev 7/07

**TELEPHONIC SELLER REGISTRATION**

DEPARTMENT OF JUSTICE
PAGE 2 of 15

c) ☐ FICTITIOUS BUSINESS NAME REGISTERED BY:

_____
(NAME OF INDIVIDUAL REGISTERING FICTITIOUS NAME)

ON _____ AT _____
(DATE REGISTERED)          (WHERE FICTITIOUS NAME(S) WAS REGISTERED)

**7.**

a) ☐ AS DEFINED IN GENERAL INSTRUCTIONS, NUMBER B1, NO OTHER COMPANY IS OUR PARENT, NOR ARE WE AFFILIATED WITH ANY OTHER COMPANY.

b) ☐ AS DEFINED IN GENERAL INSTRUCTIONS, NUMBER B1, THE FOLLOWING COMPANY IS OUR PARENT:

_____
(NAME OF PARENT COMPANY)

**OUR PARENT COMPANY IS A:**

1) ☐ CORPORATION; IT IS INCORPORATED IN:

_____
(STATE OF INCORPORATION)

☐ ATTACHED & MARKED EXHIBIT 1A IS A COPY OF ITS **ARTICLES OF INCORPORATION, BY-LAWS & AMENDMENTS** THERETO.

2) ☐ PARTNERSHIP UNDER THE LAWS OF :

_____
(STATE WHERE PARTNERSHIP FOUNDED)

☐ ATTACHED & MARKED EXHIBIT 1A IS A COPY OF ITS **PARTNERSHIP AGREEMENT**.

3) ☐ FICTITIOUS BUSINESS NAME REGISTERED BY:

_____
(NAME OF INDIVIDUAL REGISTERING FICTITIOUS NAME)

ON _____ AT _____
(DATE REGISTERED)          (WHERE FICTITIOUS NAME(S) WAS REGISTERED)

c) ☒ AS DEFINED IN GENERAL INSTRUCTIONS, NUMBER B1, WE ARE AFFILIATED WITH THE FOLLOWING COMPANY:

**Monex Credit Company**

_____
(NAME(S) OF AFFILIATED COMPANIES)

**THE COMPANY WITH WHICH YOU ARE AFFILIATED IS A:**

1) ☐ CORPORATION; IT IS INCORPORATED IN:

_____
(STATE OF INCORPORATION)

☐ ATTACHED & MARKED EXHIBIT 1B IS A COPY OF ITS **ARTICLES OF INCORPORATION, BY-LAWS & AMENDMENTS** THERETO.

2) ☒ PARTNERSHIP UNDER THE LAWS OF :       Monex Credit Company is a California Limited Partnership

_____
(STATE WHERE PARTNERSHIP FOUNDED)

☒ ATTACHED & MARKED EXHIBIT 1B IS A COPY OF ITS **PARTNERSHIP AGREEMENT**.

3) ☐ FICTITIOUS BUSINESS NAME REGISTERED BY:

_____
(NAME OF INDIVIDUAL REGISTERING FICTITIOUS NAME)

ON _____ AT _____
(DATE REGISTERED)          (WHERE FICTITIOUS NAME(S) WAS REGISTERED)

STATE OF CALIFORNIA
JUS 8773 Rev 7/07

## TELEPHONIC SELLER REGISTRATION

DEPARTMENT OF JUSTICE
PAGE 3 of 15

**8.**   a)   COMPLETE STREET ADDRESS OF THE PRINCIPAL LOCATION FROM WHICH SALES WILL BE SOLICITED TELEPHONICALLY OR BY ANY OTHER MEANS. A <u>CERTIFICATE OF FILING</u> MUST BE POSTED AT THIS LOCATION IN A CONSPICUOUS PLACE FOR INSPECTION BY ANY GOVERNMENTAL AGENCY. THUS A STREET LOCATION MAY NOT BE A POST OFFICE BOX OR POST OFFICE SUITE ADDRESS.

ADDRESS:   4910 Birch Street

CITY:   Newport Beach          STATE: California          ZIP CODE: 92660

b)   ALL OTHER STREET ADDRESSES FROM WHICH SALES WILL BE SOLICITED TELEPHONICALLY OR BY ANY OTHER MEANS. A <u>CERTIFICATE OF FILING</u> MUST BE POSTED AT EACH OF THESE LOCATIONS IN A CONSPICUOUS PLACE FOR INSPECTION BY ANY GOVERNMENTAL AGENCY, THUS A STREET LOCATION MAY NOT BE A POST OFFICE BOX OR POST OFFICE SUITE ADDRESS.

ADDRESS:   None

CITY:          STATE:          ZIP CODE:

ADDRESS:   Same as item 8(a)

CITY:          STATE:          ZIP CODE:

c)   ADDRESS OF THE MAIN LOCATION IN CALIFORNIA FROM WHICH SALES WILL SOLICIT BUSINESS IS:  A <u>CERTIFICATE OF FILING</u> MUST BE POSTED AT EACH OF THESE LOCATIONS IN A CONSPICUOUS PLACE FOR INSPECTION BY ANY GOVERNMENTAL AGENCY. THUS A STREET LOCATION MAY NOT BE A POST OFFICE BOX OR POST OFFICE SUITE ADDRESS.

ADDRESS:

CITY:          STATE:          ZIP CODE:

d)   MAILING ADDRESS [IF DIFFERENT FROM 8(a)]:

NAME          COUNTRY

ADDRESS          EMAIL

CITY          STATE          ZIP CODE

**9.**   a)   LIST THE TELEPHONE NUMBERS TO BE USED TO SOLICIT BUSINESS FROM THE LOCATION SET FORTH IN 8(a):

(949) 752-1400

(800) 949-4653 (GOLD)

b)   LIST AND DESIGNATE THE LOCATION OF EACH TELEPHONE NUMBER(S) TO BE USED TO SOLICIT FROM EACH OF THE LOCATIONS SET FORTH IN 8(b):

| LOCATION | PHONE |
|---|---|
| 4910 Birch Street, Newport Beach, CA 92660 | (949) 752-1400 |
|  | (800) 949-4653 (GOLD) |

STATE OF CALIFORNIA
JUS 8773 Rev. 7/07

**TELEPHONIC SELLER REGISTRATION**

DEPARTMENT OF JUSTICE
PAGE 4 of 15

c)  IF 8(c) IS APPLICABLE, LIST THE TELEPHONE NUMBER(S) TO BE USED TO SOLICIT BUSINESS FROM THE LOCATION SET FORTH IN 8(c)

N/A

d)  LIST THE E-MAIL ADDRESS AND/OR WEB SITE TO BE USED BY THE COMPANY:

E-MAIL ADDRESS:  monex@monex.com

WEB SITE:  www.monex.com

e)  LIST THE NAME AND PHONE NUMBER OF A PERSON TO CONTACT REGARDING THIS REGISTRATION

NAME: Gregory G. Walker, Esq.                      PHONE NUMBER:      +1 (949) 752-1400

10. LIST EACH OFFICER, DIRECTOR, TRUSTEE, GENERAL PARTNER, LIMITED PARTNER, SOLE PROPRIETOR AND OWNER, AS APPLICABLE TO THE BUSINESS. (ATTACH ADDITIONAL PAGES AS NEEDED BUT USE THE SAME FORMAT.)

1)  NAME: Louis E. Carabini                                    DATE OF BIRTH: ▉

TITLE: President/Treasurer/ Chairman of Comco Management Corporation, a California Corporation, the General Partner of Monex Deposit Company          OWNERSHIP INTEREST:  ☐ YES  ☒ NO

DRIVER'S LICENSE NUMBER
AND STATE OF ISSUANCE: ▉                                California ˗

COMPLETE STREET ADDRESS OF PRINCIPAL RESIDENCE:

ADDRESS 4910 Birch Street          CITY Newport Beach          STATE CA          ZIP CODE 92660

2)  NAME:  Michael Carabini                                   DATE OF BIRTH: ▉

TITLE:  Limited Partner of Monex Deposit Company             OWNERSHIP INTEREST:  —  —

▉                                                            California

▉          RESIDENCE:

ADDRESS  31461 Via Santa Maria          CITY San Juan Capistrano          STATE CA          ZIP CODE 92675

STATE OF CALIFORNIA
JUS 8773 Rev 7/07

**TELEPHONIC SELLER REGISTRATION**

DEPARTMENT OF JUSTICE
PAGE 5 of 15

3)

| | |
|---|---|
| NAME: Montgomery Trust, Michael A. Carabini, Trustee | DATE OF BIRTH: N/A |
| TITLE: Limited Partner of Monex Deposit Company | OWNERSHIP INTEREST: [x] YES [ ] NO |
| DRIVER'S LICENSE NUMBER AND STATE OF ISSUANCE: N/A | |

COMPLETE STREET ADDRESS OF PRINCIPAL RESIDENCE:

ADDRESS 4910 Birch Street    CITY Newport Beach    STATE CA    ZIP CODE 92660

4)

| | |
|---|---|
| NAME: Emerson Trust, Michael A. Carabini, Trustee | DATE OF BIRTH: N/A |
| TITLE: Limited Partner of Monex Deposit Company | OWNERSHIP INTEREST: [x] YES [ ] NO |
| DRIVER'S LICENSE NUMBER AND STATE OF ISSUANCE: N/A | |

COMPLETE STREET ADDRESS OF PRINCIPAL RESIDENCE:

ADDRESS 4910 Birch Street    CITY Newport Beach    STATE CA    ZIP CODE 92660

5)

| | |
|---|---|
| NAME: Michael T. Maroney | DATE OF BIRTH: 1███9 |
| TITLE: Vice President/ Sales of Comco Management Corporation, a California Corporation, the General Partner of Monex Deposit Company | OWNERSHIP INTEREST: [x] YES [ ] NO |
| DRIVER'S LICENSE NUMBER AND STATE OF ISSUANCE: ███ | California |

COMPLETE STREET ADDRESS OF PRINCIPAL RESIDENCE:

ADDRESS 1370 Los Altos    CITY Long Beach    STATE CA    ZIP CODE 90815

**11.** LIST EACH INDIVIDUAL NOT LISTED IN ANSWER TO QUESTION (10) WHO HAS MANAGEMENT RESPONSIBILITIES IN CONNECTION WITH THE BUSINESS. (ATTACH ADDITIONAL PAGES AS NEEDED BUT USE THE SAME FORMAT.)

1)

| | |
|---|---|
| NAME: David J. Gala | DATE OF BIRTH: ███ |
| DRIVER'S LICENSE NUMBER ██ N███ | California |

COMPLETE STREET ADDRESS OF PRINCIPAL RESIDENCE:

ADDRESS 2677732 Magdalena Lane    CITY Mission Viejo    STATE CA    ZIP CODE 92691

MANAGEMENT DUTIES: Sales Director: Recruits, trains, and supervises Account Representatives.

2)

| | |
|---|---|
| NAME: Sean Brazney | DATE OF BIRTH: 1███ |
| DRIVER'S LICENSE NUMBER AND STATE OF ISSUANCE: A███ | California |

COMPLETE STREET ADDRESS OF PRINCIPAL RESIDENCE:

ADDRESS 1608 1/2 Balboa Avenue    CITY Newport Beach    STATE CA    ZIP CODE 92662

MANAGEMENT DUTIES: Training Manager: Recruits, trains and supervises Account Representatives

STATE OF CALIFORNIA
JUS 8773 Rev. 7/07

# TELEPHONIC SELLER REGISTRATION

DEPARTMENT OF JUSTICE
PAGE 5 of 15

3)

| | |
|---|---|
| NAME: Brian D. Jenkins | DATE OF BIRTH: ▇ |
| TITLE: Limited Partner of Monex Deposit Company | OWNERSHIP INTEREST:   [x] YES   [ ] NO |
| DRIVER'S LICENSE NUMBER AND STATE OF ISSUANCE: ▇ | California |

COMPLETE STREET ADDRESS OF PRINCIPAL RESIDENCE:

ADDRESS 274 Walnut Street    CITY Costa Mesa    STATE CA    ZIP CODE 92627

4)

| | |
|---|---|
| NAME: Comco Management Corporation | DATE OF BIRTH: |
| TITLE: General Partner | OWNERSHIP INTEREST:   [x] YES   [ ] NO |
| DRIVER'S LICENSE NUMBER AND STATE OF ISSUANCE: | |

COMPLETE STREET ADDRESS OF PRINCIPAL RESIDENCE:

ADDRESS 4910 Birch Street    CITY Newport Beach    STATE CA    ZIP CODE 92660

5)

| | |
|---|---|
| NAME: Ronald Smoler | DATE OF BIRTH: ▇ |
| TITLE: Limited Partner of Monex Deposit Company | OWNERSHIP INTEREST:   [x] YES   [ ] NO |
| DRIVER'S LICENSE NUMBER AND STATE OF ISSUANCE: N▇ | California |

COMPLETE STREET ADDRESS OF PRINCIPAL RESIDENCE:

ADDRESS 2 Castle Pines    CITY Coto de Caza    STATE CA    ZIP CODE 92679

**11.** LIST EACH INDIVIDUAL NOT LISTED IN ANSWER TO QUESTION (10) WHO HAS MANAGEMENT RESPONSIBILITIES IN CONNECTION WITH THE BUSINESS. (ATTACH ADDITIONAL PAGES AS NEEDED BUT USE THE SAME FORMAT.)

1)

| | |
|---|---|
| NAME: | DATE OF BIRTH: |
| DRIVER'S LICENSE NUMBER AND STATE OF ISSUANCE: | |

COMPLETE STREET ADDRESS OF PRINCIPAL RESIDENCE:

ADDRESS    CITY    STATE    ZIP CODE

MANAGEMENT DUTIES:

2)

| | |
|---|---|
| NAME: | DATE OF BIRTH: |
| DRIVER'S LICENSE NUMBER AND STATE OF ISSUANCE: | |

COMPLETE STREET ADDRESS OF PRINCIPAL RESIDENCE:

ADDRESS    CITY    STATE    ZIP CODE

MANAGEMENT DUTIES:

STATE OF CALIFORNIA
JUS 8773 Rev. 7/07

DEPARTMENT OF JUSTICE
PAGE 6 of 15

## TELEPHONIC SELLER REGISTRATION

3) NAME: _____     DATE OF BIRTH: _____

DRIVER'S LICENSE NUMBER
AND STATE OF ISSUANCE: _____

COMPLETE STREET ADDRESS OF PRINCIPAL RESIDENCE:

ADDRESS _____  CITY _____  STATE _____  ZIP CODE _____

MANAGEMENT DUTIES: _____

4) NAME: _____     DATE OF BIRTH: _____

DRIVER'S LICENSE NUMBER
AND STATE OF ISSUANCE: _____

COMPLETE STREET ADDRESS OF PRINCIPAL RESIDENCE:

ADDRESS _____  CITY _____  STATE _____  ZIP CODE _____

MANAGEMENT DUTIES: _____

12. LIST EACH PERSON WHO IS IN CHARGE OF EACH LOCATION SPECIFIED IN ANSWER TO QUESTION 8. LIST EACH PERSON IN CHARGE EVEN IF THAT NAME APPEARS IN ANSWER TO ANOTHER QUESTION. (ATTACH ADDITIONAL PAGES AS NEEDED BUT USE THE SAME FORMAT.)

1) NAME: Louis E. Carabini

RESIDENCE ADDRESS:

ADDRESS 4910 Birch Street    CITY Newport Beach    STATE CA    ZIP CODE 91660

IN CHARGE OF
LOCATION AT:    4910 Birch Street, Newport Beach, California

2) NAME: _____

RESIDENCE ADDRESS:

ADDRESS _____  CITY _____  STATE _____  ZIP CODE _____

IN CHARGE OF
LOCATION AT: _____

3) NAME: _____

RESIDENCE ADDRESS:

ADDRESS _____  CITY _____  STATE _____  ZIP CODE _____

IN CHARGE OF
LOCATION AT: _____

4) NAME: _____

RESIDENCE ADDRESS:

ADDRESS _____  CITY _____  STATE _____  ZIP CODE _____

IN CHARGE OF
LOCATION AT: _____

STATE OF CALIFORNIA
JUS 8773 Rev. 7/07

### TELEPHONIC SELLER REGISTRATION

DEPARTMENT OF JUSTICE
PAGE 7 of 15

**13.** LIST THE FOLLOWING INFORMATION FOR ANY PERSON LISTED IN THE ANSWERS TO QUESTIONS 10, 11 OR 12 WHO:

1) HAS BEEN CONVICTED OF A FELONY OR MISDEMEANOR, OR PLED NOLO CONTENDERE, TO A CHARGE ALLEGING VIOLATION OF THIS TELEPHONIC SELLER LAW, OR FRAUD, THEFT, EMBEZZELMENT, FRAUDULENT CONVERSION, OR MISAPPROPRIATION OF PROPERTY; OR

2) HAS HAD ENTERED AGAINST HIM OR HER A FINAL JUDGMENT OR ORDER IN A CIVIL OR ADMINISTRATIVE ACTION, INCLUDING A STIPULATED JUDGEMENT OR ORDER, IF THE COMPLAINT OR PETITION IN THE CIVIL OR ADMINISTRATIVE ACTION ALLEGED ACTS CONSTITUTING A VIOLATION OF THIS TELEPHONIC SELLER LAW, FRAUD, THEFT, EMBEZZLEMENT, FRAUDULENT CONVERSION, OR MISAPPROPRIATION OF PROPERTY, THE USE OF UNTRUE OR MISLEADING REPRESENTATIONS IN AN ATTEMPT TO SELL OR DISPOSE OF REAL OR PERSONAL PROPERTY, OR THE USE OF UNFAIR, UNLAWFUL, OR DECEPTIVE BUSINESS PRACTICES; OR

3) IS SUBJECT TO ANY CURRENTLY EFFECTIVE INJUNCTION OR RESTRICTIVE COURT ORDER RELATING TO BUSINESS ACTIVITY AS THE RESULT OF AN ACTION BROUGHT BY A FEDERAL, STATE, OR LOCAL PUBLIC AGENCY OR UNIT THEREOF, INCLUDING BUT NOT LIMITED TO, AN ACTION AFFECTING ANY VOCATIONAL LICENSE.

PROVIDE ALL REQUESTED INFORMATION FOR EACH PERSON. (ATTACH ADDITIONAL PAGES AS NEEDED.)

IF NO INDIVIDUAL LISTED IN ANSWERS TO QUESTION 10, 11, 12 NEED TO BE LISTED BECAUSE NONE OF THEM HAVE BEEN CONVICTED OR PLED NOLO CONTENDERE TO ANY CHARGE SET FORTH IN QUESTION 13 OR IS NOT SUBJECT TO ANY CURRENT INJUNCTIVE OR RESTRICTIVE ORDER THEN MARK AN "X" HERE: ☐

---

\* NAME OF INDIVIDUAL: {15(2) and (3)} Louis E. Carabini

COURT OR ADMINISTRATIVE AGENCY RENDERING
DECISION, JUDGEMENT OR ORDER:     See Attachment

DATE OF CONVICTION, JUDGEMENT OR ORDER:  See Attachment       DOCKET NUMBER: See Attachment

---

\* NAME OF INDIVIDUAL:

COURT OR ADMINISTRATIVE AGENCY RENDERING
DECISION, JUDGEMENT OR ORDER:

DATE OF CONVICTION, JUDGEMENT OR ORDER:       DOCKET NUMBER:

---

**14.** LIST THE INFORMATION REQUIRED BY QUESTION 13 EXCEPT APPLIED TO THE TELEPHONIC SELLER. THE TELEPHONIC SELLER IS THE CORPORATION, PARTNERSHIP, FIRM, ASSOCIATION, JOINT VENTURE OR ANY OTHER TYPE OR BUSINESS ENTITY WHICH IS SUBMITTING THIS APPLICATION FOR REGISTRATION.

IF THE TELEPHONIC SELLER DOES NOT NEED TO BE LISTED BECAUSE THE SELLER HAS NOT BEEN CONVICTED OR PLED NOLO CONTENDERE TO ANY CHARGES SET FORTH IN QUESTIONS 13 OR IS NOT SUBJECT TO ANY CURRENT OR RESTRICTIVE ORDER, THEN MARK AN "X" HERE: ☒

---

\* NAME OF INDIVIDUAL:

COURT OR ADMINISTRATIVE AGENCY RENDERING
DECISION, JUDGEMENT OR ORDER:

DATE OF CONVICTION, JUDGEMENT OR ORDER:       DOCKET NUMBER:

NAME OF GOVERNMENT AGENCY WHICH
BROUGHT THE ACTION:

---

\* NAME OF INDIVIDUAL:

COURT OR ADMINISTRATIVE AGENCY RENDERING
DECISION, JUDGEMENT OR ORDER:

DATE OF CONVICTION, JUDGEMENT OR ORDER:       DOCKET NUMBER:

NAME OF GOVERNMENT AGENCY WHICH
BROUGHT THE ACTION:

STATE OF CALIFORNIA
JUS 8773 Rev. 7/07

**TELEPHONIC SELLER REGISTRATION**

DEPARTMENT OF JUSTICE
PAGE 8 of 15

15.  LIST THE FOLLOWING INFORMATION FOR ANY PERSON LISTED IN THE ANSWERS TO QUESTIONS 10, 11 OR 12 WHO HAS:

   a)   AT ANY TIME DURING THE PREVIOUS SEVEN TAX YEARS:
        - FILED IN BANKRUPTCY,
        - BEEN ADJUDGED A BANKRUPT,
        - BEEN REORGANIZED DUE TO INSOLVENCY, OR

   b)   WHO HAS BEEN A PRINCIPAL, DIRECTOR, TRUSTEE, GENERAL OR LIMITED PARTNER, OR HAD MANAGEMENT
        RESPONSIBILITIES FOR ANY OTHER CORPORATION, PARTNERSHIP, JOINT VENTURE OR BUSINESS ENTITY THAT HAS:
        - FILED IN BANKRUPTCY,
        - BEEN ADJUDGED A BANKRUPT,
        - BEEN REORGANIZED DUE TO INSOLVENCY DURING OR WITHIN ONE YEAR AFTER THE PERIOD THAT THE PERSON
          HELD THAT POSITION. (ATTACH ADDITIONAL PAGES AS NEEDED.)

IF NO PERSON LISTED IN ANSWERS TO QUESTIONS 10, 11, OR 12 NEED TO BE LISTED BECAUSE NONE OF THEM FALLS WITHIN THE
SITUATION DESCRIBED IN QUESTION 15, THEN MARK AN "X" HERE: ☒

| NAME OF INDIVIDUAL: | | | | COURT: | |
|---|---|---|---|---|---|
| ADDRESS: | | | | DATE OF EVENT: | |
| CITY: | STATE | ZIP CODE | | DOCKET NO.: | |
| NAME OF INDIVIDUAL: | | | | COURT: | |
| ADDRESS: | | | | DATE OF EVENT: | |
| CITY: | STATE: | ZIP CODE: | | DOCKET NO.: | |

16.  LIST THE SAME INFORMATION REQUIRED IN QUESTION 15 EXCEPT APPLIED TO THE TELEPHONIC SELLER. THE TELEPHONIC SELLER IS
THE CORPORATION, PARTNERSHIP, FIRM, ASSOCIATION, JOINT VENTURE OR ANY OTHER TYPE OF BUSINESS ENTITY WHICH IS
SUBMITTING THIS APPLICATION FOR REGISTRATION.

IF THE TELEPHONIC SELLER DOES NOT NEED TO BE LISTED BECAUSE THE SELLER DOES NOT FALL WITHIN THE SITUATION
DESCRIBED IN QUESTION 15, THEN MARK AN "X" HERE: ☒

| NAME OF BUSINESS: | | | | COURT: | |
|---|---|---|---|---|---|
| ADDRESS: | | | | DATE OF EVENT: | |
| CITY: | STATE: | ZIP CODE: | | DOCKET NO.: | |
| NAME OF BUSINESS: | | | | COURT: | |
| ADDRESS: | | | | DATE OF EVENT: | |
| CITY: | STATE: | ZIP CODE: | | DOCKET NO.: | |

17.  LIST THE FOLLOWING FOR EACH INDIVIDUAL WHO WILL SOLICIT ON BEHALF OF THE TELEPHONIC SELLER, AND THE NAME(S) THEY
WILL USE WHEN SOLICITING. (ATTACH ADDITIONAL PAGES AS NEEDED BUT USE THE SAME FORMAT.) * **NOTE:** A SOCIAL SECURITY
NUMBER MAY BE SUBSTITUTED IF A SOLICITOR DOES NOT HAVE A DRIVER'S LICENSE.

   1)   ACTUAL NAME: See Attachment EXHIBIT 17                           DATE OF BIRTH:

        DRIVER'S LICENSE NUMBER
        AND STATE OF ISSUANCE:

        PRINCIPAL RESIDENCE:

        ADDRESS                          CITY            STATE   ZIP CODE

        NAMES TO BE USED
        WHEN SOLICITING:

STATE OF CALIFORNIA
JUS 8773  Rev. 7/07

**TELEPHONIC SELLER REGISTRATION**

DEPARTMENT OF JUSTICE
PAGE 9 of 15

**17.**
Cont'd

**2)** ACTUAL NAME: _____  DATE OF BIRTH: _____

DRIVER'S LICENSE NUMBER
AND STATE OF ISSUANCE: _____

PRINCIPAL RESIDENCE:

ADDRESS _____ CITY _____ STATE ___ ZIP CODE _____

NAMES TO BE USED
WHEN SOLICITING: _____

**3)** ACTUAL NAME: _____  DATE OF BIRTH: _____

DRIVER'S LICENSE NUMBER
AND STATE OF ISSUANCE: _____

PRINCIPAL RESIDENCE:

ADDRESS _____ CITY _____ STATE ___ ZIP CODE _____

NAMES TO BE USED
WHEN SOLICITING: _____

**4)** ACTUAL NAME: _____  DATE OF BIRTH: _____

DRIVER'S LICENSE NUMBER
AND STATE OF ISSUANCE: _____

PRINCIPAL RESIDENCE:

ADDRESS _____ CITY _____ STATE ___ ZIP CODE _____

NAMES TO BE USED
WHEN SOLICITING: _____

**5)** ACTUAL NAME: _____  DATE OF BIRTH: _____

DRIVER'S LICENSE NUMBER
AND STATE OF ISSUANCE: _____

PRINCIPAL RESIDENCE:

ADDRESS _____ CITY _____ STATE ___ ZIP CODE _____

NAMES TO BE USED
WHEN SOLICITING: _____

**6)** ACTUAL NAME: _____  DATE OF BIRTH: _____

DRIVER'S LICENSE NUMBER
AND STATE OF ISSUANCE: _____

PRINCIPAL RESIDENCE:

ADDRESS _____ CITY _____ STATE ___ ZIP CODE _____

NAMES TO BE USED
WHEN SOLICITING: _____

STATE OF CALIFORNIA
JUS 8773 Rev 7/07

DEPARTMENT OF JUSTICE
PAGE 10 of 15

# TELEPHONIC SELLER REGISTRATION

**17.** **7)**
Cont'd

ACTUAL NAME: _____   DATE OF BIRTH: _____

DRIVER'S LICENSE NUMBER
AND STATE OF ISSUANCE: _____

PRINCIPAL RESIDENCE:

ADDRESS _____ CITY _____ STATE _____ ZIP CODE _____

NAMES TO BE USED
WHEN SOLICITING: _____

**8)**

ACTUAL NAME: _____   DATE OF BIRTH: _____

DRIVER'S LICENSE NUMBER
AND STATE OF ISSUANCE: _____

PRINCIPAL RESIDENCE:

ADDRESS _____ CITY _____ STATE _____ ZIP CODE _____

NAMES TO BE USED
WHEN SOLICITING: _____

## CHECK ONE BOX FOR EACH OF THE FOLLOWING QUESTIONS:

**18.** **a)** [ ] ATTACHED AND MARKED **EXHIBIT 2** IS A COPY OF ALL SALES SCRIPTS WE GIVE TO THOSE SOLICITING FOR US.

**b)** [x] WE DO NOT GIVE THOSE SOLICITING FOR US A SALES SCRIPT.

**19.**

**a)** [x] ATTACHED AND MARKED AS **EXHIBIT 3** IS A COPY OF ALL SALES INFORMATION OR LITERATURE WE PROVIDE TO OUR SALES PEOPLE OR OF WHICH WE INFORM OUR SALESPEOPLE (INCLUDING, BUT NOT LIMITED TO, SCRIPTS, OUTLINES, INSTRUCTIONS AND INFORMATION REGARDING HOW TO CONDUCT TELEPHONIC SALES, SAMPLE INTRODUCTIONS, SAMPLE CLOSINGS, PRODUCT INFORMATION AND CONTEST OR PREMIUM AWARD INFORMATION.)

**b)** [ ] WE DO NOT PROVIDE WRITTEN INFORMATION TO, NOR INFORM OUR SALESPEOPLE OF ANY SALES INFORMATION OR LITERATURE AS DESCRIBED IN 19(a).

**20.** **a)** [x] ATTACHED AND MARKED AS **EXHIBIT 4** IS A COPY OF ALL WRITTEN MATERIAL WE SEND ANY PROSPECTIVE OR ACTUAL PURCHASER.

**b)** [ ] WE DO NOT SEND ANY WRITTEN MATERIAL TO ANY PROSPECTIVE OR ACTUAL PURCHASER

**21.**

**a)** [x] IF YOU OR YOUR SALESPEOPLE REPRESENT OR IMPLY TO PROSPECTIVE OR ACTUAL PURCHASERS THAT THE PURCHASER WILL RECEIVE CERTAIN SPECIFIC ITEMS OR ONE OR MORE ITEMS FROM AMONG DESIGNATED ITEMS, OR A CERTIFICATE OF ANY TYPE WHICH THE PURCHASER MUST REDEEM TO OBTAIN THE ITEM DESCRIBED IN THE CERTIFICATE, WHETHER THE ITEMS ARE REFERRED TO AS GIFTS, PREMIUMS, BONUSES, PRIZES OR OTHERWISE, LIST THE FOLLOWING. (SEE GENERAL INSTRUCTIONS, NO. B2):

| | |
|---|---|
| ITEM OFFERED: Ten Ounce Silver Bar | ADDRESS _____ |
| PRICE OR VALUE OF WORTH: $ Fair market value of such bullion changes day to day with the value of silver | CITY _____ |
| BASIS FOR VALUATION: See above | STATE _____ ZIP CODE _____ |
| PRICE WE PAID: $ Fair wholesale value at time of purchase | TELEPHONE NUMBER _____ |
| SUPPLIER'S NAME: See Exhibit 26b | |

STATE OF CALIFORNIA
JUS 8773 Rev. 7/07

**TELEPHONIC SELLER REGISTRATION**

DEPARTMENT OF JUSTICE
PAGE 11 of 15

**21.**
Cont'd

* ITEM OFFERED: One Troy Ounce American Silver Eagle Coins

PRICE OR VALUE OF WORTH: $ Fair market value of such coins changes day to day with the value of silver

BASIS FOR VALUATION: See above

PRICE WE PAID: $ Fair wholesale value at time of purchase

SUPPLIER'S NAME: See Exhibit 26b.

ADDRESS
CITY
STATE          ZIP CODE
TELEPHONE NUMBER

* ITEM OFFERED: One Troy Ounce Canadian Silver Maple Leaf Coins

PRICE OR VALUE OF WORTH: $ Fair market value of such coins changes day to day with the value of silver –

BASIS FOR VALUATION: See above

PRICE WE PAID: $ Fair wholesale value at time of purchase

SUPPLIER'S NAME: See Exhibit 26b.

ADDRESS
CITY
STATE          ZIP CODE
TELEPHONE NUMBER

* ITEM OFFERED: "Why Gold? Why Now" DVD

PRICE OR VALUE OF WORTH: $ Subjective

BASIS FOR VALUATION: Subjective

PRICE WE PAID: $0.83 each

SUPPLIER'S NAME: Green Solutions

ADDRESS  5120 E. Palma, #102
CITY     Anaheim Hills
STATE  CA          ZIP CODE  92807
TELEPHONE NUMBER     +1 (714) 696-5454

b) ☐ WE DO NOT REPRESENT OR IMPLY TO PROSPECTIVE OR ACTUAL PURCHASERS THAT THE PURCHASER WILL RECEIVE CERTAIN SPECIFIC ITEMS, ONE OR MORE ITEMS FROM AMONG DESIGNATED ITEMS OR A CERTIFICATE OF ANY TYPE WHICH THE PURCHASER MUST REDEEM TO OBTAIN THE ITEM DESCRIBED IN THE CERTIFICATE.

**22.** a) ☐ WE CHECKED 21(a) AND A PURCHASER DOES NOT ACTUALLY RECEIVE ALL OF THE ITEMS DESCRIBED BY US OR OUR SALESPEOPLE:

1) WE DECIDE WHICH ITEM OR ITEMS A PARTICULAR PROSPECTIVE PURCHASER IS TO RECEIVE IN THE FOLLOWING MANNER:

2) THE ODDS A SINGLE PROSPECTIVE PURCHASER HAS OF RECEIVING EACH DESCRIBED ITEM ARE (SEE GENERAL INSTRUCTIONS, NO. B3):

3) THE NAME AND ADDRESS OF EACH RECIPIENT WHO HAS DURING THE PRECEDING 12 MONTHS (OR IF YOU HAVE NOT BEEN IN BUSINESS THAT LONG, DURING THE PERIOD YOU HAVE BEEN IN BUSINESS) RECEIVED THE ITEM HAVING THE GREATEST VALUE AND THE ITEM WITH THE SMALLEST ODDS OF BEING RECEIVED IS (SEE GENERAL INSTRUCTIONS, NO. B4):

STATE OF CALIFORNIA
IUS 8773 Rev. 7/07

# TELEPHONIC SELLER REGISTRATION

DEPARTMENT OF JUSTICE
PAGE 11 of 15

**21.**
Cont'd

\*

| | |
|---|---|
| ITEM OFFERED:  2014 Silver Market Outlook - Report | ADDRESS  3187B Airway Ave. |
| PRICE OR VALUE OF WORTH: $ Subjective | CITY  Costa Mesa |
| BASIS FOR VALUATION:Subjective | STATE CA  ZIP CODE  92626 |
| PRICE WE PAID: $0.49 | TELEPHONE NUMBER  +1 (714) 557-4597 |
| SUPPLIER'S NAME:Western Lithographics | |

\*

| | |
|---|---|
| ITEM OFFERED:2014 Gold Market Outlet - Report | ADDRESS  3187B Airway Ave. |
| PRICE OR VALUE OF WORTH: $ Subjective | CITY  Costa Mesa |
| BASIS FOR VALUATION:  Subjective | STATE CA  ZIP CODE  92626 |
| PRICE WE PAID: $ 0.70 | TELEPHONE NUMBER  +1 (714) 557-4597 |
| SUPPLIER'S NAME:  Green Solutions | |

\*

| | |
|---|---|
| ITEM OFFERED:2014 Palladium Market Outlook - Report | ADDRESS  3187B Airway Ave. |
| PRICE OR VALUE OF WORTH: $ Subjective | CITY  Costa Mesa |
| BASIS FOR VALUATION:  Subjective | STATE CA  ZIP CODE  92626 |
| PRICE WE PAID: $ 0.49 | TELEPHONE NUMBER  +1 (714) 557-4597 |
| SUPPLIER'S NAME:  Western Lithographics | |

b) ☐ WE DO NOT REPRESENT OR IMPLY TO PROSPECTIVE OR ACTUAL PURCHASERS THAT THE PURCHASER WILL RECEIVE CERTAIN SPECIFIC ITEMS, ONE OR MORE ITEMS FROM AMONG DESIGNATED ITEMS OR A CERTIFICATE OF ANY TYPE WHICH THE PURCHASER MUST REDEEM TO OBTAIN THE ITEM DESCRIBED IN THE CERTIFICATE.

**22.**  a) ☐ WE CHECKED 21(a) AND A PURCHASER DOES NOT ACTUALLY RECEIVE ALL OF THE ITEMS DESCRIBED BY US OR OUR SALESPEOPLE:

1) WE DECIDE WHICH ITEM OR ITEMS A PARTICULAR PROSPECTIVE PURCHASER IS TO RECEIVE IN THE FOLLOWING MANNER:

2) THE ODDS A SINGLE PROSPECTIVE PURCHASER HAS OF RECEIVING EACH DESCRIBED ITEM ARE (SEE GENERAL INSTRUCTIONS, NO. B3):

3) THE NAME AND ADDRESS OF EACH RECIPIENT WHO HAS DURING THE PRECEDING 12 MONTHS (OR IF YOU HAVE NOT BEEN IN BUSINESS THAT LONG, DURING THE PERIOD YOU HAVE BEEN IN BUSINESS) RECEIVED THE ITEM HAVING THE GREATEST VALUE AND THE ITEM WITH THE SMALLEST ODDS OF BEING RECEIVED IS (SEE GENERAL INSTRUCTIONS, NO. B4):

STATE OF CALIFORNIA
US 8773 Rev. 7/07

DEPARTMENT OF JUSTICE
PAGE 11 of 15

## TELEPHONIC SELLER REGISTRATION

**21.**
Cont'd

\* ITEM OFFERED: Aftershock Investor Book

PRICE OR VALUE OF WORTH: $ 27.95

BASIS FOR VALUATION: Retail

PRICE WE PAID: $ 9.78

SUPPLIER'S NAME: John Wiley & Sons

ADDRESS 360 Mill Road

CITY        Edison

STATE NJ            ZIP CODE 08817

TELEPHONE NUMBER        +1 (201) 748-6000

---

\* ITEM OFFERED:     One Troy Ounce Silver Vienna
            — Philharmonic coins —

PRICE OR VALUE OF WORTH: $ Fair market value of such
coins changes day to day with the value of silver —

BASIS FOR VALUATION: See above.

PRICE WE PAID: $ Fair wholesale value at time of purchase

SUPPLIER'S NAME: See Exhibit 26b

ADDRESS

CITY

STATE            ZIP CODE

TELEPHONE NUMBER

---

\* ITEM OFFERED: 2014 Platinum Market Outlook - Report

PRICE OR VALUE OF WORTH: $ Subjective

BASIS FOR VALUATION: Subjective

PRICE WE PAID: $ 0.49

SUPPLIER'S NAME: Western Lithographics

ADDRESS 3187B Airway Ave.

CITY        Costa Mesa

STATE CA            ZIP CODE 92626

TELEPHONE NUMBER        +1 (714) 557-4597

---

b) ☐ WE DO NOT REPRESENT OR IMPLY TO PROSPECTIVE OR ACTUAL PURCHASERS THAT THE PURCHASER WILL RECEIVE CERTAIN SPECIFIC ITEMS, ONE OR MORE ITEMS FROM AMONG DESIGNATED ITEMS OR A CERTIFICATE OF ANY TYPE WHICH THE PURCHASER MUST REDEEM TO OBTAIN THE ITEM DESCRIBED IN THE CERTIFICATE.

**22.** a) ☐ WE CHECKED 21(a) AND A PURCHASER DOES NOT ACTUALLY RECEIVE ALL OF THE ITEMS DESCRIBED BY US OR OUR SALESPEOPLE:

1) WE DECIDE WHICH ITEM OR ITEMS A PARTICULAR PROSPECTIVE PURCHASER IS TO RECEIVE IN THE FOLLOWING MANNER:

2) THE ODDS A SINGLE PROSPECTIVE PURCHASER HAS OF RECEIVING EACH DESCRIBED ITEM ARE (SEE GENERAL INSTRUCTIONS, NO. B3):

3) THE NAME AND ADDRESS OF EACH RECIPIENT WHO HAS DURING THE PRECEDING 12 MONTHS (OR IF YOU HAVE NOT BEEN IN BUSINESS THAT LONG, DURING THE PERIOD YOU HAVE BEEN IN BUSINESS) RECEIVED THE ITEM HAVING THE GREATEST VALUE AND THE ITEM WITH THE SMALLEST ODDS OF BEING RECEIVED IS (SEE GENERAL INSTRUCTIONS, NO. B4):

## TELEPHONIC SELLER REGISTRATION

**21.**
**Cont'd**

\* ITEM OFFERED:"Inclined To Liberty" - Book | ADDRESS 760 Woodland Dr.

PRICE OR VALUE OF WORTH: $Subjective | CITY Saline

BASIS FOR VALUATION:Subjective | STATE MI | ZIP CODE 48176

PRICE WE PAID: $1.00 | TELEPHONE NUMBER +1 (734) 429-5411

SUPPLIER'S NAME:McNaughton & Gunn, Inc.

---

\* ITEM OFFERED:"Why Silver? Why Now" DVD | ADDRESS 5120 E. Palma, #102

PRICE OR VALUE OF WORTH: $Subjective | CITY Anaheim Hills

BASIS FOR VALUATION:Subjective | STATE CA | ZIP CODE 92807

PRICE WE PAID: $0.63 | TELEPHONE NUMBER +1 (714) 696-5454

SUPPLIER'S NAME:Green Solutions

---

\* ITEM OFFERED: | ADDRESS

PRICE OR VALUE OF WORTH: $ | CITY

BASIS FOR VALUATION: | STATE | ZIP CODE

PRICE WE PAID: $ | TELEPHONE NUMBER

SUPPLIER'S NAME:

---

b) ☐ WE DO NOT REPRESENT OR IMPLY TO PROSPECTIVE OR ACTUAL PURCHASERS THAT THE PURCHASER WILL RECEIVE CERTAIN SPECIFIC ITEMS, ONE OR MORE ITEMS FROM AMONG DESIGNATED ITEMS OR A CERTIFICATE OF ANY TYPE WHICH THE PURCHASER MUST REDEEM TO OBTAIN THE ITEM DESCRIBED IN THE CERTIFICATE.

**22.** a) ☐ WE CHECKED 21(a) AND A PURCHASER DOES NOT ACTUALLY RECEIVE ALL OF THE ITEMS DESCRIBED BY US OR OUR SALESPEOPLE:

1) WE DECIDE WHICH ITEM OR ITEMS A PARTICULAR PROSPECTIVE PURCHASER IS TO RECEIVE IN THE FOLLOWING MANNER:

2) THE ODDS A SINGLE PROSPECTIVE PURCHASER HAS OF RECEIVING EACH DESCRIBED ITEM ARE (SEE GENERAL INSTRUCTIONS, NO. B3):

3) THE NAME AND ADDRESS OF EACH RECIPIENT WHO HAS DURING THE PRECEDING 12 MONTHS (OR IF YOU HAVE NOT BEEN IN BUSINESS THAT LONG, DURING THE PERIOD YOU HAVE BEEN IN BUSINESS) RECEIVED THE ITEM HAVING THE GREATEST VALUE AND THE ITEM WITH THE SMALLEST ODDS OF BEING RECEIVED IS (SEE GENERAL INSTRUCTIONS, NO. B4):

**22.** b) [X] WE CHECKED 21(a) AND A PURCHASER RECEIVES ALL OF THE ITEMS DESCRIBED BY OUR SALESPEOPLE.
Cont'd

c) [ ] WE CHECKED 21(b).

**23.** [ ] ATTACHED AND MARKED **EXHIBIT 5** IS A COPY OF ALL RULES, REGULATIONS, TERMS AND CONDITIONS A PROSPECTIVE PURCHASER MUST MEET IN ORDER TO RECEIVE THE ITEM(S) DESCRIBED IN ANSWER TO QUESTION 21.

**24.** a) [ ] WE DO NOT SELL OR OFFER TO SELL AN INVESTMENT OPPORTUNITY OF ANY TYPE WHATSOEVER. IF MARKED SKIP TO QUESTION 35.

b) [X] WE SELL OR OFFER TO SELL INVESTMENTS IN COINS, BULLION, METAL, STONE, MINERAL, OR INTERESTS IN OIL, GAS OR MINERAL FIELDS, WELLS OR EXPLORATION SITES. IF MARKED, ANSWER QUESTIONS 25 - 32.

c) [ ] WE SELL OR OFFER TO SELL AN INVESTMENT OPPORTUNITY OF A TYPE DIFFERENT FROM THOSE LISTED IN 24(b). IF MARKED, ANSWER QUESTIONS 33 - 34.

**25.** a) [ ] WE DO NOT SELL OR OFFER TO SELL COINS OR BULLION.

b) [ ] WE SELL OR OFFER TO SELL COINS OR BULLION, BUT FALL WITHIN THE EXEMPTION SET FORTH IN BUSINESS AND PROFESSIONS CODE SECTION 17511.1(d)(19) AND ARE SEPARATELY FILING THE INFORMATION REQUIRED BY BUSINESS AND PROFESSIONS CODE SECTIONS 17511.3, AS APPLICABLE, AND 17511.4(p) BECAUSE WE QUALIFY FOR AN EXEMPTION

c) [X] WE SELL OR OFFER TO SELL COINS OR BULLION, BUT DO NOT FALL WITHIN THE EXEMPTION SET FORTH IN BUSINESS AND PROFESSIONS CODE SECTION 17511.1(d)(19) AND ARE ANSWERING QUESTIONS 26-32.

**26.** a) [ ] WE DO NOT SELL OR OFFER TO SELL METAL , COINS, STONE OR MINERAL.

b) [X] WE SELL OR OFFER TO SELL METAL, COINS, STONE OR MINERAL AND THE NAME, ADDRESS AND TELEPHONE NUMBER OF EACH OF OUR SUPPLIERS, AND THE METAL, COIN, STONE OR MINERAL WE GET FROM EACH SUPPLIER IS AS FOLLOWS (SEE GENERAL INSTRUCTIONS, NO. B5):

See Exhibit 26(b)

**27.** a) [ ] WE DO NOT SELL OR OFFER TO SELL METAL COINS, STONE OR MINERAL.

b) [ ] WE SELL OR OFFER TO SELL METAL, COINS, STONE OR MINERAL FROM OUR OWN INVENTORY WHICH IS KEPT AT THE FOLLOWING LOCATION (SEE GENERAL INSTRUCTIONS, NO. B6):

c) [ ] WE SELL OR OFFER TO SELL METAL, COINS, STONE OR MINERAL BUT WE ARRANGE THE TRANSFER OF THE METAL, COINS, STONE OR MINERAL DIRECTLY FROM OUR SOURCES TO THE PURCHASER OR HIS/HER BANK WITHOUT TAKING POSSESSION OF IT OURSELVES.

d) [X] WE SELL OR OFFER TO SELL METAL, COINS, STONE OR MINERAL AND WE WILL EITHER RETAIN PHYSICAL POSSESSION OF THE METAL, COINS, STONE OR MINERAL PURCHASED OR WILL NOT TRANSFER PHYSICAL POSSESSION OF THE METAL, COINS, STONE OR MINERAL PURCHASED UNTIL THE PURCHASER HAS PAID IN FULL FOR THE PURCHASE AND THE ADDRESS OF EACH LOCATION WHERE THE METAL, COINS, STONE OR MINERAL WILL BE KEPT IS:

See Exhibit 27(d)

e) [ ] IF WE DO NOT OWN THE PREMISES AT WHICH THE METAL, COINS, STONE OR MINERAL WILL BE KEPT, THE NAME OF THE OWNER(S) OF THE BUSINESS(ES) AT WHICH THE METAL, COINS, STONE OR MINERAL WILL BE KEPT IS (SEE GENERAL INSTRUCTIONS, NO. B7):

ATTACHED AND MARKED **EXHIBIT 6** IS A COPY OF THE CONTRACT(S) OR OTHER DOCUMENT(S) WHICH EVIDENCES OUR RIGHT TO STORE THE METAL, COINS, STONE OR MINERAL AT THE ADDRESS(ES) DESIGNATED IN 27(e).

f) [ ] WE SELL OR OFFER TO SELL METAL, COINS, STONE OR MINERAL, BUT WE PURCHASE THE METAL, STONE OR MINERAL TO FILL ORDERS WE HAVE TAKEN FROM PURCHASERS, AND ATTACHED AND MARKED **EXHIBIT 7** IS A COPY OF ALL CONTRACTS OR OTHER DOCUMENTS EVIDENCING OUR ABILITY TO CALL UPON SUPPLIERS TO FILL OUR ORDERS.

**28.** a) [ ] WE DO NOT SELL OR OFFER TO SELL ANY METAL COINS, STONE OR MINERAL.

b) [ ] WE SELL OR OFFER TO SELL METAL, COINS, STONE OR MINERAL BUT DO NOT REPRESENT TO PURCHASERS THAT WE HAVE INSURANCE OR A SURETY BOND OF ANY TYPE RELATING TO A PURCHASER'S PURCHASE OF METAL, COINS, STONE OR MINERAL.

STATE OF CALIFORNIA
JUS 8773 Rev. 7/07

**TELEPHONIC SELLER REGISTRATION**

DEPARTMENT OF JUSTICE
PAGE 13 of 15

**28.** Cont'd  c) [X]  WE SELL OR OFFER TO SELL METAL, COINS, STONE OR MINERAL AND WE REPRESENT TO PURCHASERS THAT WE HAVE INSURANCE OR A SURETY BOND OF SOME TYPE RELATING TO A PURCHASER'S PURCHASE OF METAL, COINS, STONE OR MINERAL AND A COPY OF ALL SUCH INSURANCE POLICIES AND BONDS IS ATTACHED AND MARKED EXHIBIT 8.

**29.** a) [ ]  WE DO NOT SELL OR OFFER TO SELL METAL, COINS, STONE OR MINERAL.

b) [ ]  WE SELL OR OFFER TO SELL METAL, COINS, STONE OR MINERAL BUT DO NOT MAKE ANY REPRESENTATION AS TO THE EARNING OR PROFIT POTENTIAL OF PURCHASES OF ANY METAL, COINS, STONE OR MINERAL.

c) [X]  WE SELL OR OFFER TO SELL METAL, COINS, STONE OR MINERAL AND MAKE REPRESENTATIONS AS TO THE EARNING OR PROFIT POTENTIAL OF PURCHASES OF THE METAL, COINS, STONE OR MINERAL.  THE SUBSTANTIATING DATA IS ATTACHED AND MARKED EXHIBIT 9 (SEE GENERAL INSTRUCTIONS, NO. B8).

**30.** a) [X]  WE DO NOT SELL OR OFFER TO SELL INTERESTS IN OIL, GAS OR MINERAL FIELDS, WELLS OR EXPLORATION SITES.

b) [ ]  WE SELL OR OFFER TO SELL INTERESTS IN OIL, GAS OR MINERAL FIELDS, WELLS OR EXPLORATION SITES AND OUR OWNERSHIP INTEREST, IF ANY, IN EACH FIELD, WELL OR SITE BEING OFFERED AND THE NUMBER OF INTERESTS TO BE SOLD IN EACH IS AS FOLLOWS (SEE GENERAL INSTRUCTIONS, NO. B9):

**31.** a) [X]  WE DO NOT SELL OR OFFER TO SELL INTERESTS IN OIL, GAS OR MINERAL FIELDS, WELLS OR EXPLORATION SITES.

b) [ ]  WE SELL OR OFFER TO SELL INTERESTS IN OIL, GAS OR MINERAL FIELDS, WELLS OR EXPLORATION SITES, BUT MAKE NO REFERENCE TO PROSPECTIVE PURCHASERS ABOUT ANY INVESTIGATION HAVING BEEN DONE BY ANYONE REGARDING ANY PARTICULAR FIELD, WELL OR SITE IN WHICH WE ARE SELLING INTERESTS.

c) [ ]  WE SELL OR OFFER TO SELL INTERESTS IN OIL, GAS OR MINERAL FIELDS, WELLS OR EXPLORATION SITES AND MAKE A REFERENCE TO PROSPECTIVE PURCHASERS ABOUT INVESTIGATIONS HAVING BEEN DONE REGARDING THE FIELD, WELL OR SITE IN WHICH WE ARE SELLING INTERESTS.

ATTACHED AND MARKED EXHIBIT 10 IS A COPY OF THE REPORT AND OTHER DOCUMENTS RELATING TO THE INVESTIGATION DONE WHICH INCLUDES THEREIN THE NAME, BUSINESS ADDRESS, TELEPHONE NUMBER AND PROFESSIONAL CREDENTIALS OF THE PERSON(S) WHO MADE THE INVESTIGATION.

**32.** a) [X]  WE DO NOT SELL OR OFFER TO SELL INTERESTS IN OIL, GAS OR MINERAL FIELDS, WELLS OR EXPLORATION SITES.

b) [ ]  WE SELL OR OFFER TO SELL INTERESTS IN OIL, GAS OR MINERAL FIELDS, WELLS OR EXPLORATION SITES, BUT DO NOT MAKE ANY REPRESENTATION AS TO THE EARNING OR PROFIT POTENTIAL OF PURCHASES OF ANY INTEREST IN THESE FIELDS, WELLS OR SITES

c) [ ]  WE SELL OR OFFER TO SELL INTERESTS IN OIL, GAS OR MINERAL FIELDS, WELLS OR EXPLORATION SITES AND MAKE REPRESENTATIONS AS TO THE EARNING OR PROFIT POTENTIAL OF PURCHASES OF AN INTEREST IN THESE FIELDS, WELLS OR SITES.  THE SUBSTANTIATING DATA IS ATTACHED AND MARKED EXHIBIT 11 (SEE GENERAL INSTRUCTIONS, NO. B10).

**33.**  WE SELL THE FOLLOWING TYPE OF INVESTMENT OPPORTUNITIES:

See answers to questions 24-32

**34.** a) [X]  WE SELL OR OFFER TO SELL THE INVESTMENT OPPORTUNITY DIRECTLY FROM OUR OWN INVENTORY.

b) [ ]  WE ARRANGE THE TRANSFER OF THE INVESTMENT OPPORTUNITY, OR EVIDENCE OF OWNERSHIP OF IT FROM OUR SOURCES TO THE PURCHASER OR HIS/HER BANK WITHOUT TAKING POSSESSION OF IT OURSELVES.

c) [X]  WE WILL EITHER RETAIN PHYSICAL POSSESSION OF THE INVESTMENT OPPORTUNITY, OR OF THE EVIDENCE OF OWNERSHIP OF IT, OR WILL NOT TRANSFER PHYSICAL POSSESSION OF IT, OR OF THE EVIDENCE OF OWNERSHIP OF IT, UNTIL THE PURCHASER HAS PAID IN FULL FOR THE PURCHASE; AND

1) THE ADDRESS(ES) OF EACH LOCATION WHERE THE INVESTMENT OPPORTUNITY OR THE EVIDENCE OF ITS OWNERSHIP WILL BE KEPT IS

See Exhibit 28B

STATE OF CALIFORNIA
JUS 8773 Rev. 7/07

DEPARTMENT OF JUSTICE
PAGE 14 of 15

## TELEPHONIC SELLER REGISTRATION

**34.**
Cont'd

2) IF WE DO NOT OWN THE PREMISES AT WHICH THE INVESTMENT OPPORTUNITY, OR THE EVIDENCE OF OWNERSHIP OF IT, WILL BE KEPT, THE NAME(S) OF THE OWNER(S) OF THE BUSINESS(ES) AT WHICH THE INVESTMENT OPPORTUNITY, OR THE EVIDENCE OF OWNERSHIP OF IT, WILL BE KEPT IS:

Names of owners are not available

3) ATTACHED AND MARKED **EXHIBIT 12** IS A COPY OF THE CONTRACT OR OTHER DOCUMENT WHICH EVIDENCES OUR RIGHT TO STORE THE INVESTMENT OPPORTUNITY, OR THE EVIDENCE OF OWNERSHIP OF IT, AT THE ADDRESS(ES) DESIGNATED.

d) ☐ WE PURCHASE THE INVESTMENT OPPORTUNITY TO FILL ORDERS WE HAVE TAKEN FROM PURCHASERS AND ATTACHED AND MARKED **EXHIBIT 13** IS A COPY OF ALL CONTRACTS OR OTHER DOCUMENTS EVIDENCING OUR ABILITY TO CALL UPON SUPPLIERS TO FILL OUR ORDERS.

**35.** THE NAME AND ADDRESS OF OUR AGENT IN CALIFORNIA WHO IS AUTHORIZED TO RECEIVE SERVICE OF PROCESS IS:

| NAME: | Gregory G. Walker | | |
|---|---|---|---|
| ADDRESS: | 4910 Birch Street | | |
| CITY: | Newport Beach | STATE: CA | ZIP CODE: 92660 |

YOU MUST SIGN AND DATE **EXHIBIT 14** WHICH IS AN IRREVOCABLE CONSENT APPOINTING THE ATTORNEY GENERAL TO ACT AS YOUR ATTORNEY TO RECEIVE SERVICE OF ANY LAWFUL PROCESS IN ANY NONCRIMINAL SUIT, ACTION, OR PROCEEDING AGAINST YOU OR YOUR SUCCESSOR, EXECUTOR OR ADMINISTRATOR, WHICH MAY ARISE UNDER THE PROVISIONS OF THIS **TELEPHONIC SELLER LAW (BUSINESS AND PROFESSIONS CODE, SECTIONS 17511-17511.10)** WHEN THE AGENT DESIGNATED IN ANSWER TO QUESTION 35 HAS RESIGNED AND HAS NOT BEEN REPLACED, OR IF THE AGENT SO DESIGNATED CANNOT WITH REASONABLE DILIGENCE BE FOUND AT THE ADDRESS DESIGNATED, OR IF NO AGENT HAS BEEN DESIGNATED. (SEE GENERAL INSTRUCTIONS, NOS. B11 AND B12.)

**36.** A COPY OF YOUR BOND FOR $100,000 IN FAVOR OF THE STATE OF CALIFORNIA MUST BE SUBMITTED AS **EXHIBIT 15**. (BUSINESS AND PROFESSIONS CODE, SECTION 17511.12(a).)

**37.** **ALL PRINCIPALS OF THE TELEPHONIC SELLER MUST SIGN AND DATE THIS VERIFICATION:**

**I/WE CERTIFY OR DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF CALIFORNIA THAT ALL OF THE INFORMATION PROVIDED IN ANWERS TO QUESTIONS 1-36, AND IN THE EXHIBITS ATTACHED HERETO, IS TRUE AND CORRECT.**

| SIGNATURE | Louis E. Carabini, President, Comco Management Corporation, the General Partner, Monex Deposit Company |
|---|---|
| | PRINT NAME |
| Newport Beach, California | October 15, 2014 |
| CITY AND STATE WHERE SIGNED | DATE |
| SIGNATURE | Michael A. Carabini |
| | PRINT NAME |
| Newport Beach, California | October 15, 2014 |
| CITY AND STATE WHERE SIGNED | DATE |

STATE OF CALIFORNIA
JUS 8773 Rev. 7/07

DEPARTMENT OF JUSTICE
PAGE 15 of 15

## TELEPHONIC SELLER REGISTRATION

**37.**
Cont'd

| SIGNATURE | PRINT NAME |
|---|---|
| | Emerson Trust<br>Michael A. Carabini, Trustee |
| CITY AND STATE WHERE SIGNED | DATE |
| Newport Beach, California | October 15, 2014 |

| SIGNATURE | PRINT NAME |
|---|---|
| | Montgomery Trust<br>Michael A. Carabini, Trustee |
| CITY AND STATE WHERE SIGNED | DATE |
| Newport Beach, California | October 15, 2014 |

| SIGNATURE | PRINT NAME |
|---|---|
| | Brian Jenkins |
| CITY AND STATE WHERE SIGNED | DATE |
| Newport Beach, California | October 15, 2014 |

| SIGNATURE | PRINT NAME |
|---|---|
| | Ronald Smoler |
| CITY AND STATE WHERE SIGNED | DATE |
| Newport Beach, California | October 15, 2014 |

| SIGNATURE | PRINT NAME |
|---|---|
| | Michael T. Maroney |
| CITY AND STATE WHERE SIGNED | DATE |
| Newport Beach, California | October 15, 2014 |

| SIGNATURE | PRINT NAME |
|---|---|
| | |
| CITY AND STATE WHERE SIGNED | DATE |
| | |

| SIGNATURE | PRINT NAME |
|---|---|
| | |
| CITY AND STATE WHERE SIGNED | DATE |
| | |

| SIGNATURE | PRINT NAME |
|---|---|
| | |
| CITY AND STATE WHERE SIGNED | DATE |
| | |

# EXHIBIT 9



# Details

MONEX INTERNATIONAL LTD

NFA ID: 0001240

### Current Status

| |
|---|
| NO CURRENT STATUS |

### Regulatory Actions

| Agency | Number |
|---|---|
| NFA | 0 |
| CFTC | 1 |
| Exchanges | 0 |
| | details... |

### NFA Arbitration Decisions

| Role | Number |
|---|---|
| Claimant | 0 |
| Respondent | 1 |
| | details... |

### CFTC Reparations Cases

| | |
|---|---|
| Total | 213 |
| | details... |

### Formerly Known As

| |
|---|
| No other names |

### Business Address

| |
|---|
| 4910 BIRCH STREET<br>NEWPORT BEACH, CA  92660<br>UNITED STATES<br>(714) 752-1400 |

### Doing Business As

| |
|---|
| • MONEX PRECIOUS METALS REPORT |

### Listed Principals

## History

| Status | Effective Date |
| --- | --- |
| • COMMODITY TRADING ADVISOR WITHDRAWN | 02/05/1991 |
| • LEVERAGE TRANSACTION MERCHANT WITHDRAWN | 02/05/1991 |
| • NFA MEMBER WITHDRAWN | 02/05/1991 |
| • COMMODITY TRADING ADVISOR REGISTERED | 10/22/1986 |
| • COMMODITY TRADING ADVISOR FAILED TO RENEW | 09/30/1986 |
| • LEVERAGE TRANSACTION MERCHANT REGISTERED | 10/28/1985 |
| • NFA MEMBER APPROVED | 07/01/1982 |
| • COMMODITY TRADING ADVISOR REGISTERED | 06/30/1982 |

© 2017 National Futures Association. All Rights Reserved.

# EXHIBIT 10



# Details

MONEX TRADING CORPORATION

NFA ID: 0002366

---

### Current Status

| |
|---|
| NO CURRENT STATUS |

### Regulatory Actions

| Agency | Number |
|---|---|
| NFA | 0 |
| CFTC | 0 |
| Exchanges | 0 |
| | details... |

### NFA Arbitration Decisions

| Role | Number |
|---|---|
| Claimant | 0 |
| Respondent | 1 |
| | details... |

### CFTC Reparations Cases

| | |
|---|---|
| Total | 37 |
| | details... |

### Formerly Known As

| |
|---|
| No other names |

### Business Address

| |
|---|
| 4910 BIRCH STREET<br>NEWPORT BEACH, CA  92660<br>UNITED STATES<br>(714) 752-1400 |

### Doing Business As

| |
|---|
| No other names |

### Listed Principals

| |
|---|
| No principals currently listed |

# EXHIBIT 11

108127



SECURITIES AND EXCHANGE COMMISSION, Plaintiff, v. MONEX INTER-
NATIONAL LTD., dba PACIFIC COAST COIN EXCHANGE LOUIS E. CARA-
BINI, JR., Defendants.

No. CV 74-3634-HF

UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF
CALIFORNIA

*1975 U.S. Dist. LEXIS 16495*

August 20, 1975, Decided
August 20, 1975, Filed

**COUNSEL:** [*1] Gerald E. Boltz, Regional Administrator, Ralph H. Erickson, Assistant General Counsel, Michael D. Donahue, Chief, Branch of Enforcement, Sanya Ryan, Attorney, Attorneys for Securities and Exchange Commission, U.S. Courthouse, Room 1043, 312 North Spring Street, Los Angeles, California 90012, Telephone: (213) 688-5871.

Wyman, Bautzer, Rothman & Kuchel, Attorneys for the Defendants Monex International, Ltd., dba Pacific Coast Coin Exchange Louis E. Carabini, Jr.

**JUDGES:** Ferguson

**OPINION BY:** WARREN J. FERGUSON

**OPINION**

FINAL JUDGMENT OF PERMANENT INJUNCTION AS TO MONEX INTERNATIONAL LTD., DBA PACIFIC COAST COIN EXCHANGE AND LOUIS E. CARABINI, JR., AND STIPULATION; CERTIFICATION AUTHORIZATION; AUTHORIZATION AND DESIGNATION.

IT APPEARING to this Court that the Plaintiff, SECURITIES AND EXCHANGE COMMISSION (hereinafter referred to as plaintiff) having filed and served its complaint herein on December 12, 1974 and defendants MONEX INTERNATIONAL LTD., dba PACIFIC COAST COIN EXCHANGE AND LOUIS E. CARABINI, JR. (hereinafter referred to as defendants) having been represented by counsel, having acknowledged receipt of a copy of the Summons and Complaint filed herein and having admitted the jurisdiction [*2] of this Court, for purposes of this proceeding only over themselves and the subject matter of this action; having entered general appearances; having been fully advised and informed of their rights to a judicial determination, and plaintiff and defendants having agreed upon a basis for settlement of this action including the entry of a Final Judgement of Permanent Injunction as to MONEX INTERNATIONAL LTD. dba PACIFIC COAST COIN EXCHANGE and LOUIS E. CARABINI, JR. and it further appearing that there has been no trial of the matters alleged in the complaint, and that the defendants have waived the making of findings of fact and conclusions of law or adjudications made with respect to any matter alleged in or arising out of the Complaint, and appearing to this Court that defendants have consented to the entry of a Final Judgment of Permanent Injunction as prayed for in the Complaint without admitting or denying the allegations contained therein on the terms specified in the annexed Stipulation and Consent filed concurrently herewith enjoining said defendants from engaging in acts and practices which constitute and will constitute violations of Sections 5(a), 5(c) and 17(a) of the Securities [*3] Act of 1933, as amended [*15 U.S.C. 77e(a), 77e(c), 77q(a)*] and Section 10(b) of the Securities Exchange Act of 1934, as amended [*15 U.S.C. 78j(b)*], and *Rule 10b-5* thereunder [*17 CFR 240.10b-5*] as prayed for in the plaintiff's Complaint, and it further appearing that no notice of hearing upon the entry of said Final Judgment of Permanent Injunction by Consent need be given, the Court being fully advised in the premises, and there being no just reason for delay;

I

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the defendants, MONEX INTERNATIONAL, LTD., dba PACIFIC COAST COIN EXCHANGE and LOUIS E. CARABINI, JR., their officers, directors, subsidiaries, affiliates, agents, servants, employees, successors and assigns and all persons acting in active concert or participation with them, and each of them, be and hereby are permanently restrained and enjoined from, directly or indirectly:

A. Making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of any prospectus or otherwise, any securities, including investment contracts, evidences of indebtedness, certificates of interest [*4] or participation in a profit-sharing agreement or interest or instrument commonly known as a security regarding silver coins, gold coins, silver bullion, foreign currencies or other precious metals or commodities or any other securities unless and until a registration statement has been filed with the Securities and Exchange Commission as to such securities.

B. Making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell any securities, including investment contracts, evidences of indebtedness, certificates of interest or participation in a profit-sharing agreement or interest or instrument commonly known as a security regarding silver coins, gold coins, silver bullion, foreign currencies or other precious metals or commodities or any other securities through the use or medium of any prospectus or otherwise unless and until a registration statement is in effect with the Securities and Exchange Commission as to such securities.

C. Carrying such securities or causing them to be carried through the mails or in interstate commerce by any means or instruments of transportation for the purpose of sale or delivery [*5] after sale unless and until a registration statement is in effect with the Securities and Exchange Commission as to such securities.

provided, however, that nothing in the foregoing portion of the requested injunction shall apply to any security or transaction which is exempt from the provisions of Section 5 of the Securities Act of 1933, as amended [*15 U.S.C. 77e*].

II

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the defendants MONEX INTERNATIONAL, LTD. dba PACIFIC COAST COIN EXCHANGE and LOUIS E. CARABINI, JR., their officers, directors, subsidiaries, affiliates, agents, servants, employees, successors and assigns and all persons acting in active concert or participation with them, and each of them, be and hereby are permanently enjoined in the offer for sale, sale, and in connection with the sale or purchase of any securities, including investment contracts, evidences of indebtedness, certificates of interest or participation in a profit-sharing agreement or interest or instrument commonly known as a security regarding silver coins, gold coins, silver bullion, foreign currencies or other precious metals or commodities or any other securities of any issuer, by [*6] the use of the mails or any means or instruments of transportation or communication in interstate commerce, or any instrumentality of interstate commerce, from directly or indirectly:

A. Engaging in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person or employing any device, scheme or artifice to defraud including, but not limited to:

(1) Selling said securities to persons who because of their lack of knowledge, experience or financial net worth, could not reasonably be expected to be able to appreciate the risks involved or bear the risk or burden of an investment in said security;

(2) Using devices, schemes, brochures, advertisements or other practices which present a misleading impression of the nature and details of defendants' business and operations, the investment offered by defendants and the use to which investors' funds are put;

(3) Using investors' funds or carrying on a business in a manner contrary to representations made by defendants;

(4) Commingling investors' funds or putting those funds at the risk of the defendants' enterprise without full disclosure of these details;

(5) [*7] Selling out or closing out investors at a price lower than the best available at the time on the independent market;

(6) Setting prices other than in the manner disclosed;

(7) Employing negligent or otherwise unfair margin call practices;

(8) Failure to send investors reasonable notice of a margin call;

(9) Claiming to give investment advice to investors when, in fact, defendants' only purpose and business is to sell its products;

(10) Paying undisclosed fees or commissions to persons for referring investors or causing investors to come to or invest with defendants.

B. Making any untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, regarding, but not limited to:

(1) The merits, advantages and risks of investing in silver coins, gold coins, precious metals, currencies or other commodities;

(2) The performance of silver as an investment in bad times or in times of an economic recession or depression;

(3) Any success from investing in silver or in defendants' securities by any famous [*8] person or anyone else;

(4) The world supply of silver, the projected world supply of silver, the above ground supply of silver, the U.S. Government's stockpile of silver;

(5) The mining of silver, the expected production from silver mines, the possibilities of an increase in silver mining;

(6) The above ground supply of silver, the Indian silver hoard, the possibilities of increased silver coming into production from above ground supplies;

(7) Silver salvage and the possibilities of greater salvage;

(8) The prospects of or projections of a shortage of silver or a developing shortage of silver;

(9) The price history of silver and projections for silver prices; profits from investments at specific times without disclosures of whether such periods are representative;

(10) The commission structure for salesmen and the fact if true, that salesmen receive commissions on sales but not on repurchases;

(11) The investment advice offered by PCCE;

(12) The use PCCE makes of investors' funds or funds received from investors;

(13) The custody and storage of any commodities ordered by investors;

(14) The business and operations of [*9] the issuer or entity soliciting investments;

(15) Whether the issuer or entity soliciting investments acts as broker or dealer for the investor;

(16) Whether the issuer or entity soliciting investments acquires or stores commodities ordered or purchased or covers or hedges obligations to investors;

(17) Whether the issuer or entity soliciting investments purports to cover or hedge its obligations to investors, the nature and details of such activities and material risks involved;

(18) The nature of the interest received by investors;

(19) Similarities between the issuer or entity soliciting investments and securities or futures or commodity brokers, dealers, or exchanges;

(20) The amounts, nature and basis of fees and commissions charged by the issuer or entity soliciting investments;

(21) The basis for the prices charged and method of determining such prices;

(22) Margin agreements, requirements, calls and the rights and obligations of investors in these

margin arrangements and the risks relating to margin calls;

(23) Liquidity of the investments sold and any risks related thereto;

(24) Any representations or agreements to [*10] repurchase the investments offered and any risks related to the prices of such repurchase or possible inability or refusal to repurchase;

(25) The agreement for delivery of commodities and the actual experience and practice of making delivery;

(26) The auditing firm or any audits of the issuer or entity soliciting investments;

(27) The fact, nature and amounts of fees or commissions paid to persons or entities relating to recommending these investments or the issuer or entity soliciting investments or relating to referring investors to or causing investors to go into these investments;

or any other act, practice or course of business in violation of Section 10(b) of the Securities Exchange Act of 1934, as amended [*15 U.S.C. 78j(b)*], and Rule *17 CFR 240.10b-5* thereunder or Section 17(a) of the Securities Act, as amended [*15 U.S.C. 77q(a)*] in the offer for sale or sale or in connection with the purchase or sale of any security.

III

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the defendants MONEX INTERNATIONAL, LTD. dba PACIFIC COAST COIN EXCHANGE and LOUIS E. CARABINI, JR., their officers, directors, subsidiaries, affiliates, agents, servants, [*11] employees, successors and assigns and all persons acting

in active concert or participation with them, and each of them, be and hereby are permanently enjoined from the use of the mails or any means or instrumentality of interstate commerce, directly or indirectly,

    A. to employ any device, scheme or artifice to defraud;

    B. to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

    C. to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person,

in, or in connection with (i) an offer to make, or the making of, any transaction for the purchase, sale or delivery of silver bullion, gold bullion, bulk silver coins or bulk gold coins pursuant to a standardized contract commonly known to the trade as a margin account margin contract, leverage account or leverage contract or (ii) the maintenance or carrying of any such contract. Any proceeding for the enforcement of any violation of paragraph III of this injunction shall be initiated solely by [*12] the Commodity Futures Trading Commission. The defendants acknowledge that their conduct of business as of the date of this final judgment is subject to Section 217 of the Commodity Futures Trading Commission Act of 1974 [88 Stat. 1389, Pub. L. 93-463].

IT IS FURTHER ORDERED that the defendant MONEX INTERNATIONAL, LTD. dba PACIFIC COAST COIN EXCHANGE and LOUIS E. CARABINI, JR. provide a copy of this order to all present and future officers, directors, and sales representatives of MONEX INTERNATIONAL, LTD.

Dated: AUG 20, 1975

IT IS SO ORDERED.

WARREN J. FERGUSON

United States District Judge

It is hereby stipulated by and between the Securities and Exchange Commission (hereinafter referred to as the Commission), plaintiff in the above-styled civil action, and Monex International Ltd., and Louis E. Carabini, Jr. (hereinafter referred to as defendants), defendants in said action as follows:

1. Defendants hereby acknowledge receipt of a copy of the complaint filed herein by the plaintiff Commission and service of summons upon them.

2. For purposes of this proceeding, defendants admit the jurisdiction of this Court over them and over the subject matter of this action [*13] and enter a general appearance.

3. Defendants consent to the entry by the Court of the Final Judgment of Permanent Injunction in the form filed herewith without admitting or denying the allegations contained in the Complaint except as otherwise provided by this consent, at any time after the date hereof upon motion or presentation of either party without notice of any further proceedings.

4. Annexed hereto as Exhibit A and made a part hereof is a certificate dated August 5, 1975, of the Secretary of Monex International Ltd., dba Pacific Coast Coin Exchange, as to resolution duly adopted by the Board of Directors of this corporation evidencing its consent to this stipulation.

5. Defendants hereby waive the entry of findings of fact and conclusions of law under *Rule 52 of the Federal Rules of Civil Procedure*.

6. Without admitting or denying the allegations contained in the complaint, defendants waive an answer and all defenses to the complaint referred to in paragraph 1.

7. Defendants state that they enter into this consent voluntarily and that, other than the statements contained in this Stipulation, no promises, threats, or assurances whatsoever have been made by plaintiff [*14] Commission, its staff, or any agent thereof to induce them to enter into this consent.

Dated: August 20, 1975

MONEX INTERNATIONAL LTD. by Anthony R. Pierno

/s/ for LOUIS E. CARABINI, JR.

CERTIFICATE

The undersigned, Manila L. Furr, hereby certifies:

That she is now and at all times herein mentioned has been the duly elected, qualified and acting Secretary of Monex International, Ltd., a duly organized and existing California corporation, and in charge of the minute books and corporate records of said corporation; that attached hereto and marked Exhibit A is a full, true and correct copy of a resolution duly adopted by the board of directors of said corporation at a meeting thereof duly held on July 30, 1975, at which meeting a quorum of said board was at all times present and acting; and that said resolution has

not been modified or rescinded and is at the date of this certificate in full force and effect.

EXHIBIT A

WHEREAS, this Corporation is a defendant in Civil Action No. 74 3634HP titled *Securities and Exchange Commission of the United States v. Monex International, Ltd.*, *et al.*, which action is pending in the United States District [*15] Court for the Central District of California; and

WHEREAS, since the inception of said action the Corporation has been involved in extensive discussions and negotiations through counsel with the Securities and Exchange Commission and more recently with the Commodity Futures Trading Commission, all intended to bring about a resolution of said action; and

WHEREAS, a proposed settlement of said action in the form of the Stipulation and Consent Decree attached hereto has been tentatively agreed to by the Staff of the Securities and Exchange Commission and its Los Angeles Regional Office and said proposed settlement has been concurred in by the Commodity Futures Trading Commission Staff, and each of said Commissions is scheduled to consider all or relevant parts of such proposal at an early date; and

WHEREAS, it would be in the best interest of this Corporation, would result in the least disruption of business, and would permit the Corporation to resume a more normal pattern of business than has been the case since the inception of said action, to settle said action promptly on the terms proposed or on substantially similar terms:

NOW, THEREFORE, BE IT RE-SOLVED, that the [*16] President of this Corporation, Louis E. Carabini, be and hereby is authorized on behalf of the Company to enter into a settlement with the Securities and Exchange Commission

of said action on substantially the terms presented to this meeting and that he or any other officer whom he may designate is hereby authorized to sign, or approve signing by counsel, of all agreements, stipulations, and/or such other documents as my by required in order to accomplish said settlement.

*AUTHORIZATION*

I hereby authorize Wyman, Bautzer, Rothman and Kuchel and Jerald S. Schutzbank, Stuart Benjamin or any other partner or associate of that firm to sign on my behalf a Stipulation for the Entry of a Final Judgment of Permanent Injunction against me in the action known as Securities and Exchange Commission vs. Monex International, Ltd., et al., Civil Action #74-3634-HP in the United States District Court for the Central District of California.

I acknowledge having reviewed copies of the proposed Stipulation and Judgment prior to signing this authorization.

DATED: August 19, 1975.

LOUIS E. CARABINI

DESIGNATION AND AUTHORIZATION

Persuant to the resolution of the Board of Directors of [*17] Monex International, Ltd. of July 30, 1975, I, Louis E. Carabini,Jr., do hereby designate and authorize Anthony R. Pierno to sign, execute, and approve all agreements, stipulations, and/or such other documents as may be required in order to accomplish the settlement as said forth in said resolution of July 30, 1975.

Louis E. Carabini

**EXHIBIT 12**

ATTACHMENT TO PARAGRAPH 13

At a Special Term, Part II of the
Supreme Court of the State of New
York, held in and for the County of
New York, at the County Courthouse,
60 Centre Street, New York, New York
on the _1st_ day of ~~April~~ 1978.

P R E S E N T :

HON. **BENTLEY KASSAL**,

Justice.

----------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,  :

                                    Plaintiffs,  :

        -against-                                :       Index No. 41439/74

MONEX INTERNATIONAL, LTD.,                       :       ORDER OF PERMANENT
doing business in the State of                           INJUNCTION
New York as P.C.C.E., INC. and                   :
PACIFIC COAST COIN EXCHANGE,
LOUIS E. CARABINI, ~~~~                           :

                                    Defendants.  :

----------------------------------------X

        Upon reading and filing the Summons and Complaint

verified July 2, 1974, the Answers of defendants MONEX INTER-

NATIONAL, LTD. and LOUIS E. CARABINI, dated April 15, 1974, the

consents dated _APRIL 18, 1978_       , and the affidavit of Assistant

Attorney General WILLIAM C. RAINEY, dated March 31, 1972 and upon all of the pleadings and proceedings heretofore had herein, and it appearing to this Court that the plaintiffs and the defendant MONEX INTERNATIONAL, LTD., formerly doing business in the State of New York as C.C.C.C., INC. and PACIFIC COAST COIN EXCHANGE (hereinafter "MONEX") and LOUIS E. CARABINI (hereinafter "CARABINI"), its President, have agreed upon a basis for settlement of this action including the entry of a Final Judgment of Permanent Injunction as to MONEX and CARABINI and it further appearing that there has been no trial of the matters alleged in the Complaint and that MONEX and CARABINI have waived the making of Findings of Fact and Conclusions of Law or adjudication made with respect to any matter alleged in or arising out of the Complaint, and it appearing to this Court that MONEX and CARABINI have consented to the entry of a Final Judgment of Permanent Injunction without admitting or denying the allegations contained in the Complaint and solely for the purposes of this proceeding, under terms hereinafter specified, enjoining MONEX and CARABINI from engaging in certain acts and practices under Article 23-A of the General Business Law of the State of New York as prayed for in the Complaint, and it further appearing that no notice of hearing upon the entry of such Final Judgment

-2-

of Permanent Injunction by Consent need be given, the Court being fully advised in the premises, and there being no just reason for delay

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the following plan of reimbursement, totalling $300,000 in credits or cash as provided below, be complied with by the defendant MONEX:

a. With regard to those New York customers whose margin accounts are closed but which nevertheless reflect debit balances for accrued interest and storage owing to MONEX, MONEX will credit such accounts for the total amount of said debit balances in order to eliminate any claim which MONEX may have against said customers. Said credit is to approximate $62,000.

b. With regard to those New York customers whose margin accounts are open but which, if liquidated as of March 31, 1975, would result in debit balances due to accrued interest and storage owed to MONEX, MONEX will credit such accounts an amount which, when applied, will eliminate any claims by MONEX against said customers for such debit balances. The customer need not liquidate said account to obtain said credit. Said credits are to approximate $44,000.

c. MONEX will credit or pay in cash to all New York customers whose margin accounts are open or whose accounts were closed after July 12, 1974, (except for those customers referred to in Paragraph "a" above) such amount of money as

-2-

remains after deducting from the total sum of $133,000 as credits to the accounts referred to in Paragraphs "A" and "b" hereof. This distribution shall be prorated according to the amounts of interest and storage charges to such customers covering the period July 12, 1974 to and including March 31, 1978. Customers whose accounts are closed shall be paid in cash.

d. MONEX will establish a minimum margin requirement of no greater than 5% for all adjusted New York open accounts for a period of no less than 30 days from the date of the adjustments, and no greater than 10% for the next 30 days. After such period, MONEX shall have the right to require such customers to meet MONEX' normal margin requirement as MONEX may determine from time to time.

e. No present or former customer of MONEX need accept the above credits or cash, nor does acceptance thereof, except as an offset, in any way prejudice their rights in a class action suit now or in the future.

f. Within 90 days of the entry of this Order the defendant herein shall submit an affidavit indicating the complete compliance with this judgment, with an accompanying schedule reflecting customers' receipts of cash or credits.

g. "New York customers" shall mean those customers who were residents of New York prior to July 12, 1974 and non-residents of New York who dealt with the New York office prior to said date.

-4-

IT IS HEREBY FURTHER ORDERED, ADJUDGED AND DECREED, subject to the provisions of paragraph numbered "4" below, that the defendant GARDINI and the defendant WALE, its officers, directors, subsidiaries, employees, successors and assigns be and hereby are permanently restrained and enjoined from, within or from the State of New York, directly or indirectly:

1.  engaging or attempting to engage in any business relating to the purchase and sale of securities with the public; and from acting and engaging as agent, salesman or employee of any person, firm or corporation engaged in any business relating to the purchase and sale of securities with the public; and from writing, publishing, preparing, selling and distributing any letter or other literature advising, suggesting or in any other manner communicating advice to the public with respect to the purchase or sale of securities and of the future price fluctuations of the securities market in general; and from forecasting, advising or in any other manner suggesting, either orally or in writing, any method or methods to be used in connection with the purchase or sale of securities, and from any act in aid or furtherance of the same; and

-5-

2. engaging or attempting to engage in the business of broker or dealer in securities and from acting or engaging as agent, salesman or employee of any broker or dealer in the securities business, and from acting as or being stockholder, director, trustee, officer, member or employee of any corporation, association, syndicate, company, trust or other combination engaged in the securities business as broker or dealer; and from being or attempting to be a partner or member (limited, dormant or otherwise) of any partnership, firm, association or person engaged in the securities business as broker or dealer; and from any act in aid or furtherance of the same; and

3. engaging or attempting to act and engage as agent, broker, salesman, employee, stockholder, director, trustee, officer, associate or partner (limited, dormant or otherwise) of any corporation, company, association, trust, syndicate, firm, person or other combination, in the negotiation, advertisement, distribution and purchase to or from the public, of any negotiable documents of title, calls, options, stocks, bonds, notes, evidences of interest or indebtedness and any other

-6-

securities or any interest therein, issued and which may here-
after be issued by any person, partnership, corporation, company,
trust or association and from any act in aid or furtherance of
the same, or in any attempt thereat;

4. Nothing in the preceding portions of this Injunction
shall preclude CARLINI and MONTI, its officers, directors,
subsidiaries, employees, successors and assigns from engaging
directly or indirectly in any activity relating to commodities,
including but not limited to:

(a) the purchase or sale thereof as principal, broker,
agent, futures commission merchant, commodities pool operator,
or otherwise, for their own account or to or from the public and
on a cash or margin basis or otherwise;

(b) acting as principal, broker, agent, organizer,
general partner, advisor, underwriter, futures commission
merchant, commodities pool operator or otherwise of, or seller
or purchaser of interests in, any pooling or entity for the
purpose of pooling of funds of investors for investment in
commodities;

-7-

(c)   rendering advice as to commodities or the purchase
or sale thereof or investment therein; writing, publishing,
preparing, selling and distributing any letter or other literature
advising, suggesting or in any other manner communicating advice
to the public with respect to the purchase or sale of commodities
and of the future price fluctuations of commodities and the
commodities market in general; and forecasting, advising or in
any other manner suggesting, either orally or in writing, any
method or methods to be used in connection with the purchase or
sale of commodities.

5.   For the purposes of this Order, the term
"commodities" shall be taken in its broadest sense and, without
limitation, shall be deemed to include gold; silver, bulk coins;
copper, copper wire bars; lead; tin; zinc; platinum-group metals;
palladium; mercury; oats; corn; wheat; soybeans; grain; soybean
meal; soybean oil; coconut oil; cottonseed oil; plywood; stud
lumber; lumber; iced broilers; fish meal; rye; barley; flaxseed;
cattle; fresh eggs; potatoes; sugar; coffee; cocoa; pepper;
tomato products; apples; frozen concentrated orange juice; pork
bellies; skinned hams; beef; hogs; wool; cotton; rubber; aluminum;

-5-

quicksilver; antimony; steel; flour; United States and foreign currencies; any substance, property, right or interest subject regulation under the authority of the Commodities Futures Trading Commission or any successor thereto; spot, future or forward contracts for any of the foregoing commodities and options, straddles, spreads, arbitrage, or any other interests on or in any of the foregoing; whether or not such commodities are traded on an organized exchange, MONEX and CARABINI being permitted to engage in any such activity relating to commodities in compliance with applicable regulations issued by the Commodities Futures Trading Commission, the Securities and Exchange Commission, the New York State Attorney General, and any successors thereto or any other regulatory body or any state or federal law and whether or not such activity may be deemed to be an offering or sale of a security; and provided that MONEX and CARABINI shall not, directly or indirectly;

(i)  engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person or employing any device, scheme or artifice to defraud including, but not limited to:

-9-

(a)   using devices, schemes, brochures, advertisements or other practices which present a misleading impression of the nature and details of HONEX' business and operations, the investment offered by HONEX and the use to which investors' funds are put;

(b)   using investors' funds or carrying on a business in a manner contrary to representations made by HONEX;

(c)   commingling investors' funds or putting those funds at the risk of HONEX' enterprise without full disclosure of these details;

(d)   selling out or closing out investors at a price lower than the best available at the time on the independent market;

(e)   setting prices other than in the manner disclosed;

(f)   employing negligent or otherwise unfair margin call practices;

-10-

(g)   failing to send investors reasonable notice of margin calls;

(h)   paying undisclosed fees or commissions to persons for referring investors or causing investors to come to or invest with MONEX.

(ii) make any untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, regarding, but are limited to:

(a)   the merits, advantages and risks of investing in silver coins, gold coins, precious metals, currencies or other commodities;

(b)   the performance of silver as an investment in bad times or in times of an economic recession or depression;

(c)   any success from investing in silver or in MONEX® products by any famous person or anyone else;

-11-

(d)   the world supply of silver, the
projected world supply of silver, the
above ground supply of silver, the U.S.
Government's stockpile of silver;

(e)   the mining of silver, the expected
production from silver mines, the
possibilities of an increase in silver
mining;

(f)   the above ground supply of silver,
the Indian silver hoard, the possibilities
of increased silver coming into production
from above ground supplies;

(g)   silver salvage and the possibilities
of greater salvage;

(h)   the prospects of or projections of
a shortage of silver or a developing
shortage of silver;

(i)   the price history of silver and
projections for silver prices; profits
from investments at specific times
without disclosures of whether such
periods are representative;

-12-

(j)   the commission structure for salesmen
and the fact, if true, that salesmen
receive commissions on sales but not on
repurchases;

(k)   the investment advice offered by
NOREX;

(l)   the use NOREX makes of investors' funds
or funds received from investors;

(m)   the custody and storage of any
commodities ordered by investors;

(n)   the business and operations of NOREX;

(o)   whether NOREX acts as broker of dealer
for the investor;

(p)   whether NOREX acquires or stores
commodities ordered or purchased or covers
or hedges obligations to investors;

(q)   whether NOREX purports to cover or
hedge its obligations to investors, the
nature and details of such activities and
material risks involved;

-13-

(r) the nature of the interest received by investors;

(s) similarities between MODEX and securities or future or commodity brokers, dealers, or exchanges;

(t) the amounts, nature and basis of fees and commissions charged by MODEX;

(u) the basis for the prices charged and method of determining such prices;

(v) margin agreements, requirements, calls and the rights and obligations of investors in these margin arrangements and the risks relating to margin calls;

(w) liquidity of the investments sold and any risks related thereto;

(x) any representations or agreements to repurchase the investments offered and any risks related to the prices of such repurchase or possible inability or refusal to repurchase;

-14-

(y)  the agreement for delivery of
commodities and the actual experience
and practice of making delivery;

(z)  the auditing firm or any audits
of MONEX; and;

(aa)  the fact, nature and amounts of
fees or commissions paid to persons or
entities relating to recommending these
investments or the issuer or entity
soliciting investments or relating to
referring investors to or causing
investors to go into these investments.

6.  In view of the pendency of this action since July,
1974 and under the circumstances of the matter, and upon the
express agreement of the respective parties to this action, it is
further provided that if MONEX shall faithfully abide by the
terms and conditions of this Order and the Stipulation and Consent
filed herewith, and if MONEX and CARABINI fully comply with the
laws and regulations of the United States Government and the
State of New York, the defendants may make proper application for
a dissolution of this injunction pursuant to Section 359-g-4 of
the General Business Law after a period of three years from the
date hereof.

-15-

IT IS FURTHER ORDERED, ADJUDGED AND DECLARED that respondent shall submit to the Attorney General all advertisements and literature to be used by it in New York State, prior to its use for a period of two years from the date of this Order.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Attorney General of the State of New York may, upon notice, make such further application under the provisions of this Judgment and Decree or maintain any action for such other and further relief as petitioner may be advised is proper and necessary for the enforcement of this Order, Judgment and Decree pursuant to Article 23-A of the General Business Law of the State of New York, and of other provisions of law applicable thereto and it is further

ORDERED, ADJUDGED AND DECREED that the defendant POWER pay to the Attorney General of the State of New York, with offices at 2 World Trade Center, City and State of New York, the sum of FOUR THOUSAND ($4,000) DOLLARS pursuant to the authority of the Civil Practice Law and Rules §8303(a)(6).

Dated: New York, New York

ENTER

S/ B / KASSAL

J. S. C.

SUPREME COURT OF THE STATE
OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF
NEW YORK,

Plaintiffs,

-against-

MONEX INTERNATIONAL, LTD.,
doing business in the State
of New York as P.C.C.E.,
INC. and PACIFIC COAST COIN
EXCHANGE, LOUIS E. CARABINI,
ET AL., Defendants,

ORDER, AFFIDAVIT AND CONSENT

LOUIS J. LEFKOWITZ,
Attorney General

Attorney for....Plaintiffs

Office And Post Office Address
Capitol, Albany, N.Y. 12224
New York Office
TWO WORLD TRADE CENTER, NEW YORK, N.Y. 10047
Tel. (212) 488-7566

service of a copy of

within .................. .................

is admitted this. ............. ..........day of
................. .................. .19

---

Mr.

Please take notice that the within is a true
copy of a
this day duly entered herein in the office of
the Clerk of
Dated, N.Y.,               , 19
                    Yours, etc.,
              LOUIS J. LEFKOWITZ,
                       Attorney General.

Attorney For
Office And Post Office Address
   Capitol, Albany, N.Y. 12224
   New York Office
TWO WORLD TRADE CENTER, NEW YORK, N.Y. 10047
To                                       .Esq.

Attorney for

---

Sir:..

Please take notice that the within

will be presented for settlement and signature
herein to the Hon.
one of the judges of the within named Court, at

in the          rough of
City of New York, on the               day of
                         19 , at         M.

Dated, N.Y.,               , 19
                    Yours, etc.,
              LOUIS J. LEFKOWITZ,
                       Attorney General.

Attorney For
Office And Post Office Address
   Capitol, Albany, N.Y. 12224
   New York Office
TWO WORLD TRADE CENTER, NEW YORK, N.Y. 10047
To                                       .Esq.

Attorney for