# EXHIBIT 35

# CREDIT AGREEMENT

THIS CREDIT AGREEMENT (this "Agreement") is entered into as of April 20, 2012, by and among MONEX DEPOSIT COMPANY, a California limited partnership, and MONEX CREDIT COMPANY, a California limited partnership (the foregoing companies may be referred to collectively as "Borrowers" and each individually as a "Borrower"), and WELLS FARGO BANK, NATIONAL ASSOCIATION ("Bank"). Each reference to a "Borrower" herein shall mean each and every party individually and collectively defined as a Borrower above, and each Borrower herein shall be a coborrower to every other Borrower.

## RECITALS

Borrowers have requested that Bank extend or continue credit to Borrowers as described below (collectively, the "Credits," and each a "Credit"), and Bank has agreed to provide such credit to Borrowers on the terms and conditions contained herein.

Borrowers, Bank, Farmers & Merchants Bank of Long Beach ("Farmers Bank"), Concord Funding Company, LLC ("CFC") and BNY Midwest Trust Company ("BNY") have entered into that certain Intercreditor Agreement, dated of even date herewith, as may be amended from time to time in accordance with its terms (the "Intercreditor Agreement"), which among other things sets forth the priorities of the parties thereto in and to the collateral described therein.

Borrowers, Bank and Delaware Depository Service Company ("DDSC") have entered into that certain Depository Agreement, dated of even date herewith, as may be amended from time to time in accordance with its terms (the "Depository Agreement"), which among other things sets forth the terms under which the Wells Priority Collateral will be administered by the Depository.

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Bank and Borrowers hereby agree as follows:

## ARTICLE I
## CREDIT TERMS

SECTION 1.1.    LINE OF CREDIT.

(a)    <u>Line of Credit</u>.  Subject to the terms and conditions of this Agreement, Bank hereby agrees to make advances to Borrowers from time to time up to and including April 20, 2013, not to exceed at any time the aggregate principal amount of Twenty Five Million Dollars ($25,000,000) ("Line of Credit"), the proceeds of which shall be used to finance precious metals inventory purchases by Borrowers, to finance loans to be made by Borrowers to their customers that finance their respective purchases of Borrowers' precious metals inventory and to finance Borrowers' working capital requirements and general corporate purposes of Borrowers in the ordinary course of business.  Borrowers' joint and several obligations to repay advances under the Line of Credit shall be evidenced by a promissory note executed by Borrowers dated as of April 20, 2012 ("Line of Credit Note"), all terms of which are incorporated herein by this reference.



(b)    Limitation on Borrowings.  Outstanding borrowings under the Line of Credit, to a maximum of the principal amount set forth above, shall not at any time exceed an aggregate of (i) eighty percent (80%) of the value of Borrowers' Eligible Inventory plus (ii) the lesser of (x) one hundred percent (100%) of Borrowers' Eligible Loans and (y) eighty percent (80%) of the value of Eligible Customer Collateral minus (iii) $10,000,000 (which amount may be reduced or eliminated by amendment to this Agreement) (the "Borrowing Base").  All of the foregoing shall be determined by Bank upon receipt and review of all collateral reports required hereunder and such other documents and collateral information as Bank may from time to time require.

As used herein, "Borrowing Base Certificate" means a Borrowing Base Certificate in the form attached as Appendix A (as amended from time to time), calculating the Borrowing Base and attaching detailed reports of the Eligible Loans, Eligible Inventory and Eligible Customer Collateral as of each date provided by Borrowers to the Bank.

As used herein, "Eligible Customer Collateral" means gold, silver, platinum and palladium bullion and bullion coins, or Eligible Warehouse Receipts therefor, that are (i) owned by any Borrower's customer, (ii) listed as Eligible Customer Collateral on the Borrowing Base Certificate, (iii) serve as collateral for any Eligible Loan provided to such customer, and (iv) located at any metals depository or other premises approved by Bank and in which the applicable Borrower has a perfected security interest of first priority; provided, however, that not more than 15% of the aggregate amount of Eligible Customer Collateral shown on the Borrowing Base Certificate shall consist of Eligible Warehouse Receipts.

As used herein, "Eligible Inventory" means gold, silver, platinum and palladium bullion and bullion coins, or Eligible Warehouse Receipts therefor, that are (i) owned by the Borrowers, (ii) listed as Eligible Inventory on the Borrowing Base Certificate and (iii) located at any metals depository or other premises approved by Bank and in which Bank has a perfected security interest of first priority; provided, however, that (a) Eligible Inventory shall not include inventory that is subject to a security interest or lien in favor of any third party, or inventory otherwise deemed ineligible by Bank in its sole discretion; and (b) not more than 15% of the aggregate amount of Eligible Inventory shown on the Borrowing Base Certificate shall consist of Eligible Warehouse Receipts.

All Eligible Customer Collateral shall be valued, as of any date of determination, at the Borrowers' bid prices prevailing at or about the mid-day settlement pricing of the New York Mercantile Exchange, and all Eligible Inventory shall be valued at the Borrowers' then prevailing bid and ask mid-point prices, so long as, in each case, such bid and/or ask prices are within 95% of the last closing trade price for such bullion or bullion coin on the New York Mercantile Exchange or another exchange that Bank has consented to in writing ("Approved Exchange"), as reported by The Bloomberg Financial Markets information databases and services operated by Bloomberg, L.P., or any successor service or entity ("Bloomberg") (or, if the Approved Exchange begins to operate on an extended hours basis and does not designate the closing trade price, as the case may be, then the last trade price of such bullion or bullion coin prior to 4:00 P.M., New York time, as reported by Bloomberg).  If such bid/ask prices are not within 95% of the Approved Exchange prices so reported, then, at Bank's election, the Eligible

Customer Collateral and Eligible Inventory may instead thereafter be valued at the Approved Exchange quoted prices, as set forth above. If at any time the value cannot be calculated for any bullion or bullion coin on a particular date on any of the foregoing bases, the value of such bullion or bullion coin on such date shall be the fair market value as determined by Bank.

As used herein, "Eligible Loans" shall consist solely of loans made to Borrowers' customers (each, an "Obligor") in the ordinary course of Borrowers' business, upon which Borrowers' right to receive payment is absolute and not contingent upon the fulfillment of any condition whatsoever, and in which Bank has a perfected security interest of first priority, and:

      (i)     the loan is listed on the Borrowing Base Certificate as an Eligible Loan;

      (ii)    the loan is payable solely in U.S. Dollars;

      (iii)   the loan, together with the related loan agreement under which such loan was originated, does not contravene in any material respect any laws, rules or regulations applicable thereto (including, without limitation, usury laws, rules and regulations relating to truth in lending, fair credit billing, fair credit reporting, equal credit opportunity, fair debt collection practices and privacy);

      (iv)   all material consents, licenses or authorizations of, or registrations with, any governmental authority required to be obtained or given in connection with the origination of such loan, possession of collateral therefor, or the execution, delivery and performance of the related loan agreement, have been duly obtained or given and are in full force and effect;

      (v)    such loan is owned by a Borrower free and clear of all liens except as expressly permitted in this Agreement;

      (vi)   the loan was originated under a loan agreement that was duly authorized by the Obligor and which is in full force and effect, and constitutes the legal, valid, and binding obligation of the Obligor, enforceable against such Obligor in accordance with its terms and which is not subject to any legal proceeding, dispute, right of setoff, offset, counterclaim or defense whatsoever;

      (vii)  the loan is fully secured by a first priority perfected security interest in Eligible Customer Collateral that is owned by the Obligor;

      (viii)  the Bank has a first priority perfected security interest in the loan and the related loan agreement, and if the loan agreement is in the possession of a Borrower, it has been conspicuously marked as having been assigned to Bank;

      (ix)   no portion of the loan is subordinated to any other indebtedness of the Obligor, whether pursuant to any agreement, document or instrument or by operation of law or otherwise;

(x)    the Obligor under such loan:

(a) is living (if a natural person);

(b) is a resident of the United States of America; provided that the Obligors on up to 5% of the aggregate principal amount of all Eligible Loans may be residents of Canada;

(c) is not the United States of America or any other sovereign nation, any state or political subdivision thereof, or any municipality, agency, instrumentality or other subdivision of any of the foregoing;

(d) is not (if a natural person) a minor under the laws of his/her state of residence;

(e) is competent to enter into a contract, incur debt and grant liens on assets;

(f) is not an affiliate of any Borrower;

(g) has executed a loan agreement in the standard form used by Borrowers pursuant to which the loan was originated;

(h) has not become the subject of an Insolvency Proceeding;

(i) has never undertaken legal proceedings against Borrowers; and

(j) has not defaulted on the loan or on any previous loan made to it by a Borrower.

Notwithstanding the foregoing, "Eligible Loan" shall not include (i) any loan that is not a valid finance lender loan under California Financial Code Section 2200, et seq.; or (ii) any loan otherwise deemed ineligible by Bank in its sole discretion.

As used herein, "Eligible Warehouse Receipt" means a warehouse receipt which meets the following criteria:

(i)    the receipt is issued by a COMEX or NYMEX approved depository;

(ii)    the receipt evidences metals which, when held in direct physical form, would constitute Eligible Customer Collateral or Eligible Inventory;

(iii)    the receipt is located at a metals depository or other premises approved by Bank and is subject to a depository agreement between Bank, Borrowers and an approved depository, and Bank has a perfected security interest of first priority in such receipt; and

(iv)    one of the Borrowers is the receipt's holder of record on the issuer's books, free and clear of security interests or liens in favor of any third party, and Borrowers are not in arrears in payment of storage fees on the underlying metal.

(c)    Borrowing and Repayment.  Borrowers may from time to time during the term of the Line of Credit borrow, partially or wholly repay their outstanding borrowings, and reborrow, subject to all of the limitations, terms and conditions contained herein or in the Line of Credit Note; provided however, that if the total outstanding borrowings under the Line of Credit at any time exceed (i) the Borrowing Base or (ii) the maximum principal amount available under the Line of Credit, as set forth above (an "Overadvance Condition"), then in each such case, (x) Borrowers shall, within one Business Day of the occurrence of the Overadvance Condition, repay the outstanding principal balance of the borrowings in an amount not less than the amount of such excess, and (y) no borrowings may be made while an Overadvance Condition exists.

SECTION 1.2.    INTEREST/FEES.

(a)    Interest.  The outstanding principal balance of each credit subject hereto shall bear interest at the rate of interest set forth in the Line of Credit Note.

(b)    Computation and Payment.  Interest shall be computed on the basis of a 360-day year, actual days elapsed.  Interest shall be payable at the times and place set forth in each promissory note or other instrument or document required hereby.

(c)    Commitment Fee.  Borrowers shall pay to Bank a non-refundable commitment fee for the Line of Credit equal to One Hundred Twenty Five Thousand Dollars ($125,000), which fee shall be due and payable in full on the date of this Agreement.

(d)    Unused Commitment Fee.  Borrowers shall pay to Bank a fee equal to twenty five hundredth percent (0.25%) per annum (computed on the basis of a 360-day year, actual days elapsed) on the average daily unused amount of the Line of Credit, which fee shall be calculated on a quarterly basis by Bank and shall be due and payable by Borrowers in arrears on the last day of each calendar quarter.

SECTION 1.3.    COLLECTION OF PAYMENTS.  Each Borrower authorizes Bank to collect all principal, interest and fees due under each credit subject hereto by charging any deposit account maintained by Borrowers or any of them with Bank, for the full amount thereof. Should there be insufficient funds in any such deposit account to pay all such sums when due, the full amount of such deficiency shall be immediately due and payable by Borrowers.

SECTION 1.4.    COLLATERAL.  As security for all indebtedness and other obligations of Borrowers to Bank, each Borrower hereby grants to Bank security interests in all of its present and hereafter acquired tangible and intangible personal property and fixtures (the "Collateral"); provided that such security interest shall be (i) of first priority, in all of the Eligible Inventory, Eligible Loans, Eligible Customer Collateral, and such other assets as Bank may agree, in its discretion, to make advances against from time to time (the "Wells Priority Collateral"), (ii) of second priority (solely with respect to Farmers Bank) in the Farmers Priority Collateral (as defined in the Intercreditor Agreement) and (iii) of the priority set forth in the Intercreditor Agreement in all other Collateral.  All of the foregoing shall be evidenced by and subject to the terms of such security agreements, pledge agreements, financing statements, and other documents as Bank shall reasonably require, all in form and substance satisfactory to Bank.

SECTION 1.5.    GUARANTIES.  The payment and performance of all indebtedness and other obligations of Borrower to Bank shall be guaranteed jointly and severally by each general partner of Borrowers and by Michael A. Carabini (collectively, "Guarantors"), as evidenced by and subject to the terms of guaranties in form and substance satisfactory to Bank.

ARTICLE II
REPRESENTATIONS AND WARRANTIES

Each Borrower makes the following representations and warranties to Bank, which representations and warranties shall survive the execution of this Agreement and shall continue in full force and effect until the full and final payment, and satisfaction and discharge, of all obligations of Borrowers to Bank subject to this Agreement.

SECTION 2.1.    LEGAL STATUS.  Each Borrower is a limited partnership, duly organized and existing and in good standing under the laws of the State of California, and is qualified or licensed to do business (and is in good standing as a foreign entity, if applicable) in all jurisdictions in which such qualification or licensing is required or in which the failure to so qualify or to be so licensed could have a material adverse effect on such Borrower or on Borrowers and their respective subsidiaries, taken as a whole.  Each subsidiary of Borrower is duly organized or formed, existing and in good standing under the laws of the jurisdiction of its organization or formation, and is qualified or licensed to do business (and is in good standing as a foreign corporation or other entity, if applicable) in all jurisdictions in which such qualification or licensing is required except to the extent the failure to so qualify or to be so licensed could not have a material adverse effect on any Borrower, such subsidiary, or on Borrowers and their respective subsidiaries, taken as a whole.  As of the date hereof, no Borrower has any subsidiaries.

SECTION 2.2.    AUTHORIZATION AND VALIDITY.  This Agreement and each promissory note, contract, instrument and other document required hereby or at any time hereafter delivered to Bank in connection herewith (collectively, the "Loan Documents") have been duly authorized, and upon their execution and delivery in accordance with the provisions hereof will constitute legal, valid and binding agreements and obligations of Borrowers or the party which executes the same, enforceable in accordance with their respective terms.

SECTION 2.3.    NO VIOLATION.  The execution, delivery and performance by Borrowers of each of the Loan Documents do not violate any provision of any law or regulation, or contravene any provision of the Certificate of Formation or Partnership Agreement of any Borrower, or result in any breach of or default under any contract, obligation, indenture or other instrument to which any Borrower is a party or by which any Borrower may be bound.

SECTION 2.4.    LITIGATION.  There are no pending, or to the best of each Borrower's knowledge threatened, actions, claims, investigations, suits or proceedings by or before any governmental authority, arbitrator, court or administrative agency which could, individually or in the aggregate, have a material adverse effect on the financial condition or operation of any Borrower or all Borrowers and their respective subsidiaries, as a whole, other than those disclosed by Borrowers to Bank in writing prior to the date hereof.

SECTION 2.5.    CORRECTNESS OF FINANCIAL STATEMENTS.  The annual financial statement of each Borrower dated December 31, 2010, and all interim financial statements delivered to Bank since said date, true copies of which have been delivered by Borrowers to Bank prior to the date hereof, (a) are complete and correct and present fairly the financial condition of Borrowers, (b) disclose all liabilities of Borrowers that are required to be reflected or reserved against under generally accepted accounting principles, whether liquidated or unliquidated, fixed or contingent, and (c) have been prepared in accordance with generally accepted accounting principles consistently applied.  Since the dates of such financial statements there has been no material adverse change in the financial condition of any Borrower or all Borrowers and their respective subsidiaries, taken as a whole, nor has any Borrower or any subsidiary of any Borrower mortgaged, pledged, granted a security interest in or otherwise encumbered any of its assets or properties except in favor of Bank or as otherwise permitted by Bank in writing.

SECTION 2.6.    INCOME TAX RETURNS; TAXES.  Neither any Borrower nor any subsidiary of any Borrower has any knowledge of any pending assessments or adjustments of any Borrower's income tax payable with respect to any year.  Borrowers and each of their respective subsidiaries have filed all Federal, state and other tax returns and reports required to be filed, and have paid all Federal, state and other taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with generally accepted accounting principles.  Neither any Borrower nor any subsidiary of any Borrower is party to any tax sharing agreement.

SECTION 2.7.    NO SUBORDINATION. There is no agreement, indenture, contract or instrument to which any Borrower is a party or by which any Borrower may be bound that requires the subordination in right of payment of any Borrower's obligations subject to this Agreement to any other obligation of any Borrower.

SECTION 2.8.    PERMITS, FRANCHISES.  Borrowers and each of their respective subsidiaries possess, and will hereafter possess, all permits, consents, approvals, franchises and licenses required and rights to all trademarks, trade names, patents, and fictitious names, if any,

necessary to enable each Borrower or such subsidiary to conduct the business in which it is now engaged in compliance with applicable law.

SECTION 2.9.    ERISA.  Borrowers and their respective subsidiaries are in compliance in all material respects with all applicable provisions of the Employee Retirement Income Security Act of 1974, as amended or recodified from time to time ("ERISA"); neither any Borrower nor any of its subsidiaries has violated any provision of any defined employee pension benefit plan (as defined in ERISA) maintained or contributed to by any Borrower or such subsidiary (each, a "Plan"); no Reportable Event as defined in ERISA has occurred and is continuing with respect to any Plan initiated by any Borrower or any of its subsidiaries; Borrowers and their respective subsidiaries have met their respective minimum funding requirements under ERISA with respect to each Plan; and each Plan will be able to fulfill its benefit obligations as they come due in accordance with the Plan documents and under generally accepted accounting principles.

SECTION 2.10.    OTHER OBLIGATIONS.  Neither any Borrower nor any of its subsidiaries is in default on any obligation for borrowed money, any purchase money obligation or any other material lease, commitment, contract, instrument or obligation.

SECTION 2.11.    ENVIRONMENTAL MATTERS.  Except as disclosed by Borrowers to Bank in writing prior to the date hereof, each Borrower and each of its subsidiaries are in compliance in all material respects with all applicable federal or state environmental, hazardous waste, health and safety statutes, and any rules or regulations adopted pursuant thereto, which govern or affect any operations of any Borrower or any of its subsidiaries and/or properties, including without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Superfund Amendments and Reauthorization Act of 1986, the Federal Resource Conservation and Recovery Act of 1976, and the Federal Toxic Substances Control Act, as any of the same may be amended, modified or supplemented from time to time.  None of the operations of any Borrower or any of its subsidiaries is the subject of any federal or state investigation evaluating whether any remedial action involving a material expenditure is needed to respond to a release of any toxic or hazardous waste or substance into the environment. Neither any Borrower nor any of its subsidiaries has any material contingent liability in connection with any release of any toxic or hazardous waste or substance into the environment.

SECTION 2.12.    GOVERNMENTAL AUTHORIZATION; OTHER CONSENTS. No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any governmental authority or any other person or entity is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Borrower of this Agreement or any other Loan Document.

SECTION 2.13.    COMPLIANCE WITH LAWS. Each Borrower and each of its subsidiaries are in compliance in all material respects with the requirements of all laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which such requirement of law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted.

SECTION 2.14.  RIGHTS IN COLLATERAL. Each Borrower owns the property granted by it as collateral under this Agreement and the other Loan Documents, free and clear of any liens and other encumbrances except for liens permitted pursuant to Section 5.2. The provisions of the Loan Documents are effective to create in favor of Bank a legal, valid and enforceable lien of first priority (except as set forth in Section 1.4, Section 5.2 or Section 6.1(l)) on all right, title and interest of the respective Borrowers in and to the collateral described therein, and, except for filings completed prior to the date hereof and as contemplated hereby and by the other Loan Documents, no filing or other action will be necessary to perfect such liens. No authorization, approval or other action by, and no notice to or filing with, any governmental authority is required for either (i) the pledge or grant by any Borrower of the liens purported to be created in favor of Bank pursuant to any Loan Documents or (ii) the exercise by Bank of any rights or remedies in respect of any collateral, except for filings or recordings contemplated by the Loan Documents. Except for filings in favor of Bank and filings to evidence liens permitted by Section 5.2, no effective financing statement, fixture filing or other instrument similar in effect covering all or any part of the collateral is on file in any filing or recording office. All information supplied to Bank by or on behalf of any Borrower with respect to any of the collateral is accurate and complete in all material respects.

SECTION 2.15.  REAL PROPERTY.  As of the date hereof, neither any Borrower nor any of its subsidiaries owns any fee interest in any real property. All information supplied to Bank by or on behalf of any Borrower with respect to any of the real property in which any Borrower or any of its subsidiaries has a leasehold interest is accurate and complete in all material respects.

SECTION 2.16.  DISCLOSURE.  No information, exhibit or report furnished to Bank by or on behalf of any Borrower or any of its subsidiaries for use in connection with the transactions contemplated by this Agreement contains any untrue statement of a material fact or omits to state a material fact (known to any Borrower or any of its subsidiaries, in the case of any document not furnished by it) necessary in order to make the statements contained therein not misleading in light of the circumstances in which the same were made.

ARTICLE III
CONDITIONS

SECTION 3.1.  CONDITIONS OF INITIAL EXTENSION OF CREDIT.  The obligation of Bank to extend any credit contemplated by this Agreement is subject to the fulfillment to Bank's satisfaction of all of the following conditions:

(a)  Approval of Bank Counsel.  All legal matters incidental to the extension of credit by Bank shall be satisfactory to Bank's counsel.

(b)  Documentation.  Bank shall have received, in form and substance satisfactory to Bank, each of the following, duly executed:

(i)  This Agreement and each promissory note or other instrument or document required hereby.

     (ii)     Certificates of each Borrower's general partner, in the capacity as a general partner of the applicable Borrower, as to, and attaching if applicable: (A) copies of the Certificates of Formation, certified as of a recent date by the Secretary of State of such Borrower's state of organization; (B) copies of the partnership agreement of such Borrower; (C) copies of resolutions of the general partner or other authorizing documents of such Borrower, in form and substance satisfactory to Bank, approving the Loan Documents and the extensions of credit hereunder; (D) incumbency; and (E) copies of certificates of good standing or its equivalent with respect to such Borrower certified as of a recent date by the Secretary of State and the tax authority of such Borrower's state of organization.

     (iii)    Certificates of each Guarantor that is an entity, as to, and attaching if applicable: (A) a copy of the Certificate of Formation, certified as of a recent date by the Secretary of State of such Guarantor's state of organization; (B) a copy of the partnership agreement of such Guarantor; (C) copies of resolutions of the general partner or other authorizing documents of such Guarantor, in form and substance satisfactory to Bank, approving the Loan Documents to which it is a party and the transactions contemplated thereby; (D) incumbency; and (E) a copy of a certificate of good standing or its equivalent with respect to such Guarantor certified as of a recent date by the Secretary of State and the tax authority of such Guarantor's state of organization.

     (iv)    Continuing Security Agreement.

     (v)     A Continuing Guaranty from the persons and entities identified as Guarantors in Section 1.5 of this Agreement.

     (vi)    Disbursement Orders.

     (vii)   Intercreditor Agreement between Bank and Farmers Bank.

   (viii)   Depository Agreement among DDSC, Borrowers and Bank.

     (ix)    An opinion of counsel to Borrowers, covering such matters as Bank may reasonably request (this Agreement constituting a request by Borrowers to such counsel to deliver such opinion to Bank).

     (x)     Such other documents as Bank may require under any other Section of this Agreement.

    (c)    <u>Financial Condition</u>. There shall have been no material adverse change, as determined by Bank, in the financial condition or business of any Borrower, CFC, any Guarantor hereunder, or all Borrowers and their respective subsidiaries, taken as a whole, nor any material decline, as determined by Bank, in the market value of any collateral required hereunder or a substantial or material portion of the assets of any Borrower or any guarantor.

    (d)    <u>Insurance</u>. Borrowers shall have delivered to Bank evidence of insurance coverage on all property of each Borrower, in form, substance, amounts, covering risks and issued by companies satisfactory to Bank, and where required by Bank, with loss payable endorsements in favor of Bank.

(e)    Collateral and Hedging Audits. Bank shall have conducted an audit of the Eligible Loans, Eligible Inventory and Eligible Customer Collateral, and all books and records and hedging activities relating thereto, the results of which shall be satisfactory to Bank in its discretion, with all costs thereof paid by Borrowers.

SECTION 3.2.    CONDITIONS OF EACH EXTENSION OF CREDIT.  The obligation of Bank to make each extension of credit requested by Borrowers hereunder shall be subject to the fulfillment to Bank's satisfaction of each of the following conditions:

(a)    Compliance.  The representations and warranties contained herein and in each of the other Loan Documents shall be true on and as of the date of the signing of this Agreement and on the date of each extension of credit by Bank pursuant hereto, with the same effect as though such representations and warranties had been made on and as of each such date, and on each such date, no Event of Default as defined herein, and no condition, event or act which with the giving of notice or the passage of time or both would constitute such an Event of Default, shall have occurred and be continuing or shall exist.

(b)    Documentation.  Bank shall have received all additional documents which may be required in connection with such extension of credit.

ARTICLE IV
AFFIRMATIVE COVENANTS

Each Borrower covenants that so long as Bank remains committed to extend credit to Borrowers pursuant hereto, or any liabilities (whether direct or contingent, liquidated or unliquidated) of Borrowers to Bank under any of the Loan Documents remain outstanding, and until payment in full of all obligations of Borrowers subject hereto, each Borrower shall, and shall cause each of its subsidiaries to, unless Bank otherwise consents in writing:

SECTION 4.1.    PUNCTUAL PAYMENTS.  Punctually pay all principal, interest, fees or other liabilities due under any of the Loan Documents at the times and place and in the manner specified therein, and immediately upon demand by Bank and in no event later than the same business day on which such demand has been made, the amount by which the outstanding principal balance of any credit subject hereto at any time exceeds any limitation on borrowings applicable thereto.

SECTION 4.2.    ACCOUNTING RECORDS; COLLATERAL EXAMINATION. Maintain adequate books and records in accordance with generally accepted accounting principles consistently applied, and permit any representative of Bank, at any reasonable time, with or without notice, to inspect, audit and examine such books and records, to make copies of the same, to inspect the properties of such Borrower or any of its subsidiaries, and to conduct an audit of Eligible Loans, Eligible Inventory and Eligible Customer Collateral, and all books and records and hedging activities relating thereto, with all costs thereof paid by Borrowers not more frequently than once in each six-month period after the date of this Agreement unless an Event of Default has occurred and is continuing in which case there shall be no limitation on the

frequency of such events and all costs thereof shall be paid by Borrowers during the continuation of such Event of Default.

SECTION 4.3.    FINANCIAL STATEMENTS.  Provide to Bank all of the following, in form and detail satisfactory to Bank:

(a)    not later than 120 days after and as of the end of each fiscal year, audited financial statements of Borrowers and their respective subsidiaries, prepared by a certified public accountant acceptable to Bank in accordance with generally accepted accounting principles consistently applied, to include a balance sheet, income statement, and statement of cash flows and sources, and accompanied by the unqualified opinion of such accountant addressed to Bank;

(b)    not later than 30 days after and as of the end of each fiscal quarter and of each fiscal year, separate financial statements of Borrowers and their respective subsidiaries, in each case, prepared by Borrowers, in accordance with generally accepted accounting principles consistently applied, to include a balance sheet and income statement;

(c)    not later than 5:00 P.M., Los Angeles time, on each business day, a Borrowing Base Certificate that includes the valuation of Eligible Loans, Eligible Inventory and Eligible Customer Collateral in accordance with Section 1.1(b), an inventory collateral report, a reconciliation of accounts and immediately upon each request from Bank, a list of the names and addresses of all Borrowers' account debtors;

(d)    contemporaneously with each annual and quarterly financial statements of Borrowers and their respective subsidiaries required hereby, a certificate of the president or chief financial officer of the general partner of each Borrower that said financial statements are accurate, that demonstrate compliance, in reasonable detail, with the financial condition covenants set forth in Section 4.9 of this Agreement and that there exists no Event of Default nor any condition, act or event which with the giving of notice or the passage of time or both would constitute an Event of Default;

(e)    from time to time such other information as Bank may reasonably request.

SECTION 4.4.    COMPLIANCE.  Preserve and maintain all licenses, permits, governmental approvals, rights, privileges and franchises necessary for the conduct of business of such Borrower or any of its subsidiaries; and comply with the provisions of all documents pursuant to which such Borrower or any of its subsidiaries is organized and/or which govern such Borrower's or such subsidiary's continued existence and with the requirements of all laws, rules, regulations and orders of any governmental authority applicable to such Borrower, such subsidiary and/or its or their business.

SECTION 4.5.    INSURANCE.  Maintain and keep in force, for each business in which such Borrower or any of its subsidiaries is engaged, insurance of the types and in amounts customarily carried in similar lines of business, including but not limited to fire, extended coverage, public liability, flood, property damage and workers' compensation, with all such

insurance carried with companies and in amounts satisfactory to Bank, and deliver to Bank from time to time at Bank's request schedules setting forth all insurance then in effect.

SECTION 4.6.    FACILITIES.  Keep all properties useful or necessary to such Borrower's or any of its subsidiaries' business in good repair and condition, and from time to time make necessary repairs, renewals and replacements thereto so that such properties shall be fully and efficiently preserved and maintained.

SECTION 4.7.    TAXES AND OTHER LIABILITIES.  Pay and discharge when due any and all indebtedness, obligations, assessments and taxes, both real or personal, including without limitation federal and state income taxes and state and local property taxes and assessments, except (a) such as Borrowers or any of their respective subsidiaries may in good faith contest or as to which a bona fide dispute may arise, and (b) for which Borrowers or the applicable subsidiary have made provision, to Bank's satisfaction, for eventual payment thereof in the event any Borrower or such subsidiary is obligated to make such payment.

SECTION 4.8.    LITIGATION.  Promptly give notice in writing to Bank of any litigation pending or threatened against such Borrower or any of its subsidiaries with a claim in excess of $500,000 or when all litigation pending or threatened against Borrowers and their respective subsidiaries has aggregate claims in excess of $500,000.

SECTION 4.9.    FINANCIAL CONDITION.  Maintain the financial condition of such Borrower on a combined basis with the other Borrower as follows using generally accepted accounting principles consistently applied and used consistently with prior practices (except to the extent modified by the definitions herein), with compliance determined commencing with Borrowers' financial statements for the period ended December 31, 2011:

(a)    Tangible Net Worth not less than $40,000,000, at each fiscal quarter end, determined on a quarterly basis, with "Tangible Net Worth" defined as the aggregate of total partners' equity less any intangible assets, less any loans or advances to, or investments in, any related entities or individuals other than CFC.

(b)    Total Liabilities divided by Tangible Net Worth not greater than 7.5 to 1.0, at each fiscal quarter end, with "Total Liabilities" defined as the aggregate of current liabilities and non-current liabilities, and with "Tangible Net Worth" as defined above.

SECTION 4.10.  NOTICE TO BANK.  Promptly (but in no event more than five (5) days after the occurrence of each such event or matter) give written notice to Bank in reasonable detail of: (a) the occurrence of any Event of Default, or any condition, event or act which with the giving of notice or the passage of time or both would constitute an Event of Default; (b) any change in the name or the organizational structure of any Borrower or any of its subsidiaries; (c) the occurrence and nature of any Reportable Event or Prohibited Transaction, each as defined in ERISA, or any funding deficiency with respect to any Plan; (d) any termination or cancellation of any insurance policy which any Borrower or any of its subsidiaries is required to maintain, (e) any uninsured or partially uninsured loss through liability or property damage, or through fire, theft or any other cause affecting any property of any Borrower or any of its subsidiaries in

excess of an aggregate of $500,000, (f) any person that has (i) given any notice to any Borrower, any of its subsidiaries or any other entity or person affiliated with a Borrower or (ii) taken any other action with respect to a claimed default in the payment or performance of any obligation, or any defined event of default, claiming damages or losses in excess of $500,000 under the terms of any contract, instrument or document (other than any of the Loan Documents) pursuant to which any Borrower or any of its subsidiaries, or any Guarantor, has incurred any debt or other liability to any person or entity, or (g) of the occurrence of any event or change that has caused or evidences, either in any case or in the aggregate, a material adverse effect on the financial condition or operation of any Guarantor, any Borrower or the Borrowers and their respective subsidiaries, taken as a whole.

SECTION 4.11.  GUARANTORS' RECORDS.  Cause each Guarantor hereunder to provide to Bank not later than 60 days after each calendar year end, the financial statement of such Guarantor, prepared and certified as complete and correct in all respects by such Guarantor, to include all assets, direct and contingent liabilities, income and expenses.

SECTION 4.12.  NEW SUBSIDIARIES.  From and after the date hereof, any Borrower may acquire or create new subsidiaries, so long as, promptly, and in no event later than ten (10) business days after such acquisition or creation, such Borrower notifies Bank of that fact and causes such subsidiary to execute and deliver to Bank a joinder to this Agreement or a guaranty, in Bank's option, and a counterpart of the security agreement and other security documents, and to take all such further actions and execute all such further documents and instruments (including actions, documents and instruments comparable to those described in Section 3.1(b)) as may be, in the opinion of Bank, necessary or desirable to join such subsidiary as a borrower or to have such subsidiary as a guarantor and to create in favor of Bank a valid and perfected first priority lien on all of the property of such subsidiary.  In addition, for each such subsidiary, the applicable Borrower or subsidiary shall deliver to Bank a pledge agreement or a pledge supplement thereto and any other documents and instruments requested by Bank, in form and substance satisfactory to Bank.

SECTION 4.13.  POST CLOSING DELIVERIES; LANDLORD WAIVER.  By not later than ninety (90) days after the date hereof, execute and deliver, and cause the lessor of the Borrowers' premises located at 4910 Birch Street, Newport Beach, California 92660, to execute and deliver, a landlord consent in the form attached as Appendix B.  From and after the date hereof, in the event that any Borrower acquires any leasehold interest as lessee under any lease of real property at which Wells Priority Collateral is located, such Borrower shall, within ninety (90) days thereafter, execute and deliver, and cause the lessor of such premises to execute and deliver, a landlord consent in the form attached as Appendix B.

ARTICLE V
NEGATIVE COVENANTS

Each Borrower further covenants that so long as Bank remains committed to extend credit to Borrowers pursuant hereto, or any liabilities (whether direct or contingent, liquidated or unliquidated) of Borrowers to Bank under any of the Loan Documents remain outstanding, and

until payment in full of all obligations of Borrowers subject hereto, no Borrower will, and will not permit any of its subsidiaries to, without Bank's prior written consent:

SECTION 5.1.   USE OF FUNDS.  Use any of the proceeds of any credit extended hereunder except for the purposes stated in Article I hereof.

SECTION 5.2.   OTHER INDEBTEDNESS; LIENS.  Create, incur, assume or permit to exist any indebtedness or liabilities resulting from borrowings, loans or advances, whether secured or unsecured, matured or unmatured, liquidated or unliquidated, joint or several, or grant or permit to exist any security interest or lien on all or any portion of the assets of any Borrower or any of its subsidiaries, except (a) the liabilities of Borrowers or any of their respective subsidiaries to, and liens in favor of, Bank, (b) any liabilities or security interests of Borrowers and their respective subsidiaries existing as of the date hereof and listed on Schedule 5.2 to this Agreement, (c) any liabilities of a Borrower to another Borrower so long as such liabilities are unsecured and any instrument issued in connection therewith has been pledged and delivered to Bank and (d) any other indebtedness (including secured indebtedness), so long as such indebtedness and the security interests related thereto are subject to intercreditor and/or subordination agreements with terms and conditions acceptable to Bank (including, among other things, that such documents do not provide for a security interest in favor of any party other than Bank with respect to any Wells Priority Collateral and that the extent and priority of all other security interests is acceptable to Bank).

SECTION 5.3.   MERGER, CONSOLIDATION, TRANSFER OF ASSETS.  Merge into, dissolve, liquidate, reorganize, recapitalize or consolidate with any other entity; make any substantial change in the nature of such Borrower's business as conducted as of the date hereof; acquire all or substantially all of the assets of any other entity; nor sell, lease, transfer or otherwise dispose of all or a substantial or material portion of assets of such Borrower or any of its subsidiaries except in the ordinary course of its business.

SECTION 5.4.   LOANS, ADVANCES, INVESTMENTS, GUARANTEES.  Make any loans or advances to or investments in any person or entity, or guarantee (or become liable as surety, endorser or otherwise for) any liabilities or obligations of any other person or entity except (a) any of the foregoing existing as of, and disclosed to Bank prior to, the date hereof, (b) loans made to Borrowers' customers, or payments to or deposits with metals suppliers and futures commission merchants, in each case on standard terms in the ordinary course of the Borrowers' business, (c) loans or advances by a Borrower to another Borrower so long as such liabilities are unsecured and any instrument issued in connection therewith has been pledged and delivered to Bank, (d) investments in CFC so long as (i) the assets so invested do not constitute any Borrower's Eligible Inventory or Eligible Loans (unless Bank provides its written consent to such asset investment; such assets shall no longer be Eligible Inventory or Collateral and any Bank lien thereon shall be released upon Bank's providing written consent to a transfer thereto to DDSC pursuant to the Depository Agreement) and (ii) any equity interests received in exchange therefor have been pledged, and, if certificated, delivered to the party set forth in the Intercreditor Agreement, (e) intercompany indebtedness between any Borrower and either Newport Service Corporation, a California corporation ("Newport") or Monaco Financial Services Corporation ("Monaco"), so long as such indebtedness appears as an intangible asset on the books of the

relevant Borrower and (f) other loans, advances, investments and guarantees in an aggregate amount not to exceed $1,000,000.

SECTION 5.5.    DISTRIBUTIONS.  Declare or pay any distributions either in cash or any other property to any partner, partners or other equity holders in any Borrower or any of its subsidiaries, nor redeem, retire, repurchase or otherwise acquire any partnership interest or any other equity interest in any Borrower or any of its subsidiaries; provided, however, that any Borrower may declare or pay any such distributions, or acquire any such partnership interest in such Borrower so long as no Event of Default shall have occurred and be continuing at the time of such declaration and payment or after giving effect thereto.

SECTION 5.6.    OTHER DEBT DOCUMENTS.  Agree to create, incur, assume or permit to exist, or to amend or otherwise change the terms of, (a) any indebtedness under any notes, agreements or instruments evidencing indebtedness with Farmers Bank permitted under the terms of this Agreement, if, in any case, the effect of such creation, incurrence, assumption, permission, amendment or change is to conflict with, result in a breach of or constitute a default under the Intercreditor Agreement, or (b) any other indebtedness under any notes, agreements or instruments evidencing indebtedness permitted under the terms of this Agreement, if, in any case, the effect of such creation, incurrence, assumption, permission, amendment or change is to affect in any way the Wells Priority Collateral, including, without limitation, (i) the inclusion, or purported inclusion, of Wells Priority Collateral, or any portion thereof, as part of the collateral therefor, (ii) the agreement, or purported agreement, of such other lender to make advances against Wells Priority Collateral, or any portion thereof, (iii) any claim or assertion, or purported claim or assertion, that Bank may not foreclose on Wells Priority Collateral, or any portion thereof, or that Bank does not have a perfected security interest or lien of first priority therein or that Bank's security interest is not perfected or impaired in any other way, or (iv) obtaining a security interest or lien of first priority in any assets other than what such other lender initially has agreed to advance against.

SECTION 5.7.    FISCAL YEAR.  Change its fiscal year-end from December 31.

ARTICLE VI<br>EVENTS OF DEFAULT

SECTION 6.1.    The occurrence of any of the following shall constitute an "Event of Default" under this Agreement:

(a)    Any Borrower shall fail to pay (i) when due any principal or (ii) within three days after the same becomes due, any interest, fee or other amount payable under any of the Loan Documents.

(b)    Any financial statement or certificate furnished to Bank in connection with, or any representation or warranty made by any Borrower or any other party under this Agreement or any other Loan Document shall prove to be incorrect, false or misleading in any material respect when furnished or made.

(c)     Any failure to perform or comply with any obligation, agreement or other provision contained herein or in any other Loan Document (other than those specifically described as an "Event of Default" in this section 6.1), and with respect to any such failure that by its nature can be cured, such failure shall continue for a period of thirty (30) days from its occurrence.

(d)     (i) Any failure to pay, any failure perform any obligation, or the occurrence of any defined event of default (and the expiration of the cure period provided therefor, if any), in each case under the terms of any contract, instrument or document (other than any of the Loan Documents) pursuant to which any Borrower, any Guarantor, CFC or Newport has incurred any indebtedness in an amount equal to or greater than $500,000, the effect of which failure to perform or event of default is to cause or permit the holder of such indebtedness to cause, with the giving of notice if required, such indebtedness to be accelerated prior to its stated maturity date; or (ii) any failure to pay any amount due under the Depository Agreement within thirty (30) days after the same becomes due.

(e)     Any Borrower, any Guarantor, CFC or Newport shall become insolvent, or shall suffer or consent to or apply for the appointment of a receiver, trustee, custodian or liquidator of itself or any of its property, or shall generally fail to pay its debts as they become due, or shall make a general assignment for the benefit of creditors; any Borrower, any Guarantor, CFC or Newport shall file a voluntary petition in bankruptcy, or seeking reorganization, in order to effect a plan or other arrangement with creditors or any other relief under the Bankruptcy Reform Act, Title 11 of the United States Code, as amended or recodified from time to time ("Bankruptcy Code"), or under any state or federal law granting relief to debtors, whether now or hereafter in effect; or any Borrower, any Guarantor, CFC or Newport shall file an answer admitting the jurisdiction of the court and the material allegations of any involuntary petition; or any Borrower, any Guarantor, CFC or Newport shall be adjudicated a bankrupt, or an order for relief shall be entered against any Borrower, any Guarantor, CFC or Newport by any court of competent jurisdiction under the Bankruptcy Code or any other applicable state or federal law relating to bankruptcy, reorganization or other relief for debtors.

(f)     (i) The filing of a notice of judgment lien against any Borrower or Guarantor involving in any individual case an amount in excess of $500,000 or in the aggregate with the judgments, notices of levy, writs and like process described in clauses (ii), (iii) and (iv) of this Section 6.1(f), an amount in excess of $500,000 per fiscal year; or (ii) the recording of any abstract of judgment against any Borrower or any Guarantor in any county in which any Borrower or Guarantor has an interest in real property involving in any individual case an amount in excess of $500,000 or in the aggregate with the judgment liens, notices of levy, writs and like process described in clauses (i), (iii) and (iv) of this Section 6.1(f), an amount in excess of $500,000 per fiscal year; or (iii) the service of a notice of levy and/or of a writ of attachment or execution, or other like process, against the assets of any Borrower or Guarantor involving in any individual case an amount in excess of $500,000 or in the aggregate with the judgment liens and judgments described in clauses (i), (ii) and (iv) of this Section 6.1(f), an amount in excess of $500,000 per fiscal year; or (iv) the entry of a final judgment against any Borrower or Guarantor involving in any individual case an amount in excess of $500,000 or in the aggregate with the judgment liens, judgments and notices of levy, writs and like process described in clauses (i), (ii) and (iii) of this Section 6.1(f), an amount in excess of $500,000 per fiscal year; or (v) any

involuntary petition or proceeding pursuant to the Bankruptcy Code or any other applicable state or federal law relating to bankruptcy, reorganization or other relief for debtors is filed or commenced against any Borrower or Guarantor; provided that (A) any such action provided for in clauses (i) through (iii) of this subparagraph (f) shall not have been withdrawn within two (2) days, (B) as to any such action provided for in clause (iv) of this subparagraph (f), enforcement proceedings have been commenced and have not been withdrawn or stayed within two (2) days, or such action shall not have been withdrawn, discharged, stayed or paid within thirty (30) days, and (C) any such action provided for in clause (v) of this subparagraph (f) shall have continued undismissed or unstayed for a period of thirty (30) days.

(g)     A material adverse change shall have occurred with respect to the financial condition or business of any Borrower, any Guarantor, CFC or Newport, or any material decline, as determined by Bank, shall have occurred in the market value of any collateral required hereunder or a substantial or material portion of the assets of any Borrower, any Guarantor, CFC or Newport, which condition shall remain unremedied for a period of more than thirty (30) days following notice by Bank.

(h)     (i) The death or incapacity of any Guarantor if an individual; or (ii) the dissolution or liquidation of any Borrower, any Guarantor, CFC or Newport, if a corporation, partnership, joint venture or other type of entity; or (iii) any Borrower, any Guarantor, CFC or Newport, or any of its directors, managers, partners, stockholders or members, shall take any action seeking to effect the dissolution or liquidation of any Borrower, any Guarantor, CFC or Newport.

(i)     The withdrawal, resignation or expulsion of any one or more of the general partners in any Borrower; or any change in control of any Borrower or any entity or combination of entities that directly or indirectly control any Borrower as a result of which Michael A. Carabini and trusts for which he is the trustee collectively no longer own an aggregate of eighty-five percent (85%) or more of the common stock, members' equity or other ownership interest of any Borrower.

(j)     Any Loan Document, at any time after its execution and delivery for any reason other than satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Borrower or any Guarantor contests in any manner the validity or enforceability of any Loan Document; or any Borrower or any Guarantor denies that it has any further liability or obligation under any Loan Document or purports to revoke, terminate or rescind any Loan Document.

(k)     The occurrence of any Reportable Event or Prohibited Transaction, each as defined in ERISA, or any funding deficiency with respect to any Plan, which has resulted or could reasonably be expected to result in liability of the Borrowers in excess of $250,000 in the aggregate, or any Borrower or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under any Plan in an aggregate amount in excess of the $250,000. "ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with any Borrower within the meaning of Section 414(b) or (c) of the Internal Revenue Code of 1986 (and Sections 414(m) and (o) of the Internal Revenue Code of 1986 for purposes of provisions relating to Section 412 of the Internal Revenue Code of 1986), and with respect to

any such event or occurrence that by its nature can be cured, such condition shall continue for a period of two (2) days from the date Borrowers first become aware of such event or occurrence.

(l)     Bank shall not have or shall cease to have a valid and perfected lien (i) of first priority in the Wells Priority Collateral, (ii) of second priority (solely with respect to Farmers Bank) in the Farmers Priority Collateral (as defined in the Intercreditor Agreement) and (iii) of the priority set forth in the Intercreditor Agreement in all other Collateral as described therein; or the priority of the Bank's lien is or shall become junior to the lien of another creditor in assets other than those against which such other creditor has agreed to make loans or advances, or any other person obtains a lien on any Wells Priority Collateral.

SECTION 6.2.     REMEDIES. (a) Upon the occurrence of any Event of Default described in Section 6.1(e) or 6.1(f)(v), (i) all indebtedness of Borrowers under each of the Loan Documents, any term thereof to the contrary notwithstanding, shall, without notice, become immediately due and payable without presentment, demand, protest or notice of dishonor, all of which are hereby expressly waived by each Borrower; (ii) the obligation, if any, of Bank to extend any further credit under any of the Loan Documents shall immediately cease and terminate; and (iii) Bank shall have all rights, powers and remedies available under each of the Loan Documents, or accorded by law, including without limitation the right to resort to any or all security for any credit subject hereto and to exercise any or all of the rights of a beneficiary or secured party pursuant to applicable law, and (b) upon the occurrence of any other Event of Default, (i) all indebtedness of Borrowers under each of the Loan Documents, any term thereof to the contrary notwithstanding, shall at Bank's option and without notice become immediately due and payable without presentment, demand, protest or notice of dishonor, all of which are hereby expressly waived by each Borrower; (ii) the obligation, if any, of Bank to extend any further credit under any of the Loan Documents shall immediately cease and terminate; and (iii) Bank shall have all rights, powers and remedies available under each of the Loan Documents, or accorded by law, including without limitation the right to resort to any or all security for any credit subject hereto and to exercise any or all of the rights of a beneficiary or secured party pursuant to applicable law. All rights, powers and remedies of Bank may be exercised at any time by Bank and from time to time after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

ARTICLE VII
MISCELLANEOUS

SECTION 7.1.     NO WAIVER. No delay, failure or discontinuance of Bank in exercising any right, power or remedy under any of the Loan Documents shall affect or operate as a waiver of such right, power or remedy; nor shall any single or partial exercise of any such right, power or remedy preclude, waive or otherwise affect any other or further exercise thereof or the exercise of any other right, power or remedy. Any waiver, permit, consent or approval of any kind by Bank of any breach of or default under any of the Loan Documents must be in writing and shall be effective only to the extent set forth in such writing.

SECTION 7.2.    NOTICES.  All notices, requests and demands which any party is required or may desire to give to any other party under any provision of this Agreement must be in writing delivered to each party at the following address:

BORROWERS: MONEX DEPOSIT COMPANY:
>Louis E. Carabini
Monex Deposit Company
4910 Birch Street
Newport Beach, CA 92660
Email: louc1@monex.com
Fax: (949) 955-1109

MONEX CREDIT COMPANY:
Michael A. Carabini
Monex Credit Company
4910 Birch Street
Newport Beach, CA 92660
Email: mac@monex.com
Fax: (949) 752-0607

BANK:        WELLS FARGO BANK, NATIONAL ASSOCIATION
Irvine Regional Commercial Banking Office
2030 Main Street, Suite 900
Irvine, California 92614
MAC E2231-090
Attention: Matthew J. Taylor
Email:  Matthew.J.Taylor@wellsfargo.com
Facsimile: (866) 790-8677

or to such other address as any party may designate by written notice to all other parties.  Each such notice, request and demand shall be deemed given or made as follows:  (a) if sent by hand delivery, upon delivery; (b) if sent by mail, upon the earlier of the date of receipt or three (3) days after deposit in the U.S. mail, first class and postage prepaid; and (c) if sent by telecopy, upon receipt.

SECTION 7.3.    COSTS, EXPENSES AND ATTORNEYS' FEES; INDEMNIFICATION.  Borrowers shall pay to Bank immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorneys' fees (to include outside counsel fees and all allocated costs of Bank's in-house counsel), expended or incurred by Bank in connection with (a) the negotiation and preparation of this Agreement and the other Loan Documents, Bank's continued administration hereof and thereof, and the preparation of any amendments and waivers hereto and thereto, (b) the enforcement of Bank's rights and/or the collection of any amounts which become due to Bank under any of the Loan Documents, (c) the prosecution or defense of any action in any way related to any of the Loan Documents, including without limitation, any action for declaratory relief, whether incurred at the trial or appellate level, in an arbitration proceeding or otherwise, and including any of the

foregoing incurred in connection with any bankruptcy proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by Bank or any other person) relating to any Borrower or any other person or entity and (d) the Bank's security interests in the collateral, including without limitation, filing and recording fees and costs of appraisals, audits and title insurance. Borrowers shall indemnify Bank and Bank's affiliates and the partners, directors, officers, employees, agents, trustees and advisors of Bank and of Bank's affiliates (each, an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify and hold harmless each Indemnitee from all fees and time charges and disbursements for attorneys who may be employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Borrower arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, the consummation of the transactions contemplated hereby or thereby, or the administration of this Agreement and the other Loan Documents, (ii) any Credit or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of hazardous materials on or from any property owned or operated by any Borrower, or any environmental liability related in any way to any Borrower, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower, and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by any Borrower against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if such Borrower has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

SECTION 7.4.    SUCCESSORS, ASSIGNMENT.  This Agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators, legal representatives, successors and assigns of the parties; provided however, that no Borrower may assign or transfer its interests or rights hereunder without Bank's prior written consent.  Bank reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in, Bank's rights and benefits under each of the Loan Documents.  In connection therewith, Bank may disclose all documents and information which Bank now has or may hereafter acquire relating to any credit subject hereto, any Borrower or its business, any guarantor hereunder or the business of such guarantor, or any collateral required hereunder.

SECTION 7.5.    ENTIRE AGREEMENT; AMENDMENT.  This Agreement and the other Loan Documents constitute the entire agreement among Borrowers and Bank with respect to each credit subject hereto and supersede all prior negotiations, communications, discussions and correspondence concerning the subject matter hereof.  This Agreement may be amended or modified only in writing signed by each party hereto.

SECTION 7.6.    NO THIRD PARTY BENEFICIARIES.  This Agreement is made and entered into for the sole protection and benefit of the parties hereto and their respective permitted successors and assigns, and no other person or entity shall be a third party beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any other of the Loan Documents to which it is not a party.

SECTION 7.7.    TIME.  Time is of the essence of each and every provision of this Agreement and each other of the Loan Documents.

SECTION 7.8.    SEVERABILITY OF PROVISIONS.  If any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity without invalidating the remainder of such provision or any remaining provisions of this Agreement.

SECTION 7.9.    COUNTERPARTS.  This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be deemed to be an original, and all of which when taken together shall constitute one and the same Agreement.

SECTION 7.10.  GOVERNING LAW.  This Agreement shall be governed by and construed in accordance with the laws of the State of California.

SECTION 7.11  JOINT AND SEVERAL LIABILITY.

(a)    Each Borrower has determined and represents to Bank that it is in its best interests and in pursuance of its legitimate business purposes to induce Bank to extend credit pursuant to this Agreement.  Each Borrower acknowledges and represents that its business is related to the business of the other Borrowers, the availability of the commitments provided for herein benefits all Borrowers, and advances and other credit extensions made hereunder will be for and inure to the benefit of Borrowers, individually and as a group.

(b)    Each Borrower has determined and represents to Bank that it has, and after giving effect to the transactions contemplated by this Agreement will have, assets having a fair saleable value in excess of its debts, after giving effect to any rights of contribution or subrogation which may be available to such Borrower, and each Borrower has, and will have, access to adequate capital for the conduct of its business and the ability to pay its debts as such debts mature.

(c)    Each Borrower agrees that it is jointly and severally liable to Bank for, and each Borrower agrees to pay to Bank when due the full amount of, all indebtedness now existing or hereafter arising to Bank under or in connection with any Credit and all modifications, extensions and renewals thereof, including without limitation all advances disbursed to any Borrower under any Credit, all interest which accrues thereon, all payments due to Bank in connection with any Letter of Credit issued at the request or upon the application of any Borrower, including but not limited to the obligation to reimburse Bank for the amount of any draft paid under any Letter of Credit and all interest which accrues thereon, and all fees, costs and expenses chargeable to Borrowers or any of them in connection with any Credit.

(d)     The liability of each Borrower for any Credit shall be reinstated and revived and the rights of Bank shall continue if and to the extent that for any reason any amount at any time paid on account of any Credit is rescinded or must otherwise be restored by Bank, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, all as though such amount had not been paid.

(e)     Each Borrower authorizes Bank, without notice to or demand on such Borrower, and without affecting such Borrower's liability for any Credit, from time to time to:  (i) alter, modify, compromise, extend, accelerate or otherwise change the time for payment of, or otherwise change the terms of, the liabilities and obligations of any other Borrower to Bank on account of any Credit; (ii) take and hold security from any other Borrower for the payment of any Credit, and exchange, enforce, waive, subordinate or release any such security; (iii) apply such security and direct the order or manner of sale thereof, including without limitation, a non-judicial sale permitted by the terms of the controlling security agreement, pledge agreement or deed of trust, as Bank in its discretion may determine; (iv) release or substitute any one or more of the endorsers or any guarantors of any Credit, or any other party obligated thereon; and (v) apply payments received by Bank from any other Borrower to indebtedness of such other Borrower to Bank other than any Credit.

(f)     Each Borrower represents and warrants to Bank that it has established adequate means of obtaining from each other Borrower on a continuing basis financial and other information pertaining to each other Borrower's financial condition, and each Borrower agrees to keep adequately informed from such means of any facts, events or circumstances which might in any way affect its risks hereunder.  Each Borrower further agrees that Bank shall have no obligation to disclose to it any information or material about any other Borrower which is acquired by Bank in any manner.

(g)     Each Borrower waives any right to require Bank to: (i) proceed against any other Borrower or any other person; (ii) proceed against or exhaust any security held from any other Borrower or any other person; (iii) pursue any other remedy in Bank's power; (iv) apply payments received by Bank from any other Borrower to any Credit; or (v) make any presentments or demands for performance, or give any notices of nonperformance, protests, notices of protest or notices of dishonor in connection with any Credit.

(h)     Each Borrower waives any defense to its liability for any Credit based upon or arising by reason of:  (i) any disability or other defense of any other Borrower or any other person; (ii) the cessation or limitation from any cause whatsoever, other than payment in full, of the liability of any other Borrower for any Credit; (iii) any lack of authority of any officer, director, partner, agent or other person acting or purporting to act on behalf of any other Borrower or any defect in the formation of any other Borrower; (iv) the application by any other Borrower of the proceeds of any Credit for purposes other than the purposes intended or understood by Bank or any Borrower; (v) any act or omission by Bank which directly or indirectly results in or aids the discharge of any other Borrower by operation of law or otherwise, or which in any way impairs or suspends any rights or remedies of Bank against any other Borrower; (vi) any impairment of the value of any interest in any security for any Credits, including without limitation, the failure to obtain or maintain perfection or recordation of any

interest in any such security, the release of any such security without substitution, and/or the failure to preserve the value of, or to comply with applicable law in disposing of, any such security; or (vii) any modification of the obligations or liabilities of any other Borrower for any Credit, including without limitation the renewal, extension, acceleration or other change in time for payment of, or other change in the terms of, the indebtedness of any other Borrower for any Credit. Until the Credits and all indebtedness of each Borrower to Bank arising under or in connection with this Agreement shall have been paid in full, no Borrower shall have any right of subrogation. Each Borrower waives all rights and defenses it may have arising out of (A) any election of remedies by Bank, even though that election of remedies, such as a non-judicial foreclosure with respect to any security for any Credit, destroys its rights of subrogation or its rights to proceed against any other Borrower for reimbursement, or (B) any loss of rights it may suffer by reason of any rights, powers or remedies of any other Borrower in connection with any anti-deficiency laws or any other laws limiting, qualifying or discharging any Borrower's indebtedness for any Credit, whether by operation of Sections 726 or 580d of the Code of Civil Procedure as from time to time amended, or otherwise. Until the Credits and all indebtedness of each Borrower to Bank arising under or in connection with this Agreement shall have been paid in full, each Borrower waives any right to enforce any remedy which Bank now has or may hereafter have against any other Borrower or any other person, and waives any benefit of, or any right to participate in, any security now or hereafter held by Bank. It is the intention and desire of Borrowers to be jointly and severally liability to Bank for obligations hereunder as borrowers, and the suretyship waivers are included in this Agreement solely out of an abundance of caution in the event that any Borrower is deemed to be a guarantor or surety on account of any other Borrower's obligations hereunder.

(i)     If any of the waivers herein is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law.

(j)     It is the position of Borrowers that each Borrower benefits from the Credits that have been made available by Bank under this Agreement and from each extension of credit thereunder, regardless of whether such credit is disbursed to a joint account of Borrowers or to or for the account of any Borrower.

SECTION 7.12.   ARBITRATION.

(a)     Arbitration.  The parties hereto agree, upon demand by any party, to submit to binding arbitration all claims, disputes and controversies between or among them (and their respective employees, officers, directors, attorneys, and other agents), whether in tort, contract or otherwise in any way arising out of or relating to (i) any credit subject hereto, or any of the Loan Documents, and their negotiation, execution, collateralization, administration, repayment, modification, extension, substitution, formation, inducement, enforcement, default or termination; or (ii) requests for additional credit.

(b)     Governing Rules.  Any arbitration proceeding will (i) proceed in a location in Los Angeles County or Orange County, California before JAMS, Inc. ("JAMS"); (ii) be governed by the Federal Arbitration Act (Title 9 of the United States Code), notwithstanding any conflicting choice of law provision in any of the documents between the parties; and (iii) be conducted by JAMS, or such other administrator as the parties shall mutually agree upon, in accordance with

JAMS' Comprehensive Arbitration Rules and Procedures in effect at the time an arbitration demand is filed by any party (the "Rules"). If there is any inconsistency between the terms hereof and the Rules, the terms and procedures set forth herein shall control. Any party who fails or refuses to submit to arbitration following a demand by any other party shall bear all costs and expenses incurred by such other party in compelling arbitration of any dispute. Nothing contained herein shall be deemed to be a waiver by any party that is a bank of the protections afforded to it under 12 U.S.C. §91 or any similar applicable state law.

(c)    No Waiver of Provisional Remedies, Self-Help and Foreclosure. The arbitration requirement does not limit the right of any party to (i) foreclose against real or personal property collateral; (ii) exercise self-help remedies relating to collateral or proceeds of collateral such as setoff or repossession; or (iii) obtain provisional or ancillary remedies such as replevin, injunctive relief, attachment or the appointment of a receiver, before, during or after the pendency of any arbitration proceeding. This exclusion does not constitute a waiver of the right or obligation of any party to submit any dispute to arbitration or reference hereunder, including those arising from the exercise of the actions detailed in sections (i), (ii) and (iii) of this paragraph.

(d)    Arbitrator Qualifications and Powers. Any arbitration proceeding in which the amount in controversy is $5,000,000.00 or less will be decided by a single arbitrator selected according to the Rules, and who shall not render an award of greater than $5,000,000.00. Any dispute in which the amount in controversy exceeds $5,000,000.00 shall be decided by majority vote of a panel of three arbitrators; provided however, that all three arbitrators must actively participate in all hearings and deliberations. Each arbitrator will be a neutral retired judge of the state or federal judiciary of California, with a minimum of ten years experience in the substantive law applicable to the subject matter of the dispute to be arbitrated. The arbitrator will determine whether or not an issue is arbitratable and will give effect to the statutes of limitation in determining any claim. In any arbitration proceeding the arbitrator will decide (by documents only or with a hearing at the arbitrator's discretion) any pre-hearing motions which are similar to motions to dismiss for failure to state a claim or motions for summary adjudication. The arbitrator shall resolve all disputes in accordance with the substantive law of California and may grant any remedy or relief that a court of such state could order or grant within the scope hereof and such ancillary relief as is necessary to make effective any award. The arbitrator shall also have the power to award recovery of all costs and fees, to impose sanctions and to take such other action as the arbitrator deems necessary to the same extent a judge could pursuant to the Federal Rules of Civil Procedure, the California Rules of Civil Procedure or other applicable law. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. The institution and maintenance of an action for judicial relief or pursuit of a provisional or ancillary remedy shall not constitute a waiver of the right of any party, including the plaintiff, to submit the controversy or claim to arbitration if any other party contests such action for judicial relief.

(e)    Discovery. In any arbitration proceeding, discovery will be permitted in accordance with the Rules. All discovery shall be expressly limited to matters directly relevant to the dispute being arbitrated and must be completed no later than 20 days before the hearing date. Any requests for an extension of the discovery periods, or any discovery disputes, will be subject

to final determination by the arbitrator upon a showing that the request for discovery is essential for the party's presentation and that no alternative means for obtaining information is available.

(f)     Class Proceedings and Consolidations.  No party hereto shall be entitled to join or consolidate disputes by or against others in any arbitration, except parties who have executed any Loan Document, or to include in any arbitration any dispute as a representative or member of a class, or to act in any arbitration in the interest of the general public or in a private attorney general capacity.

(g)     Payment Of Arbitration Costs And Fees.  The arbitrator shall award all costs and expenses of the arbitration proceeding.

(h)     Miscellaneous.  To the maximum extent practicable, JAMS, the arbitrators and the parties shall take all action required to conclude any arbitration proceeding within 180 days of the filing of the dispute with JAMS.  No arbitrator or other party to an arbitration proceeding may disclose the existence, content or results thereof, except for disclosures of information by a party required in the ordinary course of its business or by applicable law or regulation.  If more than one agreement for arbitration by or between the parties potentially applies to a dispute, the arbitration provision most directly related to the Loan Documents or the subject matter of the dispute shall control.  This arbitration provision shall survive termination, amendment or expiration of any of the Loan Documents or any relationship between the parties.

(j)     Small Claims Court.  Notwithstanding anything herein to the contrary, each party retains the right to pursue in Small Claims Court in Los Angeles County or Orange County, California, any dispute within that court's jurisdiction.  Further, this arbitration provision shall apply only to disputes in which either party seeks to recover an amount of money (excluding attorneys' fees and costs) that exceeds the jurisdictional limit of the Small Claims Court.

SECTION 7.13   LIMITATION ON PAYMENTS. The parties hereto intend to conform to all applicable laws limiting the maximum rate of interest that may be charged or collected by Bank from any Borrower under this Agreement or any of the other Loan Documents. Accordingly, notwithstanding any other provision hereof or any provisions of any other Loan Documents, Borrowers shall not be required to make any payment to or for the account of Bank, and Bank shall refund any payment made by any Borrower, to the extent that such requirement or such failure to refund would violate or conflict with mandatory and nonwaivable provisions of applicable law limiting the maximum amount of interest which may be charged or collected by Bank from Borrowers. To the fullest extent permitted by law, in any action, suit or proceeding pertaining to this Agreement or any other Loan Document, the burden of proof, by clear and convincing evidence, shall be on the person claiming that this Section 7.13 applies to limit any obligation of any Borrower under this Agreement or any other Loan Documents or to require Bank to make any refund, or claiming that this Agreement or any other Loan Document conflicts with any applicable law limiting the maximum rate of interest that may be charged or collected by Bank from Borrowers, as to each element of such claim.

*[signatures follow]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the day and year first written above.

MONEX DEPOSIT COMPANY,
a California limited partnership
By:     Comco Management Corporation, its
        general partner

By: _____
Name: Louis E. Carabini
Title:  President


MONEX CREDIT COMPANY,
a California limited partnership
By:     Metco Management Corporation, its general
        partner

By: _____
Name: Michael A. Carabini
Title:  President


WELLS FARGO BANK, NATIONAL
ASSOCIATION


By:_____
Name: _____
Title: _____

*[Signature Page to Credit Agreement]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the day and year first written above.

MONEX DEPOSIT COMPANY,
a California limited partnership
By:    Comco Management Corporation, its
       general partner

       By:_____
       Name: Louis E. Carabini
       Title: President


MONEX CREDIT COMPANY,
a California limited partnership
By:    Metco Management Corporation, its general
       partner

       By:_____
       Name: Michael A. Carabini
       Title: President


WELLS FARGO BANK, NATIONAL
ASSOCIATION

By:_____
Name: Matthew J. Taylor
Title: Vice President

*[Signature Page to Credit Agreement]*

SCHEDULE 5.2

EXISTING LOANS AND SECURITY INTERESTS

SHEDULE 5

As General Partner for their respective limited partnerships, Comco and Metco are responsible and liable for the performance of the limited partnerships, MDC and MCC, which suggests like liabilities listed below, because the G.P. of partnerships sign on contracts in the normal course of business. Also, Comco and Metco have varying balances with affiliate NSC.

Futures brokerage accounts at Jefferies and R.J. O'Brien, which vary widely and at every moment during trading days. Besides daily margin required amounts, significant balances can be required as warehouse receipts are delivered to Monex Deposit Company's account.

Commodity dealers, which are refereed to as Suppliers, provide varied types of physical bullion and coin transactions, which MDC engages in constantly.

MDC due to affiliate MCC or a MCC due to affiliate MDC can vary widely, and at March month-end MDC due to MCC was $12,655,231.

MDC due to affiliate MFL was zero, but a balance can vary.

MCC due to affiliate CFC was $14,948,488 million at March month-end.

MCC due to affiliate NSC was zero, but a balance can vary.

Payables and loans can are incurred on a regular basis and include rent to landlord, balances to customers, compensation to employees, taxes, payments to contractors, charges for advertising, premiums for insurance, fees to lawyers and accounts, fees to depositories and financial institutions, credit card companies, furniture stores, office supply stores, computer services companies and other such supplier and business servicing needs.

## APPENDIX A
## FORM OF BORROWING BASE CERTIFICATE

The undersigned hereby certifies that:

1. I am the duly authorized agent of Monex Deposit Company and Monex Credit Company, each a California limited partnership (collectively, "Borrowers");

2. I have reviewed the terms of that certain Credit Agreement dated as of April 20, 2012, by and among Borrowers and Wells Fargo Bank, National Association (the "Credit Agreement"; all defined terms used in this Certificate but not defined herein having the meanings given to them in the Credit Agreement), and as of the date of this Certificate, no Event of Default, and no condition, event or act which, with the giving of notice or passage of time or both, would constitute an Event of Default, has occurred and is continuing; and

3. Set forth below is a true, accurate and complete calculation of the Borrowing Base, as of the date of this Certificate, and attached hereto are true, accurate and complete reports of the Eligible Loans, Eligible Inventory and Eligible Customer Collateral as of the date hereof.

|  | Eligible | Borrowing Base |
|---|---|---|
| a.  Eligible Inventory<br>/80% of Eligible Inventory | $_____ | $_____ |
| b.  Eligible Loans | $_____ | |
| c.  Eligible Customer Collateral | $_____ | |
| d.  Lesser of Eligible Customer Collateral and 80% of Eligible Customer Collateral | $_____ | $_____ |
| e.  Inventory Borrowing Base plus Loan Borrowing Base | | $_____ |
| f.  Less 10,000,000: | | $_____ |
| g.  Final Adjusted Borrowing Base | | $_____ |

The foregoing certifications, together with the reports attached hereto and made a part hereof, are made and delivered this _____ day of _____, _____ pursuant to the Credit Agreement.

**MONEX DEPOSIT COMPANY**,
a California limited partnership

and

**MONEX CREDIT COMPANY**,
a California limited partnership

By: _____

Name: _____

Title: Authorized Agent of
Comco Management Corporation, as general
partner of Monex Deposit Company, and
Metco Management Corporation, as general
partner of Monex Credit Company

## APPENDIX B
## FORM OF LANDLORD CONSENT


**THIS LANDLORD CONSENT AND WAIVER** (this "Consent") is made and entered into as of _____, 2012, by _____, a _____ ("Landlord"), for the benefit of Monex [Deposit Company][Credit Company], a California limited partnership ("Tenant"), and Wells Fargo Bank, National Association ("Lender").

Landlord is the owner of, or holder of a lesser interest in, those certain premises more particularly described in Exhibit A attached hereto (the "Premises"), and Tenant is the Lessee and tenant of such Premises pursuant to a certain lease agreement dated as of _____, ____ (the "Lease"). The Tenant and certain of the Tenant's affiliates are parties to that certain Credit Agreement dated as of _____, 2012 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), with the Lender pursuant to which the Lender has made and may continue to make certain financial accommodations to or for the benefit of Tenant and under which Tenant has or will incur obligations to Lender (all such obligations now existing or hereafter arising, together with interest thereon and other fees and charges in connection therewith, being referred to hereinafter collectively as the "Obligations"). The Tenant and certain of Tenant's affiliates are parties to that Security Agreement dated as of _____, 2012 (as amended, restated, supplemented or otherwise modified from time to time, the "Security Agreement"), in favor of the Lender, pursuant to which the Obligations are secured by, inter alia, all tangible and intangible personal property of Tenant, whether now owned or subsequently acquired. This Consent specifically relates to that portion of the personal property of Tenant in which Lender has a first priority security interest (the "Personal Property"). The Lender has required as a condition to the extension of such financial accommodations to Tenant under the Credit Agreement that Landlord enter into this consent and waiver.

In consideration of the preceding background, and intending to be legally bound hereby:

1.      Landlord hereby acknowledges and agrees to the first and prior right and security interest of the Lender in the Personal Property and to the exclusive rights to collect, foreclose upon, sell, transfer, liquidate or otherwise dispose of the Personal Property. Landlord agrees that, without the prior written consent of the Lender, it shall not obtain any consensual lien or security interest or exercise any rights in the Personal Property adverse to the interests of the Lender. To the extent that Landlord may have or be entitled to assert against the Personal Property any statutory, contractual or possessory security interest or lien, or any right of distraint, levy or execution, against the Personal Property, such security interest, lien and right are hereby made subject and subordinate to the prior rights and interests of the Lender in the Personal Property, and Landlord agrees not to take or institute any action to enforce or realize upon any such security interest, lien or right without the prior written consent of the Lender. Should Landlord receive any cash or other property from any realization upon such security interest, lien or right, Landlord shall hold such cash or property in trust for the benefit of the Lender and shall promptly forward such cash or property to Agent for application to the Obligations.

2.      Landlord agrees that, as between Landlord and the Lender, the Personal Property shall remain personal property and will not become part of the Premises.

3.      Lender or any of its representatives may enter upon the Premises at any reasonable time during normal business hours to inspect or remove the Personal Property, subject to the obligation to repair any damage to the Premises caused by such removal. Landlord will not hinder the Lender's actions in assembling all Personal Property located on the Premises, will permit the Lender to remove the Personal Property without charge, will grant the Lender access to the Premises at reasonable times and will not hinder the Lender's actions in enforcing its lien on the Personal Property.

4.     Landlord agrees to deliver to the Lender a copy of any notice of any claimed breach or default by Tenant under the Lease at the same time that Landlord sends such notice to Tenant, and in any event, shall give written notice to the Lender of any breach or default by Tenant under the Lease where such breach or default the default remains uncured for a period of sixty (60) days, within fifteen (15) days. Such notice shall be effective when received regardless of delivery medium.

5.     Landlord agrees that in the event of any default by the Tenant under the Lease, Landlord shall allow the Lender the opportunity to cure such default, provided, however, that (i) in no event shall the Lender's opportunity to cure continue in excess of ninety (90) days after Lender has received notice of such default from Landlord, and (ii) this Paragraph 5 shall not impose any duty on the Lender to cure any default of Tenant under the Lease or adopt any obligations of the Tenant under the Lease.

6.     Landlord agrees that in the event that it assigns all or any portion of its interest in the Lease, it shall cause the assignee to agree to be bound by the provisions of this Consent.

7.     This Consent shall be binding upon Landlord, Tenant, Lender, and their respective heirs, successors and assigns, and shall inure to the benefit of Tenant and Lenders and their respective successors and assigns, and may not be modified, amended or altered, except by writing signed by Landlord, Tenant, and Lender. This Consent does not modify any obligation as outlined in the Lease, between Tenant and Landlord. The Lease remains unchanged and in full force and effect.

          IN WITNESS WHEREOF, Landlord has caused this Consent to be made, executed and delivered the day and year first above written for the benefit of Tenant and Lender.

[LANDLORD]

By:_____
    Name:
    Title:

Address: _____

Acknowledged and Agreed:

WELLS FARGO BANK,
NATIONAL ASSOCIATION

By:_____
    Name:
    Title:

Address: _____

[MONEX]

By:_____
    Name:
    Title:

Address: _____

EXHIBIT A

Description of Premises

# EXHIBIT 37

# DELAWARE DEPOSITORY SERVICE COMPANY
## Depository Agreement

DEPOSITORY AGREEMENT, dated as of April 20, 2012 by and between Monex Credit Company, a limited partnership organized under the laws of the State of California, ("MCC"), Monex Deposit Company, a limited partnership organized under the laws of the State of California, ("MDC", and together with MCC sometimes referred to herein as "Depositors"), Wells Fargo Bank, National Association (the "Bank"), and Delaware Depository Service Company LLC, a Limited Liability Company organized under the laws of the State of Delaware (the "Depository").

## Section 1 -- Appointment of Depository

Section 1.1    The Depositors hereby appoint the Depository as custodian of the metals and warehouse receipts described in each Holdings Statement (the "Precious Metals") which the Depository will issue from time to time in accordance with Section 2.2 hereof during the term of this Agreement.

Section 1.2    The Depository hereby accepts appointment as custodian of the Precious Metals and agrees to perform its duties in respect thereof pursuant to the provisions of this Agreement.

## Section 2 -- Control, Receipt and Storage of the Precious Metals

Section 2.1    Control over the Precious Metals shall be and shall remain vested in the Depositors, except as otherwise provided in Section 5.

Section 2.2    Each delivery of Precious Metals to the Depository; and each delivery of the Precious Metals by the Depository to the Depositors, or to a party designated by Depositors pursuant to Section 8 hereof, shall be evidenced by a Holdings Statement and Product Register substantially in the form of Exhibit A attached hereto.

Section 2.3    The Depository shall receive, hold and keep the Precious Metals in the Depository's custody at its premises located at 3601 North Market Street, Wilmington, DE 19802, 3400 Governor Printz Blvd., Wilmington, DE 19802, 4200 Governor Printz Boulevard, Wilmington, DE 19802, 4 Meco Circle, Wilmington, DE 19804, or at such other locations approved by Depositors (the "Facility"). The Depository will not be responsible for the Precious Metals until they are actually delivered to and received by the Depository at its premises.

## Section 3 -- Responsibilities of Depository

Section 3.1    The Depository shall be responsible for safekeeping of the Precious Metals in the form and condition in which they are delivered to the Depository while they are in the possession or under the control of the Depository. The Depository shall keep the Precious Metals separately identified and segregated and shall mark in appropriate manner the Precious Metals held for Depositors. The Depository shall, at times during its business hours, permit any person designated on Schedule I ("Designated Persons Schedule") attached hereto or any other person designated by the written request of the Depositors (collectively, "Designated Persons") to have access to the Precious Metals for the purpose of inspection and taking inventory thereof.

Section 3.2    The Depository shall send by email to the Depositors and Bank monthly (i) a statement summarizing each receipt and each delivery of the Precious Metals held by it for the Depositors during such month, and (ii) a detailed statement of the Precious Metals held by the Depository pursuant to this Agreement during the period covered by such statement certified by an officer of the Depository. Unless the Depositors or Bank object by written notice to the Depository which is received by the Depository within 10 days after such statement is sent to the Depositors and Bank, such statement shall be conclusive and binding on the Depositors and Bank. The books, accounts and records of the Depository pertaining to its actions pursuant to this Agreement shall be kept open to inspection and audit during reasonable business hours by Designated Persons.

Section 3.3    The Depository shall, as warehouseman, acknowledge receipt from the Depositors of the Precious Metals and may, at its option, record certain specifications indicated on the Precious Metals. The Depository is not responsible for the authenticity of markings on or for the weight, fineness or contents of any of the Precious Metals, packages or sealed containers delivered to Depository by the Depositors.

Section 3.4    Delivery of the Precious Metals to the Depository will be at MCC's expense. MCC shall pay or reimburse the Depository from time to time for any taxes or other governmental charges payable, and actually paid, by the Depository upon storage or transfers of the Precious Metals made hereunder, and for all other usual, necessary and proper disbursements and expenses made or incurred by the Depository in its performance of this Agreement. For the avoidance of doubt, at no time will Bank bear, pay or be liable for any costs or expenses related to the delivery, storage or maintenance of the Precious Metals or any other activity contemplated under this Agreement.

Section 3.5    Depositors (jointly and severally) agree to indemnify and hold harmless the Depository from and against any loss, damage, taxes, charges, expense, assessments, claims or liabilities, including counsel fees, incurred by it as a result of its performance of this Agreement, except such as may arise from its own gross negligence or wrongful acts.

Section 3.6    Upon the request of a Depositor and at MCCs' expense, the Depository will undertake to do the following:

(a)    Weigh and incise bars not marked to a Depositor's standard and produce authorized bar and weight listings for corresponding material.

(b)    Assay sample bars from a Depositor's inventory by an approved assayer or transport such bars to a refinery in order to verify content.

(c)    Segregate Precious Metals for the Depositors according to collateral requirements and confirm such action to them.

Section 3.7    Neither Depository, Depositors nor Bank shall be responsible for delays or failures in performance resulting from acts beyond the control of such party. Such acts shall include but not be limited to acts such as God, strikes, lockouts, riots, acts of war, epidemics, governmental regulations superimposed after the fact, fire, communication line failures, power failures, earthquakes or other disasters.

## Section 4 -- Delivery of Precious Metals by Depositors

Section 4.1    From time to time during the term of the Agreement and in accordance with instructions of MCC, to be accompanied by the written consent of Bank and at MCC's expense, the Depository will deliver, or cause to be delivered, Precious Metals to the persons named and by the method of shipment or delivery set forth in such instructions subject to the following terms:

(a)    Upon Depositors' request for a withdrawal, Depository will assign the earliest available deliver/shipment date.

(b)    Requests for withdrawals of small shipments (10 items or less) may be made by telephone followed by written request. All other preliminary requests must be made in writing, containing the information stipulated in Section 4.1 (c) hereof and received by the Depository signed in accordance with the Designated Person Schedule -Schedule I attached hereto by email or facsimile transmission.

If a withdrawal involves receipted material, receipts must be properly endorsed and delivered to the Depository at least one full day prior to the shipment date for small shipments, at least five full days prior to shipment date for shipments involving more than 100 items (100 receipts for COMEX Silver).

(c)    The following information will be required for releasing materials:

a.    Bar list, receipt list or proper identification of material

b.    Gross weight of each item (if applicable)

c.    Total number of items

d.    Total gross weight of shipment

e.    Carrier to be used (if applicable)

f.    Any special packaging instructions

(d)    Depository will prepare and deliver material to the United States Postal Service or other carriers for delivery. Fees for this service will be specified on Schedule II hereto (the "Fee Schedule").

Section 4.2    The Depository will prepare and complete all shipping documents and, upon request provide copies of such documents to MCC.

(a)    Upon notification of an incoming overseas shipment by the client, Depository will arrange for customs clearance, entry fees and bonding, and insured transportation from Port of Entry to Depository's vault. Charges for the Customs Entry Service are available upon request.

(b)    The rates quoted for Customs Entry Service are for arrivals between the hours of 8 AM and 6 PM. Shipments arriving between the hours of 6 PM and 8 AM will be subject to premiums and are available upon request.

## Section 5 -- Bank's Right to Exercise Control

Section 5.1     Notwithstanding anything to the contrary in this Agreement, at any time during the term of the Agreement, upon receipt of written notice from Bank to Depository to such effect (the "Notice"), Depository shall not honor any directions for release of the Precious Metals from Depositors pursuant to Section 4, but shall release the Precious Metals only in accordance with Bank's instructions until Bank advises Depository to the contrary in writing.

Section 5.2     After Notice is given to Depository, Depository agrees that Bank, at its option, may enter the Facility during normal business hours and at times mutually acceptable to Bank and Depository in order to inspect or remove the Precious Metals therefrom, without charge. In any such event, Depository agrees to cooperate with Bank and not to hinder Bank's actions in enforcing its remedies with respect to the Precious Metals.

Section 5.3     All obligations of Depository as custodian of the Precious Metals under this Agreement shall continue in favor of Bank after Notice is given and shall be performed for the benefit of Bank as if Bank was the Depositor and not for the benefit of MCC or MDC.

Section 5.4     Depository shall have no duty to inquire or determine whether Depositors' obligations to Bank are in default or whether Bank is entitled to provide the Notice to Depository. Depository may rely on notices and communications it believes in good faith to be genuine and given by the appropriate party.

## Section 6 -- Fees

Section 6.1     The Depository's fees for performing services pursuant to this Agreement will be in accordance with the attached Fee Schedule and shall be due and payable by MCC upon receipt of invoice.

Section 6.2     Rates for storage and withdrawal of commodities traded on exchange receipts for which Depository is a licensed depository cannot be offered at a discount. These rates are on file with each licensing exchange. Depository has the right to change any or all of these rates by giving 90 days prior notice to the appropriate exchange. In the event of a rate change, the exchange will inform its clearing members of the new rates and effective dates.

Section 6.3     Withdrawal charges quoted are for preparation and release of shipments only. Charges for pallets, strapping, special packing or other materials required will be added to the fees in the basic agreement.

Section 6.4     In the event that payment has not been received within thirty (30) days of the invoice date, Depository reserves the right to review the credit status of MCC and to institute an interest charge on any outstanding balance from the billing date at a rate of 1.5% per month (18% per year).

Section 6.5     MCC must notify Depository of any billing errors or disputed charges within sixty (60) days of the invoice date or will thereby assume responsibility for charges including interest, until notification of error is given.

Section 6.6     The Depositors hereby agree that Depository shall have a lien upon the Precious Metals held for Depositors in an amount equal to any fees owed to Depository by MCC.

Section 6.7      Without limitation to Section 6.6, Depository will notify Bank at its address set forth below, or at such other address as Bank shall hereafter specify in writing, (i) promptly in the event that any Borrower defaults in any of its obligations to Depository, (ii) at least thirty (30) days prior to exercising any rights or remedies against Depositor and/or the Precious Metals and (iii) promptly in the event that Depository receives notice of any other security interest in any of the Precious Metals.

## Section 7 -- Termination

Section 7.1      This Agreement may be terminated by Depositors or Bank by giving written notice to the Depository specifying the date of such termination, which shall be not less than thirty dates after the date of such notice, or by the Depository by giving written notice to the Depositors and Bank specifying the date of such termination, which shall not be less than ninety (90) days after the date of such notice.  The Depositors may not terminate the Agreement without the written consent of Bank.  In the event notice of termination is given by the Depositors or Bank, the Depositors or Bank, as applicable, shall designate therein a successor depository, and the Depository shall follow the directions of the Depositors or Bank, as applicable, to deliver the Precious Metals to such successor depository at MCC's expense. In the event such notice is given by the Depository, the Depositors shall, on or before the termination date, deliver to the Depository a designation of a successor depository and instructions to deliver the Precious Metals to such successor depository.  Depositors shall give written notice to Bank of the successor depository.

Section 7.2      Upon the date set forth in any notice of termination given pursuant to Section 7.1 above, this Agreement shall terminate. On such date, the Depository shall deliver directly to the successor depository (or, if there is no successor depository, the Depositors) all of the Precious Metals held by it as Depository, and MCC shall pay Depository all fees, expenses and other amounts to which it is entitled pursuant to the terms of this Agreement.

Section 7.3      In the event that the Depository shall become incapable of performing as custodian pursuant hereto, or shall be dissolved, adjudged bankrupt or insolvent, or a trustee, receiver or conservator of the Depository or its property shall be appointed, or an application for any of the foregoing is filed, or if control of the Depository or its officers or directors be taken over by any governmental or other public authority or officer, then this Agreement shall automatically terminate and the Depository or any trustee, receiver or conservator shall, unless otherwise instructed by Bank, deliver to the Depositors or a successor depository all of the Precious Metals held by the Depository pursuant hereto upon payment by MCC of all fees, expenses and other amounts as to which the Depository is entitled pursuant to the terms of this Agreement.

Section 7.4      A successor depository resulting from the provisions of Section 7.1, 7.2 or 7.3 shall be vested with all powers, duties and obligations of its predecessor under this Agreement and any amendments thereof, and shall succeed to all exemptions and privileges of its predecessor under this Agreement and any amendments thereof.

Section 7.5      The termination of this Agreement shall not affect the obligations of either party to the other party which arise or accrue prior to the date of termination hereof.

## Section 8 -- Designated Persons

Section 8.1    Depositors must provide a listing of individuals authorized to transact business involving materials held by Depository. This list shall be attached to this Agreement as Schedule I. Designated Persons' names must be typed or printed on the list, then signed by the individuals. Instructions must be included (e.g., multiple signatures required for withdrawals). The list must be signed by an officer of each Depositor. Changes to the list must be submitted to Depository immediately.

Section 8.2    Except as provided in Section 5, the Depository shall be entitled to rely upon any notice or other instrument in writing received by the Depository from Designated Persons and reasonably believed by the Depository in good faith to be genuine.

Section 8.3    Depositors (jointly and severally) will hold harmless and indemnify Depository for any transaction made by Depository upon the instructions (whether written or by email or facsimile transmission) of an individual not properly removed from the Designated Persons list. For the avoidance of doubt, Bank shall bear no obligation of indemnification or related liability under this Agreement.

## Section 9 -- Confidential

Section 9.1    Depositors and Bank agree that it will not divulge to third parties, without the written consent of Depository, any confidential information of Depository attained from or through same in connection with the performance of this Agreement.

Section 9.2    In all cases, Depository shall maintain a degree of confidentiality with respect to client records and transactions commensurate with exchange requirements and with the standards applicable to Depository's own confidential information.

Section 9.3    It is further agreed that Depositors as Bank will not use the name of Delaware Depository Service Company LLC or any affiliate in its advertising or in its public relations with third parties without prior written consent of the Depository.

## Section 10 -- Miscellaneous

Section 10.1    Any notice, demand or instruction authorized or required by, or given pursuant to, this Agreement shall be in writing (or by email or facsimile transmission) and deemed given if delivered to a party at its principal place of business set forth on Schedule III hereto.

Section 10.2    This Agreement may not be amended or modified in any manner except by a written agreement executed by all parties with the same formality as this Agreement.

Section 10.3    This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns; provided, however, that, except as provided herein, this Agreement shall not be assignable by any party without the written consent of the other parties.

Section 10.4    This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.

THE BANK OF NEW YORK MELLON
TRUST COMPANY, N.A.

By: _____
    Name: Robert Castle
    Title: Vice President


CONCORD FUNDING COMPANY, LLC

By: _____
    Name: Michael A. Carabini
    Title: Manager

WELLS FARGO BANK, NATIONAL
ASSOCIATION

By:_____
    Name:
    Title:


FARMERS & MERCHANTS BANK OF
LONG BEACH

By:_____
    Name: W. Henry Walker
    Title: Chief Executive Officer


MONEX CREDIT COMPANY

By:_____
    Name:
    Title:


MONEX DEPOSIT COMPANY

By:_____
    Name:
    Title:


THE BANK OF NEW YORK MELLON
TRUST COMPANY, N.A.

By:_____
    Name:
    Title:


         - 15 -

Section 10.5   If any term or provision of this Agreement should be declared invalid by a court of competent jurisdiction, the remaining terms and provisions of this Agreement shall be unimpaired.

Section 10.6   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 10.7   This Agreement, together with all the Schedules and Exhibits attached hereto, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes in all respect all prior proposals, negotiations, conversations, discussions, and agreements made between the parties concerning the subject matter hereof.

IN WITNESS WHEREOF the Parties hereto have caused this Agreement to be executed as of the date first above written by their respective officers thereunto duly authorized.

**Monex Credit Company**

**Monex Deposit Company**

By: _____
Michael A. Carabini, President, Metco
Management Corporation, the General
Partner

By: _____
Louis E. Carabini, President, Comco
Management Corporation, the General
Partner

**Wells Fargo Bank, N.A.**

**Delaware Depository Service Company LLC**

By: _____

By: _____
Jonathan E. Potts, Managing Director

By: _____

Address for Notice Purposes:
2030 Main Street, Suite 900
Irvine, California 92614
MAC E2231-090
Attention: Matt Taylor
Facsimile: (866) 790-8677

Address for Notice Purposes:
3601 North Market Street
Wilmington, Delaware 19802
Attention: Jonathan E. Potts
Facsimile: (302) 762-7570
Email: jpotts@delawaredepository.com

Section 10.5   If any term or provision of this Agreement should be declared invalid by a court of competent jurisdiction, the remaining terms and provisions of this Agreement shall be unimpaired.

Section 10.6   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 10.7   This Agreement, together with all the Schedules and Exhibits attached hereto, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes in all respect all prior proposals, negotiations, conversations, discussions, and agreements made between the parties concerning the subject matter hereof.

IN WITNESS WHEREOF the Parties hereto have caused this Agreement to be executed as of the date first above written by their respective officers thereunto duly authorized.

**Monex Credit Company**

**Monex Deposit Company**

By:_____
    Michael A. Carabini, President, Metco
    Management Corporation, the General
    Partner

By:_____
    Louis E. Carabini, President, Comco
    Management Corporation, the General
    Partner

**Wells Fargo Bank, N.A.**

**Delaware Depository Service Company LLC**

By:_____
    Matthew J. Taylor
    Vice President
By:_____

By:_____
    Jonathan E. Potts, Managing Director

Address for Notice Purposes:
2030 Main Street, Suite 900
Irvine, California 92614
MAC E2231-090
Attention: Matt Taylor
Facsimile: (866) 790-8677

Address for Notice Purposes:
3601 North Market Street
Wilmington, Delaware 19802
Attention: Jonathan E. Potts
Facsimile: (302) 762-7570
Email: jpotts@delawaredepository.com

Section 10.5   If any term or provision of this Agreement should be declared invalid by a court of competent jurisdiction, the remaining terms and provisions of this Agreement shall be unimpaired.

Section 10.6   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 10.7   This Agreement, together with all the Schedules and Exhibits attached hereto, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes in all respect all prior proposals, negotiations, conversations, discussions, and agreements made between the parties concerning the subject matter hereof.

IN WITNESS WHEREOF the Parties hereto have caused this Agreement to be executed as of the date first above written by their respective officers thereunto duly authorized.

**Monex Credit Company**                                **Monex Deposit Company**


By:_____        By:_____
       Michael A. Carabini, President, Metco                Louis E. Carabini, President, Comco
       Management Corporation, the General                  Management Corporation, the General
       Partner                                               Partner


**Wells Fargo Bank, N.A.**                              **Delaware Depository Service Company LLC**


By:_____        By:_____
                                                            Jonathan E. Potts, Managing Director

By:_____

Address for Notice Purposes:                    Address for Notice Purposes:
2030 Main Street, Suite 900                     3601 North Market Street
Irvine, California 92614                         Wilmington, Delaware 19802
MAC E2231-090                                    Attention: Jonathan E. Potts
Attention: Matt Taylor                           Facsimile: (302) 762-7570
Facsimile: (866) 790-8677                        Email: jpotts@delawaredepository.com

**Schedule I**

**Designated Persons Schedule**

Michael A. Carabini
Louis E. Carabini
Brian D. Jenkins
Ron Smoler
Richard Brown

**Schedule II**

# DELAWARE DEPOSITORY SERVICE COMPANY
### Fee Schedule
### A/C 36735
4/11/12

**Storage Fees:**
**Standard Products Account\*** – Standard Products include bullion coins and bars that are stored in bulk form without regard to year of mintage or condition.

**Bullion Products**
**Gold / Platinum / Palladium / Silver:**            20 Basis Points

**Premium Products Account\*** – Premium Products include bullion products stored by year of mintage, proof attributes or other identifying marks or packaging.

**Bullion Coins**
**Gold / Platinum / Palladium / Silver:**            27 Basis Points

Percentages quoted as basis points above are an annual rate. However, storage charges are billed monthly. Bullion storage is calculated by multiplying the total dollar value of bullion in storage by the current rate; the product is then divided by twelve to yield the monthly fee. The total dollar value equals the number of ounces of each metal type multiplied by the applicable spot metal price on the last day of the billing period.

A $40.00 minimum monthly charge per account will apply in every instance.

\*Standard and Premium Products are processed and stored separately. Therefore, if Company chooses to store both Standard Products and Premium Products, two accounts will be established, and each will be maintained, reported and billed separately.

**In-Shipment Verification Fees:**
$15 per bag of 90% or 40% silver coinage for:  Coin count verification.
$0.75 Per Item for: Premium Products other than American Eagle proof coins
$0.25 Per Item For: American Eagle proof coins

**Out-Shipment Processing Fees:**
**Pick-Up** -- Preparation and release of Precious Metals to Company's Agent:
$.10 per ounce for all Precious Metals other than the items listed below. (Please note that if bags or boxes are unsealed and detailed verification and handling is required to prepare their contents for release, the standard $.10 per ounce charge will apply.)

$10.00 Per Item For:
    1) 1,000-ounce silver bars    6) Sealed 90% silver bags
    2) 100-ounce gold bars       7) Sealed 40% clad bags
    3) 400-ounce gold bars       8) Mint sealed bullion coin and bar boxes
    4) 50-ounce platinum plates   9) Non-fungible containers holding shot, sponge, powder, etc.
    5) 100-ounce palladium plates

$2.00 Per Item For: 100-ounce silver bars

A $19.50 minimum charge per out shipment will apply to any commercial carrier (e.g., Brink's, FedEx, etc.) pick-up.

A $25.00 minimum charge per out shipment will apply for any non-commercial (e.g., individual retail customer) pick-up. Company shall be liable to pay such fees as of the day it gives DDSC instructions to prepare Assets for delivery notwithstanding the fact that the delivery order may later be canceled by Company, if in fact DDSC has prepared such shipment for delivery. Shipments will be prepared in accordance with standard DDSC practices and packaging materials.

**Drop-Shipments --** Preparation and delivery of Assets via U.S. Postal Service or Express Carrier.
$19.50 per package handling fee, plus all applicable postage, registration, and insurance charges. Shipments will be prepared in accordance with standard DDSC practices and packaging materials.

**Commodity Transfer Notice Preparation & Mailing Fees:**
$3.70 Per Notice For:    Account reconciliation, notice processing and mailing.
                        (MMC to provide printed notices and envelopes.)

**Schedule III**
**Notice**

**Monex Credit Company**

Michael A. Carabini
Monex Credit Company
4910 Birch Street
Newport Beach, CA 92660
Email: mac@monex.com
Fax: (949) 752-0607

**Monex Deposit Company**

Louis E. Carabini
Monex Deposit Company
4910 Birch Street
Newport Beach, CA 92660
Email: louc1@monex.com
Fax: (949) 955-1109

**Delaware Depository Service Company LLC**

3601 North Market Street
Wilmington, Delaware 19802
Attention: Jonathan E. Potts
Facsimile: (302) 762-7570
Email: jpotts@delawaredepository.com

**Wells Fargo Bank, N.A.**

2030 Main Street, Suite 900
Irvine, California 92614
MAC E2231-090
Attention: Matt Taylor
Facsimile: (866) 790-8677

EXHIBIT A

# Delaware Depository Service Company

4/11/2012                                                                                        Page: 1 of 1

TO: **Sample Company**                                                    Account #: **123456**
RE: **Holding Statement as of 3/31/2012**

## GOLD

| Product Code | Product Description | Ounce Conversion | Prod Balance | Gross Troy Ounces |
|---|---|---|---|---|
| GB1 | Bullion Bar, .9999+ -- 1 oz. (Exchange Approved B | 1.0000 | 53.000 | 53.000 |
| GB10 | Bullion Bar -- 10 oz. (Exchange Approved Brands) | 10.0000 | 69.000 | 690.000 |
| GB100 | Bullion Bar -- 100 oz. | 1.0000 | 97.495 | 97.495 |
| GBKG | Bullion Bar, .9999+ -- 1 kg. (Exchange Approved B | 32.1510 | 15.000 | 482.265 |
| GBU1 | American Buffalo-Indian, Any Year -- 1 oz. | 1.0000 | 6,369.000 | 6,369.000 |
| GEA1 | American Eagle, Any Year -- 1 oz. | 1.0000 | 2,090.000 | 2,090.000 |
| GKA1 | Australian Kangaroo/Nugget, Any Year -- 1 oz. | 1.0000 | 70.000 | 70.000 |
| GKR1 | S. African Krugerrand -- 1 oz. | 1.0000 | 70.000 | 70.000 |
| GML1 | Canadian Maple Leaf, .9999 Fine -- 1 oz. | 1.0000 | 26,884.000 | 26,884.000 |
| GMLH | Canadian Maple Leaf -- 1/2 oz. | 0.5000 | 224.000 | 112.000 |
| GPH1 | Austrian Philharmonic, Any Year -- 1 oz. | 1.0000 | 18,962.000 | 18,962.000 |
| | | | **GOLD TOTAL** | **55,879.76** |

## PALLADIUM

| Product Code | Product Description | Ounce Conversion | Prod Balance | Gross Troy Ounces |
|---|---|---|---|---|
| PDB1 | Bullion Bar, .9995+ -- 1 oz. | 1.0000 | 5,010.000 | 5,010.000 |
| PDB10 | Bullion Bar, .9995+ -- 10 oz. | 10.0000 | 281.000 | 2,810.000 |
| PDB100 | Bullion Bar, .9995+ -- 100 oz. | 1.0000 | 682.590 | 682.590 |
| PDML1 | Canadian Maple Leaf, .9995+ -- 1 oz. | 1.0000 | 5,771.000 | 5,771.000 |
| | | | **PALLADIUM TOTAL** | **14,273.59** |

## PLATINUM

| Product Code | Product Description | Ounce Conversion | Prod Balance | Gross Troy Ounces |
|---|---|---|---|---|
| PLB10 | Bullion Bar -- 10 oz., .9995 | 10.0000 | 83.000 | 830.000 |
| PLEAH | American Eagle, Any Year -- 1/2 oz. | 0.5000 | 40.000 | 20.000 |
| PLEAQ | American Eagle, Any Year -- 1/4 oz. | 0.2500 | 3.000 | 0.750 |
| PLEAT | American Eagle, Any Year -- 1/10 oz. | 0.1000 | 148.000 | 14.800 |
| | | | **PLATINUM TOTAL** | **865.550** |

## SILVER

| Product Code | Product Description | Ounce Conversion | Prod Balance | Gross Troy Ounces |
|---|---|---|---|---|
| S401000 | US 40% Silver Coinage (1965-1970) - $1000 FV | 295.0000 | 27.000 | 7,965.000 |
| S901000 | US 90% Silver Coinage (Pre-1965) -- $1000 FV | 715.0000 | 65.000 | 46,475.000 |
| SB100 | Bullion Bar -- 100 oz. (Exchange Approved Brands | 100.0000 | 1,900.000 | 190,000.000 |
| SB1000 | Bullion Bar -- 1000 oz. | 1.0000 | 2,728,774.87 | 2,728,774.87 |
| SCMXR | COMEX Warehouse Receipt | 1.0000 | 1,535,462.83 | 1,535,462.83 |
| SEA1 | American Eagle, Any Year -- 1 oz. | 1.0000 | 79,584.000 | 79,584.000 |
| SML1 | Canadian Maple Leaf -- 1 oz. | 1.0000 | 255,100.000 | 255,100.000 |
| SPH1 | Austrian Philharmonic, Any Year -- 1 oz. | 1.0000 | 319,250.000 | 319,250.000 |
| | | | **SILVER TOTAL** | **5,162,611.705** |

**END OF REPORT**

EXHIBIT A

## Delaware Depository Service Company

3/30/12
Page: 1 of 1

TO: Sample Company
RE: Product Register for Period: 3/30/2012 to 3/30/2012

Account #: 123456

### GOLD

**GBU1**  American Buffalo-Indian, Any Year -- 1 oz.

| Activity Date | Quantity Received / Shipped (-) | | Activity Detail |
|---|---|---|---|
| | Units | Ounces | |
| 3/30/12 | -10.000 | -10.000 | ~TR~Rose Keith~87100~R654427000~~ / |
| | -10.000 | -10.000 | NET PRODUCT CHANGE |

**GEAT**  American Eagle, Any Year -- 1/10 oz.

| Activity Date | Quantity Received / Shipped (-) | | Activity Detail |
|---|---|---|---|
| | Units | Ounces | |
| 3/30/12 | -20.000 | -2.000 | ~TR~Rose Keith Jr~87100~R654427000~~ / |
| | -20.000 | -2.000 | NET PRODUCT CHANGE |
| | | -12.0000 | NET GOLD CHANGE |

### SILVER

**SEA1**  American Eagle, Any Year -- 1 oz.

| Activity Date | Quantity Received / Shipped (-) | | Activity Detail |
|---|---|---|---|
| | Units | Ounces | |
| 3/30/12 | -100.000 | -100.000 | ~TR~Potts J~87100~R654427001~~ / |
| | -100.000 | -100.000 | NET PRODUCT CHANGE |

**SPH1**  Austrian Philharmonic, Any Year -- 1 oz.

| Activity Date | Quantity Received / Shipped (-) | | Activity Detail |
|---|---|---|---|
| | Units | Ounces | |
| 3/30/12 | -100.000 | -100.000 | ~TR~Potts J~87100~R654427001~~ / |
| | -100.000 | -100.000 | NET PRODUCT CHANGE |
| | | -200.0000 | NET SILVER CHANGE |

END OF REPORT

# EXHIBIT 38



# Farmers & Merchants Bank
# Credit Memorandum

September 3, 2013

| | |
|---|---|
| **Borrower:** | **Monex Deposit Company, a California Limited Partnership**<br>**Monex Credit Company, a California Limited Partnership** |
| **Guarantors:** | **Metco Management Corporation**<br>**Comco Management Corporation**<br>**Newport Service Corporation**<br>**Michael A. Carabini - individual** |
| **Loan Amount:** | **Annual renewal of existing $50,000,000 Secured Asset Based Revolving Line of Credit. Line is formula based with daily reporting required. Maturity to be extended to October 1, 2014.** |
| **Terms Interest Rate:** | **Revolving line of credit renewable annually on October 1st., Interest is variable , payable monthly at Farmers & Merchants Bank Prime Rate plus 0.00% with a floor of 5.95%.** |

### Collateral:

Collateral consists of the assignment of precious metal commodity inventory in the form of bullion and coins and the assignment of "Atlas" contracts from Monex Credit which represent the indebtedness of the customer to Monex for commodities purchased by them and financed by Monex Credit. These contracts are secured by the commodities purchased. The assigned contracts are held at the F & M Main Office in Long Beach. The precious metal commodities in the form of both inventory and underlying collateral for the assigned contracts are held at F & M Main Office in Long Beach and at Delaware Depository Service Company in Wilmington, De. The commodities at Delaware are subject to a Depository Agreement between F & M, Delaware.

The borrowing base for advances under the line is as follows:

1) 100% of the pledged "Atlas" contracts outstanding margin balance total, not to exceed 80% of the underlying precious metal commodity market value.
2) Plus 80% of the Monex Deposit Company precious metal commodity inventory. The borrowers provide daily eligible  collateral reports showing a detail of the outstanding contracts along with a value of the underlying collateral and  a listing of the inventory and  present market value.



The reports dated August 30, 2013 show the following:

| | | | | | |
|---|---|---|---|---|---|
| Inventory | $22,785,827 | X 80% | $18,228,662 | | |
| Atlas contracts (with adjustments) | $30,531,588 | X 100% | $29,985,199 | (adjusted) | |

**Total Collateral for borrowing**      **$48,213,861**

**Outstanding line balance 5/31/2012**      **$**    **0.00**

Borrowers are required buy loan agreement to provide a BORROWING BASE CERTIFICATE on the 15th and 30th of each month and along with each request for an advance under the line of credit. The Atlas contracts are assigned on a daily basis with "spot" confirmations mailed to the borrowers monthly. A physical inventory of the collateral precious metals and contracts held by the Bank is conducted each month by F & M assigned staff. An inventory was conducted as of July 31, 2013 and results were found to be in compliance. An inventory at Delaware Depository was conducted on Dec. 7, 2012 with results also found to be in compliance.

**Additional comments regarding the "Atlas" contracts** - MDC, in its normal course of business is involved in the execution and financing of various customer commodities transactions. Customer activities are transacted on a cash or margin basis with financing provided by MCC. Commodities transactions are subject to a risk of counterparty or customer non-performance, as well as changes in economic, industry or geographical factors. However, transactions are collateralized by the underlying commodity, thereby reducing the associated risk to changes in the fair market value of the commodity. The Borrowers try to control the risk associated with these transactions by requiring its customers to maintain equity levels in compliance with internal guidelines. A current "Atlas" agreement indicates that historically minimum maintenance equity has been 12% to 18%, however, the required minimum maintenance equity percent can exceed such historical levels.

Presently MCC lends up to 75% of the value of the value of the metal upon loan origination. MCC increases initial requirements when metal prices decrease rapidly to protect customers from the likelihood of collateral calls and forced liquidation resulting from an equally rapid decline.

The initial payment of at least 25% is based on the purchase "ask" price. For the purpose of monitoring the loan, the metal is valued at "bid" price, which according to the borrower is generally 1-4% less. Equity is recalculated throughout the day to reflect current market value and activity in the account. The customer must maintain his equity above a minimum 14% level. Should the customer's account equity fall below the minimum required level, MCC will issue a collateral call requiring the customer to raise the equity to the current required level. If the customer fails to meet the collateral call within the required time period, which is no more than 5 days, and as little as 24 hours, MCC will sell enough of the metals securing the loan to raise the account's equity above the initial required level.

Irrespective of a collateral call, if at any moment, the customer's equity falls below half of the minimum 14% required level, which is the 7% foreclosure level, MCC sells, without

customer notification, metal securing the loan to raise the equity above initial equity level. If all collateral is liquidated and the proceeds are insufficient to repay the loan, MCC will establish a reserve for the potential loss and take action to collect the remaining outstanding balance. According to Mr. Carabini, their computer system "Auto-Force-Sell" application will do portfolio-wide batch foreclosures within a minute. He indicated that although there is no limit to the number of accounts that the computer can execute, it is generally few because of the equity percent stratification of individual investor self-directed accounts and the Force-Sell application is run constantly as prices change.

On April 15th of this year there was a sharp drop in the price of gold and other precious metals. Mr. Carabini indicated that Monex Credit Company was forced to execute a margin call on many of the Atlas contracts and the volume on that one day exceeded what a whole month of margin calls had been in the past. He indicated that everything went very smoothly and they did not have any negative equity on any of the sold out contracts. He said this was a real test of their systems and everything went fine.

## LOAN PURPOSE AND EXECUTIVE SUMMARY

A credit facility to the borrowers by F&M has been extended to this borrower for over 10 years. The purpose of the facility is to provide funds for the purchase of inventory and to support the contracts through the establishment of this revolving line of credit. MCC provides financing of the commodities, purchased by borrowers' customers. This facility is structured similar to the financing of accounts receivables and inventory, with the "receivable" being the open-ended "Atlas" agreements/contracts held by Monex Credit Company and inventory being the precious metals commodities of Monex Deposit Company.

The line originated on 10/3/03 in the amount of $35,000,000. Due to increased sales and the financing of the "Atlas" contracts, the line was increased to $50,000,000 on 10/6/06. On 8/18/08 by mutual consent of the borrowers and F & M Bank, and due to minimal utilization of the line, the line was decreased to $ 25,000,000. In April 2009 the line was frozen at $10,000,000 pending resolution of an IRS audit which has since been resolved. On 7/12/11 at the request of the company, the line was increased to $40,000,000 due to an anticipated increase in sales and financing of those sales based on current and projected sales. On 9/16/2011 the line was increased from $40,000,000 to $50,000,000 and the maturity was extended to 12/15/2011 to allow additional time to rewrite and redocument the line and to allow time for the borrower to complete a securitized bond issue. Due to economic and market conditions, the bond issue was not completed and the borrowers obtained other financing in the form of a $25MM line of credit granted in April of 2012 through Wells Fargo Bank, the structure of the line being similar to our F & M line of credit. The Wells line of credit was subject to Intercreditor Agreement between Wells, F & M Bank and BNY Mellon Trust Company. There were delays in the completion of the Intercreditor Agreement and our line of credit was extended to 7/15/12. The Wells line of credit was funded during the last week of April and our line of credit was paid down by $15MM on 4/27/2012 to $31MM. The increase in the F & M line of credit was to be temporary and revert back to $40MM upon completion of the securitized bond issue. Mr. Carabini then requested that the line be redocumented and continued at the $50,000,000 level in anticipation of possible future needs. All advances under the line are subject to and controlled by a formula on the borrowing base certificate that regulates

advances and outstandings. See "Collateral" above regarding controls to monitor our secured collateral position.) Any letters of credit requested by the borrowers will be considered advances under this line of credit and subject to the same terms and conditions as any advance. At present there is one standby letter of credit outstanding in the amount of $50,000.

**Line utilization** - Line utilization varies and is influenced by economic/market conditions which in turn influence precious metals commodity prices. During the past 12 months, high utilization was $39.5MM on 1/30/13, low was $0.00 on 4/17/13 and the Borrowers have been out of debt on the line since that date. The payoff of our line was from the proceeds of a $75MM securitized bond issue by related entity Concord Funding. Proceeds from this bond issue were also used to payoff the loan balance outstanding under the $25MM line of credit at Wells Fargo Bank and payoff the $4.95MM outstanding balance on the Monaco Financial $5MM line of credit at F & M Bank. The Monaco line of credit remains out of debt and line of credit at Wells has been closed out. Please see attached charts for line utilization since 2007, historical prices for gold and silver and comments regarding Commodity Price Exposure.

## SOURCES OF REPAYMENT

Repayment of interest due is from the cash flow of company operations. Repayment of principal can come from three different sources, 1) Payment of the outstanding loan balance of the Atlas contracts by Monex's customers and/or sale of inventory, 2) Refinance of the relationship by another lender, or 3) liquidation of the precious metals held as collateral for the Atlas contracts and liquidation of the precious metals commodities inventory pledged to and held by the Bank.

Income is generated from interest income , storage fees and commodity transfer fees. Atlas customers are charged interest on the commodities that they finance through Monex Credit Company. Customers who own their commodity outright, pay monthly storage and safekeeping fees to Monex to store the commodity. Monex also charges a transaction fee every time their customers make a trade. See "Ability to Repay" below for a financial analysis of the borrowers.

## BACKGROUND

Monex started as a family business owned by Louis and Anna Carabini who started with a coin shop located in Long Beach shortly after end of World War II. The Carabinis have been customers of F&M Bank for over 50 years. Louis's son, Michael Carabini has been active in the management of the company for over 20 years. He has been groomed to take over the business when Louis ultimately retires. In addition to Louis and Michael Carabini, the management team consists of Brian Jenkins and Gregory Walker. Both of these individuals have been with Monex for a number of years and play significant roles in the day to day management of the business. In addition, more than 20% of Monex's employees have been with the company for a decade or more.

The business had evolved into various companies and entities involved in the marketing and sale of precious metals as well as the financing of the purchase of these metals by their customers. Monex Credit Company (MCC) and Monex Deposit Company (MDC) are two of these companies. This credit facility provides funding for the "Atlas" precious metals trading program. Monex has had this program for over 17 years. Metals are sold out of the inventory of MDC to the public. Buyers execute "Atlas" agreements, which provide for financing of the purchase by MCC. These "Atlas" agreements are collateralized by the commodity, which the buyer purchases. All commodities are held in custody by F&M in the form of either physical metals or negotiable warehouse receipts. For other than all cash buyers, MDC assigns the agreements to MCC for financing. Interest is variable, and floats with Farmers & Merchants Bank Prime Rate. MCC in turn assigns the agreements to F&M to be included in the collateral base for borrowing base availability under this line. As indicated above, all advances are subject to the formula indicated on the Borrowing Base Certificate which is to be submitted with each request for an advance.

A related entity Monaco Financial, LLC is engaged in selling rare precious metal coins and rare bullion. Secured Credit Corporation provides financing secured by the rare precious metal and rare coins purchased. The Bank has provided a $5,000,000 unsecured (blanket UCC 1 filing) line of credit to Monaco, LLC, Secured Credit Corporation and Michael A. Carabini. See "Debt Summary" below.

## Debt Summary

| Borrower | Commitment | Interest Rate | Maturity | Outstanding Balance |
|---|---|---|---|---|
| Loan # 9 | | | | |
| Monex Deposit | | | | |
| Monex Credit | $50,000,000 secured line | P + 1% Floor 5.95% | 10/15/2013 | $0.00 |
| *Loan # 9 | | | | |
| Monaco Financial | | | | |
| Secured Credit Corp | | | | |
| Michael Carabini | $5,000,000 unsecured line | P+1% Floor 5.95% | 10/01/2013 | $0.00 |

**Total Michael Carabini F & M direct and contingent liability - $55,000,000**

*Guarantor Michael A. Carabini is a co-borrower along with Monaco Financial, LLC and Secured Credit Corporation this $5,000,000 unsecured line of credit. The line of credit is supported by a UCC 1 filing on the assets of the entities and the personal financial strength of Michael A. Carabini. A 30 day out of debt period is required. The line has been out of debt since 4/5/13. The Monaco line originated 9/28/2011.

## BORROWER / GUARANTOR FINANCIAL ANALYSIS

### Borrower:

Audited financial statements are provided to us annually and interim company prepared statements are provided monthly.

At FYE 12/31/12 the combined audited statements of the borrowers ( excluding the guarantors ) showed a combined tangible net worth of $52,297M with total liabilities of $227,511M for a Debt to Worth ratio of 4.35. This is net of any "Due To" or "Due From" any related entities including our subject guarantors with the exception of Concord Funding Company in which both borrowers have an investment interest.

Combined Borrowers revenues for the 12 month period were $48,561M which yielded a combined net profit of $4,393M. Using Direct UCA Cash Flow this gave a DCR of 8.63 on an interest only payment for our $50MM commitment. **See attached Exhibit "A .**

The combined company prepared statements of all related entities including the guarantors (except the Carabinis) and related entity Concord Funding Company for the 12 month period ending 12/31/2012 show a combined net worth of $126,339M and a combined Debt to Worth of 3.17 to 1.00. Total combined revenues for the 12 month period were $76.4MM which yielded a net income for the period of $7.4MM.

It is noted above that the combined revenues of the **"Borrowers"** was $48.5MM for 2012. This is down substantially from combined revenues of $88.5MM for 2011. It was explained by Mr. Carabini at a meeting on Feb 1, 2013 that the decline was primarily due to a $33.7MM decline in trading income for Monex Deposit due to wide fluctuations in the price of commodities, primarily gold, in 2012 which resulted in the substantial decline in trading volume.

The decline in trading volume has carried over into 2013 as wide fluctuations and a dramatic decline in precious metals has continued its adverse effect on trading income. The company prepared interim statements for the 8 month period ending August 31, 2013 are held. Monex Deposit Company showed total revenues for the period of $19,177M yielding a net loss of ($5.3MM). The loss is due primarily to a $1.6MM decline in trading income as compared to the same 8 month period in 2012 and an increase in expenses of $3.1MM for the same period. Mr Carabini explained at a meeting on Aug. 13, 2013 that he chose not to downsize or lay off employees because he expects the market to turn around and he wants to keep his experienced staff in place and ready and not have to train new employees. Monex Deposit showed a profit of $2.8MM for the month of August and Mr. Carabini feels the company should at least break even for the remainder of the year. Monex Credit Company showed total revenues of $6.4MM yielding net income of $1.69MM for the 8 month period.

**Guarantors:** Continuing Guarantees in the amount of $50,000,000 are held for the following:

| | |
|---|---|
| Metco Management Corporation | General Partner of Monex Credit |
| Comco Management Corporation | General Partner of Monex Deposit |
| Newport Service Corporation | Affiliate of the borrowers |
| Michael Carabini | Principal |

The financial statements of Metco, Comco and Newport are held and are discussed above under "Ability to Pay". The personal financial statement of Michael A. Carabini dated July 31, 2013, a principal of both borrowers is held.

The latest statement dated July 2013 shows a strong condition with a net worth of $75.2MM. Net worth consists of Cash & Liquid Assets $379M, Retirement Accounts $812M, Business Interests (Monex related and affiliated) $35.3MM, Trust Assets $32MM and Real Estate Owned $7.4MM. Liabilities shown are the mortgage, ($125M), on his home in San Juan Capistrano which he values at $1.4MM.

Trust assets shown below are those trusts where Michael A. Carabini is trustee and current primary beneficiary.

| Trust | Net Worth | | L.P. Interest | | Cash at Wells F. |
|---|---|---|---|---|---|
| Emerson Trust | $11,153,395 | 40.3% | Monex Deposit NW | | $38,161 |
| Montgomery Trust | $11,153,395 | 40.3% | Monex Deposit NW | | $12,059 |
| Amberwood Trust | $7,341,359 | 40.3% | Monex Credit | NW | $64,412 |
| Lemonwood Trust | $7,341,359 | 40.3% | Monex Credit | NW | $57,029 |
| Total | $36,989,508 | | | | $171,661 |

| | |
|---|---|
| Total cash & partnership values | $37,161,169 |
| Less Payments due to Chris Carabini | $5,,000,000 |
| Adjusted Total | $32,161,169 |

Mr. & Mrs. Carabini's personal 2012 tax return is on extension. Their 2011 tax return shows adjusted gross income of $14,590,578. An analysis of the tax return and of the 2012 audited statements and K1s, other statements show the following:

|  | | | | |
|---|---|---|---|---|
| Wages | | $2,305,543 | | |
| Interest Income | | 676,818 | | |
| Dividend income | | 28,684 | | $3,011,045 |
| Distributions from Monex Deposit for 2012 based on % ownership | | | | |
| Montgomery Trust | | 40.3% | $2,418,000 | |
| Emerson Trust | | 40.3% | $2,418,000 | |
| Michael Carabini | | 12.6% | $ 756,000 | $5,592,000 |
| Distributions From Monex Credit for 2012 based on % ownership | | | | |
| Lemonwood Investments | | 40.3% | $ 806,200 | |
| Amberwood Investments | | 40.3% | $ 806,200 | |
| Michael Carabini | | 5.0% | $ 100,000 | $1,712,400 |
| **Total Income** | | | | **$10,315,445** |
| Less | | | | |
| Federal Taxes Paid | $1,643,235 | | | |
| Itemized deductions* | 2,162,000 | | | |
| **Total expenses** | | | | **$3,805,235** |
| **Net Cash flow** | | | | **$6,510,210** |

*Includes $1,620,357 in State Tax withheld from wages by Newport Service Corp.

## SUMMARY RISK ASSESSMENT

Below is a list of the strengths and weaknesses of the credit. Strengths tend to indicate that the credit will continue to meet or exceed the Bank's expectations. A highpoint of the current was the sale in March 2013 of Contracts Receivable from Monex Credit to Concord Funding. Concord then completed a $75MM securitized bond issue. Monex Credit used the proceeds of the sale to pay off the F & M line of credit In the amount of $31MM, the $25MM line at Wells Fargo (now closed out) and the $4,950M outstanding on the Monaco line of credit at F & M. Both the Monex and Monaco lines of credit remain out of debt.

The credit strengths include:

- 50+ year customer of the Bank

- existing credit facility has been place for over 15 years with satisfactory experience

- well secured, precious metal inventory is in the Bank's possession, "Atlas" agreements/contracts are also held by the bank along with the underlying precious metals collateral securing the agreements

- under this Asset Based Line structure all advances are governed and subject to a formula based Borrowing Base certificate.

The credit weaknesses include:

> - Due to declines in the precious metals markets particularly gold and silver, which resulted in a sharp decline in "trading income", Monex Deposit shows an (\$5.3MM) loss for the 8 months ending August 31, 2013. As indicated above, principal Michael Carabini indicated in a meeting on Aug. 13, 2013 that he expects the P & L to at least breakeven for the remainder of the year. This weakness is mitigated by our well secured position, the asset based nature and reporting requirements of the credit, the financial strength of guarantor Michael Carabini and our high regard for management. It is noted here that Monex Deposit showed a profit of \$2.8MM for the month of August.
> - substantial involvement would be required to liquidate the collateral and settle all accounts assigned under the Atlas program.

### Overall, the credit risk profile for this loan facility is a "5".

### Borrowing Covenants/Agreements

This loan is covered by a Loan and Security Agreement prepared by outside counsel. Terms of the agreement include but are not limited to the following:

> 1) Borrowers to provide daily eligible collateral reports in the form of a "Custodial Account Commodity Summary Report" for precious metals commodity inventory and a "Customer Custodial Account Positions Report" for the Atlas agreements/contracts.
>
> 2) Borrowers are to provide a Borrowing Base Certificate on the 15th and last day of each month.
>
> 3) Borrower is to provide an Advance Request and Borrowing Base Certificate with each request for an advance under the line of credit.
>
> 4) Borrowers to provide annual audited financial statements within 120 days of fiscal year end and monthly company prepared financial statements within 20 days of period end.
>
> 5) Guarantor Michael A. Carabini to provide a personal financial statement annually within 180 days of borrowers fiscal year end.
>
> 6) Guarantors Metco Management Corporation, Comco Management Corporation and Newport Service Corporation are to provide monthly financial statements within 20 days of period end.
>
> 7) Borrowers shall provide Bank , on a monthly basis, with copies of any and all "Atlas" statements evidencing customer's account transactions and outstanding balances as may be requested by the Bank. These statements will be used by the Bank for confirmation purposes..
>
> 8) Borrowers shall not enter into any new asset backed financing arrangements without prior Bank approval.

9) Borrower shall not use lender's name in any of it's sales or advertising materials or in any material that it furnishes to customers or potential customers, or in any written or electronic media without first obtaining Bank's written consent.

10) Borrower to provide annual litigation summary within 45 days of borrowers fiscal year end..

# EXHIBIT 39

# LOAN WORKSHEET AND AUTHORIZATION

| BR#/BY | LC CODE | SA CODE | ☐ NEW BORROWER  ☒ OLD BORROWER | ☒ CIP COMPLETE | LOAN NUMBER | | DATE APPLICATION REC'D |
|---|---|---|---|---|---|---|---|
| 01/ES1 | TGS | TGS | ☒ NEW LOAN  ☐ RENEWAL LOAN | BY: ES1 | | | 10/1/2011 |

THESE 2 SHADED SECTIONS ARE FOR TELEPHONE APPLICATIONS ONLY. MARK AS MANY BOXES AS APPLICABLE. YOU MAY APPLY FOR A FARMERS & MERCHANTS BANK LOAN IN YOUR NAME ALONE REGARDLESS OF YOUR MARITAL STATUS. THIS LOAN IS APPLIED FOR:  ☒ IN BUSINESS NAME  ☐ IN YOUR NAME

☐ IN YOUR NAME AND YOUR SPOUSE'S / RDP'S NAME    ☐ JOINT WITH PERSON OTHER THAN SPOUSE / RDP    ☐ IN TRUST NAME
☒ JOINT WITH OTHER ENTITY (EXPLAIN)    MONEX DEPOSIT COMPANY, A CALIFORNIA LIMITED PARTNERSHIP

IF YOU ARE APPLYING INDIVIDUALLY, YOU WILL BE EVALUATED USING YOUR SEPARATE INCOME AND/OR ASSETS. IF YOU ARE MARRIED OR IN A CA REGISTERED DOMESTIC PARTNERSHIP OR YOU ARE RELYING ON ALIMONY, CHILD SUPPORT, OR SEPARATE MAINTENANCE PAYMENTS OR ON THE INCOME OR ASSETS OF ANOTHER PERSON AS THE BASIS FOR REPAYMENT OF THE CREDIT REQUESTED, WE WILL NEED THE INFORMATION ON THAT OTHER PERSON.

| BORROWER  ☐ MARK BOX IF NON-PROFIT | | SS N/TIN | BUSINESS PHONE | HOME PHONE |
|---|---|---|---|---|
| MONEX CREDIT COMPANY, A CALIFORNIA LIMITED PARTNERSHIP | | | (949) 752-1400 | |

| ☒ CO-BORROWER  ☐ COSIGNER  ☐ GUARANTOR  SSN/TIN | CG AMOUNT | CG DATE | BUSINESS PHONE | HOME PHONE |
|---|---|---|---|---|
| MONEX DEPOSIT COMPANY, A CALIFORNIA LIMITED PARTNERSHIP | | | (949) 752-1400 | |

| ☐ CO-BORROWER  ☐ COSIGNER  ☒ GUARANTOR  SSN/TIN | CG AMOUNT | CG DATE | BUSINESS PHONE | HOME PHONE |
|---|---|---|---|---|
| METCO MANAGEMENT CORPORATION (see page 5 for address) | $50,000,000 | NOTE DATE | (949) 752-1400 | |

| ☐ CO-BORROWER  ☐ COSIGNER  ☒ GUARANTOR  SSN/TIN | CG AMOUNT | CG DATE | BUSINESS PHONE | HOME PHONE |
|---|---|---|---|---|
| SEE PAGE 5 FOR ADDITIONAL GUARANTORS | $50,000,000 | NOTE DATE | | |

TYPE OF BUSINESS OR OCCUPATION OF THE BORROWERS: PRECIOUS METALS TRADING AND FINANCING

| AMOUNT | NOTE DATE | MATURITY/TERM | RATE/MARGIN (without discount) | INDEX | FLOOR | CEILING |
|---|---|---|---|---|---|---|
| $50,000,000.00 | 11/21/2012 | 10/01/2013 | 0.00% OBPR | F&M PRIME | 5.95% | N/A |

CUSTOMER WAS NOTIFIED OF THE NEED FOR GUARANTOR(S)/CO-SIGNER(S)/CO-BORROWER(S) FOR THE FOLLOWING REASON(S):    CO-SIGNER NOTICE ☐ YES ☒ NO
☒ PRINCIPAL(S)    ☐ TRUSTEE(S)/TRUSTOR(S)    ☐ APPLICANT(S) DID NOT QUALIFY AS REQUESTED    ☐ "KEY MAN"

ADDRESS: 4910 BIRCH STREET, NEWPORT BEACH, CA 92660-8100    BILLING ADDRESS: 4910 BIRCH STREET, NEWPORT BEACH, CA 92660-8100

ADDRESS WHERE MAJORITY OF FUNDS ARE USED. For vacant land the minimum data requirement includes cross streets, city, and state.
4910 BIRCH STREET, NEWPORT BEACH, CA 92660-8100

| FINANCIAL STATEMENTS | N/W$ | C/A$ | C/L$ |
|---|---|---|---|
| NAME: Monex Credit Company | 18,255,621 | 163,814,358 | 157,771,517 |
| NOTE: F/S must be less than 1 year old | | F/A$ | F/L$ |
| DATE OF F/S ON FILE 04/30/2012 | | 12,212,780 | -0- |

| FINANCIAL STATEMENTS | N/W$ | C/A$ | C/L$ |
|---|---|---|---|
| NAME: Monex Deposit Company | 40,874,240 | 3,081,851 | 18,348,055 |
| NOTE: F/S must be less than 1 year old | | F/A$ | F/L$ |
| DATE OF F/S ON FILE 04/30/2012 | | 56,140,444 | -0- |

| LOAN PURPOSE: ☒ BUSINESS PURPOSE  ☐ CONSUMER PURPOSE | DISCLOSABLE ☐ YES ☒ NO | HMDA PURPOSE ☐ YES ☒ NO |
|---|---|---|

TO REWRITE EXISTING F&M LOAN _____ (PURPOSE: Revolving Line of Credit to provide funds for the purchase of inventory and to carry the Atlas agreements/contracts (receivables) of Monex Credit Company.)

COLLATERAL (with valuation/equity) & VESTING (attach legal description if real estate secured). CHECK TYPE OF PROPERTY (Check as many as applicable):

☐ SFR
☐ POOL PLCY  ☐ MFR  ☐ CML  ☐ IND  ☐ UNIMP  ☐ FARM  ☐ HOW  FOR DWELLINGS: ☐ OWNER OCCUPIED  ☐ NON-OWNER OCCUPIED

FLOOD INSURANCE REQUIRED (Refer to Flood Determination) ☐ YES ☐ NO  ☒ NA (For unsecured loans or loans NOT secured by improved real property)
Indicate occupancy for each CML, IND, & HOW (O/O = owner occupied or N/O = Non-owner occupied) to determine UCC filing requirements

| | MARKET VALUE* | APPRAISER'S NAME: |
|---|---|---|
| 1) Blanket Lien on all assets of Monex Credit Company, a California Limited Partnership as evidenced by a UCC-1 | | |
| Financing Statement filed in CA as Filing # _____ on 09/10/1993, Expiring 09/10/2013 | | |
| 2) Blanket Lien on all assets of Monex Deposit Company, a California Limited Partnership as evidenced by a UCC-1 | | APPRAISAL DATE: |
| Financing Statement filed in CA as Filing # _____ on 09/10/1993, Expiring 09/10/2013 | | |

| Primary DCR: | Global DCR: | ☐ DCR N/A | ☒ SEE PAGE 3 FOR ADDITIONAL REQUIRED DOCUMENTS | REAL ESTATE LTV = | OTHER COLLATERAL LTV = |
|---|---|---|---|---|---|

EXCEPTION(S) & REASON(S) ~ If applicable check here ☐ and complete the Loan or Modification Credit Policy Exception Worksheet & Authorization (FM737)

WILL THE BORROWER(S) PAY AN F&M DOCUMENT PREPARATION FEE? ☒ YES ☐ NO    * Also complete Appraisal Data Collection section below

LOAN PAYMENT SCHEDULE

| 46-9 | @ $ INT. ONLY | BEGINNING 01/01/2013 |
|---|---|---|
| 1 | @ $ P&I- All Due | BEGINNING 10/01/2013 |

PRIMARY AND SECONDARY SOURCE OF REPAYMENT (SOR) ~ If income, tell applicant the following info is optional: "List alimony, separate maintenance, spousal or child support only if you want it considered to obtain this credit."
1) CONVERSION OF TRADING ASSETS    2) LIQUIDATION OF COLLATERAL
3) RECOURSE TO GUARANTORS

AUTO DEBIT ACCT #:

IF SECURED BY NON-FARM, NONRESIDENTIAL REAL ESTATE, CHECK ONE OF THE BOXES BELOW THAT DESCRIBES THE PRIMARY SOR:
☐ Real Estate (lease/rental income, sale or refi of RE)    ☐ Cash flow of ongoing business operations

ACCOUNT INFORMATION    ☐ PRICING ADJUSTED FOR COMPENSATING BALANCES PER POLICY

| # See Attached Schedule "A" | TYPE | AVG.BAL | CURR. BAL | OPENED |
|---|---|---|---|---|
| # | TYPE | AVG.BAL | CURR. BAL | OPENED |
| # | TYPE | AVG.BAL | CURR. BAL | OPENED |
| TOTAL DIRECT DEBT: $50,000,000.00 | | (Detail on page 2) | | |

| DATE: 6/26/2012 | RECOMMENDED BY  THOMAS G. SAUCHELLI, VICE PRESIDENT | LENDING LIMIT $300,000.00 | RISK RATING |
|---|---|---|---|
| DATE: | AUTHORIZED BY  W. HENRY WALKER, CHIEF EXECUTIVE OFFICER | LENDING LIMIT $20,000,000.00 | 5 |

FM150    1    APPROVAL INITIALS:    06/07/12

7-9-12    7/9/12

## DETAIL OF AGGREGATE F&M OUTSTANDING DEBT

(NOTE: Total outstanding should reflect all booked loans, lines of credit & commitments, including F&M Bankcard Credit limits, if applicable.
Show the line amount of commitments & revolving lines, not the balance currently due.)
(Refer to Loan Documentation & Procedures Manual, Section E.05)

### FOR CONSUMER, COMMERCIAL, LETTERS OF CREDIT, EQUITYLINES AND BANKCARDS

**DIRECT (Includes Sole Ownership & Partnership loans; Simple Family Trust)**

| NAME | LOAN NUMBER | TOTAL OUTSTANDING |
|---|---|---|
| MONEX CREDIT COMPANY/MONEX DEPOSIT COMPANY | ▮ | $49,950,000.00 |
| MONEX CREDIT COMPANY/MONEX DEPOSIT COMPANY | | 50,000.00 |
| | **CURRENT LOAN REQUEST** | $50,000,000.00 |
| | **LESS F&M LOAN PAY-OFF AMOUNT, if any = TOTAL DIRECT DEBT** | $50,000,000.00 |

**INDIRECT (Includes Borrower as Guarantor, Co-Signer, plus Direct & Indirect Debt of all Related Parties to the Borrower or Loan)**

| NAME | | TOTAL OUTSTANDING |
|---|---|---|
| MONACO FINANCIAL, LLC/ SECURED CREDIT CORP./ CARABINI, MICHAEL | ▮ | $ 5,000,000.00 |
| | **LESS F&M LOAN PAY-OFF AMOUNT, if any = TOTAL INDIRECT DEBT** | $ 5,000,000.00 |
| | **AGGREGATE F&M DEBT TOTAL DIRECT DEBT + TOTAL INDIRECT DEBT =** | $55,000,000.00 |

---

**DISBURSEMENT INSTRUCTIONS**
UNDISBURSED LOAN FUNDS

**FOR LINES OF CREDIT, CHECK IF:** ☐ STRAIGHT ☒ REVOLVING

**# OF REQ'D SIGNERS TO ADVANCE FUNDS: 1**   **LIMITATIONS ON ADVANCES:** N/A   **AMOUNT OF RESOLUTION/AUTHORIZATION:** $50,000,000.00

| FOR ENTITY SIGNING: ENTITY NAME AND AUTHORIZED PARTIES (NAME & TITLE) | ** | *** | # OF SIGNERS REQUIRED | SIGNING DOCUMENTS | AUTHORIZED TO SIGN DOCUMENTS | CERTIFY/ATTEST RESOLUTION | AUTHORIZED TO ADVANCE FUNDS |
|---|---|---|---|---|---|---|---|
| 1) MONEX CREDIT COMPANY, A CALIFORNIA LIMITED PARTNERSHIP | ☐ | ☐ | 1 | ☐ | ☐ | ☐ | ☐ |
| 2) BY: METCO MANAGEMENT CORPORATION, GENERAL PARTNER | ☒ | ☐ | | ☒ | ☒ | ☒ | ☐ |
| 3) BY: MICHAEL A. CARABINI, LIMITED PARTNER | ☒ | ☐ | | ☐ | ☐ | ☐ | ☐ |
| 4) BY: BRIAN D. JENKINS, LIMITED PARTNER | ☒ | ☒ | | ☐ | ☐ | ☐ | ☐ |
| 5) BY: RONALD SMOLER, LIMITED PARTNER | ☒ | ☐ | | ☐ | ☐ | ☐ | ☐ |
| 6) BY: METCO MANAGEMENT CORPORATION, LIMITED PARTNER | ☒ | ☐ | | ☐ | ☐ | ☐ | ☐ |
| 7) BY: LEMONWOOD INVESTMENTS, LIMITED PARTNER | ☐ | ☐ | | ☐ | ☐ | ☐ | ☐ |
| 8) BY: AMBERWOOD INVESTMENTS, LIMITED PARTNER | ☐ | ☐ | | ☐ | ☐ | ☐ | ☐ |
| 9) | ☐ | ☐ | | ☐ | ☐ | ☐ | ☐ |
| 10) METCO MANAGEMENT CORPORATION ( A CALIFORNIA CORPORATION) | ☐ | ☐ | 2 | ☐ | ☐ | ☐ | ☐ |
| 11) BY: MICHAEL A. CARABINI, PRESIDENT | ☐ | ☐ | | ☒ | ☒ | ☐ | ☒ |
| 12) BY: BRIAN D. JENKINS, SECRETARY & TREASURER | ☒ | ☒ | | ☒ | ☒ | ☒ | ☒ |
| 13) | ☐ | ☐ | | ☐ | ☐ | ☐ | ☐ |

** Check if party does NOT have a 20% or more ownership in the entity they are related to as shown above
*** Check the box next to the recipient (contact) who should receive letters generated by CASH OnTrack for each of the listed companies.
**IMPORTANT: IF A TRUST IS INVOLVED IN ANY CAPACITY, COMPLETE AND SUBMIT TRUST WORKSHEET (FM 276).**

BANK INSIDER TRANSACTION ONLY. CHECK ONE OR MORE
☐ EXECUTIVE OFFICER ☐ DIRECTOR ☐ PRINCIPAL SHAREHOLDER ☐ OTHER INSTITUTION INSIDER ☐ OTHER INSTITUTION EMPLOYEE ☐ F&M EMPLOYEE

**Preferred Rate Discounts ~** *If applicable, please complete the following*

| Discount Percentage: ___ % | Rules for termination of Discount Percentage: | ___ % of the aggregate direct commitment |
|---|---|---|

## Additional Required Documents ~ Include Appropriate Worksheet When Requesting Documents

| | | |
|---|---|---|
| ☒ Business Loan Agreement (see below) | ☐ Hazardous Substances Indemnity (FM580) | Subordination of Lease: ☐ SNDA (FM583) |
| ☐ Construction Loan Agreement (FM409) | ☐ Assignment of Rent(s) and Lease(s) | ☐ Lessee (FM581) ☐ Lessee/Lessor (FM581/FM582) |
| ☐ Subordination of Debt (3ʳᵈ party, Non Real Estate) | ☐ Subordination of Debt (Real Estate) | Third party Landlord: ☐ Consent ☐ Release ☐ Both |

## Loan Agreement Requirements

**Financial Reporting Requirements:**

| Description | Statement Quality | | Due In (# of days) | Frequency |
|---|---|---|---|---|
| ☒ Annual Statements from the Borrower(s) | ☐ Self prepared | CPA Prepared (Choose one): ☐ Compiled ☐ Reviewed ☒ Audited | 120 | |
| ☒ Interim Statements from the Borrower(s) | ☒ Self prepared | CPA Prepared (Choose one): ☐ Compiled ☐ Reviewed ☐ Audited | 20 | ☒ MO ☐ Q ☐ ½ Yr |
| ☒ Annual Statements from the Guarantor(s) | ☒ Self prepared | CPA Prepared (Choose one): ☐ Compiled ☐ Reviewed ☐ Audited | 30 | |
| ☒ Interim Statements from the Guarantor(s) | ☒ Self prepared | CPA Prepared (Choose one): ☐ Compiled ☐ Reviewed ☐ Audited | 20 | ☒ MO ☐ Q ☐ ½ Yr |
| Include A/R & A/P Aging Reports for: ☐ Borrower and/or ☐ Guarantor | BLA text provides for the Statement Quality to be "…in a form and substance acceptable to Lender" | | | ☐ MO ☐ Q ☐ ½ Yr ☐ Yr |
| ☐ Profit & Loss Statement for Collateral | ☐ Self prepared | CPA Prepared (Choose one): ☐ Compiled ☐ Reviewed ☐ Audited | | ☐ MO ☐ Q ☐ ½ Yr ☐ Yr |
| ☐ Rent Rolls for Collateral ☐ Include copies of new leases/amendments | ☐ Self prepared | ☐ CPA Prepared: ☐ Other: | | ☐ MO ☐ Q ☐ ½ Yr ☐ Yr |

| Description | Tax Return Quality | | Due after filing date | Supplemental Requirements |
|---|---|---|---|---|
| ☒ Tax Returns from the Borrower(s) | ☐ Self prepared | NOT Self prepared (Choose one): ☐ CPA ☐ Accountant ☒ Tax Professional | 20 days | ☒ K-1s & Schedules ☒ Filing Date Extension |
| ☐ Tax Returns from the Guarantor(s) | ☐ Self prepared | NOT Self prepared (Choose one): ☐ CPA ☐ Accountant ☐ Tax Professional | 20 days | ☐ K-1s & Schedules ☐ Filing Date Extension |
| ☐ Other Financial Reporting Requirements ~ Describe below for approval authorization and include the FM 606 with the document request submission if necessary | | | | |

**Financial Ratio and Covenant Requirements:**

| Ratio Description | Ratio or Amount | | Measured at Each |
|---|---|---|---|
| ☐ Liquidity: Working Capital: Current Ratio (LIQ-1) | In excess of | to 1.00 | ☐ MO ☐ Q ☐ ½ Yr ☐ Yr |
| ☐ Liquidity: Working Capital: Minimum Working Capital | In excess of | $ | ☐ MO ☐ Q ☐ ½ Yr ☐ Yr |
| ☐ Income Requirements:: Minimum Net Income (rolling 12-months) | In excess of | $ | ☐ MO ☐ Q ☐ ½ Yr ☐ Yr |
| ☐ Cash Flow Coverage: Cash Flow from Operations/Debt Service (COV-4) | In excess of | to 1.00 | ☐ MO ☐ Q ☐ ½ Yr ☐ Yr |
| ☐ Cash Flow Coverage: Cash Flow from Operations/Debt Service on Note (COV-3) | In excess of | to 1.00 | ☐ MO ☐ Q ☐ ½ Yr ☐ Yr |
| ☒ ~~Tangible Net Worth Leverage: Debt/Worth (LEV-2c)~~ | ~~Not in excess of~~ | ~~7.500 to 1.00~~ | ☐ MO ☒ Q ☐ ½ Yr ☐ Yr |
| ☒ ~~Tangible Net Worth Requirements (choose only one of the following):~~ | ~~Min. Dollar Amt.~~ | ~~$49,000,000~~ | % of Total Assets |
| ☐ Loan to Collateral Value Covenant ~ The Maximum Loan to Value is ___ % | | | |
| ☐ 30-day Out of Debt Covenant | | | |
| ☐ Other Ratio & Covenant Requirements ~ Describe here for approval authorization and include the FM 606 with the document request submission: | | | |

*see approval dtd 11/16/12*

**Other Miscellaneous Business Loan Agreement Requirements:**

| |
|---|
| ☐ Other Requirements ~ Describe below for approval authorization and include the FM 606 with the document request submission if necessary |

## Describe Here Other Financial Reporting Requirements for the Business Loan Agreement

*180 (per approval dtd 11/16/12)*

1) For guarantor Michael A. Carabini, a **self-prepared** annual financial statement due within ~~90 days~~ of borrowers fiscal year end is required. *Annual federal and state tax returns including any filing date extension requests, K-1 forms and supplemental schedules not later than 20 days*

## Describe Here Other Financial Covenant Requirements for the Business Loan Agreement *after filing with applicable tax authority*

1) Borrowers to provide **daily** eligible collateral reports in the form of a **"Custodial Account Commodity Summary Report"** for precious metals commodity inventory and a **"Customer Custodial Account Positions Report"** for the Atlas agreements/contracts.
2) Borrowers shall provide Bank, on a monthly basis, with copies of any and all "Atlas" statements evidencing customer's account transactions and outstanding balances, as may be requested by Bank. These statements will be used by the Bank for confirmation purposes.
3) Borrowers shall not enter into any new asset backed financing arrangements without prior Bank approval.
4) Borrower shall not use lender's name in any of its sales or advertising materials or in any material that it furnishes to customers or potential customers, or in any written or electronic media without first obtaining Bank's written consent.

5) Borrower to provide Bank with an annual litigation summary within **45 days** of borrowers fiscal year end.
6) Borrowers to provide a Borrowing Base Certificate on the 15th and last day of each month.
7) Borrower to provide an Advance Request and Borrowing Base Certificate with each request for an advance under the Line of Credit.

## ITEMIZATION OF FEES AND CHARGES

| PREPAID FINANCE CHARGES (If applicable) | | | |
|---|---|---|---|
| **FEES** | **PAYEE** | **FINANCED** | **CASH** |
| CONSTRUCTION FUND CONTROL FEES | | $ | $ |
| CONSTRUCTION INSPECTION FEES | | $ | $ |
| ESCROW FEES | FARMERS & MERCHANTS BANK OF LONG BEACH | $ | $ |
| ESCROW FEES TO OUTSIDE ESCROW CO. | | $ | $ |
| FLOOD DETERMINATION & MONITORING FEE | CBCINNOVIS | $ | $ |
| LOAN DOCUMENT FEE *(For Non-Real Estate secured)* | FARMERS & MERCHANTS BANK OF LONG BEACH | $ | $ |
| LOAN TIE-IN FEE *(Amount of Outside Escrow fee due to our loan)* | | $ | $ |
| MORTGAGE BROKER FEES | | $ | $ |
| SUB-ESCROW FEE | | $ | $ |
| TAX SERVICE FEE | NATIONWIDE REAL ESTATE TAX SERVICE, INC. | $ | $ |
| WIRE FEE *(Only real estate related loans and only if F&M required it and/or keeps the fee)* | | $ | $ |
| OTHER- | | $ | $ |
| OTHER- | | $ | $ |

| OTHER CHARGES (YOU HAVE TO IDENTIFY THE PAYEES) | | | |
|---|---|---|---|
| **FEES** | **PAYEE** | **FINANCED** | **CASH** |
| APPRAISER'S FEE | | $ | $ |
| APPRAISAL REVIEW FEE | FARMERS AND MERCHANTS BANK OF LONG BEACH | $ | $ |
| ELECTRONIC PROCESSING FEE | | $ | $ |
| HOMEOWNER'S DUES | | $ | |
| PAY-OFF DEMAND FEE | | $ | $ |
| RECONVEYANCE FEES *(To Prior Lender)* | | $ | $ |
| RECONVEYANCE TRACKING FEE | | $ | $ |
| TERMITE INSPECTION FEE | | $ | $ |
| TITLE CHARGES | | $ | $ |
| OTHER- | | $ | $ |
| OTHER- | | $ | $ |
| OTHER- | | $ | $ |
| OTHER- | | $ | $ |
| OTHER- | | $ | $ |
| OTHER- | | $ | $ |
| OTHER- | | $ | $ |
| OTHER- | | $ | $ |
| OTHER- | | $ | $ |

| OTHER CHARGES (YOU DO NOT HAVE TO IDENTIFY PAYEES) | | |
|---|---|---|
| DEPARTMENT OF MOTOR VEHICLES FEES | $ | $ |
| ESTIMATED RECORDING FEES | $ | $ |
| HAZARD INSURANCE | $ | |
| LOAN DOCUMENTATION FEE TO FARMERS & MERCHANTS BANK OF LONG BEACH *(For real estate secured)* | $ | $ |
| PROPERTY TAXES | $ | |
| (NOTE: Identify type of fees i.e. F&M fee, public officials or government agencies, credit reporting agencies) OTHER FEES- | $ | $ |
| OTHER FEES- | $ | $ |
| OTHER FEES- | $ | $ |

**CRA REPORTING SECTION**
(ALL INFORMATION MUST BE COMPLETED)

REVENUE (Please refer to the CRA Information Reporting Guidelines (FM 298) for assistance and/or contact Compliance)

GROSS ANNUAL REVENUES OF: ☐ LESS THAN OR EQUAL TO $1 MILLION    ☒ GREATER THAN $1 MILLION    ☐ NO REPORTABLE REVENUE

## COMMUNITY DEVELOPMENT

| | |
|---|---|
| 1. Are any loan proceeds being used to create or rehabilitate affordable housing (including multi-family rental housing) for low – or moderate-income individuals? | ☐ YES  ☒ NO ☐ POSSIBLY |
| 2. Are any loan proceeds being used for community services targeted to low – or moderate-income individuals or to rehabilitate community facilities in low – or moderate-income areas or targeted to low – or moderate-income individuals? | ☐ YES  ☒ NO ☐ POSSIBLY |
| 3. Will the loan proceeds be used in promoting economic development by supporting permanent job creation, retention, or improvement for persons who are currently low – or moderate-income; ~or ~ supporting permanent job creation, retention, or improvement either in low – or moderate-income areas; ~or ~ in an area targeted for redevelopment by the government? | ☐ YES  ☒ NO ☐ POSSIBLY |
| 4. Will the loan proceeds revitalize or stabilize: low – or moderate-income areas? | ☐ YES  ☒ NO ☐ POSSIBLY |
| Comments: | |

## Appraisal Data Collection

| Address/Description: | | | |
|---|---|---|---|
| Appraisal Amount | $ | Senior Lien Amount | $ |
| Appraisal Date | | Actual Net Operating Income | $ |
| Capitalization Rate | % | Actual Average Lease Rate | $      per sq. ft. |
| Annual Debt Service | | Debt Service Coverage Ratio | to 1.00 |
| Actual Vacancy Rate | % | | |
| Rentable Sq Footage | | Commercial Land Sq Footage | |
| Residential Prop Sq Ft | | | |
| Information for Additional Collateral ~ Use FM 716 (Loan or Modification Worksheet. & Authorization – Appraisal Data Exhibit) | | | |

## OTHER INFORMATION
(FOR ADDITIONAL COLLATERAL DESCRIPTION, CASH FLOW ANALYSIS OR OTHER MISC. INFO., ETC.)

## SEE ATTACHED WORKSHEET ADDENDUM

## ADDITIONAL GUARANTORS:

NAME:              COMCO MANAGEMENT CORPORATION (A CALIFORNIA CORPORATION)
ADDRESS:           4910 BIRCH STREET, NEWPORT BEACH, CA 92660-8100
TIN:
BUSINESS PHONE:    (949) 752-1400

NAME:              NEWPORT SERVICE CORPORATION  (A CALIFORNIA CORPORATION)
ADDRESS:           4910 BIRCH STREET, NEWPORT BEACH, CA 92660-8100
TIN:
BUSINESS PHONE:    (949) 752-1400

NAME:              ~~LOUIS E. CARABINI~~        *see approval to delete*
ADDRESS:           ~~4910 BIRCH STREET, NEWPORT BEACH, CA 92660-8100~~   *as guarantor dtd*
SSN:                                                              *11/16/12*
BUSINESS PHONE:    ~~(949) 752-1400~~
HOME PHONE:        ~~(949) 497-6172~~

NAME:              MICHAEL A. CARABINI
ADDRESS:           31461 VIA SANTA MARIA, SAN JUAN CAPISTRANO, CA 92675-5532
SSN:
BUSINESS PHONE:    (949) 955-3080
HOME PHONE:        (949) 443-5016

***NOTE: Address for **MONEX DEPOSIT COMPANY** - 4910 BIRCH STREET, NEWPORT BEACH, CA 92660-8100
Address for **METCO MANAGEMENT CORPORATION** - 4910 BIRCH STREET, NEWPORT BEACH, CA 92660-8100

CG Amount for all guarantors is $50,000,000.00 and CG Date is same as the Note Date.

## Loan Documents To Be Prepared By Outside Legal Counsel, BuchalterNemer.

APPROVAL INITIALS:

## Exhibit "A"

| FOR ENTITY SIGNING: ENTITY NAME AND AUTHORIZED PARTIES (NAME & TITLE) | ** | *** | # OF SIGNERS REQUIRED | SIGNING DOCUMENTS | AUTHORIZED TO SIGN DOCUMENTS | CERTIFY/ATTEST RESOLUTION | AUTHORIZED TO ADVANCE FUNDS |
|---|---|---|---|---|---|---|---|
| 1) MONEX DEPOSIT COMPANY, A CALIFORNIA LIMITED PARTNERSHIP | ☐ | ☐ | 1 | ☐ | ☐ | ☐ | ☐ |
| 2) BY: COMCO MANAGEMENT CORPORATION, GENERAL PARTNER | ☒ | ☐ | | ☒ | ☒ | ☒ | ☐ |
| 3) BY: MONTGOMERY TRUST, LIMITED PARTNER | ☐ | ☐ | | ☐ | ☐ | ☐ | ☐ |
| 4) BY: EMERSON TRUST, LIMITED PARTNER | ☐ | ☐ | | ☐ | ☐ | ☐ | ☐ |
| 5) BY: MICHAEL A. CARABINI, LIMITED PARTNER | ☒ | ☐ | | ☐ | ☐ | ☐ | ☐ |
| 6) BY: BRIAN D. JENKINS, LIMITED PARTNER | ☒ | ☐ | | ☐ | ☐ | ☐ | ☐ |
| 7) BY: RONALD SMOLER, LIMITED PARTNER | ☒ | ☐ | | ☐ | ☐ | ☐ | ☐ |
| 8) | ☐ | ☐ | | ☐ | ☐ | ☐ | ☐ |
| 9) COMCO MANAGEMENT CORPORATION (A CALIFORNIA CORPORATION) | ☐ | ☐ | 2 | ☐ | ☐ | ☐ | ☐ |
| 10) BY: LOUIS E. CARABINI, PRESIDENT | ☐ | ☐ | | ☒ | ☒ | ☐ | ☒ |
| 11) BY: GREGORY G. WALKER, SECRETARY | ☒ | ☐ | | ☒ | ☒ | ☒ | ☒ |
| 12) | ☐ | ☐ | | ☐ | ☐ | ☐ | ☐ |
| 13) NEWPORT SERVICE CORPORATION (A CALIFORNIA CORPORATION) | ☐ | ☐ | 2 | ☐ | ☐ | ☐ | ☐ |
| 14) BY: MICHAEL A. CARABINI, PRESIDENT | ☐ | ☐ | | ☒ | ☒ | ☐ | ☒ |
| 15) BY: GREGORY G. WALKER, SECRETARY | ☒ | ☐ | | ☒ | ☒ | ☒ | ☒ |
| 16) | ☐ | ☐ | | ☐ | ☐ | ☐ | ☐ |
| 17) | | | | ☐ | ☐ | ☐ | ☐ |
| 18) | | | | ☐ | ☐ | ☐ | ☐ |
| 19) | | | | ☐ | ☐ | ☐ | ☐ |
| 20) ***NOTE: Original Partnership Authorizations for both Monex | | | | ☐ | ☐ | ☐ | ☐ |
| 21) Credit Company and Monex Deposit Company are "certified to | | | | ☐ | ☐ | ☐ | ☐ |
| 22) and attested by" the corporate general partners only. All limited | | | | ☐ | ☐ | ☐ | ☐ |
| 23) partners are non-authorized. | | | | ☐ | ☐ | ☐ | ☐ |
| 24) | | | | ☐ | ☐ | ☐ | ☐ |
| 25) Brian D. Jenkins is the recipient for all | | | | ☐ | ☐ | ☐ | ☐ |
| 26) letters generated by CASH OnTrack for | | | | ☐ | ☐ | ☐ | ☐ |
| 27) each of the entities listed above. | | | | ☐ | ☐ | ☐ | ☐ |
| 28) | | | | ☐ | ☐ | ☐ | ☐ |
| 29) | | | | ☐ | ☐ | ☐ | ☐ |
| 30) | | | | ☐ | ☐ | ☐ | ☐ |
| 31) | | | | ☐ | ☐ | ☐ | ☐ |
| 32) | | | | ☐ | ☐ | ☐ | ☐ |
| 33) | | | | ☐ | ☐ | ☐ | ☐ |

Long Beach, California

July 9, 2012

A special meeting of the Loan Committee was held on July 9th 2012.

### ATTENDANCE

Members present were W. Henry Walker, Phil Bond, George McFedries, Thomas Sauchelli and Timothy Wilson.

Tom Sauchelli submitted a credit request for a revolving commercial line of credit in the amount of $50 million for Monex Credit Company and Monex Deposit Company.  This request is to rewrite and re-document the existing $50 million secured asset based revolving line of credit.

The loan is to be secured by an assignment of precious metal commodity inventory in the form of bullion and coins and assignment of "Atlas" contracts from Monex Credit which represents the indebtedness of the customer to Monex for commodities purchased by them and financed by Monex Credit. These contracts are secured by the commodities purchased. The precious metal commodities in the form of both inventory and underlying collateral for the assigned contracts are held at F & M Main Office and at Delaware Depository Service Company in Wilmington, De. The commodities at Delaware are subject to a Depository Agreement between F & M and Delaware Depository Service Company.  In addition the loan is personally guaranteed by Louis E. Carabini and Michael A. Carabini and by Metco Management Corporation, Comco Management Corporation, and Newport Service Corporation.

The borrower continues to provide daily collateral reports showing a detail of the outstanding contracts along with a value of the underlying collateral and a listing of the inventory which include the present market value.

This credit is structured as a revolving line of credit with interest only payments payable monthly and all outstanding and interest due at maturity set for October 1, 2013.  Repayment of the interest due will come from the cash flow of company's operations. Repayment of principal can come from three different sources, 1) Payment of the outstanding balance of the Atlas contracts by Monex's customers and/or sale of inventory, 2) Refinance of the relationship by another lender, or 3) liquidity of the precious metals held as collateral for the Atlas contracts and liquidation of the precious metals commodities inventory pledged to the Bank. Income is generated from interest income, storage fees and commodity transfer fees.  Atlas customers are charged interest on the commodities that they finance with Monex Credit.  Customers, who own their commodity outright, pay monthly storage and safekeeping fees to Monex to store the commodity. Monex also charges a transaction fee at the time their customers make a trade.

After the discussion concerning the borrowing relationship, borrowing covenants, review of the collateral, repayment schedule and source of repayment, it was moved by Henry Walker, seconded by Timothy Wilson, and declared carried that the line of credit be approved for $50,000,000 at F&M Bank's Prime rate with a Floor of 5.95% until the maturity date set for October 1, 2013.

## *ADJOURNMENT*

With no further business being presented, the meeting was adjourned.

_____

W. Henry Walker

_____

Timothy Wilson

_____

George McFedries

_____

Phil Bond

_____

Thomas Sauchelli

November 16, 2012


To:     Board of Directors
        Farmers & Merchants Bank of Long Beach

From:   Thomas G. Sauchelli
        Vice President, Credit Administration

Subject: Monex Deposit Company
         Monex Credit Company

Request:
         Amend and reapprove FM 150 Board approved $50,000,000 secured line of credit approved by
         Board on July 9, 2012 subject to the changes indicated below. A copy of the July 9, 2012
         approval is attached.

Comments:
         The approval on July 9,2012 was for the rewrite and redocumentation of the line of credit.
         However, negotiations continued after that date and were extended resulting in the expiring of
         the approval (90 days F & M policy). Also, the negotiations resulted in the following changes to
         the terms and conditions that were previously approved by the Board of Directors:

         - Louis Carabini is deleted as a guarantor along with any financial statement requirements for
         this guarantor.

         - The combined $40,000,000 minimum tangible net worth required on an quarterly basis is
         deleted along with the maximum 7.5 to 1.00 quarterly combined tangible net worth
         requirement is also deleted.

         - Guarantor Michael A. Carabini to provide a personal financial statement within 180 days of
         borrowers fiscal year end (previously 90 days).

         - Guarantor Michael A. Carabini to provide annual federal and state tax returns including any
         filing date extension requests, K-1 forms and supplemental schedules not later than 20 days
         after filing with applicable tax authority (not previously required).

- Other terms and conditions as negotiated and indicated in the "Amended and Restated Credit Agreement".

All other terms and conditions as previously approved on July 9, 2012 remain unchanged.

Loan documents will be drawn upon Board approval.

Approval is recommended and requested.


Thomas G. Sauchelli, Vice President

Approved Date: 11/20/12


George McFedries, Senior Vice President

By:

Board of Directors


Phillip J. Bond, Executive Vice President

By:

Board of Directors


W. Henry Walker, President

<u>**Worksheet Addendum**</u>

<u>**6/18/2012**</u>

| | |
|---|---|
| **Borrowers:** | **Monex Deposit Company, a California Limited Partnership** |
| | **Monex Credit Company, a California Limited Partnership** |
| **Guarantors:** | Metco Management Corporation |
| | Comco Management Corporation |
| | Newport Service Corporation |
| | Louis E. Carabini - individual |
| | Michael A. Carabini - individual |
| **Amount:** | **Rewrite and redocumentation of existing $50,000,000 Secured Asset Based Revolving Line of Credit. Line is formula based with daily reporting required.** |

**Terms and Interest Rate**:

Revolving line of credit renewable annually on October 1st., initial maturity to be October 1, 2013.  Interest is variable , payable monthly at Farmers & Merchants Bank Prime  Rate plus 0.00% with a floor of 5.95%.

**Collateral:**    Collateral consists of the assignment of precious metal commodity inventory in the form of bullion and coins and the assignment of "Atlas" contracts from Monex Credit which represent the indebtedness of the customer to Monex for commodities purchased by them and financed by Monex Credit.  These contracts are secured by the commodities purchased. . The assigned contracts are held at the F & M Main Office in Long Beach. The precious metal commodities in the form of both inventory and underlying collateral for the assigned contracts are held at F & M Main Office in Long Beach and at Delaware Depository Service Company in Wilmington, De. The commodities at Delaware are subject to a Depository Agreement between F & M, Delaware.

The borrowing base for advances under the line is as follows:

1) 100% of the pledged "Atlas" contracts outstanding margin balance  total, not to exceed 80% of the underlying precious metal commodity market value.

2) Plus 80% of the Monex Deposit Company precious metal commodity inventory.

<u>The borrowers provide daily eligible  collateral reports showing a detail of the outstanding contracts along with a value of the underlying collateral and  a listing of the inventory and  present market value.</u>   The reports dated May 31, 2012 show the following;

| | | | |
|---|---|---|---|
| Inventory | $ 7,737,641 | X 80% | $ 5,902,113 |
| Atlas contracts (with adjustments) | $53,267,607 | X 100% | $52,336,939 (adjusted) |
| **Total Collateral for borrowing** | | | **$58,239,052** |
| **Outstanding line balance 5/31/2012** | | | **$22,000,000** |

Under this rewrite and redocumentation borrowers are to provide a BORROWING BASE CERTIFICATE on the 15th and 30th of each month and along with each request for an advance under the line of credit. The Atlas contracts are assigned on a daily basis with "spot" confirmations mailed to the borrowers. An physical inventory of the collateral precious metals and contracts held by the Bank is conducted each month by F & M assigned staff. An inventory was conducted as of May 31,2012 and results were found to be in compliance.

**Additional comments regarding the "Atlas" contracts -** MDC, in its normal course of business is involved in the execution and financing of various customer commodities transactions. Customer activities are transacted on a cash or margin basis with financing provided by MCC. Commodities transactions are subject to a risk of counterparty or customer non-performance, as well as changes in economic, industry or geographical factors. However, transactions are collateralized by the underlying commodity, thereby reducing the associated risk to changes in the fair market value of the commodity. The Borrowers try to control the risk associated with these transactions by requiring its customers to maintain equity levels in compliance with internal guidelines. A current "Atlas" agreement indicates that historically minimum maintenance equity has been 12% to 18%, however, the required minimum maintenance equity percent can exceed such historical levels.

Presently MCC lends up to 75% of the value of the value of the metal upon loan origination. MCC increases initial requirements when metal prices increase rapidly to protect customers from the likelihood of collateral calls and forced liquidation resulting from an equally rapid decline.

The initial payment of at least 25% is based on the purchase "ask" price. For the purpose of monitoring the loan, the metal is valued at "bid" price, which according to the borrower is generally 1-4% less. Equity is recalculated throughout the day to reflect current market value and activity in the account. The customer must maintain his equity above a minimum 14% level. Should the customer's account equity fall below the minimum required level, MCC will issue a collateral call requiring the customer to raise

2

the equity to the current required level. If the customer fails to meet the collateral call within the required time period, which is no more than 5 days, and as little as 24 hours, MCC will sell enough of the metals securing the loan to raise the account's equity above the initial required level.

Irrespective of a collateral call, if at any moment, the customer's equity falls below half of the minimum 14% required level, which is the 7% foreclosure level, MCC sells, without customer notification, metal securing the loan to raise the equity above initial equity level. If all collateral is liquidated and the proceeds are insufficient to repay the loan, MCC will establish a reserve for the potential loss and take action to collect the remaining outstanding balance. According to Mr. Carabini, their computer system "Auto-Force-Sell" application will do portfolio-wide batch foreclosures within a minute. He indicated that although there is no limit to the number of accounts that the computer can execute, it is generally few because of the equity percent stratification of individual investor self-directed accounts and the Force-Sell application is run constantly as prices change.

**Background:**

Monex had started as a family business owned by Louis and Anna Carabini who started with a coin shop located in Long Beach shortly after end of World War II. The Carabinis have been customers of F&M Bank for over 50 years. Louis's son, Michael Carabini has been active in the management of the company for over 20 years. He has been groomed to take over the business when Louis ultimately retires. In addition to Louis and Michael Carabini, the management team consists of Brian Jenkins and Gregory Walker. Both of these individuals have been with Monex for a number of years and play significant roles in the day to day management of the business. In addition, more than 20% of Monex's employees have been with the company for a decade or more.

The business had evolved into various companies and entities involved in the marketing and sale of precious metals as well as the financing of the purchase of these metals by their customers. Monex Credit Company (MCC) and Monex Deposit Company (MDC) are two of these companies. This credit facility provides funding for the "Atlas" precious metals trading program. Monex has had this program for over 16 years.

Metals are sold out of the inventory of MDC to the public. Buyers execute "Atlas" agreements, which provide for financing of the purchase by MCC. These "Atlas" agreements are collateralized by the commodity, which the buyer purchases. All commodities are held in custody by F&M in the form of either physical metals or negotiable warehouse receipts. For other than all cash buyers, MDC assigns the agreements to MCC for financing. Interest is variable, and floats with Farmers & Merchants Bank Prime Rate. MCC in turn assigns the agreements to F&M to be included

3

in the collateral base for borrowing base availability under this line. As indicated above, all advances are subject to the formula indicated on the Borrowing Base Certificate which is to be submitted with each request for an advance.

A related entity Monaco Financial, LLC is engaged in selling rare precious metal coins and rare bullion. Secured Credit Corporation provides financing secured by the rare precious metal and rare coins purchased. The Bank has provided a $5,000,000 unsecured (blanket UCC 1 filing) line of credit to Monaco, LLC, Secured Credit Corporation and Michael A. Carabini. See "Debt Summary" below.

**Loan Purpose and Loan Request Detail:**

A credit facility to the borrowers by F&M has been extended to this borrower for over 10 years. The purpose of the facility is to provide funds for the purchase of inventory and to support the contracts through the establishment of this revolving line of credit. MCC provides financing of the commodities, purchased by borrowers' customers. This facility is structured similar to the financing of accounts receivables and inventory, with the "receivable" being the open-ended "Atlas" agreements/contracts held by Monex Credit Company and inventory being the precious metals commodities of Monex Deposit Company.

The line originated on 10/3/03 in the amount of $35,000,000. Due to increased sales and the financing of the "Atlas" contracts, the line was increased to $50,000,000 on 10/6/06. On 8/18/08 by mutual consent of the borrowers and F & M Bank, and due to minimal utilization of the line, the line was decreased to $ 25,000,000. In April 2009 the line was frozen at $10,000,000 pending resolution of an IRS audit which has since been resolved. On 7/12/11 at the request of the company, the line was increased to $40,000,000 due to an anticipated increase in sales and financing of those sales based on current and projected sales. On 9/16/2011 the line was increased from $40,000,000 to $50,000,000 and the maturity was extended to 12/15/2011 to allow additional time to rewrite and redocument the loan and to allow time for the borrower to complete a securitized bond issue. Due to economic and market conditions, the bond issue was not completed and the borrowers obtained other financing in the form of a $25MM line of credit granted in April of this year through Wells Fargo Bank, the structure of the line being similar to our F & M line of credit. The Wells line of credit is subject to Intercreditor Agreement between Wells, F & M Bank and BNY Mellon Trust Company. There were delays in the completion of the Intercreditor Agreement and our line of credit was extended to 7/15/12. The Wells line of credit was funded during the last week of April and our line of credit was paid down by $15MM on 4/27/2012 to $31MM. The increase in the F & M line of credit was to be temporary and revert back to $40MM upon completion of the securitized bond issue. Mr. Carabini has requested that the line be redocumented and continued at the $50,000,000 level in anticipation of

possible future needs. Although a projection of revenues and line usage has not been provided, it will be requested from the borrowers in order to anticipate future line usage. All advances under the line are subject to subject to and controlled by a formula on the borrowing base certificate that regulates advances and outstandings.  See "Collateral"  above regarding controls to monitor our secured collateral position.)  Any letters of credit requested by the borrowers will be considered advances under this line of credit and subject to the same terms and conditions as any advance.  At present there is one standby letter of credit outstanding in the amount of $50,000.

**Line utilization** - Line utilization varies and is influenced by economic/market conditions which in turn influence precious metals commodity prices.  During the past 12 months, high utilization was $46MM on 11/7/11 and 4/23/12 and low was 8MM on 6/6/11. Please see attached charts for line utilization since 2007, historical prices for gold and silver and comments regarding Commodity Price Exposure.

**Source of Repayment:**

Repayment of interest due is from the cash flow of company operations. Repayment of principal can come from three different sources, 1) Payment of the outstanding balance of the Atlas contracts by Monex's customers and/or sale of inventory, 2) Refinance of the relationship by another lender, or 3) liquidation of the precious metals held as collateral for the Atlas contracts and liquidation of the precious metals commodities inventory pledged to the Bank.

Income is generated from interest income , storage fees and commodity transfer fees. Atlas customers are charged interest on the commodities that they finance with Monex. Customers who own their commodity outright, pay monthly storage and safekeeping fees to Monex to store the commodity. Monex also charges a transaction fee every time their customers make a trade.  See "Ability to Repay" below for a financial analysis of the borrowers.

**Loan Structure:** This credit is structured as a revolving Asset Based line of credit with daily monitoring with interest only payments payable monthly and all outstanding  and unpaid principal and interest due at maturity. All requests for advances must be accompanied by a borrowing base are subject to availability indicated on the certificate.  In addition, the borrowers are to provide a borrowing base certificate twice monthly on the 15th day and last day of the month. Maturity of the line is October 1, 2013.

**Debt Summary:**

| Borrower | Commitment | Interest Rate | Maturity | Outstanding Balance |
|---|---|---|---|---|
| Loan # | (to be paid in full this new commitment) | | | |
| **Monex Deposit** | | | | |
| **Monex Credit** | $50,000,000 | P + 1% | 7/15/2012 | $37,000,000 |
| | secured line | Floor 5.95% | | |
| *Loan # | | | | |
| **Monaco Financial** | | | | |
| **Secured Credit Corp** | | | | |
| Michael Carabini | $5,000,000 | P+1% | 10/01/2012 | $5,000,000 |
| | unsecured line | Floor 5.95% | | |

**Total Michael Carabini F & M direct and contingent liability - $55,000,000**

*Guarantor Michael A. Carabini is a co-borrower along with Monaco Financial, LLC and Secured Credit Corporation this $5,000,000 unsecured line of credit. The line of credit is supported by a UCC 1 filing on the assets of the entities and the personal financial strength of Michael A. Carabini. A 30 day out of debt period is required.
Loan #         Line originated 9/28/2011

**Ability to Pay:** Audited financial statements are provided to us annually and interim company prepared statements are provided monthly.

At FYE 12/31/11 the combined audited statements of the borrowers ( excluding the guarantors ) showed a combined tangible net worth of $57,291M with total liabilities of $292,876M for a Debt to Worth ratio of 5.11. This is net of any "Due To" or "Due From" any related entities including our subject guarantors with the exception of Concord Funding Company in which both borrowers have an investment interest.
Combined revenues for the 12 month period were $88,584M which yielded a net profit of $18,136. This gave a DCR of 4.22 on an interest only payment for our $50MM commitment. **See attached Exhibit "A".** The combined company prepared statements including the guarantors (except the Carabinis) and related entity Concord Funding Company for the 12 month period ending 12/31/2011 show a combined net worth of $194,863M and a combined Debt to Worth of 1.09 to 1.00. Total combined revenues for the 12 month period were $87.5M which yielded a net income for the period of $22.7M.

The company prepared interim statements for the 4 month period ending April 30, 2012 are held. Monex Deposit Company showed total revenues for the period of $11,715M yielding a net income of $193M. Monex Credit Company showed total revenues of $3,698M yielding net income of $1,023M for the period.

6

**Management**
**Ability:**     Louis Carabini has built and managed the company over the past 50+ years. Louis's son, Michael Carabini has been active in the management of the company for over 20 years. He has been groomed to take over the business when Louis ultimately retires. In addition to Louis and Michael Carabini, the management team consists of Brian Jenkins and Gregory Walker. Both of these individuals have been with Monex for a number of years and play significant roles in the day to day management of the business.

**Guarantors:**     New Continuing Guarantees in the amount of $50,000,000 will be obtained from the following:

| | |
|---|---|
| Metco Management Corporation | General Partner of Monex Credit |
| Comco Management Corporation | General Partner of Monex Deposit |
| Newport Service Corporation | Affiliate of the borrowers |
| Louis E. Carabini | Principal |
| Michael A. Carabini | Principal |

The financial statements of Metco, Comco and Newport are held and are discussed above under "Ability to Pay". The personal financial statement of Michael A. Carabini, a principal of both borrowers is held. The latest statement dated July 2011 shows a strong condition with a net worth of $78.0MM. Net worth consists primarily of Cash & Liquid Assets $1.9MM, Retirement Accounts $1.1MM, Business Interests (Monex related and affiliated) $29.5MM, Trust Assets $40MM and Real Estate Owned $8.2MM. Liabilities shown are the mortgage, ($217M), on his home in San Juan Capistrano which he values at $1.4MM and Estimated Taxes Payable $3.2MM.

Trust assets shown below are those trusts where Michael A. Carabini is trustee and current primary beneficiary.

| Trust | Net Worth | | L.P. Interest | |
|---|---|---|---|---|
| Emerson Trust | $15,493,904 | 40.3% | Monex Deposit | Net Worth |
| Montgomery Trust | $15,493,904 | 40.3% | Monex Deposit | Net Worth |
| Amberwood Trust | $7,062,710 | 40.3% | Monex Credit | Net Worth |
| Lemonwood Trust | $7,062,710 | 40.3% | Monex Credit | Net Worth |
| Total | $45,412,230 | | | |
| Less Payments due to Chris Carabini | $ 5,,000,000 | | | |
| Adjusted Total | $40,412,230 | | | |

7

Mr. & Mrs. Carabini's personal 2010 tax return shows adjusted gross income of $27,130,748. K-1s, audited statements and tax returns of his related entities show the following distributions to Mr. Carabini::

| | | |
|---|---|---|
| Monex Dep. Company | (Michael)- | $1,980,000 |
| Monex Dep. Company | (Montgomery Trust -  Michael trustee) | $7,254,000 |
| Monex Dep. Company | (Emerson Trust - Michael trustee) | $7,254,000 |
| | | |
| Monex Cr. Company | (Michael) | $   127,500 |
| Monex Cr. Company | (Lemonwood Trust - Michael trustee) | $1,027,650 |
| Monex Cr. Company | (Amberwood Trust- Michael trustee) | $1,027,650 |
| | | |
| Monaco Financial | (Victoria Investments) | $   253,000 |
| | | |
| **Total 2010 distributions** | | $18,670,800 |

In addition, in 2010 Mr. Carabini showed wages of $1,755,630 from his various entities. His 2011 tax return is on extension.

Mr. Carabini's personal statement is maintained on a confidential basis and is held by senior management . In addition to the financial statement on Carabini, we have obtained a current credit bureau report. The  report reflects positive information.

Comment: It is noted here that we have not required any financial information from guarantor Louis Carabini. His son Michael through his trusts and personally, has an 85% interest in Monex Credit and a 92.9% interest in Monex Deposit and runs the day to day operations of both companies. Therefore, although Louis Carabini has offered his guarantee, we have for customer relations reasons and overall strength of this asset based loan and at his request waived the need for his personal financial information. Also, through Louis Carabinis discussions with Bank Senior Management, we are not aware of circumstances that would cause the his guarantee to be detrimental to the Bank.

Industry /Economics -  This is a unique industry. Economic conditions do not affect Monex's business in the same way it might affect other industries.  In fact, adverse economic conditions tend to improve their business as people look to precious metals as a safe alternative to other investments.

8

**Loan Grade  5**

**Risk Assessment:**

Strengths -

- 50+ year customer of the Bank
- existing credit facility has been place for over 15 years with satisfactory experience
- well secured, precious metal inventory is in the Bank's possession, "Atlas" agreements/contracts are also held by the bank along with the underlying precious metals collateral securing the agreements
- under this Asset Based Line structure all advances are governed and subject to a formula based Borrowing Base certificate.

Weaknesses -

- substantial involvement would be required to liquidate the collateral and settle all accounts assigned under the Atlas program.

**Borrowing Covenants/Agreements:**

This loan is covered by a Loan and Security Agreement prepared by outside counsel. Terms of the agreement include but are not limited to the following:

1) Borrowers to provide  daily eligible collateral reports in the form of a "Custodial Account Commodity Summary Report" for precious metals commodity inventory and a "Customer Custodial Account Positions Report" for the Atlas agreements/contracts.

2) Borrowers are to provide a Borrowing Base Certificate on the 15th and last day of each month.

3) Borrower is to provide an Advance Request and Borrowing Base Certificate with each request for an advance under the line of credit.

4) Borrowers to provide annual audited financial statements within 120 days of fiscal year end and monthly company prepared financial statements within 20 days of period end.

5) Tangible Net Worth of not less than $40MM, at each fiscal quarter end, with Tangible Net Worth defined as the aggregate of total partners' equity less any intangible assets, less any loans or advances to , or investments in, any related entities or individuals other than Concord Funding Company.

6) Debt to Tangible Net Worth not to exceed 7.5 to 1.0 at each fiscal quarter end with Tangible Net Worth as defined above.

7) Guarantor Michael A. Carabini to provide a personal financial statement annually within 90 days of borrowers fiscal year end.

9

8) Guarantors Metco Management Corporation, Comco Management Corporation and Newport Service Corporation are to provide monthly financial statements within 20 days of period end.

9) Borrowers shall provide Bank , on a monthly basis, with copies of any and all "Atlas" statements evidencing customer's account transactions and outstanding balances as may be requested by the Bank.  These statements will be used by the Bank for confirmation purposes..

10) Borrowers shall not enter into any new asset backed financing arrangements without prior Bank approval.

11) Borrower shall not use lender's name in any of it's sales or advertising materials or in any material that it furnishes to customers or potential customers, or in any written or electronic media without first obtaining Bank's written consent.

12) Borrower to provide annual litigation summary within 45 days of borrowers fiscal year end..

**Exhibit "A"**

**DCR 12/31/2011 AUDITED**

Monex Deposit Company                          Monex Credit Company
Audited 12/31/2011 statement                   Audited 12/31/2011 statement

(000)                                          (000)
Total Income    $79,205                        Total Income    $9,379
Net Income      $15,292                        Net Income      $2,844

Less Distri.    $ 7,000                         Less Distri.    $   400
Plus F & M                                     Plus F & M
Interest Exp    ___-0-___                       Interest Exp    $1,815

Avail Cash flow $8,292                          Avail Cash flow $4,259


TOTAL AVAILABLE CASH FLOW          $12,551

INTEREST ON F &M LINE@ 5.95%       $ 2,975
(annual at full line utilization)

                                   **DCR    4.22**

**Leverage 12/31/2011 AUDITED**
(000)
Monex Deposit Company  TNW    $41,857  Monex Credit Company TNW    $ 15,434
                       Total Liab.  $96,253                    Total Liab.  $196,623

COMBINED TANGIBLE NET WORTH    $ 57,291
COMBINED LIABILITIES           $292,876

**Combined Debt to Tangible Net Worth  5.11**



**Commodity Price Exposure**

Please refer to the attached charts for 12 month price history.

In the event of a sudden decline in the price of the precious metals underlying the customer contracts, the Co-Borrowers is authorized to sell the customer's collateral to maintain the contractually agreed upon advance rate. The cash generated by the sale of the customer's collateral would be applied to reduce the outstanding balance of the customer contract.

| | | | |
|---|---|---|---|
| Commodity Value @ orig. | $75,000 | Contract Amount | $37,500 |
| Commodity Value 33% Decline | $50,000 | Contract Amount w/Decline | $25,000 |
| Commodity Value (Liquidation) | $25,000 | Contract Amount (Liquidation) | $12,500 |

Customer may pay $12,500 to lower Contract Amount or Co-Borrowers will sell commodity down to a level supported by Commodity Value. Assuming no cash from the customer, the Co-Borrowers will sell $25,000 resulting in new contract of $12,500. If the Bank had lent 100% against the customer contract, all the proceeds would be applied to reduce the Asset-Based Loan. In this example, if this was the only contract financed under the ABL facility with the maximum advance of 100% of the Contract Amount at origination, the $25,000 in proceeds from the sale of the underlying commodity would pay the ABL facility down to $12,500. The result is the ABL facility remains in compliance.







**1-Year Historical Daily Closing Prices**
Last price as of 11-Jun-2012: $1,443

**Monex Decline Scenario**

| Commodity Value | Advance | Contract |
| --- | --- | --- |
| $ 75,000 | 0.5 | $ 37,500 |
| $ 50,000 | 0.5 | 25,000 |
| $ 37,500 | 0.5 | 18,750 |
| $ 31,250 | 0.5 | 15,625 |
| $ 28,125 | 0.5 | 14,063 |
| $ 26,563 | 0.5 | 13,281 |
| $ 25,781 | 0.5 | 12,891 |
| $ 25,391 | 0.5 | 12,695 |
| $ 25,195 | 0.5 | 12,598 |

| Commodity Value | Advance | Contract |
| --- | --- | --- |
| $ 75,000 | 0.5 | $ 37,500 |
| $ 50,000 | 0.5 | 25,000 |
| $ 25,000 | 0.5 | 12,500 |

If the Bank had advanced 100% against the contract of $37,500, the ABL facility would be in compliance after the sale of $25,000 in commodities is realized and applied to the ABL facility.

# EXHIBIT 40

## AMENDED AND RESTATED CONTINUING SECURITY AGREEMENT

1.      <u>GRANT OF SECURITY INTEREST</u>.  For valuable consideration, the undersigned **MONEX CREDIT COMPANY**, a California limited partnership, and **MONEX DEPOSIT COMPANY**, a California limited partnership (each of the foregoing, a "Debtor", and collectively on a joint and several basis, the "Debtors"), each hereby grants and transfers to **FARMERS & MERCHANTS BANK OF LONG BEACH** ("Bank") a security interest in all of each Debtor's right, title and interest in and to all of the personal property of such Debtor, in each case whether now or hereafter existing, whether tangible or intangible, whether now owned or hereafter acquired, wherever the same may be located and whether or not subject to the Uniform Commercial Code as it exists on the date of this Amended and Restated Continuing Security Agreement, or as it may hereafter be amended in the State of California (the "UCC"), including all Assigned Agreements and the following (the "Collateral"):

    (a)    all Accounts;

    (b)    all Chattel Paper;

    (c)    all Money and all Deposit Accounts, together with all amounts on deposit from time to time in such Deposit Accounts;

    (d)    all Documents;

    (e)    all General Intangibles, including all intellectual property, Payment Intangibles and Software;

    (f)    all Goods, including Inventory, Equipment and Fixtures;

    (g)    all Instruments;

    (h)    all Investment Property;

    (i)    all Letter-of-Credit Rights and other Supporting Obligations;

    (j)    all Records;

    (k)    all Commercial Tort Claims; and

    (l)    all Proceeds and Accessions with respect to any of the foregoing Collateral.

Each category of Collateral set forth above shall have the meaning set forth in the UCC (to the extent such term is defined in the UCC), it being the intention of the Debtors that the description of the Collateral set forth above be construed to include the broadest possible range of assets. In addition, "Assigned Agreements" means all Purchase and Sale Agreements and Loan, Security and Storage Agreements and related agreements, documents and instruments entered in connection therewith with any customer of any Debtor, as each such agreement, document and

instrument may be amended, restated, supplemented or otherwise modified from time to time, including, without limitation, (a) all rights of any Debtor to receive moneys due or to become due under or pursuant to the Assigned Agreements, (b) all rights of any Debtor to receive proceeds of any Supporting Obligations with respect to the Assigned Agreements, (c) all claims of any Debtor for damages arising out of any breach of or default under the Assigned Agreements, (d) all rights of any Debtor to terminate, amend, supplement, modify or exercise rights or options under the Assigned Agreements, to perform thereunder and to compel performance and otherwise exercise all remedies thereunder, and (e) all rights of any Debtor with respect to any collateral or security interests granted under or pursuant to the Assigned Agreements.

2.    OBLIGATIONS SECURED.  The obligations secured hereby are the payment and performance of:  (a) all present and future Indebtedness of Debtors to Bank; (b) all obligations of Debtors and rights of Bank under this Agreement; and (c) all present and future obligations of Debtors to Bank of other kinds.  The word "Indebtedness" is used herein in its most comprehensive sense and includes any and all advances, debts, obligations and liabilities of Debtors, or any of them, heretofore, now or hereafter made, incurred or created, whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, including under any swap, derivative, foreign exchange, hedge, deposit, treasury management or other similar transaction or arrangement, and whether any Debtor may be liable individually or jointly with others, or whether recovery upon such Indebtedness may be or hereafter becomes unenforceable.

3.    TERMINATION.  This Agreement will terminate upon the performance of all obligations of Debtors to Bank, including without limitation, the payment of all Indebtedness of Debtors to Bank, and the termination of all commitments of Bank to extend credit to any Debtor, existing at the time Bank receives written notice from Debtors of the termination of this Agreement.

4.    OBLIGATIONS OF BANK.  Bank has no obligation to make any loans hereunder.  Any money received by Bank in respect of the Collateral may be deposited, at Bank's option, into a non-interest bearing account over which no Debtor shall have control, and the same shall, for all purposes, be deemed Collateral hereunder.

5.    REPRESENTATIONS AND WARRANTIES.  Each Debtor represents and warrants to Bank that:  (a) such Debtor's legal name is exactly as set forth on the first page of this Agreement, and all of such Debtor's organizational documents or agreements delivered to Bank are complete and accurate in every respect; (b) Debtors are the owner and have possession or control of the Collateral; (c) Debtors have the exclusive right to grant a security interest in the Collateral; (d) all Collateral is genuine, free from liens, adverse claims, setoffs, default, prepayment, defenses and conditions precedent of any kind or character, except the lien created hereby or as otherwise agreed to by Bank, or as heretofore disclosed by Debtors to Bank, in writing; (e) all statements contained herein and, where applicable, in the Collateral are true and complete in all material respects; (f) no financing statement covering any of the Collateral, and naming any secured party other than Bank, is on file in any public office, other than those existing as of the date hereof and disclosed to Bank in writing prior to the date hereof; (g) all persons appearing to be obligated on the Collateral consisting of any rights to payment or

2

Proceeds have authority and capacity to contract and are bound as they appear to be; (h) all property subject to chattel paper has been properly registered and filed in compliance with law and to perfect the interest of such Debtor in such property; (i) all Collateral consisting of any rights to payment and Proceeds comply with all applicable laws concerning form, content and manner of preparation and execution, including where applicable Federal Reserve Regulation Z and any State consumer credit laws; (j) such Debtor has no Commercial Tort Claims as of the date hereof; (k) no Debtor is in the business of selling Equipment or Fixtures subject to this Agreement, and each Debtor acknowledges that no sale or other disposition of any Equipment or Fixtures, including without limitation, any Equipment or Fixtures which a Debtor may deem to be surplus, has been or shall be consented to or acquiesced in by Bank, except as specifically set forth in writing by Bank; and (l) each Assigned Agreement is in full force and effect and is enforceable against the parties thereto in accordance with its terms.

6.    <u>COVENANTS OF DEBTORS.</u>

(a)    Each Debtor agrees in general: (i) to pay Indebtedness secured hereby when due; (ii) to indemnify Bank against all losses, claims, demands, liabilities and expenses of every kind caused by property subject hereto; (iii) to permit Bank to exercise its powers; (iv) to execute and deliver such documents as Bank deems necessary to create, perfect and continue the security interests contemplated hereby; (v) not to change its name, and as applicable, its chief executive office, its principal residence or the jurisdiction in which it is organized and/or registered without giving Bank prior written notice thereof; (vi) not to change the places where any Debtor keeps any Collateral or any Debtor's records concerning the Collateral without giving Bank prior written notice of the address to which a Debtor is moving same and without obtaining Bank's prior written consent to such change; and (vii) to cooperate with Bank in perfecting all security interests granted herein and in obtaining such agreements from third parties as Bank deems necessary, proper or convenient in connection with the preservation, perfection or enforcement of any of its rights hereunder.

(b)    Each Debtor agrees with regard to the Collateral, unless Bank agrees otherwise in writing: (i) that Bank is authorized to file financing statements in the name of such Debtor to perfect Bank's security interest in Collateral; (ii) to insure the Collateral with Bank named as loss payee, in form, substance and amounts, under agreements, against risks and liabilities, and with insurance companies satisfactory to Bank; (iii) to use the Collateral in accordance with all applicable statutes, rules and regulations relating to the use and control thereof, and not to use the Collateral for any unlawful purpose or in any way that would void any insurance required to be carried in connection therewith; (iv) not to remove the Collateral from such Debtor's premises except in the ordinary course of such Debtor's business; (v) not to permit any lien on the Collateral, including without limitation, liens arising from repairs to or storage of the Collateral, except in favor of Bank; (vi) not to sell, hypothecate or otherwise dispose of, nor permit the transfer by operation of law of, any of the Collateral or any interest therein, except sales of Inventory to buyers in the ordinary course of such Debtor's business; (vii) to furnish reports to Bank of all acquisitions, returns, sales and other dispositions of Inventory in such form and detail and at such times as Bank may require; (viii) to permit Bank to inspect the Collateral at any time; (ix) to keep, in accordance with generally accepted accounting principles, complete and accurate records regarding all Collateral, and to permit Bank to inspect the same and make copies thereof at any reasonable time; (x) if requested by Bank, to receive and use reasonable

3

diligence to collect the Collateral consisting of any rights to payment and Proceeds, in trust and as the property of Bank, and to immediately endorse as appropriate and deliver such rights to payment and Proceeds to Bank daily in the exact form in which they are received together with a collection report in form satisfactory to Bank; (xi) not to commingle Collateral consisting of rights t o p ayment, P roceeds o r c ollections t hereunder w ith o ther p roperty; ( xii) t o g ive o nly normal allowances and credits and to advise Bank thereof immediately in writing if they affect any Collateral in any material respect; (xiii) on demand, to deliver to Bank returned property resulting from, or payment equal to, such allowances or credits on any Collateral consisting of rights to payment or Proceeds or to execute such documents and do such other things as Bank may reasonably request for the purpose of perfecting, preserving and enforcing its security interest in such returned property; (xiv) from time to time, when requested by Bank, to prepare and deliver a schedule of all Collateral subject to this Agreement and to assign in writing and deliver to Bank all accounts, contracts, leases and other chattel paper, instruments, documents and other evidences thereof; (xv) in the event Bank elects to receive payments of any Collateral consisting of rights to payment or Proceeds hereunder, to pay all expenses incurred by Bank in connection therewith, including expenses of accounting, correspondence, collection efforts, reporting to account or contract debtors, filing, recording, record keeping and expenses incidental thereto; (xvi) to provide any service and do any other acts which may be necessary to maintain, preserve and protect all Collateral and, as appropriate and applicable, to keep all Collateral in good and saleable condition and repair, to deal with the Collateral in accordance with the standards and practices adhered to generally by users, manufacturers or owners of like property, and to keep all Collateral free and clear of all defenses, rights of offset and counterclaims; (xvii) in the event that any Debtor shall at any time after the date hereof have any Commercial Tort Claims, such Debtor shall promptly notify Bank thereof in writing, which notice shall (A) set forth in reasonable detail the basis for and nature of such Commercial Tort Claim a nd ( B) c onstitute a n a mendment t o t his Ag reement b y w hich s uch C ommercial T ort Claim shall constitute part of the Collateral; (xviii) to pay when due all license fees, registration fees and other charges in connection with any Collateral; (xix) not to rent, lease or charter the Collateral except for sale and leasebacks permitted by the Amended and Restated Credit Agreement dated as of the date hereof among Debtors, Bank and the other parties thereto (as amended or otherwise modified from time to time, the "Credit Agreement"); (xx) notify Bank in writing of receipt by any Debtor of any interest in chattel paper and mark conspicuously each item of chattel paper and each of its records pertaining to the Collateral, with a legend, in form and substance satisfactory to Bank, indicating that such Collateral is subject to the security interest granted hereby; (xxi) deliver to Bank all promissory notes and other instruments and, at the request of Bank, all original counterparts of chattel paper, duly endorsed and accompanied by duly executed instruments of transfer or assignment, all in form and substance satisfactory to Bank; and (xxii) deliver such documents, instruments, notices, records and consents, and take such other actions, necessary to establish that Bank has control over electronic chattel paper and letter-of-credit rights of Debtors.

       (c)    Each Debtor shall at its expense: (i) if consistent with sound business practices, perform and observe all terms and provisions of the Assigned Agreements to be performed or observed by it, maintain the Assigned Agreements in full force and effect, enforce the Assigned Agreements in accordance with their respective terms, and take all such action to such end as may be from time to time requested by Bank; and (ii) upon request of Bank, (A) furnish to Bank, promptly upon receipt thereof, copies of all notices, requests and other

4

documents received by such Debtor under or pursuant to the Assigned Agreements and from time to time such information and reports regarding the Assigned Agreements as Bank may request and (B) make to the parties to such Assigned Agreements such demands and requests for information and reports or for action as such Debtor is entitled to make under the Assigned Agreements.

(d) Upon the occurrence and during the continuance of an Event of Default, no Debtor shall (i) cancel or terminate any of the Assigned Agreements or consent to or accept any cancellation or termination thereof; (ii) amend or otherwise modify the Assigned Agreements or give any consent, waiver or approval thereunder; (iii) waive any default under or breach of the Assigned Agreements; (iv) consent to or permit or accept any prepayment of amounts to become due under or in connection with the Assigned Agreements, except as expressly provided therein; or (v) take any other action in connection with the Assigned Agreements that could reasonably be expected to materially impair the value of the interest or rights of any Debtor thereunder or that could reasonably be expected to materially impair the interest or rights of Bank.

7.     POWERS OF BANK.  Each Debtor appoints Bank its true attorney in fact to perform any of the following powers, which are coupled with an interest, are irrevocable until termination of this Agreement and may be exercised from time to time by Bank's officers and employees, or any of them, whether or not such Debtor is in default:  (a) to perform any obligation of any Debtor hereunder in such Debtor's name or otherwise; (b) to give notice to account debtors or others of Bank's rights in the Collateral, to enforce or forebear from enforcing the same and make extension or modification agreements with respect thereto; (c) to release persons liable on Collateral and to give receipts and acquittances and compromise disputes in connection therewith; (d) to release or substitute security; (e) to resort to security in any order; (f) to prepare, execute, file, record or deliver notes, assignments, schedules, designation statements, financing statements, continuation statements, termination statements, statements of assignment, applications for registration or like papers to perfect, preserve or release Bank's interest in the Collateral; (g) to receive, open and read mail addressed to any Debtor; (h) to take cash, instruments for the payment of money and other property to which Bank is entitled; (i) to verify facts concerning the Collateral by inquiry of obligors thereon, or otherwise, in its own name or a fictitious name; (j) to endorse, collect, deliver and receive payment under instruments for the payment of money constituting or relating to Proceeds; (k) to prepare, adjust, execute, deliver and receive payment under insurance claims, and to collect and receive payment of and endorse any instrument in payment of loss or returned premiums or any other insurance refund or return, and to apply such amounts received by Bank, at Bank's sole option, toward repayment of the Indebtedness or replacement of the Collateral; (l) to exercise all rights, powers and remedies which any Debtor would have, but for this Agreement, with respect to all Collateral subject hereto; (m) to enter onto any Debtor's premises in inspecting the Collateral; (n) to make withdrawals from and to close deposit accounts or other accounts with any financial institution, wherever located, into which Proceeds may have been deposited, and to apply funds so withdrawn to payment of the Indebtedness; (o) to preserve or release the interest evidenced by chattel paper to which Bank is entitled hereunder and to endorse and deliver any evidence of title incidental thereto; (p) to receive, endorse and collect any drafts or other instruments, documents and chattel paper; and (q) to do all acts and things and execute all documents in the name of any

5

Debtor or otherwise, deemed by Bank as necessary, proper and convenient in connection with the preservation, perfection or enforcement of its rights hereunder.

8.    PAYMENT OF PREMIUMS, TAXES, CHARGES, LIENS AND ASSESSMENTS. Each Debtor agrees to pay, prior to delinquency, all insurance premiums, taxes, charges, liens and assessments against the Collateral, and upon the failure of any Debtor to do so, Bank at its option may pay any of them and shall be the sole judge of the legality or validity thereof and the amount necessary to discharge the same. Any such payments made by Bank shall be obligations of Debtors to Bank, due and payable immediately upon demand, together with interest at a rate determined in accordance with the provisions of this Agreement, and shall be secured by the Collateral, subject to all terms and conditions of this Agreement.

9.    EVENTS OF DEFAULT. The occurrence of any of the following shall constitute an "Event of Default" under this Agreement: (a) any default in the payment or performance of any obligation, or any defined event of default, under (i) any contract or instrument evidencing any Indebtedness, or (ii) any other agreement between any Debtor and Bank, including without limitation any loan agreement, relating to or executed in connection with any Indebtedness; (b) any representation or warranty made by any Debtor herein shall prove to be incorrect, false or misleading in any material respect when made; (c) any Debtor shall fail to observe or perform any obligation or agreement contained herein; (d) any impairment in the rights of Bank in any Collateral, or any attachment or like levy on any property of any Debtor; and (e) Bank, in good faith, believes any or all of the Collateral to be in danger of misuse, dissipation, commingling, loss, t heft, da mage o r d estruction, o r o therwise in j eopardy or uns atisfactory in character o r value.

10.    REMEDIES. Upon the occurrence of any Event of Default, Bank shall have the right to declare immediately due and payable all or any I ndebtedness secured hereby and to terminate any commitments to make loans or otherwise extend credit to any Debtor. Bank shall have all other rights, powers, privileges and remedies granted to a secured party upon default under the UCC or otherwise provided by law, including without limitation, the right (a) to contact all persons obligated to any Debtor on any Collateral and to instruct such persons to deliver all Collateral directly to Bank, and (b) to sell, lease, license or otherwise dispose of any or all Collateral. All rights, powers, privileges and remedies of Bank shall be cumulative. No delay, failure or discontinuance of B ank in exercising a ny right, power, privilege or remedy hereunder shall affect or operate as a waiver of such right, power, privilege or remedy; nor shall any single or partial exercise of any such right, power, privilege or remedy preclude, waive or otherwise affect any other or further exercise thereof or the exercise of any other right, power, privilege o r r emedy. An y w aiver, p ermit, c onsent o r a pproval o f a ny kind b y Bank o f a ny default hereunder, or any such waiver of any provisions or conditions hereof, must be in writing and shall be effective only to the extent set forth in writing. It is agreed that public or private sales or other dispositions, for cash or on credit, to a wholesaler or retailer or investor, or user of property of the types subject to this Agreement, or public auctions, are all commercially reasonable since differences in the prices generally realized in the different kinds of dispositions are ordinarily offset by the differences in the costs and credit risks of such dispositions. While an Event of Default exists: (a) Debtors shall deliver to Bank from time to time, as requested by Bank, current lists of all Collateral; (b) no Debtor will dispose of any Collateral except on terms approved by Bank; (c) at Bank's request, Debtors shall assemble and deliver all Collateral, and

6

books and records pertaining thereto, to Bank at a reasonably convenient place designated by Bank; and (d) Bank may, without notice to any Debtor, enter onto any Debtor's premises and take possession of the Collateral. With respect to any sale by Bank of any Collateral subject to this Agreement, each Debtor hereby expressly grants to Bank the right to sell such Collateral using any or all of any Debtor's trademarks, trade names, trade name rights and/or proprietary labels or marks. Each Debtor further agrees that Bank shall have no obligation to process or prepare any Collateral for sale or other disposition.

11. DISPOSITION OF COLLATERAL; TRANSFER OF INDEBTEDNESS. In disposing of Collateral hereunder, Bank may disclaim all warranties of title, possession, quiet enjoyment and the like. Any proceeds of any disposition of any Collateral, or any part thereof, may be applied by Bank to the payment of expenses incurred by Bank in connection with the foregoing, including reasonable attorneys' fees, and the balance of such proceeds may be applied by Bank toward the payment of the Indebtedness in such order of application as Bank may from time to time elect. Upon the transfer of all or any part of the Indebtedness, Bank may transfer all or any part of the Collateral and shall be fully discharged thereafter from all liability and responsibility with respect to any of the foregoing so transferred, and the transferee shall be vested with all rights and powers of Bank hereunder with respect to any of the foregoing so transferred; but with respect to any Collateral not so transferred, Bank shall retain all rights, powers, privileges and remedies herein given.

12. STATUTE OF LIMITATIONS. Until all Indebtedness shall have been paid in full and all commitments by Bank to extend credit to Debtors have been terminated, the power of sale or other disposition and all other rights, powers, privileges and remedies granted to Bank hereunder shall continue to exist and may be exercised by Bank at any time and from time to time irrespective of the fact that the Indebtedness or any part thereof may have become barred by any statute of limitations, or that the personal liability of any Debtor may have ceased, unless such liability shall have ceased due to the payment in full of all Indebtedness secured hereunder.

13. MISCELLANEOUS. When there is more than one Debtor named herein: (a) the word "Debtor" shall mean all or any one or more of them as the context requires; (b) the obligations of each Debtor hereunder are joint and several; and (c) until all Indebtedness shall have been paid in full, no Debtor shall have any right of subrogation or contribution, and each Debtor hereby waives any benefit of or right to participate in any of the Collateral or any other security now or hereafter held by Bank. Each Debtor hereby waives any right to require Bank to (i) proceed against such Debtor or any other person, (ii) marshal assets or proceed against or exhaust any security from such Debtor or any other person, (iii) perform any obligation of such Debtor with respect to any Collateral, and (d) make any presentment or demand, or give any notice of nonpayment or nonperformance, protest, notice of protest or notice of dishonor hereunder or in connection with any Collateral. Each Debtor further waives any right to direct the application of payments or security for any Indebtedness of such Debtor or indebtedness of customers of such Debtor.

14. NOTICES. All notices, requests and demands required under this Agreement must be in writing, addressed to Bank at the address specified in any other loan documents entered into between any Debtor and Bank and to any Debtor at the address of such Debtor's chief executive office (or principal residence, if applicable) specified below or to such other

7

address as any party may designate by written notice to each other party, and shall be deemed to have been given or made as follows: (a) if personally delivered, upon delivery; (b) if sent by mail, upon the earlier of the date of receipt or three (3) days after deposit in the U.S. mail, first class and postage prepaid; and (c) if sent by telecopy, upon receipt.

15.    COSTS, EXPENSES AND ATTORNEYS' FEES.  Each Debtor shall pay to Bank immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorneys' fees (to include outside counsel fees and all allocated costs of Bank's in-house counsel), expended or incurred by Bank in connection with (a) the perfection and preservation of the Collateral or Bank's interest therein, and (b) the realization, enforcement and exercise of any right, power, privilege or remedy conferred by this Agreement, whether incurred at the trial or appellate level, in an arbitration proceeding or otherwise, and including any of the foregoing incurred in connection with any bankruptcy proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by Bank or any other person) relating to any Debtor or in any way affecting any of the Collateral or Bank's ability to exercise any of its rights or remedies with respect thereto.  All of the foregoing shall be paid by Debtors with interest from the date of demand until paid in full at a rate per annum equal to the greater of ten percent (10%) or Bank's Prime Rate in effect from time to time.

16.    SUCCESSORS; ASSIGNS; AMENDMENT.  This Agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators, legal representatives, successors and assigns of the parties, and may be amended or modified only in writing signed by Bank and Debtors.

17.    SEVERABILITY OF PROVISIONS.  If any provision of this Agreement shall be held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or any remaining provisions of this Agreement.

18.    GOVERNING LAW.  This Agreement shall be governed by and construed in accordance with the laws of the State of California.

19.    ADDITIONAL REPRESENTATIONS AND WARRANTIES.  Each Debtor represents and warrants that:

(a)    it is an organization registered under the laws of the State of California;

(b)    its chief executive office is located at the following address: 4910 Birch Street, Newport Beach, California 92660; and

(c)    the Collateral (except goods in transit) is located or domiciled at the following addresses: 3601 North Market Street, Wilmington, Delaware 19802; 4200 Governor Printz Boulevard, Wilmington, Delaware 19802, 302 Pine Avenue, Long Beach, California 90802, 4910 Birch Street, Newport Beach, California 92660, and 115 Broadway, New York, New York 10006.

20.    NO NOVATION.  Debtors and Bank hereby agree that, effective upon the execution and delivery of this Amended and Restated Continuing Security Agreement (this

8

"Agreement") by each such party, the terms and provisions of that certain Commercial Security Agreement dated October 8, 2003 among Debtors and Bank (the "Original Security Agreement") shall be and hereby are amended, restated and superseded in their entirety by the terms and provisions of this Agreement. Nothing herein contained shall be construed as a substitution or novation of the obligations of Debtors outstanding under the Original Security Agreement, which obligations shall remain in full force and effect, except to the extent that the terms thereof are modified hereby or by instruments executed concurrently herewith. Nothing expressed or implied in this Agreement shall be construed as a release or other discharge of any Debtor, or any guarantor from any of its obligations or liabilities under the Original Security Agreement or any of the security agreements, pledge agreements, mortgages, guaranties or other loan documents executed in connection therewith. Each Debtor hereby (i) confirms and agrees that each Loan Document to which it is a party is, and shall continue to be, in full force and effect and is hereby ratified and confirmed in all respects except that on and after the date hereof all references in any such Loan Document to "the Security Agreement", "thereto", "thereof", "thereunder" or words of like import referring to the Original Security Agreement shall mean the Original Security Agreement as amended and restated by this Agreement; and (ii) confirms and agrees that to the extent that the Original Security Agreement or any Loan Document executed in connection therewith purports to assign or pledge to Bank, or to grant to Bank a security interest in or lien on, any collateral as security for the obligations of any Debtor from time to time existing in respect of the Original Security Agreement, such pledge, assignment or grant of the security interest or lien is hereby ratified and confirmed in all respects and shall remain effective as of the first date it became effective.

**[signature follows]**

(BN 11412603v4/Security_Agreement)

IN WITNESS WHEREOF, this Agreement has been duly executed as of November 21, 2012.

**MONEX DEPOSIT COMPANY,**
a California limited partnership

By:    Comco Management Corporation, its
       general partner

       By: _____
       Name: Louis E. Carabini
       Title: President

**MONEX CREDIT COMPANY,**
a California limited partnership

By:    Metco Management Corporation, its general
       partner

       By: _____
       Name: Michael A. Carabini
       Title: President

**FARMERS & MERCHANTS BANK OF LONG
BEACH,** a California banking corporation

By: _____
Name: Thomas G. Sauchelli
Title: Vice President/Credit Administration

By: _____
Name: Phillip J. Bond
Title: Executive Vice President

IN WITNESS WHEREOF, this Agreement has been duly executed as of November 21, 2012.

**MONEX DEPOSIT COMPANY,**
a California limited partnership

By:    Comco Management Corporation, its
general partner

By: _____

Name: Louis E. Carabini

Title: President

**MONEX CREDIT COMPANY,**
a California limited partnership

By:    Metco Management Corporation, its general
partner

By: _____

Name: Michael A. Carabini

Title: President

**FARMERS & MERCHANTS BANK OF LONG
BEACH,** a California banking corporation

By: _____

Name: Thomas G. Sauchelli

Title: Vice President/Credit Administration

By: _____

Name: Phillip J. Bond

Title: Executive Vice President

# EXHIBIT 41



**Farmers & Merchants Bank**

**Date  :**  June 17, 2016

**To    :**  W. Henry Walker, President
             John W. H. Hinrichs, Chief Financial Officer/Cashier
             Phil Bond, Executive Vice President/Chief Credit Officer
             Kathy Reed, Senior Vice President/Regional Manager

**From  :**  Phil Sblendorio, Senior Vice President/Regional Manager

**Subject:**  Commodity Audit of Monex Collateral as of May 31, 2016

1. **INVENTORY**
   An inventory of hard goods and warehouse receipts was taken by the Main Office Lending Department of Farmers and Merchants Bank on June 17, 2016. The records maintained by the Investment Department and Monex Credit Corporation were found to be in agreement with the physical inventory of the commodities held at Farmers and Merchants Main Office vault, Delaware Depository Services, and other listed depository services. An inventory of the hard goods stored at Delaware Depository was conducted on March 31, 2016 by Frank Coleman. No discrepancies were noted. The total value of commodities under Farmers & Merchants Bank's control in all locations is $146,966,821.29 at closing market value on May 31, 2016.

2. **CONFIRMATIONS**
   For the quarter ending March 31, 2016, 249 confirmation letters were sent April 8, 2016. The total number of responses to date is 70 - approximately 28%.

3. **AGREEMENTS**
   Farmers & Merchants Bank holds physical possession of the original agreements (security agreements), between Monex and its customers that Monex pledged as collateral for the loan. According to R027 dated May 31, 2016, two thousand five hundred eight (2,508) customer accounts are assigned to F&M Bank. The borrowing base of these accounts is $64,440,231.08.

4. **RECONCILIATION**
   The current credit line has a limit of $50,000,000.00. Using the commodity loan value of $13,570,349.83 plus the adjusted value of contracts of $51,112,453.11 less $242,571.86 for loans that are 90% or more paid, the borrowing base is $64,440,231.08. The loan balance on May 31, 2016 was $5,000,000.00.

Phil Sblendorio
Senior Vice President/Regional Manager
Main Office

cc: Manny Cervantes, Vice President/Controller
    Mike Fulbright, Assist. Vice Pres., Investments Dept.

Commodities Held by F&M as Collateral
Based on R028 Custodial Account Commodity Summary
As of May 31, 2016

| Commodity | Total Held | Pledged Units | Unit | Monex Value/Pledged Unit | Monex (Market Value) | Customer Values |
|---|---|---|---|---|---|---|
| Gold American Buffalo | 3,330.0000 | 2,360.000 | Coins | 1,255.100 | 2,962,036.00 | 1,200,740.00 |
| Austrian Coronas | 40.0000 | - | Coins | 1,078.200 | - | 46,850.00 |
| Gold American Eagle | 2,065.0000 | 955.000 | Coins | 1,251.000 | 1,194,705.00 | 1,372,172.00 |
| Canadian Round Howling Wolf | 1,050.0000 | 810.000 | Ozs. | 1,128.800 | 1,006,911.00 | 293,640.00 |
| Gold Bullion | 5,702.4600 | 255.055 | Ozs. | 1,216.000 | 310,146.88 | 7,500,140.00 |
| Krugerrands | 60.0000 | - | Coins | 1,114.100 | - | 72,870.00 |
| Canadian Gold Maple Leaf | 935.0000 | 565.000 | Coins | 1,238.700 | 699,865.50 | 453,351.00 |
| #310 Mountie | 30.0000 | 30.000 | Coins | 1,148.300 | 34,449.00 | |
| Gold Philharmonic | 8,830.0000 | 430.000 | Coins | 1,239.800 | 533,114.00 | 10,297,175.00 |
| 20 Oz Gold Philharmonic | 480.0000 | - | Coins | 1,098.000 | - | |
| Palladium Bullion | 12,073.0000 | 5,893.000 | Ozs. | 546.000 | 3,217,578.00 | 3,337,947.00 |
| Palladium Maple Leaf | 910.0000 | 300.000 | Coins | 555.100 | 166,530.00 | 333,182.00 |
| Platinum Amer Eagle | 47.0000 | 47.000 | Coins | 1,094.800 | 51,455.60 | |
| 1/2 Oz Platinum Amer Eagle | 14.0000 | 4.000 | Coins | 541.600 | 2,166.40 | |
| 1/4 Oz Platinum Amer Eagle | 1.0000 | 1.000 | Coins | 278.500 | 278.50 | |
| 1/10 Oz Platinum Amer Eagle | 8.0000 | 4.000 | Coins | 128.400 | 513.60 | |
| Platinum Bullion | 4,452.0400 | 2,896.040 | Ozs. | 983.000 | 2,846,807.32 | 1,528,051.00 |
| Platinum Maple Leaf | 579.0000 | 399.000 | Coins | 1,034.200 | 411,927.60 | 182,664.00 |
| 40% Silver Coins | 158.0000 | 15.000 | Bags | 4,703.000 | 76,125.00 | 711,139.00 |
| Silver Amer. Eagle | 1,178,838.0000 | 227,538.000 | Coins | 18.310 | 4,166,220.78 | 17,210,480.00 |
| Silver Bullion | 3,837,208.0460 | (961,091.954) | Ozs. | 16.020 | (15,396,693.10) | 76,358,374.00 |
| Silver Bullion WR | - | - | Ozs. | 14.800 | | |
| 90% Silver Coin | 84.5000 | 1.500 | Bags | 13,142.000 | 19,713.00 | 1,070,617.00 |
| Silver Ingot 100 oz. | 728,600.0000 | 728,600.000 | Ozs. | 16.480 | 12,007,328.00 | |
| Sil Kilo Kookaburra | 40.0000 | 40.000 | Coins | 649.000 | 25,960.00 | |
| Silver Maple Leaf | 592,340.0000 | 148,240.000 | Coins | 17.730 | 2,628,295.20 | 7,807,748.00 |
| Silver Leaf 1.5 oz | 420.0000 | 420.000 | Coins | 26.867 | 11,284.01 | |
| Silver Philharmonics | 11,100.0000 | 11,000.000 | Coins | 17.730 | 195,030.00 | 1,744.00 |
| Silver Eagles | 1,000.0000 | 1,000.000 | Coins | 16.190 | 16,190.00 | |

| | | |
|---|---|---|
| Total Monex Owned | 17,187,937.29 | + 129,778,884.00 = 146,966,821.29 |
| | | Total Commodities[1] |
| x 80% | 13,570,349.83 | |
| Plus Loans to Monex Customers (Adjusted)[2] | 51,112,453.11 | |
| Less Customers owing less than 10% of market value | (242,571.86) | |
| =Borrowing Base | 64,440,231.08 | |
| Credit Line | 50,000,000.00 | |
| Loan Balance | 5,000,000.00 | |

Market Values as presented by Monex are compared with other commodities dealers for reasonableness.
The non pledged commodities (sold to customers) are priced by Monex at the low value for the day
while the pledged commodities are valued at the closing price for the day. If all commodities were valued
at the closing price the commodities total would be higher.

[1] Should be equal to Total Values from R028 (Custodial Account Commodity Summary)
[2] Monex Customer Values Borrowing Base Total - From R027 (Customer Custodial Acct Positions)

Value per Prices based on closing market prices and R025 dtd May 31, 2016

| Code | Commodity | Location | Quantity | Unit | Value per[1] | Market Value |
|---|---|---|---|---|---|---|
| SB | Silver Bullion | Delaware | 4,312,740.6500 | Ounces | 16.020 | 69,090,105.21 |
| SLF | Silver Maple Leaf Coins | Delaware | 585,570.0000 | Coins | 17.730 | 10,382,156.10 |
| SAES | Silver American Eagle | Delaware | 1,178,838.0000 | Coins | 18.310 | 21,584,523.78 |
| SC | 90% Silver Coins | Delaware | 62.0000 | Bags | 13,142.000 | 814,804.00 |
| CC | 40% Silver Coin | Delaware | 3.0000 | Bags | 5,075.000 | 15,225.00 |
| SKKS | Silver Australian Kookaburra | Delaware | 40.0000 | Coins | 649.000 | 25,960.00 |
| SVPS | Silver Philharmonics | Delaware | 11,100.0000 | Coins | 17.730 | 196,803.00 |
| SB | Comex Electronic SB Warehouse Receipt | Delaware | (0.0570) | Ounces | 0.000 | 0.00 |
| GBS | Gold Bullion | Delaware | 1,841.4500 | Ounces | 1,216.000 | 2,239,203.20 |
| GBS Kilo | Gold Bullion - Kilo Bars (100 oz) | Delaware | 60.0000 | Bars | 39,094.400 | 2,345,664.00 |
| AC | Gold Austrian Coronas | Delaware | 40.0000 | Coins | 1,195.150 | 47,806.00 |
| ABS | Gold Buffalo Coins | Delaware | 3,330.0000 | Coins | 1,255.100 | 4,179,483.00 |
| FNSS | 99999Gold $200series Canadian Round | Delaware | 270.0000 | Coins | 1,243.100 | 335,637.00 |
| GB WR | Gold warehouse receipts | Delaware | 299.8950 | Ounces | 1,216.000 | 364,672.32 |
| MOA | Canadian Royal Mountie 1 oz | Delaware | 210.0000 | Coins | 1,148.300 | 241,143.00 |
| VPS | Gold Philharmonic | Delaware | 8,830.0000 | Coins | 1,239.800 | 10,947,434.00 |
| VPAS | 20 oz Gold Philharmonic | Delaware | 480.0000 | Coins | 1,216.000 | 583,680.00 |
| VPTS | Gold Austrian Philharmonic | Delaware | - | Ounces | 0.000 | 0.00 |
| AES | Gold American Eagle | Delaware | 1,985.0000 | Coins | 1,251.000 | 2,483,235.00 |
| GB | 500 Gold Ounces (Pails) | Delaware | 1,000.0000 | Ounces | 1,216.000 | 1,216,000.00 |
| MOA | Canadian Mounties | Delaware | 10.0000 | Coins | 1,148.300 | 11,483.00 |
| LF | Gold Maple Leaf | Delaware | 935.0000 | Coins | 1,238.700 | 1,158,184.50 |
| LFS | Canadian Maple Leaf 99999 Fine 1 oz | Delaware | 570.0000 | Coins | 1,238.700 | 706,059.00 |
| PA | Palladium Bar, 1 oz | Delaware | 7,473.0000 | Ounces | 546.000 | 4,080,258.00 |
| PA | Palladium Bullion Bar .10 oz | Delaware | 460.0000 | Ounces | 546.000 | 251,160.00 |
| PAL | Palladium Maple Leaf | Delaware | 910.0000 | Coins | 555.100 | 505,141.00 |
| PL | Platinum Bar 50 oz | Delaware | 1,561.4400 | Ounces | 983.000 | 1,534,895.52 |
| PL | Platinum Bar, 10 oz | Delaware | 1,020.0000 | Ounces | 983.000 | 1,002,660.00 |
| PL | Platinum Bar, 5 oz | Delaware | 5.0000 | Ounces | 983.000 | 4,915.00 |
| PL KG | Platinum Bullion Bar - 1kg | Delaware | 8.0000 | | 983.000 | 7,864.00 |
| PES | Platinum Amer Eagle, 1oz. | Delaware | 570.0000 | Coins | 1,094.800 | 624,036.00 |
| PES | Platinum Eagle Coins, 1.85oz. | Delaware | 129.5000 | Ounces | 1,094.800 | 141,776.60 |
| PEHS | Platinum Eagle Coins, 1/2oz. | Delaware | 957.0000 | Coins | 541.600 | 518,311.20 |
| PEQ | Platinum Eagle Coins, 1/4oz. | Delaware | 1,070.0000 | Coins | 278.500 | 297,995.00 |
| PETS | Platinum Amer Eagle, 1/10oz. | Delaware | 27.0000 | Coins | 128.400 | 3,466.80 |
| PLFS | Platinum Maple Leaf (1 oz) | Delaware | 579.0000 | Coins | 1,032.400 | 597,759.60 |
| PL | Platinum Isle of Man Noble, 1oz. | Delaware | 2.0000 | Coins | 983.000 | 1,966.00 |
| PL | Bullion Round Australian Platypus | Delaware | 200.0000 | Ounces | 983.000 | 196,600.00 |
| PL | Platinum Bullion Rd, 1oz. | Delaware | 7.0000 | Ounces | 983.000 | 6,881.00 |
| PL | Platinum Bullion Rd, 1/2oz. | Delaware | 0.5000 | Ounces | 983.000 | 491.50 |
| PL | Platinum Bullion Rd, 1/4oz. | Delaware | 0.2500 | Ounces | 983.000 | 245.75 |
| PL | Platinum Bullion Rd, 1/10oz. | Delaware | 0.1000 | Ounces | 983.000 | 98.30 |
| Commodities by Location as of June 17, 2016 (inventory) | | | | | | |
| SB | Silver Bullion | F&M | 254,067.3960 | Ounces | 16.020 | 4,070,159.68 |
| CC | 40% Silver Coin | F&M | 155.0000 | Bags | 5,075.000 | 786,625.00 |
| SC | 90% Silver Coins | F&M | 22.5000 | Bags | 13,142.000 | 295,695.00 |
| SLF | Silver Maple Leaf Coins | F&M | 7,400.0000 | Coins | 17.730 | 131,202.00 |
| GBS | Gold Bullion | F&M | 96.1340 | Ounces | 1,216.000 | 116,898.94 |
| AE | Gold American Eagle | F&M | 80.0000 | Coins | 1,251.000 | 100,080.00 |
| MOA | Canadian Mounties | F&M | 20.0000 | Coins | 1,148.300 | 22,966.00 |
| KR | Krugerrand Coins | F&M | 60.0000 | Coins | 1,233.900 | 74,034.00 |
| PEHS | Platinum Amer Eagle, 1/2 oz. | F&M | 10.0000 | Ounces | 983.000 | 9,830.00 |
| PETS | Platinum Amer Eagle, 1/10oz. | F&M | 4.0000 | Ounces | 983.000 | 3,932.00 |
| | | | | | Total* | 144,357,205.01 |

[1] **Value per** - value per commodity is obtained from Monex Rpt R025 ( Supplier Position Listing Closing Prices)
*Difference from $146,966,821.29 on the summary page is as a result of the listing of customer
holdings valued at low price for the day and the valuation in the inventory is listed as the closing price of this same day.

# EXHIBIT 42

## BANKS AND DEPOSITORIES

Physical delivery follows every customer purchase. Delivery is made either to the customer
(home or pickup) or to a bank/depository to be held in storage in the customer's name.
Deliveries are made within 28 calendar days following receipt of payment in good funds or such
shorter period as required by certain states. Upon delivery to a bank/depository, title to the
commodity is transferred to the customer. The books and records of the bank/depository will
identify the customer as the owner of the commodity until the customer takes personal
possession or the commodity is sold. The commodities held in storage for customers are assets
of the customers and not those of Monex or the bank/depository. Commodity purchases that are
financed by MCC are delivered and stored in the same manner as non-financed Atlas purchases.
Commodities are stored and assigned on a fungible basis, meaning that every unit of commodities
of like kind are stored as equivalent to all other units of such kind.

Upon receipt of the customer's commodity, the bank/depository custodian will send the customer a
Commodity Title Transfer Notice (CTTN) verifying receipt of the customer's commodity and
certifying that title to the commodity has been transferred to the customer. When the customer sells
or takes personal possession of his/her stored commodity, the bank/depository will send another
CTTN informing the customer that it is no longer holding the commodity.

Upon request, a customer may obtain a current verification of the status of his/her commodities
held in custody by the bank/depository by faxing the request with a copy of the front of his/her
CTTN to 949-261-5363.

The following bank/depositories facilities are currently being used to store customer commodities:

### Farmers and Merchants Bank, Long Beach, CA

Farmers & Merchants Bank of Long Beach was founded by C. J Walker in 1907 and remains a family
owned bank. F & M has grown slowly and safely, helping it earn its reputation as one of the strongest
banks in California. F & M has stored precious metals for Monex and it customers since 1967.

### Delaware Depository Service Company, DE

Delaware Depository Service Company (DDSC) in Wilmington Delaware is a Comex approved
depository, providing a full range of specialized precious metals custody, accounting and shipping
services to financial institutions and industrial companies worldwide.

### Coins and Things (CNT) Depository Inc., Bridgewater, MA

CNT Depository Inc. is a COMEX approved storage facility and 100% insured by Lloyd's of London.
CNT maintains direct storage and distribution relationships with the world's largest government mints. In
2011, CNT sold over $1.86 billion worth of gold to the United States Mint. CNT remains a family owned
and operated company with over 35 years of vaulting experience and excellence.

### Brink's Global Service USA Inc., Springfield Gardens, NY

As a leader in risk management and secure logistics, Brink's has safeguarded valuables since 1859. With
150 years of experience, Brink's offers the utmost quality of service. Brink's Global Services (BGS), the
global division of Brink's, Incorporated, is a COMEX approved depository. With an unsurpassed global
footprint, Brink's has more than 53,900 staff members worldwide and handles billions every day.

FOIA Confidential Treatment requested by                              MNX-CFTC-00531228
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

# EXHIBIT 43

# DELAWARE DEPOSITORY SERVICE COMPANY, LLC

## Depository Agreement



DEPOSITORY AGREEMENT, dated as of June 29, 2009 by and between Monex Credit Company, a limited partnership organized under the laws of the State of California, ("MCC"), Monex Deposit Company, a limited partnership organized under the laws of the State of California, ("MDC"), Concord Funding Company, L.L.C. ("CFC"), a limited liability company organized under the laws of the State of Delaware, and The Bank of New York Mellon Trust Company, N.A., as successor to BNY Midwest Trust Company, a national banking association, ("Trustee"), (collectively, the "Depositors") and Delaware Depository Service Company LLC, a Limited Liability Company organized under the laws of the State of Delaware (the "Depository").

WHEREAS, CFC has issued several series of Notes pursuant to a Master Indenture, dated as of October 2, 2002 (as the same may be amended from time to time, the "Master Indenture") by and between CFC and Trustee, as indenture trustee, and the Series 2002-1 Supplement thereto (the "Series 2002-1 Notes"), the Series 2004-1 Supplement thereto (the "Series 2004-1 Notes"), the Series 2005-1 Supplement thereto (the "Series 2005-1 Notes") and the Series 2006-1 Supplement thereto (the "Series 2006-1 Notes" and collectively, the "Notes"). CFC subsequently redeemed the Series 2002-1 Notes.

WHEREAS, a separate, segregated Precious Metals Depository Custodial Account (the "Concord Account") has been established by MCC with the Depository in an agency capacity as Servicer, for the account and benefit of CFC and the further benefit of CFC's assignee under the Master Indenture, the Trustee, under that certain Servicing Agreement, dated as of October 1, 2002, among MCC as Servicer, BNY as Trustee and Backup Servicer and CFC (as the same may be amended from time to time, the "Servicing Agreement"). Neither the Servicing Agreement nor any other document relating to the Master Indenture, each Supplement or the Notes to which Depository is not a party shall create any obligation on the part of Depository.

### Section I -- Appointment of Depository

Section 1.1 The Depositors hereby appoint the Depository as Custodian of the metals described in each Holdings Statement (the "Precious Metals") which the Depository will issue from time to time in accordance with Section 2.2 hereof during the term of this Agreement.

Section 1.2 The Depository hereby accepts appointment as custodian of the Precious Metals and agrees to perform its duties in respect thereof pursuant to the provisions of this Agreement.

### Section 2 -- Control, Receipt and Storage of the Precious Metals

Section 2.1 Control over the Precious Metals shall be and shall remain vested in the Depositors, as more specifically set forth in Section 2.4 hereof.

Section 2.2 Each delivery of Precious Metals to the Depository; and each delivery of the Precious Metals by the Depository to the Depositors, or to a party designated by Depositors pursuant to Section 7 hereof, shall be evidenced by a Holdings Statement and Product Register substantially in the form of Exhibit A attached hereto.

Section 2.3 The Depository shall receive, hold and keep the Precious Metals in the Depository's custody at its premises located at 3601 North Market Street, Wilmington, DE 19802, 4200 Governor Printz Boulevard, Wilmington, DE 19802, or at such other locations approved by Depositors. The Depository will not be responsible for the Precious Metals until they are actually delivered to and received by the Depository at its premises.

Section 2.4 Precious Metals may only be removed from or transferred between Depository's various storage sites by prior written notice of (a) MCC, in its capacity as Servicer for so long as MCC remains in such capacity, to be accompanied by the written consent of the Trustee, and (b) thereafter, by prior written notice of

the Trustee or such other successor Servicer as the Trustee shall certify in writing has authority to give such direction (the Trustee or such certified successor Servicer being referred to further below as the "Successor Servicer"). In the event that Depository receives conflicting instructions from MCC and Successor Servicer, Depository will follow the Successor Servicer's direction.

## Section 3 -- Responsibilities of Depository

Section 3.1 The Depository shall be responsible for safekeeping of the Precious Metals in the form and condition in which they are delivered to the Depository while they are in the possession or under the control of the Depository. The Depository shall keep the Precious Metals separately identified and segregated and shall mark in appropriate manner the Precious Metals held for Depositors. The Depository shall, at times during its business hours, permit any person designated on Schedule I ("Designated Persons Schedule") attached hereto or any other person designated by the written request of the Depositors (collectively, "Designated Persons") to have access to the Precious Metals for the purpose of inspection and taking inventory thereof.

Section 3.2 The Depository shall send to the Depositors by email monthly (i) a statement summarizing each receipt and each delivery of the Precious Metals held by it for the Depositors during such month; and (ii) a detailed statement of the Precious Metals held by the Depository pursuant to this Agreement during the period covered by such statement certified by an officer of the Depository. Unless the Depositors object by written notice to the Depository which is received by the Depository within 10 days after such statement is sent to the Depositors, such statement shall be conclusive and binding on the Depositors. The books, accounts and records of the Depository pertaining to its actions pursuant to this Agreement shall be kept open to inspection and audit during reasonable business hours by Designated Persons.

Section 3.3 The Depository shall, as warehouseman, acknowledge receipt from the Depositors of the Precious Metals and may, at its option, record certain specifications indicated on the Precious Metals. The Depository is not responsible for the authenticity of markings on or for the weight, fineness or contents of any of the Precious Metals, packages or sealed containers delivered to Depository by the Depositors.

Section 3.4 Delivery of the Precious Metals to the Depository will be at MCC's expense. MCC shall pay or reimburse the Depository from time to time for any taxes or other governmental charges payable, and actually paid, by the Depository upon storage or transfers of the Precious Metals made hereunder, and for all other usual, necessary and proper disbursements and expenses made or incurred by the Depository in its performance of this Agreement. For the avoidance of doubt, at no time will Trustee bear, pay or be liable for any costs or expenses related to the delivery, storage or maintenance of the Precious Metals or any other activity contemplated under this Agreement.

Section 3.5 MCC agrees to indemnify and hold harmless the Depository from and against any loss, damage, taxes, charges, expense, assessments, claims or liabilities, including counsel fees, incurred by it as a result of its performance of this Agreement, except such as may arise from its own gross negligence or wrongful acts.

Section 3.6 Upon the request of a Depositor and at MCCs' expense, the Depository will undertake to do the following:

3.6 (a) Weigh and incise bars not marked to a Depositor's standard and produce authorized bar and weight listings for corresponding material.

3.6 (b) Assay sample bars from a Depositor's inventory by an approved assayer or transport such bars to a refinery in order to verify content.

3.6 (c) Segregate Precious Metals for the Depositors according to collateral requirements and confirm such action to them.

Section 3.7 Neither Depository nor Depositors shall be responsible for delays or failures in performance

resulting from acts beyond the control of such party. Such acts shall include but not be limited to acts such as God, strikes, lockouts, riots, acts of war, epidemics, governmental regulations superimposed after the fact, fire, communication line failures, power failures, earthquakes or other disasters.

### Section 4 -- Delivery of Precious Metals by Depositors; Other Duties

Section 4.1 From time to time during the term of the Agreement and in accordance with instructions of MCC, to be accompanied by the written consent of the Trustee, and at MCC's expense, the Depository will deliver, or cause to be delivered, Precious Metals to the persons named and by the method of shipment or delivery set forth in such instructions subject to the following terms:

4.1 (a) Upon MCC's request for a withdrawal, to be accompanied by the written consent of the Trustee, Depository will assign the earliest available shipment/delivery date.

4.1 (b) All requests must be made in writing, containing the information stipulated in Section 4.1 (c) hereof and received by the Depository signed in accordance with the Designated Person Schedule - Schedule I attached hereto by email or facsimile transmission.

If a withdrawal involves receipted material, receipts must be properly endorsed and delivered to the Depository at least one full day prior to the shipment date for small shipments, at least five full days prior to shipment date for shipments involving more than 100 items (100 receipts for COMEX Silver).

4.1 (c) The following information will be required for releasing materials:
    a. Bar list, receipt list or proper identification of material
    b. Gross weight of each item (if applicable)
    c. Total number of items
    d. Total gross weight of shipment
    e. Carrier to be used (if applicable)
    f. Any special packaging instructions

4.1 (d) Depository will prepare and deliver material to the United States Postal Service or other carriers for delivery. Fees for this service will be specified on Schedule II hereto (the "Fee Schedule").

Section 4.2 The Depository will prepare and complete all shipping documents and, upon request provide copies of such documents to MCC and Trustee.

4. 2 (a) Upon notification of an incoming overseas shipment by the client, Depository will arrange for customs clearance, entry fees and bonding, and insured transportation from Port of Entry to Depository's vault. Charges for the Customs Entry Service are available upon request.

4.2 (b) The rates quoted for Customs Entry Service are for arrivals between the hours of 8 AM and 6 PM. Shipments arriving between the hours of 6 PM and 8 AM will be subject to premiums and are available upon request.

Section 4.3 It is understood by the parties hereto that MCC as Servicer, or Successor Servicer designated as provided above, will transmit to Depository not later than the close of Depository's business on each business day a written allocation report (accompanied by the written consent of the Trustee, in the case of a transmittal by MCC as Servicer) which will identify, separate allocations of Precious Metals as being owned by customers to whom Depositor has extended credit in the form of loans to finance the purchase of such Precious Metals, which loans have been transferred by Depositor to CFC (such allocations to be referred to for purposes hereof as the "Loan Obligor Allocations"). Such allocation report shall also include an identification of Precious Metals in the Concord Account not so allocated to Loan Obligor Allocations. The Depository and the other parties hereto agree that Precious Metals reflected on the most recently transmitted report as allocated to Loan Obligor Allocations, are held by the Depository for the account of the identified loan obligors as owner of such

3

identified Precious Metals, subject to a security interest in favor of CFC (as loan transferee of Depositor) in respect of which Depository holds possession of such Precious Metals as custodian and bailee for CFC as secured party, and for the Trustee as CFC's assignee thereof, for purposes of security interest perfection under Section 9-313 of the applicable Uniform Commercial Code or other applicable successor provision thereof. With respect to Precious Metals in the Concord Account shown on the most recently transmitted allocation report as not allocated to Loan Obligor Allocations, the Depository and the other parties hereto agree that such Precious Metals are held by the Depository for the account of CFC as owner thereof, subject to a security interest in favor of the Trustee, in respect of which Depository holds possession of such Precious Metals as custodian and bailee for the Trustee as secured party for purposes of security interest perfection under Section 9-313 of the applicable Uniform Commercial Code or other applicable successor provision thereof. The parties hereto agree that Depository has no obligation, liability or responsibility for the accuracy of any written allocation reports that it receives as aforesaid, and is only agreeing that its holdings of Precious Metals in the Concord Account are to reflect the ownership allocations and security interest status described above as reflected on the most recently transmitted written allocation report, and that such most recently transmitted written allocation report shall constitute upon Depository's receipt thereof a part of the Depository's internal books and records reflecting the status of such Concord Account in the hands of the Depository. The Depository agrees, however, that if in the ordinary course of its business it conducts any reviews or comparisons of the aggregate quantities and types of Precious Metals actually held by it against the aggregate quantities and types of Precious Metals reflected on the most recently transmitted written allocation report and discovers a discrepancy, it will promptly deliver written notice of such discrepancy to the Trustee and MCC. It also agrees to promptly deliver written notice to the Trustee when such discrepancy has been resolved with MCC and the substance of the resolution thereof.

Section 4.4 All shipments said to contain Precious Metals delivered to the Depository for original deposit into the Concord Account, and all Precious Metals transferred upon instruction of MCC from another Depositor account with Depository to the Concord Account, shall be credited to the Concord Account and will be held and stored by the Depository as custodian in accordance with the allocation provisions set forth in Section 4.3 above. Depository agrees to provide the Trustee and any Successor Servicer a concurrent copy of each monthly statement to be delivered to MCC in accordance with Section 3.2 hereof and upon written request of the Trustee or the Successor Servicer will provide concurrent copies of the daily confirmations to be delivered to MCC in accordance with Section 2.2 hereof The Depository also agrees to provide to the Trustee or the Successor Servicer, within one (1) business day of receiving written request therefor from such party, a written account statement in the form of the monthly statement referred to above, but current as of the date of preparation. If Depository transfers any property in the Concord Account between the storage sites set forth in Section 2.3 of the Agreement, Depository agrees promptly to provide Depositor and BNY with written confirmation that the property so transferred is the same Concord Account property formerly located at the site from which it was transferred.

## Section 5 -- Fees

Section 5.1 The Depository's fees for performing services pursuant to this Agreement will be in accordance with the attached Fee Schedule and shall be due and payable by MCC upon receipt of invoice.

Section 5.2 Rates for storage and withdrawal of commodities traded on exchange receipts for which Depository is a licensed depository cannot be offered at a discount. These rates are on file with each licensing exchange. Depository has the right to change any or all of these rates by giving 90 days prior notice to the appropriate exchange. In the event of a rate change, the exchange will inform its clearing members of the new rates and effective dates.

Section 5.3 Withdrawal charges quoted are for preparation and release of shipments only. Charges for pallets, strapping, special packing or other materials required will be added to the fees in the basic agreement.

Section 5.4 In the event that payment has not been received within thirty (30) days of the invoice date, Depository reserves the right to review the credit status of MCC and to institute an interest charge on any

4

outstanding balance from the billing date at a rate of 1.5% per month (18% per year). Depository agrees to provide the Trustee prompt written notice of any failure by Depositor to pay fees when due in accordance with Section 5.1 of the Agreement or of any failure to pay any other amounts owing under the Agreement when due.

Section 5.5 MCC must notify Depository of any billing errors or disputed charges within sixty (60) days of the invoice date or will thereby assume responsibility for charges including interest, until notification of error is given.

Section 5.6 The Depositors hereby agree that Depository shall have a lien upon the Precious Metals held for Depositors in an amount equal to any fees owed to Depository by MCC.

## Section 6 – Termination

Section 6.1 This Agreement may be terminated by Depositors by giving written notice to the Depository specifying the date of such termination, which shall be not less than thirty days after the date of such notice, or by the Depository by giving written notice to the Depositors specifying the date of such termination, which shall not be less than ninety (90) days after the date of such notice. In the event notice of termination is given by the Depositors, the Depositors shall designate therein a successor depository, and the Depository shall follow the directions of the Depositors (in the manner set forth in Section 2.4 hereof) to deliver the Precious Metals to such successor depository at MCC's expense. In the event such notice is given by the Depository, the Depositors shall, on or before the termination date, deliver to the Depository a designation of a successor depository and instructions to deliver the Precious Metals to such successor depository.

Section 6.2 Upon the date set forth in any notice of termination given pursuant to Section 6.1 above, this Agreement shall terminate. On such date, the Depository shall deliver directly to the successor depository (or, if there is no successor depository, the Depositors) all of the Precious Metals held by it as Depository, and MCC shall pay Depository all fees, expenses and other amounts to which it is entitled pursuant to the terms of this Agreement.

Section 6.3 In the event that the Depository shall become incapable of performing as custodian pursuant hereto, or shall be dissolved, adjudged bankrupt or insolvent, or a trustee, receiver or conservator of the Depository or its property shall be appointed, or an application for any of the foregoing is filed, or if control of the Depository or its officers or directors be taken over by any governmental or other public authority or officer, then this Agreement shall automatically terminate and the Depository or any trustee, receiver or conservator shall deliver to the Depositors or a successor depository all of the Precious Metals held by the Depository pursuant hereto upon payment by MCC of all fees, expenses and other amounts as to which the Depository is entitled pursuant to the terms of this Agreement.

Section 6.4 A successor depository resulting from the provisions of Section 6.1, 6.2 or 6.3 shall be vested with all powers, duties and obligations of its predecessor under this Agreement and any amendments thereof, and shall succeed to all exemptions and privileges of its predecessor under this Agreement and any amendments thereof.

Section 6.5 The termination of this Agreement shall not affect the obligations of either party to the other party which arise or accrue prior to the date of termination hereof.

## Section 7 -- Designated Persons

Section 7.1 Depositors must provide a listing of individuals authorized to transact business involving materials held by Depository. This list shall be attached to this Agreement as Schedule I. Designated Persons' names must be typed or printed on the list, then signed by the individuals. Instructions must be included (e.g., multiple signatures required for withdrawals). The list must be signed by an officer of each Depositor. Changes to the list must be submitted to Depository immediately.

5

Section 7.2 The Depository shall be entitled to rely upon any notice or other instrument in writing received by the Depository from Designated Persons and reasonably believed by the Depository in good faith to be genuine.

Section 7.3 MCC will hold harmless and indemnify Depository for any transaction made by Depository upon the instructions (whether written or by email or facsimile transmission) of an individual not properly removed from the Designated Persons list. For the avoidance of doubt, Trustee shall bear no obligation of indemnification or related liability under this Agreement.

## Section 8 – Confidential

Section 8.1 Depositors agree that it will not divulge to third parties, without the written consent of Depository, any confidential information of Depository attained from or through same in connection with the performance of this Agreement.

Section 8.2 In all cases, Depository shall maintain a degree of confidentiality with respect to client records and transactions commensurate with exchange requirements and with the standards applicable to Depository's own confidential information.

Section 8.3 It is further agreed that a Depositor will not use the name of Delaware Depository Service Company LLC or any affiliate in its advertising or in its public relations with third parties without prior written consent of the Depository.

## Section 9 – Miscellaneous

Section 9.1 Any notice, demand or instruction authorized or required by, or given pursuant to, this Agreement shall be in writing (or by email or facsimile transmission) and deemed given if delivered to a party at its principal place of business set forth on Schedule III hereto.

Section 9.2 This Agreement may not be amended or modified in any manner except by a written agreement executed by all parties with the same formality as this Agreement.

Section 9.3 This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns; provided, however, that, except as provided herein, this Agreement shall not be assignable by any party without the written consent of the other parties.

Section 9.4 This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.

Section 9.5 If any term or provision of this Agreement should be declared invalid by a court of competent jurisdiction, the remaining terms and provisions of this Agreement shall be unimpaired.

Section 9.6 This Agreement, together with all the Schedules and Exhibits attached hereto, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes in all respect all prior proposals, negotiations, conversations, discussions, and agreements made between the parties concerning the subject matter hereof.

Section 9.6 Depository confirms that it has not received written notice from any third person (not a party hereto) that the Concord Account or Precious Metals held or to be held by Depository in the Concord Account is subject to an ownership or security interest or lien in favor of such person (except for the interest of loan obligors as described in paragraph (2) above) and Depository further agrees to promptly notify the Trustee and Depositor if any person shall give such notice, or shall attach, levy upon or otherwise attempt to encumber the Concord Account (if such notice is not prohibited by applicable law) and shall continue to hold all materials

6

in the Concord Account pursuant to the terms of this letter pending an order from a court of competent jurisdiction directing or permitting disposition thereof. Depository acknowledges that Depositor's rights (but not obligations) under the Agreement to the extent the same relate to the Concord Account or to Precious Metals held therein, including without limitation rights of audit and inspection under Section 3.1 of the Agreement, have been assigned by Depositor to CFC and CFC has concurrently granted a security interest therein to the Trustee, and Depository consents to such assignments.

7

IN WITNESS WHEREOF the Parties hereto have caused this Agreement to be executed as of the date first above written by their respective officers thereunto duly authorized.

**Monex Credit Company**
By: Metco Management Corporation,
General Partner

**Delaware Depository Service Company LLC**

By:_____
    Michael A. Carabini, President

By:_____
    Jonathan E. Potts, Managing Director

**Monex Deposit Company**
By: Comco Management Corporation,
General Partner

By:_____
    Louis E. Carabini, President

**The Bank of New York Mellon Trust Company, N.A.,
as successor to BNY Midwest Trust Company,**
as Trustee and Backup Servicer

By:_____
            ROBERT CASTLE
Title:____VICE PRESIDENT____

**Concord Funding Company, L.L.C.**
BY:Concord Manager Corporation
(f.k.a. Concord Management Corporation), its Member-Manager

By:_____

Title:_____

IN WITNESS WHEREOF the Parties hereto have caused this Agreement to be executed as of the date first above written by their respective officers thereunto duly authorized.

**Monex Credit Company**
By: Metco Management Corporation,
    General Partner

**Delaware Depository Service Company LLC**

By:_____
    Michael A. Carabini, President

By:_____
    Jonathan E. Potts, Managing Director

**Monex Deposit Company**
By: Comco Management Corporation,
    General Partner

By:_____
    Louis E. Carabini, President

**The Bank of New York Mellon Trust Company, N.A.,
as successor to BNY Midwest Trust Company,**
as Trustee and Backup Servicer

By:_____

Title:_____

**Concord Funding Company, L.L.C.**
BY:Concord Manager Corporation
(f.k.a. Concord Management Corporation), its Member-Manager

By:_____

Title:_____

IN WITNESS WHEREOF the Parties hereto have caused this Agreement to be executed as of the date first above written by their respective officers thereunto duly authorized.

**Monex Credit Company**
By: Metco Management Corporation,
General Partner

**Delaware Depository Service Company LLC**

By: _____

Michael A. Carabini, President

By: _____

Jonathan E. Potts, Managing Director

**Monex Deposit Company**
By: Comco Management Corporation,
General Partner

By: _____

Louis E. Carabini, President

**The Bank of New York Mellon Trust Company, N.A.,
as successor to BNY Midwest Trust Company,**
as Trustee and Backup Servicer

By: _____

Title: _____

**Concord Funding Company, L.L.C.**
BY:Concord Manager Corporation
(f.k.a. Concord Management Corporation), its Member-Manager

By: _____
MICHAEL A. CARABINI

Title: PRESIDENT

*Monex / Concord Funding,*

## DELAWARE DEPOSITORY SERVICE COMPANY

*Resource
2 Monex Signers
AND
1 Trustee Signer*

### Designated Persons Schedule – Schedule I

**Monex Credit Company and Monex Deposit Company, jointly and severally** ("Monex") Indemnifies and holds Delaware Depository Service Company, LLC ("Depository") harmless from any and all liabilities, damages, losses, expenses, claims demands, suits, fines, or judgments, including but not limited to, costs and attorney's fees any Depositor (as such term is defined in the Agreement) or Depository may incur as a result of Depository's compliance with the instructions of any person named herein as authorized to act on any Depositor's behalf. Depository is authorized to accept and honor, without limit as to amount and without further inquiry, the instructions outlined below, whether personally benefiting any of the Authorized Signers, or deposited to the personal account of such person(s), or any of them, or otherwise. The authority of the persons named herein shall continue until revoked in writing by all Depositors, but Depository shall be fully protected in acting on such authority and shall not be charged with any notice of the revocation of such authority or the removal of any such person(s) unless and until it shall have actually received an amendment to this notice setting forth such revocation or removal.

| **Monex Credit Company** | **Monex Deposit Company** |
|---|---|
| Signature _____ Date | Signature _____ Date |
| Name *MICHAEL A. CARABINI* Title | Name *LOUIS E. CARABINI* Title |
| *AS PRESIDENT OF THE GENERAL PARTNER, MOTCC* | *AS PRESIDENT OF THE GENERAL PARTNER, COMCO* |

*MANAGEMENT CORPORATION          MANAGEMENT CORPORATION*

**Authorized Signers:** The signatures of two (2) Authorized Signers designated below as "Monex Authorized Signers", AND the signature of one (1) Authorized Signer designated below as a "Trustee Authorized Signers" shall at all times and in each and every instance be required to direct Depository to deliver, transfer, trade, liquidate, pledge or segregate Precious Metals in Depositors' Account; to direct payments or transfer funds, to execute any necessary documents to accomplish any of these authorized acts; and to issue instructions to Depository by written or electronic means.

### MONEX AUTHORIZED SIGNERS:

| Name | Title | Signature |
|---|---|---|
| *MICHAEL A. C ARABINI* | AUTHORIZED SIGNATORY | |
| *LOUIS E. C ARABINI* | AUTHORIZED SIGNATORY | |
| *BRIAN D. JENKINS* | AUTHORIZED SIGNATORY | |
| *RON SMOLER* | AUTHORIZED SIGNATORY | |
| *RICHARD BROWN* | AUTHORIZED SIGNATORY | |

### TRUSTEE AUTHORIZED SIGNERS:

| Name | Title | Signature |
|---|---|---|
| | | |
| | | |

# DELAWARE DEPOSITORY SERVICE COMPANY

## Designated Persons Schedule -- Schedule I

Monex Credit Company and Monex Deposit Company, jointly and severally ("Monex") indemnifies and holds Delaware Depository Service Company, LLC ("Depository") harmless from any and all liabilities, damages, losses, expenses, claims demands, suits, fines, or judgments, including but not limited to, costs and attorney's fees any Depositor (as such term is defined in the Agreement) or Depository may incur as a result of Depository's compliance with the instructions of any person named herein as authorized to act on any Depositor's behalf. Depository is authorized to accept and honor, without limit as to amount and without further inquiry, the instructions outlined below, whether personally benefiting any of the Authorized Signers, or deposited to the personal account of such person(s), or any of them, or otherwise. The authority of the persons named herein shall continue until revoked in writing by all Depositors, but Depository shall be fully protected in acting on such authority and shall not be charged with any notice of the revocation of such authority or the removal of any such person(s) unless and until it shall have actually received an amendment to this notice setting forth such revocation or removal.

                                                                                      (SEAL)
          _____      _____
          Signature                           Date

          _____      _____
          Name                                Title

Authorized Signers: The signatures of two (2) Authorized Signers designated below as "Monex Authorized Signers", AND the signature of one (1) Authorized Signer designated below as a "Trustee Authorized Signers" shall at all times and in each and every instance be required to direct Depository to deliver, transfer, trade, liquidate, pledge or segregate Precious Metals in Depositors' Account; to direct payments or transfer funds, to execute any necessary documents to accomplish any of these authorized acts; and to issue instructions to Depository by written or electronic means.

**MONEX AUTHORIZED SIGNERS:**

| Name | Title | Signature |
|---|---|---|
| | | |

**TRUSTEE AUTHORIZED SIGNERS:**

| Name | Title | Signature |
|---|---|---|
| Eric Lindahl | Vice President | |
| Robert Castle | Vice President | |
| Sally Tokich | Senior Associate | |
| David H. Hill | Senior Associate | |
| John D. Ask | Senior Associate | |

# DELAWARE DEPOSITORY SERVICE COMPANY
## Fee Schedule – Schedule II

**Storage Fees:**
**Standard Products Account\*** – Standard Products include bullion coins and bars that are stored in bulk form without regard to year of mintage or condition.

**Bullion Products**
| | |
|---|---|
| **Gold / Platinum / Palladium:** | 20 Basis Points |
| **Silver:** | 20 Basis Points (Non-Fungible products e.g., 1,000-ounce bars) |
| | $0.04 per ounce per year (Fungible products) |

**Premium Products Account\*** – Premium Products include bullion products stored by year of mintage, proof attributes or other identifying marks or packaging.

**Bullion Coins**
| | |
|---|---|
| **Gold / Platinum / Palladium:** | 27 Basis Points |
| **Silver:** | $0.06 per ounce per year |

Percentages quoted as basis points above are an annual rate. However, storage charges are billed monthly. Bullion storage is calculated by multiplying the total dollar value of bullion in storage by the current rate; the product is then divided by twelve to yield the monthly fee. The total dollar value equals the number of ounces of each metal type multiplied by the applicable spot metal price on the last day of the billing period.

A $40.00 minimum monthly charge per account will apply in every instance.

\*Standard and Premium Products are processed and stored separately. Therefore, if Company chooses to store both Standard Products and Premium Products, two accounts will be established, and each will be maintained, reported and billed separately.

**In-Shipment Verification Fees:**
$15 per bag of 90% or 40% silver coinage for: Coin count verification.
$0.75 Per Item for: Premium Products other than American Eagle proof coins
$0.25 Per Item For: American Eagle proof coins

**Out-Shipment Processing Fees:**
**Pick-Up** -- Preparation and release of Precious Metals to Company's Agent:
$.10 per ounce for all Precious Metals other than the items listed below. (Please note that if bags or boxes are unsealed and detailed verification and handling is required to prepare their contents for release, the standard $.10 per ounce charge will apply.)

$10.00 Per Item For:
| | |
|---|---|
| 1) 1,000-ounce silver bars | 6) Sealed 90% silver bags |
| 2) 100-ounce gold bars | 7) Sealed 40% clad bags |
| 3) 400-ounce gold bars | 8) Mint sealed bullion coin and bar boxes |
| 4) 50-ounce platinum plates | 9) Non-fungible containers holding shot, sponge, powder, etc. |
| 5) 100-ounce palladium plates | |

$2.00 Per Item For: 100-ounce silver bars

A $19.50 minimum charge per out shipment will apply to any commercial carrier (e.g., Brink's, FedEx, etc.) pick-up.

A $25.00 minimum charge per out shipment will apply for any non-commercial (e.g., individual retail customer) pick-up. Company shall be liable to pay such fees as of the day it gives DDSC instructions to prepare Assets for delivery notwithstanding the fact that the delivery order may later be canceled by Company, if in fact DDSC has prepared such shipment for delivery. Shipments will be prepared in accordance with standard DDSC practices and packaging materials.

**Drop-Shipments** -- Preparation and delivery of Assets via U.S. Postal Service or Express Carrier.
$19.50 per package handling fee, plus all applicable postage, registration, and insurance charges. Shipments will be prepared in accordance with standard DDSC practices and packaging materials.

**Commodity Transfer Notice Preparation & Mailing Fees:**
$3.70 Per Notice For: Account reconciliation, notice processing and mailing. (MMC to provide printed notices and envelopes.)

1

# DELAWARE DEPOSITORY SERVICE COMPANY
## Notice – Schedule III

Any notice, demand or instruction authorized or required by, or given pursuant to Section 9 of this Agreement shall be in writing and be deemed given if sent by first class airmail or delivered to a party at its principal place of business set forth below.

If to Monex Credit Company:

> Monex Credit Company
> 4910 Birch Street
> Newport Beach, CA 92660
> Fax No.: (949) 955-1109
> Attention: Michael A. Carabini

If to Monex Deposit Company:

> Monex Deposit Company
> 4910 Birch Street
> Newport Beach, CA 92660
> Fax No.: (949) 955-1109
> Attention: Michael A. Carabini

If to The Bank of New York Mellon Trust Company, N.A. (successor to BNY Midwest Trust Company):

> The Bank of New York Mellon Trust Company, N.A.,
> as Trustee and Backup Servicer
> 2 North LaSalle Street, Suite 1020
> Chicago, Illinois 60602
> Fax No.: (312) 827-8562
> Attention: Structured Finance Group – Monex

If to Concord Funding Company:

> Concord Funding Company, L.L.C.
> 4900 Birch Street
> Newport Beach, CA 92660
> Fax No.: (949) 752-0607
> Attention: Brian Jenkins, Chief Financial Officer

If to Delaware Depository Service Company:

> Delaware Depository Service Company
> 3601 North Market Street
> Wilmington, DE 19802
> Fax No.: (302) 762-7570
> Attention: Jon Potts, Managing Director

1

# DELAWARE DEPOSITORY SERVICE COMPANY

## Sample Holdings Statement – Exhibit A

## HOLDINGS STATEMENT

Sample Company Inc.
123 Main Street
Anywhere, USA 12345

Account #: 99999

Page:  1 of 1
Report Date:  9/20/2004

## GOLD

| Product Code | Product Description | Ounce Conversion | Product Balance | Gross Troy Ounces |
|---|---|---|---|---|
| GB1 | Bullion Bar, .9999 – 1 oz. | 1.0000 | 256.000 | 256.000 |
| GB10 | Bullion Bar, .9999 – 10 oz. | 10.0000 | 42.000 | 420.000 |
| GB100 | Bullion Bar, .995 – 100 oz. | 1.0000 | 11,531.258 | 11,531.258 |
| GBKG | Bullion Bar, .9999 – 1 kg. | 32.1510 | 23.000 | 716.473 |
| GEA1 | American Eagle, Any Year – 1 oz. | 1.0000 | 12,967.000 | 12,967.000 |
| GEAH | American Eagle, Any Year – 1/2 oz. | 0.5000 | 492.000 | 246.000 |
| GEAQ | American Eagle, Any Year – 1/4 oz. | 0.2500 | 369.000 | 92.250 |
| GEAT | American Eagle, Any Year – 1/10 oz. | 0.1000 | 1,275.000 | 127.500 |
| GML1 | Canadian Maple Leaf, .9999 – 1 oz. | 1.0000 | 8,629.000 | 8,629.000 |
| | | | *GOLD TOTAL* | **34,985.481** |

## PALLADIUM

| Product Code | Product Description | Ounce Conversion | Product Balance | Gross Troy Ounces |
|---|---|---|---|---|
| PDB1 | Bullion Bar, .9995 – 1 oz. | 1.0000 | 51.000 | 51.000 |
| PDB10 | Bullion Bar, .9995 – 10 oz. | 10.0000 | 48.000 | 480.000 |
| PDB100 | Bullion Bar, .9995 – 100 oz. | 1.0000 | 109.550 | 109.550 |
| | | | *PALLADIUM TOTAL* | **640.550** |

## PLATINUM

| Product Code | Product Description | Ounce Conversion | Product Balance | Gross Troy Ounces |
|---|---|---|---|---|
| PLB1 | Bullion Bar, .9995 – 1 oz. | 1.0000 | 463.000 | 463.000 |
| PLB10 | Bullion Bar, .9995 – 10 oz. | 10.0000 | 154.000 | 1,540.000 |
| PLB50 | Bullion Bar, .9995 – 50 oz. | 1.0000 | 531.594 | 531.594 |
| PLEA1 | American Eagle, Any Year – 1 oz. | 1.0000 | 2,315.000 | 2,315.000 |
| | | | *PLATINUM TOTAL* | **4,849.594** |

## SILVER

| Product Code | Product Description | Ounce Conversion | Product Balance | Gross Troy Ounces |
|---|---|---|---|---|
| SB1 | Bullion Bar, .999 – 1 oz. | 1.0000 | 951.000 | 951.000 |
| SB100C | Bullion Bar, .999 – 100 oz. | 100.0000 | 3,698.000 | 369,800.000 |
| SEA1 | American Eagle, Any Year – 1 oz. | 1.0000 | 121,162.000 | 121,162.000 |
| SML1 | Canadian Maple Leaf – 1 oz. | 1.0000 | 18,600.000 | 18,600.000 |
| SB1000 | Bullion Bar, .999 – 1000 oz. | 1.0000 | 753,159.645 | 753,159.645 |
| | | | *SILVER TOTAL* | **1,263,672.645** |

END OF REPORT

1

# DELAWARE DEPOSITORY SERVICE COMPANY

## Sample Product Register – Exhibit A

### PRODUCT REGISTER

Sample Company Inc.  
123 Main Street  
Anywhere, USA 12345

Account #: 99999

Page: 1 of 1  
Report Date: 9/20/2004  
Report Period: 9/20/2004 to 9/20/2004

| Settlement Date | Quantity Received / Shipped | DDSC Reference | | Customer Reference |
|---|---|---|---|---|
| **GEA1** | **GOLD American Eagle, Any Year – 1 oz.** | | | |
| 9/20/2004 | 107.000 | 9234138 | LM | Transfer Reference – 95583 |
| 9/20/2004 | 23.000 | 9234172 | LM | Transfer Reference – 95588 |
| 9/20/2004 | -5.000 | 9234200 | SM | To John Doe # 711356486 s&h $35.06 |
| 9/20/2004 | -18.000 | 9234221 | SM | To L. Smith # 52963546 s&h $46.87 |
| 9/20/2004 | 15.000 | 9234244 | LM | Transfer Reference – 95605 |
| **SB1000** | **SILVER Bullion Bar -- 1000-oz.** | | | |
| 9/20/2004 | 25,162.391 | 9225887 | LM | Transfer Reference – 95590 |
| 9/20/2004 | -1,957.824 | 922589 | SM | Transfer Reference – 95591 |

END OF REPORT

9

# DELAWARE DEPOSITORY SERVICE COMPANY

## Designated Persons Schedule – Schedule I

**Monex Credit Company and Monex Deposit Company, jointly and severally ("Monex")** indemnifies and holds Delaware Depository Service Company, LLC ("Depository") harmless from any and all liabilities, damages, losses, expenses, claims demands, suits, fines, or judgments, including but not limited to costs and attorney's fees any Depositor (as such term is defined in the Agreement) or Depository may in̲███████ ̲lt of Depository's compliance with the instructions of any person named herein as authorized ███████ any Depositor's behalf. Depository is authorized to accept and honor, without limit as to amount an ███████ ther inquiry, the instructions outlined below, whether personally benefiting any of the Authoriz ███████ , or deposited to the personal account of such person(s), or any of them, or otherwise. The ███████ the persons named herein shall continue until revoked in writing by all Depositors, but Depository shall be fully protected in acting on such authority and shall not be charged with any notice of the revocation of such authority or the removal of any such person(s) unless and until it shall have actually received an amendment to this notice setting forth such revocation or removal.

| **Monex Credit Company** | **Monex Deposit Company** |
|---|---|
| Signature _____ Date | Signature _____ Date |
| Name MICHAEL A. CARABINE | Name LOUIS E. CARABIN Title |
| AS PRESIDENT OF THE | AS PRESIDENT OF THE |
| GENERAL PARTNER, MSICO | GENERAL PARTNER, COMCO |

MANAGEMENT CORPORATION        MANAGEMENT CORPORATION
**Authorized Signers:** The signatures of two (2) Authorized Signers designated below as "Monex Authorized Signers", AND the signature of one (1) Authorized Signer designated below as a "Trustee Authorized Signers" shall at all times and in each and every instance be required to direct Depository to deliver, transfer, trade, liquidate, pledge or segregate Precious Metals in Depositors' Account; to direct payments or transfer funds, to execute any necessary documents to accomplish any of these authorized acts; and to issue instructions to Depository by written or electronic means.

## MONEX AUTHORIZED SIGNERS:

| Name | Title | Signature |
|---|---|---|
| MICHAEL A. CARABINI | AUTHORIZED SIGNATORY | |
| LOUIS E. CARABINI | AUTHORIZED SIGNATORY | |
| BRIAN D. JENKINS | AUTHORIZED SIGNATORY | |
| RON SMOLER | AUTHORIZED SIGNATORY | |
| RICHARD BROWN | AUTHORIZED SIGNATORY | |

## TRUSTEE AUTHORIZED SIGNERS:

| Name | Title | Signature |
|---|---|---|
| | | |
| | | |

# EXHIBIT 44

## DEPOSITORY AGREEMENT

This Depository Agreement is entered into by and among FARMERS AND MERCHANTS BANK OF LONG BEACH, a California corporation (the "Bank"), MONEX DEPOSIT CORPORATION, a California corporation ("MDC"), and MONEX CREDIT CORPORATION, a California corporation ("MCC").

## RECITALS

MDC has developed a new program which involves the extension of credit to MDC customers by MCC against the security of gold and silver bullion and bulk coins and platinum (the "Precious Metals") sold to or otherwise owned by such customers and delivered into and held for the account of such customers by financial institutions such as the Bank.

MDC and MCC desire that the Bank act as a depository for such encumbered Precious Metals owned by MDC customers and the Bank desires to so act.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and of the mutual agreements and covenants herein set forth, the Bank, MDC and MCC agree as follows:

### 1.   SAFEKEEPING OF CUSTOMER COMMODITIES.

After the execution of this Depository Agreement, the Bank shall open an account under the name "Monex Customers' Commodities Account" (the "Customers' Account"). That account shall be maintained for the exclusive purpose of receiving and holding Precious Metals owned by MDC customers. The Bank acknowledges, however, that MCC will generally have security interests in all the Precious Metals in that account.

1.01   Deposits Into and Withdrawals From the Customers' Account. At the end of each Business Day (any day other than a Saturday, Sunday or holiday or other day in which the banks in Long Beach, California are not generally open for business), MDC shall deliver various Precious Metals to the Bank for deposit to the Customers' Account and/or instructions to transfer various Precious Metals from MDC's accounts with the Bank to the Customers' Account or from the Customers' Account to such other accounts with the Bank or to such other depositories as such instructions may specify. The Bank shall accept all such deliveries into the Customers' Account and make all transfers on its books and otherwise in accordance with MDC's instructions.

All such transfers into and from the Customers' Account to other accounts at the Bank shall be made on the Bank's books on the next Business Day following the Bank's receipt of MDC instructions to make such transfer. All deliveries to other depositories shall be made in accordance with MDC's instructions.

1.02 Statements of Ownership Interest. Concurrently with the delivery of the instructions specified in Paragraph 1.01 of this Agreement, MDC shall deliver to the Bank a report (the "Report") listing the names of the MDC customers who should be reflected as owning the commodities held in the Customers' Account, together with the amount and type of Precious Metals owned by each such customer, after the transfers specified in the accompanying instructions from MDC have been made. If the amount of any type of Precious Metal in the Customers' Account after the completion of all such transfers is or will be less than or 7reater than that specified in the Report, the Bank shall immediately give MDC and MCC telephonic notice of that fact, which notice shall specify the amount of the deficiency or excess for each specific type of Precious Metal. MDC may then deposit additional Precious Metals into the Customers' Account and provide supplemental instructions for transfer into and from the Customers' Account to correct such deficiency or excess. The Bank shall accept all such deliveries and make all such transfers as soon as possible after receipt of MDC's instructions therefor. The Bank's records shall be adjusted each Business Day to reflect the ownership interest in the Precious Metals in the Customers'

-3-

Account reflected in the Report given the Bank by MDC at the close of the preceding Business Day. The Bank hereby acknowledges (1) that MDC is the agent of each of its customers for purposes of directing the Bank as bailee for such customer to deliver Precious Metals held in the Customers' Account which are owned by the customer to MDC, MCC or any third party and (2) that the customers reflected in the Bank's records (as modified each Business Day pursuant to the Report given the Bank by MDC at the close of the preceding Business Day) as owning the Precious Metals in the Customers' Account are the owners of such Precious Metals as specified in such Bank records.

1.03 Statements to Customers. Within five (5) business days of each (i) delivery of Precious Metals into the Customers' Account for an MDC customer, (ii) delivery of Precious Metals by the Bank from the Customer' Account on behalf of an MDC customer, the Bank shall issue a confirmation to such customer in the appropriate form attached as Exhibit 1 to this Agreement indicating the receipt or delivery of such Precious Metals for such customer. Each such statement shall have printed or stamped upon its face in a prominent fashion the word "nonnegotiable". The Bank hereby acknowledges that the failure to print or stamp the word "nonnegotiable" on the front of each such statement may adversely affect the security interest of MCC in the Precious Metals held in the Customers' Account.

-4-

2.   MCC's SECURITY INTEREST.

2.01   Notice and Acknowledgment of Security Interest. MCC hereby notifies the Bank and the Bank hereby acknowledges receipt of notification that the Precious Metals held in the Customers' Account are generally subject to security interests in favor of MCC. MCC hereby notifies the Bank and the Bank hereby acknowledges further that MCC's security interests in such Precious Metals are generally being perfected not by filing of a financing statement with any governmental office but rather under the provisions of Sections 9304(3) and 9305 of the California Commercial Code by MCC's notification of the Bank as a bailee that it has security interests in those Precious Metals.

2.02   Covenants of Cooperation. The Bank hereby agrees not to release any Precious Metals held in the Customers' Account to an MDC customer without prior authorization from MCC or the Bank's giving at least 5 business days' prior written notice to MCC. The Bank shall notify MCC promptly of its receipt of notice of the imposition of any charge, lien, assessment, sale, encumbrance or other transfer, attachment, execution or other process against the Precious Metals or of its receipt of any notice from any other party that such other party has a security interest in any of the Precious Metals. The Bank further agrees that upon written notice from MCC of the default of an MDC customer of the payment of any obligation to MCC, the Bank shall permit MCC to

-5-

take possession and control of any of the Precious Metals owned by such customer and held in the Customers' Account for purposes of foreclosure thereon under MCC's security interest.

### 3. COMPENSATION OF THE BANK AND INSURANCE.

3.01 Confirmation Charges. The Bank will charge MDC $1.00 for each confirmation that it sends to MDC's customers for goods received into and released from the Customers' Account. MDC will produce and bear the costs of production of the confirmation statements and their transmittal envelopes. The Bank will provide and bear the costs of postage for the confirmation statements.

3.02 Service Fees. The Bank will charge MDC monthly service fees for commodities held for MDC's customers in the Customers' Account. The fees will be based on month-end positions and be determined as follows:

      a. Commodities physically stored at the Bank:

         Silver Bullion, Silver Coins, Clad Coins, Silver Eagles ......................$1.00 per unit

         Gold Bullion, Platinum, Gold Coin Lots.................$ .50 per unit

      b. Warehouse receipts held by the Bank for commodities stored at other depositories...................$ .25 per MDC unit

MDC will be responsible for the insurance costs of commodities held in the Customers' Account at the Bank and for any storage and service fees imposed on commodities held in the Customers' Account for the Bank in other depositories.

4.   LIMITATIONS.

4.01   Limitations on the Duties of the Bank.   In the performance of its duties and obligations and in the exercise of its rights and powers pursuant to this Depository Agreement, the Bank shall be liable only to the extent of its own negligent action, negligent failure to act or wilfull misconduct, subject to the provisions of paragraph 4.02 of this Agreement.

4.02   Reliance Upon Counsel.   The Bank may, at its own expense, consult with legal counsel and any written opinion of such legal counsel furnished to the Bank shall be full and complete protection in respect of any action taken or suffered or omitted by the Bank under this Depository Agreement in good faith and in accordance with such opinion of legal counsel.   The Bank shall provide MCC and MDC with copies of each such opinion promptly upon its receipt thereof.

4.03   Interpleader by Bank.   In the event that conflicting claims or demands are made upon the Bank with respect to the subject of this Depository Agreement, the Bank may initiate an interpleader action to resolve such claims or demands; and

-7-

upon delivering to the court, or to such person as the court may direct, any Precious Metals which are the subject of such dispute, the Bank shall be relieved of all further liability with respect to those claims or demands. Notwithstanding the above, no such action shall be initiated by the Bank until the Bank has given MCC five (5) business days advance written notice of its intent to initiate such an action in order to afford MCC the opportunity to resolve such conflicting claims or demands.

4.04  Resignation of the Bank.  Notwithstanding any other provision of this Depository Agreement, the Bank may at any time resign and be discharged from its duties and obligations under this Depository Agreement, by giving written notice of such resignation to MDC and MCC. Such resignation shall be effective ninety (90) days after receipt by MDC and MCC of the Bank's written notice of resignation or upon such later date or dates as may be specified in that notice. Upon receipt of the Bank's written notice of resignation, MDC will use its best efforts to have the commodities held in the Customers' Account transferred to another depository, or delivered to or liquidated by or on behalf of its customers.  If any commodities remain in the Customers' Account after expiration of the period provided in the Bank's written notice of resignation, MDC and MCC will assign all rights which they hold relative to those commodities to the Bank which are contained in the Purchase and Sale Agreements and the Loan and Security Agreements betweeen MDC, MCC and their customers.

-8-

5. INDEMNIFICATION OF BANK

MDC and MCC shall imdemnify, defend and hold harmless the Bank against and in respect of any and all claims, demands, expenses, liabilities and damages, including reasonable attorneys' fees, that the Bank shall incur or suffer as a result of the performance of its duties and obligations under this Depository Agreement or which are caused by any inaccuracy in any instructions, report or notice given to the Bank by MDC or MCC under this Depository Agreement. The Bank shall notify MDC and MCC promptly upon receipt of any claim, demand or notice of the commencement of any action for which the Bank seeks indemnity from MDC or MCC. MDC and MCC shall thereupon be entitled to assume the defense thereof with legal counsel of their choice approved by the Bank, which approval shall not be unreasonably withheld. Upon the assumption of such defense by MDC and MCC, MDC and MCC shall not be liable to the Bank hereunder for any legal or other expenses subsequently incurred by the Bank in connection with the defense against such claim, demand or action. Notwithstanding the above, neither MDC or MCC shall be liable to the Bank for any settlement of any claim, demand or action made without the consent of such party. The Bank shall not consent to the entry of any judgment nor shall it enter into any settlement which does not include as an unconditional term therof the giving by the claimant or plaintiff to the Bank of a release from all liability in respect to the underlying claim, demand or action.

-9-

6.    MISCELLANEOUS PROVISIONS.

       6.01  MDC and MCC Customer Agreements.  MDC and MCC
agree that the agreements that they enter into with their
customers which relate to commodities held by the Bank in the
Customers' Account shall always provide MDC and MCC the right to
demand and receive full payment on any loan made pursuant to such
agreements on five (5) days written notice.  MDC and MCC further
agree that such agreements will also always provide them the
right to sell immediately any collateral pledged against or
securing such loans if a customer has failed to meet the demand
for full payment within the specified time period.

       6.02  Waivers.  No failure on the part of any party
hereto to exercise, and no delay in exercising, any right, power,
or remedy hereunder shall operate as a waiver thereof; nor shall
any single or partial exercise of any right, power or remedy
hereunder preclude any other or further exercise therof or the
exercise of any other right, power or remedy.

       6.03  Assignment.  This Depository Agreement shall be
binding upon and inure to the benefit of the parties hereto and
their respective successors and assigns; provided, however, that
none of the parties hereto may voluntarily transfer all or any
part of its duties, obligations or rights under this Depository
Agreement without the prior written consent of the other parties

hereto. Any such attempt at assignment or other transfer without such prior written consent shall be void, and the consent by the parties hereto to one such transfer shall not be deemed a consent to any subsequent transfer.

6.04   Termination.   This Depository Agreement may be terminated by any party hereto by giving the other parties to the Agreement at least ninety (90) days prior written notice of such termination.

6.05   Governing Law.   This Depository Agreement is entered into in accordance with and shall be governed by the laws of the State of California; provided, however, that in the event that any law or laws of the State of California shall require or otherwise dictate that the laws of any other state or jurisdiction be applied in any proceeding, such California law or laws shall be superceeded by this paragraph and the remaining laws of the State of California shall nonetheless be applied in such proceeding.

6.06   Severability.   In the event any of the provisions or a portion of any provision of this Depository Agreement are held to be unenforceable or invalid by a court of competent jurisdiction, the validity and enforceability of the enforceable portion of any such provision and the remaining provisions shall not be adversely affected thereby.

6.07  Costs of Proceedings.  If any party to this
Depository Agreement initiates legal proceedings against any
other party, the prevailing party shall be reimbursed for its
costs and reasonable attorneys' fees incurred in connection with
such proceedings.


6.08  Notices. Any notice, request, demand or any other
communication required or permitted hereunder shall be deemed to
have been received by the party to whom addressed on the day it
is personally delivered, or seventy-two (72) hours after it is
deposited in the United States Mail, registered or certified
mail, postage prepaid, return receipt requested, or on the day it
is deposited with a public telegraph company for transmittal,
charges prepaid, addressed:


In the case of the Bank:

                         / OF LONG BEACH
          Farmers and Merchants Bank and Trust Company
          302 Pine Avenue
          Long Beach, California  90802
          Attention:  John Hinrichs, Vice President

or to such other persons or addresses as the Bank may from time
to time furnish to MDC and MCC.


In the case of MDC:


          Monex Deposit Corporation
          4910 Birch Street
          Newport Beach, California 92660
          Attention:  Kimbrough S. Bassett, President

or to such other persons or addresses as MDC may from time to time furnish to the Bank and MCC.

        In the case of MCC:

                Monex Credit Corporation
                4910 Birch Street
                Newport Beach, California 92660
                Attention: George R. Hall, President

or to such other persons or addresses as MCC may from time to time furnish to Bank and MDC.

        6.08 Execution in Counterparts. This Depository Agreement may be executed in separate counterparts, each of which will be an original but all of which will constitute one and the same instrument.

        EXECUTED on the dates and at the place set forth below.

Date: 9/6/85

                        /OF LONG BEACH
        FARMERS AND MERCHANTS BANK ~~AND TRUST~~
        ~~COMPANY~~
        the "Bank"

        By: _____
        Title: Sr. V.P
        City of Execution: Los Dealla California

Date: _____

        MONEX DEPOSIT CORPORATION,
        "MDC"

        By: _____
        Title: President
        City of Execution: California
                 Newport Beach

Date: _____

MONEX CREDIT CORPORATION,
"MCC"

By: _____
Title: _____
City of Execution: Newport, California
Beach

# EXHIBIT 45

## FARMERS & MERCHANTS BANK OF LONG BEACH
### Depository and Safekeeping Agreement

June 19, 2013
Date

Monex Deposit Company ("MDC")
Company Name

Monex Credit Company ("MCC")
Company Name

4910 Birch St.
Street Address

Newport Beach, CA 92660
City, State/Province, Postal Code

This represents the agreement ("Agreement") between Farmers & Merchants Bank of Long Beach ("Bank") and the above named companies (collectively, and jointly and severally, "Company") (together, "the Parties" and each a "Party"), with respect to the Bank's accepting, holding as custodian, reporting, transferring and delivering valuable assets of the Company and the Company's customers, including: a) bar, coin or other form of precious metals said to contain gold, silver, platinum, or palladium, b) encapsulated and clearly identified coins certified by an entity acceptable to Depository, c) negotiable and non-negotiable warehouse receipts for such precious metals, and d) other similar items ("Assets" ) by and at the direction of Company.  Pursuant to this Agreement, any bullion and coins held by Bank representing "inventory" of the Company shall be those of Company and not bullion or coins owned by Company's customers.

1. **AUTHENTICATED NOTICE / AUTHORIZED SIGNERS.**  For purposes of this Agreement, "Authenticated Notice" shall mean detailed instructions describing Company's requested transaction and directing Bank to affect the same, sent to Bank as either a tested e-mail message, or a facsimile signed by one or more Authorized Signers of Company. Exhibit A attached hereto lists Company's Authorized Signers.

2. **ACCOUNTS.**  All shipments of Assets delivered to Bank hereunder will be stored by Bank as custodian and shall be credited, in accordance with instructions of Company, to two accounts ("Accounts") established by and for Company (the "Company Account") and Company's customers (the "Customer Account").  Upon at least one (1) business day's prior Authenticated Notice, Bank will transfer Assets from one of these accounts to the other or to another designated account at Bank, or prepare Assets for delivery out of Bank's custody in accordance with Company's Authenticated Notice.  As used in this Agreement the term "business day" shall mean a day that is not a Saturday, a Sunday or a day which the  New York Mercantile Exchange is closed for regular trading business.

3. **DELIVERY TO DEPOSITORY.**  Regarding any reasonable size shipments of Assets, during such hours as may be mutually agreed upon and upon at least two (2) business days' prior Authenticated Notice,  Bank will receive shipments of Assets for the Company Account and/or the Customer Account.  Regarding any size shipment where arrangement for receipt within two (2) business days' is impractical or unreasonable, Bank reserves the right to require up to four (4) business days' prior Authenticated Notice for delivery.

4. **STORAGE OF ASSETS.**  Bank will store such shipments of Assets received by or for Company and/or Company's customers in facilities in the States of California or Delaware.  Company may choose to have coins and bars stored without regard to year of mintage or condition ("Standard Products").  The fees charged for the services rendered hereunder are outlined in Exhibit B.   Coins certified and encapsulated by a third party grading service will be stored, transferred and shipped according to the product description and grade of the coin, and not unique serial number or identifier.

5. **DELIVERY FROM DEPOSITORY.**  Regarding any reasonable size shipments, Bank agrees to use commercially reasonable efforts to prepare Assets for delivery out of Bank's safekeeping facilities within two (2) business days of receiving Company's Authenticated Notice.  Regarding any shipment where delivery within two (2) business days is impractical or unreasonable, Bank will use commercially reasonable efforts to prepare Assets for delivery within four (4) business days.  Notwithstanding the provisions of this paragraph, Company hereby recognizes that unusual depository activity may delay delivery of precious metals beyond four (4) business days and Bank shall not be liable for any damages arising from such delays.

Page 1 of 10

6. **SAFEKEEPING OF PRECIOUS METALS FOR COMPANY CUSTOMERS.** The Company has developed a program (the "Atlas Account") which involves the extension of credit by MCC to customers who wish to finance purchases of precious metals from MDC. In the Atlas Account, such extensions of credit are secured by gold,silver or platinum bullion or bulk coins or palladium bullion (collectively, the "Precious Metals") sold to or otherwise owned by such customers ("Customers") and the Precious Metals are delivered into and held for the account of the Customers by financial institutions such as the Bank.

The Company desires that the Bank act as a depository for such encumbered precious Metals owned by Customers and on the terms and conditions set forth herein, the Bank agrees to act as a depository. The Bank is currently acting as a depository for approximately 2009 Company Customers as of the date hereof and this Agreement shall supersede and replace all prior agreements related to those existing accounts and shall govern the relationship between the Bank and the Company related to those and new Company Customer accounts.

After the execution of this Agreement, the Bank shall open an account under the name "Monex Customers' Commodities Account" (the "Customer Account"). The Customer Account shall be maintained for the exclusive purpose of receiving and holding Precious Metals owned by Customers. The Bank acknowledges, however, that MCC will generally have security interests in all the Precious Metals in the Customer Account.

a. **Deposits Into and Withdrawals From the Customer Account.** At the end of each Business Day (a day that is not a Saturday, Sunday or holiday or other day on which Bank is not open for business), the Company shall deliver various Precious Metals to the Bank for deposit to the Customer Account or instructions to transfer various Precious Metals from the Company Account and/or other accounts with the Bank to the Customer Account or from the Customer Account to such other Company accounts with the Bank or to such other depositories as specified in the instructions. The Bank shall accept all such deliveries into the Customer Account and shall make all transfers on its books in accordance with the Company's instructions. All such transfers into and from the Customer Account to other Company accounts at the Bank shall be made on the Bank's books on the next Business Day following the Bank's receipt of the Company's instructions to make such transfer. All deliveries to other depositories shall be made in accordance with the Company's instruction.

b. **Statements of Ownership Interest.** Concurrently with the delivery of the instructions specified in Section 6.a of this Agreement, the Company shall deliver to the Bank a report (the "Report") listing the names of the Customers who should be reflected as owning the Precious Metals in the Customer Account, together with the amount and type of Precious Metals owned by each such Customer, after the transfers specified in the accompanying instructions from the Company have been made. If the amount of any type of Precious Metal in the Customer Account after the completion of all such transfers is or will be less than or greater than that specified in the Report, the Bank shall promptly give the Company telephonic notice of such fact, which notice shall specify the amount of the deficiency or excess for each specific type of Precious Metal. On receipt of such notice, the Company may then deposit any additional Precious Metals into the Customer Account and provide supplemental instructions to correct any such deficiency. The Bank shall accept all such deliveries and make all such transfers as soon as possible after receipt of the Company's instructions therefor.

The Bank's records shall be adjusted each Business Day to reflect the ownership interest in the Precious Metals in the Customer Account reflected in the Report given the Bank by the Company at the close of the preceding Business Day. The Bank acknowledges that: (1) the Company is the agent of each of its Customers for purposes of directing the Bank as bailee for such Customer to deliver Precious Metals held in the Customer Account which are owned by the Customer to the Company or any third party and (2) the Customers reflected in the Bank's records (as modified each Business Day pursuant to the Report given the Bank by the Company at the close of the preceding Business Day) as owning the Precious Metals in the Customer Account are the owners of such Precious Metals as specified in such Bank records. Each such statement shall have printed or stamped upon its face in a prominent fashion the word "non-negotiable." The Bank hereby acknowledges that the failure to print or stamp the word "non-negotiable" on the front of each such statement may adversely affect the security interest of MCC in the Precious Metals held in the Customer Account.

c. **Monex Credit Company's Security Interest.**

i. **Notice and Acknowledgment of Security Interest.** MCC hereby notifies the Bank and the Bank hereby acknowledges receipt of notification that the Precious Metals held in the Customer Account are generally subject to security interests in favor of MCC. MCC hereby notifies the Bank and the Bank hereby acknowledges further that MCC's security interests in such Precious Metals are generally being perfected not by filing of a financing statement with any governmental office, but rather under the provisions of the California Uniform Commercial Code by MCC's notification of the Bank as a bailee that it has security interests in those Precious Metals.

**ii. Covenants of Cooperation.** The Bank hereby agrees not to release any Precious Metals held in the Customer Account to a Customer without prior authorization from MCC or the Bank's giving at least 5 Business Days prior written notice to MCC. The Bank shall notify MCC promptly of its receipt of notice of the imposition of any charge, lien, assessment, sale, encumbrance or other transfer, attachment, execution or other process against the Precious Metals or of its receipt of any notice from any other party that such other party has a security interest in any of the Precious Metals. The Bank further agrees that upon written notice from MCC of the default of a Customer of the payment of any obligation to MCC, the Bank shall permit MCC to take possession and control of any of the Precious Metals owned by such Customer and held in the Customer Account for purposes of foreclosure thereon under MCC's security interest.

**d. Compensation of the Bank and Insurance.**

**i. Confirmation Charges.** The Bank will charge MDC $2.00 for each commodity title transfer notice (CTTN) that it sends to Customers for goods received into and released from the Customer Account. MDC will produce and bear the costs of production of the CTTNs and their transmittal envelopes. The Bank will provide and bear the costs of postage for the CTTNs.

**ii. Service Fees.** The Bank will charge MDC monthly service fees for the Precious Metals held for its Customers in the Customer Account. The fees will be based on month-end positions and be determined as set forth in Exhibit B.

**iii. Insurance.** MDC will reimburse the Bank promptly for the insurance costs incurred by the Bank for the Precious Metals held in the Customer Account at the Bank and for any storage and service fees imposed relating to Precious Metals held in the Customer Account for the Bank in other depositories.

**e. Limitations on the Duties of the Bank.** In the performance of its duties and obligations and in the exercise of its rights and powers pursuant to Section 6 of this Agreement, the Bank shall be liable only to the extent of its own gross negligence or willful misconduct.

**f. Resignation of the Bank.** Notwithstanding any other provision of this Agreement, the Bank may at any time resign and be discharged from its duties and obligations under this Paragraph 6 by giving written notice of such resignation to the Company. Such resignation shall be effective ninety (90) days after receipt by the Company of the Bank's written notice of resignation or upon such later date or dates as may be specified in such notice. Upon receipt of the Bank's written notice of resignation, the Company shall use its best efforts to have the commodities held in the Customer Account transferred to another depository, or delivered to or liquidated by or on behalf of its Customers. If any commodities remain in the Customer Account after expiration of the period provided in the Bank's written notice of resignation, the Company shall assign all rights and obligations it holds relative to such commodities to the Bank which are contained in the applicable purchase and sale agreements and the loan and security agreements between the Company and the applicable Customers.

**g. Indemnification of Bank.** MDC and MCC shall, jointly and severally, defend and hold harmless the Bank against all all claims, demands, expenses, liabilities, losses, and damages, including actual attorney fees and expert witness fees and legal costs that the Bank incurs as a result of its duties and obligations under this Paragraph 6 or which were caused by any inaccuracy in any instruction, report or notice given to the Bank by MDC or MCC or both of them, under this Paragraph 6. The Bank shall notify MDC and MCC promptly upon receipt of any claim, demand or notice of the commencement of any lawsuit or administrative action for which the Bank seeks indemnity and MDC and MCC shall thereupon pay for the defense thereof with legal counsel chosen by the Bank. The Bank shall not consent to entry of any judgment against it and shall not enter into any settlement which does not include as an unconditional term thereof the release of the Bank from all liability respecting the underlying claim, demand, or action.

**h. MDC and MCC Customer Agreements.** MDC and MCC agree that none of the agreements that they enter into with their Customers which relate to Precious Metals held by the Bank in the Customer Account shall be amended from their current forms as of the date hereof in any manner adverse to the interests of Bank.

7. **DISCLAIMER.** BANK SHALL NOT ASCERTAIN NOR BE RESPONSIBLE NOR LIABLE FOR THE AUTHENTICITY OR CORRECTNESS OF THE MARKINGS ON, OR THE WEIGHT, CONTENTS, FINENESS OR VALUE OF ASSETS, INCLUDING, BUT NOT LIMITED TO, ASSETS HELD OR PURPORTED TO BE HELD IN ANY CONTAINER SAID TO CONTAIN SUCH ASSETS, CURRENCY, OR ANY PROPERTY PLACED IN THE COMPANY'S OR THE CUSTOMERS' ACCOUNTS. BANK IS NOT RESPONSIBLE FOR THE CUSTODY OR REPORTING OF ANY ASSAY CERTIFICATES OR OTHER DOCUMENTS OR PACKAGING THAT MAY ACCOMPANY ASSETS.

Page 3 of 10

8. **FEES.** Exhibit B attached hereto sets forth Bank's current fees and charges for its services hereunder. Bank may change fees at any time and from time to time upon not less than thirty (30) days' notice to Company. Company and Customer Assets stored with Bank pursuant hereto, as well as any of the Company's accounts and the Customer Account with Bank, shall be free of any charge, lien or claim in favor of any person claiming through Bank but Company Assets and the Company Account shall be subject to the liens in favor of Bank as provided in Section 15 hereof. All fees and charges are due and payable to Bank within thirty (30) days of the date on Company's invoice. If Company is delinquent in payment of such bills, Bank will assess a monthly late fee of $25.00, or 1 1/2% of any amount past due, whichever is greater.

9. **INSURANCE.** Bank agrees to maintain in effect all-risk insurance on Assets stored for the Company and the Customers. Upon request from Company, Bank will provide a Certificate of Insurance evidencing insurance coverage for such Assets held in safekeeping by Bank.

10. **WARRANTY.** Company represents and warrants that this Agreement has been duly authorized, executed and delivered by the Company and constitutes a valid and binding agreement of the Company. The Company represents and warrants that its execution and delivery hereof and its performance hereunder complies and will comply with all applicable law. The Company acknowledges and agrees that Bank is entitled to rely on Company's Authenticated Notices concerning all Accounts including, but not limited to, deposits, transfers and deliveries of Assets as specified herein. Company warrants that all Authenticated Notices of the Company sent or to be sent to Bank, including but not limited to, those concerning the delivery, transfer or shipment of Assets are or will be fully authorized by the Company and its Customers(if applicable) and that Bank may conclusively rely on the same without independent investigation or verification. The Company hereby holds Bank harmless from, and indemnifies Bank against, any claims, damages or losses that may arise or that Bank may suffer as a result of Bank's reliance upon Authenticated Notices of the Company. Company warrants that all representations made to Bank pursuant to this Agreement are true and correct in all material respects.

11. **INDEMNIFICATION.** Company hereby agrees to indemnify and hold Bank, its officers, directors and employees free and harmless against all liabilities, damages, losses, expenses, claims, demands, suits, fines or judgments, including but not limited to costs and attorney fees, which may be suffered by, accrued against, charged to or recoverable from Bank, its officers, directors, or employees arising out of Company's acts or omissions under this Agreement or with respect to the Assets, except to the extent such damages or liability results solely from the gross negligence or intentional misconduct of Bank, its officers, directors, employees or agents.

12. **NO THIRD PARTY BENEFIT.** Except as specifically provided herein, this Agreement is entered into solely for the benefit of the parties and it is the intent of the parties that it shall not be the basis of any cause of action by any third party. Company agrees that it will not represent to anyone that it is in any way affiliated with or an agent of Bank. Company agrees, covenants, represents and warrants that any bullion and coins held by Bank representing "inventory" of the Company shall be those of Company and not bullion or coins owned by Company's Customers.

13. **INDEPENDENT CONTRACTOR.** It is understood and agreed upon that Bank's relationship with the Company is that of a collateral custodian and this Agreement shall not be construed to create a partnership, affiliate, joint venture, agency or employer-employee relationship between Company and Bank.

14. **UNINSURED SHIPMENT INDEMNIFICATION.** Company may request from time to time that Bank ship Company or Customer Assets in Bank's custody by certain uninsured carriers and the Parties acknowledge and understand that it is possible, in such instance, that neither Company, a Customer, nor Bank may be entitled to reimbursement from any insurance or other source, if any of such Assets become damaged in transit, do not reach the intended recipient to which Company has directed they be sent or if Company suffers a loss arising from an act or omission of such carrier. Company hereby releases Bank from any liability, loss, cost, expense, or damage, and agrees to promptly indemnify Bank and hold Bank harmless against any liability, loss, cost, expense or damage which Bank may incur as a result of, in connection with, or arising in any manner whatsoever from Bank shipping Assets by such uninsured carrier at Company's request.

15. **SET-OFF.** Company agrees that Bank shall have a right of set-off against all Company accounts with Bank or any Bank affiliate. Company agrees that Bank may, at its discretion hold as security or sell Assets in Company's accounts to pay off any amounts Company may owe Bank or any Bank affiliate. If Bank makes an off-set against any Company account, Company agrees to release and indemnify Bank and its affiliates from all liability for their actions.

16. **SECURITY AGREEMENT / WAREHOUSEMAN LIEN.** Bank, in addition to any rights it may have pursuant to any security documents or otherwise between Company and Bank, in its capacity as custodian hereunder, shall have all rights, including the rights to a warehouse lien in the Assets to the greatest extent provided by Article 7 of the Uniform Commercial Code. In addition, as security for the performance of all of Company's obligations hereunder, including but not limited to, the payment of all fees and expenses owed Bank hereunder and the payment of all indemnities

owed to Bank hereunder, whether now existing or hereafter incurred, Company does hereby grant Bank, in its capacity as custodian hereunder, a security interest in the Company Assets held hereunder, in the Company Account and in the customer accounts with the Company which are secured by Assets in the Customer Account. Upon default by Company, Bank shall have, in addition to all other rights and remedies conferred on Bank hereunder, the rights and remedies of a secured party under the Uniform Commercial Code. Company shall pay to Bank any and all fees and expenses, including reasonable attorney fees, incurred by Bank in connection with its enforcement of this Agreement. Company hereby authorizes Bank to file and financing statements required under the Uniform Commercial Code and to take such actions as may be required to perfect or continue the perfection of the security interest granted pursuant hereto.

17. **FORCE MAJEURE.** Bank shall not be liable for loss, damage or destruction of Assets or for non-performance or delays of service, damage, liability, or expense directly or indirectly caused by or contributed to by or arising from: (i) any chemical, biological, or electromagnetic weapon; (ii) the use or operation, by anyone not an employee or agent of the Bank or its affiliates, as a means for inflicting harm, of any computer, computer system, computer software, computer software program, malicious code, computer virus or process or any other electronic system; (iii) ionizing radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel; (iv) the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof; (v) any weapon or device employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter, or (vi) the radioactive, toxic, explosive or other hazardous or contaminating properties of any radioactive matter. The exclusion in this sub-clause (vi) does not extend to radioactive isotopes, other than nuclear fuel, when such isotopes are being prepared, carried, stored, or used for commercial, agricultural, medical, scientific or other similar peaceful purposes.

18. **CONFIDENTIALITY.** In connection with this agreement, Company or Bank may receive certain non-public information regarding the businesses and customers of each other along with analyses, compilations, studies or other documents or other records that contain or otherwise reflect or are generated from such non-public information (hereinafter "Information"). The Company and Bank hereby agree (a) to keep the Information confidential; (b) not to disclose the Information to third parties without the prior written consent of the other party, except to employees and agents that have a need to view the Information specifically and who are bound by the obligation of confidentiality; (c) not to use the Information in any way adverse to the interests of Company or Bank, and (d) to impose the requirements in this paragraph on any subcontractors, agents, affiliates and other third parties. Furthermore, Company and Bank agree to treat confidentially any and all discussions and meetings they may have with each other. The parties further agree that this obligation will remain effective after termination of this Agreement.

19. **ANTI-MONEY LAUNDERING PROGRAM.** If Company is subject to the USA PATRIOT Act, it certifies that it has a written anti-money laundering program of compliance and supervisory procedures that complies with the Interim Final Rule under the USA PATRIOT Act. Additionally, the anti-money laundering program has been adopted by the Company, and provides for staff training and periodic audits to test efficacy of the anti-money laundering program and its procedures. Company shall complete the certificate attached hereto as Exhibit C.

20. **PROPER BOOKS AND RECORDS.** Company certifies that it maintains proper books and records in accordance with generally accepted accounting rules of the United States.

21. **ACCOUNT DISCREPANCIES AND CUSTOMER COMPLAINTS.** Company agrees to cooperate fully with Bank to resolve any Company Account or Customer Account discrepancies, or questions or complaints Company 'may have regarding such accounts. Company agrees to notify Bank promptly of any complaints its customers make to Company about the Customer Account or Bank's services.

22. **GENERAL TERMS.** This Agreement constitutes the entire agreement between the Parties. This Agreement may be amended only by a writing signed by all Parties. This Agreement shall continue until terminated by ninety (90) days written notice of termination by either Party to the other. This Agreement shall be governed by the laws of the State of California, without regard to its conflict of laws principles. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that none of the parties hereto may voluntarily transfer all or any part of its duties, obligations or rights under this Agreement without the prior written consent of the other parties hereto. Any such attempt at assignment or other transfer without such prior written consent shall be void, and the consent by the parties hereto to one such transfer shall not be deemed a consent to any subsequent transfer. The invalidity or un-enforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement and this Agreement shall remain in full force and effect so long as the economic or other legal substance of the transactions or business relations contemplated herein are not materially adversely affected. Any void or unenforceable provision shall be deemed automatically replaced by such valid and enforceable provision which most closely reflects the original intentions of the Parties with respect thereto. No failure on the part of any party hereto to exercise, and no delay in exercising, any right, power, or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise or waiver

of any right, power or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

## 23. NOTICE.

a. Account Statements, Invoices and Notices sent by Bank to Company shall be sent to Company's address noted above to the attention of Brian D. Jenkins.

b. All notices sent by Company to Bank shall be sent as follows:

> Farmers & Merchants Bank of Long Beach
> Attn: John Hinrichs
> 302 Pine Ave.
> Long Beach, CA 90802

c. Any notice, request, demand or any other communication required or permitted hereunder shall be deemed to have been received by the party to whom addressed on the day it is personally delivered, or seventy-two (72) hours after it is deposited in the United States mail, registered or certified mail, postage prepaid, return receipt requested, or on the day it is deposited with a public telegraph company for transmittal, charges prepaid, addressed:

**24. JURISDICTION, VENUE AND WAIVER.** Company and Bank agree that any controversy or claim arising out of or relating to this agreement, or the breach thereof, shall be settled by arbitration in accordance with the Comprehensive Arbitration rules of JAMS, Inc. and that judgment on the award rendered by the arbitrator or arbitrators may be entered in any court having jurisdiction thereof. Parties agree that any arbitration initiated by either Party shall be initiated and held in Orange or Los Angeles County, California. If any party to this Agreement initiates legal proceedings against any other party, the prevailing party shall be reimbursed for its costs and reasonable attorneys' fees incurred in connection with such proceedings.

**25. CERTIFICATION.** Under penalties of perjury, Company certifies that:

a. The number shown on this agreement is its correct Taxpayer Identification Number (or that Company is waiting for a number to be issued to it), and

b. It is not subject to backup withholding either because it has not been notified by the Internal Revenue Service (IRS) that it is subject to backup withholding as a result of a failure to report all interest or dividends, or the IRS has notified it that it is no longer subject to backup withholding.

**26. COUNTERPARTS AND FACSIMILE SIGNATURES.** This Agreement may be executed in separate counterparts, each of which will be an original but all of which will constitute one and the same instrument. Facsimile and electronic signatures shall be treated as originals for all purposes.

Accepted and agreed to as of the date first above stated;

**Farmers & Merchants Bank of Long Beach**      **Monex Deposit Company, a California Limited Partnership "MDC"**

_[signature]_
Authorized Signature

By: Comco Management Corporation, a CA Corporation, as General Partner

_[signature]_

Thomas G. Sauchelli
Name & Title
Vice President

_[signature]_
Authorized Signature

LOUIS E. CARABINI
PRESIDENT OF MDC'S GENERAL PARTNER
Name & Title (Please Print)

Tax Identification Number

Page 6 of 10

Monex Credit Company, a California Limited Partnership "MCC"

By: Metco Management Corporation, a CA Corp as General Partner

Authorized Signature

MICHAEL A. CARABINI
PRESIDENT OF MCC'S GENERAL PARTNER
Name & Title (Please Print)

Tax Identification Number

Page 7 of 10

# EXHIBIT 46

## PRECIOUS METALS STORAGE AGREEMENT

**THIS AGREEMENT** effective as of July 31, 2014 (the "Agreement") by and between the Brink's Global Services International, Inc., and Monex Deposit Company, with an office at 4910 Birch Street, Newport Beach, CA 92660 (hereinafter referred to as "Customer") sets forth the terms and conditions with respect to vaulting provided by the Brink's Global Services company(ies) at the facility locations specified in <u>Appendix A</u> which is incorporated in this Agreement by reference (each location referred to as "Brink's" or a "Brink's Facility").

Brink's and Customer hereby agree as follows:

1. <u>General</u>. Brink's has established in the name of Customer in each Brink's Facility listed in Appendix A, as applicable (a) an allocated gold account for the purpose of maintaining physical custody of gold ("Gold") denominated in fine troy ounces or fine metric weight as appropriate, (b) an allocated silver account for the purpose of maintaining physical custody of silver ("Silver") denominated in troy ounces or metric weight as appropriate, and/or (c) an allocated platinum group metals account for the purpose of maintaining physical custody of platinum and/or palladium ("PGM") denominated in troy ounces or metric weight as appropriate, (hereinafter each account individually referred to as an "Account" and, collectively, the "Accounts"). (Gold, Silver and PGM are herein also referred to, individually and collectively, as "Metal"). As requested by Customer, Brink's may establish sub-Accounts of Metals in the Customer's name, which may be collectively referred to with Accounts, as Accounts. In the Accounts, (i) Gold will be accounted for in terms of fine troy ounces of Gold to three decimal places, (ii) PGM will be accounted for in terms of troy ounces of Platinum or Palladium, as the case may be, to three decimal places, and (iii) Silver will be accounted for in terms of troy ounces of Silver to two decimal places. In no event will any Account be held in any name or list any party other than Customer and Customer hereby agrees that it will not provide any sub-Account information, other than quantities, to Brink's.

2. <u>Brink's Liability</u>. Brink's agrees to assume the liability for loss, damage or destruction of the Metal stored in each Brink's Facility up to the maximum liability amount applicable to the respective Brink's Facility as set forth in Appendix A. Brink's liability shall commence when: (a) possession of the Metal is taken at a Brink's Facility, and (b) upon a Brink's employee or agent signing a receipt for the Metal, following a physical count of the number of bars, coins or other form of Metal by the Brink's Facility; and Brink's Liability shall terminate when the Metal has been delivered from the Brink's Facility to a carrier designated by Customer and the Brink's Facility gets a receipt therefor. For the sake of clarity, where the carrier designated to transport the Metal is Brink's or a Brink's affiliate, such transportation shall be under a separate transport agreement between Brink's or a Brink's affiliate and Customer, and liability for loss, damage or destruction of the Metal during transport shall be governed by the terms and conditions of such transport agreement. It is understood and agreed that Brink's maximum liability for any loss, damage or destruction of Metal is up to (but not exceeding) the applicable limit set forth in Appendix A for the respective Brink's Facility, notwithstanding anything to the contrary contained in any invoice, receipt or other document delivered or received by the Brink's Facility relating to the Metal handled by the Brink's Facility under this Agreement. The parties hereto expressly understand and agree that Brink's does not assume any liability as to the authenticity or assay characteristics of any Metal. It is further understood and agreed that the Brink's Facility's count of the Metal deposited in the Accounts shall be binding and conclusive.

3. <u>Deposits</u>. From time to time during the term of this Agreement, Customer may give written notice to the relevant Brink's Facility of its intention to deposit Metal into an Account. Such written notice shall:

1

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

(i) specify the amount of Metal (in the appropriate denomination) to be deposited into the Account;

(ii) specify the Business Day (as defined below) upon which Customer shall deliver the Metal to the relevant Brink's Facility (the "Delivery Date"); and

(iii) be accompanied by a bar list specifying, for each bar to be deposited, the bar number, the brand, the weight and the fineness and, in the case of a deposit of Gold the fine and gross troy ounce weight, and in the case of PGM and Silver the gross troy ounce weight. In the case of Metal to be deposited in other than bar form, such written notice shall specify the seal number, the brand, the fineness and the fine (as applicable) and/or gross weight, and in the case of coin, type and number of coins.

Such written notice must be received by the relevant Brink's Facility at least two (2) Business Days prior to the Delivery Date. "Business Day" means any Monday through Friday, excluding holidays observed by Brink's or Customer. On the Delivery Date, the Brink's Facility shall take possession of the Metal received as specified in Customer's notice, deliver to Customer a written receipt therefor, and, concurrently therewith, credit the applicable Account with such Metal.

4. Withdrawals. From time to time during the term of this Agreement, Customer may give written notice to the relevant Brink's Facility of its intention to withdraw Metal from an Account. Such written notice shall:

(i) specify the amount of Metal (in the appropriate denomination) to be withdrawn from the Account;

(ii) specify the Business Day on which Customer will take delivery of the Metal from the relevant Brink's Facility (the "Withdrawal Date");

(iii) be accompanied by a bar list specifying, for each bar to be withdrawn, the bar number, the brand, the weight and the fineness and, in the case of a withdrawal of Gold, the fine and gross troy ounce weight; and in the case of PGM or Silver the gross troy ounce weight. In the case of a withdrawal of Metal in other than bar form, such written notice shall specify the seal number, the brand, the fineness and the fine (as applicable) and/or gross weight, and in the case of coin, the type and number of coins, and

(iv) contain the name of Customer's carrier or representative, vehicle model and registration number or other requested details of Customer's carrier or representative authorized to take delivery of the Metal to be withdrawn from the Account.

Such written notice must be given to the relevant Brink's Facility at least two (2) Business Days prior to the Withdrawal Date. Upon the relevant Brink's Facility's receipt of such written notice, the Brink's Facility shall confirm such written withdrawal instructions by contacting one of the authorized persons appearing on Customer's authorized persons list (the "Authorized Persons"), as may be amended in writing from time to time. Customer shall be responsible to ensure that each Brink's Facility will be furnished with a list of Authorized Persons as of the effective date of this Agreement. On the Withdrawal Date, the relevant Brink's Facility will release such Metal to Customer's carrier or representative and receive a written receipt therefor.

2

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530735

5. <u>Ownership and Segregation</u>. All Metal held in the Account(s) shall remain the property of Customer at all times and Brink's shall cause such Metal to be specifically identified and physically segregated at all times from coin, bullion and metal in any form whatsoever, the title to which is vested in any other person or entity. Customer hereby warrants that it is either the owner or the authorized agent of the owner of the Metal. Customer further warrants that it is authorized to accept and is accepting the terms of this Agreement not only for itself but also as agent for or on behalf of all other parties who have or may hereafter have any interest in the Metal. Customer hereby agrees to release, indemnify and hold harmless Brink's against any and all liability Brink's may incur from any claims, disputes, suits, proceedings at law or in equity, loss, liabilities, costs, payments, injury, damage and expenses of any nature (including attorney's fees and court costs) brought by or on behalf of any third parties with ownership interests in any Metal stored at a Brink's Facility.

6. <u>Access to Vault for Inventory Purposes</u>. Upon two (2) Business Days' prior written notice by Customer to the relevant Brink's Facility, and in accordance with that Brink's Facility's vault procedures, the Brink's Facility shall allow Authorized Persons to have access to the Metal in the Accounts upon presentation of proper credentials and during normal business hours in order to inspect and take inventory of the same. The Brink's Facility shall co-operate with Customer in connection with such inspection and inventory. Customer shall indemnify and hold harmless Brink's from any liability, loss, damage, cost or expense, including reasonable attorney's fees, arising out of any bodily injury or death to any Authorized Person, or loss or destruction of or damage to the property, including Metal as a result of being on the Brink's Facility, or entering or leaving therefrom, except where Brink's is shown to be negligent. In order to provide the indemnity specified above, at all times during the term of this Agreement, Customer shall maintain at its sole cost and expense, and shall provide evidence of such to Brink's, insurance coverage of the types and in the amounts set forth herein (or the country equivalent where Metals are stored) with a company or companies satisfactory to Brink's:

(a) **Comprehensive General Liability Insurance** - For bodily injury and property damage, including blanket contractual liability, professional service liability and products and completed operations, in the amount of $2,000,000 combined single limit per occurrence. Said policy will contain a full and complete breach of warranty endorsement to the effect that the insurance coverage will not be invalidated as regards the interest of Brink's by any act, failure to act, omission, or neglect of Customer which is in violation of the terms and conditions of such insurance. This policy will cover, among other risks, the contractual liability assumed under the indemnification provisions set forth in this section.

(b) **Worker's Compensation Insurance** as required by applicable workers' compensation laws or other similar programs related to the jurisdiction involved.

(c) **Employer's Liability Insurance** in unlimited amounts where required by law and in all other jurisdictions an amount of $1,000,000 each accident for bodily injury by accident; $1,000,000 policy limit for bodily injury by disease and $1,000,000 each employee for bodily injury by disease.

(d) **Crime and Fidelity Insurance** – All employees of Customer must be fully bonded, either by a 3D bond or Crime or Fidelity insurance policy in the amount of $1,000,000 per occurrence.

The foregoing insurance policy or policies shall be written by a reputable insurance company or companies authorized or licensed to transact business in the jurisdiction where this Agreement shall be performed. Customer shall notify Brink's in writing of any material modification, alteration, non-renewal

3

or cancellation of such policy or policies at least thirty (30) days prior thereto. Customer shall furnish Brink's with a certificate or certificates of insurance prior to the commencement of this Agreement.

7. Fees and Charges.

a. For the services contemplated under this Agreement, Customer agrees to pay Brink's such service charges and fees as agreed to between the parties as set forth in Appendix B, which is incorporated in this Agreement by reference, plus all applicable taxes that Brink's is required to collect in connection with the services. All charges are exclusive of VAT.

b. An annual review of the service charges and fees set forth in Appendix B will take place on each one year anniversary of the effective date of this Agreement, however, at any time, upon written notice, Brink's may increase service charges and fees in the event of a change in economic conditions beyond Brink's control that increases operating costs incurred by a Brink's Facility.

c. Should Customer default in the full and timely payment of any amounts due and owing under this Agreement or otherwise default in the performance of any of its obligations hereunder, then Customer shall also be responsible for interest and all costs and expenses incurred by Brink's in the collection of such amounts owed to Brink's, including, without limitation, reasonable attorney's fees incurred in such collection ("Unpaid Obligations"). In addition to any and all other rights and remedies provided in this Agreement and under applicable law and unless otherwise provided herein, Customer hereby agrees that Brink's shall be permitted to retain as a credit and to offset against such Unpaid Obligations, on a dollar for dollar basis, any Precious Metals which Brink's has in its possession under this Agreement.

8. Account Statements. At the close of business of each Withdrawal Date or Delivery Date with respect to an Account, each Brink's Facility will send to Customer a facsimile or electronic mail (e-mail) confirmation of the deposit or withdrawal of Metal to or from the Account on such date, together with a statement of the balance in such Account as of the close of business on such Business Day.

9. Insurance. Brink's is not an insurer. Brink's will, at its own expense, maintain insurance policies, which policies shall insure Brink's against such risks assumed by Brink's as described in Clause 1 hereof, subject always to the provisions and exclusions contained in this Agreement. Brink's will furnish Customer with a certificate evidencing such insurance, upon request.

10. Notice of Claims. Customer shall give written notice to Brink's within one (1) Business Day after Customer discovers any loss, damage or destruction of Metal in an Account, but in no event more than thirty (30) days after delivery by Brink's to Customer of a statement of the balance in Customer's Account in which a discrepancy first appears. Unless such notice is given as herein stated all claims shall be deemed waived. No action, suit or other proceeding to recover for any loss shall be brought against Brink's unless notice shall have been given as stated herein and unless such action, suit or proceeding shall have been commenced within twelve (12) months from the time a claim is made pursuant to this paragraph.

11. Loss Reimbursement. In the event of loss, damage or destruction of Customer's Metal held in an Account at a Brink's Facility, the parties shall promptly and diligently assist each other to establish the identity of the Metal lost, damaged or destroyed and shall take all such other reasonable steps as may be necessary to assure the maximum amount of salvage at a minimum cost. Affirmative written proof of the Metal lost, damaged or destroyed, subscribed and sworn to by Customer and substantiated by the books, records and accounts of Customer shall be furnished to Brink's. Brink's shall, after receipt from Customer of a proof of loss, and subject to the terms and conditions of this

4

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530737

Agreement, make payment to Customer of the Market Value (as hereinafter defined) of the Metal in the Account which is the subject of such loss, damage or destruction, provided, however, that in the event Customer takes any salvage that is recovered, the value of such salvage shall be deducted from any payment that is required to be made by Brink's under this section. If Customer does not take any salvage that is recovered, such salvage shall become the property of Brink's and/or its insurers and the value thereof shall not be deducted from any payment required to be made by Brink's. Market Value for this purpose shall be the Market Value, expressed in US Dollars, on the date of such loss, damage or destruction, if such date is undisputed by the parties, otherwise, the Business Day following Customer's notification to the Brink's Facility of such loss, damage or destruction of Metal (the "Valuation Date"), times the declared number of fine troy ounces of Gold and troy ounces of PGM and Silver, as the case may be. The Market Value will be determined for Gold and Silver by reference to the spot price for gold and silver, as the case may be, as quoted by the London Bullion Market Association on the Valuation Date, and for PGM by reference to the spot price for platinum and palladium, as the case may be, as quoted by the London Platinum and Palladium Market Association on the Valuation Date. Upon payment of a claim by Brink's, Customer hereby agrees to and does hereby assign to Brink's all of its right, title and interest in the property rights of recovery against third parties that are the subject of a claim and to execute any documents necessary to perfect such assignment upon request by Brink's or Brink's insurers.

12. <u>Limitation of Liability; Non-Hazardous Material; Force Majeure.</u>

    a.  Brink's shall not be liable for loss, damage or destruction of Metal or for non-performance or delays of service caused by or resulting from: (i) war, civil war, revolution, rebellion, insurrection, or civil strife therefrom, or any hostile act by or against a belligerent power; (ii) capture, seizure, arrest, restraint or detainment (piracy excepted), and the consequences thereof or any attempt thereat; (iii) derelict mines, torpedoes, bombs or other derelict weapons of war.

    b.  Notwithstanding anything in this Agreement to the contrary, in no case shall Brink's be liable for loss, damage or destruction of Metal or for non-performance or delays of service, damage, liability, or expense directly or indirectly caused by or contributed to by or arising from: (i) any chemical, biological, or electromagnetic weapon; (ii) the use or operation, as a means for inflicting harm, of any computer, computer system, computer software, computer software programme, malicious code, computer virus or process or any other electronic system; (iii) ionising radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel; (iv) the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof; (v) any weapon or device employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter, or (vi) the radioactive, toxic, explosive or other hazardous or contaminating properties of any radioactive matter. The exclusion in this sub-clause (vi) does not extend to radioactive isotopes, other than nuclear fuel, when such isotopes are being prepared, carried, stored, or used for commercial, agricultural, medical, scientific or other similar peaceful purposes.

    c.  Brink's shall not be liable for loss, damage or destruction of Metal or for non-performance or delays of service, liability, cost or expense directly or indirectly caused by, resulting from or in connection with any act of terrorism or any action taken in controlling, preventing, suppressing or in any way relating to any act of terrorism. An act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organization(s) or government(s), committed for political, religious, ideological or similar purposes including the

5

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

intention to influence any government and/or to put the public, or any section of the public, in fear.

d.  Customer represents and warrants that no shipment or container tendered to the Brink's Facility is or can be classified as hazardous material(s), substance(s) or waste(s) (hereinafter referred to as "hazardous materials") as such terms are or may be defined, described or listed in any applicable laws, or pursuant to any applicable governmental agency, instrumentality or department regulations(s) or executive order(s) issued or enacted by any governmental entity in connection with environmental protection, health or safety.  In the event the aforesaid representation and warranty is breached by Customer, knowingly or otherwise, Customer agrees to save, defend and hold Brink's and the Brink's Facility harmless and indemnify Brink's and the Brink's Facility from and against any claims, fines, penalties, damages, costs and attorneys' fees which may be incurred by reason of this breach.

e.  Brink's shall not be liable for non-performance or delays of service caused by strikes, lockouts or other labour disturbances, riots, authority of law, acts of God or means beyond the control of Brink's or the Brink's Facility, but, subject to the conditions, limitations and exclusions set forth in this Agreement, Brink's shall be liable for the loss, damage or destruction of any Metal received into its possession at any time not to exceed the maximum amount stated in this Agreement.  Where the Brink's Facility's ability to perform its service obligations as detailed in this Agreement is compromised by labour disturbances, commercially reasonable efforts will be made by Brink's to work with Customer to maintain the services.

f.  The liability of Brink's shall not, under any circumstances, include special, incidental, consequential, indirect or punitive losses or damages, or interest, whether or not caused by the fault or neglect of Brink's and whether or not Brink's had knowledge that such losses or damages might be incurred.

g.  Nothing in this Agreement limits or excludes Brink's liability, if any, (1) for personal injury or death resulting from Brink's negligence; (2) for any matter for which it would be illegal for Brink's to exclude or attempt to exclude its liability; or (3) for fraud on the part of Brink's.

13.  <u>Inability to Perform.</u>  In the event that (i) either Brink's or Customer fails to perform any material obligation pursuant to the terms of this Agreement and does not cure such failure within thirty (30) days after the receipt of written notice thereof from the other party, (ii) either Brink's or Customer shall be dissolved or adjudged bankrupt, or a trustee, receiver or conservator of such party or its property shall be appointed, or an application for any of the foregoing is filed, (iii) control of either Brink's or Customer is taken over by any government or other public authority, or (iv) any government or governmental agency shall have taken any action which has materially adversely affected or will materially adversely affect a party's ability to perform any of its obligations hereunder, and such action shall not have been rescinded or modified, and the adverse effects thereof shall not have been eliminated, within thirty (30) days after written notice of such action shall have been given to the other party, then this Agreement may be terminated at any time thereafter by Brink's or Customer upon written notice to the other party.  In such event, Brink's shall promptly arrange for the delivery of all Metal held for Customer in accordance with Customer's instructions.

14.  <u>Notices</u>.  Unless otherwise specifically provided, all notices and other communications to a party hereunder shall be in writing (including tested telex, facsimile, e-mail or similar writing) and shall be given by an authorized representative of the party giving such notice (as specified by such party to the other) if to Brink's, to:

6

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530739

Brink's Global Services USA, Inc.
580 Fifth Avenue, Suite 400
New York, NY, 10036

Attention:   Ben Van Kerkwijk
             Vice President - Commodities
             Tel: 212 704 5267

With a copy to:

Brink's Global Services International, Inc.
1801 Bayberry Court
Richmond, VA 23226
Attn: Legal Department

and, if to Customer, to

Monex Deposit Company
Inventory Department
4910 Birch Street
Newport Beach, CA 92660

Attention:  Anne Morgan

Telephone: 949 752 1400
Facsimile:  949 250 0553

15. <u>Investment Advice</u>.  It is understood and agreed that, as part of the establishment of the Accounts, Brink's has not undertaken a duty to supervise Customer's investment in, or to make any recommendation to Customer with respect to, the purchase, sale or other disposition of, any Metal or the balances maintained in the Accounts.

16. <u>Authority</u>.  Upon execution of this Agreement, Customer and Brink's each represent to the other that they have full right, power and authority to execute, deliver and perform this Agreement, have taken all necessary corporate action to execute, deliver and perform this Agreement, and that this Agreement has been duly executed by their respective authorized officer, and that this Agreement constitutes its legal, valid and binding obligations.

17. <u>Entire Agreement/Amendments</u>.  This Agreement and the appendices that are incorporated herein by reference, each as may be amended from time to time, constitute the entire agreement between Customer and Brink's with respect to the subject matter hereof and supersede and cancel any and all prior and/or contemporaneous offers, negotiations, promises, exceptions and understandings, whether oral or written, express or implied between the parties.  This Agreement may not be waived, altered or amended except by an instrument in writing duly executed by Brink's and Customer.

18. <u>Assignment</u>.  This Agreement shall be binding on Customer and Brink's and their respective successors and assigns.  Neither Customer nor Brink's may assign or transfer its rights or obligations hereunder without the prior written consent of the other.

7

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

19. <u>Term and Termination</u>. This Agreement shall commence on the date first above written and shall continue until cancelled, by either party, on ninety (90) days' written notice. Upon such termination, Brink's shall deliver all Metal then credited to the Accounts to Customer's designated carrier(s).

20. <u>Governing Law</u>. Except as otherwise set forth herein, this Agreement and all transactions hereunder shall be governed by and construed in accordance with the laws of England and Wales and any dispute arising out of or in connection with this Agreement shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce. The place of arbitration shall be the United Kingdom. The arbitration shall be conducted in English and a single arbitrator experienced in the commercial storage of precious metals shall be chosen by the International Chamber of Commerce Court of International Arbitration. For services performed under this Agreement within the United States, any such claim or dispute, whether based in contract, tort or otherwise, Section 12.g. shall have no force or effect hereunder, and such claim or dispute shall be governed by the laws of the State of New York, without regard to conflict of laws principles, and Customer and Brink's further agree that any such claim or dispute shall be adjudicated exclusively in the United States District Court for the Southern District of New York or the Supreme Court of the State of New York, New York County. The parties expressly and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York and the Supreme Court of the State of New York, New York County for the purposes of the adjudication of any such claim or dispute.

21. <u>Confidentiality</u>. All information regarding the Accounts, including but not limited to, (i) kind, type, quantity, form and size of Metal in the Accounts at any time, (ii) customers of Customer to whom Metal is released, delivered or transferred, and (iii) shipments of Metal either into or out of the Accounts, is considered confidential. Brink's shall keep such information confidential and not use such information, either for its own benefit or for the benefit of any third party or to disclose, except (i) as required by law, (ii) as otherwise agreed in writing by Customer and Brink's, and (iii) that Brink's may use such information where subpoenaed by governmental authority or in litigation; provided, however, that Brink's shall promptly notify Customer of the circumstances requiring such disclosure (unless such notice is prohibited by order, subpoena or by law). Brink's and Customer may have access to certain information identified by the other party as confidential in connection with performing their duties and obligations under this Agreement ("Confidential Information"). Brink's and Customer (alternatively, as applicable, the "disclosing party" and the "receiving party") agree to treat such information as confidential and shall not use or disclose Confidential Information other than in the performance of this Agreement. Notwithstanding the foregoing, the parties may disclose Confidential Information pursuant to the requirement of a governmental agency or pursuant to the requirements(s) by operation of law or court order. Confidential Information shall not include information which: (i) is in the public domain at the time of disclosure or later enters the public domain through no fault of the receiving party; (ii) is received by the receiving party from a third party independent of the disclosing party without restriction; (iii) is presently known to the receiving party or is acquired or developed by the receiving party independent of the disclosures made by the disclosing party pursuant to this Agreement; or (iv) is disclosed with the written consent of the disclosing party. This Agreement is intended to be confidential and none of its terms shall be disclosed by Brink's or Customer to any third party without the written consent of both parties, except as required by law.

22. <u>Use of a Party's Name</u>. Neither party shall use the other party's trade name, likeness, trademarks or logo, without the other party's prior written consent, which includes but is not limited to any reference to the other party on websites or marketing materials.

8

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530741

This agreement supercedes and replaces the Precious Metals Storage Agreement between Brink's U.S. and Monex Deposit Company dated November 25, 2002 and all attachments and amendments thereto.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered by its duly authorized officers as of the date first written above.

"CUSTOMER":                                   "BRINK'S":

Monex Deposit Company                         Brink's Global Services International, Inc.

By: _____                   By: _____
        (Customer Signature)                          Authorized Representative

Name: Brian D. Jenkins                        Name: DOMINIK BOSSART

Title: Executive Director                     Title: SVP AMERICAS

9

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530742

**Appendix A** to the Precious Metal Storage Agreement effective as of July 31, 2014 by and between Brink's Global Services International, Inc. and Monex Deposit Company.

**Brink's Facilities Performing Services Under the Agreement**

| Brink's Facility Location | Maximum Liability Per Brink's Facility On Any One Day |
|---|---|
| 184-45 147th Avenue<br>Springfield Gardens, NY 11413 | US$10,000,000.00 |
| 580 5th Avenue, Suite 400<br>New York, NY 10036 | US$10,000,000.00 |
| 1120 W Venice Blvd<br>Los Angeles, CA, 90015 | US$10,000,000.00 |
| 2179 S 300 W, Suite #4<br>Salt Lake City, UT, 84115 | US$10,000,000.00 |
| 2530 Century Lake Drive<br>Irving, TX 75062 | US$10,000,000.00 |
| Brink's Singapore Pte Ltd<br>1 Kaki Bukit Road 1<br>#02-23 Enterprise One<br>Singapore 415934 | US$10,000,000.00 |
| Brink's Singapore Pte Ltd<br>(Singapore Freeport)<br>32 Changi North Crescent<br>The Singapore Freeport<br>Singapore 499643 | US$10,000,000.00 |

10

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530743

**Appendix B** to the Precious Metal Storage Agreement effective as of July 31, 2014 by and between Brink's Global Services International, Inc. and Monex Deposit Company.

**Fees and Charges Effective as of** July 31, 2014:

a) Storage Charges:

Gold, Platinum, Palladium – Valuation Charge:     0.20% per year
(Daily Fee Calculation – Average Daily Metal Holdings x Daily Spot Price x Storage Rate / 365 days)

Silver – Volume Charge:                 $0.04 per Oz per year
(Daily Fee Calculation – Average Daily Metal Holdings x Storage Rate / 365 days)

b) Handling Charges:

| | |
|---|---|
| Incoming Handling Charge Per Package: | $15 per package |
| Incoming Handling Charge Per Pallet: | $20 per pallet |
| Outgoing Handling Charge Per Package: | $25 per package |
| Outgoing Handling Charge Per Pallet: | $30 per pallet |

If any incoming/outgoing shipment has multiple packages/pallets the Handling Charges will be applied to each package/pallet.

All local taxes on storage services in individual states (if/when applicable) shall be passed on to Customer in addition to charges outlined above.

Terms of payment shall be 30 days from receipt of Invoice.

* All transportation charges and services are not covered within this agreement.

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530744

# EXHIBIT 47

## PRECIOUS METALS STORAGE AGREEMENT

**THIS AGREEMENT** effective as of February 16, 2015 (the "Agreement") by and between Brink's Global Services International, Inc. ("Brink's"), Monex Deposit Company ("MDC") and Monex Credit Company ("MCC") (MCC and MDC each a "Depositor" and collectively, the "Depositors") sets forth the terms and conditions with respect to vaulting provided by Brink's Global Services company(ies) at the facility locations specified in Appendix A, which is incorporated in this Agreement by reference (each location referred to as "Brink's" or a "Brink's Facility"). This Agreement shall supersede and replace the prior Precious Metals Storage Agreement between MDC and Brink's, dated July 31, 2014, (the "Prior Agreement") and shall govern the relationship between Brink's and MCC related to the account(s) subject to the Prior Agreement as well as to all new accounts opened by Depositors with Brink's pursuant hereto.

Brink's and Depositors hereby agree as follows:

1. General. Brink's has established for the account and benefit of Depositors in each Brink's Facility listed in Appendix A, as applicable, (a) an allocated gold account for the purpose of maintaining physical custody of gold ("Gold") denominated in fine troy ounces or fine metric weight as appropriate, (b) an allocated silver account for the purpose of maintaining physical custody of silver ("Silver") denominated in troy ounces or metric weight as appropriate, and/or (c) an allocated platinum group metals account for the purpose of maintaining physical custody of platinum and/or palladium ("PGM") denominated in troy ounces or metric weight as appropriate, (hereinafter each account individually referred to as an "Account" and, collectively, the " Accounts"). (Gold, Silver and PGM are herein also referred to, individually and collectively, as "Metal"). As requested by Depositors, Brink's may establish sub-Accounts of Metals in the Accounts, which may be collectively referred to with Accounts, as Accounts. In the Accounts, (i) Gold will be accounted for in terms of fine troy ounces of Gold to three decimal places, (ii) PGM will be accounted for in terms of troy ounces of Platinum or Palladium, as the case may be, to three decimal places, and (iii) Silver will be accounted for in terms of troy ounces of Silver to two decimal places. In no event will any Account be held in any name other than Monex Deposit Company and/or Monex Credit Company.

2. Brink's Liability. Brink's agrees to assume the liability for loss, damage or destruction of the Metal stored in each Brink's Facility up to the maximum liability amount applicable to the respective Brink's Facility as set forth in Appendix A. Brink's liability shall commence when: (a) possession of the Metal is taken at a Brink's Facility, and (b) upon a Brink's employee or agent signing a receipt for the Metal, following a physical count of the number of bars, coins or other form of Metal by the Brink's Facility; and Brink's Liability shall terminate when the Metal has been delivered from the Brink's Facility to a carrier designated by a Depositor and the Brink's Facility gets a receipt therefor. For the sake of clarity, where the carrier designated to transport the Metal is Brink's or a Brink's affiliate, such transportation shall be under a separate transport agreement between Brink's or a Brink's affiliate and Depositors and liability for loss, damage or destruction of the Metal during transport shall be governed by the terms and conditions of such transport agreement. It is understood and agreed that Brink's maximum liability for any loss, damage or destruction of Metal is up to (but not exceeding) the applicable limit set forth in Appendix A for the respective Brink's Facility, notwithstanding anything to the contrary contained in any invoice, receipt or other document delivered or received by the Brink's Facility relating to the Metal handled by the Brink's Facility under this Agreement. The Depositors expressly understand and agree that Brink's does not assume any liability as to the authenticity or assay characteristics of any Metal. It is further understood and agreed that the Brink's Facility's count of the Metal deposited in the Accounts shall be binding and conclusive.

-1-

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

3.  <u>Deposits</u>. From time to time during the term of this Agreement, a Depositor may give written notice to the relevant Brink's Facility of its intention to deposit Metal into an Account.  Such written notice shall:

> (i)  specify the amount of Metal (in the appropriate denomination) to be deposited into the Account;

> (ii)  specify the Business Day (as defined below) upon which Servicer shall deliver the Metal to the relevant Brink's Facility (the "Delivery Date");

> (iii)  be accompanied by a bar list specifying, for each bar to be deposited, the bar number, the brand, the weight and the fineness and, in the case of a deposit of Gold the fine and gross troy ounce weight, and in the case of PGM and Silver the gross troy ounce weight.  In the case of Metal to be deposited in other than bar form, such written notice shall specify the seal number, the brand, the fineness and the fine (as applicable) and/or gross weight, and in the case of coin, type and number of coins; and

> (iv)  be accompanied by a Holdings Statement and Product Register substantially in the form of Exhibit A attached hereto.

Such written notice must be received by the relevant Brink's Facility at least two (2) Business Days prior to the Delivery Date.  "Business Day" means any Monday through Friday, excluding holidays observed by Brink's or any Depositor.  On the Delivery Date, the Brink's Facility shall take possession of the Metal received as specified in Depositor's notice, deliver to Depositor a written receipt therefor, and concurrently therewith, credit the applicable Account with such Metal.

4.  <u>Withdrawals</u>. From time to time during the term of this Agreement, a Depositor may give written notice to the relevant Brink's Facility of its intention to withdraw Metal from an Account.  Such written notice shall:

> (i)  specify the amount of Metal (in the appropriate denomination) to be withdrawn from the Account;

> (ii)  specify the Business Day on which the related Depositor will take delivery of the Metal from the relevant Brink's Facility (the "Withdrawal Date");

> (iii)  be accompanied by a bar list specifying, for each bar to be withdrawn, the bar number, the brand, the weight and the fineness and, in the case of a withdrawal of Gold, the fine and gross troy ounce weight; and in the case of PGM or Silver the gross troy ounce weight.  In the case of a withdrawal of Metal in other than bar form, such written notice shall specify the seal number, the brand, the fineness and the fine (as applicable) and/or gross weight, and in the case of coin, the type and number of coins;

> (iv)  contain the name of the related Depositor's carrier or representative, vehicle model and registration number or other requested details of such Depositor's carrier or representative authorized to take delivery of the Metal to be withdrawn from the Account; and

> (v)  be accompanied by a Holdings Statement and Product Register substantially in the form of Exhibit A attached hereto.

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530747

Such written notice must be given to the relevant Brink's Facility at least two (2) Business Days prior to the Withdrawal Date. Upon the relevant Brink's Facility's receipt of such written notice, the Brink's Facility shall confirm such written withdrawal instructions by contacting one of the authorized persons appearing on the Depositor's authorized persons list attached hereto as Schedule 1 (the "Authorized Persons"), as may be amended in writing from time to time. Each Depositor shall be responsible to ensure that each Brink's Facility will be furnished with a list of such Depositor's Authorized Persons as of the effective date of this Agreement. On the Withdrawal Date, the relevant Brink's Facility will release such Metal to the related Depositor's carrier or representative and receive a written receipt therefor.

5.  Ownership and Segregation. All Metal held in the Account(s) shall remain the property of Depositors and the Monex Customers (as defined below) at all times and Brink's shall cause such Metal to be specifically identified and physically segregated at all times from coin, bullion and metal in any form whatsoever, the title to which is vested in any other person or entity. Each Depositor warrants that it is authorized to accept and is accepting the terms of this Agreement and to act for each of its customers for purposes of directing Brink's to deliver precious metals in the Accounts owned by the customer to any Depositor or third party. Depositors hereby agree to release, indemnify and hold harmless Brink's against any and all liability Brink's may incur from any claims, disputes, suits, proceedings at law or in equity, loss, liabilities, costs, payments, injury, damage and expenses of any nature (including attorney's fees and court costs) brought by or on behalf of any third parties with ownership interests in any Metal in any of the Accounts stored at a Brink's Facility.

It is understood by the parties hereto that MCC will transmit to Brink's not later than the close of business on each business day a written allocation report which will identify separate allocations of Metals as being owned by customers to whom MCC has extended or may extend credit in the form of loans to finance the purchase of such Metals, (such allocations to be referred to for purposes hereof as the "Monex Customer Allocations"). Such allocation report shall also include an identification of Metals in the Accounts not so allocated to Monex Customer Allocations. Brink's and Depositors agree that Metals reflected on the most recently transmitted report as allocated to Monex Customer Allocations, are held by Brink's for the account of the identified Monex customers as owner of such identified Metals, subject to a security interest in favor of MCC in respect of which Brink's holds possession of such Metals as custodian for MCC as secured party, for purposes of security interest perfection under Section 9-313 of the applicable Uniform Commercial Code or other applicable successor provision thereof. With respect to Metals in the Accounts shown on the most recently transmitted allocation report as not allocated to Monex Customer Allocations, Brink's and the other parties hereto agree that such Metals are held by Brink's for the account of Depositors as owners thereof. The parties hereto agree that Brink's has no obligation, liability or responsibility for the accuracy of any written allocation reports that it receives as aforesaid, and is only agreeing that its holdings of Metals in the Accounts are to reflect the ownership allocations and security interest status described above as reflected on the most recently transmitted written allocation report. Brink's agrees, however, that if in the ordinary course of its business it conducts any reviews or comparisons of the aggregate quantities and types of Metals actually held by it against the aggregate quantities and types of Metals reflected on the most recently transmitted written allocation report and discovers a discrepancy, it will promptly deliver written notice of such discrepancy to MCC. It also agrees to promptly deliver written notice to MCC when such discrepancy has been resolved with MCC and the substance of the resolution thereof.

All shipments said to contain Metals delivered to Brink's for original deposit into any Account, and all Metals transferred upon instruction of MCC from another MCC account with Brink's to any Account, shall be credited to the Account and will be held and stored by Brink's as custodian in accordance with the allocation provisions set forth above. If Brink's transfers any property in any Account between the storage sites set forth in Appendix A of the Agreement, Brink's agrees promptly to provide Depositors

-3-

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530748

with written confirmation that the property so transferred is the same Account property formerly located at the site from which it was transferred.

6.   Access to Vault for Inventory Purposes. Upon two (2) Business Days' prior written notice to the relevant Brink's Facility, and in accordance with that Brink's Facility's vault procedures, the Brink's Facility shall allow Authorized Persons to have access to the Metal in the Accounts upon presentation of proper credentials and during normal business hours in order to inspect and take inventory of the same. The Brink's Facility shall co-operate in connection with such inspection and inventory. Depositors shall indemnify and hold harmless Brink's from any liability, loss, damage, cost or expense, including reasonable attorney's fees, arising out of any bodily injury or death to any Authorized Person, or loss or destruction of or damage to the property, including Metal as a result of being on the Brink's Facility, or entering or leaving therefrom, except where Brink's is shown to be negligent. In order to provide the indemnity specified above, at all times during the term of this Agreement, Depositors shall maintain at their sole cost and expense, and shall provide evidence of such to Brink's, insurance coverage of the types and in the amounts set forth herein (or the country equivalent where Metals are stored) with a company or companies satisfactory to Brink's:

(a) **Comprehensive General Liability Insurance** - For bodily injury and property damage, including blanket contractual liability, professional service liability and products and completed operations, in the amount of $2,000,000 combined single limit per occurrence. Said policy will contain a full and complete breach of warranty endorsement to the effect that the insurance coverage will not be invalidated as regards the interest of Brink's by any act, failure to act, omission, or neglect of Depositors which is in violation of the terms and conditions of such insurance. This policy will cover, among other risks, the contractual liability assumed under the indemnification provisions set forth in this section.

(b) **Worker's Compensation Insurance** as required by applicable workers' compensation laws or other similar programs related to the jurisdiction involved.

(c) **Employer's Liability Insurance** in unlimited amounts where required by law and in all other jurisdictions an amount of $1,000,000 each accident for bodily injury by accident; $1,000,000 policy limit for bodily injury by disease and $1,000,000 each employee for bodily injury by disease.

(d) **Crime and Fidelity Insurance** – All representatives of Depositors must be fully bonded, either by a 3D bond or Crime or Fidelity insurance policy in the amount of $1,000,000 per occurrence.

The foregoing insurance policy or policies shall be written by a reputable insurance company or companies authorized or licensed to transact business in the jurisdiction where this Agreement shall be performed. Depositors shall notify Brink's in writing of any material modification, alteration, non-renewal or cancellation of such policy or policies at least thirty (30) days prior thereto. Depositors shall furnish Brink's with a certificate or certificates of insurance prior to the commencement of this Agreement.

7.   Fees and Charges.

a. For the services contemplated under this Agreement, MCC agrees to pay Brink's such service charges and fees as agreed to between the parties as set forth in Appendix B, which is incorporated in this Agreement by reference, plus all applicable taxes that Brink's is required to collect in connection with the services. All charges are exclusive of VAT.

-4-

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

b. An annual review of the service charges and fees set forth in Appendix B will take place on each one year anniversary of the effective date of this Agreement, however, at any time, upon written notice, Brink's may increase service charges and fees in the event of a change in economic conditions beyond Brink's control that increases operating costs incurred by a Brink's Facility.

c. Should MCC default in the full and timely payment of any amounts due and owing under this Agreement or otherwise default in the performance of any of its obligations hereunder, then MCC shall also be responsible for interest and all costs and expenses incurred by Brink's in the collection of such amounts owed to Brink's, including, without limitation, reasonable attorney's fees incurred in such collection ("Unpaid Obligations"). In addition to any and all other rights and remedies provided in this Agreement and under applicable law and unless otherwise provided herein, MCC hereby agrees that Brink's shall be permitted to retain as a credit and to offset against such Unpaid Obligations, on a dollar for dollar basis, any Precious Metals owned by Depositors which Brink's has in its possession under this Agreement.

8. <u>Account Statements</u>. At the close of business of each Withdrawal Date or Delivery Date with respect to an Account, each Brink's Facility will send to MCC a facsimile or electronic mail (e-mail) confirmation of the deposit or withdrawal of Metal to or from the Account on such date, together with a statement of the balance in such Account as of the close of business on such Business Day.

Brink's shall report directly to a Monex Customer, within two (2) business days, each deposit of Metal to or withdrawal of Metal from an Account for such Monex Customer by mailing to the Monex Customer a Commodity Title Transfer Notice ("CTTN") provided by MCC in the form set forth in Exhibit B.

Each Brink's Facility shall send to MCC by email monthly (i) a statement summarizing each receipt and each delivery of the Precious Metals held by it for Depositors during such month, and (ii) a detailed statement of the Precious Metals held by Brink's pursuant to this Agreement during the period covered by such statement. Unless a Depositor objects by written notice to Brink's which is received by Brink's within 10 days after such statement is sent to MCC, such statement shall be conclusive and binding on the Depositor. The books, accounts and records of Brink's pertaining to its actions pursuant to this Agreement shall be kept open to inspection and audit during reasonable business hours by Authorized Persons pursuant to the terms of Section 6 herein.

9. <u>Insurance</u>. Brink's is not an insurer. Brink's will, at its own expense, maintain insurance policies, which policies shall insure Brink's against such risks assumed by Brink's as described in Clause 1 hereof, subject always to the provisions and exclusions contained in this Agreement. Brink's will furnish each Depositor with a certificate evidencing such insurance, upon request.

10. <u>Notice of Claims</u>. A Depositor shall give written notice to Brink's within one (1) Business Day after Depositor discovers any loss, damage or destruction of Metal in an Account, but in no event more than thirty (30) days after delivery by Brink's to Depositor of a statement of the balance in the Account in which a discrepancy first appears. Unless such notice is given as herein stated all claims shall be deemed waived. No action, suit or other proceeding to recover for any loss shall be brought against Brink's unless notice shall have been given as stated herein and unless such action, suit or proceeding shall have been commenced within twelve (12) months from the time a claim is made pursuant to this paragraph.

Brink's confirms that it has not received written notice from any third person (not a party hereto) that any of the Accounts or Metals held or to be held by Brink's in the Accounts is subject to an ownership or security interest or lien in favor of such person (except for the interests of Monex Customers as described

-5-

in Section 5 above) and Brink's further agrees to promptly notify Depositors if any person shall give such notice, or shall attach, levy upon or otherwise attempt to encumber any Account (if such notice is not prohibited by applicable law) and shall continue to hold all materials in the Account pursuant to the terms of this Agreement pending an order from a court of competent jurisdiction directing or permitting disposition thereof.

11.  Loss Reimbursement.  In the event of loss, damage or destruction of any Metal held in an Account at a Brink's Facility, the parties shall promptly and diligently assist each other to establish the identity of the Metal lost, damaged or destroyed and shall take all such other reasonable steps as may be necessary to assure the maximum amount of salvage at a minimum cost. Affirmative written proof of the Metal lost, damaged or destroyed, subscribed and sworn to by a Depositor and substantiated by the books, records and accounts of the Depositor shall be furnished to Brink's. Brink's shall, after receipt from a Depositor of a proof of loss, and subject to the terms and conditions of this Agreement, make payment to the Depositor of the Market Value (as hereinafter defined) of the Metal in the Account which is the subject of such loss, damage or destruction, provided, however, that in the event the Depositor takes any salvage that is recovered, the value of such salvage shall be deducted from any payment that is required to be made by Brink's under this section. If a Depositor does not take any salvage that is recovered, such salvage shall become the property of Brink's and/or its insurers and the value thereof shall not be deducted from any payment required to be made by Brink's. Market Value for this purpose shall be the Market Value, expressed in US Dollars, on the date of such loss, damage or destruction, if such date is undisputed by the parties, otherwise, the Business Day following such Depositor's notification to the Brink's Facility of such loss, damage or destruction of Metal (the "Valuation Date"), times the declared number of fine troy ounces of Gold and troy ounces of PGM and Silver, as the case may be. The Market Value will be determined for Gold and Silver by reference to the spot price for gold and silver, as the case may be, as quoted by the London Bullion Market Association on the Valuation Date, and for PGM by reference to the spot price for platinum and palladium, as the case may be, as quoted by the London Platinum and Palladium Market Association on the Valuation Date. Upon payment of a claim by Brink's, the related Depositor hereby agrees to and does hereby assign to Brink's all of its right, title and interest in the property rights of recovery against third parties that are the subject of a claim and to execute any documents necessary to perfect such assignment upon request by Brink's or Brink's insurers.

12.  Limitation of Liability; Non-Hazardous Material; Force Majeure.

   a. Brink's shall not be liable for loss, damage or destruction of Metal or for non-performance or delays of service caused by or resulting from: (i) war, civil war, revolution, rebellion, insurrection, or civil strife therefrom, or any hostile act by or against a belligerent power; (ii) capture, seizure, arrest, restraint or detainment (piracy excepted), and the consequences thereof or any attempt threat; (iii) derelict mines, torpedoes, bombs or other derelict weapons of war.

   b. Notwithstanding anything in this Agreement to the contrary, in no case shall Brink's be liable for loss, damage or destruction of Metal or for non-performance or delays of service, damage, liability, or expense directly or indirectly caused by or contributed to by or arising from: (i) any chemical, biological, or electromagnetic weapon; (ii) the use or operation, as a means for inflicting harm, of any computer, computer system, computer software, computer software programme, malicious code, computer virus or process or any other electronic system; (iii) ionising radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel; (iv) the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof; (v) any weapon or device employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter, or (vi) the radioactive, toxic, explosive or other hazardous or contaminating properties of any radioactive matter. The

-6-

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530751

exclusion in this sub-clause (vi) does not extend to radioactive isotopes, other than nuclear fuel, when such isotopes are being prepared, carried, stored, or used for commercial, agricultural, medical, scientific or other similar peaceful purposes.

c. Brink's shall not be liable for loss, damage or destruction of Metal or for non-performance or delays of service, liability, cost or expense directly or indirectly caused by, resulting from or in connection with any act of terrorism or any action taken in controlling, preventing, suppressing or in any way relating to any act of terrorism. An act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organization(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

d. Depositors represent and warrant that no shipment or container tendered to the Brink's Facility is or can be classified as hazardous material(s), substance(s) or waste(s) (hereinafter referred to as "hazardous materials") as such terms are or may be defined, described or listed in any applicable laws, or pursuant to any applicable governmental agency, instrumentality or department regulations(s) or executive order(s) issued or enacted by any governmental entity in connection with environmental protection, health or safety. In the event the aforesaid representation and warranty is breached by Depositors, knowingly or otherwise, Depositors agrees to save, defend and hold Brink's and the Brink's Facility harmless and indemnify Brink's and the Brink's Facility from and against any claims, fines, penalties, damages, costs and attorneys' fees which may be incurred by reason of this breach.

e. Brink's shall not be liable for non-performance or delays of service caused by strikes, lockouts or other labor disturbances, riots, authority of law, acts of God or means beyond the control of Brink's or the Brink's Facility, but, subject to the conditions, limitations and exclusions set forth in this Agreement, Brink's shall be liable for the loss, damage or destruction of any Metal received into its possession at any time not to exceed the maximum amount stated in this Agreement. Where the Brink's Facility's ability to perform its service obligations as detailed in this Agreement is compromised by labor disturbances, commercially reasonable efforts will be made by Brink's to work with Depositors to maintain the services.

f. The liability of Brink's shall not, under any circumstances, include special, incidental, consequential, indirect or punitive losses or damages, or interest, whether or not caused by the fault or neglect of Brink's and whether or not Brink's had knowledge that such losses or damages might be incurred.

g. Nothing in this Agreement limits or excludes Brink's liability, if any, (1) for personal injury or death resulting from Brink's negligence; (2) for any matter for which it would be illegal for Brink's to exclude or attempt to exclude its liability; or (3) for fraud on the part of Brink's.

13. <u>Inability to Perform.</u> In the event that (i) either Brink's or a Depositor fails to perform any material obligation pursuant to the terms of this Agreement and does not cure such failure within thirty (30) days after the receipt of written notice thereof from the other party, (ii) either Brink's or MCC shall be dissolved or adjudged bankrupt, or a trustee, receiver or conservator of such party or its property shall be appointed, or an application for any of the foregoing is filed, (iii) control of either Brink's or MCC is taken over by any government or other public authority, or (iv) any government or governmental agency shall have taken any action which has materially adversely affected or will materially adversely affect a party's ability to perform any of its obligations hereunder, and such action shall not have been rescinded

-7-

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530752

or modified, and the adverse effects thereof shall not have been eliminated, within thirty (30) days after written notice of such action shall have been given to the other party, then this Agreement may be terminated at any time thereafter by Brink's or MCC upon written notice to the other party. In such event, Brink's shall promptly arrange for the delivery of all Metal held for a Depositor in accordance with such Depositor's instructions.

14. Notices. Unless otherwise specifically provided, all notices and other communications to a party hereunder shall be in writing (including tested telex, facsimile, e-mail or similar writing) and shall be given by an authorized representative of the party giving such notice (as specified by such party to the other).

If to Brink's, to:

> Brink's Global Services USA, Inc.
> 580 Fifth Avenue, Suite 400
> New York, NY, 10036
> Attention: Ben Van Kerkwijk, Vice President – Commodities
>
> Telephone: 212-704-5267
> Email: Ben.VanKerkwijk@brinksinc.com
>
> With a copy to:
>
> Brink's Global Services International, Inc.
> 1801 Bayberry Court
> Richmond, VA 23226
> Attn: Legal Department

If to Monex Deposit Company, to:

> Monex Deposit Company
> Inventory Department
> 4910 Birch Street
> Newport Beach, CA 92660
> Attention: Anne Morgan
>
> Telephone: 949-752-1400
> Facsimile: 949-250-0553
> Email: inventory@monex.com

If to Monex Credit Company, to:

> Monex Credit Company
> 4910 Birch Street
> Newport Beach, CA 92660
> Attention: Michael A. Carabini
>
> Telephone: 949-752-1400
> Facsimile: 949 955-1109
> Email: mac@monex.com

-8-

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530753

15. <u>Investment Advice</u>. It is understood and agreed that, as part of the establishment of the Accounts, Brink's has not undertaken a duty to supervise any Depositor's investment in, or to make any recommendation to a Depositor with respect to the purchase, sale or other disposition of, any Metal or the balances maintained in the Accounts.

16. <u>Authority</u>. Upon execution of this Agreement, Depositors and Brink's each represent to the other that they have full right, power and authority to execute, deliver and perform this Agreement, have taken all necessary corporate action to execute, deliver and perform this Agreement, and that this Agreement has been duly executed by their respective authorized officer, and that this Agreement constitutes its legal, valid and binding obligations.

17. <u>Entire Agreement/Amendments</u>. This Agreement and the appendices that are incorporated herein by reference, each as may be amended from time to time, constitute the entire agreement between Depositors and Brink's with respect to the subject matter hereof and supersede and cancel any and all prior and/or contemporaneous offers, negotiations, promises, exceptions and understandings, whether oral or written, express or implied between the parties. This Agreement may not be waived, altered or amended except by an instrument in writing duly executed by Brink's and Depositors.

18. <u>Assignment</u>. This Agreement shall be binding on Depositors and Brink's and their respective successors and assigns. Neither a Depositor nor Brink's may assign or transfer its rights or obligations hereunder without the prior written consent of the other.

19. <u>Term and Termination</u>. This Agreement shall commence on the date first above written and shall continue until canceled, by either party, on ninety (90) days' written notice. Upon such termination, Brink's shall deliver all Metal then credited to the Accounts to Depositors' designated carrier(s).

20. <u>Governing Law</u>. Any claim or dispute under this Agreement and all transactions hereunder, whether based in contract, tort or otherwise, shall be governed by the laws of the State of New York, without regard to conflict of laws principles, and Depositors and Brink's further agree that any such claim or dispute shall be adjudicated exclusively in the United States District Court for the Southern District of New York or the Supreme Court of the State of New York, New York County. The parties expressly and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York and the Supreme Court of the State of New York, New York County for the purposes of the adjudication of any such claim or dispute.

21. <u>Confidentiality</u>. All information regarding the Accounts, including but not limited to, (i) kind, type, quantity, form and size of Metal in the Accounts at any time, (ii) customers of Depositors to whom Metal is released, delivered or transferred, and (iii) shipments of Metal either into or out of the Accounts, is considered confidential. Brink's shall keep such information confidential and not use such information, either for its own benefit or for the benefit of any third party or to disclose, except (i) as required by law, (ii) as otherwise agreed in writing by Depositors and Brink's, and (iii) that Brink's may use such information where subpoenaed by governmental authority or in litigation; provided, however, that Brink's shall promptly notify Depositors of the circumstances requiring such disclosure (unless such notice is prohibited by order, subpoena or by law). Brink's and Depositors may have access to certain information identified by the other party as confidential in connection with performing their duties and obligations under this Agreement ("Confidential Information"). Brink's and Depositors (alternatively, as applicable, the "disclosing party" and the "receiving party") agree to treat such information as confidential and shall

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530754

not use or disclose Confidential Information other than in the performance of this Agreement. Notwithstanding the foregoing, the parties may disclose Confidential Information pursuant to the requirement of a governmental agency or pursuant to the requirements(s) by operation of law or court order. Confidential Information shall not include information which: (i) is in the public domain at the time of disclosure or later enters the public domain through no fault of the receiving party; (ii) is received by the receiving party from a third party independent of the disclosing party without restriction; (iii) is presently known to the receiving party or is acquired or developed by the receiving party independent of the disclosures made by the disclosing party pursuant to this Agreement; or (iv) is disclosed with the written consent of the disclosing party. This Agreement is intended to be confidential and none of its terms shall be disclosed by Brink's or Depositors to any third party without the written consent of both parties, except as required by law.

22. <u>Use of a Party's Name</u>. No party shall use another party's trade name, likeness, trademarks or logo, without the other party's prior written consent, which includes but is not limited to any reference to the other party on websites or marketing materials.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered by its duly authorized officers as of the date first written above.

**"DEPOSITORS":**                                    **"BRINK'S":**

**Monex Deposit Company**                            **Brink's Global Services International, Inc.**

By: Comco Management Corporation,
General Partner

By: _____                       By: _____

    Louis E. Carabini, President                      Name: DOMINIK BOSSART

                                                     Title: SVP AMERICAS

**Monex Credit Company**

By: Metco Management Corporation,
General Partner

By: _____

    Michael A.. Carabini, President

-10-

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530755

Appendix A to the Precious Metal Storage Agreement effective as of February 16, 2015 by and between Brink's Global Services International, Inc., Monex Deposit Company and Monex Credit Company.

## Brink's Facilities Performing Services Under the Agreement

| Brink's Facility Location | Maximum Liability Per Brink's Facility On Any One Day |
|---|---|
| 184-45 147th Avenue<br>Springfield Gardens, NY 11413 | US$10,000,000.00 |
| 580 5th Avenue, Suite 400<br>New York, NY 10036 | US$10,000,000.00 |
| 1120 W Venice Blvd<br>Los Angeles, CA, 90015 | US$10,000,000.00 |
| 2179 S 300 W, Suite #4<br>Salt Lake City, UT, 84115 | US$10,000,000.00 |
| 2530 Century Lake Drive<br>Irving, TX 75062 | US$10,000,000.00 |
| Brink's Singapore Pte Ltd<br>1 Kaki Bukit Road 1<br>#02-23 Enterprise One<br>Singapore 415934 | US$10,000,000.00 |
| Brink's Singapore Pte Ltd<br>(Singapore Freeport)<br>32 Changi North Crescent<br>The Singapore Freeport<br>Singapore 499643 | US$10,000,000.00 |

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530756

**Appendix B** to the Precious Metal Storage Agreement effective as of February 16, 2015 by and between Brink's Global Services International, Inc., Monex Deposit Company and Monex Credit Company.

**Fees and Charges Effective as of February 16, 2015 :**

a) Storage Charges:

Gold, Platinum, Palladium – Valuation Charge:     0.20% per year
(Daily Fee Calculation – Average Daily Metal Holdings x Daily Spot Price x Storage Rate / 365 days)

Silver – Volume Charge:                          $0.04 per Oz per year
(Daily Fee Calculation – Average Daily Metal Holdings x Storage Rate / 365 days)

b) Handling Charges:

| | |
|---|---|
| Incoming Handling Charge Per Package: | $15 per package |
| Incoming Handling Charge Per Pallet: | $20 per pallet |
| Outgoing Handling Charge Per Package: | $25 per package |
| Outgoing Handling Charge Per Pallet: | $30 per pallet |

If any incoming/outgoing shipment has multiple packages/pallets the Handling Charges will be applied to each package/pallet.

c) Charges for CTTNs:

$3 for each CTTN mailed.

All local taxes on storage services in individual states (if/when applicable) shall be passed on to Depositor in addition to charges outlined above.

Terms of payment shall be 30 days from receipt of Invoice.

* Transportation charges and services are not covered within this agreement.

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)                    MNX-CFTC-00530757

Monex Credit Company and Monex Deposit Company (collectively "Monex"), jointly and severally indemnify and hold Brink's harmless from any and all liabilities, damages, losses, expenses, claims demands, suits, fines, or judgments, including but not limited to, costs and attorney's fees any Depositor (as such term is defined in the Agreement) or Brink's may incur as a result of Brink's compliance with the instructions of any person named herein as authorized to act on any Depositor's behalf. Brink's is authorized to accept and honor, without limit as to amount and without further inquiry, the instructions outlined below, whether personally benefiting any of the Authorized Signers, or deposited to the personal account of such parent(s), or any of them, or otherwise. The authority of the persons named herein shall continue until revoked in writing by the Depositors, but Brink's shall be fully protected in acting on such authority and shall not be charged with any notice of the revocation of such authority or the removal of any such person(s) unless and until it shall have actually received an amendment to this notice setting forth such revocation or removal.

| Signature | Date | Signature | Date |
|---|---|---|---|
| | 2/8/15 | | 2/14/15 |
| Name | Title | Name | Title |
| Michael A. Carabini | | Louis E. Carabini | |

**Authorized Signers:** The signatures of two (2) Authorized Signers designated below as "Monex Authorized Signers", shall at all times and in each and every instance be required to direct Brink's to deliver, transfer, trade, liquidate, pledge or segregate Precious Metals in Depositors' Accounts; to direct payments or transfer funds, to execute any necessary documents to accomplish any of these authorized acts; and to issue instructions to Brink's by written or electronic means.

| Name | Title | Signature |
|---|---|---|
| Michael A. Carabini | Authorized Signatory | |
| Louis E. Carabini | Authorized Signatory | |
| Brian D. Jenkins | Authorized Signatory | |
| Ron Snoler | Authorized Signatory | |
| Ryan Valadez | Authorized Signatory | |
| Richard T. Brown | Authorized Signatory | |
| David M. Ferm | Authorized Signatory | |
| Myrna R. Johnson | Authorized Signatory | |
| Jvann. Lahners | Authorized Signatory | |

-13-

Sample Product Register And Sample Holdings Statement – Exhibit A

## PRODUCT REGISTER

| | | | |
|---|---|---|---|
| Sample Company Inc. | Account #: 99999 | Page: 1 of 1 | |
| 123 Main Street | | Report Date: 9/20/2004 | |
| Anywhere, USA 12345 | | Report Period: 9/20/2004 to 9/20/2004 | |

| Settlement Date | Quantity Received / Shipped | DDSC Reference | | Customer Reference |
|---|---|---|---|---|
| **GEA1** | **GOLD American Eagle, Any Year – 1 oz.** | | | |
| 9/20/2004 | 107.100 | 9234138 | LM | Transfer Reference – 95583 |
| 9/20/2004 | 23.600 | 9234172 | LM | Transfer Reference – 95588 |
| 9/20/2004 | -5.000 | 9234200 | SM | To John Doe # 711356486 sklb $35.06 |
| 9/20/2004 | -18.000 | 9234221 | SM | To L. Smith # 52965540 sklb $46.87 |
| 9/20/2004 | 15.600 | 9234244 | LM | Transfer Reference – 95605 |
| | | | | |
| | **SB1000 SILVER Bullion Bar – 1000-oz.** | | | |
| 9/20/2004 | 25,162.391 | 9215887 | LM | Transfer Reference – 95590 |
| 9/20/2004 | -1,957.324 | 932589 | SM | Transfer Reference – 95591 |

END OF REPORT

-14-

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530758

## Holdings Statement

Sample Company Inc.
123 Main Street
Anywhere, USA 12345

Account #: 99999

Page: 1 of 1
Report Date: 9/20/2004

### GOLD

| Product Code | Product Description | Ounce Conversion | Product Balance | Gross Troy Ou |
|---|---|---|---|---|
| GB1 | Bullion Bar, .9999 – 1 oz. | 1.0000 | 256.000 | 256 |
| GB10 | Bullion Bar, .9999 – 10 oz. | 10.0000 | 42.000 | 420 |
| GB100 | Bullion Bar, .995 – 100 oz. | 1.0000 | 11,531.258 | 11,531 |
| GBKG | Bullion Bar, .9999 – 1 kg. | 32.1510 | 23.000 | 716 |
| GEA1 | American Eagle, Any Year – 1 oz. | 1.0000 | 12,967.000 | 12,967 |
| GEAH | American Eagle, Any Year – 1/2 oz. | 0.5000 | 492.000 | 246 |
| GEAQ | American Eagle, Any Year – 1/4 oz. | 0.2500 | 369.000 | 92 |
| GEAT | American Eagle, Any Year – 1/10 oz. | 0.1000 | 1,275.000 | 127 |
| GML1 | Canadian Maple Leaf, .9999 – 1 oz. | 1.0000 | 8,629.000 | 8,629 |
| | | | GOLD TOTAL | 34,985 |

### PALLADIUM

| Product Code | Product Description | Ounce Conversion | Product Balance | Gross Troy Ou |
|---|---|---|---|---|
| PDB1 | Bullion Bar, .9995 – 1 oz. | 1.0000 | 51.000 | 51 |
| PDB10 | Bullion Bar, .9995 – 10 oz. | 10.0000 | 48.000 | 480 |
| PDB100 | Bullion Bar, .9995 – 100 oz. | 1.0000 | 109.550 | 109 |
| | | | PALLADIUM TOTAL | 640 |

### PLATINUM

| Product Code | Product Description | Ounce Conversion | Product Balance | Gross Troy Ou |
|---|---|---|---|---|
| PLB1 | Bullion Bar, .9995 – 1 oz. | 1.0000 | 463.000 | 463 |
| PLB10 | Bullion Bar, .9995 – 10 oz. | 10.0000 | 154.000 | 1,540 |
| PLB50 | Bullion Bar, .9995 – 50 oz. | 1.0000 | 531.594 | 531 |
| PLEA1 | American Eagle, Any Year – 1 oz. | 1.0000 | 2,315.000 | 2,315 |
| | | | PLATINUM TOTAL | 4,849 |

### SILVER

| Product Code | Product Description | Ounce Conversion | Product Balance | Gross Troy O |
|---|---|---|---|---|
| SB1 | Bullion Bar, .999 – 1 oz. | 1.0000 | 951.000 | 95 |
| SB100C | Bullion Bar, .999 – 100 oz. | 100.0000 | 3,698.000 | 369,80 |
| SEA1 | American Eagle, Any Year – 1 oz. | 1.0000 | 121,162.000 | 121,16 |
| SML1 | Canadian Maple Leaf – 1 oz. | 1.0000 | 18,600.000 | 18,60 |
| SB1000 | Bullion Bar, .999 – 1000 oz. | 1.0000 | 753,159.645 | 753,15 |
| | | | SILVER TOTAL | 1,263,67 |

-15-

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530759

## Commodity Title Transfer Notice – Exhibit B



COMMODITY TITLE TRANSFER NOTICE

NON-NEGOTIABLE

### STANDARD TERMS AND CONDITIONS

**1. Receipt of Goods and/or warehouse receipts therefor.**

You are hereby notified that we ("Custodian") have received custody of the goods and/or warehouse receipts therefor ("Commodities") identified on the front of this notice and to which you hold title. Custodian will hold such commodities for your benefit in accordance with the terms and conditions of the Monex Deposit Company (MDC) Purchase and Sale Agreement and the Monex Credit Company (MCC) Loan, Security and Storage Agreement and subject to any liens which may exist or be reported to Custodian by MDC or MCC. You may request the current status of our custody of your commodities at any time by faxing a copy of the front of this notice to 949-261-5383. Without limiting in any way the applicability of any of Custodian's regulations, or of any of the terms and conditions of the aforementioned Agreements, particular attention is directed to the following:

a. Pursuant to the terms of the Agreements between you, MDC and MCC, you acknowledge that Custodian is authorized to transfer or deliver the described commodities to MDC or MCC upon receipt by Custodian of written or oral instruction from MDC or MCC without surrender of this statement and upon so doing, Custodian is free of all liability to you or other parties.

b. The warehouse receipts held by Custodian represent MDC/MCC customer commodities stored by facilities authorized in the Loan, Security and Storage Agreement. Each warehouse receipt is subject to the specific terms and conditions of storage set forth therein. Copies of such terms are available upon request from MDC. In the case of warehouse receipts, Custodian is responsible for the safekeeping of the receipt, while the issuer of the receipt is responsible for the safekeeping of the underlying commodities. Weight, fineness, and content of commodities are guaranteed only by MDC and MCC.

c. The units of commodities described represent standard MDC units as described in the Purchase and Sale Agreement unless otherwise indicated.

d. Transfers of commodities in the custody of Custodian are not complete unless reflected on records at Custodian.

e. MDC, MCC, and Custodian or their assignee or pledgee have a security interest in your commodities to the extent of your unpaid obligations thereto, if any.

f. You acknowledge that the receipt of commodities held for your benefit will be maintained collectively with the commodities held on behalf of other MCC customers which are held at one or more of several depositories throughout the United States. Custodian reserves the right at its own expense to move the commodities from one storage facility to another. Custodian also may at its own direction or that of MDC or MCC transfer custody of your commodities to another custodian provided such custodian is authorized by the aforementioned Agreements.

g. Custodian relies solely on the information it receives from MDC/MCC in performing its reconciliation of customer holdings. Custodian does not audit or review MDC/MCC records, and, accordingly, cannot represent that the information it receives is accurate.

h. You agree that you shall not grant a security interest or other right in or otherwise pledge any commodities held by Custodian to any party other than MDC, MCC, or Custodian, and Custodian will not recognize any such interest, right or pledge.

i. The provisions of this notice shall apply to and bind you, your heirs, personal representatives, successors and assigns.

**2. Delivery of Commodities.**

You are hereby notified that Custodian has released the commodities identified on the front of this notice which it has held for you to MDC pursuant to your order for delivery or transfer of these commodities. As a result, Custodian has no further liability with respect to commodities transferred.

**3. Delivery of Commodities on Sale.**

You are hereby notified that Custodian has delivered the commodities identified on the front of this notice which it has held for you to MDC pursuant to your sale. Delivery has been made at the instruction of MDC or MCC. As a result, Custodian has no further liability with respect to the commodities delivered.

-16-

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530760

# EXHIBIT 48

<u>PRECIOUS METALS STORAGE AGREEMENT</u>

**THIS AGREEMENT** effective as of May 2, 2016 (the "Agreement") by and between Brink's Global Services USA, Inc. ("Brink's"), Monex Deposit Company ("MDC"), Monex Credit Company ("MCC"), Concord Funding Company, LLC ("CFC"), and The Bank of New York Mellon Trust Company, N.A., a national banking association, as successor to BNY Midwest Trust Company ("BNY"), (in such capacity, the "Trustee"), (MCC, MDC, CFC and Trustee each a "Depositor" and collectively, the "Depositors") sets forth the terms and conditions with respect to vaulting provided by Brink's Global Services company(ies) at the facility locations specified in <u>Appendix A</u> which is incorporated in this Agreement by reference (each location referred to as "Brink's" or a "Brink's Facility").

WHEREAS, CFC has issued several series of Notes pursuant to a Master Indenture, dated as of October 2, 2002 (as the same may be amended from time to time, the "Master Indenture") by and between CFC and Trustee, as indenture trustee, and the Series 2002-1 Supplement thereto (the "Series 2002-1 Notes"), the Series 2004-1 Supplement thereto (the "Series 2004-1 Notes"), the Series 2005-1 Supplement thereto (the "Series 2005-1 Notes") and the Series 2006-1 Supplement thereto (the "Series 2006-1 Notes"), the Series 2011-1 Supplement thereto (the "Series 2011-1 Notes"), the Series 2012-1 Supplement thereto (the "Series 2012-1 Notes"), the Series 2013-1 Supplement thereto (the "Series 2013-1 Notes") and collectively, (the "Notes"). CFC subsequently redeemed the Series 2002-1 Notes, 2004-1 Notes, 2005-1 Notes, 2006-1 Notes, and 2011-1 Notes.

WHEREAS, MCC, as an agent of CFC acts as Servicer under that certain Servicing Agreement, dated as of October 1, 2002, among MCC, as Servicer, BNY, as Trustee, Portfolio Financial Servicing Company as Backup Servicer and CFC (as the same may be amended from time to time, the "Servicing Agreement"). Neither the Servicing Agreement nor any other document relating to the Master Indenture, each Supplement or the Notes to which Brink's is not a party shall create any obligation on the part of Brink's. The term "Servicer" shall include MCC, for so long as MCC remains in the capacity as Servicer, and any Successor Servicer as defined in Section 4 hereof.

Brink's and each Depositor hereby agree as follows:

1. <u>General</u>. Brink's has established for the account and benefit of CFC and the further benefit of CFC's assignee under the Master Indenture in each Brink's Facility listed in Appendix A, as applicable, (a) an allocated gold account for the purpose of maintaining physical custody of gold ("Gold") denominated in fine troy ounces or fine metric weight as appropriate, (b) an allocated silver account for the purpose of maintaining physical custody of silver ("Silver") denominated in troy ounces or metric weight as appropriate, and/or (c) an allocated platinum group metals account for the purpose of maintaining physical custody of platinum and/or palladium ("PGM") denominated in troy ounces or metric weight as appropriate, (hereinafter each account individually referred to as an "Account" and, collectively, the "Concord Account"). (Gold, Silver and PGM are herein also referred to, individually and collectively, as "Metal"). As requested by Servicer, Brink's may establish sub-Accounts of Metals in the Concord Account, which may be collectively referred to with Accounts, as Accounts. In the Accounts, (i) Gold will be accounted for in terms of fine troy ounces of Gold to three decimal places, (ii) PGM will be accounted for in terms of troy ounces of Platinum or Palladium, as the case may be, to three decimal places, and (iii) Silver will be accounted for in terms of troy ounces of Silver to two decimal places. In no event will any Account be held in any name other than Concord Funding Company, LLC.

2. <u>Brink's Liability</u>. Brink's agrees to assume the liability for loss, damage or destruction of the Metal stored in each Brink's Facility up to the maximum liability amount applicable to the respective Brink's Facility as set forth in Appendix A. Brink's liability shall commence when: (a) possession of the Metal is taken at a Brink's Facility, and (b) upon a Brink's employee or agent signing a receipt for the Metal, following a physical count of the number of bars, coins or other form of Metal by the Brink's Facility; and

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530762

Brink's Liability shall terminate when the Metal has been delivered from the Brink's Facility to a carrier designated by Servicer and the Brink's Facility gets a receipt therefor. For the sake of clarity, where the carrier designated to transport the Metal is Brink's or a Brink's affiliate, such transportation shall be under a separate transport agreement between Brink's or a Brink's affiliate and Servicer, and liability for loss, damage or destruction of the Metal during transport shall be governed by the terms and conditions of such transport agreement. It is understood and agreed that Brink's maximum liability for any loss, damage or destruction of Metal is up to (but not exceeding) the applicable limit set forth in Appendix A for the respective Brink's Facility, notwithstanding anything to the contrary contained in any invoice, receipt or other document delivered or received by the Brink's Facility relating to the Metal handled by the Brink's Facility under this Agreement. The Depositors expressly understand and agree that Brink's does not assume any liability as to the authenticity or assay characteristics of any Metal. It is further understood and agreed that the Brink's Facility's count of the Metal deposited in the Accounts shall be binding and conclusive.

3. <u>Deposits</u>. From time to time during the term of this Agreement, Servicer or MDC may give written notice to the relevant Brink's Facility of its intention to deposit Metal into an Account. Such written notice shall:

> (i) specify the amount of Metal (in the appropriate denomination) to be deposited into the Account;

> (ii) specify the Business Day (as defined below) upon which Servicer or MDC shall deliver the Metal to the relevant Brink's Facility (the "Delivery Date");

> (iii) be accompanied by a bar list specifying, for each bar to be deposited, the bar number, the brand, the weight and the fineness and, in the case of a deposit of Gold the fine and gross troy ounce weight, and in the case of PGM and Silver the gross troy ounce weight. In the case of Metal to be deposited in other than bar form, such written notice shall specify the seal number, the brand, the fineness and the fine (as applicable) and/or gross weight, and in the case of coin, type and number of coins; and

> (iv) be accompanied by a Holdings Statement and Product Register substantially in the form of Exhibit A attached hereto.

Such written notice must be received by the relevant Brink's Facility at least two (2) Business Days prior to the Delivery Date. "Business Day" means any Monday through Friday, excluding holidays observed by Brink's or any Depositor. On the Delivery Date, the Brink's Facility shall take possession of the Metal received as specified in Servicer's or MDC's notice, deliver to Servicer or MDC, as appropriate, a written receipt therefor, and concurrently therewith, credit the applicable Account with such Metal.

4. <u>Withdrawals</u>. From time to time during the term of this Agreement, (a) MCC, in its capacity as Servicer for so long as MCC remains in such capacity, t and (b) thereafter, by prior written notice of such successor Servicer as the Trustee shall certify in writing has authority to give such direction (such certified successor Servicer being referred to further below as the "Successor Servicer") may give written notice to the relevant Brink's Facility of its intention to withdraw Metal from an Account. Such written notice shall:

> (i) specify the amount of Metal (in the appropriate denomination) to be withdrawn from the Account;

> (ii) specify the Business Day on which the related Depositor will take delivery of the Metal from the relevant Brink's Facility (the "Withdrawal Date");

WAS:216927.2

2

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530763

(iii) be accompanied by a bar list specifying, for each bar to be withdrawn, the bar number, the brand, the weight and the fineness and, in the case of a withdrawal of Gold, the fine and gross troy ounce weight; and in the case of PGM or Silver the gross troy ounce weight. In the case of a withdrawal of Metal in other than bar form, such written notice shall specify the seal number, the brand, the fineness and the fine (as applicable) and/or gross weight, and in the case of coin, the type and number of coins;

(iv) contain the name of the related Depositor's carrier or representative, vehicle model and registration number or other requested details of such Depositor's carrier or representative authorized to take delivery of the Metal to be withdrawn from the Account; and

(v) be accompanied by a Holdings Statement and Product Register substantially in the form of Exhibit A attached hereto.

Such written notice must be given to the relevant Brink's Facility at least two (2) Business Days prior to the Withdrawal Date. Upon the relevant Brink's Facility's receipt of such written notice, the Brink's Facility shall confirm such written withdrawal instructions by contacting one of the authorized persons appearing on Servicer's or Trustee's authorized persons list attached hereto as Schedule 1 ("Authorized Persons"), as may be amended in writing from time to time. Each Depositor shall be responsible to ensure that each Brink's Facility will be furnished with a list of such Depositors' Authorized Persons as of the effective date of this Agreement. On the Withdrawal Date, the relevant Brink's Facility will release such Metal to the related Depositor's carrier or representative and receive a written receipt therefor. In the event that Brink's receives conflicting instructions from MCC and Successor Servicer, Brink's will follow the Successor Servicer's direction.

5. <u>Ownership and Segregation</u>. It is understood by the parties hereto that the Servicer, or Successor Servicer designated as provided in Section 4 above, will transmit to Brink's not later than the close of business on each business day a written allocation report (accompanied by the written consent of the Trustee) which will identify separate allocations of Metals as being owned by customers to whom MCC has extended credit in the form of loans to finance the purchase of such Metal (each a "Loan Obligor"), and which loans have been transferred by MCC to CFC (such allocations to be referred to for purposes hereof as the "Loan Obligor Allocations"). Such allocation report shall also include an identification of Metal in the Concord Account not so allocated to Loan Obligor Allocations. Brink's and the other parties hereto agree that Metal reflected on the most recently transmitted report as allocated to Loan Obligor Allocations, are held by Brink's for the account of the identified Loan Obligors as owners of such identified Metal, subject to a security interest in favor of CFC (as loan transferee of MCC) in respect of which Brink's holds possession of such Metal as custodian for CFC as secured party, and for the Trustee as CFC's assignee thereof, for purposes of security interest perfection under Section 9-313 of the applicable Uniform Commercial Code or other applicable successor provision thereof. With respect to Metal in the Concord Account shown on the most recently transmitted allocation report as not allocated to Loan Obligor Allocations, Brink's and the other parties hereto agree that such Metal is held by Brink's for the account of CFC as owner thereof, subject to a security interest in favor of the Trustee, as secured party for purposes of security interest perfection under Section 9-313 of the applicable Uniform Commercial Code or other applicable successor provision thereof. The parties hereto agree that Brink's has no obligation, liability or responsibility for the accuracy of any written allocation reports that it receives as aforesaid, and is only agreeing that its holdings of Metal in the Concord Account are to reflect the ownership allocations and security interest status described above as reflected on the most recently transmitted written allocation report. Brink's agrees, however, that if in the ordinary course of its business it conducts any reviews or comparisons of the aggregate quantities and types of Metals actually held by it against the aggregate quantities and types of Metals reflected on the most recently transmitted written allocation report and discovers a discrepancy, it will promptly deliver written notice of such

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530764

discrepancy to the Trustee and the Servicer. It also agrees to promptly deliver written notice to the Trustee when such discrepancy has been resolved with the Servicer and the substance of the resolution thereof.

All shipments said to contain Metals delivered to Brink's for original deposit into the Concord Account, and all Metals transferred upon instruction of the Servicer or Successor Servicer from another MCC account with Brink's under a separate precious metals storage agreement between Brink's and MCC to the Concord Account, shall be credited to the Concord Account and will be held and stored by Brink's as custodian in accordance with the allocation provisions set forth above. Brink's agrees to provide the Trustee and the Successor Servicer a concurrent copy of each monthly statement to be delivered to MCC in accordance with Section 8 hereof and upon written request of the Trustee or the Successor Servicer will provide concurrent copies of the daily confirmations to be delivered to MCC in accordance with Section 8 hereof. Brink's also agrees to provide to the Trustee or the Successor Servicer, within one (1) business day of receiving written request therefor from such party, a written account statement in the form of the monthly statement referred to above, but current as of the date of preparation. If Brink's transfers any property in the Concord Account between the storage sites set forth in Appendix A of the Agreement, Brink's agrees promptly to provide Depositors and the Successor Servicer, if any, (but only to the Trustee upon receipt of the Trustee's prior written request) with written confirmation that the property so transferred is the same Concord Account property formerly located at the site from which it was transferred.

All Metal held in the Account(s) shall remain the property of CFC and the Loan Obligors at all times, and Brink's shall cause such Metal to be specifically identified and physically segregated at all times from coin, bullion and metal in any form whatsoever, the title to which is vested in any other person or entity. The Servicer, MDC and CFC each warrants that it is authorized to accept and is accepting the terms of this Agreement and to act for each of its customers for purposes of directing Brink's to deliver precious metals in the Accounts which are owned by the customer to the customer or to any Depositor or third party. MCC hereby agrees to release, indemnify and hold harmless Brink's against any and all liability Brink's may incur from any claims, disputes, suits, proceedings at law or in equity, loss, liabilities, costs, payments, injury, damage and expenses of any nature (including attorney's fees and court costs) brought by or on behalf of any third parties, including, but not limited to Loan Obligors, with ownership interests in any Metal stored at a Brink's Facility.

6. <u>Access to Vault for Inventory Purposes</u>. Upon two (2) Business Days' prior written notice by the Servicer or Trustee to the relevant Brink's Facility, and in accordance with that Brink's Facility's vault procedures, the Brink's Facility shall allow Authorized Persons to have access to the Metal in the Accounts upon presentation of proper credentials and during normal business hours in order to inspect and take inventory of the same. The Brink's Facility shall co-operate with Servicer and Trustee in connection with such inspection and inventory. Servicer shall indemnify and hold harmless Brink's from any liability, loss, damage, cost or expense, including reasonable attorney's fees, arising out of any bodily injury or death to any Authorized Person, or loss or destruction of or damage to the property, including Metal as a result of being on the Brink's Facility, or entering or leaving therefrom, except where Brink's is shown to be negligent. In order to provide the indemnity specified above, at all times during the term of this Agreement, Servicer shall maintain at its sole cost and expense, and shall provide evidence of such to Brink's, insurance coverage of the types and in the amounts set forth herein (or the country equivalent where Metals are stored) with a company or companies satisfactory to Brink's:

  (a) **Comprehensive General Liability Insurance** - For bodily injury and property damage, including blanket contractual liability, professional service liability and products and completed operations, in the amount of $2,000,000 combined single limit per occurrence. Said policy will contain a full and complete breach of warranty endorsement to the effect that the insurance coverage will not be invalidated as regards the interest of Brink's by any act, failure to act, omission, or neglect of Servicer which is in violation of the terms and conditions of such

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530765

insurance. This policy will cover, among other risks, the contractual liability assumed under the indemnification provisions set forth in this section.

**(b) Worker's Compensation Insurance** as required by applicable workers' compensation laws or other similar programs related to the jurisdiction involved.

**(c) Employer's Liability Insurance** in unlimited amounts where required by law and in all other jurisdictions an amount of $1,000,000 each accident for bodily injury by accident; $1,000,000 policy limit for bodily injury by disease and $1,000,000 each employee for bodily injury by disease.

**(d) Crime and Fidelity Insurance** – All representatives of Servicer must be fully bonded, either by a 3D bond or Crime or Fidelity insurance policy in the amount of $1,000,000 per occurrence.

The foregoing insurance policy or policies shall be written by a reputable insurance company or companies authorized or licensed to transact business in the jurisdiction where this Agreement shall be performed. Servicer shall notify Brink's in writing of any material modification, alteration, non-renewal or cancellation of such policy or policies at least thirty (30) days prior thereto. Servicer shall furnish Brink's with a certificate or certificates of insurance prior to the commencement of this Agreement.

7. <u>Fees and Charges</u>.

   a. For the services contemplated under this Agreement, MCC agrees to pay Brink's such service charges and fees as agreed to between the parties as set forth in Appendix B, which is incorporated in this Agreement by reference, plus all applicable taxes that Brink's is required to collect in connection with the services. All charges are exclusive of VAT.

   b. An annual review of the service charges and fees set forth in Appendix B will take place on each one year anniversary of the effective date of this Agreement, however, at any time, upon written notice, Brink's may increase service charges and fees in the event of a change in economic conditions beyond Brink's control that increases operating costs incurred by a Brink's Facility.

   c. Should MCC default in the full and timely payment of any amounts due and owing under this Agreement or otherwise default in the performance of any of its obligations hereunder, then MCC shall also be responsible for interest and all costs and expenses incurred by Brink's in the collection of such amounts owed to Brink's, including, without limitation, reasonable attorney's fees incurred in such collection ("Unpaid Obligations"). In addition to any and all other rights and remedies provided in this Agreement and under applicable law and unless otherwise provided herein, MCC hereby agrees that Brink's shall be permitted to retain as a credit and to offset against such Unpaid Obligations, on a dollar for dollar basis, any Precious Metals owned by MCC which Brink's has in its possession under this Agreement.

8. <u>Account Statements</u>. At the close of business of each Withdrawal Date or Delivery Date with respect to an Account, each Brink's Facility will send to Servicer a facsimile or electronic mail (e-mail) confirmation of the deposit or withdrawal of Metal to or from the Account on such date, together with a statement of the balance in such Account as of the close of business on such Business Day.

Brink's shall report directly to a Loan Obligor within two (2) business days, each deposit of Metal to or withdrawal of Metal from an Account for such Loan Obligor by mailing to the Loan Obligor a Commodity Title Transfer Notice ("CTTN") provided by Servicer in the form set forth in Exhibit B.

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530766

Each Brink's Facility shall send to MDC, the Servicer and CFC by email monthly (i) a statement summarizing each receipt and each delivery of the Precious Metals held by it for MCC and CFC during such month, and (ii) a detailed statement of the Precious Metals held by Brink's pursuant to this Agreement during the period covered by such statement. Unless a Depositor objects by written notice to Brink's which is received by Brink's within 10 days after such statement is sent to such Depositor, such statement shall be conclusive and binding on the Depositor. The books, accounts and records of Brink's pertaining to its actions pursuant to this Agreement shall be kept open to inspection and audit during reasonable business hours by Authorized Persons pursuant to the terms of Section 6 herein.

9. <u>Insurance</u>. Brink's is not an insurer. Brink's will, at its own expense, maintain insurance policies, which policies shall insure Brink's against such risks assumed by Brink's as described in Section 2 hereof, subject always to the provisions and exclusions contained in this Agreement. Brink's will furnish each Depositor with a certificate evidencing such insurance, upon request.

10. <u>Notice of Claims</u>. Servicer shall give written notice to Brink's within one (1) Business Day after Servicer discovers any loss, damage or destruction of Metal in an Account, but in no event more than thirty (30) days after delivery by Brink's to Servicer of a statement of the balance in the Concord Account in which the discrepancy first appears. Unless such notice is given as herein stated all claims shall be deemed waived. No action, suit or other proceeding to recover for any loss shall be brought against Brink's unless notice shall have been given as stated herein and unless such action, suit or proceeding shall have been commenced within twelve (12) months from the time a claim is made pursuant to this paragraph. Brink's confirms that it has not received written notice from any third person (not a party hereto) that the Concord Account or Metals held or to be held by Brink's in the Concord Account is subject to an ownership or security interest or lien in favor of such person (except for the interest of Loan Obligors as described in Section 5 above) and Brink's further agrees to promptly notify the Trustee and Servicer if any person shall give such notice, or shall attach, levy upon or otherwise attempt to encumber the Concord Account (if such notice is not prohibited by applicable law) and shall continue to hold all materials in the Concord Account pursuant to the terms of this Agreement pending an order from a court of competent jurisdiction directing or permitting disposition thereof. Brink's acknowledges that Servicer's and Trustee's rights (but not obligations) under the Agreement to the extent the same relate to the Concord Account or to Metals held therein, including without limitation rights of audit and inspection hereunder, have been assigned by MCC to CFC and CFC has concurrently granted a security interest therein to the Trustee, and Brink's consents to such assignments.

11. <u>Loss Reimbursement</u>. In the event of loss, damage or destruction of any Depositor's Metal held in an Account at a Brink's Facility, the parties shall promptly and diligently assist each other to establish the identity of the Metal lost, damaged or destroyed and shall take all such other reasonable steps as may be necessary to assure the maximum amount of salvage at a minimum cost. Affirmative written proof of the Metal lost, damaged or destroyed, subscribed and sworn to by Servicer and substantiated by the books, records and accounts of Servicer shall be furnished to Brink's. Brink's shall, after receipt from Servicer of a proof of loss, and subject to the terms and conditions of this Agreement, make payment to Servicer of the Market Value (as hereinafter defined) of the Metal in the Account which is the subject of such loss, damage or destruction, provided, however, that in the event Servicer or Trustee takes any salvage that is recovered, the value of such salvage shall be deducted from any payment that is required to be made by Brink's under this section. If a Depositor does not take any salvage that is recovered, such salvage shall become the property of Brink's and/or its insurers and the value thereof shall not be deducted from any payment required to be made by Brink's. Market Value for this purpose shall be the Market Value, expressed in US Dollars, on the date of such loss, damage or destruction, if such date is undisputed by the parties, otherwise, the Business Day following such Depositor's notification to the Brink's Facility of such loss, damage or destruction of Metal (the "Valuation Date"), times the declared number of fine troy ounces of Gold and troy ounces of PGM and Silver, as the case may be. The Market Value will be determined for Gold and Silver by reference to the spot price for gold and silver, as the case may be, as quoted by the London Bullion Market Association on the Valuation Date, and for PGM by reference to the

WAS:216927.2

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530767

spot price for platinum and palladium, as the case may be, as quoted by the London Platinum and Palladium Market Association on the Valuation Date. Upon payment of a claim by Brink's, the related Depositor hereby agrees to and does hereby assign to Brink's all of its right, title and interest in the property rights of recovery against third parties that are the subject of a claim and to execute any documents necessary to perfect such assignment upon request by Brink's or Brink's insurers.

12. Limitation of Liability; Non-Hazardous Material; Force Majeure.

    a.   Brink's shall not be liable for loss, damage or destruction of Metal or for non-performance or delays of service caused by or resulting from: (i) war, civil war, revolution, rebellion, insurrection, or civil strife therefrom, or any hostile act by or against a belligerent power; (ii) capture, seizure, arrest, restraint or detainment (piracy excepted), and the consequences thereof or any attempt thereat; (iii) derelict mines, torpedoes, bombs or other derelict weapons of war.

    b.   Notwithstanding anything in this Agreement to the contrary, in no case shall Brink's be liable for loss, damage or destruction of Metal or for non-performance or delays of service, damage, liability, or expense directly or indirectly caused by or contributed to by or arising from: (i) any chemical, biological, or electromagnetic weapon; (ii) the use or operation, as a means for inflicting harm, of any computer, computer system, computer software, computer software programme, malicious code, computer virus or process or any other electronic system; (iii) ionising radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel; (iv) the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof; (v) any weapon or device employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter, or (vi) the radioactive, toxic, explosive or other hazardous or contaminating properties of any radioactive matter. The exclusion in this sub-clause (vi) does not extend to radioactive isotopes, other than nuclear fuel, when such isotopes are being prepared, carried, stored, or used for commercial, agricultural, medical, scientific or other similar peaceful purposes.

    c.   Brink's shall not be liable for loss, damage or destruction of Metal or for non-performance or delays of service, liability, cost or expense directly or indirectly caused by, resulting from or in connection with any act of terrorism or any action taken in controlling, preventing, suppressing or in any way relating to any act of terrorism. An act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organization(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

    d.   Servicer represents and warrants that no shipment or container tendered to the Brink's Facility is or can be classified as hazardous material(s), substance(s) or waste(s) (hereinafter referred to as "hazardous materials") as such terms are or may be defined, described or listed in any applicable laws, or pursuant to any applicable governmental agency, instrumentality or department regulations(s) or executive order(s) issued or enacted by any governmental entity in connection with environmental protection, health or safety. In the event the aforesaid representation and warranty is breached by Servicer, knowingly or otherwise, Servicer agrees to save, defend and hold Brink's and the Brink's Facility harmless and indemnify Brink's and the Brink's Facility from and against any claims, fines, penalties, damages, costs and attorneys' fees which may be incurred by reason of this breach.

    e.   Brink's shall not be liable for non-performance or delays of service caused by strikes, lockouts or other labour disturbances, riots, authority of law, acts of God or means beyond the control of

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530768

Brink's or the Brink's Facility, but, subject to the conditions, limitations and exclusions set forth in this Agreement, Brink's shall be liable for the loss, damage or destruction of any Metal received into its possession at any time not to exceed the maximum amount stated in this Agreement. Where the Brink's Facility's ability to perform its service obligations as detailed in this Agreement is compromised by labour disturbances, commercially reasonable efforts will be made by Brink's to work with Servicer to maintain the services.

f.  The liability of Brink's shall not, under any circumstances, include special, incidental, consequential, indirect or punitive losses or damages, or interest, whether or not caused by the fault or neglect of Brink's and whether or not Brink's had knowledge that such losses or damages might be incurred.

g.  Nothing in this Agreement limits or excludes Brink's liability, if any, (1) for personal injury or death resulting from Brink's negligence; (2) for any matter for which it would be illegal for Brink's to exclude or attempt to exclude its liability; or (3) for fraud on the part of Brink's.

13. <u>Inability to Perform.</u> In the event that (i) either Brink's or a Depositor fails to perform any material obligation pursuant to the terms of this Agreement and does not cure such failure within thirty (30) days after the receipt of written notice thereof from the other party, (ii) either Brink's or MCC shall be dissolved or adjudged bankrupt, or a trustee, receiver or conservator of such party or its property shall be appointed, or an application for any of the foregoing is filed, (iii) control of either Brink's or MCC is taken over by any government or other public authority, or (iv) any government or governmental agency shall have taken any action which has materially adversely affected or will materially adversely affect a party's ability to perform any of its obligations hereunder, and such action shall not have been rescinded or modified, and the adverse effects thereof shall not have been eliminated, within thirty (30) days after written notice of such action shall have been given to the other party, then this Agreement may be terminated at any time thereafter by Brink's or Servicer upon written notice to the other party. In such event, Brink's shall promptly arrange for the delivery of all Metal held for a Depositor in accordance with the instructions of a Successor Servicer or the Trustee.

14. <u>Notices.</u> Unless otherwise specifically provided, all notices and other communications to a party hereunder shall be in writing (including tested telex, facsimile, e-mail or similar writing) and shall be given by an authorized representative of the party giving such notice (as specified by such party to the other).

If to Brink's, to:

> Brink's Global Services USA, Inc.
> 580 Fifth Avenue, Suite 400
> New York, NY, 10036
> Attention:  Ben Van Kerkwijk, Vice President – Commodities
>
> Telephone: 212-704-5267
> **Email: Ben.VanKerkwijk@brinksinc.com**
>
> With a copy to:
>
> Brink's Global Services International, Inc.
> 1801 Bayberry Court
> Richmond, VA 23226
> Attn: Legal Department

WAS:216927.2

8

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530769

If to Monex Deposit Company:

   Monex Deposit Company
   Inventory Department
   4910 Birch Street
   Newport Beach, CA 92660
   Attention: Anne Morgan

   Telephone: 949-752-1400
   Facsimile: 949-250-0553
   **Email: inventory@monex.com**

If to Monex Credit Company:

   Monex Credit Company
   4910 Birch Street
   Newport Beach, CA 92660
   Attention: Michael A. Carabini

   Telephone: 949-752-1400
   Fax No.: 949-955-1109
   **Email: mac@monex.com**

If to The Bank of New York Mellon Trust Company, N.A. (successor to BNY Midwest Trust Company):

   The Bank of New York Mellon Trust Company, N.A.,
   as Trustee
   2 North LaSalle Street, Suite 1020
   Chicago, Illinois 60602
   Attention: Structured Finance Group – Monex

   Facsimile.: 312- 827-8562

If to Concord Funding Company:

   Concord Funding Company, L.L.C.
   4900 Birch Street
   Newport Beach, CA 92660
   Attention: Brian Jenkins, Chief Financial Officer

   Fax No.: (949) 752-0607

15. <u>Investment Advice</u>. It is understood and agreed that, as part of the establishment of the Accounts, Brink's has not undertaken a duty to supervise any Depositor's investment in, or to make any recommendation to any Depositor with respect to, the purchase, sale or other disposition of, any Metal or the balances maintained in the Accounts.

16. <u>Authority</u>. Upon execution of this Agreement, each Depositor and Brink's represents to the other that they have full right, power and authority to execute, deliver and perform this Agreement, have taken all necessary corporate action to execute, deliver and perform this Agreement, and that this Agreement has been duly executed by their respective authorized officer, and that this Agreement constitutes its legal,

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530770

valid and binding obligations, subject to applicable bankruptcy, insolvency or similar laws or by general principles of equity.

17. Entire Agreement/Amendments. This Agreement and the appendices that are incorporated herein by reference, each as may be amended from time to time, constitute the entire agreement between Depositors and Brink's with respect to the subject matter hereof and supersede and cancel any and all prior and/or contemporaneous offers, negotiations, promises, exceptions and understandings, whether oral or written, express or implied between the parties. This Agreement may not be waived, altered or amended except by an instrument in writing duly executed by Brink's and Depositors.

18. Assignment. This Agreement shall be binding on Depositors and Brink's and their respective successors and assigns. Neither a Depositor nor Brink's may assign or transfer its rights or obligations hereunder without the prior written consent of the other; provided, however, that no consent shall be required in connection with the assumption of the Servicer's duties by a Successor Servicer or of the rights of the Trustee by a successor trustee.

19. Term and Termination.

a. This Agreement shall commence on the date first above written and shall continue until terminated by Brink's or any Depositor, on ninety (90) days' written notice to the other parties. In the event notice of termination is given by a Depositor, the Servicer shall designate a successor depository, and Brink's shall follow the directions of the Servicer to deliver the Metals to the successor depository. In the event such notice is given by Brink's, the Servicer shall, on or before the termination date, deliver to Brink's a designation of a successor depository and instructions to deliver the Metals to such successor depository.

b. Upon the date set forth in any notice of termination given pursuant to Section 19.a. above, this Agreement shall terminate. On or before such date, Brink's shall deliver directly to the successor depository (or, if there is no successor depository, the Depositors) all of the Metals held by it for Depositors and the Loan Obligors pursuant to this Agreement, and Servicer shall pay Brink's all fees, expenses and other amounts to which it is entitled pursuant to the terms of this Agreement.

c. In the event that Brink's shall become incapable of performing as custodian pursuant hereto, or shall be dissolved or adjudged bankrupt or insolvent, or a trustee, receiver or conservator of Brink's or its property shall be appointed, or an application for any of the foregoing is filed, or if the control of Brink's be taken over by any governmental or other public authority or officer, then this Agreement shall automatically terminate and Brinks or any trustee, receiver or conservator shall deliver to the Depositors or a successor depository all of the Metals held by Brink's pursuant hereto upon payment by Sevicer of all fees, expenses and other amounts as to which Brinks is entitled pursuant to the terms of this Agreement.

d. The costs of delivery of Metals upon termination of this Agreement shall be borne by the Servicer if termination is at the request of, or due to a breach of the Agreement by, a Depositor. If the agreement is terminated at the request of, or due to a breach by, Brink's, such costs shall be borne by Brink's.

e. The termination of this Agreement shall not affect the obligations of Brink's to Depositors or Depositors to Brink's which arise or accrue prior to the date of termination hereof.

20. Governing Law. Any claim or dispute under this Agreement and all transactions hereunder, whether based in contract, tort or otherwise, shall be governed by the laws of the State of New York, without regard to conflict of laws principles, and Depositors and Brink's further agree that any such claim or

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530771

dispute shall be adjudicated exclusively in the United States District Court for the Southern District of New York or the Supreme Court of the State of New York, New York County. The parties expressly and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York and the Supreme Court of the State of New York, New York County for the purposes of the adjudication of any such claim or dispute.

21. Confidentiality. All information regarding the Accounts, including but not limited to, (i) kind, type, quantity, form and size of Metal in the Accounts at any time, (ii) the names, addresses, phone numbers, email addresses and tax identification numbers of customers of Depositors to whom Metal is released, delivered or transferred, and (iii) shipments and transfers of Metal either into, out of or among the Accounts, is considered confidential.

Brink's shall keep such information confidential and not use such information, either for its own benefit or for the benefit of any third party or to disclose, except (i) as required by law, (ii) as otherwise agreed in writing by the Servicer and Brink's, and (iii) that Brink's may use such information where subpoenaed by governmental authority or in litigation; provided, however, that Brink's shall promptly notify Depositors of the circumstances requiring such disclosure (unless such notice is prohibited by order, subpoena or by law). Brink's and Depositors may have access to certain information identified by the other party as confidential in connection with performing their duties and obligations under this Agreement ("Confidential Information"). Brink's and Depositors (alternatively, as applicable, the "disclosing party" and the "receiving party") agree to treat such information as confidential and shall not use or disclose Confidential Information other than in the performance of this Agreement.

Notwithstanding the foregoing, the parties may disclose Confidential Information pursuant to the requirement of a governmental agency or pursuant to the requirements(s) by operation of law or court order. Confidential Information shall not include information which: (i) is in the public domain at the time of disclosure or later enters the public domain through no fault of the receiving party; (ii) is received by the receiving party from a third party independent of the disclosing party without restriction; (iii) is presently known to the receiving party or is acquired or developed by the receiving party independent of the disclosures made by the disclosing party pursuant to this Agreement; or (iv) is disclosed with the written consent of the disclosing party. This Agreement is intended to be confidential and none of its terms shall be disclosed by Brink's or Depositors to any third party without the written consent of all parties, except as required by law.

22. Use of a Party's Name. Neither Depositors nor Brink's shall use such other party's(s') trade name, likenesses, trademarks or logos, without the other party's(s') prior written consent, which includes but is not limited to any reference to the other party(s) on websites or marketing materials.

23. Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original but all of which, taken together, shall constitute one and the same instrument.

IN WITNESS WHEREOF, each party has caused this Agreement to be duly executed and delivered by its duly authorized representatives as of the date first written above.

WAS:216927.2

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530772

"DEPOSITORS":

"BRINK'S":

**Monex Deposit Company**
By Comco Management Corporation,
the General Partner

By: _____
Louis E. Carabini, President

**Monex Credit Company**
By: MetcoManagementCorporation,
the General Partner

By: _____
Michael A. Carabini, President

**Concord Funding Company, L.L.C.**
By: Concord Manager Corporation
(f.k.a. Concord Management Corporation), its
Member-Manager

By: _____
Michael A. Carabini, President

**The Bank of New York Mellon Trust Company, N.A., as successor to BNY Midwest Trust Company, not in its individual capacity, but solely as Trustee**

By: _____

Title: _____

**Brink's Global Services USA, Inc.**

By: _____
Authorized Representative

Name: _____

Title: _____

WAS:216927.2

12

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530773

"DEPOSITORS":

"BRINK'S":

Monex Deposit Company
By: Comco Management Corporation,
the General Partner

Brink's Global Services USA, Inc.

By: _____
       Louis E. Carabini, President

By: _____
      Authorized Representative

Name: DOMINIK BOSSART

Title: SUP AMERICAS

Monex Credit Company
By: MetcoManagementCorporation,
the General Partner

By: _____
       Michael A. Carabini, President

Concord Funding Company, L.L.C.
By: Concord Manager Corporation
(f.k.a. Concord Management Corporation), its
Member-Manager

By: _____
       Michael A. Carabini, President

The Bank of New York Mellon Trust Company,
N.A., as successor to BNY Midwest Trust
Company, not in its individual capacity, but
solely as Trustee

By: _____

Title: _____

WAS:216927.2

12

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530774

"DEPOSITORS":

**Monex Deposit Company**
By: Comco Management Corporation,
the General Partner

By: _____
        Louis E. Carabini, President

**Monex Credit Company**
By: Metco Management Corporation,
the General Partner

By: _____
        Michael A. Carabini, President

**Concord Funding Company, L.L.C.**
By: Concord Manager Corporation
(f.k.a. Concord Management Corporation), its
Member-Manager

By: _____
        Michael A. Carabini, President

**The Bank of New York Mellon Trust Company,
N.A., as successor to BNY Midwest Trust
Company, not in its individual capacity, but
solely as Trustee**

By: _____

Title: **Vice President** _____

"BRINK'S":

Brink's Global Services USA, Inc.

By: _____
        Authorized Representative

Name: _____

Title: _____

WAS:216927.2

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530775

**Appendix A** to the Precious Metal Storage Agreement effective as of May 2, 2016 by and between Brink's Global Services USA, Inc. Monex Deposit Company, Monex Credit Company, Concord Funding Company, LLC and The Bank of New York Mellon Trust Company, N.A.

## Brink's Facilities Performing Services Under the Agreement

| Brink's Facility Location | Maximum Liability Per Brink's Facility On Any One Day |
|---|---|
| 184-45 147th Avenue<br>Springfield Gardens, NY 11413 | US$500,000,000.00 |
| 580 5th Avenue, Suite 400<br>New York, NY 10036 | US$250,000,000.00 |
| 652 Kent Avenue<br>Brooklyn, NY 11212 | US$2500,000,000.00 |
| 1120 W Venice Blvd<br>Los Angeles, CA, 90015 | US$10,000,000.00 |
| 2179 S 300 W, Suite #4<br>Salt Lake City, UT, 84115 | US$10,000,000.00 |
| Brink's Singapore Pte Ltd<br>1 Kaki Bukit Road 1<br>#02-23 Enterprise One<br>Singapore 415934 | US$10,000,000.00 |
| Brink's Singapore Pte Ltd<br>(Singapore Freeport)<br>32 Changi North Crescent<br>The Singapore Freeport<br>Singapore 499643 | US$10,000,000.00 |

WAS:216927.2

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530776

**Appendix B** to the Precious Metal Storage Agreement effective as of May 2, 2016 by and between Brink's Global Services USA, Inc. and Monex Deposit Company, Monex Credit Company, Concord Funding Company, LLC and The Bank of New York Mellon Trust Company, N.A.

**Fees and Charges Effective as of May 2, 2016:**

a) Storage Charges:

Gold, Platinum, Palladium – Valuation Charge:     0.20% per year
(Daily Fee Calculation – Average Daily Metal Holdings x Daily Spot Price x Storage Rate / 365 days)

Silver – Volume Charge:     $0.04 per Oz per year
(Daily Fee Calculation – Average Daily Metal Holdings x Storage Rate / 365 days)

b) Handling Charges:

| | |
|---|---|
| Incoming Handling Charge Per Package: | $15 per package |
| Incoming Handling Charge Per Pallet: | $20 per pallet |
| Outgoing Handling Charge Per Package: | $19.50 per package |
| Outgoing Handling Charge Per Pallet: | $30 per pallet |

If any incoming/outgoing shipment has multiple packages/pallets the Handling Charges will be applied to each package/pallet.

c) Charges for CTTNs:

$3 for each CTTN mailed.

All local taxes on storage services in individual states (if/when applicable) shall be passed on to Depositor in addition to charges outlined above.

Terms of payment shall be 30 days from receipt of Invoice.

* All transportation charges and services are not covered within this agreement.

WAS:216927.2

14

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530777

Authorized Persons Schedule – Schedule I

**Monex Credit Company and Monex Deposit Company, jointly and severally** ("Monex") indemnifies and holds Brink's harmless from any and all liabilities, damages, losses, expenses, claims demands, suits, fines, or judgments, including but not limited to, costs and attorney's fees any Depositor (as such term is defined in the Agreement) or Brink's may incur as a result of Brink's compliance with the instructions of any person named herein as authorized to act on any Depositor's behalf. Brink's is authorized to accept and honor, without limit as to amount and without further inquiry, the instructions outlined below, whether personally benefiting any of the Authorized Signers, or deposited to the personal account of such person(s), or any of them, or otherwise. The authority of the persons named herein shall continue until revoked in writing by the related Depositor, but Brink's shall be fully protected in acting on such authority and shall not be charged with any notice of the revocation of such authority or the removal of any such person(s) unless and until it shall have actually received an amendment to this notice setting forth such revocation or removal.

| Signature | Date | Signature | Date |
|---|---|---|---|
| Michael A. Carabini | as President of the General Partner of Monex Credit Company | Louis E. Carabini | as President of the General Partner of Monex Deposit Company |
| Name | Title | Name | Title |

**Authorized Signers:** The signatures of two (2) Authorized Signers designated below as "Monex Authorized Signers", AND the signature of one (1) Authorized Signer designated below as a "Trustee Authorized Signers" shall at all times and in each and every instance be required to direct Brink's to deliver, transfer, trade, liquidate, pledge or segregate Precious Metals in Depositors' Accounts; to direct payments or transfer funds, to execute any necessary documents to accomplish any of these authorized acts; and to issue instructions to Brink's by written or electronic means.

<u>**MONEX AUTHORIZED SIGNERS:**</u>

| Name | Title | Signature |
|---|---|---|
| Michael A. Carabini | Authorized Signatory | |
| Louis E. Carabini | Authorized Signatory | |
| Brian D. Jenkins | Authorized Signatory | |
| Ron Smoler | Authorized Signatory | |
| Ryan Valadez | Authorized Signatory | |
| Richard T. Brown | Authorized Signatory | |
| David M. Ferm | Authorized Signatory | |
| Myrna R. Johnson | Authorized Signatory | |
| Joanne Lahners | Authorized Signatory | |

WAS:216927.2

15

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530778

**TRUSTEE AUTHORIZED SIGNERS:**

| Name | Title | Signature |
|------|-------|-----------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

WAS:216927.2

16

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530779

## Sample Product Register and Sample Holdings Statement – Exhibit A

## PRODUCT REGISTER

Sample Company Inc.                  Account #: 99999                           Page:    1 of 1
123 Main Street                                                        Report Date:   9/20/2004
Anywhere, USA 12345                                              Report Period:   9/20/2004 to 9/20/200

| Settlement Date | Quantity Received / Shipped | DDSC Reference | | Customer Reference |
|---|---|---|---|---|
| **GEA1** | **GOLD American Eagle, Any Year – 1 oz.** | | | |
| 9/20/2004 | 107.000 | 9234138 | LM | Transfer Reference – 95583 |
| 9/20/2004 | 23.000 | 9234172 | LM | Transfer Reference – 95588 |
| 9/20/2004 | -5.000 | 9234200 | SM | To John Doe # 711356486 s&h $35.06 |
| 9/20/2004 | -18.000 | 9234221 | SM | To L. Smith # 52963546 s&h $46.87 |
| 9/20/2004 | 15.000 | 9234244 | LM | Transfer Reference – 95605 |
| **SB1000** | **SILVER Bullion Bar -- 1000-oz.** | | | |
| 9/20/2004 | 25,162.391 | 9225887 | LM | Transfer Reference – 95590 |
| 9/20/2004 | -1,957.824 | 922589 | SM | Transfer Reference – 95591 |

END OF REPORT

WAS:216927.2

17

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530780

## HOLDINGS STATEMENT

Sample Company Inc.
123 Main Street
Anywhere, USA 12345

Account #: 99999

Page:  1 of 1
Report Date:  9/20/2004

### GOLD

| Product Code | Product Description | Ounce Conversion | Product Balance | Gross Troy Ou |
|---|---|---|---|---|
| GB1 | Bullion Bar, .9999 – 1 oz. | 1.0000 | 256.000 | 256 |
| GB10 | Bullion Bar, .9999 – 10 oz. | 10.0000 | 42.000 | 420 |
| GB100 | Bullion Bar, .995 – 100 oz. | 1.0000 | 11,531.258 | 11,531 |
| GBKG | Bullion Bar, .9999 – 1 kg. | 32.1510 | 23.000 | 716 |
| GEA1 | American Eagle, Any Year – 1 oz. | 1.0000 | 12,967.000 | 12,967 |
| GEAH | American Eagle, Any Year – 1/2 oz. | 0.5000 | 492.000 | 246 |
| GEAQ | American Eagle, Any Year – 1/4 oz. | 0.2500 | 369.000 | 92 |
| GEAT | American Eagle, Any Year – 1/10 oz. | 0.1000 | 1,275.000 | 127 |
| GML1 | Canadian Maple Leaf, .9999 – 1 oz. | 1.0000 | 8,629.000 | 8,629 |
| | | | *GOLD TOTAL* | 34,985 |

### PALLADIUM

| Product Code | Product Description | Ounce Conversion | Product Balance | Gross Troy Ou |
|---|---|---|---|---|
| PDB1 | Bullion Bar, .9995 – 1 oz. | 1.0000 | 51.000 | 51 |
| PDB10 | Bullion Bar, .9995 – 10 oz. | 10.0000 | 48.000 | 480 |
| PDB100 | Bullion Bar, .9995 – 100 oz. | 1.0000 | 109.550 | 109 |
| | | | *PALLADIUM TOTAL* | 640 |

### PLATINUM

| Product Code | Product Description | Ounce Conversion | Product Balance | Gross Troy Ou |
|---|---|---|---|---|
| PLB1 | Bullion Bar, .9995 – 1 oz. | 1.0000 | 463.000 | 463 |
| PLB10 | Bullion Bar, .9995 – 10 oz. | 10.0000 | 154.000 | 1,540 |
| PLB50 | Bullion Bar, .9995 – 50 oz. | 1.0000 | 531.594 | 531 |
| PLEA1 | American Eagle, Any Year – 1 oz. | 1.0000 | 2,315.000 | 2,315 |
| | | | *PLATINUM TOTAL* | 4,849 |

### SILVER

| Product Code | Product Description | Ounce Conversion | Product Balance | Gross Troy O |
|---|---|---|---|---|
| SB1 | Bullion Bar, .999 – 1 oz. | 1.0000 | 951.000 | 95 |
| SB100C | Bullion Bar, .999 – 100 oz. | 100.0000 | 3,698.000 | 369,80 |
| SEA1 | American Eagle, Any Year – 1 oz. | 1.0000 | 121,162.000 | 121,16 |
| SML1 | Canadian Maple Leaf – 1 oz. | 1.0000 | 18,600.000 | 18,60 |
| SB1000 | Bullion Bar, .999 – 1000 oz. | 1.0000 | 753,159.645 | 753,15 |
| | | | *SILVER TOTAL* | 1,263,67 |

WAS:216927.2

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530781

## Commodity Title Transfer Notice – Exhibit B



## STANDARD TERMS AND CONDITIONS

**1. Receipt of Goods and/or warehouse receipts therefor.**

You are hereby notified that we ("Custodian") have received custody of the goods and/or warehouse receipts thereof ("Commodities") identified on the front of this notice and to which you hold title. Custodian will hold such commodities for your benefit in accordance with the terms and conditions of the Monex Deposit Company (MDC) Purchase and Sale Agreement and the Monex Credit Company (MCC) Loan, Security and Storage Agreement and subject to any liens which may exist or be imposed to Custodian by MDC or MCC. You may request the current status of our custody of your commodities at any time by faxing a copy of the front of this notice to 949-261-5363. Without limiting in any way the applicability of any of Custodian's regulations, or of any of the terms and conditions of the aforementioned Agreements, particular attention is directed to the following:

a. Pursuant to the terms of the Agreements between you, MDC and MCC, you acknowledge that Custodian is authorized to transfer or deliver the described commodities to MDC or MCC upon receipt by Custodian of written or oral instruction from MDC or MCC without surrender of this statement and upon so doing, Custodian is free of all liability to you or other parties.

b. The warehouse receipts held by Custodian represent MDC/MCC customer commodities stored by facilities authorized in the Loan, Security and Storage Agreement. Each warehouse receipt is subject to the specific terms and conditions of storage set forth therein. Copies of such terms are available upon request from MDC. In the case of warehouse receipts, Custodian is responsible for the safekeeping of the receipt, while the issuer of the receipt is responsible for the safekeeping of the underlying commodities. Weight, fineness, and content of commodities are guaranteed only by MDC and MCC.

c. The units of commodities described represent standard MDC units as described in the Purchase and Sale Agreement unless otherwise indicated.

d. Transfers of commodities in the custody of Custodian are not complete unless reflected on records at Custodian.

e. MDC, MCC, and Custodian or their assignee or pledgee have a security interest in your commodities to the extent of your unpaid obligations thereto, if any.

f. You acknowledge that the receipt of commodities held for your benefit will be maintained collectively with the commodities held on behalf of other MCC customers which are held at one or more of several depositories throughout the United States. Custodian reserves the right at its own expense to move the commodities from one storage facility to another. Custodian also may at its own direction or that of MDC or MCC transfer custody of your commodities to another custodian provided such custodian is authorized by the aforementioned Agreements.

g. Custodian relies solely on the information it receives from MDC/MCC in performing its reconciliation of customer holdings. Custodian does not audit or review MDC/MCC records, and, accordingly, cannot represent that the information it receives is accurate.

h. You agree that you shall not grant a security interest or other right in or otherwise pledge any commodities held by Custodian to any party other than MDC, MCC, or Custodian, and Custodian will not recognize any such interest, right or pledge.

i. The provisions of this notice shall apply to and bind you, your heirs, personal representatives, successors and assigns.

**2. Delivery of Commodities.**

You are hereby notified that Custodian has released the commodities identified on the front of this notice which it has held for you to MDC pursuant to your order for delivery or transfer of these commodities. As a result, Custodian has no further liability with respect to commodities transferred.

**3. Delivery of Commodities on Sale.**

You are hereby notified that Custodian has delivered the commodities identified on the front of this notice which it has held for you to MDC pursuant to your sale. Delivery has been made at the instruction of MDC or MCC. As a result, Custodian has no further liability with respect to the commodities delivered.

19

WAS:216927.2

FOIA Confidential Treatment requested by
Monex (MDC,MCC,NSC,CFC,Comco,Metco,Monaco)

MNX-CFTC-00530782

# EXHIBIT 49

Message

| | |
|---|---|
| **From**: | Brian Jenkins [bjenkins@monex.com] |
| **Sent**: | 10/27/2011 10:40:56 PM |
| **To**: | Lawver, Matthew [Matthew.Lawver@gsslg.com] |
| **Subject**: | Re: GS NDA |
| **Attachments**: | MCC Historical Loan Performance.pdf; Monex Description of Operations.pdf |

Matthew:

Attached is our Description of Operations. This is a nice overview of the entities and should give us something to talk about. I am available for a call tomorrow afternoon (PDT) or Monday between 10:00 am and 2:00 pm PDT.

Brian


Thanks Brian.

If you could supply us with some background information (financial statements, forward projections, descriptions of customer base and margin-A/R program), that would be a good starting point. Then I think we would like to set up a call to discuss with you, maybe later tomorrow or Monday?

**From:** Brian Jenkins [mailto:bjenkins@monex.com]
**Sent:** Thursday, October 27, 2011 12:41 PM
**To:** Lawver, Matthew
**Subject:** Re: GS NDA

Matthew:

Attached is a signed copy of your Non-Disclosure Agreement. The signed original will be FedEx'd priority to your attention today.

Please let me know how you would like to proceed.

Brian


As discussed.

_____
Matthew W. Lawver
Director
Specialty Lending Group


Goldman Sachs Specialty Lending Group
6011 Connection Drive

Irving, Texas 75039
Tel: 972-368-2538 | Fax: 972-368-2596
email: matthew.lawver@gsslg.com
_____


This message may contain information that is confidential or
privileged.  If
you are not the intended recipient, please advise the sender immediately
and delete this message.  See http://www.gs.com/disclaimer/email/  for
further information on confidentiality and the risks inherent in
electronic
communication.




--
Brian D. Jenkins, CFA
Chief Financial Officer
Newport Service Corporation

bjenkins@monex.com
Office: (949)752-1400 ext. 6304
This message may contain information that is confidential or
privileged.  If
you are not the intended recipient, please advise the sender immediately
and delete this message.  See http://www.gs.com/disclaimer/email/  for
further information on confidentiality and the risks inherent in
electronic
communication.




--
Brian D. Jenkins, CFA
Chief Financial Officer
Newport Service Corporation

bjenkins@monex.com
Office: (949)752-1400 ext. 6304

MNX-CFTC-00986042

## MONEX CREDIT COMPANY
## LOAN LOSS EXPERIENCE

[Appendix A.]

|  | Year | [A.]<br>Customer<br>Loan Balance | [B.]<br>Forced<br>Liquidations | [C.]<br>Loan<br>Losses | [D.]<br>Estimated<br>Commissions |
|---|---|---|---|---|---|
| 1 | 1987 | 87,647,500 | 23,299,251 | 14,602 | 291,241 |
| 2 | 1988 | 81,672,500 | 7,006,660 | 18,953 | 87,583 |
| 3 | 1989 | 75,384,600 | 8,166,390 | 1,352 | 102,080 |
| 4 | 1990 | 80,153,400 | 25,127,127 | 15,261 | 314,089 |
| 5 | 1991 | 55,201,000 | 7,569,478 | 9,505 | 94,618 |
| 6 | 1992 | 48,484,800 | 6,080,765 | 1,613 | 76,010 |
| 7 | 1993 | 41,170,600 | 8,584,061 | 246 | 107,301 |
| 8 | 1994 | 42,521,800 | 6,655,684 | 109 | 83,196 |
| 9 | 1995 | 42,316,200 | 6,237,469 | 902 | 77,968 |
| 10 | 1996 | 50,512,400 | 5,562,700 | 50 | 69,534 |
| 11 | 1997 | 45,026,600 | 39,104,218 | 8,335 | 488,803 |
| 12 | 1998 | 44,686,000 | 25,150,124 | 28,366 | 314,377 |
| 13 | 1999 | 73,035,800 | 6,467,368 | 56 | 80,842 |
| 14 | 2000 | 84,794,600 | 4,706,330 | 835 | 58,829 |
| 15 | 2001 | 49,863,000 | 6,212,240 | 111 | 77,653 |
| 16 | 2002 | 51,385,600 | 5,410,993 | 0 | 67,637 |
| 17 | 2003 | 62,127,000 | 4,228,687 | 0 | 52,859 |
| 18 | 2004 | 83,577,000 | 11,493,240 | 1,723 | 143,665 |
| 19 | 2005 | 101,703,114 | 1,802,341 | 0 | 22,529 |
| 20 | 2006 | 162,079,155 | 45,801,333 | 1,177 | 572,517 |
| 21 | 2007 | 164,759,970 | 12,385,697 | 0 | 154,821 |
| 22 | 2008 | 187,308,113 | 94,718,790 | 20,516 | 1,183,985 |
| 23 | 2009 | 103,429,482 | 528,004 | (13) | 6,600 |
| 24 | 2010 | 119,779,485 | 7,324,379 | 3,163 | 91,555 |
| 25 | 2011 | 174,439,489 | 134,041 | 0 | 1,676 |
|  | Total |  | 369,757,369 | 126,862 | 4,621,967 |
|  | Annual Average: |  | 14,790,295 | 5,074 | 184,879 |

[A.] *Monex Credit Company monthly average customer loan balances.*

[B.] *Total annual volume of forced liquidation transactions.*

[C.] *Total account deficits resulting from liquidations of customer collateral at MDC bid less commissions.*
*(Loan Loss amounts exclude any offsetting revenues gained from spread and commissions)*

[D.] *Transactions charge "commission" revenues was estimated at 1.25%.*
*In summary, aggregate commission gains on foreclosures far exceed the miniscule loan losses.*

MNX-CFTC-00986043

**MONEX CREDIT COMPANY** [Appendix B.]

**LOAN DISTRIBUTION BY ACCOUNT EQUITY**

| Account Equity | Customer Loan Balances | % of Aggregate | Number of Accounts |
|---|---|---|---|
| 6.00 - 11.99 | 7,007.32 | 0.00% | 1 |
| 12.00 - 13.99 | 0.00 | 0.00% | - |
| 14.00 - 17.99 | 259,627.92 | 0.11% | 3 |
| 18.00 - 19.99 | 156,277.08 | 0.07% | 6 |
| 20.00 - 21.99 | 123,863.98 | 0.05% | 3 |
| 22.00 - 23.99 | 36,375.20 | 0.02% | 2 |
| 24.00 - 25.99 | 694,775.43 | 0.31% | 12 |
| 26.00 - 27.99 | 1,726,273.59 | 0.76% | 28 |
| 28.00 - 29.99 | 2,494,188.12 | 1.10% | 36 |
| 30.00 - 39.99 | 84,962,333.74 | 37.52% | 717 |
| 40.00 - 49.99 | 62,615,494.67 | 27.65% | 679 |
| 50.00 - 59.99 | 32,900,079.23 | 14.53% | 476 |
| 60.00 - 69.99 | 23,104,170.84 | 10.20% | 359 |
| >= 70.00 | 17,382,128.54 | 7.68% | 1,076 |
| TOTALS | 226,462,595.66 | 100.00% | 3,398 |

# MONEX CREDIT COMPANY
## DISTRIBUTION BY CUSTOMER LOCATION

[Appendix C.]

| Customer Location | Customer Loan Balances | % of Aggregate | Number of Accounts |
|---|---|---|---|
| California | 44,040,053 | 19.17% | 783 |
| Texas | 15,008,493 | 6.53% | 308 |
| Florida | 13,213,645 | 5.75% | 320 |
| North Carolina | 11,606,665 | 5.05% | 107 |
| Arizona | 10,239,234 | 4.46% | 106 |
| New York | 9,682,391 | 4.22% | 214 |
| New Jersey | 8,884,256 | 3.87% | 145 |
| Ohio | 7,257,698 | 3.16% | 96 |
| Illinois | 7,088,810 | 3.09% | 124 |
| Pennsylvania | 6,763,542 | 2.94% | 137 |
| Washington | 6,347,520 | 2.76% | 90 |
| Oregon | 6,247,777 | 2.72% | 67 |
| Hawaii | 5,973,856 | 2.60% | 45 |
| Michigan | 5,836,180 | 2.54% | 109 |
| Maryland | 5,631,803 | 2.45% | 78 |
| Nevada | 5,593,459 | 2.44% | 56 |
| South Dakota | 5,449,386 | 2.37% | 8 |
| Georgia | 4,092,518 | 1.78% | 88 |
| Missouri | 3,701,423 | 1.61% | 58 |
| Tennessee | 3,492,541 | 1.52% | 50 |
| Colorado | 3,491,690 | 1.52% | 90 |
| Canada | 3,526,401 | 1.54% | 43 |
| Alabama | 3,306,112 | 1.44% | 55 |
| Virginia | 3,119,874 | 1.36% | 114 |
| Utah | 2,857,307 | 1.24% | 44 |
| Kentucky | 2,509,213 | 1.09% | 26 |
| Louisiana | 2,129,300 | 0.93% | 44 |
| Wisconsin | 1,955,849 | 0.85% | 46 |
| Massachusetts | 1,923,586 | 0.84% | 65 |
| Wyoming | 1,884,622 | 0.82% | 11 |
| South Carolina | 1,739,881 | 0.76% | 51 |
| Idaho | 1,675,974 | 0.73% | 28 |
| Kansas | 1,638,423 | 0.71% | 30 |
| New Mexico | 1,636,280 | 0.71% | 35 |
| Mississippi | 1,591,983 | 0.69% | 25 |
| Indiana | 1,514,586 | 0.66% | 41 |
| Alaska | 1,500,328 | 0.65% | 22 |
| Iowa | 1,173,975 | 0.51% | 22 |
| Arkansas | 985,970 | 0.43% | 20 |
| Connecticut | 959,282 | 0.42% | 39 |
| West Virginia | 745,686 | 0.32% | 19 |
| North Dakota | 529,434 | 0.23% | 11 |
| Maine | 427,094 | 0.19% | 12 |
| Rhode Island | 363,722 | 0.16% | 11 |
| Oklahoma | 117,014 | 0.05% | 20 |
| Vermont | 77,269 | 0.03% | 9 |
| Military | 53,017 | 0.02% | 1 |
| Puerto Rico | 32,588 | 0.01% | 3 |
| Minnesota | 29,171 | 0.01% | 13 |
| Washington DC | 9,598 | 0.00% | 5 |
| Delaware | 5,977 | 0.00% | 5 |
| Mexico | 5,621 | 0.00% | 1 |
| New Hampshire | 5,064 | 0.00% | 3 |
| Montana | 5,000 | 0.00% | 5 |
| Nebraska | 314 | 0.00% | 4 |
| | 229,678,453 | 100.00% | 3962 |

MNX-CFTC-00986045

## Monex Deposit Company – Monex Credit Company
The Atlas Precious Metals Investment Account

*Edited: 10/27/11*

# *Description of Operations*

## Introduction

Louis Carabini entered the precious metals investment industry in 1967 in Long Beach, California, and became a pioneer in retail investment vehicles. The Monex name has been recognized as the industry leader for over 40 years. Now, in Newport Beach, three generations are actively working in different facets of the business. Several affiliated companies have been doing business in the Newport Beach Monex building since 1974. The Atlas program was initiated in 1985 to meet the need for a physical precious metals delivery program, which would be regulated according to state code. Monex Deposit Company and Monex Credit Company were formed as partnerships in 1987. Also, Newport Service Corporation was formed that same year to provide administrative and financial services to Monex affiliated companies. Presently, about 250 employees work for Monex affiliated companies.

## MONEX DEPOSIT COMPANY – MDC

### What MDC Buys and Sells

Monex Deposit Company ("MDC") buys and sells gold, silver, platinum and palladium in bullion and coin forms from and to customers in the retail market, and from and to dealers in the wholesale market. MDC makes a market in over 30 different precious metal products. The coins offered by MDC are bullion coins and not rare numismatic coins, and sell for a small premium over bullion bars. Customer transactions are typically in units of 10 ounces for gold, platinum and palladium, and 100 and 1,000 ounces for silver. MDC acts as a principal in all of its retail and wholesale transactions. Each retail customer has a designated Account Representative. Presently, there are 120 Monex Account Representatives. Purchases and sales transaction volume is over $4 billion per year.

### Customers

MDC receives its customers through its advertising on CNN, FOX, CNBC, the Internet and referrals. About a quarter of MDC's customers are from referrals. MDC does not do cold-call soliciting. Prospective customers contact Monex by telephone, by the hundreds each day. When a prospective customer contacts MDC, the person is assigned to one of MDC's Account Representatives through its automated call distribution system. Nearly all customers are U.S. residents spread across America. [See Appendix C] Generally, customers are high net worth individuals.

1

## MDC Price Quotations

MDC quotes and publishes its retail prices, at which it will buy and sell throughout each trade day. Normal business hours are from 5:30 AM to 5:30 PM PST Monday through Friday. MDC's prices change often on all products throughout the day, and are electronically transmitted to MDC sales personnel and published live on the Internet. The "ask" price is the offer to sell price to customers and the "bid" is the offer to buy price. The differences between bid-ask is referred to as "the spread." Typically, spreads are around 3%, plus or minus 1.5%.

## Trade Desk Confirmation

MDC customers execute orders on a three-party recorded conference line. The customer, his Monex Account Representative and an administrative trade desk clerk all confirm the order. Once confirmed, the order is processed and a written trade confirmation is mailed within 24 hours. In addition to market orders, customers may place limit and stop-limit orders on this same recorded trade desk line. All orders are posted to the on-line customer site every half hour, along with mark-to-market valuations and equity calculations.

## Full Physical Delivery

MDC meets all its retail obligations by buying and selling physical metal, as needed, to assure timely delivery. MDC maintains large quantities of bullion and coin inventories at several depositories across the United States, which stand ready to be transferred to new purchasers. Customers may choose to take personal delivery or receive delivery and title through their Monex-designated Custodian. A Custodian is a bank or nationally recognized COMEX depository. When MDC notifies the Custodian that title of a specified quantity of precious metals has been transferred to a customer, MDC's obligation to that customer for that purchase is completed. Following notification, the Custodian sends the customer a Commodity Title Transfer Notice stating that they have such metal in their custody, and that they are holding it for the benefit of the customer. The customer retains title to the metal, until such time as he takes personal delivery, or sells his metal to MDC. All customer products at Custodians are stored on a fungible basis.

## MDC's Competition

There are thousands of precious metal dealers and market-makers around the world. Most dealers in the U.S. are coin dealers specializing in numismatic items and provide only personal delivery. Monex is unique in having a sizable, long-running business specializing in physical precious metals for delivery or storage, and on a financed basis through its proprietary Atlas program.

## MDC Trading Counterparts

MDC has long-standing relationships with many wholesale physical precious metals dealers, who are wholesale trading counterparts. MDC has a few commodity futures brokerage accounts, for the purpose of hedging and taking or making delivery of exchange warehouse receipts. Also, MDC is an official authorized distributor for two Government Mints, the Royal Canadian Mint and the Austrian Mint. Wholesale transactions, which are generally large in nature, are typically traded according to the London market "LBMA" fixing prices for each of the specific precious metals. However, on a minute-by-minute basis, wholesale and retail dealers adjust their prices based on transaction reporting from the NYMEX/COMEX futures markets.

2

## MONEX CREDIT COMPANY – MCC

**Financing a Purchase**

Monex Credit Company ("MCC") provides financing to customers, who wish to purchase precious metals from MDC on credit. Historically, approximately 25% of MDC's customers have purchased metals using funds borrowed from MCC, pursuant to the Atlas loan agreement. Credit customers can always take immediate delivery of their product purchased by paying the balance owed on their loan. The loans are payable on demand and bear interest at variable rates determined by MCC, where rates are generally about 2.5% above prime. MCC also charges customers a monthly service fee of a few dollars per unit of commodity held at month-end.

**Loan Collateral**

The metals purchased serve as collateral for the loans. The metals securing all MCC loans are held in insured independent depositories. Customers have title to the collateral, while MCC maintains possession, control and its security interest. MCC currently lends up to 75% of the value of the metal upon loan origination. MCC increases the initial equity requirements, when metal prices increase rapidly, to protect customers from the likelihood of collateral calls and forced liquidation resulting from an equally rapid decline. Loan sizes vary from near zero to over $1,000,000. Recently, customer borrowings have ranged up to $250 million, while customer ownership amounts on account have ranged up to $800 million.

**Commodity Leasing**

MCC also loans (leases) bullion. Customers who wish to be "short" the market, with the hope of gaining by a later decrease in price, can do so by borrowing a commodity from MCC and immediately selling it to MDC. Such borrowers can then wait and, hopefully, purchase the commodity later at a lower price and return it to MCC. However, if the price is higher when he purchases it, the borrower will suffer a loss. Borrowing commodities involves lease fees. Such fees are quoted as annualized percentage rates, and vary with each metal.

**Commercial Loans and Leases**

The Atlas program is designated as commercial, and non-consumer, by the State of California. In 1985, Monex obtained a formal opinion from the California Commissioner of Corporations that the financed purchase of precious metals on the terms offered by Monex involve commercial loans, and not consumer transactions. This is because a "consumer" is defined as an individual who acquires goods or services primarily for personal, family or household purposes, whereas Monex transactions are for investment purposes. The Atlas account cannot serve "personal, family or household purposes," when customers do not have physical possession, and the metal is held by an independent depository in fungible bulk form. Furthermore, JAMS, which has dispute jurisdiction according to the arbitration section of the Customer Account Agreement, has upheld the designation. They have determined and ruled: "*that these kinds of contracts involving investment in metals or metals contracts are not considered the purchase and/or sale of goods or services that are personal in nature. Thus this matter is a non-consumer matte*r."

**Loan Monitoring**

When MCC finances metals purchase, the customer is required to make an initial payment of at least 25% of the purchase price. For the purpose of monitoring the loan, the metal is valued at

MNX-CFTC-00986048

MDC's bid price, which is about a percent lower than wholesale. Account equity is recalculated throughout the day to reflect current market value of the metals, accrual of interest, the inflow or outflow of cash, and any changes in positions. The customer must maintain his equity above the minimum required level, which is currently 14%. Should the customer's account equity fall below the minimum required level, MCC will issue a collateral call requiring the customer to raise the equity to the current initial required level. If the customer fails to meet the collateral call within the required time period, which is no more than 5 days, MCC will sell enough of the metals securing the loan to raise the account's equity above the current initial required equity level. In periods of abnormally high volatility, MCC increases customer equity requirements. If metals prices are relatively volatile at the time of a collateral call, or the amount of the call is large, MCC may require the borrower to wire the call amount. MCC will not wait for collateral calls to be made, when the price continues to fall and breaches the foreclosure 7% equity level.

**MCC Foreclosure Efficiencies**
Irrespective of a collateral call, if the customer's equity ever falls below half of the minimum 14% required level, which is the 7% foreclosure level, MCC sells (without customer notification) metal securing the loan. The amount sold is typically the minimum amount necessary to raise the equity above the initial investment requirement. If all the account collateral is liquidated and the proceeds are insufficient to repay the loan, MCC will establish a reserve for the potential loan loss and take action to collect the remaining outstanding balance that it is owed. If the balance is not recovered within 30 days, the customer receivable is written off and a loan loss is incurred. Because of the efficient nature of the collateral, along with Monex loan monitoring diligence, loans losses have been miniscule. [See Appendix A] Monex uses an "Auto-Force-Sell" application, which does instant portfolio-wide batch foreclosures. This system, which does not use Account Representatives to execute liquidations, enables Monex to liquidate its portfolio pool-wide in seconds. Loan equity is monitored continuously and foreclosures are done instantly throughout the day. Note, that although there is no limit to the number that the computer system can execute, it is generally few because of the equity percent stratification of individual investor self-directed accounts. [See Attachment B] The system automatically books the liquidation orders to customer accounts based on metals sold, and applies the proceeds to the loan. Of course, disaster recovery is a critical component of projected reliability. Monex maintains its backup files in two off-site locations. Furthermore, as a fail-safe precaution, Monex has a real-time off-site dynamic "Hot" backup facility for equity management programs.

**Customer Monthly Statement**
At month-end, MCC mails each customer a monthly statement that details the activity in the account during the month, a status of the holdings in the account as of the last day of the month, the prevailing interest and lease rates, and a year-to-date summary. The activity section shows the quantities and prices of all purchases and sales during the month and all related charges and credits, such as commissions, service fees, lease fees and interest. The status section shows a "snapshot" of the account holdings and values. The interest and lease rate section shows the current rates and date and rate of any changes. The summary section shows the total interest, services fees and net realized gains and losses for the calendar year-to-date. In addition to the Monthly Statement, Monex mails an Annual Statement at year-end. Also, Monex customers can access their account information on-line in real-time, which is posted with mark-to-market equity calculations each half-hour.

4

MNX-CFTC-00986049

## ACCOUNTING AND FINANCIAL SERVICES – NSC

**Administrative Services**

Newport Service Corporation ("NSC") provides various administrative, accounting, financial, inventory control, data processing, marketing, publishing, and compliance support services to MDC, MCC and other affiliated companies. Officers are Michael Carabini, President, Gregory G. Walker, Vice President-Law and Brian Jenkins, CFO. [See Attached Management Bios]

## ACCOUNT ADMINISTRATION

**Documents**

If a prospective customer is interested, they are sent a package of marketing material. Marketing fulfillment packages include, sales brochures, market reports, informational DVDs and financial books. Also, each package contains the Atlas Agreement, titled "Purchase and Sale Agreement," and "Loan, Security and Storage Agreement," which must be executed by the customer in order to open a storage or financed account. For the purpose of accounts receivable funding, the original Customer Account Agreement ("CAA"), as chattel paper, is designated to a specific lender. Upon the customer's first transaction, the account is assigned to a lender-specific pool and the customer loan is pledged to that financial institution. For a loan to be eligible for the borrowing base, the CAA must be delivered to that lending institution or its document custodian.

**Written and Verbal Disclosures**

Monex is extremely thorough in regards to investment legal disclosures. For example, the Purchase and Sale Agreement states the role of MDC as a principal, that investing in precious metals is of high risk, that one can lose more than one's investment, that MDC's prices may differ from prices quoted by other dealers and markets, and that Monex and it representatives act as principals and have an inherent conflict of interest. The Loan, Security and Storage Agreement further discloses the risks of borrowing for investment purposes, the interest rates and their application to the account, and the monthly service fees. Furthermore, before the customer is allowed to place his first credit purchase, he is read a verbal disclosure statement, which is recorded. The transcript of this verbal disclosure is included in the fulfillment package he receives. In summary, the recorded disclosure re-emphasizes some important issues of the Customer Agreement, such as, that they have read and understand the Atlas Customer Account Agreement, that their account is self-directed, that there is no guarantee of profit and they can lose money. In addition, the customer's written Confirmation reiterates many of the disclosures made in the Agreements and the recorded Verbal Disclosure. Though its disclosures could not be more extensive, Monex has included in their Agreements the ability of the customer to rescind their very first order within five days.

**Account Representative Monitoring**

Account Representatives are required to contact customers solely from their office phone and not from home, by cell phone, nor by e-mail. As such, Monex has a system whereby management can monitor conversation at any time without detection. Both MDC sales management and the NSC Compliance Department monitor calls on an ongoing basis to assure compliance with policies, accuracy and the Monex exceptional code of professionalism.

5

 MNX-CFTC-00986050

**Large Account Monitoring**

Large account holders are periodically called as a matter of company policy. Such calls are made by a manager or administrative person about every 4 to 6 months. The purpose is to determine the customer's satisfaction with the services of his or her Account Representative, the timely receipt and accuracy of trade confirmations and statements, and if there are any questions or other requests. Such conversations are recorded and reviewed by the company's Compliance Department.

**Inventory Records**

Metals collateral securing MCC's loans, and metals owned by MDC as inventories, are stored at insured depositories. A Monex-designated customer Custodian is either a bank or a COMEX-approved depository. The Custodian depository provides safekeeping for both the metals it holds and the metals at other depositories that are subject to NYMEX/COMEX warehouse receipts. Each business day, detailed reports are produced and delivered to each customer Custodian, and also the applicable borrowing base reports are delivered to each lending institution. All customer positions and MDC inventories are marked to the market at prevailing prices. Custodial reports, which are provided to those depositories, show every customer to whom has title to a quantity of metals held, its value, and the amount the customer owes MCC. In addition, a report shows a summary of the entire quantity of commodities held and the quantity for which customers hold title, of which excess amounts are MDC inventories.

**Warehouse Receipt Storage**

The NYMEX/COMEX is the CFTC federally regulated futures exchange. Historically, precious metals contracts made delivery of physical bullion through warehouse receipts as negotiable bearer instruments. Now, the warehouse receipts are more efficiently held without paper form through FCM futures brokerage accounts, regulated by the CFTC. About five depositories are approved by the exchange. As part of the exchange rules, these licensed depositories must provide periodic audits of the metals by independent auditors. This provides an extremely efficient mechanism for transferring the ownership of authenticated metals between commercial dealers, investors, fabricators and refiners. Warehouse receipts are held by Custodian depositories as commodity to pass title to customers, within a lender-specific asset pool.


## OTHER COMPANIES

**Monex Affiliated Companies**

Concord Funding Company, LLC, was established in 1995 as a bankruptcy-remote single purpose entity to achieve structured financing of an asset-backed securitization. MCC originated loans are sold at-par to Concord Funding. Concord has tended to average about $100 million in outstanding structured funding, with remaining Atlas funding requirements achieved through traditional borrowing base driven variable funding facilities. Concord Funding's general manger is Concord Manager Corporation. MCC's general partner is Metco Management Corporation and MDC's general partner is Comco Management Corporation. Monaco Financial, LLC, was established in 1997 to specialize in certified numismatic collectibles.

6

MNX-CFTC-00986051

# EXHIBIT 50

Monthly Customer Statement

# MONEX CREDIT COMPANY

**4910 Birch Street    Newport Beach    California    92660**

**(949) 752-1400    (800) 949-GOLD (4653)**



SHEENA & YUN LIU

| ACCOUNT NUMBER |
|---|
| ▮▮▮455-0 |
| ACCOUNT REPRESENTATIVE |
| JAMES Y. IPEK (2116) |
| DATE |
| JULY 31, 2011 |

| DATE | TRANSACTION NUMBER | TRANSACTION TYPE | UNITS | DESCRIPTION | LOAN BALANCE | BORROWED COMMODITY SELL PROCEEDS |
|---|---|---|---|---|---|---|
| | | | | BALANCE FORWARD | 53,698.01CR | |
| | | | | ACTIVITY DURING MONTH: | | |
| 07/07/11 | 312332 | SOLD | 2 | 1000 OUNCES SILVER  05/12/11 | 72,236.00 | |
| | | | | PROFIT $5,574.00 | | |
| 07/07/11 | 315138 | SOLD | 2 | 10 OUNCES PALLADIUM 03/15/11 | 15,484.00 | |
| | | | | PROFIT $1,284.00 | | |
| 07/14/11 | 314212 | PURCHASED | 1 | 10 OUNCES PLATINUM | (17,784.00) | |
| 07/21/11 | 324510 | SOLD | 4 | 10 OUNCES PALLADIUM 02/24/11 | 31,916.00 | |
| | | | | PROFIT $564.00 | | |
| 07/29/11 | 329493 | PURCHASED | 2 | 10 OUNCES PLATINUM | (35,932.00) | |
| 07/31/11 | | | | INT. & LEASE CREDITS | 207.09 | |
| 07/31/11 | | | | SERVICE FEE | (15.00) | |
| | | | | BALANCE MONTH-END | 119,810.10CR | |
| | | | | MONTH END ACCOUNT STATUS: | ORIGINAL TRANSACTION AMT | MARKET VALUE |
| 06/13/11 | 303130 | OWNED | 1 | 1000 OUNCES SILVER | 35,885.00 | 39,789.00 |
| 07/14/11 | 314212 | OWNED | 1 | 10 OUNCES PLATINUM | 17,784.00 | 17,686.00 |
| 07/29/11 | 329493 | OWNED | 2 | 10 OUNCES PLATINUM | 35,932.00 | 35,372.00 |
| | | | | TOTAL OWNED COMMODITY | 89,601.00 | 92,847.00 |
| 07/31/11 | | | | ACCOUNT SUMMARY: | | |
| | | | | LOAN BALANCE | 119,810.10CR | |
| | | | | TOTAL INDEBTEDNESS | 119,810.10CR | |
| | | | | MKT.VAL.OWNED COMMODITY | 92,847.00 | |
| | | | | EQUITY | 212,657.10 | 229.0% |
| | | | | PAGE 1 OF 1 | | |

| PLEASE NOTE EFFECTIVE:  08/01/11 | | | | | YEAR TO DATE SUMMARY | |
|---|---|---|---|---|---|---|
| | ANNUAL LOAN RATES | SILVER | GOLD | PLATINUM | PALLADIUM | INT. & LEASE CHARGES | INT. & LEASE CREDITS |
| CHARGED: | 5.90% | (2.00%) | (2.00%) | (2.00%) | | 0.00 | 1,374.00 |
| CREDITED: | 2.00% | | | | 0.00% | SERVICE FEES | REALIZED PROFIT (LOSS) |
| REMIT FUNDS TO: MONEX CREDIT CO., PO BOX 71640, CHICAGO, IL 60694-1640 | | | | | (209.50) | 23,054.00 |

IF YOU BELIEVE YOUR MONTHLY STATEMENT IS INACCURATE YOU SHOULD PROMPTLY CONTACT THE MONEX COMPLIANCE DEPARTMENT. YOUR FAILURE TO DO SO WITHIN TEN (10) BUSINESS DAYS OF YOUR RECEIPT OF THIS STATEMENT WILL RESULT IN YOUR WAIVER OF ALL RIGHTS TO CONTEST SUCH MATTER.

FOIA Confidential Treatment Requested by
Monex (MDC, MCC, NSC, CFC, Comco, Metco, Monaco)

MNX-CFTC_00042779

**EXHIBIT 51**

# Monex



4910 Birch Street, Newport Beach, CA 92660 • (949) 752-1400

## CONFIRMATION

| DATE | TRANS-ACTION NUMBER | DEL. OR REC. | BOUGHT | SOLD | DESCRIPTION | TOTAL BUY/SELL CHARGE | UNIT PRICE | (DEBIT)/CREDIT | TOTAL |
|------|------|------|------|------|------|------|------|------|------|
| 06/21/13 | 321470 | | 2 | | 10 OUNCES PLATINUM PURCHASE | 0.00 | 13898 *1354* | (27,796.00) | (27,796.00) |
| 06/21/13 | 321474 | | 2 | | 1000 OUNCES SILVER PURCHASE | 0.00 | 20170 *1921* | (40,340.00) | (40,340.00) |
| | | | | | TOTAL | | | | (68,136.00) |

*75000.*

YOUR ACCOUNT IS SELF-DIRECTED. THIS MEANS YOU ARE RESPONSIBLE FOR ALL PURCHASING, SELLING AND BORROWING DECISIONS FOR THE ACCOUNT. IF THIS CONFIRMATION CONTAINS ANY TRANSACTION WHICH YOU HAVE NOT AUTHORIZED OR ANY OTHER INACCURACY, YOU MUST REPORT IT IMMEDIATELY TO THE MONEX COMPLIANCE DEPARTMENT. YOUR FAILURE TO DO SO WITHIN TEN (10) BUSINESS DAYS OF YOUR RECEIPT OF THIS CONFIRMATION WILL RESULT IN YOUR WAIVER OF ALL RIGHTS TO CONTEST SUCH MATTER.

PAGE 1 OF 1

SHEENA & YUN LIU

SAN MARCOS          CA 92069

| ACCOUNT NUMBER |
|---|
| |
| ACCOUNT REPRESENTATIVE |
| JAMES Y. IPEK (2116) |
| CONFIRMATION DATE |
| JUNE 21, 2013 |

THE REVERSE SIDE OF THIS PAGE CONTAINS IMPORTANT INFORMATION. PLEASE READ IT.

# EXHIBIT 52

# MONEX CREDIT COMPANY
4910 Birch Street
Newport Beach, CA 92660
949-752-1400

# ACCOUNT SUMMARY

Retain for your Records

Page 1 of 1

## TAX YEAR 2014

Date Prepared: JANUARY 28, 2015

Recipient's Name and Address

**Account Number:** ████679-0

Account Representative:
MICHAEL MOLFINO (2142)
1-800-949-4653

SUZANNE L. CAPPELLO &
VIRGINIA TAROZZI
C/O PATRICIA THORBURN

NAPLES        FL 34112

### DETAIL INFORMATION

| DATE | TRANSACTION NUMBER | TRANSACTION TYPE | UNITS | DESCRIPTION | LOAN BALANCE | BORROWED COMMODITY SELL PROCEEDS |
|---|---|---|---|---|---|---|
| | | | | BALANCE FORWARD | (100,067.84) | |
| | | | | ACTIVITY DURING YEAR: | | |
| 03/13/14 | 413283 | PURCHASED | 13 | 10 1oz PLATINUM LEAF | (201,396.00) | |
| | | | | COMMISSION | (2,013.96) | |
| 03/13/14 | 421419 | SOLD | 20 | 10 PALLADIUM LEAFS 11/21/13 | 157,060.00 | |
| | | | | COMMISSION | (1,178.00) | |
| | | | | PROFIT $5,220.40 | | |
| 05/12/14 | 413283 | SOLD | 13 | 10 1oz PLATINUM LEAF 03/13/14 | 190,008.00 | |
| | | | | COMMISSION | (1,900.08) | |
| | | | | LOSS $15,302.04 | | |
| 06/03/14 | | | | CASH PAID | (37,748.78) | |
| 06/03/14 | | | | WIRE FEE | (10.00) | |
| 12/31/14 | | | | INT. & LEASE CHARGES | (2,601.08) | |
| 12/31/14 | | | | INT. & LEASE CREDITS | 45.74 | |
| 12/31/14 | | | | SERVICE/STORAGE FEE | (198.00) | |
| | | | | BALANCE YEAR-END | 0.00 | |
| 12/31/14 | | | | ACCOUNT SUMMARY: | | |
| | | | | LOAN BALANCE | 0.00 | |
| | | | | TOTAL INDEBTEDNESS | 0.00 | |
| | | | | EQUITY | 0.00 | |

### YEAR TO DATE SUMMARY

| INT. & LEASE CHARGES | INT. & LEASE CREDITS |
|---|---|
| (2,601.08) | 45.74 |

| SERVICE FEES | REALIZED PROFIT (LOSS) |
|---|---|
| (198.00) | (10,081.64) |

CREDIT COMPANY

**2014 Form 1099-INT**
Interest Income
Copy B for Recipient
Department of the Treasury - Internal Revenue Service
(OMB No. 1545-0122)

ayer ID Number: *******6559
ount Number: ███ 679-0

Page 1 of 1
Date Prepared: JANUARY 28, 2015

### Recipient's Name and Address

### Payer's Name and Address

MONEX CREDIT COMPANY
4910 BIRCH STREET
NEWPORT BEACH, CA 92660
949-752-1400

SUZANNE L. CAPPELLO &
VIRGINIA TAROZZI
C/O PATRICIA THORBURN
███████

NAPLES     FL 34112

Federal ID Number: ████████

| Box | Description | | Total |
|-----|-------------|---|-------|
| 1 | Interest Income | $ | 45.74 |
| 4 | Federal Income Tax Withheld | | 0.00 |

**This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported. If you have any questions regarding information on this form please call us.**

# EXHIBIT 53

```
NEWPORT SERVICE                                                                          DATE 03/31/16  PAGE    1
P4300-R017                                                                               RUN 04/01/16  00:55

                                        POSITION REPORT
                           * CONFIDENTIAL PROPERTY OF THE COMPANY *
```

| NAME KEY / ACCT. NO. | C U S T O M E R | EQ% | NUMBER | TRADE DATE | UPDT /TERM | UNITS | COMMODITY | BALANCE | COST | PRICE CURRENT | AGE/FEE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| H=N L= C= V=N #=Y SD | | EQUITY: 1,463 | | 1,463 | 03/31 | | CASH BAL | 1,463.18- | MV: | 0 | |
| | | 100.00% | | M-CUSH: 1,463 | | | ACCT BAL | 1,463.18- | | | 1,463.18 XSEQ |
| H=N L= C=K V=Y #=Y CA | | EQUITY: 684 | | 684 | 03/31 | | CASH BAL | 684.33- | MV: | 0 | |
| | | 100.00% | | M-CUSH: 684 | | | ACCT BAL | 684.33- | | | 684.33 XSEQ |
| H=N L=F C= V=N #=N CA  GAIN: 47,660 | | EQUITY: | 0270508 | 05/04/88 | 02/09 | 2 | AC | 16,256.00 | MV: 23330 | | |
| | | 65.89% | | 31,404 | 03/31 | | CASH BAL | 16,256.47 | 47,660 | | 20,918.33 XSEQ |
| | | | | M-CUSH: 24,732 | | | ACCT BAL | 16,256.47 | | | |
| H=N L=A C=F V=Y #=Y CA  GAIN: 9,029 | | EQUITY: | 0429478 | 09/29/99 | 12/30 | 1 | GBX | 3,138.38 | 3138.38 12168 | | |
| | | 99.10% | | 12,058 | 03/30 | | CASH BAL | 3,028.76 | MV: 12,168 | | 9,381.42 XSEQ |
| | | | | M-CUSH: 10,354 | | | ACCT BAL | 109.62 | | | |
| H=N L= C=G V=Y #=Y AK | | EQUITY: 110 | | 110 | 04/11 | | CASH BAL | 109.93- | MV: | 0 | |
| | | 100.00% | | M-CUSH: 110 | | | ACCT BAL | 109.93- | | | 109.93 XSEQ |
| ATF H=N L= C=V V=N #=Y CA | | EQUITY: 1,799 | | 1,799 | 03/31 | | ACCT BAL | 1,799.20- | MV: | 0 | 1,799.20 XSEQ |
| | | 100.00% | | M-CUSH: 1,799 | | | | | | | |
| H=N L= C=F V=Y #=Y CA | | EQUITY: 10,902 | | 10,902 | 03/31 | | CASH BAL | 10,901.70- | MV: | 0 | |
| | | 100.00% | | M-CUSH: 10,902 | | | ACCT BAL | 10,901.70- | | | 10,901.70 XSEQ |
| H=N L=A C=S V=G #=Y CA  GAIN: 7,239 | | EQUITY: | 0323141 | 10/23/14 | 11/14 | 2 | SABV | 3,960.54 | 1980.27 1775 | 526 DAYS | |
| | | 102.01% | 0266821 | 08/20/90 | 03/02 | 1 | SC | 5,520.00 | 5520 13170 | | |
| | | | | 17,056 | 03/21 | | CASH BAL | 9,816.60- | MV: 16,720 | | 12,876.06 XSEQ |
| | | | | M-CUSH: 14,715 | | | ACCT BAL | 336.06- | | | |
| ATF H=N L= C=S V=G #=Y IL | | EQUITY: 11,250 | | 11,250 | 03/31 | | CASH BAL | 11,250.18- | MV: | 0 | |
| | | 100.00% | | M-CUSH: 11,250 | | | ACCT BAL | 11,250.18- | | | 11,250.18 XSEQ |
| H=N L=A C=K V=Y #=Y KS  LOSS: 106,535 | | EQUITY: | 0301231 | 02/01/13 | 02/25 | 61 | SBSI | 202,122.89 | 3313.49 1567 | | |
| | | 92.79% | | 88,694 | 03/02 | | CBSH | 195,230.01- | MV: 95,587 | | 64,797.37 XSEQ |
| | | | | M-CUSH: 75,312 | | | ACCT BAL | 6,892.88- | | | |
| H=N L= C=L V=Y #=Y GA | | EQUITY: 2,874 | | 2,874 | 03/31 | | CASH BAL | 2,873.72- | MV: | 0 | |
| | | 100.00% | | M-CUSH: 2,874 | | | ACCT BAL | 2,873.72- | | | 2,873.72 XSEQ |

# EXHIBIT 54

```
NEWPORT SERVICE                                    POSITION REPORT SUMMARY                    DATE 08/16/16 PAGE    1
P4315-R015                                              TEAM: 000                             RUN  08/17/16 00:41

ACCT-REP   ACCOUNTS  TRADES      GAINS     LOSSES  UNITS   LONG-MV  COMLOAN-MV  TOTAL-MV    BALANCE      XSEQ   EQ-PCT

  EMPLOYEE    65       24      151,619    12,087    242   303,121        0      303,121   8,217,518-  8,424,285  810.97%
  MONACO      20       19            0    15,575    449    49,175        0       49,175     604,154-    646,741  365.18%
s SCC          7        2            0         0      2         0        0            0      93,631          2,347  100.00%

TEAM TOTAL    92       45      151,619    27,662    693   352,296        0      352,296   8,728,042-  9,073,374  582.58%
```

```
NEWPORT SERVICE                           POSITION REPORT SUMMARY                    DATE 08/16/16  PAGE       2
P4315-R015                                      TEAM: 003                            RUN  08/17/16 00:41
```

| ACCT-REP | ACCOUNTS | TRADES | GAINS | LOSSES | UNITS | LONG-MV | COMLOAN-MV | TOTAL-MV | BALANCE | XSEQ | EQ-PCT |
|---|---|---|---|---|---|---|---|---|---|---|---|
| J BOHUSLAVIZ | 163 | 238 | 2,746,618 | 2,353,360 | 1,249 | 10,847,845 | 3,709,847 | 14,557,692 | 4,416,827- | 8,573,823 | 88.62% |
| T CASTALDI | 214 | 198 | 224,406 | 927,135 | 589 | 4,649,785 | 681,774- | 5,331,559 | 2,932,450- | 5,717,438 | 130.59% |
| C CHANGE | 1 | 1 | 15,008 | 0 | 1 | 14,938 | | 14,938 | 775- | 14,978 | 125.27% |
| R DEVOGLER | 233 | 235 | 819,077 | 944,337 | 682 | 3,860,931 | 2,337,735 | 6,198,666 | 3,947,633- | 54,176 | 93.96% |
| A DIAZ | 226 | 370 | 932,691 | 3,146,488 | 1,360 | 9,155,968 | 135,840 | 9,291,808 | 188,757- | 6,871,931 | 98.37% |
| A DURRANI | 69 | 103 | 68,073 | 144,907 | 409 | 3,000,082 | 1,131,297 | 4,131,379 | 758,254- | 1,863,571 | 77.40% |
| S FALLON | 235 | 311 | 1,250,074 | 2,416,862 | 1,508 | 12,745,562 | 3,333,552 | 16,079,114 | 8,129,106- | 1,801,566 | 111.07% |
| R FREMAN | 174 | 202 | 2,711,112 | 541,714 | 2,356 | 17,398,942 | 1,251,302 | 18,650,244 | 1,593,515- | 10,449,148 | 80.94% |
| D GOLAN | 190 | 172 | 542,412 | 835,991 | 823 | 5,251,443 | 0 | 5,251,443 | 760,109- | 4,798,216 | 114.64% |
| P HORN | 133 | 180 | 322,020 | 996,787 | 827 | 4,148,483 | 13,584 | 4,162,067 | 452,598 | 2,711,037 | 89.03% |
| C IMKAMP | 175 | 217 | 1,667,779 | 2,232,615 | 1,180 | 6,892,303 | 6,069,197 | 12,961,500 | 6,938,346- | 5,265,587 | 77.63% |
| J IPEK | 218 | 406 | 649,223 | 2,702,264 | 1,353 | 8,628,188 | 1,094,760- | 9,722,948 | 2,875,000- | 8,202,699 | 112.88% |
| A JOHNSTON | 197 | 408 | 1,638,878 | 1,998,366 | 1,885 | 11,668,001 | 56,620 | 11,724,621 | 477,108 | 8,368,979 | 95.23% |
| M KARBY | 190 | 296 | 274,047 | 7,352,128 | 2,320 | 21,091,968 | 220,099 | 21,312,067 | 3,121,931- | 19,237,887 | 114.27% |
| B KENNEDY | 233 | 300 | 775,228 | 1,041,489 | 1,260 | 15,907,825 | 220,099 | 16,127,924 | 1,758,286- | 10,442,836 | 89.09% |
| J KIM | 65 | 35 | 94,554 | 111,495 | 342 | 1,603,490 | 383,500- | 1,986,990 | | 2,557,015 | 184.11% |
| A LEVINE | 267 | 667 | 5,860,718 | 859,924 | 2,111 | 12,065,957 | | 12,065,957 | | 11,225,727 | 91.42% |
| H MANNINO | 288 | 269 | 1,752,718 | 1,723,221 | 1,197 | 1,067,557 | 27,378 | 1,094,935 | | | 83.61% |
| G MORTON | 185 | 364 | 4,675,109 | 697,231 | 1,811 | 19,494,790 | 0 | 19,494,790 | 3,222,090- | 11,663,566 | 94.77% |
| A MOSS | 217 | 176 | 608,014 | 496,315 | 498 | 4,713,248 | 20,009- | 4,733,257 | 293,391 | 3,354,933 | 94.32% |
| M PATTON | 401 | 754 | 4,784,500 | 9,232,128 | 6,202 | 33,869,895 | 4,203,700- | 38,073,595 | 2,735,529- | 24,287,194 | 90.29% |
| A REYES | 169 | 113 | 95,143 | 1,365,766 | 575 | 3,653,364 | 1,905,077- | 5,558,441 | 2,633,315- | 3,291,050 | 72.89% |
| K SMITH | 125 | 147 | 693,808 | 493,298 | 481 | 4,939,590 | 60,027- | 4,999,617 | 1,278,287- | 2,424,484 | 89.43% |
| D SOULAKIS | 54 | 113 | 798,743 | 121,372 | 419 | 6,896,446 | 0 | 6,896,446 | 4,200,118 | 1,050,523 | 39.43% |
| D ST.AMANT | 126 | 159 | 118,982 | 1,017,089 | 749 | 3,245,569 | 4,118,536- | 7,364,105 | 3,840,359- | 2,056,157 | 57.30% |
| N VASHISHT | 163 | 192 | 166,379 | 545,464 | 1,127 | 5,648,094 | 679,200- | 6,327,294 | 958,500- | 2,752,065 | 69.82% |
| TEAM TOTAL | 4,711 | 6,626 | 34,285,314 | 44,297,748 | 34,114 | 248,429,352 | 31,653,133- | 280,082,485 | 30,201,318- | 185,025,556 | 92.99% |

NEWPORT SERVICE
P4315-R015

POSITION REPORT SUMMARY
TEAM: 004

DATE 08/16/16 PAGE 3
RUN 08/17/16 00:41

| ACCT-REP | ACCOUNTS | TRADES | GAINS | LOSSES | UNITS | LONG-MV | COMLOAN-MV | TOTAL-MV | BALANCE | XSEQ | EQ-PCT |
|---|---|---|---|---|---|---|---|---|---|---|---|
| D ALMANCE | 257 | 362 | 596,953 | 1,745,164 | 1,941 | 7,842,116 | 736,060- | 8,578,176 | 1,821,972- | 6,977,201 | 111.79% |
| T ARCE | 38 | 58 | 455,418 | 43,083 | 206 | 986,805 | 131,378- | 1,118,183 | 14,079- | 4,638,396 | 88.11% |
| P BALAEFF | 285 | 394 | 453,782 | 3,069 | 313 | 8,633,861 | 1,816,648- | 10,449,709 | 277,253 | 1,841 | 71.12% |
| B BARTH | 246 | 402 | 804,477 | 932,188 | 1,332 | 8,455,982 | 1,047,074- | 9,500,056 | 3,824,296- | 9,253,830 | 132.33% |
| T BERG | 221 | 324 | 729,708 | 2,368,580 | 3,504 | 12,626,055 | 4,005,641- | 16,631,696 | 6,795,681- | 11,932,230 | 103.87% |
| F CASTRO | 217 | 282 | 395,389 | 1,100,760 | 1,277 | 8,186,633 | 1,121,864- | 9,308,497 | 7,667,163- | 12,871,648 | 176.59% |
| J CHANG | 41 | 64 | 181,582 | 42,440 | 371 | 1,479,145 | 147,212- | 1,626,357 | 409,193 | 589,777 | 63.79% |
| M DUPUIS | 195 | 280 | 423,594 | 1,987,735 | 932 | 7,452,593 | 80,036- | 7,532,629 | 2,666,372- | 8,272,079 | 134.73% |
| D FALER | 291 | 515 | 1,276,905 | 2,418,279 | 2,146 | 12,424,856 | 905,825- | 13,330,681 | 1,942,377- | 10,547,017 | 107.62% |
| K FERLIC | 308 | 402 | 836,952 | 3,065,760 | 1,671 | 16,604,284 | 680,306- | 17,284,590 | 1,633,805- | 13,429,538 | 101.90% |
| F GALLINA | 182 | 269 | 846,345 | 976,005 | 1,677 | 6,788,990 | 96,638- | 6,885,628 | 908,673- | 5,984,818 | 111.30% |
| F GONZALEZ | 341 | 478 | 590,375 | 1,736,960 | 1,775 | 10,344,591 | 781,819- | 11,126,410 | 1,274,087- | 8,326,651 | 103.34% |
| G GOVEL | 180 | 185 | 154,850 | 149,570 | 443 | 1,896,237 | | 1,896,237 | 20,650- | 1,470,081 | 101.37% |
| M LADENHEIM | 327 | 480 | 692,119 | 2,759,163 | 1,646 | 12,514,971 | 81,504- | 12,596,475 | 911,011 | 8,493,100 | 91.83% |
| B MORRIS | 173 | 250 | 585,125 | 527,774 | 2,774 | 8,881,971 | 490,738- | 9,372,709 | 588,718- | 6,993,369 | 100.00% |
| B ROSALES | 34 | 24 | 16,427 | 7,712 | 62 | 345,726 | | 345,726 | 145,822- | 407,733 | 141.71% |
| J SCHILLER | 237 | 257 | 530,421 | 1,092,353 | 1,058 | 10,386,392 | 660,297- | 11,362,392 | 599,929- | 6,824,755 | 103.20% |
| S SHEFFIELD | 36 | 36 | 54,186 | 353 | 0 | 362,392 | | 362,392 | 18,921 | 103,213 | 92.65% |
| J SMITH | 319 | 437 | 653,703 | 2,269,856 | 2,082 | 16,268,309 | 1,280,576- | 17,548,885 | 84,428- | 11,202,073 | 117.77% |
| D STOCKTON | 348 | 534 | 977,663 | 2,313,725 | 1,754 | 11,337,517 | | 11,337,517 | 2,020,008- | 11,632,382 | 117.77% |
| D WALES | 211 | 355 | 1,921,191 | 2,793,491 | 3,177 | 19,710,542 | 4,565,355- | 24,275,892 | 5,821,665- | 15,967,121 | 98.87% |
| W WASHINGTON | 31 | 22 | 6,847 | 80,524 | 77 | 793,905 | 300,135- | 1,094,040 | 166,945- | 526,837 | 73.17% |
| L ZOLLITSCH | 116 | 205 | 1,453,195 | 54,705 | 1,095 | 7,846,700 | | 7,846,700 | 3,125,649- | 2,972,101 | 61.12% |
| TEAM TOTAL | 4,631 | 6,615 | 14,197,286 | 29,948,463 | 32,454 | 192,567,901 | 18,928,501- | 211,496,402 | 32,142,159- | 158,984,288 | 103.51% |

```
NEWPORT SERVICE                              POSITION REPORT SUMMARY              DATE 08/16/16 PAGE    4
P4315-R015                                        TEAM: 005                       RUN  08/17/16 00:41

ACCT-REP  ACCOUNTS  TRADES    GAINS     LOSSES  UNITS  LONG-MV  COMLOAN-MV  TOTAL-MV   BALANCE     XSEQ   EQ-PCT

T DIMARCELLO     6       9        0      1,134     11   18,979          0    18,979      6,526    10,028   77.55%
V FERNANDEZ     27      34        0     10,658     78  312,539          0   312,539    177,931    63,529   43.78%
B HOLDEN        15      23   23,115      3,842     48  290,261          0   290,261     52,773-  325,500  134.46%
T LAZE           1       1        0         86      1        0          0         0          0         0  100.00%
J MARTINEZ      41      50    1,790      7,550     77  308,172          0   308,172    453,349-  690,180  247.81%
J RAKIJIAN      25      54   43,422     70,344     90  598,769          0   598,769     18,372-  480,530  103.07%
D SMITH         32      34   48,844     12,578    109  642,494          0   642,494    249,902   248,730   62.38%

TEAM TOTAL     147     205  117,172    106,193    414 2,171,214         0 2,171,214     90,135- 1,818,503  107.01%
```

```
NEWPORT SERVICE                          POSITION REPORT SUMMARY                        DATE 08/16/16 PAGE    5
P4315-R015                                     TEAM: 006                                RUN 08/17/16 00:41
```

| ACCT-REP | ACCOUNTS | TRADES | GAINS | LOSSES | UNITS | LONG-MV | COMLOAN-MV | TOTAL-MV | BALANCE | XSEQ | EQ-PCT |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AVAILABLE | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 226- | 225 | 100.00% |
| W BROWN | 20 | 44 | 0 | 1,297 | 1,831 | 6,462,232 | 0 | 6,462,232 | 544,846 | 1,156,470 | 92.04% |
| J MARSHALL | 12 | 61 | 0 | 2,093,470 | 1,149 | 4,743,041 | 0 | 4,743,041 | 611,116 | 2,215,327 | 96.60% |
| B MOSELEY | 23 | 30 | 0 | 600 | 926 | 841,100 | 0 | 841,100 | 206,422 | 232,770 | 76.53% |
| N SHARKEY | 75 | 299 | 0 | 2,619,792 | 4,823 | 16,467,379 | 0 | 16,467,379 | 2,227,309 | 3,334,881 | 86.47% |
| TEAM TOTAL | 132 | 434 | 0 | 4,715,160 | 8,729 | 28,513,752 | 0 | 28,513,752 | 3,589,467 | 6,939,676 | 89.13% |

```
NEWPORT SERVICE                                              POSITION REPORT SUMMARY                       DATE 08/16/16 PAGE     6
P4315-R015                                                         TEAM: 007                               RUN  08/17/16 00:41

ACCT-REP     ACCOUNTS  TRADES  GAINS  LOSSES  UNITS   LONG-MV   COMLOAN-MV  TOTAL-MV    BALANCE    XSEQ     EQ-PCT

T BAKER          12       8      0     220       9         0         0           0       18,975     6,054   100.00%
A BENBRAHIM      21      14      0       0      14   167,125         0     167,125       63,637    19,925    61.92%
Y CANFIELD       10       7      0       0     243   685,000         0     685,000      210,808   131,691    62.23%
V CAO            12      23      0       0   1,132 1,958,375         0   1,958,375      543,386   482,901    74.66%
T CLUCAS          2       1      0     222       2         0         0           0       10,352-   10,352   100.00%
D DUQUETTE        3      17      0       0      17   186,717         0     186,717       48,491    44,867    74.03%
V GUPTA           1       1      0       0       1         0         0           0            0         0   100.00%
G LOPEZ          11       3      0       0     201   603,000         0     603,000      116,684   184,816    80.65%
M MELLO           2       3      0       0      22         0         0           0          314-      314   100.00%
  MX007ZZX        1       0      0       0       0         0         0           0          444-      444   100.00%
A PRICE           9       7      0       0       7    77,841         0      77,841       24,315    14,605    68.76%
B RICHARDS       26      27      0       0     423 1,202,500         0   1,202,500      377,417    38,270    69.79%
M SANFORD         5       2      0       0     101         0         0           0        6,224-    6,224   100.00%
R WINOKUR        28      59      0       0     158   531,400         0     531,400      118,607   146,167    79.05%

TEAM TOTAL      143     172      0     442   2,330 5,411,958         0   5,411,958    1,504,985 1,086,637    73.92%
```

NEWPORT SERVICE
P4315-R015

POSITION REPORT SUMMARY
TEAM: 008

| ACCT-REP | ACCOUNTS | TRADES | GAINS | LOSSES | UNITS | LONG-MV | COMLOAN-MV | TOTAL-MV | BALANCE | XSEQ | EQ-PCT |
|---|---|---|---|---|---|---|---|---|---|---|---|
| J BARTEL | 28 | 57 | 0 | 117,886 | 4,446 | 2,147,002 | 0 | 2,147,002 | 287,473 | 904,296 | 99.20% |
| T FRANKLIN | 2 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 4,702- | 6,515 | 100.00% |
| R LASSLEY | 16 | 11 | 0 | 19,601 | 39 | 62,761 | 0 | 62,761 | 878 | 33,981 | 98.60% |
| MX008ZZX | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 166- | 166 | 100.00% |
| J NIENHUIS | 12 | 18 | 0 | 0 | 1,205 | 2,941,230 | 0 | 2,941,230 | 805,201 | 658,409 | 72.62% |
| D SEARLES | 4 | 45 | 0 | 0 | 540 | 1,888,310 | 0 | 1,888,310 | 721,321 | 222,834 | 61.80% |
| D SMITH | 12 | 23 | 0 | 0 | 23 | 89,182 | 0 | 89,182 | 41,760- | 86,350 | 146.82% |
| P STREAM | 8 | 4 | 0 | 0 | 13 | 0 | 0 | 0 | 4,820- | 4,819 | 100.00% |
| TEAM TOTAL | 83 | 159 | 0 | 137,488 | 6,267 | 7,128,485 | 0 | 7,128,485 | 1,763,425 | 1,917,373 | 79.08% |

NEWPORT SERVICE                                          POSITION REPORT SUMMARY                         DATE 08/16/16 PAGE        8
P4315-R015                                                     TEAM: 996                                 RUN 08/17/16 00:41

| ACCT-REP | ACCOUNTS | TRADES | GAINS | LOSSES | UNITS | LONG-MV | COMLOAN-MV | TOTAL-MV | BALANCE | XSEQ | EQ-PCT |
|----------|----------|--------|-------|--------|-------|---------|------------|----------|---------|--------|--------|
| L REMOVED | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 46,069- | 46,068 | 100.00% |
| TEAM TOTAL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 46,069- | 46,068 | 100.00% |

NEWPORT SERVICE
P4315-R015

POSITION REPORT SUMMARY
TEAM: 998

DATE 08/16/16 PAGE    9
RUN 08/17/16 00:41

| ACCT-REP | ACCOUNTS | TRADES | GAINS | LOSSES | UNITS | LONG-MV | COMLOAN-MV | TOTAL-MV | BALANCE | XSEQ | EQ-PCT |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BAD | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,936- | 1,936 | 100.00% |
| BAD | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 521- | 521 | 100.00% |
| B BAD | 26 | 4 | 61,827 | 0 | 5 | 85,385 | 0 | 85,385 | 4,560 | 60,181 | 94.54% |
| B BAD | 12 | 3 | 52,010 | 4,038 | 4 | 72,816 | 0 | 72,816 | 1,526 | 55,270 | 97.90% |
| TEAM TOTAL | 42 | 7 | 113,837 | 4,038 | 9 | 158,201 | 0 | 158,201 | 3,729 | 117,908 | 97.64% |

```
NEWPORT SERVICE                                    POSITION REPORT SUMMARY                         DATE 08/16/16 PAGE   10
P4315-R015                                              TEAM: 999                                  RUN  08/17/16 00:41

ACCT-REP   ACCOUNTS  TRADES   GAINS   LOSSES  UNITS   LONG-MV   COMLOAN-MV   TOTAL-MV    BALANCE      XSEQ   EQ-PCT

LEGAL            6      5          0       0    401  1,625,000          0  1,625,000     882,766     6,194   45.68%
LEGAL            1      0          0       0      0          0          0          0      6,727-     6,726  100.00%
L LEGAL         22      4     24,943       0      6     50,048          0     50,048      1,738-    33,139  103.47%
L LEGAL          2      1     14,938       0      1     14,938          0     14,938    102,837-   114,040  788.43%
L LEGAL          2      1     14,194       0      1      2,163          0      2,163     17,868-    19,490  926.08%

TEAM TOTAL      33     11     40,076       0    409  1,692,149          0  1,692,149     753,596   179,592   55.47%
```

# EXHIBIT 55

08/02/16
P9495-R495

CUSTOMER UNREALIZED LOSS REPORT
FOR MONTH ENDING 07/31/16
SALES REGION 003

PAGE 1



| UNREALIZED LOSS | NO OF ACCTS | CUSTOMER NAME | ACCT REP | ACCOUNT NUMBER | MARKET VALUE | EQUITY DOLLARS | REALIZED P/L |
|---|---|---|---|---|---|---|---|
| -3,480,457 | 1 | [redacted] | KMR | [redacted] | 11,668,636 | 1,711,434 | 0 |
| -3,043,278 | 1 | [redacted] | MRK | [redacted] | 2,666,589 | 1,894,469 | 0 |
| -1,908,995 | 1 | [redacted] | KMR | [redacted] | 2,294,526 | 4,160,771 | 47,988 |
| -1,012,445 | 1 | [redacted] | MRK | [redacted] | 1,110,285 | 1,110,853 | 0 |
| -960,560 | 1 | [redacted] | DIA | [redacted] | 1,715,895 | 1,710,373 | 0 |
| -934,364 | 1 | [redacted] | IMP | [redacted] | 1,029,913 | 1,072,078 | 12,935 |
| -540,734 | 1 | [redacted] | MRK | [redacted] | 423,927 | 190,034 | 0 |
| -468,344 | 1 | [redacted] | FAL | [redacted] | 1,847,766 | 1,188,567 | 0 |
| -420,993 | 1 | [redacted] | FAL | [redacted] | 1,784,631 | 3,179,421 | -6,150 |
| -382,826 | 1 | [redacted] | ACJ | [redacted] | 961,894 | 914,380 | 0 |
| -368,121 | 1 | [redacted] | SMW | [redacted] | -1,717,758 | 428,779 | -106,356 |
| -351,605 | 1 | [redacted] | BOH | [redacted] | -210,950 | 186,659 | -148,618 |
| -324,607 | 2 | [redacted] | IPK | [redacted] | -858,795 | 171,822 | 8,885 |
| -317,048 | 1 | [redacted] | REY | [redacted] | 716,380 | 718,026 | 10,680 |
| -306,299 | 1 | [redacted] | DIA | [redacted] | 296,160 | 293,228 | 0 |
| -298,810 | 1 | [redacted] | IPK | [redacted] | 603,720 | 731,278 | 0 |
| -271,570 | 1 | [redacted] | KMR | [redacted] | 1,419,870 | 1,419,794 | -50,445 |
| -267,544 | 1 | [redacted] | REY | [redacted] | -2,608 | 176,911 | 0 |
| -265,879 | 1 | [redacted] | FAL | [redacted] | 383,553 | 384,008 | 1,920 |
| -258,729 | 1 | [redacted] | ACJ | [redacted] | 343,179 | 348,706 | 0 |
| -256,171 | 1 | [redacted] | RCF | [redacted] | -543,852 | 344,496 | 0 |
| -251,313 | 1 | [redacted] | BOH | [redacted] | 240,420 | 198,694 | 0 |
| -245,607 | 1 | [redacted] | DIA | [redacted] | 222,057 | 113,521 | 0 |
| -235,707 | 1 | [redacted] | IPK | [redacted] | 302,805 | 149,798 | 0 |
| -230,193 | 1 | [redacted] | DIA | [redacted] | 677,850 | 674,936 | 0 |
| -227,715 | 1 | [redacted] | HLM | [redacted] | 207,850 | 200,760 | 0 |
| -220,721 | 1 | [redacted] | IPK | [redacted] | 789,824 | 798,284 | 0 |
| -211,447 | 1 | [redacted] | CLD | [redacted] | 570,601 | 564,750 | 0 |
| -206,132 | 1 | [redacted] | KMR | [redacted] | -45,849 | 124,179 | 0 |
| -202,009 | 1 | [redacted] | IMP | [redacted] | -1,023,350 | 364,613 | 1,621 |
| -194,400 | 1 | [redacted] | IMP | [redacted] | 464,301 | 337,894 | 12,670 |
| -192,318 | 1 | [redacted] | FAL | [redacted] | 242,244 | 266,200 | 0 |
| -184,841 | 1 | [redacted] | DIA | [redacted] | 648,381 | 328,211 | 0 |
| -179,135 | 1 | [redacted] | MRK | [redacted] | 535,800 | 574,736 | 0 |
| -178,800 | 1 | [redacted] | HLM | [redacted] | 242,244 | 199,798 | 0 |
| -172,336 | 1 | [redacted] | MRK | [redacted] | 105,580 | 54,855 | 0 |
| -171,812 | 1 | [redacted] | IPK | [redacted] | 141,309 | 195,222 | 2,458 |
| -168,373 | 1 | [redacted] | ACJ | [redacted] | 248,847 | 373,933 | 0 |
| -166,303 | 1 | [redacted] | KMR | [redacted] | 282,618 | 281,796 | 0 |
| -165,294 | 1 | [redacted] | KMR | [redacted] | 284,248 | 273,606 | -46,733 |
| -159,345 | 1 | [redacted] | BOH | [redacted] | -294,648 | 192,115 | 0 |
| -142,962 | 1 | [redacted] | MRK | [redacted] | 262,431 | 94,429 | 0 |
| -139,585 | 1 | [redacted] | IMP | [redacted] | 100,935 | 73,477 | 0 |
| -139,284 | 1 | [redacted] | REY | [redacted] | 270,693 | 208,770 | 0 |
| -136,365 | 1 | [redacted] | ACJ | [redacted] | 181,683 | 550,265 | 0 |
| -135,794 | 1 | [redacted] | IMP | [redacted] | 549,810 | 506,324 | 0 |
| -135,222 | 1 | [redacted] | BOH | [redacted] | 374,077 | 244,483 | 0 |
| -134,037 | 1 | [redacted] | MRK | [redacted] | 241,180 | 368,318 | 0 |
| -133,499 | 1 | [redacted] | DIA | [redacted] | 322,232 | | 0 |

08/02/16
P9995-R495

CUSTOMER UNREALIZED LOSS REPORT
FOR MONTH ENDING 07/31/16
SALES REGION 003

PAGE 2

| UNREALIZED LOSS | NO OF ACCTS | CUSTOMER NAME | ACCT REP | ACCOUNT NUMBER | MARKET VALUE | EQUITY DOLLARS | REALIZED P/L |
|---|---|---|---|---|---|---|---|
| -132,028 | 1 |  | DIA | | 181,683 | 124,919 | 0 |
| -128,393 | 1 | | DIA | | 181,683 | 78,454 | 0 |
| -128,140 | 1 | | GSM | | 181,683 | 133,516 | 0 |
| -126,244 | 1 | | HLM | | 127,725 | 127,767 | 0 |
| -126,018 | 1 | | HPU | | 100,935 | 40,930 | 0 |
| -123,440 | 1 | | IMP | | -464,640 | 76,225 | 44,956 |
| -120,637 | 2 | | MRK | | 1,774,808 | 1,075,995 | 12,105 |
| -119,772 | 1 | | MRK | | 323,727 | 323,280 | 0 |
| -117,501 | 1 | | DIA | | 140,397 | 138,734 | 0 |
| -115,939 | 1 | | BOH | | -219,003 | 68,738 | -9,210 |
| -115,726 | 1 | | MRK | | 460,208 | 512,821 | 0 |
| -115,491 | 1 | | IPK | | 160,888 | 174,708 | 160 |
| -115,683 | 1 | | IMP | | -261,511 | 28,940 | -607 |
| -111,274 | 1 | | BOH | | 365,110 | 43,967 | 0 |
| -111,274 | 1 | | SMW | | 141,309 | 143,142 | 0 |
| -110,682 | 1 | | IPK | | 369,071 | 364,582 | 0 |
| -109,574 | 1 | | BOH | | 432,973 | 522,325 | 0 |
| -109,245 | 1 | | MRK | | 222,057 | 91,283 | 0 |
| -107,906 | 1 | | IPK | | 191,316 | 104,458 | 0 |
| -103,830 | 1 | | IPK | | 166,108 | 169,220 | 0 |
| -102,480 | 1 | | BOH | | -614,010 | 152,068 | -42,265 |
| -102,026 | 1 | | RCF | | 100,935 | 99,631 | 0 |
| -100,803 | 1 | | CLD | | 141,309 | 143,058 | 1,568 |
| -98,080 | 1 | | VSN | | 233,987 | 239,447 | 0 |
| -96,795 | 1 | | ACJ | | 80,748 | 158,209 | 0 |
| -93,060 | 1 | | RJD | | -35,419 | 45,240 | 0 |
| -90,833 | 1 | | FAL | | 80,748 | 78,840 | 4,595 |
| -90,731 | 1 | | VSN | | -67,746 | 108,622 | 0 |
| -90,577 | 1 | | KBF | | 417,942 | 416,054 | 0 |
| -90,407 | 1 | | BOH | | -42,579 | 47,812 | -27,466 |
| -89,407 | 1 | | RJD | | -293,610 | 82,090 | 14,603 |
| -88,770 | 1 | | BOH | | 267,900 | 265,946 | 0 |
| -88,513 | 1 | | GSM | | 1,181,972 | 1,014,583 | 0 |
| -86,770 | 1 | | KMR | | 121,122 | 145,528 | 0 |
| -85,591 | 1 | | MRK | | 116,761 | 103,538 | 0 |
| -85,386 | 1 | | MRK | | 376,155 | 380,351 | 0 |
| -85,335 | 1 | | MRK | | 376,155 | 398,851 | 0 |
| -84,193 | 1 | | HLM | | 174,702 | 174,702 | 0 |
| -83,068 | 1 | | HLM | | 60,105 | 70,252 | 0 |
| -82,212 | 1 | | KMR | | 121,122 | 116,306 | 170 |
| -81,995 | 1 | | ACJ | | 181,305 | 210,328 | 0 |
| -81,902 | 1 | | HLM | | 181,305 | 219,901 | 2,697 |
| -81,706 | 1 | | KMR | | 920,648 | 371,733 | 0 |
| -81,306 | 1 | | MRK | | 221,490 | 88,213 | 0 |
| -80,251 | 1 | | MRK | | 121,122 | 120,791 | 0 |
| -79,796 | 1 | | BOH | | 344,400 | 957,462 | 0 |
| -79,089 | 1 | | ACL | | 142,822 | 113,737 | 0 |
| -78,520 | 1 | | IMP | | 122,400 | 120,462 | 0 |
| -78,358 | 1 | | MRK | | 80,748 | 34,592 | 0 |
| -78,148 | 1 | | KBF | | 244,284 | 298,076 | 2,811 |

08/02/16
P9495-R495

CUSTOMER UNREALIZED LOSS REPORT
FOR MONTH ENDING 07/31/16
SALES REGION 003

PAGE 3

| UNREALIZED LOSS | NO OF ACCTS | CUSTOMER NAME | ACCT REP | ACCOUNT NUMBER | MARKET VALUE | EQUITY DOLLARS | REALIZED P/L |
|---|---|---|---|---|---|---|---|
| -77,683 | 1 | ███ | ACL | ███ | 124,440 | 117,226 | 0 |
| -77,175 | 1 | ███ | MRK | ███ | 100,935 | 69,302 | 0 |
| -76,186 | 1 | ███ | FAL | ███ | 167,238 | 168,053 | 0 |
| -75,498 | 1 | ███ | GSM | ███ | 203,699 | 203,117 | 0 |
| -74,829 | 1 | ███ | REY | ███ | 100,935 | 204,582 | 0 |
| -74,217 | 1 | ███ | MRK | ███ | 183,069 | 184,047 | 0 |
| -73,300 | 1 | ███ | ACJ | ███ | 100,935 | 101,126 | 0 |
| -72,600 | 1 | ███ | REY | ███ | 80,748 | 71,535 | 1,905 |
| -71,868 | 1 | ███ | DGO | ███ | 87,351 | 88,840 | 0 |
| -71,787 | 1 | ███ | GSM | ███ | 60,561 | 59,249 | 0 |
| -71,691 | 1 | ███ | FAL | ███ | -307,695 | 120,788 | -58,031 |
| -71,076 | 1 | ███ | ACL | ███ | 53,040 | 45,370 | 0 |
| -70,936 | 1 | ███ | ACJ | ███ | 16,676 | -83 | -83 |
| -70,836 | 1 | ███ | REY | ███ | 146,753 | 56,596 | 996 |
| -70,780 | 1 | ███ | MRK | ███ | 335,422 | 109,193 | 0 |
| -70,654 | 1 | ███ | RJD | ███ | 331,326 | 333,047 | 0 |
| -69,853 | 1 | ███ | SMW | ███ | 60,561 | 61,276 | 0 |
| -69,152 | 1 | ███ | BOH | ███ | 428,640 | 452,633 | 0 |
| -68,883 | 1 | ███ | KJA | ███ | -107,829 | 45,631 | -30,638 |
| -68,850 | 2 | ███ | SMW | ███ | -378,875 | 133,870 | -18,138 |
| -68,607 | 1 | ███ | MRK | ███ | 225,141 | 227,566 | 0 |
| -68,049 | 2 | ███ | DGO | ███ | 265,982 | 263,210 | 0 |
| -68,023 | 2 | ███ | REY | ███ | 80,748 | 91,193 | 220 |
| -67,688 | 1 | ███ | HPU | ███ | 199,365 | 199,594 | 0 |
| -65,829 | 1 | ███ | MNI | ███ | 299,264 | 243,056 | 570 |
| -65,562 | 1 | ███ | MRK | ███ | 618,453 | 619,254 | 0 |
| -64,124 | 1 | ███ | MRK | ███ | 60,561 | 25,307 | 0 |
| -63,916 | 1 | ███ | IPK | ███ | 60,561 | 60,365 | 0 |
| -63,368 | 1 | ███ | DIA | ███ | 80,444 | 119,447 | 792 |
| -63,080 | 1 | ███ | DGO | ███ | 262,368 | 261,349 | 0 |
| -63,040 | 1 | ███ | HPU | ███ | 80,748 | 64,707 | 0 |
| -63,026 | 1 | ███ | HPU | ███ | 80,748 | 75,758 | 0 |
| -62,902 | 1 | ███ | ACJ | ███ | 94,143 | 106,727 | 0 |
| -61,941 | 1 | ███ | IPK | ███ | 225,947 | 226,299 | 0 |
| -61,572 | 1 | ███ | SNA | ███ | 60,561 | 59,994 | 0 |
| -60,067 | 1 | ███ | FAL | ███ | 185,909 | 197,973 | -1,851 |
| -60,056 | 1 | ███ | IPK | ███ | 96,161 | 153,493 | -67,027 |
| -59,889 | 1 | ███ | DGO | ███ | 114,141 | 113,565 | 0 |
| -59,411 | 1 | ███ | MRK | ███ | 147,439 | 145,742 | 0 |
| -58,628 | 1 | ███ | RJD | ███ | 107,538 | 43,796 | 0 |
| -58,236 | 1 | ███ | BOH | ███ | 134,139 | 140,419 | 0 |
| -57,441 | 1 | ███ | MRK | ███ | 30,374 | 18,316 | 0 |
| -57,215 | 1 | ███ | VSN | ███ | 263,918 | 264,274 | 0 |
| -57,014 | 1 | ███ | KBF | ███ | 161,307 | 177,314 | 0 |
| -56,569 | 1 | ███ | MRK | ███ | 40,374 | 21,050 | 0 |
| -56,116 | 1 | ███ | MNI | ███ | 112,018 | 43,184 | 0 |
| -56,017 | 1 | ███ | IMP | ███ | -75,945 | 51,933 | 880 |
| -55,905 | 1 | ███ | KMR | ███ | 40,374 | 39,928 | 0 |
| | | ███ | MRK | ███ | 201,870 | 86,048 | 0 |
| | | ███ | KBF | ███ | 372,876 | 371,469 | 0 |

CUSTOMER UNREALIZED LOSS REPORT
FOR MONTH ENDING 07/31/16
SALES REGION 003



| UNREALIZED LOSS | NO OF ACCTS | CUSTOMER NAME | ACCT REP | ACCOUNT NUMBER | MARKET VALUE | EQUITY DOLLARS | REALIZED P/L |
|---|---|---|---|---|---|---|---|
| -55,766 | 1 | | MRK | | 108,914 | 106,929 | 0 |
| -55,540 | 1 | D | IPK | | 446,329 | 478,296 | 0 |
| -55,486 | 1 | | CLD | | 40,374 | 40,340 | 0 |
| -55,420 | 1 | | SMW | | -276,310 | 86,021 | 43,440 |
| -54,207 | 1 | | MRK | | 232,663 | 192,689 | 0 |
| -54,000 | 1 | | KMR | | -3,586 | 53,988 | 6,105 |
| -51,696 | 1 | | CLD | | 79,772 | 80,174 | 0 |
| -50,934 | 1 | | KMR | | 80,748 | 85,236 | 0 |
| -50,557 | 1 | | FAL | | 174,135 | 240,466 | 0 |
| -50,532 | 1 | | HPU | | 162,084 | 168,164 | 0 |
| -50,390 | 1 | | HLM | | 363,366 | 102,535 | 23,426 |
| -50,302 | 1 | | HPU | | 125,348 | 105,693 | 0 |
| -50,108 | 1 | | DGO | | 80,140 | 36,789 | 0 |

08/02/16
P9495-R495

CUSTOMER UNREALIZED LOSS REPORT
FOR MONTH ENDING 07/31/16
SALES REGION 004

PAGE 5

| UNREALIZED LOSS | NO OF ACCTS | CUSTOMER NAME | ACCT REP | ACCOUNT NUMBER | MARKET VALUE | EQUITY DOLLARS | REALIZED P/L |
|---|---|---|---|---|---|---|---|
| -597,694 | 1 | | KDF | | 908,415 | 903,932 | 0 |
| -579,417 | 1 | | DJW | | 922,841 | 916,983 | 0 |
| -486,615 | 1 | | BEF | | 888,228 | 736,521 | 2,638 |
| -453,123 | 1 | | SEJ | | 847,177 | 776,436 | -322,906 |
| -422,163 | 1 | | LNK | | 850,326 | 863,649 | 0 |
| -367,587 | 1 | | LNK | | 1,026,736 | 335,333 | 22,012 |
| -352,060 | 1 | | SEJ | | 403,740 | 922,559 | 0 |
| -322,435 | 1 | | OCK | | 403,740 | 270,830 | -82,655 |
| -313,214 | 0 | | BNB | | 585,423 | 253,603 | 0 |
| -311,163 | 0 | | DJW | | 423,927 | 586,501 | 61,051 |
| -274,019 | 1 | | GGF | | 800,960 | 561,472 | 910 |
| -257,306 | 1 | | DUP | | 726,732 | 843,203 | 0 |
| -245,187 | 1 | | TLB | | 445,330 | 103,110 | 0 |
| -235,183 | 1 | | CSF | | 1,103,450 | 1,103,147 | 0 |
| -220,680 | 1 | | KDF | | 820,080 | 824,827 | 0 |
| -219,731 | 1 | | CSF | | 242,244 | 344,386 | 0 |
| -218,671 | 1 | | LNK | | 201,870 | 146,125 | 0 |
| -198,712 | 1 | | ZOL | | 625,797 | 170,363 | -24 |
| -194,057 | 2 | | FDR | | -171,327 | 162,961 | -28,527 |
| -192,500 | 1 | | TLB | | -1,128,215 | 215,193 | 21,403 |
| -191,634 | 1 | | OCK | | 161,496 | 172,767 | 0 |
| -183,192 | 1 | | KDF | | 181,683 | 184,044 | 0 |
| -181,557 | 1 | | BEF | | 386,174 | 389,821 | 7,264 |
| -180,349 | 1 | | TLB | | 162,612 | 137,788 | 0 |
| -174,764 | 1 | | TLB | | 222,057 | 221,312 | 13,930 |
| -173,433 | 1 | | DJW | | 123,102 | 235,135 | 0 |
| -164,887 | 1 | | DUP | | 160,485 | 160,887 | 0 |
| -160,987 | 1 | | DUP | | 28,419 | 298,359 | 2,145 |
| -158,371 | 1 | | AMD | | 282,618 | 148,118 | 0 |
| -158,062 | 1 | | LNK | | 383,553 | 286,115 | 3,005 |
| -148,502 | 1 | | AMD | | 221,300 | 467,627 | 14,000 |
| -146,800 | 1 | | TLB | | 262,431 | 312,524 | 1,803 |
| -146,146 | 1 | | AMD | | 222,057 | 322,795 | 630 |
| -142,646 | 1 | | FDR | | 100,935 | 238,240 | 0 |
| -134,646 | 1 | | LNK | | 181,683 | 95,080 | -6,475 |
| -132,237 | 1 | | DUP | | 165,005 | 182,341 | 0 |
| -131,228 | 1 | | FDR | | 163,536 | 165,016 | 0 |
| -120,944 | 1 | | AMD | | 334,875 | 163,328 | 5,853 |
| -120,258 | 1 | | GGF | | 173,252 | 338,073 | 0 |
| -111,950 | 1 | | DJW | | 101,783 | 636,204 | 0 |
| -110,568 | 1 | | KDF | | 101,935 | 143,474 | 0 |
| -109,807 | 1 | | LNK | | 100,935 | 152,908 | 0 |
| -108,477 | 1 | | AMD | | 366,834 | 128,935 | 791 |
| -108,275 | 1 | | AMD | | 100,935 | 375,379 | 0 |
| -108,168 | 1 | | KDF | | 368,176 | 2,025,403 | 0 |
| -103,447 | 1 | | DJW | | 262,431 | 214,937 | 4,831 |
| -103,293 | 1 | | KDF | | -433,080 | 298,753 | 658,375 |
| -102,204 | 1 | | FDR | | 100,479 | 564,256 | 12,176 |
| -101,990 | 1 | | DJW | | | 298,753 | |
| -99,145 | 1 | | OCK | | | 101,150 | |

08/02/16
P9495-R495

CUSTOMER UNREALIZED LOSS REPORT
FOR MONTH ENDING 07/31/16
SALES REGION 004

PAGE 6



| UNREALIZED LOSS | NO OF ACCTS | CUSTOMER NAME | ACCT REP | ACCOUNT NUMBER | MARKET VALUE | EQUITY DOLLARS | REALIZED P/L |
|---|---|---|---|---|---|---|---|
| -98,906 | 1 | ███ | FDR | ███ | 315,859 | 317,421 | 0 |
| -98,868 | 1 | ███ | SEJ | ███ | 132,025 | 125,283 | -42,546 |
| -97,852 | 1 | ███ | BNB | ███ | -676,929 | 125,609 | 0 |
| -94,308 | 1 | ███ | DJW | ███ | 114,330 | 118,803 | -165,274 |
| -93,555 | 1 | ███ | CSF | ███ | -1,264,830 | 188,147 | 0 |
| -91,444 | 1 | ███ | GPJ | ███ | 100,631 | 101,765 | 0 |
| -90,993 | 1 | ███ | KDF | ███ | 295,100 | 110,476 | 0 |
| -89,464 | 1 | ███ | OCK | ███ | 80,748 | 290,777 | 37,677 |
| -87,418 | 1 | ███ | KDF | ███ | 242,419 | 239,450 | 0 |
| -86,959 | 1 | ███ | DUP | ███ | 121,122 | 128,106 | 0 |
| -86,651 | 1 | ███ | FDR | ███ | 100,935 | 145,397 | 1,644 |
| -84,839 | 1 | ███ | FDR | ███ | 125,008 | 158,768 | 0 |
| -84,528 | 1 | ███ | SIL | ███ | 181,683 | 76,461 | 20,880 |
| -82,377 | 1 | ███ | GPJ | ███ | 418,717 | 421,163 | 0 |
| -81,950 | 1 | ███ | OCK | ███ | 80,657 | 78,937 | 0 |
| -81,590 | 1 | ███ | TLB | ███ | -431,400 | 407,727 | 299,735 |
| -81,454 | 1 | ███ | FDR | ███ | 121,122 | 121,285 | 0 |
| -81,141 | 1 | ███ | LNK | ███ | 60,561 | 62,951 | 0 |
| -79,894 | 1 | ███ | TLB | ███ | -171,165 | 81,400 | 9,770 |
| -79,700 | 1 | ███ | BNB | ███ | -1,161,600 | 2,292,768 | 118,846 |
| -78,687 | 1 | ███ | FDR | ███ | 60,561 | 59,830 | 0 |
| -78,316 | 1 | ███ | KDF | ███ | 201,870 | 225,455 | 0 |
| -77,837 | 1 | ███ | TLB | ███ | 181,116 | 88,012 | 0 |
| -77,411 | 1 | ███ | FDR | ███ | 229,309 | 283,617 | -1,014 |
| -77,057 | 1 | ███ | GGF | ███ | 73,956 | 75,302 | 0 |
| -76,870 | 1 | ███ | DUP | ███ | 201,828 | 207,564 | -15,883 |
| -75,221 | 1 | ███ | AMD | ███ | 39,205 | 39,005 | 0 |
| -75,227 | 1 | ███ | AMD | ███ | 185,763 | 183,543 | 0 |
| -74,760 | 1 | ███ | DJW | ███ | -410,260 | 98,664 | -100,977 |
| -74,727 | 1 | ███ | FDR | ███ | 60,561 | 25,001 | 0 |
| -72,588 | 1 | ███ | DJW | ███ | 227,715 | 226,399 | 0 |
| -71,703 | 1 | ███ | DUP | ███ | 241,628 | 65,935 | 0 |
| -71,600 | 1 | ███ | KDF | ███ | 80,748 | 79,974 | 0 |
| -71,358 | 1 | ███ | TLB | ███ | 60,561 | 62,730 | 0 |
| -71,288 | 1 | ███ | SEJ | ███ | 80,748 | 80,582 | 0 |
| -70,800 | 1 | ███ | WAS | ███ | -307,695 | 77,262 | 11,802 |
| -69,775 | 1 | ███ | FDR | ███ | 222,057 | 226,776 | 341 |
| -69,365 | 1 | ███ | FDR | ███ | 121,122 | 121,128 | 0 |
| -68,928 | 1 | ███ | CSF | ███ | -1,115,136 | 177,055 | -430,263 |
| -68,359 | 1 | ███ | FDR | ███ | 118,688 | 117,513 | 0 |
| -67,432 | 1 | ███ | SEJ | ███ | 80,748 | 185,512 | 0 |
| -66,832 | 1 | ███ | SIL | ███ | 120,210 | 135,516 | 0 |
| -65,240 | 1 | ███ | OCK | ███ | 67,710 | 134,464 | 0 |
| -64,762 | 1 | ███ | DUP | ███ | 68,186 | 68,186 | 0 |
| -64,454 | 1 | ███ | DUP | ███ | 208,962 | 217,837 | 0 |
| -63,711 | 1 | ███ | OCK | ███ | 343,179 | 342,311 | 0 |
| -63,115 | 1 | ███ | SEJ | ███ | 80,748 | 32,954 | 0 |
| -62,554 | 1 | ███ | LNK | ███ | 100,935 | 105,398 | -3,930 |
| | 1 | ███ | LNK | ███ | 60,561 | 60,622 | 0 |

08/02/16
P9495-R495

CUSTOMER UNREALIZED LOSS REPORT
FOR MONTH ENDING 07/31/16
SALES REGION 004

PAGE 7



| UNREALIZED LOSS | NO OF ACCTS | CUSTOMER NAME | ACCT REP | ACCOUNT NUMBER | MARKET VALUE | EQUITY DOLLARS | REALIZED P/L |
|---|---|---|---|---|---|---|---|
| -61,867 | 1 | | DJW | | 80,748 | 42,904 | 0 |
| -61,794 | 1 | | BEF | | 60,561 | 69,194 | 0 |
| -61,582 | 1 | | OCK | | 54,654 | 55,537 | 0 |
| -61,483 | 2 | | GGF | | 314,539 | 585,376 | -6,100 |
| -61,018 | 1 | | OCK | | 282,618 | 205,659 | 8,664 |
| -60,731 | 1 | | FDR | | 192,992 | 199,230 | 0 |
| -60,509 | 1 | | OCK | | 121,122 | 50,824 | 0 |
| -59,633 | 1 | | OCK | | 73,956 | 79,678 | 0 |
| -59,515 | 1 | | OCK | | 60,774 | 99,751 | 0 |
| -58,674 | 1 | | KDF | | 282,618 | 298,779 | 2,723 |
| -58,609 | 1 | | GPJ | | 246,224 | 295,285 | 0 |
| -58,444 | 1 | | DJW | | 1,851,504 | 1,321,347 | 0 |
| -58,420 | 1 | | DJW | | 105,293 | 110,309 | -250,791 |
| -58,104 | 1 | | DJW | | 100,935 | 100,295 | 0 |
| -58,050 | 1 | | DUP | | 570,200 | 568,200 | 0 |
| -58,004 | 1 | | LNK | | 60,561 | 55,145 | 0 |
| -57,653 | 1 | | TLB | | 80,748 | 79,742 | 0 |
| -57,530 | 1 | | TLB | | 106,354 | 129,347 | 0 |
| -57,184 | 1 | | FDR | | 40,374 | 40,536 | 0 |
| -56,611 | 1 | | TLB | | 108,609 | 110,252 | 0 |
| -56,276 | 1 | | TLB | | 207,423 | 206,249 | 0 |
| -55,915 | 1 | | BNB | | 297,944 | 205,672 | -22,826 |
| -55,187 | 1 | | FDR | | 160,740 | 160,364 | 0 |
| -55,154 | 1 | | SEJ | | 160,740 | 162,483 | 0 |
| -54,484 | 1 | | SIL | | 147,534 | 147,714 | 0 |
| -54,476 | 1 | | AMD | | 176,763 | 70,812 | 0 |
| -53,973 | 1 | | GPJ | | 40,050 | 44,912 | 0 |
| -53,574 | 1 | | DUP | | 87,332 | 35,588 | 0 |
| -53,108 | 1 | | AMD | | 40,374 | 1,155 | 0 |
| -53,041 | 1 | | DJW | | -124,382 | 80,653 | 5,526 |
| -52,635 | 1 | | SEJ | | 60,561 | 26,736 | 0 |
| -52,179 | 1 | | DJW | | 198,593 | 126,425 | 0 |
| -51,944 | 1 | | OCK | | 239,840 | 250,245 | 0 |
| -51,921 | 1 | | LNK | | 40,374 | 46,592 | 0 |
| -51,724 | 1 | | TLB | | 60,561 | 21,230 | 896 |
| -50,905 | 1 | | OCK | | 141,309 | 180,175 | 3,322 |
| -50,729 | 1 | | OCK | | 34,315 | 35,924 | 0 |
| -50,510 | 1 | | GPJ | | 0 | 0 | 0 |
| -50,069 | 1 | | GGF | | 60,561 | 26,716 | 0 |

```
08/02/16                        CUSTOMER UNREALIZED LOSS REPORT                           PAGE    8
P9495-R495                         FOR MONTH ENDING 07/31/16
                                        SALES REGION 005

UNREALIZED  NO OF   CUSTOMER    ACCT  ACCOUNT    MARKET    EQUITY    REALIZED
  LOSS      ACCTS     NAME      REP   NUMBER      VALUE   DOLLARS      P/L
----------  -----   --------    ----  -------    ------   -------    --------
  -61,993     1      ████       RAK    ████      80,748   80,804         0
```

# EXHIBIT 56

DATE 08/16/16    PAGE      1
RUN  08/16/16    23:15

NEWPORT SERVICE
P4100-R715

                                      EQUITY CALLS

                              CO                                   CALL      EQUITY
ACCOUNT NAME / ADDRESS     ACCOUNT    LOC  ACCT REP              AMOUNT    PERCENT
                           NUMBER          AG-OFF-INL

                                 NO DATA FOR REPORT

# EXHIBIT 57

DATE 08/16/16  PAGE   1
RUN 08/16/16    23:23

MTD EQUITY CALLS

NEWPORT SERVICE CORP
P4122-R723M

| DATE | CO | ACCOUNT | AMOUNT |
|------|----|---------|--------|
| 08/01/16 | H | ███████ | 3,313.56 |
| 08/01/16 | H | ███████ | 5,862.17 |
| 08/01/16 | H | ███████ | 3,440.31 |
| 08/02/16 | H | ███████ | 3,564.11 |
| 08/09/16 | H | ███████ | 3,074.26 |
| 08/10/16 | H | ███████ | 1,030.50 |
| CO TOTAL: | H | 6 | 20,284.91 |

# EXHIBIT 58

```
NEWPORT SERVICE CORP                      MTD FORCED LIQUIDATIONS                    DATE 07/29/16  PAGE  1
P4121-R722M                                                                          RUN  07/29/16      22:26

DATE      ACCOUNT      CO  LOC           AMOUNT   EQY %      BALANCE   COMMISSION       INDEX

07/04/16  ████████      H   F       13,326.63-   28.55   12,077.30-      237.37       440.83
07/15/16  ████████      H   F       26,224.88-  100.00    2,103.34-      467.12       667.32

          LOC TOTAL:    H   F    2  39,551.51-                           704.49     1,108.15

          CO TOTAL:     H       2  39,551.51-                           704.49     1,108.15
```

# EXHIBIT 59

08/02/16
P9493-R493

MONTHLY CUSTOMER INDEX REPORT
FOR MONTH ENDING 07/31/16
SALES REGION 003

PAGE   1



| TOTAL INDEX | NO OF ACCTS | CUSTOMER NAME | ACCOUNT REP | ACCOUNT NUMBER | NO OF TRADES | EQUITY DOLLARS | EQUITY TURNOVER |
|---|---|---|---|---|---|---|---|
| 90,992 | 1 | ██████ | HLM | ██████ | 7 | 0 | .00 |
| 56,487 | 1 | ██████ | HLM | ██████ | 11 | 329,536 | 17.14 |
| 41,154 | 1 | ██████ | HLM | ██████ | 11 | 3,846,352 | 1.06 |
| 27,642 | 1 | ██████ | SOD | ██████ | 14 | 299,753 | 9.22 |
| 27,355 | 1 | ██████ | KBF | ██████ | 7 | 294,518 | 9.28 |
| 26,863 | 1 | ██████ | DUR | ██████ | 29 | 144,380 | 18.60 |
| 19,929 | 1 | ██████ | BOH | ██████ | 5 | 152,068 | 13.10 |
| 17,570 | 1 | ██████ | DUR | ██████ | 16 | 344,178 | 5.10 |
| 17,038 | 1 | ██████ | KMR | ██████ | 2 | 1,190,476 | 1.43 |
| 15,951 | 1 | ██████ | RCF | ██████ | 27 | 118,433 | 13.46 |
| 13,334 | 2 | ██████ | FAL | ██████ | 2 | 3,179,421 | .41 |
| 13,194 | 1 | ██████ | RCF | ██████ | 2 | 2,967,978 | 1.21 |
| 12,010 | 1 | ██████ | IMP | ██████ | 3 | 1,972,978 | 1.29 |
| 11,763 | 2 | ██████ | KJA | ██████ | 10 | 280,728 | 4.27 |
| 10,856 | 1 | ██████ | MNI | ██████ | 4 | 240,325 | 26.92 |
| 10,035 | 1 | ██████ | MRK | ██████ | 2 | 1,595,540 | .62 |
| 9,861 | 1 | ██████ | SOD | ██████ | 6 | 369,956 | 2.66 |
| 9,427 | 1 | ██████ | RCF | ██████ | 10 | 93,582 | 10.07 |
| 9,318 | 1 | ██████ | SOD | ██████ | 40 | 52,023 | 17.91 |
| 9,075 | 1 | ██████ | KBF | ██████ | 8 | 430,630 | 2.10 |
| 8,997 | 1 | ██████ | IMP | ██████ | 3 | 0 | 2.00 |
| 8,959 | 1 | ██████ | KBF | ██████ | 4 | 377,332 | 2.37 |
| 8,749 | 1 | ██████ | HLM | ██████ | 17 | 81,842 | 10.69 |
| 8,671 | 1 | ██████ | DUR | ██████ | 3 | 45,460 | 19.07 |
| 8,530 | 1 | ██████ | MRK | ██████ | 3 | 1,330,515 | .64 |
| 8,486 | 1 | ██████ | HLM | ██████ | 1 | 255,940 | 3.36 |
| 7,746 | 1 | ██████ | SNA | ██████ | 3 | 501,838 | 1.49 |
| 7,722 | 2 | ██████ | MRK | ██████ | 1 | 371,854 | 1.54 |
| 7,646 | 1 | ██████ | VSN | ██████ | 9 | 57,569 | 2.07 |
| 7,493 | 1 | ██████ | MRK | ██████ | 15 | 87,798 | 13.28 |
| 7,462 | 1 | ██████ | SOD | ██████ | 3 | 105,528 | 8.49 |
| 7,371 | 1 | ██████ | SNA | ██████ | 4 | 48,650 | 6.98 |
| 7,358 | 2 | ██████ | KBF | ██████ | 6 | 30,352 | 15.12 |
| 7,268 | 1 | ██████ | VSN | ██████ | 8 | 67,542 | 23.94 |
| 7,124 | 1 | ██████ | HLM | ██████ | 6 | 204,600 | 10.54 |
| 6,650 | 1 | ██████ | KBF | ██████ | 6 | 51,275 | 3.25 |
| 6,466 | 1 | ██████ | VSN | ██████ | 3 | 60,696 | 12.61 |
| 6,220 | 1 | ██████ | DUR | ██████ | 3 | 102,535 | 10.24 |
| 6,158 | 1 | ██████ | HLM | ██████ | 3 | 85,191 | 6.00 |
| 6,040 | 1 | ██████ | HLM | ██████ | 4 | 140,615 | 7.09 |
| 6,000 | 1 | ██████ | MRK | ██████ | 2 | 190,246 | 4.91 |
| 5,943 | 1 | ██████ | GSM | ██████ | 1 | 186,639 | 5.97 |
| 5,900 | 1 | ██████ | BOH | ██████ | 9 | 25,248 | 3.18 |
| 5,889 | 1 | ██████ | DUR | ██████ | 6 | 45,631 | 23.32 |
| 5,817 | 1 | ██████ | KJA | ██████ | 5 | 33,343 | 12.74 |
| 5,579 | 1 | ██████ | SNA | ██████ | 5 | 154,758 | 16.73 |
| 5,496 | 2 | ██████ | MRK | ██████ | 2 | 39,036 | 3.55 |
| 5,458 | 1 | ██████ | SNA | ██████ | 6 | 49,992 | 13.98 |
| 5,383 | 1 | ██████ | DUR | ██████ | 16 | 49,992 | 10.76 |
| 5,377 | 1 | ██████ | SMW | ██████ | 1 | 0 | .00 |

08/02/16
P9493-R493

MONTHLY CUSTOMER INDEX REPORT
FOR MONTH ENDING 07/31/16
SALES REGION 003

PAGE 2

| TOTAL INDEX | NO OF ACCTS | CUSTOMER NAME | ACCOUNT REP | ACCOUNT NUMBER | NO OF TRADES | EQUITY DOLLARS | EQUITY TURNOVER |
|---|---|---|---|---|---|---|---|
| 5,248 | 1 | ▮ | SNA | ▮ | 4 | 37,914 | 13.84 |
| 5,221 | 1 | ▮ | VSN | ▮ | 9 | 82,917 | 6.29 |
| 5,075 | 1 | ▮ | FAL | ▮ | 1 | 581,364 | .87 |
| 5,055 | 1 | ▮ | KJA | ▮ | 8 | 22,803 | 22.16 |
| 4,875 | 1 | ▮ | DUR | ▮ | 10 | 41,446 | 11.76 |
| 4,798 | 2 | ▮ | SMW | ▮ | 6 | 133,870 | 3.58 |
| 4,693 | 2 | ▮ | ACL | ▮ | 6 | 172,040 | 2.72 |
| 4,632 | 2 | ▮ | DUR | ▮ | 11 | 37,129 | 12.47 |
| 4,607 | 1 | ▮ | CLD | ▮ | 5 | 233,397 | 1.97 |
| 4,542 | 1 | ▮ | GSM | ▮ | 5 | 207,882 | 2.18 |
| 4,507 | 1 | ▮ | CLD | ▮ | 5 | 71,709 | 6.28 |
| 4,497 | 1 | ▮ | HLM | ▮ | 3 | 41,780 | 10.76 |
| 4,476 | 1 | ▮ | RJD | ▮ | 3 | 82,090 | 5.45 |
| 4,430 | 1 | ▮ | BOH | ▮ | 3 | 72,588 | 6.00 |
| 4,307 | 1 | ▮ | DGO | ▮ | 1 | | |
| 4,276 | 1 | ▮ | ACL | ▮ | 10 | 199,902 | 2.13 |
| 4,253 | 1 | ▮ | CLD | ▮ | 9 | 5,567 | 76.40 |
| 4,235 | 1 | ▮ | KMR | ▮ | 9 | 4,160,771 | .10 |
| 4,194 | 1 | ▮ | ACJ | ▮ | 2 | 615,750 | .68 |
| 3,939 | 1 | ▮ | SNA | ▮ | 4 | 27,666 | 14.23 |
| 3,855 | 1 | ▮ | RJD | ▮ | 2 | 173,283 | 2.22 |
| 3,850 | 2 | ▮ | SOD | ▮ | 2 | 255,345 | 1.50 |
| 3,818 | 1 | ▮ | HLM | ▮ | 8 | 56,777 | 6.72 |
| 3,793 | 1 | ▮ | SNA | ▮ | 4 | 23,893 | 15.87 |
| 3,776 | 1 | ▮ | ACL | ▮ | 10 | 68,919 | 5.47 |
| 3,767 | 2 | ▮ | SMW | ▮ | 5 | 49,307 | 7.64 |
| 3,760 | 1 | ▮ | RCF | ▮ | 5 | 247,495 | 14.19 |
| 3,715 | 1 | ▮ | GSM | ▮ | 7 | 87,537 | 4.24 |
| 3,664 | 2 | ▮ | ACJ | ▮ | 12 | 423,525 | .86 |
| 3,610 | 1 | ▮ | DUR | ▮ | 15 | 56,750 | 6.36 |
| 3,519 | 1 | ▮ | DGO | ▮ | 4 | | .00 |
| 3,513 | 1 | ▮ | MNI | ▮ | 5 | 34,385 | 10.21 |
| 3,479 | 1 | ▮ | ACL | ▮ | 3 | | .00 |
| 3,476 | 1 | ▮ | GSM | ▮ | 1 | 202,378 | 1.71 |
| 3,405 | 1 | ▮ | CLD | ▮ | 5 | 27,809 | 12.24 |
| 3,388 | 1 | ▮ | CLD | ▮ | 12 | 27,015 | 12.54 |
| 3,295 | 1 | ▮ | KBF | ▮ | 3 | 153,768 | 2.14 |
| 3,287 | 1 | ▮ | MRK | ▮ | 5 | 500 | 657.41 |
| 3,263 | 1 | ▮ | SOD | ▮ | 6 | 140,563 | 2.32 |
| 3,222 | 2 | ▮ | ACJ | ▮ | 2 | 64,456 | 4.99 |
| 3,214 | 1 | ▮ | RJD | ▮ | 2 | 38,850 | 8.27 |
| 3,101 | 1 | ▮ | DUR | ▮ | 12 | 38,365 | 11.73 |
| 3,091 | 1 | ▮ | SNA | ▮ | 4 | 20,610 | 14.99 |
| 3,086 | 1 | ▮ | BOH | ▮ | 1 | 306,857 | 1.00 |
| 3,077 | 1 | ▮ | IMP | ▮ | 5 | 20,984 | 14.66 |
| 2,979 | 1 | ▮ | VSN | ▮ | 1 | 118,282 | 2.51 |
| 2,964 | 1 | ▮ | DUR | ▮ | 7 | 23,340 | 12.70 |
| 2,947 | 1 | ▮ | RJD | ▮ | 3 | 23,481 | 12.55 |
| 2,829 | 1 | ▮ | CLD | ▮ | 7 | 59,462 | 4.75 |
| 2,802 | 1 | ▮ | MNI | ▮ | 2 | 27,179 | 10.30 |

08/02/16
P9493-R493

MONTHLY CUSTOMER INDEX REPORT
FOR MONTH ENDING 07/31/16
SALES REGION 003

PAGE 3



| TOTAL INDEX | NO OF ACCTS | CUSTOMER NAME | ACCOUNT REP | ACCOUNT NUMBER | NO OF TRADES | EQUITY DOLLARS | EQUITY TURNOVER |
|---|---|---|---|---|---|---|---|
| 2,782 | 1 | | MRK | | 1 | 159,819 | 1.74 |
| 2,777 | 1 | | DGO | | 2 | 0 | .00 |
| 2,753 | 1 | | DGO | | 3 | 190,116 | 1.44 |
| 2,703 | 1 | | MNI | | 9 | 10,577 | 25.55 |
| 2,693 | 1 | | KBF | | 1 | 0 | .00 |
| 2,682 | 1 | | KBF | | 3 | | .00 |
| 2,680 | 1 | | KBF | | 3 | 0 | .00 |
| 2,675 | 1 | | SMW | | 2 | 32,126 | 8.32 |
| 2,663 | 1 | | ACJ | | 4 | 58,216 | 4.57 |
| 2,654 | 1 | | REY | | 3 | 21,096 | 12.57 |
| 2,650 | 1 | | KBF | | 2 | 0 | .00 |
| 2,639 | 1 | | KBF | | 5 | 234,608 | 1.12 |
| 2,638 | 1 | | ACJ | | 2 | 4,937 | 53.43 |
| 2,630 | 1 | | SMW | | 3 | 86,021 | 2.99 |
| 2,535 | 1 | | SOD | | 7 | | .00 |
| 2,500 | 1 | | DUR | | 13 | 17,186 | 14.54 |
| 2,485 | 1 | | BOH | | 2 | 57,233 | 4.34 |
| 2,457 | 1 | | SMW | | 2 | 4,897 | 50.16 |
| 2,429 | 1 | | MRK | | 1 | 221,088 | 1.09 |
| 2,414 | 1 | | ACL | | 10 | 41,213 | 5.85 |
| 2,380 | 1 | | MRK | | 1 | 47,658 | 4.99 |
| 2,377 | 1 | | BOH | | 1 | 73,234 | 3.24 |
| 2,318 | 1 | | DIA | | 1 | 25,625 | 9.04 |
| 2,285 | 1 | | ACL | | 12 | 124,962 | 1.82 |
| 2,272 | 1 | | REY | | 1 | 171,822 | 1.32 |
| 2,271 | 1 | | SOD | | 3 | 54,890 | 4.13 |
| 2,241 | 1 | | DUR | | 11 | 123,276 | 10.58 |
| 2,231 | 1 | | SMW | | 1 | 123,874 | 1.80 |
| 2,188 | 1 | | SOD | | 4 | 43,495 | 5.02 |
| 2,155 | 1 | | SOD | | 3 | 18,785 | 11.47 |
| 2,119 | 1 | | IPK | | 3 | 758 | 279.45 |
| 2,116 | 2 | | SOD | | 1 | 47,189 | 4.48 |
| 2,081 | 1 | | BOH | | 11 | 75,234 | 2.76 |
| 2,055 | 1 | | REY | | 1 | 48,212 | 4.26 |
| 2,054 | 1 | | KBF | | 4 | 55,753 | 3.68 |
| 2,052 | 1 | | VSN | | 9 | 112,094 | 1.83 |
| 2,041 | 1 | | ACL | | 9 | 236,143 | .86 |
| 2,027 | 1 | | SOD | | 6 | 39,654 | 5.11 |
| 2,025 | 1 | | RCF | | 1 | 10,006 | 20.23 |

```
08/02/16                          MONTHLY CUSTOMER INDEX REPORT                          PAGE   4
P9493-R493                         FOR MONTH ENDING 07/31/16
                                        SALES REGION 004
```

| TOTAL INDEX | NO OF ACCTS | CUSTOMER NAME | ACCOUNT REP | ACCOUNT NUMBER | NO OF TRADES | EQUITY DOLLARS | EQUITY TURNOVER |
|---|---|---|---|---|---|---|---|
| 135,916 | 1 | | TLB | | 16 | 407,727 | 33.33 |
| 131,873 | 1 | | DJW | | 23 | 564,256 | 23.37 |
| 111,275 | 1 | | CSF | | 11 | 177,055 | 62.84 |
| 93,700 | 1 | | SEJ | | 10 | 776,436 | 12.06 |
| 64,190 | 1 | | KDF | | 18 | 1,051,341 | 6.10 |
| 61,905 | 2 | | CSF | | 4 | 1,010,068 | 6.12 |
| 57,172 | 1 | | SEJ | | 7 | 527,248 | 10.84 |
| 48,151 | 1 | | SIL | | 4 | 1,019,793 | 4.72 |
| 44,165 | 1 | | DJW | | 15 | 210,309 | 20.99 |
| 39,401 | 1 | | TLB | | 5 | 215,193 | 18.30 |
| 26,835 | 1 | | DUP | | 3 | 498,067 | 5.38 |
| 25,555 | 1 | | GPJ | | | | .00 |
| 18,555 | 1 | | LNK | | 4 | 2,732,453 | .67 |
| 18,496 | 1 | | LNK | | 6 | 559,918 | 3.30 |
| 18,268 | 1 | | SEJ | | 6 | 1,218,104 | 1.49 |
| 17,501 | 1 | | TLB | | 6 | 789,312 | 2.21 |
| 17,385 | 1 | | TLB | | 3 | | .00 |
| 17,211 | 2 | | FDR | | 35 | 162,961 | 10.56 |
| 16,306 | 1 | | CSF | | 23 | 193,647 | 8.42 |
| 16,144 | 1 | | ZOL | | 14 | 401,671 | 4.01 |
| 15,167 | 1 | | KDF | | 8 | 84,518 | 17.94 |
| 14,379 | 1 | | CSF | | 8 | 185,879 | 7.73 |
| 14,185 | 1 | | WAS | | 4 | 0 | .00 |
| 13,634 | 1 | | ZOL | | 6 | 170,363 | 8.00 |
| 12,027 | 1 | | MKJ | | 9 | 340,813 | 3.52 |
| 11,503 | 1 | | BEF | | 9 | 192,339 | 5.98 |
| 11,497 | 1 | | TLB | | 6 | 189,132 | 16.59 |
| 11,287 | 1 | | CSF | | 4 | 198,146 | 5.99 |
| 11,248 | 4 | | FDR | | 10 | 150,246 | 7.48 |
| 10,510 | 1 | | BNB | | 4 | 265,715 | 3.95 |
| 10,488 | 1 | | LNK | | 10 | 335,333 | 3.12 |
| 10,218 | 1 | | BNB | | | 2,292,768 | .44 |
| 8,932 | 1 | | FDR | | 8 | 233,744 | 3.82 |
| 8,901 | 2 | | ZOL | | 22 | 183,484 | 4.85 |
| 8,285 | 2 | | ARO | | 55 | 79,428 | 10.43 |
| 7,978 | 2 | | SEJ | | 4 | 77,244 | 10.32 |
| 7,830 | 0 | | TLB | | 3 | 0 | .00 |
| 7,373 | 1 | | TLB | | 12 | 27,191 | 27.11 |
| 7,344 | 1 | | TLB | | 5 | 46,972 | 15.63 |
| 7,318 | 1 | | DUP | | | 0 | .00 |
| 7,230 | 1 | | DUP | | 2 | 1,297 | 557.34 |
| 6,936 | 1 | | KDF | | 3 | 210,587 | 3.29 |
| 6,920 | 1 | | SIL | | 1 | 232,877 | 3.23 |
| 6,872 | 1 | | SIL | | 2 | 248,259 | 2.76 |
| 6,563 | 1 | | OCK | | 6 | 88,900 | 7.38 |
| 6,535 | 1 | | KDF | | 6 | 429,677 | 1.52 |
| 6,166 | 1 | | BEF | | 2 | 680 | 907.00 |
| 6,081 | 1 | | DJW | | 4 | 98,664 | 6.16 |
| 5,944 | 1 | | CSF | | 2 | 262,535 | 2.26 |
| 5,817 | 1 | | LNK | | 13 | 86,710 | 6.70 |

08/02/16
P9493-R493

MONTHLY CUSTOMER INDEX REPORT
FOR MONTH ENDING 07/31/16
SALES REGION 004

PAGE 5



| TOTAL INDEX | NO OF ACCTS | CUSTOMER NAME | ACCOUNT REP | ACCOUNT NUMBER | NO OF TRADES | EQUITY DOLLARS | EQUITY TURNOVER |
|---|---|---|---|---|---|---|---|
| 5,650 | 1 | | DUP | | 4 | 0 | .00 |
| 5,479 | 2 | | GGF | | 14 | 585,376 | .93 |
| 5,173 | 2 | | DUP | | 2 | 201,192 | 2.57 |
| 5,169 | 2 | | CSF | | 1 | 2,595,872 | .19 |
| 4,993 | 1 | | BEF | | 6 | 161,401 | 3.09 |
| 4,905 | 1 | | ZOL | | 13 | 178,271 | 2.75 |
| 4,787 | 1 | | BEF | | 5 | 161,448 | 2.96 |
| 4,614 | 1 | | ZOL | | 2 | 604,656 | .76 |
| 4,515 | 1 | | GGF | | 2 | 248,257 | 1.81 |
| 4,502 | 1 | | SIL | | 2 | 81,231 | 5.54 |
| 4,483 | 1 | | KDF | | 3 | 104,369 | 4.29 |
| 4,393 | 1 | | DJW | | 1 | 636,204 | .69 |
| 4,399 | 1 | | OCK | | 1 | 270,830 | 1.62 |
| 4,318 | 1 | | AMD | | 2 | 0 | .00 |
| 4,317 | 1 | | DJW | | 2 | 208,408 | 2.07 |
| 3,864 | 1 | | FDR | | 16 | 35,015 | 11.03 |
| 3,817 | 1 | | TLB | | 3 | 70,568 | 5.40 |
| 3,787 | 1 | | MKJ | | 3 | 252,259 | 1.50 |
| 3,718 | 1 | | MKJ | | 3 | 115,074 | 3.23 |
| 3,715 | 1 | | DJW | | 4 | 105,217 | 3.53 |
| 3,668 | 1 | | OCK | | 5 | 75,782 | 4.83 |
| 3,630 | 2 | | GGE | | 1 | 198,634 | 1.82 |
| 3,590 | 1 | | ZOL | | 8 | 503,687 | .71 |
| 3,578 | 1 | | SEJ | | 6 | 0 | .00 |
| 3,470 | 1 | | LNK | | 1 | 45,446 | 7.63 |
| 3,460 | 1 | | LNK | | 1 | 12,695 | 27.25 |
| 3,440 | 1 | | CHN | | 2 | 101,467 | 3.39 |
| 3,430 | 1 | | DJW | | 1 | 80,663 | 4.35 |
| 3,421 | 1 | | DJW | | 5 | 0 | .00 |
| 3,417 | 1 | | MKJ | | 1 | 43,524 | 7.85 |
| 3,395 | 1 | | SEJ | | 2 | 0 | .00 |
| 3,350 | 1 | | ZOL | | 6 | 103,010 | 3.25 |
| 3,273 | 1 | | BEF | | 1 | 204,786 | 1.59 |
| 3,255 | 1 | | CSF | | 5 | 79,607 | 4.08 |
| 3,243 | 1 | | LNK | | 3 | 61,718 | 5.25 |
| 3,182 | 1 | | TLB | | 1 | 38,191 | 8.33 |
| 3,146 | 1 | | KDF | | 5 | 75,979 | 4.14 |
| 3,144 | 1 | | DJW | | 4 | 235,135 | 1.33 |
| 3,122 | 1 | | FDR | | 2 | 0 | .00 |
| 3,090 | 1 | | CHN | | 3 | 50,481 | 6.12 |
| 3,047 | 1 | | SEJ | | 4 | 654 | 462.89 |
| 3,027 | 1 | | TLB | | 12 | 161,550 | 1.82 |
| 2,958 | 1 | | ZOL | | 9 | 478,033 | 1.59 |
| 2,857 | 2 | | CSF | | 9 | 28,970 | 9.86 |
| 2,787 | 2 | | BNB | | 2 | 205,672 | 1.35 |
| 2,753 | 1 | | DJW | | 4 | 41,660 | 6.60 |
| 2,751 | 2 | | TLB | | 2 | 302,559 | 6.90 |
| 2,695 | 1 | | KDF | | 5 | 42,561 | 6.33 |
| 2,667 | 1 | | MKJ | | 2 | 0 | .00 |
| 2,647 | 1 | | WAS | | 2 | 176,983 | 1.49 |

08/02/16
P9493-R493

MONTHLY CUSTOMER INDEX REPORT
FOR MONTH ENDING 07/31/16
SALES REGION 004

PAGE    6

| TOTAL INDEX | NO OF ACCTS | CUSTOMER NAME | ACCOUNT REP | ACCOUNT NUMBER | NO OF TRADES | EQUITY DOLLARS | EQUITY TURNOVER |
|---|---|---|---|---|---|---|---|
| 2,508 | 1 |  | SEJ | | 4 | 40,231 | 6.23 |
| 2,358 | 1 | | LNK | | 7 | 30,414 | 7.75 |
| 2,347 | 1 | | KDF | | 3 | 190,651 | 1.23 |
| 2,281 | 1 | | SEJ | | 6 | 59,108 | 3.85 |
| 2,271 | 1 | | CSF | | 13 | 50,174 | 4.52 |
| 2,256 | 1 | | BNB | | 5 | 187,267 | 1.20 |
| 2,252 | 1 | | OCK | | 4 | 229,408 | .98 |
| 2,250 | 1 | | MKJ | | 2 | 41,229 | 5.45 |
| 2,221 | 1 | | OCK | | 10 | 106,902 | 2.07 |
| 2,175 | 1 | | BEF | | 3 | 235,535 | .92 |
| 2,147 | 1 | | MKJ | | 2 | 0 | .00 |
| 2,136 | 1 | | BNB | | 13 | 123,637 | 1.72 |
| 2,099 | 1 | | DUP | | 7 | 60,134 | 3.48 |
| 2,094 | 1 | | RBA | | 2 | 73,686 | 2.84 |
| 2,086 | 1 | | GGE | | 1 | 0 | .00 |
| 2,083 | 1 | | SEJ | | 4 | 2,103 | 99.02 |
| 2,079 | 1 | | ZOL | | 7 | 17,456 | 11.90 |
| 2,078 | 1 | | ZOL | | 1 | 0 | .00 |
| 2,078 | 1 | | SEJ | | 1 | 236,441 | .87 |
| 2,075 | 2 | | SEJ | | 1 | 907,575 | .22 |
| 2,072 | 1 | | GPJ | | 1 | 0 | .00 |
| 2,003 | 1 | | TLB | | 9 | 11,127 | 17.99 |

08/02/16
P9993-R493

MONTHLY CUSTOMER INDEX REPORT
FOR MONTH ENDING 07/31/16
SALES REGION 005

PAGE    7

| TOTAL INDEX | NO OF ACCTS | CUSTOMER NAME | ACCOUNT REP | ACCOUNT NUMBER | NO OF TRADES | EQUITY DOLLARS | EQUITY TURNOVER |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 4,105 | 1 |  | FVR | | 5 | 0 | .00 |
| 3,421 | 1 | | MAZ | | 15 | 0 | .00 |
| 2,414 | 1 | | SDE | | 2 | 1,441 | 167.53 |
| 2,275 | 1 | | FVR | | 1 | 0 | .00 |
| 2,026 | 1 | | FVR | | 15 | 18,443 | 10.98 |

# EXHIBIT 60

08/02/16
P9494-R494

CUSTOMER MARKET VALUE REPORT
FOR MONTH ENDING 07/31/16
SALES REGION 003

PAGE 1



| MARKET VALUE | NO. OF ACCTS | CUSTOMER NAME | ACCOUNT REP | ACCOUNT NUMBER | MONTHLY INDEX | EQUITY DOLLARS |
|---|---|---|---|---|---|---|
| 11,668,636 | 1 | [redacted] | KMR | [redacted] | 0 | 1,711,434 |
| 6,056,100 | 1 | [redacted] | KBF | [redacted] | 0 | 4,629,187 |
| 5,251,461 | 1 | [redacted] | RCF | [redacted] | 1,088 | 1,877,151 |
| 4,721,449 | 1 | [redacted] | GSM | [redacted] | 0 | 3,635,718 |
| 3,477,846 | 2 | [redacted] | RCF | [redacted] | 13,044 | 5,967,940 |
| 3,450,355 | 1 | [redacted] | RCF | [redacted] | 0 | 1,593,101 |
| 2,666,589 | 1 | [redacted] | MRK | [redacted] | 0 | 1,894,469 |
| 2,396,064 | 1 | [redacted] | FAL | [redacted] | 4,235 | 6,529,101 |
| 2,294,526 | 1 | [redacted] | KMR | [redacted] | 5,075 | 4,160,771 |
| 2,260,944 | 1 | [redacted] | FAL | [redacted] | 0 | 581,364 |
| 2,255,669 | 1 | [redacted] | BOH | [redacted] | 0 | 2,261,435 |
| -1,947,631 | 1 | [redacted] | FAL | [redacted] | 0 | 1,188,567 |
| -1,784,631 | 2 | [redacted] | FAL | [redacted] | 13,334 | 1,447,516 |
| -1,774,808 | 1 | [redacted] | MRK | [redacted] | 1,944 | 3,075,995 |
| -1,717,758 | 1 | [redacted] | SMW | [redacted] | 0 | 428,777 |
| -1,715,895 | 1 | [redacted] | DIA | [redacted] | 0 | 710,373 |
| 1,554,110 | 1 | [redacted] | MRK | [redacted] | 0 | 487,283 |
| 1,419,870 | 1 | [redacted] | REY | [redacted] | 0 | 1,419,794 |
| 1,392,000 | 1 | [redacted] | MRK | [redacted] | 0 | 1,227,112 |
| 1,377,600 | 1 | [redacted] | HLM | [redacted] | 41,154 | 3,846,352 |
| 1,330,867 | 1 | [redacted] | SOD | [redacted] | 27,642 | 299,753 |
| 1,324,103 | 1 | [redacted] | ACL | [redacted] | 0 | 1,320,259 |
| 1,202,100 | 1 | [redacted] | ACL | [redacted] | 0 | 812,909 |
| 1,181,972 | 1 | [redacted] | GSM | [redacted] | 0 | 1,134,623 |
| 1,129,632 | 1 | [redacted] | MNI | [redacted] | 0 | 1,014,583 |
| 1,116,267 | 1 | [redacted] | SNA | [redacted] | 9,861 | 780,533 |
| 1,110,285 | 1 | [redacted] | SOD | [redacted] | 0 | 369,956 |
| -1,029,913 | 1 | [redacted] | MRK | [redacted] | 0 | 1,110,853 |
| -1,023,350 | 1 | [redacted] | IMP | [redacted] | 12,763 | 1,072,078 |
| -1,009,350 | 1 | [redacted] | IMP | [redacted] | 0 | 364,613 |
| 1,009,350 | 1 | [redacted] | VSN | [redacted] | 7,722 | 371,654 |
| 1,005,060 | 1 | [redacted] | KBF | [redacted] | 27,355 | 294,518 |
| 986,808 | 1 | [redacted] | ACJ | [redacted] | 4,194 | 615,750 |
| 970,237 | 1 | [redacted] | BOH | [redacted] | 0 | 424,909 |
| 961,894 | 1 | [redacted] | IMP | [redacted] | 0 | 1,528,130 |
| 928,602 | 1 | [redacted] | ACJ | [redacted] | 0 | 914,380 |
| 897,075 | 1 | [redacted] | KMR | [redacted] | 0 | 371,733 |
| -858,795 | 1 | [redacted] | IPK | [redacted] | 0 | 906,084 |
| 856,543 | 1 | [redacted] | REY | [redacted] | 2,272 | 171,822 |
| 813,408 | 1 | [redacted] | MRK | [redacted] | 0 | 295,875 |
| 789,824 | 1 | [redacted] | MRK | [redacted] | 0 | 277,026 |
| 787,190 | 1 | [redacted] | ACL | [redacted] | 2,041 | 236,143 |
| 764,205 | 1 | [redacted] | CLD | [redacted] | 0 | 790,284 |
| 757,433 | 1 | [redacted] | ACL | [redacted] | 4,276 | 199,902 |
| 716,380 | 1 | [redacted] | DGO | [redacted] | 0 | 883,568 |
| 707,938 | 1 | [redacted] | HLM | [redacted] | 8,486 | 252,540 |
| 687,222 | 1 | [redacted] | DIA | [redacted] | 0 | 718,026 |
| 677,550 | 1 | [redacted] | HPU | [redacted] | 0 | 703,172 |
|  |  | [redacted] | SOD | [redacted] | 3,850 | 255,345 |
|  |  | [redacted] | HLM | [redacted] | 0 | 674,736 |

08/02/16
P9494-R494

CUSTOMER MARKET VALUE REPORT
FOR MONTH ENDING 07/31/16
SALES REGION 003

PAGE 2

| MARKET VALUE | NO OF ACCTS | CUSTOMER NAME | ACCOUNT REP | ACCOUNT NUMBER | MONTHLY INDEX | EQUITY DOLLARS |
|---|---|---|---|---|---|---|
| 648,381 | 1 | ■ | MRK | ■ | 0 | 1,328,211 |
| 623,330 | 1 | ■ | MRK | ■ | 0 | 401,213 |
| 618,453 | 1 | ■ | MRK | ■ | 19,929 | 619,254 |
| -614,010 | 1 | ■ | BOH | ■ | 0 | 152,068 |
| -608,985 | 2 | ■ | IPK | ■ | 0 | 252,997 |
| 607,815 | 1 | ■ | HLM | ■ | 56,487 | 594,508 |
| 605,610 | 1 | ■ | HLM | ■ | 0 | 329,536 |
| 603,720 | 1 | ■ | KMR | ■ | 0 | 731,278 |
| 602,775 | 1 | ■ | SOD | ■ | 0 | 136,621 |
| 599,783 | 1 | ■ | ACL | ■ | 4,693 | 237,030 |
| 585,600 | 2 | ■ | ACL | ■ | 0 | 172,040 |
| 584,920 | 1 | ■ | IMP | ■ | 817 | 579,063 |
| 573,225 | 1 | ■ | GSM | ■ | 0 | 172,231 |
| 573,120 | 1 | ■ | GSM | ■ | 0 | 563,546 |
| 570,601 | 1 | ■ | KMR | ■ | 0 | 564,750 |
| 561,997 | 1 | ■ | FAL | ■ | 0 | 279,719 |
| 555,275 | 1 | ■ | DUR | ■ | 26,863 | 144,380 |
| 549,810 | 1 | ■ | BOH | ■ | 0 | 550,265 |
| -544,200 | 1 | ■ | RJD | ■ | 3,855 | 173,283 |
| -543,852 | 1 | ■ | RCF | ■ | 0 | 348,706 |
| 540,945 | 1 | ■ | ACL | ■ | 0 | 245,342 |
| 540,200 | 1 | ■ | HLM | ■ | 0 | 574,736 |
| 535,800 | 1 | ■ | SNA | ■ | 7,933 | 529,857 |
| 531,640 | 1 | ■ | GSM | ■ | 0 | 281,959 |
| 531,640 | 1 | ■ | MRK | ■ | 15,951 | 537,063 |
| 505,718 | 1 | ■ | RCF | ■ | 0 | 118,433 |
| 504,167 | 1 | ■ | CLD | ■ | 0 | 664,862 |
| 495,615 | 1 | ■ | ACJ | ■ | 576 | 742,092 |
| 485,824 | 2 | ■ | FAL | ■ | 0 | 501,386 |
| 480,840 | 1 | ■ | ACJ | ■ | 387 | 152,250 |
| -464,640 | 1 | ■ | GSM | ■ | 0 | 455,431 |
| -464,372 | 1 | ■ | IMP | ■ | 6,007 | 76,225 |
| 464,301 | 1 | ■ | MRK | ■ | 0 | 149,615 |
| 460,208 | 1 | ■ | FAL | ■ | 0 | 337,894 |
| 456,160 | 1 | ■ | MRK | ■ | 5,990 | 512,821 |
| 450,911 | 1 | ■ | GSM | ■ | 590 | 100,246 |
| 446,329 | 1 | ■ | GSM | ■ | 0 | 150,193 |
| 444,114 | 1 | ■ | IPK | ■ | 3,664 | 478,296 |
| 436,566 | 1 | ■ | KMR | ■ | 0 | 445,250 |
| 432,973 | 1 | ■ | ACJ | ■ | 0 | 423,525 |
| 428,973 | 1 | ■ | BOH | ■ | 0 | 522,325 |
| 428,921 | 1 | ■ | BOH | ■ | 0 | 453,633 |
| 425,775 | 1 | ■ | IMP | ■ | 0 | 456,775 |
| 423,927 | 1 | ■ | DIA | ■ | 7,371 | 455,236 |
| 423,927 | 1 | ■ | SNA | ■ | 0 | 105,528 |
| 423,927 | 1 | ■ | MRK | ■ | 0 | 190,034 |
| 423,927 | 1 | ■ | HLM | ■ | 0 | 183,481 |
| 417,942 | 1 | ■ | KBF | ■ | 684 | 418,054 |
| 410,099 | 1 | ■ | GSM | ■ | 0 | 101,961 |
| 408,420 | 1 | ■ | BOH | ■ | 0 | 405,859 |

08/02/16
P9494-R494

CUSTOMER MARKET VALUE REPORT
FOR MONTH ENDING 07/31/16
SALES REGION 003

PAGE 3



| MARKET VALUE | NO OF ACCTS | CUSTOMER NAME | ACCOUNT REP | ACCOUNT NUMBER | MONTHLY INDEX | EQUITY DOLLARS |
|---|---|---|---|---|---|---|
| 408,390 | 1 | | BOH | | 0 | 434,440 |
| 403,740 | 1 | | KBF | | 8,959 | 377,332 |
| 401,916 | 1 | | DGO | | 0 | 391,267 |
| 401,214 | 1 | | MRK | | 0 | 178,584 |
| 400,700 | 1 | | GSM | | 0 | 399,712 |
| 400,700 | 1 | | ACL | | 0 | 385,458 |
| 393,570 | 1 | | RCF | | 0 | 586,517 |
| 393,120 | 1 | | VSN | | 2,979 | 118,282 |
| 383,553 | 1 | | ACJ | | 0 | 384,008 |
| -378,875 | 2 | | SMW | | 4,798 | 133,870 |
| 376,761 | 1 | | SOD | | 3,263 | 140,563 |
| 376,155 | 1 | | MRK | | 0 | 398,851 |
| 376,155 | 1 | | MRK | | 0 | 380,351 |
| 374,077 | 1 | | MRK | | 0 | 576,324 |
| 372,876 | 1 | | KBF | | 0 | 371,469 |
| 370,510 | 1 | | MRK | | 0 | 293,766 |
| 369,071 | 1 | | IPK | | 0 | 364,582 |
| 365,117 | 1 | | BOH | | 0 | 453,960 |
| 363,366 | 1 | | HLM | | 6,158 | 102,535 |
| 363,366 | 1 | | SOD | | 7,462 | 87,798 |
| 360,630 | 1 | | GSM | | 0 | 350,670 |
| 351,250 | 1 | | GSM | | 3,476 | 202,378 |
| 351,250 | 1 | | GSM | | 0 | 669,805 |
| 349,058 | 1 | | HLM | | 6,040 | 85,191 |
| 346,568 | 1 | | GSM | | 0 | 454,284 |
| 346,409 | 1 | | ACL | | 1,042 | 485,680 |
| 346,020 | 1 | | GSM | | 0 | 350,018 |
| 345,877 | 1 | | ACL | | 0 | 344,260 |
| 345,756 | 1 | | ACJ | | 0 | 349,413 |
| 345,072 | 1 | | KJA | | 0 | 346,586 |
| 344,400 | 1 | | BOH | | 0 | 957,462 |
| 343,179 | 1 | | BOH | | 773 | 344,496 |
| 343,179 | 1 | | SOD | | 1,764 | 342,435 |
| 341,536 | 1 | | ACL | | 0 | 234,484 |
| 338,210 | 1 | | VSN | | 0 | 339,301 |
| 335,422 | 1 | | MRK | | 0 | 102,193 |
| 331,326 | 1 | | RJD | | 0 | 333,047 |
| -328,208 | 1 | | CLD | | 2,829 | 59,462 |
| 326,799 | 1 | | ACJ | | 0 | 96,328 |
| 326,308 | 1 | | HLM | | 0 | 327,701 |
| 323,727 | 1 | | MRK | | 0 | 323,280 |
| 323,242 | 1 | | DIA | | 0 | 368,318 |
| 319,807 | 1 | | GSM | | 0 | 361,417 |
| 318,984 | 1 | | GSM | | 0 | 319,964 |
| -307,695 | 1 | | FAL | | 4,430 | 120,788 |
| -307,695 | 1 | | BOH | | 0 | 72,588 |
| -307,695 | 1 | | SMW | | 0 | 52,753 |
| 305,682 | 1 | | GSM | | 0 | 304,671 |
| 302,805 | 1 | | DIA | | 0 | 149,798 |
| 302,805 | 1 | | GSM | | 154 | 116,614 |

08/02/16
P9494-R494

CUSTOMER MARKET VALUE REPORT
FOR MONTH ENDING 07/31/16
SALES REGION 003

PAGE 4



| MARKET VALUE | NO OF ACCTS | CUSTOMER NAME | ACCOUNT REP | ACCOUNT NUMBER | MONTHLY INDEX | EQUITY DOLLARS |
|---|---|---|---|---|---|---|
| 301,846 | 1 | [REDACTED] | MRK | [REDACTED] | | 303,909 |
| 301,671 | 1 | [REDACTED] | IPK | [REDACTED] | 1,296 | 301,795 |
| 300,700 | 1 | [REDACTED] | SMW | [REDACTED] | 0 | 337,468 |
| 300,525 | 1 | [REDACTED] | HLM | [REDACTED] | 0 | 301,117 |
| 300,299 | 1 | [REDACTED] | GSM | [REDACTED] | 0 | 210,094 |
| 299,508 | 1 | [REDACTED] | DUR | [REDACTED] | 0 | 301,083 |
| 299,264 | 1 | [REDACTED] | MNI | [REDACTED] | 0 | 243,056 |
| 296,160 | 1 | [REDACTED] | IPK | [REDACTED] | 0 | 293,228 |
| 294,690 | 1 | [REDACTED] | ACJ | [REDACTED] | 0 | 294,367 |
| 293,675 | 1 | [REDACTED] | ACJ | [REDACTED] | 841 | 82,308 |
| -293,610 | 1 | [REDACTED] | RJD | [REDACTED] | 4,476 | 82,090 |
| 292,130 | 1 | [REDACTED] | HPU | [REDACTED] | | 291,523 |
| 291,595 | 1 | [REDACTED] | ACL | [REDACTED] | | 298,049 |
| 287,540 | 1 | [REDACTED] | MNI | [REDACTED] | | 288,185 |
| -287,182 | 1 | [REDACTED] | SMW | [REDACTED] | 154 | 42,724 |
| 285,894 | 1 | [REDACTED] | KMR | [REDACTED] | | 298,921 |
| 282,618 | 1 | [REDACTED] | HLM | [REDACTED] | 8,749 | 81,842 |
| 282,618 | 1 | [REDACTED] | KMR | [REDACTED] | | 281,796 |
| 282,618 | 1 | [REDACTED] | SOD | [REDACTED] | 2,081 | 75,234 |
| 281,295 | 1 | [REDACTED] | IPK | [REDACTED] | | 603,127 |
| 281,000 | 1 | [REDACTED] | GSM | [REDACTED] | 0 | 117,047 |
| 281,000 | 1 | [REDACTED] | GSM | [REDACTED] | 0 | 117,047 |
| 280,642 | 1 | [REDACTED] | DIA | [REDACTED] | 0 | 281,020 |
| 280,490 | 1 | [REDACTED] | HLM | [REDACTED] | 0 | 130,133 |
| -279,648 | 1 | [REDACTED] | MRK | [REDACTED] | 0 | 279,606 |
| -277,545 | 1 | [REDACTED] | DUR | [REDACTED] | | 60,696 |
| -276,210 | 1 | [REDACTED] | SMW | [REDACTED] | 6,220 | 86,021 |
| 275,520 | 2 | [REDACTED] | DUR | [REDACTED] | 2,580 | 344,178 |
| 272,280 | 2 | [REDACTED] | ACJ | [REDACTED] | 17,780 | 64,456 |
| -272,100 | 1 | [REDACTED] | ACL | [REDACTED] | 3,222 | 270,724 |
| 270,693 | 1 | [REDACTED] | MRK | [REDACTED] | | 627,083 |
| 270,414 | 1 | [REDACTED] | RJD | [REDACTED] | 509 | 42,421 |
| 269,394 | 2 | [REDACTED] | ACJ | [REDACTED] | 427 | 73,477 |
| 269,034 | 2 | [REDACTED] | CLD | [REDACTED] | 698 | 243,668 |
| 267,900 | 1 | [REDACTED] | MRK | [REDACTED] | 5,496 | 154,758 |
| 266,805 | 1 | [REDACTED] | SNA | [REDACTED] | 835 | 79,922 |
| -266,669 | 1 | [REDACTED] | BOH | [REDACTED] | | 265,946 |
| 265,982 | 1 | [REDACTED] | ACL | [REDACTED] | 155 | 303,962 |
| 263,918 | 1 | [REDACTED] | REY | [REDACTED] | | 40,700 |
| 262,431 | 1 | [REDACTED] | DGO | [REDACTED] | 0 | 263,210 |
| 262,368 | 1 | [REDACTED] | VSN | [REDACTED] | 0 | 264,274 |
| 260,710 | 1 | [REDACTED] | IMP | [REDACTED] | 0 | 192,115 |
| 254,503 | 1 | [REDACTED] | KBF | [REDACTED] | 0 | 104,418 |
| 251,160 | 1 | [REDACTED] | DGO | [REDACTED] | 0 | 261,349 |
| 248,847 | 1 | [REDACTED] | ACJ | [REDACTED] | 564 | 241,824 |
| 247,102 | 1 | [REDACTED] | ACJ | [REDACTED] | 4,607 | 63,425 |
| 245,529 | 1 | [REDACTED] | CLD | [REDACTED] | 0 | 233,397 |
| | 1 | [REDACTED] | KMR | [REDACTED] | 0 | 373,933 |
| | 1 | [REDACTED] | ACJ | [REDACTED] | 0 | 249,878 |
| | 1 | [REDACTED] | RCF | [REDACTED] | | 250,170 |

08/02/16
P9494-R494

CUSTOMER MARKET VALUE REPORT
FOR MONTH ENDING 07/31/16
SALES REGION 003

PAGE 5

| MARKET VALUE | NO OF ACCTS | CUSTOMER NAME | ACCOUNT REP | ACCOUNT NUMBER | MONTHLY INDEX | EQUITY DOLLARS |
|---|---|---|---|---|---|---|
| 245,300 | 1 | | GSM | | 0 | 235,847 |
| 245,200 | 1 | | DGO | | 0 | 245,155 |
| -244,890 | 1 | | IMP | | 727 | 50,711 |
| 244,284 | 1 | | KBF | | 148 | 298,076 |
| 244,202 | 1 | | MRK | | 0 | 90,112 |
| 243,187 | 1 | | HPU | | 0 | 96,839 |
| 242,890 | 1 | | GSM | | 0 | 242,304 |
| 242,244 | 1 | | FAL | | 0 | 129,302 |
| 242,244 | 1 | | DIA | | 0 | 266,200 |
| 242,244 | 1 | | MRK | | 0 | 199,798 |
| 241,435 | 1 | | GSM | | 3,715 | 87,537 |
| 241,180 | 1 | | BOH | | 0 | 244,483 |
| 241,120 | 1 | | KJA | | 1,654 | 111,216 |
| 241,120 | 1 | | GSM | | 0 | 239,718 |
| 240,420 | 1 | | DIA | | 0 | 198,694 |
| 234,150 | 1 | | ACL | | 0 | 123,994 |
| 233,987 | 1 | | VSN | | 0 | 239,447 |
| 232,663 | 1 | | MRK | | 0 | 192,689 |
| 229,619 | 1 | | HLM | | 0 | 72,496 |
| 228,660 | 2 | | ACL | | 2,285 | 124,962 |
| 227,136 | 1 | | HLM | | 3,818 | 56,777 |
| 226,595 | 1 | | DGO | | 0 | 224,294 |
| 225,947 | 1 | | MRK | | 0 | 69,836 |
| 225,466 | 1 | | IPK | | 0 | 226,299 |
| 225,141 | 1 | | MRK | | 0 | 230,434 |
| 224,985 | 1 | | MRK | | 0 | 227,566 |
| 222,057 | 1 | | HLM | | 9,075 | 240,013 |
| 222,057 | 1 | | KBF | | 0 | 430,630 |
| 221,490 | 1 | | IPK | | 0 | 113,521 |
| 220,385 | 2 | | MRK | | 0 | 91,283 |
| -219,003 | 1 | | FAL | | 0 | 82,213 |
| 218,400 | 1 | | BOH | | 0 | 135,636 |
| 218,400 | 1 | | DGO | | 0 | 68,738 |
| 218,400 | 1 | | RCF | | 0 | 217,135 |
| 218,400 | 1 | | DGO | | 0 | 374,607 |
| 217,356 | 1 | | MRK | | 2,782 | 125,461 |
| 216,112 | 1 | | ACL | | 905 | 159,819 |
| 216,091 | 1 | | ACL | | 0 | 72,999 |
| 215,538 | 1 | | IPK | | 4,507 | 63,406 |
| 211,787 | 1 | | CLD | | 0 | 216,736 |
| 211,324 | 1 | | MRK | | 0 | 71,709 |
| 211,125 | 1 | | ACJ | | 725 | 116,738 |
| -210,690 | 1 | | KBF | | 0 | 209,886 |
| 207,854 | 1 | | FAL | | 0 | 203,860 |
| 207,210 | 1 | | BOH | | 5,943 | 259,576 |
| -205,130 | 1 | | RCF | | 435 | 186,639 |
| -205,130 | 1 | | DUR | | 1,527 | 61,322 |
| | 1 | | KBF | | 7,358 | 343,461 |
| | 1 | | BOH | | 1,475 | 48,650 |
| | | | | | | 42,896 |

08/02/16
P9494-R494

CUSTOMER MARKET VALUE REPORT
FOR MONTH ENDING 07/31/16
SALES REGION 003

PAGE 6

| MARKET VALUE | NO OF ACCTS | CUSTOMER NAME | ACCOUNT REP | ACCOUNT NUMBER | MONTHLY INDEX | EQUITY DOLLARS |
|---|---|---|---|---|---|---|
| -205,130 | 1 | ███ | BOH | ███ | 2,485 | 57,233 |
| 204,210 | 2 | ███ | DGO | ███ | 0 | 208,011 |
| 203,699 | 1 | ███ | GSM | ███ | 0 | 203,117 |
| 202,938 | 1 | ███ | DUR | ███ | 4,875 | 41,446 |
| 201,960 | 1 | ███ | DIA | ███ | 0 | 229,292 |
| 201,870 | 1 | ███ | ACL | ███ | 0 | 188,149 |
| 201,870 | 1 | ███ | GSM | ███ | 0 | 200,615 |
| 201,870 | 1 | ███ | IPK | ███ | 768 | 198,905 |
| 201,870 | 1 | ███ | CLD | ███ | 0 | 65,082 |
| 201,870 | 1 | ███ | CLD | ███ | 0 | 193,012 |
| 201,870 | 1 | ███ | MRK | ███ | 0 | 86,048 |
| 201,870 | 1 | ███ | ACL | ███ | 0 | 201,743 |
| 201,870 | 1 | ███ | HLM | ███ | 6,466 | 62,986 |
| 201,870 | 1 | ███ | VSN | ███ | 0 | 61,275 |
| 201,870 | 1 | ███ | KJA | ███ | 0 | 204,087 |
| 201,718 | 1 | ███ | HLM | ███ | 0 | 201,843 |
| 200,994 | 1 | ███ | FAL | ███ | 0 | 200,319 |
| 199,840 | 1 | ███ | IMP | ███ | 1,063 | 82,265 |
| 199,365 | 1 | ███ | HPU | ███ | 0 | 199,594 |
| 196,602 | 1 | ███ | SNA | ███ | 0 | 182,534 |
| 196,059 | 1 | ███ | ACJ | ███ | 0 | 56,716 |
| 195,648 | 1 | ███ | KBF | ███ | 0 | 195,276 |
| 193,396 | 1 | ███ | MRK | ███ | 0 | 148,013 |
| 193,015 | 1 | ███ | ACL | ███ | 0 | 192,968 |
| 192,181 | 1 | ███ | SOD | ███ | 9,318 | 52,023 |
| 191,316 | 1 | ███ | IPK | ███ | 0 | 104,458 |
| -190,439 | 1 | ███ | RJD | ███ | 3,214 | 38,850 |
| 189,779 | 1 | ███ | DGO | ███ | 2,753 | 190,116 |
| 189,701 | 1 | ███ | GSM | ███ | 667 | 50,228 |
| 189,098 | 1 | ███ | RCF | ███ | 0 | 188,031 |
| 188,395 | 1 | ███ | ACL | ███ | 0 | 76,298 |
| 187,908 | 1 | ███ | MRK | ███ | 0 | 67,281 |
| 187,530 | 1 | ███ | ACJ | ███ | 816 | 37,511 |
| 185,909 | 1 | ███ | FAL | ███ | 0 | 197,973 |
| -184,617 | 1 | ███ | IMP | ███ | 920 | 27,443 |
| 184,498 | 1 | ███ | MRK | ███ | 0 | 184,052 |
| 183,069 | 1 | ███ | MRK | ███ | 0 | 184,047 |
| 182,690 | 1 | ███ | GSM | ███ | 0 | 94,777 |
| 181,683 | 1 | ███ | DIA | ███ | 0 | 78,454 |
| 181,683 | 1 | ███ | GSM | ███ | 0 | 133,516 |
| 181,683 | 1 | ███ | DIA | ███ | 0 | 137,722 |
| 181,683 | 1 | ███ | ACL | ███ | 0 | 174,910 |
| 181,683 | 1 | ███ | IMP | ███ | 0 | 208,770 |
| 181,683 | 1 | ███ | DIA | ███ | 0 | 124,919 |
| 181,665 | 1 | ███ | ACL | ███ | 622 | 86,736 |
| 181,305 | 1 | ███ | MRK | ███ | 0 | 198,546 |
| 181,204 | 1 | ███ | ACJ | ███ | 151 | 210,328 |
| 178,204 | 1 | ███ | RCF | ███ | 0 | 180,007 |
| 178,131 | 1 | ███ | ACJ | ███ | 21 | 50,121 |
| 177,178 | 1 | ███ | CLD | ███ | 0 | 177,988 |

08/02/16
P9494-R494

CUSTOMER MARKET VALUE REPORT
FOR MONTH ENDING 07/31/16
SALES REGION 003

PAGE 7



| MARKET VALUE | NO OF ACCTS | CUSTOMER NAME | ACCOUNT REP | ACCOUNT NUMBER | MONTHLY INDEX | EQUITY DOLLARS |
|---|---|---|---|---|---|---|
| 176,969 | 1 | | ACJ | | 0 | 38,231 |
| 175,682 | 1 | | KBF | | 0 | 176,817 |
| 175,178 | 1 | | MRK | | 0 | 76,544 |
| 175,030 | 1 | | MRK | | 0 | 84,383 |
| 174,702 | 1 | | HLM | | 0 | 174,702 |
| 174,572 | 2 | | BOH | | 2,116 | 47,189 |
| 174,135 | 1 | | FAL | | 0 | 240,466 |
| 173,755 | 1 | | RCF | | 0 | 164,773 |
| 173,526 | 1 | | IPK | | 0 | 196,022 |
| 172,416 | 1 | | KBF | | 1,033 | 308,303 |
| 170,360 | 1 | | KBF | | 0 | 49,791 |
| 169,356 | 1 | | ACL | | 0 | 198,984 |
| 167,771 | 1 | | KBF | | 0 | 167,762 |
| 167,252 | 1 | | MRK | | 0 | 164,376 |
| 167,238 | 1 | | FAL | | 0 | 168,053 |
| 167,042 | 1 | | KBF | | 0 | 151,067 |
| 166,108 | 1 | | IPK | | 0 | 169,220 |
| 166,078 | 1 | | MRK | | 0 | 76,952 |
| 165,768 | 1 | | GSM | | 0 | 171,214 |
| -164,104 | 1 | | SMW | | 2,675 | 32,126 |
| -164,104 | 1 | | SNA | | 0 | 27,426 |
| 164,016 | 1 | | SOD | | 450 | 155,762 |
| -163,260 | 1 | | RJD | | 850 | 41,274 |
| 163,213 | 1 | | IPK | | 0 | 155,364 |
| 163,200 | 1 | | DGO | | 1,835 | 75,529 |
| 162,960 | 1 | | ACL | | 0 | 162,407 |
| 162,093 | 1 | | HPU | | 0 | 185,769 |
| 162,004 | 1 | | HPU | | 0 | 168,164 |
| 161,575 | 1 | | ACL | | 0 | 106,477 |
| 161,496 | 1 | | SNA | | 0 | 39,036 |
| 161,496 | 1 | | ACJ | | 5,458 | 230,795 |
| 161,496 | 1 | | SNA | | 0 | 37,914 |
| 161,496 | 1 | | IPK | | 5,248 | 133,648 |
| 161,496 | 1 | | HLM | | 4,497 | 41,780 |
| 161,496 | 1 | | SOD | | 2,188 | 43,495 |
| 161,307 | 1 | | KBF | | 0 | 177,314 |
| 161,161 | 1 | | MRK | | 0 | 158,904 |
| 161,161 | 1 | | IPK | | 2,639 | 174,708 |
| 160,888 | 1 | | KBF | | 0 | 234,608 |
| 160,740 | 2 | | CLD | | 0 | 158,671 |
| 160,280 | 1 | | IPK | | 0 | 158,778 |
| 160,280 | 1 | | HLM | | 0 | 160,734 |
| 160,280 | 1 | | ACL | | 0 | 219,104 |
| 158,406 | 1 | | ACL | | 0 | 161,312 |
| -156,563 | 1 | | RJD | | 0 | 248,179 |
| 156,100 | 2 | | IPK | | 0 | 48,755 |
| 155,388 | 1 | | ACJ | | 2,271 | 132,310 |
| 154,515 | 1 | | SOD | | 0 | 54,890 |
| 154,137 | 1 | | MRK | | 0 | 410,425 |
| 153,385 | 1 | | ACL | | 0 | 187,103 |

08/02/16
P9494-R494

CUSTOMER MARKET VALUE REPORT
FOR MONTH ENDING 07/31/16
SALES REGION 003

PAGE    8

| MARKET VALUE | NO OF ACCTS | CUSTOMER NAME | ACCOUNT REP | ACCOUNT NUMBER | MONTHLY INDEX | EQUITY DOLLARS |
|---|---|---|---|---|---|---|
| 152,713 | 1 |  | MNI | | 896 | 183,506 |
| 151,536 | 2 | | VSN | | 1,139 | 161,367 |
| -151,008 | 1 | | RCF | | 870 | 23,920 |

08/02/16
P9494-R494

CUSTOMER MARKET VALUE REPORT
FOR MONTH ENDING 07/31/16
SALES REGION 004

PAGE 9

| MARKET VALUE | NO OF ACCTS | CUSTOMER NAME | ACCOUNT REP | ACCOUNT NUMBER | MONTHLY INDEX | EQUITY DOLLARS |
|---|---|---|---|---|---|---|
| 3,431,790 | 1 | | SIL | | 48,151 | 1,019,793 |
| 2,906,135 | 1 | | KDF | | 64,190 | 1,051,341 |
| 2,578,606 | 2 | | TLB | | | 4,053,814 |
| 2,426,130 | 1 | | LNK | | 18,575 | 2,732,453 |
| 2,064,222 | 1 | | ZOL | | 3,590 | 503,687 |
| 1,851,504 | 1 | | DJW | | | 1,321,347 |
| 1,776,456 | 1 | | SEJ | | 57,172 | 527,248 |
| 1,392,000 | 1 | | DJW | | | 1,469,902 |
| 1,313,470 | 1 | | AMD | | 1,709 | 1,318,844 |
| -1,264,830 | 1 | | CSF | | 11,287 | 188,147 |
| -1,204,200 | 1 | | MKJ | | 534 | 1,288,643 |
| -1,198,962 | 1 | | GPJ | | | 1,297,887 |
| 1,161,993 | 1 | | BNB | | 10,218 | 2,292,768 |
| 1,138,248 | 1 | | SSJ | | 18,268 | 1,218,104 |
| -1,128,215 | 1 | | TLB | | 39,401 | 1,215,193 |
| -1,115,136 | 1 | | CSF | | 111,275 | 177,055 |
| 1,103,420 | 1 | | TLB | | | 1,103,110 |
| 1,088,240 | 10 | | FDR | | | 1,100,662 |
| 1,049,724 | 1 | | LNK | | 18,496 | 559,918 |
| -1,034,844 | 1 | | MKJ | | | 176,558 |
| 1,026,736 | 1 | | LNK | | 10,488 | 335,333 |
| 1,021,050 | 1 | | BNB | | | 1,224,518 |
| 1,016,226 | 1 | | GGF | | | 1,019,222 |
| 1,009,350 | 1 | | DJW | | | 1,012,285 |
| 1,003,713 | 1 | | SIL | | 6,920 | 252,877 |
| 943,620 | 1 | | DJW | | 767 | 1,195,055 |
| 922,841 | 1 | | KDF | | | 916,983 |
| 908,415 | 1 | | BEF | | | 909,932 |
| 888,228 | 1 | | DJW | | | 736,521 |
| 873,377 | 1 | | DJW | | | 944,933 |
| 861,631 | 1 | | CSF | | | 862,551 |
| 850,326 | 1 | | LNK | | | 863,649 |
| 847,177 | 1 | | SEJ | | 93,700 | 776,436 |
| 820,080 | 1 | | KDF | | | 824,827 |
| 800,960 | 1 | | GGF | | -135 | 561,472 |
| 736,725 | 1 | | GGF | | | 1,083,795 |
| 726,732 | 1 | | DUP | | | 843,203 |
| -685,400 | 1 | | KDF | | | 778,017 |
| -684,380 | 1 | | KDF | | 6,936 | 210,587 |
| -676,929 | 4 | | BNB | | 1,690 | 125,609 |
| 667,947 | 2 | | FDR | | 11,248 | 150,246 |
| 633,797 | 1 | | SEJ | | 2,075 | 907,575 |
| -625,170 | 1 | | ZOL | | 13,634 | 107,363 |
| 618,426 | 1 | | DJW | | 44,165 | 210,309 |
| 605,043 | 1 | | BEF | | | 620,415 |
| 597,662 | 1 | | ZOL | | 4,614 | 604,656 |
| 587,496 | 1 | | CSF | | 16,306 | 193,647 |
| 585,423 | 1 | | ZOL | | | 463,800 |
| 583,110 | 1 | | BNB | | | 253,603 |
| | 1 | | DJW | | | 684,077 |



08/02/16
P9494-R494

CUSTOMER MARKET VALUE REPORT
FOR MONTH ENDING 07/31/16
SALES REGION 004

PAGE 10

| MARKET VALUE | NO OF ACCTS | CUSTOMER NAME | ACCOUNT REP | ACCOUNT NUMBER | MONTHLY INDEX | EQUITY DOLLARS |
|---|---|---|---|---|---|---|
| 570,200 | 1 |  | DUP |  | 0 | 568,200 |
| 564,291 | 1 |  | FDR |  | 8,932 | 233,744 |
| 524,160 | 1 |  | FDR |  | 0 | 524,367 |
| 513,762 | 1 |  | SEJ |  | 0 | 458,959 |
| 504,675 | 1 |  | BNB |  | 0 | 505,171 |
| 499,888 | 1 |  | BNB |  | 0 | 499,765 |
| 486,361 | 1 |  | BEF |  | 11,503 | 192,339 |
| 484,488 | 2 |  | ZOL |  | 8,901 | 183,484 |
| 477,756 | 2 |  | ZOL |  | 2,858 | 478,033 |
| 472,120 | 2 |  | BNB |  | 10,510 | 265,715 |
| 462,876 | 1 |  | SEJ |  | 0 | 475,061 |
| 460,304 | 1 |  | TLB |  | 0 | 470,712 |
| 446,005 | 1 |  | KDF |  | 6,533 | 429,677 |
| -433,080 | 1 |  | RBA |  | 0 | 424,488 |
| -431,688 | 1 |  | DJW |  | 131,873 | 564,256 |
| -431,400 | 1 |  | LNK |  | 1,812 | 122,330 |
| 423,927 | 1 |  | TLB |  | 135,916 | 407,727 |
| 423,927 | 1 |  | DJW |  | 0 | 586,501 |
| 418,717 | 1 |  | BEF |  | 0 | 186,953 |
| -414,807 | 1 |  | GPJ |  | 0 | 421,163 |
| 413,280 | 1 |  | BEF |  | 3,273 | 204,786 |
| -410,260 | 1 |  | ZOL |  | 16,144 | 401,671 |
| -410,260 | 1 |  | SIL |  | 0 | 265,932 |
| 403,740 | 1 |  | DJW |  | 6,081 | 98,664 |
| 403,740 | 1 |  | OCK |  | 4,389 | 270,830 |
| 403,740 | 1 |  | SEJ |  | 0 | 922,559 |
| 403,400 | 1 |  | MKJ |  | 0 | 405,171 |
| 398,181 | 1 |  | DJW |  | 0 | 218,818 |
| 391,454 | 1 |  | BEF |  | 0 | 134,741 |
| 386,174 | 1 |  | TLB |  | 0 | 386,662 |
| 383,553 | 1 |  | BEF |  | 0 | 389,821 |
| 375,060 | 1 |  | AMD |  | 757 | 467,627 |
| 368,176 | 1 |  | FDR |  | 0 | 383,555 |
| 366,834 | 1 |  | KDF |  | 0 | 214,937 |
| 343,179 | 1 |  | KDF |  | 0 | 375,379 |
| -342,190 | 1 |  | OCK |  | 0 | 342,311 |
| 337,675 | 1 |  | BEF |  | 1,136 | 103,627 |
| 334,875 | 1 |  | KDF |  | 4,483 | 104,369 |
| 330,127 | 1 |  | FDR |  | 0 | 337,640 |
| 329,028 | 1 |  | GGF |  | 26,835 | 338,073 |
| -322,992 | 1 |  | DUP |  | 0 | 498,067 |
| 322,992 | 1 |  | DJW |  | 2,175 | 335,638 |
| 322,992 | 1 |  | BEF |  | 0 | 235,535 |
| 315,859 | 1 |  | AMD |  | 0 | 329,205 |
|  | 1 |  | DJW |  | 0 | 328,128 |
|  | 1 |  | SEJ |  | 0 | 429,825 |
|  | 1 |  | GGF |  | 4,515 | 248,257 |
|  | 1 |  | OCK |  | 1,397 | 337,118 |
|  | 1 |  | DUP |  | 0 | 131,804 |
|  | 1 |  | FDR |  | 0 | 317,421 |

08/02/16
P9494-R494

CUSTOMER MARKET VALUE REPORT
FOR MONTH ENDING 07/31/16
SALES REGION 004

PAGE   11

| MARKET VALUE | NO OF ACCTS | CUSTOMER NAME | ACCOUNT REP | ACCOUNT NUMBER | MONTHLY INDEX | EQUITY DOLLARS |
|---|---|---|---|---|---|---|
| 315,633 | 1 | ▓ | BEF | ▓ | 4,787 | 161,448 |
| 314,539 | 2 | ▓ | GGF | ▓ | 5,479 | 585,376 |
| 313,816 | 1 | ▓ | OCK | ▓ | 0 | 313,186 |
| -307,695 | 1 | ▓ | KDF | ▓ | 0 | 88,320 |
| -307,695 | 1 | ▓ | WAS | ▓ | 1,009 | 77,262 |
| 302,805 | 1 | ▓ | SIL | ▓ | 6,872 | 248,259 |
| 302,944 | 1 | ▓ | ZOL | ▓ | 0 | 127,166 |
| 298,991 | 1 | ▓ | BNB | ▓ | 2,787 | 205,672 |
| 297,944 | 1 | ▓ | KDF | ▓ | 0 | 110,476 |
| 295,100 | 1 | ▓ | AMD | ▓ | 1,841 | 103,898 |
| 293,456 | 1 | ▓ | LNK | ▓ | 5,817 | 86,710 |
| 292,400 | 1 | ▓ | OCK | ▓ | 1,245 | 205,659 |
| 282,618 | 1 | ▓ | KDF | ▓ | 0 | 298,779 |
| 282,618 | 1 | ▓ | LNK | ▓ | 0 | 286,115 |
| 282,618 | 1 | ▓ | OCK | ▓ | 6,563 | 88,900 |
| 280,490 | 1 | ▓ | GPJ | ▓ | 0 | 272,622 |
| 277,887 | 1 | ▓ | TLB | ▓ | 861 | 84,622 |
| 275,667 | 1 | ▓ | DJW | ▓ | 0 | 143,386 |
| 275,520 | 1 | ▓ | FDR | ▓ | 0 | 276,212 |
| 275,520 | 1 | ▓ | SEJ | ▓ | 2,078 | 236,441 |
| 271,560 | 1 | ▓ | BNB | ▓ | 0 | 646,494 |
| 267,900 | 1 | ▓ | TLB | ▓ | 11,407 | 69,132 |
| 264,472 | 1 | ▓ | DJW | ▓ | 0 | 272,731 |
| 264,297 | 1 | ▓ | FDR | ▓ | 629 | 219,715 |
| 263,357 | 1 | ▓ | OCK | ▓ | 0 | 279,649 |
| 262,431 | 1 | ▓ | SIL | ▓ | 0 | 266,939 |
| 262,431 | 1 | ▓ | AMD | ▓ | 454 | 392,795 |
| 260,455 | 1 | ▓ | FDR | ▓ | 594 | 298,753 |
| 260,455 | 1 | ▓ | AMD | ▓ | 0 | 261,023 |
| 260,143 | 1 | ▓ | GPJ | ▓ | 0 | 114,474 |
| 258,362 | 1 | ▓ | SEJ | ▓ | 0 | 261,718 |
| 256,278 | 1 | ▓ | ZOL | ▓ | 0 | 114,279 |
| 253,344 | 1 | ▓ | MKJ | ▓ | 3,787 | 252,259 |
| 250,506 | 1 | ▓ | AMD | ▓ | 0 | 251,424 |
| 248,091 | 1 | ▓ | ZOL | ▓ | 1,902 | 59,471 |
| 246,528 | 1 | ▓ | DUP | ▓ | 0 | 137,343 |
| 246,224 | 1 | ▓ | GPJ | ▓ | 0 | 295,285 |
| 245,215 | 1 | ▓ | OCK | ▓ | 0 | 90,526 |
| 245,052 | 1 | ▓ | SIL | ▓ | 819 | 489,132 |
| 242,424 | 1 | ▓ | SEJ | ▓ | 0 | 152,115 |
| 242,419 | 1 | ▓ | KDF | ▓ | 0 | 239,450 |
| 242,244 | 1 | ▓ | CSF | ▓ | 0 | 344,386 |
| 242,244 | 1 | ▓ | GGF | ▓ | 0 | 234,121 |
| 241,628 | 1 | ▓ | DUP | ▓ | 389 | 65,935 |
| 241,299 | 1 | ▓ | DJW | ▓ | 0 | 245,378 |
| 240,902 | 1 | ▓ | TLB | ▓ | 2,947 | 161,550 |
| 239,840 | 1 | ▓ | OCK | ▓ | 0 | 250,245 |
| 236,094 | 1 | ▓ | SEJ | ▓ | 0 | 233,988 |
| 234,885 | 1 | ▓ | KDF | ▓ | 2,347 | 190,651 |
| 233,233 | 1 | ▓ | GPJ | ▓ | 0 | 88,726 |

08/02/16
P9494-R494

CUSTOMER MARKET VALUE REPORT
FOR MONTH ENDING 07/31/16
SALES REGION 004

PAGE 12

| MARKET VALUE | NO OF ACCTS | CUSTOMER NAME | ACCOUNT REP | ACCOUNT NUMBER | MONTHLY INDEX | EQUITY DOLLARS |
|---|---|---|---|---|---|---|
| 229,309 | 1 | (redacted) | FDR | (redacted) | 0 | 283,617 |
| 228,640 | 1 | (redacted) | CHN | (redacted) | 1,736 | 57,141 |
| 227,715 | 1 | (redacted) | DJW | (redacted) | 0 | 226,399 |
| 226,662 | 1 | (redacted) | CHN | (redacted) | 1,663 | 97,247 |
| 224,170 | 1 | (redacted) | GGF | (redacted) | 1,539 | 92,886 |
| 223,000 | 1 | (redacted) | GPJ | (redacted) | 0 | 89,471 |
| 223,057 | 1 | (redacted) | CHN | (redacted) | 0 | 223,255 |
| 222,057 | 1 | (redacted) | FDR | (redacted) | 0 | 238,240 |
| 222,057 | 1 | (redacted) | TLB | (redacted) | 0 | 221,312 |
| 222,057 | 1 | (redacted) | CSF | (redacted) | 0 | 188,547 |
| 221,753 | 1 | (redacted) | FDR | (redacted) | 0 | 280,776 |
| 220,584 | 1 | (redacted) | FDR | (redacted) | 0 | 280,564 |
| 220,385 | 1 | (redacted) | TLB | (redacted) | 833 | 311,394 |
| 219,129 | 1 | (redacted) | CSF | (redacted) | 0 | 112,394 |
| 218,400 | 1 | (redacted) | DUP | (redacted) | 126 | 220,890 |
| 217,829 | 1 | (redacted) | TLB | (redacted) | 0 | 56,329 |
| 215,369 | 1 | (redacted) | DJW | (redacted) | 439 | 219,676 |
| 214,827 | 1 | (redacted) | ZOL | (redacted) | 0 | 68,566 |
| 214,320 | 1 | (redacted) | GGF | (redacted) | 0 | 213,019 |
| 209,664 | 1 | (redacted) | OCK | (redacted) | 910 | 126,405 |
| 208,962 | 1 | (redacted) | DJW | (redacted) | 327 | 215,411 |
| 207,423 | 1 | (redacted) | BNB | (redacted) | 0 | 91,973 |
| 206,640 | 2 | (redacted) | DUP | (redacted) | 0 | 217,837 |
| -205,130 | 1 | (redacted) | DJW | (redacted) | 3,630 | 206,249 |
| -205,130 | 1 | (redacted) | GGE | (redacted) | 1,462 | 198,634 |
| -205,130 | 1 | (redacted) | TLB | (redacted) | 3,715 | 163,103 |
| -205,130 | 1 | (redacted) | DJW | (redacted) | 4,717 | 105,217 |
| -205,130 | 1 | (redacted) | DJW | (redacted) | 1,468 | 208,408 |
| 204,195 | 1 | (redacted) | TLB | (redacted) | 0 | 69,468 |
| 202,338 | 1 | (redacted) | SIL | (redacted) | 0 | 239,459 |
| 202,197 | 1 | (redacted) | KDF | (redacted) | 0 | 201,090 |
| 201,870 | 1 | (redacted) | GPJ | (redacted) | 15,167 | 123,064 |
| 201,870 | 1 | (redacted) | KDF | (redacted) | 0 | 84,518 |
| 201,870 | 1 | (redacted) | GGE | (redacted) | 0 | 202,494 |
| 201,870 | 1 | (redacted) | KDF | (redacted) | 2,647 | 225,455 |
| 201,870 | 1 | (redacted) | WAS | (redacted) | 777 | 176,983 |
| 201,870 | 1 | (redacted) | DUP | (redacted) | 151 | 207,544 |
| 201,870 | 1 | (redacted) | KDF | (redacted) | 0 | 222,534 |
| 201,870 | 1 | (redacted) | LNK | (redacted) | 0 | 146,125 |
| 201,870 | 1 | (redacted) | DJW | (redacted) | 1,446 | 220,350 |
| 201,870 | 1 | (redacted) | KDF | (redacted) | 3,243 | 233,102 |
| 201,870 | 1 | (redacted) | LNK | (redacted) | 734 | 61,718 |
| 201,326 | 2 | (redacted) | ZOL | (redacted) | 0 | 125,500 |
| 198,593 | 1 | (redacted) | DUP | (redacted) | 0 | 201,414 |
| 196,701 | 1 | (redacted) | DJW | (redacted) | 573 | 126,425 |
| 194,511 | 1 | (redacted) | GGF | (redacted) | 0 | 197,665 |
| 193,868 | 1 | (redacted) | KDF | (redacted) | 3,255 | 208,968 |
| 192,992 | 1 | (redacted) | CSF | (redacted) | 0 | 79,607 |
| 190,973 | 1 | (redacted) | FDR | (redacted) | 0 | 199,230 |
| | 1 | (redacted) | FDR | (redacted) | 0 | 54,296 |

08/02/16
P9494-R494

CUSTOMER MARKET VALUE REPORT
FOR MONTH ENDING 07/31/16
SALES REGION 004

PAGE 13

| MARKET VALUE | NO OF ACCTS | CUSTOMER NAME | ACCOUNT REP | ACCOUNT NUMBER | MONTHLY INDEX | EQUITY DOLLARS |
|---|---|---|---|---|---|---|
| 190,970 | 1 | ███ | FDR | ███ | 0 | 285,737 |
| 190,582 | 1 | ███ | DJW | ███ | 0 | 259,841 |
| 189,505 | 1 | ███ | GPJ | ███ | 0 | 185,476 |
| 188,286 | 1 | ███ | CSF | ███ | 822 | 190,840 |
| 187,902 | 1 | ███ | LNK | ███ | 0 | 213,554 |
| 185,763 | 1 | ███ | AMD | ███ | 0 | 186,543 |
| 181,683 | 1 | ███ | DJW | ███ | 0 | 177,724 |
| 181,683 | 1 | ███ | LNK | ███ | 3,470 | 45,446 |
| 181,683 | 1 | ███ | MKJ | ███ | 1,179 | 76,461 |
| 181,683 | 1 | ███ | DUP | ███ | 0 | 182,341 |
| 181,683 | 1 | ███ | KDF | ███ | 0 | 184,044 |
| 181,683 | 1 | ███ | MKJ | ███ | 1,897 | 568,684 |
| 181,683 | 1 | ███ | DUP | ███ | 0 | 182,708 |
| 181,683 | 1 | ███ | OCK | ███ | 0 | 76,461 |
| 181,683 | 1 | ███ | MKJ | ███ | 0 | 78,564 |
| 181,683 | 1 | ███ | DJW | ███ | 0 | 201,754 |
| 181,683 | 1 | ███ | ZOL | ███ | 0 | 94,934 |
| 181,463 | 1 | ███ | GGF | ███ | 0 | 182,157 |
| -181,268 | 1 | ███ | CSF | ███ | 2,271 | 50,174 |
| 181,116 | 1 | ███ | TLB | ███ | 0 | 88,012 |
| 178,332 | 1 | ███ | BEF | ███ | 0 | 67,734 |
| 176,763 | 1 | ███ | AMD | ███ | 1,752 | 70,812 |
| 176,504 | 2 | ███ | WAS | ███ | 0 | 50,657 |
| 174,720 | 1 | ███ | FDR | ███ | 0 | 316,847 |
| 174,281 | 1 | ███ | KDF | ███ | 1,210 | 174,223 |
| 174,135 | 1 | ███ | OCK | ███ | 0 | 178,523 |
| 174,135 | 1 | ███ | DJW | ███ | 0 | 172,763 |
| 174,000 | 1 | ███ | DJW | ███ | 0 | 90,008 |
| 173,804 | 1 | ███ | SEJ | ███ | 0 | 173,117 |
| 173,252 | 1 | ███ | DJW | ███ | 4,393 | 636,204 |
| 172,263 | 1 | ███ | TLB | ███ | 0 | 412,570 |
| -171,327 | 2 | ███ | FDR | ███ | 17,211 | 162,961 |
| -171,165 | 1 | ███ | TLB | ███ | 1,968 | 81,400 |
| 170,940 | 1 | ███ | DJW | ███ | 0 | 170,828 |
| 169,815 | 1 | ███ | GGE | ███ | 0 | 60,863 |
| 167,910 | 1 | ███ | OCK | ███ | 0 | 64,997 |
| 166,400 | 1 | ███ | DJW | ███ | 0 | 157,569 |
| 165,025 | 1 | ███ | SIL | ███ | 0 | 162,205 |
| 165,005 | 1 | ███ | FDR | ███ | 0 | 165,016 |
| -164,140 | 1 | ███ | KDF | ███ | 0 | 171,847 |
| 164,104 | 1 | ███ | TLB | ███ | 1,170 | 37,704 |
| 163,556 | 1 | ███ | AMD | ███ | 0 | 163,328 |
| 163,338 | 1 | ███ | BNB | ███ | 0 | 366,679 |
| 163,368 | 1 | ███ | LNK | ███ | 0 | 106,329 |
| 163,200 | 1 | ███ | SEJ | ███ | 0 | 237,656 |
| 162,612 | 1 | ███ | TLB | ███ | 0 | 137,788 |
| 161,496 | 1 | ███ | KDF | ███ | 1,217 | 65,642 |
| 161,496 | 1 | ███ | OCK | ███ | 0 | 242,545 |
| 161,496 | 1 | ███ | BEF | ███ | 0 | 111,088 |
| 161,496 | 1 | ███ | LNK | ███ | 296 | 68,538 |

08/02/16
P9494-R494

CUSTOMER MARKET VALUE REPORT
FOR MONTH ENDING 07/31/16
SALES REGION 004

PAGE 14



| MARKET VALUE | NO OF ACCTS | CUSTOMER NAME | ACCOUNT REP | ACCOUNT NUMBER | MONTHLY INDEX | EQUITY DOLLARS |
|---|---|---|---|---|---|---|
| 161,496 | 1 |  | ZOL |  | 4,905 | 178,271 |
| 161,496 | 1 |  | DUP |  | 0 | 298,359 |
| 161,496 | 1 |  | MKJ |  | 0 | 64,479 |
| 161,496 | 1 |  | OCK |  | 0 | 172,767 |
| 161,496 | 1 |  | DJW |  | 0 | 73,169 |
| 161,496 | 2 |  | GPJ |  | 1,502 | 81,957 |
| 161,496 | 1 |  | KDF |  | 0 | 125,593 |
| 161,496 | 1 |  | MKJ |  | 3,417 | 43,524 |
| 160,934 | 1 |  | ZOL |  | 598 | 88,117 |
| 160,788 | 1 |  | SEJ |  | 0 | 254,400 |
| 160,740 | 1 |  | FDR |  | 0 | 159,978 |
| 158,108 | 1 |  | SEJ |  | 0 | 160,364 |
| 156,685 | 1 |  | ZOL |  | 1,917 | 162,483 |
| 156,100 | 1 |  | KDF |  | 319 | 84,087 |
| 155,430 | 1 |  | GGF |  | 0 | 63,464 |
| 155,391 | 1 |  | SEJ |  | 0 | 63,413 |
| 154,515 | 1 |  | DJW |  | 0 | 110,248 |
| 154,137 | 1 |  | SEJ |  | 1,183 | 173,783 |
| 154,096 | 1 |  | FDR |  | 0 | 158,403 |
| 154,038 | 1 |  | OCK |  | 495 | 54,449 |
|  | 1 |  | LNK |  | 0 | 136,925 |
|  |  |  |  |  |  | 87,527 |

08/02/16
P9494-R494

CUSTOMER MARKET VALUE REPORT
FOR MONTH ENDING 07/31/16
SALES REGION 005

PAGE  15

| MARKET VALUE | NO OF ACCTS | CUSTOMER NAME | ACCOUNT REP | ACCOUNT NUMBER | MONTHLY INDEX | EQUITY DOLLARS |
|---|---|---|---|---|---|---|
| | |  | | | | |
| 302,805 | 1 | | SDE | | 856 | 74,868 |
| 160,929 | 1 | | RAK | | 0 | 161,684 |

# EXHIBIT 61

```
NEWPORT SERVICE                         ACCOUNT REP AWARDS REPORT              DATE 08/16/16   PAGE      1
P55110-R162                            08/01/16 THRU 08/16/16                  RUN 08/16/16   23:23
```

J BOHUSLAVIZ
MX-003-BOH
REG INDEX 67.86 / INDEX 6,598.01 / @ 15%
FINANCED NAIPS 67.86 / NON-FINANCED NAIPS 6,530.15 / TOTAL NAIPS 67.86 / FINANCED 67.86 / NAIPS BONUS $989.70
NAIDS --RE ACT-- 0.00 --NEW(FIN)-- --NEW ACCT-- --EXISTING--
---PRODUCT--- ---TOTAL--- / ACCOUNT BONUS $0.00 / PRODUCT BONUS $0.00
GROSS PAY $989.70

T CASTALDI
MX-003-CLD
REG INDEX 0.00 / INDEX 5,505.24 / @ 15%
FINANCED NAIPS 0.00 / NON-FINANCED NAIPS 5,505.24 / TOTAL NAIPS 0.00 / FINANCED 0.00 / NAIPS BONUS $825.79
NAIDS --RE ACT-- 0.00 --NEW(FIN)-- --NEW ACCT-- --EXISTING--
---PRODUCT--- ---TOTAL--- / ACCOUNT BONUS $0.00 / PRODUCT BONUS $0.00
GROSS PAY $825.79

R DEVOGLER
MX-003-RJD
REG INDEX 2,878.54 / INDEX 10,498.57 / @ 15%
FINANCED NAIPS 2,878.54 / NON-FINANCED NAIPS 7,620.03 / TOTAL NAIPS 2,878.54 / FINANCED 2,878.54 / NAIPS BONUS $1,574.79
NAIDS --RE ACT-- 2,878.54 --NEW(FIN)-- --NEW ACCT-- --EXISTING--
---PRODUCT--- ---TOTAL--- / ACCOUNT BONUS $1,000.00 / PRODUCT BONUS $0.00
GROSS PAY $2,574.79

A DIAZ
MX-003-DIA
REG INDEX 0.00 / INDEX 4,008.49 / @ 15%
FINANCED NAIPS 0.00 / NON-FINANCED NAIPS 4,008.49 / TOTAL NAIPS 0.00 / FINANCED 4,008.49 / NAIPS BONUS $601.27
NAIDS --RE ACT-- 0.00 --NEW(FIN)-- --NEW ACCT-- --EXISTING--
---PRODUCT--- ---TOTAL--- / ACCOUNT BONUS $0.00 / PRODUCT BONUS $0.00
GROSS PAY $601.27

A DURRANI
MX-003-DUR
REG INDEX 202.11 / INDEX 14,196.70 / @ 15%
FINANCED NAIPS 202.11 / NON-FINANCED NAIPS 13,994.59 / TOTAL NAIPS 202.11 / FINANCED 329.73 / NAIPS BONUS $2,129.51
NAIDS --RE ACT-- 202.11 --NEW(FIN)-- 127.62 --NEW ACCT-- --EXISTING--
---PRODUCT--- ---TOTAL--- / ACCOUNT BONUS $0.00 / PRODUCT BONUS $0.00
GROSS PAY $2,129.51

S FALLON
MX-003-FAL
REG INDEX 0.00 / INDEX 14,131.83 / @ 15%
FINANCED NAIPS 0.00 / NON-FINANCED NAIPS 14,131.83 / TOTAL NAIPS 1,703.79 / FINANCED 1,703.79 / NAIPS BONUS $2,119.77
NAIDS --RE ACT-- 0.00 --NEW(FIN)-- 1,703.79 --NEW ACCT-- --EXISTING--
---PRODUCT--- ---TOTAL--- / ACCOUNT BONUS $500.00 / PRODUCT BONUS $0.00
GROSS PAY $2,619.77

R FREEMAN
MX-003-RCF
REG INDEX 2,250.84 / INDEX 48,153.27 / @ 19%
FINANCED NAIPS 2,250.84 / NON-FINANCED NAIPS 45,902.43 / TOTAL NAIPS 2,250.84 / FINANCED 2,374.14 / NAIPS BONUS $9,149.12
NAIDS --RE ACT-- 2,250.84 --NEW(FIN)-- 123.30 --NEW ACCT-- --EXISTING--
---PRODUCT--- ---TOTAL--- / ACCOUNT BONUS $1,000.00 / PRODUCT BONUS $0.00
GROSS PAY $10,149.12

D GOLAN
MX-003-DGO
REG INDEX 0.00 / INDEX 5,905.87 / @ 15%
FINANCED NAIPS 0.00 / NON-FINANCED NAIPS 5,905.87 / TOTAL NAIPS 0.00 / FINANCED 5,905.87 / NAIPS BONUS $885.88
NAIDS --RE ACT-- 0.00 --NEW(FIN)-- --NEW ACCT-- --EXISTING--
---PRODUCT--- ---TOTAL--- / ACCOUNT BONUS $0.00 / PRODUCT BONUS $0.00
GROSS PAY $885.88

```
NEWPORT SERVICE                          ACCOUNT REP AWARDS REPORT                    DATE 08/16/16   PAGE    2
P5510-R162                                08/01/16 THRU 08/16/16                       RUN  08/16/16   23:23
```

**P HORN**

```
MX-003-HPU       REG INDEX    3,322.04       NAIDS        0.00   TOTAL NAIPS     0.00   INDEX    3,322.04    @ 15%
FINANCED NAIPS        0.00   NON-FINANCED NAIPS     0.00       NAIPS         0.00   --NEW ACCT--           FINANCED     0.00   NAIPS BONUS     $498.31
-----PRODUCT-----            ------TOTAL------             --RE ACT----NEW(FIN)----EXISTING                                    ACCOUNT BONUS     $0.00
                                                                                                                              PRODUCT BONUS     $0.00
                                                                                                                              GROSS PAY       $498.31
```

**C IMKAMP**

```
MX-003-IMP       REG INDEX    4,088.38       NAIDS        0.00   TOTAL NAIPS     0.00   INDEX    4,088.38    @ 15%
FINANCED NAIPS        0.00   NON-FINANCED NAIPS     0.00       NAIPS         0.00   --NEW ACCT--           FINANCED     0.00   NAIPS BONUS     $613.26
-----PRODUCT-----            ------TOTAL------             --RE ACT----NEW(FIN)----EXISTING                                    ACCOUNT BONUS     $0.00
                                                                                                                              PRODUCT BONUS     $0.00
                                                                                                                              GROSS PAY       $613.26
```

**J IPEK**

```
MX-003-IPK       REG INDEX    4,312.88       NAIDS        0.00   TOTAL NAIPS     0.00   INDEX    4,312.88    @ 15%
FINANCED NAIPS        0.00   NON-FINANCED NAIPS     0.00       NAIPS         0.00   --NEW ACCT--           FINANCED     0.00   NAIPS BONUS     $646.93
-----PRODUCT-----            ------TOTAL------             --RE ACT----NEW(FIN)----EXISTING                                    ACCOUNT BONUS     $0.00
                                                                                                                              PRODUCT BONUS     $0.00
                                                                                                                              GROSS PAY       $646.93
```

**A JOHNSTON**

```
MX-003-ACJ       REG INDEX   11,418.63       NAIDS      280.50   TOTAL NAIPS   280.50   INDEX   11,418.63    @ 15%
FINANCED NAIPS        0.00   NON-FINANCED NAIPS   280.50       NAIPS       280.50   --NEW ACCT--           FINANCED   280.50   NAIPS BONUS   $1,712.79
-----PRODUCT-----            ------TOTAL------             --RE ACT----NEW(FIN)----EXISTING                                    ACCOUNT BONUS     $0.00
                                                                                                                              PRODUCT BONUS     $0.00
                                                                                                                              GROSS PAY     $1,712.79
```

**M KARBY**

```
MX-003-KMR       REG INDEX   14,746.04       NAIDS      468.48   TOTAL NAIPS 1,467.48   INDEX   15,214.52    @ 16%
FINANCED NAIPS      468.48   NON-FINANCED NAIPS   468.48       NAIPS     1,467.48   --NEW ACCT--           FINANCED 1,935.96   NAIPS BONUS   $2,434.32
-----PRODUCT-----            ------TOTAL------             --RE ACT----NEW(FIN)----EXISTING                                    ACCOUNT BONUS   $500.00
                                                                                                                              PRODUCT BONUS     $0.00
                                                                                                                              GROSS PAY     $2,934.32
```

**B KENNEDY**

```
MX-003-KBF       REG INDEX   51,845.10       NAIDS        0.00   TOTAL NAIPS   679.16   INDEX   51,845.10    @ 20%
FINANCED NAIPS        0.00   NON-FINANCED NAIPS     0.00       NAIPS       679.16   --NEW ACCT--           FINANCED   679.16   NAIPS BONUS  $10,369.02
-----PRODUCT-----            ------TOTAL------             --RE ACT----NEW(FIN)----EXISTING                                    ACCOUNT BONUS     $0.00
                                                                                                                              PRODUCT BONUS     $0.00
                                                                                                                              GROSS PAY    $10,369.02
```

**J KIM**

```
MX-003-KJA       REG INDEX    7,411.86       NAIDS        0.00   TOTAL NAIPS 2,208.66   INDEX    7,411.86    @ 15%
FINANCED NAIPS        0.00   NON-FINANCED NAIPS     0.00       NAIPS     2,208.66   --NEW ACCT--           FINANCED 2,208.66   NAIPS BONUS   $1,111.78
-----PRODUCT-----            ------TOTAL------             --RE ACT----NEW(FIN)----EXISTING                                    ACCOUNT BONUS $1,000.00
                                                                                                                              PRODUCT BONUS     $0.00
                                                                                                                              GROSS PAY     $2,111.78
```

**A LEVINE**

```
MX-003-ACL       REG INDEX   21,732.37       NAIDS        0.00   TOTAL NAIPS   314.18   INDEX   21,732.37    @ 17%
FINANCED NAIPS        0.00   NON-FINANCED NAIPS     0.00       NAIPS       314.18   --NEW ACCT--           FINANCED   314.18   NAIPS BONUS   $3,694.50
-----PRODUCT-----            ------TOTAL------             --RE ACT----NEW(FIN)----EXISTING                                    ACCOUNT BONUS     $0.00
                                                                                                                              PRODUCT BONUS     $0.00
                                                                                                                              GROSS PAY     $3,694.50
```

```
NEWPORT SERVICE                       ACCOUNT REP AWARDS REPORT                         DATE 08/16/16   PAGE   3
P55110-R162                           08/01/16  THRU  08/16/16                          RUN  08/16/16   23:23
----------------------------------------------------------------------------------------------------------------
H MANNINO
  MX-003-HLM          REG INDEX        7,777.48   NAIDS         0.00   INDEX     7,777.48   @ 15%          $1,166.62
  FINANCED NAIPS          0.00         NON-FINANCED NAIPS    2,886.49                       NAIPS BONUS    $1,000.00
  --------PRODUCT--------            NON-FINANCED          2,886.49                         ACCOUNT BONUS      $0.00
  ---------TOTAL---------            FINANCED              2,886.49                         PRODUCT BONUS      $0.00
    --RE ACT---NEW(FIN)---EXISTING     TOTAL NAIPS         2,886.49                         GROSS PAY      $2,166.62
    --NEW ACCT---NEW(FIN)              2,886.49
----------------------------------------------------------------------------------------------------------------
G MORTON
  MX-003-GSM          REG INDEX        7,880.44   NAIDS         0.00   INDEX     7,880.44   @ 15%          $1,182.07
  FINANCED NAIPS        215.70         NON-FINANCED NAIPS      123.91                       NAIPS BONUS        $0.00
  --------PRODUCT--------            FINANCED                339.61                         ACCOUNT BONUS      $0.00
  ---------TOTAL---------            TOTAL NAIPS             339.61                         PRODUCT BONUS      $0.00
    --RE ACT---NEW(FIN)---EXISTING                                                          GROSS PAY      $1,182.07
    --NEW ACCT---NEW(FIN)
----------------------------------------------------------------------------------------------------------------
A MOSS
  MX-003-MNI          REG INDEX       20,569.36   NAIDS         0.00   INDEX    20,569.36   @ 17%          $3,496.79
  FINANCED NAIPS          0.00         NON-FINANCED NAIPS    1,571.06                       NAIPS BONUS      $500.00
  --------PRODUCT--------            NON-FINANCED          1,571.06                         ACCOUNT BONUS      $0.00
  ---------TOTAL---------            FINANCED              1,571.06                         PRODUCT BONUS      $0.00
    --RE ACT---NEW(FIN)---EXISTING     TOTAL NAIPS         1,571.06                         GROSS PAY      $3,996.79
    --NEW ACCT---NEW(FIN)              1,571.06
----------------------------------------------------------------------------------------------------------------
M PATTON
  MX-003-MRK          REG INDEX        7,696.29   NAIDS         0.00   INDEX     7,696.29   @ 15%          $1,154.44
  FINANCED NAIPS        928.42         NON-FINANCED NAIPS    6,767.87                       NAIPS BONUS        $0.00
  --------PRODUCT--------            NON-FINANCED              0.00                         ACCOUNT BONUS      $0.00
  ---------TOTAL---------            TOTAL NAIPS           7,696.29                         PRODUCT BONUS      $0.00
    --RE ACT---NEW(FIN)---EXISTING                                                          GROSS PAY      $1,154.44
    --NEW ACCT---NEW(FIN)                928.42
----------------------------------------------------------------------------------------------------------------
A REYES
  MX-003-REY          REG INDEX       11,704.30   NAIDS         0.00   INDEX    11,704.30   @ 15%          $1,755.65
  FINANCED NAIPS        815.20-        NON-FINANCED NAIPS    2,083.07                       NAIPS BONUS      $500.00
  --------PRODUCT--------            FINANCED              1,267.87                         ACCOUNT BONUS      $0.00
  ---------TOTAL---------            TOTAL NAIPS           1,267.87                         PRODUCT BONUS      $0.00
    --RE ACT---NEW(FIN)---EXISTING                                                          GROSS PAY      $2,255.65
    --NEW ACCT---NEW(FIN)              1,267.87
----------------------------------------------------------------------------------------------------------------
K SMITH
  MX-003-SNA          REG INDEX        4,523.89   NAIDS         0.00   INDEX     4,523.89   @ 15%            $678.58
  FINANCED NAIPS          0.00         NON-FINANCED NAIPS      838.75                       NAIPS BONUS        $0.00
  --------PRODUCT--------            TOTAL NAIPS             838.75                         ACCOUNT BONUS      $0.00
  ---------TOTAL---------                                                                   PRODUCT BONUS      $0.00
    --RE ACT---NEW(FIN)---EXISTING                                                          GROSS PAY        $678.58
    --NEW ACCT---NEW(FIN)
----------------------------------------------------------------------------------------------------------------
D SOULAKIS
  MX-003-SOD          REG INDEX       14,811.14   NAIDS         0.00   INDEX    14,811.14   @ 15%          $2,221.67
  FINANCED NAIPS      3,219.40         NON-FINANCED NAIPS      816.63                       NAIPS BONUS    $2,000.00
  --------PRODUCT--------            FINANCED              4,036.03                         ACCOUNT BONUS      $0.00
  ---------TOTAL---------            TOTAL NAIPS           4,036.03                         PRODUCT BONUS      $0.00
    --RE ACT---NEW(FIN)---EXISTING                                                          GROSS PAY      $4,221.67
    --NEW ACCT---NEW(FIN)              3,219.40
----------------------------------------------------------------------------------------------------------------
D ST.AMANT
  MX-003-SMW          REG INDEX       18,264.74   NAIDS         0.00   INDEX    18,264.74   @ 16%          $2,922.36
  FINANCED NAIPS         82.05         NON-FINANCED NAIPS        0.00                       NAIPS BONUS        $0.00
  --------PRODUCT--------            TOTAL NAIPS              82.05                         ACCOUNT BONUS      $0.00
  ---------TOTAL---------                                                                   PRODUCT BONUS      $0.00
    --RE ACT---NEW(FIN)---EXISTING                                                          GROSS PAY      $2,922.36
    --NEW ACCT---NEW(FIN)                 82.05
----------------------------------------------------------------------------------------------------------------
```

```
NEWPORT SERVICE                          ACCOUNT REP AWARDS REPORT                      DATE 08/16/16  PAGE   4
P5510-R162                               08/01/16 THRU 08/16/16                         RUN  08/16/16  23:23

N VASHISHT     MX-003-VSN    REG INDEX  20,831.30    NAIDS    698.88   TOTAL INDEX 21,530.18 @ 17%        $3,660.13
               FINANCED NAIPS    698.88  NON-FINANCED NAIPS    865.36  TOTAL NAIPS  1,564.24  NAIPS BONUS    $500.00
               -----PRODUCT-----  -----TOTAL-----  RE ACT----NEW(FIN)-NEW ACCT---EXISTING  FINANCED ACCOUNT BONUS  $0.00
                                                                                          PRODUCT BONUS         $0.00
                                                                                          GROSS PAY          $4,160.13

TEAM TOTALS    MX-003        REG INDEX 332,387.05    NAIDS 10,714.53   TOTAL INDEX 343,101.58             $57,595.05
               FINANCED NAIPS 10,115.03  NON-FINANCED NAIPS 16,172.01  TOTAL NAIPS 26,287.04  NAIPS BONUS  $8,500.00
               -----PRODUCT-----  -----TOTAL-----  RE ACT----NEW(FIN)-NEW ACCT---EXISTING  FINANCED ACCOUNT BONUS  $0.00
                                                                                          PRODUCT BONUS         $0.00
                                                                                          GROSS PAY         $66,095.05
```

```
NEWPORT SERVICE                         ACCOUNT REP AWARDS REPORT                        DATE 08/16/16   PAGE  5
P55510-R162                              08/01/16 THRU 08/16/16                          RUN  08/16/16   23:23
```

## D ALMANCE — MX-004-AMD

| | | | | |
|---|---|---|---|---|
| REG INDEX 10,286.38 | NAIDS 2,311.55 | TOTAL 2,311.55 | INDEX 12,597.93 | @ 15% |
| FINANCED NAIPS 2,311.55 | NON-FINANCED NAIPS | TOTAL NAIPS 1,277.10 | FINANCED 3,588.65 | NAIPS BONUS $1,889.69 |
| ---PRODUCT--- | ---TOTAL--- | -RE ACT---NEW(FIN)- | -NEW ACCT---EXISTING | ACCOUNT BONUS $1,500.00 |
| | | | | PRODUCT BONUS $0.00 |
| | | | | BONUS $0.00 |
| | | | | GROSS PAY $3,389.69 |

## T ARCE — MX-004-ARO

| | | | | |
|---|---|---|---|---|
| REG INDEX 12,864.82 | NAIDS 124.28 | TOTAL 124.28 | INDEX 12,989.10 | @ 15% |
| FINANCED NAIPS 124.28 | NON-FINANCED NAIPS | TOTAL NAIPS 497.70 | FINANCED 621.98 | NAIPS BONUS $1,948.37 |
| ---PRODUCT--- | ---TOTAL--- | -RE ACT---NEW(FIN)- | -NEW ACCT---EXISTING | ACCOUNT BONUS $0.00 |
| | | | | PRODUCT BONUS $0.00 |
| | | | | BONUS $0.00 |
| | | | | GROSS PAY $1,948.37 |

## P BALLAEFF — MX-004-BEF

| | | | | |
|---|---|---|---|---|
| REG INDEX 5,876.94 | NAIDS 0.00 | TOTAL 0.00 | INDEX 5,876.94 | @ 15% |
| FINANCED NAIPS 0.00 | NON-FINANCED NAIPS | TOTAL NAIPS 299.50 | FINANCED 299.50 | NAIPS BONUS $881.54 |
| ---PRODUCT--- | ---TOTAL--- | -RE ACT---NEW(FIN)- | -NEW ACCT---EXISTING | ACCOUNT BONUS $0.00 |
| | | | | PRODUCT BONUS $0.00 |
| | | | | BONUS $0.00 |
| | | | | GROSS PAY $881.54 |

## B BARTH — MX-004-BNB

| | | | | |
|---|---|---|---|---|
| REG INDEX 21,409.31 | NAIDS 347.13 | TOTAL 347.13 | INDEX 21,756.44 | @ 17% |
| FINANCED NAIPS 347.13 | NON-FINANCED NAIPS | TOTAL NAIPS 2,935.98 | FINANCED 3,283.11 | NAIPS BONUS $3,698.59 |
| ---PRODUCT--- | ---TOTAL--- | -RE ACT---NEW(FIN)- | -NEW ACCT---EXISTING | ACCOUNT BONUS $1,500.00 |
| | | | | PRODUCT BONUS $0.00 |
| | | | | BONUS $0.00 |
| | | | | GROSS PAY $5,198.59 |

## T BERG — MX-004-TLB

| | | | | |
|---|---|---|---|---|
| REG INDEX 8,391.74 | NAIDS 0.00 | TOTAL 0.00 | INDEX 8,391.74 | @ 15% |
| FINANCED NAIPS 0.00 | NON-FINANCED NAIPS | TOTAL NAIPS 608.26 | FINANCED 608.26 | NAIPS BONUS $1,258.76 |
| ---PRODUCT--- | ---TOTAL--- | -RE ACT---NEW(FIN)- | -NEW ACCT---EXISTING | ACCOUNT BONUS $0.00 |
| | | | | PRODUCT BONUS $0.00 |
| | | | | BONUS $0.00 |
| | | | | GROSS PAY $1,258.76 |

## F CASTRO — MX-004-CSF

| | | | | |
|---|---|---|---|---|
| REG INDEX 45,619.12 | NAIDS 0.00 | TOTAL 0.00 | INDEX 45,619.12 | @ 19% |
| FINANCED NAIPS 0.00 | NON-FINANCED NAIPS | TOTAL NAIPS 3,998.70 | FINANCED 3,998.70 | NAIPS BONUS $8,667.63 |
| ---PRODUCT--- | ---TOTAL--- | -RE ACT---NEW(FIN)- | -NEW ACCT---EXISTING | ACCOUNT BONUS $1,500.00 |
| | | | | PRODUCT BONUS $0.00 |
| | | | | BONUS $0.00 |
| | | | | GROSS PAY $10,167.63 |

## J CHANG — MX-004-CHN

| | | | | |
|---|---|---|---|---|
| REG INDEX 12,115.47 | NAIDS 787.41 | TOTAL 787.41 | INDEX 12,902.88 | @ 15% |
| FINANCED NAIPS 787.41 | NON-FINANCED NAIPS | TOTAL NAIPS 3,654.66 | FINANCED 4,442.07 | NAIPS BONUS $1,935.43 |
| ---PRODUCT--- | ---TOTAL--- | -RE ACT---NEW(FIN)- | -NEW ACCT---EXISTING | ACCOUNT BONUS $2,000.00 |
| | | | | PRODUCT BONUS $0.00 |
| | | | | BONUS $0.00 |
| | | | | GROSS PAY $3,935.43 |

## M DUPUIS — MX-004-DUP

| | | | | |
|---|---|---|---|---|
| REG INDEX 22,239.34 | NAIDS 2,531.19 | TOTAL 2,531.19 | INDEX 24,770.53 | @ 17% |
| FINANCED NAIPS 2,531.19 | NON-FINANCED NAIPS | TOTAL NAIPS 3,280.94 | FINANCED 5,812.13 | NAIPS BONUS $4,210.99 |
| ---PRODUCT--- | ---TOTAL--- | -RE ACT---NEW(FIN)- | -NEW ACCT---EXISTING | ACCOUNT BONUS $2,500.00 |
| | | | | PRODUCT BONUS $200.00 |
| | | | | BONUS $0.00 |
| | | | | GROSS PAY $6,910.99 |

```
NEWPORT SERVICE                      ACCOUNT REP AWARDS REPORT            DATE 08/16/16  PAGE     6
P5510-R162                           08/01/16 THRU 08/16/16               RUN 08/16/16  23:23
```

**D FALER** — MX-004-FDR

| | | | |
|---|---|---|---|
| REG INDEX 981.49 | NAIDS 108.56 | INDEX 29,293.90 | @ 17% |
| FINANCED NAIPS 0.00 | TOTAL NAIPS 2,278.82 | FINANCED 3,260.31 | NAIPS BONUS $4,979.96 |
| NON-FINANCED NAIPS 29,185.34 | --NEW(FIN)--NEW ACCT--EXISTING | TOTAL NAIPS | ACCOUNT BONUS $1,500.00 |
| ---TOTAL--- --RE ACT--- | | | PRODUCT BONUS $0.00 |
| ---PRODUCT--- | | | BONUS $0.00 |
| | | | GROSS PAY $6,479.96 |

**K FERRLIC** — MX-004-KDF

| | | | |
|---|---|---|---|
| REG INDEX 0.00 | NAIDS 0.00 | INDEX 30,856.40 | @ 18% |
| FINANCED NAIPS 0.00 | TOTAL NAIPS 0.00 | FINANCED 0.00 | NAIPS BONUS $5,554.15 |
| NON-FINANCED NAIPS 30,856.40 | --NEW(FIN)--NEW ACCT--EXISTING | TOTAL NAIPS | ACCOUNT BONUS $0.00 |
| ---TOTAL--- --RE ACT--- | | | PRODUCT BONUS $0.00 |
| ---PRODUCT--- | | | BONUS $0.00 |
| | | | GROSS PAY $5,554.15 |

**P GALLINA** — MX-004-GPJ

| | | | |
|---|---|---|---|
| REG INDEX 0.00 | NAIDS 0.00 | INDEX 7,280.72 | @ 15% |
| FINANCED NAIPS 0.00 | TOTAL NAIPS 3,824.48 | FINANCED 3,824.48 | NAIPS BONUS $1,092.11 |
| NON-FINANCED NAIPS 7,280.72 | --NEW(FIN)--NEW ACCT--EXISTING | TOTAL NAIPS | ACCOUNT BONUS $1,500.00 |
| ---TOTAL--- --RE ACT--- | | | PRODUCT BONUS $0.00 |
| ---PRODUCT--- | | | BONUS $0.00 |
| | | | GROSS PAY $2,592.11 |

**F GONZALEZ** — MX-004-GGF

| | | | |
|---|---|---|---|
| REG INDEX 0.00 | NAIDS 0.00 | INDEX 3,669.18 | @ 15% |
| FINANCED NAIPS 0.00 | TOTAL NAIPS 69.45 | FINANCED 69.45 | NAIPS BONUS $550.38 |
| NON-FINANCED NAIPS 3,669.18 | --NEW(FIN)--NEW ACCT--EXISTING | TOTAL NAIPS | ACCOUNT BONUS $0.00 |
| ---TOTAL--- --RE ACT--- | | | PRODUCT BONUS $0.00 |
| ---PRODUCT--- | | | BONUS $0.00 |
| | | | GROSS PAY $550.38 |

**G GOVEL** — MX-004-GGE

| | | | |
|---|---|---|---|
| REG INDEX 0.00 | NAIDS 0.00 | INDEX 5,978.24 | @ 15% |
| FINANCED NAIPS 0.00 | TOTAL NAIPS 326.07 | FINANCED 326.07 | NAIPS BONUS $896.74 |
| NON-FINANCED NAIPS 5,978.24 | --NEW(FIN)--NEW ACCT--EXISTING | TOTAL NAIPS | ACCOUNT BONUS $0.00 |
| ---TOTAL--- --RE ACT--- | | | PRODUCT BONUS $0.00 |
| ---PRODUCT--- | | | BONUS $0.00 |
| | | | GROSS PAY $896.74 |

**M LADENHEIM** — MX-004-LNK

| | | | |
|---|---|---|---|
| REG INDEX 0.00 | NAIDS 0.00 | INDEX 28,353.03 | @ 17% |
| FINANCED NAIPS 0.00 | TOTAL NAIPS 2,209.85 | FINANCED 2,209.85 | NAIPS BONUS $4,820.02 |
| NON-FINANCED NAIPS 28,353.03 | --NEW(FIN)--NEW ACCT--EXISTING | TOTAL NAIPS | ACCOUNT BONUS $1,000.00 |
| ---TOTAL--- --RE ACT--- | | | PRODUCT BONUS $0.00 |
| ---PRODUCT--- | | | BONUS $0.00 |
| | | | GROSS PAY $5,820.02 |

**K MORRIS** — MX-004-MKJ

| | | | |
|---|---|---|---|
| REG INDEX 0.00 | NAIDS 0.00 | INDEX 47,244.57 | @ 19% |
| FINANCED NAIPS 0.00 | TOTAL NAIPS 2,085.33 | FINANCED 2,085.33 | NAIPS BONUS $8,976.47 |
| NON-FINANCED NAIPS 47,244.57 | --NEW(FIN)--NEW ACCT--EXISTING | TOTAL NAIPS | ACCOUNT BONUS $1,000.00 |
| ---TOTAL--- --RE ACT--- | | | PRODUCT BONUS $0.00 |
| ---PRODUCT--- | | | BONUS $0.00 |
| | | | GROSS PAY $9,976.47 |

**B ROSALES** — MX-004-RBA

| | | | |
|---|---|---|---|
| REG INDEX 299.38 | NAIDS 181.76 | INDEX 9,440.73 | @ 15% |
| FINANCED NAIPS 0.00 | TOTAL NAIPS 149.54 | FINANCED 481.14 | NAIPS BONUS $1,416.11 |
| NON-FINANCED NAIPS 9,291.19 | --NEW(FIN)--NEW ACCT--EXISTING | TOTAL NAIPS | ACCOUNT BONUS $0.00 |
| ---TOTAL--- --RE ACT--- | | | PRODUCT BONUS $0.00 |
| ---PRODUCT--- | | | BONUS $0.00 |
| | | | GROSS PAY $1,416.11 |

```
NEWPORT SERVICE                          ACCOUNT REP AWARDS REPORT                 DATE 08/16/16  PAGE    7
P5510-R162                               08/01/16 THRU 08/16/16                    RUN  08/16/16  23:23
```

**J SCHILLER — MX-004-SIL**

| Field | | |
|---|---|---|
| REG INDEX 337.10 | NAIDS 337.10 | INDEX 14,255.05 @ 15% |
| FINANCED NAIPS 13,917.95 | NON-FINANCED NAIPS 1,006.81 | FINANCED 1,343.91 | 
| --PRODUCT-- | --TOTAL-- TOTAL NAIPS | NAIPS BONUS $2,138.26 |
| | RE ACT---NEW(FIN)--NEW ACCT--EXISTING | ACCOUNT BONUS $500.00 |
| | | PRODUCT BONUS $0.00 |
| | | BONUS $0.00 |
| | | GROSS PAY $2,638.26 |

**S SHEFFIELD — MX-004-SHE**

| Field | | |
|---|---|---|
| REG INDEX 8,549.54 | NAIDS 0.00 | INDEX 8,549.54 @ 15% |
| FINANCED NAIPS 0.00 | NON-FINANCED NAIPS 3,932.46 | FINANCED 3,932.46 |
| --PRODUCT-- | --TOTAL-- TOTAL NAIPS | NAIPS BONUS $1,282.43 |
| | RE ACT---NEW(FIN)--NEW ACCT--EXISTING | ACCOUNT BONUS $1,500.00 |
| | | PRODUCT BONUS $0.00 |
| | | BONUS $0.00 |
| | | GROSS PAY $2,782.43 |

**J SMITH — MX-004-SEJ**

| Field | | |
|---|---|---|
| REG INDEX 19,543.43 | NAIDS 503.74 | INDEX 20,047.17 @ 17% |
| FINANCED NAIPS 448.77 | NON-FINANCED NAIPS 1,994.79 | FINANCED 2,443.56 |
| --PRODUCT-- | --TOTAL-- TOTAL NAIPS | NAIPS BONUS $3,408.02 |
| | RE ACT---NEW(FIN)--NEW ACCT--EXISTING | ACCOUNT BONUS $1,000.00 |
| | | PRODUCT BONUS $0.00 |
| | | BONUS $0.00 |
| | | GROSS PAY $4,408.02 |

**D STOCKTON — MX-004-OCK**

| Field | | |
|---|---|---|
| REG INDEX 31,587.74 | NAIDS 2,698.36 | INDEX 34,286.10 @ 18% |
| FINANCED NAIPS 2,698.36 | NON-FINANCED NAIPS 1,289.36 | FINANCED 3,997.72 |
| --PRODUCT-- | --TOTAL-- TOTAL NAIPS | NAIPS BONUS $6,171.50 |
| | RE ACT---NEW(FIN)--NEW ACCT--EXISTING | ACCOUNT BONUS $1,500.00 |
| | | PRODUCT BONUS $200.00 |
| | | BONUS $0.00 |
| | | GROSS PAY $7,871.50 |

**D WALES — MX-004-DJW**

| Field | | |
|---|---|---|
| REG INDEX 121,422.66 | NAIDS 387.63 | INDEX 121,810.29 @ 23% |
| FINANCED NAIPS 387.63 | NON-FINANCED NAIPS 1,042.40 | FINANCED 1,430.03 |
| --PRODUCT-- | --TOTAL-- TOTAL NAIPS | NAIPS BONUS $28,016.37 |
| | RE ACT---NEW(FIN)--NEW ACCT--EXISTING | ACCOUNT BONUS $500.00 |
| | | PRODUCT BONUS $0.00 |
| | | BONUS $0.00 |
| | | GROSS PAY $28,516.37 |

**W WASHINGTON — MX-004-WAS**

| Field | | |
|---|---|---|
| REG INDEX 8,599.51 | NAIDS 138.57 | INDEX 8,738.08 @ 15% |
| FINANCED NAIPS 138.57 | NON-FINANCED NAIPS 1,168.35 | FINANCED 1,306.92 |
| --PRODUCT-- | --TOTAL-- TOTAL NAIPS | NAIPS BONUS $1,310.71 |
| | RE ACT---NEW(FIN)--NEW ACCT--EXISTING | ACCOUNT BONUS $500.00 |
| | | PRODUCT BONUS $0.00 |
| | | BONUS $0.00 |
| | | GROSS PAY $1,810.71 |

**L ZOLLITSCH — MX-004-ZOL**

| Field | | |
|---|---|---|
| REG INDEX 19,086.03 | NAIDS 211.58 | INDEX 19,297.61 @ 16% |
| FINANCED NAIPS 211.58 | NON-FINANCED NAIPS 2,694.17 | FINANCED 2,905.75 |
| --PRODUCT-- | --TOTAL-- TOTAL NAIPS | NAIPS BONUS $3,087.62 |
| | RE ACT---NEW(FIN)--NEW ACCT--EXISTING | ACCOUNT BONUS $1,000.00 |
| | | PRODUCT BONUS $0.00 |
| | | BONUS $0.00 |
| | | GROSS PAY $4,087.62 |

**TEAM TOTALS — MX-004**

| Field | | |
|---|---|---|
| REG INDEX 523,368.65 | NAIDS 10,636.64 | INDEX 534,005.29 |
| FINANCED NAIPS 11,604.44 | NON-FINANCED NAIPS 40,666.94 | FINANCED 52,271.38 |
| --PRODUCT-- | --TOTAL-- TOTAL NAIPS | NAIPS BONUS $98,191.85 |
| | RE ACT---NEW(FIN)--NEW ACCT--EXISTING | ACCOUNT BONUS $20,500.00 |
| | | PRODUCT BONUS $400.00 |
| | | BONUS $0.00 |
| | | GROSS PAY $119,091.85 |

```
NEWPORT SERVICE                         ACCOUNT REP AWARDS REPORT                     DATE 08/16/16   PAGE  8
P55110-R162                             08/01/16 THRU 08/16/16                        RUN  08/16/16  23:23
```

Column headers (per rep block):

- REG INDEX | INDEX | @ 15%
- FINANCED NAIPS | NON-FINANCED NAIPS | NAIDS | TOTAL NAIPS | NAIPS BONUS
- ---PRODUCT--- | ---TOTAL--- | --RE ACT--- | --NEW(FIN)- -NEW ACCT- --EXISTING | FINANCED ACCOUNT BONUS
- PRODUCT BONUS
- BOOK BUILDING BONUS
- GROSS PAY

| Rep | Code | REG INDEX | INDEX | FINANCED NAIPS | NON-FINANCED NAIPS | FINANCED | NAIDS | NAIPS BONUS (@15%) | FINANCED ACCOUNT BONUS | PRODUCT BONUS | BOOK BUILDING BONUS | GROSS PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| T DIMARCELLO | MX-005-DIR | 0.00 | 279.33 | 279.33 | 0.00 | 123.40 | 123.40 | $41.90 | $0.00 | $0.00 | $200.00 | $241.90 |
| V FERNANDEZ | MX-005-FVR | 331.09 | 4,933.22 | 4,602.13 | 331.09 | 683.41 | 352.32 | $739.98 | $0.00 | $0.00 | $0.00 | $739.98 |
| B HOLDEN | MX-005-HON | 533.50 | 4,309.10 | 3,775.60 | 533.50 | 1,273.20 | 739.70 | $646.37 | $500.00 | $0.00 | $0.00 | $1,146.37 |
| T LAZE | MX-005-LTI | 0.00 | 51.72 | 51.72 | 0.00 | 0.00 | 0.00 | $7.76 | $0.00 | $0.00 | $100.00 | $107.76 |
| J MARTINEZ | MX-005-MAZ | 640.44 | 4,832.53 | 4,192.09 | 640.44 | 1,302.94 | 662.50 | $724.88 | $500.00 | $500.00 | $1,800.00 | $3,524.88 |
| J RAKIJIAN | MX-005-RAK | 107.87 | 2,942.46 | 2,834.59 | 107.87 | 1,536.25 | 1,428.38 | $441.37 | $500.00 | $0.00 | $0.00 | $941.37 |
| D SMITH | MX-005-SDE | 0.00 | 10,803.13 | 10,803.13 | 0.00 | 8,674.48 | 8,674.48 | $1,620.47 | $2,000.00 | $0.00 | $500.00 | $4,120.47 |
| TEAM TOTALS | MX-005 | 1,612.90 | 28,151.49 | 26,538.59 | 1,612.90 | 13,593.68 | 11,980.78 | $4,222.73 | $3,500.00 | $500.00 | $2,600.00 | $10,822.73 |

```
NEWPORT SERVICE                        ACCOUNT REP AWARDS REPORT                    DATE 08/16/16   PAGE  9
P55110-R162                             08/01/16 THRU 08/16/16                       RUN 08/16/16   23:23

W BROWN      MX-006-WDB
             REG INDEX      2,447.04 NAIDS         0.00 TOTAL INDEX      2,447.04 @ 15%                $367.06
             FINANCED NAIPS     0.00 NON-FINANCED NAIPS      220.32 TOTAL NAIPS      220.32 NAIPS BONUS       $0.00
             ---PRODUCT---      ---TOTAL---      --RE ACT---      --NEW(FIN)- -NEW ACCT- --EXISTING FINANCED ACCOUNT BONUS   $0.00
                                                                                                      PRODUCT BONUS    $0.00
                                                                                                      GROSS PAY      $367.06

D CHAPMAN    MX-006-CDW
             REG INDEX        360.00 NAIDS         0.00 TOTAL INDEX        360.00 @ 15%                 $54.00
             FINANCED NAIPS     0.00 NON-FINANCED NAIPS        0.00 TOTAL NAIPS        0.00 NAIPS BONUS       $0.00
             ---PRODUCT---      ---TOTAL---      --RE ACT---      --NEW(FIN)- -NEW ACCT- --EXISTING FINANCED ACCOUNT BONUS   $0.00
                                                                                                      PRODUCT BONUS    $0.00
                                                                                                      GROSS PAY       $54.00

J MARSHALL   MX-006-RSH
             REG INDEX     56,328.39 NAIDS         0.00 TOTAL INDEX     56,328.39 @ 20%             $11,265.68
             FINANCED NAIPS     0.00 NON-FINANCED NAIPS      400.00 TOTAL NAIPS      400.00 NAIPS BONUS       $0.00
             ---PRODUCT---      ---TOTAL---      --RE ACT---      --NEW(FIN)- -NEW ACCT- --EXISTING FINANCED ACCOUNT BONUS   $0.00
                                                                                                      PRODUCT BONUS    $0.00
                                                                                                      GROSS PAY   $11,265.68

B MOSELEY    MX-006-BCM
             REG INDEX     10,565.66 NAIDS         0.00 TOTAL INDEX     10,565.66 @ 15%              $1,584.85
             FINANCED NAIPS     0.00 NON-FINANCED NAIPS      490.83 TOTAL NAIPS      490.83 NAIPS BONUS       $0.00
             ---PRODUCT---      ---TOTAL---      --RE ACT---      --NEW(FIN)- -NEW ACCT- --EXISTING FINANCED ACCOUNT BONUS   $0.00
                                                                                                      PRODUCT BONUS    $0.00
                                                                                                      GROSS PAY    $1,584.85

N SHARKEY    MX-006-SNP
             REG INDEX     25,875.18- NAIDS        0.00 TOTAL INDEX     25,875.18- @  %                  $0.00
             FINANCED NAIPS     0.00 NON-FINANCED NAIPS       53.82 TOTAL NAIPS       53.82 NAIPS BONUS       $0.00
             ---PRODUCT---      ---TOTAL---      --RE ACT---      --NEW(FIN)- -NEW ACCT- --EXISTING FINANCED ACCOUNT BONUS   $0.00
                                                                                                      PRODUCT BONUS    $0.00
                                                                                                      GROSS PAY        $0.00

TEAM TOTALS  MX-006
             REG INDEX     43,825.91 NAIDS         0.00 TOTAL INDEX     43,825.91                   $13,271.59
             FINANCED NAIPS     0.00 NON-FINANCED NAIPS    1,164.97 TOTAL NAIPS    1,164.97 NAIPS BONUS       $0.00
             ---PRODUCT---      ---TOTAL---      --RE ACT---      --NEW(FIN)- -NEW ACCT- --EXISTING FINANCED ACCOUNT BONUS   $0.00
                                                                                                      PRODUCT BONUS    $0.00
                                                                                                      GROSS PAY   $13,271.59
```

```
NEWPORT SERVICE                          ACCOUNT REP AWARDS REPORT                    DATE 08/16/16   PAGE   10
P5510-R162                               08/01/16 THRU 08/16/16                       RUN  08/16/16   23:23
```

**T BAKER**  MX-007-TDB

| | | | |
|---|---|---|---|
| REG INDEX 7,146.36 | INDEX 7,146.36 | TOTAL | @ 15%          $1,071.95 |
| FINANCED NAIPS 0.00 | NAIPS 1,257.30 | TOTAL NAIPS | NAIPS BONUS     $0.00 |
| NON-FINANCED NAIPS 7,146.36 | NAIDS 0.00  FINANCED | NEW ACCT | ACCOUNT BONUS   $0.00 |
| ---TOTAL--- | -NEW(FIN)- -EXISTING | | PRODUCT BONUS   $0.00 |
| ---PRODUCT--- RE ACT---NEW(FIN) | | | GROSS PAY    $1,071.95 |

**A BENBRAHIM**  MX-007-BHA

| | | | |
|---|---|---|---|
| REG INDEX 10,161.73 | INDEX 10,161.73 | TOTAL | @ 15%          $1,524.26 |
| FINANCED NAIPS 0.00 | NAIPS 673.22 | TOTAL NAIPS | NAIPS BONUS     $0.00 |
| NON-FINANCED NAIPS 10,161.73 | NAIDS 0.00  FINANCED | NEW ACCT | ACCOUNT BONUS   $0.00 |
| ---TOTAL--- | -NEW(FIN)- -EXISTING | | PRODUCT BONUS   $0.00 |
| ---PRODUCT--- RE ACT---NEW(FIN) | | | GROSS PAY    $1,524.26 |

**Y CANFIELD**  MX-007-CYG

| | | | |
|---|---|---|---|
| REG INDEX 1,762.79 | INDEX 1,762.79 | TOTAL | @ 15%            $264.42 |
| FINANCED NAIPS 0.00 | NAIPS 763.21 | TOTAL NAIPS | NAIPS BONUS     $0.00 |
| NON-FINANCED NAIPS 1,762.79 | NAIDS 0.00  FINANCED | NEW ACCT | ACCOUNT BONUS   $0.00 |
| ---TOTAL--- | -NEW(FIN)- -EXISTING | | PRODUCT BONUS   $0.00 |
| ---PRODUCT--- RE ACT---NEW(FIN) | | | GROSS PAY      $264.42 |

**V CAO**  MX-007-CAO

| | | | |
|---|---|---|---|
| REG INDEX 4,192.68 | INDEX 4,192.68 | TOTAL | @ 15%            $628.90 |
| FINANCED NAIPS 0.00 | NAIPS 2,047.50 | TOTAL NAIPS | NAIPS BONUS     $0.00 |
| NON-FINANCED NAIPS 4,192.68 | NAIDS 0.00  FINANCED | NEW ACCT | ACCOUNT BONUS   $0.00 |
| ---TOTAL--- | -NEW(FIN)- -EXISTING | | PRODUCT BONUS   $0.00 |
| ---PRODUCT--- RE ACT---NEW(FIN) | | | GROSS PAY      $628.90 |

**T CLUCAS**  MX-007-CLU

| | | | |
|---|---|---|---|
| REG INDEX 628.41 | INDEX 628.41 | TOTAL | @ 15%             $94.26 |
| FINANCED NAIPS 0.00 | NAIPS 0.00 | TOTAL NAIPS | NAIPS BONUS     $0.00 |
| NON-FINANCED NAIPS 628.41 | NAIDS 0.00  FINANCED | NEW ACCT | ACCOUNT BONUS   $0.00 |
| ---TOTAL--- | -NEW(FIN)- -EXISTING | | PRODUCT BONUS   $0.00 |
| ---PRODUCT--- RE ACT---NEW(FIN) | | | GROSS PAY       $94.26 |

**V GUPTA**  MX-007-GUP

| | | | |
|---|---|---|---|
| REG INDEX 9,334.04 | INDEX 9,334.04 | TOTAL | @ 15%          $1,400.11 |
| FINANCED NAIPS 0.00 | NAIPS 8,573.54 | TOTAL NAIPS | NAIPS BONUS     $0.00 |
| NON-FINANCED NAIPS 9,334.04 | NAIDS 0.00  FINANCED | NEW ACCT | ACCOUNT BONUS   $0.00 |
| ---TOTAL--- | -NEW(FIN)- -EXISTING | | PRODUCT BONUS   $0.00 |
| ---PRODUCT--- RE ACT---NEW(FIN) | | | GROSS PAY    $1,400.11 |

**G LOPEZ**  MX-007-LPZ

| | | | |
|---|---|---|---|
| REG INDEX 360.68 | INDEX 360.68 | TOTAL | @ 15%             $54.10 |
| FINANCED NAIPS 0.00 | NAIPS 234.00 | TOTAL NAIPS | NAIPS BONUS     $0.00 |
| NON-FINANCED NAIPS 360.68 | NAIDS 0.00  FINANCED | NEW ACCT | ACCOUNT BONUS   $0.00 |
| ---TOTAL--- | -NEW(FIN)- -EXISTING | | PRODUCT BONUS   $0.00 |
| ---PRODUCT--- RE ACT---NEW(FIN) | | | GROSS PAY       $54.10 |

**M MELLO**  MX-007-MLY

| | | | |
|---|---|---|---|
| REG INDEX 3,430.80 | INDEX 3,430.80 | TOTAL | @ 15%            $514.62 |
| FINANCED NAIPS 0.00 | NAIPS 3,430.80 | TOTAL NAIPS | NAIPS BONUS     $0.00 |
| NON-FINANCED NAIPS 3,430.80 | NAIDS 0.00  FINANCED | NEW ACCT | ACCOUNT BONUS   $0.00 |
| ---TOTAL--- | -NEW(FIN)- -EXISTING | | PRODUCT BONUS   $0.00 |
| ---PRODUCT--- RE ACT---NEW(FIN) | | | GROSS PAY      $514.62 |

```
NEWPORT SERVICE                      ACCOUNT REP AWARDS REPORT                    DATE 08/16/16  PAGE 11
P5510-R162                           08/01/16 THRU 08/16/16                       RUN  08/16/16  23:23


A PRICE      MX-007-PDA
             REG INDEX   12,978.54   NAIDS         0.00   TOTAL INDEX   12,978.54  @ 15%     $1,946.78
             FINANCED NAIPS   0.00   NON-FINANCED NAIPS  161.46-   TOTAL NAIPS  161.46-   NAIPS BONUS        $0.00
             ---PRODUCT---   ---TOTAL---   ---RE ACT---   ---NEW(FIN)---NEW ACCT---EXISTING   FINANCED ACCOUNT BONUS    $0.00
                                                                                             PRODUCT BONUS             $0.00
                                                                                             GROSS PAY             $1,946.78

B RICHARDS   MX-007-WRR
             REG INDEX    1,227.50   NAIDS         0.00   TOTAL INDEX    1,227.50  @ 15%       $184.13
             FINANCED NAIPS   0.00   NON-FINANCED NAIPS  245.12   TOTAL NAIPS   245.12   NAIPS BONUS        $0.00
             ---PRODUCT---   ---TOTAL---   ---RE ACT---   ---NEW(FIN)---NEW ACCT---EXISTING   FINANCED ACCOUNT BONUS    $0.00
                                                                                             PRODUCT BONUS             $0.00
                                                                                             GROSS PAY               $184.13

M SANFORD    MX-007-SMC
             REG INDEX    2,268.96   NAIDS         0.00   TOTAL INDEX    2,268.96  @ 15%       $340.34
             FINANCED NAIPS   0.00   NON-FINANCED NAIPS  215.46   TOTAL NAIPS   215.46   NAIPS BONUS        $0.00
             ---PRODUCT---   ---TOTAL---   ---RE ACT---   ---NEW(FIN)---NEW ACCT---EXISTING   FINANCED ACCOUNT BONUS    $0.00
                                                                                             PRODUCT BONUS             $0.00
                                                                                             GROSS PAY               $340.34

R WINOKUR    MX-007-WKU
             REG INDEX   23,783.46   NAIDS         0.00   TOTAL INDEX   23,783.46  @ 17%     $4,043.19
             FINANCED NAIPS   0.00   NON-FINANCED NAIPS  491.40   TOTAL NAIPS   491.40   NAIPS BONUS        $0.00
             ---PRODUCT---   ---TOTAL---   ---RE ACT---   ---NEW(FIN)---NEW ACCT---EXISTING   FINANCED ACCOUNT BONUS    $0.00
                                                                                             PRODUCT BONUS             $0.00
                                                                                             GROSS PAY             $4,043.19

TEAM TOTALS  MX-007
             REG INDEX   77,275.95   NAIDS         0.00   TOTAL INDEX   77,770.09             $12,067.06
             FINANCED NAIPS   0.00   NON-FINANCED NAIPS  17,770.09   TOTAL NAIPS  17,770.09   NAIPS BONUS        $0.00
             ---PRODUCT---   ---TOTAL---   ---RE ACT---   ---NEW(FIN)---NEW ACCT---EXISTING   FINANCED ACCOUNT BONUS    $0.00
                                                                                             PRODUCT BONUS             $0.00
                                                                                             GROSS PAY            $12,067.06
```

```
NEWPORT SERVICE                         ACCOUNT REP AWARDS REPORT                    DATE 08/16/16  PAGE 12
P5510-R162                              08/01/16 THRU 08/16/16                       RUN 08/16/16  23:23

J BARTEL     MX-008-BOA
             REG INDEX    75,016.22           NAIDS     0.00    INDEX   75,016.22  @ 21%        $15,753.41
             FINANCED NAIPS      0.00  NON-FINANCED NAIPS  4,320.80  TOTAL NAIPS  4,320.80   NAIPS BONUS        $0.00
             -----TOTAL-----  --RE ACT----NEW(FIN)--NEW ACCT---EXISTING           FINANCED ACCOUNT BONUS       $0.00
             ---PRODUCT---                                                         PRODUCT BONUS               $0.00
                                                                                  GROSS PAY               $15,753.41

T FRANKLIN   MX-008-FTC
             REG INDEX     4,208.71           NAIDS     0.00    INDEX    4,208.71  @ 15%           $631.31
             FINANCED NAIPS      0.00  NON-FINANCED NAIPS  1,790.82  TOTAL NAIPS  1,790.82   NAIPS BONUS        $0.00
             -----TOTAL-----  --RE ACT----NEW(FIN)--NEW ACCT---EXISTING           FINANCED ACCOUNT BONUS       $0.00
             ---PRODUCT---                                                         PRODUCT BONUS               $0.00
                                                                                  GROSS PAY                  $631.31

S HAYNE      MX-008-HAV
             REG INDEX       632.88           NAIDS     0.00    INDEX      632.88  @ 15%            $94.93
             FINANCED NAIPS      0.00  NON-FINANCED NAIPS    632.88  TOTAL NAIPS    632.88   NAIPS BONUS        $0.00
             -----TOTAL-----  --RE ACT----NEW(FIN)--NEW ACCT---EXISTING           FINANCED ACCOUNT BONUS       $0.00
             ---PRODUCT---                                                         PRODUCT BONUS               $0.00
                                                                                  GROSS PAY                   $94.93

R LASSLEY    MX-008-RXL
             REG INDEX     6,761.35           NAIDS     0.00    INDEX    6,761.35  @ 15%         $1,014.20
             FINANCED NAIPS      0.00  NON-FINANCED NAIPS    260.19  TOTAL NAIPS    260.19   NAIPS BONUS        $0.00
             -----TOTAL-----  --RE ACT----NEW(FIN)--NEW ACCT---EXISTING           FINANCED ACCOUNT BONUS       $0.00
             ---PRODUCT---                                                         PRODUCT BONUS               $0.00
                                                                                  GROSS PAY                $1,014.20

J NIENHUIS   MX-008-JWN
             REG INDEX    65,000.00           NAIDS     0.00    INDEX   65,000.00  @ 20%        $13,000.00
             FINANCED NAIPS      0.00  NON-FINANCED NAIPS      0.00  TOTAL NAIPS      0.00   NAIPS BONUS        $0.00
             -----TOTAL-----  --RE ACT----NEW(FIN)--NEW ACCT---EXISTING           FINANCED ACCOUNT BONUS       $0.00
             ---PRODUCT---                                                         PRODUCT BONUS               $0.00
                                                                                  GROSS PAY               $13,000.00

D SEARLES    MX-008-DWS
             REG INDEX     1,891.26           NAIDS     0.00    INDEX    1,891.26  @ 15%           $283.69
             FINANCED NAIPS      0.00  NON-FINANCED NAIPS      0.00  TOTAL NAIPS      0.00   NAIPS BONUS        $0.00
             -----TOTAL-----  --RE ACT----NEW(FIN)--NEW ACCT---EXISTING           FINANCED ACCOUNT BONUS       $0.00
             ---PRODUCT---                                                         PRODUCT BONUS               $0.00
                                                                                  GROSS PAY                  $283.69

D SMITH      MX-008-SUT
             REG INDEX    10,203.96           NAIDS     0.00    INDEX   10,203.96  @ 15%         $1,530.59
             FINANCED NAIPS      0.00  NON-FINANCED NAIPS  9,844.50  TOTAL NAIPS  9,844.50   NAIPS BONUS        $0.00
             -----TOTAL-----  --RE ACT----NEW(FIN)--NEW ACCT---EXISTING           FINANCED ACCOUNT BONUS       $0.00
             ---PRODUCT---                                                         PRODUCT BONUS               $0.00
                                                                                  GROSS PAY                $1,530.59

P STREAM     MX-008-STP
             REG INDEX     4,872.82           NAIDS     0.00    INDEX    4,872.82  @ 15%           $730.92
             FINANCED NAIPS      0.00  NON-FINANCED NAIPS    873.82  TOTAL NAIPS    873.82   NAIPS BONUS        $0.00
             -----TOTAL-----  --RE ACT----NEW(FIN)--NEW ACCT---EXISTING           FINANCED ACCOUNT BONUS       $0.00
             ---PRODUCT---                                                         PRODUCT BONUS               $0.00
                                                                                  GROSS PAY                  $730.92
```

```
NEWPORT SERVICE                        ACCOUNT REP AWARDS REPORT                    DATE 08/16/16  PAGE  13
P5510-R162                               08/01/16 THRU 08/16/16                      RUN 08/16/16  23:23

TEAM TOTALS
  MX-008        REG INDEX  168,587.20        NAIDS       0.00      TOTAL INDEX  168,587.20
  FINANCED NAIPS     0.00  NON-FINANCED NAIPS  17,723.01      TOTAL NAIPS   17,723.01   NAIPS BONUS            $33,039.05
  ----PRODUCT----   ----TOTAL----RE ACT----NEW(FIN)--NEW ACCT---EXISTING            FINANCED ACCOUNT BONUS       $0.00
                                                                                   PRODUCT BONUS                $0.00
                                                                                   GROSS PAY              $33,039.05

GRAND TOTALS
                REG INDEX 1171,983.35        NAIDS  22,964.07      TOTAL INDEX 1194,947.42
  FINANCED NAIPS  23,332.37  NON-FINANCED NAIPS 105,477.80      TOTAL NAIPS  128,810.17   NAIPS BONUS           $218,387.33
  ----PRODUCT----   ----TOTAL----RE ACT----NEW(FIN)--NEW ACCT---EXISTING            FINANCED ACCOUNT BONUS    $32,500.00
                                                                                   PRODUCT BONUS               $900.00
                                                                                   BOOK BUILDING BONUS           $0.00
                                                                                                             $2,600.00
                                                                                   GROSS PAY             $254,387.33
```

# EXHIBIT 62

NEWPORT SERVICE  
P4670-R477M     MTD ACCOUNT REPRESENTATIVE PRODUCTION REPORT    (REPRO)     DATE 08/16/16   PAGE 1  
                                                                               RUN 08/16/16 23:47

***** C L O S I N G *****

|  | O P E N I N G | | | | | | | |
|  | REGULAR | | MVP | | | | | |
| NAME | LONG | COMLOAN | LONG | COMLOAN | TOTAL OPENING | SELL BACK | COVER | INDEX POINTS |
|---|---|---|---|---|---|---|---|---|
| D ALMANCE | 822,404 | 0 | 0 | 0 | 822,404 | 108,999 | 0 | 10,286 |
| T ARCE | 840,249 | 60,562 | 0 | 0 | 900,811 | 547,501 | 120,446 | 12,865 |
| T BAKER | 61,281 | 0 | 0 | 0 | 61,281 | 2,500 | 0 | 9,615 |
| P BALAEFF | 371,596 | 0 | 0 | 0 | 371,596 | 68,961 | 0 | 5,877 |
| J BARTEL | 751,799 | 0 | 0 | 0 | 751,799 | 333,000 | 0 | 92,406 |
| B BARTH | 1,066,714 | 0 | 0 | 0 | 1,066,714 | 149,285 | 1,218,110 | 21,409 |
| A BENBRAHIM | 58,316 | 0 | 0 | 0 | 58,316 | 0 | 0 | 10,162 |
| T BERG | 730,935 | 0 | 0 | 0 | 730,935 | 39,362 | 59,844 | 8,392 |
| J BOHUSLAVIZ | 15,033 | 117,908 | 0 | 0 | 132,941 | 215,674 | 123,558 | 6,530 |
| W BROWN | 38,090 | 0 | 0 | 0 | 38,090 | 1,260 | 0 | 2,447 |
| Y CANFIELD | 697,447 | 0 | 0 | 0 | 697,447 | 685,000 | 0 | 1,863 |
| V CAO | 24,628 | 0 | 0 | 0 | 24,628 | 0 | 0 | 4,193 |
| T CASTALDI | 161,547 | 161,220 | 0 | 0 | 322,767 | 112,557 | 1,160,232 | 5,505 |
| F CASTRO | 3,064,545 | 40,652 | 0 | 0 | 3,105,197 | 763,855 | 1,732,753 | 45,115 |
| J CHANG | 895,651 | 0 | 0 | 0 | 895,651 | 2,160 | 71,454 | 12,115 |
| D CHAPMAN | 5,000 | 0 | 0 | 0 | 5,000 | 0 | 0 | 360 |
| T CLUCAS | 11,171 | 0 | 0 | 0 | 11,171 | 0 | 0 | 628 |
| R DEVOGLER | 150,965 | 0 | 0 | 0 | 150,965 | 175,926 | 0 | 7,620 |
| A DIAZ | 106,277 | 0 | 0 | 0 | 106,277 | 166,821 | 0 | 4,008 |
| T DIMARCELLO | 8,463 | 0 | 0 | 0 | 8,463 | 0 | 0 | 279 |
| M DUPUIS | 447,210 | 0 | 0 | 0 | 447,210 | 410,706 | 61,680 | 22,239 |
| A DURRANI | 184,895 | 582,011 | 0 | 0 | 766,906 | 578,433 | 490,642 | 13,995 |
| D FALER | 1,675,730 | 0 | 0 | 0 | 1,675,730 | 1,839,340 | 0 | 29,185 |
| S FALLON | 215,349 | 1,000,132 | 0 | 0 | 1,215,481 | 139,953 | 20,593 | 14,132 |
| K FERLIC | 1,802,862 | 98,900 | 0 | 0 | 1,901,762 | 450,707 | 1,639,852 | 30,856 |
| V FERNANDEZ | 146,625 | 34,993 | 0 | 0 | 181,618 | 73,411 | 105,064 | 4,675 |
| T FRANKLIN | 46,377 | 0 | 0 | 0 | 46,377 | 0 | 0 | 4,209 |
| R FREMAN | 2,742,379 | 0 | 0 | 0 | 2,742,379 | 363,080 | 104,004 | 45,281 |
| P GALLINA | 301,876 | 0 | 0 | 0 | 301,876 | 61,114 | 0 | 5,906 |
| D GOLAN | 114,085 | 0 | 0 | 0 | 114,085 | 151,312 | 0 | 3,669 |
| F GONZALEZ | 124,523 | 0 | 0 | 0 | 124,523 | 95,681 | 11,526 | 5,978 |
| G GOVEL | 337,608 | 0 | 0 | 0 | 337,608 | 31,522 | 0 | 720 |
| V GUPTA | 4,000 | 0 | 0 | 0 | 4,000 | 0 | 0 | 9,334 |
| V GUPTA | 48,489 | 0 | 0 | 0 | 48,489 | 0 | 0 | 0 |
| S HAYNE | 3,518 | 0 | 0 | 0 | 3,518 | 0 | 0 | 633 |
| S HAYNE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| B HOLDEN | 116,417 | 0 | 0 | 0 | 116,417 | 69,863 | 0 | 3,776 |
| P HORN | 65,826 | 26,804 | 0 | 0 | 92,630 | 98,812 | 13,453 | 3,322 |
| C IMKAMP | 85,673 | 0 | 0 | 0 | 85,673 | 299,550 | 119,851 | 4,088 |

```
NEWPORT SERVICE                    MTD ACCOUNT REPRESENTATIVE PRODUCTION REPORT   (REPPRO)              DATE 08/16/16  PAGE   2
P4670-R477M                                                                                            RUN  08/16/16  23:47
```

| | ***** OPENING ***** | | | | ***** CLOSING ***** | | |
| | REGULAR | | MVP | | TOTAL | | | INDEX |
| NAME | LONG | COMLOAN | LONG | COMLOAN | OPENING | SELL BACK | COVER | POINTS |
|---|---|---|---|---|---|---|---|---|
| J IPEK | 49,930 | 0 | 0 | 0 | 49,930 | 146,208 | 0 | 4,313 |
| A JOHNSTON | 638,176 | 0 | 0 | 0 | 638,176 | 344,045 | 0 | 11,419 |
| M KARBY | 1,115,278 | 0 | 0 | 0 | 1,115,278 | 238,382 | 0 | 14,746 |
| B KENNEDY | 3,982,673 | 0 | 0 | 0 | 3,982,673 | 2,748,716 | 0 | 51,845 |
| J KIM | 457,744 | 0 | 0 | 0 | 457,744 | 0 | 41,550 | 7,412 |
| M LADENHEIM | 1,140,292 | 0 | 0 | 0 | 1,140,292 | 1,624,425 | 41,238 | 28,353 |
| R LASSLEY | 40,022 | 0 | 0 | 0 | 40,022 | 16,918 | 0 | 7,001 |
| T LAZE | 2,181 | 0 | 0 | 0 | 2,181 | 0 | 0 | 52 |
| A LEVINE | 1,355,766 | 20,346 | 0 | 0 | 1,376,112 | 634,778 | 19,938 | 21,732 |
| G LOPEZ | 2,337 | 0 | 0 | 0 | 2,337 | 0 | 0 | 361 |
| H MANNINO | 174,225 | 0 | 0 | 0 | 174,225 | 206,428 | 0 | 7,777 |
| J MARSHALL | 650,637 | 0 | 0 | 0 | 650,637 | 292,500 | 0 | 56,942 |
| J MARTINEZ | 186,582 | 0 | 0 | 0 | 186,582 | 104,087 | 0 | 4,192 |
| M MELLO | 5,500 | 0 | 0 | 0 | 5,500 | 0 | 0 | 1,100 |
| M MERLI | 17,311 | 0 | 0 | 0 | 17,311 | 0 | 0 | 3,441 |
| K MORRIS | 1,614,703 | 0 | 0 | 0 | 1,614,703 | 235,724 | 3,610,213 | 47,245 |
| G MORTON | 494,572 | 0 | 0 | 0 | 494,572 | 157,928 | 0 | 7,880 |
| B MOSELEY | 128,159 | 0 | 0 | 0 | 128,159 | 460,000 | 0 | 13,393 |
| A MOSS | 1,021,965 | 100,479 | 0 | 0 | 1,122,444 | 374,248 | 207,447 | 20,569 |
| J NIENHUIS | 604,700 | 0 | 0 | 0 | 604,700 | 340,000 | 0 | 65,940 |
| M PATTON | 218,127 | 0 | 0 | 0 | 218,127 | 332,750 | 0 | 6,768 |
| A PRICE | 128,503 | 0 | 0 | 0 | 128,503 | 22,000 | 0 | 17,639 |
| J RAKIJIAN | 161,975 | 0 | 0 | 0 | 161,975 | 24,798 | 0 | 2,835 |
| A REYES | 499,203 | 13,336 | 0 | 0 | 512,539 | 95,672 | 80,377 | 11,704 |
| B RICHARDS | 32,992 | 0 | 0 | 0 | 32,992 | 20,014 | 0 | 1,297 |
| B ROSALES | 387,185 | 0 | 0 | 0 | 387,185 | 568,386 | 0 | 9,184 |
| M SANFORD | 5,800 | 0 | 0 | 0 | 5,800 | 0 | 0 | 2,269 |
| J SCHILLER | 725,182 | 0 | 0 | 0 | 725,182 | 106,956 | 20,815 | 13,918 |
| D SEARLES | 241,501 | 0 | 0 | 0 | 241,501 | 0 | 0 | 1,871 |
| N SHARKEY | 241,701 | 0 | 0 | 0 | 241,701 | 500,000 | 0 | 24,875 |
| S SHEFFIELD | 532,966 | 0 | 0 | 0 | 532,966 | 4,380 | 0 | 8,550 |
| S SMITH | 612,310 | 0 | 0 | 0 | 612,310 | 16,737 | 0 | 10,003 |
| D SMITH | 54,072 | 0 | 0 | 0 | 54,072 | 0 | 0 | 10,204 |
| D SMITH | 1,900,485 | 0 | 0 | 0 | 1,900,485 | 268,282 | 0 | 19,543 |
| K SMITH | 213,540 | 0 | 0 | 0 | 213,540 | 24,872 | 159,832 | 4,524 |
| D SOULAKIS | 579,007 | 0 | 0 | 0 | 579,202 | 579,202 | 41,338 | 11,592 |
| D ST.AMANT | 1,256,341 | 0 | 0 | 0 | 1,256,341 | 347,733 | 124,890 | 18,265 |
| D STOCKTON | 1,074,859 | 0 | 0 | 0 | 1,074,859 | 518,948 | 39,756 | 31,588 |
| P STREAM | 28,954 | 0 | 0 | 0 | 28,954 | 19,000 | 0 | 4,933 |

NEWPORT SERVICE
P4670-R477M

MTD ACCOUNT REPRESENTATIVE PRODUCTION REPORT (REPPRO)

DATE 08/16/16 PAGE 3
RUN 08/16/16 23:47

| NAME | OPENING | | | | | CLOSING | | INDEX POINTS |
| | REGULAR LONG | COMLOAN | MVP LONG | COMLOAN | TOTAL OPENING | SELL BACK | COVER | |
|---|---|---|---|---|---|---|---|---|
| N VASHISHT | 1,512,384 | 0 | 0 | 0 | 1,512,384 | 531,558 | 0 | 20,831 |
| D WALES | 7,387,578 | 6,180,651 | 0 | 0 | 13,568,229 | 7,231,157 | 6,872,450 | 121,423 |
| W WASHINGTON | 398,752 | 0 | 0 | 0 | 398,752 | 329,150 | 0 | 8,600 |
| R WINOKUR | 170,633 | 0 | 0 | 0 | 170,633 | 0 | 0 | 23,783 |
| L ZOLLITSCH | 1,023,584 | 0 | 0 | 0 | 1,023,584 | 1,121,393 | 0 | 19,086 |
| ACTIVE A/R | 50,711,186 | 8,437,994 | 0 | 0 | 59,149,180 | 28,568,417 | 17,473,920 | 1,203,136 |
| OTHER A/R | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL A/R | 50,711,186 | 8,437,994 | 0 | 0 | 59,149,180 | 28,568,417 | 17,473,920 | 1,203,136 |
| MISC. TOTALS | 72,390 | 0 | 0 | 0 | 72,390 | 0 | 0 | 1,348 |
| GRAND TOTALS | 50,783,576 | 8,437,994 | 0 | 0 | 59,221,570 | 28,568,417 | 17,473,920 | 1,204,484 |
| % OPENING | 85.8% | 14.2% | .0% | .0% | | 62.0% | 38.0% | REG 100.0% MVP .0% |

NUMBER OF TRADES   2,117

# EXHIBIT 63

## TABLE A

| Atlas Customer Accounts in the Monex Database[1] | | |
|---|---|---|
| | Full Period<br>January 2, 2009 - March 31, 2017 | Review Period<br>July 16, 2011 - March 31, 2017 |
| Number of Accounts | 105,332 | 81,353 |
| Number of Leveraged Accounts[2] | 15,650 | 12,185 |

[1] Each of these totals is based on the data provided by Monex from its customer positions database.

[2] Throughout summaries, we considered an Atlas account to be a "leveraged" account after it used margin for over 1 month.

*This summary is based on data produced by Monex to the CFTC during the course of the CFTC's investigation. This summary relies on the completeness of the data provided by Monex and is subject to revision based on ongoing discovery.*

## TABLE B

## Leveraged Atlas Customer Accounts Trading Position Duration Summary[1]

| | Long Positions | | Short Positions | | All Positions | |
|---|---|---|---|---|---|---|
| | | % of Long | | % of Short | | % of All |
| Number of Positions Opened and Closed Same Day | 294 | 0.60% | 155 | 1.83% | 449 | 0.78% |
| Number of Positions Opened and Closed Within 2 Days | 2,036 | 4.14% | 1,154 | 13.59% | 3,190 | 5.53% |
| Number of Positions Opened and Closed Within 14 Days | 11,274 | 22.91% | 4,609 | 54.29% | 15,883 | 27.52% |
| Number of Positions Opened and Closed Within 28 Days | 17,305 | 35.16% | 6,214 | 73.20% | 23,519 | 40.76% |
| **Number of Positions Opened and Closed** | **49,218** | | **8,489** | | **57,707** | |
| Median Duration (Days) | 55.00 | | 13.00 | | 44.00 | |
| Mean Duration (Days) | 151.50 | | 30.47 | | 133.69 | |

[1] This table is based on the data provided by Monex from its customer transactions database. The table is limited to trades opened during the review period (July 16, 2011 to March 31, 2017) and closed with an offsetting trade (i.e., not a delivery or pick-up) in "leveraged" accounts.

*This summary is based on data produced by Monex to the CFTC during the course of the CFTC's investigation. This summary relies on the completeness of the data provided by Monex and is subject to revision based on ongoing discovery.*

## TABLE C

### Leveraged Atlas Customer Accounts Trading Position Delivery Summary[1]

| | Long Positions | | Short Positions | | All Positions | |
|---|---|---|---|---|---|---|
| | | % of Long | | % of Short | | % of All |
| Number of Positions Closed by Delivery[2] | 3,651 | 6.11% | 0 | 0.00% | 3,651 | 5.33% |
| Number of Positions Closed by Offset | 49,218 | 82.41% | 8,489 | 97.35% | 57,707 | 84.31% |
| Number of Positions Open (Not Closed)[3] | 6,855 | 11.48% | 231 | 2.65% | 7,086 | 10.35% |
| **Total Positions** | **59,724** | | **8,720** | | **68,444** | |

[1] This table is based on the data provided by Monex from its customer transactions database. The table is limited to trades in "leveraged" accounts opened during the review period (July 16, 2011 to March 31, 2017).

[2] Positions closed by delivery also include positions closed by physical pick-up.

[3] Trading positions without a closing trade or a delivery are considered "open" in the Monex database as of the end of the review period (March 31, 2017).

*This summary is based on data produced by Monex to the CFTC during the course of the CFTC's investigation. This summary relies on the completeness of the data provided by Monex and is subject to revision based on ongoing discovery.*

## TABLE D

| Margin Calls and Forced Liquidations Summary[1] | | | |
|---|---|---|---|
| | Transactions | Leveraged Accounts[2] | % of Leveraged Accounts[2] |
| Number of Margin Calls | 5,074 | 3,264 | 26.79% |
| Number of Forced Liquidations | 3,282 | 1,850 | 15.18% |
| Total Margin Calls and Forced Liquidations | 8,356 | 3,773 | 30.96% |

[1] This table is based on the data provided by Monex from its customer transactions database. All margin calls and forced liquidations occurred during the review period (July 16, 2011 to March 31, 2017). Monex's database includes identifiers for forced liquidations and margin calls.

[2] As shown in Table A, there are 12,185 "leveraged" Atlas customer accounts during the review period.

*This summary is based on data produced by Monex to the CFTC during the course of the CFTC's investigation. This summary relies on the completeness of the data provided by Monex and is subject to revision based on ongoing discovery.*

## TABLE E

### PNL Summary of Leveraged Atlas Customer Accounts[1]

| | Number of Accounts | Net PNL | Number of Losing Accounts | % Losing Accounts | Max Loss | Max Profit | Average Loss | Average Profit |
|---|---|---|---|---|---|---|---|---|
| Trading Profit/Loss[2] | 8,223[3] | -$227,872,988.58 | 6,591 | 80.15% | -$9,576,090.14 | $400,066.26 | -$35,774.33 | $4,850.28 |
| Trading Profit/Loss (Corrected)[4] | 12,185 | -$290,381,690.75 | 10,970 | 90.03% | -$11,295,279.49 | $329,013.79 | -$27,173.86 | $6,371.25 |
| Trading Profit/Loss (Corrected, Realized & Unrealized)[5] | 12,185 | -$330,690,594.13 | 10,501 | 86.18% | -$11,295,279.49 | $310,099.43 | -$32,145.57 | $4,079.57 |

[1] This table is based on the data provided by Monex from its database, and is limited to charges assessed and trading positions that were opened after an account became leveraged, during the review period (July 16, 2011 to March 31, 2017).

[2] See Gomberg Dec., ¶ 138 for the definition of "Trading Profit/Loss."

[3] See id. (explaining why this metric was limited to only 8,223 leveraged Atlas customer accounts).

[4] See Gomberg Dec., ¶ 139 for the definition of "Trading Profit/Loss (Corrected)."

[5] See Gomberg Dec., ¶ 141 for the definition of "Trading Profit/Loss (Corrected, Realized & Unrealized)."

*This summary is based on data produced by Monex to the CFTC during the course of the CFTC's investigation. This summary relies on the completeness of the data provided by Monex and is subject to revision based on ongoing discovery.*

## TABLE F

## Summary of January 2, 2009 to July 15, 2011 Pricing

### Monex Spot Prices[1]

| Metal | January 2, 2009 | July 15, 2011 | % Change |
|---|---|---|---|
| Gold | $870.00 / ounce | $1,583.00 / ounce | 81.59% |
| Silver | $11.07 / ounce | $38.32 / ounce | 246.16% |
| Platinum | $929.00 / ounce | $1,759.00 / ounce | 89.34% |
| Palladium | $185.00 / ounce | $776.00 / ounce | 319.46% |

### PNL Summary of Leveraged Atlas Customer Accounts[2]

#### January 2, 2009 to July 15, 2011

| | |
|---|---|
| Number of Leveraged Atlas Accounts | 7,448 |
| Net loss (Trading Profit/Loss (Corrected, Realized & Unrealized))[3] | -$9,008,463.88 |
| Number of Leveraged Atlas Accounts With a Loss | 4,240 |
| % Leveraged Atlas Accounts With a Loss | 56.93% |

[1] This summary table is based on data taken from the metals pricing tables in the Monex database.

[2] This summary table is based on data taken from the transaction data in the Monex database.

[3] Trading Profit/Loss (Corrected, Realized & Unrealized) PNL is the same as in Table E.

*This summary is based on data produced by Monex to the CFTC during the course of the CFTC's investigation. This summary relies on the completeness of the data provided by Monex and is subject to revision based on ongoing discovery.*

## TABLE G

| Monex Revenue From Leveraged Atlas Customer Accounts[1] July 16, 2011 to March 31, 2017 | |
|---|---|
| Bid-Ask Spread Charge | $95,310,536.93 |
| Interest Charges[2] | $57,272,121.80 |
| Commissions | $14,378,114.14 |
| Service Fees | $6,495,628.56 |
| **Total** | **$173,456,401.43** |

[1] This table is based on voluminous transaction data in the Monex database that includes records for bid-ask spread charges, interest, commissions, and service fees. This table is limited to charges and fees assessed during the review period on accounts after they became "leveraged."

[2] Monex pays out interest to leveraged customer accounts with positive <u>cash</u> balances. Monex's records reflect that it paid out $2,763,410.08 in interest to such accounts during the review period.

*This summary is based on data produced by Monex to the CFTC during the course of the CFTC's investigation. This summary relies on the completeness of the data provided by Monex and is subject to revision based on ongoing discovery.*

## TABLE H

# Summary of Final 6 Months of Data in Monex Database For Leveraged Atlas Customer Accounts[1]

## October 2016 - March 2017

| Month | Total Monex Revenue | New Leveraged Accounts Established Per Month | Number of Leveraged Trades Across ALL Atlas Accounts |
|---|---|---|---|
| October, 2016 | $1,930,062.35 | 102 | 1,749 |
| November, 2016 | $3,045,694.45 | 127 | 2,873 |
| December, 2016 | $1,980,093.49 | 57 | 1,489 |
| January, 2017 | $1,934,830.48 | 29 | 1,489 |
| February, 2017 | $1,706,364.82 | 40 | 1,244 |
| March, 2017 | $2,670,667.39 | NA[2] | 2,066 |
| Total | $13,267,712.98 | 355 | 8,844 |
| Average per Month | $2,211,285.50 | 71.00 | 1,768.80 |

[1] This table is a summary of voluminous data from the Monex customer transactions database. All records reviewed were for accounts after they had become leveraged based on data fields in the database.

[2] We considered an Atlas account to be "leveraged" after using margin for over 1 month. March 2017 is the last month of data in the Monex database, so accounts cannot be identified as "leveraged" until the following month.

*This summary is based on data produced by Monex to the CFTC during the course of the CFTC's investigation. This summary relies on the completeness of the data provided by Monex and is subject to revision based on ongoing discovery.*